# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1)  VIDEO GAMING TECHNOLOGIES, INC.,<br><br><br>        Plaintiff,<br><br>v.<br><br>1)  CASTLE HILL STUDIOS LLC<br>      (d/b/a CASTLE HILL GAMING);<br>2)  CASTLE HILL HOLDING LLC<br>      (d/b/a CASTLE HILL GAMING); and<br>3)  IRONWORKS DEVELOPMENT, LLC<br>      (d/b/a CASTLE HILL GAMING)<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)  Case No. 4:17-cv-00454-GKF-mjx<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## VIDEO GAMING TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANTS' <u>MOTION TO DISMISS</u>

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................ 1

STATEMENT OF THE CASE ................................................................................... 3

    VGT's Marks and CHG's Infringing Marks ...................................................... 3

    VGT's Trade Dress and CHG's Infringing Trade Dress .................................... 4

    VGT's Trade Secrets and CHG's Misappropriation Thereof ............................ 5

ARGUMENT ............................................................................................................. 6

    I.     THE COMPLAINT STATES CLAIMS FOR TRADEMARK
          INFRINGEMENT UNDER THE APPLICABLE LEGAL STANDARD. ............ 7

    II.    THE COMPLAINT STATES CLAIMS FOR TRADE DRESS
          INFRINGEMENT UNDER THE APPLICABLE LEGAL STANDARD. .......... 11

    III.   THE COMPLAINT STATES CLAIMS FOR MISAPPROPRIATION OF
          VGT'S TRADE SECRETS UNDER THE APPLICABLE LEGAL
          STANDARD. ................................................................................................... 21

    IV.   IF VGT HAS NOT STATED ANY OF ITS CLAIMS UNDER THE
          APPLICABLE LEGAL STANDARD, VGT SHOULD BE GRANTED
          LEAVE TO AMEND. ..................................................................................... 24

    CONCLUSION .................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AJB Enters, LLC v. Backjoy Orthotics,*
   LLC, No. 3:16-CV-00758 (VAB), 2016 WL 7341702 (D. Conn. Dec. 18,
   2016) ...................................................................................................................20

*Allen v. Town of Colcord, Okla.,*
   874 F. Supp. 2d 1276 (N.D. Okla. 2012) .........................................................6

*AMD Southfield Michigan Ltd. P'ship v. Michigan Open MRI LLC,*
   337 F. Supp. 2d 978 (E.D. Mich. 2004)...........................................................19

*Arcsoft, Inc. v. Cyberlink Corp.,*
   No. 15-CV-03707-WHO, 2016 WL 861103 (N.D. Cal. Mar. 7, 2016)................17

*ArCzar, Inc. v. Navico, Inc.,*
   No. 11-CV-805-CVE-PJC, 2012 WL 3150815 (N.D. Okla. Aug. 2, 2012)...........23

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)...........................................................................................6

*Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack
   Apparel Co.,*
   550 F.3d 465 (5th Cir. 2008) .............................................................................15

*Beer Nuts, Inc. v. Clover Club Foods Co.,*
   805 F.2d 920 (10th Cir. 1986) .......................................................................3, 4

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)............................................................................................6

*Big Vision Private, Ltd. v. E.I. Dupont De Nemours & Co.,*
   1 F. Supp. 3d 224 (S.D.N.Y. 2014)...................................................................21

*BioCore, Inc. v. Khosrowshahi,*
   96 F. Supp. 2d 1221 (D. Kan. 2000) .................................................................21

*Cobalt Flux, Inc. v. Positive Gaming AS,*
   No. 2:08-CV-185 TS, 2008 WL 4534182 (D. Utah Oct. 6, 2008) ...........6, 7, 21, 22

*Cory Van Rijn, Inc. v. California Raisin Advisory Bd.,*
   697 F. Supp. 1136 (E.D. Cal. 1987)...................................................................7

*Donchez v. Coors Brewing Co.,*
   392 F.3d 1211 (10th Cir. 2004) .........................................................................19

*Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*,
  799 F. Supp. 2d 846 (N.D. Ill. 2011) ..................................................22

*First Sav. Bank, F.S.B. v. U.S. Bancorp*,
  117 F. Supp. 2d 1061 (D. Kan. 2000) ..................................................8

*Georgia-Pac. Consumer Prods. LP v. Kimberly-Clark Corp.*,
  647 F.3d 723 (7th Cir. 2011) ..................................................15

*Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494 (6th Cir.
  2013) ..................................................15

*Integrated Bus. Techs., LLC v. Netlink Sols., LLC*,
  No. 16-CV-048-TCK-PJC, 2016 WL 4742306 (N.D. Okla. Sept. 12, 2016)..................21, 24

*Kimray, Inc. v. Norriseal-Wellmark, Inc.*,
  No. CIV-16-1167-D, 2017 WL 1906941 (W.D. Okla. May 8, 2017) ..................................................17

*Le Book Pub., Inc. v. Black Book Photography, Inc.*,
  418 F. Supp. 2d 305 (S.D.N.Y. 2005)..................................................7

*Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*,
  285 F.3d 1353 (Fed. Cir. 2002)..................................................23

*Lepton Labs, LLC v. Walker*,
  55 F. Supp. 3d 1230 (C.D. Cal. 2014) ..................................................6

*Lewis v. Wal-Mart Stores, Inc.*,
  232 F.R.D. 687 (N.D. Okla. 2005)..................................................24

*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*,
  43 F.3d 922 (4th Cir. 1995) ..................................................6

*McAirlaids, Inc. v. Kimberly-Clark Corp.*,
  756 F.3d 307 (4th Cir. 2014) ..................................................15

*McGraw-Edison Co. v. Walt Disney Prods.*,
  787 F.2d 1163 (7th Cir. 1986) ..................................................10

*Mintz v. Subaru of Am., Inc.*,
  No. 16-CV-03384-MMC, 2016 WL 5909360 (N.D. Cal. Oct. 11, 2016) ..................................................7

*Nabisco, Inc. v. Warner-Lambert Co.*,
  220 F.3d 43 (2d Cir. 2000)..................................................7

*Navajo Nation v. Urban Outfitters, Inc.*,
  935 F. Supp. 2d 1147 (D.N.M. 2013) ..................................................6

*Paradigm All., Inc. v. Celeritas Techs., LLC,*
    659 F. Supp. 2d 1167 (D. Kan. 2009) ................................................................2, 22

*Pre-Paid Legal Servs., Inc. v. Cahill,*
    171 F. Supp. 3d 1219 (E.D. Okla. 2016) ....................................................21, 22, 23

*Robbins v. Oklahoma,*
    519 F.3d 1242 (10th Cir. 2008) ..............................................................................6

