1

1       UNITED STATES DISTRICT COURT FOR THE

2            NORTHERN DISTRICT OF OKLAHOMA

3

4   VIDEO GAMING TECHNOLOGIES, INC.,    )
                                        )
5                 Plaintiff,            )
                                        )
6   vs.                                 ) CASE NO. 17-CV-454-GKF-JFJ
                                        )
7   CASTLE HILL STUDIOS, LLC., et al.,  )
                                        )
8                 Defendants.           )

9

10

11

12

13

14

15          TRANSCRIPT OF RECORDED PROCEEDINGS
                     DECEMBER 6, 2017
16   BEFORE THE HONORABLE JODI F. JAYNE, MAGISTRATE JUDGE PRESIDING

17                     **MOTION HEARING**

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFF:            MR. GARY M. RUBMAN
                                   MR. MICHAEL SAWYER
 3                                 Covington & Burling, LLP
                                   One City Center
 4                                 850 Tenth Street, NW
                                   Washington, D.C. 20001-4956
 5
                                   MR. GRAYDON DEAN LUTHEY, JR.
 6                                 Gable Gotwals
                                   1100 ONEOK Plaza
 7                                 100 W. 5th Street
                                   Tulsa, OK 74103-4217
 8
     FOR THE DEFENDANTS:           MR. JAMES COLLIN HODGES
 9                                 James C. Hodges, PC
                                   2622 E. 21st Street
10                                 Suite 4
                                   Tulsa, OK 74114
11
                                   MR. JONATHAN SPENCER JACOBS
12                                 Zobrist Law Group PLLC
                                   1900 Arlington Blvd.
13                                 Suite B
                                   Charlottesville, VA 22905
14
                                   MR. ROBERT COURTNEY GILL
15                                 Saul Ewing Arnstein
                                   & Lehr LLP
16                                 1919 Pennsylvania Avenue NW
                                   Suite 550
17                                 Washington, D.C. 20006

18                          **********

19

20

21

22

23

24

25
```

```
 1   PROCEEDINGS:

