# APPENDIX 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1)  VIDEO GAMING TECHNOLOGIES, INC.,          )<br>                                                    )<br>                                                    )<br>          Plaintiff,                                )<br>                                                    )<br>v.                                                  )<br>                                                    )<br>1)  CASTLE HILL STUDIOS LLC                     )<br>     (d/b/a CASTLE HILL GAMING);                )<br>2)  CASTLE HILL HOLDING LLC                     )<br>     (d/b/a CASTLE HILL GAMING); and            )<br>3)  IRONWORKS DEVELOPMENT, LLC                  )<br>     (d/b/a CASTLE HILL GAMING)                 )<br>                                                    )<br>          Defendants.                             ) | Case No. 4:17-cv-00454-GKF-jfj<br><br>**Jury Trial Demanded** |

### FIRST AMENDED COMPLAINT

Plaintiff Video Gaming Technologies, Inc. ("VGT") brings this Complaint for injunctive relief, monetary damages, and all other appropriate remedies against Defendants Ironworks Development LLC, Castle Hill Holding LLC, and Castle Hill Studios LLC (collectively, "Castle Hill Gaming" or "CHG").  VGT alleges as follows:

### NATURE OF THE ACTION

1.      This is an action for (1) trademark infringement, trade dress infringement, and unfair competition in violation of Sections 32 and 43(a) of the Federal Trademark Act (the "Lanham Act"), 15 U.S.C. §§ 1114 and 1125(a), Oklahoma state law, Okla. Stat. Ann. tit. 78, § 51-56 (the "Oklahoma Deceptive Trade Practices Act"), and Oklahoma common law, (2) misappropriation of trade secrets in violation of Oklahoma state law, Okla. Stat. Ann. tit. 78, §§ 85-94 (the "Oklahoma Uniform Trade Secrets Act"), (3) misappropriation of confidential business information in violation of Oklahoma common law, (4) misappropriation of trade

1

secrets in violation of the Defend Trade Secrets Act of 2016 (DTSA), Pub.L. 114–153, 130 Stat. 376, enacted May 11, 2016, codified at 18 U.S.C. § 1836, et seq., and (5) misappropriation of trade secrets under the Virginia Uniform Trade Secrets Act, Va. Code Ann. §§ 59.1-336 to 59.1-343.

2.      VGT and CHG are competitors who distribute Class II bingo-based player terminals.  VGT, the leader in the industry, was founded more than 25 years ago.  CHG, a relative newcomer, was founded by former VGT employees and continues to employ several former VGT employees, including in its executive positions.

3.      In seeking to compete with VGT, CHG has copied VGT's successful games and improperly used VGT's trade secrets.  As discussed below, the copying has ranged from the overall themes and appearances of the games to the sound of the bells that ring when a player wins.  Rather than investing the time and resources necessary to develop player terminals on its own, CHG has taken shortcuts to compete, unfairly, with VGT.  CHG is mimicking games that VGT spent decades developing and promoting, and its unlawful conduct has resulted in actual consumer confusion.

4.      Through this lawsuit, VGT seeks to enjoin CHG from benefitting further from its infringement and misappropriation as well as damages to compensate VGT for the harm it has suffered.

## THE PARTIES

5.      Plaintiff Video Gaming Technologies, Inc. is a Tennessee corporation, located at 308 Mallory Station Rd., Franklin, Tennessee 37067.

6.      Defendant Ironworks Development LLC is a limited liability company organized under the laws of Virginia, located at 1807 Seminole Trail, Suite 204, Charlottesville, Virginia 22901.  Ironworks Development LLC operates under the fictitious name "Castle Hill Gaming."

7.      Defendant Castle Hill Holding LLC is a foreign limited liability company organized under the laws of Delaware, located at 1807 Seminole Trail, Suite 207, Charlottesville, Virginia 22901.[1]  Castle Hill Holding LLC operates under the fictitious name "Castle Hill Gaming."

8.      Defendant Castle Hill Studios LLC is a foreign limited liability company organized under the laws of Nevada, located at 1807 Seminole Trail, Suite 204, Charlottesville, Virginia 22901.  Castle Hill Studios LLC operates under the fictitious name "Castle Hill Gaming."

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action under 15 U.S.C. §§ 1121 and 1125, 18 U.S.C. § 1836 and under 28 U.S.C. §§ 1331 and 1338.  This Court has jurisdiction over Plaintiff's state law claims under 28 U.S.C. §§ 1332, 1338(b), and 1367(a) as well as under general principles of supplemental and pendent jurisdiction.  The amount in controversy in Plaintiff's state law claims exceeds $75,000.

10.     This Court has personal jurisdiction over all defendants.  Castle Hill Gaming maintains substantial, continuous, and systematic contacts in Oklahoma and regularly transacts business within Oklahoma, including selling, leasing, and operating player terminals in Oklahoma as well as conducting promotional events and activities at casinos in Oklahoma.

---

[1] This is the address listed in the Virginia State Corporation Commission records.  To the extent this address is incorrect, VGT believes the correct address is 1807 Seminole Trail, Suite 204, Charlottesville, Virginia 22901.

11.     Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in the Northern District of Oklahoma.

## FACTS ENTITLING VGT TO RELIEF

**A.     VGT**

12.     VGT is the leading developer, manufacturer, and distributor of Class II bingo-based player terminals in North America.  Founded in 1991, VGT now offers more than 20,000 player terminals in over 140 locations throughout the United States.

13.     Since its inception, VGT has received awards and achieved milestones, including becoming the top provider of Class II player terminals in the United States and the top provider in Oklahoma (one of the largest Class II markets in the United States).

14.     VGT prides itself on providing players with a fun and rewarding gaming experience and its customers with exceptional products and service.  Because of its unique gaming experience, VGT has fostered and maintained player loyalty and has provided significant revenue streams for its customers.

15.     VGT maintains manufacturing and sales operations in Oklahoma.

**A.     VGT's Products**

16.     Although VGT offers games for every player type and preference, all of its games are categorized as Class II bingo-based player terminals.

17.     The Indian Gaming Regulatory Act ("IGRA"), enacted in 1988 to regulate gaming on Native American land, established three different classes of games, each with a different regulatory scheme.  One of the classes, commonly referred to as Class II, includes games of chance based on bingo.  Under IGRA, Native American tribes are allowed to conduct, license, and regulate Class II gaming as long as the state in which the tribe operates permits them to do so.  In contrast to Class III gaming (which is the more typical gaming often associated with

4

casinos in Las Vegas and other locations), the tribes do not incur taxes on Class II gaming revenue and are not required to enter into state compacts to offer Claim II gaming.

