## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1) VIDEO GAMING TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> 1) CASTLE HILL STUDIOS LLC <br>     (d/b/a CASTLE HILL GAMING); <br> 2) CASTLE HILL HOLDING LLC <br>     (d/b/a CASTLE HILL GAMING); and <br> 3) IRONWORKS DEVELOPMENT, LLC <br>     (d/b/a CASTLE HILL GAMING) <br><br> Defendants. | Case No. 4:17-cv-00454-GKF-jfj <br><br> **REDACTED** |

### PLAINTIFF VIDEO GAMING TECHNOLOGIES INC.'S
### OPPOSITION TO DEFENDANTS' MOTION TO COMPEL DISCOVERY

Defendants' motion to compel (Dkt. No. 117), filed the day fact discovery closed, seeks to distract from their infringement of Plaintiff Video Gaming Technologies, Inc.'s ("VGT's") intellectual property by making groundless and irrelevant allegations concerning VGT's compliance with regulations promulgated by the National Indian Gaming Commission ("NIGC"). Defendants have not articulated a legal basis that would justify engaging in satellite litigation on regulatory issues. Nor have they provided a factual basis for their assertion that the VGT products at issue (bingo-based gaming systems) do not comply with all applicable regulations. Defendants have deposed multiple VGT witnesses, including VGT's President and its Vice-President in charge of compliance, all of whom confirmed that VGT's products comply with the regulations—a conclusion also reached by the independent, third-party testing laboratories that certify all VGT products before they are deployed in the field. Defendants' belated request to take yet another deposition on this issue is a waste of time and resources.

Even if the deposition provided supporting evidence for Defendants' fanciful claim, that evidence would neither excuse their infringement of VGT's intellectual property nor bear on the damages for such infringement or any other issue properly before the Court.

Similarly, Defendants articulate no cognizable basis for compelling VGT to produce unredacted versions of its customer agreements. Defendants do not explain why the additional information they seek is relevant to any claim or defense in this case or why they believe that information VGT already has produced about the placement and performance of its games at each casino is not sufficient.

## BACKGROUND

VGT is the leading developer, manufacturer, and distributor of Class II bingo-based systems in North America, including in Oklahoma, which is one of the largest Class II markets in the United States.[1] A few years ago, longtime VGT officials left to start a new gaming company, where they hired other VGT employees and began marketing and selling games, including in Oklahoma, that bear unmistakable similarities—in both appearance and gameplay—to VGT's most popular games. These similarities are described and shown in VGT's Complaint, including in Exhibit 4 thereto, which sets forth side-by-side comparisons of VGT's games and Defendants' games. (Dkt. No. 2, Ex. 4.) In this litigation, VGT seeks redress for infringement of its trademarks and trade dress and misappropriation of its trade secrets and confidential information by Defendants. Defendants have not asserted any counterclaims against VGT. Fact discovery closed August 3, the same day Defendants filed their motion.

---

[1] The Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, which regulates gaming on Native American land, establishes three classes of games, each with a different regulatory scheme. The Class II games at issue here include games of chance based on bingo, in contrast to Class III gaming often associated with casinos in Las Vegas.

**ARGUMENT**

Defendants' motion requests that (a) VGT produce a Rule 30(b)(6) witness to testify on VGT's compliance with legal and regulatory requirements and (b) VGT produce unredacted versions of its customer agreements. Both requests should be denied.

**I.   Defendants Should Not Be Allowed Another Deposition on Legal and Regulatory Compliance**

Late in the discovery period, Defendants propounded discovery requests related to VGT's compliance with NIGC regulations, and asked questions about regulatory compliance during several Rule 30(b)(1) depositions, including a deposition of VGT's Vice President for Gaming Compliance, Rich Williamson, which focused almost exclusively on this issue. Shortly after this deposition, Defendants served their Rule 30(b)(6) deposition notice, which seeks testimony (in Topic No. 7) on VGT's "efforts to maintain compliance with licensing, regulatory, or other legal requirements for the VGT Games in casinos." (Defs.' Mot. to Compel (Dkt. No. 117) (hereinafter, "Mot.") at 4.) Although this topic would broadly encompass compliance with *any* law or regulation, the motion acknowledges that Defendants are focused on a particular set of NIGC requirements: the "minimum technical standards" for Class II gaming systems. (*See* Mot. at 2 ("Through this motion, Castle Hill seeks discovery regarding VGT's efforts to comply with the minimum technical requirements promulgated by the NIGC.").)

