IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA

VIDEO GAMING TECHNOLOGIES, INC.,    )
                                     )
             Plaintiff,        )
                                     )
-vs-                          ) No. 17-CV-454-GKF-JFJ
                                   )
CASTLE HILL STUDIOS, LLC, et al.,    )
                                   )
            Defendant(s).      )

**TRANSCRIPT OF TELEPHONIC MOTION HEARING**

BEFORE THE HONORABLE JODI F. JAYNE

UNITED STATES MAGISTRATE JUDGE

SEPTEMBER 6, 2018

A P P E A R A N C E S

**Gary M. Rubman and Peter A. Swanson,** Attorneys at Law, Covington & Burling, 850 Tenth Street N.W., Washington, DC, 20001, attorneys on behalf of the Plaintiff;

**Henry A. Platt and Matthew J. Antonelli,** Attorneys at Law, Saul, Ewing, Arnstein & Lehr, 1919 Pennsylvania Avenue N.W., Suite 550, Washington, DC 20006, attorneys on behalf of the Defendants.

*REPORTED BY:*      *BRIAN P. NEIL, RMR-CRR*
                            *United States Court Reporter*

Thursday, September 6, 2018

\* \* \* \* \*

**DEPUTY COURT CLERK:**   This is Case No. 17-CV-454-GKF-JFJ, Video Gaming Technologies, Inc., v. Castle Hill Studios, LLC, et al.   Counsel, please enter your appearance for the record.

**MR. SWANSON:**   This is Peter Swanson from Covington & Burling on behalf of Plaintiff Video Gaming Technologies, Inc., and also with me is Gary Rubman of Covington & Burling.

**MR. PLATT:**   And for defendants, this is Henry Platt of Saul, Ewing, Arnstein & Lehr, and with me is Matt Antonelli.

**THE COURT:**   Good morning, everyone.   This is Judge Jayne.   I'm in the courtroom and we are on the record on defendants' motion to compel, which is docket 117.   I apologize for the delay this morning.   We had some technical difficulties caused by some wires and other things that I certainly don't understand but we think we have those resolved now.   So thanks for your patience.

I'd like to start with topic 7 of the Rule 30(b)(6) notice.   The way I see this dispute is that it's related to plaintiff's compliance with certain NIGC regulations. Defendants are ultimately trying to show that some of plaintiff's games are out of compliance with the NIGC regulations, and that results in equitable reasons plaintiff should not be able to recover under the relevant statute.

1       Plaintiff it seems is arguing that topic 7 is not

2   relevant because those are not actual legitimate or relevant

3   defenses and this is wasteful because defendant has already

4   deposed Mr. Williamson, and it appears some other employees as

5   Rule 30(b)(1) witnesses, and essentially defendants should be

6   willing to designate those as their Rule 30(b)(6) testimony.

7       I do have some questions.  First, this is for the

8   defendants.  It seemed in your reply brief that you shifted the

9   focus really of your relevance argument from damages to the two

10  defenses and then the opinions offered by Stacy Friedman.

11      So my question is, are you still contending that this

12  is relevant to damages or have you abandoned that position?

13      **MR. PLATT:**  This is Henry Platt, Your Honor.  A

14  couple of things just timing-wise.  As far as, you know, our

15  argument about relevance to damages, shortly before the close

16  of discovery, the plaintiffs filed a first amended complaint,

17  with the judge's permission, of course, which they did not

18  eliminate their claim for damages from their lost profit --

19  from plaintiff's lost profits.

20      They have a first amended -- I mean, their sixth

21  supplemental responses to interrogatory 13 regarding damages

22  which they amended, I think, a few days before close of

23  discovery.  They continue to say that they were seeking lost

24  revenue.  The 30(b)(6) witness said they were seeking lost

25  revenue.

1    After we filed our motion, they had an expert give a

2  report in which he didn't mention lost revenue -- I mean, their

3  lost profits, instead focused on disgorgement and unjust

4  enrichment arguments.  So we have this argument because --

5  well, frankly, they hadn't abandoned it and I don't know that

6  they have formally abandoned it.

7    But all that said, it still does go to damages because

8  under the Lanham Act under Section -- hold on -- the damage

9  provision of section -- of the Lanham Act, 15 U.S.C. 1117(a),

10  provides that any of the damages awarded, including unjust

11  enrichment and the defendants' profits, are -- they're entitled

12  to it only to the subject -- to the principles of equity.

13    We think that it still goes to that issue because the

14  court needs to consider the equitable issues, which we've

15  raised the defenses, even if it's determining that the damages

16  to be awarded are the disgorgement of the plaintiff's -- I

17  mean, the defendants' profits and any revenue.

18    There is a Tenth Circuit case discussing this, which is

19  the *Western Diversified Services* case, which is a 2000 --

20    **THE COURT:**  Mr. Platt, is that in one of your briefs

21  somewhere?  Could you point me to that, if it is?

22    **MR. PLATT:**  No, it is not.  But my point is just the

23  statement about the statute is.

24    **THE COURT:**  Sure.

25    **MR. PLATT:**  This is just interpreting that statute

1    because the statute says that you have to look at equitable

2    principles.  The Tenth Circuit followed that rule so we think

3    it is very relevant to this issue.

4              **THE COURT:**  Yeah.  And that dovetails into one of my

5    other questions, which was obviously you've now asserted these

6    affirmative defenses, I think it's affirmative defense 17 and

7    18, the unclean hands defense and the illegal use defense.

8              And my question was going to be for you just -- and I

9    think you've answered it by your last statement -- but if Judge

10   Frizzell had denied the motion for leave to amend and you would

11   have had no opportunity to amend your answer and add those two

12   defenses, would you still have been entitled to this discovery

13   on general relevance grounds to damages and to the language in

14   15 U.S.C. 1117(a) that references equitable principles?

15             **MR. PLATT:**  Well, we believe we would because the

16   equitable principles apply.

17             But, in addition, they did amend the complaint and they

18   added new claims under the Virginia Trade Secret Act they added

19   new claims under the federal Defend Trade Secret Act and

20   they're seeking injunctive relief under these claims, which,

21   again, brings into focus all these equitable issues and we

22   certainly had a right to add those defenses.

23             Frankly, it was only in the last couple of weeks when

24   we did our 30(b)(6) deposition and deposed the president of the

25   company and some other individuals that it really came out

1    how -- and they produced this document that showed that, you

2    know, tens of thousands of -- I don't know if tens of thousands

3    -- I think it was 90 percent of their games are noncompliant,

4    we only found that out in the last couple of weeks.  We

5    certainly would have moved to amend to add the claim if we

6    thought it was relevant at that point, but we didn't have

7    because they filed their motion frankly.  I think we have the

8    right to assert any defenses we have to those claims, including

9    the new claims, which these certainly cover.

10            **THE COURT:**  Thank you.  That's helpful.

11            Plaintiff, I have some questions for you.  And I'm

12    going to give you a chance to make any other arguments you wish

13    to make.  I just want to cover my questions first.

14            Plaintiff, assuming that I overrule your relevance

15    objections, what would be plaintiff's preference between

16    producing Mr. Williamson again for a deposition or submitting

17    some sort of sworn declaration, which I think was offered as a

18    compromise I saw in some of the correspondence between you all?

19    And if you want to look at something specific, I'm looking at

20    page 3 of Exhibit B to defendants' motion, and it appears to be

21    the letter when -- or an e-mail where it was proposed -- some

22    other form of declaration and it had just four topics listed

23    underneath it.

24            I'm wondering if I overrule your relevance objections

25    or other objections, what is plaintiff's preference for --

1  | between a Rule 30(b)(6) depo and this type of sworn

2  | declaration?

3  |         **MR. SWANSON:**  Good morning, Your Honor.  This is

4  | Peter Swanson from Covington & Burling.

5  |         **THE COURT:**  Good morning.

6  |         **MR. SWANSON:**  I'm happy to -- happy to answer that

7  | question.

8  |        And, first, just to clarify the position, it is not

9  | limited to relevance.  But we also see it as a fishing

10 | expedition because they have no evidence in support of this

11 | theory of noncompliance and the document that Mr. Platt just

12 | referred to they are mischaracterizing.  In addition, their

13 | issue with timeliness and lack of diligence in pursuing this

14 | discovery.  I'm happy to talk about that later.

