**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1) VIDEO GAMING TECHNOLOGIES, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cv-00454-GKF-jfj |
| | ) | |
| 1) CASTLE HILL STUDIOS LLC | ) | **REDACTED** |
| (d/b/a CASTLE HILL GAMING); | ) | |
| 2) CASTLE HILL HOLDING LLC | ) | |
| (d/b/a CASTLE HILL GAMING); and | ) | |
| 3) IRONWORKS DEVELOPMENT, LLC | ) | |
| (d/b/a CASTLE HILL GAMING) | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF VIDEO GAMING TECHNOLOGIES, INC.'S MOTION TO EXCLUDE**
**THE TESTIMONY OF ROBERT ZEIDMAN IN PART AND SUPPORTING BRIEF**

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

## TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................. 1

II.  BACKGROUND ................................................................................................. 2

    A.  VGT's Trade Secret Claims. ....................................................................... 3

    B.  The Parties' Experts on Trade Secret and Confidential Information Issues. .......... 5

III.  LEGAL STANDARD .......................................................................................... 7

IV.  ARGUMENT ....................................................................................................... 7

    A.  Mr. Zeidman's Opinion Regarding Source Code Copying Is Non-Responsive, Irrelevant, and Substantially Prejudicial to VGT. ............................. 7

    B.  Mr. Zeidman's Opinions on Casino Game Design and the Gaming Industry Should Be Stricken. .................................................................... 10

        1.  Mr. Zeidman Is Not Qualified to Offer Opinions on Casino Gaming. ................................................................................................ 11

        2.  Mr. Zeidman's Gaming-Specific Opinions Are Not Reliable. ................. 15

    C.  Mr. Zeidman's Reference to ███████████ Should Be Stricken As Irrelevant and an Attempt to Unduly Prejudice the Jury. ............................... 17

V.  CONCLUSION ................................................................................................... 18

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER**

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*103 Investors I, L.P. v. Square D Co.*,
    372 F.3d 1213 (10th Cir. 2004) ............................................................8

*Alfred v. Caterpillar, Inc.*,
    262 F.3d 1083 (10th Cir. 2001) ......................................................9, 11

*Basanti v. United States*,
    666 F. App'x 730 (10th Cir. 2016) .....................................................12

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ............................................................................7

*Ho v. Michelin N. Am., Inc.*,
    520 F. App'x 658 (10th Cir. 2013) .....................................................12

*Mike's Train House, Inc. v. Lionel, L.L.C.*,
    472 F.3d 398 (6th Cir. 2006) .........................................................15, 16

*Solid Gold Casino Hotel & Resort of Tunica v. Miles*,
    No. 02-2863 B/An, 2004 WL 5499007 (W.D. Tenn. Dec. 14, 2004) ...................12

*Theoharis v. Rongen*,
    No. C13-1345RAJ, 2014 WL 3563386 (W.D. Wash. July 18, 2014) ...................8

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ......................................................9, 10

*United States v. Gabaldon*,
    389 F.3d 1090 (10th Cir. 2004) ............................................................7

*United States v. Henderson*,
    564 F. App'x 352 (10th Cir. 2014) .......................................................8

*United States v. Medina-Copete*,
    757 F.3d 1092 (10th Cir. 2014) .....................................................11, 15

**Statutes**

Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ...............................2

**Other Authorities**

Fed. R. Civ. P. 26(a)(2)(D)(ii) .............................................................8

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

Fed. R. Evid. 401 ..................................................................................................................7, 9

Fed. R. Evid. 402 ..................................................................................................................7, 9

Fed. R. Evid. 403 ..................................................................................................................7, 9

Fed. R. Evid. 702 .............................................................................................................7, 11, 15

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

## I.  INTRODUCTION

Plaintiff Video Gaming Technologies, Inc. ("VGT") moves to exclude testimony of Robert Zeidman, who purports to provide, on behalf of Defendants (collectively, "CHG"), rebuttal opinions relating to VGT's claims for misappropriation of its trade secrets and confidential information.

Early in this case, CHG retained Mr. Zeidman to analyze whether CHG's source code is copied from VGT's source code.  Mr. Zeidman specializes in this type of analysis, which he often undertakes with use of a software tool he created.  In this case, much of Mr. Zeidman's rebuttal report explains his software tool and his use of that tool to analyze whether CHG copied VGT's source code.

