**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

VIDEO GAMING TECHNOLOGIES,
INC.,

                Plaintiff,

     vs.

CASTLE HILL STUDIOS LLC, *et al.,*

                Defendants.

CASE NO. 17-CV-00454-GKF-JFJ

**REDACTED – PUBLIC VERSION**

**DEFENDANTS' MOTION TO EXCLUDE**
**PLAINTIFF'S EXPERT YORAM WIND**

## Table of Contents

TABLE OF AUTHORITIES ................................................................................................. ii

I.     INTRODUCTION ......................................................................................................1

II.    SURVEY BACKGROUND .......................................................................................2

III.   STANDARD FOR EXCLUSION OF EXPERT TESTIMONY ...............................3

IV.   ARGUMENT ............................................................................................................4

    A.   The Wind Survey Used a Side-by-Side Format Disfavored in this Circuit ...................................4

    B.   The Wind Survey Used Impermissible Suggestive and Leading Questions ................................6

    C.   Dr. Wind Utterly Failed to Replicate Market Conditions by Using Artist Renderings That Did Not Capture Actual Gameplay .............................................8

    D.   The Order of the EGMs Used in the Survey Was Biased ..........................................................11

    E.   The Survey Tested Only One VGT Game in a Specific Cabinet Configuration ........................12

    F.   Dr. Wind Selected Improper Controls ......................................................................................15

    G.   The Wind Survey Contains Several Fatal Technical Errors .......................................................16

        a)   20% of Respondents Were Shown an Image of VGT's Mr. Money Bags Game Instead of Castle Hill's New Money Game ..........................................17

        b)   Despite Dr. Wind's Claim that a Respondent Could "Zoom" on an Image, the Survey Had No Such Functionality ..........................................19

        c)   The Wind Survey Used Higher Quality Images for VGT and Castle Hill, Thus Creating Significant Bias ..................................................21

    H.   Dr. Wind Should be Excluded Because his Report Includes Summaries of Evidence and Testimony of Fact Witnesses ........................................21

V.    CONCLUSION ......................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Alexander v. Smith & Nephew, P.L.C.,*
98 F. Supp. 2d 1287 (N.D. Okla. 2000) ..................................................................... 3

*Bell Helicopter Textron, Inc. v. Helicomb Int'l Inc.,*
No. 05-CV-0322-CVE-FHM, 2005 WL 8150059 (N.D. Okla. July 14, 2005) ............... 8

*Bright v. Ohio Nat'l Life Assurance Corp.,*
No. 11-CV-475-GKF-FHM, 2013 WL 12327512 (N.D. Okla. Jan. 09, 2013)
(Frizzell, C.J.) ............................................................................................................. 3

*Hodgdon Powder Co. v. Alliant Techsystems, Inc.,*
512 F. Supp. 2d 1178 (D. Kan. 2007) ........................................................................ 3

*Hornady Mfg. Co., Inc. v. Doubletap, Inc.,*
746 F.3d 995 (10th Cir. 2014) .................................................................................... 7

*iFreedom Direct Corp. v. First Tennessee Bank Nat. Ass'n,*
2012 WL 3067597 (D. Utah July 27, 2012) ............................................................... 22

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.,*
828 F.2d 1482 (10th Cir. 1987) .................................................................................. 4

*National Indemnity Co. v. Nelson, Chipman & Burt,*
2013 WL 12303138 (D. Utah Jan. 22, 2013) .............................................................. 22

*Oklahoma v. Tyson Foods, Inc.,*
No. 05-CV-329-GKF-PJC, 2009 WL 10271834 (N.D. Okla. Aug. 17, 2009) ............... 3

*Parks LLC v. Tyson Foods, Inc.,*
863 F.3d 220 (7th Cir. 2017) ...................................................................................... 4

*Sally Beauty Co. v. Beautyco, Inc.,*
304 F.3d 964 (10th Cir. 2002) .................................................................................... 4

*Scott Fetzer Co. v. House of Vacuums, Inc.,*
381 F.3d 477 (5th Cir. 2004) ...................................................................................... 6

*SquirtCo v. Seven-Up Co.,*
628 F.2d 1086 (8th Cir. 1980) .................................................................................... 4

*Union Carbide Corp. v. Ever-Ready, Inc.,*
531 F.2d 366 (7th Cir. 1976) ............................................................................... 4, 5, 14

*Water Pik, Inc. v. Med-Sys., Inc.*,
   726 F.3d 1136 (10th Cir. 2013) ..................................................................................*passim*

*Water Pik, Inc. v. Med-Systems, Inc.*,
   No. 10-CV-1221-PAB-CBS, 2012 WL 2153162 (D. Colo. June 13, 2012) ..................................6, 7

*Winning Ways, Inc. v. Holloway Sportswear, Inc.*,
   913 F. Supp. 1454 (D. Kan. 1996) ..................................................................................3

## Other Authorities

Federal Rule of Evidence 702 ..................................................................................3

*Likelihood of Confusion Studies and the Straitened Scope of Squirt*, Jerre B. Swann, 98
   Trademark Rep. 739, 746 (2008),..................................................................................4, 5

McCarthy on Trademarks and Unfair Competition § 32:173.50 (5th ed.)

Defendants, Castle Hill Studios LLC, Castle Hill Holdings LLC, and Ironworks Development LLC (collectively, "Castle Hill" or "Defendants"), move to exclude the testimony and reports of plaintiff Video Gaming Technologies, Inc.'s ("VGT") survey expert Yoram Wind.[1]

## I.    INTRODUCTION

VGT hired Dr. Yoram ("Jerry") Wind to conduct an internet survey (the "Wind Survey") purportedly designed to test the likelihood of consumer confusion between VGT's and Castle Hill's electronic gaming machines ("EGMs"). While VGT's trademark and trade dress claims against Castle Hill implicate more than a dozen different VGT titles and a dozen different Castle Hill titles, the Wind Survey addressed only VGT's Mr. Money Bags game and Castle Hill's New Money game, in only one particular cabinet configuration.

