# EXHIBIT B

# REDACTED PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1)  VIDEO GAMING TECHNOLOGIES, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cv-00454-GKF-jfj |
| | ) | |
| 1)  CASTLE HILL STUDIOS LLC | ) | **CONTAINS CONFIDENTIAL OR** |
| (d/b/a CASTLE HILL GAMING); | ) | **HIGHLY CONFIDENTIAL** |
| 2)  CASTLE HILL HOLDING LLC | ) | **INFORMATION – SUBJECT TO** |
| (d/b/a CASTLE HILL GAMING); and | ) | **PROTECTIVE ORDER** |
| 3)  IRONWORKS DEVELOPMENT, LLC | ) | |
| (d/b/a CASTLE HILL GAMING) | ) | |
| | ) | |
| Defendants. | ) | |

**Reply Expert Report of Dr.  Yoram (Jerry) Wind**

**September 14, 2018**

## Table of Contents

I.    **Objective** ...................................................................................................... 1

II.   **Executive Summary** ...................................................................................... 1

III.  **Analysis of Mr. Berger's Criticisms** .......................................................... 1

    A.   **The survey universe I used is neither over-inclusive nor under-inclusive.** ............................................................................................... 1

    B.   **The Squirt design is more appropriate than the Eveready design, and, if anything, use of "static" images resulted in an understatement of confusion.** ................................................................................. 4

    C.   **The stimuli used in the Initial Report are representative of the parties' product lines.** ................................................................. 6

    D.   **The images used in the survey were the best available and provided sufficient detail.** ................................................................. 7

    E.   **The survey contained no leading questions, and use of a compound question is acceptable in this context.** ......................................... 10

    F.   **The survey adequately represents the casino environment.** ........................... 11

    G.   **The inclusion of verbatim responses in a report is not only generally accepted, but best practice.** ................................................ 11

    H.   **Extrapolation is possible.** ............................................................... 11

    I.   **The section entitled Analysis of Other Relevant Evidence in the Initial Report supports the conclusions from the survey, not the opposite.** ............. 11

IV.   **Analysis of Mr. Schoettelkotte's Arguments Relating to VGT's Internal Surveys** ...................................................................................................... 12

V.    **Conclusion** ................................................................................................... 15

clearly show that the stimuli share many elements with the rest of their respective product lines, as seen in Appendices A and B.[18]

Because the stimuli used in the survey are representative of the VGT and CHG product lines at issue, it is possible to extrapolate the results to the other products in these product lines. Again, if Mr. Berger truly disagreed with this position and thought that use of other products would have led to different results, he could have replicated the survey, substituting alternative products, as opposed to merely speculating about the possible effects of such.

### D.    The images used in the survey were the best available and provided sufficient detail.

Mr. Berger's fourth criticism covers other aspects of the stimuli chosen for the survey, but have no more merit than the earlier points he raises.

First, although Mr. Berger claims that the quality of the images of the VGT and CHG EGMs are higher definition than the images of the other stimuli EGMs, when viewed without zooming, all five images have similar resolution. Even after zooming, the image of the Scientific Games EGM has similar resolution to the images of the VGT and CHG EGMs.

As noted, the images I chose were the best available if I wanted to ensure that the lineup included EGMs that could all be found in the same casino. As discussed below, the house marks on the CHG and VGT EGMs are less prominent than the house marks on some of the other stimuli; I therefore wanted to keep resolution of the VGT and CHG EGMs as high as possible so that respondents could see the VGT and CHG house marks. And it bears emphasis that no respondent identified resolution or a similar concept in their verbatim responses in explaining their substantive responses.

Second, Mr. Berger incorrectly claims that the VGT and CHG EGMs were presented in a more similar format than the images of the other stimuli EGMs. Specifically, Mr. Berger states that the VGT and CHG EGMs appear to be front-facing, 2D images, whereas the Scientific Games and Konami EGMs appear to be "side-view" images, and the IGT EGM appears to be a front-facing, 3D image. *See* Survey Rebuttal Report at 16.

As an initial matter, the characterization of the images of the Scientific Games and Konami EGMs as "side-view" inaccurately implies that the images focus on the side of the EGMs; rather, these images show the entire front face of the EGMs off-set at a slight angle so that one side of the EGMs is also somewhat visible.

