# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| VIDEO GAMING TECHNOLOGIES, INC., | |
| Plaintiff, | CASE NO. 17-CV-00454-GKF-JFJ |
| v. | **PUBLIC – REDACTED VERSION** |
| CASTLE HILL STUDIOS LLC, *et al.* | |
| Defendants. | |

# DEFENDANTS' MOTION TO LIMIT THE TESTIMONY OF PLAINTIFF'S DAMAGES EXPERT MELISSA A. BENNIS

Defendants, Castle Hill Studios LLC, Castle Hill Holdings LLC, and Ironworks Development LLC (collectively, "CHG" or "Defendants"), move for an order limiting the testimony of Plaintiff's damages expert, Melissa A. Bennis.

I. **INTRODUCTION**

Plaintiff, Video Gaming Technologies, Inc. ("Plaintiff" or "VGT"), provided an expert report for damages expert Melissa A. Bennis, dated August 10, 2018. *See* Expert Report and Disclosure of Melissa A. Bennis ("Opening Report"), a copy of which is attached hereto as **Exhibit A** (without the voluminous schedules). Ms. Bennis was retained to opine on damages in the event that Defendants are found liable on any claim. Opening Report at 2. A copy of Ms. Bennis' Reply Report (without the voluminous schedules) is attached hereto as **Exhibit B**.[1] Three categories of Ms. Bennis's opinions are improper and should be excluded.

*First*, in determining which costs and expenses to offset against revenue in order to determine profit, Ms. Bennis purports to determine the depreciation expense applicable to CHG's electronic gaming machines ("EGMs"). However, Ms. Bennis did not depreciate the EGMs as provided for by law. Instead, she applied a different accounting concept altogether, which she arbitrarily selected. CHG is a start-up company which has lost money every year. The effect of stretching the depreciation of assets over a longer time period is to make it appear that CHG is profitable, when in fact it is not.

*Second*, Ms. Bennis opines on an element of Plaintiff's damages based on its trade secrets and confidential information claims consisting of alleged "avoided research and development costs" by CHG. However, Ms. Bennis did not review any financial data or perform any independent analysis in connection with this "opinion." Rather, she relied on an estimate of development costs prepared by someone else in an email, and on information from another VGT expert, Stacy Friedman. The

---

[1] Both reports and exhibits together total 633 pages.

1

opinion she gives is therefore not hers, but the opinion of others which she has adopted. This opinion on avoided research and development costs is unsupported by any accepted accounting methodology, or any independent analysis. Ms. Bennis merely seeks to bolster someone else's lay opinion, and to cloak that casual opinion with the apparent imprimatur of an expert.

*Third*, Ms. Bennis improperly summarizes "facts" and offers legal opinions and conclusions. Such opinions are beyond the purview of any expert, and Plaintiff should be precluded from offering such testimony.

## II. THE MELISSA BENNIS EXPERT REPORTS AND OPINIONS

### A. The Depreciation Opinion

In her Opening Report, in a section entitled ▮▮▮▮▮▮▮▮▮▮ Ms. Bennis acknowledged that ▮▮▮▮▮▮▮▮▮▮ Opening Report at 29. Ms. Bennis goes on to state that she understands ▮▮▮▮▮▮▮▮▮▮  *Id.* Based on her conversation with Mr. Sevigny, rather than use of accepted accounting principles or the Internal Revenue Code, Ms. Bennis then re-calculated CHG's depreciation over a ten year period. *Id.* at 29-30.

This is an important point in the calculation of profits. The Lanham Act gives a successful plaintiff the ability to recover, *inter alia*, a defendant's profits in accordance with the principles of equity. 15 U.S.C. § 1117(a); Opening Report at 13-14. Ms. Bennis admitted in her Opening Report that even with the improvement in CHG's financial performance ▮▮▮▮▮▮▮▮▮▮ Opening Report at 17. Consequently, even Ms. Bennis admits that Castle Hill is losing money every year. A monetary loss means there are no profits.

