**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1) VIDEO GAMING TECHNOLOGIES, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cv-00454-GKF-jfj |
| | ) | |
| 1) CASTLE HILL STUDIOS LLC | ) | **REDACTED VERSION** |
| (d/b/a CASTLE HILL GAMING); | ) | |
| 2) CASTLE HILL HOLDING LLC | ) | |
| (d/b/a CASTLE HILL GAMING); and | ) | |
| 3) IRONWORKS DEVELOPMENT, LLC | ) | |
| (d/b/a CASTLE HILL GAMING) | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF VIDEO GAMING TECHNOLOGIES, INC.'S
<u>MOTION FOR AND BRIEF IN SUPPORT OF PARTIAL SUMMARY JUDGMENT</u>**

## Table of Contents

Page

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ................................ 2

    A.     VGT Developed Its ▉▉▉▉ Algorithm Over Many Years. ........................ 2

    B.     VGT Took Reasonable Measures to Keep the Algorithm Secret. ........................ 4

    C.     VGT's Algorithm Derives Independent Value From Not Being Generally Known or Readily Ascertainable. ........................................................................ 5

    D.     CHG Has Acquired, Used, and Disclosed VGT's ▉▉▉▉ Algorithm. ............ 7

    E.     Former VGT Engineers Employed by CHG Owed VGT a Duty to Maintain the Confidentiality of VGT's ▉▉▉▉ Algorithm. ........................... 9

III. LEGAL STANDARD ...................................................................................... 11

IV. ARGUMENT .................................................................................................. 12

    A.     VGT Is Entitled to Summary Judgment on CHG's Unclean Hands and Illegality Defenses. ........................................................................................ 12

        1.     Relevant Law ................................................................................ 13

        2.     CHG's Unclean Hands Defense ................................................... 15

        3.     CHG's Illegality Defense ............................................................. 26

    B.     VGT Is Entitled to Partial Summary Judgment on Its Claims for Misappropriation of Trade Secrets Under the DTSA and VUTSA. ................... 31

        1.     There Is No Genuine Dispute of Material Fact that VGT's ▉▉▉▉ Algorithm Is a Trade Secret. ....................................................... 34

        2.     There Is No Genuine Dispute of Material Fact that CHG Has Misappropriated the VGT ▉▉▉▉ Algorithm. .................................... 39

V. CONCLUSION ................................................................................................ 46

## Table of Authorities

CASES                                                                 Page(s)

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
   722 F.3d 1229 (10th Cir. 2013) ........................................................................14, 18, 24, 25

*1-800 Contacts, Inc. v. Memorial Eye, P.A.*,
   No. 2:08-cv-983, 2010 WL 5149269 (D. Utah Dec. 13, 2010) ...............................14

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................11

*Anheuser-Busch, Inc. v. Cohen*,
   37 F.2d 393 (D. Md. 1930) .....................................................................................17

*Arctic Energy Servs., LLC v. Neal*,
   No. 18-CV-00108-PAB-KLM, 2018 WL 1010939 (D. Colo. Feb. 22, 2018)........................34

*Avtec Sys., Inc. v. Peiffer*,
   805 F. Supp. 1312 (E.D. Va. 1992) .......................................................................44

*Basic Am., Inc. v. Shatila*,
   992 P.2d 175 (Idaho 1999)......................................................................................38

*BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*,
   303 F.3d 1332 (Fed. Cir. 2002)...............................................................................38

*Cartel Asset Mgmt. v. Ocwen Fin. Corp.*,
   No. 01-cv-01644, 2010 WL 3522409 (D. Colo. Aug. 11, 2010)..........................14, 21, 22, 26

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ...............................................................................................11

*Cent. Plastics Co. v. Goodson*,
   537 P.2d 330 (Okla. 1975)......................................................................................40

*Chapman v. BOK Fin. Corp.*,
   No. 12-cv-613, 2014 WL 3700870 (N.D. Okla. July 25, 2014) ............................11

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
   526 U.S. 687 (1999)................................................................................................20

*Cmty. Counselling Serv., Inc. v. Reilly*,
   317 F.2d 239 (4th Cir. 1963) ..................................................................................44

*Colo. Supply Co. v. Stewart*,
   797 P.2d 1303 (Colo. App. 1990)...........................................................................35

*Decision Insights, Inc. v. Sentia Grp., Inc.*,
    416 F. App'x 324 (4th Cir. 2011) ....................................................................37, 38

*Dream Games of Ariz., Inc. v. PC Onsite*,
    561 F.3d 983 (9th Cir. 2009) ..................................................................................22

*Ed Nowogroski Ins., Inc. v. Rucker*,
    971 P.2d 936 (Wash. 1999).....................................................................................40

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
    No. 2:15-CV-1202-WCB, 2017 WL 275465 (E.D. Tex. Jan. 20, 2017) ...........21, 22

*First Fin. Bank, N.A. v. Bauknecht*,
    71 F. Supp. 3d 819, 843 (C.D. Ill. Oct. 24, 2014)...................................................35

*Flow Control Indus., Inc. v. AMHI, Inc.*,
    278 F. Supp. 2d 1193 (W.D. Wash. 2003)...............................................................25

*FN Herstal SA v. Clyde Armory, Inc.*,
    838 F.3d 1071 (11th Cir. 2016) ...................................................................... *passim*

*Food Servs. of Am., Inc. v. Carrington*,
    No. CV-12-00175-PHX-GMS, 2013 WL 4507593 (D. Ariz. Aug. 23, 2013) .......35

*Fund of Funds, Ltd. v. First Am. Fund of Funds*,
    274 F. Supp. 517 (S.D.N.Y. 1967)..........................................................................17

*Gen. Steel Domestic Sales, LLC v. Chumley*,
    No. 10-cv-01398, 2012 WL 2589241 (D. Colo. July 3, 2012) ................................20

*Hertz v. Luzenac Grp.*,
    576 F.3d 1103 (10th Cir. 2009) .........................................................................35, 38

*Holmes v. Border Brokerage Co.*,
    51 Wash. 2d 746, 321 P.2d 898 (1958)....................................................................17

*Hooley Super-Markets, Inc. v. Hygrade Food Prods. Corp.*,
    174 U.S.P.Q. 173, 1972 WL 17754 (T.T.A.B. 1972).............................................18

*In re Innovative Constr. Sys., Inc.*,
    793 F.2d 875 (7th Cir. 1986) ..................................................................................42

*Interbake Foods, L.L.C. v. Tomasiello*,
    461 F. Supp. 2d 943 (N.D. Iowa 2006)....................................................................38

*Jackson v. Odenat*,
    9 F. Supp. 3d 342, 364 (S.D.N.Y. 2014)..................................................................19

*K-Tec, Inc. v. Vita-Mix Corp.*,
  729 F. Supp. 2d 1312 (D. Utah 2010)....................................................................14

*Keystone Driller Co. v. Gen. Excavator Co.*,
  290 U.S. 240 (1933)..............................................................................................20, 21

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*,
  15 F. Supp. 2d 389 (S.D.N.Y. 1998).......................................................................28

*Mitchell Bros. Film Grp. v. Cinema Adult Theater*,
  604 F.2d 852 (5th Cir. 1979) ..................................................................................22

*Nalley v. Dunn*,
  No. 09-cv-0771, 2010 WL 2868180 (N.D. Okla. July 20, 2010) ...........................15

*Newport News Indus. v. Dynamic Testing, Inc.*,
  130 F. Supp. 2d 745 (E.D. Va. 2001) ......................................................................45

*Oliva v. Ramirez*,
  No. 07-1569, 2007 WL 2436305 (D.P.R. Aug. 21, 2007).......................................17

*Powell v. Mobile Cab & Baggage Co.*,
  263 Ala. 476, 83 So. 2d 191 (1955) ........................................................................17

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
  324 U.S. 806 (1945).................................................................................................14

*ProLine Prods., L.L.C. v. McBride*,
  2014 OK CIV APP 34, 324 P.3d 430 (Okla. Civ. App. 2014) ...............................37

*Purzel Video GmbH v. St. Pierre*,
  10 F. Supp. 3d 1158, 1169 (D. Colo. 2014).............................................................15

*Russian Kurier, Inc. v. Russian Am. Kurier, Inc.*,
  899 F. Supp. 1204 (S.D.N.Y. 1995).........................................................................17

*S. Cal. Darts Ass'n v. Zaffina*,
  762 F.3d 921 (9th Cir. 2014) ....................................................................... *passim*

*Solarcity Corp. v. Pure Solar Co.*,
  No. CV 16-01814-BRO, 2016 WL 11019989 (C.D. Cal. Dec. 27, 2016)...............45

*Space Systems/Loral, LLC v. Orbital ATK, Inc.*,
  306 F. Supp. 3d 845, 855 (E.D. Va. 2018) ..............................................................34

*Texas Tech Univ. v. Spiegelberg*,
  461 F. Supp. 2d 510 (N.D. Tex. 2006) ....................................................................25

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
505 U.S. 763 (1992) ................................................................................................29

*U.S. Light & Heating Co. of Me. v. U.S. Light & Heating Co. of N.Y.*,
181 F. 182 (S.D.N.Y. 1910) ....................................................................................17

*United Phosphorus, Ltd. v. Midland Fumigant, Inc.*,
205 F.3d 1219 (10th Cir. 2000) ..............................................................................26

*US W. Commc'ns, Inc. v. Office of Consumer Advocate*,
498 N.W.2d 711 (Iowa) ...........................................................................................38

*Water Pik, Inc. v. Med–Systems, Inc.*,
726 F.3d 1136 (10th Cir. 2013) ..............................................................................11

