## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

VIDEO GAMING TECHNOLOGIES, INC.,

        Plaintiff,

v.

CASTLE HILL STUDIOS LLC, *et al.*

        Defendants.

CASE NO. 17-CV-00454-GKF-JFJ

**PUBLIC – REDACTED VERSION**

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR
## <u>MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ III

I. INTRODUCTION .................................................................................................................... 1

II. STATEMENT OF UNDISPUTED MATERIAL FACTS.......................................................... 1

    A.   THE PARTIES .......................................................................................................................... 1
    B.   VGT'S TRADEMARKS.............................................................................................................. 3
    C.   CASTLE HILL'S TRADEMARKS AND FEDERAL COPYRIGHTS ....................................................... 4
    D   VGT'S INCONSISTENT "TRADE DRESS" ................................................................................... 4
    E.   VGT'S TRADE DRESS: NON-DISTINCTIVE AND INDUSTRY STANDARD ......................................... 8
    F.   VGT'S "TRADE DRESS": NO SECONDARY MEANING ................................................................ 11
    G.   VGT'S "TRADE DRESS": FUNCTIONAL ..................................................................................... 12
    H.   CASTLE HILL'S GAMES ........................................................................................................... 13
    I.   VGT AND CASTLE HILL: DE MINIMIS CONFUSION ..................................................................... 15
    J.   ████████████████████████████████████ ............................................................. 15
    K.   ██████████████████████████M ............................................................................... 16
    L.   VGT OTHER ALLEGED TRADE SECRETS AND CONFIDENTIAL INFORMATION ............................... 17

III.     CHG IS ENTITLED TO JUDGMENT ON VGT'S TRADEMARK CLAIMS ..................................... 18

    A.   CASTLE HILL IS ENTITLED TO JUDGMENT ON COUNTS I, II, III, AND IV AS TO ALL GAMES NOT IDENTIFIED
IN VGT'S IDENTIFICATION OF EXTANT TRADEMARK INFRINGEMENT CLAIMS ......................................... 19
    B.   THE AMENDED COMPLAINT ONLY IDENTIFIES FIVE REGISTERED TRADEMARKS WITH RESPECT TO THE
FOUR GAME SERIES VGT IDENTIFIED IN DOC. 143 ................................................................................ 19
    C.   CASTLE HILL IS ENTITLED TO JUDGMENT ON ALL OF VGT'S WORD MARK CLAIMS ...................... 19
    D.   CASTLE HILL'S NEW MONEY GAME DOES NOT INFRINGE VGT'S MR. MONEY BAGS DESIGN MARK .......... 20
        i.   *There is Little Similarity Between the Two Marks*................................................................ 22
        ii.   *Castle Hill Did Not Copy VGT's Design Mark* ................................................................... 24
        iii.   *VGT Has No Evidence of Actual Confusion* ....................................................................... 24
        iv.   *VGT and Castle Hill's Casino Customers Are Careful and Discerning* ................................. 25
        v.   *VGT's Mr. Money Bags Design Mark is Not Strong* .......................................................... 26
    E.   CASTLE HILL IS ENTITLED TO JUDGMENT ON VGT'S UNREGISTERED TRADEMARK CLAIMS FOR MR. MONEY
BAGS, CRAZY BILL, POLAR HIGH ROLLER, AND GREENBACK JACK ........................................................ 27
        i.   *VGT's Marks Are Not Inherently Distinctive* .................................................................... 28
        ii.   *VGT Cannot Met its Burden to Establish Secondary Meaning*............................................ 29
        iii.   *CHG's New Money, Arctic Cash/Ice, Coin Slinger, and Nugget Mountain Games Are Not Likely
to Cause Confusion With VGT's Games*................................................................................... 30
            1.   Unregistered Trademarks for Mr. Money Bags ............................................................... 30
            2.   Unregistered Trademarks for Polar High Roller ............................................................. 31
            3.   Unregistered Trademarks for Crazy Bill ........................................................................ 32
            4.   Unregistered Trademarks for Greenback Jack ................................................................ 32
        iv.   *VGT's Marks Are Not Strong*........................................................................................... 33

IV.CHG IS ENTITLED TO JUDGMENT ON VGT'S TRADE DRESS CLAIMS ........................................ 34

    A.   VGT DOES NOT HAVE A CONSISTENT TRADE DRESS .................................................................. 34
      B.   *VGT's Alleged Trade Dress is Not Distinctive Because it Has Not Acquired Secondary Meaning* 38
        i.   *VGT Must Prove Secondary Meaning* ............................................................................... 38
        ii.   *VGT's Alleged Trade Dress Has Not Acquired Secondary Meaning* ..................................... 39
    C.   THERE IS NO LIKELIHOOD OF CONFUSION BETWEEN VGT AND CASTLE HILL GAMES BASED ON VGT'S
ALLEGED TRADE DRESS .......................................................................................................................... 40

*i.*     *There is Little Similarity Between the Trade Dress*................................................40

*ii.*     *Castle Hill Did Not Copy VGT's Alleged Trade Dress*............................42

*iii.*     *There is No Evidence of Actual Confusion*.............................................42

*iv.*     *VGT and Castle Hill's Casino Customers Are Careful and Discerning*...........43

*v.*     *VGT's Alleged Trade Dress is Weak* ....................................................43

D.     VGT'S TRADE DRESS IS FUNCTIONAL ....................................................44

**V. CASTLE HILL IS ENTITLED TO JUDGMENT ON VGT'S TRADE SECRETS CLAIMS** .................. 46

A.     ████████████████ ................................................................48

B.     ██████████████████████████████████████████████ ....49

C.     "KNOW HOW" ....................................................................................49

**VI. VGT'S MISAPPROPRIATION OF BUSINESS INFORMATION CLAIM IS DISPLACED BY ITS TRADE SECRETS CLAIMS** .................................................................. 50

**VII.    CONCLUSION** ....................................................................................51

**<u>Table of Authorities</u>**

CASES

*Arctic Energy Servs., LLC v. Neal*,
  No. 18-CV-00108-PAB, 2018 WL 1010939 (D. Colo. Feb. 22, 2018)....................47

*Boss Manuf., Inc. v. Parker Traps International, Inc.*,
  1995 WL 767314 (D. Kan. Nov. 30, 1995) ...............................................46

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
  973 F. 2d 1033 (2nd Cir. 1992).............................................................23

*Brunswick Corp. v. Spinit Reel Co.*,
  832 F.2d 513 (10th Cir. 1987) ..............................................................45

*Checkpoint Sys. v. Check Point Software Techs., Inc.*,
  269 F.3d 270 (3d Cir. 2001)..................................................................25

*Conopco, Inc. v. May Dep't Stores Co.*,
  46 F.3d 1556 (Fed. Cir. 1994)...............................................................23

*CTI Svcs. v. Haremza*,
  797 F. Supp. 2d 1257 (N.D. Okla. 2011) ................................................50

*Dastar Corp. v. Twentieth Century Fox*,
  539 U.S. 23 (2003)..............................................................................33

*Farren v. Autoviable Servs., Inc.*,
  508 P.2d 646 (Okla. 1973)....................................................................48

*First Sav. Bank, F.S.B. v. First Bank System, Inc.*,
  101 F.3d 645 (10th Cir. 1996) ..............................................................44

*Forney Indus., Inc. v. Daco of Mo., Inc.*,
  835 F.3d 1238 (10th Cir. 2016) ......................................................... passim

*Framed Wall Art, LLC v. PME Holdings*,
  2008 WL 5205822 (D. Utah Dec. 12, 2008)............................................34

*General Motor Corp. v. Urban Gorilla, LLC*,
  500 F.3d 1222 (10th Cir. 2007) ............................................................38

*Hammerton, Inc. v. Heisterman*,
  2008 WL 2004327 (D. Utah May 9, 2008)..............................................34

*Hartford House, Ltd. v. Hallmark Cards, Inc.*,
  846 F.2d 1268 (10th Cir. 1988) .......................................................32, 44

*Heartsprings, Inc. v. Heartspring, Inc.*,
 143 F.3d 550 (10th Cir. 1998) ................................................................43

*Hornady Mfg. Co. v. Doubletap, Inc.*,
 746 F.3d 995 (10th Cir. 2014) ........................................................ passim

*Inspired by Design, LLC v. Sammy's Sew Shop, LLC*,
 2016 WL 6093778 (D. Kan. Oct. 19, 2016) .........................................46

*King of the Mountain Sports, Inc. v. Chrysler Corp.*,
 185 F.3d 1084 (10th Cir. 1999) .............................................................20

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
 113 F.3d 373 (2nd Cir. 1997).........................................................32, 36

*Leatherman Tool Group, Inc. v. Cooper Industries, Inc.*,
 199 F.3d 1009 (9th Cir. 1999) ...............................................................45

*Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*,
 528 F.3d 1258 (10th Cir. 2008) .............................................................33

*Micro Consulting, Inc. v. Zubeldia*,
 813 F. Supp. 1514 (W.D. Okla. 1990) .............................................49, 50

*MTG Guarnieri Mfg., Inc. v. Cloutare*,
 239 P. 3d 202 (Okla. Civ. App. 2010) ...................................................47

*Powell Products, Inc. v. Marks*,
 948 F. Supp. 1469 (D. Colo. 1996).........................................................50

*Sally Beauty Co. v. Beautyco, Inc.*
 304 F.3d 964 (10th Cir. 2002) ........................................................28, 34

*Savant Homes, Inc. v. Collins*,
 809 F.3d 1133 (10th Cir. 2016) .............................................................39

*Space Systems/Loral, LLC v. Orbital ATK, Inc.*,
 306 F. Supp. 3d 845 (E.D. Va. 2018) .....................................................47

*Streetwise Maps, Inc. v. VanDam, Inc.*,
 159 F.3d 739 (2d Cir. 1998).................................................................42

*Tie Tech, Inc. v. Kinedyne Corp.*,
 296 F.3d 778 (9th Cir. 2002) .................................................................46

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,
 532 U.S. 23 (2001).........................................................................44, 45

*Universal Money Centers, Inc. v. American Tel. & Tel. Co.*,
  22 F.3d 1527 (10th Cir. 1994) ..........................................................................40, 43

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
  529 U.S. 205 (2000)...........................................................................29, 38, 39, 44

*Walt Disney Co. v. Goodtimes Home Video Corp.*,
  830 F. Supp. 762 (S.D.N.Y. 1993) ..................................................................34, 38

*Water Pik, Inc. v. Med-Systems, Inc.*,
  726 F.3d 1136 (10th Cir. 2013) ......................................................................passim

*Winning Ways, Inc. v. Holloway Sportswear, Inc.*,
  913 F. Supp. 1454 (D. Kan. 1996)...................................................................39, 40

## STATUTES

15 U.S.C. § 1125(a)(3)...........................................................................................38, 44

Lanham Act............................................................................................................31, 33

Lanham Act § 43..............................................................................................31, 33, 38

Okla. Stat. Ann. tit. 15, § 217....................................................................................48

Okla. Stat. tit. 78, § 92(a)...........................................................................................50

## OTHER AUTHORITIES

25 CFR § 547, et seq..................................................................................................2

Local Rule 3.6............................................................................................................20

## I.    INTRODUCTION

When this case commenced, VGT claimed that Castle Hill: infringed on dozens of its trademarks (registered and unregistered); copied its trade dress (which included "common elements" used "throughout all VGT 3-Reel Mechanical Games" and at least sixteen "themes" used in dozens of its games); and misappropriated VGT's unspecified trade secrets and confidential information (including its "math underlying the games" and "the source code used to operate the games"). Doc. 2. After months of discovery, which included dozens of depositions, hundreds of pages of interrogatory responses, and hundreds of thousands of pages of documents and source code exchanged, VGT realized that it had to shift the paradigm. It completely abandoned the original trade dress it claimed to be at issue, abandoned dozens of trademark claims, and finally admitted that it had no evidence whatsoever that Castle Hill actually copied *any* of its source code. In desperation, it then filed, with leave of Court, on the eve of the discovery cutoff, an Amended Complaint seeking to add trade secrets claims relating to ██████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████. As the Court will find evident from the facts and arguments set forth below, despite all VGT's arm-waving and "hide-the-ball" voluminous discovery responses, there is no merit to its claims, and summary judgment should be granted.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    The Parties

1.    Plaintiff Video Gaming Technologies, Inc. ("VGT") is a Tennessee corporation based in Tennessee. First Amended Complaint ("Compl.") ¶ 5. VGT describes itself as the leading

manufacturer of Class II[1] bingo-based electronic gaming machines ("EGMs") in North America. *Id.* at ¶ 12. VGT was acquired by an Australian company, Aristocrat Leisure ("Aristocrat"), in October 2014. *See* Ex. 1, Sevigny Dep. at 16:23-25.[2]  VGT's current President is Jay Sevigny.

2.　　　VGT had offices in Charlottesville, Virginia, until 2011, when its then owner, Jon Yarbrough, decided to close it. When he closed the office, some employees (software development, game design, and hardware development employees) were terminated, and some moved to Tennessee. *See id.* at 24-27. A large number of employees who were offered employment with VGT in Tennessee chose not to relocate. *See* Ex. 2, Taylor Dep. at 46.

