**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1) VIDEO GAMING TECHNOLOGIES, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cv-00454-GKF-jfj |
| | ) | |
| 1) CASTLE HILL STUDIOS LLC | ) | **REDACTED** |
| (d/b/a CASTLE HILL GAMING); | ) | |
| 2) CASTLE HILL HOLDING LLC | ) | |
| (d/b/a CASTLE HILL GAMING); and | ) | |
| 3) IRONWORKS DEVELOPMENT, LLC | ) | |
| (d/b/a CASTLE HILL GAMING) | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION**
**TO EXCLUDE PLAINTIFF'S EXPERT YORAM WIND**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.    THE WIND SURVEY .......................................................................................... 3

III.   LEGAL STANDARD ........................................................................................... 5

IV.   ARGUMENT ........................................................................................................ 6

      A.    Dr. Wind Used an Appropriate Survey Format. ................................. 6

      B.    The Wind Survey Used Standard, Non-Leading Questions. ............... 9

      C.    The Wind Survey Accurately Portrayed Survey Stimuli. ................ 10

      D.    The Wind Survey Used a Standard Ordering Method That Produced
            No Ordering Bias. .............................................................................. 12

      E.    The Wind Survey Used a Representative Example of CHG's
            Infringement. ..................................................................................... 14

      F.    The Wind Survey Used Reasonable Controls. .................................. 15

      G.    The "Technical Errors" in Dr. Wind's Survey Are Not "Fatal." ..... 18

            1.    Not One Respondent in Dr. Wind's Corrected Report Was
                  Exposed to an Erroneous Image. ........................................... 18

            2.    Dr. Wind's Survey Allowed Respondents to Enlarge All
                  Features of Depicted EGMs. .................................................. 20

            3.    Dr. Wind's Survey Used Images of Comparable Quality. ... 21

      H.    Dr. Wind's Convergent Validity Analysis is Proper and Helpful. ... 22

V.    CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Active Sports Lifestyle USA LLC v. Old Navy, LLC*,
No. SACV 12-00572 JVS (Ex), 2013 WL 11239385 (C.D. Cal. Nov. 21, 2013) .................................................................................................................21

*Am. Thermos Prods. Co. v. Aladdin Indus., Inc.*,
207 F. Supp. 9 (D. Conn. 1962) (2d Cir. 1963) ..................................................12

*Bales v. Green*,
No. 16-CV-106-GKF-JFJ, 2018 WL 1633321 (N.D. Okla. Mar. 27, 2018) ..........................22

*Beer Nuts, Inc. v. Clover Club Foods Co.*,
805 F.2d 920 (10th Cir. 1986) ...........................................................................7

*Brunswick Corp. v. Spinit Reel Co.*,
832 F.2d 513 (10th Cir. 1987) .....................................................................5, 15

*Children's Med. Ctr. of Dall. v. Columbia Hosp. at Med. City Dall. Subsidiary, L.P.*,
No. 3-04-CV-2436-BD, 2006 WL 616000 (N.D. Tex. Mar. 10, 2006)...................23

*Cohen v. Trump*,
No. 3:13-CV-2519-GPC-WVG, 2016 WL 4543481 (S.D. Cal. Aug. 29, 2016)....................23

*Copy Cop, Inc. v. Task Printing, Inc.*,
908 F. Supp. 37 (D. Mass. 1995) .......................................................................5

*Oklahoma ex rel. Edmondson v. Tyson Foods, Inc.*,
No. 05-CV-329-GKF-SAJ, 2008 WL 1994910 (N.D. Okla. May 5, 2008) .............................1

*H.S. Field Servs., Inc. v. CEP Mid-Continent, LLC*,
No. 12-CV-531-GKF-PJC, 2015 WL 11156965 (N.D. Okla. Aug. 24, 2015)...................1, 22

*Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*,
82 F.3d 1533 (10th Cir. 1996) ...........................................................6, 10, 12, 18

*James Burrough Ltd. v. Sign of Beefeater, Inc.*,
540 F.2d 266 (7th Cir. 1976) .............................................................................5

*King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084 (10th Cir. 1999) ........................................................................6, 7

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)..........................................................................................1

*Malinski v. BNSF Ry. Co.*,
  No. 15-CV-502-JED-FHM, 2017 WL 1199750 (N.D. Okla. Mar. 31, 2017) ........................22

*Nat'l Football League v. Governor of Del.*,
  435 F. Supp. 1372 (D. Del. 1977) ..............................................................................5

*Skycam, Inc. v. Bennett*,
  No. 09-CV-294-GKF-FHM, 2011 WL 2551188 (N.D. Okla. June 27, 2011) ........................1

*SquirtCo v. Seven-Up Co.*,
  628 F.2d 1086 (8th Cir. 1980) ..................................................................................3

*Union Carbide Corp. v. Ever-Ready, Inc.*,
  531 F.2d 366 (7th Cir. 1976) ................................................................................6, 8

*Water Pik, Inc. v. Med-Sys., Inc.*,
  726 F.3d 1136 (10th Cir. 2013) ......................................................................7, 9, 10

*Whirlpool Props., Inc. v. LG Elecs. U.S.A., Inc.*,
  No. 1:03 CV 414, 2006 WL 62846 (W.D. Mich. Jan. 10, 2006) ...................................22

## Other Authorities

Fed. R. Evid. 703 ................................................................................................22

Himanshu Mishra & Ruth M. Corbin, *Internet Surveys in Intellectual Property
  Litigation: "Doveryai, No Proveryai,"* 107 Trademark Rep. 1097 (2017) ..........................24

Jerre B. Swann, *Eveready and Squirt—Cognitively Updated*, 106 Trademark Rep.
  727 (2016) ...........................................................................................................8

Ted Robert Hunt, *Scientific Validity and Error Rates: A Short Response to the
  PCAST Report*, 25 Fordham L. Rev. 24 (2017) ......................................................24

## I.      INTRODUCTION

A trial court's gatekeeper[1] function involves two separate inquires:  first, to determine whether the expert is qualified to offer the proposed opinions; second, to assess whether the expert's opinions are reliable.  *See, e.g., H.S. Field Servs., Inc. v. CEP Mid-Continent, LLC*, No. 12-CV-531-GKF-PJC, 2015 WL 11156965, at*1 (N.D. Okla. Aug. 24, 2015); *Skycam, Inc. v. Bennett*, No. 09-CV-294-GKF-FHM, 2011 WL 2551188, at *2 (N.D. Okla. June 27, 2011) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)).

