# EXHIBIT C



# Transcript of Dr. Yoram (Jerry) Wind

**Date:** September 20, 2018
**Case:** Video Gaming Tech -v- Castle Hill Studios

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Dr. Yoram (Jerry) Wind
Conducted on September 20, 2018

4 (13 to 16)

---

**3**

1    A.  For the second report, I did not have
2  **Research Now involved.**
3    Q.  What does Wind Associates do in addition
4  to your expert witness services?
5    A.  **Consulting to various firms.  Being on**
6  **advisory boards of various firms, I gave lectures,**
7  **seminars.**
8    Q.  In Appendix G of your opening report, if
9  you could turn to that.
10      MR. ROMAN:  What is Appendix G?
11    Q.  It's the list of materials relied on --
12  I'm sorry, deposition of prior testimony.
13    A.  **Yes.**
14    Q.  Appendix G of your report, Exhibit 1,
15  you list cases in which you've given trial and
16  deposition testimony between 2014 and 2018; is
17  that correct?
18    A.  **Correct.**
19    Q.  Is that complete?
20    A.  **Yes, as far as I know.**
21    Q.  How many cases would you estimate you've
22  given expert trial or deposition testimony in your
23  career?
24    A.  **Probably over 50.**
25    Q.  Over 50?

---

**4**

1    A.  **Yes.**
2    Q.  And how many of those cases did you
3  testify at trial?
4    A.  **I have no idea.  Probably over ten.**
5    Q.  And were any of your opinions or your
6  reports in any of these cases the subject of a
7  Daubert motion?
8    A.  **None that I know that have been accepted**
9  **as a Daubert.**
10    Q.  Were any of your opinions or reports
11  excluded by any court?
12    A.  **No, not that I know of.**
13    Q.  So you're unaware of any opinion or
14  report of yours ever being excluded?
15    A.  **Correct.**
16    Q.  And have you ever been not qualified as
17  an expert witness by a court?
18    A.  **No.**
19    Q.  What about an administrative tribunal?
20    A.  **Not that I know of.**
21    Q.  Now, in all these cases you've done in
22  your career, other than this one, have any of them
23  involved the gaming industry?
24    A.  **No.**
25    Q.  And do you consider yourself to be an

---

**5**

1  expert on the gaming industry?
2    A.  **No.**
3    Q.  I know you've written dozens of books
4  and articles over the years.  Have any of them
5  been about the gaming industry?
6    A.  **No.**
7    Q.  And it may be obvious from the last
8  question, have any of them been about the Oklahoma
9  gaming market?
10    A.  **No.**
11    Q.  Have any of them been about Oklahoma in
12  general?
13    A.  **Yes.**
14    Q.  Of these cases where you were an expert
15  over the years in either trial or deposition
16  testimony, how many involved claims of trademark
17  or trade dress infringement?
18    A.  **I don't know.  I don't keep track of**
19  **these.**
20    Q.  Well, if you could just look at exhibit
21  G, we'll limit it to 2014 to 2018.  Can you tell
22  me which of those involved trademark or trade
23  dress infringement claims.
24    A.  **I'm trying to remember.  Unlike you**
25  **lawyers, you remember every case, the minute I**

---

**6**

1  **finish a case, I forget it.**
2    Q.  Take your time.
3    A.  **I really don't -- you know, it's hard**
4  **time to remember the specifics.  I would say about**
5  **a third of them probably were trademark, but I**
6  **could not tell you which specific ones.**
7    Q.  So about a third of the cases you've
8  listed where you had trial and deposition
9  testimony between 2014 and 2018 in exhibit G,
10  about a third of them had to do with trademark
11  infringement; is that what you're saying?
12    A.  **That's my best guess.  I really don't**
13  **remember each one of them.**
14    Q.  What about trade dress infringement?
15    A.  **I probably couldn't part this, you know,**
16  **part the trade -- trademark, trade dress.**
17    Q.  And you understand the distinction
18  between trademark and trade dress, sir?
19    A.  **Yes.**
20    Q.  Of the trademark and trade dress
21  infringement cases that you've done over the
22  years, approximately what percentage were on
23  behalf of the plaintiff?
24    A.  **I have no idea.**
25    Q.  Is it fair to say you don't know the

Transcript of Dr. Yoram (Jerry) Wind
Conducted on September 20, 2018

11 (41 to 44)

**4**

1  management did not rely much on those studies, did
2  not see much value on them and decided not to --
3  not to continue them.
4      Q.  Do you recall speaking with Mr. North
5  about anything else?
6      A.  Not as I sit here now.
7      Q.  Have you had any conversations with
8  anybody else from VGT?
9      A.  No.
10     Q.  In the preparation of your rely report,
11 did you speak with anybody from VGT?
12     A.  No.
13     Q.  Now, I notice in Appendix H of your
14 initial report, you cite just above the telephone
15 conference with Mr. Ryan, you cite, VGT, quote,
16 about VGT, and then there's a web address; do you
17 see that?
18     A.  Yeah.
19     Q.  Did you review any VGT web pages besides
20 this particular page?
21     A.  No.  But basically, it's not a single
22 page, it's, you know, because they looked at their
23 website.
24     Q.  You looked at the whole website?
25     A.  Whole website.

**42**

1      Q.  So why did you limit your citation and
2  list of materials reviewed just to the page about
3  VGT?
4      A.  I guess that's what I was thinking at
5  the time.  But I actually looked at the entire
6  website.
7      Q.  You looked at the entire website.  And
8  did you review any of the pictures or descriptions
9  of VGT's games on its website?
10     A.  Yeah, I definitely looked at some of the
11 pictures they had there.
12     Q.  Did you think it was important in
13 formulating your survey or your opinions in this
14 case to look at the VGT games on its website?
15     A.  Yes.
16     Q.  And you didn't list that in your report,
17 though?
18     A.  Well, I think that we do mention we
19 bring a number of examples, actually, of -- to
20 various pictures that we saw.  I think I've listed
21 them somewhere.
22         There was a lot of pictures, also,
23 in the complaint.  There are -- there are a lot of
24 pictures throughout, so there's tons of pictures
25 that I've seen.

**43**

1      Q.  My question was related just to the
2  website, though.
3      A.  I saw what was on the website.
4      Q.  Okay.  Do you recall approximately how
5  many different games VGT has on its website?
6      A.  No.
7      Q.  Did you look at the games that they
8  have?
9      A.  I skimmed the website and focused on
10 specific things that I thought were relevant at
11 the time.
12     Q.  How did you know what was relevant
13 before you reviewed their website?
14     A.  Relevant to what I was looking for.  I
15 was looking for basically trying to get a feel for
16 the product that they have.
17     Q.  So in addition to the pictures, did you
18 review any of the pages on VGT's website that
19 described the different types of games VGT
20 markets?
21     A.  Yeah, whatever was there, I looked at
22 the website.
23     Q.  And did you review the pages on VGT's
24 website describing the different types of game
25 cabinets it uses for its games?

**44**

1      A.  Yes.
2      Q.  And what do you recall about that?
3      A.  The number of cabinets.  But then there
4  was one that we selected for the study seemed to
5  be the best-selling cabinet and machine.  It's not
6  only the cabinet, but the totality of the machine.
7      Q.  And what do you mean by that?
8      A.  Well, it's not only the cabinet, it's
9  the -- you know, when you say -- when you look at
10 the product, if it's the best-selling product they
11 have, it's not only the cabinet, it's the totality
12 of the offering of the machine and everything
13 there.
14     Q.  So you mean not just the structural
15 cabinet itself, you're talking about the whole
16 machine in that particular cabinet?
17     A.  Correct.
18     Q.  All right.  My question is, did you look
19 at the whole machine that they have in their games
20 in different cabinet frames?
21     A.  Whatever they had on the website I
22 looked at.
23     Q.  Did you think that was important?
24     A.  Yeah, I think, like, basically, you
25 know, everything I looked at was important to try

Transcript of Dr. Yoram (Jerry) Wind
Conducted on September 20, 2018

13 (49 to 52)

49

1 it was my final decision what stimuli were to be
2 included.
3    Q.  All right.  So you narrowed it down to
4 IGT, Scientific Games and Konami, correct?
5    A.  Correct.
6    Q.  And how did you decide which game to use
7 from IGT, Scientific Games and Konami, were those
8 recommendations from Plaintiff's counsel?
9    A.  Yes, I relied to a larger set of them
10 because it was primary two considerations if we
11 look at a number of different options.  One is the
12 one which are, you know, basically, you know, have
13 characteristics that would have some in common
14 with the test ones that I wanted to look at, the
15 VGT and CHG.  And two, that we had available
16 pictures, there was a huge issue in this case to
17 try to find out the actual visual stimuli to be
18 able to show respondent.
19    Q.  And you said you considered various
20 options.  What other options did you consider but
21 reject?
22    A.  I don't remember now.  There were a
23 number of -- look at a product, you know,
24 different machines, and we look for the one that
25 will be basically, you know, some similar elements

