UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

VIDEO GAMING TECHNOLOGIES, INC.,

                      Plaintiff,

v.

CASTLE HILL STUDIOS LLC, *et al.*

                      Defendants.

CASE NO. 17-CV-00454-GKF-JFJ

**PUBLIC – REDACTED VERSION**

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE REGARDING THIRD PARTY GAMES

Defendants, Castle Hill Studios LLC, Castle Hill Holdings LLC, and Ironworks Development LLC (collectively, "CHG" or "Defendants"), file this opposition to Plaintiff Video Gaming Technologies, Inc.'s ("VGT") Motion In Limine Regarding Third Party Games (the "Motion"). ECF 155 (filed under seal).

Through its motion, VGT seeks to improperly preclude CHG from introducing evidence "of slot machines or bingo-based games made by other manufacturers … that CHG has *not* disclosed in discovery," Motion at 1 (emphasis in original), even though CHG plainly had no obligation to identify or disclose *every* slot machine in existence in discovery, and to preclude CHG "from altering CHG's position on which disclosed third party games are most similar to the VGT games at issue," *id.*, even though VGT has repeatedly "altered" what *it* believes to be the "games at issue" in this case. VGT's claims are a continually evolving and moving target, and CHG should not be hamstrung from producing appropriate evidence to rebut VGT's latest theories. Moreover, with its discovery requests VGT attempts to improperly shift its burden of proof onto CHG, when it is Plaintiff's burden to show distinctiveness in the market. It is not Defendants' burden to show the absence of distinctiveness. Further, evidence of additional third party games would hardly amount to

"unfair surprise." Plaintiff's motion is merely an attempt to limit Defendants' ability to put on a defense and respond to Plaintiff's evidence at trial, whatever such evidence is. Finally, VGT's Motion would improperly limit the testimony of lay witnesses.

## I.  FACTUAL BACKGROUND

When this case commenced, VGT claimed, *inter alia*, that CHG infringed on dozens of its trademarks (registered and unregistered),[1] and copied its trade dress for its Class II electronic gaming machines ("EGMs"). With respect to the trade dress, VGT claimed in its Complaint that it had "common law rights to the trade dress (*i.e.*, the overall appearance and commercial impression) used in connection with its 3-Reel Mechanical Games," which "includes, but is not limited to, the following individual trade dress packaging features: GAME CABINET; GAME PLAY SOUND; AWARD SOUND; BINGO PLAY AND PAYS; and RED SCREEN FREE SPINS." Doc. 2, ¶ 22. These "individual" trade dress features, according to the Complaint, are "common elements" used "throughout **all** VGT 3-Reel Mechanical Games."[2] *Id.* at ¶ 31 (emphasis added). VGT alleged that *each* of these *individual* trade dress features "is non-functional and has become an indicator that a game is likely owned by VGT." *See id.* at ¶¶ 23-27.

In addition, VGT alleged that each of its games has a "theme" that "is part of that specific game's trade dress." *Id.* at ¶ 31. VGT then identified 16 different game "themes" as part of its trade dress, including: frontier gold mining themes ("Crazy Bill"); money/cash themes ("Mr. Money Bags"

---

[1] The overwhelming majority of VGT's trademark claims have since been abandoned by Plaintiff. *See* Doc. 143.

[2] Of course, as detailed on pages 34-38 of Defendants' Motion for Summary Judgment, Doc. 184 (under seal), VGT does not actually have a *consistent* trade dress for its 3-reel mechanical games, and, accordingly, it has modified its description of the "elements" of its trade dress several times throughout discovery in this litigation. VGT uses numerous different cabinets, in numerous different configurations, with markedly different appearances, for the exact same game titles often on the same casino floors. VGT has long ago abandoned its claim that there are "common elements" used "throughout *all* VGT 3-Reel Mechanical Games," as originally alleged in paragraph 31 of the Complaint. Nevertheless, VGT failed to correct this glaring misstatement of fact when it filed its Amended Complaint just prior to the close of discovery. *See* Doc. 103, ¶ 31.

