# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1) VIDEO GAMING TECHNOLOGIES, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cv-00454-GKF-JFJ |
| | ) | |
| 1) CASTLE HILL STUDIOS LLC | ) | **REDACTED** |
| (d/b/a CASTLE HILL GAMING); | ) | |
| 2) CASTLE HILL HOLDING LLC | ) | |
| (d/b/a CASTLE HILL GAMING); and | ) | |
| 3) IRONWORKS DEVELOPMENT, LLC | ) | |
| (d/b/a CASTLE HILL GAMING) | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO LIMIT THE
TESTIMONY OF PLAINTIFF'S DAMAGES EXPERT MELISSA A. BENNIS**

## **TABLE OF CONTENTS**

I.    BACKGROUND ............................................................................................... 1

II.   ARGUMENT ..................................................................................................... 2

     A.   Ms. Bennis's Opinions Regarding Treatment of Capital Costs Are Based on Accepted Methodologies and Are Reliable. ..................................... 3

     B.   Ms. Bennis's Opinions Regarding CHG's Avoided Research and Development Costs Are Reliable. ............................................................. 6

          1.   Ms. Bennis's Opinions Are Based on Analysis of Evidence In the Record. ....................................................................................... 7

          2.   CHG's Criticisms of Ms. Bennis's Damages Report Are Baseless. .......... 11

     C.   Ms. Bennis Properly Relies on "Facts" to Support Her Opinions. ....................... 14

     D.   Ms. Bennis Does Not Improperly Opine on Legal Conclusions or Legal Standards. ...................................................................................... 17

III.  CONCLUSION ............................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Benton v. Avedon Eng'g, Inc.*,
  2012 WL 3399367 (D. Colo. Aug. 15, 2012) ...........................................................6

*Choice Hotels Int'l, Inc. v. Zeal, LLC*,
  135 F. Supp. 3d 451 (D.S.C. 2015) ........................................................................4

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ................................................................................................1

*Dodge v. Cotter Corp.*,
  328 F.3d 1212 (10th Cir. 2003) ............................................................................14

*Oklahoma ex rel. Edmondson v. Tyson Foods, Inc.*,
  No. 05-CV-329-GKF-SAJ, 2008 WL 1994910 (N.D. Okla. May 5, 2008) ...................2, 7, 16

*Entrepreneur Media, Inc. v. JMD Entm't Grp., LLC*,
  958 F. Supp. 2d 588 (D. Md. 2013) .......................................................................4

*Formax, Inc. v. Alkar-Rapidpak-MP Equip., Inc.*,
  2014 WL 3057116 (E.D. Wis. July 7, 2014) .........................................................13

*GlobeRanger Corp. v. Software AG*,
  826 F.3d 477 (5th Cir. 2016) .................................................................................6

*Gomez v. Martin Marietta Corp.*,
  50 F.3d 1511 (10th Cir. 1995) ..............................................................................14

*H.S. Field Servs., Inc. v. CEP Mid-Continent LLC*,
  2015 WL 11156965 (N.D. Okla. Aug. 24, 2015) ......................................1, 2, 5, 14

*iFreedom Direct Corp. v. First Tenn. Bank Nat'l Ass'n*,
  No. 2:09-CV-205-DN, 2012 WL 3067597 (D. Utah July 27, 2012) ......................15

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ...............................................................................................2

*Malinski v. BNSF Railway Co.*,
  2017 WL 1199750 (N.D. Okla. Mar. 31, 2017) ...................................................14

*Marketquest Grp., Inc. v. BIC Corp.*,
  2018 WL 1756117 (S.D. Cal. Apr. 12, 2018) .........................................................4

*Nat'l Indem. Co. v. Nelson, Chipman & Burt*,
    No. 2:07-CV-996 TS, 2013 WL 12303138 (D. Utah Jan. 22, 2013) ...................................16

*New York Racing Ass'n, Inc. v. Stroup News Agency Corp.*,
    920 F. Supp. 295 (N.D.N.Y. 1996) .........................................................................4

*Sunlight Saunas v. Sundance Sauna, Inc.*,
    427 F. Supp. 2d 1022 (D. Kan. 2006) .....................................................................4

*Tiramisu Int'l LLC v. Clever Imports LLC*,
    741 F. Supp. 2d 1279 (S.D. Fla. 2010) ...................................................................4

