# EXHIBIT 14

**IFRS 3**

# Business Combinations

In April 2001 the International Accounting Standards Board (Board) adopted IAS 22 *Business Combinations*, which had originally been issued by the International Accounting Standards Committee in October 1998.  IAS 22 was itself a revised version of IAS 22 *Business Combinations* that was issued in November 1983.

In March 2004 the Board replaced IAS 22 and three related Interpretations (SIC-9 *Business Combinations—Classification either as Acquisitions or Unitings of Interests*, SIC-22 *Business Combinations—Subsequent Adjustment of Fair Values and Goodwill Initially Reported* and SIC-28 *Business Combinations—'Date of Exchange' and Fair Value of Equity Instruments*) when it issued IFRS 3 *Business Combinations*.

Minor amendments were made to IFRS 3 in March 2004 by IFRS 5 *Non-current Assets Held for Sale and Discontinued Operations* and IAS 1 *Presentation of Financial Statements* (as revised in September 2007), which amended the terminology used throughout the Standards, including IFRS 3.

In January 2008 the Board issued a revised IFRS 3.

Other Standards have made minor consequential amendments to IFRS 3.  They include *Improvements to IFRSs* (issued in May 2010), IFRS 10 *Consolidated Financial Statements* (issued May 2011), IFRS 13 *Fair Value Measurement* (issued May 2011), *Investment Entities* (Amendments to IFRS 10, IFRS 12 and IAS 27) (issued October 2012), IFRS 9 *Financial Instruments* (Hedge Accounting and amendments to IFRS 9, IFRS 7 and IAS 39) (issued November 2013), *Annual Improvements to IFRSs 2010–2012 Cycle* (issued December 2013), *Annual Improvements to IFRSs 2011–2013 Cycle* (issued December 2013), IFRS 15 *Revenue from Contracts with Customers* (issued May 2014), IFRS 9 *Financial Instruments* (issued July 2014), IFRS 16 *Leases* (issued January 2016), IFRS 17 *Insurance Contracts* (issued May 2017) and *Annual Improvements to IFRS Standards 2015–2017 Cycle* (issued December 2017).

IFRS 3

Contents

*from paragraph*

**INTERNATIONAL FINANCIAL REPORTING STANDARD 3**
*BUSINESS COMBINATIONS*

| | |
|---|---|
| **OBJECTIVE** | **1** |
| **SCOPE** | **2** |
| **IDENTIFYING A BUSINESS COMBINATION** | **3** |
| **THE ACQUISITION METHOD** | **4** |
| **Identifying the acquirer** | **6** |
| **Determining the acquisition date** | **8** |
| **Recognising and measuring the identifiable assets acquired, the liabilities assumed and any non-controlling interest in the acquiree** | **10** |
| **Recognising and measuring goodwill or a gain from a bargain purchase** | **32** |
| **Additional guidance for applying the acquisition method to particular types of business combinations** | **41** |
| **Measurement period** | **45** |
| **Determining what is part of the business combination transaction** | **51** |
| **SUBSEQUENT MEASUREMENT AND ACCOUNTING** | **54** |
| **Reacquired rights** | **55** |
| **Contingent liabilities** | **56** |
| **Indemnification assets** | **57** |
| **Contingent consideration** | **58** |
| **DISCLOSURES** | **59** |
| **EFFECTIVE DATE AND TRANSITION** | **64** |
| **Effective date** | **64** |
| **Transition** | **65** |
| **REFERENCE TO IFRS 9** | **67A** |
| **WITHDRAWAL OF IFRS 3 (2004)** | **68** |
| **APPENDICES** | |
| **A Defined terms** | |
| **B Application guidance** | |
| **C Amendments to other IFRSs** | |
| **APPROVAL BY THE BOARD OF IFRS 3 ISSUED IN JANUARY 2008** | |

FOR THE ACCOMPANYING GUIDANCE LISTED BELOW, SEE PART B OF THIS EDITION

ILLUSTRATIVE EXAMPLES

APPENDIX
Amendments to guidance on other IFRSs

COMPARISON OF IFRS 3 (AS REVISED IN 2008) AND SFAS 141(R)

TABLE OF CONCORDANCE

© IFRS Foundation

IFRS 3

FOR THE BASIS FOR CONCLUSIONS, SEE PART C OF THIS EDITION

**BASIS FOR CONCLUSIONS**

**APPENDIX TO THE BASIS FOR CONCLUSIONS**
Amendments to the Basis for Conclusions on other IFRSs

**DISSENTING OPINIONS**

IFRS 3

International Financial Reporting Standard 3 *Business Combinations* (IFRS 3) is set out in paragraphs 1–68 and Appendices A–C. All the paragraphs have equal authority. Paragraphs in **bold type** state the main principles. Terms defined in Appendix A are in *italics* the first time they appear in the IFRS. Definitions of other terms are given in the Glossary for International Financial Reporting Standards. IFRS 3 should be read in the context of its objective and the Basis for Conclusions, the *Preface to International Financial Reporting Standards* and the *Conceptual Framework for Financial Reporting*. IAS 8 *Accounting Policies, Changes in Accounting Estimates and Errors* provides a basis for selecting and applying accounting policies in the absence of explicit guidance.

                    © IFRS Foundation

# International Financial Reporting Standard 3
## *Business Combinations*

## Objective

1    The objective of this IFRS is to improve the relevance, reliability and comparability of the information that a reporting entity provides in its financial statements about a *business combination* and its effects.  To accomplish that, this IFRS establishes principles and requirements for how the *acquirer*:

   (a)    recognises and measures in its financial statements the *identifiable* assets acquired, the liabilities assumed and any *non-controlling interest* in the *acquiree*;

   (b)    recognises and measures the *goodwill* acquired in the business combination or a gain from a bargain purchase; and

   (c)    determines what information to disclose to enable users of the financial statements to evaluate the nature and financial effects of the business combination.

## Scope

2    This IFRS applies to a transaction or other event that meets the definition of a business combination.  This IFRS does not apply to:

   (a)    the accounting for the formation of a joint arrangement in the financial statements of the joint arrangement itself.

   (b)    the acquisition of an asset or a group of assets that does not constitute a *business*.  In such cases the acquirer shall identify and recognise the individual identifiable assets acquired (including those assets that meet the definition of, and recognition criteria for, *intangible assets* in IAS 38 *Intangible Assets*) and liabilities assumed.  The cost of the group shall be allocated to the individual identifiable assets and liabilities on the basis of their relative *fair values* at the date of purchase.  Such a transaction or event does not give rise to goodwill.

   (c)    a combination of entities or businesses under common control (paragraphs B1–B4 provide related application guidance).

2A    The requirements of this Standard do not apply to the acquisition by an investment entity, as defined in IFRS 10 *Consolidated Financial Statements*, of an investment in a subsidiary that is required to be measured at fair value through profit or loss.

## Identifying a business combination

3    **An entity shall determine whether a transaction or other event is a business combination by applying the definition in this IFRS, which requires that the assets acquired and liabilities assumed constitute a business.  If the assets acquired are not a business, the reporting entity**

IFRS 3

shall account for the transaction or other event as an asset acquisition. Paragraphs B5–B12 provide guidance on identifying a business combination and the definition of a business.

## The acquisition method

**4**      **An entity shall account for each business combination by applying the acquisition method.**

5      Applying the acquisition method requires:

  (a)      identifying the acquirer;

  (b)      determining the *acquisition date*;

  (c)      recognising and measuring the identifiable assets acquired, the liabilities assumed and any non-controlling interest in the acquiree; and

  (d)      recognising and measuring goodwill or a gain from a bargain purchase.

### Identifying the acquirer

**6**      **For each business combination, one of the combining entities shall be identified as the acquirer.**

7      The guidance in IFRS 10 shall be used to identify the acquirer—the entity that obtains *control* of another entity, ie the acquiree.  If a business combination has occurred but applying the guidance in IFRS 10 does not clearly indicate which of the combining entities is the acquirer, the factors in paragraphs B14–B18 shall be considered in making that determination.

### Determining the acquisition date

**8**      **The acquirer shall identify the acquisition date, which is the date on which it obtains control of the acquiree.**

9      The date on which the acquirer obtains control of the acquiree is generally the date on which the acquirer legally transfers the consideration, acquires the assets and assumes the liabilities of the acquiree—the closing date.  However, the acquirer might obtain control on a date that is either earlier or later than the closing date.  For example, the acquisition date precedes the closing date if a written agreement provides that the acquirer obtains control of the acquiree on a date before the closing date.  An acquirer shall consider all pertinent facts and circumstances in identifying the acquisition date.

### Recognising and measuring the identifiable assets acquired, the liabilities assumed and any non-controlling interest in the acquiree

#### Recognition principle

**10**      **As of the acquisition date, the acquirer shall recognise, separately from goodwill, the identifiable assets acquired, the liabilities assumed and any non-controlling interest in the acquiree.   Recognition of identifiable assets acquired and liabilities assumed is subject to the conditions specified in paragraphs 11 and 12.**

                  © IFRS Foundation

*Recognition conditions*

11    To qualify for recognition as part of applying the acquisition method, the identifiable assets acquired and liabilities assumed must meet the definitions of assets and liabilities in the *Framework*[1] *for the Preparation and Presentation of Financial Statements* at the acquisition date. For example, costs the acquirer expects but is not obliged to incur in the future to effect its plan to exit an activity of an acquiree or to terminate the employment of or relocate an acquiree's employees are not liabilities at the acquisition date. Therefore, the acquirer does not recognise those costs as part of applying the acquisition method. Instead, the acquirer recognises those costs in its post-combination financial statements in accordance with other IFRSs.

12    In addition, to qualify for recognition as part of applying the acquisition method, the identifiable assets acquired and liabilities assumed must be part of what the acquirer and the acquiree (or its former *owners*) exchanged in the business combination transaction rather than the result of separate transactions. The acquirer shall apply the guidance in paragraphs 51–53 to determine which assets acquired or liabilities assumed are part of the exchange for the acquiree and which, if any, are the result of separate transactions to be accounted for in accordance with their nature and the applicable IFRSs.

13    The acquirer's application of the recognition principle and conditions may result in recognising some assets and liabilities that the acquiree had not previously recognised as assets and liabilities in its financial statements. For example, the acquirer recognises the acquired identifiable intangible assets, such as a brand name, a patent or a customer relationship, that the acquiree did not recognise as assets in its financial statements because it developed them internally and charged the related costs to expense.

14    Paragraphs B31–B40 provide guidance on recognising intangible assets. Paragraphs 22–28B specify the types of identifiable assets and liabilities that include items for which this IFRS provides limited exceptions to the recognition principle and conditions.

*Classifying or designating identifiable assets acquired and liabilities assumed in a business combination*

**15    At the acquisition date, the acquirer shall classify or designate the identifiable assets acquired and liabilities assumed as necessary to apply other IFRSs subsequently. The acquirer shall make those classifications or designations on the basis of the contractual terms, economic conditions, its operating or accounting policies and other pertinent conditions as they exist at the acquisition date.**

16    In some situations, IFRSs provide for different accounting depending on how an entity classifies or designates a particular asset or liability. Examples of

---

1    IASC's *Framework for the Preparation and Presentation of Financial Statements* was adopted by the IASB in 2001. In September 2010 the IASB replaced the *Framework with the Conceptual Framework for Financial Reporting.*

IFRS 3

classifications or designations that the acquirer shall make on the basis of the pertinent conditions as they exist at the acquisition date include but are not limited to:

(a)    classification of particular financial assets and liabilities as measured at fair value through profit or loss or at amortised cost, or as a financial asset measured at fair value through other comprehensive income in accordance with IFRS 9 *Financial Instruments*;

(b)    designation of a derivative instrument as a hedging instrument in accordance with IFRS 9; and

(c)    assessment of whether an embedded derivative should be separated from a host contract in accordance with IFRS 9 (which is a matter of 'classification' as this IFRS uses that term).