*Sally Beauty Co. v. Beautyco, Inc.,*
    304 F.3d 964 (10th Cir. 2002) ...................................................................1, 7, 8, 19

*Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.),*
    544 F.2d 1167 (2d Cir. 1976)...................................................................................9

*SCS Direct, Inc. v. Insassy, Inc.,*
    No. 3:14CV0020(JBA), 2016 WL 1384762 (D. Conn. Apr. 7, 2016)....................18

*Sit-Up Ltd. v. IAC/InterActiveCorp.,*
    No. 05 Civ. 9292 (DLC), 2008 U.S. Dist. LEXIS 12017 (S.D.N.Y. Feb. 20,
    2008) ......................................................................................................................21

*Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.,*
    15 F.3d 1427 (7th Cir. 1994) ................................................................................23

*Standyne, Inc. v. Lins,*
    490 F.2d 1396 (C.C.P.A. 1974) ..........................................................................9, 10

*Stat Ltd. v. Beard Head, Inc.,*
    60 F. Supp. 3d 634 (E.D. Va. 2014) .....................................................................1, 6

*Storagecraft Tech. Corp. v. Symantec Corp.,*
    No. 2:07 cv 856 CW, 2009 U.S. Dist. LEXIS 10608 (D. Utah Feb. 11, 2009)......21

*Stratienko v. Cordis Corp.,*
    429 F.3d 592 (6th Cir. 2005) ................................................................................23

*Superior Edge, Inc. v. Monsanto Co.,*
    964 F. Supp. 2d 1017 (D. Minn. Aug. 9, 2013).....................................................22

*Talking Rain Beverage Co. v. S. Beach Beverage Co.,*
    349 F.3d 601 (9th Cir. 2003) ................................................................................15

*TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc.,*
    No. CIV. 13-1356, 2013 WL 6827348 (D. Minn. Dec. 26, 2013).........................23

*Touchpoint Commc'ns, LLC v. Dentalfone, LLC,*
    No. 3:15-CV-05240-JRC, 2016 WL 525932 (W.D. Wash. Feb. 10, 2016) ...........17

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.,*
    532 U.S. 23 (2001) .............................................................................14, 15

*Two Pesos, Inc. v. Taco Cabana, Inc.,*
    505 U.S. 763 (1992) ...................................................................................4

*Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.,*
    No. 12 CIV. 3599, 2013 WL 866867 (S.D.N.Y. Mar. 8, 2013) .............................19

*Valu Eng'g, Inc. v. Rexnord Corp.,*
    278 F.3d 1268 (Fed. Cir. 2002) .................................................................15, 16

*Weber-Stephen Prods. LLC v. Sears Holding Corp.,*
    No. 13-CV-01686, 2013 WL 5782433 (N.D. Ill. Oct. 25, 2013) ...........................20

**Statutes**

15 U.S.C. § 1065 ...........................................................................................3

25 U.S.C. § 2701 et seq. ..................................................................................3

**Rules**

Fed. R. Civ. P. 8 ......................................................................................21, 22

Fed. R. Civ. P. 11(b) .......................................................................................23

## INTRODUCTION

Plaintiff Video Gaming Technologies, Inc. ("VGT") seeks redress for infringement of its trademarks and trade dress and misappropriation of its trade secrets by Defendants Castle Hill Studios LLC, Castle Hill Holding LLC, and Ironworks Development, LLC (collectively, "CHG").  CHG has employed former VGT officials and employees to make casino games for CHG with marks, features, and gameplay that so closely mimic VGT's innovative games that CHG has caused, and is likely to continue to cause, confusion in the marketplace.

CHG's motion to dismiss fails as a threshold matter because it seeks resolution of factual issues at the pleading stage.  With respect to VGT's claims of trademark and trade dress infringement, the central issue, likelihood of confusion, "is a question of fact," *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002), that is "rarely resolved at the motion to dismiss stage," *Stat Ltd. v. Beard Head, Inc.*, 60 F. Supp. 3d 634, 638 (E.D. Va. 2014).  Similarly, dismissal of the trade secret claims is inappropriate because CHG improperly urges the Court to apply a heightened standard and ignores the Complaint's allegations that specifically identify VGT's trade secrets, including the source code and math underlying its games.

CHG's arguments regarding trademark infringement are meritless for three additional reasons:  (i) CHG ignores that VGT's claims are based on its marks *as a whole*—which include both the names of the games and associated artwork (not just the names, as CHG suggests)—and that when VGT's marks as a whole are compared with CHG's marks as a whole, the similarities are readily apparent; (ii) CHG identifies third party federal trademark registrations, but provides no evidence that these marks are used in connection with relevant games (nor would such evidence be appropriate in support of a motion to dismiss); and (iii) CHG's proposed consumer group for the likelihood of confusion analysis excludes casino patrons, at least some of whom are

unsophisticated and therefore more easily confused than the casino operators on which CHG focuses.

With respect to VGT's trade dress infringement claims, CHG's arguments are likewise meritless for three additional reasons.  First, on the issue of VGT's themes, CHG's recitation of third party federal trademark registrations is similarly meaningless without evidence that these marks are used in connection with relevant games; CHG also mischaracterizes VGT's themes in a way that makes them seem generic (*e.g.*, a "money" theme) when in fact the Complaint identifies examples of elements, including characters and imagery, that comprise each game's theme.  Second, on the issue of functionality, contrary to CHG's assertions, VGT alleges not only that alternative designs are available, but also that its trade dress features are arbitrary—the key factor in determining whether a feature is functional.  Third, on the issue of distinctiveness, again contrary to CHG's arguments, the allegations in the Complaint that the combination of VGT's trade dress features is "unique" (with images to support the allegation) satisfies the pleading standard.[1]

Finally, as to trade secret misappropriation, the Complaint sufficiently identifies the nature of VGT's trade secrets (such as its source code) because VGT is not required "to plead its trade secrets in detail, as such a disclosure would effectively amount to a surrender of the trade secret."  *Paradigm All., Inc. v. Celeritas Techs., LLC*, 659 F. Supp. 2d 1167, 1185 (D. Kan. 2009).  VGT also explains the role those trade secrets play within VGT's games and alleges facts suggesting that CHG, including employees who had worked in senior roles at VGT,

---

[1] Even if VGT is deemed not to have adequately pled that its trade dress features are *inherently* distinctive, VGT plainly makes allegations that the features have acquired secondary meaning and thus *become* distinctive.  Among other things, the Complaint alleges that VGT has been exclusively using these features for years, that it uses these features in its advertising, and that as a result consumers have come to associate these features with VGT.

misappropriated these trade secrets in developing CHG's games.  These allegations are sufficient under Oklahoma law, which CHG omits in favor of law from New York, a jurisdiction that, unlike Oklahoma, has not adopted the Uniform Trade Secrets Act ("UTSA").