 2   ---------------------------------------------------------------

 3            THE DEPUTY COURT CLERK:  This is case number 17-CV-

 4   454-GKF-JFJ, Video Gaming Technologies, Inc. vs. Castle Hill

 5   Studies -- or Studios -- sorry -- LLC, et al.

 6      Counsel, please enter your appearance for the record.

 7            MR. LUTHEY:  Good morning, Your Honor.

 8            THE COURT:  Good morning.

 9            MR. LUTHEY:  Dean Luthey for the plaintiff, and I have

10   with me as my co-counsel, who have been admitted pro hac vice

11   in this case, Mr. Gary Rubman and Mr. Michael Sawyer of the

12   District of Columbia.

13            THE COURT:  Good morning.  Welcome to Tulsa.

14   Mr. Rubman; is that right?

15            MR. RUBMAN:  It's actually Rubman, but --

16            THE COURT:  Rubman.  Okay.

17            MR. RUBMAN:  -- people say either.

18            THE COURT:  Rubman and Mr. Sawyer.  Okay.

19            MR. HODGES:  James Hodges for the Castle Hill

20   defendants.  With me is Robert Gill of Washington and Jonathan

21   Jacobs of Washington.

22            THE COURT:  Okay.  Which is which?

23            MR. HODGES:  Mr. Gill (INDICATING).

24            THE COURT:  Mr. Gill?  Okay.

25            MR. GILL:  Good morning, Your Honor.
```

1          **THE COURT:**  Good morning.  Mr. Gill and Mr. Jacobs?

2          **MR. JACOBS:**  Yes, Your Honor.  Good morning.

3          **THE COURT:**  Okay.  Okay.  Before we get started, I

4    just wanted to let you all know that I do routinely set these

5    motions to compel or discovery motions for hearing.  I do that

6    just because I like to hear arguments from you and because it

7    helps me get to the motions more quickly.  But if there's ever

8    a time -- I know you travel a long way for what might be a

9    short hearing and you are more than welcome to request to

10   appear by phone.  We do that regularly here.  You can send your

11   local counsel and just make a request to appear by telephone

12   and we'll consider that and pretty routinely grant it,

13   especially on some of these discovery motions.  I'm not saying

14   I'm not glad you're here -- you are welcome -- but I just want

15   to let you know that that's something that we will routinely

16   grant here, so...

17       Okay.  We're here today on plaintiff's motion to compel

18   trade secret discovery and for entry of a protective order

19   which is docket 47.  I want to clarify for you the argument

20   that I really want to hear today and it's kind of limited to

21   two issues.  The first is, for lack of a better term, what I am

22   calling the plaintiff's estoppel argument.  This really isn't a

23   typical motion to compel because it seeks in more of a

24   preemptive manner to preclude defendant from making a

25   particular objection based on a prior representation that was

1  made allegedly to you all and to the court.  So, it's not a

2  perfect analogy but it's somewhat akin to it.  Estoppel

3  argument, based on this representation, they should be estopped

4  from even asserting this objection, and I want to hear argument

5  on that.

6      I also will hear arguments on your motion for a protective

7  order.  I want to know where you are, what you've negotiated,

8  if you've discussed anything further than what's in the

9  motions, and I will hear from you substantively on what your

10  disagreements are on a protective order at this point.

11      What I don't want to hear arguments on are the substance of

12  the merits of any objections made by defendants to the requests

13  for production after the plaintiff filed their motion.  So,

14  whether plaintiff -- or whether plaintiff has adequately

15  defined its trade secret in the complaint to require

16  compliance.  I know that defendant has some briefing on that in

17  their motion and some case law, plaintiff really hasn't had a

18  chance to respond to that, and I just don't think that's what's

19  before us today, so I don't want to hear substantive argument

20  on that particular thing.  We're going to limit it to those two

21  arguments.

22      Does anyone have any questions as to how we're going to

23  proceed?

24          **MR. HODGES:**  No, ma'am.

25          **THE COURT:**  Plaintiff?  No.

1      Okay.  Well, then, with that, I will start with the

2   plaintiff.  You're recognized in support of your motion on

3   those two issues.

4           **MR. RUBMAN:**  Thank you, Your Honor.  May I approach?

5           **THE COURT:**  Yes, please do.

6           **MR. RUBMAN:**  Good morning, Your Honor.

7           **THE COURT:**  Good morning.

8           **MR. RUBMAN:**  Gary Rubman from Covington and Burling.

9   It's a pleasure to be down in Tulsa, so we appreciate the

10  opportunity.

11     We did prepare a couple of slides that I thought would be

12  helpful for understanding the background.  If I may hand them

13  up.  Would that be okay?

14          **THE COURT:**  Yes, sir.

15          **MR. RUBMAN:**  So, focusing on the -- I think what you

16  called the estoppel argument or maybe a waiver argument --

17          **THE COURT:**  Sure.

18          **MR. RUBMAN:**  -- or --

19          **THE COURT:**  You can call it -- you don't have to stick

20  with that phrase.  That's just helping me in my mind to keep it

21  straight, but you can --

22          **MR. RUBMAN:**  Sure.

23          **THE COURT:**  -- call it anything you would like.

24          **MR. RUBMAN:**  It is a little bit of a unique posture we

25  have here, and we recognize that, but we think the background

Video Gaming v Castle Hill (12-06-2017 Motion Hearing)                    7

1    and what led to this appearance today is a bit unusual and so

2    that's why we thought it would be helpful to, in a couple of

3    slides, go through the history and explain kind of why we feel

4    like the motion should be granted.

5        The basics here is there was going to be a scheduling

6    conference on the 30th of October.  That was right before they

7    switched -- or right after they switched counsel.  We got a

8    call and they said, "We really want to cancel that

9    conference."  To do that, we reached a deal.  In our view,

10   they've reneged on that deal and I think the slides will help

11   explain that.

12       The first slide, slide 2, is really to show kind of where

13   we started and where we are now.  On the left -- this is what

14   was said in the joint status report.  This was the only issue

15   in dispute when that status report was filed.  It was the only

16   issue that was going to be argued on October 30th.  And there,

17   you'll see that they say, "The court should delay any discovery

18   plaintiff obtains from defendants relating to the

19   misappropriation of trade secrets until plaintiff has described

20   with reasonable particularity the trade secrets and

21   confidential information."  That was their objection.  That was

22   the dispute.

23       Now, fast forward to where we are today and their

24   opposition to the motion to compel.  They're raising the same

25   argument.  "VGT must specify with particularity the trade

1    secrets at issue in its complaint before Castle Hill produces

2    its highly confidential business information."  That's really

3    where we are.

4        The next slide -- and I won't go through all of these, but

5    even in their opposition brief there's some inconsistencies.

6    These are all quotes from the opposition brief they filed a

7    couple weeks ago.  Page 5, they say, "We're not sequencing,

8    we're not doing what we said before that we were waiving."  It

9    says, "But Castle Hill has not asked the court to sequence or

10   otherwise stay discovery regarding the trade secret claims."

11       On the right, and I won't read them to you, there's three

12   examples of quotes in that same brief later on where they

13   actually pretty clearly say we are sequencing.  They use the

14   word "before," they use the word "prior to," and again I won't

15   read the quotes to you but the cites are there.

16       So, with that as the basic background, the next few slides

17   are really kind of, again, a little more of a step-by-step way

18   of how we got to where we are, and we thought it was helpful to

19   actually show the language from the joint status report on

20   slide 4.

21       Our position, "Defendants therefore should not be permitted

22   to delay responding to plaintiff's pending discovery requests."

23   Their position, which as I read, was that we first need to

24   describe it with reasonable particularity, which, again, we

25   have differing views on whether we have, and I understand the

1  court's request that we not discuss that today.

2     And then we have the new counsel arrive, and here's the

3  e-mail exchange.  Again, this was included as exhibit A --

4          **THE COURT:**  Yes.

5          **MR. RUBMAN:**  -- but -- and we've modified it slightly

6  just so it fits on the slide, so there's an ellipses here, so I

7  don't want to -- I mean, there are other things in this e-mail

8  exchange but --

9          **THE COURT:**  I've reviewed the whole e-mail exchange,

10 so --

11         **MR. RUBMAN:**  Okay.

12         **THE COURT:**  -- that's fine.  No, I want you to go