18.    Many of VGT's Class II  player terminals are 3-reel mechanical games (hereinafter, "VGT 3-Reel Mechanical Games").  As their name implies, 3-reel mechanical games have three mechanical reels that physically spin when the player places a wager and then pushes a button or pulls a handle (as opposed to many modern player terminals that display only a graphical representation of spinning reels on a video screen).  *See* Exhibit 1 for an example of a VGT LUCKY DUCKY 3-Reel Mechanical Game.

**A.    VGT's Valuable Trademarks and Trade Dress**

19.    VGT owns more than 200 U.S. federal trademark registrations and applications in connection with its Class II bingo-based games (collectively, the "VGT Marks"), including the following federal registrations relevant to this dispute:

    a.  Reg. No. 3,395,857 for the mark CRAZY BILLIONS (incontestable);

    b.  Reg. No. 3,152,743 for the mark MR. MONEY BAGS & Design (incontestable);

    c.  Reg. No. 4,138,672 for the mark MR. MONEY BAGS;

    d.  Reg. No. 3,755,296 for the mark POLAR HIGH ROLLER (incontestable);

    e.  Reg. No. 4,248,628 for the mark LUCKY LEPRECHAUN;

    f.  Reg. No. 3,172,016 for the mark HOT RED RUBY (incontestable);

    g.  Reg. No. 3,366,567 for the mark GEMS AND JEWELS (incontestable);

    h.  Reg. No. 3,024,428 for the mark MR. MILLIONAIRE (incontestable);

    i.  Reg. No. 3,506,608 for the mark GREENBACK JACK (incontestable);

    j.  Reg. No. 4,505,824 for the mark PLANETARY PIGS;

    k.  Reg. No. 3,596,682 for the mark COUNTIN' CASH (incontestable);

l.   Reg. No. 3,410,436 for the mark DIAMOND FEVER (incontestable);

m.   Reg. No. 3,628,337 for the mark RADIANT ROCKS (incontestable);

n.   Reg. No. 4,675,543 for the mark CAP'N CRABBY'S CA$H;

o.   Reg. No. 3,412,822 for the mark SUPER SPEEDWAY SEVENS (incontestable);

p.   Reg. No. 4,278,098 for the mark LUCKY DUCKY & Design;

q.   Reg. No. 4,274,157 for the mark LUCKY DUCKY;

r.   Reg. No. 3,091,012 for the mark CRAZY CHERRY (incontestable);

s.   Reg. No. 3,602,998 for the mark RED SCREEN FREE SPINS (incontestable); and

t.   Reg. No. 5,147,377 for the mark RED SPINS.

Copies of the registration certificates for the above marks are available on the United States Patent & Trademark Office ("USPTO") website.  All of these federal trademark registrations cover "computer software or firmware for games of chance on any computerized platform, including dedicated gaming consoles, and video lottery terminals; gaming devices, namely, gaming machines, bingo machines, with or without video output" (or variations of this description) in Classes 9 or 28.  VGT uses each trademark in connection with the VGT 3-Reel Mechanical Games.

20.   Pursuant to 15 U.S.C. § 1057(b), the registration certificates for all of VGT's registered marks, including those marks identified above, constitute at least *prima facie* evidence of the validity of those registrations, of VGT's ownership of the trademarks, and of VGT's exclusive right to use those trademarks in commerce and in connection with the products and services specified in the registration certificates.

21.     Pursuant to 15 U.S.C. § 1115, for those marks that have become incontestable, the registration certificates for VGT's marks, including those marks identified above, constitute not just *prima facie* evidence, but *conclusive* evidence of the validity of those registrations, of VGT's ownership of the trademarks, and of VGT's exclusive right to use those trademarks in commerce and in connection with the products and services specified in the registration certificates.

22.     VGT also has common law rights to the trade dress (*i.e.*, the overall appearance and commercial impression) used in connection with its 3-Reel Mechanical Games (hereinafter, the "VGT Trade Dress").  The VGT Trade Dress includes, but is not limited to, the following individual trade dress packaging features: GAME CABINET; GAME PLAY SOUND; AWARD SOUND; BINGO PLAY AND PAYS; and RED SCREEN FREE SPINS.

23.     The GAME CABINET trade dress feature refers to the cabinet VGT uses to display its 3-Reel Mechanical Games.  Because the choice of cabinet is arbitrary and there are alternate cabinets available, the GAME CABINET trade dress feature is non-functional and has become an indicator that a game is likely owned by VGT.

24.     The GAME PLAY SOUND trade dress feature refers to the sound made by the VGT 3-Reel Mechanical Games during standard play (*e.g.*, the sound of the reels spinning). Because the sounds chosen by VGT are arbitrary and there are alternate sounds available, the GAME PLAY SOUND trade dress feature is non-functional and has become an indicator that a game is likely owned by VGT.

25.     The AWARD SOUND trade dress feature refers to VGT's use of specific sounds, including the sound of a mechanical bell, as an indicator that the player has won credits. Because the choice of a sound, specifically a mechanical bell, to convey this information to players is arbitrary and there are alternate means of conveying such information available, the

AWARD SOUND trade dress feature is non-functional and has become an indicator that a game is likely owned by VGT.

26.     The BINGO PLAY AND PAYS trade dress feature refers to the winning bingo patterns VGT uses with its 3-Reel Mechanical Games, the method for conducting the ball drop VGT uses with its 3-Reel Mechanical Games, and the pay tables VGT uses to display to players the credits that will be awarded for each winning combination on the reels of the 3-Reel Mechanical Games.  Because the choice of the specific patterns, ball call method, and payout amounts are arbitrary and there are alternates available, the BINGO PLAY AND PAYS trade dress feature is non-functional and has become an indicator that a game is likely owned by VGT.

27.     The RED SCREEN FREE SPINS trade dress feature refers to VGT's bonus spin feature in which its 3-Reel Mechanical Games randomly enter bonus spin mode (while a Game is in this bonus spin mode, the bingo display screen on the Game turns red and the reels begin spinning without the player needing to input any additional credits).  Because the manner in which VGT's bonus spin feature works and the choice of a "red screen" to designate bonus spins is arbitrary and there are alternate means of conveying this information, the RED SCREEN FREE SPINS trade dress feature is non-functional and has become an indicator that a game is likely owned by VGT.

28.     The combination of the above individual trade dress features is inherently distinctive because it is unique and does not describe the 3-Reel Mechanical Games.