The NIGC's minimum technical standards, promulgated in 2008 and codified at 25 C.F.R. § 547, "introduced several new requirements for Class II gaming systems designed to protect the security and integrity of Class II gaming systems and tribal operations." Minimum Technical Standards for Class II Gaming Systems and Equipment, 82 Fed. Reg. 61172 (Dec. 27, 2017). The requirements include specifications for the hardware and software used in

3

Class II bingo-based systems. *See, e.g.*, 25 C.F.R. § 547.7 (2008); *id.* § 547.8. Recognizing the cost and burden of upgrading existing systems to comply with these requirements, the NIGC allowed existing systems to remain in operation during a sunset period. *See* 82 Fed. Reg. 61172. In late 2017, as the expiration of the sunset period was approaching,[2] the NIGC eliminated the sunset requirement. *See id.* That is, grandfathered systems no longer need to be upgraded.

VGT, which has been offering Class II systems since before 2008, has both grandfathered systems, which do not need to comply with all minimum technical standards,[3] and non-grandfathered systems, which do. (Ex. D, Williamson Dep. at 58:24–59:3, 60:12–61:17.)[4] ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (Ex. E, Harvie Dep. at 86:9-17; Ex. D, Williamson Dep. at 85:9–16.)

Although Defendants have received documents and have had ample opportunity to question VGT's witnesses on this issue, they have provided *no* evidence of VGT systems that are required to—but do not—comply with the minimum technical standards (or, for that matter, any other regulation). To the contrary, VGT's witnesses have repeatedly testified that all of its games comply with applicable regulations, including any applicable minimum technical standards. (Ex. F, Sevigny Dep. at 193:20–194:3, 194:20–195:2; Ex. D, Williamson

---

[2] The original sunset date was in 2013, but the NIGC subsequently extended the sunset to November 10, 2018. *See* 82 Fed. Reg. 61172.

[3] The regulation required grandfathered systems to receive certification that they complied with certain technical standards. *See* 25 C.F.R. § 547.4 (2008).

[4] Exhibits A–C were submitted with Defendants' motion. Exhibits D–M are submitted with VGT's opposition. *See* Decl. of Peter A. Swanson in Support of Pl.'s Opp'n to Mot. to Compel.

Dep. at 75:12–18, 61:1–17; Ex. G, Yarbrough Dep. at 218:5–220:3.) Mr. Williamson, who leads VGT's 25-person compliance department, testified that his job is "[t]o ensure that the products that VGT creates are compliant with regulations, as well as engagements between personnel at the company and regulators, to ensure that we adhere to their regulations for all mechanisms of engagement." (Ex. D, Williamson Dep. at 22:6–13; *see generally id.* at 22:14–28:2.) Moreover, every VGT product passes an extensive regulatory approval process, including receiving certification from an independent testing laboratory and approval by a tribal regulator, before the product is placed on the casino floor. (*Id.* at 26:17–27:1, 32:9–20, 49:6–7.)

Defendants' insistence on taking further discovery on this collateral issue should be denied for at least four reasons.

*First*, the requested Rule 30(b)(6) deposition would have no bearing on any claim or defense in this intellectual property case. This case is about Defendants' offering of games that copy VGT's trademarks and trade dress for its most popular games in an effort to confuse consumers, as well as Defendants' use of VGT trade secrets and confidential information in developing their games. Given the evidence of intentional and deliberate copying—not to mention actual confusion by consumers—it is not surprising that Defendants seek to shift the focus to VGT's compliance with NIGC regulations. But Defendants do not have any cause of action against VGT based on regulatory non-compliance (an issue that can be addressed only by the appropriate regulators), and a mini-trial on regulatory issues has no place in this intellectual property dispute.