15 |        But to answer your question --

16 |         **THE COURT:**  Let me rephrase then.  Assuming I

17 | overrule all your objections --

18 |         **MR. SWANSON:**  Sure.

19 |         **THE COURT:**  -- and I'm going to let you tell me what

20 | all those objections are.  I wasn't trying to limit you to

21 | relevance.

22 |         **MR. SWANSON:**  Sure.

23 |         **THE COURT:**  Just tell me at this point what would be

24 | your preference.

25 |         **MR. SWANSON:**  Yeah.  The declaration that they

1    proposed in Exhibit B at page 3, I mean, as I read it, it goes

2    well beyond the topic.  They're asking for data and records for

3    thousands of games, manufacture dates, the dates on which games

4    were submitted to testing labs for certification, and then

5    testing lab reports and certificates from the tribal gaming

6    regulators.

7         Certainly by the time they made that request, and even

8    by the time they served a 30(b)(6) notice, the deadline for

9    serving requested production and interrogatories had already

10   passed.  And so I think, you know, as between the two, if we

11   had to choose, we would choose the deposition --

12        THE COURT:  The deposition as limited to topic 7 as

13   worded?

14        MR. SWANSON:  As limited to topic 7.  I mean, I

15   think it's still overbroad because topic 7 applies to any --

16   compliance with any and all laws of regulations, and their

17   motion makes clear that this is just about one particular set

18   of regulations, the minimal technical standards.  So I don't

19   think we should be having the deposition to every possible law

20   and regulation that may be applicable.

21        The other is, this request in the deposition topics

22   were the dates of manufacture for all of the VGT games is, in

23   our view, improper attempts at an interrogatory after the

24   deadline for certain interrogatories.  That's not information

25   that any witness can sit there and testify to based on their

1    knowledge or recollection.  This would require VGT to do an

2    extensive and burdensome search for data and have to produce

3    that data to Castle Hill.

4         **THE COURT:**  Okay.  Thank you.  Those were the things

5    that I wanted to clear up before I heard your arguments so that

6    I could have those in my mind.

7         Now I'd like to go back to you, plaintiff, and let you

8    make any points that you would like to make on this motion.

9    I'm sorry.  Defendant, I would like to start with you.  I

10   apologize.  It's your motion.

11        As you're making your arguments, just keep in mind that

12   I've read your briefs and all correspondence.  I haven't read

13   all the depositions but I've read most of the depositions.  So

14   if there's something in there you think is particularly

15   important that I may not have seen, let me know.  I did see the

16   relevant exchange between counsel during Mr. Williamson's

17   deposition, which I think lays the groundwork for the current

18   dispute, at least over topic 7 of the Rule 30(b)(6) notice.

19        So with that, please feel free at this time to make any

20   arguments you'd like to make.

21        **MR. PLATT:**  Thank you, Your Honor.  Henry Platt

22   again.

23        **THE COURT:**  Yes.

24        **MR. PLATT:**  As far as the topic 7 and the 30(b)(6),

25   just a little background -- well, just to respond to something

1    that Mr. Swanson said, yes, we are limiting the 30(b)(6) to the

2    NIGC minimum technical standard requirements and the

3    grandfathering provisions.  We're not looking for compliance

4    with everything in the universe.  That's pretty clear, as I

5    said, which we said in our briefs.

6           Now, the document that we've attached to the motion and

7    that we started questioning some witnesses about purports that

8    the overwhelming majority of the plaintiff's machines are not

9    compliant with the current minimum standards for class II

10   games.  Now, that doesn't make them illegal in and of itself

11   because there was provision -- there was a regulation in 2008

12   that said that any games that were manufactured prior to a

13   particular date -- I believe it was November 10th, 2008 --

14   would be considered grandfathered for five years, be allowed to

15   keep them on the floor for five years, subject to if within X

16   number of days they were approved by the gaming commission and

17   so forth.  So they had many games that were not in compliance

18   but were grandfathered.

19          That five-year grandfather provision was then extended

20   another five years so it's set to expire in the end of -- I

21   believe it's this year but -- in November of this year.  But

22   last fall the commission eliminated the sunset provision and

23   made the grandfathering provision permanent.  So the point,

24   though, is that it still only relates to games that were

25   actually manufactured or in use in November of 2008.

1          What we have in this case is evidence that they

2   continued to make these same games with this same improper --

3   same system that's not up to standards well after 2008 and they

4   continued to place them on the floor.  We have some deposition

5   testimony along the way where they're not sure how many but,

6   you know, there could be, there may be -- well, we think that

7   it's significant.  Because they have twenty thousand games,

8   okay, or twenty-something thousand games and the

9   ninety-something percent of them are not in compliance.

10         We find it very hard to believe that -- the other

11  10 percent is another thing that they've actually put out as

12  new in the last ten years.  And if these games are illegal and

13  they're claiming that they have some sort of independent

14  economic value in these -- that the trade secrets that they're

15  claiming we stole making them how they work, we think that's

16  very relevant and we think it's very important.

17         I think we have a right certainly in the court

18  fashioning these equitable remedies to determine whether or not

19  to issue an injunction and whether or not we're -- you know,

20  they should be entitled to disgorgement of our profits because

21  they unfairly competed -- they're claiming unfair competition

22  when these games aren't even legal.  Well, to a large extent.

23  Obviously, we don't think all of them are.  But it's certainly

24  something we're allowed to explore and make relevant arguments

25  to the court.  They're asking for millions of dollars here,

1    many millions of dollars, and we're entitled to raise our

2    equitable defenses which we think are very valid and very

3    strong.

4         Now, as for the other issue, which I think is pretty

5    straightforward --

6         **THE COURT:**  Yeah.  I don't want to get to that yet,

7    the redacted documents.

8         **MR. PLATT:**  Yeah.

9         **THE COURT:**  I want to stay focused on the 30(b)(6)

10   right now.

11        **MR. PLATT:**  Okay.  Well, like I said, you know, we

12   did take -- you know, we asked for information in

13   interrogatories and in document requests and basically we got

14   the end, if you pardon the expression.

15        **THE COURT:**  You got the what?  I'm sorry.  I

16   misunderstood you.  You got the what?

17        **MR. PLATT:**  We got a lot of resistance and we got a

18   lot of, hey, we'll talk about it in our meet-and-confer

19   meetings and they never got to it and then we had follow-ups

20   and then they don't think it's relevant and we didn't get

21   anywhere.  So we just started asking the witnesses to answer

22   the questions, and what we got was conflicting statements from

23   the head of compliance, from the president of the company, from

24   the former owner or CEO of the company, and the management

25   people.  We got information all over the place, different

1  versions of what they did and what they're doing, and we're

2  entitled to one official accounting of what they have done to

3  be compliant and whether or not they've gotten the proper

4  certifications to be compliant.  That's the point of a 30(b)(6)

5  deposition, to get the official company position on this, and

6  we think we're plainly entitled to this.

7           THE COURT:  So is it your position that you did have

8  an interrogatory geared toward this issue?  And I understand

9  that maybe it came up in depositions and you weren't focused on

10 it until then.  But I'm asking:  In your interrogatories, in

11 your requests for production, did you ask for things similar to

12 what you are asking for in topic 7 of your 30(b)(6) notice that

13 you're claiming you didn't get or that you got resistance on?

14          MR. PLATT:  Honestly, Your Honor, I believe so but I

15 would have to go back and find the specific line.  It's been --

16          THE COURT:  Well, I only ask because I feel like

17 part of plaintiff's argument is, this is late in the process,

18 this is something they could have asked for in an

19 interrogatory.  This looks more like an interrogatory

20 especially part (d) of the request, and so it does kind of

21 matter to me to some extent if that's something that you asked

22 for or whether this is a new issue that has come up in June or

23 July of this year.

24          MR. PLATT:  Well, Your Honor, as far as being -- I

25 mean, they're saying that we're asking -- maybe it could have

1  better written -- but, you know, they have to come in and give

2  us the date one by one of 20,000 games.  That's not what we're

3  asking for, you know.  We need to know how many games were

4  manufactured and put on the floor that are not compliant after

5  November 10th of 2008.  That's what -- we need numbers.  We

6  don't need, you know, each specific game title, you know, for

7  this specific machine, that this went into effect -- went into

8  -- was manufactured on this date or that date.