Mr. Zeidman should be precluded from testifying about his source code copying analysis because it has nothing to do with the trial in this case.  ███████████████████████ ███████████████████████████████████████  Rather, VGT's claim is that CHG misappropriated, *inter alia*, proprietary functionality related to VGT's bingo-based electronic gaming machines ("EGMs").  Although such functionality may be reflected in VGT's source code, it can be misappropriated in different ways without copying the source code, as Mr. Zeidman admits:  "[T]rade secret theft can also involve copying a method for accomplishing some function without copying the actual source code that implements that function."  Ex. A at 253.  Because Mr. Zeidman's software tool looks only for low-level copying of code, it does not and cannot rebut the opinions of VGT's expert that CHG has misappropriated trade secret functionality that does not depend on specific source code.

Aware of the shortcomings of Mr. Zeidman's code copying analysis, CHG also asked him to address the *actual* trade secrets and confidential information that are the subject of VGT's expert report.  All these trade secrets and confidential information are specific to casino gaming.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

But Mr. Zeidman has no experience or other expertise in the gaming industry—let alone the Class II bingo-based games offered by VGT and CHG.  And his general software expertise does not qualify him to respond to VGT's expert—a professional casino game designer with nearly two decades of experience in the industry—on issues such as development of casino games, what is known regarding the design and functionality of such games, and the types of information valuable to gaming companies.

Lacking the requisite expertise, Mr. Zeidman relies on Internet searches and misguided attempts to turn Mr. Friedman's report against itself.  But he brings no insight to these issues because he is not an expert in this area, and ███████████████████████████ ██████████████████████████  Ex. C, Zeidman Dep. Tr. 100:9–14. As a result, he offers opinions that contradict CHG witness testimony, and he makes other errors, including failing to understand how CHG's games function and focusing on differences lacking meaningful distinction.

CHG's attempt to bootstrap casino gaming opinions through its source code copying expert should be rejected.  Because Mr. Zeidman does not have the requisite experience, his gaming-related opinions are unqualified and unreliable.

## II.    BACKGROUND

VGT is the leading developer, manufacturer, and distributor of Class II bingo-based systems in North America, including in Oklahoma, one of the largest Class II markets in the United States.[1]  A few years ago, longtime VGT officials left to start a new gaming company,

---

[1] The Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, which regulates gaming on Native American land, establishes three classes of games, each with a different regulatory scheme.  The Class II games at issue here include games of chance based on bingo, in contrast to Class III gaming often associated with casinos in Las Vegas.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

CHG, where they hired other VGT employees and began marketing and selling games, including

in Oklahoma, that bear unmistakable similarities—in both appearance and gameplay—to VGT's

most popular games.

The present motion primarily concerns VGT's claims for misappropriation of trade

secrets and confidential information that VGT developed over years of creating and refining its

Class II systems and games.

### A.    VGT's Trade Secret Claims.

As CHG's own documents acknowledge,                             Like

traditional (*i.e.*, Class III) slot machines, the Class II games at issue in this case include a player-

facing device (often called an "electronic gaming machine," "EGM," or "player terminal") that

accepts wagers from players, displays the outcome of the games, and provides winnings

(generally in the form of tickets that can be redeemed for cash).  But unlike traditional slot

machines—where the player typically wins or loses based on the outcome of spinning reels on

that player's EGM—the outcome of VGT's games is determined by a live bingo game involving

EGMs throughout the casino (and, in some cases, multiple casinos) and one or more servers,

which coordinate the bingo game among participants (*e.g.*, assigning bingo cards to EGMs and

calling balls).  On each wager, a VGT player receives a bingo card, which is evaluated against

the called balls to determine if the player has achieved any of a number of winning bingo

patterns.  The EGM translates all winning and losing outcomes into spins of the reels—*e.g.*, one

winning bingo pattern might result in three cherries on the reels.  When a player achieves the

game-ending pattern, the bingo game terminates.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

A Class II game requires an entire system to handle this and other bingo-specific functionality (which is not needed in Class III games). In designing its system, VGT had to overcome challenges and address design issues specific to this Class II functionality. For example, VGT had to make choices as to the design and play of the bingo game, such as how to assign bingo cards to players, how often to call balls, how many winning patterns to include, and how to determine the end of the game. There were also technical challenges with implementing that functionality in a reliable system that casinos would want to use. In addition, federal regulations specify requirements for Class II bingo games—*e.g.*, each game must have at least two players, and duplicate bingo cards cannot be sold for the same game. The regulations, however, do not explain any methodology for meeting these requirements—which means that a company like VGT had to figure out these matters for itself.