The Wind Survey and Dr. Wind's testimony should be excluded as unreliable, irrelevant, and biased. The Wind Survey was a side-by-side style survey, which is strongly disfavored in the Tenth Circuit, and used improper leading questions. Further, the survey was designed in a biased manner based on the selection and order of the images shown to survey respondents, the quality of the images used, the controls that were selected, and the fact that the survey used only static, artist-rendered images, instead of actual photographs or video of gameplay. The survey was further fundamentally flawed in several respects, purportedly unknown to Dr. Wind until his deposition. First, for one of the five "arrays" of games, which was shown to roughly 20% of the survey's 446 respondents, if a respondent clicked on the image of the *Castle Hill* game, an enlarged image of the *VGT* game was displayed for comparison, which means those respondents were literally asked whether two identical images had games that looked similar. It is hard to imagine a more fatal flaw

---

[1]    Dr. Wind submitted three reports in this case: 1) his original 755-page report, "Likelihood of Confusion Between VGT and CHG Electronic Gaming Machines," dated August 10, 2018 ("Report") (**Exhibit A**); 2) the "Reply Expert Report of Dr. Yoram (Jerry) Wind," dated September 14, 2018 ("Reply Report") (**Exhibit B**); and 3) a 658-page "Corrected" version of the original Report, dated September 24, 2018 ("Corrected Report") (**Exhibit C**).

than this. Second, despite the fact that Dr. Wind claims the survey was designed to allow respondents to "zoom" on the EGM images to compare various features and artwork, the survey as presented did not actually include such functionality; instead, it merely allowed a respondent to slightly enlarge an image, not to zoom or focus on a particular spot on an EGM. When the images were enlarged, the VGT and Castle Hill images were of much higher quality than two of the controls. For all of these reasons, Dr. Wind's survey is flawed, biased, and should be precluded, along with any opinions based on the survey.

In addition to offering his biased and flawed survey, Dr. Wind's reports also include improper summaries of fact evidence and legal opinions regarding the conclusions to be drawn from such evidence. As an expert witness, Dr. Wind is not permitted to simply summarize evidence and make legal conclusions therefrom. Any such testimony must be excluded at trial.

## II.    SURVEY BACKGROUND

The Wind Survey, conducted on the internet, displayed artist renderings of five EGMs to survey respondents. The EGMs were labelled with letters, K, M, P, S, and T. The K machine was a VGT Mr. Money Bags machine in VGT's LS cabinet, with a 20 inch screen. The M machine was Castle Hill's New Money machine in a Retro cabinet. The survey included three additional EGMs as "controls." Report at 7. Dr. Wind contracted with a third-party research firm, Research Now, to find respondents and to administer the survey. *Id.* at 7, n.6. After a respondent answered some preliminary background questions, the respondent was shown one of five possible arrays of the five games. *In four of those five arrays, the VGT and Castle Hill games were displayed side-by-side.* The respondents were then asked a series of questions, including whether they thought any of the machines were made by the same company, whether they thought any of the machines were made by associated companies, and whether any of the companies had to get permission from one another to make the machines. Report at 8-10.

As set forth below, the Wind Survey was designed in a biased manner in order to achieve the results VGT sought – a finding of likely customer confusion. Because of the intrinsic bias and flawed methodology, as well as several specific technical errors, the survey results are unreliable, of little probative value, and must be excluded.

## III.    STANDARD FOR EXCLUSION OF EXPERT TESTIMONY

Federal Rule of Evidence 702 requires expert testimony and opinions be based upon: 1) sufficient facts or data; 2) reliable principles and methods; and 3) a reliable application of principles and methods to the facts of the case. Fed. R. Evid. 702. Further, the court must determine whether the expert's specialized knowledge will assist the trier of fact to understand the evidence or determine a fact at issue. *Id.* Rule 702, therefore, imposes "an important 'gate-keeping' function with regard to the admissibility of expert opinions." *Oklahoma v. Tyson Foods, Inc.*, No. 05-CV-329-GKF-PJC, 2009 WL 10271834, at *1 (N.D. Okla. Aug. 17, 2009).

The Court's reliability inquiry is "flexible," but the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Bright v. Ohio Nat'l Life Assurance Corp.*, No. 11-CV-475-GKF-FHM, 2013 WL 12327512 at *1 (N.D. Okla. Jan. 09, 2013) (Frizzell, C.J.). "The Court cannot rely on an expert's mere assurance that the methodology and data are reliable." *Id.* (quoting *Alexander v. Smith & Nephew, P.L.C.,* 98 F. Supp. 2d 1287, 1293 (N.D. Okla. 2000)). "An expert's testimony may be excluded where it is based on subjective beliefs or unsupported speculation which is no more than *ipse dixit* guesswork." *Id.* at *2; *see Hodgdon Powder Co. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007) (listing elements to consider regarding reliability of survey evidence). While survey deficiencies often relate to the weight to be given to the survey, when the "deficiencies are so substantial as to render the survey's conclusions untrustworthy, a court should exclude the survey from evidence." *Hodgdon Power*, 512 F. Supp. 2d at 1181 (quoting *Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1466 (D. Kan. 1996)).

## IV.    ARGUMENT

### A.    The Wind Survey Used a Side-by-Side Format Disfavored in this Circuit

There are two predominant formats of consumer surveys used in trademark litigation to show a likelihood of confusion. The first, the "*Ever-Ready*" survey, named after *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 385-88 (7th Cir. 1976), "involves showing consumers only the potentially-infringing product and asking open-ended questions to determine whether they believe the product is associated with the senior mark." *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 232-33 (7th Cir. 2017) (citing Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*, 98 Trademark Rep. 739, 746 (2008) (describing the *Ever-Ready* format as the "gold standard" for likelihood of confusion surveys)). An *Ever-Ready* survey "is usually employed by owners of commercially strong marks." *Id.* at 233 (citation omitted). "Holders of weaker marks more frequently employ a *Squirt* survey, named after the type used in *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1089 n.4 (8th Cir. 1980)." *Id.* In a *Squirt* survey, "two products are *placed side by side*, often with other products that serve as controls, and participants are asked questions to determine if confusion exists as to the source of the products." *Id.* (citing Swann, 98 Trademark Rep. at 749-50) (emphasis added).