---

[18] Nor is Mr. Berger correct in relying on inclusion of "toppers" on most of CHG's EGMs (in contrast to VGT's EGMs, which do not) or on the inclusion of side lighting on some VGT EGMs. With regard to the former, I am puzzled by Mr. Berger's point—I used an image of a CHG EGM with a topper and an image of a VGT EGM without a topper as stimuli because that is how they are most often found in casino. As for side lighting, it is my understanding that VGT does not include EGMs with such lighting as part of the product lines at issue.

Furthermore, if Mr. Berger were correct that positioning of the VGT and CHG EGMs created a bias toward choosing those two EGMs, that same bias should have applied to the Scientific Games and Konami EGMs, which are similarly positioned to each other. Yet the survey results show that only 4.3% of the responses identifying a pair of EGMs as related identified the Scientific Games and Konami EGMs, compared to 56.6% identifying the VGT and CHG EGMs. Even if one assumes that all the responses that identified the Scientific Games and Konami EGMs were due to the positioning of the machines (in spite of the lack of a single mention of this factor in any of the verbatim responses) and uses this 4.3% as a control, one is still left with a statistically significant number of respondents identifying the VGT and CHG EGMs.

I also disagree with Mr. Berger's claim that the IGT EGM appears to be 3D whereas the VGT and CHG EGMs appear to be 2D because the VGT EGM actually appears 3D (the button deck in the image of the VGT EGM is slightly wider than the rest of the cabinet frame). The only reason that the image of the IGT EGM may be more noticeably 3D than the image of the VGT EGM is that the IGT EGM has an arm and its button deck extends further than the VGT EGM. Thus, the IGT EGM likely appears more noticeably 3D than the VGT EGM in real life as well when viewed head-on. Given that the VGT EGM is actually 3D and that the CHG EGM is the only 2D image in the lineup, by Mr. Berger's logic, there should have been a bias toward associating the VGT EGM with the other three 3D stimuli. Of course, if there were any such bias, it appears to have been dwarfed by the obvious similarities between the images of the VGT and CHG EGMs because not a single respondent identified only the VGT, Konami, Scientific Games, and IGT EGMs as coming from the same source.[19]

Third, at the same time that Mr. Berger criticizes the excessive detail in the images of the VGT and CHG EGMs, he also criticizes the lack of detail in these same images. Specifically, he claims that the image of the CHG EGM does not "allow the respondent to see the CHG trademarks displayed prominently on the glass" and that "[i]t is also difficult to read the VGT trademarks on the VGT image used in the survey." *See* Survey Rebuttal Report at 17.

It is clear that the reason that more respondents did not recognize the VGT and CHG house marks was not insufficient detail in the images, but rather the lack of prominence of the house marks themselves. Indeed, the zoom feature used in the survey allowed respondents to see the VGT and CHG house marks if the respondents knew for what they were looking. But only one respondent said that he or she thought that the VGT house mark was on both the VGT and CHG EGMs, and no respondent noticed that the VGT and CHG EGM house marks are different. Furthermore, only three respondents said that they were unable to see as many details as they wanted when asked to provide feedback on the survey.

In the Survey Rebuttal Report, Mr. Berger surprisingly and without apparent basis makes the opposite claim, namely that "both manufacturers prominently display their logos, or house marks, on their products." The close-up images below undermine any such claim:

---

[19] Although one respondent—3745—identified KPST in Q2a, the verbatim responses suggest that he or she included P by mistake. *See* Initial Report at Appendix F-4.

 

Fourth, and finally, Mr. Berger criticizes my choice of control stimuli, noting that (a) only the VGT and CHG EGMs have the word "money" in the title, (b) only the VGT and CHG EGMs use purple as the primary color, and (c) only the VGT, CHG, Scientific Games, and IGT EGMs have rounded tops. Mr. Berger then cites examples of alternative EGMs that I could have used as controls.