CHG's damages expert, Todd Schoettelkotte, opined that CHG's EGMs should be depreciated over a four-year period using straight-line depreciation, beginning on the date that the

2

EGMs are first available for use. *See* Rebuttal Expert Report of W. Todd Schoettelkotte Relating to Damages, dated August 31, 2018, at ¶¶ 28-31, a copy of which is attached hereto as **Exhibit C** (without schedules). Mr. Schoettelkotte found that Ms. Bennis did not properly account for EGM depreciation under a straight-line methodology, because she only accounted for depreciation when the EGMs were actually generating revenue. *Id.* Mr. Schoettelkotte also opined that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at ¶ 29. In this regard Mr. Schoettelkotte provided evidence that the methodology Ms. Bennis employed was contrary to the depreciation period provided for by law. Mr. Schoettelkotte also established that the approach taken by Ms. Bennis was contrary to the standard depreciation methodology employed by other companies in the gaming industry, such as Bally, Everi, IGT and SGC. *Id.*

In her Reply Report, Ms. Bennis did not abandon her opinion about a 10 year depreciation period, although she did soften on this point a bit. She stated that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Reply Report at 4.

Ms. Bennis admitted in her deposition that her calculation was not intended to capture depreciation of EGMs. Rather than determine depreciation, Ms. Bennis engaged in something that was more ▮▮▮▮▮▮▮▮▮ analysis. Bennis Deposition ("Bennis Dep.") at 47:2-48:2, a copy of which is attached as **Exhibit D**. The idea of depreciation is a tax concept, which is different than the concept of cost of goods sold. *Id.* at 49:15-50:12. The factual premise for that is the Bennis depreciation opinion assumed that the EGMs would remain in service for at least 10 years, but CHG has not even been in business for 10 years. *Id.* at 48:8-10.

Ms. Bennis should not be permitted to ignore accepted accounting methods, or the depreciation period provided for by law, and to apply a completely different concept in order to create the fiction of profitability for a start-up entity such as CHG.

3

B.     The Avoided Research and Development Cost Opinion

In her Opening Report Ms. Bennis stated that:



Opening Report at 33-34.

Ms. Bennis then goes on to state that she relied on a back of the envelope "calculation" made by Alan Roireau of CHG which compared VGT development costs to CHG development costs for Class II EGMs. *Id.* at 34. In an email Mr. Roireau drafted for marketing purposes, he estimated that it took VGT ███████████████████████████████ to develop its Class II Bingo engine. *Id.* at 34 & n.183. Mr. Roireau then stated that it took ████████ ██████████████████████████████ for its Class II bingo system. ████████████ ██████████ *Id.* at 34. Mr. Roireau also stated that █████████████████████████████ ████████████████████████ *Id.*

Ms. Bennis opines that ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████ *Id.* Ms. Bennis states that ██████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████[2] *Id.*

Ms. Bennis then used the estimates in Mr. Roireau's email to conclude that ████████ ████████████████████████████████████████████████████████████ *Id.* at 35. While Ms.

---

[2] Defendants have separately moved to exclude the testimony and reports of Stacy Friedman.

4

Bennis recognizes that some of these cost savings may be due to other factors, she again relies on Mr. Friedman's opinion to conclude that ▉▉▉▉▉▉ of the differential relates to trade secrets that were misappropriated. *Id.* Ms. Bennis then opines based on the above that  *Id.*

In her deposition Ms. Bennis admitted that she did not perform a review of any VGT financial data in connection with her opinion on this topic. To the contrary, she admitted that she relied on the email that Mr. Roireau prepared, and on conversations with VGT employee Josh Davis and VGT expert Stacy Friedman. Ms. Bennis testified as follows:



Bennis Dep. at 69:2-8. *See also id.* at 69:9-71:10.

As reflected in her reports and in her deposition testimony, Ms. Bennis' avoided research and development cost opinion did not involve any actual analysis, nor is her conclusion the product of any accepted methodology. Ms. Bennis admits that she did not even consider in her avoided research and development "analysis" the fact that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *Id.* at 73:3-14. *See also id.* at 73:14-75:25. For her opinion Ms. Bennis merely relied on the email drafted by Mr. Roireau for marketing purposes, and on her conversation with VGT expert Stacy Friedman.