*Woods v. Nationbuilders Ins. Servs., Inc.*,
No. 11-CV-02151, 2014 WL 1303504 (D. Colo. Mar. 27, 2014) ..........................12

*Worthington v. Anderson*,
386 F.3d 1314 (10th Cir. 2004) ..............................................................................18

*Yeager v. Fort Knox Sec. Prods.*,
602 F. App'x 423 (10th Cir. 2015) .....................................................................17, 18

**STATUTES**

18 U.S.C. § 1836(b)(1) ...................................................................................................39

18 U.S.C. § 1839(3) ..................................................................................................34, 36

18 U.S.C. § 1839(5)(A) ..................................................................................................39

18 U.S.C. § 1839(5)(B)(ii)(II) ........................................................................................46

18 U.S.C. § 1839(5)(B)(ii)(II) & (III) ...........................................................................40

18 U.S.C. § 1839(6) ........................................................................................................40

18 U.S.C. § 1839(6)(A) ..................................................................................................44

Defend Trade Secrets Act, 18 U.S.C. § 1836 ................................................................34

Va. Code Ann. § 59.1-336 ..................................................................................... *passim*

Virginia Uniform Trade Secrets Act, Va. Code Ann. §§ 59.1-336 to 59.1-343 ...........34

**OTHER AUTHORITIES**

25 C.F.R. § 547 (2008) .......................................................................................... *passim*

82 Fed. Reg. 61172 (Dec. 27, 2017) ................................................................. *passim*

Fed. R. Civ. P. 56(a) .................................................................................... 11

Fed. R. Civ. P. 56(e) App. ............................................................................. 11

6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition,
    § 19:123 (5th ed.) ..................................................................................... 27

*Restatement (Third) of Unfair Competition* § 39 cmt. d (1995) ...................... 38

1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.07A (2018) ...................... 38

4 Roger M. Milgrim, *Milgrim on Trade Secrets* § 15.01[1][a][ii] (2018) .......... 37

S. Rep. No. 1333 (1946) ................................................................................ 29

I.   **INTRODUCTION**

This is an intellectual property case about longtime VGT officials who left to start a new gaming company, Castle Hill Gaming ("CHG"), where they hired other VGT employees and began marketing and selling games that bear unmistakable similarities—in both appearance and gameplay—to VGT's most popular games.  VGT asserts that CHG has infringed VGT's trademarks (including the symbols and artwork surrounding VGT's games), that CHG has infringed VGT's trade dress (the overall look and feel of VGT's games and game machines), and that CHG has misappropriated VGT's trade secrets and confidential information (such as the know-how required to design and build successful games).

By this motion, VGT seeks summary judgment on two issues in an effort to streamline the issues for trial.

First, CHG cannot establish its affirmative defenses of unclean hands and illegality. Although CHG has never clearly articulated the basis for these defenses, discovery suggests that CHG, in a transparent attempt to distract from its own misconduct, seeks to raise at trial collateral issues that have no bearing on VGT's claims, such as whether all of VGT's games complied with certain tribal gaming regulations.  Although VGT disputes CHG's allegations, it is well established that unclean hands and illegality are narrow defenses that do not permit a defendant to raise at trial alleged misconduct of the plaintiff unrelated to the claims at issue. Because CHG cannot establish elements of its unclean and illegality defenses for this and other reasons, summary judgment in VGT's favor is appropriate.

Second, VGT moves for summary judgment that CHG misappropriated VGT's trade secret ███████ algorithm (one of several misappropriated trade secrets at issue in this case). The material facts are not in dispute: ███████████████████████████

███████████████████████████████████████████

1



Accordingly, summary judgment is both appropriate and necessary to ensure that CHG makes no further use or disclosure of VGT's trade secret algorithm.

II.   **STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[1]**

    A.   **VGT Developed Its ▮▮▮▮▮▮ Algorithm Over Many Years.**

    1.

---

[1] The undisputed facts identified in this section relate to VGT's motion for summary judgment on its trade secret claims. VGT has not identified undisputed facts specifically relating to the portion of the motion directed to CHG's affirmative defenses because those issues can be decided purely as a matter of law.

[2] Exhibits A through E are attached to the Declaration of Josh Davis in Support of Plaintiff's Motion for Partial Summary Judgment ("Davis Decl."); Exhibit F is attached to the Declaration of Stacy Friedman in Support of Plaintiff's Motion for Partial Summary Judgment ("Friedman Decl."); Exhibits G through H are attached to the Declaration of Richard Williamson in Support of Plaintiff's Motion for Partial Summary Judgment ("Williamson Decl."); and Exhibits I



- ████████████████████████████████████
████████████

- ████████████████████████████████████
████████████████████████████████████
████████

- ████████████████████████████████████
████████████████████████████████

- ████████████████████████████████████
███████

- ████████████████████████████████████
████████████████████████████████████
████████████

2.      VGT developed its █████████ Algorithm over multiple years relying on the

contributions of multiple engineers.  Davis Decl. ¶¶ 6–10.

3.      ████████████████████████████
████████████████████████████████████████████

████████████

4.      ████████████████████████████

████████████████████████████████

───────────────

through RR are attached to the Declaration of Michael Sawyer in Support of Plaintiff Video
Gaming Technologies, Inc.'s Motion for Partial Summary Judgment.

5.     VGT developed its ███████ algorithm in, among other places, Virginia, and used it on games deployed in other states, including Oklahoma.  Davis Decl. ¶ 19.

**B.    VGT Took Reasonable Measures to Keep the Algorithm Secret.**

6.     ████████████████████████████████████████████
████████████████████████ Davis Decl. ¶ 14; Ex. I, Suggs Dep. Tr. 84:22–85:5, 87:12–25.

7.     ████████████████████████████████████████
████████████████████████ Davis Decl. ¶ 15; Ex. C at VGT0001813; Ex. D at VGT0001789.

8.     ████████████████████████████████████████████
████████████████████████████████████ Davis Decl. ¶ 15.

9.     ████████████████████████████████████████
███████████████████████ Davis Decl. ¶ 15.

10.    ████████████████████████████████████████
████████████████ Davis Decl. ¶ 16; Williamson Decl. ¶ 3; *see, e.g.*, Ex. G at VGT0056192–204; Ex. H at VGT0056178–80.

11.    VGT requires its employees to undertake confidentiality obligations to VGT.  Ex. J, Yarbrough Dep. Tr. 225:25–226:6; *see, e.g.*, Ex. K, VGT0006912-15; Ex. L, VGT0006862–63.

12.    The security measures VGT took with respect to the ███████ Algorithm were reasonable under the circumstances.  Ex. I, Suggs Dep. Tr. 87:12–88:5; Friedman Decl. ¶¶ 22–23.

**C.    VGT's Algorithm Derives Independent Value From Not Being Generally Known or Readily Ascertainable.**

13.    VGT has not publicly disclosed the ████ Algorithm.  Davis Decl. ¶ 16.

14.    The VGT ████ Algorithm is neither generally known nor readily ascertainable by others.  Ex. I, Suggs Dep. Tr. 48:25–50:24, 85:15–21; Friedman Decl. ¶¶ 24–25.

15.    ████████████████████████████████ ████ Davis Decl. ¶ 18; Friedman Decl. ¶ 26; Ex. I, Suggs Dep. Tr. 42:6–43:17; Ex. M, Zeidman Dep. Tr. 220:23–221:16.

16.    ████████████████████████████████ ████████████████  Ex. HH, Roireau 30(b)(6) Dep. Tr. 73:19–76:2, 156:19–158:6; Ex. S, VGT's Dep. Ex. 488.

17.    ████████████████████████████████ ████████████████  Friedman Decl. ¶ 29; Ex. M, Zeidman Dep. Tr. 176:20–25, 182:2–4, 187: 7–10, 190:9–12, 192:7–9, 192:20–24, 203:2–18.

18.    ████████████████████████████████ ████████████  Friedman Decl. ¶ 29; Ex. M, Zeidman Dep. Tr. 182:5–8, 187:11–14, 190:13–15, 192:7–9, 192:20–24, 203:2–18.

19.    ████████████████████████████████ ████████████████  Friedman Decl. ¶ 29; Ex. M, Zeidman Dep. Tr. 182:9–11, 188:22–189:2, 190:16–19, 192:7–9, 192:20–24, 203:2–18.

20.    ████████████████████████████████ ████████████████  Friedman

Decl. ¶ 29; Ex. M, Zeidman Dep. Tr. 182:21–25, 188:22–189:2, 190:20–23, 192:7–9, 192:20–24, 203:2–18.

21. ████████████████████████████████████████

████████████████████████████ Friedman Decl. ¶ 29; Ex. M, Zeidman Dep. Tr. 183:2–7, 189:3–8, 190:24–191:2, 192:7–9, 192:20–24, 203:2–18.

22. ████████████████████████████████████████

████████████████████████████████████████ Friedman Decl. ¶ 29; Ex. M, Zeidman Dep. Tr. 182:12–20, 189:9–13, 191:3–8, 192:7–9, 192:20–24, 203:2–18.

23. ██████████████████████████████████

Friedman Decl. ¶¶ 13–15; Davis Decl. ¶¶ 6, 17.

24. ████████████████████████████████████████

████████████████████████████████████████

███████████████ Ex. N, Scheiner Dep. Tr. 182:24–184:22, 233:14–235:11; Davis Decl. ¶¶ 6–10; Friedman Decl. ¶ 33.

25. ████████████████████████████████████

████████████████████████████████ Ex. O, CHG0087147-49; Ex. N, Scheiner Dep. Tr. 190:11–192:24, 196:24–198:24; Ex. P, CHG0086662.