3.　　　VGT currently leases approximately ███████████████████████████ ████████████████████████████████████████████. VGT considers *the tribes* to be its customers. *See* Ex. 1, Sevigny Dep. at 36, 41-42.

4.　　　VGT's primary product is a "stepper," also known as a mechanical reel game, although it has thousands of video reel machines as well. All of VGT's products are Class II games. *See* Ex. 1, Sevigny Dep. at 34-36.

5.　　　█████████████████████████████████████████ █████████████████████████████████████ ████████████████████████ *See* Ex. 3, Williamson Dep. at 82:13-17; Exs. 4-5, Williamson Dep. Exs. 102 & 103.

6.　　　Castle Hill Studios LLC and Ironworks Development LLC are single-member LLCs that are wholly owned by Castle Hill Holding LLC. Collectively, the entities do business as Castle

---

[1]The Indian Gaming Regulatory Act ("IGRA") regulates Class II games and, through the National Indian Gaming Commission ("NIGC") imposes minimum technical standards for those games. Compl. ¶ 17; 25 CFR § 547, et seq. Class II games look like traditional slot machines, but by law are based on the game of bingo. Class III games not based on bingo, and include typical slot machines found in Las Vegas casinos. Compl. ¶ 17.

[2] All references to exhibits herein refer to the exhibits attached to the Declaration of Robert C. Gill, filed herewith.

Hill Gaming ("Castle Hill" or "CHG"). *See* Ex. 6, Watson Dep. at 28-29; Ex. 7, VGT Dep. Ex. 435.

7.      In 2010, former VGT employee John Taylor founded Castle Hill in Charlottesville, Virginia. Mr. Taylor had been fired from VGT in September 2009, and was unemployed for a period of time before he founded Castle Hill. *See* Ex. 2, Taylor Dep. at 38-39, 53-55.

8.      Castle Hill has and does employ individuals who formerly worked at VGT. *See* Ex. 8, CHG Fourth Supp. Obj. and Resp. to First Set of Rogs., Second Supp. Response to Rog. No. 12. Nearly all of CHG employees who previously worked at VGT lost their jobs when VGT closed its Charlottesville office, and  were employed by other companies before being hired by Castle Hill. *See* Ex. 9, Fulton Dep. at 18-24; Ex. 10, Larson Dep. at 73-75; Ex. 11, Morgan Dep. at 12-15; Ex. 12, Roireau Dep. at 59-61; Ex. 13, Roireau 30(b)(6) Dep. at 170; Ex. 14, Scheiner Dep. at 20-21; Ex. 15, Sisson Dep. at 16; Ex. 16, Sprinkle Dep. at 88-90; Ex. 17, Suggs Dep. at 10-11; Ex. 18, Weilacher Dep. at 25-26. Many of the programmers and artists had worked together for years at other companies, long before they worked at VGT.

9.      Although Castle Hill's first games were Class III, it was always CHG's intention to make Class II games. To expedite the game development process, and save costs, CHG purchased a third-party off-the-shelf Class III gaming software platform from IntuiCode. *See* Ex. 2, Taylor Dep. at 93-94.  Castle Hill made Class III games initially to test its software platform from IntuiCode, but was designing both Class II and Class III games. The Class III games were the first to obtain regulatory approval from gaming labs for release into the marketplace. *See* Ex. 6, Watson Dep. at 64-67; Ex. 2, Taylor Dep. at 92-93.

**B.      VGT's Trademarks**

10.      VGT claims infringement of trademarks that VGT uses on the following "series" of three-reel mechanical bingo games: Crazy Bill; Mr. Money Bags; Polar High Roller; and Greenback Jack. VGT has abandoned the remainder of its trademark infringement claims. *See* ECF No. 143.

11.    In its Amended Complaint, VGT has identified only five registered trademarks relating to the Crazy Bill, Mr. Money Bags, Polar High Roller, and Greenback Jack game series: CRAZY BILLIONS (reg. no. 3,395,857); MR. MONEY BAGS (reg. no. 4,138,672); MR. MONEY BAGS & design (reg. no. 3,152,743); POLAR HIGH ROLLER (reg. no. 3,755,296); and GREENBACK JACK (reg. no. 3,506,608). *See* Compl. ¶ 19.  Four of these five of these registrations are word marks; one of the Mr. Money Bags registrations includes a design mark. *Id.*

### C.    Castle Hill's Trademarks and Federal Copyrights

12.    Castle Hill has obtained trademark registrations for each of its game names. The Castle Hill registered trademarks which remain at issue and which VGT asserts infringe its marks are described above are as follows:  NUGGET MOUNTAIN (reg. no. 5,408,181); NEW MONEY (reg. no. 4,871,351); ARCTIC CASH (reg. no. 4,998,719); ARCTIC ICE (reg. no. 5,292,150); and COIN SLINGER (reg. no. 4,875,096). *See* Ex. 8, at 5-6; Ex. 19-23, CHG USPTO registrations.  CHG also has registered federal copyrights over its artwork associated with these games.  *See* Ex. 24-26.

### D    VGT's Inconsistent "Trade Dress"

13.    Although VGT alleges that it has "common law rights to the trade dress (*i.e.*, the overall appearance and commercial impression) used in connection with its 3-Reel Mechanical Games," Compl. ¶ 22, VGT does not have a single consistent "overall" look for these games. Specifically, VGT offers its most popular games in at least three completely different cabinets: VGT's thin-line (aka "LS") cabinet, sit-down slant cabinet, and XSpin video cabinet. *See* Ex. 27, Starr Dep. at 41-43; Ex. 1, Sevigny Dep. at 56-57;  Exs. 28-30, Sevigny Dep. Ex. 176 (LS cabinet) and 182 (slant cabinet), 183 (LS in foreground and slant on back wall); Ex. 31, VGT000132 (Xspin cabinet). VGT also has an extra-large version of its LS cabinet, called the XL. Ex. 27, Starr Dep. at 141; Ex. 32, North Dep. at 78; Ex. 1, Sevigny Dep. at 56. VGT also offers its newer games in Helix and Helix+ cabinets. Ex. 27, Starr Dep. at 246-48; Ex. 1, Sevigny Dep. at 62].

14.    VGT has games in commerce in *all* of these various cabinets. *Id.* at Ex. 32, North Dep. at 147-50. The *same* game titles and themes are offered by VGT in a variety of different cabinets, even within the *same* casinos. *Id.* at Ex. 33, VGT0056091. The overall appearance of a particular game which is offered in different cabinet styles is different, as admitted by VGT's President. *See* Ex. 1, Sevigny Dep. at 135:15-147:16; Ex. 29-30, 34-36, CHG Dep. Exs. 179-183].

15.    In addition to the cabinets themselves, VGT has several different options for lighting on its three-reel mechanical and video EGMs, including "LS lighting" on the sides of some machines, which makes them look like jukeboxes. *See* Ex. 27, Starr Dep. at 212-13; Ex. 37, McGill Dep. at 69; Ex. 1, Sevigny Dep. at 85-86; *see also* Compl. Exh. 4 at 10 (depicting VGT game Planetary Pigs in the jukebox style). VGT implemented its "jukebox" style lighting in 2015, and began pushing this special lighting package in 2016 ███████████████████." *See* Ex. 32, North Dep. at 83-84.

16.    Some VGT games in the same Oklahoma casinos – with the same titles – have the jukebox lighting package, while others do not. *See* Ex. 27, Starr Dep. at 212-13; Ex. 37, McGill Dep. at 69; Ex. 38, Eubanks Dep. at 105; Ex. 39, Kovach (30(b)(6)) Dep. at 46. VGT does not track how many of its games have the jukebox lighting package on them. *See* Ex. 39, Kovach (30(b)(6) Dep. at 45-46. The overall appearance of the same game offered with jukebox lighting and games without jukebox lighting is different. *Compare* Exs. 40-41, Sevigny Dep. Ex. 177 *with* Ex. 178.

17.    VGT's red screen free spins feature is a game play feature where VGT's screen displays a red tint. *See* Ex. 1, Sevigny Dep. at 80-81. Unlike CHG's Instant Free Pay bonus feature, the reels on the VGT EGMs do not turn red during the red screen bonus feature, *id.* at 82-83, although VGT *plans to* implement such a feature in the future. *Id.* As VGT's President admitted, ████████████████████████ *Id.* at 84.

18.    VGT does not use the same sounds across all of its products, and has changed its

5

award sounds over time. When VGT creates different titles, VGT might add new sounds or might use old sounds. Different VGT titles on its Class II electronic gaming machines use different award sounds.  VGT has also changed the award sounds over time within the same game titles. *See* Ex. 37, McGill Dep. at 113; Ex. 42, Yarbrough Dep. at 71-72.

19.    VGT's three-reel mechanical games also occasionally come with a fourth reel located in the rounded top of the machine. *See* Ex. 37, McGill Dep. at 103-04; Ex. 38, Eubanks Dep. at 91-92; Ex. 42, Yarbrough Dep. at 127-28.  Some of VGT's three-reel mechanical games have a "spin the wheel" or "spin the reel" feature which is driven by the fourth reel. *See* Ex. 38, Eubanks Dep. at 92; Ex. 1, Sevigny p. 68-69].

20.    VGT's games come both with and without "toppers". *See* Ex. 27, Starr Dep. at 235-36; Ex. 37, McGill Dep. at 104-05; Ex. 41, Sevigny Dep. Ex. 178 (showing toppers). VGT does not track how many of its games have toppers on them. *See* Ex. 39, Kovach (30(b)(6) Dep. at 45.  When VGT uses toppers on its games, the toppers come in various shapes and sizes, including squares, rectangles, circles, and ovals. *See* Ex. 37, McGill Dep. at 104-05.  The most common topper shape that VGT uses are ovals. *See* Ex. 1, Sevigny Dep. at 87-88.  The overall appearance of the same game offered with or without toppers is different.  *See* Exs. 43-44, VGT0007003; VGT0007009.

21.    Over the years, VGT has used 6-inch, 9-inch, 14-inch, 15-inch, 19-inch, 20-inch, 22-inch, and 32-inch screens on its EGMs. Some VGT games with the same title are available in cabinets with a variety of screen sizes. For example, Mr. Money Bags has been used in cabinets with at least the 6-inch, 9-inch, 14-inch, and 19-inch LCD screens. *See* Ex. 37, McGill Dep. at 119-20; Ex. 39, Kovach (30(b)(6)) Dep. at 36. The VGT games with the same title and same cabinet but different sized screens have different artwork surrounding those screens. *See* Ex. 27, Starr Dep. at 240.

22.    VGT uses artwork with dark color schemes on some of its games (*e.g.* Mr. Money

6

Bags), while other games have bright color schemes (*e.g.* Polar High Roller). *See* Ex. 42, Yarbrough Dep. at 152-53; Ex. 43, Yarbrough Ex. 164.  VGT uses artwork with characters on some of its games (*e.g.*, Mr. Money Bags), while other games do not use characters (*e.g.*, Radiant Rocks and Red Hot Rubies x2). *See* Ex. 42, Yarbrough Dep. at 152-53; Ex. 45, Yarbrough Ex. 164. VGT uses cartoon-style character artwork on some of its games (*e.g.*, Polar High Roller), while other games have a realistic style character artwork (*e.g.*, Hot Red Ruby). *See* Ex. 42, Yarbrough Dep. at 154; Ex. 45, Yarbrough Ex. 164.

23.     VGT's pseudo-paytables, also known as paytables, are located on different areas of its games, sometimes in the top panel artwork and sometimes on the belly glass. *See* Ex. 27, Starr Dep. at 235-36; 239; Ex. 46, Starr 88, *compare*, VGT0019840 and VGT0019848, Ex. 47; Ex. 42, Yarbrough Dep. at 154-55; Ex. 45, Yarbrough Ex. 164. Some VGT games do not even have paytables located on the games (*e.g.*, Crazy Billions! and Greenback Jack). *See* Ex. 45, Yarbrough Ex. 164.

24.     VGT has used different artists for its games, resulting in different art styles for different game titles under the same brand, such as Mr. Money Bags. *See* Ex. 42, Yarbrough Dep. at 155; Ex. 45, Yarbrough Ex. 164. Some VGT games have different versions of the same game with different artwork and colors, where the character of the game looks different. . *See* Ex. 27, Starr Dep. at 31.

25.     ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

█████████████████████████

### E.    VGT's Trade Dress: Non-distinctive and Industry Standard

26.    VGT uses the same game cabinet as other Class II game manufacturers. *See* Ex. 27, Starr Dep. at 35. One of these other Class II game manufacturers, Cadillac Jack, and a game called Pot of Gold made by U.S. Coin, used the original Spec International cabinet which was the same as VGT's original cabinet. *See* Ex. 37, McGill Dep. at 54-55; Ex. 16, Sprinkle Dep. at 179-80. Pot of Gold used the round top cabinet before VGT's original cabinet was in use in 2001. *See* Ex. 42, Yarbrough Dep. at 73. Cadillac Jack was using the same gaming cabinets as VGT, "…close to the same time VGT – VGT did whenever they started, because it looks exactly the same as far as the cabinet." *See* Ex. 27, Starr Dep. at 35-36. Other Class II game manufacturers, including Nova Gaming, AGS, and possibly Eclipse Gaming, were also using the same game cabinet as VGT. *See* Ex. 27, Starr Dep. at 35-37; Ex. 16, Sprinkle Dep. pp. 179-80.  *See also* Ex. 51, Harvie Dep. at 53-54; Ex. 52, Graham Dep. at 60-62; (Cadillac Jack, Bally, Williams, IGT, and Nova have all had similar cabinets).