There is no dispute as to the first inquiry:  CHG has not challenged—and cannot credibly challenge—the qualifications of  VGT's survey expert Yoram (Jerry) Wind, arguably the dean of survey experts.  Dr. Wind is the Lauder Professor Emeritus and Professor of Marketing at the Wharton School of the University of Pennsylvania.  Ex. A,[2] Wind Rep. at 4.  He joined the Wharton faculty more than half a century ago in 1967 after receiving his Ph.D. in marketing from Stanford University.  *Id.* (full resume available at https://faculty.wharton.upenn.edu/wp-content/uploads/2016/11/Jerry.Wind_.CV_.4.16.18nomarkup.pdf).  Dr. Wind has published 25 books and authored more than 300 papers, articles, and monographs on consumer research and other marketing issues.  *Id.*  He has won all four major marketing awards and been inducted into the marketing hall of fame.  *Id.*  Even CHG's survey expert, Mr. Berger, concedes Dr. Wind's ██████████████████████  Ex. D, Berger Dep. Tr. 15:8-15.

---

[1] Notably, this "gatekeeper" function "is not a prevailing concern in a bench trial or hearing to the court, because the court functions as the trier of fact."  *Oklahoma ex rel. Edmondson v. Tyson Foods, Inc.*, No. 05-CV-329-GKF-SAJ, 2008 WL 1994910, at *1 (N.D. Okla. May 5, 2008).  VGT does not oppose CHG's motion to strike VGT's jury demand.  *See* Dkt. 201.

[2] All references to exhibits herein refer to the exhibits attached to the Declaration of Gary Rubman, filed herewith.

Most important for present purposes, Dr. Wind has testified at deposition and trial more than 50 times, and no court or agency has ever excluded his surveys or testimony.  Ex. C, Wind Dep. Tr. 14:5-20.  As a teacher, researcher, consultant, expert witness, and editor, Dr. Wind has conducted and evaluated thousands of marketing and consumer research studies.  Ex. A, Wind Rep. at 5.

Despite Dr. Wind's credentials and flawless record, CHG challenges the reliability of his report here.  Ironically, CHG does so on the basis of a report by its own expert, James Berger, that it cites, *see* Mot. at Exhibit D, but understandably does not highlight that by his own admission, ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████.  Ex. D, Berger Dep. Tr. 84:19-23.

Unsurprisingly, therefore, none of the supposed "fatal flaws" identified by CHG has a meaningful effect on the validity or reliability of Dr. Wind's survey.  Indeed, Mr. Berger acknowledges as much, conceding that ██████████████████████ *id.* at 121:8-10, that ██████████████████████████████ *id.* at 129:13-22, that ███████████████████████████████████████████ ████████████████████████ *id.* at 115:8-18, and that ██████████████████ ██████████████████████ (which is unsurprising given that he did not even try to design an alternative survey), *id.* at 104:13-16.

Although CHG is free to poke and prod into tweaks that could have been made— including by Mr. Berger, had he even attempted to conduct his own survey—to Dr. Wind's

survey on cross-examination, there is no basis to exclude Dr. Wind's relevant and reliable testimony concerning that survey and related topics.

## II.    THE WIND SURVEY

Dr. Wind conducted a double-blind experiment to test whether consumers are likely to be confused as to the source of electronic gaming machines ("EGMs") produced by VGT and CHG in the context of an array of EGMs that might appear in the real-world marketplace of a casino floor.  Ex. A, Wind Rep. at 6.

Dr. Wind designed his survey by building on a standard variation of a *Squirt*[3] survey, in which the stimuli are viewed side-by-side.  He constructed his array of stimuli by selecting as an anchor one of VGT's EGMs most relevant to this case (*i.e.*, VGT's best-selling EGM, Mr. Money Bags), selecting the EGM CHG designed to look like Mr. Money Bags as the CHG test EGM (*i.e.*, CHG's New Money EGM), and then selecting three representative third-party EGMs as controls.  *Id.* at 6-7; Ex. B, Wind Reply Rep. at 4-7; Ex. C, Wind Dep. Tr. 49:6-18, 51:22-52:10.

Dr. Wind chose the control EGMs so as to avoid potential bias.  Specifically, he required that the controls share a common theme with the test EGMs, which in this case is the common industry theme of wealth or money, and that they be offered within the same casinos as the VGT and CHG EGMs to establish a realistic representation of the EGMs in the marketplace of a casino floor.  Ex. A, Wind Rep. at 6-7; Ex. B, Wind Reply Rep. at 7.

Dr. Wind then randomly assigned the three control EGMs and the two test EGMs into lettered positions in an array.  Ex. A, Wind Rep. at 7.  To avoid potential bias resulting from disproportionate assignment to a far-left position or far-right position, Dr. Wind ordered that the

---

[3] *See SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1089 n.4 (8th Cir. 1980).

array be rotated, resulting in five different arrays where each stimulus was displayed once in each position (*i.e.*, the first, second, third, fourth, and fifth positions).  *Id.*; Ex. C, Wind Dep. Tr. 165:17-167:2.

The survey administrator, Research Now, showed qualified survey respondents[4] one of the arrays[5] and asked them to answer standard baseline questions about whether any depicted EGMs were made by the same company, made by affiliated companies, or required permission from the maker of any of the other EGMs.  Ex. A, Wind Rep. at 2, 6, 8-11.

To gain insight into the reasons behind respondents' answers, as well as into the applicability of the results more broadly, the survey then asked respondents open-ended questions aimed at ferreting out (i) any statistically significant differences between the confusion rate among the two test EGMS, *i.e.,* the VGT and CHG EGMs, and the confusion rates between the test EGMs and any of the three controls and, if so, (ii) whether those differences are attributable to trade dress or trademark elements at issue.  *Id.*

As noted by CHG, Dr. Wind learned during discovery that a technical glitch in Research Now's program led to presentation of an erroneous image of a VGT EGM instead of a CHG EGM to a subset of respondents shown one of the five arrays.  Ex. E, Wind Mem. to Corrected Rep. at 1 (Sept. 24, 2018) ("Wind Memo").  This glitch occurred only when two conditions were met:  First, the respondent had to be randomly shown one particular rotation of the five possible rotations of stimuli; and, second, the respondent had to elect to view an enlarged image of the CHG stimulus.  *Id.*  Although most respondents were not shown this particular rotation and

---

[4] The survey universe was comprised of those respondents who indicated that they had visited, or planned to visit, a casino in Oklahoma and had played, or planned to play, slot machines or bingo-based games.  *See* Ex. A, Wind Rep. at 8, App. C-1.