50

1 to the VGT and CHG.
2    Q.  When you --
3    A.  These were the ones.  And also, major
4 consideration was as I said before, is the
5 availability of pictures that we could use.
6    Q.  And you said you reviewed IGT,
7 Scientific Game and Konami's websites in
8 preparation of your report even though you didn't
9 list it in Appendix H.  Was that before or after
10 you and Plaintiff's counsel selected which games
11 to put in the survey?
12    A.  About the same time.
13    Q.  What does that mean, about the same
14 time?
15    A.  Well, during the discussion of the
16 specific machines, I opened the website and looked
17 at them.
18    Q.  Do you recall if you reviewed IGTs
19 website to see their different games and game
20 cabinets that they offered?
21    A.  Whatever they had on the -- on the
22 website at the time.
23    Q.  Well, these are huge companies with huge
24 websites with hundreds, if not thousands, of
25 pages.  You looked at something very specific in

5

1 there, didn't you, or did you peruse everything
2 that they had on their website?
3    A.  I did not spend hours looking at each
4 one of their websites.
5    Q.  So what specifically were you looking at
6 on their website?
7    A.  Some of the pictures of the machines it
8 had.
9    Q.  And how did you figure out where to go
10 on their website, what factors were you taking
11 into account?
12    A.  What do you mean by what factors?  I was
13 looking at their website, at the different product
14 that they had, and we were looking basically --
15 you know, a while on the phone call to try to
16 narrow down the product, trying to look at what
17 other products are there.
18    Q.  So in deciding what stimuli to use, you
19 were on the phone with attorneys from Covington &
20 Burling?
21    A.  I think it was Rebecca, yeah.
22    Q.  Okay.  And what did Rebecca tell you
23 about stimuli that you should use in your survey?
24    A.  I don't think they said, you know, what
25 I should use.  She basically suggested we

52

1 basically -- it's like sequencing process that I
2 think was supplied in my rebuttal report.  You
3 know, what is the anchor, what is the best-selling
4 VGT machine.  We found this.  Then what will be
5 the comparable machine to CHG tried to copy from
6 VGT based on their documents.  So we found this.
7       And then once you anchor on this,
8 then looking for three other products that have
9 some similar characteristics to these two, that's
10 the process we're answering.
11    Q.  Okay.  As you sit here today, do you
12 recall any specific pages on or games that you
13 viewed on IGT's website?
14    A.  No.
15    Q.  As you sit here today, did you review
16 any specific pages or games that you looked at on
17 Scientific Games' website?
18    A.  No.
19    Q.  As you sit here today, do you recall any
20 specific games or pages that you reviewed on
21 Konami's website?
22    A.  No.
23    Q.  As you sit here today, do you recall any
24 games on IGT's website or how many games on IGT's
25 website had the word "money" in it?

Transcript of Dr. Yoram (Jerry) Wind
Conducted on September 20, 2018

15 (57 to 60)

---

**57**

1 Scientific Games that had the name -- the word
2 "money" in its title that you chose not to use for
3 other reasons?
4     **A.  I don't recall.**
5     Q.  But it's possible?
6         MR. ROMAN:  Object to the form.
7     Q.  When you reviewed Scientific Games'
8 website, do you recall whether it had any class II
9 games?
10     **A.  I don't recall at this stage.**
11     Q.  Was that something that you considered?
12     **A.  We looked at primarily class II, but**
13 **also class III machines.**
14     Q.  So as you sit here today, do you know
15 whether Scientific Games has any class II machines
16 on its website?
17     **A.  I don't recall.**
18     Q.  And as you sit here today, do you
19 know or do you recall whether Konami had any class
20 II games on its website?
21     **A.  Same answer.**
22     Q.  I'm sorry?
23     **A.  Same answer.**
24     Q.  You don't know?
25     **A.  I don't recall.**

---

**58**

1     Q.  Was that an important factor you used in
2 determining which pictures to use in your array?
3     **A.  Well, we wanted to include a product**
4 **that had both class II and class III.**
5         **The key criteria was to have all**
6 **these machines present in one casino.  So we're**
7 **basically -- you narrow it pretty much when you**
8 **make sure that the machines are only those**
9 **available of that specific casino and pictures are**
10 **available of them.**
11     Q.  All right.  Do you believe that it's
12 difficult to find different class II machines in
13 Indian casinos in Oklahoma?
14         MR. ROMAN:  Object to the form.
15     **A.  That's not what I said.**
16     Q.  I'm sorry?
17     **A.  That's not what I said.  I said we're**
18 **looking for the machines -- the machines that we**
19 **selected had all to be in one casino.**
20     Q.  In Oklahoma?
21     **A.  In Oklahoma.  And in one casino.  Not**
22 **across casinos.  And we had to have pictures**
23 **available for them that we could use.  These were,**
24 **you know, pragmatic, critical considerations in**
25 **the selection.**

---

**59**

1     Q.  In making your selections, did you have
2 a preference as to whether or not the control
3 stimuli were class II or class III?
4     **A.  I wanted to make sure that the five --**
5 **the five machines included some class II and some**
6 **class III.**
7     Q.  So you deliberately put some class III
8 in the array?
9     **A.  Correct.**
10     Q.  Did you review Konami's website to see
11 if it had any three-reel mechanical games to use
12 in your survey instead of a video machine?
13     **A.  I don't recall at this stage.**
14     Q.  Was that an important factor in
15 determining which stimuli to use as controls,
16 whether or not they were three-reel mechanical,
17 five-reel mechanical or video?
18     **A.  I think it was one of the**
19 **considerations.**
20     Q.  Do you know what I mean when I say three
21 or five-reel mechanical machine?
22     **A.  Vaguely.  I'm not a gambling expert on**
23 **this machine, but I heard the term many times.**
24     Q.  And do you know what I mean by a video
25 machine?

---

**60**

1     **A.  Yes.**
2     Q.  What is your understanding?
3     **A.  I think so the video -- large video**
4 **component as part of the machine.**
5     Q.  So where did you get the images of the
6 various machines you show on page seven of your
7 survey?
8     **A.  Rebecca got it for us.  Originally, I**
9 **actually wanted to get videos and not just still**
10 **machines -- photographs, but this was the best we**
11 **could get of these machines.**
12     Q.  Now, if you look at page seven, I think
13 you're already there, at the pictures.
14     **A.  Yeah.**
15     Q.  You don't provide a source for those
16 pictures, do you?
17     **A.  You're correct.**
18     Q.  Why is that?
19     **A.  I guess oversight.**
20     Q.  And you said these pictures were picked
21 by Rebecca Dalton, counsel for Plaintiff?
22     **A.  Provided by her.  We -- as I discussed**
23 **before, it was a process where I was with her on**
24 **the phone a number of times in trying to select**
25 **the product.  We went through the process, then**

Transcript of Dr. Yoram (Jerry) Wind
Conducted on September 20, 2018

28 (109 to 112)

09

1  some reward at the end of this, and the pay table
2  tells them basically how much are they going to
3  get in the game.
4      Q.  Based on what's on the reels?
5      A.  Right, based on various sequencing of
6  the reels.
7      Q.  And what does that have to do with
8  bingo?
9          MR. ROMAN:  Object to the form.
10     A.  The game is a bingo-based game.
11     Q.  What does that mean?
12         MR. ROMAN:  Object to the form.
13     Q.  If you don't know, you don't know.
14     A.  So multiple -- my understanding of bingo
15  is multiple people playing bingo, and basically,
16  to the extent that you have a hit, it sort of
17  shows there and you get some payout for this.
18  But, again, I'm not the right respondent for this.
19     Q.  Now, you said you conducted a study for
20  people who play or intend to play these machines
21  in Oklahoma casinos.  Why did you limit your study
22  to Oklahoma casinos?
23     A.  My understanding is that that's where
24  the bulk of the market is.
25     Q.  Do you know how many states VGT has

0

1  games in?
2      A.  Yes, but I think we looked primarily at
3  markets where both -- both VGT and CHG had
4  machines.
5      Q.  Do you know how many states Castle Hill
6  has games in?
7      A.  No.  I think I saw somewhere that
8  Oklahoma and one casino in Texas, but I'm not
9  sure.
10     Q.  Do you know if there's casinos in which
11  VGT has games but Castle Hill doesn't?
12     A.  Yes, my recollection of numbers is like
13  there are 55 casinos in Oklahoma, something like
14  this, and 51 of the 55 have CHG machines in them.
15     Q.  What about outside of Oklahoma?
16     A.  I think that CHG, my best understanding
17  is that they have only one casino outside of
18  Oklahoma and Texas.
19     Q.  It's your belief that Castle Hill has
20  one casino outside of Oklahoma?
21     A.  That's my recollection from the various
22  material.
23     Q.  On pages five to six of the report, you
24  say a little bit more about your objectives.  You
25  state -- again, you talk about the same statement

1  about the empirical study.  But the last sentence
2  in the first paragraph of section 4A states, in
3  particular, the study seeks to determine the rate
4  of confusion due to the similar look of the
5  company's trademarks, trade dress or both; do you
6  see that?
7      A.  Yes.
8      Q.  You then drop a footnote in saying that
9  it bears mention that because the experiment used
10  static images, not video or audio of the EGMs, it
11  does not offer insight into any additional
12  confusion that might be caused by the sound of the
13  machines, the feel of the game play, or the use of
14  the free spin features.
15         That's a true statement?
16     A.  Yes.
17     Q.  You then speculate that had we been able
18  to include these additional features in the study,
19  it is possible that there would have been even
20  greater levels of confusion among the respondents
21  as I understand that VGT alleges that these
22  features also are similar between the VGT and CHG
23  EGMs.
24     A.  Correct.
25         MR. ROMAN:  Is there a question or