and "Countin' Cash"); arctic themes ("Polar High Roller"); Irish Luck themes ("The Lucky Leprechaun"); attractive/sexy women themes ("Hot Red Ruby" and "Gems and Jewels"); precious gems and jewels themes ("Gems and Jewels," "Diamond Fever," "Red Hot Rubies" and "Radiant Rocks"); Las Vegas/Millionaire/wealth themes ("Mr. Millionaire" and "Mr. Money Bags"); Old/Wild West themes ("Greenback Jack" and "Crazy Bill"); anthropomorphic cartoon animal themes ("Polar High Roller," "Planetary Pigs," "Countin' Cash" and "Lucky Ducky"); race car themes ("Super Speedway Sevens"); pirate themes ("Cap'n Crabby's Ca$h"); and a "cherry" theme ("Crazy Cherry"). *See id.* at ¶¶ 32-34, 68-70; Doc. 2-4.[3]

During discovery, VGT requested wide-ranging information relating to the adoption of "each Mark and Trade Dress feature used" in connection with CHG's games, "including the names, logos, themes, cabinets, sounds, bingo patterns, pay tables, ball call method, and Instant Free Pay bonus feature." Motion Exh. C at 27. In response, CHG provided extensive information regarding both the creation of its own games, including the different elements and themes VGT claimed (at the time) to constitute its infringed "trade dress." *See id.* at 27-73. Specifically, in explaining that the allegedly "distinctive" individual trade dress features and themes VGT put at issue are actually *ubiquitous* features and themes that have been utilized throughout the gaming industry *for decades*, CHG provided non-exclusive images as *examples* of the *multitude* of competing games utilizing the exact same game features and themes. *See id.* at 30-73 (repeatedly stating: "Images of *certain* of these games are below.") (emphasis added).

---

[3] During discovery, VGT's President, Jay Sevigny, and Executive Vice President of Sales, James Starr, ███████████████████████████████████████████████████████ *See, e.g.*, **Exhibit A**, Sevigny Dep. at 111:7-23, 112:18-25, 155:2-4, 156:20-157:3 ███████████████████ **Exhibit B**, Starr Dep. at 27:15-17, 29:19-30:2, 31:5-8, 33:15-34:4, 106:7-21, 170:23-171:15 ████████████████

3

For example, with respect to the "themes," VGT alleged that CHG's "Nugget Mountain" game infringes on its "Crazy Bill" gold mining theme. *See* Doc. 2, ¶ 68. Specifically, VGT alleged that both games feature "a cartoon miner with a bushy white beard, bushy white moustache, and bushy white eyebrows, wearing a raggedy brown cowboy hat with an upturned front brim that has a nick in the fabric above the miner's left eye, mining for gold nuggets in the desert in the Old West." *Id.; see also* Doc. 2-4 (game images). In its interrogatory response, CHG explained that Nugget Mountain is based on the generic theme of mining for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Motion Exh. C at 35.

In furtherance of its response, CHG identified several games in the industry inspired by similar themes of gold mining and/or gold nuggets, and provided images of four competitor games with the same theme (made by Aruze, International Game Technology ("IGT") and Bally). *See id.* at 36-37. Three of those games ("Gold Quest," "Strike it Rich Again," and "Golden Frontier") feature a virtually identical cartoon miner character, all of which were plainly inspired by the classic image of George "Gabby" Hayes, an actor who appeared in countless Western-themed films during the 1930s to 1950s, including films about the gold-mining culture of the Wild West. *Id.* at 35-37 (providing photos of Gabby Hayes, a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Doc. 2, ¶ 68).[4]

---

[4] Indeed, simply googling the phrase "cartoon gold miner image" results in *dozens* of nearly identical images. *See* Google Search for "cartoon gold miner image," https://www.google.com/search?q=cartoon+gold+miner+image&client=firefox-b-1&tbm=isch&tbo=u&source=univ&sa=X&ved=2ahUKEwicsNvFurHeAhWxTt8KHSrrBZMQ7Al6BAgGEB8&biw=1376&bih=661 (last viewed November 14, 2018).