*Wisconsin Alumni Research Found. v. Apple, Inc.*,
    135 F. Supp. 3d 865 (W.D. Wis. 2015) .................................................................13

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*,
    2015 WL 12731924 (D. Del. Nov. 4, 2015) .........................................................13

**Statutes**

15 U.S.C. § 1117(a) ...................................................................................................3

Lanham Act ............................................................................................................3, 4

**Other Authorities**

Fed. R. Evid. 702 ..........................................................................................1, 2, 14, 15

5 McCarthy on Trademarks and Unfair Competition § 30:66 (4th ed.) .........................5

Defendants Castle Hill Studios LLC, Castle Hill Holdings LLC, and Ironworks Development LLC's (collectively, "CHG") seek to exclude testimony of Video Game Technologies's ("VGT")'s damages expert, Melissa Bennis, but its arguments rely on mischaracterizations of her opinions and the facts supporting those opinions.[1] CHG goes so far as to argue that notwithstanding the requirement in Federal Rule of Evidence 702 that expert opinions be "based on sufficient facts or data," the Court should preclude Ms. Bennis from "testifying about facts." Mot. at 14 (Dkt. 175, "Motion"). CHG's concerns are more appropriately addressed through "[v]igorous cross-examination" and "presentation of contrary evidence." *H.S. Field Servs., Inc. v. CEP Mid-Continent LLC*, 2015 WL 11156965, at *3 (N.D. Okla. Aug. 24, 2015) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993)).

## I.    BACKGROUND

Ms. Bennis is an experienced expert on financial and business issues, including in the context of valuing intellectual property and evaluating damages. *See* Ex. A, Bennis Opening Rpt. at 1; Ex. G, Bennis CV.[2] She earned a Bachelor of Science degree in finance from the University of Illinois at Urbana-Champaign and a Masters of Business Administration degree (with majors in accounting, marketing, and management and strategy) from the Kellogg Graduate School of Management at Northwestern University. Ex. G, Bennis CV. She also is a licensed certified public accountant. *Id.* Before her current role as a principal at the financial

---

[1] For example, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Ex. C at 23.

[2] Citations to Exhibit A-F are to the exhibits attached to CHG's motion (Dkt. 175); all citations to Exhibits G-N are to the accompanying Declaration of Gary Rubman.

consulting firm Davis & Hosfield Consulting, Ms. Bennis served as a manager in the Forensic Accounting Practice at KPMG, LLP. *Id.*

Ms. Bennis served an opening report on August 10 in which she offers opinions regarding damages VGT should be awarded in the event that it prevails on its trademark, trade dress, and/or trade secret claims. Ex. A, Bennis Opening Rpt. Ms. Bennis includes in her report a discussion of background facts that support her opinions. *Id.*

CHG's damages expert, Mr. Schoettelkotte, served a rebuttal report on August 31 responding to some, but not all, of Ms. Bennis's opinions. Ex. C, Schoettlekotte Rebuttal Rpt. Aspects of Mr. Schoettelkotte's opinions are the subject of a motion to exclude. Dkt. 163. Ms. Bennis served a reply report on September 14, responding to Mr. Schoettelkotte's opinions. Ex. B, Bennis Reply Rpt.

## II.    ARGUMENT

Federal Rule of Evidence 702 requires that expert testimony be "based on sufficient facts or data" and be "the product of reliable principles and methods." Fed. R. Evid. 702(b) & (c). The test for reliability is "flexible," and this Court has latitude when deciding whether an expert's opinions are sufficiently reliable to satisfy Rule 702. *See H.S. Field Servs*, 2015 WL 11156965, at *1 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999)). Mere disagreement with an expert's opinions or the facts underlying those opinions is not a sufficient basis to strike an expert's opinions. Rather, that is the purpose of "[v]igorous cross-examination" and "presentation of contrary evidence." *Id.* at *3; *see also Oklahoma ex rel. Edmondson v. Tyson Foods, Inc.*, No. 05-CV-329-GKF-SAJ, 2008 WL 1994910, at *1 (N.D. Okla. May 5, 2008) (holding that the gatekeeping role is "not a prevailing concern in a bench trial or hearing to the court, because the court functions as the trier of fact").

2

### A.    Ms. Bennis's Opinions Regarding Treatment of Capital Costs Are Based on Accepted Methodologies and Are Reliable.