17    This IFRS provides an exception to the principle in paragraph 15:

(a)    classification of a lease contract in which the acquiree is the lessor as either an operating lease or a finance lease in accordance with IFRS 16 *Leases*.

(b)    [deleted]

The acquirer shall classify those contracts on the basis of the contractual terms and other factors at the inception of the contract (or, if the terms of the contract have been modified in a manner that would change its classification, at the date of that modification, which might be the acquisition date).

**Measurement principle**

**18    The acquirer shall measure the identifiable assets acquired and the liabilities assumed at their acquisition-date fair values.**

19    For each business combination, the acquirer shall measure at the acquisition date components of non-controlling interests in the acquiree that are present ownership interests and entitle their holders to a proportionate share of the entity's net assets in the event of liquidation at either:

(a)    fair value; or

(b)    the present ownership instruments' proportionate share in the recognised amounts of the acquiree's identifiable net assets.

All other components of non-controlling interests shall be measured at their acquisition-date fair values, unless another measurement basis is required by IFRSs.

20    Paragraphs 24–31A specify the types of identifiable assets and liabilities that include items for which this IFRS provides limited exceptions to the measurement principle.

**Exceptions to the recognition or measurement principles**

21    This IFRS provides limited exceptions to its recognition and measurement principles.  Paragraphs 22–31A specify both the particular items for which

    © IFRS Foundation

exceptions are provided and the nature of those exceptions.  The acquirer shall account for those items by applying the requirements in paragraphs 22–31A, which will result in some items being:

(a)     recognised either by applying recognition conditions in addition to those in paragraphs 11 and 12 or by applying the requirements of other IFRSs, with results that differ from applying the recognition principle and conditions.

(b)     measured at an amount other than their acquisition-date fair values.

### Exception to the recognition principle

#### Contingent liabilities

22     IAS 37 *Provisions, Contingent Liabilities and Contingent Assets* defines a contingent liability as:

(a)     a possible obligation that arises from past events and whose existence will be confirmed only by the occurrence or non-occurrence of one or more uncertain future events not wholly within the control of the entity; or

(b)     a present obligation that arises from past events but is not recognised because:

(i)      it is not probable that an outflow of resources embodying economic benefits will be required to settle the obligation; or

(ii)     the amount of the obligation cannot be measured with sufficient reliability.

23     The requirements in IAS 37 do not apply in determining which contingent liabilities to recognise as of the acquisition date.  Instead, the acquirer shall recognise as of the acquisition date a contingent liability assumed in a business combination if it is a present obligation that arises from past events and its fair value can be measured reliably.  Therefore, contrary to IAS 37, the acquirer recognises a contingent liability assumed in a business combination at the acquisition date even if it is not probable that an outflow of resources embodying economic benefits will be required to settle the obligation.  Paragraph 56 provides guidance on the subsequent accounting for contingent liabilities.

### Exceptions to both the recognition and measurement principles

#### Income taxes

24     The acquirer shall recognise and measure a deferred tax asset or liability arising from the assets acquired and liabilities assumed in a business combination in accordance with IAS 12 *Income Taxes*.

25     The acquirer shall account for the potential tax effects of temporary differences and carryforwards of an acquiree that exist at the acquisition date or arise as a result of the acquisition in accordance with IAS 12.

IFRS 3

**Employee benefits**

26    The acquirer shall recognise and measure a liability (or asset, if any) related to the acquiree's employee benefit arrangements in accordance with IAS 19 *Employee Benefits*.

**Indemnification assets**

27    The seller in a business combination may contractually indemnify the acquirer for the outcome of a contingency or uncertainty related to all or part of a specific asset or liability.  For example, the seller may indemnify the acquirer against losses above a specified amount on a liability arising from a particular contingency; in other words, the seller will guarantee that the acquirer's liability will not exceed a specified amount.  As a result, the acquirer obtains an indemnification asset.  The acquirer shall recognise an indemnification asset at the same time that it recognises the indemnified item measured on the same basis as the indemnified item, subject to the need for a valuation allowance for uncollectible amounts.  Therefore, if the indemnification relates to an asset or a liability that is recognised at the acquisition date and measured at its acquisition-date fair value, the acquirer shall recognise the indemnification asset at the acquisition date measured at its acquisition-date fair value.  For an indemnification asset measured at fair value, the effects of uncertainty about future cash flows because of collectibility considerations are included in the fair value measure and a separate valuation allowance is not necessary (paragraph B41 provides related application guidance).

28    In some circumstances, the indemnification may relate to an asset or a liability that is an exception to the recognition or measurement principles.  For example, an indemnification may relate to a contingent liability that is not recognised at the acquisition date because its fair value is not reliably measurable at that date.  Alternatively, an indemnification may relate to an asset or a liability, for example, one that results from an employee benefit, that is measured on a basis other than acquisition-date fair value.    In those circumstances, the indemnification asset shall be recognised and measured using assumptions consistent with those used to measure the indemnified item, subject to management's assessment of the collectibility of the indemnification asset and any contractual limitations on the indemnified amount.  Paragraph 57 provides guidance on the subsequent accounting for an indemnification asset.

**Leases in which the acquiree is the lessee**

28A    The acquirer shall recognise right-of-use assets and lease liabilities for leases identified in accordance with IFRS 16 in which the acquiree is the lessee.  The acquirer is not required to recognise right-of-use assets and lease liabilities for:

(a)    leases for which the lease term (as defined in IFRS 16) ends within 12 months of the acquisition date; or

(b)    leases for which the underlying asset is of low value (as described in paragraphs B3–B8 of IFRS 16).

28B    The acquirer shall measure the lease liability at the present value of the remaining lease payments (as defined in IFRS 16) as if the acquired lease were a new lease at the acquisition date.  The acquirer shall measure the right-of-use

    © IFRS Foundation

IFRS 3

asset at the same amount as the lease liability, adjusted to reflect favourable or unfavourable terms of the lease when compared with market terms.

*Exceptions to the measurement principle*

**Reacquired rights**

29 The acquirer shall measure the value of a reacquired right recognised as an intangible asset on the basis of the remaining contractual term of the related contract regardless of whether market participants would consider potential contractual renewals when measuring its fair value. Paragraphs B35 and B36 provide related application guidance.

**Share-based payment transactions**

30 The acquirer shall measure a liability or an equity instrument related to share-based payment transactions of the acquiree or the replacement of an acquiree's share-based payment transactions with share-based payment transactions of the acquirer in accordance with the method in IFRS 2 *Share-based Payment* at the acquisition date. (This IFRS refers to the result of that method as the 'market-based measure' of the share-based payment transaction.)

**Assets held for sale**

31 The acquirer shall measure an acquired non-current asset (or disposal group) that is classified as held for sale at the acquisition date in accordance with IFRS 5 *Non-current Assets Held for Sale and Discontinued Operations* at fair value less costs to sell in accordance with paragraphs 15–18 of that IFRS.

**Insurance contracts**

31A The acquirer shall measure a group of contracts within the scope of IFRS 17 *Insurance Contracts* acquired in a business combination as a liability or asset in accordance with paragraphs 39 and B93–B95 of IFRS 17, at the acquisition date.

## Recognising and measuring goodwill or a gain from a bargain purchase

**32** **The acquirer shall recognise goodwill as of the acquisition date measured as the excess of (a) over (b) below:**

(a) **the aggregate of:**

    (i) **the consideration transferred measured in accordance with this IFRS, which generally requires acquisition-date fair value (see paragraph 37);**

    (ii) **the amount of any non-controlling interest in the acquiree measured in accordance with this IFRS; and**

    (iii) **in a business combination achieved in stages (see paragraphs 41 and 42), the acquisition-date fair value of the acquirer's previously held equity interest in the acquiree.**

(b) **the net of the acquisition-date amounts of the identifiable assets acquired and the liabilities assumed measured in accordance with this IFRS.**

IFRS 3

33 In a business combination in which the acquirer and the acquiree (or its former owners) exchange only equity interests, the acquisition-date fair value of the acquiree's equity interests may be more reliably measurable than the acquisition-date fair value of the acquirer's equity interests.  If so, the acquirer shall determine the amount of goodwill by using the acquisition-date fair value of the acquiree's equity interests instead of the acquisition-date fair value of the equity interests transferred.  To determine the amount of goodwill in a business combination in which no consideration is transferred, the acquirer shall use the acquisition-date fair value of the acquirer's interest in the acquiree in place of the acquisition-date fair value of the consideration transferred (paragraph 32(a)(i)).  Paragraphs B46–B49 provide related application guidance.

**Bargain purchases**

34 Occasionally, an acquirer will make a bargain purchase, which is a business combination in which the amount in paragraph 32(b) exceeds the aggregate of the amounts specified in paragraph 32(a).  If that excess remains after applying the requirements in paragraph 36, the acquirer shall recognise the resulting gain in profit or loss on the acquisition date.  The gain shall be attributed to the acquirer.

35 A bargain purchase might happen, for example, in a business combination that is a forced sale in which the seller is acting under compulsion.  However, the recognition or measurement exceptions for particular items discussed in paragraphs 22–31A may also result in recognising a gain (or change the amount of a recognised gain) on a bargain purchase.

36 Before recognising a gain on a bargain purchase, the acquirer shall reassess whether it has correctly identified all of the assets acquired and all of the liabilities assumed and shall recognise any additional assets or liabilities that are identified in that review.  The acquirer shall then review the procedures used to measure the amounts this IFRS requires to be recognised at the acquisition date for all of the following:

(a) the identifiable assets acquired and liabilities assumed;

(b) the non-controlling interest in the acquiree, if any;

(c) for a business combination achieved in stages, the acquirer's previously held equity interest in the acquiree; and

(d) the consideration transferred.

The objective of the review is to ensure that the measurements appropriately reflect consideration of all available information as of the acquisition date.

**Consideration transferred**

37 The consideration transferred in a business combination shall be measured at fair value, which shall be calculated as the sum of the acquisition-date fair values of the assets transferred by the acquirer, the liabilities incurred by the acquirer to former owners of the acquiree and the equity interests issued by the acquirer.  (However, any portion of the acquirer's share-based payment awards exchanged for awards held by the acquiree's employees that is included in consideration transferred in the business combination shall be measured in

      © IFRS Foundation

accordance with paragraph 30 rather than at fair value.) Examples of potential forms of consideration include cash, other assets, a business or a subsidiary of the acquirer, *contingent consideration*, ordinary or preference equity instruments, options, warrants and member interests of *mutual entities*.

38  The consideration transferred may include assets or liabilities of the acquirer that have carrying amounts that differ from their fair values at the acquisition date (for example, non-monetary assets or a business of the acquirer). If so, the acquirer shall remeasure the transferred assets or liabilities to their fair values as of the acquisition date and recognise the resulting gains or losses, if any, in profit or loss. However, sometimes the transferred assets or liabilities remain within the combined entity after the business combination (for example, because the assets or liabilities were transferred to the acquiree rather than to its former owners), and the acquirer therefore retains control of them. In that situation, the acquirer shall measure those assets and liabilities at their carrying amounts immediately before the acquisition date and shall not recognise a gain or loss in profit or loss on assets or liabilities it controls both before and after the business combination.