## STATEMENT OF THE CASE

VGT is the leading developer, manufacturer, and distributor of Class II bingo-based player terminals in North America, including in Oklahoma, which is one of the largest Class II markets in the United States.  Compl. ¶¶ 12-13.[2]

A few years ago, longtime VGT officials left to start a new gaming company, CHG, where they have hired other VGT employees and have been marketing and selling games, including in Oklahoma, that bear unmistakable similarities—in both appearance and gameplay— to VGT's most popular games.  *Id.* ¶¶ 50-59, 61-89.  These similarities, as set forth in the Complaint, are summarized below.

### VGT's Marks and CHG's Infringing Marks

VGT owns more than 200 U.S. federal trademark registrations and applications for marks it uses in connection with Class II bingo-based games, most of which are incontestable under the Lanham Act.  Compl. ¶¶ 19-20.  Incontestability is conclusive evidence that the marks are valid and that the owner of the marks has the exclusive right to use the marks in connection with the goods and services listed in the registrations.  15 U.S.C. § 1065.  "An 'incontestable' mark cannot be challenged as lacking secondary meaning; such marks are conclusively presumed to be

---

[2] The Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, which regulates gaming on Native American land, establishes three classes of games, each with a different regulatory scheme.  The Class II games at issue here include games of chance based on bingo, in contrast to Class III gaming often associated with casinos in Las Vegas.

(continued…)

nondescriptive or to have acquired secondary meaning." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 924 (10th Cir. 1986).

VGT also owns common law rights in the unregistered trademarks that it uses in connection with Class II bingo-based games (*i.e.*, the games' logos), which incorporate VGT's federally registered trademarks (*i.e.*, the names of the games).[3]  Compl. ¶ 22.  VGT has been using these marks in its advertising and promotional activities for years, and the public has come to associate these marks with VGT.  *Id.* ¶¶ 35-40.

As set forth in the Complaint, more than half of CHG's Class II bingo-based games incorporate marks that when viewed as a whole are confusingly similar to the marks used by VGT in connection with its own Class II bingo-based games.  *Id.* ¶¶ 60-72.  Exhibits 3 and 4 to the Complaint, reproduced as Attachments A and B hereto, sets forth 15 side-by-side examples where CHG has incorporated VGT marks (and trade dress) into its own games.

**VGT's Trade Dress and CHG's Infringing Trade Dress**

The VGT Trade Dress is comprised of a combination of themes with non-functional trade dress features, including the cabinet that houses the games ("GAME CABINET"), the sounds made during standard game play ("GAME PLAY SOUND"), the mechanical bell sound that signals that a player has won ("AWARD SOUND"), the winning bingo patterns and other game play elements ("BINGO PLAY AND PAYS"), and the red display during bonus play ("RED

---

[3] Although the Complaint refers only to "common law rights to the trade dress," Compl. ¶ 22, VGT's common law trademark rights are also encompassed within the common law trade dress rights as part of the games' themes because trademarks and trade dress both serve as source identifiers, with the former consisting of words, names, symbols, and designs and the latter consisting of the overall look and feel of a product, which itself often includes words, names, symbols, and/or designs.  *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 (1992) ("[Trade dress] may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.") (internal citation and quotations omitted).  To the extent that it is unclear whether VGT has alleged infringement of its common law trademark rights and if formal clarification is necessary, VGT can amend the Complaint accordingly.

SCREEN FREE SPINS"). *Id.* ¶¶ 22-27, 31. This unique combination of trade dress features is inherently distinctive because consumers recognize it as a source identifier. *Id.* ¶ 28. VGT has emphasized the VGT Trade Dress in its advertising and promotional activities for years, and the public has come to associate the VGT Trade Dress with VGT. *Id.* ¶¶ 29-30, 35-40.

Much like with CHG's trademarks, more than half of CHG's Class II bingo-based games use trade dress confusingly similar to the VGT Trade Dress, including nearly identical cabinets, sounds (including a mechanical bell that signals an award of credits), bingo patterns and pay tables, and a bonus feature in which the display turns red. *Id.* ¶¶ 60-81. The cabinets of VGT and CHG can be seen, side-by-side, in Attachment B, and the other features—including similar, if not identical, sounds, bingo patterns and pay tables, and bonus mode—are described in the Complaint at ¶¶ 75-81.

## VGT's Trade Secrets and CHG's Misappropriation Thereof

VGT has developed and protected confidential information relating to the development and operation of its Class II bingo-based games, including math and source code undergirding the games. Compl. ¶¶ 41–43. This information has never been shared with the public and possesses independent economic value, and VGT has taken steps to maintain its confidentiality, including by requiring employees to protect its secrecy. *Id.* ¶¶ 44–48.

After hiring former VGT officials and employees, including VGT's former Vice President of Engineering, Director of Software, and Director of Hardware Development, CHG released games that closely mimic the play of VGT's games. Compl. ¶¶ 51, 98. Specifically, CHG's games use the same or similar payouts, bingo mechanics, and volatility (*i.e.*, the level of risk associated with the games). *Id.* ¶¶ 43, 98. Even the pay tables of CHG's games, which arise from the underlying trade secret math, are identical to VGT's games. *See id.*, Ex. 6.

**ARGUMENT**

Judge Payne of this Court has "emphasize[d] that even after *Twombly* and *Iqbal*, granting a defendant's motion to dismiss is 'a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice.'" *Allen v. Town of Colcord, Okla.*, 874 F. Supp. 2d 1276, 1283 (N.D. Okla. 2012) (quoting *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009)). Although "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), "'plausible' cannot mean 'likely to be true,'" and therefore the allegations in the complaint must be "assumed to be true," *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

These principles are particularly applicable here. Generally, "dismissal for failure to state a claim is 'appropriate in only the most extreme trademark infringement cases, such as where goods are unrelated as a matter of law, since the likelihood of confusion is generally a question of fact.'" *Navajo Nation v. Urban Outfitters, Inc.*, 935 F. Supp. 2d 1147, 1162 (D.N.M. 2013) (quoting *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009)); *see also Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 933 (4th Cir. 1995) (noting "inherently factual" nature of likelihood of confusion analysis). So too are trade dress infringement claims "rarely resolved at the motion to dismiss stage," *Stat Ltd.*, 60 F. Supp. 3d at 638; *see also Lepton Labs, LLC v. Walker*, 55 F. Supp. 3d 1230, 1240 (C.D. Cal. 2014) ("So long as a plaintiff has alleged a complete recitation of the concrete elements of its alleged trade dress, it should be allowed to proceed."); because there "is no heightened pleading standard for trade secrets claims," a plaintiff can satisfy the pleading standard by "set[ting] forth in general terms

what its trade secrets are," *Cobalt Flux, Inc. v. Positive Gaming AS*, No. 2:08-CV-185 TS, 2008 WL 4534182, at *3 (D. Utah Oct. 6, 2008).