13 through this the way you want to, but I just want you to know

14 don't worry about ellipses, I've seen the whole thing, --

15         **MR. RUBMAN:**  Okay.  Thank you.

16         **THE COURT:**  And e-mail chains can be hard to read, so

17 --

18         **MR. RUBMAN:**  Yes, --

19         **THE COURT:**  -- I appreciate that.

20         **MR. RUBMAN:**  -- we're trying to simplify it and we're

21 doing our best, but again, the essence of the deal is here, is

22 that they will immediately drop the timing base or the

23 sequencing objection on trade secret.

24     We also, point number 2, which is omitted from the slide,

25 is they'll negotiate in good faith the protective order and ESI

1   agreement by I think it was the 8th was the day we put in

2   there.  Those were two of the things we said, "If you do that,

3   we get the fact you just switched counsel."  Mr. Gill had a

4   trial coming up the next week.  You know, we didn't want to --

5   we wanted to be reasonable, but that was the deal we struck and

6   that was the deal we relied upon in canceling that scheduling

7   conference.  But for that deal, this issue would have been

8   argued on October 30th.

9        **THE COURT:**  Let me ask you on that point.  So, do you

10  believe that Judge Frizzell, in his scheduling conference, was

11  going to address the substantive question that's now, you know,

12  kind of trickling in front of me on these issues, or do you

13  think he was just going to decide we're either going to stay

14  discovery pending the motion to dismiss or we're not?

15       **MR. RUBMAN:**  Well, that issue wasn't raised in this

16  joint status report.  They never said they're seeking a stay of

17  discovery while the motion is dismissed or pending.  All they

18  said was this one issue, this was one disputed issue in there,

19  and it was this.  So, obviously I don't know what he was

20  thinking.  Perhaps he was --

21       **THE COURT:**  Sure, sure.

22       **MR. RUBMAN:**  -- going to view it as a motion to stay.

23  But they've never filed that motion and, in any event, they

24  bear a very heavy burden on that motion.  The case law in

25  Oklahoma is pretty clear that staying discovery pending a

1   motion to dismiss is unusual and they have to have a compelling

2   need, and they haven't raised those arguments, they haven't

3   argued burden, they haven't argued any of the arguments you

4   typically would raise in such a motion.  So, it's possible that

5   would have been the way he handled it but, you know, all we

6   know is there was one disputed issue and this was it.

7          **THE COURT:**  Let's talk for a minute about the consent

8   motion to strike scheduling conference since we're on that and

9   the language that was used.  And I guess defendants drafted

10  this; is that right?

11         **MR. RUBMAN:**  So, this is slide 6 --

12         **THE COURT:**  Okay.

13         **MR. RUBMAN:**  Yes, --

14         **THE COURT:**  Need to skip ahead?

15         **MR. RUBMAN:**   -- we're on the same page, but -- so

16  then they said, "Okay, fine, we want to file this consent

17  motion."  All we said, and there's an e-mail in the exchange,

18  is, "Just make it clear that you're dropping the objection

19  that's in the joint status report."  I forget the exact

20  language we used.  And then they wrote, and this is paragraph

21  5, again shown on slide 6, "The parties requested a scheduling

22  conference to address defendants' request that discovery be

23  sequenced as to plaintiff's trade secret claim.  Defendants

24  have agreed to withdraw the request."

25         **THE COURT:**  And you're saying, to you, and based on

1   these e-mails, that to you that meant, "Not only are we

2   withdrawing our request for things to be sequenced, we're going

3   to immediately produce them without this particular objection

4   that we've been talking about?"  That's what you believed that

5   agreement was?

6          **MR. RUBMAN:**  And we tried to confirm that in a

7   subsequent exchange.

8          **THE COURT:**  Yes.

9          **MR. RUBMAN:**  If you've seen the exchanges, I won't

10  belabor the point.  But, yes, we were clear on the phone with

11  them.  There was a pretty clear, in our minds, understanding of

12  that.  That's what we cared about and that's really a basis on

13  which we agreed to cancel that conference.

14         **THE COURT:**  Okay.  You can go back to slide 4.  Thank

15  you.

16         **MR. RUBMAN:**  No, it's fine.  I think we should move

17  on.

18         **THE COURT:**  Okay.

19         **MR. RUBMAN:**  Things then progressed.  I won't belabor

20  the points on the others, but I do want to then go to slide 9.

21      So, they then -- and before we get to slide 9, actually,

22  they then refused to meet and confer.  Time and time again we

23  asked for opportunities and they either would say, "Okay, we're

24  available the following days," and so we said, "Okay," and then

25  they were not available.  Or they proposed a deal, "Well, how

1    about both sides exchange this on November 22nd," and we said,

2    "Okay," and then they backtracked from that.

3         So I think, you know, when you go through this chain of

4    e-mails, I think it's pretty clear what both sides were focused

5    on.  They even offered us the deal to exchange both on November

6    22nd and we accepted it.  So, you know, at least that's our

7    understanding of this.

8         So then things went forward.  They refused to meet and

9    confer.  We tried, we offered to go to their office, which

10   they're a few blocks down from us, and we never got a response.

11   We filed a motion.  They then ultimately filed their

12   opposition.  But in the interim, the parties did serve

13   discovery requests on November 22nd.  We served pretty

14   extensive requests subject to there not being a protective

15   order in place, so we avoided confidential information.  But,

16   you know, 50-page responses I think we gave them.  We produced

17   I think a little under 2,000 pages of documents in several

18   categories.  They also served responses, which included mostly

19   objections.  They objected to virtually everything.  But they

20   did serve a couple responses.  And there's one I want to

21   highlight in particular which I think is interesting for this

22   case to kind of show what's going on.

23        In interrogatory number 13, we said, "Describe all

24   information, documents, and things in your possession, custody

25   or control, that any former VGT employee brought from VGT to

Video Gaming v Castle Hill (12-06-2017 Motion Hearing)                14

1   Castle Hill, were created by or at VGT or are the property of

2   VGT."  So, we're basically saying, "Tell us what stuff you have

3   that's ours."

4       Their response, in part, "None of the former VGT employees

5   were asked to bring documents with them.  And Castle Hill's

6   practice was and is to tell former VGT employees that they're

7   prohibited from bringing into Castle Hill any documents

8   belonging to plaintiff."  They didn't say, "We didn't take

9   anything with us."  What they said is that none of these

10  employees were asked to bring it with them.  So they're very

11  selectively, and in our mind, doing in a very kind of

12  questionable way answering some discovery but not others.

13          THE COURT:  And that can be the subject of a separate

14  motion to compel.  I don't feel like that's what we're here

15  today on.

16          MR. RUBMAN:  Sure, but --

17          THE COURT:  Do you agree with that?

18          MR. RUBMAN:  -- then when you look at, on slide 9,

19  we've put in examples here of just -- it goes to their point

20  about this being premature.  And I don't know if you want to

21  hear anything on that or not, but they basically say, "Well, we

22  filed too soon.  How do we know what their objections were

23  going to be?  How do we know what they were going to stand

24  on?"  Well, then, in fact, they filed their responses and they

25  stood on this.

Video Gaming v Castle Hill (12-06-2017 Motion Hearing)                    15

1          **THE COURT:**  I understand, but I don't have those in

2     front of me.  I haven't had a chance to read those or review

3     those or hear arguments on.  You know, I'm not overly concerned

4     about meeting and conferring.  I do think that's an important

5     requirement before you file this motion.  What I'm most

6     concerned about is the fact that I haven't had time to really

7     look at -- digest the request and the objections.

8          **MR. RUBMAN:**  Okay.  Sure.

9          **THE COURT:**  I mean, is this what I have in front of

10    me, page 9 of your slides, or am I mistaken in that the

11    objections are a part of the record?

12         **MR. RUBMAN:**  They are not.

13         **THE COURT:**  Okay.

14         **MR. RUBMAN:**  When Castle Hill filed its opposition, it

15    didn't include them.  We obviously didn't have a reply brief.

16         **THE COURT:**  Right.

17         **MR. RUBMAN:**  This was in here in case you were

18    concerned about the argument about being premature.

19         **THE COURT:**  Understood.

20         **MR. RUBMAN:**  Just to show that they did, in fact, then

21    rely on it.  And we can move on if that's not a concern today.