29.     VGT has also been exclusively using the above individual trade dress features of the VGT Trade Dress in combination in connection with the its 3-Reel Mechanical Games for many years, and consumers often identify VGT 3-Reel Mechanical Games' terminals by the VGT Trade Dress.

30.     Indeed, consumers seek to play VGT games in part because of the RED SCREEN FREE SPINS trade dress feature as well as the other trade dress features discussed above.

31.     In addition to the VGT Trade Dress features above, which are common elements throughout all VGT 3-Reel Mechanical Games, each VGT 3-Reel Mechanical Game has a theme that is part of that specific game's trade dress (collectively, the "VGT Themes" included within "VGT Trade Dress").

32.     For example, in one of VGT's most popular games, Mr. Money Bags, the MR. MONEY BAGS THEME shows a cartoon middle-aged man with a slightly chubby pale face and a smirking smile wearing a suit and a light gray fedora surrounded by dollar bills.

33.     Because of the popularity of Mr. Money Bags, VGT has created additional games that incorporate the MR. MONEY BAGS THEME with variations.  For instance, the imagery on the Mr. Money Bags Lucky Streak game depicts the character Mr. Money Bags in a lightning storm, and the imagery on the Mr. Money Bags Road to Riches game depicts the character Mr. Money Bags driving down a highway.

34.     VGT has popular themes that it has been using in connection with the VGT 3-Reel Mechanical Games for years, including CRAZY BILL THEME, MR. MONEY BAGS THEME, POLAR HIGH ROLLER THEME, THE LUCKY LEPRECHAUN THEME, HOT RED RUBY THEME, GEMS AND JEWELS THEME, MR. MILLIONAIRE THEME, GREENBACK JACK THEME, PLANETARY PIGS THEME, COUNTIN' CASH THEME, DIAMOND FEVER THEME, RADIANT ROCKS THEME, RED HOT RUBIES X2 THEME, SUPER SPEEDWAY SEVENS THEME, LUCKY DUCKY THEME, and CRAZY CHERRY THEME.

35.     Themes are a factor in a player's decision to play a game.  Players become familiar with the themes and are drawn to games based on the themes, including as a result of the players' past experiences playing games with those themes.

36.     Because the source of Class II games is important to players, especially to frequent gamblers, VGT has invested in creating and developing all the above unique VGT Marks and Trade Dress to develop and foster the reputation, recognition, and goodwill associated with its products and services.

37.     VGT has used the VGT Marks and Trade Dress in its advertising and promotional materials, including on VGT's website at <vgt.net>.

38.     The VGT Marks and Trade Dress have also received unsolicited publicity, further associating the VGT Marks and Trade Dress with VGT.

39.     As a result of VGT's use of the VGT Marks and Trade Dress, including the VGT Themes, the VGT Marks and Trade Dress have acquired recognition among the public, which has come to associate the VGT Marks and Trade Dress with VGT's products and services.

40.     Because of the goodwill and public recognition associated with them, the VGT Marks and Trade Dress have become valuable.

**D.     VGT's Valuable Trade Secrets**

41.     In addition to the VGT Marks and Trade Dress, VGT owns trade secrets relating to the development and operation of the VGT 3-Reel Mechanical Games, including trade secrets relating to the math underlying the games, the specifics of the manner in which the bingo game is played in the games (including the process and timing for the ball drops), and the source code used to operate the games (individually and collectively, the "VGT Trade Secrets").

42.     The VGT 3-Reel Mechanical Games operate based on source code, which is essentially a collection of computer instructions, written using a human-readable programming

10

language, that is used to control aspects of VGT's games, including, for example, the code used for purposes of controlling the bingo server (referred to as "Live Call 2003 Bingo Server") and the code used for purposes of controlling the interactions with the hardware aspects of the games (referred to as the "mechanical reels source code", "Client 6" or "Client 7"). The Live Call 2003 Bingo Server controls how the bingo aspects of the game function, including the ball calls, distribution of bingo cards, tracking of pay tables, and accounting for each game terminal. The mechanical reels source code (also known as Client 6 or Client 7) controls other aspects of the games, including the control of the mechanical reels (including the red screen free spin feature), the processes for accepting wagers, the processes for generating payouts, and the interactions with the bell used by the player terminals to indicate successful outcomes.

43.    Operation of the VGT 3-Reel Mechanical Games depends on the underlying math developed for the games. The math dictates, among other things, the probabilities of winning, the payouts for each win and the volatility of the game (i.e., the level of risk associated with the game). Ultimately, it is the math behind the game that determines the percentage of wagered money that the game pays back to the players (referred to as the "return to player" or "RTP").

44.    All the VGT Trade Secrets, including those described above, are confidential and have never been shared with the public. VGT has invested time and resources in developing the VGT Trade Secrets, which are integral to its business operations.

45.    The VGT Trade Secrets possess independent economic value by virtue of not being generally known to, nor readily ascertainable through legitimate means by, other persons who could benefit financially from their disclosure or use. The VGT Trade Secrets are related to products and services used in interstate commerce—i.e., VGT's games, which are designed, developed, marketed, leased, and used across multiple states.

11

46.    VGT has used layers of security to preserve and maintain confidentiality and to prevent unauthorized use or disclosure of the VGT Trade Secrets and other confidential information.   These methods include, without limitation, (1) restricting use of and access to documents that contain trade secrets and confidential information; (2) restricting use of and access to computer networks that contain trade secrets and confidential information; (3) requiring employees to sign employment agreements, which require them to maintain in confidence trade secrets and confidential information; and (4) requiring employees to attend presentations that discuss trade secrets and the importance of protecting them.

47.    The following is an example of the relevant language contained in the version of VGT's employee agreement that applies to most of the former VGT employees identified later in this Complaint:

> 3. I understand that my employment by the Company creates a relationship of confidence and trust between me and the Company with respect to any information of a confidential or secret nature that may be learned or developed by me during the period of my employment by the Company and which (i) relates to the business of the Company or to the business of any customer or supplier of the Company, or (ii) has been created, discovered or developed by, or has otherwise become known to the Company and has commercial value in the business in which the Company is engaged (hereinafter called "Proprietary Information"). By way of illustration, but not limitation, Proprietary Information includes trade secrets, processes, formulas, computer programs, data, know-how, inventions, improvements, techniques, marketing plans, product plans, strategies, forecasts and customer lists.
>
> 4. All Proprietary Information shall be the sole property of the Company and its assigns. I hereby assign to the Company any rights I may have or acquire in all Proprietary Information. At all times, both during my employment and after its termination, I will keep in confidence and trust all Proprietary Information, and I will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company. In the event of the termination of my employment by me or by the Company for any reason, I will promptly deliver to the Company all materials, documents and data of

12

> any nature containing or pertaining to any Proprietary Information and I will not take with me any such materials, documents or data or any reproduction thereof.