Defendants' relevance argument spans a mere two sentences in its motion and lacks any citation to authority. Defendants first assert that a mini-trial on NIGC regulations is relevant to

damages "to the extent VGT argues that its revenues have been impacted by Castle Hill's allegedly infringing game titles." (Mot. at 4.)  Even assuming, *arguendo*, that Defendants are correct about relevance, VGT is not seeking damages in the form of lost revenue from its games.[5]  Therefore, Defendants' reliance on damages is misplaced.

Defendants also claim that this issue is relevant to its recently added unclean hands and "illegality" defenses.[6]  (*See id.*)  Defendants have never explained the factual or legal basis for these defenses, either during the meet-and-confer process or in response to a VGT interrogatory calling for such information (despite promising to supplement their response to this interrogatory more than two weeks ago).  (Ex. H (Defendants' responses to VGT's interrogatory requesting the factual and legal bases for Defendants' affirmative defenses); Ex. I (email from Defendants' counsel to VGT's counsel, Aug. 2, 2018, promising supplementation).)[7]

This failure is telling, given that unclean hands is a narrow defense in a trademark case.  *See 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1255 (10th Cir. 2013) ("[T]he

---

[5] On August 10, 2018, VGT served its opening expert report on damages issues.  VGT is seeking damages in the form of Defendants' revenue from their infringing games, as well as the amounts by which Defendants were unjustly enriched from their use of VGT's trade secrets and confidential information.

[6] As Defendants acknowledge, they added these defenses in an answer filed August 1, 2018—two days before the close of fact discovery. (Mot. at 2.)  Although the deadline for amending pleadings had long since passed (Dkt. No. 57), Defendants did not seek leave to amend their answer (and, even if they had, they would not have been able to establish good cause for the untimely amendment).  Instead, they sought to capitalize on VGT's filing of an amended complaint, which was filed with leave of Court (Dkt. No. 102), even though the affirmative defenses have no apparent connection to the amendments to VGT's complaint, which added trade secret claims under federal and Virginia law (complementing the claim under Oklahoma law), while making ***no*** change to the trademark and trade dress claims.

[7] When asked about relevance during Mr. Williamson's deposition, Defendants' counsel did not mention unclean hands or "illegality," instead claiming that regulatory compliance is relevant to damages.  (Ex. D, Williamson Dep. at 67:12–13.)

doctrine of unclean hands 'does not empower a court of equity to deny relief for any and all inequitable conduct on the part of the plaintiff.' . . . Rather, a plaintiff's unclean hands will bar recovery for trademark infringement only if the inequitable conduct is 'related to the plaintiff's cause of action.'" (quoting *Worthington v. Anderson*, 386 F.3d 1314, 1320 (10th Cir. 2004))); 6 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 31:49 (5th ed.) ("[T]o constitute unclean hands in a trademark infringement case, the . . . conduct must directly relate to the trademark that is the subject matter of the lawsuit.").

So is "illegality," to the extent it is even a cognizable defense. *See FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1087 (11th Cir. 2016). In *FN Herstal*, the Eleventh Circuit declined to decide whether unlawful use is a defense in a trademark litigation, but explained that, in the context of administrative actions at the Patent and Trademark Office, the defense requires, *inter alia*, a showing that "the issue of compliance has previously been determined (with a finding of non-compliance) by a court or government agency having competent jurisdiction under the statute involved, or where there has been a per se violation of a statute regulating the sale of a party's goods." *Id.* (quoting *Kellogg Co. v. New Generation Foods, Inc.*, Opposition No. 72,638, 1988 WL 252503, at *3 (T.T.A.B. 1988)). In addition, "[t]here must be a nexus between the use of the mark and the violation, and the violation must be material." *Id.* A violation is material only if it is of "'such gravity and significance that the usage must be considered unlawful—so tainted that, as a matter of law, it could create no trademark rights.'" *Id.* (quoting *Gen. Mills Inc. v. Health Valley Foods*, Opposition No. 76,303, 1992 WL 296518, at *3 (T.T.A.B. 1992)).