9       I mean, what we -- you know, there's a strict cutoff in

10  the law, November 10th, 2008.  What we need to know is, you

11  know, the number of games that were produced -- were

12  manufactured after that -- after that that they have on their

13  floors of their casinos that they're claiming are grandfathered

14  but are not actually compliant.  It's not like they need to sit

15  there and read off a list.  I mean, it's something that they

16  have and they can easily provide.

17       **THE COURT:**  Well, that's not exactly what -- what

18  part (d) says.  So you're willing to limit (d)?  (d) asks for

19  someone to come testify as to the date of manufacture for all

20  VGT games on casino floors in Oklahoma.

21       **MR. PLATT:**  Yes.  No.  I mean, yes, yes.  Like I

22  said, it was probably poorly worded, but certainly we need to

23  know, you know, how many games and what titles because they've

24  sued us for infringing on 20 different titles that are on the

25  floor that were manufactured after that date that are not

1  compliant.

2          THE COURT:   And is that something that plaintiff is

3  going to be able to answer, or are they denying that they have

4  any games that are noncompliant from what you know so far?  I

5  mean, is that -- what I'm asking is, is that a straightforward

6  answer?

7          MR. PLATT:   Yes.  They are required to have the date

8  of manufacture by the NIGC regulations.  They know the date of

9  manufacture of all their machines, they know what system op

10  they're in, and they know whether they're compliant or not.

11  Yes, they have that information.

12          And if it is correct that all their games are fully

13  compliant, then obviously we've just discovered that and we'll

14  make the appropriate, you know, or not make the appropriate

15  argument -- we'll appropriately not make an argument if it

16  doesn't bear out but we're entitled to discovery.  We don't

17  have to just take their word for it that they're all compliant

18  when we're getting conflicting statements from their own people

19  in depositions.

20          THE COURT:   Okay.

21          MR. SWANSON:   Your Honor --

22          THE COURT:   Yeah.  One second.  Okay.  I think that

23  covers all my questions and issues that I wanted to ask

24  defendants on the 30(b)(6) issue.

25          Is there anything else, Mr. Platt?

1          MR. PLATT:  On the 30(b)(6)?  No.

2          THE COURT:  Okay.  I will hear from you now,

3    Mr. Swanson.

4          MR. SWANSON:  Thank you, Your Honor.  I mean, I'll

5    start with -- I mean, I guess I wasn't quite clear kind of

6    where we landed on part (d) on the date of manufacture.  But if

7    what they're saying now is they just want the total number of

8    games that are grandfathered, they have that in the document

9    that they cite which is Exhibit A to their motion.  So that

10   information they already have.  Those are the grandfathered

11   games and --

12         THE COURT:  Mr. Platt, what else -- I'm going to

13   interrupt you just right here.  Mr. Platt, what else do you

14   want besides the total number of games that are grandfathered,

15   which he says you already have?

16         MR. PLATT:  It's a little more complicated than

17   that.  They're saying they're grandfathered.  We're saying to

18   be grandfathered we need to know the date of manufacture of

19   these games because that's what the regulations require.

20         They have one of their witnesses taking quite an

21   interesting view that has to do with, you know, a system that

22   was -- you know, the underlying, you know, computer software

23   that was approved, where the regulations are very clear and the

24   guidance is very clear that it's a "physically off the assembly

25   line" issue.  So by them saying that they're grandfathered, it

1   is sort of their conclusory argument that they're legal.

2        We're specifically limiting it to -- we need to know

3   the date of manufacture, not whether they were grandfathered or

4   not.

5        THE COURT:    Okay.

6        MR. PLATT:    I mean, we need both.    Obviously,

7   they're claiming they're grandfathered.    But, you know, because

8   if the date of manufacture is after that and it's not

9   compliant, then it's not grandfathered.

10       THE COURT:    Okay.    You can continue, Mr. Swanson.

11       MR. SWANSON:    Sure.    It sounds to me like they're

12   not narrowing part (d) at all.    They still want the date of

13   manufacture for thousands and thousands of games that are

14   grandfathered.    That is not something, as far as I'm aware,

15   they have requested in the interrogatories.    So, again, I do

16   think it's untimely.

17       But, I mean, I think the larger point that I want to

18   start with is that I think Mr. Platt admitted there that

19   grandfathered games, and specifically grandfathered games in

20   Exhibit A that are referred to as noncompliant, this doesn't

21   show that they violate the regulations because grandfathered

22   games by definition do not have to comply with the NIGC and the

23   minimum technical data.    They've come forward with no other

24   evidence in support of this theory.    It is pure speculation as

25   far as I can tell.

1     So, you know, before we have to undertake the burden of

2   putting up a witness for the second time on this, they should

3   have to be able to provide some basis at this late stage of the

4   case for why they actually think there's any substance to this

5   theory beyond just a pure fishing expedition.

6     So, I mean, I think that's -- that's reason alone to

7   deny the request.

8         **THE COURT:**  Well, let me go back to Mr. Platt then

9   on that.

10     Why is this more than pure speculation, Mr. Platt?  Why

11   is this not a fishing expedition?

12         **MR. PLATT:**  Because the president of VGT, Jay

13   Sevigny, testified in his deposition that he didn't have the

14   specific knowledge of the status of the games built after 2008,

15   which is what we have on page 3 of our reply.

16     All right.  He said that they're probably, maybe, he

17   doesn't know, there could be games that are -- that are

18   noncompliant or manufactured after that date but he doesn't

19   know off the top of his head.  That's why we need an official

20   corporate position and statement as to when these games were

21   manufactured because they're playing fast and loose with the

22   definition of what's regulated -- what's grandfathered.

23         **THE COURT:**  Okay.  Thank you.  You can continue,

24   Mr. Swanson.

25         **MR. SWANSON:**  Sure.  Thank you, Your Honor.

1    I mean, these conflicting statements in Mr. Sevigny's

2    testimony doesn't prove anything.  First of all, I don't

3    believe that's what Mr. Sevigny testified to; but even if it

4    is, that doesn't show that there are actually games that do not

5    meet the definition of the grandfather provision.

6    So they had the chance to depose several witnesses on

7    this.  They had the chance to ask for documents.  They actually

8    had some documents relating to this issue.  We're now halfway

9    through expert discovery and they still have no evidence in

10    support of this theory.  So we think their argument is a

11    fishing expedition.

12    In addition, even if they had some evidence, this is

13    not relevant.  I do agree with Mr. Platt that equity is an

14    issue in the case versus injunctive relief.  We're seeking the

15    equitable remedy and disgorgement of profits, but all the cases

16    we cite in our opposition show that -- that you can't just

17    claim some technical violation of a regulation or a law and

18    that deprives the plaintiff of relief in a trademark or trade

19    secret case.  The cases are clear that this is a very -- to the

20    extent this is a defense at all, this is a very narrow defense

21    and it's not applicable in a case such as this.

22    **THE COURT:**  Mr. Swanson, let me stop you there.  The

23    cases you cited me, don't those -- none of those involve the

24    request for discovery obviously.  Those were affirming or

25    denying grants for summary judgment, they were discussing the

1    evidence, and those cases at least indicate to me -- I do

2    understand it does appear to be a fairly narrow defense, but

3    those cases don't tell me what's discoverable, do they?

4         MR. SWANSON:  Well, I mean, they tell you what's

5    relevant and what's not relevant.  I agree they're not cases

6    deciding a motion to compel or a discovery motion but they make

7    clear that the bar is pretty high.  I do think that's important

8    in looking at Rule 26 and proportionality and what's the likely

9    benefit of this.  I mean, are we just going to have to collect

10   all this data about manufacture dates, put up Mr. Williamson

11   again, and then, you know, the court grants us summary judgment

12   on this?  Because it's clear they don't have anything coming

13   close to an unclean hands or illegality defense.  So I think

14   it's irrelevant and there's very little intended benefit likely

15   to come from this.