Beyond these Class II–specific issues, VGT encountered broader challenges associated with casino games. These included developing math that would serve the twin aims of appealing to players and providing sufficient profitability for casinos.

VGT spent years and invested resources in overcoming these problems to build successful Class II games. Although not all of VGT's design choices, functionality, and solutions are confidential, many are. And CHG has misappropriated much of this proprietary functionality and information, which allowed it to develop its Class II games in an unusually quick timeframe. The VGT trade secrets and confidential information at issue cover several aspects of VGT's game design and functionality, including without limitation:

- ████████████████████████████████████████████████████████
- ████████████████████████████████████████████████████████

4

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER**

- ███████████████████████████████████████████████
- ███████████████████████████████████████████████

### B.    The Parties' Experts on Trade Secret and Confidential Information Issues.

VGT served an opening expert report addressing the trade secret and confidential information issues in the case by Stacy Friedman.  Mr. Friedman is a casino game designer with two decades of experience in the industry.  Mr. Friedman has been employed by or consulted for many of the major gaming companies, and he operates a consulting business in which he advises "Internet casino software vendors, new game inventors, and casino game manufacturers in the fields of wagering gameplay design, mathematical analysis, and statistical verification."  Ex. D, Friedman Rpt. ¶¶ 4–5.  Mr. Friedman has experience designing and analyzing both Class II and Class III games.  *Id.* ¶¶ 4–8.  Relying on his expertise as a casino game designer, Mr. Friedman plans to offer opinions on, *inter alia*, the difficulty of designing successful Class II games, the particulars of the trade secrets and confidential information regarding VGT's Class II games, and CHG's use of those trade secrets and confidential information.  *Id.* ¶¶ 11–12, 14–15.

In response to Mr. Friedman's expert report, CHG served a report from Robert Zeidman. Unlike Mr. Friedman, Mr. Zeidman is not a game designer and has no expertise in the Class II gaming industry or even casino gaming in general.  *See* Ex. C, Zeidman Dep. Tr. 8:5–6 ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER**

Mr. Zeidman's expertise instead is in the area of *general* software design and analysis.

*Id.* at 6:25–7:10.  He has a specialty in investigating potential copying of source code, and he has

developed a software tool specifically for this purpose.  *See* Ex. E, Zeidman Rpt. ¶¶ 22–24.  As

he has explained, this "tool focuses on finding software copyright infringement."  Ex. A at 233.

He admits that

Ex. C, Zeidman

Dep. Tr. 96:21–97:4.

Consistent with his expertise,

Ex. E, Zeidman Rpt. ¶ 120

*Id.* § III.

---

2

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER**

██████████████████████████████████████████

███████████████

## III.    LEGAL STANDARD

An expert witness's testimony must contain an opinion based on the witness's "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. Specifically, the testimony must be given by a witness who has first been "qualified as an expert by knowledge, skill, experience, training, or education," and the testimony must be "the product of reliable principles and methods." *Id.* This rule "imposes on the district court a gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). Moreover, all testimony must be relevant—tending to make a fact of consequence more or less probable, Fed. R. Evid. 401, 402—and must not be substantially more prejudicial than probative, Fed. R. Evid. 403.

## IV.    ARGUMENT

Much of Mr. Zeidman's testimony should be excluded because (1) his source code copying analysis is non-responsive to Mr. Friedman's Opening Report, irrelevant, and substantially more prejudicial than probative; (2) he is not qualified to render opinions on gaming-specific issues, and those opinions are unreliable; and (3) his reference to ██████████ ██████████ is irrelevant and prejudicial.

### A.    Mr. Zeidman's Opinion Regarding Source Code Copying Is Non-Responsive, Irrelevant, and Substantially Prejudicial to VGT.