Side by side surveys, such as a *Squirt* survey, are disfavored in this Circuit. In trademark and trade dress infringement actions such as this, the question is whether the "allegedly infringing mark will confuse the public when singly presented, rather than when presented side by side with the protected trademark." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002); *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487 (10th Cir. 1987) (it is "axiomatic in trademark law that 'side-by-side' comparison is not the test.") (internal quotation omitted)); *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1147 (10th Cir. 2013) ("a side-by-side comparison ordinarily is not the proper method of determining likelihood of confusion."). As the Tenth Circuit explained in *Water*

*Pik*, "A side-by-side comparison can emphasize differences in marks that might not be noticed by the actual shopper (thereby decreasing the respondents' likelihood of confusion), or it may bring to mind the senior mark when the respondent would not otherwise have thought of it (thereby increasing the respondents' likelihood of confusion)." *Id.*

In designing his survey, Dr. Wind chose not to use the "gold standard" *Ever-Ready* consumer confusion survey – which is the appropriate format where the "senior mark is strong and widely recognized." McCarthy on Trademarks and Unfair Competition § 32:173.50 (5th ed.); *see also* Jerre B. Swann, *Eveready and Squirt-Cognitively Updated*, 106 Trademark Rep. 727, 734 (2016) (describing *Eveready* as the "gold standard for assessing confusion as to (readily recalled) top-of-mind marks"). Dr. Wind's decision to instead use a disfavored side-by-side comparison of Castle Hill's and VGT's games contradicts his opinion and conclusion that VGT's trademarks and trade dress are "strong."[2] *See* Report at 31 ("I conclude that the VGT trademarks and trade dress are strong.").

In his report, impermissibly relying on other unrelated market studies VGT had conducted over the years, Dr. Wind noted that ████████████████████████████████ ████████████████████████████████████████████████████████ ██████ Report at 26-27. When asked, ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ Dr. Wind responded: ████████████████ ████████████████████████████      ████████████████████ ██████ Wind Dep. at 123:1-9 (emphasis added).[3] If VGT's trademarks, trade dress, and overall brand recognition are truly as strong as Dr. Wind claims, then there is no justification for his decision to use a side-by-side survey format.

---

[2]    *See also* Rebuttal Report of James T. Berger, dated August 31, 2018 ("Berger Report," attached as **Exhibit D**) ¶¶ 23-28.

[3]    All cited pages of Dr. Wind's deposition are attached hereto as **Exhibit E**.

### B.    The Wind Survey Used Impermissible Suggestive and Leading Questions

In reviewing a survey's objectivity, courts also look at the degree of suggestiveness of each question asked. As the Tenth Circuit explained in *Water Pik,* "[a] survey question that begs its answer by suggesting a link between plaintiff and defendant cannot be a true indicator of the likelihood of consumer confusion." 726 F.3d at 1147 (quoting *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 488 (5th Cir. 2004)). In *Water Pik*, the survey respondents "were asked whether two or more of the products were made by the same company; whether two or more of the products' makers had a business affiliation; and whether one or more of the makers had received permission or approval from one of the others. They could answer yes, no, or not sure." *Id.* Considering these questions, the district court found these three questions to be suggestive and leading, and thus unreliable, *Water Pik, Inc. v. Med-Systems, Inc.*, No. 10-CV-1221-PAB-CBS, 2012 WL 2153162, at *9-10 (D. Colo. June 13, 2012), and the Tenth Circuit concurred. 726 F.3d at 1147-48.

Although Dr. Wind agrees that "a survey should avoid asking leading questions," Wind Dep. at 127:20-22, he nevertheless used nearly identical questions to the ones found to be leading in *Water Pik* in his survey here. First, he asked: "Do you think that any of these machines are made by the same company?" Report at 9. The other options available to a respondent were: "Do you think that each of the machines is made by a different company?", and "Don't you have an opinion?"[4] Just as in *Water Pik*, Dr. Wind's question "suggests, at least implicitly, that respondents should believe that there is some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers." *Water Pik*, 2012 WL 2153162 at *9; *see also Water Pik,* 726 F.3d at 1147.

---

[4]    The question "Don't you have an opinion?" is itself improper and suggestive, in that it suggests that the respondent *should* have an opinion, thus leading an otherwise undecided respondent to select the option that the machines were related.

The second question found to be improperly suggestive in *Water Pik* was whether one or more of the companies' "products you see now have a business affiliation or connection with the other shown here?" 2012 WL 2153162 at *10. The third improper question inquired as to whether "[o]ne or more of the product you see now received permission or approval from the others shown here." *Id.* The court there determined that "[b]oth of these questions suggest to the respondent that there should be an association between the companies that produce the products in the survey." *Id.* Further, the court observed that by limiting the universe of products to the "others shown here," the questions suggested a relationship between the products. *Id.* As the court noted, a more appropriate question would have asked survey respondents whether or not the product was "approved, licensed, or sponsored" by another company or not. *Id.* (quoting McCarthy on Trademarks and Unfair Competition § 32:175 (5th ed.)).

Dr. Wind again used the same questions as those found to be improper in *Water Pik*. The Wind Survey asked respondents whether they thought "any of the machines are made by companies that are associated or affiliated with each other" and whether any of the pictured machines "are made by a company that had to get permission or authorization from one or more of the companies that make the other machines." Report at 10.

Finding that "the district court could reasonably view the survey questions as improperly leading," 726 F.3d at 1147, the 10th Circuit affirmed the district court's rejection of the survey expert in *Water Pik*, concluding that the survey's methodological flaws, including the improperly leading questions, rendered the survey devoid of probative value and thus irrelevant. *See id.* at 1148 ("The district court could reasonably conclude that the question suggested the very answer most helpful to Med–Systems' cause rather than eliciting responses as they might occur spontaneously in the marketplace."); *see also Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1005-06 (10th Cir. 2014) (rejecting survey that used questions similar to those in *Water Pik* as "entitled to little weight

7

on the issue of actual confusion"). Dr. Wind's use of suggestive and leading questions is a methodological flaw in his survey that renders his conclusions unreliable. The survey should be excluded on this basis.

### C.    Dr. Wind Utterly Failed to Replicate Market Conditions by Using Artist Renderings That Did Not Capture Actual Gameplay

It is axiomatic that a consumer confusion survey must compare marks or trade dress based on how a consumer would encounter those marks or trade dress in the actual marketplace. A survey must replicate, to the extent possible, actual marketplace conditions. *Water Pik*, 726 F.3d at 1146-47. Indeed, "any meaningful inquiry into the likelihood of confusion necessarily must replicate the circumstances in which the ordinary consumer actually confronts (or probably will confront) the conflicting mark." *Bell Helicopter Textron, Inc. v. Helicomb Int'l Inc.*, No. 05-CV-0322-CVE-FHM, 2005 WL 8150059, at *3 (N.D. Okla. July 14, 2005) (quotation omitted).