In doing so, Mr. Berger seemingly forgets his (correct) position that the choice of stimuli should replicate the marketplace as closely as possible. Specifically, most of the alternative EGMs that Mr. Berger cites are EGMs for which there is no evidence that they are in the same casinos as the VGT and CHG EGMs.[20]

Similarly, in suggesting alternative control stimuli, Mr. Berger seemingly forgets his (incorrect) position that the control stimuli should consist only of Class II EGMs. Notably, CHG has confirmed that only two of the six alternative controls that Mr. Berger suggests—Money Talks and $tinkin' Rich—are Class II EGMs.[21]

As for Mr. Berger's point that only some of the EGMs that I used as stimuli shared certain features, *e.g.*, the word "money," the color purple, and the rounded top, I am perplexed. As an initial matter, his complaint seems to be that CHG EGMs look too much like VGT EGMs, which, of course, is why the survey shows confusion. In any event, I controlled for these features, as discussed in the Initial Report (at 14-16), by sub-dividing those respondents who identified at least three elements, with at least one element from the Macro Group and one element from the Micro Group, from those respondents who identified elements from only one group or only one element from each group. In other words, if a respondent said that the only

---

[20] *See* Defendants' Supplemental Objections and Responses to Plaintiff's Fourth Interrogatories to Defendants, July 29, 2018. Although Mr. Berger cites two alternative EGMs, The Money Man and Stinkin' Rich, for which CHG claims it has evidence of these EGMs being in the same casinos as the VGT and CHG EGMs, CHG did not so inform VGT until July 29, after I had begun the survey, and even then, CHG has not confirmed that the images of these EGMs that appear in its interrogatory response are representative of the EGMs as found in these casinos.

[21] *See id.*

reason he or she believed that the VGT and CHG EGMs are made by the same company was that those two EGMs had the word "money" in their titles, that respondent fell into a separate category.  Thus, comparing the number of test respondents who identified trademark elements and/or this specific combination of trade dress elements—51.4%—with those who identified elements from only one group or only one element from each group—32.8%—shows that more of the confusion was due to the trademark elements and/or this specific combination of trade dress elements, as opposed to the types of elements that Mr. Berger identifies.

### E.    The survey contained no leading questions, and use of a compound question is acceptable in this context.

Mr. Berger's fifth criticism is that the survey used leading and compound questions.

With respect to the purportedly leading questions, although Mr. Berger asserts that the survey should have included "an explanation at the start of the survey that tells the respondent that they don't have to know the answers to all the questions and if they don't know an answer it's perfectly OK to say, 'DON'T KNOW,'" he ignores that the survey did include a "no opinion" answer for each question, where relevant, which is more important than including an explanation along the lines of what Mr. Berger suggests.

It also bears repeating that all respondents are or were members of the Research Now internet panel, so they are familiar with surveys and aware that they do not have to answer every question.  *See* Initial Report at 7.

Finally, Mr. Berger proceeds from a false premise in suggesting that the questions that follow the below format should have included the words "if any" as well as an option to answer "don't know":

- Which machines do you think are made by the same company? Please select the machines that you think are made by the same company.

Specifically, Mr. Berger seems to have overlooked that respondents were asked these questions only if they said that they thought "[t]wo (or more) of the machines are made by the same company" when asked the previous open-ended question; in other words, the respondents had already concluded that at least two machines were made by the same company.

Nor is there merit to Mr. Berger's criticism of the survey for using a compound question, *i.e.,* that the survey referred to "companies that are associated *or* affiliated with each other."  It does not matter whether the respondents' answers would have differed for the different components.  If a respondent believes that VGT's EGM is made by a company *associated* with the company that makes CHG's EGM, that respondent is considered to be equally as confused as a respondent who believes that VGT's EGM is made by a company *affiliated* with the company that makes CHG's EGM.

**F.      The survey adequately represents the casino environment.**

I address Mr. Berger's sixth criticism—that the survey fails to replicate the casino environment in which the EGMs are presented—in the discussion relating to use of "static" images above at 4-5.

**G.      The inclusion of verbatim responses in a report is not only generally accepted, but best practice.**

Mr. Berger's seventh criticism is that the Initial Report is unnecessarily complex and fails to consider key information.

With regard to the latter, Mr. Berger essentially restates his earlier criticisms about the stimuli images and use of Class III EGMs, and these criticisms are therefore meritless for the same reasons discussed above.

As for the complexity claim, Mr. Berger seems to be criticizing the length of the report due to the inclusion of the verbatim survey responses, a position contrary to the guidance of Professor McCarthy:  "Often, an examination of the respondents' verbatim responses to the 'why' question are the most illuminating and probative part of a survey, for they provide a window into consumer thought processes in a way that mere statistical data cannot."[22]

**H.      Extrapolation is possible.**

I address Mr. Berger's eighth criticism, that the survey unfairly extrapolates results to other trademarks and trade dress, in Section III.C above at 5-7.