As for Mr. Friedman, he does not have a degree in accounting, has no experience as an accountant, and did not even have any educational courses in accounting. *See* Deposition of Stacy Friedman ("Friedman Dep.") at 41, a copy of which is attached hereto as **Exhibit E**. He also has

5

no education or training in the field of valuing software. *Id.* at 41-42. While Mr. Friedman acknowledged that there are recognized methods for valuing software, he admitted that he is not familiar with any of them. *Id.* at 42. Even more importantly, Mr. Friedman conceded that his opinion was not even intended to actually quantify the costs which were allegedly avoided:

[REDACTED]

*See id.* at 227-28.

The fact that the position Ms. Bennis takes on avoided research and development is not a valid opinion and the product of principled analysis also is apparent from the language she used to express her opinion. She claims that the estimate given by Al Roireau in his email was a "reasonable estimate" rather than asserting that it was the result of financial analysis. While Ms. Bennis acknowledges that [REDACTED] of the cost savings which CHG enjoyed in the development of its products may be due to other factors, she makes no effort to quantify her definition of "some." Instead, Ms. Bennis relied on Mr. Friedman in order to conclude that [REDACTED] of the differential relates to trade secrets that were misappropriated. [REDACTED] is an imprecise term that conveys the concept of a "guess" much more than it does a "calculation." *Id.* at 35

### E. Ms. Bennis Summarized Evidence and Testimony of Fact Witnesses

Ms. Bennis' reports contain significant amounts of summarized evidence. This includes, *e.g.*, the [REDACTED] for her opinions, Opening Report at 16-17; a statement about the [REDACTED] *id.* at 18-19; and information about [REDACTED] *Id.* at 19. Ms. Bennis also discusses [REDACTED] *Id.* at 24-25.

The factual background given for the various Melissa Bennis opinions is something for which Ms. Bennis does not have personal knowledge. She should not be permitted to testify about such things as alleged "facts."

### F. Ms. Bennis Offered Legal Conclusions and Opined on Legal Standards

Ms. Bennis opines that it was improper for CHG's damages expert to rely on marketing surveys which VGT had obtained in the regular course of business. Opening Report at 16-20. Ms. Bennis offered opinions about marketing and consumer surveys, and relied on information she obtained from VGT's expert Yoram (Jerry) Wind. *Id.*

Dr. Wind's survey and opinions are the subject of a separate *Daubert* motion that is being filed concurrently with this motion for reasons more fully explained in that submission. Ms. Bennis should not be permitted to offer opinions that consist of or include legal conclusions, legal standards, or the opinions given by other experts.

### III. STANDARD OF REVIEW

Under Rule 702, an expert's opinion is admissible only if four basic requisites are met:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Rule 702 'imposes a special gatekeeping obligation on the trial judge to ensure that an opinion offered by an expert is reliable.'" *U.S. v. Velarde*, 214 F.3d 1204, 1208 (10th Cir. 2000). "A trial court's gatekeeper duty requires two separate inquiries: (1) the witness must be qualified to offer the opinions he is espousing and (2) the proponent of the witness bears the burden

7

of proving by a preponderance of the evidence that its witness's opinions are both relevant and reliable." *Bright v. Ohio Nat'l Life Assurance Corp.*, 2012 WL 12888316 at *1 (N.D. Okla. Nov. 29, 2012) (Frizzell, C.J.) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 52 (1999)).

The Court determines whether an expert is qualified to render an opinion based on "knowledge, skill, experience, training, or education." *See Bright v. Ohio Nat'l Life Assurance Corp.*, 2013 WL 121479 at *2 (N.D. Okla. Jan. 9, 2013) (Frizzell, C.J.) (citing Fed. R. Evid. 702; *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001)).

As to the issue of reliability, the Supreme Court in *Daubert* identified four nonexclusive factors the trial court may consider: (1) whether the opinion is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operations; and (4) whether the theory has been accepted in the scientific community. *See Aircraft Fueling Systems, Inc. v. Southwest Airlines Co.*, 2011 WL 6122627, at *5 (N.D. Okla. Dec. 8, 2011) (Frizzell, J.) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 593-95 (1993)).

The Court's inquiry is "flexible," but the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Bright v. Ohio Nat'l Life Assurance Corp.*, 2013 WL 12327512 at *1 (Jan. 09, 2013) (Frizzell, C.J.). "At a minimum, [the expert] should describe the method he used in reaching, and the data supporting, his determination." *Id.* "The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of a non-scientific, experience based-testimony." *Aircraft Fueling Systems,* 2011 WL 6122627 at *5. "The Court cannot rely on an expert's mere assurance that the methodology and data are reliable." *Id.* "An expert's testimony may be excluded where it is based on subjective beliefs or

8

unsupported speculation which is no more than *ipse dixit* guesswork." *Bright*, 2012 WL 12888316 at *2.