26. █████████████████████████████████

████████████████████████████ Ex. I, Suggs Dep. Tr. 85:15–87:2; Ex. RR at CHG0087703; Friedman Decl. ¶ 32; Ex. M, Zeidman Dep. Tr. 244:21–245:22.

27. ██████████████████████████████ Ex. I, Suggs Dep. Tr. 87:3–6; Friedman Decl. ¶ 32.

### D.    CHG Has Acquired, Used, and Disclosed VGT's ███████ Algorithm.

28.    ████████████████████████████████████████████████████ Ex.

HH, Roireau 30(b)(6) Dep. Tr. 74:13–76:9; Ex. S, VGT's Dep. Ex. 488, Ex. Q, at CHG0089317,

CHG0089320; Ex. II, VGT's Dep. Ex. 380.

29.    ████████████████████████████████████████████████████

████████████████████████████████ Ex. HH, Roireau 30(b)(6) Dep. Tr.

74:13–76:9.

30.    ██████████████████████████████████ Ex. I, Suggs

Dep. Tr. 88:25–91:6, 224:22–225:21.[3]

31.    ████████████████████████████████████████████

██████ Ex. I, Suggs Dep. Tr. 34:8–14.

32.    ██████████████████████████████████ Ex. I, Suggs Dep.

Tr. 223:9–226:3.

33.    ██████████████████████████████████

█████████████ Ex. I, Suggs Dep. Tr. 224:22–225:21.

34.    ████████████████████████████████████████████

████████████████████████ Ex. N, Scheiner Dep. Tr. 215:7–22.

35.    ██████████████████████████████████████

████████████████████████████████████████████

---

[3] CHG agreed to designate the Rule 30(b)(1) testimony of Mr. Suggs on, *inter alia,* ████
████████ as Rule 30(b)(6) testimony. *See* Ex. LL, Mr. Platt Email to Mr. Sawyer (July 26, 2018); Ex. MM, Plaintiff's Notice of Deposition of Defendants Castle Hill Studios LLC, Castle Hill Holding LLC, and Ironworks Development, LLC (Feb. 5, 2018).



██████████████████████████████████████████████ Ex. I, Suggs Dep. Tr. 89:10–91:6; Ex. Q at CHG0089320.

36.    ██████████████████████████████████████████

████ Ex. Q at CHG0089320; Friedman Decl. ¶ 36(a) (citing Ex. F); Ex. M, Zeidman Dep. Tr. 224:12–16.

37.    ██████████████████████████████████████████

█████████████ Ex. Q at CHG0089320; Friedman Decl. ¶ 36(b) (citing Ex. F); Ex. M, Zeidman Dep. Tr. 224:17–21; Ex. I, Suggs Dep. Tr. 91:7–92:23.

38.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████ Ex. Q at CHG0089320; Friedman Decl. ¶ 36(c) (citing Ex. F); Ex. M, Zeidman Dep. Tr. 225:16–19; Ex. I, Suggs Dep. Tr. 96:20–97:10.

39.    ██████████████████████████████████████████

██████████████████████████████████████ Ex. Q at CHG0089320; Ex. S, VGT's Dep. Ex. 488; Friedman Decl. ¶ 36(d) (citing Ex. F); Ex. M, Zeidman Dep. Tr. 226:8–11; Ex. I, Suggs Dep. Tr. 97:21–98:3.

40.    ██████████████████████████████████████████

██████████████████████ Ex. Q at CHG0089320; Ex. S, VGT's Dep. Ex. 488; Friedman Decl. ¶ 36(e) (citing Ex. F); Ex. M, Zeidman Dep. Tr. 226:18–21.

41.    ██████████████████████████████████████████

████████████████████████ Ex. Q at CHG0089320; Ex. S, VGT's Dep. Ex. 488; Friedman Decl. ¶ 36(f) (citing Ex. F); Ex. M, Zeidman Dep. Tr. 226:22–227:7.

42. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. Q at CHG0089320; Ex. S, VGT's Dep. Ex. 488; Friedman Decl. ¶ 36(f) (citing Ex. F); Ex. M, Zeidman Dep. Tr. 226:22–227:7; Ex. I, Suggs Dep. Tr. 98:8–17.

43. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ Ex. Q at CHG0089320; Ex. S, VGT's Dep. Ex. 488; Friedman Decl. ¶ 36(f) (citing Ex. F); Ex. I, Suggs Dep. Tr. 98:8–17.

44. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Ex. I, Suggs Dep. 79:20-82:23, 221:25-222:22; Ex. Q at CHG0089320; Ex. S, VGT's Dep. Ex. 488; Friedman Decl. ¶ 37.

45. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. I, Suggs Dep. 88:25–89:5.

46. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ Ex. HH, Roireau 30(b)(6) Dep. Tr. 74:13–76:9.

47. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ Friedman Decl. ¶¶ 36–37; Ex. II, VGT's Dep. Ex. 380; Ex. HH, Roireau 30(b)(6) Dep. Tr. 74:13–76:9.

**E.    Former VGT Engineers Employed by CHG Owed VGT a Duty to Maintain the Confidentiality of VGT's ▮▮▮▮▮ Algorithm.**

48. All VGT employees signed confidentiality agreements. Ex. J, Yarbrough Dep. Tr. 225:25–226:6.

49.     Mr. Suggs worked for VGT in Virginia.  Ex. I, Suggs Dep. Tr. 9:22–11:1, 13:25–14:13; Davis Decl. ¶¶ 8, 19.

50.    ████████████████████████████████████████ Ex. I, Suggs Dep. Tr. 24:18–25:19; Ex. K at VGT0006912–15.

51.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Ex. I, Suggs Dep. Tr. at 48:3–16.

52.    ████████████████████████████████████

███████████████████████████████████████████████

██████ Ex. I, Suggs Dep. Tr. 227:15–24; Ex. QQ, at CHG0087214.

53.    ███████████████████████████████████████████

███████████████████ *see* Ex. U at CHG0089313–14; Ex. N, Scheiner Dep. Tr. 218:6–220:5, ██████████████████████████████████████████

Ex. JJ, Roireau 30(b)(1) Dep. Tr. 48:19–49:10.

54.    ████████████████████████████████████████ Ex. I, Suggs Dep. Tr. 227:15–24.

55.    ████████████████████████████████████████

██████████████████████████████████ Ex. JJ, Roireau 30(b)(1) Dep. Tr. 297:11–298:12.

56.    ████████████████████████████████████████

██████████████████████████████████████ Ex. JJ, Roireau 30(b)(1) Dep. Tr. 294:6–295:10.

57. ████████████████████████████████████ Ex. HH,

Roireau 30(b)(6) Dep. Tr. 168:2–6.

## III.    LEGAL STANDARD

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (internal quotation marks omitted); *see* Fed. R. Civ. P. 56(a). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). "[I]f the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Water Pik*, 726 F.3d at 1143–44.

A party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e) App. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. "In essence, the inquiry for the Court is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Chapman v. BOK Fin. Corp.*, No. 12-cv-613, 2014 WL 3700870, at *2 (N.D. Okla. July 25, 2014) (quoting *Anderson*, 477 U.S. at 250).

IV.    **ARGUMENT**

    A.    **VGT Is Entitled to Summary Judgment on CHG's Unclean Hands and Illegality Defenses.**

CHG articulates no factual basis—or even a cogent theory—to support its unclean hands and illegality defenses.  Unclean hands and illegality are identified in three of the more than 20 affirmative defenses asserted by CHG in response to VGT's claims based on CHG's use of confusingly similar trademarks and trade dress and misappropriation of VGT trade secrets and confidential information.  *See* Dkt. 112 at 18, 20 (¶ 2 ("unclean hands"), ¶ 17 ("unclean hands"), and ¶ 18 ("illegality")).[4]  CHG's answer contains *no* explanation of its unclean hands defense and only a terse explanation of its illegality defense.

Although VGT served an interrogatory seeking clarification of the basis for CHG's defenses, it was met only with rote objections and irrelevant responses.  *See* Ex. V, VGT's Second Set of Interrogatories to CHG at 3-4 (Jan. 18, 2018) (requesting "factual and legal bases for each of the affirmative defenses You assert in this case"); Ex. W, CHG's Objections and Answers to VGT's Second Set of Interrogatories at 4 (Feb. 20, 2018) (discussing possible laches grounds, but no "unclean hands" grounds); Ex. X, Email from Mr. Gill to Mr. Rubman (Aug. 2, 2018) (inchoate promise to supplement CHG's Objections and Answers to VGT's Second Set of Interrogatories).  Despite promising clarification, CHG never provided a supplemental discovery response addressing its unclean hands and illegality defenses.[5]

---

[4] CHG has also raised an affirmative defense of "bad faith," Dkt. 112 at 20 (¶ 15), but has never explained the factual or legal basis for this defense.  To the extent it relies on the same allegations as its unclean hands and illegality defenses, it fails for the same reasons.

[5] CHG's failure to provide a basis for these defenses constitutes independent grounds to disallow CHG from asserting them at trial.  *See Woods v. Nationbuilders Ins. Servs., Inc.*, No. 11-CV-02151, 2014 WL 1303504, at *2-3 (D. Colo. Mar. 27, 2014) (refusing to allow defendant to introduce defense at trial where defendant failed to provide factual basis for defense in response to discovery requests).