27.    VGT uses ubiquitous themes on its games, such as cash, money, wealth, diamonds, gems, coins, the high life, gold, animals, attractive or "hot" women, penguins or the arctic, anthropomorphic animals, wild animals, miners, Asian themes, luck, luck of the Irish, four leaf clovers, pots of gold, leprechauns, Las Vegas, high rollers, the Wild West, race cars and racing, motorcycles, and genies. *See* Ex. 27, Starr Dep. at 26-34, 39-40, 167-173]; Ex. 32, North Dep, at 43-49, 61-63].

28.     Wealth-themed games are common and standard in the industry. As explained by VGT's Product Marketing Manager in charge of the games at issue in this case, "wealth is a very prominent overarching theme across a lot of different style games."  These include games involving diamonds, gold, money, vaults, banks, cash, and gems. *See* Ex. 32, North Dep. at 43, 61-63; Ex. 53, North Ex. 10.  Similarly, bars, sevens, and cherries on reels are all standard symbols used throughout the gaming industry. *See* Ex. 27, Starr Dep. at 169; Ex. 32, North Dep. at 63;.

29.     VGT has a product strategy designed around using industry-standard themes. *See* Exs. 27, Starr Dep. at 168; Ex. 53, North Ex. 10 ███████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████].

30.     It is common for EGMs to have a light on top, referred to as a candle. It is also common for one of the lights in the candle to be red. *See* Ex. 27, Starr Dep. at 238. Most game makers use candles on top of their cabinets. The candles normally have components of red and white. *See* Ex. 1, Sevigny Dep. 70-71.

31.     Other companies in the Class II industry, including IGT, Nova, and Cadillac Jack, typically feature a mechanical bell on their Class II games. *See* Ex. 27, Starr Dep. at 238; Ex. 16, Sprinkle Dep. at 180-82; Ex. 47, VGT0019840, at VGT0019846].

32.     A PAR sheet is a document given to a casino which provides mathematical information about a game, including the hold, probabilities, payouts based on the pseudo-paytables, and bingo patterns. *See* Ex. 32, North Dep. at 111-13; Ex. 54, North Ex. 16. PAR sheets are treated as confidential in the industry, including by VGT and Castle Hill. █████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████     *See* Ex. 55, Carlson Dep. at 79; Ex. 56, Roelofs Dep. at 69-71; Ex. 16,

Sprinkle Dep. at 98-99].

33.     The mathematical information for a Class II game can be reverse engineered based on the data publicly displayed on the pseudo-paytables and help screens on the EGMs LCD display, and knowledge about the method by which the balls are called during the game. *See* Ex. 1, Sevigny Dep. at 182-87. Information about the ball call is not secret, and is also posted on the help screens of the game or discernable from the face of the machine. *See* Ex. 1, Sevigny Dep. at 198-99; 225-26.

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████. *See* Ex. 1, Sevigny Dep. at 182-89; Ex. 57, Sevigny Dep. Ex. 126.

34.     VGT did not invent the bingo patterns it uses. *See* Ex. 42, Yarbrough Dep. at 96-97. VGT's bingo patterns for its Class II games are standard or classic patterns and are available on the internet – whether using the same name or different names – including VGT's game-ending win, which it calls a "Cover-All", as well as at least the following other bingo patterns: VGT's "Kite" pattern; VGT's "Private Stripes" pattern; VGT's "L" pattern; VGT's "Small Pyramid" pattern; VGT's "Tee" pattern; VGT's "Double Postage Stamp" pattern; VGT's "Outside Corners" pattern; VGT's "Inside Corners" pattern; VGT's "Open Diamond" pattern; VGT's "X" pattern; VGT's "Lucky Seven" pattern; VGT's "Postage Stamp" pattern; VGT's "Six-Pack"; VGT's Small Diamond"; and VGT's Cross-Corners. *See* Ex. 32, North Dep. at 114-118; Ex. 58, North Dep. Ex. 17. Other companies in the Class II industry, including IGT, use similar bingo patterns on their Class II games. *See* Ex. 32, North Dep. at 120-21.

35.     The pseudo-paytables VGT shows on its EGMs are neither unique nor original. VGT copied its most commonly used paytables from another game manufacturer, IGT███████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████



36.    Other companies in the Class II industry, including IGT, use red screen bonus features on their Class II games. It is common for game manufacturers to use the color red and to feature red colors to gain attraction or provide alerts. *See* Ex. 32, North Dep. at 199-200; Ex. 51, Harvie Dep. at 131-32; Ex. 63, North Dep. Ex. 36. Extra spins features are common in the industry. *See* Ex. 1, Sevingy Dep. at 84-85.

37.    VGT sends employees to industry conferences to look at and follow market trends to emulate and include new features in future products, including software, cabinets, lighting, and signage. *See* Ex. 27, Starr Dep. at 209-10; Ex. 64, Roelofs Dep. Exh. 99; Ex. 55, Carlson Dep. at 40-43].

38.    IGT's Class II games have similarities with VGT's Class II games. IGT's games have round tops cabinets, larger bingo cards, similar style artwork, similar themes, red screen bonus features, and toppers. *See* Ex. 32, North Dep. at 199-205; Ex. 63, North Dep. Ex. 36.

**F.    VGT's "Trade Dress": No Secondary Meaning**

39.    In the past VGT commissioned consumer surveys by independent third parties which demonstrate that few players know or care about the source or manufacturer of the games, and that players do not find the cabinet the game is in, the titles, themes, or the manufacturer to be an important factor when playing a game. *See* Ex. 65, VGT0006959 at VGT0006968; Ex. 66,

VGT0030969 at VGT0030976-77, 31002; Ex. 67, VGT0031013 at 31020-21, 31061; Ex. 68, VGT0031072 at 31079-80, 31117; Ex. 69, YARBROUGH0000533 at YARBROUGH0000567-569.

40.     VGT's survey expert in this case, Dr. Yoram (Jerry) Wind, did not perform a secondary meaning study. *See* Gill Decl., Ex. 70, Wind Dep. at 121.

**G.     VGT's "Trade Dress": Functional**

41.     VGT's LS ("thin-line") cabinet was designed to be less deep to allow customers to fit more EGMs onto casino floors, and have more space between their aisles in the casino. *See* Gill Decl., Ex. 27, Starr Dep. at 38; Ex. 37, McGill Dep. at 50-54; Ex. 1, Sevigny Dep. at 57; Ex. 42, Yarbrough Dep. at 85-86. VGT's "legacy cabinet is "a very functional cabinet." *See* Ex. 71, Smitherman Dep. at 25.

42.     The function of the LCD monitors on VGT's cabinets is to provide information to the player about the game, including information about the winning bingo patterns, the bingo card, and the amount of credits. *See* Ex. 37, McGill Dep. at 95-96, 118-19.

43.     The function of the reels or "entertaining display" is to display an interim winning bingo presentation based on the bingo card outcome and pseudo-paytable outcome. The purpose is to give players another version of entertainment driven by the game of bingo and to make the player feel like they are playing a traditional slot machine. *See* Ex. 72, Davis (30(b)(6)) Dep. at 126-29; Ex. 27, Starr Dep. at 59-60.

44.     The function of the toppers is to attract players or communicate something to players, such as a win or that something is wrong. The toppers are also promotional and can identify the source of a game. *See* Ex. 72, Davis (30(b)(6)) Dep. at 149-52; Ex. 37, McGill Dep. at 105.

45.     The function of VGT's mechanical bell is to reinforce wins and signal wins to prospective players. *See* Ex. 32, North Dep. at 65-66; Ex. 38, Eubanks Dep. at 89-90; Ex. 1, Sevigny Dep. at 73-75. The mechanical bell also has the function of notifying casino operators of a security

breach. *See* Ex. 38, Eubanks Dep. at 89-90. VGT uses a mechanical bell because it can be heard "across the casino floor." *See* Ex. 42, Yarbrough Dep. at 223.

46.    The purpose of VGT's red strobe light is to signal wins and to flash and signal casino attendants when the player hits the call attendant button. *See* Ex. 38, Eubanks pp. 60-62, Ex. 1, Sevigny p. 72.  VGT uses a strobe light, as opposed to an incandescent bulb,  because it can be seen "across the casino floor." *See* Ex. 42, Yarbrough Dep. at 223.

47.    The purpose of VGT's game play sounds is to attract players. *See* Ex. 38, Eubanks Dep. at 110-11.

### H.    Castle Hill's Games

48.    Castle Hill believed that it could be additive to the Class II marketplace without replacing any VGT games. *See* Ex. 6, Watson Dep. at 58-59.  Castle Hill's plan was to make its own Class II games, not make Class II games in the style of VGT. *See* Ex. 6, Watson Dep. at 64-67. Castle Hill's games were not intended to be recognized by players as VGT's games, but rather Castle Hill's games were designed to *compete* directly with VGT's games. *See* Ex. 16, Sprinkle Dep. at 162-71; Ex. 98.

49.    Castle Hill purchases its game cabinets from GT Source. Castle Hill has three cabinets in the market: the Atlas style cabinet; refurbished "retro" style cabinets; and new Retro cabinets. When Castle Hill first started, GT Source informed Castle Hill it had refurbished "retro" style cabinets that had been used by other manufacturers, which it could sell to Castle Hill at a lower cost. Castle Hill purchased the Atlas cabinets and the lower-cost refurbished "retro" style cabinets. After GT Source ran out of refurbished "retro" style cabinets, GT Source began manufacturing Castle Hill's new Retro cabinet. *See* Ex. 52, Graham Dep. at 132-37.

50.    GT Source, the supplier of Castle Hill's game cabinets, was never told to copy VGT's cabinets. *See* Ex. 52, Graham Dep. at 222-23. The Atlas square-top cabinets do not look like

13

VGT's cabinets. *See* Ex. 27, Starr Dep. at 220. VGT admits that the Atlas cabinets allow CHG's games to be distinguished from VGT's games. Compl. at ¶ 62 & Compl. Exh. 3.

51.     Castle Hill's "retro" style cabinets and new Retro cabinets are distinguishable from VGT's LS cabinets. *See* Ex. 74, Defendants' Response to Plaintiff's Seventh Set of Rogs, Rog 25. Castle Hill uses a rectangular topper on its cabinet to display the name of the game, artwork for the game, and the Castle Hill name. *See* Compl. Exh. 4.

52.     Castle Hill uses original artwork on all of its games. Castle Hill also uses original names on its games. *See* Ex. 59, Marsh Dep. at 240-42, 248, 251-53, 263-64; Exs. 75-77, Marsh Dep. Exs. 53, 56, 60; Ex. 78, Milligan Dep. at 244; Ex. 79-81, Milligan Dep. Ex. 8, 9 & 10.

53.     Castle Hill uses a custom bell manufactured by WL Jenkins. *See* Ex. 16, Sprinkle Dep. at 81. VGT uses a different bell by the same manufacturer. *See* Ex. 16, Sprinkle Dep. at 323.

54.     Castle Hill hired a musician, Bobby Read, to create distinctive game play sounds for Castle Hill's games. *See* Ex. 8, [Defendants' Fourth Am. Obj. and Resp. to Fourth Set of Rogs., Rog. 2].

55.     Castle Hill purchases its strobe lights from GT Source. ██████████████ ████████████████████████████████████████████████████ ████████████████ Castle Hill's strobes also have a call attendant light. *See* Ex. 16, Sprinkle Dep. at 256-57.

56.     Castle Hill's instant free pay feature plays a video where the instant free pay logo is displayed. The instant free pay logo is orange and white. The screen where the instant free pay logo is displayed is red. *See* Ex. 15, Sisson Dep. at 225-27. The reels also turn red during the instant free pay feature, unlike VGT's reels, which do not turn red during the VGT red screen free spins feature. *Id.; see also* Ex. 1, Sevigny Dep. at 201.

57.     The relevant customers for the games at issue in this case are tribal casinos. *See* Gill

14

Decl., Ex. 27, Starr Dep. at 65. The tribal casino customers in the current market are knowledgeable and sophisticated about gaming machines. These customers are familiar with VGT products and the manufacturers of other games in other casinos. The negotiations with these customers concern the lease of expensive equipment. ████████████████████████████████████████ The tribal customers take these negotiations seriously. *See* Ex. 27, Starr Dep. at 84-86.

58.    The slot manager or casino manager makes the decision on where games are placed in a casino. *See* Ex. 27, Starr Dep. at 82-83. Only some casino customers have agreed to requests by VGT to locate EGMs in a specific area in the casino. *See* Ex. 27, Starr Dep. at 82-83.