[5] As discussed below, although there were initially five arrays, Dr. Wind later discarded the results of one array because of a technical glitch—with no material effect on the results.

although there is no reason to believe that many of those respondents who were shown this rotation elected to enlarge the image of the CHG EGM, Dr. Wind, out of an abundance of caution, issued a corrected version of his report, in which he removed the responses of all 93 shown the problematic rotation—and thus all 93 respondents who could have been exposed to the erroneous image. *Id.* Even after removing these respondents, Dr. Wind's survey generated 353 valid responses—nearly double the industry standard. *Id.*; Ex. A, Wind Rep. at 2; *see* Ex. D, Berger Dep. Tr. 144:24-145:13, 236:7-11 (█████████████████████████████ ███████████). Thus, as conceded by CHG's own survey expert, ███████████ ████████████████████████████████████████████████. Ex. D, Berger Dep. Tr. 235:16-236:25.

Dr. Wind's analysis of the clean data in his corrected report found the overall net confusion rate between VGT's and CHG's EGMs to be 45.9%. Ex. E, Wind Memo at 1 (as opposed to the pre-glitch confusion rate of 47.5%). Such confusion is more than double the amount typically required of courts to be considered evidence of likelihood of confusion. *See, e.g.*, *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 278 (7th Cir. 1976) (15%); *Copy Cop, Inc. v. Task Printing, Inc.*, 908 F. Supp. 37, 42, 48 (D. Mass. 1995) (16.5%); *Nat'l Football League v. Governor of Del.*, 435 F. Supp. 1372, 1380-81 (D. Del. 1977) (19-21%); *accord* Ex. D, Berger Dep. Tr. 146:20-23 (████).

## III.    LEGAL STANDARD

"In a case such as this in which confusion as to product source is a material issue, a survey may be the only available method of showing the public state of mind." *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 522 (10th Cir. 1987). A trademark survey "is trustworthy if it is shown to have been conducted according to generally accepted survey principles." *Id.* "Technical and methodological deficiencies in the survey, including the sufficiency of the

5

universe sampled, bear on the weight of the evidence, not the survey's admissibility." *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1544-46, 1546 n.9 (10th Cir. 1996) (rejecting technical and methodological challenges regarding, *inter alia*, improper survey universe, leading questions, improper market conditions, and improper stimuli).

Although CHG raises eight arguments in its challenge to Dr. Wind's survey and proposed testimony, none has merit; at most, they are matters for cross-examination. We address them in the order presented in CHG's motion.

## IV.   ARGUMENT

### A.   Dr. Wind Used an Appropriate Survey Format.

Although CHG insists that Dr. Wind was all but required to employ an *Ever-Ready*[6] survey format (in which respondents are shown only the allegedly infringing product and asked questions as to its source), instead of the *Squirt* format he instead used (where the CHG EGM was included in a lineup with a VGT EGM and three control EGMs), an *Ever-Ready* format is neither required nor desirable where, as here, the products at issue appear proximately in the marketplace. It also bears emphasis that ███████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████. Ex. D, Berger Dep. Tr. 109:10-110:14.

Case law supports the propriety of Dr. Wind's choice. "'The closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results.'" *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir. 1999) (quoting 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:163) (internal punctuation omitted). Although consumers

---

[6] *See Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 385-88 (7th Cir. 1976).

"*typically* do not engage in side by side comparison of the products," *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 926 (10th Cir. 1986) (emphasis added), side-by-side comparisons *are* appropriate where "products are simultaneously or sequentially accessible in the marketplace." *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1147 (10th Cir. 2013) (citing 6 McCarthy § 32:163).

Here, Dr. Wind designed a *Squirt*-style survey to reflect the situation that consumers would encounter in the marketplace, namely, a casino floor filled with ███████ ████████████ of competing EGMs arranged side-by-side. *See* Ex. F, Friedman Rep. at ¶ 23; Ex. A, Wind Rep. at 6; Ex. C, Wind Dep. Tr. 117:25-118:9. Dr. Wind also was careful to adopt stimuli offered in the same marketplace; in other words, the array included five different games that all appear within the same real-world casinos. Ex. A, Wind Rep. at 7 n.4, 9, 41; Ex. B, Wind Reply Rep. at 7, 9, 9 n.20; Ex. C, Wind Dep. Tr. 58:1-25. Dr. Wind further cued respondents to consider the stimuli in the context of the marketplace by instructing them to "look at the five machines the way you normally would before selecting a machine to play." Ex. A, Wind Rep. at 9. By taking such factors into account, Dr. Wind did precisely what he should have, that is, "mirror the situation in which the ordinary person would encounter" VGT's EGMs simultaneously with the EGMs of CHG and third parties as best he could. *See Water Pik*, 726 F.3d at 1147.

CHG's position to the contrary is inconsistent both with its own (incorrect) litigation position that VGT's marks are weak, *see, e.g.*, Dkt. 30 at 12 (CHG Motion to Dismiss), and with the authority on which CHG relies. Specifically, despite placement of CHG games next to VGT games in casinos, CHG insists that because VGT's marks are strong, Dr. Wind should have used an *Ever-Ready*-style survey, in which respondents are not able to see VGT's EGMs alongside

those of competitors.  This claim is inconsistent with generally accepted survey principles, including those championed by the author on which CHG and its survey expert rely, Professor Swann:  "[W]hen marks exist proximately in the market, *Eveready* may not, by itself, be appropriate to test for likelihood of confusion as to strong marks that are generally recognized, but not readily recalled."  Jerre B. Swann, *Eveready and Squirt—Cognitively Updated*, 106 Trademark Rep. 727, 734 (2016) (emphases removed).  Indeed, use of "an *Eveready alone* to test . . . the likelihood of confusion as to two *proximate marks* under circumstances where an aided *Squirt* would assess viable (real world) *comparison* opportunities is a fatal flaw."  *Id.* at 746; *see id.* at 732-33 ("In prior writings, I overemphasized the commercial strength component of a mark as a qualification for Eveready survey treatment . . . .  Cognitively, however, commercial strength, as typically understood, is not sufficient in and of itself; it is the 'top-of-mind' characteristic that truly gives a mark reach.  'Top-of-mind' refers to marks that are readily accessible in memory.").