2

1  not?
2      Q.  No, I'm just pointing this out.
3          The question is, since you did not
4  study those issues, isn't it fair to say that it's
5  also possible that there would have been lower
6  levels of confusion based on the actual sound,
7  look and feel of those other features --
8          MR. ROMAN:  Object to the form.
9      Q.  -- since we're speculating?
10     A.  No.  I'm going with based on my
11  assumption here is the fact that CHG tried to copy
12  VGT.
13     Q.  But isn't that circular, sir?  You're
14  saying they're the same because they tried to copy
15  it; isn't that what you're saying?
16     A.  But circular, you know, the logic here
17  is very simple.  You know, there are a number of
18  items here we were not able to capture in the
19  stimuli.  These items, which we did not capture,
20  were items that CHG tried to copy from VGT.  If
21  they basically copied them, then this would be
22  greater similarity between the two machines on
23  these dimensions as well; and therefore, the one
24  direction that you would expect is that our
25  confusion level is underestimating additional

Transcript of Dr. Yoram (Jerry) Wind
Conducted on September 20, 2018

29 (113 to 116)

**Page 3**

1  confusion.
2     Q.  Dr. Wind, if you think that the evidence
3  clearly shows that Castle Hill copied all the
4  elements of the trade dress and the look and feel
5  of the machines based on what you reviewed, why
6  did you bother to do a confusion study?
7     A.  Because to try to determine confusion or
8  not, you need consumers' perceptions.
9     Q.  So if you didn't test confusion --
10       MR. ROMAN:  He was still answering
11  the question.
12    Q.  I'm sorry, go ahead.
13    A.  And we did -- we basically did the study
14  on those elements that we could measure.  And we
15  could measure the reaction to the picture.  We
16  could not measure the reaction to other elements.
17       So I feel very comfortable with
18  concluding the level of confusion we had based on
19  the stimuli we had in the study.  But then given
20  the fact that there are other elements that we
21  were not able to capture in the study, basically,
22  I feel confident to say that if CHG has been
23  successful in copying these features of VGT, one
24  would expect to have greater similarity between
25  the two and therefore greater level of confusion.

**Page 4**

1  That's the basis for my footnote.
2     Q.  Well, that goes back to my question,
3  which is if you think that the evidence is so
4  clear based on what you've been provided from
5  VGT's attorneys that VGT copied the look and feel
6  of all of the machines in all of the titles that
7  are at issue in this case, then -- and that you
8  believe is enough evidence for you to form your
9  opinion that the -- because they intentionally
10 copied, they're confusingly similar, the question
11 is why did you bother to do a survey at all?
12    A.  Because you --
13       MR. ROMAN:  Object to the form.
14    A.  Because you need consumer surveys.  It's
15 not my perceptions that governs it.  What governs
16 if there is confusion or not are consumers'
17 perceptions.
18    Q.  Got it.
19    A.  And we did consumers' perceptions on
20 whatever we could, and this is the base.
21    Q.  Okay.
22    A.  Now, there are elements that we were not
23 able to test.  So as opposed to just ignoring
24 them, I am basically suggesting in this footnote
25 to the extent that CHG has been successful in

**Page 5**

1  copying these other elements that we were not able
2  to measure in copying VGT, then my estimate of
3  confusion here is underestimating the real level
4  of confusion in the marketplace.
5     Q.  And that's your opinion based on the
6  documentation and evidence provided by VGT's
7  attorneys and not based on a survey?
8     A.  Right, the conclusion, the additional
9  conclusion in terms of what would be -- if you
10 want to project beyond the survey, you know, we
11 have a solid, strong evidence of confusion based
12 on the visual stimuli we presented to consumer.
13       If you ask me then the question
14 what would be the projection for real level of
15 confusion in the marketplace based on other
16 characteristic that the survey was not able to
17 capture, then the answer is relatively
18 straightforward.  If CHG has been successful in
19 copying VGT as they intended based on the document
20 that I have seen, and I have not seen other
21 document that suggested they did not try to copy,
22 then my estimate of confusion is underestimating
23 the real level of confusion in the marketplace.
24       MR. PLATT:  Let's take a break.
25       THE VIDEOGRAPHER:  Off the record

**Page 6**

1  at 10:48.
2       (Recess.)
3       THE VIDEOGRAPHER:  We're back on
4  the record 10:59.
5  CONTINUED EXAMINATION BY MR. PLATT:
6     Q.  Dr. Wind, let's talk about the confusion
7  study itself.  What exactly were you trying to
8  determine in this study?
9     A.  If there is confusion, and if there is,
10 what the level of confusion.
11    Q.  Confusion between what?
12    A.  Between the two, two firms, the VGT and
13 CHG.
14    Q.  You were asking participants to decide
15 whether there was any confusion between Mr. Money
16 Bags in a particular cabinet and format with
17 Castle Hill's game New Money in a particular
18 cabinet.
19    A.  Correct.
20       MR. ROMAN:  Object to the form.
21    Q.  Correct, sir?
22    A.  Correct.
23    Q.  And what kind of study did you conduct,
24 is there a term of art?
25    A.  It's a -- it's a confusion study, you

Transcript of Dr. Yoram (Jerry) Wind
Conducted on September 20, 2018

30 (117 to 120)

**Page 7**

1 know, basically with multiple stimuli that
2 assesses the confusion at the individual level.
3    Q.  So was a Squirt survey or an Eveready
4 survey?
5    A.  A Squirt.
6    Q.  Can you explain the difference between
7 an Eveready and a Squirt survey.
8    A.  Eveready, we're talking about stimuli
9 and we're asking people in a test group, you know,
10 basically the same typical confusion questions,
11 the same confusion questions we ask here, and you
12 have the control group that you're showing them
13 another stimuli and asking them for those three
14 sets of questions.
15       In the Squirt, you're showing
16 people a comparative set of basically the two
17 items you're interested in, plus some other
18 control items.  That's what I've done here.
19    Q.  When you're doing a Squirt survey, are
20 you trying to recreate how consumers would
21 encounter the products in the marketplace?
22    A.  Yes.
23    Q.  Is it your opinion that -- well, let me
24 back up.
25       What would be the deciding factor

**Page 8**

1 for you or factors for you as to whether to
2 perform an Eveready survey as opposed to a Squirt
3 survey?
4    A.  The market kind of realty here with
5 casino where people are confronted with a lot of
6 machines, and it makes sense to show them the two
7 machines in question in the context of a few
8 others.  So given this, this was kind of the
9 natural selection for design.
10       And that's the reason also that in
11 selecting the stimuli they were spending a lot of
12 time on earlier this morning was important that
13 all five machines that we selected, the two tests
14 and the three controls were available in the same
15 casino.
16    Q.  You chose casinos where VGT, and in
17 particular, Mr. Money Bags, as opposed to any of
18 their other games, is the most prominent?
19    A.  Correct.
20    Q.  Why did you pick the most prominent
21 game?
22    A.  Whenever you have a large product line,
23 the question is, you know, what -- what are the
24 stimuli you're going to select.  And the natural
25 selection criteria is typically the dominant

**Page 9**

1 stimuli, the dominant product in this product
2 line, because that's the one that most people are
3 familiar with, that's the one that's been the most
4 successful.
5    Q.  Is it your opinion that VGT has strong
6 marks?
7    A.  Yes.
8    Q.  Turn to page 25 of your report.  In the
9 top sentence you say, here there is evidence
10 suggesting that the trademarks and trade dress of
11 VGTs EGMs are strong, correct?
12    A.  Yes.
13    Q.  And then on the next page you say,
14 fifth, consumer opinion data derived from studies
15 conducted at the request of VGT in the course of
16 its regular business support the conclusion that
17 VGT's trademarks and trade dress are well known
18 among relevant consumers.  Why do you say that?
19    A.  It's a fact.
20    Q.  And you base that on what studies?
21    A.  These are the studies that VGT
22 commissions especially in the time periods 2011,
23 '12.  I think some of them are even earlier.
24    Q.  Did those studies analyze the strength
25 of the particular trademarks that we listed before

**Page 20**

1 in paragraph 19 of the First Amended Complaint?
2    A.  Not explicitly.  But there were studies
3 that were done for different purposes, and some of
4 them suggest some various quotes for the studies
5 that show that basically the strength of some of
6 VGT trade dress and trademarks.
7    Q.  I guess that's what I'm getting at.  So
8 you said that the studies that show particular
9 trademarks are strong.  But are there studies that
10 show all of the specific trademarks listed in
11 paragraph 19 of the First Amended Complaint are
12 strong?
13    A.  I don't recall any study that shows all
14 of the trademarks that we reviewed before, but
15 there are -- the studies indicate on a number of
16 the responses that they capture some of the trade
17 dress, some of the trademarks.
18    Q.  Well, responses, that only had to do
19 with one particular trademark, the Mr. Money Bags
20 trademark, correct?
21       In other words --
22    A.  I don't know.
23    Q.  -- it says nothing about the strength of
24 the word mark Polar High Roller, does it?
25    A.  I don't recall the studies included in