Not once in its response did CHG ever claim that this was an *exhaustive* list of casino games with similar themes and images, which, as VGT itself now admits, are commonplace in the industry. *See, e.g.,* **Exhibit B**, Starr Dep. at 40:7-18 (VGT Executive VP for Sales admitting that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; *id.* at 106:4-21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

In further response to this interrogatory, CHG identified dozens of other competitor games with respect to the other VGT "themes" at issue, *never once asserting that the examples provided were exhaustive. See, e.g.,* Motion Exh. C at 30-32 (images of ubiquitous high roller/Las Vegas themed games similar to CHG's "Mr. Martini" game); *id.* at 32-34 (images of commonplace anthropomorphic pig themed games similar to CHG's "Aces & Hogs" game); *id.* at 38-40 (images of ubiquitous precious gems and jewels themed games similar to CHG's "Genie's Gems," "10,000 Diamonds," "20,000 Diamonds" and "Pink Sapphires" games); *id.* at 41-44 (images of ubiquitous money and wealth themed games similar to CHG's "New Money, "Arctic Cash," "Coin Slinger" and "Amazing Cash" games); *id.* at 44-47 (images of ubiquitous arctic/polar themed games with anthropomorphic animals, such as polar bears and penguins, similar to CHG's "Arctic Cash" and "Arctic Ice" games); *id.* at 47-50 (images of ubiquitous Wild West themed games similar to CHG's "Coin Slinger" game); *id.* at 51-54 (images of ubiquitous Irish Luck themed games similar to CHG's "Dublin Your Luck" game); *id.* at 55-58; (images of ubiquitous attractive/sexy women themed games similar to CHG's "Double Hotness" game); *id.* at 59-62 (images of ubiquitous pirate themed games similar to CHG's "Captain Bacon" game).

In addition, in response to Interrogatory No. 2, CHG provided similar examples with respect to the individual trade dress "features" allegedly at issue which are commonplace throughout the gaming industry. For example, with respect to the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and referred the Court

5

to Exhibit 6 of the Complaint for examples of "VGT pay tables that CHG has copied." Doc. 2, ¶ 78; Doc. 2-6. In its interrogatory response, CHG explained that its pay tables are actually ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[5] *See* Motion Exh. C at 67-72.

Similarly, with respect to the "game cabinet" feature, CHG explained that it selected its "retro style" cabinet from a third-party re-seller, GT Source, because ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id.* at 62. By way of example, CHG noted that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[6] *Id.* at 62-63. CHG did not identify any specific *games* that were housed in these ubiquitous cabinets, only the *manufacturers* (which is obviously why VGT wants to prevent CHG from using pictures of these commonplace machines during the trial).

After CHG provided these discovery responses, VGT served an additional interrogatory, seeking detailed information regarding "each of the third party games referred to in Defendants' Second Supplemental Objections and Responses to Plaintiff's First Interrogatories." Motion Exh. E

---

[5] During discovery, VGT *admitted* that its own pay tables, which it had actually alleged to be "an indicator that a game is likely owned **by VGT**," Doc. 2, ¶ 26 (emphasis added), ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See* Doc. 184, SOF ¶ 35. Once again, VGT failed to correct this glaring misstatement of fact when it filed its Amended Complaint just prior to the close of discovery. *See* Doc. 103, ¶ 26.