When determining the amount of CHG's *profits* that should be disgorged in the event that there is a finding of liability, the Lanham Act requires Ms. Bennis to identify only CHG's *revenues* from the games at issue and leaves to CHG the burden of proving amounts, *i.e.,* costs associated with those revenues, that should be deducted.  *See* 15 U.S.C. § 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.").

In her opening report, Ms. Bennis identifies CHG's revenues and, even though not required to do so, also identifies a deduction based on the costs CHG incurred in manufacturing the cabinets used for the accused games.  Ex. A, Bennis Opening Rpt. at 29-30.  Ms. Bennis calculated that it cost CHG an average of ▆▆▆▆ to manufacture each game cabinet, *id.* at 29, a figure that CHG has not disputed.  Based on her understanding that the cabinets may be used for more than ten years, Ms. Bennis allocated the manufacturing costs ▆▆▆▆ over an expected useful life of ten years (120 months) to calculate an average monthly capital cost of ▆▆▆ per cabinet.  *Id.* at 29-30.  She then deducted this expense from CHG's monthly revenues to determine profits.  *Id.* at 30.  Ms. Bennis has been clear that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆ *See* Ex. H, Bennis 9/26/18 Dep. Tr. 47:2-48:2 ▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ); 51:7-9 (▆▆▆▆▆▆▆

████████████████████████████████████████████████████████████████

████████████ .[3]

Although CHG calls Ms. Bennis's "cost of goods sold" analysis a "Depreciation Opinion," Mot. at 2, criticizes her for "ignor[ing] accepted accounting methods," *id.* at 10, and argues that she "did not depreciate the EGMs as provided for by law," *id.* at 1, CHG does not cite a single case supporting its argument, let alone any case indicating that IRS tax depreciation principles must—or even should—be used when calculating disgorgement of profits under the Lanham Act.  The one case CHG cites, *Sunlight Saunas v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022 (D. Kan. 2006), does not address these issues, but rather stands for the unremarkable proposition that experts must provide well-reasoned and reliable opinions.  *Id.* at 1030 (striking an expert who did not do an independent analysis and instead relied on forecasts prepared by the client that were "conclusory, evasive and anything but expert").

To the contrary, the "cost of goods sold" approach Ms. Bennis used is a widely accepted methodology for purposes of evaluating cost deductions under the Lanham Act.  *See, e.g.*, *New York Racing Ass'n, Inc. v. Stroup News Agency Corp.*, 920 F. Supp. 295, 301 (N.D.N.Y. 1996) (under Lanham Act, accused infringer has "statutory burden to offer *evidence as to the costs of goods sold*") (emphasis added); *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1291 (S.D. Fla. 2010) (same); *Choice Hotels Int'l, Inc. v. Zeal, LLC*, 135 F. Supp. 3d 451, 472 (D.S.C. 2015) (same); *Entrepreneur Media, Inc. v. JMD Entm't Grp., LLC*, 958 F. Supp. 2d 588, 597 (D. Md. 2013) (same); *Marketquest Grp., Inc. v. BIC Corp.*, 2018 WL 1756117, at *4 (S.D. Cal. Apr. 12, 2018) (rejecting *Daubert* motion of damages expert in trademark case who

---

[3] CHG does not dispute that Ms. Bennis conducted a "cost of goods sold" analysis.  *See* Mot. at 10 ("Ms. Bennis engaged in a different analysis -- 'akin to a cost of goods sold'").

deducted costs of goods sold); 5 McCarthy on Trademarks and Unfair Competition § 30:66 (4th ed.) ("When the burden is not carried, plaintiff is awarded all revenue for that year."). CHG ignores these cases.

CHG's final argument—that Ms. Bennis's "cost of goods sold" analysis is unreliable, Mot. at 10—fares no better. CHG's sole criticism is that Ms. Bennis allocated the manufacturing costs over a ten-year period instead of four years.[4] But CHG's Chief Executive Officer, Arthur Watson, testified that he ███████████████████████████████████████████ ███████████████████████████████████████████████. *See* Ex. I, Watson 7/12/18 Dep. Tr. 123:11-24. He also testified that CHG's decision to ██████████████ ████████████████████████████ *See id.* at 123:5-7. Neither CHG nor Mr. Schoettelkotte has been able to point to evidence indicating that CHG believes its gaming machines will have a useful life of only four years, and Jay Sevigny, VGT's Chief Executive Officer, informed Ms. Bennis that ██████████████████████████████████████ ████████████████████████ Ex. A, Bennis Opening Rpt. at 29.