*Contingent consideration*

39  The consideration the acquirer transfers in exchange for the acquiree includes any asset or liability resulting from a contingent consideration arrangement (see paragraph 37). The acquirer shall recognise the acquisition-date fair value of contingent consideration as part of the consideration transferred in exchange for the acquiree.

40  The acquirer shall classify an obligation to pay contingent consideration that meets the definition of a financial instrument as a financial liability or as equity on the basis of the definitions of an equity instrument and a financial liability in paragraph 11 of IAS 32 *Financial Instruments: Presentation*. The acquirer shall classify as an asset a right to the return of previously transferred consideration if specified conditions are met. Paragraph 58 provides guidance on the subsequent accounting for contingent consideration.

## Additional guidance for applying the acquisition method to particular types of business combinations

### A business combination achieved in stages

41  An acquirer sometimes obtains control of an acquiree in which it held an equity interest immediately before the acquisition date. For example, on 31 December 20X1, Entity A holds a 35 per cent non-controlling equity interest in Entity B. On that date, Entity A purchases an additional 40 per cent interest in Entity B, which gives it control of Entity B. This IFRS refers to such a transaction as a business combination achieved in stages, sometimes also referred to as a step acquisition.

42  In a business combination achieved in stages, the acquirer shall remeasure its previously held equity interest in the acquiree at its acquisition-date fair value and recognise the resulting gain or loss, if any, in profit or loss or other comprehensive income, as appropriate. In prior reporting periods, the acquirer

IFRS 3

may have recognised changes in the value of its equity interest in the acquiree in other comprehensive income. If so, the amount that was recognised in other comprehensive income shall be recognised on the same basis as would be required if the acquirer had disposed directly of the previously held equity interest.

42A    When a party to a joint arrangement (as defined in IFRS 11 *Joint Arrangements*) obtains control of a business that is a joint operation (as defined in IFRS 11), and had rights to the assets and obligations for the liabilities relating to that joint operation immediately before the acquisition date, the transaction is a business combination achieved in stages. The acquirer shall therefore apply the requirements for a business combination achieved in stages, including remeasuring its previously held interest in the joint operation in the manner described in paragraph 42. In doing so, the acquirer shall remeasure its entire previously held interest in the joint operation.

**A business combination achieved without the transfer of consideration**

43    An acquirer sometimes obtains control of an acquiree without transferring consideration. The acquisition method of accounting for a business combination applies to those combinations. Such circumstances include:

(a)    The acquiree repurchases a sufficient number of its own shares for an existing investor (the acquirer) to obtain control.

(b)    Minority veto rights lapse that previously kept the acquirer from controlling an acquiree in which the acquirer held the majority voting rights.

(c)    The acquirer and acquiree agree to combine their businesses by contract alone. The acquirer transfers no consideration in exchange for control of an acquiree and holds no equity interests in the acquiree, either on the acquisition date or previously. Examples of business combinations achieved by contract alone include bringing two businesses together in a stapling arrangement or forming a dual listed corporation.

44    In a business combination achieved by contract alone, the acquirer shall attribute to the owners of the acquiree the amount of the acquiree's net assets recognised in accordance with this IFRS. In other words, the equity interests in the acquiree held by parties other than the acquirer are a non-controlling interest in the acquirer's post-combination financial statements even if the result is that all of the equity interests in the acquiree are attributed to the non-controlling interest.

**Measurement period**

**45    If the initial accounting for a business combination is incomplete by the end of the reporting period in which the combination occurs, the acquirer shall report in its financial statements provisional amounts for the items for which the accounting is incomplete. During the measurement period, the acquirer shall retrospectively adjust the provisional amounts recognised at the acquisition date to reflect new information obtained about facts and circumstances that existed as of**

    © IFRS Foundation

**the acquisition date and, if known, would have affected the measurement of the amounts recognised as of that date. During the measurement period, the acquirer shall also recognise additional assets or liabilities if new information is obtained about facts and circumstances that existed as of the acquisition date and, if known, would have resulted in the recognition of those assets and liabilities as of that date. The measurement period ends as soon as the acquirer receives the information it was seeking about facts and circumstances that existed as of the acquisition date or learns that more information is not obtainable. However, the measurement period shall not exceed one year from the acquisition date.**

46    The measurement period is the period after the acquisition date during which the acquirer may adjust the provisional amounts recognised for a business combination. The measurement period provides the acquirer with a reasonable time to obtain the information necessary to identify and measure the following as of the acquisition date in accordance with the requirements of this IFRS:

(a)    the identifiable assets acquired, liabilities assumed and any non-controlling interest in the acquiree;

(b)    the consideration transferred for the acquiree (or the other amount used in measuring goodwill);

(c)    in a business combination achieved in stages, the equity interest in the acquiree previously held by the acquirer; and

(d)    the resulting goodwill or gain on a bargain purchase.

47    The acquirer shall consider all pertinent factors in determining whether information obtained after the acquisition date should result in an adjustment to the provisional amounts recognised or whether that information results from events that occurred after the acquisition date. Pertinent factors include the date when additional information is obtained and whether the acquirer can identify a reason for a change to provisional amounts. Information that is obtained shortly after the acquisition date is more likely to reflect circumstances that existed at the acquisition date than is information obtained several months later. For example, unless an intervening event that changed its fair value can be identified, the sale of an asset to a third party shortly after the acquisition date for an amount that differs significantly from its provisional fair value measured at that date is likely to indicate an error in the provisional amount.

48    The acquirer recognises an increase (decrease) in the provisional amount recognised for an identifiable asset (liability) by means of a decrease (increase) in goodwill. However, new information obtained during the measurement period may sometimes result in an adjustment to the provisional amount of more than one asset or liability. For example, the acquirer might have assumed a liability to pay damages related to an accident in one of the acquiree's facilities, part or all of which are covered by the acquiree's liability insurance policy. If the acquirer obtains new information during the measurement period about the acquisition-date fair value of that liability, the adjustment to goodwill resulting from a change to the provisional amount recognised for the liability would be

IFRS 3

offset (in whole or in part) by a corresponding adjustment to goodwill resulting from a change to the provisional amount recognised for the claim receivable from the insurer.

49    During the measurement period, the acquirer shall recognise adjustments to the provisional amounts as if the accounting for the business combination had been completed at the acquisition date. Thus, the acquirer shall revise comparative information for prior periods presented in financial statements as needed, including making any change in depreciation, amortisation or other income effects recognised in completing the initial accounting.

50    After the measurement period ends, the acquirer shall revise the accounting for a business combination only to correct an error in accordance with IAS 8 *Accounting Policies, Changes in Accounting Estimates and Errors.*

## Determining what is part of the business combination transaction

**51    The acquirer and the acquiree may have a pre-existing relationship or other arrangement before negotiations for the business combination began, or they may enter into an arrangement during the negotiations that is separate from the business combination. In either situation, the acquirer shall identify any amounts that are not part of what the acquirer and the acquiree (or its former owners) exchanged in the business combination, ie amounts that are not part of the exchange for the acquiree. The acquirer shall recognise as part of applying the acquisition method only the consideration transferred for the acquiree and the assets acquired and liabilities assumed in the exchange for the acquiree. Separate transactions shall be accounted for in accordance with the relevant IFRSs.**

52    A transaction entered into by or on behalf of the acquirer or primarily for the benefit of the acquirer or the combined entity, rather than primarily for the benefit of the acquiree (or its former owners) before the combination, is likely to be a separate transaction. The following are examples of separate transactions that are not to be included in applying the acquisition method:

(a)    a transaction that in effect settles pre-existing relationships between the acquirer and acquiree;

(b)    a transaction that remunerates employees or former owners of the acquiree for future services; and

(c)    a transaction that reimburses the acquiree or its former owners for paying the acquirer's acquisition-related costs.

Paragraphs B50–B62 provide related application guidance.

### Acquisition-related costs

53    Acquisition-related costs are costs the acquirer incurs to effect a business combination. Those costs include finder's fees; advisory, legal, accounting, valuation and other professional or consulting fees; general administrative costs, including the costs of maintaining an internal acquisitions department; and costs of registering and issuing debt and equity securities. The acquirer

    © IFRS Foundation

shall account for acquisition-related costs as expenses in the periods in which the costs are incurred and the services are received, with one exception. The costs to issue debt or equity securities shall be recognised in accordance with IAS 32 and IFRS 9.

## Subsequent measurement and accounting

54 **In general, an acquirer shall subsequently measure and account for assets acquired, liabilities assumed or incurred and equity instruments issued in a business combination in accordance with other applicable IFRSs for those items, depending on their nature. However, this IFRS provides guidance on subsequently measuring and accounting for the following assets acquired, liabilities assumed or incurred and equity instruments issued in a business combination:**

(a) **reacquired rights;**

(b) **contingent liabilities recognised as of the acquisition date;**

(c) **indemnification assets; and**

(d) **contingent consideration.**

**Paragraph B63 provides related application guidance.**

### Reacquired rights

55 A reacquired right recognised as an intangible asset shall be amortised over the remaining contractual period of the contract in which the right was granted. An acquirer that subsequently sells a reacquired right to a third party shall include the carrying amount of the intangible asset in determining the gain or loss on the sale.

### Contingent liabilities

56 After initial recognition and until the liability is settled, cancelled or expires, the acquirer shall measure a contingent liability recognised in a business combination at the higher of:

(a) the amount that would be recognised in accordance with IAS 37; and

(b) the amount initially recognised less, if appropriate, the cumulative amount of income recognised in accordance with the principles of IFRS 15 *Revenue from Contracts with Customers*.

This requirement does not apply to contracts accounted for in accordance with IFRS 9.

### Indemnification assets

57 At the end of each subsequent reporting period, the acquirer shall measure an indemnification asset that was recognised at the acquisition date on the same basis as the indemnified liability or asset, subject to any contractual limitations on its amount and, for an indemnification asset that is not subsequently measured at its fair value, management's assessment of the collectibility of the

IFRS 3

indemnification asset.  The acquirer shall derecognise the indemnification asset only when it collects the asset, sells it or otherwise loses the right to it.

### Contingent consideration

58    Some changes in the fair value of contingent consideration that the acquirer recognises after the acquisition date may be the result of additional information that the acquirer obtained after that date about facts and circumstances that existed at the acquisition date.  Such changes are measurement period adjustments in accordance with paragraphs 45–49.  However, changes resulting from events after the acquisition date, such as meeting an earnings target, reaching a specified share price or reaching a milestone on a research and development project, are not measurement period adjustments.  The acquirer shall account for changes in the fair value of contingent consideration that are not measurement period adjustments as follows:

(a)    Contingent consideration classified as equity shall not be remeasured and its subsequent settlement shall be accounted for within equity.

(b)    Other contingent consideration that:

(i)    is within the scope of IFRS 9 shall be measured at fair value at each reporting date and changes in fair value shall be recognised in profit or loss in accordance with IFRS 9.

(ii)    is not within the scope of IFRS 9 shall be measured at fair value at each reporting date and changes in fair value shall be recognised in profit or loss.

## Disclosures

**59    The acquirer shall disclose information that enables users of its financial statements to evaluate the nature and financial effect of a business combination that occurs either:**

**(a)    during the current reporting period; or**

**(b)    after the end of the reporting period but before the financial statements are authorised for issue.**

60    To meet the objective in paragraph 59, the acquirer shall disclose the information specified in paragraphs B64–B66.

**61    The acquirer shall disclose information that enables users of its financial statements to evaluate the financial effects of adjustments recognised in the current reporting period that relate to business combinations that occurred in the period or previous reporting periods.**

62    To meet the objective in paragraph 61, the acquirer shall disclose the information specified in paragraph B67.

63    If the specific disclosures required by this and other IFRSs do not meet the objectives set out in paragraphs 59 and 61, the acquirer shall disclose whatever additional information is necessary to meet those objectives.