## I.   THE COMPLAINT STATES CLAIMS FOR TRADEMARK INFRINGEMENT UNDER THE APPLICABLE LEGAL STANDARD.

VGT's Complaint sets forth facts establishing all elements of a prototypical trademark infringement claim. Specifically, VGT alleges that it owns exclusive rights to the marks it uses in connection with Class II bingo-based games, Compl. ¶¶ 19-22, that these marks are inherently distinctive and known to consumers, *id.* ¶¶ 19-21, 35-40, that CHG uses confusingly similar marks in connection with its own Class II bingo-based games in overlapping casinos, *id.* ¶¶ 60-72, that CHG does so with intent to confuse consumers, *id.* ¶¶ 82, 84, 87, 89, and that CHG has succeeded in sowing confusion and is likely to cause further confusion if not enjoined, *id.* ¶ 90.

In response, not only does CHG wrongly suggest that trademark infringement claims are often resolved at the pleading stage,[4] *see* Mot. at 9-10, but it improperly focuses on (and mischaracterizes) two of the six non-exhaustive factors typically considered by courts in the Tenth Circuit in a likelihood of confusion analysis,[5] *i.e.*, similarity of the marks and

---

[4] The cases that CHG cites in which courts have granted motions to dismiss are inapposite. *See Mintz v. Subaru of Am., Inc.*, No. 16-CV-03384-MMC, 2016 WL 5909360, at *2 (N.D. Cal. Oct. 11, 2016) (no likelihood of confusion as a matter of law between marks SHARE THE LOVE and A WORLD OF LOVE, FOR YOU AND THOSE YOU LOVE, where only similarities between marks are use of word "love" and image of a hand and marks are used in connection with unrelated goods, specifically vehicles and calendars and other publications); *Le Book Pub., Inc. v. Black Book Photography, Inc.*, 418 F. Supp. 2d 305, 311 (S.D.N.Y. 2005) (no likelihood of confusion between LE BOOK NY and THE BLACK BOOK DIRECTORY, where marks have obvious differences in design elements and packaging); *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46-48 (2d Cir. 2000) (no likelihood of confusion between DENTYNE ICE and ICE BREAKERS, where "DENTYNE" is well-known house brand and marks have obvious differences in design elements and packaging); *Cory Van Rijn, Inc. v. California Raisin Advisory Bd.*, 697 F. Supp. 1136, 1145 (E.D. Cal. 1987) (granting motion to dismiss where plaintiff did not oppose trademark portion of motion).

[5] Those factors are "(1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and (continued…)

sophistication of the consumers, and ignores the other four factors, including intent to confuse and actual confusion, both of which are alleged in the Complaint and should not be excluded from the likelihood of confusion analysis in this case.

As to similarity, CHG first asks the Court to conclude that there is none between its marks and VGT's marks as a matter of law, *see* Mot. at 9-15, notwithstanding the images included in the Complaint, *see* Attachments A and B.  For example:

VGT - Crazy Billions                    CHG - Welcome to Nugget Mountain



Given the obvious similarities, it is unsurprising that CHG's brief includes almost no images of either party's games.

Instead, CHG focuses on the names of the games, *see* Mot. at 10-11, glossing over that it is the similarity between the marks as a whole that is likely to cause confusion.  Although most of VGT's federally registered trademarks are for word marks, some of VGT's registrations include design elements, and VGT also maintains common law trademark rights in the design elements that accompany the names of the games as a result of its use of these design elements in connection with its games.[6]  *See First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1061,

---

manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks."  *Sally Beauty Co.*, 304 F.3d at 972.

[6] In its brief, CHG has parsed out VGT's trademark rights separately from VGT's trade dress rights.  VGT does not believe that this is proper as the trademark and trade dress rights are highly intertwined.  *See supra* footnote 3.  Nevertheless, for purposes of this brief, VGT has addressed these claims separately.  Relatedly, because almost all of VGT's and CHG's federal trademark registrations are for word marks, the failure of the U.S. Patent and Trademark Office ("USPTO") to cite VGT's marks as a bar to registration of CHG's marks, *see* Mot. at 5, is unsurprising; it (continued…)

1069–70 (D. Kan. 2000) ("A fundamental tenet of trademark law is that use of a mark in commerce in connection with products or services creates rights under state and federal law.") (quoting *Secular Organizations for Sobriety, Inc. v. Ullrich*, 213 F.3d 1125, 1130 (9th Cir. 2000)).  And as seen above and in Attachments A and B, the similarities between these design elements in VGT's games and CHG's games are readily apparent.[7]

Nor is there merit to CHG's arguments based on third party federal trademark registrations for game names that include similar words.  *See* Mot. at 11-15.  CHG does not cite authority to support its position that the Court can, much less should, consider this type of evidence on a motion to dismiss, much less for its apparent position that this evidence should be considered in evaluating *similarity* of marks in a likelihood of confusion analysis.  Rather, such evidence is typically considered after the pleading stage, along with other facts, in assessing *strength* of a mark.  *See, e.g.*, *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1173–74 (2d Cir. 1976).

In any event, existence of third party trademark registrations is meaningless without evidence that the marks in these registrations are being used in the marketplace (and such evidence, of course, has no place in a motion to dismiss).  As one court has explained, "in the absence of evidence of the extent of actual continuing use of registered marks, mere registrations are entitled to little weight in establishing whether there is likely to be confusion because registrations by themselves do not indicate how the public mind may have been conditioned."

---

also bears emphasis that the USPTO determines similarity in a vacuum without consideration of how marks are used in the marketplace.

[7] Although some CHG marks are more similar to VGT marks than others, VGT includes a list of games with similar themes in its Complaint because all the games viewed together demonstrate a pattern of behavior that supports an inference of intent to deceive on the part of CHG.

(continued…)

*Standyne, Inc. v. Lins*, 490 F.2d 1396, 1397 (C.C.P.A. 1974); *see also McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1171 (7th Cir. 1986) (denying summary judgment motion in part because of failure to adduce "evidence that these 'similar trademarks' are actually used by third parties or that they have been promoted and are recognized by consumers").[8]

Even assuming that the marks cited by CHG are being used in connection with Class II games and in the same casinos as VGT's and CHG's games (notwithstanding that an online investigation suggests that the vast majority are not), there is nothing to CHG's suggestion that a game with a name that includes the term "money" but has no other similarity to VGT's or CHG's games is relevant for assessing likelihood of confusion between VGT's games and CHG's games. VGT obviously does not claim exclusive rights to use of the word "money" or any similar word on its own in connection with gaming machines. Rather, VGT alleges infringement based on the marks as a whole.