22         But having walked through the background there, I mean, I

23    think our story, our argument should be fairly clear, is that

24    in our mind we had a deal.  We think the communications and the

25    correspondence both with us over the phone and by e-mail, as

1   well as with the court, confirm that and we think that they're

2   reneging on that deal and that's really why we're here.

3          **THE COURT:**  Tell me what prejudice you think you've

4   suffered as a result of that at this point.

5          **MR. RUBMAN:**  Well, we want this case to get moving.

6   We think there's a lot of smoke, we think there's a lot of fire

7   here.  In our mind, they are literally copying our games.  We

8   won't go into detail there.  They're some of our most senior

9   former employees.  There's a lot of reason to believe very

10  strongly that they're using our trade secrets.  We want this

11  discovery, we want to proceed quickly, and we've been trying to

12  proceed quickly.  We want to get to injunctive relief.  Once we

13  get that discovery, we think we'll be in a position, depending

14  on what the discovery shows, we think it's going to confirm

15  everything we're saying and we want to file a preliminary

16  injunction and we've told them that and that's why we want this

17  case to move.  We want to get into discovery.

18         **THE COURT:**  The fact that you don't have a scheduling

19  order in place makes it less important that we move quickly, to

20  me.  I understand that he didn't -- Judge Frizzell did not stay

21  discovery, --

22         **MR. RUBMAN:**  Uh-huh.

23         **THE COURT:**  -- obviously, and you guys are proceeding

24  with discovery.  But the fact that he entered an order that

25  says, "I'm going to wait to enter a scheduling order until I

1  rule on the motion to dismiss," does not help your case.

2         **MR. RUBMAN:**  Well, it is effectively then doing a

3  unilateral motion to stay discovery is what they've done here.

4  They've selectively decided which discovery to stay and which

5  discovery to proceed with.

6         **THE COURT:**  And you can seek to compel that.  I mean,

7  like I said, I don't view Judge Frizzell's order as precluding

8  you from going forward with discovery, but the fact that he

9  doesn't have a scheduling order in place and we're not dealing

10 with deadlines like we normally are certainly doesn't -- it

11 just seems like there's less prejudice and there's more time to

12 go through the normal processes that we would normally go

13 through --

14        **MR. RUBMAN:**  Right.

15        **THE COURT:**  -- on a motion to compel.

16        **MR. RUBMAN:**  Well, the aspect of prejudice is they are

17 continuing to launch games, they're continuing to cause harm to

18 our client, they're continuing to compete out in the

19 marketplace throughout Oklahoma and elsewhere.  The sooner we

20 can move, the more we can minimize that harm.  So we do want to

21 proceed, we want to move, and that's why -- so this motion to

22 compel is really focused on just the very specific categories

23 of information that were part of that deal.  We didn't try to

24 ask them for everything then.  And to be clear, we were focused

25 on what's called the regulatory submissions and testing lab

 1  submissions.  These are the documents they submit to get their

 2  games approved, including their source code and their

 3  underlying math.  These are materials that they're required to

 4  maintain and submit to the regulatory bodies but also then

 5  maintain.  So there should be very little burden and this will

 6  go to the core of the allegations in this case, at least this

 7  part of the case; there's the separate trademark and trade

 8  dress stuff, but...  So that's what we were really focused on

 9  here and that's really --

10        **THE COURT:**  And that's your request for productions 1,

11  6, and 7, that's the focus of --

12        **MR. RUBMAN:**  Yeah.

13        **THE COURT:**  -- that; correct?

14        **MR. RUBMAN:**  Yeah.  And so if we could have an

15  order -- and we're happy to produce the same, we've told them

16  that.  That's what this is about.  We're not here asking you

17  for the relief on all of the other issues.  We recognize that's

18  outside this motion.  But what this motion really in our mind

19  is about is about that deal, and that deal was clear in that

20  e-mail that the regulatory submissions, the testing lab

21  submissions, those include the math, the source code, and

22  that's really what we're getting at.  We're not asking for any

23  other relief at this time.

24        **THE COURT:**  I understand.

25        **MR. RUBMAN:**  On the issue of the protective order, my

 1  colleague, Mike Sawyer, was going to handle that.  I don't know

 2  if you want to do these all together or separate.

 3         **THE COURT:**  Yes, I'd like to stay with the plaintiff

 4  and hear on the protective order.

 5         **MR. RUBMAN:**  Okay.  May I have Mr. Sawyer address

 6  that?

 7         **THE COURT:**  Yes.

 8         **MR. SAWYER:**  Good morning, Your Honor.

 9         **THE COURT:**  Good morning.

10         **MR. SAWYER:**  So, on the protective order we've been

11  trying to negotiate it for about 10 weeks now.  Because this is

12  a trade secret case and we knew we'd need to have a protective

13  order in place so discovery could proceed.  Before the Rule

14  26(f) conference, we sent Castle Hill a proposed protective

15  order.  That was about 10 weeks ago.  And there's been about a

16  dozen e-mails on this.  We've only had one meet-and-confer with

17  Mr. Jacobs.  During that meet-and-confer, which happened back

18  in October, the parties seemed pretty close to an agreement on

19  the terms of a proposed protective order except for on one

20  sticking issue with regard to how many non-lawyer

21  representatives would be able to see confidential information.

22  But since that one meet-and-confer, we have not been able to

23  get any meet-and-confer with the current counsel, Mr. Gill's

24  firm, and, as a result, we can't proceed to provide the trade

25  secret information they're asking for.

1    They agreed to make best efforts to meet and confer and

2  enter a protective order by November 8th and they made that

3  agreement in advance of the scheduling conference so that --

4  that was part of the deal to cancel the scheduling conference.

5  After the scheduling conference was canceled, they have not

6  provided a single substantive comment on the protective order.

7  They have been unwilling to meet and confer.  We had two

8  separate occasions in which they said they were available to

9  meet and confer.  We told them, "So are we.  Let's go ahead and

10  come to our offices or we'll go to yours," and they just

11  wouldn't follow through on that.

12    So, in terms of where the parties are actually apart on the

13  protective order, there's actually kind of an ironic aspect in

14  that some of the criticisms of the proposed protective order in

15  the opposition brief are to revisions to the court's default

16  protective order that were originally proposed by Castle Hill.

17  So, I can get through those as we go through the specifics.

18    But there's basically three revisions to the court's

19  default protective order that we've proposed.  Two of them seem

20  to be not objectionable to Castle Hill.  The first is the

21  source code provision.  We've added that in just so that there

22  are technical protections so the source code can't be stolen if

23  it's on a network machine.  And it doesn't appear Castle Hill

24  objects to that.

25    The second major change is we proposed a change to the

1  procedure for handling sealed filings so that we can lodge a
2  sealed filing with the court in the event a motion to seal
3  hasn't yet been granted, and that's just out of the concern of
4  what to happen if a motion to seal would be opposed, how we'd
5  actually provide the sealed filing by the deadline.  Again,
6  Castle Hill doesn't appear to be concerned with that.
7      The last change is who can see the designated information.
8  And here Castle Hill appears to want to have more employees
9  have access to the confidential and highly confidential
10  information than VGT does.  And while we recognize the court's
11  default protective order has terms in there, even Castle Hill
12  proposed changing some of those terms, and I think the reality
13  here is these are parties who are competitors; this is not a
14  traditional case in that when you have, you know, competitors
15  in the marketplace, we have Castle Hill machines right next to
16  VGT machines on the casino floor, they're both competing to
17  sell these machines to casinos and, as a result, when they're
18  requesting very sensitive business information like our future
19  business plans, our financial information, the cost of our
20  games, our source code, our pay tables, things like that,
21  that's the type of thing we really want to be sure is protected
22  and can't be accessed by employees who are then going to --
23  whether through bad intentions or even their own inadvertent
24  intentions, once they know it, they can't unlearn it.  And
25  that's where the case law in this area recognizes that if an