48.     Through these layers of security, including requiring employees to protect the secrecy of its trade secrets and other confidential information, VGT has taken reasonable steps to preserve the secrecy of the VGT Trade Secrets.

**E.     Castle Hill Gaming and its Infringement of the VGT Marks and Trade Dress**

49.     Castle Hill Gaming is a relatively new developer and distributor of casino games that compete directly with VGT games, including the VGT 3-Reel Mechanical Games.

50.     CHG was founded by former VGT employees and employs former VGT employees.

51.     As of December 2016, three out of five members of CHG's executive team were former VGT employees:  John R. Taylor III was the Vice President of Engineering at VGT for almost six years before becoming President and Chief Executive Office of CHG; Alan Roireau was the Director of Software at VGT for almost eight years before becoming the Chief Development Officer of CHG; and Jason Sprinkle was a founding member of VGT, where he worked for 17 years in senior roles, including as Treasurer, Director of Operations/General Manager, and Director of Hardware Development before becoming the Chief Creative Officer of CHG.  *See* Screenshot of <castlehillgaming.com> from January 1, 2017, obtained via the Internet Archive Wayback Machine attached as Exhibit 2.

52.     According to Mr. Taylor's LinkedIn profile, he stopped working at CHG in January 2017, but it is unclear who has replaced Mr. Taylor as President and Chief Executive Officer of CHG because CHG removed its "About Us" section from its website around the same time that Mr. Taylor appears to have left his positions.

53.     According to Mr. Roireau's LinkedIn profile, he continues to work at CHG as

Chief Development Officer:

> As Chief Development Officer for Castle Hill Gaming, Alan is tasked with
> a variety of hands-on management activities, including hiring and
> managing technical and creative staff. Beyond cultivating and fostering a
> rewarding company culture, he also provides guidance for the
> development of the company's next-generation Tribal casino games.

54.     Mr. Roireau's LinkedIn profile also describes his former role at VGT:

> At VGT, Alan grew the development staff from three people to a team of
> more than 120. He was responsible for directing and managing the
> engineering of hardware, software, and firmware—including design,
> technical writing, statistics, and QA—before these areas were all spun off
> into separate divisions. In his role as Director of Software Development,
> Alan ensured that all software was in regulatory compliance and met all
> requirements within appropriate government jurisdictions. He directed a
> geographically diverse staff, overseeing the Project Management,
> Platform, Applications, Field Support/Maintenance, and Tools and
> Configuration Management groups. Alan employed appropriate systems
> development life cycle (SDLC) methodologies in all software
> development for VGT, including Extreme, Spiral, Agile, and SCRUM.

55.     According to Mr. Sprinkle's LinkedIn profile, he not only continues to work for

CHG, but he was recently promoted to Chief Operating Officer of CHG in December 2016:

> As Chief Operating Officer of Castle Hill Gaming, Jason provides
> seasoned guidance and oversight for sales, service, game design and
> development. He is responsible for fostering a rewarding, high-
> performance team environment that centers on personal and professional
> growth. Additionally, Jason is focused on establishing a company culture
> that empowers Castle Hill's teams to create and shape the future of casino
> gaming through the design of fun and profitable games, devices, and
> gaming experiences.

56.     Mr. Sprinkle's LinkedIn profile also describes his former role as the Director of

Hardware Development at VGT:

> At VGT, Jason was responsible for the successful engineering of the
> company's gaming products, from conceptual design to fully operational,
> production ready prototypes. He was also a member of the executive board
> and multiple strategic committees. Jason led 13 direct reports, including

14

ME/EE engineers, project managers, machinists, technicians, and technical writers. He built a culture of high-performance teams around accountability and continuous improvement of products, processes, and metrics. Jason was instrumental in the successful design and deployment of dozens of profitable products and backward-compatible improvements, increasing route profitability at a minimal cost.

Jason provided engineering support for over 20,000 gaming devices in multiple regulatory jurisdictions at VGT and created and developed industry-leading IP and competitive products that continue to dominate the market today. At the time, VGT had a 100% safety compliance rating on surprise manufacturing inspections from UL labs.

57.    In his LinkedIn profile, Mr. Sprinkle describes his former role as the Director of

Operations/GM at VGT as follows:

As Director of Operations/GM at VGT, Jason was directly responsible for the day-to-day operations of engineering, manufacturing, and service across six states and five regions of Mexico. He managed and mentored ten direct reports and was overall responsible for 147 associates company-wide. At VGT, Jason managed the successful manufacture, delivery, and deployment of over 11,000 gaming devices through precise JIT inventory management, vendor negotiation, and partnerships. He successfully managed $51MM in fixed assets deployed across multiple jurisdictions and handled the accounting for over $151MM in revenue annually, with an average collection rate below 30 days.

Jason's other roles at VGT included the daily service and repair of gaming devices across multiple jurisdictions. He managed a mobile service fleet and inventory in a highly regulated industry with no violations. Jason was dedicated to fostering a culture of innovation at VGT, where ideas came from people at all levels of the company and beyond, from associates to customers to truck drivers.

58.    Mr. Sprinkle's biography on an early version of the CHG website (as of April 4,

2014) stated:

As one of the founders of Video Gaming Technologies, Inc. (VGT), serving for 17 years, Jason can claim creative credits to its highest-earning and most-played Class II products and titles, including Mr. Money Bags. Jason's keen intuition into players desires, coupled with his understanding of game design, manufacturing, and casino operations have created a proven track record of innovation and success over the past 20 years in the industry."

15

59.    In addition to these officials, other employees have left VGT to work for CHG, including George Weilacher (software engineer), Brian Cody (software engineer), Aaron Milligan (artist), Seth Morgan (software engineer), Josh Larson (software engineer), Paul Suggs (Software Engineer Group Manager), Rich Sisson (artist), Kelly Davis (software engineer), Robert Gilkerson (software engineer), Dan Fulton (statistician), BH Booker (software engineer), and Teri Gomez (project manager).

60.    As a result of the knowledge of these former VGT employees, CHG has known of VGT's rights in the VGT Marks and Trade Dress at all relevant times.

61.    Sometime in or around March 2015, CHG began advertising its first four games on its website, two of which (QUACK-TASTIC! and SOAPBOX SALLY) featured themes that resembled two of VGT's games (LUCKY DUCKY and SUPER SPEEDWAY SEVENS, respectively).