Defendants cannot show that they meet the requirements of these defenses. Instead, Defendants apparently believe that if they can somehow show non-compliance with any NIGC

7

regulation (despite the lack of such a finding by any regulatory body), this exonerates them from liability for copying VGT's trademarks and trade dress and misappropriating VGT's trade secrets and confidential information.

The motion cites no authority for this remarkable position. As a leading treatise has observed, such a rule would "turn[] every federal judge hearing a trademark infringement suit into a potential collateral enforcer of hundreds of labeling and licensing laws." McCarthy, § 19:123. Moreover, Defendants' position would mean that a plaintiff who is found to have technically violated some law or regulation not only would suffer the legal or regulatory consequences, but also would lose its intellectual property rights, while the infringer would get a free pass. That is not the law. *See FN Herstal*, 838 F.3d at 1087-88 (rejecting unlawful use defense based on alleged violations of federal statutes and regulations); *Southern California Darts Ass'n v. Zaffina*, 762 F.3d 921, 931-32, 932-33 (9th Cir. 2014) (rejecting unlawful use and unclean hands defenses based on trademark owner's failure to register as a corporation and pay taxes); *1-800 Contacts*, 722 F.3d at 1255 (rejecting unclean hands defense based on allegation that trademark owner had engaged in the same type of misconduct as defendant).

In short, Defendants' unsupported allegation that VGT's games—which were certified by testing laboratories and approved by regulatory authorities before their placement in casinos—are not in compliance with an NIGC regulation has no relationship to the trademark, trade dress, and trade secret claims asserted in this case. Defendants should not be permitted further discovery into this sideshow.

*Second*, the requested discovery would be a waste of time, particularly in light of the extensive discovery Defendants have already taken on this issue. Defendants have questioned at least four current and former VGT employees about the minimum technical standards,

including VGT's current President (Mr. Sevigny), VGT's Vice-President for Gaming Compliance (Mr. Williamson), VGT's founder and former CEO (Mr. Yarbrough), and a product manager at VGT (Mr. Harvie). The questioning of Mr. Williamson on this particular issue spans approximately half of the 127-page transcript (with the remainder devoted to other compliance issues). Moreover, VGT has produced representative submissions to testing labs (which certify the games) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇—both of which served as the basis for questions of Mr. Williamson. (*See, e.g.*, Ex. J, Williamson Dep. Ex. 102; Ex. K, Williamson Dep. Ex. 105.)

Despite this discovery, Defendants offer no factual basis for their speculation that VGT has games that do not meet the minimum technical standards and are not grandfathered. Defendants misleadingly cite an internal VGT document that discusses ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Ex. D, Williamson Dep. at 82:3–8.)[8] *See also* 82 Fed. Reg. at 61175. Thus, the document is not evidence of a regulatory violation.

Defendants cite no other factual basis for alleging non-compliance with the NIGC regulations. Having failed to provide a shred of evidence to support this allegation, Defendants should not be permitted to waste more time on this issue, as "the likely benefit of

---

[8] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Ex. D, Williamson Dep. at 60:6–15, 108:15–20.)

this attempted fishing expedition [is] speculative at best." *See Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1238 (10th Cir. 2000) ("When a [party] first pleads its allegations in entirely indefinite terms, without in fact knowing of any specific wrongdoing by the [other party], and then bases massive discovery requests upon those nebulous allegations, in the hope of finding particular evidence of wrongdoing, [the requesting party] abuses the judicial process.").

*Third*, a Rule 30(b)(6) deposition would impose an unfair burden on VGT in light of Defendants' delay in serving the Rule 30(b)(6) notice. Defendants waited to serve the notice until *four days after* they devoted hours to NIGC-related issues during the deposition of Mr. Williamson, who would have been VGT's designee on this topic. Remarkably, Defendants' motion attempts to fault VGT for not designating Mr. Williamson on Rule 30(b)(6) topics that had yet to be disclosed: "VGT did not designate Mr. Williamson as a corporate designee as to any topics in advance of his deposition; instead, it attempts to limit Castle Hill's scope of inquiry after-the-fact." (Mot. at 5.) Defendants do not explain how VGT was supposed to achieve this feat of clairvoyance.