16        THE COURT:  Yes, I understand.  And I do think it is

17   important to the proportionality analysis as to how much

18   benefit they're likely to get from that and those cases do help

19   me understand that issue.  But I was just making sure you

20   weren't contending that -- I mean, if anything, those cases say

21   sometimes this defense might work, it might be relevant, and I

22   think the phrase they use is -- at least one of the cases used

23   whether the person seeking damages under the copyright act, or

24   whatever it is, dirtied their hands in acquiring the right he

25   now asserts or that the manner of dirtying renders inequitable

1   the assertion of such rights against the defendant.  I'm not

2   sure I've put my brain about exactly what that means, but it

3   certainly is not every technical violation just as you've

4   indicated.

5          So you can continue.

6          MR. SWANSON:  Right.  And, I mean, I think the

7   discussion we're having this morning is -- you know, just kind

8   of demonstrates that this isn't appropriate in a trademark and

9   trade secret case.  I mean, we're talking about, you know,

10  interpretation of arcane regulations and would require the

11  court of do fact-finding into, I guess, dates of manufacture of

12  VGT games and they have to interpret the NIGC regulations, I

13  mean, binding us to this.  All of that is really beside the

14  point.

15         I actually think Castle Hill in their reply didn't

16  address any authority.  The one case they did cite that

17  addressed this issue, which is a district court case from 30

18  years ago, had some pretty interesting language, the *Bambu*

19  *Sales* case.

20         And on page 4 of that case, the court -- and it's

21  actually quoting the Second Circuit and the Third Circuit here

22  -- but the court says, "Noting that unless the defense were

23  limited to misuses frustrating the purposes of the copyright or

24  trademark statute, the court posed the incongruous result that

25  'arguably an infringer could defend on the ground that the work

1    had been transported into the state in the copyright owner's

2    truck that does not meet federal safety and pollution

3    requirements or by an interstate carrier not certificated as

4    required by the Interstate Commerce Act. The possibilities are

5    well nigh limitless.'  In a similar case, the Third Circuit

6    refused to permit the defense of unclean hands to stand where a

7    defendant sought to preclude a claim of patent infringement on

8    the allegation that the plaintiff used the patented product in

9    an illegal gambling business.  The court rejected the defense

10   observing: '. . . if the defendant can do no more than show

11   that the complainant has committed some legal or moral offense,

12   which affects the defendant only as it does the public at

13   large, the court must grant the equitable remedy and leave the

14   punishment of the offender to other forums.'"

15          So I think it's, you know, the lack of relevance

16   combined with the fact that they had no evidence in support of

17   a theory that there are grandfathered games that really

18   shouldn't be grandfathered, I think it's those two combined,

19   along with just the lack of diligence here, and since we note

20   in our opposition that discovery was served after

21   Mr. Williamson's deposition and we have been asking them for

22   months to please serve your 30(b)(6) deposition so we don't

23   have witnesses that get redeposed.  So they simply were not

24   diligent.

25          And I think, Your Honor, for all those reasons, we

1    think this request should be denied.

2         THE COURT:  Tell me about any burden --

3    burdensomeness objections that you have with topic 7, I guess

4    with the limitations to part (d) that we have discussed today,

5    to the extent those are clear to you.  Tell me what kind of

6    time, what kind of effort this is going to take for your

7    company to look for and prepare somebody for this deposition.

8         MR. SWANSON:  Yes, Your Honor.  It even burdens us

9    as part of -- if I understood Mr. Platt the last time, they're

10   not limiting part (d) of topic 7 which I think is the most

11   burdensome aspect of it.  And so this would require VGT to have

12   to go through its records and identify the date of manufacture

13   for, you know, it's 10,000-plus games that may be

14   grandfathered.

15        So there's a lot more than just preparing

16   Mr. Williamson to testify here.  It's a pretty massive --

17        THE COURT:  What I'm asking you is, how hard is that

18   to do?  I mean, honestly for your people, is it -- is that a

19   huge undertaking or is that information that's pretty readily

20   available in some sort of spreadsheet?  How long do you believe

21   that would take them to prepare?

22        MR. SWANSON:  I -- you know, I can't answer that

23   question specifically.  I mean, it's not trivial given the

24   number of games that we're talking about here.  Obviously,

25   we're talking about games because they're grandfathered they go

1   back quite a ways in time, and so I don't know exactly what the

2   recordkeeping is on that.

3           THE COURT:  Well, isn't he asking -- and I could be

4   misunderstanding some of this grandfathering issue so please

5   correct me -- but isn't he asking for how many games and what

6   titles are on the floor that were manufactured after

7   November 10th, 2008; or is that incorrect?

8           MR. SWANSON:  Well, maybe Mr. Platt can clarify.

9           THE COURT:  Mr. Platt, I have written down how many

10  games and what titles are on the floor that are noncompliant

11  and that were manufactured after November 10th, 2008.

12          MR. PLATT:  That's correct, Your Honor.

13          THE COURT:  So maybe I misunderstood what you just

14  said, Mr. Swanson, regarding what you'd be looking for in terms

15  of old machines, old records.  I think he's asking for machines

16  that were manufactured after 2008.  Does that in any way limit

17  the burden, or are we talking about apples and oranges?

18          MR. SWANSON:  I mean, I think they're -- you know,

19  they're applying that cutoff date and I think that would limit

20  what we would have to look for.  I mean, you know, there

21  certainly are, you know -- yeah, yeah, I think that would

22  narrow it.  I still don't know that that, you know, makes it an

23  easy task.

24          THE COURT:  Okay.  Let's move on to the issue of the

25  redacted documents, unless there's any other arguments either

1    one of you would like to make on the Rule 30(b)(6) issues.

2         Mr. Platt, anything further you'd like to say?

3         MR. PLATT:  Just in terms of burdensome, they're

4    required to maintain records of this information for regulatory

5    purposes and they have to comply.  Frankly, if it's as cut and

6    dried as they say it is, then this really shouldn't be a big

7    issue.  If all of their games were manufactured -- that were

8    manufactured after November 10th of 2008 are fully compliant,

9    then there's really not an issue here.

10        The fact that they're making such a big deal out of

11   this when we've had dozens of depositions and hundreds of

12   thousands of pages of documents exchanged makes me very

13   suspicious of the motivation here in trying to avoid disclosing

14   this very simple basic information.

15        THE COURT:  Okay.

16        MR. SWANSON:  And, Your Honor -- yeah.  And, Your

17   Honor, part of the point here is we're more than a month after

18   the close of discovery.  And so, I mean, yes, all of our games

19   are compliant and, you know, but -- so we take issue with, you

20   know --

21        THE COURT:  Well, but they did issue this Rule

22   30(b)(6) notice before the discovery cutoff; correct?  I can't

23   remember what day it was, but it was about a month before the

24   discovery cutoff?

25        MR. SWANSON:  Yes.  Yeah.

1       **THE COURT:**  So, I mean, it's late in the process.

2   But the request wasn't after the deadline and then the motion

3   was filed on the day of the deadline and it's -- you know, it's

4   a month after that because of briefing and now we're having a

5   hearing.  So yes, we're past the discovery deadline but the

6   request was made timely.

7       It sounds like -- at least defendants are making the

8   argument -- that there were things that came up in the 30(b)(1)

9   depositions, the fact depositions, that made defendant believe

10  that one binding 30(b)(6) representation was necessary and

11  perhaps, you know, that's something that defendants couldn't

12  know until those depositions.

13      So I don't want to get too far down this path that this

14  is an untimely request.  It was late in the process.  But so

15  was your amended complaint and so is the amended answer, you

16  know, that prompted some of these affirmative defenses being

17  named, I think.  So I just wanted to clarify that in terms of

18  timeliness.

19      I didn't mean to cut you off, Mr. Swanson.  I

20  apologize.  If there's anything else you would like to argue

21  before we move on, please feel free to do so.

22      **MR. SWANSON:**  The only other point I'll just

23  mention, Your Honor, is that the 30(b)(1) deposition testimony

24  that they're referring to does not suggest in any way that

25  there are games that are not properly grandfathered in.  So if

1  you look at that testimony, you'll see it just doesn't support

2  this theory.  So they have nothing to go on.  This is just

3  conjecture.

4          THE COURT:  Thank you.  Mr. Platt, now let's talk

5  about your motion to compel, I guess just the -- you want the

6  documents in their entirety?

7          MR. PLATT:  Yeah.  I think it's pretty

8  straightforward, Your Honor.