Mr. Zeidman's opinions and analysis regarding source code copying (¶¶ 14–36 and 120–35), should be stricken for at least three reasons.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

*First*, this opinion is not proper rebuttal.  A rebuttal expert report must "attempt[] to disprove or contradict the *evidence* to which it is contrasted."  *United States v. Henderson*, 564 F. App'x 352, 365 (10th Cir. 2014) (emphasis added; internal quotation marks omitted); *see also* Fed. R. Civ. P. 26(a)(2)(D)(ii) (rebuttal testimony permitted if it "is intended solely to contradict or rebut" other expert testimony).  The rebuttal report must "fairly meet[] the initial proof." *Henderson*, 564 F. App'x at 365 (internal quotation mark omitted); *see also 103 Investors I, L.P. v. Square D Co.*, 372 F.3d 1213, 1218 (10th Cir. 2004) (overturning exclusion of rebuttal expert report because "its main thrust was to rebut" and it "did not espouse a new theory").  For example, one court found that expert testimony addressing the consequences of the plaintiff's continued illicit drug use was not proper rebuttal because the expert to which it responded had not addressed this issue in coming to conclusions about the plaintiff's post-traumatic stress disorder.  *See Theoharis v. Rongen*, No. C13-1345RAJ, 2014 WL 3563386, at *5 (W.D. Wash. July 18, 2014).

Here, Mr. Zeidman admits that ███████████████████████████████████████ ████████ Ex. E, Zeidman Rpt. ¶ 120.  Therefore, Mr. Zeidman's opinion about source code copying does not "attempt[] to disprove or contradict the *evidence*" proffered by Mr. Friedman. *Henderson*, 564 F. App'x at 365 (emphasis added).  Mr. Zeidman's opinion on source code copying could have been authored without reading Mr. Friedman's report, or even knowing that Mr. Friedman wrote a report.  Because Mr. Zeidman's source code copying opinion addresses an issue not raised by Mr. Friedman's report, it should be excluded as improper rebuttal.  *See Theoharis*, 2014 WL 3563386, at *5 ("Dr. Saxon offered no opinion on any preexisting or unrelated mental health conditions, and Dr. Vandenbelt's attempt to do so is not proper rebuttal.").

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

*Second*, Mr. Zeidman's opinion is irrelevant to the claims and defenses that will be presented at trial.  For testimony to be relevant, it must make a fact that is of consequence in that case more or less probable.  *See* Fed. R. Evid. 401, 402; *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1088 (10th Cir. 2001) (expert's testimony relevant because "although it [was] not dispositive and might be countered by conflicting testimony, it could allow the jury to infer" a fact in dispute).  ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████  This situation is unlike the expert's testimony in *Alfred*, which, if believed by the jury, would advance a party's case ██████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████  *See* Ex. A at 253.  Therefore, this opinion should be excluded as irrelevant.

*Third*, and finally, Mr. Zeidman's opinion on source code copying should be excluded because its prejudice to VGT will far exceed its benefit to CHG.  "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Expert evidence in particular can have a "powerful and potentially misleading effect" on jurors.  *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004).  For this reason, "sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403."  *Id.*; *see also id.* ("Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors,

and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.").

Here, Mr. Zeidman's opinion on source code copying has significant potential to mislead the jury. If Mr. Zeidman were allowed to testify that ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████ *See* Ex. C, Zeidman Dep. Tr. 96:21–97:4█████████████

██████████████████████████████████████████████████████████; *id.* at 97:11–20

████████████████████████████████████████████████████████████

████████████████████████████████████████████████.

If his report and deposition are any indication of the topics on which he will focus during trial, the Court should expect a discussion of the components of computer code, facets of his custom code-analysis software, and his process for analyzing code. *See* Ex. E, Zeidman Rpt. §§ III, VI.C (spanning approximately 15 pages). Such technical expert testimony "may be assigned talismanic significance in the eyes of lay jurors." *Frazier*, 387 F.3d at 1263. Mr. Zeidman's lengthy, complicated build-up to his conclusion on source code copying has the potential to sway jurors despite being irrelevant to the issue the jury will need to decide.

**B.     Mr. Zeidman's Opinions on Casino Game Design and the Gaming Industry Should Be Stricken.**

Mr. Zeidman offers more than half a dozen opinions specific to casino games and the gaming industry:

- ████████████████████████████████████████████████████████

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER**



Ex. E, Zeidman Rpt. ¶¶ 50–60, 66–67, 73–74, 81–82, 90–92.

- ██████████████████████████████████████ *Id.* ¶¶ 61–62, 68–69, 75–76, 83–84, 89.

- ██████████████████████████████████████ *Id.* ¶¶ 63, 70–71, 78–79, 86–87, 93–94.