This case is all about EGMs that are on Tribal casino floors. As any visitor to a casino can attest, walking on to a casino floor often leads to "sensory overload." Indeed, VGT's own industry expert explained the experience of walking a casino floor as follows:



Opening Expert Report of Stacy Friedman (**Exhibit F**), ¶ 23. As Mr. Friedman goes on to explain, machine developers use various techniques to attract would-be players, including lighting and sounds; indeed, many  *Id.*

In his opening report, Dr. Wind states that the trade dress elements at issue in VGT's claims against Castle Hill are: a red screen bonus feature; a distinctive-sounding mechanical bell; a cabinet frame with a certain size, shape and layout; a red strobe light; certain bingo patterns with associated awards; paytables posted on the cabinet; and artwork. Report at 1. Despite VGT's industry expert's description of the marketplace as a "cacophony" of light and sound, Dr. Wind failed to account for *any* real world marketplace conditions in designing his study. The EGM images used in the study were still images and, in fact, not even actual photographs of the games. Instead, Dr. Wind selected artist renderings. *See* Report at 7.

When asked at his deposition how and why he chose to proceed in this manner, Dr. Wind explained that originally he wanted to use video which would allow him to "capture the sound, a little bit of the entire day-to-day dynamics of the machines, but we could not get video." Wind Dep. at 64:9-65:9.[5] Dr. Wind testified that he relied solely on the representations of VGT's counsel that video or photographs were not available for the survey. He did not question these representations or make any attempt whatsoever to himself source photographs or video to capture market conditions. *Id.* The Wind Survey merely instructed respondents to "look at the five machines the way you normally would before selecting a machine to play." Report at 9. This was impossible based on the survey design; it is beyond cavil that an EGM player chooses between *physical* machines, not *drawings* of such machines. Wind Dep. at 73:8-19.

By failing to use videos of the EGMs during gameplay, or as they are presented in an actual casino, the survey had no way of testing lights, sounds, or any number of other trade dress features. Dr. Wind concedes and recognizes that his survey did not test the sound of the machines (which

---

[5]    Inexplicably, Dr. Wind chose not to conduct a casino "intercept" survey – as had been repeatedly done for VGT in the past – on the floor of one of the scores of Indian casinos in Oklahoma, which would have replicated the actual casino environment, because he "was told for this particular study and the design that I wanted, you know, the internet panel was the best way to collect data." *See* Wind Dep. at 137:17-138:7. Dr. Wind never identified *who* told him this or why.

would include the mechanical bell), the feel of the gameplay (the bingo patterns and payouts), or the use of free spin features (meaning the "red screens" alleged to be part of VGT trade dress). Report at 6, n1; Reply Report at 5.

Dr. Wind claimed that he was unable to get video to use in his survey. Strangely, and despite the fact that the parties have exchanged hundreds of still images of VGT, Castle Hill and other competitors' games throughout the course of discovery in this case, Dr. Wind claimed he was also unable to obtain and use actual photographs. Instead, the stimuli used in the survey are artist renderings. When questioned about his attempts to obtain photos, he admitted again that all he did was rely on VGT's attorneys. Wind Dep. at 65:10-25.

When Castle Hill's survey expert criticized Dr. Wind's failure to use video, photos, or an "on-site or off-site with a mock casino" in a survey facility, *see* Berger Report ¶ 38, Dr. Wind responded that ████████████████████████████████████████████ ████████████████████████████████████████████ Reply at 5. Not only did Dr. Wind fail to explain the basis for his statement that VGT was unable to obtain photographs of EGMs, his assertion regarding photos is belied **by the very same document in which he makes it**. Indeed, in "Appendix A" to his Reply Report, Dr. Wind included six actual photographs of VGT games which are far better representations of the games than the static renderings. Dr. Wind's biased selection of stimuli renders the survey of little probative value.

Casino customers do not select slot machines based on viewing a still, artist rendered image; rather, the machines are moving, flashing lights, making noises, and playing videos. The Wind Survey utterly failed to capture the stimuli that would have been emanating from each of the individual EGMs selected for his study, or for the "cacophony" of sights and sounds that a consumer would encounter on the casino floor from the combination of all other EGMs. The use of

static, drawn images in place of machines which flash lights and make sounds is unrealistic and not a proper methodology. The survey is fundamentally unreliable.

### D.    The Order of the EGMs Used in the Survey Was Biased

The survey presented each respondent with the five-game EGM array, with letters identifying each individual EGM. In his report, Dr. Wind states that he directed the lineup to be "rotated" in order to "avoid potential bias." Report at 6. He plainly failed to accomplish this objective. With a universe of five items, there were a potential 120 different combinations of the stimuli that could have been presented (*i.e.* 5x4x3x2x1=120). But instead of using anywhere near that number, or assigning each respondents' array randomly, Dr. Wind chose to limit the arrays to five configurations, as follows: K-M-P-S-T; T-K-M-P-S; S-T-K-M-P; P-S-T-K-M; and M-P-S-T-K. **The arrays selected were biased in that in four of the five configurations, i.e., 80% of the time, the VGT game (K) was displayed directly next to the Castle Hill game (M).** This left only one permutation in which Mr. Money Bags and New Money had any "control" EGMs separating them. Wind Dep. at 168:14-21.[6]

The bias introduced by displaying the Castle Hill and VGT games side-by-side – as specifically disfavored in this Circuit – instead of randomized, is demonstrated by the survey results. For the four arrays in which the "K" and "M" EGM images were side-by-side, the percentage of respondents who identified *only* Mr. Money Bags and New Money as being made by the same company was between 20.2% and 22.4%. Meanwhile, for the only configuration in which those two games were *not* side by side and instead had controls between them, a significantly lower number of respondents, 15.8%, identified Mr. Money Bags and New Money as being made by the same company. Wind Dep. at 172:12-173:14. Dr. Wind, inexplicably, claimed that this 5-7% decrease in

---

[6]    When Dr. Wind served his "corrected" report following his deposition, one entire array option was eliminated. This still means that 3 out of 4 respondents (*i.e.*, 75%) saw an array that displayed Castle Hill and VGT directly next to each other.

the total number of "confused" respondents – a roughly 22-30% difference – was "not a big difference" and "insignificant." Wind Dep. at 173:24–174:31; 175:20-24 (admitting that it was "a 25 percent or more difference").

The order of the stimuli in the Wind Survey was biased and designed to lead respondents to find similarities between the VGT and Castle Hill game titles. Such a biased design leads to biased and untrustworthy results. *Water Pik,* 726 F.3d at 1147 ("A side-by-side comparison can emphasize differences in marks that might not be noticed by the actual shopper"). If Dr. Wind wanted to design a survey that was fair and impartial he should have randomized the order of the EGM images (instead of simply rotating a pre-selected order), or otherwise selected a set number of arrays that ***did not*** put the two items he was testing directly next to one another 80% of the time.