**I.      The section entitled Analysis of Other Relevant Evidence in the Initial Report supports the conclusions from the survey, not the opposite.**

Finally, Mr. Berger's criticisms concerning the "Analysis of Other Relevant Evidence" in the Initial Report miss the point and suggest that he is unfamiliar with or misunderstands the concept of convergence validity.  In claiming that this section consists of "'contentions,' not based on [the] survey, that have no basis in fact or survey theory," Mr. Berger ignores that this section does not claim to be based on the survey or survey theory.  Rather, as the Initial Report itself describes:  "The objective of this section is to assess whether other relevant evidence is consistent with the results of the consumer study.  If other evidence suggests that confusion is likely between VGT and CHG EGMs, the study's convergent finding is more likely to be valid." This section of the Initial Report then describes facts that support the conclusions from the survey.

In any event, neither of the two specific points that Mr. Berger makes in this section of the Survey Rebuttal Report regarding strength of the trademarks and trade dress and evidence of actual confusion has merit.  First, although Mr. Berger claims (at 23 of the Survey Rebuttal Report) that it would be "difficult if not impossible [for VGT] to establish secondary meaning

---

[22] McCarthy, *supra* note 5, § 32:175.

# Appendix A

## Comparison of VGT Games

| 19/20-inch LS Cabinet | | | | | |
|---|---|---|---|---|---|
| Mr. Money Bags (*i.e.*, survey stimulus) | Crazy Bill's Gold Strike | Polar High Roller | Lucky Ducky[1] | Mr. Millionaire | Crazy Cherry |
|  |  Excerpted from VGT0009553 |  Excerpted from VGT0000278 |  Excerpted from VGT0007106 |  Excerpted from VGT0000649 |  Excerpted from VGT0000796 |

Red strobe

Bingo screen in upper left corner of large video screen displaying artwork

Artwork

Paytable in round top

Player tracking terminal

Three mechanical reels

Denomination indicator on glass above buttons

Bill acceptor on right, ticket printer on left, both above artwork

Four to six buttons

[1] Because the particular game in this photograph features a topper, the red strobe is not visible, but it is my understanding that the red strobe would appear on top of the topper.



**6-inch LS Cabinet**

| Mr. Money Bags | Polar High Roller | Lucky Ducky | Crazy Bill's Gold Strike | Hot Red Ruby | Hot Red Ruby (with player tracking) |
|---|---|---|---|---|---|

Red strobe

Bingo screen in small video screen centered above reels

Artwork

Excerpted from VGT0001748

Excerpted from VGT0001756

Excerpted from VGT0001744

Excerpted from VGT0001732

Excerpted from VGT0001742

Paytable in round top

Artwork

Three mechanical reels

Four to six buttons

Excerpted from VGT0000566

Bill acceptor on right, ticket printer on left, both above artwork

**<u>Appendix B</u>**
**Comparison of CHG Games**



New Money (*i.e.*, survey stimulus)

Welcome to Nugget Mountain

Arctic Cash

Arctic Ice

Double Hotness

Mr. Martini

Red strobe

Paytable in round top

Bingo screen centered above reels in large video screen displaying artwork

Player tracking terminal

Three mechanical reels

Denomination indicator on glass above buttons

Artwork

Bill acceptor on right, ticket printer on left, both above artwork

Five buttons

Excerpted from VGT0000062

Excerpted from VGT0000063

Excerpted from VGT0000053

Excerpted from VGT0000054

Excerpted from VGT0000057

Excerpted from VGT0000061

**Appendix C**
**List of New Materials Reviewed**

- Rebuttal Report of James T. Berger, August 31, 2018
- Rebuttal Expert Report of W. Todd Schoettelkotte Relating to Damages, August 31, 2018
- Defendants' Supplemental Objections and Responses to Plaintiff's Fourth Interrogatories to Defendants, July 29, 2018
- Excerpts of Deposition Transcript of Daniel Fulton, dated August 1, 2018
- Sevigny Dep. Ex. 180
- VGT0007009
- Jerre B. Swann, *Eveready and Squirt—Cognitively Updated*, 106 The Trademark Reporter 727, 734 (2016)
- J. Thomas McCarthy, 6 McCarthy on Trademarks and Unfair Competition § 32:160-32:161, 32:175, 32:187
- https://www.youtube.com/watch?v=oU9q8X9Uldc
- https://www.facebook.com/castlehillgaming/videos/vb.552775911511888/737348076388003/?type=2&theater