"The second prong of the *Daubert* inquiry concerns relevancy or 'fit.'" *Aircraft Fueling Systems*, 2011 WL 6122627 at *6. The trial court must determine if the proffered evidence aids the trier of fact. *See id.*

IV. **ARGUMENT**

    A. **Ms. Bennis' Opinion on Depreciation Relies on Flawed Methodology and is Unreliable**

Ms. Bennis should not be permitted to offer her opinion that the EGMs should be subjected to 10 year depreciation. The Court determines whether an expert is qualified to render an opinion based on knowledge, skill, experience, training, or education. *See Bright*, 2013 WL 121479 at *2. Ms. Bennis' reports and deposition testimony establishes that she employed an incorrect depreciation methodology, and that her opinion is unreliable.

"The Court cannot rely on an expert's mere assurance that the methodology and data are reliable." *Alexander v. Smith & Nephew, P.L.C.*, 98 F. Supp. 2d 1287, 1293 (N.D. Okla. 2000) "An expert's testimony may be excluded where it is based on subjective beliefs or unsupported speculation which is no more than *ipse dixit* guesswork." *Bright*, 2012 WL 12888316 at *2.

In her Opening Report Ms. Bennis admitted that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Opening Report at 29. Ms. Bennis did not challenge the four-year period as contrary to law or generally accepted accounting principles. Nevertheless, based on her conversation with VGT's President Mr. Sevigny, Ms. Bennis "re-calculated" CHG's depreciation over a ten year period. *Id.* at 29-30. Such a re-calculation was necessary to establish the existence of a profit, since Ms. Bennis *admitted* in her Opening Report, CHG has lost money every year. *Id.* at 17 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

9

Ms. Bennis admitted in her deposition that her depreciation calculation was really not intended to capture the depreciation of EGMs at all. Rather than determine depreciation, Ms. Bennis engaged in a different analysis – ▮▮▮▮▮▮▮▮▮▮ Bennis Dep. at 47:2-48:2. The idea of depreciation is a tax concept, which is a different analysis. *Id.* at 49:15-50:12.

Ms. Bennis should not be allowed to ignore accepted accounting methods or principles, or to ignore the depreciation period permitted by law. *See, e.g., Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022, 1030 (D. Kan. 2006) ("plaintiff's [expert's] projections are more sleight of hand than consistent with generally accepted economic methodology."). Ms. Bennis should be precluded from giving her opinion that the EGMs should be depreciated over 10 years, since that opinion is not based on accepted methodology, and is unreliable.

### B.  Ms. Bennis is Not Qualified to Offer an Opinion on the Alleged Avoided Research and Development Costs, and Her Methodology is Unreliable

In her Opening Report Ms. Bennis stated that:



Opening Report at 33-34.

Ms. Bennis then goes on to state that she relied on a back of the envelope "calculation" made by Alan Roireau of CHG which compared VGT development costs to CHG development costs for Class II EGMs. *Id.* at 34. In an email Mr. Roireau drafted for marketing purposes, he estimated that it took ▮▮▮▮▮▮▮▮▮▮ to develop its Class II Bingo engine. *Id.* at 34 & n.183. Mr. Roireau then stated that it took CHG ▮▮▮▮▮▮▮▮▮▮



*Id.* at 34.  Mr. Roireau also stated that ▮

Ms. Bennis opines that ▮

*Id.*  Ms. Bennis states that ▮

*Id.*

Ms. Bennis then used the estimates in Mr. Roireau's email to conclude that ▮ *Id.* at 35.  While Ms. Bennis recognizes that some of these cost savings may be due to other factors, she again relies on Mr. Friedman's opinion to conclude that "a substantial majority" of the differential relates to trade secrets that were misappropriated.  *Id.*  Ms. Bennis then opines based on the above that ▮ *Id.*

In her deposition Ms. Bennis admitted that she did not perform a review of any VGT financial data in connection with this opinion.  To the contrary, she admits that she relied on the email that Mr. Roireau prepared, and on conversations with VGT employee Josh Davis and VGT expert Stacy Friedman.  Ms. Bennis testified as follows:



Bennis Dep. at 69:2-8.  *See also* Bennis Dep. at 69:9-71:10.