As a result, VGT has been left to guess at the grounds for these affirmative defenses based only on the direction of CHG's deposition questioning and discovery requests served by CHG late in discovery.  Based on this limited information, VGT's best guess is that CHG may attempt to assert the following unclean hands theories at trial:

- CHG believes that some VGT games do not comply with all National Indian Gaming Commission ("NIGC") regulations (the "Regulatory Theory"[6]);

- CHG believes that ███████████████████████████████████████ ███████████████████████████████████ and

- CHG believes that ██████████████████████████████████████ █████████████████████████████████████████████████ ███████████████████

None of these theories has merit, but rather constitute an effort by CHG to throw mud at VGT in an attempt to distract from the merits of VGT's claims.  Even if CHG's allegations were true, case law, including in the Tenth Circuit, is clear that they do not amount to either an unclean hands or illegality defense.  Because CHG is unable to establish essential elements of these defenses (to the extent that they even apply in this context), VGT is entitled to summary judgment.

### 1.     Relevant Law

Unclean hands and illegality are narrow defenses in intellectual property cases and may bar relief only if closely tied to specific causes of action at issue.  As the Tenth Circuit has explained, "the doctrine of unclean hands does not empower a court of equity to deny relief for any and all inequitable conduct on the part of the plaintiff. . . .  Rather, a plaintiff's unclean

---

[6] This theory would seemingly also serve as the basis for CHG's "illegality" defense.

hands will bar recovery for trademark infringement only if the inequitable conduct is related to the plaintiff's cause of action."  *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1255 (10th Cir. 2013) (internal punctuation omitted); *see also Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, No. 01-cv-01644, 2010 WL 3522409, at *3-4 (D. Colo. Aug. 11, 2010) ("Viewed objectively, Defendants' proposed affirmative defense merely seeks to punish Mr. Coats and Cartel Asset Management for 'extraneous transgressions' that are logically distinct from the wrongful conduct that forms the basis for Defendants' liability.").

Mere assertion of one of these defenses does not give a defendant *carte blanche* to trot out all possible misbehavior in which the plaintiff ever allegedly engaged; instead, the accused conduct must be directly related to the claims at issue.  *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) ("[W]hile equity does not demand that its suitors shall have led blameless lives as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue.") (internal punctuation omitted); *FN Herstal SA v. Clyde Armory, Inc.*, 838 F.3d 1071, 1087 (11th Cir. 2016) ("There must be a nexus between the use of the mark and the violation, and the violation must be material.").

CHG "has the burden to prove all elements of [these] affirmative defense[s]."  *K-Tec, Inc. v. Vita-Mix Corp.*, 729 F. Supp. 2d 1312, 1316 (D. Utah 2010) (internal punctuation omitted); *see FN Herstal SA*, 838 F.3d at 1087 ("The party asserting the [illegality] defense must establish that it applies by clear and convincing evidence."); *1-800 Contacts, Inc. v. Memorial Eye, P.A.*, No. 2:08-cv-983, 2010 WL 5149269, at *4 (D. Utah Dec. 13, 2010) ("Unclean hands or trademark misuse[] is purely an affirmative defense and does not form the basis for an affirmative claim for recovery.") (internal punctuation omitted).  Therefore, on summary judgment, CHG "has the burden to produce evidence showing that a genuine issue of material

fact requires submission of this issue to the jury." *Nalley v. Dunn*, No. 09-cv-0771, 2010 WL 2868180, at *6 (N.D. Okla. July 20, 2010).

> **2.    CHG's Unclean Hands Defense**

A defense of unclean hands requires a defendant to show that "the party seeking equitable relief is (1) guilty of conduct involving fraud, deceit, unconscionability, or bad faith, (2) directly related to the matter at issue, (3) that injures the other party, and (4) affects the balance of equities between the litigants." *Purzel Video GmbH v. St. Pierre*, 10 F. Supp. 3d 1158, 1169 (D. Colo. 2014) (internal punctuation omitted).

CHG has failed to establish any element of its unclean hands defense regardless of which theory it may pursue at trial.

> **a)    CHG Lacks Support for an Unclean Hands Defense Under Its Regulatory Theory.**

CHG's Regulatory Theory appears centered around VGT's supposed non-compliance with the so-called "Minimum Technical Standards" promulgated by NIGC in 2008 and codified at 25 C.F.R. § 547 (2008). *See* Minimum Technical Standards for Class II Gaming Systems and Equipment, 82 Fed. Reg. 61172 (Dec. 27, 2017). These standards, designed to protect the "security and integrity" of Class II gaming systems and tribal operations, include specifications for the hardware and software used in Class II bingo-based systems. *See id.*; *see also, e.g.*, 25 C.F.R. §§ 547.7-8 (2008).

CHG appears focused on whether some VGT games qualify for "grandfather" status under the Minimum Technical Standards. *See* Dkt. 126 at 2–3 (CHG reply brief in support of motion to compel relating to NIGC issue). Grandfather status refers to the NIGC's decision, in recognition of the cost and burden of upgrading existing systems to comply with the new requirements, to allow those systems to remain in operation during a sunset period originally

15

scheduled to end in 2013.  *See* 82 Fed. Reg. at 61172.  The NIGC later extended the sunset period to 2018, then ultimately eliminated the requirement to upgrade existing systems altogether.  *See id.*  That is, grandfathered systems no longer need to be upgraded.  *See id.*[7]

In accordance with NIGC regulations, VGT has consistently sought proper certification of compliance with technical standards for its grandfathered systems.  *See* 25 C.F.R. § 547.4 (2008).  VGT has submitted its games to test laboratories for certification.  *See* Ex. Y, Williamson 30(b)(1) Dep. Tr. 26:13-27:1, 32:9-20, 49:6-7; Ex. Z, Williamson 30(b)(6) Dep. Tr. 23:13-24:7, 80:10-83:25.  VGT has then submitted those certified games to tribal gaming regulatory authorities for approval before the games are placed on casino floors.  *See id.*

At no stage of this multi-level review process—by the entities with the greatest expertise on NIGC compliance issues—have VGT's games been found to be non-compliant with technical standards.  *See id.*

CHG seeks to second-guess the evaluations performed by these expert entities based on its own novel interpretation of NIGC's regulations—an interpretation with which VGT (and apparently all relevant regulatory reviewers) disagrees—and asks this Court in this *trademark* case to interpret the Minimum Technical Standards, find facts related to VGT's compliance, and then analyze whether the regulations have been met.

There is no good reason for the Court to entertain CHG's specious theory, however, because even if it were proven, CHG cannot establish any element of an unclean hands defense.  The alleged non-compliance with the Minimum Technical Standards is simply not the kind of

---

[7] ████████████████████████████████████████████████ Ex. Y, Williamson 30(b)(1) Dep. Tr. 85:9–22; Ex. Z, Williamson 30(b)(6) Dep. Tr. 41:13–42:21.

conduct that can constitute unclean hands. *See, e.g., S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 931-33 (9th Cir. 2014) (no unclean hands for trademark owner's failure to register as a corporation and pay taxes).[8]

(1)    *Non-Compliance with the NIGC's Minimum Technical Standards Is Not Deceitful or Fraudulent.*

Although the Tenth Circuit has observed that "the clean-hands inquiry looks for fraudulent and deceitful conduct," *Yeager v. Fort Knox Sec. Prods.*, 602 F. App'x 423, 429 (10th Cir. 2015), CHG points only to supposed technical violations of the NIGC's Minimum Technical Standards. *See, e.g.*, Dkt. 117 (seeking discovery on "compliance with licensing, regulatory, or other legal requirements [including] NIGC's minimum technical standards"). Any alleged non-compliance with these standards would have nothing to do with fraudulent or deceitful conduct by VGT.

To the contrary, NIGC's Minimum Technical Standards are aimed only at ensuring that game systems are sufficiently technologically capable of protecting against third-party threats to the security and integrity of casino games.[9] *See* 82 Fed. Reg. 61172, 61172 (Dec. 27, 2017)

---

[8] *See also, e.g., Oliva v. Ramirez*, No. 07-1569, 2007 WL 2436305, at *5 (D.P.R. Aug. 21, 2007) (no unclean hands for failure to register business in Puerto Rico); *Russian Kurier, Inc. v. Russian Am. Kurier, Inc.*, 899 F. Supp. 1204, 1211 (S.D.N.Y. 1995) (no unclean hands for illegal copying and republishing of written works); *Fund of Funds, Ltd. v. First Am. Fund of Funds*, 274 F. Supp. 517, 519 n.1 (S.D.N.Y. 1967) (no unclean hands for violation of Securities and Exchange Commission regulations); *Holmes v. Border Brokerage Co.*, 51 Wash. 2d 746, 752, 321 P.2d 898, 902-03 (1958) (no unclean hands for technical violations of customs regulations); *Powell v. Mobile Cab & Baggage Co.*, 263 Ala. 476, 480-81, 83 So. 2d 191, 194-95 (1955) (no unclean hands for violation of business licensing law); *Anheuser-Busch, Inc. v. Cohen*, 37 F.2d 393, 395 (D. Md. 1930) (no unclean hands for violation of prohibition laws by trademark owner producing beer); *U.S. Light & Heating Co. of Me. v. U.S. Light & Heating Co. of N.Y.*, 181 F. 182, 185-86 (S.D.N.Y. 1910) (no unclean hands for violation of law requiring a license and payment of state taxes).

[9] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. Y, Williamson 30(b)(1) Dep. Tr. 55:9-56:23.