59.    VGT and Castle Hill both display their "house marks" or company name and/or logos on their games. *See* Gill Decl., Ex. 38, Eubanks Dep. at 64-65, 115-16.

I.    **VGT and Castle Hill: De Minimis Confusion**

60.    Dr. Wind performed a likelihood of confusion survey for VGT. Castle Hill has challenged the reliability and admissibility of Dr. Wind's survey and opinions. Castle Hill's expert, James Berger, also challenges Dr. Wind's opinions. To the extent the Wind survey is admissible, the only games addressed in the survey were VGT's Mr. Money Bags and Castle Hill's New Money. *See generally* Defendants' Motion To Exclude Plaintiff's Expert Yoram Wind, filed herewith.

61.    VGT has identified 14 instances of alleged "actual confusion." *See* Gill Decl., Ex. 82, VGT Sixth Suppl. Objections and Respons. to CHG First Set of Rogs, pp. 187-95. Castle Hill has challenged the admissibility of these instances of "actual confusion" as *de minimis* and irrelevant. *See generally* Defendants' Motion In Limine To Exclude Evidence Of Alleged "Actual Confusion," filed herewith, which is incorporated herein by reference, given the page limitations.

J.    ████████████████████████████

62.    ████████████████████████████████████

████████████████████████████████████████



63.

64.

65.

66.

**K.**

67.



68. ███████████████████████████████████████████

**L.    VGT Other Alleged Trade Secrets and Confidential Information**

69. ██████████████████████████████████████

███████████████████████████████████████████. *See* Ex. 2, Taylor

Dep. at 188:17-189:17.

70. ███████████████████████████████████

████ *See* Ex. 84, Zeidman Dep. at 246:4-248:9.

71.    VGT's expert, Stacy Friedman, did not offer the opinion that Castle Hill copied any

source code of VGT. *See* Ex. 87, Friedman Dep. at 158-59.

72. ██████████████████████████████████

████████████████████████████████████████.

73. █████████████████████████████████████████

███████████████████████████.

### III.    CHG IS ENTITLED TO JUDGMENT ON VGT'S TRADEMARK CLAIMS

Count I of VGT's Complaint alleges infringement of VGT's federally registered marks. Compl. ¶ 104. The Complaint identified twenty registered trademarks as the basis for this claim. Am. Compl. ¶ 19. VGT has further described the claim in response to Castle Hill's interrogatories, providing an 86 page response. *See* Ex. 82. As set forth in Castle Hill's Reply in Support of Motion to File Briefs in Excess of Twenty-Five Pages (Doc. 138), the scope of this claim has been unclear, and the Court required VGT to identify its extant trademark infringement claims in writing. *See* Doc. 142.

While VGT filed an Identification of Extant Trademark Infringement Claims (Doc. 143), its position remains unclear. According to VGT, despite the fact that Count I of the Complaint still alleges infringement with respect to 20 federal trademark registrations, VGT's trademark claim is now limited to four themes: Crazy Bill; Mr. Money Bags, Polar High Roller; and Greenback Jack. *See* Doc. 143. VGT states that with respect to those four series of games, VGT's marks include work marks, logo/design marks, artwork, and characters, and that these various categories "include 11 federal trademark registrations and applications."[3]

VGT does not identify by registration number the marks at issue as to those four games, instead leaving Castle Hill and the Court to root through its nearly 200 page interrogatory responses and guess at the information. When the trademarks for the four remaining games are examined, it is clear that all that really remains of Count I is a single design mark for Mr. Money Bags. Castle Hill is

---

[3] When asked to identify its marks and explain the basis for its infringement claim, VGT offered similar general "categories" of marks but has completely failed to identify the ***specific marks*** at issue. A Mr. Money Bags EGM, for example, has artwork covering nearly the entire game. When VGT states that its marks include "the artwork that appears on each panel of the game cabinet," this is not an identification of an individual mark, but rather a generic description of art appearing on an area of a game. If VGT cannot, or refuses to, clearly identify its own marks, Castle Hill and the Court are left to guess what the basis for its claim really is. VGT's failure to specifically identify specific trademarks should be fatal to its claims.

entitled to judgment with respect to that mark, and all other of VGT's registered trademark claims.

### A. Castle Hill is Entitled to Judgment on Counts I, II, III, and IV as to All Games Not Identified in VGT's Identification of Extant Trademark Infringement Claims

In its recent filing, VGT made clear that its trademark claims are limited to the four games listed above. VGT has not, however, taken any steps to dismiss its claims with respect to all of the other VGT titles and Castle Hill titles that it identifies in the Amended Complaint and its interrogatory responses. Further, in Counts III and IV of the Amended Complaint VGT alleges that Castle Hill has infringed the "VGT Marks" in violation of the Oklahoma Deceptive Practices Act and common law, and in Count II, VGT alleges unfair competition in connection with its unregistered marks. Castle Hill is entitled to judgment on Counts I, II, III, and IV as to all titles other than the four identified in VGT's Identification of Extant Trademark Infringement Claims.

### B. The Amended Complaint Only Identifies Five Registered Trademarks With Respect to the Four Game Series VGT Identified in Doc. 143

Pursuant to Local Civil Rule 3.6, complaints in trademark cases "shall cite therein the . . . trademark number[.]" Accordingly, VGT's only registered trademark claims are those specifically identified by number in the Amended Complaint. With respect to the four game series VGT concedes remain at issue, the Amended Complaint identifies only five trademarks: Reg. No. 3,395,857 (Crazy Billions); Reg. No. 3,152,743 (Mr. Money Bags & Design); Reg. No. 4,138,672 (Mr. Money Bags); Reg. No. 3,755,296 (Polar High Roller); and, Reg. No. 3,506,608 (Greenback Jack). *See* Am. Compl. ¶ 19 (a)-(d), (i). Four of the marks at issue are word marks. Only one is a design mark.

### C. Castle Hill is Entitled to Judgment on All of VGT's Word Mark Claims

In response to Castle Hill's interrogatories, VGT conceded that it does not allege that Castle Hill has infringed on VGT's word marks. VGT stated: ███████████████████

███████████████████████████████████████████████

19

████████████████████████ *See* Ex. 82 at 18, n.3 (emphasis added). As set forth

above, the ***only*** registered trademarks at issue in this case (with the exception of a single design mark

for Mr. Money Bags) are word marks.[4] Moreover, to the extent VGT asserts that it has unregistered

word marks relating to the Mr. Money Bags, Polar High Roller, Wild Bill, and Greenback Jack series

of games, it likewise is not contending that Castle Hill's games infringe those word marks. Because

VGT concedes that it does not allege that Castle Hill's games infringe its word marks, Castle Hill is

entitled to judgment as a matter of law on all counts, including but not limited to Counts I, II, III,

and IV, to the extent such counts relate to infringement arising out of registered or unregistered

word marks.[5]

### D.    Castle Hill's New Money Game Does Not Infringe VGT's Mr. Money Bags Design Mark

The key inquiry in a trademark infringement case is likelihood of confusion between the two

marks. *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999).

Likelihood of confusion involves questions of fact, but is "amenable to summary judgment in

appropriate circumstances." *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1001 (10th Cir. 2014);

*see King of the Mountain*, 185 F.3d at 1089 ("Courts retain an important authority to monitor the outer

limits of substantial similarity within which a jury is permitted to make the factual determination

---

[4] Note that even if the Court were to excuse VGT's failure to comply with Local Rule 3.6 and allow VGT to add additional registered trademarks through a discovery response, instead of through a properly filed complaint, the analysis remains the same. VGT's interrogatory responses identify five additional registered marks relating to the remaining four game series. Each of those five marks is a word mark only.

[5] To the extent VGT argues that its word marks remain at issue, its claims would still fail for all the reasons set forth below with respect to its unregistered trademarks. The words VGT uses in its marks relate to common and ubiquitous themes in the gaming industry and are generic. Castle Hill's word marks are easily distinguished from VGT's word marks. Castle Hill's marks for New Money, Nugget Mountain, Coinslinger, and Arctic Cash/Arctic Ice, other than the use of the word "money," do not share any common words with VGT's marks, and the presentation of those marks is not likely to cause any customer confusion.

whether there is a likelihood of confusion.") (internal citation omitted).

In determining likelihood of confusion, courts review six non-exhaustive factors: (1) degree of similarity between marks; (2) intent of alleged infringer in adopting marks; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) degree of care likely to be exercised by purchasers; and (6) strength or weakness of marks. *Hornady*, 746 F.3d at 1001. No single factor is dispositive and the "importance of any particular factor in a specific case can depend on a variety of circumstances, including the force of another factor." *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013).

After judgment is entered as to VGT's registered word marks, the only remaining registered trademark at issue is VGT's design mark for Mr. Money Bags, Reg. No. 3,152,743. The USPTO describes the mark as follows: "The mark consists of the words MR. MONEY BAGS with a picture of a man in a hat smoking a cigar surrounded by bags of money and piles of loose bills and coins." Ex. 93 at VGT0065805. Further, "[c]olor is not claimed as a feature of the mark." *Id.*

When asked to explain the factual basis for its trademark infringement claim, including to state "each CHG Mark and the corresponding VGT Mark with which you contend such CHG Mark is likely to be confused," VGT responded with an 86 page response. Ex. 82 at 6-92. Notably, VGT does not distinguish in its response between its registered and unregistered marks. As to Mr. Money Bags alone, VGT asserts that it has trademarks with respect to all of the following titles within the Mr. Money Bags series: Mr. Money Bags; Mr. Money Bags II; Mr. Money Bags Deluxe!; Mr. Money Bags Deluxe Beach; Mr. Mr. Money Bags Lucky Streak; Mr. Money Bags Road to Riches; Money Bags Sparkling Wilds; Mr. Money Bags Bringin' the Bucks; Mr. Money Bags WAP; and Mr. Money Bags $UPER HIT$ JACKPOT$. *Id.* at 22. While each of those titles includes the character of Mr. Money Bags, the artwork, colors, design, and appearance is different for each individual game. Nevertheless, VGT alleges that a single Castle Hill game, New Money, infringes each and every one

21

of the Mr. Money Bags games.

According to VGT, the registered design mark that forms the basis of its claim in Count I of the Amended Complaint is only used on a limited number of VGT machines. As it explained in its response, VGT ███████████████████████████████████████████ ███████████████████████████████████████ sometime in the late 2000s or early 2010s. *Id.* at 23. VGT does **not** have a registered trademark for the "modernized alternative" or any of the various other versions of Mr. Money Bags. The **only** registered design mark is for the original Mr. Money Bags image, which VGT includes in color and can be seen on a gaming machine, in its interrogatory response. *See id.*

Focusing only of the registered design mark, it is clear that there is no likelihood of confusion between Mr. Money Bags and New Money. Castle Hill is entitled to judgment as a matter of law.

### i.    There is Little Similarity Between the Two Marks

The similarity between the marks is the "first and most important factor" and is gauged based on sight, sound, and meaning. *Hornady*, 746 F.3d at 1001. Here, VGT alleges the similarities between Mr. Money Bags and New Money to be as follows:



Ex. 82 at 32. The only real similarity VGT has noted is the presence of a hat, which VGT certainly does not have exclusive rights to. VGT glosses over the most striking difference between the two marks: Mr. Money Bags is a grown man, and the character in New Money is a baby. And despite VGT's assertion that the New Money baby is male, the character's gender is not apparent from the image. The New Money baby is far more "cartoonish" in appearance than Mr. Money Bags.

Further, Mr. Money Bags is smoking a cigar; the baby is not. Mr. Money bags is wearing a blue

suit coat, white pants, red polka-dotted tie, and black shoes; the baby is not. Mr. Money Bags is "tipping" his hat, which is angled downwards on his head, while the baby is not touching the hat, which is angled upwards. While both characters are smiling, the baby has a goofy grin in the middle of the face and the baby's tongue is out; meanwhile, Mr. Money Bags has a toothy smirk. The baby has very large wide-open circular green eyes, while Mr. Money Bags' eyes are smaller, more ovular, and slightly squinted. Mr. Money Bags is placed next to a life-size brown bag with a dollar sign on the front and dollar bills poking out of the top; New Money does not feature any such bag of money. Mr. Money Bags is surrounded by neat stacks of dollars, gold coins, and several additional bags of money; the New Money baby is surrounded by loose dollar bills and stacks strewn about. The New Money baby is featured against a purple background with columns of light purple dollar signs; Mr. Money Bags is featured on a black background with dark purple rows of solid color.

With respect to the presentation of the words on the marks, the words "New Money" are set in gold lettering with tiny "glimmers" in it, reminiscent of light shining on gold. The "Mr. Money Bags" text, meanwhile, is yellow (the "Mr.") and purple ("Money Bags"). The "Mr." appears in italics, while the "Money Bags" is in all capital letters and surrounded by a patterned border of alternating yellow and white dots. Further, New Money features a tag-line "Gotta Bet Max To Win Stacks." further differentiating it from Mr. Money Bags, which contains no such tag-line, but only the game title.