Here, in accordance with Professor Swann's explanation, Dr. Wind concluded that his *Squirt* format "was kind of the natural selection for design."  Ex. C, Wind Dep. Tr. 117:25-118:15.  He based that opinion on his understanding that although VGT's marks are strong in that they are generally recognized, they may not be readily recalled by name, as necessary to conduct an effective *Ever-Ready* survey.  *See id.* at 123:1-9 ("Yes, even though I'm not sure the -- top of my mind in term of mention the name, but definitely, they'll recognize it when they see it.").  Moreover, VGT's marks and CHG's marks exist proximately in the casino marketplace, allowing for comparison opportunities.  Ex. A, Wind Rep. at 6; Ex. C, Wind Dep. Tr. 117:25-118:9.

**B.      The Wind Survey Used Standard, Non-Leading Questions.**

The Tenth Circuit, quoting Professor McCarthy, has described the balance that survey

questions should strike in the following way:

> In the author's view, it is not improperly leading to present the respondent with a
> fair and accurate representation of the contesting marks and ask in a neutral manner
> if the respondent thinks there is or is not some connection, affiliation or sponsorship
> relation between the owners of the marks—or that the respondent doesn't know. . . .
> However, it will probably be improperly leading to suggest the desired response in
> the form of a yes or no question.

*Water Pik, Inc.*, 726 F.3d at 1147-48 (quoting 6 McCarthy §§ 32:172, 32:175).

Dr. Wind's adherence to these principles is demonstrated by the (standard) language used

for his three primary questions:

> Now looking at these machines,
> a.  Do you think that any of these machines are made by the same company?  OR
> b.  Do you think that each of the machines is made by a different company?  OR
> c.  Don't you have an opinion?[7]
>
> [Answer Options]
> 1.  Two (or more) of these machines are made by the same company
> 2.  Each of the machines is made by a different company
> 3.  No opinion

Ex. A, Wind Rep. at 9-11.

As reflected above, Dr. Wind did not use yes-or-no questions or suggest a desired

response.  In fact, Dr. Wind bolstered the neutrality of his questions by presenting the sub-parts

in random order, ensuring that respondents were equally likely to read first the possibility that all

the machines were made by different companies as they were to read first the possibility that

---

[7] The phrase "Don't you have an opinion" is not, as CHG suggests, improper and suggestive.
There is no other way to phrase this question, other than perhaps changing it to a declarative
statement such as "No opinion."  Furthermore, although CHG suggests that this option would
lead an undecided respondent to select the answer option in support of a relationship, nothing in
the neutral phrasing of the question would lead a respondent to select the relationship option over
the no-relationship option.

some machines might have been made by the same company.  *Id.* at 9 n.8 (computer program used to implement survey rotated options and responses).  He also made clear in both the question and the answer that respondents need not form an opinion if unsure.

Dr. Wind's questions stand in contrast to the questions criticized in *Water Pik*.  There, the survey presented respondents with only three stimuli and asked uninformative questions that suggested one particular response, that is, "whether two or more of the [three total] products' makers had a business affiliation."  *Water Pik*, 726 F.3d at 1147-48.  Further, the answer options available to the *Water Pik* respondents did not provide details, but were instead limited to the simple choice between "yes, no, or not sure."  *Id.* at 1147.  Thus, unlike here, respondents in *Water Pik* were left only with an incomplete understanding of the options available to them, leading them to assume more readily a connection among the stimuli.

### C.  The Wind Survey Accurately Portrayed Survey Stimuli.

Although CHG focuses on how it—or, more accurately, its survey expert Mr. Berger— would have presented the stimuli differently in an alternative survey, Mr. Berger made clear the shallowness of this critique when explaining why he did not perform his own survey: ███

███████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████ Ex. D, Berger Dep. Tr. 115:7-18.

Each of CHG's more specific criticisms as to presentation of the stimuli constitutes, at best, the kind of methodological issues that go to a survey's weight, not its admissibility.  *See Harolds Stores*, 82 F.3d at 1544-46, 1546 n.9.

For example, although CHG argues that Dr. Wind's survey should have used photographs or videos instead of artist depictions of the EGMs, CHG does not identify any inaccurately

portrayed element in the stimuli that he used.  CHG unsurprisingly cites no support for the remarkable proposition that a survey cannot employ an accurate depiction of a trademarked product simply because it does not adhere to the opposing party's preferred format.

Similarly, although CHG argues that Dr. Wind's survey should have included "lighting and sounds" to help replicate the "'cacophony' of sights and sounds that a consumer would encounter on the casino floor," this approach, if it could be implemented, would almost certainly have led to even *higher* rates of confusion given the evidence that CHG also sought to mimic the visual and noise elements of VGT's EGMs.  Therefore, even if Dr. Wind were able to isolate and test those elements on the VGT and CHG EGMs, addition of more similar elements between the games would not have been to CHG's benefit, Ex. B, Wind Reply Rep. at 5; as explained by Mr. Berger, ████████████████████████████████████████████████████ ████████████████████ Ex. D, Berger Dep. Tr. 189:25-190:11.

Likewise, although CHG argues that Dr. Wind should have conducted the survey in a casino instead of online, as confirmed by Mr. Berger, ████████████████████████ ████████ *Id.* at 93:19-22; *see id.* at 114:9-20 (████████████████████████████ ████████████████████████████████████).[8]

Finally, as represented by VGT's counsel at the November 13, 2018 status conference, VGT sought permission from casinos for a professional photographer to take photographs of the VGT, CHG, and third-party EGMs on casino floors using professional photography equipment,

---

[8] Even assuming that Dr. Wind could have gained access to a casino (he could not, as discussed below), conducting the survey in a casino where the respondents can see, or could have recently seen, the goods and marks in question might have biased the survey.  *Id.* at 124:9-17 (████ ███████████████████████████████████████████████████████████████████████ ██████████████████████████.

but the casinos were unwilling to grant permission. *See* Ex. C, Wind Dep. Tr. 64:6-66:16. Some casinos prohibit taking any images on casino floors to preserve the security of their games and operations, and others prohibit use of photography equipment for fear that it will make casino patrons uncomfortable. The casinos that VGT contacted were particularly reluctant to allow VGT to gather images for use in litigation with CHG, given that the casinos are customers of both VGT and CHG and that CHG is a business partner of some. As a result, VGT is using the best photographs, images and videos available to it.