2

1 the other thumb studies included some of the other
2 trademarks in --
3    Q.  Oh, I'm sorry.
4    A.  -- two places.  I was referring to the
5 other studies.
6    Q.  I misunderstood.  I thought you meant
7 your studies.
8    A.  No.  I was referring to the other
9 studies conducted by VGT in the course of their
10 business.
11    Q.  Do you recall any particular study
12 conducted by VGT that was limited to the strength
13 of word marks?
14    A.  No.  As I mentioned before, that all of
15 them are other objectives; but when you look at a
16 study, there is some evidence in the studies to
17 suggest strength of some of the trade dress and
18 trademarks.
19    Q.  And so we're clear, the study you
20 performed in this case did not measure the
21 strength of VGT's trademarks or trade dress,
22 correct?
23    A.  Correct, it was a confusion study, not a
24 secondary meaning study.
25    Q.  On page 26 of your report, under the

23

1    Q.  Based on near a hundred percent
2 awareness of VGT and the 40 to 45 percent market
3 share, would you say that it's fair to say that
4 VGT is a top-of-mind brand for regular Oklahoma
5 casino players?
6        MR. ROMAN:  Object to the form.
7    A.  Yes, even though I'm not sure the -- top
8 of my mind in term of mention the name, but
9 definitely, they'll recognize it when they see it.
10    Q.  Specifically, which VGT marks do you
11 think are strong?
12    A.  Well, if you look at the -- you have to
13 go and look at the -- excuse me, the specific
14 studies and what they capture there, so...
15    Q.  Well, the studies say what the studies
16 say.
17    A.  Right.
18    Q.  My question is do you have an opinion
19 over which particular VGT marks are strong?
20    A.  My opinion is based only on what the
21 study says.  I'm not an expert in the area, I just
22 rely on those studies.
23    Q.  Thank you.  And how did you decide
24 whether to do a Squirt or an Eveready study?
25    A.  As I said before, because I thought

22

1 fifth, the next paragraph, it says the first set
2 of these studies that I reviewed sought the
3 opinion of casino employees, paren, VGT's direct
4 customers, closed paren, and showed demand from
5 VGT by its direct customers; i.e., casino
6 operators as well as VGT's market dominance.
7        Now, that is not something that you
8 tested for in your studies, correct?
9    A.  Correct.
10    Q.  So you're basing your opinion based
11 solely on these studies that you cite here,
12 correct?
13    A.  Correct.  That's what I said before, all
14 of -- all the items under fifth are the other
15 consumer studies or customer studies conducted by
16 VGT in the conduct of the regular business a few
17 years ago.
18    Q.  And some of the specifics that you point
19 out and you rely upon are the statement that
20 there's near a hundred percent awareness of VGT --
21 of VGT; do you see that?
22    A.  Yeah.
23    Q.  And it says that there's a 40 to 45
24 percent market share within the state for VGT?
25    A.  Yes.

24

1 given the market reality for measuring confusion,
2 potential confusion, among machines in a casino,
3 Squirt would be the natural and the most preferred
4 methodology.
5    Q.  In addition to the Squirt study that you
6 performed, did you perform an Eveready or any
7 other type of survey in this case?
8    A.  No.
9    Q.  Are there standard practices or
10 procedures on how to conduct a Squirt survey?
11    A.  I'm not sure.  I'm not sure.  I think
12 it's a general -- it's a -- it's a methodology
13 which has been done in many areas in consumer
14 research and marketing way before its application
15 in legal cases and before the adopting of the name
16 Squirt.
17    Q.  Now, I noticed in Appendix C of your
18 reply report you replied on -- you relied upon the
19 treatise McCarthy On Trademarks and Unfair
20 Competition; is that right?
21    A.  Correct.
22    Q.  And do you consider Professor McCarthy
23 to be a recognized and reliable expert on the
24 subject of trademark and trade dress litigation?
25    A.  Yes.

Transcript of Dr. Yoram (Jerry) Wind
Conducted on September 20, 2018

34 (133 to 136)

33

1     A.  Yes.
2     Q.  Who decided on those states?
3     A.  I did.
4     Q.  Why?
5     A.  Initially, we tried to get respondents
6  based on data that Research Now had about gambling
7  or gaming.  And we found that we got very, very
8  few responses.  We were not able to get any
9  respondents.
10           And then we primarily checked with
11  VGT in term of what is the areas they get most of
12  the clients in Oklahoma from, and these were the
13  states.  And the Research Now then tried to
14  experiment getting people from these areas and
15  were successful and we focused the search on them.
16     Q.  All right.  So Texas, Kansas, Missouri
17  and Arkansas all abut Oklahoma, correct?  They're
18  all next to Oklahoma?
19     A.  I think including Oklahoma.
20     Q.  Well, Oklahoma doesn't sit next to
21  Oklahoma.
22     A.  Yeah, yeah.
23     Q.  They're all adjacent states?
24     A.  Yeah, adjacent.
25     Q.  All right.

34

1     A.  That's based on my understanding,
2  validated by the survey, that this is a feeding
3  group for casinos in Oklahoma.
4     Q.  Okay.
5     A.  That's the reason they selected people
6  from there.
7     Q.  So it's basically Oklahoma and the
8  surrounding states, correct?
9     A.  Correct.
10     Q.  All right.  Well, there's two other
11  states that are surrounding Oklahoma, that would
12  be Colorado and New Mexico on the western edge.
13  Why were they excluded from the study?
14     A.  They were not suggested as part of the
15  feeding states.
16     Q.  Suggested by who?
17     A.  By VGT.
18     Q.  And why did you choose to exclude
19  residence of any other state whether or not
20  they've played or intended to play casinos in
21  Oklahoma?
22     A.  We just couldn't get them in because of
23  any reasonable time or economic way.  The
24  percentage, we tried a natural sample originally,
25  and we got almost no responses naturally for

35

1  meeting the criteria that we had for the sample.
2     Q.  How exactly were the participants in the
3  study selected?
4     A.  There was an invitation to participate
5  in the study.  Or if you mean earlier research on
6  the selected random sample of their people from
7  their internet panel and send them invitation to
8  participate in the study.  And people went through
9  the screening, and those who met the screening
10  ended up with the 446 responded with the study.
11     Q.  On page five of Appendix A of your
12  report, there's a Q&A about the sample source that
13  they use.
14     A.  Uh-hum.
15     Q.  Now, it talks about sometimes these
16  studies are advertised, sometimes people are
17  invited.  You're saying here it was invitation
18  only?
19     A.  Correct.
20     Q.  Okay.  And do you know how Research Now
21  populates its panel?
22     A.  Constantly, you know, recruits new
23  people to join the panels, many, many sources.
24     Q.  And are the participants provided any
25  incentives for completing the surveys?

36

1     A.  Yes.
2     Q.  And if the participant is excluded from
3  the survey, for example, if they never gambled in
4  Oklahoma or don't intend to game in Oklahoma, does
5  he or she still get the incentive?
6     A.  I don't know because they are recruiting
7  for many organizations.  There are different
8  organizations with different arrangements with
9  them.  So some of them are like frequent flier
10  miles they're getting and some don't.  So I don't
11  know if some will get if they're not responding.
12  I know they do get a reward if they do respond.
13     Q.  Have you used Research Now before?
14     A.  Yes.
15     Q.  You often use them?
16     A.  Yes, whenever there is an internet panel
17  requirement, I use them.
18     Q.  Have you ever done an analysis or study
19  as to whether or not their panels are reflective
20  of the demographics of the general population?
21     A.  They are -- they and most other panels
22  will claim that they have a matched demographic.
23           I don't think the demographic is
24  the challenge.  The challenge is the nature of
25  respondent.  And in early years of internet panel,

---

**65**

1    Q.  -- of the stimuli you actually used, the
2    only two that have --
3    **A.  Yeah.**
4    Q.  -- the word "money" in the title are
5    Mr. Money Bags and New Money, correct?
6    **A.  I think so.  I cannot see the signs on**
7    **the other three here.**
8    Q.  Well, one is Imperial Wealth, the other
9    one has gold in the name, and the third -- the
10   final has gold in the name.
11   **A.  And a sign of dollar --**
12   Q.  Right.
13   **A.  -- dollar sign, which is money.**
14   Q.  Right.  But it doesn't have the word
15   "money"?
16   **A.  Correct.**
17   Q.  And you placed New Money and Mr. Money
18   Bags right next to each other in the survey,
19   right?
20   **A.  They were rotated.  But, yeah, some of**
21   **them, absolutely, they were together, one extra**
22   **dollar.**
23   Q.  In fact, on page six of your report, you
24   state that to avoid potential bias by the same
25   placement of machines next to each other, I

**66**

1    directed that the lineup for each be rotated.  And
2    that's what --
3    **A.  Correct.**
4    Q.  -- you were just referring to?
5    **A.  Correct.**
6    Q.  And what do you mean by rotated?
7    **A.  Well, so the -- the machines will appear**
8    **on the screen in different orders.  It won't**
9    **always be the same machine on the left side and,**
10   **you know, the other machines in the same order.**
11   **So you basically rotate the order of the machines.**
12   **So people see different machines in the most left,**
13   **different machines next to it, different machines**
14   **that they liked and so on.**
15   Q.  The next paragraph on that page, you say
16   each respondent show one of the five rotations; is
17   that correct?
18   **A.  Correct.**
19   Q.  So this wasn't a random order shown to
20   the respondents, it was a rotation of one
21   particular array, correct?
22   **A.  Correct.**
23   Q.  Why didn't you do it randomly?
24   **A.  These are the two, you know, accepted**
25   **approach.  One is you create certain rotations,**