[6] CHG subsequently supplemented this interrogatory response to note that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See* **Exhibit C**, Defs.' Fourth Supp. Objs. and Resps. to Pl.'s First Interrogs. at 74.

at 1 (VGT Interrogatory No. 21). In response, CHG objected to the request as, *inter alia*, "overly broad and unduly burdensome," in that " ██████████████████████████████████████████████████████████████████████████████████ " *See id.* at 1-2. Subject to and without waiving that objection, CHG nevertheless provided as much information it had regarding the games identified in its prior discovery response that it had in its possession, custody and control. *See id.* at 2-5.

Still not satisfied, VGT served yet another interrogatory, this time requesting that CHG "Identify the five (5) third party games with features resulting in an overall look and feel that CHG contends most closely resembles the overall look and feel of the VGT 3-Reel Mechanical Games at issue in this litigation," and, for each, identify detailed information about such games. Motion Exh. A at 4 (VGT Interrogatory No. 24). In response, CHG objected to the request as vague and ambiguous, in that "VGT has not defined what it means by 'overall look and feel of the VGT 3-Reel Mechanical Games,'" and objected to the request "to the extent it suggest [sic] that the VGT games at issue in the litigation all share a common 'overall look and feel.'" *See* Motion Exh. B at 2. Subject to and without waiving those objections, CHG nevertheless referred Plaintiff to the information regarding third-party games it had previously provided in its response to Interrogatory 2, several hundred pages of documents regarding third-party games CHG produced in discovery, and its response to Interrogatory No. 21. *See id.* at 2-3.

Responding to Interrogatory 24 as written, of course, was an impossibility, as the trade dress elements of the "games at issue" in this litigation are a continually evolving and moving target. VGT's 3-reel mechanical games come in dozens of titles in numerous different cabinet configurations – often placed side-by-side in the same casinos. *See* Doc. 184, at SOF ¶¶ 13-24 & exhibits cited therein, which are incorporated herein by reference (detailing the numerous different cabinets VGT uses, the different lighting options used by VGT, including "jukebox" lighting, the

7

different sound packages used by VGT, the use of an occasional "fourth-reel" on top of its cabinets, the inconsistent use of "toppers," the use of inconsistent artwork within game themes, and the use of at least eight different size monitors on its machines). By way of example, pictures of six different configurations of "Mr. Money Bags Theme" games alone are pictured in Attachment A hereto,[7] *none* of which look like the image VGT shows on page 4 of its Motion.

As noted by VGT in its Motion, the parties held a meet and confer conference over CHG's objections and response to Interrogatory No. 24, and, as a compromise, CHG agreed to supplement its response to the Interrogatory with Rule 30(b)(6) testimony. ▌ *See* **Exhibit D**, July 31, 2018 e-mail from Henry Platt to Michael Sawyer.

CHG designated Dan Fulton as a Rule 30(b)(6) witness to testify on this topic. During the deposition, VGT asked a very different question than it did in Interrogatory No. 24. Instead of allowing the witness to testify broadly regarding CHG's opinions regarding the numerous games that have a similar "look" to the various VGT's games, or its opinions regarding games that have a similar "feel" to the game play of VGT's EGMs, VGT's counsel asked ▌ **Exhibit E**, Fulton 30(b)(6) Dep. at 21:15-19 (emphasis added).[8] In fact, throughout the deposition, VGT's counsel repeatedly insisted on limiting Mr. Fulton's options to the games identified in the interrogatory response. *See, e.g., id.* at

---

[7] The first four images in Attachment A are taken directly from VGT's website, and the two photographs (which include the sit-down "slant" cabinet and an "LS" upright cabinet with a six-inch screen) were exhibits used in the depositions.

[8] Contrary to the implication in VGT's Motion, VGT never once asked Mr. Fulton to identify "the five third party games with features resulting in an overall look and feel that CHG contends most closely resemble the overall look and feel" of the drawing of one of dozens of VGT games – in one of several particular cabinets used by VGT, without a "jukebox" lighting package, without a topper, and with a large video screen – as reproduced on page 4 of its Motion.