At bottom, this dispute is a classic example of two experts disagreeing on an issue. The proper solution is not to strike Ms. Bennis's opinion, but rather to allow CHG an opportunity to cross-examine Ms. Bennis and to have its witnesses offer contrary opinions at trial. *See H.S. Field Servs.*, 2015 WL 11156965, at *3.

---

[4] CHG's use of a four-year depreciation period has the effect of understating damages by forcing all expenses relating to manufacturing into the period that largely coincides with the damages period. Ex. B, Bennis Reply Rpt. at 5. Because the gaming machines have an expected useful life that extends past the damages period, CHG's approach artificially deflates its profits during this period.

**B.**  **Ms. Bennis's Opinions Regarding CHG's Avoided Research and Development Costs Are Reliable.**

Ms. Bennis's opinions regarding damages for misappropriation of trade secrets and confidential business information are based on materials CHG executives prepared in connection with ███████████████████████████████████████████. Although CHG must have believed that the information was reliable for those purposes,[5] it now criticizes the very same calculations—describing them as, among other things, "guesstimates" and "drafted for marketing purposes"—in an effort to minimize its damages exposure. Of course, that CHG now cynically seeks to discredit information that it previously provided to █████████ ████████ does not mean Ms. Bennis's opinions are unreliable. To the contrary, it raises doubts about the reliability of Mr. Schoettelkotte's opinions because he relies on litigation-driven explanations from CHG executives that are inconsistent with materials the same executives prepared before this litigation. In any event, these issues, too, are for cross-examination at trial.

CHG does not appear to challenge Ms. Bennis's underlying opinion that avoided research and development costs are a proper measure of damages,[6] and its criticism of the evidence on which Ms. Bennis relies in forming her opinions go to the weight, not the admissibility, of her

---

[5] Providing false or misleading information to █████████████ could implicate various federal and state civil and criminal statutes, including with respect to fraud.

[6] Avoided research and development costs is a widely-accepted measure of damages. *See, e.g., GlobeRanger Corp. v. Software AG*, 826 F.3d 477, 499-500 (5th Cir. 2016) (affirming damages award based on unjust enrichment theory rooted in avoided research and development costs); *Benton v. Avedon Eng'g, Inc.*, 2012 WL 3399367, at *5-6 (D. Colo. Aug. 15, 2012) (finding reliable an unjust enrichment methodology based on analysis of cost-saving achieved as a result of misappropriation of trade secrets). CHG's expert Mr. Schoettelkotte does not argue that avoided research and development costs is an improper measure of damages; to the contrary, based on his own calculation, he opines that ████████████████████████████ ██████ Ex. C, Schoettelkotte Rebuttal Rpt. ¶ 56; *compare* Ex. A, Bennis Opening Rpt. at 16, 35 (range of $██████ million).

testimony. *See Tyson Foods*, 2008 WL 1994910, at *1 (rejecting *Daubert* motion on basis that the arguments go to weight, not admissibility).

### 1. Ms. Bennis's Opinions Are Based on Analysis of Evidence In the Record.

To determine the amount of CHG's unjust enrichment, Ms. Bennis compares what it cost CHG to develop its Class II bingo system to what it cost VGT to develop its system and then, based on information provided by VGT's technical expert, attempted to account for differences in the development process that may be attributable to factors other than CHG's use of VGT's trade secrets and confidential business information.

Ms. Bennis's analysis of these issues was aided by the performance by CHG executives of a similar analysis before this litigation.

- **August 19, 2015:** Alan Roireau, CHG's Chief Development Officer and Chief Technology Officer and formerly VGT's Director of Software Development, sent the following email to two other CHG executives, Mr. Watson and Jason Sprinkle:



Ex. J at 2.

- **August 20, 2015:** Mr. Watson responded to Mr. Roireau the next day:





Ex. J at 1-2.

- **January 26, 2016:** Mr. Watson forwarded the email exchange from August:



Ex. J at 1.

- **Sometime after January 26, 2016:** CHG prepared the "polish[ed]" version described above. In this document, titled "                    " CHG wrote, in pertinent part:







Ex. K at 1.