    © IFRS Foundation

## Effective date and transition

### Effective date

64    This IFRS shall be applied prospectively to business combinations for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after 1 July 2009.  Earlier application is permitted.  However, this IFRS shall be applied only at the beginning of an annual reporting period that begins on or after 30 June 2007.  If an entity applies this IFRS before 1 July 2009, it shall disclose that fact and apply IAS 27 (as amended in 2008) at the same time.

64A    [Deleted]

64B    *Improvements to IFRSs* issued in May 2010 amended paragraphs 19, 30 and B56 and added paragraphs B62A and B62B.  An entity shall apply those amendments for annual periods beginning on or after 1 July 2010.  Earlier application is permitted.  If an entity applies the amendments for an earlier period it shall disclose that fact.  Application should be prospective from the date when the entity first applied this IFRS.

64C    Paragraphs 65A–65E were added by *Improvements to IFRSs* issued in May 2010.  An entity shall apply those amendments for annual periods beginning on or after 1 July 2010.  Earlier application is permitted.  If an entity applies the amendments for an earlier period it shall disclose that fact.  The amendments shall be applied to contingent consideration balances arising from business combinations with an acquisition date prior to the application of this IFRS, as issued in 2008.

64D    [Deleted]

64E    IFRS 10, issued in May 2011, amended paragraphs 7, B13, B63(e) and Appendix A.  An entity shall apply those amendments when it applies IFRS 10.

64F    IFRS 13 *Fair Value Measurement*, issued in May 2011, amended paragraphs 20, 29, 33, 47, amended the definition of fair value in Appendix A and amended paragraphs B22, B40, B43–B46, B49 and B64.  An entity shall apply those amendments when it applies IFRS 13.

64G    *Investment Entities* (Amendments to IFRS 10, IFRS 12 and IAS 27), issued in October 2012, amended paragraph 7 and added paragraph 2A.  An entity shall apply those amendments for annual periods beginning on or after 1 January 2014.  Earlier application of *Investment Entities* is permitted.  If an entity applies these amendments earlier it shall also apply all amendments included in *Investment Entities* at the same time.

64H    [Deleted]

64I    *Annual Improvements to IFRSs 2010–2012 Cycle*, issued in December 2013, amended paragraphs 40 and 58 and added paragraph 67A and its related heading.  An entity shall apply that amendment prospectively to business combinations for which the acquisition date is on or after 1 July 2014.  Earlier application is permitted.  An entity may apply the amendment earlier provided that IFRS 9 and

IFRS 3

IAS 37 (both as amended by *Annual Improvements to IFRSs 2010–2012 Cycle*) have also been applied.  If an entity applies that amendment earlier it shall disclose that fact.

64J    *Annual Improvements Cycle 2011–2013* issued in December 2013 amended paragraph 2(a).  An entity shall apply that amendment prospectively for annual periods beginning on or after 1 July 2014.  Earlier application is permitted.  If an entity applies that amendment for an earlier period it shall disclose that fact.

64K    IFRS 15 *Revenue from Contracts with Customers*, issued in May 2014, amended paragraph 56.  An entity shall apply that amendment when it applies IFRS 15.

64L    IFRS 9, as issued in July 2014, amended paragraphs 16, 42, 53, 56, 58 and B41 and deleted paragraphs 64A, 64D and 64H.  An entity shall apply those amendments when it applies IFRS 9.

64M    IFRS 16, issued in January 2016, amended paragraphs 14, 17, B32 and B42, deleted paragraphs B28–B30 and their related heading and added paragraphs 28A–28B and their related heading.  An entity shall apply those amendments when it applies IFRS 16.

64N    IFRS 17, issued in May 2017, amended paragraphs 17, 20, 21, 35 and B63, and after paragraph 31 added a heading and paragraph 31A.  An entity shall apply those amendments when it applies IFRS 17.

64O    *Annual Improvements to IFRS Standards 2015–2017 Cycle*, issued in December 2017, added paragraph 42A.  An entity shall apply those amendments to business combinations for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after 1 January 2019.  Earlier application is permitted.  If an entity applies those amendments earlier, it shall disclose that fact.

## Transition

65    Assets and liabilities that arose from business combinations whose acquisition dates preceded the application of this IFRS shall not be adjusted upon application of this IFRS.

65A    Contingent consideration balances arising from business combinations whose acquisition dates preceded the date when an entity first applied this IFRS as issued in 2008 shall not be adjusted upon first application of this IFRS.  Paragraphs 65B–65E shall be applied in the subsequent accounting for those balances.  Paragraphs 65B–65E shall not apply to the accounting for contingent consideration balances arising from business combinations with acquisition dates on or after the date when the entity first applied this IFRS as issued in 2008.  In paragraphs 65B–65E business combination refers exclusively to business combinations whose acquisition date preceded the application of this IFRS as issued in 2008.

65B    If a business combination agreement provides for an adjustment to the cost of the combination contingent on future events, the acquirer shall include the amount of that adjustment in the cost of the combination at the acquisition date if the adjustment is probable and can be measured reliably.

                    © IFRS Foundation

65C    A business combination agreement may allow for adjustments to the cost of the combination that are contingent on one or more future events. The adjustment might, for example, be contingent on a specified level of profit being maintained or achieved in future periods, or on the market price of the instruments issued being maintained. It is usually possible to estimate the amount of any such adjustment at the time of initially accounting for the combination without impairing the reliability of the information, even though some uncertainty exists. If the future events do not occur or the estimate needs to be revised, the cost of the business combination shall be adjusted accordingly.

65D    However, when a business combination agreement provides for such an adjustment, that adjustment is not included in the cost of the combination at the time of initially accounting for the combination if it either is not probable or cannot be measured reliably. If that adjustment subsequently becomes probable and can be measured reliably, the additional consideration shall be treated as an adjustment to the cost of the combination.

65E    In some circumstances, the acquirer may be required to make a subsequent payment to the seller as compensation for a reduction in the value of the assets given, equity instruments issued or liabilities incurred or assumed by the acquirer in exchange for control of the acquiree. This is the case, for example, when the acquirer guarantees the market price of equity or debt instruments issued as part of the cost of the business combination and is required to issue additional equity or debt instruments to restore the originally determined cost. In such cases, no increase in the cost of the business combination is recognised. In the case of equity instruments, the fair value of the additional payment is offset by an equal reduction in the value attributed to the instruments initially issued. In the case of debt instruments, the additional payment is regarded as a reduction in the premium or an increase in the discount on the initial issue.

66    An entity, such as a mutual entity, that has not yet applied IFRS 3 and had one or more business combinations that were accounted for using the purchase method shall apply the transition provisions in paragraphs B68 and B69.

**Income taxes**

67    For business combinations in which the acquisition date was before this IFRS is applied, the acquirer shall apply the requirements of paragraph 68 of IAS 12, as amended by this IFRS, prospectively. That is to say, the acquirer shall not adjust the accounting for prior business combinations for previously recognised changes in recognised deferred tax assets. However, from the date when this IFRS is applied, the acquirer shall recognise, as an adjustment to profit or loss (or, if IAS 12 requires, outside profit or loss), changes in recognised deferred tax assets.

## Reference to IFRS 9

67A    If an entity applies this Standard but does not yet apply IFRS 9, any reference to IFRS 9 should be read as a reference to IAS 39.

IFRS 3

## Withdrawal of IFRS 3 (2004)

68        This IFRS supersedes IFRS 3 *Business Combinations* (as issued in 2004).

        © IFRS Foundation

## Appendix A
## Defined terms

*This appendix is an integral part of the IFRS.*

| | |
|---|---|
| **acquiree** | The business or businesses that the **acquirer** obtains control of in a **business combination**. |
| **acquirer** | The entity that obtains control of the **acquiree**. |
| **acquisition date** | The date on which the **acquirer** obtains control of the **acquiree**. |
| **business** | An integrated set of activities and assets that is capable of being conducted and managed for the purpose of providing a return in the form of dividends, lower costs or other economic benefits directly to investors or other owners, members or participants. |
| **business combination** | A transaction or other event in which an **acquirer** obtains control of one or more **businesses**.  Transactions sometimes referred to as 'true mergers' or 'mergers of equals' are also **business combinations** as that term is used in this IFRS. |
| **contingent consideration** | Usually, an obligation of the **acquirer** to transfer additional assets or **equity interests** to the former owners of an **acquiree** as part of the exchange for control of the acquiree if specified future events occur or conditions are met.  However, *contingent consideration* also may give the acquirer the right to the return of previously transferred consideration if specified conditions are met. |
| **equity interests** | For the purposes of this IFRS, *equity interests* is used broadly to mean ownership interests of investor-owned entities and owner, member or participant interests of **mutual entities**. |
| **fair value** | *Fair value* is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.  (See IFRS 13.) |
| **goodwill** | An asset representing the future economic benefits arising from other assets acquired in a **business combination** that are not individually identified and separately recognised. |
| **identifiable** | An asset is *identifiable* if it either:<br><br>(a)  is separable, ie capable of being separated or divided from the entity and sold, transferred, licensed, rented or exchanged, either individually or together with a related contract, identifiable asset or liability, regardless of whether the entity intends to do so; or<br><br>(b)  arises from contractual or other legal rights, regardless of whether those rights are transferable or separable from the entity or from other rights and obligations. |
| **intangible asset** | An **identifiable** non-monetary asset without physical substance. |

IFRS 3

| | |
|---|---|
| **mutual entity** | An entity, other than an investor-owned entity, that provides dividends, lower costs or other economic benefits directly to its **owners**, members or participants. For example, a mutual insurance company, a credit union and a co-operative entity are all mutual entities. |
| **non-controlling interest** | The equity in a subsidiary not attributable, directly or indirectly, to a parent. |
| **owners** | For the purposes of this IFRS, *owners* is used broadly to include holders of **equity interests** of investor-owned entities and owners or members of, or participants in, **mutual entities**. |

    © IFRS Foundation

## Appendix B
## Application guidance

*This appendix is an integral part of the IFRS.*

### Business combinations of entities under common control (application of paragraph 2(c))

B1    This IFRS does not apply to a business combination of entities or businesses under common control.  A business combination involving entities or businesses under common control is a business combination in which all of the combining entities or businesses are ultimately controlled by the same party or parties both before and after the business combination, and that control is not transitory.

B2    A group of individuals shall be regarded as controlling an entity when, as a result of contractual arrangements, they collectively have the power to govern its financial and operating policies so as to obtain benefits from its activities. Therefore, a business combination is outside the scope of this IFRS when the same group of individuals has, as a result of contractual arrangements, ultimate collective power to govern the financial and operating policies of each of the combining entities so as to obtain benefits from their activities, and that ultimate collective power is not transitory.

B3    An entity may be controlled by an individual or by a group of individuals acting together under a contractual arrangement, and that individual or group of individuals may not be subject to the financial reporting requirements of IFRSs. Therefore, it is not necessary for combining entities to be included as part of the same consolidated financial statements for a business combination to be regarded as one involving entities under common control.

B4    The extent of non-controlling interests in each of the combining entities before and after the business combination is not relevant to determining whether the combination involves entities under common control.  Similarly, the fact that one of the combining entities is a subsidiary that has been excluded from the consolidated financial statements is not relevant to determining whether a combination involves entities under common control.

### Identifying a business combination (application of paragraph 3)

B5    This IFRS defines a business combination as a transaction or other event in which an acquirer obtains control of one or more businesses.  An acquirer might obtain control of an acquiree in a variety of ways, for example:

    (a)    by transferring cash, cash equivalents or other assets (including net assets that constitute a business);

    (b)    by incurring liabilities;

    (c)    by issuing equity interests;

    (d)    by providing more than one type of consideration; or

    (e)    without transferring consideration, including by contract alone (see paragraph 43).