Nor is there merit to CHG's third point in support of its argument that VGT's trademark infringement claims fail as a matter of law because consumers of VGT's and CHG's games are sophisticated, *see* Mot. at 15-16, based on statements made by VGT's parent company, Aristocrat, to the USPTO. CHG, however, ignores that the USPTO *rejected* Aristocrat's argument: "The examining attorney must presume that the users and consumers of applicant's goods are both casinos and the average gambler. . . . When the relevant consumer includes both professionals and the general public, the standard of care for purchasing the goods is that of the

---

[8] Notably, an online investigation reveals that for approximately half the trademark registrations cited by CHG, the marks do not appear to be in use. For the marks that do appear to be in use, many seem to be used only in connection with *online* games—not in casinos. Indeed, of the handful of marks that *may* be in use in casinos, there is no evidence that these marks are being used in connection with Class II games that compete directly with VGT's and CHG's games or that these games are in any of the same casinos (or even the same states) as VGT's and CHG's games.

least sophisticated potential purchaser." *See* Decl. of Rebecca B. Dalton, Ex. 1.  Accordingly, even if this factor could be determined as a matter of law at the pleading stage (which it cannot in such circumstances), it would likely be determined in *VGT's* favor.

Finally, even assuming that mark similarity and consumer sophistication could be determined as a matter of law, the rest of the factors in the likelihood of confusion analysis weigh in VGT's favor—especially on a motion to dismiss where the allegations in a complaint must be accepted as true.  Specifically, VGT has pled facts supporting the following: (i) VGT's marks are strong; (ii) CHG uses its confusingly similar marks in connection with identical Class II games that compete directly with VGT's games in overlapping casinos; (iii) CHG copied VGT's marks to cause consumer confusion; and (iv) there have been instances of actual confusion between the marks.  Because a fact-finder must weigh each of the six likelihood of confusion factors, and because VGT has sufficiently pled facts to state plausible claims for trademark infringement, those claims should not be dismissed.[9]

## II.   THE COMPLAINT STATES CLAIMS FOR TRADE DRESS INFRINGEMENT UNDER THE APPLICABLE LEGAL STANDARD.

As with the trademark infringement claims, the Complaint sets forth facts establishing all elements of a prototypical trade dress infringement claim.  Specifically, VGT alleges that it owns exclusive rights to the trade dress it uses in connection with Class II bingo-based games, Compl. ¶ 22, that this trade dress is inherently distinctive and/or known to consumers, *id.* ¶¶ 28-30, 35-40, that CHG uses confusingly similar trade dress in connection with its own Class II bingo-based games in overlapping casinos, *id.* ¶¶ 60-81, that CHG is doing so with intent to confuse

---

[9] The arguments in this section apply equally to all of VGT's trademark infringement claims as well as to its unfair competition claims.

consumers, *id.* ¶¶ 82, 84, 87, 89, and that CHG has in fact succeeded in sowing confusion and is likely to cause further confusion if not enjoined, *id.* ¶ 90.

CHG's responses to the trade dress claims are similar to its responses to the trademark infringement claims and fail for many of the same reasons.

First, even assuming that it is appropriate to consider CHG's argument that VGT's themes are "generic and ubiquitous" on a motion to dismiss (which it is not), the proposition, again, is unsupported.  CHG provides no evidence that the names of games registered by the USPTO are being used, let alone evidence that these names are being used in connection with Class II gaming machines in any of the same casinos as VGT's and CHG's games.  *See* Mot. at 16-18.  To the contrary, as noted, that does not appear to be the case.

Similarly, CHG mischaracterizes VGT's themes and makes the demonstrably false claim that "the artwork on Castle Hill's slot machines looks nothing like the art on VGT's machines." Mot. at 2.  For example, although CHG suggests that the only common feature of VGT's Polar High Roller game and CHG's Arctic Cash and Arctic Ice games is a "polar/arctic" theme, which is shared by dozens of other games, *id.* at 2, 4, 10, 11, 17, CHG's games are plainly more like VGT's Polar High Roller game than other games with "polar/arctic" themes because, in addition to a "polar/arctic" theme, the games share specific elements within this theme (*e.g.*, anthropomorphic cartoon polar animals wearing sunglasses and other clothing items, partying and dancing with money on ice as if it were tropical), as well as nearly identical cabinets and other features.  In addition to providing visual comparisons (which have been reproduced below), VGT describes these similarities (as well as the similarities between other VGT and CHG games) in the Complaint.  Compl. ¶¶ 65-81.

VGT - Polar High Roller          CHG - Arctic Cash          CHG - Arctic Ice



Of course, this analysis should not be conducted in isolation on a motion to dismiss (where all factual allegations are accepted as true), but rather by a factfinder in the context of a complete record.  Along those lines, although there may be third parties that offer games with "polar/arctic" themes, no other third party offers games with a similar "polar/arctic" theme *and* games with a similar "miner" theme, *and* games with a similar "money" theme, *and* games with all the other similar themes identified in the Complaint, *combined with* all the other trade dress features that CHG has copied *and* uses this trade dress in connection with Class II games that compete directly with those of VGT.

13

It also bears emphasis that CHG does not even attempt to address the similarities between the other trade dress features found on VGT's games (*i.e.*, VGT's GAME CABINET, GAME PLAY SOUND, AWARD SOUND, BINGO PLAY AND PAYS, and RED SCREEN FREE SPINS) and those found on CHG's games. Instead, CHG erroneously claims that VGT has not asserted facts alleging that these features are non-functional and distinctive. *See* Mot. at 18-22.

With respect to **functionality**, although CHG quotes the Complaint's allegations that the features are arbitrary and that alternative designs are available, *see id.* at 18 (quoting Compl. ¶¶ 23-27), CHG ignores the allegation of arbitrariness and cites three cases from the Fifth and Sixth Circuits for the proposition that availability of alternative designs is irrelevant. Even assuming that CHG can wish away allegations of arbitrariness, its cases do not support CHG's position because: (i) none was decided on a motion to dismiss, (ii) the case CHG cites from the Sixth Circuit is not representative of Sixth Circuit law, much less Tenth Circuit law, (iii) the Fifth Circuit has since backtracked from the position taken in these cases, and (iv) the majority rule is to the contrary.