```
 1   employee gets access to confidential information of a

 2   competitor, they won't be able to not use it throughout the

 3   course of their regular employment when they're making their

 4   own competitive decisions about how Castle Hill should go about

 5   running its business.

 6       So, with respect to the specific terms that appear to be of

 7   concern to Castle Hill, we have -- for the highly confidential

 8   information, there appear to be three complaints in their

 9   opposition brief.  The first is that we've proposed that

10   outside counsel be of record in the litigation.  That's simply

11   so that the court has disciplinary authority and jurisdiction

12   over the outside --

13              THE COURT:  Let me stop you for a second.  Which

14   provision are you talking about now on your proposed protective

15   order?

16              MR. SAWYER:  Certainly, Your Honor.  Let me just grab

17   it.

18              THE COURT:  And I'm looking at the document that's

19   attached as exhibit E to your motion.

20              MR. SAWYER:  Great.  So this would be what Castle

21   Hill's concern here is, it's on page 11, paragraph b.i.

22              THE COURT:  Okay.

23              MR. SAWYER:  Now, the court's default just provides

24   for outside counsel to receive access.  The only change we made

25   there was that the outside counsel be of record so that we know
```

1  who's seeing our confidential information and they will have

2  entered an appearance and therefore be subject to the

3  jurisdiction of the court.  We don't think that's causing any

4  prejudice to Castle Hill.  All they have to do is have outside

5  counsel enter an appearance.

6      The second complaint that's in Castle Hill's opposition

7  about the highly confidential information is that our proposed

8  protective order eliminates access by in-house counsel.  It's a

9  little hard to understand why that's objectionable given that

10 they don't have in-house counsel, but that was part of an

11 agreement that was reached in exchange for, you know, --

12 basically what happened was when they first sent us their

13 proposal, they proposed eliminating the ability of company

14 representatives for VGT getting access to Castle Hill's

15 confidential infor- -- highly confidential information.  And in

16 exchange for that proposal, we said, "Well, look, if you don't

17 want our employees to be able to see the highly confidential

18 information, your employees shouldn't be able to see that

19 either," and ultimately Mr. Jacobs and I had a phone call and

20 we basically reached agreement that also we take away the

21 ability for in-house counsel to access it, so even VGT, which

22 has in-house counsel, wouldn't be able to see it either.

23 That's a fairly standard provision, that there be some level of

24 designation, that is, outside counsel eyes only.  So, that's

25 for the highly confidential information.

1    If I can turn to the confidential information.  So, again

2  they appear to have three complaints in the opposition brief.

3  One is that it, again, would limit access for in-house counsel

4  to only three attorneys.

5          **THE COURT:**  Uh-huh.

6          **MR. SAWYER:**  The same basic issue, it's hard to see

7  how that causes prejudice.  If they want more in-house counsel

8  to have access to the confidential material, I don't think

9  that's a huge sticking point for us, but we proposed three so

10  that it wouldn't be everyone on VGT's legal team out of concern

11  for them.

12    And then the second complaint is that our proposal would

13  eliminate access by parties entirely.  That's not what our

14  proposal does.  Our proposal has one party representative is

15  able to see the confidential information.  And they suggest

16  that that's too low, they want it to be five, and we understand

17  that is the court's default; however, these are competitors,

18  and in situations where competitors are seeking access to each

19  other's trade secrets, it's important that there not be

20  widespread access.

21    And consistent -- we've seen examples of a trade secret

22  case before Judge Frizzell where it was just two company

23  representatives.  We have other examples where, in a patent

24  case in this court's district in Colorado, it was just one

25  company representative for confidential information.

Video Gaming v Castle Hill (12-06-2017 Motion Hearing)          25

1      But the really important aspect for us is we've asked

2  Castle Hill, "Tell us why you need five.  Are there five people

3  overseeing the litigation?"  And they haven't provided any

4  reason why they need five.  They just have said, "We want

5  five."

6      So, the concern here is that if these people get access to

7  it, we know they're not going to be lawyers, they're not going

8  to be subject to having -- the risk of having their bar license

9  taken away if they violate the protective order, and we -- even

10 if they're well intentioned, there's a risk that once they

11 learn the information that's designated as confidential, they

12 could then go ahead and use it, even if they're not trying to,

13 once they know this is Castle Hill's price -- or VGT's price

14 with this vendor, if they're buying from the same vendor,

15 they're going to have that benefit of that knowledge and they

16 won't be able to compartmentalize it in their mind.  So, for

17 that reason, we'd suggest limiting it consistent with the

18 examples for protective orders between two competing companies.

19     And, with that, I'll just note, one argument they make in

20 the opposition brief is that we -- well, let me say it this

21 way.  They don't contest that we'd be harmed if their employees

22 were to have access to this information.  All they say is that

23 the harm may have already occurred so we shouldn't care about

24 it.  And it's kind of a funny argument to make because they

25 haven't admitted yet that their employees have accessed the

1   information.  They also haven't denied it.  But we should not

2   give, you know, unfettered access to our confidential

3   information, especially given that they're discovery requests,

4   they're not limited to the materials that VGT had when Castle

5   Hill employees were there.  It includes materials that continue

6   to be created.

7      So, with that, Your Honor, unless there are any questions,

8   I'll --

9            **THE COURT:**  No.  Thank you.

10           **MR. SAWYER:**  Thanks.

11           **THE COURT:**  Mr. Gill?

12           **MR. GILL:**  Good morning, Your Honor.

13           **THE COURT:**  Good morning.

14           **MR. GILL:**  I think it's important to point out, too,

15   the contextual background for what was going on.  This case

16   obviously had been filed and predecessor counsel had filed a

17   motion to dismiss and we were in the process of taking this

18   case over literally days before I was ready to begin this jury

19   trial in Virginia that began on Monday the 30th, which was the

20   same date that the conference was scheduled in this court.  And

21   I had a phone call with counsel where we talked about that,

22   among other things, the fact that I had a trial coming up on

23   that Monday.  And what I had understood, the previously-made

24   objection made by counsel to be, that basically we don't think

25   we should be engaging in trade secret discovery until such time

Video Gaming v Castle Hill (12-06-2017 Motion Hearing)                    27

 1    as the court rules on the motion to dismiss.  That's what I was

 2    thinking, and I said that in the phone call with counsel from

 3    Covington on that Friday before the Monday hearing where we

 4    were trying to figure out the parameters of what the agreement

 5    was, which was a little mushy in the phone call.  But I

 6    remember laughing and saying to them, "Well, I'm not going to

 7    take the position that you have to wait and get a ruling on the

 8    motion to dismiss before you engage in trade secrets

 9    discovery," and I clearly intended to comply with that, that

10    representation.

11        What we did not discuss, and what I did not intend to waive

12    or relinquish or give up is substantive objections that we may

13    have to individual discovery requests.  So, I had thought that

14    what predecessor counsel was going to do was to ask the court

15    at the scheduling conference for a formal stay of discovery so

16    trade secret discovery could not proceed at all until such time

17    as the motion was resolved.

18        And to be candid, and I mean this with no disrespect to my

19    predecessor, because I thought the motion they prepared was

20    well done, well written, but at the same time I didn't feel

21    comfortable taking the same position.  I thought I was being

22    more reasonable by saying I'm not going to take that position,

23    but at the same time I never agreed to roll over and give

24    complete access to my client's highly confidential information

25    without objection.  I never intended to do that.

1      And I'm also in the process of taking over the case,

2  learning about the case procedurally, learning about the case

3  factually.  There was a lot I didn't know about the case at

4  that point.  There's a lot I still don't know about the case.

5  But with regard to the issue of documents, we did serve

6  objections and responses on the 22nd as was agreed.  We did not

7  produce documents on the 22nd, any documents.  And I will tell

8  the court I couldn't produce documents on the 22nd.

9      Predecessor counsel used an outside firm to process

10  electronic data.  We did not want to use the same outside firm.

11  We wanted to bring that data in-house.  We have our own review

12  platform that we use with, you know, software review the

13  documentation.  And to be candid, we had difficulty dealing

14  with the outside vendor and getting the data.  We didn't have

15  the data by the 22nd.  I sure couldn't review and process and

16  produce anything by the 22nd.

17      So, there's a suggestion here, subtle though it may be,

18  that there was foot dragging on the part of the defendants who

19  were not interested in doing what was supposed to be done when

20  actually what I was trying to do was I was trying to be careful

21  and I was trying to tell them at the same time in good faith

22  what my position was going to be.  So, I never said to them

23  that, "Look, we're going to give up these substantive

24  objections to the trade secret request."

25      And I was actually very glad to hear Mr. Sawyer raise the

1    issue in the context of the protective order discussion about

2    trade secret law and how trade secret law doesn't prohibit the

3    use of information what a former employee has in their head

4    because to me, as I come into this case, and I have tried a few

5    trade secrets cases, that is the elephant in the room in this

6    case, and there's a lot of recent press on that.  There is a

7    trade secrets case that the court may be aware is raging right

8    now in the Northern District of California before William Alsup

9    and that was brought by Waymo against Uber Technologies and

10   there's frequent commentary in the legal press on that case.

11        The reason that it's relevant to this is that case was