62.    These original CHG games used gaming cabinets called the "Atlas." As shown in Exhibit 3, use of the Atlas cabinets in CHG's QUACK-TASTIC! and SOAPBOX SALLY games allowed the cabinets to be distinguished from VGT's similarly-themed LUCKY DUCKY and SUPER SPEEDWAY SEVENS games.

63.    These original CHG games were also Class III games, as opposed to Class II games, which further distinguished CHG's games from VGT's.

64.    It is VGT's understanding that CHG's original game offerings were not as successful as CHG had hoped.

65.    Sometime between March 2015 and June 2016, CHG began offering Class II games that more closely resemble VGT's.

16

66.    Since March 2015, CHG has launched at least twenty-four Class II bingo-based games that use three mechanical reels, all of which use the same cabinet as the VGT 3-Reel Mechanical Games.

67.    CHG's new games also continue to incorporate marks and themes that bear a striking resemblance to the VGT 3-Reel Mechanical Games.

68.    For example, copying VGT games with a CRAZY BILL THEME, which feature a cartoon miner with a bushy white beard, bushy white moustache, and bushy white eyebrows, wearing a raggedy brown cowboy hat with an upturned front brim that has a nick in the fabric above the miner's left eye, mining for gold nuggets in the desert in the Old West, CHG recently came out with a WELCOME TO NUGGET MOUNTAIN THEME, which consists of elements that are nearly identical to those of the CRAZY BILL THEME, namely a cartoon miner with a bushy white beard, bushy white moustache, and bushy white eyebrows, wearing a raggedy brown cowboy hat with an upturned front brim that has a nick in the fabric above the miner's left eye, mining for gold nuggets in the desert in the Old West.  *See* page 2 of Exhibit 4 for a comparison of the imagery of VGT's CRAZY BILL THEME with the imagery of CHG's WELCOME TO NUGGET MOUNTAIN THEME.

69.    Similarly, copying VGT games with the MR. MONEY BAGS THEME, which, as mentioned above, feature a cartoon middle-aged man with a slightly chubby pale face and a smirking smile wearing a light gray felt fedora that has a wide brim, indented crown, and dark gray trim surrounded by stacks of both bound and loose dollar bills, CHG recently came out with a NEW MONEY THEME, which features a cartoon baby with a slightly chubby pale face and a smirking smile wearing a light gray felt fedora that has a wide brim, indented crown, and dark gray trim surrounded by stacks of both bound and loose dollar bills, that is essentially a younger

(i.e., "new") version of the MR. MONEY BAGS THEME.  *See* page 3 of Exhibit 4 for a comparison of the imagery of VGT's MR. MONEY BAGS THEME with the imagery of CHG's NEW MONEY THEME.

70.    Likewise, copying a VGT game with a POLAR HIGH ROLLER THEME, which features anthropomorphic cartoon polar animals (including one polar bear and multiple penguins) wearing sunglasses and other clothing items, acting like they are on vacation, partying and dancing with money on ice in the arctic as if it were warm and sunny outside with snow-capped mountains in the background, CHG recently came out with an ARCTIC CASH THEME, which features elements nearly identical to those of the POLAR HIGH ROLLER THEME, namely anthropomorphic cartoon polar animals (including one polar bear and multiple penguins) wearing sunglasses and other vacation clothing items, acting like they are on vacation, partying and dancing with money on ice in the arctic as if it were warm and sunny outside with snow-capped mountains in the background.  *See* page 4 of Exhibit 4 for a comparison of the imagery of VGT's POLAR HIGH ROLLER THEME with the imagery of CHG's ARCTIC CASH THEME.

71.    After releasing the ARCTIC CASH THEME game, CHG released another similarly themed game that even more closely resembles the POLAR HIGH ROLLER THEME, one of VGT's most popular games, presumably because the ARCTIC CASH THEME was successful.  Specifically, CHG released the ARCTIC ICE THEME, which has a more non-descript background for the characters, emphasizes the color blue, gives the penguin characters a more prominent role and shows the penguins partying, dancing, and jumping while dollar bills and other objects fly in the air around them, much like the POLAR HIGH ROLLER THEME.  *See id.*

72.     Indeed, more than half of CHG's twenty-four Class II games incorporate marks and themes confusingly similar to those of VGT's games.  *See* Exhibit 4 for a full comparison of CHG's Infringing Games with their VGT counterparts.  Exhibit 5 includes examples of Class II games owned by other third party competitors for the sake of comparison to Exhibit 4.

73.     For each of the Infringing Games, CHG uses a cabinet it calls the "Retro," which is nearly identical to the cabinet used by VGT for the VGT 3-Reel Mechanical Games.

74.     Thus, CHG has copied VGT's GAME CABINET trade dress feature in addition to copying the VGT Themes.

75.     CHG has also copied VGT's GAME PLAY SOUND, AWARD SOUND, BINGO PLAY AND PAYS, and RED SCREEN FREE SPINS trade dress features.

76.     First, the sound made by the Infringing Games during standard play (*e.g.*, the sound of the reels spinning) is very similar to VGT's GAME PLAY SOUND.

77.     Likewise, the award sound made by the Infringing Games to indicate that the player has won credits is nearly identical to VGT's AWARD SOUND.  On information and belief, CHG even purchased the same type of mechanical bell from the same manufacturer as VGT.

78.     Similarly, for many of the Infringing Games, CHG uses winning bingo patterns and pays that are the same as many of VGT's BINGO PLAY AND PAYS.  *See* Exhibit 6 for examples of VGT pay tables that CHG has copied.

79.     Many of the winning bingo patterns used in the Infringing Games also are the same as winning bingo patterns used in VGT's games.  For example, for some games, CHG uses the identical winning bingo patterns for the smaller payout amounts, which are the patterns that players see most frequently.  CHG also uses a ball call method for its bingo game that mimics

the ball drop method used in VGT games, including the approach of calling balls from the five columns of the bingo card in order (i.e., first calling a ball from the "B" column, then from the "I" column, then from the "N" column, and so forth).

80.    Additionally, the Infringing Games incorporate a bonus feature called INSTANT FREE PAY, which uses "hot screens" or "red screens" and which is activated at random during free spin mode or on losing spin combinations, much like VGT's RED SCREEN FREE SPINS.

81.    CHG's use of these marks and trade dress features confusingly similar to the VGT Marks and Trade Dress, including the VGT Themes, gives the Infringing Games a nearly identical look, sound, and feel to the VGT 3-Reel Mechanical Games.