Defendants' delay is particularly inexcusable given that VGT had asked Defendants to serve their notice more than a month before Mr. Williamson's deposition. (Ex. L (email from VGT's counsel to Defendants' counsel, May 17, 2018).) As VGT noted at the time, Defendants' "continuing delay in serving a 30(b)(6) notice [was] causing prejudice to VGT, as some individuals who VGT would have designated to testify on some of the likely topics already ha[d] been deposed in their capacities as 30(b)(1) witnesses." (*Id.*) In other words, VGT sought to avoid the exact problem presented by Defendants' motion: the burden of

subjecting employees to multiple depositions.[9]  Notwithstanding VGT's request for a more orderly process, Defendants inexplicably waited more than one month—until June 18—to serve their notice, which was less than one month before the then-July 13 fact discovery cut-off.  (Dkt. No. 70.)

It also bears mention that Defendants have rejected VGT's compromise proposal to treat Mr. Williamson's testimony as the testimony of VGT on these issues.  Although Defendants correctly note that they are not required to accept a designation of Rule 30(b)(1) testimony (Mot. at 5), they fail to explain why they need any additional testimony from VGT. *See* Fed. R. Civ. P. 26(b)(1) (discovery must be "proportional to the needs of the case"); Fed. R. Civ. P. 26(b)(2)(C)(i) (court must limit discovery if "the discovery sought is unreasonably cumulative or duplicative").  Ironically, in response to VGT's Rule 30(b)(6) deposition notice, *Defendants* requested that VGT agree to treat prior Rule 30(b)(1) testimony by Defendants' employees as Rule 30(b)(6) testimony—a proposal that VGT accepted on several 30(b)(6) topics.

Having already deposed Mr. Williamson (and other witnesses) extensively on regulatory issues, Defendants' notice appears to be an untimely effort to obtain detailed and burdensome information that Defendants failed to request in interrogatories.  In particular, Topic No. 7 requests information on "the date of manufacture for all VGT Games on casino floors," which would require VGT to search and produce records for ***thousands*** of games.[10]

---

[9] While VGT deposed certain of Defendants' employees twice (both as Rule 30(b)(1) witnesses and Rule 30(b)(6) witnesses), this was by Defendants' choice.  VGT served its Rule 30(b)(6) notice in February, and Defendants thus had the opportunity to designate these employees as Rule 30(b)(6) witnesses prior to their 30(b)(1) depositions.

[10] ▮

This information clearly is beyond the recall or ability of any witness and should have been requested through an interrogatory. The deadline for serving interrogatories, however, was June 13—five days before Defendants served their Rule 30(b)(6) notice.[11] This apparent end-run around the case schedule should not be permitted.

*Fourth*, and finally, the topic is overbroad and unduly burdensome. As noted above, it seeks detailed information about thousands of VGT games. Moreover, although Defendants claim that the motion seeks testimony concerning the NIGC's minimum technical standards, 25 C.F.R. § 547, the topic is not limited to this regulation, but rather sweeps in *any and all* "licensing, regulatory or other legal requirements." (Mot. at 4.) There is no basis for seeking such broad testimony, which would compound the burden of preparing a witness on this topic.

## II.  Defendants Have Failed to Provide Any Reason for Needing Unredacted Versions of VGT's Customer Agreements

Defendants' request for additional information concerning VGT's agreements with its customers also should be denied. Defendants claim the redactions to the agreements have deprived them of two categories of redacted information: (1) the number and titles of the games being leased to the casinos and (2) the financial arrangement between VGT and the casinos. (Mot. at 8.) But VGT months ago produced detailed spreadsheets to Defendants containing information about the number and titles of each VGT game at issue leased to each casino from 2007 through 2017, including information about the revenue generated by each game.[12]

---

[11] June 13 was thirty days before the July 13 close of discovery under the Court's Amended Scheduling Order. (Dkt. No. 70.) The parties subsequently agreed to an extension of discovery, which the Court approved (Dkt. No. 101), but this was conditioned on the parties' agreement not to serve additional discovery requests.