9          THE COURT:  Yeah.

10          MR. PLATT:  I mean, we served this request in

11  February and they responded in March saying, oh, we should talk

12  about it or something.  We've had numerous meet-and-confers

13  about various topics.  We brought it up several times and they

14  asked us for these exact documents.  We provided all our

15  agreements with the tribes to them, and so they obviously think

16  they're relevant because they asked for them and we gave them

17  to them.

18          They said -- you know, after going back and forth and

19  we started saying, well, where the heck are the agreements,

20  they said, oh, yeah, we're working on it, we're working on it.

21  Then they said they'd produce it and then they repeatedly said

22  they'd produce it and they'd say they're in the process of

23  producing it.  We didn't actually get it until the Friday

24  before the close of discovery, you know, in -- whenever it

25  was -- in July, at which point it was part of a Friday night

1    document-dump with over 8,000 pages of documents and in it we

2    found hundreds of agreements with unbelievable redactions.   If

3    you look at -- we attached three of them to the reply, which

4    you can see that there are literally page after page after page

5    just completely redacted.

6           Now, there is a stipulated protective order in this

7    case.   They could have marked these "highly confidential" -- in

8    fact, I think they did mark them "highly confidential."   Yeah,

9    they did.   They're marked "highly confidential," which is

10   basically attorneys' eyes only, with no explanation --

11          **THE COURT:**   Let me stop you there.   Because I do

12   want you to remind me -- I don't have it in front of me in your

13   joint protective order -- who can view documents designated as

14   "highly confidential"?

15          **MR. PLATT:**   Just lawyers.

16          **THE COURT:**   Okay.   So it is an attorneys' eyes only

17   for that provision?

18          **MR. PLATT:**   Yes.   I think experts maybe also, but

19   yes.   The clients can't even see it.

20          **THE COURT:**   Thank you.   You can continue.

21          **MR. PLATT:**   Right.   So at no time did they ever

22   raise any objection to our request which I think is on its face

23   a waiver.   At no time did they say that they were going to

24   redact this stuff, so we, you know, managed to sort through

25   while we're in the middle of all our 30(b)(6) depositions on

1    the last week of discovery, you know.

2         It's all obviously relevant because, you know, they're

3    claiming that we're stealing floor space from them, that we've

4    copied the volatility and various aspects of the game, which is

5    all requirements from, you know, the casinos.  Some of the

6    agreements talk about how -- they vary from specific standards,

7    you know, that they can have them removed so we need to be able

8    to know what those standards are.  Because if they're claiming

9    that, you know, they had games removed from the floor because

10   of us, you know, we need to know why and we need to know what

11   the standards are.

12        Frankly, we don't know -- and a lot of that has to do

13   with the placement of the games.  They're saying we improperly

14   tried to place games close to theirs.  And to the extent that

15   they're claiming that they -- you know, that they're entitled

16   to our profits, again, going to equitable principles, to the

17   extent that, you know, any of these -- you know, they took out

18   the financial terms.  If these agreements have been paying

19   guaranteed minimums from the casinos, you know, whatever we did

20   is irrelevant.  If they're entitled to X percentage of the

21   floor space, you know, because they have a monopoly in this

22   market pretty much, or almost a monopoly -- I think they have

23   40 percent of the market, although I did see one document that

24   said 90 percent on the -- on the mechanical games, 90 percent

25   of the market, we're entitled to know what those terms are.

1    So, you know, when the court is fashioning -- if it

2    ever gets to -- fashioning, you know, appropriate remedies of

3    disgorgement and lost profits, and to the extent that they

4    continue to argue their other damages theories, I think the

5    terms of the agreements with these casinos is very, very

6    relevant and very important.

7    **THE COURT:**  Okay.  Mr. Platt, did plaintiff assert

8    any written objections to the document requests that prompted

9    production of these customer agreements?

10    **MR. PLATT:**  I'm sorry.  Can you repeat that, Your

11    Honor?

12    **THE COURT:**  Sure.  I understand in your

13    correspondence back and forth over the course of several months

14    they did not object to producing these agreements, which is

15    part of your waiver argument, and I'm, of course, very

16    interested in that.  And I'm wondering if plaintiff asserted

17    written objections to the document requests somewhere that

18    prompted production of these customer agreements and whether I

19    need to be considering those as well?  And maybe this is a

20    question better directed to plaintiff but --

21    **MR. PLATT:**  Well, I can answer it, Your Honor.  If

22    you look on page 6 of our motion, we have our actual request

23    and their objection in response to request No. 77.  It's on

24    page 6 copied verbatim.  They object -- they incorporate their

25    general objections.  They say it's overly broad, unduly

1    burdensome, including to the extent it seeks "all contracts or

2    agreements."  They further object to the request to the extent

3    defendants seek documents from VGT that are not commensurate --

4    I'm sorry? -- not commensurate with defendants' own document

5    production.  Of course, we produced all of ours.

6           And second, we are now waiving the general specific

7    objection.  They're available to meet and confer regarding a

8    mutual agreement governing the parties' production of customer

9    bids.

10          Well, we met and conferred, we all talked, we went back

11   and forth a hundred times, and we produced all of our

12   agreements and they said they'd produce theirs.  Then they give

13   us redacted agreements with -- I still have no explanation as

14   to why they did --

15          **THE COURT:**  And they didn't tell you -- they didn't

16   tell you this is really sensitive financial information, this

17   contains lease terms, this contains financial terms that we

18   don't think are relevant and that we plan to redact?  You're

19   saying that was not part of your meet-and-confer in any of your

20   discussions?

21          **MR. PLATT:**  No, Your Honor, it was not.

22          **THE COURT:**  Okay.  So this was just a surprise when

23   you got these documents that were redacted?  And obviously

24   they're not redacted for privilege so you didn't get any type

25   of log?

1        MR. PLATT:  Exactly.

2        THE COURT:  They're just redacted?

3        MR. PLATT:  Yes.

4        THE COURT:  Okay.  What -- assuming -- I have some

5    concerns about waiver issues and things like that.  But

6    assuming that they get to redact things just because they think

7    they're irrelevant, why is that financial information or lease

8    term information helpful to you?  You mentioned about -- I

9    guess you mentioned some things, guaranteed minimums, floor

10   space issues.

11        But in a concise, two-sentence synopsis, tell me why

12   that information -- and I know you don't know what it is

13   because it's redacted, but you can tell generally by the

14   context what types of information they redacted and they said

15   they've redacted things that they don't want you to know about

16   the finances about their financial agreements.  So why is that

17   financial or other information important or could be relevant

18   in this case?

19        MR. PLATT:  Sure.  It's all relevant to the extent

20   that -- that -- let me think of the best way to put this.  The

21   terms of the agreement, they're saying that we are competing

22   unfairly against them.

23        Now, the tribes who they have these agreements with,

24   these are the actual customers.  These are the people who are

25   relevant in terms of, you know, their infringement claim.

1    These are the people that would allegedly be confused, right,

2    these tribes.  These are the people that are very sophisticated

3    and that have very specific requirements on the return to

4    player, on the hold on these machines, on the volatility, on

5    whether or not they get to stay on the floor, where they get to

6    be on the floor, how many machines they get to have on the

7    floor, what are their minimums on the floor, which all goes to,

8    you know -- they're saying that, you know, we have -- you know,

9    there's a casino in Tulsa, the River Spirit Casino, where they

10   have -- I'm estimating -- about 2,000 games, 1500 games.  I

11   think Castle Hill has 10 or 15 of them, okay?  They're claiming

12   that we -- that we were putting them strategically next to

13   their games, even though they're all over the floor space, even

14   though they may have guarantees about specific high-traffic

15   areas that, you know, we may want to be in.  All these

16   agreements cover all these issues that they're saying that

17   we're trying to pull something over them when they have

18   guarantees on it.

19         So I think it's -- without knowing what the rest, you

20   know -- the page after page after page of over a hundred

21   documents actually said, I mean, on its face, just from what

22   we've seen, that's where we think it's relevant.

23         THE COURT:  Thank you.  That's helpful.

24         Mr. Swanson, I'll hear from you now on this issue of

25   the redacted customer agreements.