- ██████████████████████████████ *Id.* ¶ 100.

- ██████████████████████████████ *Id.* ¶ 105.

- ██████████████████████████████ *Id.* ¶¶ 111–14.

- ██████████████████████████████ *Id.* ¶ 117.

- ██████████████████████████████ *Id.* ¶ 119.

Mr. Zeidman should be precluded from offering these opinions because (a) he does not have the relevant expertise and (b) his methodology is unreliable.

**1.    Mr. Zeidman Is Not Qualified to Offer Opinions on Casino Gaming.**

Expert witnesses must be "qualified . . . by knowledge, skill, experience, training, or education" in the relevant discipline to be allowed to provide their opinions.  Fed. R. Evid. 702. It is not enough to be qualified as an expert in *some* discipline; it must be in the *relevant* discipline for each opinion proffered.  *See United States v. Medina-Copete*, 757 F.3d 1092, 1102–03, 1105 (10th Cir. 2014) (law enforcement officer with expertise in religious iconography did not qualify as "expert on the connection between [a particular saint's] worship and drug trafficking" because connection between particular saint and drug trafficking was not adequately shown); *Alfred*, 262 F.3d at 1087–89 (expert experienced in evaluating equipment's compliance

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER**

with engineering standards was not qualified to opine on related "human factors" because expert admitted "there are specialists in human factors and that he is not one" and expert had no prior experience evaluating specific machine at issue).[3]

For example, in *Washington v. Kellwood*, a certified public accountant with "extensive experience in the field of business valuations" was qualified to opine on an enterprise's value, but not on "what efforts at marketing and promoting would be reasonable and whether [the defendant] met those standards," because he had no expertise in that industry-specific area. 105 F. Supp. 3d 293, 309–10 (S.D.N.Y. 2015). "Deeming [the expert in *Washington*] qualified as a valuator d[id] not provide [him] with *carte blanche* to opine on every issue in the case." *Id.* (last alteration in original; internal quotation marks omitted).

Similarly, in a case involving the gaming industry, a court excluded proffered expert testimony from two witnesses for failing to "identify any type of prior experience, training or knowledge that would normally be expected for one who seeks to render opinions regarding projected revenue for a start-up casino." *Solid Gold Casino Hotel & Resort of Tunica v. Miles*, No. 02-2863 B/An, 2004 WL 5499007, at *3 (W.D. Tenn. Dec. 14, 2004).

Here, Mr. Zeidman admits that he does not ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. C,
Zeidman Dep. Tr. 8:5–6. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ *See id.* at 11:20–22, 12:17–19, 15:12–14. ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex.



---

[3] *See also Basanti v. United States*, 666 F. App'x 730, 733–34 (10th Cir. 2016) (affirming exclusion of doctor's testimony that providing earlier language-interpretation services to non-native English speaker would have resulted in earlier diagnosis because doctor was not experienced in diagnosing patient's condition); *Ho v. Michelin N. Am., Inc.*, 520 F. App'x 658, 665 (10th Cir. 2013) (affirming exclusion of expert testimony because proponent "failed to explain how [the expert's] general experience in the tire industry qualified him to opine on design issues").

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

E, Zeidman Rpt. ¶¶ 3–12, Exh. A. ███████████████████████████████

███████████████████████████ *See* Ex. C, Zeidman Dep. Tr. 12:12–14:19

█████████████████████████████████████████████████████████;

*id.* at 16:22–17:7 ███████████████████████████; *id.* at

23:11–15 █████████████████████████████.[4]

    Such expertise is required to offer the gaming-specific opinions in his report, including

what is known in the industry, what is valuable to a Class II company, and how Class II games

operate. ██████████████████████████████

██████████████ *See* Ex. B at CHG0015314 █████████████████

████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████ *See* Ex.

F, Roireau 30(b)(6) Dep. Tr. 121:19–21 █████████████████████

████████████████████; Ex. G, Roireau 5/15/2018 Dep. Tr. 161:6–

162:3 ██████████████████████████████████

███████████████████████████████.

    For example, Mr. Zeidman opines that █████████████████████

████████████████████████████ Ex. E, Zeidman Rpt.