### E.    The Survey Tested Only One VGT Game in a Specific Cabinet Configuration

In its Amended Complaint, VGT identifies more than a dozen of its own titles and alleges that more than a dozen of Castle Hill's EGMs infringe VGT's trademarks and trade dress. The Wind Survey, however, tested only *one* VGT trademark, Mr. Money Bags, and *one* Castle Hill trademark, New Money. Further, the survey presented the Mr. Money Bags trademark in a specific cabinet configuration – VGT's LS cabinet, with a 20 inch screen, without a topper, and without a lighting package – failing to take into account that VGT offers the Mr. Money Bags game, and various spinoffs, in dozens of cabinet configurations.[7]

---

[7]    Although Dr. Wind repeatedly states that he was purporting to test the trademarks and trade dress "at issue" in this litigation, *see, e.g.,* Report at 2, 6, 14 & 24, and affirmatively represents in his reply report that it is his ███████████████████████████████████████████████ ██████████ eply at 6 & 7 n.18, no such limitation actually exists on VGT's alleged "trade dress" anywhere in the Amended Complaint. *See* Am. Compl. ¶¶ 22-29 (alleging a "common" trade dress for all of VGT's "3-Reel Mechanical Games" that is "unique" and "inherently distinctive"). *Of course, the obvious underlying point Dr. Wind is trying to skirt is that VGT does not actually have a consistent, inherently distinctive trade dress.* That is why he had to bias the survey to achieve VGT's desired outcome.

In fact, VGT offers its 3-reel mechanical EGMs in at least three different cabinets: the LS version used by Dr. Wind; the sit-down "slant" cabinet, *see* Sevigny Dep. Ex. 182 (**Exhibit G**), and the XL oversized cabinet. *See* Sevigny Dep. at 56:15-22 (**Exhibit H**). VGT also offers its games using a 6 inch screen, a 15 inch screen, a 19 inch screen, a 20 inch screen, and a 32 inch screen. Kovach Dep. Tr. at 36:5-19 (**Exhibit I**). The screen size makes games appear different to a player. *Compare* Sevigny Dep. Ex. 181 *with* Sevigny Dep. Ex. 179 (**Exhibits J & K**). Many VGT games also have a lighting package consisting of string-style lighting outside the outer rim of the cabinet, which gives the cabinet a "jukebox" feel. Starr Dep. Tr. 212:16-213:11 (**Exhibit L**); *id.* at 85:20-86:8; Sevigny Dep. Ex. 178 (**Exhibit M**). By way of example, in its Amended Complaint, VGT states that a comparison of its Mr. Money Bags game to Castle Hill's New Money game can be found in Exhibit 4. Am. Compl. (ECF No. 103) at ¶ 69. The image of Mr. Money Bags *in the Amended Complaint* looks vastly different from the image it chose to use *in the Wind Survey*. It uses a smaller screen, different front panels, different artwork, different colors, and is displayed at an angle. Attached hereto as **Exhibit N** is a side-by-side comparison of the image VGT chose for the Amended Complaint to the one it chose for the survey.

When questioned as to how and why he selected the Mr. Money Bags theme, as opposed to one of the sixteen other themes VGT identifies in its Amended Complaint, Dr. Wind stated that it was his understanding that Mr. Money Bags was the most "prominent" VGT game. He did nothing to independently verify whether or not Mr. Money Bags in the 20 inch screen (in the LS cabinet without a topper and without jukebox lighting) was indeed the most "prominent" VGT game or configuration, but instead used it based on the selection of VGT's counsel. Dr. Wind could identify no basis, either in scholarly publications or case law, for his decision to select the "most prominent" VGT title, as opposed to one of the other various games at issue in this case. Wind Dep. at 221:15-

20 ("Nothing comes to mind.").[8]

While he could point to no authority supporting the decision to select a VGT game based on "prominence," Dr. Wind admitted that he "deliberately chose to use a machine that would most likely be familiar to the [survey] respondent." Wind Dep. at 157:25-158:5. He selected the particular Mr. Money Bags image used as opposed to either another image of Mr. Money Bags or another VGT game because he considered it more likely that respondents would recognize it, and because it looked most like the image of the Castle Hill game he wanted to use. This is an admission of intentional bias. *See Water Pik,* 726 F.3d at 1147 ("A side-by-side comparison … may bring to mind the senior mark when the respondent would not otherwise have thought of it (thereby increasing the respondents' likelihood of confusion)." This, of course, is the very reason why an *Ever-Ready* survey was more appropriate than a side-by-side *Squirt* survey.

Dr. Wind's selection of only one configuration of Mr. Money Bags and one configuration of New Money is further troubling given his attempt to project the results of the survey as to those discrete titles across *all* VGT and Castle Hill offerings. *See* Report at 24 (conclusions extended to all VGT and Castle Hill EGMs). But the survey very clearly tested only the *single* VGT title against the *single* Castle Hill title, and then only specific cabinet configurations of those two games.

Without any explanation or basis, other than a claim that ████████████████████████ ████████████████████████████████████ Reply Report at 6, Dr. Wind attempts to extrapolate from the survey and conclude that there is a likelihood of confusion for *all* VGT and Castle Hill EGMs. This is an improper and impermissible leap in logic that amounts to pure *ipse dixit* speculation. Dr. Wind was unable to explain why the single VGT game and single Castle Hill game included in his survey allow him to draw conclusions about *all* of the companies' other games, which

---

[8]     Notably, the "prominence" of the survey control games was ***not*** a factor. It only mattered to Dr. Wind in selecting the VGT game that VGT thought would garner the most favorable survey results. Wind Dep. at 158:6-159:1 (prominence of game only mattered for the "anchor" not for the controls).

were ***not*** tested at all. Dr. Wind failed to present any theory, method, evidence, or argument that the images of the games he selected were representative of all VGT or CHG games. Dr. Wind admitted that his survey did not test VGT versus Castle Hill; it only tested a particular VGT game title with particular artwork against a particular Castle Hill game title with particular artwork. Wind Dep. at 161:23-162:7. Simply put, his attempt to expand his results to the full line of Castle Hill and VGT games is not supported by accepted theory, method, evidence, or argument, much less by the actual survey he conducted.

### F.    Dr. Wind Selected Improper Controls

The criteria Dr. Wind (through VGT's attorneys) used for selecting the three control EGMs included in the survey was that the games had to have a money or wealth theme, and have been available at the Choctaw-Durant Casino. Report at 7; Wind Dep. at 62:25-7 (counsel selected the Durant Casino); *id.* at 67:25-68:17 ("I relied on the lawyers on VGT to provide this information."). When examined, however, it is clear that the EGMs selected were not proper controls and instead were selected in order to skew and bias the results of the survey.