11

As reflected in her expert reports and deposition testimony, Ms. Bennis' avoided research and development cost analysis did not involve any actual analysis, nor is her conclusion the product of any accepted methodology. Ms. Bennis admits that she did not even consider in her avoided research and development "analysis" the fact that ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ ▊▊▊▊▊▊▊ *Id.* at 73:3-14. *See also id.* at 73:14-75:25. For her opinion Ms. Bennis merely relied on the email drafted by Mr. Roireau for marketing purposes, and on her conversation with VGT expert Stacy Friedman.

As for Mr. Friedman, he does not have a degree in accounting, has no experience as an accountant, and did not even have any educational courses in accounting. *See* Friedman Dep at 41. He also has no education or training in the field of valuing software. *Id.* at 41-42. While Mr. Friedman acknowledged that there are recognized methods for valuing software, he admitted that he is not familiar with any of them. *Id.* at 42.

Consequently, Mr. Friedman is not qualified to offer an opinion which involves the value of software, or the computation of damages. Even more importantly, *Mr. Friedman* conceded that his opinion was not even intended to actually quantify the costs which were allegedly avoided:



*Id.* at 227-28.

That Ms. Bennis's avoided research and development opinion is neither valid nor the product of any particular expertise is also apparent from the language she used to express this opinion. She claimed that the "estimate" given by Al Roireau in his email was a ▊▊▊▊▊ ▊▊▊▊▊ and did not assert that it was the result of any financial analysis. While Ms. Bennis acknowledged that ▊▊▊▊ of cost savings which CHG enjoyed in the development of its products

12

may be due to other factors, she made no effort to quantify ▮▮▮ effort. Instead, Ms. Bennis relied wholly on Mr. Friedman to conclude that ▮▮▮▮▮▮ of the differential in costs necessary to creation of the parties' bingo systems relates to trade secrets that were misappropriated. This is plainly a guess with no backing, no calculation behind it, and no expertise necessary to make this guess.

Ms. Bennis cannot, as Mr. Friedman did, simply adopt Mr. Roireau's subjective financial opinion without doing any actual analysis. *See TK-7 Corp. v. Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) ("expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction."). Here, of course, Mr. Roireau has *not* been presented as an expert by either party, and has testified (repeatedly) that his "calculation" was nothing more than a back-of-the-envelope guesstimate, made without any actual supporting data:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Roireau Dep. at 206:7-18 **(Exhibit F)** (emphasis added). Simply having Ms. Bennis review Mr. Roireau's email guess and stamp it with approval does not turn it into an expert opinion: a "party may not 'elevate and advocate the value of individual evidence by having it recounted by an expert.'" *Freedom Direct Corp. v. First Tennessee Bank Nat. Ass'n*, 2012 WL 3067597 at *3 (D. Utah July 27, 2012).

Consequently, the Bennis opinion on avoided research and development costs does not reflect careful financial analysis or expertise, and must be excluded.

### C. Ms. Bennis Should Be Precluded from Testifying About Facts or Summarizing Evidence

Ms. Bennis should be precluded from summarizing or characterizing documents or facts in this case. This includes, *e.g.*, the ██████████ for her opinions, Opening Report at 16-17; a statement about the ████████████████████████████ *id.* at 18-19; and information about ██████████████████████████ *Id.* at 19. Ms. Bennis also discusses ████████████████████████████████ *Id.* at 24-25. The factual background given for the various Melissa Bennis opinions is an area where Ms. Bennis does not have any personal knowledge or professional expertise.

"[N]o expert or any other witness will be permitted to simply summarize the facts and depositions of others." *Freedom Direct Corp.*, 2012 WL 3067597 at *3; *see also National Indemnity Co. v. Nelson, Chipman & Burt*, 2013 WL 12303138 at *1 (D. Utah Jan. 22, 2013) (same). "Moreover, a party may not 'elevate and advocate the value of individual evidence by having it recounted by an expert.'" *Freedom Direct Corp.*, 2012 WL 3067597 at *3. The Court should preclude Ms. Bennis from summarizing, characterizing or testifying about facts.