("When implemented in 2008, the part 547 minimum technical standards introduced several new requirements for Class II gaming systems designed to protect the security and integrity of Class II gaming systems and tribal operations."). CHG's allegations, even if assumed to be correct (which they are not), do not invoke fraud or deceit, but rather mere technical, regulatory non-compliance, not the type of conduct necessary to establish unclean hands. *See Yeager*, 602 F. App'x at 429–30 (dismissing unclean hands defense because claims of failure to comply with terms of a contract, "even if assumed to be meritorious, are not based on fraud"); *see also Hooley Super-Markets, Inc. v. Hygrade Food Prods. Corp.*, 174 U.S.P.Q. 173, 1972 WL 17754, at *2 (T.T.A.B. 1972) (no unclean hands for technically illegal shipments of products in interstate commerce).

> (2)    *Non-Compliance with the NIGC's Minimum Technical Standards Is Not Directly Related to VGT's Causes of Action.*

Even if non-compliance with the NIGC's Minimum Technical Standards could be considered deceitful, CHG has failed to demonstrate a connection between any such violation and VGT's causes of action.

"[T]he 'unclean hands' doctrine does not empower a court of equity to deny relief for any and all inequitable conduct on the part of the plaintiff. Instead, the inequitable conduct must be *related to the plaintiff's cause of action*." *Worthington v. Anderson*, 386 F.3d 1314, 1320 (10th Cir. 2004) (emphasis added). "[A] plaintiff's unclean hands will bar recovery for trademark infringement only if the inequitable conduct is 'related to the plaintiff's cause of action,'" such as in the case of "deception in or misuse of the trademark itself" or "when the plaintiff has acted inequitably toward the defendant *in relation to the trademark*." *1-800 Contacts*, 722 F.3d at 1255 (emphasis in original).

18

Here, CHG has failed to demonstrate that any supposed violation of the Minimum Technical Standards would have affected the "acquisition or use" of VGT's intellectual property. *Jackson v. Odenat*, 9 F. Supp. 3d 342, 364 (S.D.N.Y. 2014). Simply put, whether or not some VGT games had proper grandfather status has nothing to do with whether CHG infringed or misappropriated VGT's trademarks, trade dress, or trade secrets. Although CHG has attempted to tie its Regulatory Theory to VGT's causes of actions on the grounds that (i) the Minimum Technical Standards include cabinet-related requirements and "an important aspect of VGT's alleged trade dress . . . is the cabinet," Dkt. 126 at 4-5 (arguing that "to qualify as a 'grandfathered' game under the relevant NIGC regulations, VGT's game cabinets must meet certain requirements") and (ii) VGT's supposed bad conduct must be considered when evaluating equitable remedies, *see id.* at 2, neither ground is sufficient to establish a relationship to VGT's intellectual property claims.

As to CHG's claim that the regulations are relevant to VGT's trade dress because "one of the challenges VGT experienced in complying with NIGC regulations was making necessary changes to its gaming cabinet," Dkt. 126 at 4, that claim is belied by the deposition testimony referenced by CHG:

19

Ex. Y, Williamson 30(b)(1) Dep. Tr. 109:4-19 (emphasis added). Obviously, a consumer would not be expected to see or hear any part of a game's cash box *inside the cabinet*, negating any connection between this change and the game's trade dress.

CHG's attempt to reframe its Regulatory Theory as responsive to VGT's claim for disgorgement of profits is no more logical. CHG contends that because "an award of a defendant's profits is not automatic" and is subject to principles of equity, an unclean hands defense is relevant to VGT's causes of action for purposes of evaluating disgorgement. *See* Dkt. 126 at 2 (CHG reply brief in support of motion to compel). Putting aside whether *VGT's* regulatory compliance should have any bearing on disgorgement of *CHG's* profits, CHG's argument conflates two distinct elements. An unclean hands defense requires *both* that the conduct affect the equitable relationship between the parties *and* that the conduct be directly related to the cause of action in the litigation. *See Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933) (doctrine of unclean hands does not apply "unless the wrongful conduct is directly connected with and material to the matter in litigation" and "in some measure affect[s] the equitable relations between the parties"). Without relevance to VGT's cause of action, the Court would never need to reach the stage of weighing the equities.[10]

Moreover, it would be entirely inappropriate to permit CHG to reframe its unclean hands defense at such a late stage. *See Gen. Steel Domestic Sales, LLC v. Chumley*, No. 10-cv-01398, 2012 WL 2589241, at *2 (D. Colo. July 3, 2012) ("Armstrong shall not be permitted, at this late stage of the proceedings, to recast its [unclean hands] defense as applicable to General Steel's

---

[10] Relatedly, because CHG's affirmative defenses are purely equitable, VGT's supposedly unclean hands would be an issue for the Court's review, not a jury's. *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 719 (1999) (no right to jury trial for equitable claims). For that reason, VGT has moved simultaneously with this motion to exclude *in limine* the topics of CHG's affirmative defenses from trial before the jury.

trademark and false advertising requests for relief"). CHG seemingly first expressed its profits-focused relevance argument when it submitted its reply in support of its motion to compel on August 27, 2018—four weeks after the close of fact discovery. *See* Dkt. 126. There was no reason for CHG to wait this long, particularly in light of its failure to identify this basis when VGT first asked for it—in January 2018. *See* Ex. V, VGT's Second Set of Interrogatories to CHG at 3-4 (requesting "factual and legal bases for each of the affirmative defenses You assert in this case").

> (3)  *Non-Compliance with the NIGC's Minimum Technical Standards Does Not Involve an Injury to CHG that Affects the Balance of the Equities.*

A defense of unclean hands requires a showing that the plaintiff has engaged in wrongful conduct "that injures the other party" and "affects the balance of equities between the litigants." *See Cartel*, 2010 WL 3522409, at *3; *see Keystone Driller*, 290 U.S. at 245 (unclean hands applies "only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication").

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 2:15-CV-1202-WCB, 2017 WL 275465, (E.D. Tex. Jan. 20, 2017), is illustrative. There, the defendant alleged that an inventor on the patent-in-suit was able to acquire confidential information while co-authoring a paper with the defendant's employees. *Id.* at *2, *8. According to the defendant, his access to this confidential information derived from his active failure to disclose to the journal publishing the co-authored paper that he was a named inventor on a potentially competitive patent application—as he was required to disclose under the journal's conflict-of-interest rules. *See id.* at *2. The court rejected this argument, concluding that "Lilly has not offered any evidence that Dr. Úckert's failure to disclose the pendency of the '561 application caused injury to Lilly, any unjust benefit to Úckert or UroPep, or was otherwise material to the present litigation." *Id.* at *9.

21

Rather, the court observed that the inventor's failure to comply with the "conflict-of-interest policy is not related to this litigation, because the conflict-of-interest policy was designed to protect <u>European Urology</u> and its readers, not to protect Lilly." *Id.*

Similarly, here, CHG has produced no evidence to demonstrate that any alleged regulatory non-compliance by VGT has injured CHG. *See generally* Ex. W, CHG's Objections and Answers to VGT's Second Set of Interrogatories (identifying no injury to CHG from a regulatory violation); Dkt. 112, CHG's Amended Answer (same); Dkt. 117, CHG's Motion to Compel (same); Dkt. 126, CHG's Reply in Support of Motion to Compel (same). The Minimum Technical Standards were designed for casino "security and integrity," 82 Fed. Reg. at 61172—not to protect CHG or competitors. *See Eli Lilly,* 2017 WL 275465, at *2, *8; *accord Dream Games of Ariz., Inc. v. PC Onsite,* 561 F.3d 983, 991 (9th Cir. 2009) ("[L]imiting copyright protection on a broad public injury rationale would lead to absurd and unacceptable results. . . . Arguably an infringer could defend on the ground that the work had been transported into the state in the copyright owner's truck that does not meet federal safety and pollution requirements. . . . The possibilities are well nigh limitless.") (quoting *Mitchell Bros. Film Grp. v. Cinema Adult Theater*, 604 F.2d 852, 864 (5th Cir. 1979)).

Although CHG may be trying to cast VGT in a negative light, VGT's purportedly unclean conduct did not induce CHG to infringe or misappropriate VGT's intellectual property or otherwise change the equitable relations between the parties to this lawsuit. *See Eli Lilly,* 2017 WL 275465, at *8; *Cartel*, 2010 WL 3522409, at *3.

        b)     <u>CHG Also Lacks Support for an Unclean Hands Defense Under Its ███████ and ████████ Theories.</u>

CHG has sought to throw mud at VGT in at least two other ways: its ████████ Theory and its ██████ Theory, which likewise should be rejected.



CHG has not alleged (nor could it) that VGT has ever engaged in such copying or deception.

*See* Ex. DD, Sprinkle Dep.

---

[11] Although CHG served a request for documents relating to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ x. AA, CHG's Third Request for Production of Documents and Things to VGT at 4 (May 4, 2018), CHG has not articulated its theory in any discovery responses, including in response to VGT's interrogatory asking CHG to explain the factual and legal bases for its affirmative defenses. *Compare* Ex. V, VGT's Second Set of Interrogatories to CHG at 3-4 (Jan. 18, 2018) (requesting the "factual and legal bases for each of the affirmative defenses You assert in this case"), *with* Ex. W, CHG's Objections and Answers to VGT's Second Set of Interrogatories at 4 (Feb. 20, 2018) (discussing possible laches grounds, but no "unclean hands" grounds). This failure is an independent ground on which the Court could preclude CHG from offering this theory at trial.
[12]



Under either theory, however, CHG has failed to present evidence—or even a viable theory—sufficient to establish an unclean hands defense.