Finally, Castle Hill prominently displays its company name or "house mark" on its games, including New Money, which operates to distinguish its games from those of other manufacturers, eliminating or mitigating any likelihood of confusion. *See Water Pik,* 726 F.3d at 1156; *see also Conopco, Inc. v. May Dep't Stores Co.,* 46 F.3d 1556 (Fed. Cir. 1994); *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,* 973 F. 2d 1033 (2nd Cir. 1992). There is no dispute of fact on this point.

Given the number of stark differences between Mr. Money Bags and New Money, it is

implausible that a customer would sit down and play a New Money machine thinking that they were actually playing a Mr. Money Bags game. The fact that Castle Hill includes its house mark or logo on every single New Money machine negates any risk of confusion. The differences between the two marks establish that Castle Hill is entitled to judgment as to Count I.

### ii.      Castle Hill Did Not Copy VGT's Design Mark

The fact that the Mr. Money Bags design mark and the artwork for New Money have so many differences is evidence that Castle Hill did not attempt to copy. *See Hornady Mfg. Co.*, 746 F.3d at 1003-04. Castle Hill's games were not intended to be recognized as VGT games; rather, Castle Hill's games were designed to compete with VGT and all other Class II EGM manufacturers. SOF ¶48. Moreover, Castle Hill took significant steps to ensure that its games were legally competing in the Class II marketplace, including registering its word marks, including the mark for New Money, with the USPTO, which approved Castle Hill's use of the mark as not confusingly similar to any other mark. SOF ¶12. Castle Hill further applied for and received a copyright registration from the Copyright Office for the artwork featured on its New Money EGMs. *Id.*

### iii.      VGT Has No Evidence of Actual Confusion

Evidence of actual confusion between the allegedly infringing mark and the plaintiff's mark is "considered the best evidence of a likelihood of confusion." *Hornady*, 746 F.3d at 1004. Here, VGT has no compelling evidence of actual confusion. To the extent VGT has attempted to identify alleged instances of "actual confusion," they are irrelevant, unreliable, *de minimis*, and not probative as to any specific VGT mark. The inadequacies of VGT's evidence of actual confusion are set forth in Castle Hill's Motion in Limine to Exclude Evidence of Alleged "Actual Confusion," filed herewith. Castle Hill hereby incorporates all of its arguments from that motion by reference.

As set forth in that motion, the instances of alleged actual confusion provide little insight into the nature of the confusion. VGT has never alleged, and has no evidence of, any confusion between

the Mr. Money Bags registered design mark and New Money. Significantly, and by VGT's own admission, it is phasing out the Mr. Money Bags registered design mark in favor of its unregistered "modernized alternative." This change to Mr. Money Bags' appearance further underscores the unreliability of VGT's "actual confusion" evidence. Even if the Court were able to resolve the evidentiary issues and relevance of the alleged instances of actual confusion, a small number of anecdotal examples of confusion cannot establish a likelihood of confusion. *See*, *e.g.*, *id.* at 1005 ("a handful of instances over the ten years in which [the defendant] was in the market constitute *de minimis* evidence of a likelihood of confusion."); *Water Pik,* 726 F.3d at 1150-51 ("isolated, anecdotal instances of actual confusion may be *de minimis* and may be disregarded in the confusion analysis"); *Checkpoint Sys. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 298-99 (3d Cir. 2001) (twenty instances were *de minimis*).

VGT's proffered likelihood of confusion survey evidence also is flawed. As set forth in Castle Hill's Motion to Exclude Plaintiff's Expert Yoram Wind (the "Wind Motion"), VGT hired a survey expert who conducted a likelihood of confusion survey as to a Mr. Money Bags game and a New Money game. For all the reasons set forth in Castle Hill's motion, which are incorporated herein by reference, the Wind Survey was biased, fundamentally flawed, and should be excluded. Even if the Court were not to completely exclude the Wind Survey and opinions, that survey did not address likelihood of confusion between VGT's Mr. Money Bags registered design mark and Castle Hill's New Money game. Rather, the survey focused on a specific version of Mr. Money Bags in a particular cabinet configuration. VGT chose to use its "modernized" Mr. Money Bags artwork for purposes of the survey and ***did not even test*** likelihood of confusion between its actual registered design mark and New Money.

### iv.    VGT and Castle Hill's Casino Customers Are Careful and Discerning

VGT and Castle Hill do not offer their Class II EGMs directly to consumers. VGT and Castle

Hill enter into agreements with tribal casinos, who agree to allow placement of a certain number of EGMs on the casino floor. The individuals who negotiate such deals on behalf of Native American tribes are sophisticated and knowledgeable about the Class II market and would never be confused regarding whether a game was a VGT or Castle Hill game. SOF ¶57. Individual casino patrons who play EGMs do not know or care about the source or manufacturer of the game they are playing, according to pre-litigation surveys commissioned by VGT. SOF ¶39. EGMs are unique and unlike other products in a casino, a player is likely to play multiple games during a single visit. The mere fact that a player chooses to play a Castle Hill game does not mean the same player will not also choose to play a VGT game.

### v.    VGT's Mr. Money Bags Design Mark is Not Strong

The strength of a mark has two components: conceptual strength, relating to the mark's distinctiveness; and, commercial strength, relating to its level of recognition in the marketplace. The Mr. Money Bags design mark is conceptually weak. There is nothing particularly unique or special about the fact that VGT created a "money" themed casino game. Indeed, the theme of wealth or money, and games featuring cash money and coins, are ubiquitous in the industry. SOF ¶¶27-29. Throughout this case Castle Hill has identified many examples of other game titles with similar themes. *See* Ex. 8 at 42 (identifying game titles "Money Bags White Nights; The Money Man; Bags of Cash; Double Fat Cash; Crazy Coin; Catch the Money; Money Talks; Greenback Attack; and, Stinkin' Rich"). Likewise, in its filings with the USPTO for the Mr. Money Bags design mark, VGT admitted that the word "Money" is generic in the gaming industry, stating that there were "nearly 200 pending or registered marks for gaming equipment that use the word "Money" as part of the mark." *See* Ex. 93 at VGT0065876 (specifically identifying "Money Groove," "Money in the Bank," "The Good, the Bad and the Money," "Moonshine Money," "Run For Your Money," "I.C. Money," "On The Money," "Show Me The Money," and "Money To Burn"). VGT's use of the word

26

"money" is highly descriptive and generic in gambling, and thus lacks strength. *See Water Pik*, 726 F.3d at 1152 (only suggestive, arbitrary, or fanciful marks are considered strong).

The conceptual strength of VGT's mark is further weakened by the fact that VGT does not have exclusive rights to the Mr. Money Bags design. VGT did not independently develop the Mr. Money Bags character. Rather, it purchased the art as part of a "conversion kit" from a third-party, Suburban Graphics, which sold the artwork under the name "Fat Cash." VGT has absolutely no record of obtaining exclusive rights to the artwork at the time it purchased the kit. Suburban continued to offer the "Fat Cash" conversion kit after VGT bought the kit and turned it into Mr. Money Bags. Indeed, it was not until June 7, 2011 that VGT entered into an agreement with Suburban, which purported to vest exclusive rights to Fat Cash retroactively. SOF ¶25. The agreement the parties executed is ineffective in any event, as it failed to convey goodwill.

With respect to commercial strength, VGT cannot meet its burden to demonstrate that the Mr. Money Bags design mark is strong. Castle Hill suspects that VGT will point to its multiple game titles featuring the Mr. Money Bags character or words, and argue that it has marketed Mr. Money Bags for years. While that may be true, VGT admits that beginning in the late 2000s or early 2010s it began to move away from the registered design mark to its "modernized" version. Advertising dollars or game offerings featuring artwork and a character ***different*** from the Mr. Money Bags registered design mark is not evidence of the commercial strength ***of that particular mark***. Because VGT has no evidence with respect to the commercial strength of the registered design mark, this factor weighs in Castle Hill's favor.

> ### E. Castle Hill is Entitled to Judgment on VGT's Unregistered Trademark Claims for Mr. Money Bags, Crazy Bill, Polar High Roller, and Greenback Jack

For the four game series remaining at issue, VGT has identified categories of alleged trademarks which it alleges Castle Hill has infringed. As set forth above, VGT has abandoned its word mark claims with respect to these games. All that remains is VGT's claims based on unregistered

trademarks relating to the games' alleged logo/design marks, artwork, and characters. Unlike claims based on registered trademarks, VGT's unregistered trademarks are not entitled to a presumption of validity. *See Forney Indus., Inc. v. Daco of Mo., Inc.*, 835 F.3d 1238, 1244 (10th Cir. 2016). For each of its unregistered marks VGT has the burden of proving that: 1) the mark is inherently distinctive or has acquired secondary meaning; and 2) Castle Hill's use of the allegedly infringing mark is likely to cause customer confusion. *Id.* Because VGT's marks are not inherently distinctive and have not acquired secondary meaning, and because Castle Hill's marks are not confusingly similar to VGT's, Castle Hill is entitled to judgment on all of VGT's unregistered trademark claims.

### i.    VGT's Marks Are Not Inherently Distinctive

A mark is deemed inherently distinctive when "its intrinsic nature serves to identify a particular source. Such [marks] almost automatically tell a customer that they refer to a brand and immediately signal a brand or a product source." *Id.* at 1244-45 (quoting *Sally Beauty Co. v. Beautyco, Inc.* 304 F.3d 964, 977 (10th Cir. 2002)).

For all of the reasons why VGT's Mr. Money Bags design mark is not strong, its unregistered marks relating to the Mr. Money Bags series of games are not strong. The mark is not inherently distinctive. There are countless games which include images of money, cash, or wealth, and countless games that use the word "money" in the title. Likewise, the "Crazy Bill" series,[6] which is VGT's gold-mining themed series of games, is based on a ubiquitous and commonplace theme in the gaming/gambling industry of mining for gold. SOF ¶¶27-29. Gold is universally associated with wealth and affluence, and games featuring gold mining are popular and commonplace. Throughout

---

[6] VGT alleges that the Crazy Bill series includes the following titles: Crazy Bill's Gold Strike; Crazy Billions; Crazy Bill's Gold Strike $UPER HIT$ JACKPOT$; Dynamite Daisy; and, Crazy Bill Gushin' Gold. As with all of its claims, VGT has failed to specifically identify the alleged trademarks, instead stating for each game title that the marks include "at least" the word marks, the design/logo, the artwork on each panel, and the game character. Of course, for the Crazy Bill series alone this leaves twenty categories of marks, which VGT has made no effort to further define. This is true for all of VGT's marks.

discovery in this case, Castle Hill expressly identified at least the following EGMs with a similar gold-mining theme as the VGT Crazy Bill series: Gold Quest; Strike it Rich Again; Golden Frontier; Gold Miner; Eureka Gold Mine; and, Miner's Quest. Ex. 8 at 36-38. Indeed, Gold Quest, Strike it Rich Again, and Golden Frontier all even include images of miners similar to the "Crazy Bill" and "Dynamite Daisy" characters featured in VGT's games.

The Polar High Roller series[7] is also not inherently distinctive. First, the term "High Roller" is synonymous with a rich gambler living a lavish lifestyle. Second, winter/arctic themed games, include games featuring arctic-style animals, are ubiquitous and commonplace. SOF ¶27; Ex.8 at 45-48 (identifying Arctic Aces; Just Chillin; Arctic Stars Keno; Polar Bash; Polar Nights; Plenty of Penguins; Polar Plunge; and Guardians of the North, each of which features both an arctic theme and cartoon animals). Nor is Greenback Jack, VGT's wild west themed game, distinctive. Again, VGT admits that cowboy and wild west games are popular casino and gaming themes. SOF ¶27; Ex. 8 at 48-51 (identifying The Magnificent Seven; Desperado's Wild; Wild West Cash; Beat the Bandits; Dueling Wilds; Grit Guns and Gold; Winner of the West; and, Gold Slinger).

There is nothing distinctive or source-identifying about any of VGT's game titles.

### ii.    VGT Cannot Met its Burden to Establish Secondary Meaning

Because VGT's marks are not inherently distinctive, they can gain protection only if they have developed secondary meaning such that "the primary significance of the mark is to identify the source of the product rather than the product itself." *Forney Indus.*, 835 F.3d at 1245 (quoting *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000)).

When Castle Hill inquired regarding the alleged secondary meaning of VGT's marks in discovery, VGT pointed to various marketing materials, promotional efforts, and sales revenue. But

---

[7] VGT alleges that this series includes the following titles: Polar High Roller; Polar High Roller Lightning Wilds; Fortune Flurry; and Frozen Fortunes.

VGT has not and cannot demonstrate that its sales have been generated by the specific unregistered marks for which it seeks protection (each of which the Court will have to review independent of VGT's other marks). VGT cannot also not meet its burden to show that its marketing and advertising has been targeted at identifying VGT as the source of the specific marks at issue. The primary purpose of VGT's unregistered trademarks remains to identify the specific EGM itself, not to identify VGT as a common source of those various EGMs.