At the end of the day, to the extent that CHG and Mr. Berger believe that they could

█████████████████████████████████████████████████████████████████████ Ex. D, Berger Dep. Tr. 228:25-229:11, such differences in professional opinion "bear on the weight of the evidence, not the survey's admissibility," *Harolds Stores*, 82 F.3d at 1544-46, 1546 n.9. As expressed in a well-known trademark survey case, "any conclusion in this area cannot be reduced to a figure of unimpeachable accuracy but must, at best, be an approximation." *Am. Thermos Prods. Co. v. Aladdin Indus., Inc.*, 207 F. Supp. 9, 21 (D. Conn. 1962), *aff'd*, 321 F.2d 577 (2d Cir. 1963). And, again, if he truly believed that these differences would have produced different results, Mr. Berger could have substituted different images and tested his theories; it is telling that he did not even attempt to do so. *See* Ex. I, Website of James T. Berger, *available at* https://www.jamesberger.net/litigation-support/products/ (advertising surveys that "[c]an be developed and implemented in 10 days to two weeks"); Ex. D, Berger Dep. Tr. 93:11-18.

**D.    The Wind Survey Used a Standard Ordering Method That Produced No Ordering Bias.**

There are two commonly accepted methods for ordering survey arrays. Ex. C, Wind Dep. Tr. 166:23-167:2. The first method randomizes the order of stimuli for each array. *Id.* at

166:23-167:2.  The primary downside[9] to this approach is that it may result in a stimulus drawing more attention if it appears disproportionately in more prominent positions, such as the leftward positions where it may be seen first as respondents view the array from left to right.  *See* Ex. A, Wind Rep. at 2; Ex. C, Wind Dep. Tr. 166:6-14, 168:22-170:10.  The second method— the one used by Dr. Wind—randomizes the first array, then sequentially rotates each subsequent array.  Ex. C, Wind Dep. Tr. 166:23-167:2; Ex. A, Wind Rep. at 2, 7.  The downside to this approach is that although it prevents stimuli from appearing more frequently in a more prominent position, it may result in them appearing next to one another more frequently.[10]  Ex. C, Wind Dep. Tr. 166:23-167:2.

     In addition to avoiding positional bias, use of the sequential approach allowed Dr. Wind to confirm the absence of bias.  Under CHG's hypothesis that adjacency of two stimuli would have caused respondents to indicate confusion between them, the survey results should have reflected approximately equal confusion rates for each pair of adjacent stimuli.  *Id.* at 169:24-170:6.  Instead, whereas respondents indicated confusion between the VGT EGM and the CHG EGM 56.8% of the time, Ex. A, Wind Rep. at 20, they indicated confusion between other pairs of adjacent stimuli, on average, only seven percent of the time.[11]  *See* Ex. A, Wind Rep. at 20; Ex. C, Wind Dep. Tr. 174:4-24.  This difference reflects an approximately eight-fold increase in confusion when the adjacent stimuli were the VGT and CHG EGMs and demonstrates that

---

[9] It may also be difficult to implement a survey that relies on randomization for each array.  *See Id.* at 166:23-167:2.

[10] Indeed, this circumstance is what happened here when the survey randomly assigned the VGT and CHG stimuli to adjacent positions in the initial array.  *See* Ex. A, Wind Rep. at 7.

[11] The results for the other pairs of stimuli that more frequently appeared next to one another were as follows:  S&T (20.6%), P&S (4.5%), T&K (1.7%), and M&P (1.4%).  *Id.* at 20; Ex. C, Wind Dep. Tr. 174:4-24 ("no [other pair] comes even close").  "K" and "M" refer to the VGT and CHG EGMs, respectively, and "P," "S," and "T" refer to control EGMs.  Ex. A, Wind Rep. at 7.

CHG's purported bias simply did not manifest.  *See* Ex. C, Wind Dep. Tr. 168:22-170:10, 174:4-24, 176:1-15.

> **E.      The Wind Survey Used a Representative Example of CHG's Infringement.**

Similarly, there is no basis for CHG's criticism of Dr. Wind both for focusing on the pairing of VGT's Mr. Money Bags and New Money CHG's New Money or for his rationale as to how his survey projects to other instances of infringement.

Contrary to CHG's characterization of his testimony, and as explained in the background above, Dr. Wind has at all times provided a clear, consistent explanation of his reasons for using Mr. Money Bags and New Money for this survey.  Most centrally, Dr. Wind, for practical reasons, was unable to implement multiple surveys to test the scores of permutations of CHG's infringement, so he had to focus on a translatable example.  *See id.* at 192:4-193:11.  Dr. Wind therefore viewed his options as either selecting one of the most important EGMs in the case, Mr. Money Bags, or randomly assigning a VGT EGM.  *See id.* at 191:13-24.  Identifying a game at random could have resulted in a machine that CHG would challenge as atypical, *see id.* at 191:13-24—so Dr. Wind instead chose VGT's best-selling game as a starting point, using the version of this game that has the most placements and generates the most revenue, Ex. B, Wind Reply Rep. at 6, along with its CHG analog, New Money, *see* Ex. C, Wind Dep. Tr.  44:2-13, 191:13-193:11.

Also contrary to CHG's characterization, Dr. Wind has provided a clear, consistent explanation of his rationale for how the results of his survey project to the full range of CHG's infringements.

As an initial matter, Dr. Wind's survey itself provides helpful insight on this measure. Through open-ended, verbatim responses to questions asked after the standard three baseline questions concerning the relationship among the stimuli, Dr. Wind controlled for influence of

similar game titles and artwork by separating out responses that indicate confusion stemming from such trademark elements as opposed to confusion stemming from trade dress elements such as the shape of the cabinet. Ex. A, Wind Rep. at 15-16, 22 Fig. 3a; Ex. B, Wind Reply Rep. at 6. This analysis allowed Dr. Wind to confirm that most respondents' confusion stemmed from trade dress elements—elements, by definition, shared across VGT's games. Ex. A, Wind Rep. at 22 Fig. 3a; Ex. B, Wind Reply Rep. at 6.