**67**

1    **the other one is random.  Sometime it's easier for**
2    **the fields to work with established rotations.**
3    Q.  All right.  So to visualize, let's turn
4    to page seven and look at this array.  Each of the
5    games has a number associated with it, correct?
6    And so K is VGT, M is Castle Hill, P is Konami, S
7    is Scientific Games and T is IGT, correct?
8    **A.  Correct.**
9    Q.  And I understand that in the actual game
10   the manufacturer names are not there?
11   **A.  Correct.**
12   Q.  That's just for identification purposes?
13   **A.  Correct.**
14   Q.  So the world of possible viewings, am I
15   correct is what we have here, we have KMPST?
16   **A.  Uh-hum.**
17   Q.  Then we have TKMPS, STKMP, PSTKM and
18   MPSTK, right, those are the five possibilities?
19   **A.  Correct.**
20   Q.  And in those, Mr. Money Bags will always
21   Mr. Money Bags K will always be next to Mr. Money
22   Bags M in all possible permutations except for
23   MPSTK New Money, I'm sorry.
24        MR. ROMAN:  It's confusing, I know.
25   Q.  Move to strike.

**68**

1        MR. ROMAN:  What page are you on?
2    Q.  I'm just looking at the stimuli on page
3    seven.
4        MR. ROMAN:  Okay.  I thought you
5    were reading off of something.  Oh, you're
6    reading off your notes.
7    Q.  I'm reading off my notes.
8        MR. ROMAN:  Okay.  Sorry.
9    Q.  You know, maybe we ought -- would it be
10   easier if I wrote that down?
11   **A.  No, that's fine.**
12   Q.  You followed it?
13   **A.  I followed it.**
14   Q.  All right.  So there's only one
15   permutation of the five possibilities where
16   Mr. Money Bags is not shown directly next to New
17   Money, correct?
18   **A.  Yeah.**
19   Q.  So that would be 80 percent of the time,
20   correct?
21   **A.  Sounds like a reasonable calculation.**
22   Q.  I'm a lawyer, not a mathematician, but
23   just checking.  You have the Stanford Ph.D.
24        So 80 percent of the time
25   respondents compared the drawings of Mr. Money

Transcript of Dr. Yoram (Jerry) Wind
Conducted on September 20, 2018

69

1  Bags and New Money directly next to each other,
2  which was the bias you were seeking to avoid by
3  rotating the pictures in the first place, right?
4      A.  Well, there are two types of potential
5  bias.  One potential bias is the order effect in
6  which case how many times K would appear first,
7  how many times K would appear second, how many
8  times K would appear third, how many times K would
9  appear fourth, how many times K would appear fifth
10  and so on.  So the rotation that we have, they're
11  control for this.  So, basically, each one of the
12  five machines appeared equal amount of times in
13  each one of the five locations.
14          You're right that in the specific
15  case there is a situation where K and M appeared
16  most of the time together, but so have been other
17  combination.  So it has been also M and P and P
18  and S and T and T and K.
19          So a simple way to test is there a
20  bias or not is to ask the question is there any
21  other pair that appears together one after the
22  other that basically people selected them just
23  because they appeared next to each other.
24          And if you look at the data, then
25  it suggests that there's no other pair that

70

1  basically appears even close to these two, even
2  though if your hypothesis is that it's the
3  location that makes the difference here, you're
4  expected to have equal number of people selecting
5  M and P or P and S or S and T or T and K and the
6  other kind of addressing items.
7          So based on this, I feel that,
8  yeah, potentially this could have been bias, but
9  once you check it against the data, we chose that
10  there is no bias here.
11      Q.  Okay.  Let's check it against the data.
12  Can you turn to table 39 of your report.
13          MR. ROMAN:  Henry, when you get to
14  a stopping point.
15      Q.  Sure, right after we finish this.
16          MR. ROMAN:  Thank you.
17      Q.  Table 39, if you're looking
18  electronically, it's page 232 of the PDF.
19      A.  It's computer tabulation.
20          MS. FLAX:  I think it's 128.
21      Q.  Yes, 128 of the tables.
22          MR. ROMAN:  Is it table 22?
23      Q.  Table 39.
24          MR. ROMAN:  Table 39.
25      Q.  Okay.  If you look at -- can you tell us

7

1  what table 39 is.
2      A.  It's a table that shows the responses
3  for -- if you go back to my report --
4      Q.  Well, let me ask this, is it fair to say
5  that this is a table showing the actual responses
6  to each of your questions based on the order of
7  the viewed images?
8      A.  Not to each of the questions, no.  What
9  it is -- it shows -- that's the reason why I
10  wanted to go to the -- to the actual report.  If
11  you look at figure 3A, which is page 22nd of the
12  report, these are the columns.  So the column --
13      Q.  Page 20, I'm sorry?
14      A.  Page 22 in my report.
15      Q.  Okay.
16      A.  Figure 3A.
17      Q.  Sure.
18      A.  So this is the categorization of the
19  open-ended responses.  This is for the reasons for
20  perceived similarity of the different stimuli.
21          So the columns is one -- first one,
22  you have a total for the whole sample, and then
23  you have tests, which would be basically the
24  hundred -- the 289 people responded test.  And
25  then you have K and M only, which will be 183

72

1  people, and then you have basically the others.
2  And control will be the 77 people.  So if you look
3  at -- basically, these are the columns.
4      Q.  I understand.
5      A.  Then it shows you basically how many
6  people received each one of those patterns.
7      Q.  Okay.  Well, let's focus on the K and M
8  only, column C on table 39.  That's the 183, which
9  you said on figure 3A appears, that's the first
10  column, the test, right?
11      A.  Right.
12      Q.  All right.  Those are people that in
13  that -- in your survey only identified Castle
14  Hill's New Money with VGT's Mr. Money Bags?
15      A.  Correct.
16      Q.  No others, correct?
17      A.  Correct.
18      Q.  Okay.  So if we look on table 39, right?
19      A.  Yeah.
20      Q.  If you look at for that column, column
21  C, right, the first one is KMPST, correct; do you
22  see that?
23      A.  Right.
24      Q.  And 38 or 20.8 percent respondents did
25  that, correct?

73

1    A.  Right.
2    Q.  And so MPSTK in that order for column C,
3  K and M only, is 15.8 percent, correct?
4    A.  Right.
5    Q.  And the next one is PSTKM, 37, which is
6  20.2 percent, right?
7    A.  Yes.
8    Q.  The next one STKMP, it's 41, which is
9  22.4 percent?
10    A.  Right.
11    Q.  And the last one TKMPS --
12    A.  Right.
13    Q.  -- is 38 or 20.8 percent?
14    A.  Right.
15    Q.  Like I used to do with my kids, we can
16  say one of these things is not like the other,
17  right?
18      They're all approximately 20 to
19  22 percent, except for MPSTK, which is
20  15.8 percent, correct?
21    A.  Well, but basically, the difference is
22  not that significant.  Basically, all of them,
23  it's close between 16 and 22, and --
24    Q.  Well, all of them are between 20 and 22
25  except for that particular one which is 15.8,

74

1  correct?
2    A.  I doubt -- this is insignificant.  It's
3  not a big difference.
4    Q.  Okay.  Well, it's a 20 percent
5  difference, isn't it?
6    A.  Yeah.  But the better test of this if
7  there is bias or not is to ask how many of the
8  other pairs that appear together, how many of
9  them -- not in this data, but how many people
10  selected M and P, how many people selected P and
11  S, how many people selected S and T, all the ones
12  which are close to each other.
13      Because you also have a situation
14  that M and P appears basically in most of them
15  together.  And if you look at this, if you look at
16  table two of my report, you'll find out that
17  basically in terms of the pairs there is no one
18  that comes even close to the level of repairs that
19  you have -- this is figure 2A on page 20.
20      You know, you have basically
21  56.6 percent selected K and M.  The closest to it
22  is S and T was 21 percent and everything else is
23  below it.  Even if you take all the other ones
24  together combined, it's less than 56.6 percent.
25    Q.  All right.  Just to close the little bit

75

1  of gap here, so on table 39, would you agree or
2  not agree that there is an approximately
3  25 percent difference in the survey results
4  finding confusion between Mr. Money Bags and New
5  Money between the one where the individual
6  machines are not next to each other and the ones
7  where they are?
8      MR. ROMAN:  Object to the form.
9    A.  I think that by stating it as a
10  percentage difference between the two you are
11  exaggerating the difference, because, basically,
12  if you look at the entire definition between 15.8
13  and 22 -- 22.4, it's within the range.  It's
14  hardly significant, so I --
15    Q.  It's a 25 percent difference, though,
16  isn't it?
17      MR. ROMAN:  Object to the form.
18    A.  But look at -- look at this in the
19  context.  Look in the context of the --
20    Q.  I'm asking you specifically on the data
21  there, that's yes or no, is that a 25 percent or
22  more difference?
23    A.  I didn't calculate.  I'll trust your
24  calculation.
25    Q.  Thank you.