26:13-22 ███████████████████████████████████████

███████████████████████████████████ *id.* at 32:17-24 ███████████

███████████████████████████████████████████████████

CHG's response to Interrogatory No. 21, as discussed above, was limited to the games it had identified in response to Interrogatory No. 2, in which CHG provided examples of third party games which shared common "themes" with CHG and VGT games, and common *individual* game "features" which VGT had claimed to be elements of its trade dress. Although many of the third party games identified in CHG's interrogatory response shared similar "looks" regarding various aspects of the individual trade dress, *e.g.*, the pay tables, the cabinet style, and artistic elements, CHG never once claimed that it believed any of these third party games actually were "most similar" to VGT's games. That it is VGT's goal to nevertheless artificially limit CHG's ability to refer to games not set forth *in its interrogatory responses* – which were provided as mere examples – is confirmed by VGT in its motion, in which it seeks to preclude CHG from "altering" its "position on which *disclosed* third party games are most similar to the VGT games at issue." Motion at 1 (emphasis in original).

When Mr. Fulton was questioned on this topic during his 30(b)(6) deposition, he did his best to respond to the questions but refused to accept VGT's premise that a single game could be "closest" in "overall look and feel" to VGT's 3-reel mechanical games. *See* **Exhibit E**, Fulton 30(b)(6) Dep. at 23:14-24 ████████████████████████████████████

███████████████████████████████████████████████████

████████████████ *See id.* at 27:13-14; *id.* at 54:9-55:3 ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

9

███████████████████████████████████████████████████████████████

███████████████████████████████████████████ *Id.* at 38:8-40:3.

For example, when VGT requested Mr. Fulton to explain his answers, Mr. Fulton commented that the IGT S3000 game cabinet (used to house the game Double Diamond Haywire and other IGT games) closely resembled *certain* VGT games, but not all. If a different VGT cabinet were discussed, Mr. Fulton asserted he ███████████████████ *Id.* at 40:1-3 ███████ ██████████████████████████████████████████ In this respect, Mr. Fulton testified that, focusing on just the look of the VGT's LS cabinet, Cadillac Jack, AGS, and Multimedia all use the exact same cabinet and, in fact, the very cabinets CHG itself uses were *used* cabinets from Cadillac Jack. *Id.* at 57:14-22.

Further, Mr. Fulton stated that his answers to VGT's questions regarding similar games were artificially limited because VGT only allowed Mr. Fulton to pick a *single* game. *Id.* at 59:3-13. ███████████████████████████████████████████████████████████████ ███████████████████████████████████ *Id.* at 60:9-13; *see also id.* 59:8-13 ████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████

VGT never moved to compel further information regarding either CHG's response to Interrogatory No. 24 or its Rule 30(b)(6) deposition testimony on the topic. VGT never served a discovery request asking VGT to identify *all* "slot machines or bingo-based games made by other manufacturers" of which it is aware that have themes or features "similar" to VGT EGMs.

## II. ARGUMENT

### A. VGT's Motion Improperly Seeks to Shift the Burden of Persuasion

By requesting that CHG be precluded from "introducing or soliciting at trial evidence of slot machines or bingo-based games made by other manufacturers" that have not been previously "disclosed" in discovery, VGT is improperly attempting to shift its own burden of proof. To obtain relief for its trademark and trade dress claims "*a plaintiff must show*: (1) The trade dress [or mark] is inherently distinctive or has become distinctive through secondary meaning; (2) There is a likelihood of confusion among consumers as to the source of the competing products; and (3) The trade dress is nonfunctional." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1147 (10th Cir. 2016) (quoting *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1227 (10th Cir. 2007)) (emphasis added).