- **Deposition Testimony:** CHG employees confirmed that ████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████ For example, when asked about the August 19 email, Mr. Roireau testified that it was a ████████████████████████████████ ████████████████████████████████████████ Ex. L, Roireau 5/15/18 Dep. Tr. 206:13-18; when asked whether the calculation needed to be corrected, he testified, "████████████████████████████████" *Id.* at 206:19-22 (emphasis added). Similarly, when Mr. Watson (CHG's CEO) was shown Mr. Roireau's estimates, he did not ███████████████████████████████████████████ ██████████████████████████████████████████, Ex. I, Watson 7/12/18 Dep. Tr. 250:18-251:12, and explained that he "██████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████ *Id.*

- **Confirmation of CHG's Valuations:** Rather than relying solely on the CHG documents and testimony summarized above, Ms. Bennis also confirmed the accuracy of CHG's

valuations in at least three different ways.  First, with respect to VGT's costs to develop its Class II bingo system, Ms. Bennis spoke with Josh Davis, a software engineer at VGT.  Mr. Davis, who was not allowed to see CHG's internal documents, provided independent estimates of the number of VGT engineers involved in developing VGT's system (and the costs of each engineer) that were consistent with Mr. Roireau's estimates.  *See, e.g.*, Ex. B, Bennis Reply Rpt. at 26.  Second, Ms. Bennis separately confirmed CHG's estimates with Stacy Friedman (VGT's gaming industry expert), who estimated the approximate cost of developing VGT's system to be between ▮▮▮▮▮▮▮▮▮▮ million.  Ex. A, Bennis Opening Rpt. at 34-35; Ex. B, Bennis Reply Rpt. at 26.[7]  Third, as Ms. Bennis notes in her reply report, data that CHG produced ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Ex. D, Bennis 9/26/18 Dep. Tr. 29 (noting that payroll data provided to Mr. Schoettelkotte indicates tha ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ ).[8]

- **Ms. Bennis's Calculation:**  Based on the documents, testimony and discussions described above, Ms. Bennis opines that it cost VGT between $▮▮▮▮▮▮ million over seven years to develop its Class II bingo engine and that it took CHG only ▮▮▮▮ ▮▮▮▮▮▮▮▮ to develop its bingo engine.  Ex. A, Bennis Opening Rpt. at 33-35; Ex. B, Bennis Reply Rpt. at 24-30.  Accordingly, Ms. Bennis concludes that CHG spen ▮▮▮ ▮▮▮▮▮▮▮ less than VGT to develop its bingo engine.  *Id.*  Ms. Bennis, however,

---

[7] Mr. Friedman offers opinions on CHG's avoided research and development costs in two expert reports and intends to testify on these issues at trial.  Ms. Bennis is relying on Mr. Friedman for the technical aspects of these issues.

[8] This information is contained in Schedule 11A to Mr. Schoettelkotte's report, which is the subject of a motion to strike on the basis that CHG failed to produce it to VGT during fact discovery.  *See* Dkt. 163 at III.A.

did not stop there.  Recognizing that some cost savings were due to factors other than misappropriated trade secrets, Ms. Bennis spoke with VGT's technical expert, Mr. Friedman, who analyzed CHG's development efforts and estimated that a ███████████ of CHG's cost savings was due to misappropriated trade secrets and confidential business information. Using ███████████████████████████████████, Ms. Bennis opines that between ███████████████████████████████████ of CHG's cost savings is attributable to the trade secrets and confidential business at issue in this case.

### 2.    CHG's Criticisms of Ms. Bennis's Damages Report Are Baseless.

Although not clear from the motion, CHG's primary criticisms appear to fall into two general categories:  (1) reliability of the underlying CHG materials and testimony on which Ms. Bennis relies; and (2) Ms. Bennis's reliance on opinions offered by VGT's technical expert, Mr. Friedman.  These criticisms lack merit.

Specifically, CHG asserts that Ms. Bennis did not do "any actual analysis," Mot. at 13, and criticizes her reliance on CHG's materials that CHG now disparages.  *Id.* at 10 ("email Mr. Roireau drafted for marketing purposes"); *id.* at 12 (same); *id.* at 13 ("back-of-the-envelope guesstimate"); *id.* ("made without any actual supporting data"); *id.* ("Mr. Roireau's email guess").[9]  CHG also seeks to minimize the importance and reliability of its own executive, Mr. Roireau, who CHG notes has "not been presented as an expert by either party."  Mot. at 13.