IFRS 3

B6    A business combination may be structured in a variety of ways for legal, taxation or other reasons, which include but are not limited to:

(a)    one or more businesses become subsidiaries of an acquirer or the net assets of one or more businesses are legally merged into the acquirer;

(b)    one combining entity transfers its net assets, or its owners transfer their equity interests, to another combining entity or its owners;

(c)    all of the combining entities transfer their net assets, or the owners of those entities transfer their equity interests, to a newly formed entity (sometimes referred to as a roll-up or put-together transaction); or

(d)    a group of former owners of one of the combining entities obtains control of the combined entity.

## Definition of a business (application of paragraph 3)

B7    A business consists of inputs and processes applied to those inputs that have the ability to create outputs. Although businesses usually have outputs, outputs are not required for an integrated set to qualify as a business. The three elements of a business are defined as follows:

(a)    **Input:** Any economic resource that creates, or has the ability to create, outputs when one or more processes are applied to it. Examples include non-current assets (including intangible assets or rights to use non-current assets), intellectual property, the ability to obtain access to necessary materials or rights and employees.

(b)    **Process:** Any system, standard, protocol, convention or rule that when applied to an input or inputs, creates or has the ability to create outputs. Examples include strategic management processes, operational processes and resource management processes. These processes typically are documented, but an organised workforce having the necessary skills and experience following rules and conventions may provide the necessary processes that are capable of being applied to inputs to create outputs. (Accounting, billing, payroll and other administrative systems typically are not processes used to create outputs.)

(c)    **Output:** The result of inputs and processes applied to those inputs that provide or have the ability to provide a return in the form of dividends, lower costs or other economic benefits directly to investors or other owners, members or participants.

B8    To be capable of being conducted and managed for the purposes defined, an integrated set of activities and assets requires two essential elements—inputs and processes applied to those inputs, which together are or will be used to create outputs. However, a business need not include all of the inputs or processes that the seller used in operating that business if market participants are capable of acquiring the business and continuing to produce outputs, for example, by integrating the business with their own inputs and processes.

B9    The nature of the elements of a business varies by industry and by the structure of an entity's operations (activities), including the entity's stage of development.

© IFRS Foundation

Established businesses often have many different types of inputs, processes and outputs, whereas new businesses often have few inputs and processes and sometimes only a single output (product). Nearly all businesses also have liabilities, but a business need not have liabilities.

B10   An integrated set of activities and assets in the development stage might not have outputs. If not, the acquirer should consider other factors to determine whether the set is a business. Those factors include, but are not limited to, whether the set:

(a)   has begun planned principal activities;

(b)   has employees, intellectual property and other inputs and processes that could be applied to those inputs;

(c)   is pursuing a plan to produce outputs; and

(d)   will be able to obtain access to customers that will purchase the outputs.

Not all of those factors need to be present for a particular integrated set of activities and assets in the development stage to qualify as a business.

B11   Determining whether a particular set of assets and activities is a business should be based on whether the integrated set is capable of being conducted and managed as a business by a market participant. Thus, in evaluating whether a particular set is a business, it is not relevant whether a seller operated the set as a business or whether the acquirer intends to operate the set as a business.

B12   In the absence of evidence to the contrary, a particular set of assets and activities in which goodwill is present shall be presumed to be a business. However, a business need not have goodwill.

## Identifying the acquirer (application of paragraphs 6 and 7)

B13   The guidance in IFRS 10 *Consolidated Financial Statements* shall be used to identify the acquirer—the entity that obtains control of the acquiree. If a business combination has occurred but applying the guidance in IFRS 10 does not clearly indicate which of the combining entities is the acquirer, the factors in paragraphs B14–B18 shall be considered in making that determination.

B14   In a business combination effected primarily by transferring cash or other assets or by incurring liabilities, the acquirer is usually the entity that transfers the cash or other assets or incurs the liabilities.

B15   In a business combination effected primarily by exchanging equity interests, the acquirer is usually the entity that issues its equity interests. However, in some business combinations, commonly called 'reverse acquisitions', the issuing entity is the acquiree. Paragraphs B19–B27 provide guidance on accounting for reverse acquisitions. Other pertinent facts and circumstances shall also be considered in identifying the acquirer in a business combination effected by exchanging equity interests, including:

(a)   *the relative voting rights in the combined entity after the business combination*—The acquirer is usually the combining entity whose owners as a group retain or receive the largest portion of the voting rights in the

IFRS 3

combined entity. In determining which group of owners retains or receives the largest portion of the voting rights, an entity shall consider the existence of any unusual or special voting arrangements and options, warrants or convertible securities.

(b)     *the existence of a large minority voting interest in the combined entity if no other owner or organised group of owners has a significant voting interest*—The acquirer is usually the combining entity whose single owner or organised group of owners holds the largest minority voting interest in the combined entity.

(c)     *the composition of the governing body of the combined entity*—The acquirer is usually the combining entity whose owners have the ability to elect or appoint or to remove a majority of the members of the governing body of the combined entity.

(d)     *the composition of the senior management of the combined entity*—The acquirer is usually the combining entity whose (former) management dominates the management of the combined entity.

(e)     *the terms of the exchange of equity interests*—The acquirer is usually the combining entity that pays a premium over the pre-combination fair value of the equity interests of the other combining entity or entities.

B16     The acquirer is usually the combining entity whose relative size (measured in, for example, assets, revenues or profit) is significantly greater than that of the other combining entity or entities.

B17     In a business combination involving more than two entities, determining the acquirer shall include a consideration of, among other things, which of the combining entities initiated the combination, as well as the relative size of the combining entities.

B18     A new entity formed to effect a business combination is not necessarily the acquirer. If a new entity is formed to issue equity interests to effect a business combination, one of the combining entities that existed before the business combination shall be identified as the acquirer by applying the guidance in paragraphs B13–B17. In contrast, a new entity that transfers cash or other assets or incurs liabilities as consideration may be the acquirer.

## Reverse acquisitions

B19     A reverse acquisition occurs when the entity that issues securities (the legal acquirer) is identified as the acquiree for accounting purposes on the basis of the guidance in paragraphs B13–B18. The entity whose equity interests are acquired (the legal acquiree) must be the acquirer for accounting purposes for the transaction to be considered a reverse acquisition. For example, reverse acquisitions sometimes occur when a private operating entity wants to become a public entity but does not want to register its equity shares. To accomplish that, the private entity will arrange for a public entity to acquire its equity interests in exchange for the equity interests of the public entity. In this example, the public entity is the **legal acquirer** because it issued its equity interests, and the

© IFRS Foundation

private entity is the **legal acquiree** because its equity interests were acquired. However, application of the guidance in paragraphs B13–B18 results in identifying:

(a)    the public entity as the **acquiree** for accounting purposes (the accounting acquiree); and

(b)    the private entity as the **acquirer** for accounting purposes (the accounting acquirer).

The accounting acquiree must meet the definition of a business for the transaction to be accounted for as a reverse acquisition, and all of the recognition and measurement principles in this IFRS, including the requirement to recognise goodwill, apply.

### Measuring the consideration transferred

B20    In a reverse acquisition, the accounting acquirer usually issues no consideration for the acquiree. Instead, the accounting acquiree usually issues its equity shares to the owners of the accounting acquirer. Accordingly, the acquisition-date fair value of the consideration transferred by the accounting acquirer for its interest in the accounting acquiree is based on the number of equity interests the legal subsidiary would have had to issue to give the owners of the legal parent the same percentage equity interest in the combined entity that results from the reverse acquisition. The fair value of the number of equity interests calculated in that way can be used as the fair value of consideration transferred in exchange for the acquiree.

### Preparation and presentation of consolidated financial statements

B21    Consolidated financial statements prepared following a reverse acquisition are issued under the name of the legal parent (accounting acquiree) but described in the notes as a continuation of the financial statements of the legal subsidiary (accounting acquirer), with one adjustment, which is to adjust retroactively the accounting acquirer's legal capital to reflect the legal capital of the accounting acquiree. That adjustment is required to reflect the capital of the legal parent (the accounting acquiree). Comparative information presented in those consolidated financial statements also is retroactively adjusted to reflect the legal capital of the legal parent (accounting acquiree).

B22    Because the consolidated financial statements represent the continuation of the financial statements of the legal subsidiary except for its capital structure, the consolidated financial statements reflect:

(a)    the assets and liabilities of the legal subsidiary (the accounting acquirer) recognised and measured at their pre-combination carrying amounts.

(b)    the assets and liabilities of the legal parent (the accounting acquiree) recognised and measured in accordance with this IFRS.

(c)    the retained earnings and other equity balances of the legal subsidiary (accounting acquirer) **before** the business combination.

IFRS 3

(d)     the amount recognised as issued equity interests in the consolidated financial statements determined by adding the issued equity interest of the legal subsidiary (the accounting acquirer) outstanding immediately before the business combination to the fair value of the legal parent (accounting acquiree).  However, the equity structure (ie the number and type of equity interests issued) reflects the equity structure of the legal parent (the accounting acquiree), including the equity interests the legal parent issued to effect the combination.  Accordingly, the equity structure of the legal subsidiary (the accounting acquirer) is restated using the exchange ratio established in the acquisition agreement to reflect the number of shares of the legal parent (the accounting acquiree) issued in the reverse acquisition.

(e)     the non-controlling interest's proportionate share of the legal subsidiary's (accounting acquirer's) pre-combination carrying amounts of retained earnings and other equity interests as discussed in paragraphs B23 and B24.

## Non-controlling interest

B23     In a reverse acquisition, some of the owners of the legal acquiree (the accounting acquirer) might not exchange their equity interests for equity interests of the legal parent (the accounting acquiree).  Those owners are treated as a non-controlling interest in the consolidated financial statements after the reverse acquisition.  That is because the owners of the legal acquiree that do not exchange their equity interests for equity interests of the legal acquirer have an interest in only the results and net assets of the legal acquiree—not in the results and net assets of the combined entity.  Conversely, even though the legal acquirer is the acquiree for accounting purposes, the owners of the legal acquirer have an interest in the results and net assets of the combined entity.

B24     The assets and liabilities of the legal acquiree are measured and recognised in the consolidated financial statements at their pre-combination carrying amounts (see paragraph B22(a)).  Therefore, in a reverse acquisition the non-controlling interest reflects the non-controlling shareholders' proportionate interest in the pre-combination carrying amounts of the legal acquiree's net assets even if the non-controlling interests in other acquisitions are measured at their fair value at the acquisition date.

## Earnings per share

B25     As noted in paragraph B22(d), the equity structure in the consolidated financial statements following a reverse acquisition reflects the equity structure of the legal acquirer (the accounting acquiree), including the equity interests issued by the legal acquirer to effect the business combination.

B26     In calculating the weighted average number of ordinary shares outstanding (the denominator of the earnings per share calculation) during the period in which the reverse acquisition occurs:

(a)     the number of ordinary shares outstanding from the beginning of that period to the acquisition date shall be computed on the basis of the weighted average number of ordinary shares of the legal acquiree

(accounting acquirer) outstanding during the period multiplied by the exchange ratio established in the merger agreement; and

(b)  the number of ordinary shares outstanding from the acquisition date to the end of that period shall be the actual number of ordinary shares of the legal acquirer (the accounting acquiree) outstanding during that period.