CHG's argument is dependent on a misreading of the Supreme Court's decision in *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001), which reaffirmed the "traditional" test for functionality: "a product feature is functional . . . if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Id.* at 32 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850, n. 10 (1982)). The Court held that if a feature is functional under the "traditional" test, there is no need to apply the "competitive necessity" test, which recognizes the availability of "other design possibilities" as a relevant factor. *See id.* at 33-34. At the same time, the Court recognized that the situation would be different "[i]n a case where a manufacturer seeks to protect *arbitrary*, incidental, or ornamental

aspects of features of a product." *Id.* (features functional in part because plaintiff had "pointed to nothing *arbitrary* about the components of its device or the way they are assembled") (emphases added).[10]

Contrary to CHG's claims, the Fifth and Sixth Circuits do not interpret *TrafFix* to mean that availability of alternative designs is always irrelevant to the functionality inquiry. Rather, the most recent decisions by these courts of appeals to address this issue have merely held that availability of alternative designs is irrelevant under the "traditional" test. *See Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 485–86 (5th Cir. 2008); *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 505–07 (6th Cir. 2013).

Moreover, CHG ignores that the Fourth, Seventh, Ninth, and Federal Circuits interpret *TrafFix* as simply clarifying that availability of alternative designs *alone* is not enough to establish functionality under either test, but that such information is still a "legitimate source of evidence to determine whether a feature is functional in the first place," even under the "traditional" test. *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1274-76 (Fed. Cir. 2002); *see also McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 312 (4th Cir. 2014); *Georgia-Pac. Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727-28 (7th Cir. 2011); *Talking Rain Beverage Co. v. S. Beach Beverage Co.*, 349 F.3d 601, 603 (9th Cir. 2003).

The leading treatise on trademark law has similarly expressed the view that *TrafFix* does not mean "that alternative designs cannot be considered as one source of evidence, along with

---

[10] It bears mention that *TrafFix* involved a utility patent, which courts consider to be "strong evidence that the features therein claimed are functional." *Id*. at 29-30.

(continued…)

others, in the initial determination" under the traditional test.  1 McCarthy on Trademarks and Unfair Competition § 7:75 (5th ed.).[11]

In any event, regardless of the test applied, VGT has adequately pled non-functionality because VGT alleges that each of its trade dress features is arbitrary (and therefore non-functional under any variation of the "traditional" test) *in addition to* alleging that alternate designs are available.  Compl. ¶¶ 23-27.

Nor is there merit to CHG's argument that VGT's trade dress features are functional as a matter of law because the features perform functions (*e.g.*, indicating that a player has won).  As the Federal Circuit has explained, there is a distinction between a feature's performance of a function and legal functionality for purposes of a trade dress infringement analysis:  "[D]e facto functional means that the design of a product has a function, i.e., a bottle of any design holds fluid. . . . *De jure* functionality means that the product has a particular shape because it works better in this shape."  *Valu Eng'g, Inc.*, 278 F.3d at 1274 (quoting *In re R.M. Smith, Inc.*, 734 F.2d 1482, 1484 (Fed. Cir. 1984) (internal quotation omitted).  Trade dress features that are *de jure* functional will always fail the "traditional" test for functionality and can therefore never be protected, but trade dress features that are *de facto* functional, like VGT's, may be protectable. *See id.*

Turning to CHG's argument that VGT has not adequately alleged that its trade dress features are inherently **distinctive**, CHG again cites cases decided on motions for summary judgment, not motions to dismiss and overlooks a recent case from the Western District of

---

[11] The USPTO also takes a similar stance:  "[S]ince the preservation of competition is an important policy underlying the functionality doctrine, competitive need, although not determinative, remains a significant consideration in functionality determinations."  Trademark Manual of Examining Procedure 1202.02(a)(iii)(A) (20th ed. 2017).

Oklahoma. In that case, the court found trade dress allegations to be sufficiently pled even though the complaint contained language broader than VGT's: "The configuration and visual design of Kimray's treater valve is distinctive and non-functional"; "[d]ue to its distinctive appearance and extensive use by Kimray, Kimray's treater valve is strong and well-recognized." *See* Complaint at 3, *Kimray, Inc. v. Norriseal-Wellmark, Inc.*, No. CIV-16-1167-D, 2017 WL 1906941, at \*3 (W.D. Okla. May 8, 2017). Specifically, the court held: "At some point during discovery or the summary judgment stage, Kimray will need to identify what elements of its design are distinctive and which are non-functional, but that degree of specificity is not required at the pleading stage in this case." 2017 WL 1906941 at \*3.

Other courts have similarly found that specificity is not required for pleading distinctiveness and that because distinctiveness is fact-dependent, it should rarely be resolved at the pleading stage. *See, e.g.*, *Arcsoft, Inc. v. Cyberlink Corp.*, No. 15-CV-03707-WHO, 2016 WL 861103, at \*3 (N.D. Cal. Mar. 7, 2016) ("[Defendant's] attacks on the distinctiveness and nonfunctionality of ArcSoft's asserted trade dress come too early in these proceedings. It may raise them again once the parties have had an opportunity for discovery and a factual record has been developed."); *Touchpoint Commc'ns, LLC v. Dentalfone, LLC*, No. 3:15-CV-05240-JRC, 2016 WL 525932, at \*4 (W.D. Wash. Feb. 10, 2016) ("[Distinctiveness] involves a factual question that should not be decided at this stage of the litigation.").

In addition to mischaracterizing the pleading standard for distinctiveness, CHG wrongly argues that VGT has not provided facts to support its claim that its trade dress features are inherently distinctive, Mot. at 21, ignoring that the Complaint includes images of its games as well as images of its competitors' games (including those of other cabinet designs that CHG could have used if it was not copying VGT). *See* below and Exhibit 5 to the Complaint,

17

reproduced as Attachment C.  Moreover, the Complaint alleges that CHG itself has a second cabinet that is not similar to VGT's cabinet, but that CHG primarily uses the VGT lookalike for its Class II games.  Compl. ¶¶ 62, 73.

VGT - Crazy Billions



CHG - Welcome to Nugget Mountain



Rocket Gaming Systems - Risk and Reward



These images, which include to the far right a cabinet used by a third party, confirm that VGT's themes and GAME CABINET are not "common basic" shapes or designs and are not mere refinements of well-known ornamentations.[12]  Moreover, although CHG asserts that VGT's

---

[12] Such images are often considered by courts in determining whether a plaintiff has adequately pled inherent distinctiveness.  *See, e.g.*, *SCS Direct, Inc. v. Insassy, Inc.,* No. 3:14CV0020(JBA), (continued…)

allegation that the combination of its trade dress features is "unique" is "conclusory," there is no other way to state this fact, and VGT cannot include images of every other game on the market.