12   going to trial this week and it was continued the last minute

13   for discovery issues.  But in connection with a hearing on jury

14   instructions in that case, Judge Alsup blasted the parties for

15   not submitting an instruction to deal with what he termed the

16   lobotomy issue, quote/unquote.  I wouldn't use the same term

17   but he's the judge, he can use whatever term he wishes.  And

18   that was exactly the issue that Mr. Sawyer just mentioned to

19   Your Honor, and, that is, a trade secret law does not reach

20   information that's in the heads of the former employees.  You

21   can try to reach that with a noncompete agreement, and this

22   plaintiff did restrict information and competition with

23   noncompete agreements, but that was long ago.  So this

24   plaintiff had actually been a Virginia entity and they had left

25   Virginia and moved to Tennessee and they left a lot of talent

1    behind.  So, this wasn't a situation where people left the

2    plaintiff's employ, went to a competitor and took, you know,

3    computers or thumb drives full of information, because to my

4    knowledge, based on what I know now, standing before you today,

5    I have no knowledge that any of my people took anything from

6    the plaintiff.

7        When I gave the discovery responses, I couldn't say that I

8    had reviewed the documents and couldn't find anything because I

9    couldn't review the documents.  But based on what I know today,

10   I have no knowledge that any of these defendants have taken any

11   information from the plaintiff in this case at all.

12       And so, to me, what the Honorable William Alsup referred to

13   as the lobotomy issue is going to be a big issue for us in this

14   case.  And for me, that's an issue that really makes the issue

15   that we briefed in our opposition brief about needing to

16   specify what the trade secrets are so we could respond

17   particularly critical for us.  It's relevant to the motions

18   before the court today, it's relevant with regard to discovery

19   objections and responses going forward, and it's relevant to

20   the protective order as well, I think.

21       So, there's a lot of issues that are wrapped up together.

22   I am going to try to do this as much as I can in a linear way

23   and respond to counsel's arguments as they raise them with the

24   court.

25       With respect to Your Honor's question to counsel about time

1   and prejudice, I think the answer to the question is pretty

2   clear: there is no prejudice, this case is early on, there is

3   no scheduling order.

4       I also want to tell the court that the plaintiff sent a

5   cease and desist letter to the Castle Hill defendants a year

6   before the litigation was filed, didn't file the litigation for

7   a year, so the notion that the plaintiff is going to come into

8   court and show irreparable harm based on the passage of time, I

9   think, is belied by the time line in the record in this case.

10  So, there is no prejudice.  If they thought there was

11  prejudice, they would have filed suit sooner and they would

12  have requested some sort of injunctive relief.

13      But I think it is clear, we are entitled I think under the

14  cases that we have cited to Your Honor, we are entitled to know

15  really more of the substance of what their claims are because,

16  you know, I looked at the complaint and the allegations in the

17  complaint are very much like the case that we cited in our

18  brief, this *DeRubeis* case, which is from the Northern District

19  of Georgia.  And, you know, in paragraph 41 they say that it

20  relates to the math underlying the games and the specifics of

21  the manner in which the bingo game is played including the

22  so-called ball drop, and the source code used to operate the

23  games.  But there's no specificity at all.

24      And the reason we need the additional information is, first

25  of all -- and I put this in my e-mail to counsel, I wasn't

1   hiding the ball, my e-mail was that part of the record in this

2   case says, "Your allegations are vague and conclusory."  I need

3   to know what the basis is for your claims so I can determine

4   the scope and relevancy of discovery because, without that, I

5   can't tell.  It can't be everything I've got.  I can't do that.

6   I owe it to my client to resist that issue and that's what I'm

7   trying to do, but I'm telling the court I'm trying to do it in

8   a way that I think is reasoned.  I'm not asking that trade

9   secret discovery be stayed until ruling on the motion to

10  dismiss.  I understand that could take many months.  I'm not

11  asking for that.  But I do have a right, I think, to know what

12  the plaintiff has in connection with these allegations before I

13  respond and provide my client's confidential information,

14  particularly with the --

15          **THE COURT:**  Mr. Gill, let me stop you.  And like I

16  said, I'm not going to decide that issue --

17          **MR. GILL:**  Yes, ma'am.

18          **THE COURT:**  -- on this motion.

19          **MR. GILL:**  All right.

20          **THE COURT:**  I'm going to decide whether you're going

21  to get to make that objection or not.

22          **MR. GILL:**  I understand.

23          **THE COURT:**  And so --

24          **MR. GILL:**  I understand.

25          **THE COURT:**  -- there's no reason to go too far --

1           **MR. GILL:**  I understand.

2           **THE COURT:**  -- into that.

3           **MR. GILL:**  I understand.

4       But, in any event, there was no discussion among counsel,

5   when he was talking about continuing that hearing, there was no

6   discussion about waiver of any objections.  None.  No

7   discussion.

8       So, in any event, it was our intention at the time that we

9   would deal with these discovery issues on an ongoing basis as

10  they arise in the normal course, as they typically do, meaning

11  the party serves a request, the other party serves an objection

12  and response, and if you don't like the objection and response,

13  then you challenge them in the motion.  That's what we

14  anticipated by that.  That's exactly what we anticipated by

15  that.

16      Now, with regard to the issues relating to the protective

17  order, counsel is correct on several issues.  I don't object to

18  the language they propose with regard to the source code.  To

19  the extent source code is produced, I think the language that

20  has been proposed in the protective order is acceptable for

21  that.

22      So Mr. Sawyer represented to Your Honor that I didn't

23  object, and he's right, --

24           **THE COURT:**  Okay.

25           **MR. GILL:**  -- I don't.

1    **THE COURT:**   Thank you.

2    **MR. GILL:**   All right.   Mr. Sawyer represented to Your

3    Honor that he didn't think I objected to their proposed

4    language about the sealed filings, and I agree with him on that

5    too.

6      I think that if we're going to have a protective order that

7    provides for documents that need to be filed under seal, the

8    order should give us carte blanche to be able to file those

9    documents under seal in accordance with the terms of that order

10   without having to do a filing every time.   I think that's

11   usually the way I've seen it done.   I've never had a court say

12   that we've got to do seriatim filings in order to be able to do

13   that, and I think this provides a framework for that and I

14   don't -- I don't object to that.

15   **THE COURT:**   I will just tell you, both of you, this

16   goes to both of you, and I'm more than willing to consider it

17   if you jointly agree to that, but I have been -- I have never

18   seen that type of limitation on motions to seal.   This court

19   routinely requires them, even in cases with a whole lot of

20   confidential information and a whole lot of trade secrets, --

21   **MR. GILL:**   Right.

22   **THE COURT:**   -- every time there's a sealing, there's a

23   motion to seal that happens before it.   So that is our normal

24   practice.   Like I said, --

25   **MR. GILL:**   Right.

Video Gaming v Castle Hill (12-06-2017 Motion Hearing)                    35

1          **THE COURT:**  -- I'll consider it, especially if you

2   agree to it, but I'm skeptical --

3          **MR. GILL:**  Right.

4          **THE COURT:**  -- of that.  I haven't seen it.  I was

5   involved -- we have a multi-district litigation going on right

6   now, and every time there's a motion to seal, granting, --

7          **MR. GILL:**  Right.

8          **THE COURT:**  -- and then it's sealed.

9          **MR. GILL:**  Right.

10         **THE COURT:**  So, I'm --

11         **MR. GILL:**  Right.

12         **THE COURT:**  -- happy to hear that.  I'm just letting

13  you know --

14         **MR. GILL:**  Right.  Well, --

15         **THE COURT:**  -- that's something that I'll have to

16  really consider.

17         **MR. GILL:**  I understand.  And just like the plaintiff

18  is the master of its complaint, you're the master of your

19  docket.  If you want all those filings on your docket, we'll

20  obviously comply --

21         **THE COURT:**  Sure.

22         **MR. GILL:**  -- with your requirements.  But I do want

23  to say I think the methodology that the plaintiff has proposed

24  on that particular issue is reasonable, and I think if the

25  order contemplates the fact that we're going to have this

1    confidential information that should not be made publicly

2    available, then the order should provide us with a mechanism to

3    go ahead and submit that information under seal.  I think it is

4    a less costly, less burdensome procedure for all involved --

5           **THE COURT:**  Yeah.

6           **MR. GILL:**  -- but obviously, you know, we'll abide by

7    whatever Your Honor wishes.

8           **THE COURT:**  And that provision is designed to prevent

9    oversealing, and --

10          **MR. GILL:**  Right.

11          **THE COURT:**  -- parties getting lazy --

12          **MR. GILL:**  Right.

13          **THE COURT:**  -- not just saying, "I'll seal it," file

14   it under seal, and courts -- this is really to protect the

15   court's interest in public access to documents --

16          **MR. GILL:**  Oh, I understand.

17          **THE COURT:**  -- so that we can look at a motion and

18   say, --

19          **MR. GILL:**  Right.

20          **THE COURT:**  -- "Don't know if that really needs sealed

21   or not."

22          **MR. GILL:**  Right.

23          **THE COURT:**  So, that's the principle the provision is

24   trying to vindicate.

25          **MR. GILL:**  Well, and if it weren't for the trade

1  secret aspects of this case, I think that would be fine, but I

2  think these cases are unique for a number of reasons and I

3  think that's one.  I think we know, going into this, that

4  there's going to be a lot of data that's going to be designated

5  under that order and there's going to be a lot of those

6  motions.

7        **THE COURT:**  Sure.

8        **MR. GILL:**  So, I think you may be tired of seeing them

9  on your docket after a while.  So, -- in any event, but like I

10  said, I do agree with that and --

11        **THE COURT:**  Okay.