82.    That more than half of CHG's Class II games contain these confusingly similar marks and trade dress features suggests that CHG intentionally seeks to confuse players and to lead them to believe, incorrectly, that CHG's games were developed by VGT, with the goal of enticing players to play CHG's games.

83.    CHG thus has knowingly and for profit engaged in this infringing use of the VGT Marks and Trade Dress to attract players, knowing that players would wrongly believe that the games are associated or affiliated with, or sponsored or endorsed by, VGT.

84.    The likelihood of confusion created by this intentional offering of nearly identical goods with nearly identical trade dress is even greater because CHG offers these Infringing Games through identical marketing channels in direct competition with VGT's 3-Reel Mechanical Games.

85.    Indeed, the Infringing Games often appear in the same casinos as the VGT 3-Reel Mechanical Games.  Within the casinos, the Infringing Games are located close to the VGT 3-Reel Mechanical Games.

86.    In at least one casino in Durant, Oklahoma, many of the CHG games are placed directly in the middle of the VGT games.

87.    On information and belief, CHG sales representatives seek the placement of CHG's games in the middle of VGT games to increase the likelihood that players will confuse the Infringing Games with VGT games.

88.    On information and belief, CHG plans to continue to expand its infringing line of products.  For example, CHG has filed an application for the mark AMAZING CHERRY (Ser. No. 86,732,457) presumably because it intends to use the name AMAZING CHERRY in connection with a game that will have a cherry theme -- just like VGT's CRAZY CHERRY THEME.

89.    CHG's AMAZING CHERRY mark application further supports the conclusion that CHG has engaged in a pattern of infringement reflecting its intent to confuse and deceive consumers as to the source of its products.

90.    CHG's copying of the VGT Marks and Trade Dress has resulted, and will continue to result, in instances of actual confusion.

91.    On August 10, 2016, in an effort to resolve this matter without litigation, VGT sent a letter by certified mail to CHG, requesting that CHG cease and desist from its infringing behavior.

92.    CHG, through its counsel, responded to the letter, but did not agree to cease and desist from its infringing behavior.

**F.    Castle Hill Gaming's Misappropriation of the VGT Trade Secrets**

93.    On information and belief, CHG has misappropriated VGT Trade Secrets and other confidential business information.

21

94.     As described above, former VGT officials and employees left VGT to work for CHG (collectively, the "Former VGT Employees").

95.     During the time the Former VGT Employees were employed at VGT, they had access to VGT Trade Secrets, including the VGT Trade Secrets discussed above.

96.     The Former VGT Employees were aware that the VGT Trade Secrets are confidential and proprietary and that this information should not be shared outside VGT.

97.     All of the Former VGT Employees signed employee agreements that included a confidentiality provision requiring them to protect the secrecy of VGT's trade secrets and other confidential information.

98.     Nevertheless, the Former VGT Employees have shared information relating to the VGT Trade Secrets with CHG, which has used one or more of the VGT Trade Secrets in connection with the development of its games, including, without limitation, the Infringing Games.  This is evident based on the fact that the play of CHG's games, including without limitation, the payouts, bingo mechanics, and volatility, which are determined by the source code and underlying math of the game, mimics the play of VGT's games.

99.     By willfully and maliciously misappropriating these trade secrets and confidential business information, CHG has violated the Oklahoma Uniform Trade Secrets Act.

100.    CHG has committed certain acts of misappropriation in the development of CHG's games after May 11, 2016, the effective date of the DTSA.  These acts of misappropriation have occurred in a number of states, including Virginia, and in interstate commerce.  For example, on information and belief, sometime after May 11, 2016, CHG copied and used, in Virginia and elsewhere, a proprietary algorithm used in VGT's bingo games, and

CHG submitted software code implementing this algorithm from Virginia to a testing lab in another state.

101.    By willfully and maliciously misappropriating VGT's trade secrets, CHG has violated the DTSA and the Virginia Uniform Trade Secrets Act.

102.    CHG's unlawful conduct has injured VGT, weakening VGT's competitive position and providing CHG with an unfair competitive advantage.  Unless enjoined, CHG will continue to injure VGT.

**COUNT I**
**(Federal Trademark Infringement in Violation**
**of Section 32 of the Lanham Act)**

103.    The information and allegations set forth in paragraphs 1 through 100 above are incorporated as though fully set forth herein.

104.    CHG's offering of the Infringing Games violates Section 32 of the Lanham Act, 15 U.S.C. § 1114, because it constitutes willful and deliberate use in commerce of reproductions, copies, and/or colorable imitations of VGT's federally registered marks in connection with the sale, offering for sale, distribution, and advertising of CHG's products and services in a manner likely to cause confusion and mistake and to deceive.

105.    CHG's unlawful conduct has been and continues to be willful and deliberate and in bad faith.

106.    These violations have irreparably damaged VGT, and it has no adequate remedy at law.  Unless enjoined, CHG will continue the infringing use, further injuring VGT and confusing the public.

107.    On information and belief, CHG has received revenues and profits as a result of its infringing use, to which CHG is not entitled, and VGT has also suffered damages as a result

of the infringing use, for which CHG is responsible.

## COUNT II
### (Unfair Competition and Trade Dress Infringement for Product Packaging in Violation of Section 43(a) of the Lanham Act)

108.    The information and allegations set forth in paragraphs 1 through 107 above are incorporated as though fully set forth herein.

109.    CHG's offering of the Infringing Games violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  CHG has willfully and deliberately used in commerce words, terms, names, symbols, devices, and combinations thereof, as well as false designations of origin likely to cause confusion and mistake and to deceive as to the affiliation, connection, or association of CHG with VGT and as to the origin, sponsorship, or approval by VGT of products and services provided by CHG.

110.    CHG's unlawful conduct has been and continues to be willful and deliberate and in bad faith.

111.    These violations have irreparably damaged VGT, and it has no adequate remedy at law.  Unless enjoined, CHG will continue the infringing use, further injuring VGT and confusing the public.

112.    On information and belief, CHG has received revenues and profits as a result of their infringing use, to which CHG is not entitled, and VGT has also suffered damages as a result of the infringing use, for which CHG is responsible.

## COUNT III
### (Unfair Competition, Trade Dress Infringement, and Trademark Infringement in Violation of the Oklahoma Deceptive Practices Act])

113.    The information and allegations set forth in paragraphs 1 through 112 above are incorporated as though fully set forth herein.