[12] Defendants did not raise concerns about the redactions before moving to compel. VGT produced the agreements on July 27. That same day, VGT proposed that the parties conduct an in-person meet-and-confer on July 30 to address any remaining disputes. On July 29, Defendants informed VGT that they were not available to meet and confer in person on July 30

With the exception of the conclusory statements that the information is "clearly relevant" (Mot. at 8) and "plainly relevant" (*id.* at 9), Defendants fail to explain the relevance of any of the redacted information—including information about the financial relationships between VGT and the casinos—to the claims or defenses in this litigation. *See* Fed. R. Civ. P. 26(b)(1) (discovery limited to "non-privileged matter that is relevant to any party's claims or defense and proportional to the needs of the case").

To the extent Defendants argue that detailed information about VGT's arrangements with the casinos is relevant to damages issues (which they have not), VGT's damages theories are independent of the number of VGT games at any casino or the amount of revenue generated from those games. Rather, VGT's damages theories are directed to the financial benefits *Defendants* improperly obtained through their misconduct, including the amounts by which Defendants were unjustly enriched. Accordingly, the specific details about VGT's arrangements with casinos is not relevant to damages (or any other issue) in this case.

As VGT and Defendants are competitors in a market that consists of a relatively small number of direct customers (casinos with Class II gaming machines), detailed information about VGT's current contractual relationships with casinos is highly sensitive information, the improper disclosure of which to Defendants' employees or the public would cause significant harm to VGT.[13] Particularly in light of Defendants' failure to explain the relevance of this

---

and instead offered to confer by phone. Given the requirement of the local rules for an in-person meet and confer, VGT offered to meet in person on August 1 or after the depositions scheduled to take place throughout the remainder of the week. Although Defendants' counsel agreed to meet following a deposition on August 1, Defendants' counsel left that deposition immediately upon its conclusion without meeting and conferring on any of the remaining disputed issues. At no point during this process did Defendants raise concerns—either in writing or in person—about the redactions in the agreements.

[13] [redacted]

highly sensitive information or why the information VGT already has supplied about the placement and performance of VGT's games at each casino is not adequate, the Court should deny Defendants' request for unredacted copies of the customer agreements.

## CONCLUSION

For the foregoing reasons, VGT respectfully requests that this Court deny Defendants' motion to compel in its entirety.

▬▬▬▬▬▬▬▬▬ (Ex. M.)

| | |
|---|---|
| Dated: August 17, 2018 | */s/ Gary M. Rubman* |

Graydon Dean Luthey, Jr., OBA No. 5568
GABLE GOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, OK 74103-4217
Telephone: (918) 595-4821
Facsimile: (918) 595-4990
dluthey@gablelaw.com

Gary M. Rubman
Peter A. Swanson
Michael S. Sawyer
Rebecca B. Dalton
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 778-5465
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
   (admitted pro hac vice)

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1221
Facsimile: (212) 841-1010
nroman@cov.com
   (admitted pro hac vice)

***Counsel for Video Gaming Technologies, Inc.***

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2018, I filed the foregoing Plaintiff Video Gaming Technologies Inc.'s Opposition to Defendants' Motion to Compel Discovery via ECF, which caused a true and correct copy of the foregoing to be delivered to the following counsel for Defendants:

Robert C. Gill
Thomas S. Schaufelberger
Matthew J. Antonelli
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
tschauf@saul.com
matt.antonelli@saul.com

Sherry H. Flax
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA 4254
JAMES C. HODGES, PC
2622 East 21st Street, Suite 4
Tulsa, OK 74114
Telephone: (918) 779-7078
JHodges@HodgesLC.Com

Duane H. Zobrist
Jonathan S. Jacobs
ZOBRIST LAW GROUP PLLC
1900 Arlington Blvd. Suite B
Charlottesville, VA 22903
Telephone: (434) 658-6400
dzobrist@zoblaw.com
jjacobs@zoblaw.com

*Attorneys for Defendants*

                                                                      */s/ Gary Rubman*