1      **MR. SWANSON:**  Thank you, Your Honor.  And I'll pick

2   up right there with the relevance claim because I did not hear,

3   you know, what the specific fact is that they want to prove at

4   trial and what is the legal issue that that fact goes to based

5   on the customer agreement.  I mean, these are vague assertions

6   that they're entitled to know this information, but I just

7   don't see what it is that they think the, you know, specific

8   length of term for the agreements or the percentage of revenue

9   that VGT earns from its customers, how they're actually going

10  to use that information at trial.

11      Again, we're now halfway through expert discovery.

12  They served four rebuttal expert reports.  I do not believe

13  based on my review that any of your rebuttal expert reports

14  talked about the customer agreements or claim that they need

15  more information about VGT's customer relationships to offer

16  their opinions.

17      So we're at a point in the case where we're going to be

18  filing dispositive motions and motions in limine in a couple of

19  weeks.  They should know how it is specifically that they're

20  planning to use this information at trial, if they get it, and

21  I haven't heard that.

22      This is not a case where we are claiming VGT's lost

23  profits as a form of damages.  If we were, conceivably they

24  might be relevant, but we're just seeking to disgorge Castle

25  Hill's profits.  So that makes their agreements with the

1    customers relevant, but VGT's agreements with customers have no

2    bearing on Castle Hill's profits that it earns on games.

3            THE COURT:  Well, plaintiff -- or defendants --

4    defendant argued that it's not clear from the pleadings or from

5    the 30(b)(6) testimony that the lost profits claim is

6    completely abandoned.

7            Do you believe that's clear and that everybody's

8    operating on the same page at this point in the case?

9            MR. SWANSON:  Yes, Your Honor.  We served the

10   damages expert report several weeks ago, and our damages expert

11   was not claiming lost profits, did not offer any opinions on

12   that.  Yes, our only monetary relief we're seeking is

13   disgorgement of profits as well as attorneys' fees --

14           THE COURT:  So is it your position, Mr. Swanson,

15   that a party can just redact documents for irrelevance at will

16   without coming to court and asking first?

17           MR. SWANSON:  Yes, Your Honor.  I do believe it's

18   appropriate to redact irrelevant information from documents

19   that you produce.  And, you know, here, we're talking about

20   information that's extremely sensitive for VGT and is also

21   confidential information of VGT customers as well.  So it's --

22   it's -- you know, both VGT and the customers have an interest

23   in protecting this information, and given the lack of

24   relevance --

25           THE COURT:  Well, you sort of -- typically, the way

1   this is done is you file an objection -- you know, some sort of

2   objection that says, we'll give you the documents but we're

3   going to redact a whole heck a lot of them because there's a

4   lot of information that, A, we don't think is relevant; and B,

5   is very sensitive.  And then the other side has a chance to,

6   you know, file a motion to compel on that or some other method

7   that this gets before the court, you know, before now, before

8   you've gone through months of meet-and-confers and a

9   last-minute production with redacted documents.

10          Do you have any reason for not kind of bringing, I

11  guess, this to plaintiff's attention so that he could be ready

12  for the redactions that he was going to get -- I'm sorry --

13  defendants could be ready for the redactions they were going to

14  get?

15          **MR. SWANSON:**  Well, as Mr. Platt noted, our response

16  to the requests for production did not say that we would be

17  producing documents.  We said we would like to meet and confer

18  to discuss an appropriate and mutual agreement for production

19  of customer agreements.

20          I don't think that meet-and-confer ever happened.  I

21  think the meet-and-confers that Mr. Platt was referring to

22  were, you know, conversations here or there about, you know,

23  why aren't we getting your customers agreements?  We did say we

24  would produce them and we did.  I do recognize it was late in

25  discovery and that was in part because of just the process of

1    doing these redactions and, you know, given our client's

2    concerns making sure that the most sensitive information was

3    redacted.

4         But we also, you know, could have met and conferred

5    about this before they filed a motion to compel but they didn't

6    do that.  They just put this in the motion and filed it.  And,

7    again, I do acknowledge it was -- it was at the end of

8    discovery but that never happened.

9         **THE COURT:**  What types or categories of information

10   are on the entirely redacted pages in Exhibit 7 to the reply

11   brief, the large chunks, you know?  I can tell from context

12   what's redacted in the agreements but the large pages of

13   redactions.  I'm curious.  Without you at this point because

14   you're, you know, here arguing about it in court, obviously you

15   don't want to give that away.  So without doing that, can you

16   tell me generally what those are?

17        **MR. SWANSON:**  Yes, Your Honor.  In Exhibit 7, the

18   redaction -- the two redactions, one is the -- this is on the

19   first page of Exhibit 7 -- is the term of the agreement, the

20   length of time the agreement would be in force.  And then the

21   full-page redaction on the second page is the resolution from

22   the tribal gaming board.  It's referred to in paragraph 2 on

23   the first page.  But that's -- that's a customer document, it's

24   not a VGT document.  That's something that came from the

25   customer.  And so I think that's actually their confidential

1    information more so than VGT's.

2           In Exhibit 8, which has pages of redactions, these are

3    in the schedules that followed the agreement, those are lists

4    of games and serial numbers for the games.  We separately

5    produced to Castle Hill spreadsheets that show the VGT games in

6    particular casinos, the titles, the numbers, and the revenue.

7    We haven't given them serial numbers.  I don't know why the

8    serial numbers were relevant but that's -- that's what's in the

9    redactions in terms of a --

10          THE COURT:  Okay.  Thank you.

11          MR. SWANSON:  And, you know, just on that point,

12   Your Honor, they do have all that information about which games

13   are in which casinos, revenue.  I think that just, you know,

14   further, you know, shows why the redacted information here

15   there's really no purpose to producing it --

16          THE COURT:  Okay.

17          MR. SWANSON:  So we do have a protective order in

18   this case.  Mr. Platt mentioned that.  I think there are pieces

19   that recognize that pursuant to the protective order that it

20   doesn't eliminate the need to show relevance and it is the

21   requesting party's burden to show relevance.

22          You know, frankly, Your Honor, we have some concerns

23   here about the protective order, including what we thought were

24   rebuttal expert reports on Friday.  One of the expert reports

25   was from their damages expert who was never disclosed to us

1    under the protective order as required, and they've been giving

2    VGT confidential information to that expert for months and

3    months without having complied with the protective order.  And

4    so, you know, we do have some concerns that I think support our

5    redactions there.

6         And for those reasons, Your Honor, we think the request

7    should be denied.

8         THE COURT:  Thank you.  Mr. Platt, I'm going to give

9    you one last chance to articulate for me -- you know, I know

10   you did it but he's saying he's still -- Mr. Swanson still

11   hasn't heard what fact, what legal issue that this information

12   could possibly be relevant to.  And I understand you to say,

13   you know, the tribes are the customers, they're the people who

14   would be confused, but I kind of -- I tend to agree with

15   Mr. Swanson.  I would like, you know, a very clear statement

16   from you as to why this information -- assuming that I don't

17   find that any objections are waived -- at this point in the

18   case knowing what you know about damages, knowing what you know

19   about everything else, how you'd use this at trial I guess is

20   the best way to say it.

21        MR. PLATT:  Sure, Your Honor.  I think the best way

22   -- actually let me just back up and respond to one thing that

23   was just said about this -- the protective order.

24        That is the most after-the-fact, post-hoc

25   rationalization I ever heard.  There was a technical failure of

1    us to alert the plaintiff that our expert are actually signed a

2    protective order back in April when he actually signed it and

3    has complied with it completely.  Yes, we didn't give them the

4    adequate notice but they have -- you know, they now know that

5    there's no objection to that, there's no claim that anybody

6    violated, you know -- exposed any confidential information.

7         But just to move on to your specific question, Your

8    Honor, if you look at Exhibit 8 to our reply brief, it's the

9    agreement with the Comanche Nation, okay, now, if you flip

10   forward -- if you look, for example, on page 40, topic H, the

11   location of the machines, the vendor has agreed that the gaming

12   board has an ongoing right to assign floor locations to the

13   machines, then there's all kinds of provisions about moving the

14   machines.

15        They're claiming we stole their floor space, that we

16   have been moving stuff into places to improperly compete with

17   them and to move them out of these areas.  Now, what this says,

18   I don't know what's in here but I think we're entitled to look

19   at it to see what that is.