¶¶ 50, 56–57, 60.  But to form such an opinion, an expert would need to be familiar with the

methods for █████████████ or at least methods that could be used.  In his deposition,

however, Mr. Zeidman was unable to ████████████████████████

███████████████████████ Ex. C, Zeidman Dep. Tr. 200:5–18; *see also*

_____

[4] *See supra* note 2.

13

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

*id.* at 220:23–221:3 ████████████████████████████████████

████████████████████. Lacking such familiarity, Mr. Zeidman's understanding of what

is known comes from █████████████████████████████████████

███████████████████████████. *See, e.g.,* Ex. E, Zeidman Rpt. ¶¶ 51–55.[5]

As another example, ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████ *Id.* ¶ 105. But until this lawsuit, ████████████████████

████████████████████████████. Ex. C, Zeidman Dep. Tr. 16:22–23.

██████████████████████████████████████████████. *Id.*

at 23:11–15. ████████████████████████████████████

████████████████████ *See id.* at 18:8–11 ███████████████████

████████████.

Mr. Zeidman's general experience with software and source code does not qualify him

to render opinions requiring intimate knowledge of casino gaming. █████████████

████████████████████████████████████████████████████

████████████████████████████████████ Mr. Zeidman may

understand the building blocks of software, but that does not qualify him to opine on the

functionality of *any* machine implemented by software. It takes experience in the relevant

---

[5] Additionally, ████████████████████████████████████████████

████████████████████████████████████████████████████

*See* Ex. E, Zeidman Rpt. ¶¶ 51–60.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

industry to analyze whether industry-specific functionality reflects something new or valuable *in that industry*.

Because Mr. Zeidman lacks experience with casino gaming, he should not be permitted to express opinions as to the casino gaming trade secrets and confidential information at issue in this case. *See Medina-Copete*, 757 F.3d at 1102–03, 1105 (finding witness not qualified to opine on connection between religious iconography and crime, despite being an expert in religious iconography, because of lack of expertise in *connecting* the two).

### 2.    Mr. Zeidman's Gaming-Specific Opinions Are Not Reliable.

Mr. Zeidman's gaming-specific testimony should also be stricken because it is not "the product of reliable principles and methods." Fed. R. Evid. 702. It is especially important for experts to have "insight into th[e] industry" when analyzing potential trade secret misappropriation. *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 408 (6th Cir. 2006). In *Mike's Train House*, an expert attempted to assess whether one Korean model-train manufacturer had copied design drawings from another. *Id.* Because the expert was not familiar with the Korean model-train design industry, he mistakenly counted similarities between the designs that were standard in the industry (e.g., using the number 2600 to identify the train's boiler) as signs of copying. *Id.* The court found that the expert's "methodology d[id] not reflect the realities of the Korean design industry, and thus c[ould not] be relied upon." *Id.*

Like *Mike's Train House*, where the expert's lack of familiarity with a specific industry led him to draw faulty conclusions of trade secret misappropriation from his copying analysis, Mr. Zeidman performed a trade secret misappropriation analysis without possessing expert-level understanding of the relevant industry. ███████████████████████████████

███████████████████████████ Ex. C, Zeidman Dep. Tr. 100:9–14. This

15

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

failure led to inaccuracies and misunderstandings that a gaming expert would have avoided,

including, for example:



- Ex. C, Zeidman Dep. Tr. 237:21–238:5.

- *Id.* at 240:25–243:5.

- *See, e.g., id.* at 17:12–21; *id.* at 40:19–22.

Although VGT could bring these mistakes to the jury's attention during cross-examination, it should not have to do so. These mistakes and others should result in exclusion of

Mr. Zeidman's testimony, just as the expert's mistakes in *Mike's Train House* warranted his

exclusion. *See* 472 F.3d at 407 ("We conclude that the district court abandoned its gate-keeping

function by failing to make any findings regarding the reliability of [the expert's] testimony.");

*id.* at 408 (concluding "[the expert's] testimony was not reliable under *Daubert*").

Similarly, Mr. Zeidman's opinions regarding whether trade secrets and confidential

information are generally known or valuable are not based on reliable methods. Mr. Zeidman

attempts to infer what is generally known or valuable in the gaming industry based purely on Mr.

Friedman's report and using simplistic (and often incorrect) logic. *See, e.g.*, Ex. E, Zeidman Rpt.

16

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER**

¶ 61 ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████; *id.* ¶ 75 ████████████████

███████████████████████████████████████████████████

████████████████████████████.