First, only one of the three control EGMs was even a Class II bingo-based machine (control "T"). The other two controls selected were Class III (traditional slot) products, and one of those (control "P") does not even have reels, as it is a video slot product. The selection of only one Class II bingo game also introduces bias into the survey. The bingo cards are easy to spot on a Class II game, and the presence of a bingo card on the VGT and Castle Hill game, and not two of the three controls, leads respondents to assume a similarity between those games. The inclusion of a video product also makes it more easily distinguishable from the remaining selections.

Second, despite the widespread prevalence of round-top slot machines, Control P is a flat-top machine. This selection is notable because Castle Hill offers its games in a flat-top style cabinet, known as the "Atlas" cabinet. VGT has made very clear throughout this case that Castle Hill's Atlas

cabinet is *not* at issue for purposes of its trade dress claim. Because the flat-top machine is easily distinguishable from the other machines, *see* Am. Compl. ¶ 62 & Ex. 3 thereto, a bias is created in favor of selecting from among the remaining four choices, all of which share the round-top feature.

Third, despite stating that he selected games with a wealth or money theme, Dr. Wind ignored as controls the countless other games that have the actual word "money" in the title. Indeed, the *only* two games used that contain "money" in the title are the Castle Hill and VGT games. Castle Hill has previously identified several other EGM titles that include the word "money" in the title, but VGT chose ***not*** to use any of those EGMs as controls. Although Dr. Wind claims to have perused (with VGT's counsel) the websites of other gaming companies used in his array, he could not recall if they offered games with "money" in the title. Wind Dep. at 56:9-13.

Finally, further biasing the results is the fact that two out of the three control EGMs were displayed at an angle, such that the respondent could see the depth of the machine. Despite actually having images of Mr. Money Bags that displayed the game on an angle, Dr. Wind chose to use straight-on images of Mr. Money Bags and New Money. Again, only one of the three controls used a front image. When asked to explain this obvious distinguishing feature, Dr. Wind stated that "those are the only ones we could find." Wind Dep. at 257:4-20. Dr. Wind of course made no effort to identify other images, beyond his conversations with counsel for VGT. Wind Dep. at 260:11-15 (he was told "categorically, these are the only pictures that are available"). Of course, that is objectively untrue. *See, e.g.,* Am. Compl. Exh. 4 at p. 3 (image of Mr. Money Bags shown at an angle). The similar imaging of the Mr. Money Bags and New Money games biases respondents towards associating those images more so than the angled images.

### G.    The Wind Survey Contains Several Fatal Technical Errors

In addition to all of the aforementioned methodological flaws and bias, the Wind Survey also contained several specific fundamental flaws. First, one of the EGM arrays improperly displayed an

image of the VGT game instead of the Castle Hill game when a respondent clicked to "enlarge" the image. Second, despite Dr. Wind's insistence that respondents were able to "zoom" in on specific machine elements, the survey actually did not have this functionality. Finally, if a respondent did attempt to "enlarge" the images of the various EGMs, the enlarged versions of the VGT and Castle Hill games were of significantly higher quality than those of the controls.  Each of these issues in and of themselves are sufficient to disqualify the survey as biased and untrustworthy, and taken together they demonstrate that the survey is devoid of any probative value and must be excluded.

<blockquote>

a)      **20% of Respondents Were Shown an Image of VGT's Mr. Money Bags Game Instead of Castle Hill's New Money Game**
</blockquote>

As set forth above, respondents were shown one of five different arrangements (and for all but one of those arrays, Dr. Wind chose to place the VGT and CHG games directly next to one another). Respondents were instructed to click on an image of a particular game in order to enlarge it as part of their review. For one of the five array options, shown to roughly 20% of survey takers (the T-K-M-P-S order), if a respondent clicked on the Castle Hill game (labeled as "M"), they were shown an enlarged image of VGT's Mr. Money Bags. This error was unknown to Dr. Wind until the time of his deposition, when he could say little more than "this is strange." Wind Dep. at 249:22-251:4. Dr. Wind went on to admit that without reexamining the data and removing all respondents who were impacted by the mistake in the system, he would not feel comfortable with any of his survey opinions or the results of the survey. Wind Dep. at 256:3-21 ("But I don't feel comfortable drawing any conclusion at this stage until we redo the analysis.").

Following the deposition, VGT served Castle Hill with a "Corrected" Report, together with a "Memorandum" from Dr. Wind, **Exhibit O**, in which he removed the 20% of respondents who were shown the improper image during the survey, and attempted to say that this mistake did not matter. This is troubling for several reasons. First, removing the 93 respondents (out of a total of 446) impacted by Dr. Wind's error leaves a universe of only 353 respondents (out of a universe of

millions of residents just living in Oklahoma). Dr. Wind stated that he made the decision regarding sample size of the survey, and designed it for a universe of "400 plus, so somewhere around 400 people." Wind Dep. at 140:16-19. Dr. Wind's "corrected" report and accompanying memorandum make absolutely no effort to address how having a smaller sample size impacts the reliability of the survey or the margin of error in the survey. Indeed, Dr. Wind continues to state that his results are "significant at the 95% confidence level or higher" – with absolutely no explanation of where this number came from. But the number of survey respondents impacts the confidence level, an issue that Dr. Wind has failed to account for. Moreover, it does not take a survey expert to understand that a survey in which 20% of the respondents had to be removed because they were shown flawed data is far less reliable than a survey of a larger sample size without similar flaws (and all the other biases discussed above).

Second, Dr. Wind and/or Research Now did not pick up on the image error either when designing and administering the survey, or when reviewing the results. Indeed, counsel for Castle Hill was able to discover the rather obvious and glaring issue simply by viewing the survey on-line. Further, the survey's verbatim responses indicated that there was an issue which should have been apparent to Dr. Wind if he had actually read the hundreds of pages of verbatim responses set forth in his Report. For example, one respondent stated that the "name of the game is the same," which it is not. Another respondent stated that both game names contained the words "money bags," an objectively false statement caused by the respondent viewing the incorrect image of the VGT game but thinking it was the Castle Hill game. Dr. Wind admitted and recognized that  the names of the VGT and Castle Hill games included in his survey were not actually the same. Wind Dep. at 252:17-253:17.