### E. Ms. Bennis Should Be Precluded From Opining on Legal Conclusions or Legal Standards

Finally, Ms. Bennis should be precluded from giving opinions which are legal conclusions or recitals of legal standards. An expert cannot testify as to what constitutes a "trade secret" or "misappropriation," and an expert cannot argue based on her mere *ipse dixit* that but for knowledge of the plaintiff's system, a defendant's technology would have taken longer to develop. *Skycam, Inc. v. Bennett*, 2011 WL 2551188 at *4-5 (N.D. Okla. June 27, 2011) (Frizzell, J.).

Ms. Bennis' reports are comprised of improper factual summaries and legal opinions. Such testimony would usurp the Court's role, and would be of no help to the jury. "[A]n expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by

applying the law to the facts." *See The Pioneer Centres Holding Company Employee Stock Ownership Plan & Trust v. Alterus Fin., N.A.*, 858 F.3d 1324, 1342 (10th Cir. 2017).  An expert may not opine on whether testimony is credible, even if such evaluation is based on scientific or technical expertise. *See U.S. v. Hill*, 749 F.3d 1250, 1260 (10th Cir. 2014) (citing *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005)).  "[I]t is axiomatic that the judge is the sole arbiter of the law and its applicability." *See Bright v. Ohio Nat'l Life Assurance Corp.*, 2013 WL 121479 at *3 (N.D. Okla. Jan. 9, 2013) (Frizzell, C.J.) (quoting *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988)).  While an otherwise qualified expert applying a reliable methodology may opine on the ultimate legal issue in a case, an expert cannot submit a report consisting primarily of legal conclusions.  *Bright*, 2013 WL 12479 at *4.

Ms. Bennis opines that it was improper for CHG's damages expert Todd Schoettelkotte to rely on marketing surveys which VGT had obtained.  Opening Report at 16-20.  Ms. Bennis offered opinions about such marketing and consumer surveys, and relied on information she obtained from VGT expert Yoram (Jerry) Wind.  *Id.*  Dr. Wind's survey and opinions are the subject of a separate *Daubert* motion that is being filed concurrently with this motion for reasons more fully explained in that submission.  Ms. Bennis should not be permitted to offer opinions that consist of or include legal conclusions, legal standards, or the opinions given by other experts.  She is not qualified to testify about consumer surveys.

**V.     CONCLUSION**

Defendants, Castle Hill Studios LLC, Castle Hill Holdings LLC, and Ironworks Development LLC respectfully request that their motion be granted.

Dated: October 12, 2018                    Respectfully submitted,

/s/ *Robert C. Gill*
Robert C. Gill (admitted *pro hac vice*)
Henry A. Platt (admitted *pro hac vice*)
Thomas S. Schaufelberger (admitted *pro hac vice*)
Matthew J. Antonelli (admitted *pro hac vice*)
Jeremy B. Darling (admitted *pro hac vice*)
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
henry.platt@saul.com
tschauf@saul.com
matt.antonelli@saul.com
jeremy.darling@saul.com

Sherry H. Flax (admitted *pro hac vice*)
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA #4254
JAMES C. HODGES, P.C.
2622 East 21st Street, Suite 4
Tulsa, Oklahoma 74114
(918) 779-7078
(918) 770-9779 (facsimile)
JHodges@HodgesLC.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of October, 2018, I caused a copy of the foregoing **DEFENDANTS' MOTION TO LIMIT THE TESTIMONY OF PLAINTIFF'S DAMAGES EXPERT MELISSA A. BENNIS – PUBLIC REDACTED VERSION** to be filed using the Court's ECF system, which will provide electronic notification of filing to the following counsel for Plaintiff:

Graydon Dean Luthey, Jr.
GABLE GOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, OK 74103-4217
(918) 595-4821
(918) 595-4990 (facsimile)
dluthey@gablelaw.com
*Counsel for Plaintiff*

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1221
(212) 841-1010 (facsimile)
nroman@cov.com
*Counsel for Plaintiff*

Gary M. Rubman
Peter Swanson
Michael Sawyer
Rebecca B. Dalton
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
(202) 778-5465 (facsimile)
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
*Counsel for Plaintiff*

*/s/ Robert C. Gill*
Robert C. Gill