> (1)    *CHG'S* ▮▮▮▮▮ *and* ▮▮▮▮▮ *Theories Do Not Show Deceitful Conduct Directly Related to VGT's Causes of Action.*

In reviewing a motion for summary judgment, the Tenth Circuit squarely held that merely accusing a trademark plaintiff of engaging in conduct toward third parties similar to that alleged in the complaint cannot establish a defense of unclean hands. *1-800 Contacts*, 722 F.3d at 1255. There, the defendant, accused of unauthorized use of trademarks in keyword advertising, argued that the plaintiff's hands were unclean because it "has done precisely what it accuses [defendant] of doing—bidding on keywords similar to the marks of its competitors, including [defendant], only with much greater financial reward." *Id.* The Tenth Circuit rejected this argument, concluding that "such alleged misconduct by [plaintiff], however, is irrelevant to the claim against [defendant]." *Id.*

---

[13] As noted (*supra* note 5), this failure is an independent ground on which the Court could preclude CHG from offering this theory at trial; CHG should be limited to what it said in response to VGT's discovery request.

Other courts have reached the same conclusion.  *See, e.g.*, *Texas Tech Univ. v. Spiegelberg*, 461 F. Supp. 2d 510, 527-28 (N.D. Tex. 2006) (plaintiff's asserted infringement of third party's trademark is irrelevant); *Flow Control Indus., Inc. v. AMHI, Inc.*, 278 F. Supp. 2d 1193, 1198 (W.D. Wash. 2003) (trademark owner's alleged infringement of a mark of the accused infringer "has nothing to do with" alleged infringement which is subject matter of litigation).

Here, CHG's ███████ and ███████ Theories are examples of the kind of finger-pointing that cannot support an unclean hands defense as a matter of law.  Quoting a leading treatise, the Tenth Circuit provided the following relevant example:

> The plaintiff's alleged infringement of a different trademark does not furnish grounds for an unclean hands defense.  For example, if A sues B for infringement of A's trademark ALPHA, can B deflect the lawsuit by claiming that A has unclean hands, alleging that A is infringing B's trademark BETA?  The answer is that this is not unclean hands because A's alleged infringement of the trademark BETA is not relevant to the subject matter of the litigation concerning B's alleged infringement of the trademark ALPHA.  The plaintiff's alleged infringement of another's mark is actually a form of the defense of *jus tertii*, which is uniformly rejected by the courts.

*1-800 Contacts*, 722 F.3d at 1255 (quoting 6 J. Thomas McCarthy, McCarthy on Trademark and Unfair Competition § 31:48 at 31-131 (4th ed.).  In fact, CHG's ███████ and ███████ Theories are even further removed from CHG's unlawful use of VGT's intellectual property because they do not even relate to a supposed violation of CHG's rights, but rather of unspecified third parties' rights.  And no such party has accused VGT of infringement or misappropriation.

> (2)    *CHG's* ███████ *and* ███████ *Theories Do Not Show an Injury to CHG that Affects the Balance of the Equities.*

CHG also cannot show, as required for a defense of unclean hands, that VGT has engaged in unclean conduct "that injures the other party" and "affects the balance of equities

between the litigants." *Cartel*, 2010 WL 3522409, at *3, *report and recommendation adopted by*, No. 01-CV-01644-REB-CBS, 2010 WL 3522408 (D. Colo. Sept. 2, 2010). In *Cartel*, for example, the court was unpersuaded that the plaintiff's failure to pay off third-party debtors despite the plaintiff's contrary testimony under oath injured the defendant. *See id.* at *1-3. The court instead observed that although the defendants "may wish to cast [the plaintiff's employee] in a negative light," his conduct toward third parties "did not induce action by the Ocwen Defendants or change the equitable relations between the specific parties to this lawsuit." *Id.* at *4.

A similar result is warranted here. CHG argues, at most, that VGT violated rights of third parties. But an injury to the rights of a third party is not an injury to the rights of CHG and does not affect the balance of equities.

### 3.      CHG's Illegality Defense

CHG's affirmative defense of illegality appears to be premised on the same conduct as its Regulatory Theory of unclean hands, that is, on VGT's putative violations of the NIGC Minimum Technical Standards. CHG's belated[14] attempt to recast this defense as one of illegality serves CHG no better.

As an initial matter, the defense of "illegality" stands on shaky ground. As the Eleventh Circuit explained in *FN Herstal SA v. Clyde Armory Inc.*, the doctrine derives from the administrative setting of the U.S. Patent and Trademark Office, which requires "lawful use" of a trademark to support federal trademark registration. 838 F.3d at 1086-87, *cert. denied*, 137 S. Ct. 1436, 197 L. Ed. 2d 649 (2017); *accord United Phosphorus, Ltd. v. Midland Fumigant, Inc.*,

---

[14] CHG did not assert an affirmative defense of illegality until filing an amended answer, without leave of the Court, on August 1, 2018, after the deadline for amended pleadings. *See* Dkt. 57; Dkt. 117 at 2.

205 F.3d 1219, 1225 (10th Cir. 2000).  The Eleventh Circuit expressly declined to decide whether illegality is a valid defense in a trademark *litigation*.  *FN Herstal SA*, 838 F.3d at 1087 ("This Court has not adopted the unlawful use doctrine and need not do so today because even if we were to adopt it, Clyde Armory has not submitted evidence sufficient to raise an issue of fact in this respect.") (footnote omitted).  As the leading treatise has explained, permitting such a litigation defense would "turn[] every federal judge hearing a trademark infringement suit into a potential collateral enforcer of hundreds of labeling and licensing laws," risk jeopardizing the intellectual property rights of plaintiffs guilty of no more than a mere technical violation of an unrelated law, and provide infringers with a free pass at the expense of the continued confusion of the public.  *See* 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 19:123 (5th ed.).

Even assuming, as the Eleventh Circuit did in *FN Herstal*, that illegality is an affirmative defense to trademark infringement, the defense is difficult to establish.  *See FN Herstal SA*, 838 F.3d at 1087-88 (rejecting unlawful use defense based on alleged violations of federal statutes and regulations); *S. Cal. Darts*, 762 F.3d at 931-32, 932-33 (rejecting unlawful use and unclean hands defenses based on trademark owner's failure to register as corporation and pay taxes).  It requires proof of (i) an indisputable violation of a statute, (ii) a nexus between use of the mark and the violation, and (iii) a material violation—that is, one "so tainted that, as a matter of law, it could create no trademark rights."  *FN Herstal SA*, 838 F.3d at 1086–87.

Here, CHG cannot establish that the defense could apply in this case.

a)    <u>CHG Has Not Established Any Indisputably Illegal Act.</u>

Use of a mark may be considered "unlawful" only if noncompliance with a law has been previously determined by a court or government agency or there is a clear *per se* violation.  *See id.* at 1087–88.

27

CHG, however, has not provided evidence of a finding of noncompliance by the NIGC or any other relevant agency.  To the contrary, VGT's games have been consistently approved by testing laboratories, tribal gaming regulatory authorities, and tribes themselves before being placed on casino floors.  *See* Ex. Y, Williamson 30(b)(1) Dep. Tr. 26:13-27:1, 32:9-20, 49:6-7; Ex. Z, Williamson 30(b)(6) Dep. Tr. 23:13-24:7, 80:10-83:25.

Nor has CHG specified—much less adduced evidence to demonstrate—a *per se* violation of an NIGC regulation.  Instead, witnesses, including VGT's President Jay Sevigny and Vice-President Rich Williamson, have all confirmed that VGT's products comply with applicable regulations.  *See* Ex. BB, Sevigny Dep. Tr. 193:20–194:3, 194:20–195:2; Ex. Y, Williamson 30(b)(1) Dep. Tr. 75:12–18, 61:1–17.

Given that VGT disputes CHG's Regulatory Theory, this defense would require the Court to interpret and apply the regulations itself, as if this were a regulatory proceeding.  There is no basis in the record before the Court to justify it second-guessing the relevant regulators and serving as a collateral enforcer of the Minimum Technical Standards.  *See Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 15 F. Supp. 2d 389, 397 (S.D.N.Y. 1998) (granting summary judgment against illegality defense premised on violation of federal securities laws).

> b)  <u>CHG Has Not Established a Nexus Between CHG's Use of Its Trademarks and Any Putative Regulatory Violation.</u>

For a regulatory violation to undermine trademark rights, there must be clear and convincing evidence of a nexus between use of the mark and the violation.  *FN Herstal SA*, 838 F.3d at 1087–88.  No nexus exists, for example, where the asserted "misconduct would be unrelated to the purpose of the federal trademark laws and, therefore, collateral and immaterial." *S. Cal. Darts*, 762 F.3d at 931–32 (no nexus between trademark rights and business-registration and tax laws).

28

As discussed above with respect to CHG's Regulatory Theory for unclean hands, there is no such connection here between compliance with the NIGC's Minimum Technical Standards and VGT's trademarks. The standards are intended to bolster the security of gaming machines and operations, *see* 82 Fed. Reg. 61172, 61172 (Dec. 27, 2017), which obviously is unrelated to the purpose of the Lanham Act:

> The purpose underlying any trade-mark statute is twofold. One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats. This is the well-established rule of law protecting both the public and the trade-mark owner.

S. Rep. No. 1333, at 3 (1946); *see Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 782 n.15 (1992) (Stevens, J., concurring in the judgment) (quoting the foregoing report).

Thus, even assuming, *arguendo*, that VGT did not comply with one of the NIGC regulations, "its misconduct would be unrelated to the purpose of the federal trademark laws and, therefore, collateral." *S. Cal. Darts Ass'n*, 762 F.3d at 931–32.