### iii. CHG's New Money, Arctic Cash/Ice, Coin Slinger, and Nugget Mountain Games Are Not Likely to Cause Confusion With VGT's Games

The test for likelihood of confusion for VGT's unregistered marks is the same six-factor analysis applied above to VGT's Mr. Money Bags registered design mark. For the intent to copy and degree of care factors, the Court's analysis should be the same regardless of game title; these factors weigh in Castle Hill's favor. With respect to the evidence of actual confusion, for Crazy Bill, Polar High Roller, and Greenback Jack, VGT has no evidence, either direct or through the Wind Survey, of confusion. The Wind Survey only tested Mr. Money Bags (the "modernized alternative" of the original artwork) against New Money. It did not test any other game series or any other Mr. Money Bags titles (and should be excluded in any event). As set forth in the Wind Motion, survey results with respect to the "modernized alternative" of Mr. Money Bags *is not probative* of potential confusion between VGT's Greenback Jack and any Castle Hill offering, for example, or any other game pairing. The degree of similarity and strength of mark factors are addressed with respect to each game series below.

### 1. Unregistered Trademarks for Mr. Money Bags

As is obvious from a review of the Mr. Money Bags marks, all of them look different from each other, and each looks different than New Money. There is no similarity, for example, between the New Money baby and Mr. Money Bags Deluxe Beach, which features a shirtless adult male wearing

reflective sunglasses, a yellow hat with a green stripe, green swimming trunks with dollar signs, green flip flops, smoking a cigar, drinking an umbrella drink, and waving his hand in a "hang loose" gesture, while standing on a sandy beach with the ocean in the background, next to palm trees and a beach umbrella, with an orange sun and white clouds set against a blue sky. Castle Hill's New Money simply does not look at all like that.

Nor does Castle Hill offer a version of New Money that looks anything like Mr. Money Bags Lucky Streak, which features a blue-suited man jumping in the air "clicking" his heels together in front of a dark blue background with streaks of lightning surrounding him, or that looks anything like Road to Riches, where the Mr. Money Bags character is in a red sports car driving down a highway with green fields and a pink sky in the background. Indeed, New Money is significantly different from each and every Mr. Money Bags offering. In the end, the only similarity that VGT can point to, and the crux of its complaint, is that Castle Hill put a hat on a baby. That single similarity is insufficient to support a trademark infringement claim under the Lanham Act, as it is not likely to cause customer confusion.

### 2.    Unregistered Trademarks for Polar High Roller

VGT's explanation for how the Castle Hill games infringe Polar High Roller is that both game series ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████ Ex. 8 at 36.

The words and font used on the Castle Hill games "Arctic Cash" and "Arctic Ice" differentiate them from VGT games, as does the fact that the VGT games prominently feature a sunglass-wearing polar bear, whereas the prominent characters in Arctic Cash are a seal and a porpoise, and Arctic Ice features only penguins. VGT does not have exclusive rights to create games with cartoon

animals, or to create games with winter themes. *See Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1274 (10th Cir. 1988) (party did not have "exclusive rights in an artistic style or in some concept, idea, or theme of expression"); *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 382 (2nd Cir. 1997) ("If the law protected style at such a level of abstraction, Braque might have prevented Picasso from selling cubist paintings in the United States.").

### 3.        Unregistered Trademarks for Crazy Bill

VGT's complaint with respect to Castle Hill's Nugget Mountain game is that it features a miner with a white beard and a cowboy hat, who is mining for gold in the wild west. Again, the stylized title of the Castle Hill game differentiates it from VGT's various Crazy Bill games. Indeed, other than Dynamite Daisy, all of the Crazy Bill series games use the words "Crazy Bill" or "Crazy Billions" somewhere on the game. Nugget Mountain is further differentiated from Dynamite Daisy because Dynamite Daisy is a white-haired female character. As set forth in Castle Hill's discovery responses, the miner featured in Nugget Mountain is inspired by George "Gabby" Hayes, an actor who appeared in Western-themed films during the 1930s-50s, and had a bushy beard and word a hat similar to the miner in Nugget Mountain. VGT does not have exclusive rights to make gold-mining games.

### 4.        Unregistered Trademarks for Greenback Jack

VGT complains that both its Greenback Jack and Castle Hill's Coinslinger ███████████

████████████████████████████████████████████████████████

██████████████████████████████ Again, the words and stylized font of the two games is easily distinguishable, as is the color scheme used for the backgrounds. Greenback Jack is riding a horse, smoking a cigar or cigarette, and surrounded by more than a dozen "townspeople." The man in Coin Slinger is standing alone with only one other character in the scene. The man in Coin Slinger has a mustache and is flipping a coin up in the air. The games look nothing alike.

iv.    **VGT's Marks Are Not Strong**

VGT cannot meet its burden of showing that its unregistered trademarks are strong. VGT has admitted that its games do not have unique themes, and instead have common and ubiquitous themes in the gambling industry (wealth, the wild west, animals, etc.). SOF ¶¶27-29.

Moreover, Castle Hill has registered trademarks with respect to all four of the games that VGT claims to be infringing. For New Money, Arctic Cash, and Coin Slinger, Castle Hill also has registered copyrights for the games' artwork, and it has a pending registration for Nugget Mountain. It is undisputed that Castle Hill either purchased or created the unique artwork used in the Castle Hill games. VGT has not challenged Castle Hill's copyrights, and Castle Hill is entitled to a presumption of validity as the copyright holder, which can only be overcome upon a showing that it was not entitled to a copyright certificate in the first place. *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1262 (10th Cir. 2008). The Court should be circumspect of VGT's claims that Castle Hills' registered trademarks and copyrighted artwork infringes VGT's unregistered trademarks. *See Dastar Corp. v. Twentieth Century Fox*, 539 U.S. 23, 33-34 (2003) (the rights of a copyright holder are part of a "carefully crafted bargain," under which once the copyright monopoly expires the public may use the work at will without attribution. "Thus, in construing the Lanham Act, we have been 'careful to caution against misuse or over-extension' of trademark protections traditionally occupied by copyright") (citations omitted).

Because VGT cannot meet its burden to demonstrate that its unregistered marks are entitled to protection as inherently distinctive or as having acquired secondary meaning, Castle Hill is entitled to judgment as a matter of law on all of VGT's infringement and unfair competition claims arising out of its unregistered marks. Even if VGT were somehow able to survive summary judgment on the question of distinctiveness, Castle Hill is still entitled to judgment because the Castle Hill games in question are not likely to cause confusion in the marketplace. The Court can make this

determination on summary judgment stage based on the apparently dissimilar marks, and VGT's lack of any evidence of confusion.

## IV.    CHG IS ENTITLED TO JUDGMENT ON VGT'S TRADE DRESS CLAIMS

### A.    VGT Does Not Have a Consistent Trade Dress

VGT's trade dress claims fail because VGT does not have a *consistent* trade dress. The trade dress of a product is its overall image and appearance, and can include size, shape, color, texture, graphics, and sales techniques. *See Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002). Because VGT's trade dress consists of a number of different products, it is not protectable. To establish protection for a line of products, VGT must establish that its products have  a recognizable and "consistent overall look." *See Walt Disney Co. v. Goodtimes Home Video Corp.*, 830 F. Supp. 762, 766 (S.D.N.Y. 1993) (finding no consistent trade dress); *Framed Wall Art, LLC v. PME Holdings*, 2008 WL 5205822 (D. Utah Dec. 12, 2008) (same); *Hammerton, Inc. v. Heisterman*, 2008 WL 2004327 (D. Utah May 9, 2008) (same).

VGT has an obligation to articulate the specific elements which comprise its trade dress. *See Forney Indus.,* 835 F. 3d at 1252 (10th Cir. 2016) (finding no consistent or distinctive trade dress). In its Amended Complaint, VGT vaguely identified six trade dress features: (1) the game cabinet; (2) the game play sounds; (3) the award sounds; (4) the bingo play and pays; (5) the red screen free spins; and (6) the themes of the games. *See* Doc. 103, ¶¶ 23-31.

VGT's ever-evolving articulation of its trade dress elements is itself recognition of its inconsistent trade dress. The evolution of VGT's definition of the "game cabinet" feature alone is illustrative. In its original and Amended Complaint, VGT broadly defines its "game cabinet" feature to refer to "the cabinet VGT uses to display its 3-Reel Mechanical Games." *See* Docs. 2 & 103, ¶ 23. In Exhibit 4 to both complaints, VGT included an image of its Planetary Pigs game with its "jukebox" style side lighting package and a topper. *See* Doc. 2-4, p. 10; Doc. 103-1, p. 17.

34

VGT's response to Castle Hill's second interrogatory generically defined the "game cabinet" feature as "the cabinet that houses the games." Ex. 8 at 93. VGT also stated that "[b]elow are examples of specific games in each of the above series that incorporate the VGT Trade Dress as compared to CHG's games that incorporate similar trade dress…," and VGT showed its Planetary Pigs game with the "jukebox" lighting package and a topper again. *Id.* at 95, 100.

In its first supplemental response, VGT changed its definition of the "game cabinet" to "refer to the standard-sized cabinet that VGT uses to display its 3-reel mechanical games."  *Id.* at 107. VGT also specifically stated that the "game cabinet" feature "includes, but is not limited to, the size, shape, color, material, and placement of the physical cabinet components, including, but not limited to, the cabinet frame, art glass, reels, buttons, bingo screen, payout table, topper, and red strobe light (i.e., the RED CANDLE)." *Id.* Side lighting on a game cabinet is necessarily included in VGT's definition of "physical cabinet components" in its new, broad and all-encompassing definition set forth in its first supplemental response, and its inclusion of the "topper" is express.

In its second supplemental response, after numerous depositions wherein VGT's trade dress was shown to be inconsistent, VGT changed course and redefined its definition of its trade dress, including the "game cabinet" feature, describing it as follows: "the mechanical-reel version of VGT's LS (a/k/a C6) cabinet. VGT's other mechanical reel cabinets, including the sit-down (a/k/a slant) cabinet and the XL cabinet (with a 32-inch video screen), are not part of the VGT Trade Dress. Similarly, the VGT Trade Dress does not include the side lighting that appears on some of VGT's 3-reel mechanical games."  *Id.* at 121.

VGT's articulation of its trade dress claims have been shifting and inconsistent. Rather than identify the elements of its claims, VGT set forth a vague list of trade dress elements in the Complaint, and broadened those elements until it realized it had a problem – and then reversed course as Castle Hill's obvious defenses emerged. VGT cannot escape its inconsistent trade dress by

pretending it does not exist. The absence of a recognizable and consistent overall look warrants dismissal. *See Forney Industries, Inc.*, 835 F.3d at 1252-53 (finding "[t]here are several reasons for not protecting a vaguely defined trade dress," and explaining that failure to articulate a claimed trade dress increases difficulty of litigation for courts, juries, and competitors in the market, including the defendant, to understand what new designs would be subject to challenge by the trademark holder).

Given the breadth of VGT's claims for a series of products, the Court must be mindful to protect competition. *See Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997) (finding no consistent trade dress and noting "when protection is sought for an entire line of products, our concern for protecting competition is acute.").

Although VGT has limited its claims to three-reel mechanical games, Doc. 103, ¶ 23, VGT's games at issue are offered in multiple cabinets. SOF ¶¶13-14, 21. Even the LS cabinet on which VGT has most recently focused varies in lighting, toppers, themes, artwork styles, and extra reel features, providing no consistent look or feel across the line. SOF ¶¶15-16, 20. VGT's games, cabinets, game names, artwork, sounds, and red screen free spins feature have all also changed over the years, providing further inconsistency.

While VGT now defines its "game cabinet" feature to refer to "the cabinet VGT uses to display its 3-Reel Mechanical Games," Doc. 103, ¶ 23, VGT's EGMS on the casino floors (with the same titles and within the same families of "themes") are offered in numerous cabinets, including the LS cabinet, sit-down slant cabinet, XSpin video cabinet, XL cabinet, and Helix and Helix+ cabinets. SOF ¶13. At least three of these cabinets are offered in 3-reel mechanical: the LS cabinet, the sit-down slant cabinet, and the XL cabinet. SOF ¶¶13-14. The same games are offered by VGT in the same casinos in these various cabinets, and they look different. *Id.*

Even considering VGT's LS cabinet in a vacuum – which players encountering these various cabinets in the marketplace cannot do – VGT's alleged cabinet trade dress is inconsistent. The

current LS cabinet began as a different, off-the-shelf cabinet used by other manufacturers, and was "cut down" to create VGT's current slim-line cabinet. VGT leased both versions of these cabinets together in the market for years. VGT has subsequently updated the cabinet's hardware and lighting, affecting its appearance to consumers.

VGT has also added "jukebox" lighting to many of its cabinets, which dramatically changes the appearance, and has added toppers of various shapes and sizes, and changed its monitors numerous times. SOF ¶¶15-16, 20. VGT even has some "3-reel mechanical" cabinets with an *extra* fourth reel feature in the topper. SOF ¶19; *see also* Ex. 8 at 45 (image of EGM with fourth reel in topper). While VGT attempts to claim that its "jukebox" lighting feature is not part of its claim and not relevant, the Amended Complaint controls and tells a different story. *See* Doc. 103-1, p. 17.