In addition, Dr. Wind's report analyzes the convergent evidence explaining why the results project to other circumstances—such as CHG's plan to emulate VGT games across the product line—that gave Dr. Wind further confidence that the results of his survey project beyond the test EGMs.[12] *See* Ex. A, Wind Rep. at 24-43; Ex. C, Wind Dep. Tr. 193:3-11, 111:8-115:23. In other words, because the study showed that CHG successfully created confusion regarding the test EGMs, and given the data demonstrating that CHG's intent to copy extended beyond those EGMs, Dr. Wind was able to conclude with confidence that CHG's efforts to create confusion beyond the test EGMs would also have been successful.

In any event, whether the results of Dr. Wind's survey project to other infringements is a matter of weight, not admissibility. *See Brunswick*, 832 F.2d at 523 n.6 (declining to evaluate whether survey results projectable because results are separately evidence of actual confusion).

### F.    The Wind Survey Used Reasonable Controls.

None of CHG's four arguments concerning Dr. Wind's selection of control EGMs has merit.

---

[12] It bears mention that whereas CHG criticizes Dr. Wind for supposedly failing to present a rationale for how his survey could extend to other games in CHG's the product line, elsewhere in its motion CHG criticizes Dr. Wind for including such supporting evidence. *Compare* Motion at 12-15 *with* Motion at 21-24.

*First*, use of both Class II and Class III games as controls was entirely appropriate because the evidence suggests that most casino patrons either do not recognize the distinction between Class II and Class III games or do not view the distinction as meaningful. Ex. B, Wind Reply Rep. at 3-4. According to a marketing research study conducted before this litigation,



Ex. A, Wind Rep. at 3, Ex. J, Meczka Report, VGT0006968; most were instead

Ex. J, Meczka Report, VGT0006969. Such lack of consumer awareness is consistent with Dr. Wind's own survey results. *See* Ex. B, Wind Reply Rep. at 3 (only nine of 366 respondents suggested familiarity with bingo-based stimuli). In fact, the survey found that the second most common rate of confusion after that between the VGT and CHG EGMs was that between a Class II control game and a Class III control game. *See id.* at 3-4. In this respect, it bears mention that CHG itself

*See* Ex. K, Defs.' Third Suppl. Objs. and Resps. to Pl.'s First Interrogs. to Defs., at 30-74 (

).[13]

*Second*, use of a control stimulus with a flat top, as opposed to a rounded top, appropriately represented the different cabinet designs that appear in casinos. Ex. B, Wind Reply Rep. at 9. Tellingly, CHG's complaint seems to be that CHG EGMs look too much like

---

[13] As expressed by a CHG artist responsible for designing the kinds of visual features displayed in Dr. Wind's survey, "Well, I don't see competition as Class II or Class III. I see competition as whatever is in the casinos, because I don't know that -- I don't know that the players understand the difference." Ex. H, Sisson Dep Tr. 158:11-17.

VGT EGMs, which, of course, is why the survey shows confusion.  Ex. D, Berger Dep. Tr. 193:13-25 (███████████████████████████████████).  ███████████
████████████████████████████████████████████████████████████████████
████████████████████   Ex. G, CHG EGM Performance Rep., CHG0023342, CHG0023349.  In any event, Dr. Wind controlled for any over-reliance on a shared feature by separating out responses that focus on a single feature and found that more respondents were confused by trademark elements or the combination of trade dress elements than they were by the types of elements that CHG now identifies.  Ex. B, Wind Reply Rep. at 10.

*Third*, use of control stimuli that share wealth and money themes—even if not the precise word "money"—appropriately replicates the marketplace as closely as possible.  Ex. B, Wind Reply Rep. at 9.  Although Mr. Berger points to alternative EGMs that Dr. Wind could have used, there was no evidence at the time that Dr. Wind began his survey that any of those alternatives was offered in the same casinos as the VGT and CHG EGMs (and at least some are not).  *Id.*  Thus, their inclusion would have undermined Dr. Wind's efforts to recreate the marketplace of a casino where consumers might encounter the entire array of machines in the survey.  *Id.*  In any event, as noted, Dr. Wind controlled for any over-reliance on a single feature, such as the word "money," by separating out respondents who identified any such feature as the sole reason why they believed the EGMs to be made by the same company.  *Id.* at 9-10.

*Fourth*, and finally, presentation of some control games at a slight angle instead of straight-on did not introduce bias into the survey.  *Id.* at 7-8.  As an initial matter, the angled images show the entire front face of the machines, so CHG does not—and cannot—argue that angling prevented respondents from observing the features of the games.  *Id.* at 7.  More centrally, the lack of bias is borne out by the survey results.  If the positioning of the VGT and

CHG EGMs created a bias toward pairing those two EGMs, that same bias should have applied to the Scientific Games and Konami EGMs, which are similarly positioned to each other.  *Id.* at 8.  Yet only 4.3% of respondents identifying a pair of EGMs as related identified the Scientific Games and Konami EGMs, compared to 56.6% identifying the VGT and CHG EGMs.  *Id.*

Additionally, it bears mention that CHG's assertion that Dr. Wind's statement that the straight-on image he used of Mr. Money Bags was all that was available to him was "objectively untrue" is itself misleading, if not flatly false.  The alternative image CHG cites, *see* Am. Compl. Ex. 5 at 3, is of a different and less commonly available version of the game, not the best-selling game that Dr. Wind selected as the anchor for his survey.

### G.    The "Technical Errors" in Dr. Wind's Survey Are Not "Fatal."

Although none of the so-called "technical errors" in Dr. Wind's survey diminishes the validity of the results, it bears repeating that any such issues "bear on the weight of the evidence, not the survey's admissibility."  *Harolds Stores*, 82 F.3d at 1544-46, 1546 n.9.

### 1.    Not One Respondent in Dr. Wind's Corrected Report Was Exposed to an Erroneous Image.

Ignoring the testimony of its own survey expert that ████████████████████████████████ ████████████████████████████████████████████, *see* Ex. D, Berger Dep. Tr. 235:16-236:25, CHG still tries to use Research Now's technical glitch as a basis for jettisoning Dr. Wind's survey.  As explained above, because of the glitch, some respondents shown one of the five arrays may have seen an image of a VGT game instead of a CHG game if they enlarged the image of the CHG stimulus.  Ex. E, Wind Memo at 1.  Dr. Wind remediated this error by removing the results from *all* respondents who could have possibly seen the erroneous image.  Ex. E, Wind Memo at 1.