76

1    A.  But I'm saying, again, in this context,
2  this is the wrong measure of is there a bias or
3  not.  The correct measure is there a bias or not
4  is to look at the other pairs that appear close
5  together and ask the question do you get similar
6  type of results.
7      And if you want to, if you find out
8  that the other -- look at the average of all the
9  other pairs that appear together, calculate this a
10  control, and deduct from the tests we have, the
11  results we have, this number, and you'll find out
12  that, basically, you're not changing at all the
13  results we got because it's a tiny little number
14  compared to the huge number of confusion that we
15  have, up to 56.6 percent confusion.
16      MR. PLATT:  Thank you.  Take a
17  break.
18      THE VIDEOGRAPHER:  Off the record
19  at 12:14.
20      (Recess.)
21      THE VIDEOGRAPHER:  Back on the
22  record at 12:48.
23  BY MR. PLATT:
24    Q.  Good afternoon, Dr. Wind.
25    A.  Good afternoon.  Thanks for lunch.

Transcript of Dr. Yoram (Jerry) Wind
Conducted on September 20, 2018

48 (189 to 192)

**89**

1  to see which ones are most like the other, right?
2      **A.  Yeah, in general term.**
3      Q.  In a nutshell, right, with a follow-up
4  question as to why?
5      **A.  Right.**
6      Q.  Okay.  Does that study, that survey,
7  determine whether or not VGT actually has an
8  established trade dress?
9      **A.  By itself, it's not a trade dress study.**
10  **It's primarily the magnitude of results would**
11  **suggest that the reasonable inference is they do**
12  **have a trade dress.**
13      Q.  Well, you say the magnitude of the
14  study.  The study you said showed a high
15  correlation of people finding similarities based
16  on your questions between the New Money and the
17  Castle Hill game, correct?
18      **A.  Yes.**
19      Q.  I mean, the New Money Castle Hill game
20  and the VGT Mr. Money Bags, correct?
21      **A.  Correct.**
22      Q.  All right.  But that doesn't establish
23  in any way whether or not VGT actually has a trade
24  dress, it just means that these two things look
25  alike?

**90**

1      **A.  Well, but, basically, you have two**
2  **things here, you have, one, is they look alike in**
3  **term of the overall looks.  Obviously, consumer**
4  **judgment is based on the overall look and feel of**
5  **the machines.**
6      Q.  Well, not feel, they didn't touch,
7  right?
8      **A.  The look.  And the second fact is look**
9  **at the open-ended responses, look at what people**
10  **told us in term of why did they group them**
11  **together, and a lot of the items that they grouped**
12  **them together is because of design elements.**
13      Q.  Okay.  Yeah, so they said that they
14  thought design elements were similar.  But my
15  point is that doesn't establish that there is a
16  distinctive trade dress that VGT has on its
17  product line, does it?
18      **A.  Well, that's what I said, by inference,**
19  **given the magnitude of the similarity, perceived**
20  **similarity, you can infer that VGT does have a**
21  **trade dress.**
22      Q.  Why do you make that -- how can you make
23  that inference?
24      **A.  Because if it would not have it, we**
25  **would not have this level of similarity.  The only**

**9**

1      **reason we have the similarity is because people**
2  **perceived, you know, similarity on these specific**
3  **dimensions, and this means that these dimensions**
4  **are real for the consumers.  So that's where the**
5  **inference comes.**
6      Q.  My second point of confusion, and I know
7  you've answered this before, but I'd like to hear
8  it again, why did you pick the most popular game,
9  the most common in the most common configuration
10  to compare?
11          MR. ROMAN:  I have to object.
12      Asked and answered.
13      Q.  It has been asked and answered.  I don't
14  think I really understand the question, so -- I
15  mean the answer.
16      **A.  The answer is simple, what other**
17  **criteria could you apply to select a machine.  One**
18  **is random, and I did not feel comfortable going**
19  **random because you can come up with a totally**
20  **atypical machine.**
21          **And second is basically a criteria**
22  **such as, you know, what is the most popular**
23  **machine, which is a common criteria used in**
24  **marketing.**
25      Q.  But VGT is suing Castle Hill over 20

**92**

1  different titles beyond, roughly, beyond Mr. Money
2  Bags.
3      **A.  Uh-hum.**
4      Q.  But you didn't think it was important to
5  see if any of the respondents had any level of
6  confusion at all between those other games?
7      **A.  Well, as I said before, I don't think**
8  **it's very realistic given the very difficult**
9  **situation of getting stimuli.  We had a very hard**
10  **time getting even these stimuli.**
11          **It's very difficult to get**
12  **respondent -- that respondent, the company**
13  **respondent we had to go through to try to get the**
14  **400 respondent we got here.  So it would not have**
15  **been realistic in term of feasibility, in term of**
16  **time, in term of cost to try to do multiple**
17  **studies on multiple stimuli.**
18          **If it was an easier situation and**
19  **you have the right stimuli, yeah, you could**
20  **definitely -- and easy to get people, yeah, you**
21  **can then select randomly from the set, let's say,**
22  **three or four of them and run three or four tests.**
23  **But we didn't have the luxury of ability to do it.**
24  **So we had to narrow it down to, okay, which**
25  **machine do we select.  So I thought the criteria**

Transcript of Dr. Yoram (Jerry) Wind
Conducted on September 20, 2018

49 (193 to 196)

93

1  for selecting a machine makes a lot of sense.
2  That's the reason I did it.
3        And then the second question is,
4  once you have the study, can you project it to the
5  rest of the line. So if you look at the study and
6  you look at the second part of my report, which is
7  other supporting data that suggests confusion out
8  of the five elements, I'm suggesting in the second
9  part of my report I feel confident, unless shown
10 other evidence to the contrary, that the results
11 can be projected to the rest of the line.
12    Q. In the array you used on page seven in
13 the survey, you chose to use a VGT game with the
14 pseudo pay table in the rounded top instead of the
15 belly glass as it is in several of their other
16 games; is that correct?
17    A. Correct.
18    Q. Have you seen pictures of VGT games with
19 the pseudo pay table in a place other than the
20 rounded top?
21    A. Yes.
22    Q. And in the specific pseudo pay tables
23 that you used, you chose to use a VGT game and a
24 Castle Hill game that has the same pseudo pay
25 table and the rounded top instead of any of the

94

1  other pseudo pay tables used by the parties in the
2  various games, correct?
3    A. Yeah, this is the one that was available
4  for me in terms of pictures for me to work with.
5    Q. The games?
6    A. The games.
7    Q. So even though VGT has games with many
8  different pay tables, you chose the one that was
9  the same as the Castle Hill game you chose to
10 display even though Castle Hill has different pay
11 tables, also?
12    A. But Castle Hill elected to basically to
13 copy VGT. So they are the ones who selected this
14 type of -- it's not like I invented this -- this
15 machine. It's Castle Hill that designed this
16 machine to copy VGT. And we tried to find out to
17 what extent this copying is perceived by consumers
18 as basically similar.
19    Q. All right. If you could turn to Exhibit
20 6, to the amended complaint. Exhibit 6 is a chart
21 purporting to show VGT's various pay tables and
22 various pay tables from Castle Hill; do you see
23 that?
24    A. Yes.
25    Q. Do you see how the pay tables for

95

1  Mr. Money Bags is different than the pay table for
2  Polar High Roller, the numbers are different?
3    A. Yes.
4    Q. And do you see how on the next page the
5  Gems and Jewels table is different from the other
6  two you just looked at?
7    A. Yes.
8    Q. And do you see how Castle Hill has
9  different pay tables as well?
10    A. Yes.
11    Q. So when you put two machines next to
12 each other for comparison in your array, you chose
13 the ones that just happened to have the same pay
14 tables, correct?
15    A. Well, they are part of the array. They
16 are part of the available options. I did not
17 invent these.
18    Q. I understand. But you could have chosen
19 a game with any of these other pay tables on it,
20 but you chose the one that happened to be the
21 same, right?
22    A. Again, I asked primarily to give me the
23 one which is the best-selling unit and -- and --
24 and product.
25    Q. Okay.

96

1    A. And this is the one that I got.
2    Q. And you --
3    A. The matching to this was basically the
4  matching -- if you go to the complaint, the
5  original matching that was in the previous exhibit
6  we saw, we tried primarily to compare the Money
7  Bag with the New Money.
8    Q. Okay.
9    A. I got the best pictures they could give
10 me on these two.
11    Q. All right. So you picked a Castle Hill
12 game and a VGT game that had the same pseudo pay
13 table, correct?
14    A. Yes.
15    Q. And what about the pseudo pay tables on
16 the Konami, Scientific Games and IGT machines, did
17 you make an attempt to match those as well?
18    A. I asked for -- basically, the units --
19 once we selected those that existed in the same
20 casino, I asked to get the one that had similar
21 characteristics to the VGT and CHG, and I don't --
22 I did not select explicitly specific pay tables
23 for them.
24    Q. So you deliberately chose to use two
25 machines that had the same pay table, but you made

Transcript of Dr. Yoram (Jerry) Wind
Conducted on September 20, 2018

23

1    A.  As much time as they wanted.
2    Q.  Wasn't that one of the things that
3 eliminated people from the study?
4    A.  Only if someone did it very, very fast.
5 I think the rule is 30 percent faster than the
6 medium then they are excluded from the study
7 because they are basically the people are just
8 trying to complete the questionnaire.  They're not
9 paying any attention.  There's no way they could
10 have paid attention for the stimuli.  So we
11 actually we protected against people speeding up
12 sort of the process.
13    Q.  What about people taking too long, were
14 they excluded?
15    A.  No.  We just basically focused on the
16 bottom line, on the speed.
17    Q.  All right.  What do you mean by they
18 were given the option of enlarging the images?
19    A.  Well, it was a screen and they could
20 have actually enlarged the image to see it larger.
21    Q.  How did they do that?
22    A.  By moving their mouse on this.
23    Q.  And they would click on it?
24        Okay.  And was this a zoom feature?
25    A.  Yes.