In seeking protection for a line of products VGT has an additional burden. VGT must prove that its products have a recognizable and "consistent overall look." *See Walt Disney Co. v. Goodtimes Home Video Corp.*, 830 F. Supp. 762, 766 (S.D.N.Y. 1993) (finding no consistent trade dress); *Framed Wall Art, LLC v. PME Holdings*, 2008 WL 5205822, at *4-9 (D. Utah Dec. 12, 2008) (same); *Hammerton, Inc. v. Heisterman*, 2008 WL 2004327, at *5, *5 n. 28 (D. Utah May 9, 2008) (same). This burden requires VGT to confront the *entire* relevant market to demonstrate that its mark or dress is inherently distinct and has sufficient strength. VGT's burden is not limited to specific games. *See e.g. Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 379 (2d Cir. 1997) ("[A]nalysis [in determining if dress is inherently distinctive] will always require a look at the product and the market in which it competes."); *see also Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1152 (10th Cir. 2013) (regarding a trademark claim: "extensive third-party use of a component of a disputed term undermines the strength of the term as a whole").

In its Motion, VGT admits that it is attempting to "pin down" CHG. Motion at 2. However, it is VGT's burden to demonstrate that its mark and games have been infringed upon by proving that its trade dress is inherently distinctive (or has acquired a secondary meaning), that there is a likelihood of confusion, and that the trade dress is nonfunctional. This requires the entire market of

11

relevant competitors to be considered. Limiting CHG to discussing only certain games shifts this burden of persuasion and forces CHG to defend a factual position that it has not admitted. *See* **Exhibit E**, Fulton 30(b)(6) Dep. at 23:14-24, 60:2-25. The point is that the themes and features VGT asserts to be "distinctive" are ubiquitous throughout the gaming industry, and CHG should not be arbitrarily restricted from rebutting any claim by VGT at trial that any individual feature or theme of its games are somehow "unique."

### B. The Introduction of Additional Third Party Games Would Not Amount to An "Unfair Surprise"

VGT argues that it "seeks to avoid the unfair surprise" in defending its mark and trade dress against additional third party games. Motion at 1. However, the discussion or introduction of third party games does not alter the basic issues and facts disclosed. To the contrary, such information is central to whether VGT can meet its burden of persuasion. *See Connaghan v. Maxus Expl. Co.*, 5 F.3d 1363, 1365 (10th Cir. 1993) (testimony at issue was necessary to resolve the case and therefore there was no unfair surprise given that both parties knew the information was central to the issue in litigation). CHG has been making the argument throughout this litigation that VGT does not have a consistent or unique trade dress, and the "themes" of its games are commonplace, if not ubiquitous, used throughout the gaming industry for decades. Indeed, CHG questioned the majority of the VGT witnesses it deposed on these very issues, and obtained confirmation of VGT's position.

VGT *knows* that it is CHG's position that the LS cabinet it uses is "classic" and common in the industry – the CHG cabinets VGT objects to were bought *used*, having formerly been used by competitors Nova and Cadillac Jack. VGT *knows* that it is CHG's position that the pay tables it (and VGT) uses on its machines have been used throughout the industry for decades. VGT *knows* that it is CHG's position that numerous third party companies use a mechanical bell, and virtually *every* slot machine in the industry has a red light on its top. VGT *knows* that it is CHG's position that the bingo patterns VGT uses on its EGMs are neither unique nor proprietary, having been used by

12

numerous other companies over the years – and for over a century in bingo halls across the country. VGT *knows* that it is CHG's position that many manufacturers use free-spin bonus features, where the machines light up in different colors, most commonly red. None of this can constitute a "surprise" to VGT; if it believes its numerous games – in all of their configurations – are distinctive or have acquired secondary meaning, they need to prove it, not prevent CHG from countering whatever theory they put forward with examples of games contradicting their claims. The discussion of additional third-party games does not alter or change VGT's proposed claims and legal theories. There is no realistic risk of unfair surprise or prejudice.



*See e.g.* Sarah Carlson Deposition at 41:3-18, 42:4-16 (**Exhibit F**); *see also* Defense Exhibits 138, 139, 140, 143, 144, and 145,

Therefore, the discussion or introduction of relevant third-party games would not unfairly prejudice VGT during trial. Such information is inherent to VGT's burden of persuasion and would not introduce new issues or facts at issue in this dispute.