As an initial matter, Mr. Roireau, as well as the other CHG executives involved in preparing the valuations, had every incentive to ensure that CHG provided accurate information to ███████████████ .  Tellingly, CHG has not produced any documents indicating that CHG

---

[9] In his report, Mr. Schoettelkotte goes so far as to assert that CHG's materials were ████████ ████████████████████████████████████████████████ Ex. C, Schoettelkotte Rebuttal Rpt. ¶ 49.

has ever informed ████████████████ that the information CHG provided them when CHG

was ████████████████ was "drafted for marketing purposes," merely a "guesstimate," or

created "without any actual supporting data."  It is entirely appropriate for Ms. Bennis—just like

CHG's ████████████—to rely on these materials.

 CHG's efforts to minimize the importance of Mr. Roireau are similarly unavailing.  Mr.

Roireau is a senior executive at CHG who serves as the Chief Development Officer and Chief

Technology Officer.  He previously served in a senior role at VGT as its Director of Software

Development.  Therefore, he was well-positioned to provide accurate estimates of both CHG's

and VGT's costs to develop their bingo systems.  Ex. B, Bennis Reply Rpt. at 25-26.  Indeed,

Mr. Schoettelkotte asserts that ████████████████████████ and describes him

as "████████████████████████████." Ex. N, Schoettlekotte 9/22/18  Dep. Tr. 21:22-

24 ("████████████████████████████████

████████████████."); 33:17-21 ("████████████████████████

████████████████████████████████████

████████████████████"); 214:24-215:1 (████████████████████

████████████████████████████████"); 226:7-10

(similar); 230:13-25 (similar); 231:2-6 ("████████████████████████

████████████████████████████████████████

████████████████████████████").

 In any event, Mr. Roireau was not the only CHG executive involved.  As noted, Mr.

Roireau sent his initial draft of the key document to Mr. Watson, who offered feedback, and

CHG officials prepared and refined drafts over the following months before it was ████████

into the version that ultimately was provided to CHG's ████████████.  Moreover, neither

Mr. Roireau nor Mr. Watson express concerns about the accuracy of the information.  *See supra* p. 9.[10]

There is no more merit to CHG's final category of criticisms, relating to Ms. Bennis's reliance on information provided by Mr. Friedman to support her opinions.  Experts routinely rely on information outside their area of expertise that is provided by other experts.  *See, e.g., Wisconsin Alumni Research Found. v. Apple, Inc.*, 135 F. Supp. 3d 865, 885 (W.D. Wis. 2015) ("it is common for pure damages experts to rely on technical experts in their analysis"); *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, 2015 WL 12731924, at *6 (D. Del. Nov. 4, 2015) ("damages experts routinely rely on facts and opinions provided by technical experts when rendering their damages analysis"); *Formax, Inc. v. Alkar-Rapidpak-MP Equip., Inc.*, 2014 WL 3057116, at *2 (E.D. Wis. July 7, 2014) ("It is perfectly reasonable for a finance and damages expert to adopt the conclusions of other experts. Whether those conclusions are sound can be explored at trial through cross-examination and other expert testimony.").  That is precisely what Ms. Bennis has done here.  She is not an expert on the technical issues in this case and does not purport to be.  Accordingly, when Ms. Bennis had questions on technical issues relevant to her damages opinions, she spoke with those better-suited to address those issues, including Mr.

---

[10] Ms. Bennis also corroborated the information she learned from CHG's documents and testimony, including by talking with Josh Davis, a Principal Software Engineer at VGT who is familiar with VGT's efforts to develop its bingo engine.  Ex. A, Bennis Opening Rpt. at 34; Ex. B, Bennis Reply Rpt. at 26.

Friedman.[11]  Should CHG dispute the information provided by Mr. Friedman, it will have an opportunity to cross-examine her at trial.[12]

### C.     Ms. Bennis Properly Relies on "Facts" to Support Her Opinions.

CHG similarly has it backwards when it criticizes Ms. Bennis for including in her report background sections that support her opinions, including a section titled "Basis and Reasoning" and sections discussing economic evidence relating to the strength of the marks at issue in this litigation and the economic benefits the parties achieved through use of those marks.  *See* Mot. at 6-7.  Although CHG seeks to preclude Ms. Bennis from "summarizing, characterizing or testifying about facts," *id.* at 14, it is entirely appropriate for experts to summarize, characterize and testify about relevant facts.  An expert who fails to do so would be subject to exclusion.  *See* Fed. R. Evid. 702 (expert testimony must be "based on sufficient fact or data"); *H.S. Field Servs., Inc.*, 2015 WL 11156965, at *3 (denying *Daubert* motion and noting that the expert "outlines in detail the pleadings, deposition transcripts and exhibits, documents, and conversations he considered in forming his opinions"); *Malinski v. BNSF Railway Co.*, 2017 WL 1199750, at *2 (N.D. Okla. Mar. 31, 2017) ("expert opinion 'must be based on facts which enable [the expert] to express a reasonably accurate conclusion'") (quoting *Dodge v. Cotter*