B27   The basic earnings per share for each comparative period before the acquisition date presented in the consolidated financial statements following a reverse acquisition shall be calculated by dividing:

(a)  the profit or loss of the legal acquiree attributable to ordinary shareholders in each of those periods by

(b)  the legal acquiree's historical weighted average number of ordinary shares outstanding multiplied by the exchange ratio established in the acquisition agreement.

## Recognising particular assets acquired and liabilities assumed (application of paragraphs 10–13)

B28– [Deleted]
B30

### Intangible assets

B31   The acquirer shall recognise, separately from goodwill, the identifiable intangible assets acquired in a business combination. An intangible asset is identifiable if it meets either the separability criterion or the contractual-legal criterion.

B32   An intangible asset that meets the contractual-legal criterion is identifiable even if the asset is not transferable or separable from the acquiree or from other rights and obligations. For example:

(a)  [deleted]

(b)  an acquiree owns and operates a nuclear power plant. The licence to operate that power plant is an intangible asset that meets the contractual-legal criterion for recognition separately from goodwill, even if the acquirer cannot sell or transfer it separately from the acquired power plant. An acquirer may recognise the fair value of the operating licence and the fair value of the power plant as a single asset for financial reporting purposes if the useful lives of those assets are similar.

(c)  an acquiree owns a technology patent. It has licensed that patent to others for their exclusive use outside the domestic market, receiving a specified percentage of future foreign revenue in exchange. Both the technology patent and the related licence agreement meet the contractual-legal criterion for recognition separately from goodwill even if selling or exchanging the patent and the related licence agreement separately from one another would not be practical.

B33   The separability criterion means that an acquired intangible asset is capable of being separated or divided from the acquiree and sold, transferred, licensed,

IFRS 3

rented or exchanged, either individually or together with a related contract, identifiable asset or liability. An intangible asset that the acquirer would be able to sell, license or otherwise exchange for something else of value meets the separability criterion even if the acquirer does not intend to sell, license or otherwise exchange it. An acquired intangible asset meets the separability criterion if there is evidence of exchange transactions for that type of asset or an asset of a similar type, even if those transactions are infrequent and regardless of whether the acquirer is involved in them. For example, customer and subscriber lists are frequently licensed and thus meet the separability criterion. Even if an acquiree believes its customer lists have characteristics different from other customer lists, the fact that customer lists are frequently licensed generally means that the acquired customer list meets the separability criterion. However, a customer list acquired in a business combination would not meet the separability criterion if the terms of confidentiality or other agreements prohibit an entity from selling, leasing or otherwise exchanging information about its customers.

B34    An intangible asset that is not individually separable from the acquiree or combined entity meets the separability criterion if it is separable in combination with a related contract, identifiable asset or liability. For example:

(a)    market participants exchange deposit liabilities and related depositor relationship intangible assets in observable exchange transactions. Therefore, the acquirer should recognise the depositor relationship intangible asset separately from goodwill.

(b)    an acquiree owns a registered trademark and documented but unpatented technical expertise used to manufacture the trademarked product. To transfer ownership of a trademark, the owner is also required to transfer everything else necessary for the new owner to produce a product or service indistinguishable from that produced by the former owner. Because the unpatented technical expertise must be separated from the acquiree or combined entity and sold if the related trademark is sold, it meets the separability criterion.

### Reacquired rights

B35    As part of a business combination, an acquirer may reacquire a right that it had previously granted to the acquiree to use one or more of the acquirer's recognised or unrecognised assets. Examples of such rights include a right to use the acquirer's trade name under a franchise agreement or a right to use the acquirer's technology under a technology licensing agreement. A reacquired right is an identifiable intangible asset that the acquirer recognises separately from goodwill. Paragraph 29 provides guidance on measuring a reacquired right and paragraph 55 provides guidance on the subsequent accounting for a reacquired right.

B36    If the terms of the contract giving rise to a reacquired right are favourable or unfavourable relative to the terms of current market transactions for the same or similar items, the acquirer shall recognise a settlement gain or loss. Paragraph B52 provides guidance for measuring that settlement gain or loss.

© IFRS Foundation

### Assembled workforce and other items that are not identifiable

B37    The acquirer subsumes into goodwill the value of an acquired intangible asset that is not identifiable as of the acquisition date. For example, an acquirer may attribute value to the existence of an assembled workforce, which is an existing collection of employees that permits the acquirer to continue to operate an acquired business from the acquisition date. An assembled workforce does not represent the intellectual capital of the skilled workforce—the (often specialised) knowledge and experience that employees of an acquiree bring to their jobs. Because the assembled workforce is not an identifiable asset to be recognised separately from goodwill, any value attributed to it is subsumed into goodwill.

B38    The acquirer also subsumes into goodwill any value attributed to items that do not qualify as assets at the acquisition date. For example, the acquirer might attribute value to potential contracts the acquiree is negotiating with prospective new customers at the acquisition date. Because those potential contracts are not themselves assets at the acquisition date, the acquirer does not recognise them separately from goodwill. The acquirer should not subsequently reclassify the value of those contracts from goodwill for events that occur after the acquisition date. However, the acquirer should assess the facts and circumstances surrounding events occurring shortly after the acquisition to determine whether a separately recognisable intangible asset existed at the acquisition date.

B39    After initial recognition, an acquirer accounts for intangible assets acquired in a business combination in accordance with the provisions of IAS 38 *Intangible Assets*. However, as described in paragraph 3 of IAS 38, the accounting for some acquired intangible assets after initial recognition is prescribed by other IFRSs.

B40    The identifiability criteria determine whether an intangible asset is recognised separately from goodwill. However, the criteria neither provide guidance for measuring the fair value of an intangible asset nor restrict the assumptions used in measuring the fair value of an intangible asset. For example, the acquirer would take into account the assumptions that market participants would use when pricing the intangible asset, such as expectations of future contract renewals, in measuring fair value. It is not necessary for the renewals themselves to meet the identifiability criteria. (However, see paragraph 29, which establishes an exception to the fair value measurement principle for reacquired rights recognised in a business combination.) Paragraphs 36 and 37 of IAS 38 provide guidance for determining whether intangible assets should be combined into a single unit of account with other intangible or tangible assets.

## Measuring the fair value of particular identifiable assets and a non-controlling interest in an acquiree (application of paragraphs 18 and 19)

### Assets with uncertain cash flows (valuation allowances)

B41    The acquirer shall not recognise a separate valuation allowance as of the acquisition date for assets acquired in a business combination that are measured at their acquisition-date fair values because the effects of uncertainty about future cash flows are included in the fair value measure. For example, because

IFRS 3

this IFRS requires the acquirer to measure acquired receivables, including loans, at their acquisition-date fair values in accounting for a business combination, the acquirer does not recognise a separate valuation allowance for the contractual cash flows that are deemed to be uncollectible at that date or a loss allowance for expected credit losses.

### Assets subject to operating leases in which the acquiree is the lessor

B42    In measuring the acquisition-date fair value of an asset such as a building or a patent that is subject to an operating lease in which the acquiree is the lessor, the acquirer shall take into account the terms of the lease.  The acquirer does not recognise a separate asset or liability if the terms of an operating lease are either favourable or unfavourable when compared with market terms.

### Assets that the acquirer intends not to use or to use in a way that is different from the way other market participants would use them

B43    To protect its competitive position, or for other reasons, the acquirer may intend not to use an acquired non-financial asset actively, or it may not intend to use the asset according to its highest and best use.  For example, that might be the case for an acquired research and development intangible asset that the acquirer plans to use defensively by preventing others from using it.  Nevertheless, the acquirer shall measure the fair value of the non-financial asset assuming its highest and best use by market participants in accordance with the appropriate valuation premise, both initially and when measuring fair value less costs of disposal for subsequent impairment testing.

### Non-controlling interest in an acquiree

B44    This IFRS allows the acquirer to measure a non-controlling interest in the acquiree at its fair value at the acquisition date.  Sometimes an acquirer will be able to measure the acquisition-date fair value of a non-controlling interest on the basis of a quoted price in an active market for the equity shares (ie those not held by the acquirer).  In other situations, however, a quoted price in an active market for the equity shares will not be available.  In those situations, the acquirer would measure the fair value of the non-controlling interest using other valuation techniques.

B45    The fair values of the acquirer's interest in the acquiree and the non-controlling interest on a per-share basis might differ.  The main difference is likely to be the inclusion of a control premium in the per-share fair value of the acquirer's interest in the acquiree or, conversely, the inclusion of a discount for lack of control (also referred to as a non-controlling interest discount) in the per-share fair value of the non-controlling interest if market participants would take into account such a premium or discount when pricing the non-controlling interest.

        © IFRS Foundation

## Measuring goodwill or a gain from a bargain purchase

### Measuring the acquisition-date fair value of the acquirer's interest in the acquiree using valuation techniques (application of paragraph 33)

B46    In a business combination achieved without the transfer of consideration, the acquirer must substitute the acquisition-date fair value of its interest in the acquiree for the acquisition-date fair value of the consideration transferred to measure goodwill or a gain on a bargain purchase (see paragraphs 32–34).

### Special considerations in applying the acquisition method to combinations of mutual entities (application of paragraph 33)

B47    When two mutual entities combine, the fair value of the equity or member interests in the acquiree (or the fair value of the acquiree) may be more reliably measurable than the fair value of the member interests transferred by the acquirer. In that situation, paragraph 33 requires the acquirer to determine the amount of goodwill by using the acquisition-date fair value of the acquiree's equity interests instead of the acquisition-date fair value of the acquirer's equity interests transferred as consideration.  In addition, the acquirer in a combination of mutual entities shall recognise the acquiree's net assets as a direct addition to capital or equity in its statement of financial position, not as an addition to retained earnings, which is consistent with the way in which other types of entities apply the acquisition method.

B48    Although they are similar in many ways to other businesses, mutual entities have distinct characteristics that arise primarily because their members are both customers and owners.  Members of mutual entities generally expect to receive benefits for their membership, often in the form of reduced fees charged for goods and services or patronage dividends.  The portion of patronage dividends allocated to each member is often based on the amount of business the member did with the mutual entity during the year.

B49    A fair value measurement of a mutual entity should include the assumptions that market participants would make about future member benefits as well as any other relevant assumptions market participants would make about the mutual entity.  For example, a present value technique may be used to measure the fair value of a mutual entity.  The cash flows used as inputs to the model should be based on the expected cash flows of the mutual entity, which are likely to reflect reductions for member benefits, such as reduced fees charged for goods and services.

## Determining what is part of the business combination transaction (application of paragraphs 51 and 52)

B50    The acquirer should consider the following factors, which are neither mutually exclusive nor individually conclusive, to determine whether a transaction is part of the exchange for the acquiree or whether the transaction is separate from the business combination:

IFRS 3

(a)   **the reasons for the transaction**—Understanding the reasons why the parties to the combination (the acquirer and the acquiree and their owners, directors and managers—and their agents) entered into a particular transaction or arrangement may provide insight into whether it is part of the consideration transferred and the assets acquired or liabilities assumed.  For example, if a transaction is arranged primarily for the benefit of the acquirer or the combined entity rather than primarily for the benefit of the acquiree or its former owners before the combination, that portion of the transaction price paid (and any related assets or liabilities) is less likely to be part of the exchange for the acquiree.  Accordingly, the acquirer would account for that portion separately from the business combination.

(b)   **who initiated the transaction**—Understanding who initiated the transaction may also provide insight into whether it is part of the exchange for the acquiree.  For example, a transaction or other event that is initiated by the acquirer may be entered into for the purpose of providing future economic benefits to the acquirer or combined entity with little or no benefit received by the acquiree or its former owners before the combination.   On the other hand, a transaction or arrangement initiated by the acquiree or its former owners is less likely to be for the benefit of the acquirer or the combined entity and more likely to be part of the business combination transaction.