Even if VGT were deemed not to have sufficiently alleged that its trade dress is inherently distinctive, VGT plainly has sufficiently alleged that its trade dress has acquired secondary meaning. Secondary meaning is acquired when the "primary significance [of the descriptive trade dress] in the minds of potential consumers is no longer as an indicator of something about the product itself but as an indicator of its source or brand." *Sally Beauty Co.*, 304 F.3d at 978 (citation omitted). As with every other issue that CHG raises, the question of whether "trade dress has acquired secondary meaning is a question of fact and thus generally should not be decided at the summary judgment stage," let alone at the pleading stage. *Id.* As CHG correctly notes, Mot. at 21-22, secondary meaning can be shown through "circumstantial evidence regarding: (1) the length and manner of [the mark's] use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture." *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1218 (10th Cir. 2004). VGT's Complaint alleges facts relating to each of these factors, and others. Compl. ¶¶ 29, 36-40.

The two cases cited by CHG in support of its argument that these allegations are insufficient are inapposite. First, in *Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.*, No. 12 CIV. 3599, 2013 WL 866867, at *3-4 (S.D.N.Y. Mar. 8, 2013), the court

---

2016 WL 1384762, at *3 (D. Conn. Apr. 7, 2016) (plausible inference that plaintiff's trade dress inherently distinctive because plaintiff provided description and images of packaging); *AMD Southfield Michigan Ltd. P'ship v. Michigan Open MRI LLC*, 337 F. Supp. 2d 978, 983 (E.D. Mich. 2004) ("Plaintiff's trade dress' total image, which includes features such as size, shape, color or color combinations, texture or graphics, as demonstrated in the photographs Plaintiff has provided in both its brief and complaint, conveys a distinctive impression. The trade dress appears unique in its layout, choice of color and graphics.") (internal citation omitted).

found that the plaintiff's statement that it spent $2.4 million annually in advertising expenses was insufficient to plead secondary meaning, but CHG ignores that, unlike VGT, the plaintiff in that case gave no indication that this advertising made use of the trade dress in question.  *See* VGT Compl. ¶ 37 ("VGT has used the VGT Marks and Trade Dress in its advertising and promotional materials").  Similarly, in *AJB Enters, LLC v. Backjoy Orthotics*, LLC, No. 3:16-CV-00758 (VAB), 2016 WL 7341702, at *3 (D. Conn. Dec. 18, 2016), CHG glosses over that, unlike VGT, the plaintiff failed to allege a connection between the trade dress and the plaintiff as the source of the descriptive trade dress, *see* VGT Compl. ¶ 39 ("the public . . . has come to associate the VGT Marks and Trade Dress with VGT's products and services"); tellingly, the court in that case also noted that the "vast majority of the Second Circuit cases referenced by the parties involved trade dress infringement claims that were permitted to proceed to later stages of litigation," *AJB Enterprises*, at *3.

When complaints make allegations of secondary meaning similar to VGT's, courts deny motions to dismiss.  As an example, in *Weber-Stephen Prods. LLC v. Sears Holding Corp.*, No. 13-CV-01686, 2013 WL 5782433 (N.D. Ill. Oct. 25, 2013), the plaintiff pled, like VGT, that its trade dress was "unique" and had a "distinctive appearance" and that it "expended considerable time, effort and resources to design and develop" this trade dress.  *Id.* at *3.  Denying the motion to dismiss, the court held:  "Read together, these factual allegations plausibly plead that Weber has invested into building its brand cachet in the marketplace, causing consumers to associate grills possessing the unique and distinctive riveted metal shroud and door trim with the Weber brand [*i.e.*, that the grills had acquired secondary meaning]."  *Id.* at *6.

20

The same result is appropriate here.[13]

## III.   THE COMPLAINT STATES CLAIMS FOR MISAPPROPRIATION OF VGT'S TRADE SECRETS UNDER THE APPLICABLE LEGAL STANDARD.

Like its arguments on the trademark and trade dress claims, CHG's arguments on the trade secret claims misapprehend the pleading requirements.  Although CHG claims that at the pleading stage a plaintiff must specifically describe the alleged trade secret at issue, Mot. 23, none of the cases cited by CHG involved a motion to dismiss.[14]

To the contrary, to plead a misappropriation claim under the Oklahoma Uniform Trade Secrets Act ("OUTSA"), a plaintiff need only "sufficiently allege: (1) the existence of a trade secret; (2) misappropriation of this secret by the defendant; and (3) use of the secret by the defendants to the detriment of the plaintiff."  *Integrated Bus. Techs., LLC v. Netlink Sols., LLC*, No. 16-CV-048-TCK-PJC, 2016 WL 4742306, at *2 (N.D. Okla. Sept. 12, 2016); *see also Pre-Paid Legal Servs., Inc. v. Cahill*, 171 F. Supp. 3d 1219, 1227 (E.D. Okla. 2016).  Thus, as noted above, *see supra* at 2, 6–7, the "usual notice pleading requirements under Rule 8" apply to trade secret claims.  *See, e.g.*, *Cobalt Flux*, 2008 WL 4534182, at *3 (D. Utah Oct. 6, 2008) (denying motion to dismiss trade secret claims because motion relied on cases "resolved at the summary judgment stage").

---

[13] CHG does not make any unique arguments as to why the unfair competition claims should be dismissed.  *See* Mot. at 24.

[14] *See Big Vision Private, Ltd. v. E.I. Dupont De Nemours & Co.*, 1 F. Supp. 3d 224, 256–57 (S.D.N.Y. 2014) (resolving summary judgment motion); *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05 Civ. 9292 (DLC), 2008 U.S. Dist. LEXIS 12017, at *20–25 (S.D.N.Y. Feb. 20, 2008) (same); *see also BioCore, Inc. v. Khosrowshahi*, 96 F. Supp. 2d 1221, 1229–30 (D. Kan. 2000) (setting forth factual findings from bench trial), *rev'd and remanded*, 80 F. App'x 619 (10th Cir. 2003); *Storagecraft Tech. Corp. v. Symantec Corp.*, No. 2:07 cv 856 CW, 2009 U.S. Dist. LEXIS 10608 (D. Utah Feb. 11, 2009), at *3 (resolving discovery motions).

VGT has satisfied the notice pleading requirements of Rule 8 in identifying the trade secrets at issue.  VGT has identified two types of source code as well as the underlying math relating to its games as trade secrets.  For example, VGT has identified "the code used for purposes of controlling the bingo server (referred to as 'Live Call 2003 Bingo Server')" and explained that this code "controls how the bingo aspects of the game function, including the ball calls, distribution of bingo cards, tracking of pay tables, and accounting for each game terminal." Compl. ¶ 42.  Similarly, VGT has identified "the code used for purposes of controlling the interactions with the hardware aspects of the games (referred to as the 'mechanical reels source code,' 'Client 6' or 'Client 7')," which "controls other aspects of the games, including the control of the mechanical reels (including the red screen free spin feature), the processes for accepting wagers, the processes for generating payouts, and the interactions with the bell used by the player terminals to indicate successful outcomes."  *Id.*  And the math underlying VGT's games dictates the probabilities of winning, the payouts for each win, and the volatility of the game. *Id.* ¶ 43.  This identification meets the pleading requirements for a trade secret claim. [15] Whether the identified "information in fact qualifies as a 'trade secret' under the OUTSA is not properly before the Court at [the pleading] stage of litigation" because "the determination of whether specific information qualifies as a trade secret involves a factual inquiry."  *Cahill*, 171 F. Supp. 3d at 1227.