12        **MR. GILL:**  -- but obviously we'll abide by whatever

13  Your Honor says on that.

14     With regard to the content of the order, I do have some

15  objections.  You know, the form order that this district uses

16  does not prohibit client access to just plain confidential

17  information, and the red-line document that I got struck

18  through the language that provided for party access, which was

19  the basis for my comment in my brief.

20     Counsel is correct that there was other language in that,

21  and I address this my brief also, that talked about having a

22  representative have access to that.

23     But, you know, here's a position that I find myself in:

24  I've come into the case that's already pending and I'm trying

25  to get a grip on what's going on factually and procedurally and

1  legally, and I'm drinking out of a fire hose, so to speak, and

2  I'm trying to figure out what I need to do in order to be able

3  to defend the case and communicate meaningfully with the client

4  with whom I have no prior relationship before this case, and I

5  feel like my client has a right to be able to participate

6  meaningful in the defense of this action.

7       And my concern in looking at the order, first of all, in

8  all my years of practice, and you can probably tell by the

9  absence of hair on my head and the gray in my beard, that

10 that's a number that begins with a 3 at this point, I've never

11 seen a protective order that limited client access to just

12 plain confidential information.  I've seen it with respect to

13 highly confidential information but just not plain confidential

14 information, and I think that is an unworkable restriction.

15      I would like to have the opportunity to discuss this with

16 the client, particularly in a trade secret case because, you

17 know, one of the defenses in these types of cases is this is

18 the particular claim that's been made for which trade secret

19 protection is sought, and I need to be able to discuss with the

20 client what that specific claim is.  I would like for the

21 client to be able to see whatever the evidentiary material is

22 that underlies that complaint because the client may be able to

23 say, in response to that, "No, we didn't use this or anything

24 like this.  This is how we did it and I need that in order to

25 be able to defend the claim."  And if I can't have that

1  communication with the client, that significantly hampers my

2  ability to be able to defend the case, and that's my concern.

3  I'm looking at this for a logistical, you know, not trying to

4  be hypertechnical about it.  This is a very basic thing for me.

5  I'm concerned about being able to meaningfully communicate with

6  my client and have the client be able to meaningful assist me

7  in the defense of the case.

8          **THE COURT:**  Why haven't you met and conferred with

9  them about this protective order?  It sounds like there's a

10  whole lot you agree on.

11          **MR. GILL:**  Well, there is, but, you know, to be

12  candid, what happened was, you know, I felt like no good deed

13  was going unpunished with respect to my communications with

14  counsel.  I told them candidly that what my view was on trade

15  secret discovery about how I needed to know more of the

16  substance of their claims to be able to respond, and it was

17  obvious from the request for the meet-and-confer they were

18  trying to game the system and file the motion to compel

19  discovery against me before our responses are even due.  And

20  once it was obvious to me that was what was happening, frankly,

21  I didn't feel there was enough good faith involved to make it

22  worthwhile, and I thought, "You want to run to court and file a

23  motion before my discovery is due?  I'm perfectly happy to

24  discuss this with the judge and have the judge resolve the

25  issue in a way that, like it or not, it'll be done, that's what

1    I do." So, that's how that happened. I felt like I was candid

2    and honest with counsel in my e-mail that's part of the record

3    where I said, "Look, I need to know this stuff," and I felt

4    like I was punished for it. So, that's why. Okay?

5       With respect to highly confidential information, that

6    obviously presents a thornier issue, and I will be candid with

7    the court on that, that because it's thornier, I think there

8    are balancing interests involved and the answer to that issue

9    is a little bit less clear to me about how to do it.

10       I do obviously -- you know, I have the same concern that I

11   expressed to Your Honor with respect to confidential

12   information. I need -- I desperately need to be able to

13   discuss this meaningfully with my client and have my client

14   assist me in the defense of this action, and I'm concerned

15   about any procedure that interferes with my ability to do that.

16       And while we're at it, let's just go ahead, if you're okay

17   with this, let's just go ahead and put all our cards on the

18   table on this too, just so you know where I'm coming from.

19       We took over the case from Mr. Jacob's firm, Mr. Jacobs is

20   in the courtroom this morning, and Mr. Jacobs and his firm

21   basically serve as outside in-house counsel for this client.

22   This is a small start-up company. So, at a minimum, I would

23   like to be able to include Mr. Jacobs and Mr. Zobrist in the

24   scope of any order that's entered. They -- you know, that

25   gives me a level -- because they understand the client and the

 1    industry -- that gives me a certain level of protection.

 2        I clearly still would like to be able to discuss this with

 3    the client, and I'm obviously willing to abide by whatever

 4    reasonable restrictions the court feels are necessary in order

 5    to protect confidential information.  But frankly, one of the

 6    ways to protect that confidential information is to just not

 7    have door-open discovery on any trade secrets at issue in the

 8    case.  That, to me, is a good reason why the analysis that the

 9    district court used in that *DeRubeis* case from the Northern

10    District of Georgia is helpful.  It's helpful to not only allow

11    the defendant to be able to formulate a defense to whatever the

12    claims are, and it keeps the plaintiff from formulating its

13    claims based on what it learns in discovery, but it also limits

14    the risk of overexposure of highly confidential information in

15    the context of trade secret cases.

16        Now, as I suggested to Your Honor, this is not my first

17    trade secrets rodeo, and I have seen in these cases parties who

18    request incredibly confidential information, whether it's

19    warranted or not.  Things like client lists, you know,

20    information about processes that are not protected by patents

21    that are therefore not public.  Things that you -- that are

22    really, you know, the goods in the company store, that if you

23    lose this stuff, it could really impair your business going

24    forward.  I am very worried about that.  And I think, as a

25    defendant against whom I don't feel appropriate claims have

1  been asserted, I have an obligation to protect my client from

2  that and that's what I'm trying to do with this.  So, just so

3  you know.  You know, that's my rationale behind what it is I'm

4  trying to do.

5      So, we're trying to get our hands around this.  We're

6  trying to get our hands around the documents.  We're trying to

7  get our hands around the other issues.  We're trying to figure

8  out, in addition to what we already have with regard to

9  documents, what we need to obtain.  So, we are trying to do

10 what we need to do, but we feel like the plaintiff needs to do

11 that too and they need to do this in the ordinary course and

12 they need to not jump the gun and come in and try to, you know,

13 cut us off at the knees on something which would limit our

14 ability to deal with these claims on the merits which I think

15 is particularly unfair when the claim hasn't been asserted, you

16 know, in detail in the first instance.  So, that's where I am.

17     I'm certainly happy to answer any questions Your Honor has

18 for me.

19         **THE COURT:**  Okay.  I don't have any further questions.

20 Thank you.

21         **MR. GILL:**  All right.  Thank you, Judge.

22         **THE COURT:**  Would you like to respond to that,

23 Mr. Rubman, in any way?

24         **MR. RUBMAN:**  Thank you, Your Honor.  Again, Gary

25 Rubman from Covington on behalf of VGT.

1      I think a lot of the things that I would have wanted to

2  respond to are the issues that I think you asked us not to

3  argue, including whether or not we were specific enough.

4  Unless you want to hear argument on that, I'll defer for

5  another day.

6          **THE COURT:**  I'm not going to decide that on this

7  motion.

8          **MR. RUBMAN:**  Okay.  So then on that, you know, I'm

9  happy to respond to any questions.  We obviously have a very

10 different understanding of some of the information in the

11 slides.  It sounds to me like they're still standing on the

12 objection that they waived and that they told the court they

13 were waiving.

14     So, unless you have questions, I'm happy to stand -- to

15 sit.

16         **THE COURT:**  Well, I do have one question about

17 their -- they have an interrogatory to you to be more specific

18 issued now.

19         **MR. RUBMAN:**  Uh-huh.

20         **THE COURT:**  You're saying, "I understand, I can't

21 respond to that until we have a protective order in place."

22         **MR. RUBMAN:**  Correct.

23         **THE COURT:**  Is that correct?

24         **MR. RUBMAN:**  Correct.

25         **THE COURT:**  Do you plan -- and you don't have to tell

1   me this if you don't want to right now, but is it your plan to

2   respond to that interrogatory and do you think that could take

3   care of the specificity problem?

4           **MR. RUBMAN:**  Absolutely.

5           **THE COURT:**  So, a protective order could be essential

6   to resolving a lot of these disputes, --

7           **MR. RUBMAN:**  Absolutely.

8           **THE COURT:**  -- it sounds like.  Okay.

9           **MR. RUBMAN:**  Absolutely.  The concern is -- again,

10  without going into the issue you don't want to debate, we think

11  we've been specific enough.  Put that aside.  We're going to be

12  even more specific.  You know, we've given them specific names

13  of specific source code already, but we're going to get even

14  more specific.  We have it drafted.  We're ready, you know, we

15  can serve this pretty quickly, but we're afraid of getting in

16  an endless loop of motions and bothering you.  And from what

17  we've seen so far, we don't have a high degree of confidence

18  that that's going to kind of lead to them raising their hands

19  and saying, "Okay, we'll provide it."  So, that's our concern.

20  We believe they've waived this objection.  But regardless, you

21  know, we are happy -- we're ready, willing, and able to serve

22  more detailed information on this, subject to a protective

23  order, you know, with appropriate protections, and that's what

24  we've been trying to do.

25          **THE COURT:**  Thank you.

1            MR. RUBMAN:  Do you have anything on the protective