114.     CHG's offering of the Infringing Games, including its unauthorized use of the VGT Marks and Trade Dress, violates the Oklahoma Deceptive Trade Practices Act, Okla. Stat. Ann. tit. 78, § 51-56.  CHG has willfully and deliberately passed off its products as those of VGT and knowingly made false representations as to the source, sponsorship, approval, or certification of its goods and services.

115.     CHG's unlawful conduct has been and continues to be willful and deliberate and in bad faith.

116.     These violations have irreparably damaged VGT, and it has no adequate remedy at law.   Unless enjoined, CHG will continue the infringing use, further injuring VGT and confusing the public.

117.     On information and belief, CHG has received revenues and profits as a result of their infringing use, to which CHG is not entitled, and VGT has also suffered damages as a result of the infringing use, for which CHG is responsible.

## COUNT IV
### (Unfair Competition, Trade Dress Infringement, and Trademark Infringement under Common Law)

118.     The information and allegations set forth in paragraphs 1 through 117 above are incorporated as though fully set forth herein.

119.      CHG's unauthorized use of the VGT Marks and Trade Dress constitutes trademark infringement and unfair competition under Oklahoma common law.  VGT is the prior user of the VGT Marks and Trade Dress, and CHG's willful and deliberate use of the VGT Marks and Trade Dress in commerce is likely to cause, and has already caused, confusion, mistake, and deception as to origin, sponsorship, or approval by VGT.

120.     CHG's unlawful conduct has been and continues to be willful and deliberate and

in bad faith.

121.    These violations have irreparably damaged VGT, and it has no adequate remedy at law.  Unless enjoined, CHG will continue the infringing use, further injuring VGT and confusing the public.

122.    On information and belief, CHG has received revenues and profits as a result of its infringing use, to which CHG is not entitled, and VGT has also suffered damages as a result of the infringing use, for which CHG is responsible.

**COUNT V**
**(Misappropriation of Trade Secrets in Violation of**
**the Oklahoma Uniform Trade Secrets Act)**

123.    The information and allegations set forth in paragraphs 1 through 122 above are incorporated as though fully set forth herein.

124.    CHG has violated the Oklahoma Uniform Trade Secrets Act, Okla. Stat. Ann. tit. 78, §§ 85-94.

125.    CHG has used one or more of the VGT Trade Secrets without VGT's consent, having acquired them by improper means, or knowing or having reason to know that the trade secrets were derived from a person who had acquired them by improper means, or who otherwise owed a duty to VGT to maintain their secrecy or limit their use.

126.    The VGT Trade Secrets that CHG has used had independent economic value, were not generally known or readily accessible by proper means by others who could obtain economic value from their use, and were the subject of efforts reasonable under the circumstances to maintain their secrecy.

127.    CHG has used one or more of the VGT Trade Secrets when developing games for CHG, including the CHG Infringing Games.

128.    At the time it used the VGT Trade Secrets, CHG knew or had reason to know that the VGT Trade Secrets were derived from persons who used improper means to acquire the information, including by those who had a duties to VGT to maintain the secrecy of the VGT Trade Secrets and limit their use, including use by VGT of VGT Trade Secrets that CHG knew or had reason to know were obtained in violation of confidentiality agreements between VGT and its former employees.

129.    CHG has used one or more of the VGT Trade Secrets without consent from VGT.

130.    CHG's unlawful conduct has been and continues to be willful, malicious, deliberate, and in bad faith.

131.    These violations have irreparably damaged VGT, and it has no adequate remedy at law.  Unless enjoined, CHG will continue the infringing use, further injuring VGT and confusing the public.

132.    On information and belief, CHG has received revenues and profits as a result of its infringing use, to which CHG is not entitled, and VGT has also suffered damages as a result of the infringing use, for which CHG is responsible.

### COUNT VI
**(Misappropriation of Confidential Business Information
in Violation of Common Law)**

133.    The information and allegations set forth in paragraphs 1 through 132 above are incorporated as though fully set forth herein.  To the extent any of the VGT Trade Secrets detailed above are found not to rise to the level of trade secret, the identified items nonetheless constitute confidential business information, which were particular to VGT and were not generally known or readily accessible by proper means by others.

134.    CHG's acquisition through improper means of, and unauthorized use of, this

confidential business information constitutes misappropriation of VGT's confidential business information under Oklahoma common law.

135.    CHG's unlawful conduct has been and continues to be willful, malicious, deliberate, and in bad faith.

136.    These violations have irreparably damaged VGT, and it has no adequate remedy at law.   Unless enjoined, CHG will continue the infringing use, further injuring VGT and confusing the public.

137.    On information and belief, CHG has received revenues and profits as a result of its infringing use, to which CHG is not entitled, and VGT has also suffered damages as a result of the infringing use, for which CHG is responsible.

## COUNT VII
### (Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act)

138.    The information and allegations set forth in paragraphs 1 through 137 above are incorporated as though fully set forth herein.

139.    CHG has violated the Defend Trade Secrets Act of 2016 (DTSA), 18 U.S.C. § 1836, et seq.

140.    CHG has used one or more of the VGT Trade Secrets without VGT's consent, having acquired them by improper means, or knowing or having reason to know that the trade secrets were derived from a person who had acquired them by improper means, or who otherwise owed a duty to VGT to maintain their secrecy or limit their use.

141.    The VGT Trade Secrets that CHG has used had independent economic value, were not generally known or readily accessible by proper means by others who could obtain economic value from their use, and were the subject of efforts reasonable under the

circumstances to maintain their secrecy.  The VGT Trade Secrets are related to products and services used in interstate commerce.

142.    CHG has used one or more of the VGT Trade Secrets when developing games for CHG, including the CHG Infringing Games in Exhibit 4.  CHG has disclosed one or more of the VGT Trade Secrets to third parties, including testing labs.

143.    At the time it used or disclosed the VGT Trade Secrets, CHG knew or had reason to know that the VGT Trade Secrets (a) were derived from or through persons who used improper means to acquire the VGT Trade Secrets; (b) were acquired under circumstances giving rise to a duty to VGT to maintain the secrecy of the VGT Trade Secrets and limit their use; and (c) were derived from or through persons who owed a duty to VGT to maintain the secrecy of the VGT Trade Secrets and limit their use.  In particular, CHG knew or had reason to know the VGT Trade Secrets were obtained or derived in violation of confidentiality agreements between VGT and one or more Former VGT Employees.

144.    CHG has used and disclosed one or more of the VGT Trade Secrets without consent from VGT.

145.    CHG's unlawful conduct has been and continues to be willful, malicious, deliberate, and in bad faith.

146.    These violations have irreparably damaged VGT, and it has no adequate remedy at law.  Unless enjoined, CHG will continue the infringing use, further injuring VGT and confusing the public.