20        If you turn to page 5 of this same agreement, No. 4,

21   minimum monthly --

22        **THE COURT:**  And so it's relevant because you're

23   going to argue we didn't steal their floor space or something

24   about this provision proves that they were going to have the

25   floor space no matter what we did?  Is that the argument?

1    MR. PLATT:  Yes, Your Honor.  Yes, Your Honor.

2    THE COURT:  Okay.

3    MR. PLATT:  And then if you look on page 5, minimum

4    monthly performance requirements, it must meet the monthly

5    minimum performance requirements.  Well, if they weren't living

6    up to their minimum monthly performance requirements and they

7    lost floor space for that and we took it, that's obviously

8    relevant.  So we are entitled to know what the terms of that

9    is.

10    The same thing with a currency plan at the bottom of

11    that page, C, where they eliminate the whole thing.  So we

12    don't even know what they're supposed to do.  The next

13    provision is about they're unable to show they're moved.

14    But on page 7(c), the machine variances, their expert

15    claims that this is one of the trade secrets we stole, that we

16    -- that the volatility of their games and the variances.  This

17    information is certainly relevant.  It goes right to -- they're

18    saying this is what we stole, and yet they have requirements of

19    things that they need to meet.

20    Now, as for the schedules, I understood Mr. Swanson to

21    say, well, it's full of serial numbers and the locations of the

22    games.  That's obviously relevant.  Especially to the extent

23    we're going to claim that many of those games are, you know,

24    like we said, illegal, and therefore, if they have the numbers,

25    we certainly can know which ones are legal and which ones

1   aren't illegal because we have spreadsheets so when they give

2   us that information.

3           You know, and then if you look on the last page of this

4   exhibit, the completely blacked-out page on VGT 0064464, now,

5   there's some sort of graphic behind this.  We don't know what

6   it is.  I don't know what that relates to.  I find it hard to

7   believe it's a bunch of serial numbers.  It has some sort of

8   artwork.

9           But the point is, we have no idea and they don't get to

10  just decide which portions of these agreements they think may

11  or may not be relevant when they, first of all, don't agree

12  with our theories of the case and what's relevant so it's

13  certainly -- I don't think they get to be the ones to decide

14  that.  And they certainly had an obligation under Rule, you

15  know, 37 to seek a protective order if they thought that this

16  stuff -- they don't get to just do this, they have to ask the

17  court's permission to withhold it.  They didn't do that and

18  they never told us they were going to do it and they just did

19  it.

20          We actually did -- in answering something Mr. Swanson

21  raised, in June Mr. Gill, counsel to the defendants, and

22  Mr. Sawyer, counsel for the plaintiff, they met in Chicago and

23  talked about it and Mr. Sawyer said he'd produce it.  We then

24  got a -- all that's laid out in the motion in the trail of

25  e-mails going back and forth.  And he came back and said, well,

1   I didn't mean it was going to be today, it will be in the next

2   couple days.  Then it was a month later.  They spent the next

3   month redacting this stuff and working on -- even Mr. Swanson

4   said it was a lot of effort because I'm sure it was.  We only

5   gave an example of three but I think there's over a hundred

6   that are like this.  They went through all that effort.  They

7   certainly had the time to raise that with us.

8        We didn't discover it until it was in a document dump

9   on Friday night the week before discovery closed, where I think

10  that we had six or seven depositions scheduled that week all

11  around the country.  To get through those thousands of pages of

12  documents to even find this, then, you know, we should have had

13  another meet-and-confer on something that they already agreed

14  to produce to us is, you know, not required.

15            THE COURT:  Okay.

16            MR. SWANSON:  Your Honor, if I could just respond

17  to --

18            THE COURT:  Of course.

19            MR. SWANSON:  -- a couple of those things?

20            THE COURT:  Sure.

21            MR. SWANSON:  So, I mean, on the Exhibit 8, I mean,

22  the points that Mr. Platt mentioned, I mean, this whole idea of

23  they're stealing floor space from us, they can -- you know, if

24  they want to refute that allegation, they can testify at trial

25  that, you know, they haven't asked this casino to place their

1    games next to VGT games.  I don't know why VGT's customer

2    agreements have anything to do with that.

3         In addition, the specific portion of Exhibit 8 that

4    Mr. Platt pointed to, we didn't redact page 3, paragraph (h).

5    We didn't redact the provision about location of equipment and

6    machines on the floor.  The redaction is actually a separate

7    subparagraph that has to do more with financial terms so that

8    doesn't have to do with placing the games on the floor.

9         The discussion of volatility in math, we produced all

10   the confidential math information that we're relying on.  We've

11   given them volatility information, given them information on

12   the whole percentages for our games so they know all of that.

13   They gave them hundreds and hundreds of pages of internal,

14   highly-confidential documents that show the math and the

15   specific percentages for games at issue.  They have all of

16   that.

17        All of these financial terms that he's pointing to,

18   again, conceivably that could be relevant if we were claiming

19   that them taking games away from VGT that we, therefore, lost

20   revenue from the customers or lost profits from the customers.

21   But we're not claiming that.  We're just claiming that for

22   whatever games they do have on the floor, whether they were

23   replaced the VGT games or didn't replace the VGT games, we get

24   to disgorge their profits.  Our customer agreements have

25   nothing to do with that.

1    **THE COURT:**  Okay.  Please bear with me for just a

2    few minutes.

3    Okay.  With respect to the 30(b)(6) issues, topic 7,

4    the court overrules the relevance objection and the court finds

5    topic 7 relevant to affirmative defenses 17 and 18 in

6    defendants' amended answer which are equitable defenses.  Those

7    defenses are part of the pleadings that will govern trial and

8    constitute defenses to which Rule 26 discovery applies.

9    Although plaintiff has cited some cases rejecting these

10   defenses under particular factual scenarios, as I mentioned, in

11   questioning these cases did not reject request for discovery

12   and, in fact, indicated in some cases that it was a

13   fact-specific question.  In the *Clyde Armory* case, the court

14   said that Clyde Armory has not submitted evidence sufficient to

15   raise an issue of fact in this respect.

16   So I'm not persuaded that this is a completely

17   irrelevant fishing expedition at this point.  There are

18   asserted defenses in this case, there's equitable relief

19   sought, and I think that there has been enough occur in the

20   30(b)(1) depositions to permit the defendants at this point to

21   get one collective Rule 30(b)(6) answer on some of these

22   topics.

23   So I am not prepared, based on the briefing that's

24   before me, to determine whether the alleged manner of -- for

25   lack of a better phrase -- dirtying of the hands -- that's

1    taken from the *Zefina* case out of the Ninth Circuit -- I'm just

2    not prepared to determine whether that renders an equitable

3    plaintiff's assertion of their rights in this case.  I don't

4    think I have enough in front of me to make that determination

5    and I think that it's still relevant at this point in the case

6    for discovery purposes.  I'm just not going to wholly preclude

7    any discovery on this equitable defense which is essentially

8    what plaintiff is asking me to do.

9          And I would also note, as I did earlier, that the

10   discovery request regarding topic 7 was made before the

11   discovery cutoff.  I know now that we're after that discovery

12   cutoff but the motion -- the request was made timely and the

13   motion was filed.  I don't think this is going to be a huge

14   interruption of what you're doing now to prepare for trial so

15   I'm going to permit that 30(b)(6) deposition.

16         Now, I will say that these defenses and these issues

17   have arisen sort of late in the process and that has some

18   consequences.  The first consequence is is that there may be

19   more proportionality limitations than if this would have come

20   up at the outset of discovery.  As I indicated, I'm going to

21   permit plaintiff to dictate how they provide this information.

22   Plaintiff has indicated that they would prefer to produce a

23   30(b)(6) witness on these topics again so that is what I'm

24   going to order.

25         With respect to part (d) of topic 7, that will be

1    limited as we have discussed here today.  And if there's any

2    confusion after this hearing as to exactly what that is, I

3    expect you to communicate with each other and I expect you,

4    Mr. Platt, to clarify that for Mr. Swanson.  But it's as we've

5    discussed, which is how many games and what titles are on the

6    floor that are noncompliant that are manufactured after

7    November 10th, 2008.

8         In my view, plaintiff was not able to articulate any

9    severe or particular or extreme burden that preparing for those

10   limited topics that are addressed in topic 7 was -- plaintiff

11   was not able to show that that was going to be an overly

12   burdensome thing for their 30(b)(6) witness to prepare for.  So

13   the motion to compel is granted with the limitation on topic

14   (d) that we've discussed.