Furthermore, many of Mr. Zeidman's opinions on what is generally known are apparently

███████████████████████████████████████████████████

████████    *See, e.g., id.* ¶¶ 51–54, Exs. D–G (reproducing Internet pages that mention

████████████████████); *id.* ¶¶ 66–67, Exs. P–Q (reproducing Internet pages describing

████████████ and Class II gaming regulations).  Even though none of the webpages he found

discloses the trade secrets and confidential information at issue, he opines that ████████████

███████████████████████████████████████████

████████    *E.g., id.* ¶ 50.  Notably, his opinions ██████████████████████████████

███████████████████████████████████████.  *See, e.g.,* Ex. H, Suggs

Dep. Tr. 85:18–21 ██████████████████████████████████████.

In short, lacking any knowledge of the industry, Mr. Zeidman has no reliable basis for

attempting to bridge the gap between the webpages he found and the VGT trade secrets at issue.

**C.    Mr. Zeidman's Reference to** ████████████████████ **Should Be Stricken As
Irrelevant and an Attempt to Unduly Prejudice the Jury.**

Paragraph 92 of Mr. Zeidman's report speculates that ████████████████████████████

███████████████████████████████████████████████████

████████    This speculation has nothing to do with any of the trade secret or confidential

information claims in the case—indeed, the ████████████████████████████

17

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

███████████████████████████████. CHG's effort to bootstrap this issue through

Mr. Zeidman's testimony is therefore improper.

Mr. Zeidman attempts to connect this speculation to his opinion relating to ███████

█████████████, one of the items of confidential know-how that CHG misappropriated.[6]

Mr. Zeidman claims that ██████████████████████████████ Ex. E, Zeidman

Rpt. ¶ 92, which is indeed true. But VGT's trade secret and confidential information concern the



Not only is this opinion irrelevant, it risks prejudice and jury confusion by erroneously

suggesting that the ███████████████████████████████████████

████████    Therefore, Mr. Zeidman should not be permitted to testify to this issue.

## V.    CONCLUSION

For the foregoing reasons, VGT respectfully requests that this Court exclude the

following testimony of Mr. Zeidman: (1) his source code copying tool and analysis, including

the opinions set forth in ¶¶ 14–36 and 120–35; (2) any gaming-specific opinions, including the

opinions set forth in ¶¶ 50–64, 66–87, 89–94, 100, 105, 111–14, 117, and 119; and (3) his

discussion of ██████████████ in ¶ 92.

---

[6] A "façade" is a collection of reel symbols displayed to the player for particular wins or losses. The term "façade" refers to the fact that, in a Class II game, the reels themselves do not dictate a win or loss, but rather are used as a representation of an outcome of a bingo game.

[7] ███████████████████████████████████████████
██████████████████████████████████████████

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER**

October 12, 2018

*/s/ Gary M. Rubman*
Graydon Dean Luthey, Jr., OBA No. 5568
GABLE GOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, OK 74103-4217
Telephone: (918) 595-4821
Facsimile: (918) 595-4990
dluthey@gablelaw.com

Gary M. Rubman
Peter A. Swanson
Michael S. Sawyer
Rebecca B. Dalton
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 778-5465
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
  (admitted pro hac vice)

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1221
Facsimile: (212) 841-1010
nroman@cov.com
  (admitted pro hac vice)

**Counsel for Video Gaming Technologies, Inc.**

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2018, I filed the foregoing Plaintiff Video Gaming

Technologies, Inc.'s Motion to Exclude the Testimony of Robert Zeidman in Part and

Supporting Brief via ECF, which caused a true and correct copy of the foregoing to be delivered

to the following counsel for Defendants:

Robert C. Gill
Thomas S. Schaufelberger
Matthew J. Antonelli
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
tschauf@saul.com
matt.antonelli@saul.com

Sherry H. Flax
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA 4254
JAMES C. HODGES, PC
2622 East 21st Street, Suite 4
Tulsa, OK 74114
Telephone: (918) 779-7078
JHodges@HodgesLC.Com

Duane H. Zobrist
Jonathan S. Jacobs
ZOBRIST LAW GROUP PLLC
1900 Arlington Blvd. Suite B
Charlottesville, VA 22903
Telephone: (434) 658-6400
dzobrist@zoblaw.com
jjacobs@zoblaw.com

*Attorneys for Defendants*

*/s/ Gary M. Rubman*