As set forth above, the survey showed respondents one of five different arrays (out of a universe of 120 available permutations). Basic diligence required Dr. Wind or Research Now to test

each of those five arrays to avoid this very situation. Testing the five arrays would not have been burdensome or particularly time-consuming. Dr. Wind's failure to do so demonstrates that the survey was biased, flawed, and unreliable.

> **b)** **Despite Dr. Wind's Claim that a Respondent Could "Zoom" on an Image, the Survey Had No Such Functionality**

When respondents were shown the EGM array, they were told to "look at the five machines the way you normally would before selecting a machine to play." Report at 9. To aid in their review, the survey told them: "You can zoom in to see any element of a machine better." *Id.* This implied that a respondent could click the image and focus on a specific element of the machine, such as the bingo card, or the artwork, etc.

Indeed, the zoom functionality was central to Dr. Wind's reply report in response to Castle Hill's survey expert's report. Castle Hill's expert pointed out that while both Castle Hill and VGT games display their house trademarks which identify the manufacturer on the front of the machines, the survey did not allow a respondent to clearly see those source-identifying marks. In his reply report, Dr. Wind expressly relied on the "zoom" feature, stating that it allowed a respondent to focus on the name of the company, stating: "Indeed, the zoom feature used in the survey allowed respondents to see the VGT and CHG house marks if the respondents knew for what they were looking." Reply Report at 8. Dr. Wind's reply report even included an image of the house marks, purportedly as he claims they could be viewed using the "zoom feature." *Id.* at 9.

During his deposition, Dr. Wind doubled-down on his reliance on the "zoom feature," claiming "you could focus on a specific part of the picture." Wind Dep. at 214:1–215:6. Dr. Wind repeated this assertion regarding the zoom feature several times during his deposition, insisting that respondents had the option of zooming in on specific EGM elements as part of their review, until counsel actually pulled up the electronic survey on a laptop and asked Dr. Wind to demonstrate how the zoom feature worked. And despite everything Dr. Wind had said regarding the zoom feature, it

did not work as he claimed it did. Instead, a respondent could click on an image to make it slightly larger, but the respondent could not move the image around or zoom in on any specific parts of the image. **When asked about whether a respondent could "zoom in on [an EGM image] to show any of the detail," Dr. Wind responded "Apparently, not."** Wind Dep. at 245:16-18. Despite serving a "corrected" report following his deposition, Dr. Wind made absolutely no attempt to address his representations regarding the zoom functionality.

The failure to include a zoom function was not a minor flaw. As discussed above, the static artist-renderings of EGMs hardly demonstrate what the machines actually look like under real world market conditions (such as backlighting of the house marks). At the very least respondents should have been able to zoom in on specific elements of the artwork as part of their review. But the Wind Survey failed to make even this basic functionality available to respondents. This error did not go unnoticed by survey respondents. Indeed, at least seven respondents specifically noted in their verbatim responses that the images they were shown needed more detail, and complained about their inability to zoom in on the pictures. Wind Dep. at 216:20-218:22. Dr. Wind apparently failed to read these responses.

Dr. Wind himself had claimed that the zoom feature "allowed respondents to see the VGT and CHG house marks if the respondent knew for what they were looking." Reply Report at 8. That statement is demonstrably false. Who knows what the results of the survey would have been had respondents actually been able to study the machines in detail, including but certainly not limited to the ***names of the manufacturers displayed on the machines***. *See Water Pik,* 726 F.3d at 1146-47 (failure to include house mark in product array "exaggerated the similarities between the two marks, likely increasing the confusion of the respondents.").

A survey expert has an obligation to design and administer a survey which minimizes error and bias. McCarthy on Trademarks and Unfair Competition § 32:170 (5th ed.); Wind Dep. at 126:3-

9. Here, Dr. Wind acknowledged glaring error in the both the design of the survey and his report upon which it was based with respect to the lack of the zoom feature. And despite the fact that he took measures after the deposition to try to remedy the bias caused by the "incorrect image" issue discussed above, he took no steps to address the lack of zoom functionality (or even identify it as an issue). Nor did he state that he undertook a comprehensive review of the remainder of his survey to ensure it was free of similar errors and bias. Having been confronted with so many errors and issues during his deposition, a reasonable and responsible survey expert would have done so.

c)      **The Wind Survey Used Higher Quality Images for VGT and Castle Hill, Thus Creating Significant Bias**

A third fatal flaw in the Wind Survey is that the images of the VGT and Castle Hill EGMs shown to respondents were of significantly higher quality than those of the controls. While Dr. Wind maintains that the resolution of the five games is the same when not enlarged – which they are plainly not – he concedes that *when enlarged*, the Castle Hill and VGT games both appear in high resolution with greater clarity than the controls. Out of the three controls, only one has a high resolution. The other two control images are grainy and fuzzy when enlarged. *See* Reply Report at 7; Wind Dep. at 221:2-6 ("Q: [O]nly one of the three controls you used had the same resolution when respondents tried to zoom in on them? A: Correct."). The only explanation Dr. Wind could offer for selecting control images with lower resolution than the two games he was testing was that they were the "best available." As set forth above, Dr. Wind did nothing to try to get better images, other than ask VGT's counsel. The selection of two controls with significantly lower image resolution created a clear bias towards associating the higher definition VGT and Castle Hill games.

H.      **Dr. Wind Should be Excluded Because his Report Includes Summaries of Evidence and Testimony of Fact Witnesses**

Dr. Wind should be precluded from summarizing the documentary evidence and testimony of fact witnesses. After concluding the "survey" portion of his analysis, Dr. Wind spends a

21

significant portion of his report and reply recounting documents and testimony, which he refers to as "other relevant evidence." *See, e.g.*, Report at 24-44; Reply at 12-15. While Dr. Wind purports to include a nearly 20 page summary of deposition testimony and documents in order to "assess whether other relevant evidence is consistent with the results of the consumer study," Report at 24, this evidentiary summary is improper and should be disallowed.

"[N]o expert will be permitted to simply summarize the facts and depositions of others." *iFreedom Direct Corp. v. First Tennessee Bank Nat. Ass'n*, 2012 WL 3067597 at *3 (D. Utah July 27, 2012); *see also National Indemnity Co. v. Nelson, Chipman & Burt*, 2013 WL 12303138 at *1 (D. Utah Jan. 22, 2013) (same). "Moreover, a party may not 'elevate and advocate the value of individual evidence by having it recounted by an expert.'" *iFreedom Direct Corp.*, 2012 WL 3067597 at *3. That is precisely what Dr. Wind attempts to do here.