### c) CHG Has Not Established the Materiality of Any Putatively Illegal Conduct.

For "unlawful use" to preclude relief against an infringer, such use must be of "'such gravity and significance that the usage must be considered unlawful—so tainted that, as a matter of law, it could create no trademark rights.'" *FN Herstal SA*, 838 F.3d at 1087–88 (quoting *Gen. Mills Inc. v. Health Valley Foods*, Opp. No. 76,303, 24 U.S.P.Q.2d 1270, 1992 WL 296518, at *3 (T.T.A.B. 1992)); *S. Cal. Darts*, 762 F.3d at 931-932.

In *General Mills*, the Trademark Trial and Appeal Board highlighted the distinction between "unlawful uses [that] are of such a nature (*e.g.*, use of a mark in connection with an illegal drug) that it would be unthinkable to register a mark" from "uses [that] should not result

29

in refusal of registration (or cancellation of a registration) because of some purely collateral defect."  24 U.S.P.Q.2d 1270, 1992 WL 296518, at *4.  Technical regulatory requirements, it held, fall into the latter category:

> It is clear from even a cursory review of the relevant labeling regulatory statutes that many requirements are purely technical in nature and that violations of such requirements may be relatively harmless and may be subsequently corrected. While our decision herein will require the Board to make a case by case determination of the importance or materiality of the labeling requirement which a party may have violated, we believe that such a case by case determination is preferable to a blanket policy of finding every possible technical violation to result in cancellation of a registration, no matter how minor or harmless the violation may be.  Such a rigid approach serves the interests of neither justice nor common sense and such an approach is not mandated by the case law on this matter.

*Id.*

Here, CHG has pointed to, at most, technical violations of complex regulations entirely divorced from the rationales of trademark law.  It would "serve the interests of neither justice nor common sense" to allow CHG to continue to infringe VGT's trademarks, and thereby continue to confuse the public, because CHG has alleged that VGT ran afoul of a technical requirement with no bearing on the ability of VGT's marks to indicate a single source.  *See id.*; *S. Cal. Darts*, 762 F.3d at 931–32.

Moreover, even if CHG could establish that certain of VGT's games are not in compliance (which it cannot), CHG cannot show that the gravity of any such violation would rise to the level of "creat[ing] no trademark rights."  CHG has not alleged that all (or even a majority) of VGT's games are non-compliant (even under CHG's erroneous interpretation of the NIGC standards).  *See* Dkt. 112 at 20 (¶ 18 ((alleging that "*many* of those non-compliant games are not eligible for grandfathered status (non-compliant but legal)" (emphasis added))).

**B.    VGT Is Entitled to Partial Summary Judgment on Its Claims for Misappropriation of Trade Secrets Under the DTSA and VUTSA.**

VGT is a pioneering developer of Class II games, which are governed by the Indian Gaming Regulatory Act ("IGRA").  The Class II games at issue in this case involve bingo played on electronic gaming machines ("EGMs").  Friedman Decl. ¶¶ 11, 12.  The combination of regulatory requirements and the electronic nature of bingo presents unique challenges for Class II games not present in traditional paper bingo or slot machines.  *Id.* ¶¶ 13, 14.



- ████████████████████████████ *Id.* ¶ 12(a).

- ██████████████████████████████ *Id.* ¶ 12(b).

- ████████████████████████████████████

  ████████████████████████████████████

  ████ *Id.* ¶ 12(c).

- ██████████████████████████████

  ████████████████████████████████████

  *Id.* ¶ 12(d).

- ██████████████████████████████████ *Id.* ¶ 12(e).

---

[15] The bingo card is a 5x5 grid and thus has 25 spaces, one of which is a free space.  The numbers 1-75 appear on the bingo card, with 1-15 in the first column, 16-30 in the second column, etc.



*Id.* ¶ 12(f).

Although this submission was made in August 2017 after this litigation began, *compare* Dkt. No. 2, *with* Ex. Q at CHG0089317, CHG did not disclose it to VGT until March 2018, Dkt. No. 74, Ex. O.  Upon discovering this use of VGT's algorithm by CHG, VGT immediately notified CHG and requested that CHG cease all such use.  Dkt. No. 74, Ex. O.



VGT offered to "discuss a resolution of the issue," Dkt. 74, Ex. A at 1, but CHG declined to do so and instead opposed VGT's request to amend its complaint so that the issue could be addressed in this case.  *See* Dkt. 79.  The Court, however, granted VGT leave

33

to amend its complaint to assert claims for trade secret misappropriation under the federal

Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836,  and the Virginia Uniform Trade Secrets

Act ("VUTSA"), Va. Code Ann. §§ 59.1-336 to 59.1-343; these claims are Counts VII and VIII

in VGT's First Amended Complaint (Dkt. 103).

      VGT is entitled to partial summary judgment on its claims for misappropriation of trade

secrets under the DTSA and the VUTSA.  As explained below, the undisputed facts demonstrate

that (1) VGT's method for ███████████████████████ is a trade secret related to

products used in interstate commerce; and (2) CHG misappropriated this trade secret by

acquiring, using, and disclosing the method notwithstanding the former VGT employees'

obligations to keep it confidential.  As such, CHG is liable for trade secret misappropriation

under the DTSA and VUTSA.  *See Arctic Energy Servs., LLC v. Neal*, No. 18-CV-00108-PAB-

KLM, 2018 WL 1010939, at *2 (D. Colo. Feb. 22, 2018) (elements of DTSA claim); *Space*

*Systems/Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 855 (E.D. Va. 2018) ("The

VUSTA's elements are similar to the DTSA and require a plaintiff to prove: (1) the existence of

a 'trade secret'; and (2) the 'misappropriation' of that trade secret by the defendant.").

### 1.    There Is No Genuine Dispute of Material Fact that VGT's ██████ Algorithm Is a Trade Secret.

      The DTSA and the VUTSA define "trade secret" similarly.  A "trade secret" is

information, such as a method, technique, or process, that (i) is subject to reasonable measures of

secrecy and (ii) "derives independent economic value, actual or potential, from not being

generally known to, and not being readily ascertainable through proper means by, another person

who can obtain economic value from the disclosure or use of the information."  18 U.S.C.

§ 1839(3); *see also* Va. Code Ann. § 59.1-336.

VGT's ▇▇▇▇▇ algorithm is a method, technique, or process that meets both parts of the statutory definitions.

> a)    *VGT took reasonable measures to maintain the secrecy of its algorithm.*

For information to qualify as a trade secret, the owner must protect its secrecy using measures that are "reasonable under the circumstances." *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1112 (10th Cir. 2009) (quoting *Colo. Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990)) (applying Colorado's version of the Uniform Trade Secrets Act). This requirement does not mandate that the owner take every conceivable precaution: "Just because there is something else that [VGT] *could* have done does not mean that their efforts were unreasonable under the circumstances." *Id.* at 1113 (emphasis added).



Ex. I, Suggs Dep. Tr. 84:18–88:5.

*See* SOF ¶¶ 6–9. VGT's expert has offered unrebutted testimony that these steps are consistent with industry practice. Friedman Decl. ¶¶ 22–23.

These undisputed facts demonstrate as a matter of law that VGT has used reasonable security measures to protect the secrecy of its algorithm. *See, e.g.*, *First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 843 (C.D. Ill. Oct. 24, 2014) (holding as matter of law that requiring computer security codes, instructing employees on handling confidential information, and requiring confidentiality agreements were reasonable even when "Defendants . . . produced evidence that Plaintiff could have done more"); *Food Servs. of Am., Inc. v. Carrington*, No. CV-

12-00175-PHX-GMS, 2013 WL 4507593, *7–10 (D. Ariz. Aug. 23, 2013) (holding as matter of law that informing employees of secrecy obligation, restricting access by password, requiring confidentiality agreements, and restricting access to only persons with permission were reasonable even though Defendants alleged some employees did not actually sign the confidentiality agreements and documents were not labeled "confidential").

CHG has no contrary evidence. ██████████████████████████ ████████████████████████████████████████████, *see* Dkt. 79 at 6, CHG has no evidence to support this claim. ████████████████████████ ████████████████████████████████████████████ Davis Decl. ¶ 15. ████████████████████████████████████ ████████████████████████ SOF ¶¶ 7–9.

> b)    *VGT's algorithm has independent economic value from not being generally known to or readily ascertainable by others.*

The undisputed facts show that the VGT ██████ Algorithm "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3); *accord* Va. Code Ann. § 59.1-336.

First, there can be no dispute that VGT's algorithm is not readily ascertainable through proper means by others. ████████████████████████████████ █████████████████████████████████████ Friedman Decl. ¶ 25; SOF ¶ 14. CHG's purported expert, Mr. Zeidman, does not offer an opinion on this element.

Second, there is no genuine dispute of material fact that VGT's algorithm is not generally known. Here, VGT has not publicly disclosed the algorithm, SOF ¶ 13; to the contrary, it has

████████████████████████████████████████████████████████ SOF ¶¶

2, 6.  VGT's expert, Mr. Friedman—who has worked as a casino game designer for two

decades—is not aware of any public disclosures of the algorithm and has opined that it is not

generally known.  Friedman Decl. ¶¶ 24–26.  ████████████████████████

████████████████████████████████ SOF ¶ 15.  ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *see* Suggs Dep. Tr. 85:15–21, 48:25–50:22

(emphasis added).  This evidence establishes a *prima facie* case that the identified trade secret is

not generally known.  *See Decision Insights, Inc. v. Sentia Grp., Inc.*, 416 F. App'x 324, 330 (4th

Cir. 2011); *ProLine Prods., L.L.C. v. McBride*, 2014 OK CIV APP 34, ¶ 8, 324 P.3d 430, 432

(Okla. Civ. App. 2014) (*prima facie* case of trade secrecy established from fact testimony

outlining development efforts and the competitive advantage that flows from information not

being known); 4 Roger M. Milgrim, *Milgrim on Trade Secrets* § 15.01[1][a][ii] (2018) ("an

expert's belief that claimed trade secret matter is not generally known may suffice, absent

defendant's affirmatively proving the contrary").