VGT's other trade dress features are similarly inconsistent. VGT does not use the same sound on its games, and has changed its game play sounds and award sounds over time. SOF ¶18. VGT uses approximately 50 different paytables for its games, and, as clear from the examples in the Amended Complaint itself, they are not consistently shown in the rounded top. *See e.g.*, Doc 103-1 at 16-18 (Greenback Jack, Planetary Pigs, Countin' Cash); Ex. 8 at 18 (Crazy Bill's Gold Strike), 30 (Mr. Money Bags Sparkling Wilds); 31 (Mr. Money Bags Bringin' the Bucks); 34 (Polar High Roller Lightning Wilds); 88-90 (Fortune Flurry and Frozen Fortunes). VGT even changed the appearance of its most recognizable feature, the red screen free spins. In fact, VGT *plans* to make *further* changes and to emulate Castle Hill's instant free pay feature by lighting its reels red. SOF ¶17. Finally, VGT's artwork and game names have no apparent consistency in style, coloring, character use, paytable use, or paytable placement.

VGT's products, including its three-reel mechanical games, are diverse and have changed over the years. As a result, its current products look and sound different from the original products, and vary greatly from game to game. While this may help VGT reach more players, it results in a lack of

a consistent trade dress. *See Walt Disney Co.*, 830 F. Supp. at 767-68 (Disney classic clamshell VHS containers inconsistent trade dress because of, *inter alia,* placement and size of artwork, characters, text, fonts, and colors).

### B.    VGT's Alleged Trade Dress is Not Distinctive Because it Has Not Acquired Secondary Meaning

To establish trade dress infringement, VGT must prove its games have a recognizable and consistent overall look. *See* Section IV(A) above. If it meets that burden, it must then prove: (1) its trade dress  has become distinctive through secondary meaning; (2) its trade dress is not functional; and, (3) there is a likelihood of confusion among consumers as to the source of the competing products. *See General Motor Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1227 (10th Cir. 2007) (citing 15 U.S.C. § 1125(a)(3)).

### i.    VGT Must Prove Secondary Meaning

VGT must prove that its alleged trade dress has acquired secondary meaning. "[I]n an action for infringement of an unregistered trade dress under § 43 of the Lanham Act, a product's design is distinctive, and therefore protectable, *only* upon a showing of secondary meaning." *Wal-Mart Stores Inc. v. Samara Bros. Inc.*, 529 U.S. 205, 216 (2000) (emphasis added).

VGT's trade dress claims arise from its products' design. VGT's game cabinet feature involves the design of the shape of the cabinet, LCD screen, topper, button deck, red strobe light, and other hardware components; VGT's game play sounds feature involves the design of the sounds that emanate from the game based on software code; VGT's award sound feature involves the design of VGT's mechanical bell in its game cabinet; VGT's bingo play and pays involves the design and functionality of the ball call, pseudo-paytables, and payouts; VGT's red screen free spins involves the design of VGT's bonus round where the game screen changes color; and VGT's themes involves the design of the artwork to attract players to the game. Accordingly, VGT must prove secondary meaning. *See Forney Indus.,* 835 F.3d at 1248 (in close cases, "lower courts 'err on the side

of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning.'") (quoting *Wal-Mart Stores, Inc.*, 529 U.S. at 215).

### ii.    VGT's Alleged Trade Dress Has Not Acquired Secondary Meaning

VGT cannot meet its burden to demonstrate that the alleged VGT Trade Dress has acquired secondary meaning. Secondary meaning can be established through direct evidence, such as surveys or consumer testimony, or circumstantial evidence. *Id.* at 1253. Here, VGT has no direct evidence of secondary meaning. As set forth more fully below, the Wind Survey did not test the VGT Trade Dress features, and did not test for secondary meaning. To the extent VGT has conducted surveys of its casino consumers in the past, those surveys do not address the alleged VGT Trade Dress.

Accordingly, VGT will have to put forth circumstantial evidence of the secondary meaning. VGT may argue that its games have been offered in the Oklahoma market for years and have produced millions of dollars in revenue. Evidence of market presence and financial performance is not probative of secondary meaning without a causal connection between its leasing of EGMs and the specific trade dress features. *See Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1148 (10th Cir. 2016) ("[s]tanding alone, sales volume may not be indicative of secondary meaning because it could be related to factors other than source identification."); *Water Pik*, 726 F.3d at 1154-55 ("Evidence that its products had millions of users and that its products were sold through well-known retailers does not tell us whether the sales were stimulated by the mark.").

Nor is evidence of VGT's advertising or marketing efforts a sufficient predicate for a finding of secondary meaning. VGT has the burden, which it cannot meet, to show that its advertising was targeted to specifically emphasize its trade dress features. *See Forney Indus.*, 835 F.3d at 1254 (advertising did not highlight trade dress); *Winning Ways*, 913 F. Supp. at 1470 (the "critical question . . . is not the extent of the promotional efforts but their effectiveness in creating an association between the trade dress and plaintiff." (citation omitted)); *see also* McCarthy on Trademarks § 8:8.50

("secondary meaning cannot usually be proven by advertising . . . the advertising must draw attention to the alleged trade dress."). Here, VGT may point to its advertising and marketing efforts, but it cannot show that its advertising focused on its claimed trade dress features.

VGT simply cannot meet its burden to prove that a "significant or substantial part of the buying class uses the trade dress to identify a single source." *Winning Ways, Inc. v. Holloway Sportswear, Inc.,* 913 F. Supp. 1454, 1468 (D. Kan. 1996) (citing McCarthy on Trademarks and Unfair Competition § 32.54[2][a] (3d ed. 1995)). Accordingly, its claimed trade dress is not entitled to protection.

### C. There is No Likelihood of Confusion Between VGT and Castle Hill Games Based on VGT's Alleged Trade Dress

Alleged similarities between VGT's trade dress and Castle Hill's games are not likely to cause confusion. The same likelihood of confusion test which applies to VGT's trademark claims applies here. *See Water Pik,* 726 F.3d at 1143.

#### i. There is Little Similarity Between the Trade Dress

For similarity between alleged trade dress, the Court should "not engage in a side-by-side comparison," but rather, "determine whether the alleged infringing mark will be confusing to the public when singly presented." *See Universal Money Centers, Inc. v. American Tel. & Tel. Co.*, 22 F.3d 1527, 1531 (10th Cir. 1994).

Other than the fact that both parties make electronic bingo games which are styled after classic slot machines, VGT's trade dress is not similar to Castle Hill's games. The "retro" cabinets that VGT uses are not unique, and are not proprietary to VGT. The "retro" style cabinets Castle Hill uses were purchased second-hand from GT Source, who had obtained the cabinets from gaming companies Nova Gaming and Cadillac Jack. SOF ¶26.

Castle Hill uses a rectangular "topper" on the top of its cabinet to help distinguish its games. Castle Hill's topper looks like an iPad mounted on top of its EGMs, which display game titles and

40

Castle Hill logos. VGT does not consistently use a topper, and when it does they are oval in shape and advertise VGT's different game titles. VGT's retro or LS cabinets also frequently include tubular lighting around the edge of the machines in neon colors which creates a "halo" of light around the machine, and emulates the look of a jukebox. Castle Hill does not use such lighting.

Castle Hill uses a light on top of its cabinets which has a red lens stacked on top of a white lens. The Castle Hill lights are manufactured by Seco Larm, but they are purchased from GT Source. Castle Hill's lights are different than VGT's strobes. Castle Hill's lights use both red and white LED lights which are selectable. Castle Hill's light, unlike VGT's light, has a white call attendant light. *See* SOF ¶55. The red lens signals a win or jackpot, and the white lens performs the "call attendant" function. VGT uses a strobe light rather than an incandescent bulb.

Castle Hill's "Retro" cabinets that it is now using were designed by GT Source. The new Retro cabinets are wider and shorter than VGT's LS cabinet. *See* SOF ¶50-51 The different dimensions cause the look of the top, arched portion of the cabinet to be different from VGT's cabinet. Castle Hill's round-top cabinet also incorporates player tracking features and functions. Castle Hill's cabinet using a 21.5" monitor, and a separate denomination bar above the reels with its own artwork and lighting. Castle Hill's reel glass is not as tall as on VGT's cabinet, and Castle Hill's cabinet door is short. Castle Hill uses a custom manufactured mechanical bell. While VGT uses a bell manufactured by the same company, they are not the same. Other companies use mechanical bells, and VGT cannot claim similarity based on manufacturer alone. SOF ¶31. Castle Hill hired a musician to create distinctive game play sounds. SOF ¶54. Castle Hill's instant free pay feature plays a movie where the instant free pay logo is displayed. The logo is orange and white, and the screen is red. The reels also turn red. VGT's red screen free spins feature, on the other hand, displays a translucent red film, not a video, and the reels do not turn red. SOF ¶¶17, 56. The game themes are all generic, but Castle Hill uses all original artwork for its games.

41

### ii.    Castle Hill Did Not Copy VGT's Alleged Trade Dress

Castle Hill did not copy VGT's alleged trade dress. Its game titles all have registered trademarks, and much of the original artwork it uses on its machines is federally copyrighted. Castle Hill intended to compete in the Class II market without needing to replace any VGT games. The testimony of Castle Hill's artists and creative team expressly shows that there was no intended relationship between the majority of VGT and Castle Hill's games. As described in detail, *supra*, the only similarity between the artwork is the fact that the baby in New Money is wearing a hat similar to the one worn by Mr. Money Bags in some of its games. The VGT's games use generic, round-top, Class II gaming cabinets with industry-standard paytables, themes, bingo patterns, red lights, bonus features, and game play and award sounds.

VGT cannot claim ownership of, or that Castle Hill intended to copy, what was never VGT's to own in the first place. Even if the Court finds that VGT has some limited rights over some features of its alleged trade dress, this factor still weighs against VGT because there is no evidence that Castle Hill intended to deceive purchasers as to the source of the product. *See Water Pik, Inc.*, 726 F.3d at 1158 ("The intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product") (quoting and explaining *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 741-42 (2d Cir. 1998)).

### iii.    There is No Evidence of Actual Confusion

Just as VGT has no evidence of actual confusion with respect to its trademarks, it similarly has no evidence of actual confusion based on the VGT Trade Dress. First, VGT should not be permitted to offer its proposed direct evidence of actual confusion because that evidence is fundamentally unreliable and should be excluded, as set forth in Castle Hill's Motion in Limine to Exclude Evidence of Alleged "Actual Confusion." Even if VGT is permitted to offer the anecdotal evidence of alleged confusion, that evidence is not causally connected to the VGT Trade Dress.

VGT has no evidence of a casino or player being confused by Castle Hill's bell, red light, cabinet, bingo patterns, paytables, or bonus feature. VGT cannot demonstrate any connection between its *de minimis* anecdotal evidence and the trade dress features for which it (currently) seeks protection.

VGT's survey evidence also is not probative on the issue of actual confusion related to the VGT Trade Dress. As set forth in Castle Hill's Motion to Exclude VGT Expert Yoram Wind, the Wind Survey did not test the VGT Trade Dress features. The still artist-renderings included in the survey array made it impossible for a respondent to see how the lights look when illuminated, to hear the bell ringing, to see a bonus feature functioning, to see the bingo patterns and associated payouts, or to see the height, width, depth, and other dimensions of the cabinet. It also only displayed one paytable with respect to one VGT title. The Wind Survey, even if it were admissible, did not test for potential customer confusion arising out of VGT's alleged trade dress – in all its different permutations.

### iv.    VGT and Castle Hill's Casino Customers Are Careful and Discerning

A consumer exercising a high degree of care in selecting a product reduces the likelihood of confusion. *See Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 557 (10th Cir. 1998). The relevant customers for the games at issue in this case are tribal casinos. SOF ¶3. As set forth above, the tribal casinos in Oklahoma and elsewhere are knowledgeable and sophisticated about gaming machines, and are familiar with VGT's products and the makers of other games. These customers also take these negotiations seriously. SOF ¶57. This factor weighs in favor of Castle Hill.

### v.    VGT's Alleged Trade Dress is Weak

"A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *Universal Money Centers, Inc. v. American Tel. & Tel. Co.*, 22 F.3d 1527, 1534 (10th Cir. 1994) (finding evidence of similar marks used by competitors renders mark weak). VGT's trade dress is weak for all of the reasons set forth above

43

regarding functionality, lack of distinctiveness, and lack of secondary meaning, including but not limited to the fact that VGT lacks a consistent trade dress, and the trade dress features for which it seeks protection are commonplace, ubiquitous, and utilized by many other EGM manufacturers. Given that VGT's trade dress is weak, the Court should weigh this factor heavily against any likelihood of confusion. *See First Sav. Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 655 (10th Cir. 1996) ("Because the common feature of the two marks is weak, the dissimilarities weigh heavily against any likelihood of confusion.").