Mr. Berger's testimony as to effectiveness of the steps taken by Dr. Wind is unequivocal:

18



Ex. D, Berger Dep. Tr. 235:16-236:25.

Although CHG may wish to bury the opinions of its own expert, because Dr. Wind designed a survey using more than twice the number of required respondents, the results remain valid even after removing approximately one-fifth of those respondents.

### 2. Dr. Wind's Survey Allowed Respondents to Enlarge All Features of Depicted EGMs.

CHG strains semantics—and credulity—to characterize the image-enlarging feature of Dr. Wind's survey as a "fatal" technical flaw. Dr. Wind's report accurately states the following: "We gave respondents time to review the images and the option of enlarging the images." Ex. A, Wind Rep. at 7. Although during his deposition Dr. Wind inaccurately described this feature as allowing a respondent to "zoom" in on narrow sections of the stimuli, *see* Ex. C, Wind Dep. Tr. 213:24-214:3, Dr. Wind later confirmed that a more accurate description would be that "you've clicked on it and it's an enlarged picture," *id.* at 245:13-15.

More fundamentally, CHG has not demonstrated any meaningful consequence of use of an "enlargement" feature as opposed to a "zoom" feature. To the contrary, while taking the survey during his deposition, Dr. Wind confirmed that the feature provided "an enlarged picture, and in this picture, you can see the name of the game and the numbers on the pay tables" and "that this is a bingo card." *Id.* at 245:19-25.

Instead, CHG points to questionable characterizations of the record.

For example, CHG erroneously claims that Dr. Wind's report "included an image of the house marks, purportedly as he claims they could be viewed using the 'zoom feature.'" Dr. Wind makes no such claim, but instead states only that "[t]he close-up images below undermine any such claim [about prominence of house marks]." Ex. B, Wind Reply Rep. at 8-9.

Similarly, although CHG emphasizes that "[t]his error did not go unnoticed by survey respondents" by pointing to seven verbatim responses that mention the ability to enlarge images,

20

CHG neglects to mention that the seven were among the original 446 respondents (in other words, 1.56% of respondents).  *See* Ex. C, Wind. Dep. Tr. 135:2-10, 216:20-24.  CHG also claims that Dr. Wind did not read the verbatim responses despite clear testimony to the contrary.  *Id.* at 217:6-11 ("I went over all -- I went over all the verbatims."); *see id.* at 218:17-22 ("All we know that it says or she says you could make the zoom even more refined or more zoomed in.  It doesn't say anything that they could not do it.").

Further, despite CHG's suggestions to the contrary, it is ultimately unquestioned that the images in the survey do, in fact, contain the VGT and CHG house marks.[14]  *See* Motion to Exclude Wind at 21 (conceding that "*when enlarged*, the Castle Hill and VGT games both appear in high resolution"); Ex. C, Wind Dep Tr. 220:13-16 ("I was able to read [the names of the games] easily when I -- when I completed the questionnaire on the screen.").  VGT can hardly be to blame for CHG's decision to employ a small, discreetly placed house mark (which it chose to make the same size as VGT's and place in the same location as VGT's).

### 3. Dr. Wind's Survey Used Images of Comparable Quality.

Nor is there anything to CHG's complaint that Dr. Wind's survey was biased because of differences in image quality among the stimuli—again, at most, an issue for cross-examination.  As discussed above, Dr. Wind used the best images available to create a realistic array of games that could be encountered in a single casino.  Ex. B, Wind Reply Rep. at 7.  *See, e.g.*, *Active Sports Lifestyle USA LLC v. Old Navy, LLC*, No. SACV 12-00572 JVS (Ex), 2013 WL 11239385, at *15 (C.D. Cal. Nov. 21, 2013) ("poor image size or quality . . . is subject to cross-

---

[14] House marks do not identify particular goods or services—rather, they identify the provider of a variety of goods or services, with such goods or services often themselves identified by a separate trademark or service mark.  Here, the house marks are the VGT & Design and CHG & Design emblems that appear on all VGT and CHG EGMs.

examination"); *Whirlpool Props., Inc. v. LG Elecs. U.S.A., Inc.*, No. 1:03 CV 414, 2006 WL 62846, at *7 (W.D. Mich. Jan. 10, 2006) ("Plaintiff's [photo-quality] criticisms go to the weight of the evidence, not its admissibility.").  Moreover, because CHG uses a small house mark, Dr. Wind had to ensure that the VGT and CHG EGMs were as high resolution as possible so that respondents could view those marks if they wanted to do so.  Ex. B, Wind Reply Rep. at 7.  It also bears emphasis that no respondent identified resolution as a reason for grouping EGMs together in the verbatim responses.  *Id.*

### H.    Dr. Wind's Convergent Validity Analysis is Proper and Helpful.

CHG's final argument—that the last section of Dr. Wind's report amounts to a mere expert stamp of approval of facts and arguments—proceeds from an erroneous premise, namely, that the basis for Dr. Wind's opinions "can flow only from the survey that he conducted."  *See H.S. Field Servs.*, 2015 WL 11156965, at *3 (opinion reliable where expert "outlines in detail the pleadings, deposition transcripts and exhibits, documents, and conversations he considered in forming his opinions," together with "his own experience").  This proposition is untrue for at least three reasons.

*First*, and most fundamentally, an expert witness is not only allowed to consider other evidence in the record when developing an expert opinion, Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."), but, in fact, is expected to review and describe the full range of data necessary to provide "a complete statement of all opinions the witness will express and the basis and reasons for them [and] the facts or data considered by the witness in forming them," *Bales v. Green*, No. 16-CV-106-GKF-JFJ, 2018 WL 1633321, at *2 (N.D. Okla. Mar. 27, 2018).  Indeed, an expert may provide an opinion based on facts and data so long as they are of a type on which experts in the field reasonably rely in forming opinions.  *See, e.g.*, *Malinski v. BNSF Ry. Co.*, No. 15-CV-

502-JED-FHM, 2017 WL 1199750, at *3 (N.D. Okla. Mar. 31, 2017) (physician permitted to base opinion on direct patient examination as well as medical and accident records); *Cohen v. Trump*, No. 3:13-CV-2519-GPC-WVG, 2016 WL 4543481, at *9 (S.D. Cal. Aug. 29, 2016) (marketing professor permitted to analyze aims of apparent marketing strategies); *Children's Med. Ctr. of Dall. v. Columbia Hosp. at Med. City Dall. Subsidiary, L.P.*, No. 3-04-CV-2436-BD, 2006 WL 616000, at *5 (N.D. Tex. Mar. 10, 2006) (professor permitted to testify regarding weakness of mark based on third-party use).  Both survey experts in this case agree that ███████ ███████████████████████████████████████████████████.  *See* Ex. C, Wind Dep. Tr. 264:7-13; Ex. D, Berger Dep. Tr. 134:4-8.