24

1    Q.  What do you mean by a zoom feature?
2    A.  That you can basically enlarge a section
3 to see it larger.
4    Q.  Okay.
5    A.  It gets it back to normal.
6    Q.  So if you clicked on it, you got a
7 bigger picture?
8    A.  Correct.
9    Q.  It wasn't like you can -- I don't know
10 if you do online shopping.  If you want to look at
11 something when you're online shopping, you can
12 actually zoom into fine detail of specific parts
13 of a picture.  It wasn't that, you just get a
14 slightly bigger picture, correct?
15    A.  But you could focus on a specific part
16 of the picture.
17    Q.  I'm sorry?
18    A.  You could focus on part -- parts of the
19 picture.
20    Q.  Have you taken this survey, sir?
21    A.  I did.
22    Q.  And it's your testimony that you can
23 zoom in and focus on a specific part of this
24 picture?
25    A.  I did not do it.  I did basically a full

25

1 adjustment of enlarging it.
2    Q.  All right.
3    A.  I did not do it.  But my understanding
4 is that the technology that Research Now allows
5 you to select specific parts of the picture that
6 you want to do it.
7    Q.  Well, I would agree with you that
8 technology allows it.  What I disagree with you is
9 that your survey allows you to do that, but we'll
10 get back to that later.
11        On page nine of your report, you
12 state that -- let me see where it is -- the main
13 question you state, the main questionnaire
14 states -- and these are what the actual players
15 are told, right?
16    A.  Right.
17    Q.  It says you can zoom in to see any
18 element of the machine better.  That's what you
19 were just saying, right?
20    A.  Right.
21    Q.  And it's your testimony that's actually
22 true?
23    A.  My understanding is that the -- the
24 questionnaire as implemented allowed them to do
25 it.

26

1    Q.  Did you review the verbatim responses in
2 this case?
3    A.  Yes.
4    Q.  And part of your survey, you asked for
5 feedback regarding the survey --
6    A.  Right.
7    Q.  -- afterwards?
8        Turn to table 38, on page 126 of
9 the tables.
10        MR. ROMAN:  What page?
11    Q.  126?
12    A.  The tables.  Computer tabulation.
13    Q.  So it's table 38.
14    A.  Correct.
15    Q.  The question on this table that was
16 asked do you have any feedback about this survey
17 and your experience taking it.
18    A.  This was the last question of the
19 survey.
20    Q.  Sure.  And one of the things people said
21 was need more detail, zoom in on pictures to
22 answer, correct?
23    A.  Yeah, there were seven people that
24 mentioned it.
25    Q.  So that was an issue raised?

27

1    A.  By seven people.
2    Q.  By seven people.  What about in the
3  verbatim responses?
4    A.  What is the question about it, what
5  about it?
6    Q.  Did you review the verbatim responses of
7  those seven people to see if they had additional
8  concerns about the zoom feature?
9    A.  No, I did not follow on this specific
10  seven people.  I went over all -- I went over all
11  the verbatims.
12    Q.  Okay.  And did you notice other
13  people -- that people were mentioning the problem
14  with the zoom feature within the other verbatim
15  responses?
16    A.  I don't recall any.
17    Q.  Let's look at a couple.  If you can turn
18  to page 21 of the verbatim responses, respondent
19  2351.
20    A.  What's the number?
21    Q.  2351, page 21.
22    A.  Page 21?
23    Q.  Yes.
24    A.  I have page 20.
25    Q.  Specifically, response D3, very

28

1  frustrated as zoom didn't get me enough details to
2  tell you what you needed to know.
3    A.  So this would be one of the seven
4  people.
5    Q.  Presumably.
6    A.  It has to be because otherwise it would
7  have been listed in -- in part of the response in
8  the previous table we looked at.
9    Q.  All right.  And then again for
10  respondent 5219, page 57.
11    A.  5219?
12    Q.  Uh-hum.
13    A.  What page?
14    Q.  57.
15    A.  So this person says you could make the
16  zoom even more refined or more zoomed in.
17    Q.  So they weren't able to zoom in on the
18  features they wanted like you said?
19    A.  No, we don't know it.  All we know that
20  it says or she says you could make the zoom even
21  more refined or more zoomed in.  It doesn't say
22  anything that they could not do it.
23    Q.  Were all the machines that you showed
24  shown in the same resolution?
25    A.  When they looked at them at the five,

29

1  yes, the five looked basically the same
2  resolution.  I think when you enlarged them, I
3  think some of them may have been a better
4  resolution.
5    Q.  And which ones had the best resolution?
6    A.  I don't recall at this stage.
7    Q.  Well, it was the VGT game and Castle
8  Hill game for sure, right?
9    A.  I just don't recall, you know, which of
10  the five had it.  I recall that there was a --
11  basically a comment on this, but it was only when
12  you zoomed that some of the resolution improved.
13    Q.  Look at page seven of your reply report
14  and tell me if that refreshes your recollection.
15        Specifically, the paragraph under
16  section D, which is the images used in the survey
17  were the best available and provided sufficient
18  detail, you say, first, although Mr. Berger claims
19  that the quality of the images of the VGT and CHG
20  EGMs are higher definition than the images of the
21  other stimuli EGMs when viewed without zooming,
22  all five images have similar resolution.
23        Let's look at the pictures.  All
24  right.  So we have on page seven.  You have your
25  five pictures.  You want to look at the actual

220

1  survey pictures that you have, we can do those.
2        So without zooming, can you read
3  the names of the games?
4    A.  The copy you gave me of the
5  questionnaire is black and white.  This is not the
6  way the respondents saw them.  They saw them on
7  the screen in color, and they were asked whether
8  they can see it in color.
9    Q.  I apologize, I did ask for color copies
10  and I'm sort of surprised you didn't get one.
11        So why don't we use this.
12    A.  So what is the question?
13    Q.  Can you read the names of the games?
14    A.  Not -- not on paper.  I was able to read
15  them easily when I -- when I completed the
16  questionnaire on the screen.
17    Q.  Let me take that back.  We'll look at
18  the actual online one in a little while.
19        You said they have the same
20  resolution when not enlarged, correct?
21    A.  Correct.
22    Q.  And then you stated in your report on
23  page seven that even after zooming, the image of
24  the Scientific Games EGM has similar resolution to
25  the images of the VGT and CHG EGMs, correct?

Transcript of Dr. Yoram (Jerry) Wind
Conducted on September 20, 2018

62 (245 to 248)

245

1  correct.  You cannot go more than once.
2      Q.  Okay.  So, again, we're back to we
3  qualified.  On the next screen, we'll show you
4  five gaming machines that you may see in an
5  Oklahoma casino.
6      A.  Right.
7      Q.  And the order that came up is the KMPST.
8  That's the same order that's in the report,
9  correct?
10     A.  Correct.
11     Q.  All right.  So let try the zoom feature.
12 How do you zoom?
13         So you've clicked on it and it's an
14 enlarged picture, right?
15     A.  An enlarged picture, right.
16     Q.  Can you zoom in on that to show any of
17 the detail?
18     A.  Apparently, not.
19     Q.  So you have an enlarged picture, and in
20 this picture, you can see the name of the game and
21 the numbers on the pay tables; is that correct?
22     A.  Yes.
23     Q.  And you can see that this is a bingo
24 card?
25     A.  Yes.

246

1      Q.  Okay.  Let's look at some of the others.
2          You click on, whatever you like to
3  do, and you're trying to move them.  But to
4  enlarge them, you need to click?
5          MS. FLAX:  Double click.
6      A.  Double click.
7      Q.  Okay.  All right.  So what's the name of
8  this game?
9      A.  This is the Gold Winners.  This is
10 gold -- Gold Winners.
11     Q.  Okay.  Do you recall whose machine that
12 is?
13     A.  No.
14     Q.  Okay.  And you can enlarge P?
15     A.  Yeah.
16     Q.  Okay.  Again, you can't zoom in on it
17 any more than that, correct?
18     A.  I was mistaken before.  Because I just
19 enlarged it, and had a discussion with the field
20 to try to allow zooming on specific sections, and
21 I forgot that eventually they said they could not
22 do it on this version, it's only enlarging.  So I
23 misspoke way, way before.
24     Q.  Okay.
25     A.  You want to continue?