    **C.**    **VGT's Motion Attempts to Improperly Limit the Future Testimony of Lay Witnesses**

Finally, as discussed above, the notion that there are third party games which are "most similar to the VGT games at issue" is fallacious – especially given the multitude of different game themes at issue. Moreover, throughout this litigation, VGT has repeatedly changed what it claims to be its trade dress "at issue" (not to mention the trademarks at issue), while alleging in *both* its original and amended complaints that the "individual" trade dress features are "common elements" used

13

"throughout **all** VGT 3-Reel Mechanical Games." Doc. 2, ¶ 31; Doc. 103, ¶ 31. This is simply objectively untrue. Accordingly, despite its prior express allegations, VGT currently seeks to limit its trade dress to certain games, in a single game cabinet, with a particular lighting package, with no topper, with a large video screen, in only a 3-reel mechanical format (*i.e.*, excluding video and 5-reel mechanical games), because it believes CHG's games are most similar to *that* configuration. VGT does *not* get to ignore reality: VGT uses the exact same game titles and themes in multiple cabinets, in multiple configurations, with dramatically different looks and feels, side-by-side in the very same casinos as CHG. CHG should not be precluded from having its witnesses testify about the multitude of third party games that share the different features and themes.

In its Motion, VGT implies that CHG somehow failed to disclose every competitors' games during discovery and should therefore be estopped from discussing them at trial. That is also untrue. As VGT never requested that CHG identify "every" game in existence that contradicts its specious claims of "distinctiveness," or that use game features that VGT alleges have "become an indicator that a game is likely owned by VGT," *see* Doc 2, ¶¶ 23-27, CHG should have the right to elicit testimony at trial – whether from its own witnesses, experts or VGT's witnesses (who have extensive knowledge about the gaming industry) regarding any game in existence.

### III.    CONCLUSION

For the foregoing reasons, CHG respectfully requests that the Court enter an order denying VGT's Motion in Limine Regarding Third Party Games.

Dated:  November 16, 2018

Respectfully submitted,

*/s/ Robert C. Gill*
Robert C. Gill (admitted *pro hac vice*)
Henry A. Platt (admitted *pro hac vice*)
Thomas S. Schaufelberger (admitted *pro hac vice*)
Matthew J. Antonelli (admitted *pro hac vice*)
Jeremy B. Darling (admitted *pro hac vice*)
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
henry.platt@saul.com
tschauf@saul.com
matt.antonelli@saul.com
jeremy.darling@saul.com

Sherry H. Flax (admitted *pro hac vice*)
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA #4254
JAMES C. HODGES, P.C.
2622 East 21st Street, Suite 4
Tulsa, Oklahoma 74114
(918) 779-7078
(918) 770-9779 (facsimile)
JHodges@HodgesLC.com

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on this 16th day of November, 2018, I caused a copy of the foregoing **DEFENDANTS' OPPOSITION TO PLAINTIFF VIDEO GAMING TECHNOLOGIES INC.'S MOTION IN LIMINE REGARDING THIRD PARTY GAMES – PUBLIC REDACTED VERSION** to be filed via the Court's ECF system, which will provide electronic notification of filing to the following counsel for Plaintiff:

Graydon Dean Luthey, Jr.
GABLE GOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, OK 74103-4217
(918) 595-4821
(918) 595-4990 (facsimile)
dluthey@gablelaw.com
*Counsel for Plaintiff*

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1221
(212) 841-1010 (facsimile)
nroman@cov.com
*Counsel for Plaintiff*

Gary M. Rubman
Peter Swanson
Michael Sawyer
Rebecca B. Dalton
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
(202) 778-5465 (facsimile)
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
*Counsel for Plaintiff*

                                    */s/ Robert C. Gill*
                                    Robert C. Gill

# ATTACHMENT A







 

20