---

[11] Ms. Bennis's reports clearly identify when she relied upon information provided by Mr. Friedman. *See, e.g.*, Ex. A, Bennis Opening Rpt. n. 182, 184, 185, 189, 192; Ex. B, Bennis Reply Rpt. n. 116, 117, 119, 126, 131.

[12] CHG criticizes Mr. Friedman on the basis that he lacks experience as an accountant, Mot. at 12, but Ms. Bennis is not relying on him for any such expertise.  She is relying on him for his technical expertise, including his experience developing and analyzing gaming systems.  To the extent CHG argues Mr. Friedman's opinion regarding a ▮▮▮▮▮▮▮▮▮▮ is not sufficiently precise, such an argument should be rejected, as "absolutely certainty is not required." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (expert opinion "must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . .  absolute certainty is not required") (quoting *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995)); *Malinski v. BNSF Railway Co.*, 2017 WL 1199750, at *3 (N.D. Okla. Mar. 31, 2017) (same).  Regardless, this argument goes to weight, not admissibility.

*Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003)); *iFreedom Direct Corp. v. First Tenn. Bank Nat'l Ass'n*, No. 2:09-CV-205-DN, 2012 WL 3067597, at *3 (D. Utah July 27, 2012) (holding that an expert "may rely on deposition testimony to reach his own opinions").

The portions of Ms. Bennis's opening report that CHG seeks to exclude (pages 16-19 and 24-25) contain precisely the type of facts on which damages experts are to rely. For example, CHG seeks to strike support for Ms. Bennis's opinion that the ███████████████████ ████████████████████████████████████████████ (pages 18-19 and 24-25) and that ████████████████████████████████████████████ ████████████████████████████ (page 19). This background information is relevant to opinions that both sides' damages experts offer with respect to the determination of the portion of CHG's profits that are attributable to CHG's use of VGT's trademarks and trade dress. Of course, had Ms. Bennis offered opinions on these issues without identifying factual support—the very types of "facts" CHG now argues Ms. Bennis should not be allowed to summarize or characterize—CHG presumably would have moved to strike her opinions on the basis that they fail to comply with Rule 702.

CHG also takes different positions with respect to Ms. Bennis than it takes with respect to Mr. Schoettelkotte, who offers opinions on the same issues as Ms. Bennis and supports those opinions by "summarizing, characterizing or testifying about facts." Indeed, Mr. Schoettelkotte emphasizes the importance of ████████████████████████████████████████ ████████████████████████████████████████:

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████



Ex. C, Schoettelkotte Rebuttal Rpt. ¶ 60 (emphasis added); *see also id.* ¶ 59

*id.* ¶ 26 (

Just as VGT has not challenged Mr. Schoettelkotte's opinions on the specious ground that he summarized, characterized or testified about facts, Ms. Bennis should likewise be permitted to express opinions based on the record evidence. This is particularly true, here, because this is a bench trial. *Nat'l Indem. Co. v. Nelson, Chipman & Burt*, No. 2:07-CV-996 TS, 2013 WL 12303138, at *1 (D. Utah Jan. 22, 2013) (in bench trial, declining to strike expert report despite finding that "portions of [the expert's] report improperly summarize the depositions of others"); *see also Tyson Foods*, 2008 WL 1994910, at *1 (holding that the gatekeeping role is "not a prevailing concern in a bench trial or hearing to the court, because the court functions as the trier of fact").