(c)   **the timing of the transaction**—The timing of the transaction may also provide insight into whether it is part of the exchange for the acquiree. For example, a transaction between the acquirer and the acquiree that takes place during the negotiations of the terms of a business combination may have been entered into in contemplation of the business combination to provide future economic benefits to the acquirer or the combined entity.  If so, the acquiree or its former owners before the business combination are likely to receive little or no benefit from the transaction except for benefits they receive as part of the combined entity.

### Effective settlement of a pre-existing relationship between the acquirer and acquiree in a business combination (application of paragraph 52(a))

B51   The acquirer and acquiree may have a relationship that existed before they contemplated the business combination, referred to here as a 'pre-existing relationship'.  A pre-existing relationship between the acquirer and acquiree may be contractual (for example, vendor and customer or licensor and licensee) or non-contractual (for example, plaintiff and defendant).

B52   If the business combination in effect settles a pre-existing relationship, the acquirer recognises a gain or loss, measured as follows:

(a)   for a pre-existing non-contractual relationship (such as a lawsuit), fair value.

(b)   for a pre-existing contractual relationship, the lesser of (i) and (ii):

© IFRS Foundation

IFRS 3

(i)    the amount by which the contract is favourable or unfavourable from the perspective of the acquirer when compared with terms for current market transactions for the same or similar items. (An unfavourable contract is a contract that is unfavourable in terms of current market terms. It is not necessarily an onerous contract in which the unavoidable costs of meeting the obligations under the contract exceed the economic benefits expected to be received under it.)

(ii)    the amount of any stated settlement provisions in the contract available to the counterparty to whom the contract is unfavourable.

If (ii) is less than (i), the difference is included as part of the business combination accounting.

The amount of gain or loss recognised may depend in part on whether the acquirer had previously recognised a related asset or liability, and the reported gain or loss therefore may differ from the amount calculated by applying the above requirements.

B53    A pre-existing relationship may be a contract that the acquirer recognises as a reacquired right. If the contract includes terms that are favourable or unfavourable when compared with pricing for current market transactions for the same or similar items, the acquirer recognises, separately from the business combination, a gain or loss for the effective settlement of the contract, measured in accordance with paragraph B52.

### Arrangements for contingent payments to employees or selling shareholders (application of paragraph 52(b))

B54    Whether arrangements for contingent payments to employees or selling shareholders are contingent consideration in the business combination or are separate transactions depends on the nature of the arrangements. Understanding the reasons why the acquisition agreement includes a provision for contingent payments, who initiated the arrangement and when the parties entered into the arrangement may be helpful in assessing the nature of the arrangement.

B55    If it is not clear whether an arrangement for payments to employees or selling shareholders is part of the exchange for the acquiree or is a transaction separate from the business combination, the acquirer should consider the following indicators:

(a)    *Continuing employment*—The terms of continuing employment by the selling shareholders who become key employees may be an indicator of the substance of a contingent consideration arrangement. The relevant terms of continuing employment may be included in an employment agreement, acquisition agreement or some other document. A contingent consideration arrangement in which the payments are automatically forfeited if employment terminates is remuneration for post-combination services. Arrangements in which the contingent

IFRS 3

payments are not affected by employment termination may indicate that the contingent payments are additional consideration rather than remuneration.

(b)  *Duration of continuing employment*—If the period of required employment coincides with or is longer than the contingent payment period, that fact may indicate that the contingent payments are, in substance, remuneration.

(c)  *Level of remuneration*—Situations in which employee remuneration other than the contingent payments is at a reasonable level in comparison with that of other key employees in the combined entity may indicate that the contingent payments are additional consideration rather than remuneration.

(d)  *Incremental payments to employees*—If selling shareholders who do not become employees receive lower contingent payments on a per-share basis than the selling shareholders who become employees of the combined entity, that fact may indicate that the incremental amount of contingent payments to the selling shareholders who become employees is remuneration.

(e)  *Number of shares owned*—The relative number of shares owned by the selling shareholders who remain as key employees may be an indicator of the substance of the contingent consideration arrangement.  For example, if the selling shareholders who owned substantially all of the shares in the acquiree continue as key employees, that fact may indicate that the arrangement is, in substance, a profit-sharing arrangement intended to provide remuneration for post-combination services. Alternatively, if selling shareholders who continue as key employees owned only a small number of shares of the acquiree and all selling shareholders receive the same amount of contingent consideration on a per-share basis, that fact may indicate that the contingent payments are additional consideration.  The pre-acquisition ownership interests held by parties related to selling shareholders who continue as key employees, such as family members, should also be considered.

(f)  *Linkage to the valuation*—If the initial consideration transferred at the acquisition date is based on the low end of a range established in the valuation of the acquiree and the contingent formula relates to that valuation approach, that fact may suggest that the contingent payments are additional consideration.  Alternatively, if the contingent payment formula is consistent with prior profit-sharing arrangements, that fact may suggest that the substance of the arrangement is to provide remuneration.

(g)  *Formula for determining consideration*—The formula used to determine the contingent payment may be helpful in assessing the substance of the arrangement.  For example, if a contingent payment is determined on the basis of a multiple of earnings, that might suggest that the obligation is contingent consideration in the business combination and that the formula is intended to establish or verify the fair value of the acquiree. In contrast, a contingent payment that is a specified percentage of

 © IFRS Foundation

earnings might suggest that the obligation to employees is a profit-sharing arrangement to remunerate employees for services rendered.

(h)    *Other agreements and issues*—The terms of other arrangements with selling shareholders (such as agreements not to compete, executory contracts, consulting contracts and property lease agreements) and the income tax treatment of contingent payments may indicate that contingent payments are attributable to something other than consideration for the acquiree. For example, in connection with the acquisition, the acquirer might enter into a property lease arrangement with a significant selling shareholder. If the lease payments specified in the lease contract are significantly below market, some or all of the contingent payments to the lessor (the selling shareholder) required by a separate arrangement for contingent payments might be, in substance, payments for the use of the leased property that the acquirer should recognise separately in its post-combination financial statements. In contrast, if the lease contract specifies lease payments that are consistent with market terms for the leased property, the arrangement for contingent payments to the selling shareholder may be contingent consideration in the business combination.

### Acquirer share-based payment awards exchanged for awards held by the acquiree's employees (application of paragraph 52(b))

B56    An acquirer may exchange its share-based payment awards[2] (replacement awards) for awards held by employees of the acquiree. Exchanges of share options or other share-based payment awards in conjunction with a business combination are accounted for as modifications of share-based payment awards in accordance with IFRS 2 *Share-based Payment*. If the acquirer replaces the acquiree awards, either all or a portion of the market-based measure of the acquirer's replacement awards shall be included in measuring the consideration transferred in the business combination. Paragraphs B57–B62 provide guidance on how to allocate the market-based measure. However, in situations in which acquiree awards would expire as a consequence of a business combination and if the acquirer replaces those awards when it is not obliged to do so, all of the market-based measure of the replacement awards shall be recognised as remuneration cost in the post-combination financial statements in accordance with IFRS 2. That is to say, none of the market-based measure of those awards shall be included in measuring the consideration transferred in the business combination. The acquirer is obliged to replace the acquiree awards if the acquiree or its employees have the ability to enforce replacement. For example, for the purposes of applying this guidance, the acquirer is obliged to replace the acquiree's awards if replacement is required by:

(a)    the terms of the acquisition agreement;

(b)    the terms of the acquiree's awards; or

---

2    In paragraphs B56–B62 the term 'share-based payment awards' refers to vested or unvested share-based payment transactions.

IFRS 3

(c)     applicable laws or regulations.

B57    To determine the portion of a replacement award that is part of the consideration transferred for the acquiree and the portion that is remuneration for post-combination service, the acquirer shall measure both the replacement awards granted by the acquirer and the acquiree awards as of the acquisition date in accordance with IFRS 2. The portion of the market-based measure of the replacement award that is part of the consideration transferred in exchange for the acquiree equals the portion of the acquiree award that is attributable to pre-combination service.

B58    The portion of the replacement award attributable to pre-combination service is the market-based measure of the acquiree award multiplied by the ratio of the portion of the vesting period completed to the greater of the total vesting period or the original vesting period of the acquiree award. The vesting period is the period during which all the specified vesting conditions are to be satisfied. Vesting conditions are defined in IFRS 2.

B59    The portion of a non-vested replacement award attributable to post-combination service, and therefore recognised as remuneration cost in the post-combination financial statements, equals the total market-based measure of the replacement award less the amount attributed to pre-combination service. Therefore, the acquirer attributes any excess of the market-based measure of the replacement award over the market-based measure of the acquiree award to post-combination service and recognises that excess as remuneration cost in the post-combination financial statements. The acquirer shall attribute a portion of a replacement award to post-combination service if it requires post-combination service, regardless of whether employees had rendered all of the service required for their acquiree awards to vest before the acquisition date.

B60    The portion of a non-vested replacement award attributable to pre-combination service, as well as the portion attributable to post-combination service, shall reflect the best available estimate of the number of replacement awards expected to vest. For example, if the market-based measure of the portion of a replacement award attributed to pre-combination service is CU100 and the acquirer expects that only 95 per cent of the award will vest, the amount included in consideration transferred in the business combination is CU95. Changes in the estimated number of replacement awards expected to vest are reflected in remuneration cost for the periods in which the changes or forfeitures occur not as adjustments to the consideration transferred in the business combination. Similarly, the effects of other events, such as modifications or the ultimate outcome of awards with performance conditions, that occur after the acquisition date are accounted for in accordance with IFRS 2 in determining remuneration cost for the period in which an event occurs.

B61    The same requirements for determining the portions of a replacement award attributable to pre-combination and post-combination service apply regardless of whether a replacement award is classified as a liability or as an equity instrument in accordance with the provisions of IFRS 2. All changes in the market-based measure of awards classified as liabilities after the acquisition date

and the related income tax effects are recognised in the acquirer's post-combination financial statements in the period(s) in which the changes occur.

B62    The income tax effects of replacement awards of share-based payments shall be recognised in accordance with the provisions of IAS 12 *Income Taxes*.

### Equity-settled share-based payment transactions of the acquiree

B62A    The acquiree may have outstanding share-based payment transactions that the acquirer does not exchange for its share-based payment transactions. If vested, those acquiree share-based payment transactions are part of the non-controlling interest in the acquiree and are measured at their market-based measure. If unvested, they are measured at their market-based measure as if the acquisition date were the grant date in accordance with paragraphs 19 and 30.

B62B    The market-based measure of unvested share-based payment transactions is allocated to the non-controlling interest on the basis of the ratio of the portion of the vesting period completed to the greater of the total vesting period and the original vesting period of the share-based payment transaction. The balance is allocated to post-combination service.

## Other IFRSs that provide guidance on subsequent measurement and accounting (application of paragraph 54)

B63    Examples of other IFRSs that provide guidance on subsequently measuring and accounting for assets acquired and liabilities assumed or incurred in a business combination include:

(a)    IAS 38 prescribes the accounting for identifiable intangible assets acquired in a business combination. The acquirer measures goodwill at the amount recognised at the acquisition date less any accumulated impairment losses. IAS 36 *Impairment of Assets* prescribes the accounting for impairment losses.

(b)    [deleted]

(c)    IAS 12 prescribes the subsequent accounting for deferred tax assets (including unrecognised deferred tax assets) and liabilities acquired in a business combination.

(d)    IFRS 2 provides guidance on subsequent measurement and accounting for the portion of replacement share-based payment awards issued by an acquirer that is attributable to employees' future services.