---

[15] *See, e.g.*, *Paradigm*, 659 F. Supp. 2d at 1185 (plaintiff not required "to plead its trade secrets in detail, as such a disclosure would effectively amount to a surrender of the trade secret"); *Cobalt Flux*, 2008 WL 4534182, at *3 (finding sufficient complaint setting "forth in general terms what its trade secrets are: proprietary and confidential technology and know-how, as well as other intellectual property, relating to interactive dance video games and hardware such as dance pads"); *see also Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*, 799 F. Supp. 2d 846, 850 (N.D. Ill. 2011) ("[T]he alleged trade secrets need not be disclosed in detail in a complaint to survive a motion to dismiss."); *Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d 1017, 1042 (D. Minn. Aug. 9, 2013) ("the exact nature of the trade secret is a matter for discovery").

CHG also incorrectly asserts that VGT has failed to allege "how Castle Hill has used" its trade secrets. Mot. at 23–24. The Complaint, however, alleges that former VGT employees had access to VGT trade secrets during their employment and were subject to confidentiality obligations to VGT, but nevertheless shared those secrets with CHG, which used them to develop infringing games that "mimic[] the play of VGT's games." Compl. ¶¶ 94–98. Specifically, the Complaint's allegations that the games have similar gameplay and that CHG has copied the look and feel of the VGT games makes it plausible that CHG has incorporated VGT's trade secrets into the CHG games.[16] Although CHG may dispute those allegations, whether CHG "actually misappropriated a trade secret … remains a question of fact not properly at issue here." *Cahill*, 171 F. Supp. 3d at 1228.

Finally, CHG improperly criticizes VGT's allegations of trade secret use as having been made on "information and belief." Mot. at 23. Rule 11(b), however, expressly permits this form of pleading, and courts in this district "consider the substance of plaintiff's allegations, rather than their form," and "will not automatically disregard allegations based on 'information and belief.'" *ArCzar, Inc. v. Navico, Inc.*, No. 11-CV-805-CVE-PJC, 2012 WL 3150815, at *2 (N.D. Okla. Aug. 2, 2012). Indeed, "in this specific context, little else is required to state a plausible

---

[16] *See, e.g.*, *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005) ("Permitting an inference of use from evidence of access and similarity is sound because misappropriation and misuse can rarely be proved by convincing direct evidence.") (internal quotation and alterations omitted); *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1361 (Fed. Cir. 2002) ("These showings—access and similarity—may support a trade secret misappropriation claim."); *Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.*, 15 F.3d 1427, 1432 (7th Cir. 1994) (holding that it was "entirely reasonable" to "infer that DSC used Sokol's trade secret" because "DSC's product was similar to Sokol's"); *TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc.*, No. CIV. 13-1356 ADM/FLN, 2013 WL 6827348, at *1, *4 (D. Minn. Dec. 26, 2013) (finding that allegations of defendant developing and marketing "competing products that are functionally similar" to the plaintiff's products after defendant "hired employees from [plaintiff] who had expertise in their development" were sufficient to state a plausible trade secret claim).

(continued…)

claim for relief" because it "is plausible that a former … employee could obtain unauthorized access" to his former employer's confidential information. *Netlink*, 2016 WL 4742306, at *6. Thus, even where a former employer "lacks knowledge as to how" its information was misused at the pleading stage, allegations "upon information and belief" that such misuse occurred "have sufficiently alleged that Defendants did so." *Id.*[17]

## IV.   IF VGT HAS NOT STATED ANY OF ITS CLAIMS UNDER THE APPLICABLE LEGAL STANDARD, VGT SHOULD BE GRANTED LEAVE TO AMEND.

To the extent that VGT is deemed not to have adequately stated its claims, VGT should be afforded an opportunity to replead. *See, e.g., Lewis v. Wal-Mart Stores, Inc.*, 232 F.R.D. 687, 688 (N.D. Okla. 2005) ("The liberal granting of motions for leave to amend reflects the basic policy that pleadings should enable a claim to be heard on its merits.") (quoting *Calderon v. Kansas Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999)).  VGT submits that it will be able to amend its Complaint to address any of the purported deficiencies identified by CHG and can make a proffer to that effect if necessary.

## CONCLUSION

For the foregoing reasons, CHG's motion to dismiss should be denied.  Alternatively, VGT should be granted leave to amend the Complaint.

October 23, 2017                                 Respectfully submitted,

                                                */s/ Graydon Dean Luthey, Jr.*
                                                Graydon Dean Luthey, Jr., OBA No. 5568
                                                GABLE GOTWALS
                                                1100 ONEOK Plaza
                                                100 West Fifth Street
                                                Tulsa, OK 74103-4217

---

[17] CHG does not make any unique arguments as to why Count VI for misappropriation of confidential business information should be dismissed.  *See* Mot. at 23 n.8.  Nor does CHG identify precedent indicating that confidential business information must be specifically identified, let alone be specifically identified at the pleading stage.

24

Telephone: (918) 595-4821
Facsimile: (918) 595-4990
dluthey@gablelaw.com

Gary M. Rubman
Peter A. Swanson
Michael S. Sawyer
Rebecca B. Dalton
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C.  20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 778-5465
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
   (admitted pro hac vice)

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1221
Facsimile: (212) 841-1010
nroman@cov.com
   (admitted pro hac vice)

***Counsel for Video Gaming Technologies, Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 23, 2017, I filed the foregoing Video Gaming

Technologies, Inc.'s Opposition to Defendants' Opening Brief in Support of Motion to Dismiss

Complaint via ECF, which cause a true and correct copy of the foregoing Opposition to be

delivered to the following:

James C. Hodges, OBA 4254
JAMES C. HODGES, PC
2622 East 21st Street, Suite 4
Tulsa, OK 74114
Telephone: (918) 779-7078
JHodges@HodgesLC.Com

Duane H. Zobrist
Jonathan S. Jacobs
ZOBRIST LAW GROUP PLLC
1900 Arlington Blvd. Suite B
Charlottesville, VA 22903
Telephone: (434) 658-6400
dzobrist@zoblaw.com
jjacobs@zoblaw.com

*Attorneys for Defendants Castle Hill*
*Studios LLC, Castle Hill Holdings LLC,*
*and Ironworks Development LLC*

*/s/ Graydon Dean Luthey, Jr.*