2   order?

3            MR. SAWYER:  I do.

4        THE COURT:  Thank you.

5            MR. RUBMAN:  May Mr. Sawyer briefly respond on that?

6        THE COURT:  Yes, he may.

7            MR. RUBMAN:  Thank you.

8            MR. SAWYER:  Thank you, Your Honor.  Again, Mike

9   Sawyer for Covington.

10      Just three quick points on the protective order.  I have to

11  confess I have not practiced for as long as Mr. Gill has, but

12  in my experience it's quite common for there to be provisions

13  that restrict the number of company representatives that can

14  see confidential information.

15      I have two case cites I can offer Your Honor.  The first is

16  one from Chief Judge Frizzell, one of his cases in this court,

17  it's *Skycam vs. Actioncam*, 09-CV-294.  There, it was only two

18  company reps.  The other is *A Major Difference v. Wellspring*

19  *Products*, that's 243 FRD 415 from the District of Colorado, and

20  there it was just one company representative that had access to

21  the confidential information.

22            THE COURT:  Could you repeat that cite?  243 FRD --

23            MR. SAWYER:  415.

24        THE COURT:  Thank you.

25            MR. SAWYER:  Sure.

1    Again, in both those cases, it was also for highly

2 confidential information there was a level that was outside

3 counsel eyes only.

4    And so the second point would be to the concern about

5 Mr. Jacobs.  I believe Mr. Jacobs is still counsel of record,

6 so he would be able to access the highly confidential

7 information as outside counsel of record under the proposed

8 protective order.

9    The third point I'd make is simply that with respect to the

10 meet-and-confer, they had agreed to make best efforts to

11 resolve this by November 8th.  We didn't file our motion until

12 November 14th.  There was just no effort on their end to

13 actually meet and confer about this.  We would really have

14 liked to resolve this without having to involve Your Honor but

15 it just seemed like we couldn't get there without actually

16 filing a motion.

17          **THE COURT:**  Okay.

18          **MR. SAWYER:**  Thank you, Your Honor.

19          **THE COURT:**  Thank you.

20    Okay.  I'm ready to issue my ruling today.

21    On the motion to compel trade secret discovery, docket 47

22 essentially has two parts, the part about the motion to compel

23 trade secret discovery and the motion for entry of a protective

24 order.  That motion, as I've said, I really view this properly

25 characterized as a motion to estop defendants from objecting to

1  requests for production 1, 6, and 7 on grounds that their trade

2  secrets must be defined with greater particularity.  So, that

3  motion, as explained in that way, is going to be denied for

4  three reasons.

5     First, and most importantly, this is a substantive question

6  that I think should be resolved on the merits, if possible.

7  Defendant has cited law that causes me some concern about

8  compelling this discovery based purely on an e-mail agreement

9  that occurred between counsel, and I'd prefer to have full

10  briefing on the law and the objection before compelling these

11  requests for production.

12     Second, plaintiff is not going to suffer any degree of

13  prejudice from delay until this issue is properly presented to

14  the court.  Judge Frizzell will not enter a scheduling order

15  until he rules on the motion to dismiss, so we're not facing

16  any looming pending deadlines.

17     The first two reasons are my most important reasons for

18  denying this motion, and I don't want to get too far in the

19  weeds on this e-mail dispute that's been presented to me, but

20  as a third reason for denying the motion, it does appear to me

21  that there's a legitimate dispute as to the agreement reached

22  as set forth in the consent motion to strike scheduling

23  conference.

24     I do certainly take seriously any misrepresentations that

25  were made to Judge Frizzell about an agreement that was

 1    reached, and that's extremely important to me and that's what

 2    I'm focused on making sure did not occur in this case, and if

 3    it did, if plaintiff suffered any prejudice from that, that's

 4    something that I would be interested in vindicating.  But I'm

 5    just not -- I think defendants have an arguable position that

 6    they were only agreeing not to ask for a stay of trade secret

 7    discovery pending resolution of a motion to dismiss rather than

 8    agreeing not to make any objections at all in the course -- or

 9    to those particular topics in the course of discovery.

10        In looking just at the consent motion to strike scheduling

11    conference, that language that discovery be sequenced as to

12    plaintiff's trade secret claim, that plain language to me does

13    not mean they're going to start producing without making

14    objections.  It means they're not going to argue for a stay of

15    the trade secret portion of discovery pending the outcome of

16    their motion.

17        I certainly do understand plaintiff's position, reading the

18    e-mail exchanges, but like I said, my principal concern is

19    whether Judge Frizzell was misled in some way and then issued a

20    ruling that caused plaintiff to suffer prejudice.  That to me

21    is really what I'm trying to make sure did not occur, and I'm

22    not convinced that that occurred; therefore, I find no reason

23    to circumvent normal discovery processes or to prevent

24    defendant from raising this objection what I would call in the

25    normal course, which is, I think, what defendant is asking to

Video Gaming v Castle Hill (12-06-2017 Motion Hearing)                    49

1  do.

2      So, the motion in the way that I've limited it today, is

3  denied.  That doesn't mean I'm not going to give you a ruling

4  on this substantive issue if it comes up again.

5      On the motion for protective order, it's going to be denied

6  to the extent you're requesting me to enter that protective

7  order right now.  What I am going to do, because you all

8  haven't seemed to be able to do this, is I'm going to order you

9  to meet and confer, and I think a great time to do it would be

10  right now that everybody is here after this hearing.

11      And I will give you a set deadline of two weeks from today

12  for submitting either a joint protective order that you agree

13  on or filing any necessary motions to resolve disputes.  If you

14  can do it quicker than that, that's even better, and I will get

15  to it as quickly as I can.  It sounds like you're in agreement

16  on the source code.  It sounds like you are in agreement on the

17  motion to seal requirement and our local rules.  As I said, I

18  have some concerns, but again, I'm happy to consider a joint

19  motion on that and I'll look at it, and I'll talk to Judge

20  Frizzell about it, too, because that's going to impact his

21  docket in a meaningful way as well.  But like I said, if you

22  want to agree to that, I will certainly consider it.  And I

23  think your sticking points are going to be more the

24  confidential information and highly confidential information

25  and who's going to be allowed to see this stuff.

1    I will tell you, to give you some guidance, that I do have

2    concerns about defendant being able to meaningfully involve his

3    client in this, so I do have concerns about that and, you know,

4    I think that's something that's going to be important to

5    consider.  But again, I don't think there's any reason for me

6    to get involved yet.  I think you guys haven't met, you haven't

7    talked, and I want all this before me in writing, I want to

8    really make sure I understand exactly what it is that you're

9    disputing and exactly what it is I need to resolve.

10    The good news is I've already heard all the arguments on

11    it, so I will not set that motion for protective order unless I

12    have other questions or other things that we haven't cleared up

13    today, I don't plan to set that for hearing, as well.  We've

14    resolved most of those arg- -- the arguments have been made

15    today that I think will be relevant to whatever it is that you

16    get on file.

17        **MR. GILL:**  May I address the court on the motion to

18    seal issue?

19        **THE COURT:**  Briefly.

20        **MR. GILL:**  I just wanted to say, Your Honor, that if

21    there is some sort of protocol or language that you would like

22    to use in this district that the parties could use that would

23    assist the court in dealing with this issue and protecting the

24    court from motions by outside parties who get access to this

25    data, we're happy to try to look at that and incorporate that.

1    If there's anything we can do to minimize the risk to the court

2    from that, because as I understood Your Honor's comment

3    earlier, one of the reasons that you like to have these

4    sequential motions to seal is because you do sometimes get

5    inquiries from outside parties like --

6              **THE COURT:**  No.  I'm sorry I wasn't clear on that.

7    I've never seen an inquiry from an outside party on a motion to

8    seal.  What I was saying was that the underlying principle of

9    those is that most of the time we expect documents and filings

10   to be public, --

11             **MR. GILL:**  Right.

12             **THE COURT:**  -- and unless you tell us a good reason

13   why they should be sealed, we like to have things public, if

14   possible.

15             **MR. GILL:**  Right.

16             **THE COURT:**  And particularly what I think -- I wasn't

17   here when they enacted that local rule, but part of the problem

18   is people would have one exhibit that needed to be sealed, or

19   maybe even four lines in an exhibit that needed to be sealed

20   and they filed the whole motion under seal and nobody can see

21   it and nobody has public access to it, and there's just no

22   reason for that.

23      So, no, to answer your question, I've never seen an outside

24   inquiry.  That's not my concern.  My concern is the court's

25   ability to deny your motion to seal if it does not believe the

```
 1   entire thing needs sealed.
 2           MR. GILL:  Okay.  Fair enough.
 3           THE COURT:  So, yes.
 4      Okay.  Is there anything else that we need to take up here
 5   today, Mr. Rubman?
 6           MR. RUBMAN:  No, Your Honor.
 7           THE COURT:  Mr. Gill?
 8           MR. GILL:  No, ma'am.  Thank you.
 9           THE COURT:  Thank you both.
10           THE DEPUTY COURT CLERK:  All rise.
11           THE COURT:  Court's adjourned.
12      (PROCEEDINGS CLOSED)
13                        REPORTER'S CERTIFICATION
14      WHILE NOT PRESENT TO STENOGRAPHICALLY REPORT THE FOREGOING
15   PROCEEDINGS, I CERTIFY THAT IT WAS TRANSCRIBED TO THE BEST OF
16   MY ABILITY FROM A DIGITAL AUDIO RECORDING.
17                     CERTIFIED:  s/Greg Bloxom
                                   Greg Bloxom, RMR, CRR
18                                 United States Court Reporter
                                   333 W. 4th Street, RM 411
19                                 Tulsa, OK 74103
                                   (918)699-4878
20                                 greg_bloxom@oknd.uscourts.gov
21
22
23
24
25
```