147.    On information and belief, CHG has received revenues and profits as a result of its infringing use, to which CHG is not entitled, and VGT has also suffered damages as a result of the infringing use, for which CHG is responsible.

## COUNT VIII
### (Misappropriation of Trade Secrets in Violation of
### the Virginia Uniform Trade Secrets Act)

148.    The information and allegations set forth in paragraphs 1 through 147 above are incorporated as though fully set forth herein.

149.    CHG has violated the Virginia Uniform Trade Secrets Act, Va. Code Ann. §§ 59.1-336 to 59.1-343.

150.    CHG has used one or more of the VGT Trade Secrets without VGT's consent, having acquired them by improper means, or knowing or having reason to know that the trade secrets were derived from a person who had acquired them by improper means, or who otherwise owed a duty to VGT to maintain their secrecy or limit their use.

151.    The VGT Trade Secrets that CHG has used had independent economic value, were not generally known or readily accessible by proper means by others who could obtain economic value from their use, and were the subject of efforts reasonable under the circumstances to maintain their secrecy.

152.    CHG has used one or more of the VGT Trade Secrets when developing games for CHG, including the CHG Infringing Games, in Virginia.  CHG has disclosed one or more of the VGT Trade Secrets, in or from Virginia, to third parties, including testing labs.

153.    At the time it used and disclosed the VGT Trade Secrets, CHG knew or had reason to know that the VGT Trade Secrets (a) were derived from or through persons who used improper means to acquire the VGT Trade Secrets; (b) were acquired under circumstances giving rise to a duty to VGT to maintain the secrecy of the VGT Trade Secrets and limit their use; and (c) were derived from or through persons who owed a duty to VGT to maintain the secrecy of the VGT Trade Secrets and limit their use.  In particular, CHG knew or had reason to

30

know the VGT Trade Secrets were obtained or derived in violation of confidentiality agreements between VGT and one or more Former VGT Employees.

154.    CHG has used and disclosed one or more of the VGT Trade Secrets without consent from VGT.

155.    CHG's unlawful conduct has been and continues to be willful, malicious, deliberate, and in bad faith.

156.    These violations have irreparably damaged VGT, and it has no adequate remedy at law.  Unless enjoined, CHG will continue the infringing use, further injuring VGT and confusing the public.

157.    On information and belief, CHG has received revenues and profits as a result of its infringing use, to which CHG is not entitled, and VGT has also suffered damages as a result of the infringing use, for which CHG is responsible.

## PRAYER FOR RELIEF

WHEREFORE, VGT respectfully requests that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief, including but not limited to the following:

A.    An order declaring that CHG's offering of the Infringing Games constitutes trademark infringement, trade dress infringement, and unfair competition under federal and state law;

B.    An order declaring that CHG has misappropriated VGT Trade Secrets and confidential business information in violation of state law;

C.    A permanent injunction enjoining CHG and its employees, agents, partners, officers, directors, owners, shareholders, principals, subsidiaries, related companies, affiliates, distributors, dealers, and all persons in active concert or participation with any of them:

1.    From displaying, advertising, promoting, selling or offering for sale, leasing, or otherwise distributing the Infringing Games as well as casino games of any kind using any marks, logos, designs, symbols, devices, or other indicators that are confusingly similar to the VGT Marks and Trade Dress;

2.    From directly or indirectly engaging in conduct that tends to falsely represent that CHG, any products or services offered by CHG, or any activities undertaken by CHG, are in any way associated or connected with VGT or in any way sponsored by or affiliated with VGT;

3.    From using or disclosing VGT Trade Secrets;

4.    From assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs C(1)-(3);

D.    An order directing CHG to destroy all copies or reproductions of any and all of the Infringing Games, as well as any related signage, advertisements, promotional materials, stationery, forms, and/or any other materials and things that contain or bear marks, logos, designs, symbols, devices, or other indicators confusingly similar to the VGT Marks and Trade Dress;

E.    An order directing CHG to cease and desist its misappropriation, and refrain from misappropriation, of VGT's trade secrets, in accordance with the Oklahoma Uniform Trade Secrets Act, the Defend Trade Secrets Act, and the Virginia Uniform Trade Secrets Act;

32

F.      An order requiring CHG to account for and pay to VGT any and all profits arising from the foregoing acts, and increasing such profits, in accordance with 15 U.S.C. § 1117 and other applicable laws, including but not limited to the Oklahoma Deceptive Practices Act, the Oklahoma Uniform Trade Secrets Act, the Defend Trade Secrets Act, and the Virginia Uniform Trade Secrets Act;

G.      An order requiring CHG to pay VGT all damages sustained by VGT as a result of the foregoing acts in an amount to be determined at trial, and multiplying such damages in accordance with 15 U.S.C. § 1117 and other applicable laws, including but not limited to the Oklahoma Deceptive Practices Act, the Oklahoma Uniform Trade Secrets Act, the Defend Trade Secrets Act, and the Virginia Uniform Trade Secrets Act;

H.      An order requiring CHG to pay VGT its litigation expenses, including reasonable attorneys' fees and the costs of this action, pursuant to 15 U.S.C. § 1117 and other applicable laws, including but not limited to the Oklahoma Deceptive Practices Act, the Oklahoma Uniform Trade Secrets Act, the Defend Trade Secrets Act, and the Virginia Uniform Trade Secrets Act;

I.      An order requiring CHG to pay VGT punitive damages for the intentional, willful, and wanton nature of CHG's acts;

J.      An order directing that, within thirty (30) days of entry of the injunction and order, CHG file with this Court and serve on VGT's attorneys a report in writing and under oath setting forth the manner and form in which CHG has complied with the injunction and order; and

K.      Other relief as the Court may deem appropriate.

## **DEMAND FOR JURY TRIAL**

VGT demands a trial by jury on all counts set forth herein.

Respectfully submitted,

33

May 21, 2018

_____
Graydon Dean Luthey, Jr., OBA No. 5568
GABLE GOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, OK 74103-4217
Telephone: (918) 595-4821
Facsimile: (918) 595-4990
dluthey@gablelaw.com

Gary M. Rubman (admitted *pro hac vice*)
Peter Swanson (admitted *pro hac vice*)
Michael Sawyer (admitted *pro hac vice*)
Rebecca B. Dalton (admitted *pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C.  20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 778-5465
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com

Neil K. Roman (admitted *pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1221
Facsimile: (212) 841-1010
nroman@cov.com

***Counsel for Video Gaming Technologies, Inc.***