15        With respect to the redacted customer agreements,

16   plaintiff didn't object to this request for production in the

17   specifics -- specifically related to the financial information

18   or other information that's now redacted.  They obviously --

19   plaintiff obviously did not redact for privilege and plaintiff

20   did not produce any sort of privilege log.  Plaintiff simply

21   redacted what it deemed irrelevant from an otherwise relevant

22   customer agreement.

23        Plaintiff indicated to defendants it would produce

24   these agreements for months without informing defendants that

25   they planned to redact large chunks of the agreements, and from

1    what I understand defendants did not redact similar information

2    from their customer agreements.

3         So under these circumstances, the court finds the

4    redactions improper and I'm going to order that the agreements

5    must be produced unredacted.  In my view, the proper method for

6    this would have been to file some sort of motion for protective

7    order, alert defendants to the issue, seek a ruling from the

8    court.  You're asking me to rule on relevance objections

9    without me being able to see the agreements and without me

10   really having a grasp of what's contained in those agreements

11   and that's just not typically how this is done.  The producing

12   party doesn't just get to decide that something is irrelevant,

13   and I think that's particularly true in this case given the

14   fact that we have a stipulated protective order that is

15   attorneys' eyes only.

16        I do understand that this is sensitive information.  I

17   do understand that you're claiming that defendants have stolen

18   trade secrets already.  It was not lost on me that the -- one

19   of the lease agreements still had a VGT footer apparently that

20   Castle Hill was using.  But the solution to this problem is

21   that these agreements are subject to the attorneys' eyes only

22   provision of the protective order.  If this information is

23   indeed irrelevant and never used as part of the case or the

24   trial, then it should never see the light of day and it should

25   never reach a competitor.

1        But if in the event it is -- it does end up being

2    relevant and it is used at trial or attached to motions for

3    summary judgment in some way, then that's something that you

4    can deal with at that time.  But for now, and for purposes of

5    discovery, I find that you need to produce those in an

6    unredacted form.

7        Those are my two rulings on those topics.  Is there --

8    are there any questions or is there anything further that we

9    need to address here today from the defendants' perspective?

10       **MR. PLATT:**  I do not believe so, Your Honor.  Just

11   in terms of timing, is there -- how long before they need to

12   produce this stuff?  Because we're running up against the

13   summary judgment deadline of October 5th and we have expert

14   discovery and we're in the middle -- we're in the middle of

15   reports and we're going to have --

16       **THE COURT:**  What's your request -- Mr. Platt, what's

17   your request for when the documents unredacted are produced and

18   what's your request for when the Rule 30(b)(6) happens?

19       **MR. PLATT:**  Well, as far as the documents, I mean,

20   since they redacted them, we must have unredacted versions.  So

21   I don't see why within, you know, five days that they can't

22   turn that around.

23       **THE COURT:**  Is that acceptable, Mr. Swanson?  And

24   your objections, of course, are noted.

25       **MR. SWANSON:**  I think the end of next week would be

1    doable, September 14th.

2              **THE COURT:**  Why is it going to take that long?

3              **MR. SWANSON:**  I mean, we are talking about -- I

4    think Mr. Platt said a hundred or so agreements.  But we could

5    -- I suppose we could probably do it by a week from today.

6    We're also in the middle of preparing a reply to the expert

7    reports --

8              **THE COURT:**  Sure.

9              **MR. PLATT:**  -- the four expert reports of Castle

10   Hill.  So those are due on the 14th.

11             **THE COURT:**  Okay.  Those will be due a week from

12   today, the agreements.

13        Now let's talk about the Rule 30(b)(6).

14             **MR. PLATT:**  Your Honor, the problem is that we have,

15   I think, seven depositions over the next three weeks on these

16   experts, and then -- which we've been scheduling back and forth

17   and they're all over the place.  So --

18             **THE COURT:**  Well, it sounds like maybe that's an

19   issue better for you all to work out outside of the scope of

20   this hearing.  Is that correct?

21             **MR. PLATT:**  Yeah.  It's just -- it's just that our

22   motions for summary judgment are *Daubert* motions.  The motions

23   in limine are due the 5th of October.  I don't know if that's

24   for you or for the judge.  If we could move that one week, that

25   would allow us to get this done and include whatever we have in

1    that --

2              THE COURT:  That's not for me and I don't -- I

3    really am not in favor of doing anything that's causing any

4    deadlines to be moved.

5              MR. PLATT:  I understand.  That's why I just raised

6    it.  I'm trying to figure out --

7              THE COURT:  Mr. Swanson, do you think this is doable

8    in a way that's not going to require an extension of the

9    deadlines?

10             MR. SWANSON:  Yes, Your Honor.  And I think one

11   issue here that would be helpful is imposing a time limit on

12   the deposition.

13             THE COURT:  Oh, I agree, yeah.  I mean, how long --

14   I'm fine with that.  How long -- I mean, I can't imagine this

15   would take very long, Mr. Platt.

16             MR. PLATT:  Four hours is fine, Your Honor.  And if

17   we use less, we use less.

18             MR. SWANSON:  Okay.  Yeah.  I mean, we have an issue

19   with that because they've already taken a number of hours with

20   30(b)(6) depositions, and I think we were generally keeping the

21   30(b)(6) testimony to about -- I think it was about seven

22   hours.  I don't see why they need more than two hours.

23             THE COURT:  How much do you believe is left if

24   you're going to allocate seven?  You think they've taken all of

25   that, Mr. Swanson?

1    MR. SWANSON:   Off the top of my head -- I was not

2  present at all of these depositions but, I mean -- and Henry

3  may disagree but I think you guys have probably taken at least

4  five.

5    MR. PLATT:   Honestly, you know, I think I spent an

6  hour here, I think Matt spent an hour there.   I would be

7  surprised if it was five.   So I would be surprised.

8    THE COURT:   Listen, if we're going to go to the

9  trouble to have this deposition, I'm going to permit four

10  hours.   I'm allowing it to happen.   I'm going to allow him to

11  ask all the questions he wants to ask.   I hope that, Mr. Platt,

12  you will keep it brief.   I hope you'll keep in mind you've

13  already had 30(b)(6) testimony and keep it -- if you can make

14  it two, please make it two, but I'm going to permit you four,

15  if you need it.

16    MR. PLATT:   Thank you, Your Honor.

17    THE COURT:   Does that resolve issues with -- and I

18  do expect you -- I expect the parties to get that deposition

19  scheduled in a way that does not necessitate any requests for

20  extension of the deadlines, if possible.   So I hope that you

21  can work all those issues out without having to go to Judge

22  Frizzell to request additional time.

23    Does that seem like that's going to be something that

24  you can accomplish, Mr. Platt?

25    MR. PLATT:   Yeah.   I think Mr. Swanson and I and

1    their other partner, Mr. Roman, who's been working on the

2    30(b)(6) scheduling, I think the three of us can certainly work

3    out something that's workable.

4              THE COURT:  Okay.  I will also say that I like to

5    commend parties who have gone through a whole lot of discovery,

6    which you all have, with very few disputes that have had to

7    come in front of me.  You've had a lot of depositions and a lot

8    of documents and I read all your correspondence back and forth,

9    and I appreciate your civility and professionalism that both of

10   you have showed throughout this process.  So keep it up.

11             If you have any other issues, please don't hesitate to

12   call Camie and either ask for an expedited hearing or file

13   another motion, and I'll be happy to try to get to anything as

14   quick as I can to prevent you all from needing anymore

15   extensions.

16             So with that, court's adjourned and you all have a

17   great day.

18             MR. PLATT:  Thank you, Your Honor.

19             MR. SWANSON:  Thank you, Your Honor.

20             THE COURT:  Thank you.

21                  *(The proceedings were concluded)*

22

23

24

25

*C E R T I F I C A T E*

I, Brian P. Neil, a Certified Court Reporter for the Northern District of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in above-captioned case.

I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 4th day of October 2018.

s/ Brian P. Neil
_____
*Brian P. Neil, RMR-CRR*
*United States Court Reporter*