Dr. Wind spends large portions of his expert reports simply regurgitating fact deposition testimony and documents, not to explain the basis for his own opinions – which can flow only from the survey that he conducted – but in an effort to put an "expert" stamp of approval on VGT's spin on the purported evidence. Dr. Wind claims to reach several "conclusions" based on his review of the evidence.[9] Among them are that "VGT trademarks and trade dress are strong." Report at 31. Importantly, however, Dr. Wind admitted at his deposition that he "did not design a survey to look at the strength of the trademark;" nor was his survey designed to analyze the strength of VGT's alleged trade dress, Wind Dep. at 262:23-263:9, and his survey did not purport to test secondary meaning. *Id.* at 101:15-17. Rather, Dr. Wind made very clear in his deposition testimony that the "other relevant evidence" portion of his report was simply a regurgitation of information spoon-fed

---

[9]    Dr. Wind further attempts to offer a rebuttal to Castle Hill's damages expert. Reply Report at 12-15. Dr. Wind, of course, is not a financial or accounting expert, Wind Dep. at 78:10-12, and his critiques of Castle Hill's damages expert are little more than the arguments of counsel regarding the evidence Castle Hill's expert relied on. Dr. Wind is not qualified or permitted to make those arguments.

22

to him by VGT's counsel, *id.* at 102:4-7 ("Right, they're the source of all the material that I reviewed."), which he did not independently verify or, in some instances, even bother to review, *id.* at 37:25-36:10.

By way of further example, Dr. Wind's review of "other relevant evidence" resulted in his stating that alleged similarities between VGT and Castle Hill games "relating to the artwork, the cabinet, the red strobe light, the mechanical bell, the red free spin feature, the bingo patterns, and the paytables, amongst other similarities, result in a similar overall look and feel between Castle Hill's and VGT's games." Report at 40. When asked to explain the basis for his alleged "opinions" regarding various elements of the VGT and Castle Hill games that he had not tested, Dr. Wind explained that he did not independently review or verify any of the information he included in his report, choosing instead to rely solely on what he was told by VGT's counsel and during one interview with a VGT executive. In fact, despite reaching an opinion as to the "overall look and feel" of both Castle Hill and VGT games, Dr. Wind admitted that he had never even seen or played an EGM made by either company in person and has never even visited an Oklahoma casino, because he "didn't have the time." Wind Dep. at 69:19-70:20.

When asked to expand upon the individual trade dress features he included in his "other relevant evidence," Dr. Wind was unable to do so. With respect to the similarities and differences between the red free spin feature, which Dr. Wind expressly references as one of the elements he considered in concluding that the "overall look and feel" of VGT's and Castle Hill's games was similar, Dr. Wind was unable to describe how either VGT's or Castle Hill's feature worked, because he was "not an expert on the – on the gaming machines." *Id.* at 88:8-9; *see also id.* at 92:24-93:2 (when asked if he could explain Castle Hill's and VGT's red screen features, Dr. Wind stated: "No. I'm not a machine expert.").

When asked to explain his understanding of VGT's bell, Dr. Wind stated that he did not

know what allegedly made VGT's bell distinctive, *id.* at 94:7-9, and that his survey did not present any bell sounds to consumers, so his only basis for any "opinions" regarding the bell was based on reviewing materials from VGT's counsel. *Id.* at 95:4-14. Likewise, Dr. Wind did not do any analysis of the bingo patterns VGT and Castle Hill use in their respective games, and could not name any individual bingo patterns. *Id.* at 286:3-8. The only basis for Dr. Wind's "conclusion" that the bingo patterns used by VGT and Castle Hill create a similar "overall look and feel" was a conversation he had with a VGT executive, who told him that was the case. This is also true with respect to Dr. Wind's contention that the "paytables" used by the companies result in a similar look and feel, which he "took no independent effort to verify." *Id.* at 286:12- 287:4.

VGT apparently intends to use Dr. Wind as a mouthpiece to summarize evidence and the testimony of other witnesses and make arguments regarding the import of such evidence and testimony. Not only is Dr. Wind not an expert on "summarizing evidence," he failed to perform even the most basic review of the evidence he purports to rely on (for example, he renders "opinions" about paytables that he **never even reviewed**). The rules do not allow an expert to be used in this manner, and Dr. Wind himself recognizes that he is not "qualified to weigh the evidence in this case." *Id.* at 265:4-7. To the extent Dr. Wind is permitted to testify at all (which he should not be, for the reasons set forth above), the Court should preclude him from offering opinions and arguments regarding what the evidence in this case means. That is an argument for VGT's counsel to make, not for a consumer survey expert. Anything Dr. Wind says regarding his alleged "other relevant evidence" is unreliable and amounts to little more than *ipse dixit*.

V.    **CONCLUSION**

For the foregoing reasons, Castle Hill respectfully requests that this motion be granted and that the Court enter an order precluding VGT's expert witness Dr. Jerry Wind from testifying at trial.

Dated:  October 12, 2018                    Respectfully submitted,

                                            */s/ Robert C. Gill*

Robert C. Gill (admitted *pro hac vice*)
Henry A. Platt (admitted *pro hac vice*)
Thomas S. Schaufelberger (admitted *pro hac vice*)
Matthew J. Antonelli (admitted *pro hac vice*)
Jeremy B. Darling (admitted *pro hac vice*)
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
henry.platt@saul.com
tschauf@saul.com
matt.antonelli@saul.com
jeremy.darling@saul.com

Sherry H. Flax (admitted *pro hac vice*)
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA #4254
JAMES C. HODGES, P.C.
2622 East 21st Street, Suite 4
Tulsa, Oklahoma 74114
(918) 779-7078
(918) 770-9779 (facsimile)
JHodges@HodgesLC.com

*Counsel for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 12th day of October, 2018, a copy of the foregoing **DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT YORAM WIND – REDACTED PUBLIC VERSION** was filed using the Court's ECF system, which provided service to the following:

Graydon Dean Luthey, Jr.
GABLE GOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, OK 74103-4217
(918) 595-4821
(918) 595-4990 (facsimile)
dluthey@gablelaw.com
*Counsel for Plaintiff*

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1221
(212) 841-1010 (facsimile)
nroman@cov.com
*Counsel for Plaintiff*

Gary M. Rubman
Peter Swanson
Michael Sawyer
Rebecca B. Dalton
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
(202) 778-5465 (facsimile)
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
*Counsel for Plaintiff*

*/s/ Robert C. Gill*
Robert C. Gill

26