CHG has failed to produce evidence showing that VGT's algorithm is generally known.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

Even if CHG could show that all components of VGT's algorithm are publicly known—and it cannot—there would still not be a genuine issue of material fact because the "fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements." *Restatement (Third) of Unfair Competition* § 39 cmt. d (1995); *see also Hertz*, 576 F.3d at 1109 (applying same rule in a UTSA jurisdiction); *BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332, 1340 (Fed. Cir. 2002) ("Although Superior cites various published references showing summary descriptions of similar technology, substantial evidence of record establishes that the ***particular combination*** used by Fiberweb France was not generally known or readily ascertainable by the public." (emphasis added)); *Basic Am., Inc. v. Shatila*, 992 P.2d 175, 189 (Idaho 1999) (affirming trial court finding trade secret to be a "unique combination of generally known elements which was not in the public domain"); *Decision Insights*, 416 F. App'x at 330 ("[A] trade secret might consist of several discrete elements, any one of which could have been discovered by study of material available to the public." (internal quotation marks omitted)).

Third, there is no genuine dispute that the confidential nature of VGT's algorithm provides independent economic value. "[C]ourts will generally conclude that the necessary independent economic value requirement is met if the trade secret would be useful to a competitor and would require cost, time, and effort to duplicate." 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.07A (2018); *see also Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943, 965 (N.D. Iowa 2006) ("[I]nformation kept secret that would be useful to a competitor and require cost, time and effort to duplicate is of economic value." (quoting *US W. Commc'ns, Inc. v. Office of Consumer Advocate*, 498 N.W.2d 711, 714 (Iowa))). It is beyond dispute that



████████████    Thus, the VGT ████████ Algorithm provides a competitive advantage to VGT from not being generally known.[16]

> c)    *The VGT algorithm relates to products and services used in interstate commerce.*

A claim under the DTSA may be brought only "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). VGT has developed the ████████ Algorithm in, among other places, Virginia, and used it on games deployed in other states, including Oklahoma. SOF ¶ 5. The algorithm has therefore been used in interstate commerce.

> 2.    **There Is No Genuine Dispute of Material Fact that CHG Has Misappropriated the VGT ████████ Algorithm.**

Under the DTSA and the VUTSA, an act of trade secret misappropriation occurs when a party acquires a trade secret that it knows or has reason to know was acquired through improper means. 18 U.S.C. § 1839(5)(A); *see also* Va. Code Ann. § 59.1-336. Improper means includes

---

[16] CHG's only dispute here relies on a mischaracterization of the opinion of Mr. Friedman, VGT's gaming expert. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████ If anything, this testimony demonstrates the VGT algorithm's secrecy and value.

breach or inducement of a breach of a duty to maintain secrecy. 18 U.S.C. § 1839(6); *see also* Va. Code Ann. § 59.1-336.

Both statutes also proscribe disclosure or use of a trade secret while knowing, or having reason to know, that the knowledge of the trade secret was "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret" or "derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(II) & (III); *see also* Va. Code Ann. § 59.1-336.

Here, the undisputed facts demonstrate that CHG has violated both statutes based on acquiring, using, and disclosing the VGT ▮▮▮ Algorithm that CHG acquired from former VGT employees in violation of their duties to VGT.

a)



---

[17] Mr. Suggs's use of the VGT ▮▮▮ Algorithm from memory is actionable as trade secret misappropriation. Although CHG has implied that there could be no misappropriation without a physical taking of information from VGT, that is not the law: "The Uniform Trade Secrets Act does not distinguish between written and memorized information," and it "does not require a plaintiff to prove actual theft or conversion of physical documents." *Ed Nowogroski Ins., Inc. v. Rucker*, 971 P.2d 936, 946 (Wash. 1999) (en banc) (analyzing statutory text virtually identical to text in the VUTSA and OUTSA); *accord Cent. Plastics Co. v. Goodson*, 537 P.2d 330, 334 (Okla. 1975) (adopting same rule under common law).



*Id.* at 225:22–226:3; *see also* SOF ¶ 32.

CHG's purported expert, Mr. Zeidman,[18] does not dispute most of these similarities. Although he claims that there are two implementation differences between the two algorithms, his opinions are insufficient to create a genuine dispute of material fact.



In view of this admission and his failure to support his (erroneous) opinion during the deposition, the opinion cannot create a *genuine* factual dispute.

And, even if this distinction were germane to the operation of the algorithm, CHG cannot avoid liability for misappropriating VGT's trade secret by making a slight modification. *See, e.g.*, *In re Innovative*

---

[18] As explained in VGT's motion to strike, Mr. Zeidman is not qualified to offer opinions on this issue, and his opinions are unreliable.

*Constr. Sys., Inc.*, 793 F.2d 875, 887 (7th Cir. 1986) ("the user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret") (internal quotations omitted). █████████████████████████████████

████████████████████████████████ █████████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

### b) CHG's acquisition, use and disclosure of VGT's algorithm constitutes misappropriation.

The undisputed facts establish that CHG is liable for misappropriation under at least Sections 1839(5)(A), 1839(5)(B)(ii)(II), and 1839(5)(B)(ii)(III) of the DTSA as well as corresponding provisions of the VUTSA, Va. Code Ann. § 59.1-336.

<u>First</u>, CHG has acquired, used, and disclosed the VGT ███████ Algorithm. █████████

█████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ SOF ¶¶

───────────────────────────

[19] ████████████████████████████████████████████████████████████████████

███████████████████

50–51; *see* 18 U.S.C. § 1839(6)(A) (improper means includes breach of a duty to maintain secrecy); Va. Code Ann. § 59.1-336 (same). █████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████    *See Cmty. Counselling Serv., Inc. v. Reilly*, 317 F.2d 239, 244 (4th Cir. 1963) (former employee "may not use confidential information or trade secrets obtained from the former employer, appropriating, in effect, to his competitive advantage what rightfully belongs to his employer"); *Avtec Sys., Inc. v. Peiffer*, 805 F. Supp. 1312, 1321 (E.D. Va. 1992) ("It is well established that an employee violates his duty of loyalty, fidelity and responsibility to his employer by using confidential information to the detriment of his employer and to the advantage of a competitive firm."), *aff'd in part, vacated in part on other grounds*, 21 F.3d 568 (4th Cir. 1994).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

█████████████████████████████████

███████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████

███████████████████████████████████

██████████████████████████

█████████████████████████████

██████████████████████████████

██████████████████████████

███████████████████████████████████

███████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████

███████████████████████████████████

█████████████

    <u>Fourth</u>, CHG is liable for Mr. Suggs's misappropriation of VGT's algorithm through the doctrine of *respondeat superior*.  *See Newport News Indus. v. Dynamic Testing, Inc.*, 130 F. Supp. 2d 745, 750, 754 (E.D. Va. 2001) (applying doctrine of *respondeat superior* to trade secret claims brought under the VUTSA); *Solarcity Corp. v. Pure Solar Co.*, No. CV 16-01814-BRO

(DTBx), 2016 WL 11019989, at *5 (C.D. Cal. Dec. 27, 2016) (same under DTSA). ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ *See* 18 U.S.C.

§ 1839(5)(B)(ii)(II); Va. Code Ann. § 59.1-336. ████████████████████

███████████████████████, SOF ¶ 31, CHG is liable for that misappropriation under

the doctrine of *respondeat superior*.

\* \* \* \*

For these reasons, VGT is entitled to summary judgment that CHG misappropriated the

████████ Algorithm trade secret in violation of the DTSA and VUTSA.

V.    **CONCLUSION**

For the foregoing reasons, VGT respectfully requests that the Court grant partial

summary judgment in VGT's favor on (a) CHG's defenses of unclean hands and illegality and

(b) VGT's claims for misappropriation of trade secrets under the DTSA and VUTSA.

October 12, 2018

*/s/ Gary M. Rubman*

Graydon Dean Luthey, Jr., OBA No. 5568
GABLE GOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, OK 74103-4217
Telephone: (918) 595-4821
Facsimile: (918) 595-4990
dluthey@gablelaw.com

Gary M. Rubman
Peter A. Swanson
Michael S. Sawyer
Rebecca B. Dalton
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C.  20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 778-5465
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
   (admitted pro hac vice)

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1221
Facsimile: (212) 841-1010
nroman@cov.com
   (admitted pro hac vice)

***Counsel for Video Gaming Technologies, Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 12, 2018, I filed a redacted version of the foregoing

Plaintiff Video Gaming Technologies, Inc.'s Motion for and Brief in Support of Partial Summary

Judgment via ECF, which caused service to be effected on the following counsel for Defendants:

Robert C. Gill
Thomas S. Schaufelberger
Matthew J. Antonelli
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
tschauf@saul.com
matt.antonelli@saul.com

Sherry H. Flax
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA 4254
JAMES C. HODGES, PC
2622 East 21st Street, Suite 4
Tulsa, OK 74114
Telephone: (918) 779-7078
JHodges@HodgesLC.Com

Duane H. Zobrist
Jonathan S. Jacobs
ZOBRIST LAW GROUP PLLC
1900 Arlington Blvd. Suite B
Charlottesville, VA 22903
Telephone: (434) 658-6400
dzobrist@zoblaw.com
jjacobs@zoblaw.com

*Attorneys for Defendants*

                                                            */s/ Gary Rubman*

1