### D.    VGT's Trade Dress is Functional

VGT has the burden to prove that its alleged trade dress is *not* functional. *See* 15 U.S.C. § 1125(a)(3). "This burden of proof gives force to the well-established rule that trade dress protection may not be claimed for product features that are functional." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001). This is not an easy burden to satisfy; "product design almost invariably serves purposes other than source identification." *Id.* at 29 (quoting *Wal-Mart*, 529 U.S. at 206). If VGT cannot prove that its alleged trade dress is non-functional, its claims fail. *See TrafFix Devices, Inc.*, 532 U.S. at 24 ("Functionality having been established, whether the design has acquired secondary meaning need not be considered.").

The Supreme Court has set forth two tests to determine whether trade dress is functional. First, "a product feature is functional ... if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices, Inc.*, 532 U.S. at 32. Second, "a functional feature is one the exclusive use of which would put competitors at a significant non-reputation-related disadvantage." *Id.* "Whether the feature is functional should turn on 'whether the protection of the feature would hinder competition or impinge on the rights of others to compete effectively in the sale of goods.'" *Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1272 (10th Cir. 1988).

The Tenth Circuit also recognizes the doctrine of aesthetic functionality. "Because a function of

44

certain products is aesthetic appeal, a feature intrinsic to the aesthetic appeal of those products may not be entitled to trademark protection." *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 519 (10th Cir. 1987). It is proper to consider issues of non-reputation-related disadvantage in cases involving aesthetic functionality. *See TrafFix Devices, Inc.*, 532 U.S. at 32.

VGT's asserted trade dress is functional. VGT's "thin-line" LS cabinet, as the name implies, was designed to be slim and allow more cabinets to fit onto casino floors. SOF ¶41. The function of VGT's LCD monitors on VGT's cabinets is to provide information to the player about the game. SOF ¶42. The toppers on VGT's cabinets attract players to the game and indicate the game name and indicate source. The game play sound attracts players to the game, and maintains interest in game play. SOF ¶47. The award sound feature, including the use of its mechanical bell, alerts players to a win and attracts players in the casino to the game. SOF ¶18. VGT's mechanical bell and strobe light were designed so that they could be seen and heard from across the casino floor. SOF ¶46. VGT's bingo play and pay feature is functional in that bingo patterns and associated ball calls, as well as the payouts for those patterns, are essential to the game of bingo; the game cannot be played without patterns, a ball call, and associated payouts. The function of the psuedo-paytables on the machines are aesthetic, designed to emulate classic slot machines. SOF ¶43. The red screen free spins feature uses a ubiquitous gambling color, red, to notify the player that they are in a bonus round outside of the normal game. The game themes provide aesthetic value and attract players to the games. *See* SOF ¶29.

Every alleged VGT trade dress feature is functional and serves a utilitarian purpose. VGT's combination of all nonfunctional features into a single, functional alleged trade dress does not somehow save its trade dress claims. *See Leatherman Tool Group, Inc. v. Cooper Industries, Inc.*, 199 F.3d 1009, 1013 (9th Cir. 1999) ("Leatherman is correct that trade dress must be viewed as a whole, but where the whole is nothing more than functional parts, and where the arrangement and combination

45

of the parts is designed to result in a superior performance, it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is non-functional."); *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 786 (9th Cir. 2002) (same); *Inspired by Design, LLC v. Sammy's Sew Shop, LLC*, 2016 WL 6093778 (D. Kan. Oct. 19, 2016) (finding combination of functional features not protectable); *Boss Manuf., Inc. v. Parker Traps International, Inc.*, 1995 WL 767314 (D. Kan. Nov. 30, 1995) (finding combination of functional and aesthetic features not protectable).

Other competitors have used, and continue to use, "thin-line" retro cabinets, similar round top cabinets, bingo patterns, paytables, red bonus features, candles, and themes, both before and after VGT. VGT's trade dress claims seek to prevent Castle Hill from using a classic, functional cabinet design and competing effectively in the market. *See Inspired by Design, LLC*, 2016 WL 6093778 at *7 ("Many other competitors in the industry make [products] using almost the same combinations of the features that plaintiff claims are part of its trade dress. This lends additional support for the functionality of plaintiff's trade dress.").

VGT's alleged trade dress is functional and its trade dress claims fail. If Castle Hill cannot use games that are made in the style of classic Vegas slot machines it would suffer a serious competitive disadvantage in the market. As VGT's own Executive Vice President for Sales admitted, the very "purpose of the design" of a Class II EGM is to "emulate that classic traditional slot gaming experience." Starr Dep. at 208:2-6.

## V.     CASTLE HILL IS ENTITLED TO JUDGMENT ON VGT'S TRADE SECRETS CLAIMS

Counts V, VII, and VIII of the Amended Complaint are based on VGT's allegation that Castle Hill has misappropriated its trade secrets. The Amended Complaint itself does not specify what VGT's trade secrets are, other than to offer a very general description that VGT "owns trade secrets" relating to, essentially, all aspects of its Class II EGMs. *See* Doc. 103 at ¶ 41. Because VGT's original complaint failed to identify its trade secrets with specificity, Castle Hill moved to dismiss.

46

VGT's vague description of its trade secrets did not end at the pleadings stage. Castle Hill asked VGT in discovery to "describe with specificity each trade secret you claim CHG misappropriated." Instead of providing specificity, VGT responded that "[g]iven the volume of trade secrets relating to VGT's bingo-based games, VGT cannot reasonably be expected to describe every trade secret in detail." Ex. 8 at 130. VGT then went on to state that its trade secrets included "but were not limited to" a list of 37 alleged "secrets." *Id.* at 131-42. Many of the enumerated items were not really descriptions of secrets, but were categories of information, such as ██████████████████ ████████████████████ VGT supplemented its response five times, but it remained unclear what specific trade secrets were claimed to be at issue.

VGT served expert reports and, for the first time, articulated that VGT's misappropriation claim relates to only two specific items, ██████████████████████████████ ████████████████ and one general "catch all" category which VGT describes as "VGT know-how."

Castle Hill understands that Counts VII and VIII of the Amended Complaint relate only to the ████████████████████████████, while Count V relates to ██████████████████████ and general "know how." Whether arising under Oklahoma's or Virginia's version of the Uniform Trade Secrets Act, or the Defend Trade Secrets Act, VGT must prove the existence of a trade secret, and misappropriation by Castle Hill. *See Arctic Energy Servs., LLC v. Neal*, No. 18-CV-00108-PAB, 2018 WL 1010939, at *2 (D. Colo. Feb. 22, 2018) (listing elements of Defend Trade Secrets Act claim); *Space Systems/Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 855 (E.D. Va. 2018) (VUTSA elements); *MTG Guarnieri Mfg., Inc. v. Cloutare*, 239 P. 3d 202, 209 (Okla. Civ. App. 2010) (OUTSA).

VGT's alleged secrets do not qualify as trade secrets, nor were they "misappropriated" by Castle Hill. Importantly, VGT ***does not allege*** that Castle Hill "stole" anything directly from VGT. This is

47

not a case where Castle Hill is alleged to have downloaded and used VGT source code (indeed, VGT now admits that Castle Hill did not copy its source code), or otherwise improperly accessed VGT files to gain insight into "trade secrets." Rather, VGT alleges that former employees remembered information from their time at VGT. VGT has not sued any of those former employees in their individual capacities, despite having employment agreements with many of them.[8] What is troubling about VGT's approach to its trade secrets claim, particularly its vague, catch-all "know how" category of alleged secrets, is that VGT includes every aspect of its Class II EGMs. If the restrictions VGT attempts to place on its former employees were valid, no VGT employee would ever be able to leave VGT to work at another Class II gaming company. Given Oklahoma's strong public policy protecting the rights of employees to compete in the marketplace, VGT's assertion of generalized "know how" trade secrets fails. *See* Okla. Stat. Ann. tit. 15, § 217 (non-competes void as against public policy); *Farren v. Autoviable Servs., Inc.*, 508 P.2d 646 (Okla. 1973) (same). Castle Hill is entitled to judgment on Counts V, VII, and VIII.

**A.**   ██████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

---

[8] To that end, to the extent the Court examines whether Castle Hill obtained VGT trade secrets through "improper means," it will need to look at the state law applicable to VGT's relationships with its former employees in order to determine what obligations, if any, the departing employee owed to VGT. For most employees, the applicable law will be Virginia or Tennessee.   Because VGT's trade secrets claim should be disposed of on other grounds, such an examination should be unnecessary.



C.    **"Know How"**

With respect to Castle Hill's alleged misappropriation of VGT "know how," VGT has been unable to identify specific information that Castle Hill has misappropriated and/or used to VGT's detriment. Rather, VGT's "know how" argument focuses on Castle Hill's employees' "knowledge" about various aspects of Class II EGM development.

VGT notably does not allege that Castle Hill "copied" any of its information, but rather asserts that when Castle Hill was developing its games that its employees had not "forgotten" the skill sets and industry knowledge they developed in their past employment at VGT. VGT alleges that this "know-how" is "remembered information" by the former employees. As set forth above, VGT's approach to "know how" essentially is a lifetime non-compete. It is a wrongful attempt by VGT to restrain its former employees from ever working for a competitor.

In any trade secrets case the court must balance an employer's right to protect truly proprietary

49

and confidential information with an employee's right to use his "knowledge, skill, and experience in subsequent employment." *Micro Consulting*, 813 F. Supp. at 1535. When the alleged trade secrets are as broad, amorphous and undefined as VGT's "know how" allegations, the balance of equities tips in favor of former employees.

VGT has not and cannot identify a specific piece of information that qualifies as a trade secret, which Castle Hill allegedly misappropriated to VGT's detriment. Rather, VGT complains about Castle Hill's use (and in one instance, testing only) of generally known approaches to solving problems commonplace in the Class II industry. VGT cannot point to any actual harm suffered as a result of the alleged misappropriation. Under these circumstances, and because there is no question of material fact with respect to VGT's trade secrets claims, Castle Hill is entitled to judgment as a matter of law.

## VI.   VGT'S MISAPPROPRIATION OF BUSINESS INFORMATION CLAIM IS DISPLACED BY ITS TRADE SECRETS CLAIMS

In Count VI, VGT claims that Castle Hill misappropriated "confidential business information," which it identifies as the same exact information that it relies on in support of its various trade secret claims. For all of the reasons that VGT's trade secret claims fail, so too does its business information claim. Castle Hill is also entitled to judgment as to Count VI because the Uniform Trade Secrets act displaces "conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." Okla. Stat. tit. 78, § 92(a); *see CTI Svcs. v. Haremza*, 797 F. Supp. 2d 1257, 1261-62 (N.D. Okla. 2011) (finding breach of fiduciary duty claim was displaced by trade secrets act to the extent it alleged misappropriation of trade secrets). VGT 's confidential business information claim is "no more than a restatement of the same operative facts which would plainly and exclusively spell out only trade secret misappropriation." *Id.* at 1261 (quoting *Powell Products, Inc. v. Marks*, 948 F. Supp. 1469, 1474 (D. Colo. 1996).

## VII.    CONCLUSION

For all of the foregoing reasons, Castle Hill is entitled to judgment as a matter of law.


Dated:  October 12, 2018                    Respectfully submitted,

                                             */s/ Robert C. Gill*
                                             Robert C. Gill (admitted *pro hac vice*)
                                             Henry A. Platt (admitted *pro hac vice*)
                                             Thomas S. Schaufelberger (admitted *pro hac vice*)
                                             Matthew J. Antonelli (admitted *pro hac vice*)
                                             Jeremy B. Darling (admitted *pro hac vice*)
                                             SAUL EWING ARNSTEIN & LEHR, LLP
                                             1919 Pennsylvania Avenue, NW, Suite 550
                                             Washington, D.C. 20006
                                             (202) 295-6605
                                             (202) 295-6705 (facsimile)
                                             robert.gill@saul.com
                                             henry.platt@saul.com
                                             tschauf@saul.com
                                             matt.antonelli@saul.com
                                             jeremy.darling@saul.com

                                             Sherry H. Flax (admitted *pro hac vice*)
                                             SAUL EWING ARNSTEIN & LEHR, LLP
                                             500 E. Pratt Street, Suite 900
                                             Baltimore, Maryland 21202
                                             (410) 332-8764
                                             (410) 332-8785 (facsimile)
                                             sherry.flax@saul.com

                                             James C. Hodges, OBA #4254
                                             JAMES C. HODGES, P.C.
                                             2622 East 21st Street, Suite 4
                                             Tulsa, Oklahoma 74114
                                             (918) 779-7078
                                             (918) 770-9779 (facsimile)
                                             JHodges@HodgesLC.com

                                             *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of October, 2018, I caused a copy of the foregoing **DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT – REDACTED PUBLIC VERSION** to be filed using the Court's ECF system, which will provide electronic notification of filing to the following counsel for Plaintiff:

Graydon Dean Luthey, Jr.
GABLE GOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, OK 74103-4217
(918) 595-4821
(918) 595-4990 (facsimile)
dluthey@gablelaw.com
*Counsel for Plaintiff*

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1221
(212) 841-1010 (facsimile)
nroman@cov.com
*Counsel for Plaintiff*

Gary M. Rubman
Peter Swanson
Michael Sawyer
Rebecca B. Dalton
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
(202) 778-5465 (facsimile)
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
*Counsel for Plaintiff*


 */s/ Robert C. Gill*
 Robert C. Gill

1