 *Second*, applying those general principles to this case, survey experts are not mere technicians who design and implement surveys in a vacuum; rather, they evaluate related data to place those surveys in context.  As confirmed by Mr. Berger, ███████████████████████ ███████████████████████████████████████████████ *i.e.*, the survey.  Ex. D, Berger Dep. Tr. 134:4-8.  What Dr. Wind did in this case was produce primary data, his survey, then look to other evidence to see if it supports the survey results (which it did).  *See* Ex. C, Wind Dep. Tr. 261:12-267:2.  Indeed, as discussed above, Dr. Wind uses evidence from the record to project the survey results to other examples of CHG's infringement; specifically, CHG's design philosophy across its product line, including CHG's desire to emulate VGT's product line, allowed him to "feel confident, unless shown other evidence to the contrary, that the results can be projected to the rest of [product] line."  *Id.* at 193:3-11, 111:8-115:23.

 *Third*, and finally, in addition to his survey expertise, Dr. Wind applies his marketing expertise to the data to assess consumer behavior and reactions in the marketplace.  As CHG's expert Mr. Berger concedes, a professional marketing professor such as Dr. Wind ███████

████████████████████████████████ Ex. D, Berger Dep. Tr. 128:23-

129:4; *see* Ex. A, Wind Rep. at 5 (qualified as marketing expert in prior cases). Of course, Dr.

Wind is far more than a run-of-the-mill marketing professor. *See* Ex. A, Wind Rep. at 4-5; Ex.

D, Berger Dep. Tr. 15:8-15 ████████████████████████████████

████████████████ ).

Dr. Wind thus applies his independent judgment as an expert in surveys, marketing, and

consumer behavior to evaluate the results of his survey in the context of the facts of this case.

*See* Ex. A, Wind Rep. at 24 ("The objective of this section is to assess whether other relevant

evidence is consistent with the results of the consumer study. If other evidence suggests that

confusion is likely between VGT and CHG EGMs, the study's convergent finding is more likely

to be valid."); *see also* Ex. B, Wind Reply Rep. at 11; Ex. C, Wind Dep. Tr. 266:10-267:2 ("I've

been working with many companies in [a] consulting, advisory capacity and others, and it always

involved evaluating data and interpreting it."). Convergence validity and the closely related

concept of external validity refer in the survey context "to whether the right elements were

measured in the right way." Himanshu Mishra & Ruth M. Corbin, *Internet Surveys in*

*Intellectual Property Litigation: "Doveryai, No Proveryai,"* 107 Trademark Rep. 1097, 1103-04

(2017). This analysis includes looking beyond the survey itself "to confirm that the inferences

hold true in everyday life" and that the inferences can be supported by "the congruency of

measurements from different methodologies." *Id.* at 1104. By analyzing other data sources

against the results of his survey, Dr. Wind applies the full extent of his expertise to provide a

more complete and meaningful assessment of likely consumer reactions to placement of CHG

games in competition with VGT games. *See* Ted Robert Hunt, *Scientific Validity and Error*

*Rates: A Short Response to the PCAST Report*, 25 Fordham L. Rev. 24, 38-39 (2017) ("Scholars

and commentators generally recognize that there is no one best way to study a phenomenon of interest.  However it is clear that a convergent approach to evaluating scientific validity makes the best use of all available evidence bearing upon the fitness of a particular method for an intended use.").

Dr. Wind has done this type of analysis before, Ex. C, Wind Dep. Tr. 264:7-13, and CHG identifies no reason why it would be improper for him to do it again here.

## V.    CONCLUSION

For the foregoing reasons, CHG's motion to exclude Dr. Wind should be denied.


November 16, 2018                                    Respectfully submitted,

                                                    */s/ Gary M. Rubman*
                                                    Graydon Dean Luthey, Jr., OBA No. 5568
                                                    GABLE GOTWALS
                                                    1100 ONEOK Plaza
                                                    100 West Fifth Street
                                                    Tulsa, OK 74103-4217
                                                    Telephone: (918) 595-4821
                                                    Facsimile: (918) 595-4990
                                                    dluthey@gablelaw.com

                                                    Gary M. Rubman
                                                    Peter A. Swanson
                                                    Michael S. Sawyer
                                                    Rebecca B. Dalton
                                                    COVINGTON & BURLING LLP
                                                    One CityCenter
                                                    850 Tenth Street, NW
                                                    Washington, D.C.  20001-4956
                                                    Telephone: (202) 662-6000
                                                    Facsimile: (202) 778-5465
                                                    grubman@cov.com
                                                    pswanson@cov.com
                                                    msawyer@cov.com
                                                    rdalton@cov.com
                                                      (admitted pro hac vice)

                                                    Neil K. Roman

25

COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1221
Facsimile: (212) 841-1010
nroman@cov.com
   (admitted pro hac vice)

***Counsel for Video Gaming Technologies, Inc.***

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2018, I filed a redacted version of the foregoing

Response to Defendants' Motion to Exclude Plaintiff's Expert Yoram Wind via ECF, which

caused service to be effected on the following counsel for Defendants:

Robert C. Gill
Thomas S. Schaufelberger
Matthew J. Antonelli
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
tschauf@saul.com
matt.antonelli@saul.com

Sherry H. Flax
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA 4254
JAMES C. HODGES, PC
2622 East 21st Street, Suite 4
Tulsa, OK 74114
Telephone: (918) 779-7078
JHodges@HodgesLC.Com

Duane H. Zobrist
Jonathan S. Jacobs
ZOBRIST LAW GROUP PLLC
1900 Arlington Blvd. Suite B
Charlottesville, VA 22903
Telephone: (434) 658-6400
dzobrist@zoblaw.com
jjacobs@zoblaw.com

*Attorneys for Defendants*

/s/ Gary M. Rubman

27