247

1      Q.  No.  Actually, what I want to do is
2  start over and I want to get a different array.
3      A.  Okay.
4      Q.  So let's see if we can do that.  Let me
5  get the numbers for this one to start over.
6          Okay.  So do you want to do it
7  or --
8      A.  Go ahead, you can do it.
9      Q.  Sure.  I have read and understand,
10 right?
11     A.  Yeah.  There is no space between them.
12     Q.  I will be female this time just for fun,
13 and then I'll be 29 because that's a great age.
14     A.  Sounds good.
15     Q.  And my zip code, 20006, this will work,
16 and I'll be in education just like you.
17     A.  That's good.
18     Q.  I've already completed it.  I'll let you
19 in any way for testing.
20         Okay.  Have you visited the casino.
21 Oklahoma.  Slot or bingo machines.  We've
22 qualified.  This is the array where they're
23 separate, correct?
24     A.  Correct.
25     Q.  This is the one possibility where

248

1  they're not next to each other?
2      A.  Correct.
3      Q.  All right.  Start over.
4      A.  Keep in mind that this is not what
5  consumers see because you're in test mode.  The
6  consumers see actually without all these errors
7  that you already responded to this.  So you're
8  basically on the test version.
9      Q.  Got it.
10     A.  And not the real version the consumers
11 saw.
12     Q.  I'll be male this time.
13         This one is STKMP, correct?
14     A.  Yeah.
15     Q.  Okay.  I'm afraid I'm going to have to
16 do this one more time to get to the array I'm
17 looking for.
18         Oh, it's my age, sorry.
19     A.  This will be a world record.
20     Q.  Yeah.
21     A.  Two-thousand-year old person.
22     Q.  Education.  I hope it works this time.
23         Okay.  The array that we have now
24 is in the order of TKMPS, correct?
25     A.  Yes.

Transcript of Dr. Yoram (Jerry) Wind
Conducted on September 20, 2018

26

1  conclusions there, correct?
2     A. Yes.
3     Q. And that's based on the data that you
4  provided that we've already discussed?
5     A. Correct.
6     Q. And the results of your study are, the
7  empirical the quantitative part, is dependent upon
8  the actual data that was received, so if there
9  were any problems with that data, that would
10 impact the results of the study?
11    A. Correct.
12    Q. So let's look at the second then. This
13 was your second objective of the -- your second
14 objective on page one was to examine other
15 relevant evidence to assess whether this evidence
16 supports the conclusions of the empirical study.
17 And that's what you've done in section five
18 beginning on page 24 of your report; is that
19 correct?
20    A. Correct.
21    Q. Who wrote this section of the report?
22    A. I did.
23    Q. Every word?
24    A. Yeah.
25    Q. You typed it out yourself?

263

1     A. Correct, I did not design a study to
2  look at the strength of the trademark.
3     Q. And I believe you testified earlier that
4  your study did not analyze the strength of VGT's
5  trade dress either?
6     A. Well, it was not designed to test it
7  explicitly. But we talked about that you can
8  infer from the strong results on confusion, you
9  can infer as to the trademark and trade dress.
10    Q. But you cannot infer the trade dress and
11 any likelihood of confusion between the trade
12 dress of titles other than Mr. Money Bags and New
13 Money, correct?
14    A. Well, that's a separate topic. That's
15 my fifth topic, which is basically to what extent
16 you can project the results to the product lines
17 beyond the specific item tested.
18    Q. Right. But you're talking in general
19 here that VGT's trademarks and trade dress of
20 their VGT EGMs are strong.
21    A. Because the data that I'm reporting here
22 does not limit themself to the stimuli used in my
23 study.
24    Q. Meaning the information that you relied
25 upon provided by VGT's attorneys to use?

262

1     A. A draft.
2     Q. Did you receive an outline of it from
3  Covington?
4     A. No.
5     Q. In your decision to use the various
6  materials that you cited here, did you rely upon
7  the instructions or advice of VGT's attorneys?
8     A. No. I discussed with them, obviously,
9  what other available data are there, which led to
10 identifying the five topics that I covered under
11 this -- this section.
12    Q. All right. In section A, the strength
13 of VGT -- VGT's EGM trademarks and trade dress,
14 you say the stronger the trademarks and trade
15 dress the more likely it is that emulation of
16 those trademarks and/or trade dress will lead to
17 confusion because consumers are more likely to
18 remember strong trademarks and trade dress and are
19 more likely to associate them with a wide arrange
20 of products, and you opine that the evidence
21 suggests that the trademarks and trade dress are
22 strong.
23       And, again, you did absolutely no
24 empirical analysis of the strength of VGT's
25 trademarks, correct?

264

1     A. Right, all the data available from VGT,
2  so all the data that I am reporting on pages 25
3  through -- I'm missing a page here -- until 31.
4  These are data that relate not only to the two
5  stimuli I used in my study, but to general
6  information relating to VGT.
7     Q. When you do a confusion study to
8  determine the likelihood of confusion in other
9  cases, do you typically include a discussion of
10 whether other relevant factors are consistent with
11 the survey's conclusions?
12    A. To the extent such data are available,
13 yes.
14    Q. And so we're clear, where did you obtain
15 the evidence you considered from?
16    A. Well, I asked basically, you know, I
17 discussed with counsel what are the variables that
18 will support the conclusion based on the
19 philosophy of convergence validity; to what they
20 extend it to, there are many source of information
21 and ideas supporting the same thing, its strengths
22 and conclusions we had; identify those five areas
23 and ask them to give me all the information
24 available about these five areas.
25    Q. Okay. Do you have any legal training?

Transcript of Dr. Yoram (Jerry) Wind
Conducted on September 20, 2018

265

1    A.   No.
2    Q.   Have you ever served on a jury?
3    A.   No.
4    Q.   Do you believe you are qualified to
5    weigh the evidence in this case?
6         MR. ROMAN:  Object to the form.
7    A.   Not from a legal point of view.
8    Q.   Yet you've gone through the evidence
9    presented to you from VGT's attorneys and based on
10   the evidence that you read, not subject to
11   cross-examination or counterpoint by Castle Hill,
12   you have determined that all of this supports the
13   conclusion that Castle Hill has deliberately
14   copied machines and infringed upon the trademarks
15   and trade dress of VGT; is that correct?
16        MR. ROMAN:  Object to the form.
17   A.   Some of the documents concerning the
18   copying was documents where, basically, Castle
19   Hill, you know, documents and deposition
20   testimony; furthermore, the whole procedure is
21   based on -- this is based on my best understanding
22   of the material I saw.
23        To the extent that there is
24   counterevidence for this, there are data that
25   shows, no, they did not copy, they did not intend

266

1    to copy, you know, that's where the rebuttal
2    report comes in.  So Mr. Berger could have
3    included this in his rebuttal report, and were you
4    correct here in filming the data.
5         Everything I'm saying here is based
6    on this data, the data reported here that I
7    reviewed and support the case, support basically
8    the conclusion of confusion, which my empirical
9    study established.
10   Q.   What in your -- I recognize you have a
11   very impressive resume and lots of experience,
12   sir.  My, I guess my is, what is it in your
13   qualifications that you believe makes you
14   qualified to review and weigh evidence?
15        MR. ROMAN:  Object to the form.
16   A.   I, again, I'm not reviewing them or
17   weighing them from a legal point of view.  But all
18   my professional life, I've been basically looking
19   at data.  I've been working with many companies in
20   consulting, advisory capacity and others, and it
21   always involved evaluating data and interpreting
22   it.  And what does it mean?  As a faculty member
23   all of these years, that's what it mean in term of
24   teaching the evaluation of students' work,
25   mentoring, so in every capacity in my writings in

267

1    every one of my professional life, that's what I
2    do.
3    Q.   If you could turn to page 25 of your
4    report.  You say, first, I understand that VGT is
5    the leading North American developer,
6    manufacturer, distributor of class II EGMs, and
7    then you cite to that one particular web page that
8    you cited in your report --
9    A.   Right.
10   Q.   -- that you relied upon.
11        And you say I understand that it is
12   the leading North American developer, manufacturer
13   and distributor of class II EGMs; that it has been
14   exclusively using its trademarks and trade dress
15   for years, paren, with only relative minor
16   variations in its trade dress that have not
17   affected the overall commercial impression of the
18   products, closed paren, and then you drop a
19   footnote to records of the United States Patent
20   and Trademark Office; do you see that?
21   A.   Yes.
22   Q.   What is the basis for your statement
23   that VGT has made only relatively minor variations
24   in its trade dress and that they have not affected
25   the overall commercial impression of the products?

268

1    A.   That's my understanding from the
2    discussion and document I looked at.  If I'm
3    wrong, if there are evidence to the contrary, I'll
4    change it.
5    Q.   Well, we looked at pictures of Mr. Money
6    Bags in the sit-down cabinet, right?
7    A.   Right.
8    Q.   You remember that?
9    A.   Yeah.
10   Q.   And you agree that it was a completely
11   different look than the one you showed, but you
12   didn't use that because it was the most popular
13   you said, right?
14   A.   Whether it's perceived as different or
15   not, it's not my judgment, it should be the
16   judgment of consumers.
17        And I basically believed that based
18   on VGT management belief that they have a
19   consistent kind of look and feel over the years.
20   I have not seen data to the contrary that will
21   show that consumers perceived any of the other
22   picture you showed me differently than the one
23   that I tested.
24   Q.   All right.  So you got the one you
25   tested.  You have the one in Exhibit 6 with the