### D. Ms. Bennis Does Not Improperly Opine on Legal Conclusions or Legal Standards.

CHG's final argument is that Ms. Bennis should not be allowed to offer opinions on legal conclusions or legal standards, but it is unclear precisely which opinions CHG seeks to strike.[13] In its proposed order, CHG seeks an order precluding Ms. Bennis from testifying generally as to "legal conclusions or legal standards." But in its motion, CHG appears to focus on only one issue, criticizing her opinion "that it was improper for CHG's damages expert Todd Schoettelkotte to rely on marketing surveys which VGT had obtained." Mot. at 14-15 (citing Bennis Opening Rpt. at 16-20).[14]

To the extent that Mr. Schoettelkotte is allowed to offer opinions at trial based on survey evidence,[15] Ms. Bennis should be allowed to respond to those opinions. That is precisely what Ms. Bennis did in her reply report. After summarizing Mr. Schoettelkotte's opinions, Ms. Bennis identifies flaws in those opinions, including contrary evidence that Mr. Schoettelkotte ignores. Ex. B, Bennis Reply Rpt. at 16-20. As Ms. Bennis explains, ███████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ *Id.* at 18. Ms. Bennis also observes that Mr. Schoettelkotte relies

---

[13] CHG includes statements in the Motion indicating that experts are not allowed to testify as to what constitutes a "trade secret" or "misappropriation" or arguing based on "mere *ipse dixit* that but for knowledge of the plaintiff's system, a defendant's technology would have taken longer to develop." Mot. at 14. It appears that CHG included these statements by mistake, as Ms. Bennis does not offer any such opinions and has no intention of doing so.

[14] CHG's citation to Ms. Bennis's opening report appears to be another mistake. Ms. Bennis offered opinions on these issues in her reply report in response to Mr. Schoettelkotte's opinions.

[15] The "surveys" on which Mr. Schoettelkotte relies are ███████████████████████████ ████████████████████████████████████ on issues unrelated to this litigation. Ex. B at 16-19. Neither Mr. Schoettelkotte nor Ms. Bennis offers opinions relating to the separate survey VGT's expert, Dr. Wind, conducted in connection with this litigation.

on cherry-picked information ███████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████. *Id.* at 19.  None of this

analysis amounts to testimony about an improper "legal conclusion" or "legal standard."

CHG concludes its argument with the following ironic statement: "She is not qualified to testify about consumer surveys."  Mot. at 15.  On the one hand, CHG asserts that its expert, Mr. Schoettelkotte—who has a degree in accounting, Ex. M, Schoettelkotte CV at 1, and who concedes that he is not ███████████████, Ex. N, Schoettelkotte 9/22/18 Dep. Tr. 49:13-20 (████████████████████████████")—should be allowed to offer opinions relating to surveys.  On the other hand, CHG believes VGT's expert, Ms. Bennis—who is both a licensed certified public accountant and has an MBA (with one of her majors being in marketing)—is not qualified to respond to his opinions regarding the very same surveys.  Obviously, there is no basis for this double standard.

## III.    CONCLUSION

For the foregoing reasons, CHG's Motion should be denied.

November 16, 2018                          Respectfully submitted,

                                           */s/ Gary M. Rubman*
                                           Graydon Dean Luthey, Jr., OBA No. 5568
                                           GABLE GOTWALS
                                           1100 ONEOK Plaza
                                           100 West Fifth Street
                                           Tulsa, OK 74103-4217
                                           Telephone: (918) 595-4821
                                           Facsimile: (918) 595-4990
                                           dluthey@gablelaw.com

                                           Gary M. Rubman
                                           Peter A. Swanson
                                           Michael S. Sawyer
                                           Rebecca B. Dalton
                                           COVINGTON & BURLING LLP

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

One CityCenter
850 Tenth Street, NW
Washington, D.C.  20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 778-5465
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
   (admitted pro hac vice)

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1221
Facsimile: (212) 841-1010
nroman@cov.com
   (admitted pro hac vice)

***Counsel for Video Gaming Technologies, Inc.***

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2018, I filed a redacted version of the foregoing via

ECF, which caused service to be effected on the following counsel for Defendants:

Robert C. Gill
Thomas S. Schaufelberger
Matthew J. Antonelli
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
tschauf@saul.com
matt.antonelli@saul.com

Sherry H. Flax
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA 4254
JAMES C. HODGES, PC
2622 East 21st Street, Suite 4
Tulsa, OK 74114
Telephone: (918) 779-7078
JHodges@HodgesLC.Com

Duane H. Zobrist
Jonathan S. Jacobs
ZOBRIST LAW GROUP PLLC
1900 Arlington Blvd. Suite B
Charlottesville, VA 22903
Telephone: (434) 658-6400
dzobrist@zoblaw.com
jjacobs@zoblaw.com

*Attorneys for Defendants*

                                                        */s/ Gary M. Rubman*