(e)    IFRS 10 provides guidance on accounting for changes in a parent's ownership interest in a subsidiary after control is obtained.

## Disclosures (application of paragraphs 59 and 61)

B64    To meet the objective in paragraph 59, the acquirer shall disclose the following information for each business combination that occurs during the reporting period:

IFRS 3

(a)    the name and a description of the acquiree.

(b)    the acquisition date.

(c)    the percentage of voting equity interests acquired.

(d)    the primary reasons for the business combination and a description of how the acquirer obtained control of the acquiree.

(e)    a qualitative description of the factors that make up the goodwill recognised, such as expected synergies from combining operations of the acquiree and the acquirer, intangible assets that do not qualify for separate recognition or other factors.

(f)    the acquisition-date fair value of the total consideration transferred and the acquisition-date fair value of each major class of consideration, such as:

    (i)    cash;

    (ii)    other tangible or intangible assets, including a business or subsidiary of the acquirer;

    (iii)    liabilities incurred, for example, a liability for contingent consideration; and

    (iv)    equity interests of the acquirer, including the number of instruments or interests issued or issuable and the method of measuring the fair value of those instruments or interests.

(g)    for contingent consideration arrangements and indemnification assets:

    (i)    the amount recognised as of the acquisition date;

    (ii)    a description of the arrangement and the basis for determining the amount of the payment; and

    (iii)    an estimate of the range of outcomes (undiscounted) or, if a range cannot be estimated, that fact and the reasons why a range cannot be estimated.  If the maximum amount of the payment is unlimited, the acquirer shall disclose that fact.

(h)    for acquired receivables:

    (i)    the fair value of the receivables;

    (ii)    the gross contractual amounts receivable; and

    (iii)    the best estimate at the acquisition date of the contractual cash flows not expected to be collected.

The disclosures shall be provided by major class of receivable, such as loans, direct finance leases and any other class of receivables.

(i)    the amounts recognised as of the acquisition date for each major class of assets acquired and liabilities assumed.

© IFRS Foundation

(j)    for each contingent liability recognised in accordance with paragraph 23, the information required in paragraph 85 of IAS 37 *Provisions, Contingent Liabilities and Contingent Assets*. If a contingent liability is not recognised because its fair value cannot be measured reliably, the acquirer shall disclose:

    (i)    the information required by paragraph 86 of IAS 37; and

    (ii)    the reasons why the liability cannot be measured reliably.

(k)    the total amount of goodwill that is expected to be deductible for tax purposes.

(l)    for transactions that are recognised separately from the acquisition of assets and assumption of liabilities in the business combination in accordance with paragraph 51:

    (i)    a description of each transaction;

    (ii)    how the acquirer accounted for each transaction;

    (iii)    the amounts recognised for each transaction and the line item in the financial statements in which each amount is recognised; and

    (iv)    if the transaction is the effective settlement of a pre-existing relationship, the method used to determine the settlement amount.

(m)    the disclosure of separately recognised transactions required by (l) shall include the amount of acquisition-related costs and, separately, the amount of those costs recognised as an expense and the line item or items in the statement of comprehensive income in which those expenses are recognised. The amount of any issue costs not recognised as an expense and how they were recognised shall also be disclosed.

(n)    in a bargain purchase (see paragraphs 34–36):

    (i)    the amount of any gain recognised in accordance with paragraph 34 and the line item in the statement of comprehensive income in which the gain is recognised; and

    (ii)    a description of the reasons why the transaction resulted in a gain.

(o)    for each business combination in which the acquirer holds less than 100 per cent of the equity interests in the acquiree at the acquisition date:

    (i)    the amount of the non-controlling interest in the acquiree recognised at the acquisition date and the measurement basis for that amount; and

    (ii)    for each non-controlling interest in an acquiree measured at fair value, the valuation technique(s) and significant inputs used to measure that value.

(p)    in a business combination achieved in stages:

IFRS 3

(i)     the acquisition-date fair value of the equity interest in the acquiree held by the acquirer immediately before the acquisition date; and

(ii)    the amount of any gain or loss recognised as a result of remeasuring to fair value the equity interest in the acquiree held by the acquirer before the business combination (see paragraph 42) and the line item in the statement of comprehensive income in which that gain or loss is recognised.

(q)    the following information:

(i)     the amounts of revenue and profit or loss of the acquiree since the acquisition date included in the consolidated statement of comprehensive income for the reporting period; and

(ii)    the revenue and profit or loss of the combined entity for the current reporting period as though the acquisition date for all business combinations that occurred during the year had been as of the beginning of the annual reporting period.

If disclosure of any of the information required by this subparagraph is impracticable, the acquirer shall disclose that fact and explain why the disclosure is impracticable.  This IFRS uses the term 'impracticable' with the same meaning as in IAS 8 *Accounting Policies, Changes in Accounting Estimates and Errors*.

B65    For individually immaterial business combinations occurring during the reporting period that are material collectively, the acquirer shall disclose in aggregate the information required by paragraph B64(e)–(q).

B66    If the acquisition date of a business combination is after the end of the reporting period but before the financial statements are authorised for issue, the acquirer shall disclose the information required by paragraph B64 unless the initial accounting for the business combination is incomplete at the time the financial statements are authorised for issue.  In that situation, the acquirer shall describe which disclosures could not be made and the reasons why they cannot be made.

B67    To meet the objective in paragraph 61, the acquirer shall disclose the following information for each material business combination or in the aggregate for individually immaterial business combinations that are material collectively:

(a)    if the initial accounting for a business combination is incomplete (see paragraph 45) for particular assets, liabilities, non-controlling interests or items of consideration and the amounts recognised in the financial statements for the business combination thus have been determined only provisionally:

(i)     the reasons why the initial accounting for the business combination is incomplete;

(ii)    the assets, liabilities, equity interests or items of consideration for which the initial accounting is incomplete; and

(iii)    the nature and amount of any measurement period adjustments recognised during the reporting period in accordance with paragraph 49.

(b)    for each reporting period after the acquisition date until the entity collects, sells or otherwise loses the right to a contingent consideration asset, or until the entity settles a contingent consideration liability or the liability is cancelled or expires:

(i)    any changes in the recognised amounts, including any differences arising upon settlement;

(ii)    any changes in the range of outcomes (undiscounted) and the reasons for those changes; and

(iii)    the valuation techniques and key model inputs used to measure contingent consideration.

(c)    for contingent liabilities recognised in a business combination, the acquirer shall disclose the information required by paragraphs 84 and 85 of IAS 37 for each class of provision.

(d)    a reconciliation of the carrying amount of goodwill at the beginning and end of the reporting period showing separately:

(i)    the gross amount and accumulated impairment losses at the beginning of the reporting period.

(ii)    additional goodwill recognised during the reporting period, except goodwill included in a disposal group that, on acquisition, meets the criteria to be classified as held for sale in accordance with IFRS 5 *Non-current Assets Held for Sale and Discontinued Operations*.

(iii)    adjustments resulting from the subsequent recognition of deferred tax assets during the reporting period in accordance with paragraph 67.

(iv)    goodwill included in a disposal group classified as held for sale in accordance with IFRS 5 and goodwill derecognised during the reporting period without having previously been included in a disposal group classified as held for sale.

(v)    impairment losses recognised during the reporting period in accordance with IAS 36.    (IAS 36 requires disclosure of information about the recoverable amount and impairment of goodwill in addition to this requirement.)

(vi)    net exchange rate differences arising during the reporting period in accordance with IAS 21 *The Effects of Changes in Foreign Exchange Rates*.

(vii)    any other changes in the carrying amount during the reporting period.

(viii)    the gross amount and accumulated impairment losses at the end of the reporting period.

IFRS 3

(e)   the amount and an explanation of any gain or loss recognised in the current reporting period that both:

(i)   relates to the identifiable assets acquired or liabilities assumed in a business combination that was effected in the current or previous reporting period; and

(ii)   is of such a size, nature or incidence that disclosure is relevant to understanding the combined entity's financial statements.

## Transitional provisions for business combinations involving only mutual entities or by contract alone (application of paragraph 66)

B68   Paragraph 64 provides that this IFRS applies prospectively to business combinations for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after 1 July 2009.  Earlier application is permitted.  However, an entity shall apply this IFRS only at the beginning of an annual reporting period that begins on or after 30 June 2007.  If an entity applies this IFRS before its effective date, the entity shall disclose that fact and shall apply IAS 27 (as amended in 2008) at the same time.

B69   The requirement to apply this IFRS prospectively has the following effect for a business combination involving only mutual entities or by contract alone if the acquisition date for that business combination is before the application of this IFRS:

(a)   *Classification*—An entity shall continue to classify the prior business combination in accordance with the entity's previous accounting policies for such combinations.

(b)   *Previously recognised goodwill*—At the beginning of the first annual period in which this IFRS is applied, the carrying amount of goodwill arising from the prior business combination shall be its carrying amount at that date in accordance with the entity's previous accounting policies.  In determining that amount, the entity shall eliminate the carrying amount of any accumulated amortisation of that goodwill and the corresponding decrease in goodwill.  No other adjustments shall be made to the carrying amount of goodwill.

(c)   *Goodwill previously recognised as a deduction from equity*—The entity's previous accounting policies may have resulted in goodwill arising from the prior business combination being recognised as a deduction from equity.  In that situation the entity shall not recognise that goodwill as an asset at the beginning of the first annual period in which this IFRS is applied.  Furthermore, the entity shall not recognise in profit or loss any part of that goodwill when it disposes of all or part of the business to which that goodwill relates or when a cash-generating unit to which the goodwill relates becomes impaired.

(d)   *Subsequent accounting for goodwill*—From the beginning of the first annual period in which this IFRS is applied, an entity shall discontinue amortising goodwill arising from the prior business combination and shall test goodwill for impairment in accordance with IAS 36.

                    © IFRS Foundation

IFRS 3

(e)   *Previously recognised negative goodwill*—An entity that accounted for the prior business combination by applying the purchase method may have recognised a deferred credit for an excess of its interest in the net fair value of the acquiree's identifiable assets and liabilities over the cost of that interest (sometimes called negative goodwill).  If so, the entity shall derecognise the carrying amount of that deferred credit at the beginning of the first annual period in which this IFRS is applied with a corresponding adjustment to the opening balance of retained earnings at that date.

IFRS 3

## Appendix C
## Amendments to other IFRSs

*The amendments in this appendix shall be applied for annual reporting periods beginning on or after 1 July 2009. If an entity applies this IFRS for an earlier period, these amendments shall be applied for that earlier period. Amended paragraphs are shown with new text underlined and deleted text struck through.*

\* \* \* \* \*

*The amendments contained in this appendix when this revised IFRS was issued in 2008 have been incorporated into the relevant IFRSs published in this volume.*

© IFRS Foundation

## Approval by the Board of IFRS 3 issued in January 2008

International Financial Reporting Standard 3 *Business Combinations* (as revised in 2008) was approved for issue by eleven of the fourteen members of the International Accounting Standards Board.  Professor Barth and Messrs Garnett and Smith dissented.  Their dissenting opinions are set out after the Basis for Conclusions.

| | |
|---|---|
| Sir David Tweedie | Chairman |
| Thomas E Jones | Vice-Chairman |
| Mary E Barth | |
| Hans-Georg Bruns | |
| Anthony T Cope | |
| Philippe Danjou | |
| Jan Engström | |
| Robert P Garnett | |
| Gilbert Gélard | |
| James J Leisenring | |
| Warren J McGregor | |
| Patricia L O'Malley | |
| John T Smith | |
| Tatsumi Yamada | |