# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1)  VIDEO GAMING TECHNOLOGIES, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cv-00454-GKF-jfj |
| | ) | |
| 1)  CASTLE HILL STUDIOS LLC | ) | **REDACTED** |
| (d/b/a CASTLE HILL GAMING); | ) | |
| 2)  CASTLE HILL HOLDING LLC | ) | |
| (d/b/a CASTLE HILL GAMING); and | ) | |
| 3)  IRONWORKS DEVELOPMENT, LLC | ) | |
| (d/b/a CASTLE HILL GAMING) | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF VIDEO GAMING TECHNOLOGIES, INC.'S
RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## Table of Contents

Page

I.    INTRODUCTION ........................................................................................ 1

II.   RESPONSE TO CHG'S STATEMENT OF UNDISPUTED MATERIAL FACTS ......... 5

III.  LEGAL STANDARD ................................................................................... 9

IV.   STATEMENT OF THE CASE .................................................................... 10

      A.   VGT's Trademark and Trade Dress Claims ........................................ 10

           1.   Infringement of Unregistered Trade Dress ............................... 10

           2.   Infringement of Unregistered Trademarks for VGT Games.................... 12

           3.   Infringement of Registered MR. MONEY BAGS & Design Mark.......... 13

      B.   VGT's Misappropriation of Trade Secrets and Confidential Information
           (CBI) Claims ............................................................................... 14

V.    ARGUMENT ........................................................................................ 14

      A.   There Are Genuine Issues of Material Fact As To All Elements of VGT's
           Trademark and Trade Dress Claims. ................................................. 14

           1.   VGT's Trademarks and Trade Dress Are Distinctive............................. 15

           2.   There Is a Likelihood of Confusion Between VGT's Trademarks
                and Trade Dress and CHG's Trademarks and Trade Dress..................... 25

           3.   VGT's Trade Dress Is Non-Functional..................................... 33

           4.   VGT's Trade Dress Is Consistent. ........................................... 36

      B.   CHG Is Not Entitled To Summary Judgment on VGT's Trade Secret and
           Confidential Information Claims. ..................................................... 38

           1.   VGT Has Substantial Evidence of Misappropriation. ............................ 38

           2.   Disputed Fact Issues Preclude Summary Judgment in CHG's Favor
                On VGT's Trade Secret Claims................................................. 42

           3.   Disputes Of Material Fact Preclude Summary Judgment On VGT's
                Claim For Misappropriation Of Business Information............................ 49

VI.    CONCLUSION ............................................................................................................ 50

## Table of Authorities

**Page(s)**

CASES

*Am. Biomedical Grp., Inc. v. Techtrol, Inc.*,
374 P.3d 820 (Okla. 2016) ........................................................................5, 49

*Amoco Oil Co. v. Rainbow Snow, Inc.*,
809 F.2d 656 (10th Cir. 1987) .......................................................................1

*Arabalo v. City of Denver*,
625 F. App'x 851 (10th Cir. 2015) ..............................................................44

*B&B Hardware, Inc. v. Hargis Indus., Inc.*,
135 S. Ct. 1293 (2015) ................................................................................16

*Basic American, Inc. v. Shatila*,
992 P.2d 175 (Idaho 1999) ..........................................................................44

*Beer Nuts, Inc. v. Clover Foods Co.*,
805 F.2d 920 (10th Cir. 1986) ...............................................................25, 28

*Best Cellars Inc. v. Grape Finds at Dupont, Inc.*,
90 F. Supp. 2d 431 (S.D.N.Y. 2000) ...........................................................38

*Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*,
561 F.2d 1365 (10th Cir. 1977) ...................................................................29

*Blue Star Land Servs., LLC v. Coleman*,
Case No. CIV-17-931-R, 2017 WL 6210901 (W.D. Okla. Dec. 8, 2017)..............................47

*Brunswick Corp. v. British Seagull Ltd.*,
35 F.3d 1527 (Fed. Cir. 1994) .....................................................................36

*Brunswick Corp. v. Spinit Reel Co.*,
832 F.2d 513 (10th Cir. 1987) ..........................................................1, 26, 35

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*,
No. 01 CIV. 11295, 2003 WL 21056809 (S.D.N.Y. May 8, 2003)..........................................11

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..................................................................................9, 45

*Cent. Plastics Co. v. Goodson*,
537 P.2d 330 (Okla. 1975).............................................................................49

*Classic Touch Decor, Inc. v. Michael Aram, Inc.*,
No. 15-CV-453 NGG RLM, 2015 WL 6442394 (E.D.N.Y. Oct. 23, 2015) .........................37

*Coit v. Zavaras*,
175 F. App'x 226 (10th Cir. 2006) .......................................................................44

*Collelo v. Geographic Servs., Inc.*,
727 S.E.2d 55 (Va. 2012).........................................................................................46

*Copy Cop v. Task Printing*,
908 F. Supp. 37 (D. Mass. 1995) .........................................................................26

*CTI Servs. LLC v. Haremza*,
797 F. Supp. 2d 1257 (N.D. Okla. 2011)...............................................................49

*Ed Nowogroski Ins., Inc. v. Rucker*,
971 P.2d 936 (Wash. 1999) (en banc).....................................................................49

*Foremost Ins. Co. Grand Rapids, Michigan Inc. v. Kinnan*,
No. 16-CV-152-KHR, 2016 WL 9453818 (D. Wyo. Nov. 8, 2016) .......................................13

*Forney Indus., Inc. v. Daco of Mo., Inc.*,
835 F.3d 1238 (10th Cir. 2016) .................................................................15, 16, 17, 36

*Frito-Lay, Inc. v. Morton Foods, Inc.*,
316 F.2d 298 (10th Cir. 1963) ...............................................................................25

*GTE Corp. v. Williams*,
904 F.2d 536 (10th Cir. 1990) ...............................................................................16

*Happy Sumo Sushi, Inc. v. Yapona, Inc.*,
No. 2:08-CV-348 TS, 2008 WL 3539628 (D. Utah Aug. 11, 2008) .......................................37

*Haywood v. Nye*,
999 F. Supp. 1451 (D. Utah 1998).........................................................................44

*Integrated Bus. Techs., LLC v. Netlink Sols., LLC*,
No. 16-CV-048-TCK-PJC, 2016 WL 4742306 (N.D. Okla. Sept. 12, 2016).........................49

*Integrated Global Srvs., Inc. v. Mayo*,
No. 3:17-cv-563, 2017 WL 4052809 (E.D. Va. Sept. 13, 2017) .............................................46

*Interstellar Starship Servs. Ltd. v. Epix Inc.*,
184 F.3d 1107 (9th Cir. 1999) .................................................................................1

*James Burrough, Ltd. v. Sign of Beefeater, Inc.*,
540 F.2d 266 (7th Cir. 1976) .................................................................................26

*King of the Mountain Sports, Inc. v. Chrysler Corp.*,
 185 F.3d 1084 (10th Cir. 1999) ................................................................17, 29, 30, 31

*MTG Guarnieri Mfg., Inc. v. Clouatre*,
 239 P.3d 202 (Okla. Civ. App. 2010) ...........................................................42, 48, 49

*Nat'l Football League v. Governor of Del.*,
 435 F. Supp. 1372 (D. Del. 1977).............................................................................26

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
 469 U.S. 189 (1985).................................................................................................13

*ProLine Prod., L.L.C. v. McBride*,
 324 P.3d 430 (Okla. Civ. App. 2014) .......................................................................47

*Qualitex Co. v. Jacobson Prods. Co., Inc.*,
 514 U.S. 159 (1995).............................................................................................33, 35

*Reno Air Racing Ass'n, Inc. v. McCord*,
 452 F.3d 1126 (9th Cir. 2006) .................................................................................17

*Rivendell Forest Prod., Ltd. v. Georgia-Pac. Corp.*,
 28 F.3d 1042 (10th Cir. 1994) .................................................................................43

*Rose Art Indus., Inc. v. Swanson*,
 235 F.3d 165 (3d Cir. 2000).....................................................................................37

*Sally Beauty Co. v. Beautyco, Inc.*,
 304 F.3d 964 (10th Cir. 2002) ........................................................................ *passim*

*Savant Homes, Inc. v. Collins*,
 809 F.3d 1133 (10th Cir. 2016) .....................................................................17, 20, 21

*Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*,
 568 F.2d 1342 (Fed. Cir. 1977).................................................................................17

*Skycam, LLC v. Bennett*,
 No. 09-CV-294-GKF-FHM, 2013 WL 5328937 (N.D. Okla. Sept. 20, 2013)........................48

*Sloan v. Mud Prod., Inc.*,
 114 F. Supp. 916 (N.D. Okla. 1953) .........................................................................44

*In re Slokevage*,
 441 F.3d 957 (Fed. Cir. 2006)...................................................................................18

*Space Sys./Loral, LLC v. Orbital ATK, Inc.*,
 No. 4:17-cv-00025-RAJ-LRL, 2018 WL 701280 (E.D. Va. Feb. 2, 2018) ................42, 46, 47

*Standard Oil Co. v. Standard Oil Co.*,
    252 F.2d 65 (10th Cir. 1958) ..................................................................................25

*Team Tires Plus, Ltd. v. Tires Plus, Inc.*,
    394 F.3d 831 (10th Cir. 2005) ................................................................................24

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
    532 U.S. 23 (2001).........................................................................................33, 34, 35

*Trainor v. Apollo Metal Specialties, Inc.*,
    318 F.3d 976 (10th Cir. 2002) ................................................................................45

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763 (1992).......................................................................................10, 15, 19

*Vail Assocs., Inc. v. Vend-Tel-Co.*,
    516 F.3d 853 (10th Cir. 2008) ...........................................................................16, 24

*Value Eng'g, Inc. v. Rexnord Corp.*,
    278 F.3d 1268 (Fed. Cir. 2002).........................................................................33, 36

*Vornado Air Circulation Sys., Inc. v. Duracraft Corp.*,
    58 F.3d 1498 (10th Cir. 1995) ...........................................................................10, 15

*Wal-Mart Stores, Inc. v. Samara Bros, Inc.*,
    529 U.S. 205 (2000)..................................................................................................19

*Water Pik, Inc. v. Med-Systems, Inc.*,
    726 F.3d 1136 (10th Cir. 2013) ....................................................................25, 27, 29

*Wellogix v. Accenture, LLP*,
    788 F. Supp. 2d 523 (S.D. Tex. 2011) ....................................................................46

*Windon Third Oil & Gas Drilling P'ship v. Fed. Deposit Ins. Corp.*,
    805 F.2d 342 (10th Cir. 1986) ................................................................................44

**STATUTES**

78 Okla. Stat. § 86..............................................................................................42, 46

15 U.S.C. § 1057(b) ...................................................................................................16

18 U.S.C. § 1839.........................................................................................................42, 46

25 U.S.C. § 2701 *et seq*............................................................................................10

Va. Code. Ann. § 59.1-336 ......................................................................................42, 46

## I.      INTRODUCTION

Plaintiff Video Gaming Technologies, Inc. ("VGT") seeks relief from unlawful copying of its casino games by the Castle Hill defendants (collectively, "CHG").  CHG now seeks to shirk responsibility for its conduct by moving for summary judgment on virtually all aspects of VGT's trademark infringement, trade dress infringement, and trade secret misappropriation claims.  As explained below, summary judgment is inappropriate.

As an initial matter, because each element of trademark and trade dress infringement claims is fact-intensive, *see, e.g.*, *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 978 (10th Cir. 2002) (distinctiveness); *Amoco Oil Co. v. Rainbow Snow, Inc.*, 809 F.2d 656, 661-62 (10th Cir. 1987) (likelihood of confusion); *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 520 (10th Cir. 1987) (functionality); *Interstellar Starship Servs. Ltd. v. Epix Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999), summary judgment is rarely appropriate.

Summary judgment is particularly inappropriate where, as here, there is evidence that defendants intentionally copied the asserted trademarks or trade dress.  *Sally Beauty*, 304 F.3d at 976 ("[A defendant's] intent to copy, standing alone, may be enough to preclude summary judgment in its favor.").  "One who adopts a mark similar to another already established in the marketplace does so at his peril, because the court presumes that he can accomplish his purpose: that is, that the public will be deceived.  All doubt must be resolved against him."  *Id.* at 973.

Such intent is clear from a declaration CHG's Chief Technical Officer (Al Roireau) made to CHG's Chief Creative Officer (Jason Sprinkle): ████████████████████████ ██████  Ex. 134, CHG0023869.  The strategy is illustrated by CHG's imitation of VGT's Mr. Money Bags game with its new game, New Money:  In instructing a CHG artist regarding the design of New Money, Mr. Sprinkle stated, ████████████████████ ████████████████████████████████████████████████████

████████████████████████    Ex. 135, CHG0033528; Ex. 117, Sprinkle Dep. Tr. 320:8-321:1, 322:18-25, 334:5-9, 343:2-344:7, 391:18-393:1.[1]  The artists successfully implemented these instructions—as one CHG employee stated: ████████████████████ ████████████████████████████████    Ex. 138, CHG0123758; Ex. 102, Booker Dep. Tr. 118:3-119:25.

Similarly, during design of CHG's Arctic Cash game, Mr. Sprinkle applied pressure on a CHG artist to make the game look similar to VGT's Polar High Roller game: ████████ ████████████████    Ex. 129, CHG0008379; *see also* Ex. 117, Sprinkle Dep. Tr. 167:25-168:6 ████████████████████████ ████████████████████    When the CHG artist pushed back and created a design that did not resemble Polar High Roller as closely as Mr. Sprinkle wanted, *see* Ex. 144, Trover Dep. Tr. 124:10-20, Mr. Sprinkle ████████ ████████████████████████████████ ████████████████████████████████ ████████████████    Ex. 145, CHG0041144.

Even a casual observer can see the obvious similarities that resulted between the artwork for Mr. Money Bags and New Money and Polar High Roller and Arctic Cash.  *See* Dkt. 103 at Ex. 4 (with images replicated below).

---

[1] Citations to Exhibit 1–92 are to the exhibits attached to CHG's motion (Dkt. 184); all citations to Exhibits 93–269 are to the accompanying Declaration of Gary Rubman.  To reduce the complexity and burden, VGT has not submitted authenticating declarations for all documents produced by VGT.  VGT can provide such declarations if helpful to the Court or if necessary to respond to any authenticity challenges raised by CHG.

VGT - Mr. Money Bags    CHG - New Money    VGT - Polar High Roller    CHG - Arctic Cash

   

Artwork is just one aspect of VGT's games that CHG has copied. Using VGT's trademarks and trade dress as ████████████████████████████████ ████████████████ Ex. 128, CHG0008304, CHG has ████████████████████████ ████████████████████████████████████████████ *id.* at CHG0008346. That is, CHG has meticulously copied almost every aspect of VGT's oldest and most successful products (mechanical reel games in its "legacy" cabinet), including the game cabinet itself, the arrangement of elements within the cabinet, the lights and sounds, VGT's popular bonus feature (Red Screen Free Spins®), and the specific bingo patterns used in the game—just to name a few. *See, e.g.*, Ex. 132, CHG0008779 ████████████████████ ████████████████████████████████████████████████ ████████████. The copying even extends to such details as spacing of the mechanical reels. As CHG employees recognized: ████████████████████████████████ ████████████████████████████████████████ ████████████████ Ex. 257, CHG0087649.

The result is games that are confusingly similar even where the artwork and titles differ, as shown in the photo below (excerpted from Ex. 226, VGT0007001; VGT games are closest to camera; CHG games are directly behind):



More broadly, CHG misstates or ignores the record as to the elements of VGT's trademark and trade dress claims.  Not only does CHG gloss over the damning evidence of its intent to infringe, but it omits other inconvenient facts—including the 14 identified instances of actual confusion and a consumer survey that removes all doubt as to likelihood of confusion, the touchstone of trademark and trade dress law.  Moreover, not only were CHG employees aware of consumer confusion, but they found it amusing.  Finally, and perhaps most tellingly, rather than show its games side-by-side with VGT's games, as VGT does above, CHG selectively describes features of the games in the apparent hope that the Court will take its word for its conclusion that the games bear no resemblance to one another when in fact the opposite is true.

Summary judgment as to VGT's claims for misappropriation of trade secrets and confidential business information ("CBI") is also unwarranted.  Despite VGT having served lengthy interrogatory responses and expert reports supporting these claims, CHG seeks to dispose of them through conclusory arguments crammed into a few pages at the end of the Motion.  CHG cites little record evidence (and, when it does, relies solely on its own testimony

and documents) and ignores all the evidence supporting VGT's misappropriation claims, including, conveniently, CHG testimony and documents unhelpful to CHG (*e.g.*, testimony that ███████████████████████████████████████████████████ algorithms).

The evidence CHG overlooks makes clear that its copying of VGT is not limited to the outward appearance of the games. █████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████ Ex. 146, CHG0023446. CHG has not offered evidence that any of the ideas, algorithms, and information at issue is not a trade secret or otherwise confidential or not misappropriated—much less shown that there is not even a dispute as to these issues.

Although CHG also seeks to dispose of VGT's claim for misappropriation of CBI by arguing that this common law claim is preempted by the Oklahoma Uniform Trade Secrets Act ("OUTSA"), the Oklahoma Supreme Court rejected this argument two years ago in a case CHG fails to cite. *See Am. Biomedical Grp., Inc. v. Techtrol, Inc.*, 374 P.3d 820, 827 (Okla. 2016). Thus, even if any of the confidential VGT information does "not ris[e] to the level of a trade secret," *id.*, VGT's claim for common law misappropriation would still survive.

## II.    RESPONSE TO CHG'S STATEMENT OF UNDISPUTED MATERIAL FACTS

VGT disputes the following purportedly "undisputed" facts set forth in the motion for summary judgment, as numbered by CHG.[2]

3-4.  Disputed.  *See* Ex. 114, Sevigny Dep. Tr. 36:4-37:14, 45:1-12; Ex. 118, Starr Dep. Tr. 65:6-10, 67:1-15; Ex. 122, Watson Fact Dep. Tr. 70:1-17; Ex. 148, VGT0018916.

---

[2] Those "facts" not listed are undisputed for purposes of summary judgment, although VGT may disagree with CHG as to their relevance or contest these statements if asserted as fact at trial.

5. Disputed. *See* Ex. 125, Williamson 30(b)(6) Dep. Tr. 23:13-24:7, 26:13-27:1, 32:9-20, 44:1-20, 49:6-7, 80:10-83:25.

7. Disputed. *See* Ex. 120, Taylor Dep. Tr. 53:7-21, 55:15-20.

8. Disputed. *See* Ex. 105, Fulton Fact Dep. Tr. 19:2-20:3; Ex. 107, Larson Dep. Tr. 73:24-75:9; Ex. 110, Morgan Dep. Tr. 12:7-13:19; Ex. 113, Scheiner Dep. Tr. 20:24-21:10; Ex. 117, Sprinkle Dep. Tr. 88:13-90:4.

9. Disputed. *See* Ex. 122, Watson Fact Dep. Tr. 163:17-24.

10. Disputed. *See* Dkt. 143.

12. Disputed. *See* Dkt. 35 at 3-4; Dkt. 143; Ex. 149, 18 n.3.

13. Disputed. *See* Dkt. 103 at Ex. 6; Ex. 149 at 92-122; Ex. 150, VGT0001708; Ex. 153, VGT0056091; Ex. 155, unstamped deposition exhibit but produced as VGT0065517; Ex. 111, North Dep. Tr. 149:3–5.

16. Disputed. North Decl. ¶ 2.

17. Disputed. *See* Ex. 165, VGT0010623; Ex. 114, Sevigny Dep. Tr. 82:19-83:6.

18. Disputed. *See* Ex. 108, McGill Tr. 113:25-115:24; Ex. 127, Yarbrough Tr. 72:10-25.

20. Disputed. *See* Ex. 111, North Dep. Tr. 85:22-86:2.

21. Disputed. *See* Ex. 153, VGT0056091; *compare* Ex. 157, VGT0001732 *with* Ex. 157, VGT0013629.

22. Disputed. *See* Ex. 109, Marsh Dep. Tr. 108:8-23.

24. Disputed. *See* Ex. 109, Marsh Dep. Tr. 107:19-109:10, 177:23-178:8.

25. Disputed. *See* Ex. 114, Sevigny Dep. Tr. 133:1-134:2, 205:5-213:21.

26. Disputed. *See* Ex. 118, Starr Dep. Tr. 35:6-20; Ex. 108, McGill Dep. Tr. 52:9-54:16; Ex. 111, North Dep. Tr. 136:19–137:2.

27.  Disputed.  *See* Ex. 118, Starr Dep. Tr. 32:23-34:4, 170:20-173:7; Ex. 111, North Dep. Tr. 48:5-49:21, 202:13-203:1.

29.  Disputed.  Ex. 118, Starr Dep. Tr. 168 (discussion limited to specific ██████ ███████████████████████████████████

30.  Disputed.  *See* Ex. 108, McGill Dep. Tr. 60:14-20.

31.  Disputed.  *See* Ex. 118, Starr Dep. Tr. 238:15-19; Ex. 117, Sprinkle Dep. Tr. at 180:9-182:3, 422:17-423:11, 426:11-427:5; Ex. 225, VGT0019846.

32.  Disputed.  Ex. 117, Sprinkle Dep. Tr. 99:8-14; Ex. 103, Carlson Dep. Tr. 79:10-15, 201:7-10; Ex. 127, Yarbrough Dep. Tr. 166:21-167:19, 175:13-22.

33.  Disputed.  Ex. 114, Sevigny Dep. Tr. 182–89; Ex. 223, Schmid Dep. Tr. 109:5–114:10; Ex. 158, Friedman Dep. Tr. 174:17–177:12.

34.  Disputed.  *See* Ex. 111, North Dep. Tr. 115:13-118:24, 120:21-121:3.

35.  Disputed.  *See* Ex. 127, Yarbrough Dep. Tr. 178:2-180:16.

36.  Disputed.  *See* Ex. 111, North Tr. 199-200; Ex. 158, Friedman Tr. 334:18–339:13.

37.  Disputed.  *See* Ex. 114, Sevigny Dep. Tr. 233:17-234:9.

38.  Disputed.  *See* Ex. 111, North Dep. Tr. 200:8-12 ███████████████████████ ███████████████████████; Ex. 224, VGT0007005.

39.  Disputed.  *See* Ex. 126, Wind Dep. Tr. 275:4-279:4.

44.  Disputed.  *See* Ex. 108, McGill Dep Tr. 105:19-21.

45-46.  Disputed.  *See* Ex. 127, Yarbrough Dep. Tr. 221:21-224:2 ██████████████████ ███████████████████████████████████████████████████████████ ██████████████████████.

47.  Disputed.  *See* Ex. 158, Friedman Dep. Tr. 298:7-299:20.

48.  Disputed.  *See* Ex. 134, CHG0023869.

49.  Disputed.  *See* Ex. 227, CHG0036487 █████████████████████████

███████████████████████

50.  Disputed.  *See* Ex. 106, Graham Tr. 119:19-125:19, 127:25-128:6, 177:17-178:13.

51.  Disputed.  *See* Ex. 160, VGT0001661-87; Ex. 121, Valandra Tr. 23:20-22 (when Mr.

Valandra went to casinos to see the VGT and CHG games in person for his report, he would

████████████████████████████████████ about whether a game was

made by VGT or CHG), 123:15-127:16, 135:20-136:2, 144:3-146:14; Ex. 226, VGT0007001.

52.  Disputed.  *See, e.g.*, Ex. 136, CHG0090196-219.

53.  Disputed.  *See* Ex. 117, Sprinkle Dep. Tr. 371:8-373:13 ██████████████

███████████████████████████████████████████████████████████████

███████████████████████████████ .

54.  Disputed.  *Compare* Ex. 165, VGT0010623, *with* Ex. 166, VGT0007548.

55.  Disputed.  *See* Ex. 117, Sprinkle Dep. Tr. 257:4-17.

57.  Disputed.  *See* Ex. 114, Sevigny Dep. Tr. 36:4-37:14, 45:1-12; Ex. 118, Starr Dep.

Tr. 65:6-10, 67:1-15; Ex. 122, Watson Fact Dep. Tr. 70:1-17; Ex. 148, VGT0018916.

60.  Disputed.  Ex. 126, Wind Dep. Tr. 115:5-23, 192:4-193:11.

62.  Disputed.  *See* Ex. 219, Friedman 10/12/2018 Decl. ¶ 19; Ex. 220, Davis 10/10/2018

Decl. ¶ 12.[3]

---

[3] This brief cites two declarations from Stacy Friedman and Josh Davis.  Each submitted a declaration in support of Plaintiff's Motion for Partial Summary Judgment (Dkt. 179), which have been resubmitted as Exhibits 219 and 220 to this motion.  Each witness has also submitted a declaration in support of this brief, respectively the "Friedman Decl." and "Davis Decl."

63.  Disputed.  Friedman Decl. ¶¶ 12–16; Ex. 220, Davis 10/10/2018 Decl. ¶¶ 6–10, 17, 18; Ex. 219, Friedman 10/12/2018 Decl. ¶¶ 24–35.

64.  Disputed.  Friedman Decl. ¶¶ 17–19.

65.  Disputed.  Ex. 113, Scheiner Dep. Tr. 215:7–216:9 ███████████████████

████████████████ Ex. 143, Roireau 30(b)(6) Dep. Tr. 94:3–13 ███████████████

██████████████████████

66.  Disputed.  Friedman Decl. ¶ 20.

67.  Disputed.  Ex. 119, Suggs Dep. Tr. 80:14–81:5; Friedman Decl. ¶¶ 21–29; Davis Decl. ¶¶ 9–15, Ex. H.

68.  Disputed.  Ex. 119, Suggs Dep. Tr. 80:14–81:17, 82:10-13; Friedman Decl. ¶¶ 23–29; Davis Decl. ¶¶ 9–15.

69.  Disputed.  *See* Ex. 120, Taylor Dep. Tr. 188:17-189:17 ████████████████████

████████████████ Shults Decl. ¶¶ 7–9, 13; Friedman Decl. ¶¶ 39–41.

70.  Disputed.  Shults Decl. ¶¶ 10–13; Friedman Decl. ¶¶ 42–43.

72.  Disputed.  Ex. 147, Harvie Dep. Tr. 179:5–9; Ex. 158, Friedman Dep. Tr. 174:17–177:12; Shults Decl. ¶¶7–9.

73. Disputed.  Ex. 220, Davis 10/10/2018 Decl. ¶ 15.

## III.   LEGAL STANDARD

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "We construe the evidence and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant."  *Sally Beauty*, 304 F.3d at 971.

## IV.    STATEMENT OF THE CASE

The focus of this case is on the Class II games made by VGT and CHG.  Under the Indian Gaming Regulatory Act, these games include games of chance based on bingo, as opposed to the Class III slot machines often associated with Las Vegas casinos.  *See* 25 U.S.C. § 2701 *et seq*.  *See* Dkt. 166 at 3 (description of bingo-based Class II games).

### A.    VGT's Trademark and Trade Dress Claims

This action is not a run-of-the-mill infringement case where a defendant has inadvertently adopted a mark or design that too closely resembles one of the plaintiff's.  Rather, this case is about CHG building its entire company around a systematic ███████████████████████ ██████████████████████████, resulting in a product line that is almost a mirror image of VGT's.  *See* Ex. 136, CHG0090196-219.

To streamline the issues for trial, VGT has focused its claims to those most central to resolution of the present dispute.  Because CHG insists that it still does not understand the scope of VGT's claims, we provide a summary of the core claims:

#### 1.    Infringement of Unregistered Trade Dress

"Trade dress features are those comprising a product's look or image" and may "be applied to a single feature or a combination of features."  *Vornado Air Circulation Sys., Inc. v. Duracraft Corp.*, 58 F.3d 1498, 1502 (10th Cir. 1995); *see* 1 McCarthy on Trademarks and Unfair Competition § 8:1 (5th ed.) ("While trade dress is most often defined as a totality of elements, there is no reason why the plaintiff cannot define a list of elements consisting of less than the totality of features appearing on a package or container.").  Trade dress may include features such as "size, shape, color or color combinations, texture, graphics, or even particular sales techniques."  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n.1 (1992).

10

Here, VGT asserts the following combination of trade dress elements shared across two of its most popular mechanical-reel product lines:

(1)  the GAME CABINET (*i.e.*, the size, shape, color, material, and placement of components in VGT's standard-sized legacy or "LS" cabinets without optional lighting around the sides of the machine, *i.e.*, "jukebox" lighting, and with either 6-inch or 19/20-inch video screens—the latter of which distinguish the two relevant product lines);

(2)  the RED STROBE (*i.e.*, the red light on top of the cabinet);

(3)  the REEL RESOLUTION SOUND (*i.e.*, the sound made as each reel comes to a stop);

(4)  the AWARD SOUND (*i.e.*, the mechanical bell sound that signals that a player has won);

(5)  the BINGO PLAY AND PAYS (*i.e.*, the bingo pattern-payout combinations that VGT uses within each pseudo-paytable, *i.e.*, the visual representation of what combinations of reel symbols correspond with wins); and

(6)  the RED SCREEN FREE SPINS (*i.e.*, a free spin feature in which the video screen turns red signifying that players are being provided escalating awards).

*See* Dkt. 103 at 7-10; Ex. 149, 107-22.[4]

These trade dress elements can be seen and heard in the examples submitted with this motion. *See* Ex. 157, VGT0001732, -13629 (GAME CABINET); Ex. 152, VGT0056100 (RED STROBE); Ex. 165, VGT0010623 (REEL RESOLUTION SOUND); *id.* (AWARD SOUND); Ex. 154 (BINGO PLAY AND PAYS); Ex. 167, https://www.youtube.com/watch?v=oU9q8X9Uldc (RED SCREEN FREE SPINS).

Not only do all Class II games in CHG's "Retro" cabinets incorporate trade dress elements confusingly similar to the VGT elements identified above and therefore infringe the VGT trade dress, but, as discussed below, some games also feature trademarks similar to VGT's

---

[4] Although CHG criticizes VGT for "shifting" the elements of its trade dress, VGT has simply narrowed its definition throughout discovery to be as specific as possible. *See, e.g.*, *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, No. 01 CIV. 11295, 2003 WL 21056809, at *5 (S.D.N.Y. May 8, 2003) ("Inasmuch as a description which closely approximates, represents, or encapsulates the total image may aid the finder of fact in considering a trade dress infringement claim, it is not uncommon for courts to permit trade dress claimants to alter their formulations of what constitutes a given trade dress.").

trademarks, another aspect of VGT's trade dress.  Because use of similar trademarks in games such as New Money and Arctic Cash heightens the confusion, CHG games with similar trademarks infringe VGT's trade dress for this additional reason.

### 2.    Infringement of Unregistered Trademarks for VGT Games

Although VGT does not assert that CHG's word marks, *standing alone*, infringe VGT's word marks, *standing alone*, VGT does assert that CHG has infringed the trademarks, including the games' titles, logos, characters, and overall artwork, used on four series of VGT games (Mr. Money Bags, Polar High Roller, Crazy Bill, and Greenback Jack), as seen in the example images below.  Excerpted from Dkt. 103 at Ex. 4.

VGT - Mr. Money Bags



CHG - New Money



VGT - Polar High Roller



CHG - Arctic Cash



CHG - Arctic Ice



VGT - Crazy Billions



CHG - Welcome to Nugget Mountain



VGT - Greenback Jack



CHG - Coin Slinger



*See also* Dkt. 143 at 1-2; Ex. 149, 12-86; Reg. Nos. 2,979,205, 4,306,260, 5,556,323, 5,120,201, 5,120,209, 3,755,296, 3,152,743, 3,395,857, 3,506,608, 4,138,672, and Ser. No. 87/676,450.[5] Contrary to CHG's suggestion, VGT asserted its position as to these claims as early as the original Complaint, *see* Dkt. 2 at Ex. 4; Dkt. 103 at Ex. 4, and clarified its position in its Response to Interrogatory No. 1, served November 22, 2017, and its First Supplemental Response to Interrogatory No. 1, served March 16, 2018.

### 3.    Infringement of Registered MR. MONEY BAGS & Design Mark

VGT's claim of registered trademark infringement is limited to its MR. MONEY BAGS & Design mark.[6]  *See* Reg. No. 3,152,743.  Although CHG argues, without substantiating evidence, that VGT does not own exclusive rights to the MR. MONEY BAGS & Design mark,

████████████████████████████████████████████████

████████████████████████    *See* Ex. 127, Yarbrough Dep. Tr. 184:9-198:13; Ex. 114, Sevigny Dep. Tr. 133:1-134:2, 205:5-213:21.  Furthermore, VGT has been exclusively using the MR. MONEY BAGS & Design mark since at least June 17, 2002, and owns a federal registration covering this mark, which has become incontestable, *see* Reg. No. 3,152,743, creating a conclusive presumption that VGT is the owner of the mark, *see Park 'N Fly, Inc. v.*

---

[5] The Court can take judicial notice of U.S. Patent & Trademark Office ("USPTO") records. *See, e.g.*, *Foremost Ins. Co. Grand Rapids, Michigan Inc. v. Kinnan*, No. 16-CV-152-KHR, 2016 WL 9453818, at *2 (D. Wyo. Nov. 8, 2016) ("Courts within the Tenth Circuit have [] held a 'court may take judicial notice of the contents of an agency's website.'").  Registration certificates and file histories for all cited USPTO registrations and applications are available here:  http://tmsearch.uspto.gov/.

[6] VGT's registrations for other marks, however, remain relevant to the analysis of VGT's infringement claims based on its *unregistered* marks.

*Dollar Park & Fly, Inc.*, 469 U.S. 189, 196 (1985) ("With respect to incontestable marks . . .

registration is *conclusive* evidence of the registrant's exclusive right to use the mark.").[7]

Notably, the federal registration (shown on the right) does not

include a color claim, meaning that VGT owns exclusive rights to the

design below in all color schemes.  As discussed below, CHG's New

Money game infringes this registered mark.



### B. VGT's Misappropriation of Trade Secrets and Confidential Information (CBI) Claims

VGT's claims for misappropriation of trade secrets and CBI concern CHG's use of

proprietary VGT information in designing and developing its Class II games.  These trade secrets

and CBI include, for example, VGT's algorithm for ███████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████  Through the former VGT employees that CHG

hired, CHG has improperly acquired and used, and in some cases disclosed, these trade secrets

and CBI.  VGT addresses these claims in Section V.B below.

## V.  ARGUMENT

### A. There Are Genuine Issues of Material Fact As To All Elements of VGT's Trademark and Trade Dress Claims.

Both trademark and trade dress infringement require proof (i) that plaintiff's trademark or

trade dress is distinctive and (ii) that consumers are likely to be confused by defendant's

---

[7] Although CHG claims, without record support, that because VGT is "phasing out" the MR. MONEY BAGS & Design mark, the mark is not strong, VGT did not begin using the alternative design of Mr. Money Bags until the late 2000s or early 2010s, meaning that between that time and June 17, 2002 when VGT first used the MR. MONEY BAGS & Design mark, the MR. MONEY BAGS & Design mark was the *only* mark being used.  Also, VGT has studies showing that ████████████████████████████████████  *See* Ex. 67, VGT0031063.  It also bears emphasis that the MR. MONEY BAGS & Design mark is still used on a significant number of games.  *See* Ex. 153, VGT0056091.

trademark or trade dress "into thinking that the defendant is affiliated, connected, or associated with the plaintiff or that the defendant's goods originated with, or are sponsored or approved by the plaintiff." *Vornado*, 58 F.3d at 1503.  In addition, trade dress infringement requires proof that the asserted trade dress is not functional.  *Sally Beauty*, 304 F.3d at 977.

VGT has produced evidence establishing—or, at a minimum, creating a triable issue of fact as to—each element of its trademark and trade dress claims.

### 1.    VGT's Trademarks and Trade Dress Are Distinctive.

A mark may be distinctive inherently or through acquisition of secondary meaning. *Forney Indus., Inc. v. Daco of Mo., Inc.*, 835 F.3d 1238, 1244 (10th Cir. 2016).  "A mark is inherently distinctive if its intrinsic nature serves to identify a particular source." *Id.* (internal punctuation omitted).  Alternatively, it can gain protection once "it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Id.* at 1245.

Whether a trademark or trade dress is distinctive—either inherently or through secondary meaning—is a question of fact and thus generally should not be decided on summary judgment. *Sally Beauty*, 304 F.3d at 978.

### a)    VGT's Trademarks and Trade Dress Are Inherently Distinctive.

In analyzing inherent distinctiveness, courts generally place the trademark or trade dress into one of five categories:  fanciful; arbitrary; suggestive; descriptive; or generic. *Forney*, 835 F.3d 1245.  Fanciful, arbitrary, and suggestive marks, "because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Id.* (quoting *Two Pesos*, 505 U.S. at 768).  Descriptive marks, which "convey an immediate idea of the ingredients, qualities, or characteristics of the goods," are not distinctive

and require proof of secondary meaning to be protected; generic marks, which refer "to the genus of which the particular product is a species," are never protectable. *Id.*

### (1)   VGT's Trademarks

Both VGT's registered and unregistered trademarks are inherently distinctive.

As for VGT's registered marks, CHG apparently concedes that they are distinctive given that registered marks are entitled to a presumption of distinctiveness. *See B&B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1310 (2015) ("Registration is 'prima facie evidence of the validity of the registered mark.'") (quoting 15 U.S.C. § 1057(b)); *GTE Corp. v. Williams*, 904 F.2d 536, 539 (10th Cir. 1990) ("significance of registration without proof of secondary meaning . . . is that the Patent and Trademark Office has 'concluded' that the mark or figure was not '"merely descriptive" "but suggestive"' . . . [*i.e.*, inherently distinctive]"); Reg. Nos. 2,979,205, 4,306,260, 5,556,323, 5,120,201, 5,120,209, 3,755,296, 3,152,743, 3,395,857, 3,506,608, 4,138,672, and Ser. No. 87/676,450.  Notably, several of these registrations have become incontestable, which transforms this rebuttable presumption into a *conclusive* presumption.  *See Vail Assocs., Inc. v. Vend-Tel-Co.*, 516 F.3d 853, 884 (10th Cir. 2008) (district court's finding mark to be weak was clear error in part because mark was subject to incontestable registration).

Although VGT does not assert infringement of all its registered marks, the distinctiveness of these marks is relevant to VGT's unregistered marks because many combine VGT's registered marks with additional design elements.  *See, e.g.*, Dkt. 103 at Ex. 4 (displaying MR. MONEY BAGS, CRAZY BILLIONS, POLAR HIGH ROLLER, and GREENBACK JACK word marks along with design elements).  Contrary to CHG's spurious claim that these word-and-design marks are generic—*i.e.*, that they refer "to the genus" of Class II EGMs, *see Forney*, 835 F.3d at 1245—the conclusion that the word marks themselves are not generic necessarily implies that adding whimsical design elements, like VGT's anthropomorphic animals, only bolsters the

inherent distinctiveness of the marks by creating unique composite marks.  *See King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1093 (10th Cir. 1999) (mark consisting of wording and stylized skier element "at least suggestive" for skiing event services); *see also Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126 (9th Cir. 2006) (even if air racing pylons may be "generic" of air races, a particular design of pylons and racing planes is valid trademark). Thus, the conclusive presumption that the relevant registered word marks are inherently distinctive should apply equally to the unregistered word-and-design marks that include such registered word marks.

### (2)    VGT's Trade Dress

"A trade dress is inherently distinctive if its 'intrinsic nature serves to identify a particular source.'"  *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1147 (10th Cir. 2016).  "Like trademarks, the inherent distinctiveness of a trade dress is categorized along the generic-descriptive-suggestive-arbitrary-fanciful spectrum."  *Sally Beauty*, 304 F.3d at 977.  Some courts supplement this spectrum of distinctiveness by considering the factors identified in *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342, 1344 (Fed. Cir. 1977), which ask whether the asserted trade dress (1) is "a common basic shape or design," (2) is "unique or unusual in a particular field," or (3) is "a mere refinement of a commonly-adopted and well-known form of ornamentation."  *Forney*, 835 F.3d at 1246 (quoting *Seabrook*, 568 F.2d at 1344).

Here, elements of VGT's trade dress—and, *a fortiori*, its combination of elements—are arbitrary and serve to identify the source of VGT's games.  The RED SCREEN FREE SPINS element, for example, is an arbitrary way to display and announce that a player has won; whereas other competitors' games straightforwardly announce when a player's last spin results in two or more bingo pattern matches, VGT crafted a unique feature where ███████████████

████████████████████████████████████████████████

 Ex. 127, Yarbrough Dep. Tr. 80:18-82:1; *see also* Ex. 121, Valandra Dep. Tr. 203:20-204:9 ).  Similarly, CHG's own expert admitted that Ex. 121, Valandra Dep. Tr. 151:2-153:15, 195:9-22 227:14-20 234:5-22

When these distinctive elements are considered together, VGT's combination of trade dress elements conveys to consumers that the underlying games derive from a particular source. *See* Ex. 127, Yarbrough Dep. Tr. 225:7-17

CHG's assertion, without record support, that VGT's trade dress features must be classified as product design rather than product packaging (and thus incapable of inherent distinctiveness), *see* Mot. at 38-39, misses the mark for three reasons.

First, and most importantly at the summary judgment stage, "whether trade dress is product design is a factual finding." *In re Slokevage*, 441 F.3d 957, 959 (Fed. Cir. 2006).

Second, and as emphasized by CHG elsewhere when erroneously perceived as advantageous, VGT offers some of the games at issue in different cabinet designs and in connection with different trade dress features. *See* Mot. at 4-5 (arguing that VGT's non-asserted, alternative cabinet designs undermine VGT's asserted trade dress). CHG, too, offers identical

18

games in both its accused Retro cabinets and in its non-accused Atlas cabinets—indeed, part of

CHG's product strategy has been to ███████████████████████████████████

███████████████████████████████████████████████.  *See* Mot. at 14; Ex. 171,

CHG0090058 ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████ (emphasis in original).  That both VGT and CHG house

their games in different forms of trade dress suggests that those forms are product packaging

rather than product design.

Third, even if aspects of VGT's trade dress are physically incorporated into the whole of

VGT's EGMs rather than discarded like a candy wrapper, the Supreme Court has made clear that

permanent, physical features can create inherently distinctive product packaging.  *See Two*

*Pesos*, 505 U.S. at 765.  In *Two Pesos*, the Supreme Court addressed the following combination

of trade dress features:

> a festive eating atmosphere having interior dining and patio areas decorated with
> artifacts, bright colors, paintings and murals.  The patio includes interior and
> exterior areas with the interior patio capable of being sealed off from the outside
> patio by overhead garage doors.  The stepped exterior of the building is a festive
> and vivid color scheme using top border paint and neon stripes.  Bright awnings
> and umbrellas continue the theme.

*Id.* at 765.  As the Supreme Court later explained, such permanent physical features may

constitute "product packaging . . . or else some *tertium quid* that is akin to product packaging."

*Wal-Mart Stores, Inc. v. Samara Bros, Inc.*, 529 U.S. 205, 214-15 (2000) (discussing *Two Pesos*

trade dress).  Thus, if the umbrellas, garage doors, and patio areas that contribute to a festive

eating atmosphere can be inherently distinctive trade dress, there is no reason why the bells,

lights, and cabinet design that contribute to an interesting game must, as CHG suggests, be

classified as product design as a matter of law.

### b) **VGT's Trademarks and Trade Dress Have Acquired Secondary Meaning.**

Even if VGT's trademarks and trade dress are not inherently distinctive, they have acquired secondary meaning.

In evaluating secondary meaning, the "ultimate inquiry is whether in the consumer's mind the mark denotes a single thing coming from a single source.  That single source, however, need not be known by name by consumers." *Sally Beauty*, 304 F.3d at 978 (quotations and citations omitted).  As CHG correctly notes, secondary meaning can be established through direct evidence, such as consumer surveys, or circumstantial evidence, such as:

> (1) the length and manner of the trade dress's use, (2) the nature and extent of advertising and promotion of the trade dress, (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the trade dress and a particular product or venture, (4) actual consumer confusion, (5) proof of intentional copying, or (6) evidence of sales volume.

*Savant Homes*, 809 F.3d at 1148 (citations omitted).

Contrary to CHG's myopic focus on only the second and third types of circumstantial evidence, *see* Mot. at 29-30, 39-40, VGT has evidence of each type to establish the secondary meaning of its trademarks and trade dress.

### (1) **CHG Intentionally Copied VGT's Trademarks and Trade Dress.**

At summary judgment, it is worth focusing initially on evidence of intent because CHG's "intent to copy, standing alone, may be enough to preclude summary judgment in its favor." *Sally Beauty*, 304 F.3d at 976; *see id.* at 978 ("This court has previously considered proof of intentional copying as relevant to whether a trademark has acquired secondary meaning.").

CHG—staffed with former VGT officers and employees—has built its ████████ ███████████████████████████████████████████████████ *See* Ex. 136, CHG0090196-219; Mot. at SOF 8.  There is abundant evidence of this intent.  *See, e.g.*, Ex. 133, CHG0008922

("reminiscent of the old [VGT cabinet screen] sizes is best"); Ex. 172, CHG0019199 █████

██████████████████████████████████████████████████████████████████████

Although VGT, as the nonmovant, is to have all evidentiary inferences drawn in the light most favorable to it, *see Sally Beauty*, 304 F.3d at 972, 978, the Court need not infer much where, as here, CHG has made clear its intent to copy. Mr. Sprinkle at one point explained to CHG artists that CHG's goal was ████████████████████████████████████████ ███████ Ex. 173, CHG0090623. Indeed, Mr. Roireau, CHG's Chief Technical Officer, was forced to admit the obvious:

████████████████████████████████████████████████

███████████████████████

Ex. 112, Roireau Fact Dep. Tr. 271:8-272:8.

Although CHG was aware that its ██████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████. *See* Ex. 137, CHG0090613.

> **(2)    VGT's Use and Promotion of Its Trademarks and Trade Dress Has Resulted in Commercial Success and Recognition.**

As CHG correctly notes, VGT has circumstantial evidence of secondary meaning relating to the commercial success of its games bearing on the asserted trademarks and trade dress. *See* Mot. at 39; *see also Savant Homes*, 809 F.3d at 1148 (discussing interrelated evidence of length of use, extent of advertising, efforts to connect mark and product, and sales volume). Contrary to CHG's suggestion, however, this evidence does not stand alone and cannot be disregarded, particularly when considered with the foregoing evidence of CHG's intent to copy.

VGT has used the trademarks and trade dress at issue in this case for years and in some cases nearly two decades. *See, e.g.*, Reg. Nos. 2,979,205, 4,306,260, 5,556,323, 5,120,201,

5,120,209, 3,755,296, 3,152,743, 3,395,857, 3,506,608, 4,138,672, and Ser. No. 87/676.450; Ex.

117, Sprinkle Dep. Tr. 421:11-422:16; Ex. 114, Sevigny Dep Tr. 36.  Over the past decade alone,

VGT has generated more than ███████ from its EGMs—most of which include the trademarks

and trade dress at issue in this litigation—and increased the number of its three-reel mechanical

EGMs on casino floors from approximately ████████████████—most of which again

include the trademarks and trade dress at issue.  *See* Ex. 148, VGT0018916; Ex. 174,

VGT0018917; Ex. 175, VGT0056092; Ex. 168, VGT0064927.  VGT is the top provider of Class

II games in Oklahoma, one of the largest Class II markets in the United States.  Ex. 114, Sevigny

Dep. Tr. 36; *see* Mot. at 1-2.

The prevalence and success of VGT, especially in Oklahoma, can be seen in a few

examples of quotes from interviews with VGT's top clients conducted by Meczka

Marketing/Research/Consulting:

- ████████████████████████████████ Ex. 176, VGT0052950.

- ████████████████████████████████ *Id.* at VGT0052951.

- ████████████████████████████████ Ex. 177, VGT0052977.

*See also* Ex. 178, VGT0007436 ████████████████████████

████████████

VGT's commercial success is attributable, at least in part, to its investment of

approximately ████████ over the past decade to advertise and market its games, including by

promoting the games and associated trade dress at issue.  Ex. 179, VGT0010605; *see also, e.g.*,

Ex. 180, VGT0000096, -139-149, -153-65, -167-68, -1693-1722.  VGT has advertised and

marketed across media, including catalogues, trade shows, presentations, radio advertisements, billboards, swag, Facebook, websites, and even in-casino promotions featuring a Mr. Money Bags actor. *See, e.g.*, *id.*

Despite CHG's conclusory assertion that VGT's marketing has been untethered to particular trademarks and trade dress, VGT has evidence demonstrating that these efforts have created an association between VGT and the relevant trademarks and trade dress. For example, VGT has produced printouts of websites demonstrating players' recognition of the VGT marks and trade dress at issue. *See, e.g.*, Ex. 181, VGT0007193-95, -7291-92, -7385-86, -7438-440, -7413-14, -7534-543. In addition, marketing research studies of casinos and casino patrons commissioned before this dispute reflect the strength of VGT's trademarks and trade dress:



- ███████████████████████████████████████████ *See* Ex. 176, VGT0052948-50.

- ███████████████████████████████████████████ Ex. 67, VGT0031061.

- ███████████████████████████████████████████

Moreover, VGT's casino partners have confirmed that ████████████████ ██████████████████████████████ *see* Ex. 183, VGT0053082-83, and third parties have given unsolicited publicity to VGT's games and brands, *see, e.g.*, Ex. 185, VGT0010189-90.

At the summary judgment stage, it is appropriate to infer secondary meaning in favor of the non-movant trademark plaintiff based on such evidence of commercial success.  *See Sally Beauty*, 304 F.3d at 978 (drawing inference of secondary meaning in light of evidence of long use, sales volume, and intentional copying); *see also Hornady*, 746 F.3d at 1007-08 (drawing inference of "a conscious connection in the public's mind between the [plaintiff's] mark and its products" based on 17 years of use and hundreds of thousands of dollars in advertising).  As the Tenth Circuit has explained, although evidence of commercial success (such as sales volume), standing alone, is not determinative of secondary meaning, it "may indicate secondary meaning when presented in conjunction with other evidence."  *Sally Beauty*, 304 F.3d at 978.  Such "other evidence" may include "record evidence which indicates that [the defendant] intentionally copied some aspect of the [asserted product]."  *Id.*

Accordingly, where, as here, evidence of commercial success is presented in conjunction with evidence of intentional copying, there is a genuine issue of material fact as to secondary meaning.

### (3)    CHG's Intentional Copying Has Resulted in Actual Consumer Confusion.

Where there is actual confusion in the marketplace, "necessarily [the senior mark] would have a strong secondary meaning."  *Vail Assocs., Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 866 (10th Cir. 2008); *see also Donchez*, 392 F.3d at 1218.  As described in Section V.A.2.a, below, VGT has both direct and indirect evidence that CHG has created such actual confusion.

Because VGT has adduced evidence establishing that its trademarks and trade dress have attained secondary meaning, summary judgment is improper.  *Sally Beauty*, 304 F.3d at 972.

**2.   There Is a Likelihood of Confusion Between VGT's Trademarks and Trade Dress and CHG's Trademarks and Trade Dress.**

The "key inquiry" in an infringement action is "likelihood of confusion between two similar marks." *Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 832-33 (10th Cir. 2005).

CHG correctly identifies the six factors in a likelihood of confusion analysis:  evidence of actual confusion; strength of the asserted mark; infringer intent in adopting the accused mark; similarity between the competing marks; degree of care that consumers are likely to exercise in purchasing the parties' products; and similarity of the parties' products and the manner in which they market them. *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013). "The factors underlying a likelihood of confusion analysis in a trademark infringement claim apply equally to trade dress infringement claims." *Sally Beauty*, 304 F.3d at 979.

As set forth below, all six factors weigh in VGT's favor.

**a)   Actual Confusion Already Exists in the Marketplace.**

"Although not necessary to prevail on a trademark [or trade dress] infringement claim, evidence of actual confusion in the marketplace may be the best indication of likelihood of confusion." *Sally Beauty*, 304 F.3d at 974, 979; *see Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65, 74 (10th Cir. 1958) ("There can be no more positive proof of likelihood of confusion than evidence of actual confusion."); *see also* 4 McCarthy on Trademarks and Unfair Competition § 23:13 (5th ed.) ("Any evidence of actual confusion is strong proof of the fact of a likelihood of confusion.").

At the same time, evidence of actual confusion is "not necessary to prevail on a trademark infringement claim," *Sally Beauty*, 304 F.3d at 974, because evidence of actual confusion is often "exceedingly difficult" to obtain, particularly where "the goods are relatively inexpensive." *Beer Nuts, Inc. v. Clover Foods Co.*, 805 F.2d 920, 928 (10th Cir. 1986).  Thus,

where, as here, a plaintiff has evidence of actual confusion, that evidence should not be disregarded at summary judgment. *Frito-Lay, Inc. v. Morton Foods, Inc.*, 316 F.2d 298, 301 (10th Cir. 1963) (inappropriate for court to disregard 15 anecdotal incidents of confusion).

Actual confusion can be shown through survey evidence or anecdotal evidence. *See Sally Beauty*, 304 F.3d at 974 (survey); *Brunswick Corp.*, 832 F.2d at 522 (anecdotal). Contrary to CHG's repeated claim that VGT has "no evidence" of actual confusion, *see* Mot. at 24, 30, 42, VGT has adduced both direct and anecdotal evidence of actual confusion.

VGT has direct evidence of actual confusion in the form of a likelihood-of-confusion survey conducted by Dr. Wind, which tested whether consumers are likely to be confused as to the source of EGMs produced by VGT and CHG in the context of an array of EGMs that might appear in the real-world marketplace of a casino floor. Ex. 126, Wind Dep. Tr. 49:6-18, 51:22-52:10, 106:25-107:22, 110:23-111:7, 117:23-118:15, 121:11-18. Dr. Wind, after controlling for possible confounding factors (*e.g.*, shared use of wealth or money themes), found a net confusion rate of 45.9%,[8] more than double the amount typically considered evidence of likelihood of confusion. *See* Ex. 101, Berger Dep. Tr. 146:24-147:3; *see also, e.g.*, *James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 278 (7th Cir. 1976) (15%); *Copy Cop v. Task Printing,* 908 F. Supp. 37, 42, 48 (D. Mass. 1995) (16.5%); *Nat'l Football League v. Governor of Del.*, 435 F. Supp. 1372, 1380-81 (D. Del. 1977) (19-21%). Although the results of Dr. Wind's survey are particularly relevant to the trade dress elements shared across VGT's games, Dr. Wind confirmed through open-ended questions and convergent evidence that the results of his survey

---

[8] Dr. Wind observed that this rate is likely conservative because the survey could not account for every similarity between VGT and CHG EGMs. Ex. 126, Wind Dep. Tr. 111:8-114:1.

project to the full range of VGT's infringed trademarks and trade dress.  *See* Ex. 126, Wind Dep. Tr. 111:8-115:23, 193:3-11.[9]

VGT has also introduced anecdotal evidence of at least 14 instances of actual confusion involving three types of market participants.

First, VGT has anecdotal evidence of actual confusion among casino patrons, VGT's ultimate customers.  *See* Ex. 187, VGT0056086-87 (frequent player complained to onsite VGT employee that "one of your new" games—actually a CHG game—was malfunctioning); *id.* (fan of VGT games mistakenly believed CHG game to be VGT Crazy Bill game); Ex. 160, VGT0001661-62 (Facebook user stating "Looks like I need to come play some VGT" in response to images of CHG games posted by casino); *id.* at VGT0001673-687 (gaming forum users discussing images of CHG games described as "some VGT $1 machines"); *see also* Ex. 117, Sprinkle Dep. Tr. 266:10-268:23, 434:6-435:13 (██████████████████████████████████ ████████████████████████.

Second, VGT has anecdotal evidence of actual confusion among casino employees, VGT's direct customers.  *See* Ex. 188, VGT0007594-95 (assistant general manager requested that VGT install CHG game mistakenly believed to be in VGT's Mr. Money Bags product line

---

[9] CHG offers no citations to support its arguments concerning the Wind survey, but instead improperly incorporates arguments from its separate motion to exclude Dr. Wind's report and testimony.  *See* Mot. at 25.  This Court limited CHG's opening summary judgment brief to 50 pages, a limitation CHG has already exceeded by one, even when using a font type (Garamond) that does not appear to comply with the local rules and that is different than the font CHG used previously in this case; VGT estimates that using the smaller font type allowed CHG to shorten its brief by at least two pages.  CHG should not be permitted to circumvent the Court's ruling in this manner or by incorporating arguments from other briefs.  *See Water Pik, Inc.*, 726 F.3d at 1160 ("Arguments inadequately briefed in the opening brief are waived.").  To the extent that the Court considers the incorporated arguments for purposes of CHG's summary judgment motion, VGT respectfully refers the Court to its opposition to CHG's motion to exclude Dr. Wind.  *See* Dkt. 211.  (It also bears mention that although CHG's opening brief refers to an accompanying Gill declaration, it appears that no such declaration was filed.)

after playing CHG game at another casino); Ex. 189, VGT0006767-69 (gaming director observed CHG's New Money and Arctic Cash games at another casino, then inquired with VGT as to their availability); Ex. 190, VGT0006762-64 (casino floor technician mistakenly asked onsite VGT employee to fix CHG game).

Third, and finally, VGT has anecdotal evidence of actual confusion among those particularly knowledgeable about VGT's products, VGT employees.  *See* Ex. 190, VGT0006762-64 (VGT technician who saw error notice on what he believed to be VGT game did not recognize it as CHG game until after opening machine); Ex. 162, VGT0007561-62 (VGT sales team supervisor mistook CHG games for VGT games in casino); Ex. 191, VGT0053034-35 (VGT field services manager mistakenly instructed VGT technicians to fix error message on CHG game); Ex. 189, VGT0006767-69; Ex. 202, VGT0006765-66 (VGT product development employee mistook CHG convention booth for VGT convention booth); Ex. 192, VGT0007569-73 (former VGT Interim President mistook CHG games for VGT games after being notified of installation in casino). ██████████████████████████████████████

████████████████████████████  *See* Ex. 115, Sisson Fact Dep. Tr. 298:11-299:8.

It is telling that there have been so many reports of confusion over the approximately three years that CHG has been offering Class II games, particularly given the difficulty of identifying those who are confused when most may never realize that they are confused.  4 McCarthy on Trademarks and Unfair Competition § 23:12 (5th ed.) ("Persons who are truly confused will often never be aware of the deception.  Others who were confused and later learned of their deception will often not bother to report the fact."); *accord Beer Nuts*, 805 F.2d at 928.  In these circumstances, the 14 instances are likely representative of a broader set.

Finally, there is nothing to CHG's disingenuous claim that VGT has no, or only *de minimis*, evidence of actual confusion.[10]  The *de minimis* label applies only where there have been smaller numbers of isolated instances over longer periods of time, among other factors. *See, e.g.*, *Hornady*, 746 F.3d at 1004-05 (three instances over ten years); *Water Pik*, 726 F.3d at 1150-51 (three instances and survey data reflecting only 2.6% confusion rate); *King of the Mountain Sports*, 185 F.3d at 1092-93 (seven instances, but dissimilar products and marks); *Universal Money Centers*, 22 F.3d 1527, 1535 (10th Cir. 1994) (three instances); *see also Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1372 (10th Cir. 1977) (dozen instances of actual confusion not *de minimis*).  Here, the 14 instances of actual confusion identified by VGT coupled with the likelihood of actual confusion revealed by Dr. Wind's study defeats any claim that VGT's evidence of actual confusion is *de minimis*, especially at the summary judgment stage.

> **b)**    **VGT's Marks and Trade Dress Are Conceptually and Commercially Strong.**

"The stronger the mark, the greater the likelihood that encroachment on the mark will cause confusion."  *Sally Beauty*, 304 F.3d at 975.  "Strength has two aspects:  conceptual strength, or the mark's place on the spectrum of distinctiveness, and commercial strength, or its level of recognition in the marketplace."  *Water Pik*, 726 at 1151.

As discussed in Section V.A.1, above, a genuine issue of material fact exists as to whether VGT's trademarks and trade dress are conceptually and commercially strong.  *See id.* at 1154 ("The difference between commercial strength and secondary meaning is that the former is

---

[10] *Compare* Mot. at 24 ("VGT Has *No* Evidence of Actual Confusion") *with id.* ("Here, VGT has no *compelling* evidence of actual confusion.") (emphases added).

a range, while the latter is a threshold . . . .  Nevertheless, the same evidentiary findings are generally probative of both . . . .") (internal punctuation omitted).

<strong>c)    CHG Intentionally Designed Its Trademarks and Trade Dress to Resemble VGT's Trademarks and Trade Dress.</strong>

"One who adopts a mark similar to another already established in the marketplace does so at his peril, because the court presumes that he can accomplish his purpose:  that is, that the public will be deceived. All doubt must be resolved against him."  *Sally Beauty*, 304 F.3d at 973 (citations and quotation omitted).

As described in Section V.A.1.b)(1) above, CHG's



Ex. 134, CHG0023869; *see also* Ex. 193, CHG0024015

In addition to the evidence cited above of CHG's intent to mimic trade dress and trademarks associated with VGT's most popular games, other evidence confirms CHG's strategy.  *See, e.g.*, Ex. 194, CHG0008910

(emphasis added)); Ex. 269, CHG0090828

"); Ex. 117, Sprinkle Tr. 320:8-332:9, 343:2-344:7, 383:21-386:8, 391:18-393:1.  This evidence that CHG chose trademarks and trade dress[11] with the intent of copying VGT, *standing alone*, is sufficient to justify an inference of likelihood of confusion.  *Id.* at 973.

---

[11] Where, as here, evidence supports an intent to copy trademarks, trade dress, or both, "a reasonable inference is that [CHG] wanted to copy the whole of [VGT's product] line.  Any doubts about this factor must be resolved against [CHG]."  *Sally Beauty*, 304 F.3d at 973-74.

**d)    CHG's Trademarks and Trade Dress Resemble VGT's Trademarks and Trade Dress.**

"We test the degree of similarity between marks on three levels: sight, sound, and meaning." *King of the Mountain Sports*, 185 F.3d at 1090. "We do not consider these factors in isolation. Instead, we must examine them in the context of the marks as a whole as they are encountered in the marketplace." *Id.* (internal punctuation omitted). "The court must consider the effect of marketplace presentation, including lettering styles, logos and coloring schemes." *Hornady*, 746 F.3d at 1002 (internal punctuation and citation omitted). "We give the similarities of the marks more weight than the differences." *King of the Mountain Sports*, 185 F.3d at 1090.

Regarding visual similarities, it bears emphasis that CHG has eschewed visual comparison of VGT's and CHG's EGMs in favor of written descriptions, often misleading, of purported differences between VGT's and CHG's marks and trade dress. CHG's approach is understandable given the unavoidable conclusions drawn from visual comparisons, as set forth above. As CHG's own survey expert testified when criticizing Dr. Wind's use in his survey of VGT's Mr. Money Bags game and CHG's New Money game, the ███████████████████

██████ Ex. 101, Berger Dep. Tr. 207:7-18; *see also id.* at 193:14-25 █████████████

█████████████████████████████████████████████████

███████████████████████████████████ Another

CHG expert testified to the same effect. Ex. 121, Valandra Dep. Tr. 132:3-133:20.

In addition, although CHG's word marks alone may not be similar in sound to VGT's word marks, those marks are similar in meaning, particularly when combined with similar visual themes bolstering those meanings. Indeed, it seems that the only thing that CHG did not copy as closely as possible were VGT's word marks, apparently because even CHG realized that would be going too far. *See* Ex. 117, Sprinkle Dep. Tr. 347:22-349:5; Ex. 195, CHG0039934-35.

As for each of the individual trade dress elements, the similarities are not only readily apparent upon a cursory comparison but also unsurprising given that CHG mimicked VGT with respect to most of them. For example, CHG uses the same GAME CABINET as VGT for most of its games, including modifications intended to mimic VGT features. *See* above at 4; Ex. 117, Sprinkle Dep. Tr. 322:18-25, 360:18-363:17; Ex. 122, Watson Fact Dep. Tr. 36:23-37:17, 230:25-231:25; Ex. 121, Valandra Dep. Tr. 120:7-121:3. CHG ███████ chose a red strobe with the same red lens ███████ as VGT's RED STROBE. *Compare* Ex. 196, VGT0056098-99 *with* Ex. 197, VGT0056100-01; *see also* Ex. 117, Sprinkle Dep. Tr. 343:2-8, 367:19-368:11. CHG ███████████████████ ███████████ *Compare* Ex. 165, VGT0010623 *with* Ex. 166, VGT0007548; *see also* Ex. 117, Sprinkle Dep. Tr. 244:6-246:16, 377:2-378:8. And CHG ███████ chose a nearly identical bell ███████ as VGT's AWARD SOUND. *Compare* Ex. 165, VGT0010623 *with* Ex. 166, VGT0007548; *see also* Ex. 117, Sprinkle Dep. Tr. 343:13-16, 369:13-370:17.

As for the BINGO PLAY AND PAYS, CHG not only uses many of the same bingo patterns, including Inside Corners, Private Stripes, Postage Stamp, Corners, and Corporal Stripes, which happen to be some of the ones that hit with the most frequency, but also uses the same or similar payouts for each of these patterns as the amounts used by VGT within the same pseudo-paytables as VGT. *Compare* Ex. 154 *with* Ex. 198, CHG0094498-4512 *and* Ex. 201, VGT0007075-86, -118-125; *see also* Dkt. 103 at Ex. 6.

Lastly, CHG uses the same root/fifth/octave relationship for its reel resolution sounds as VGT's REEL RESOLUTION SOUNDS, except a half-step lower, as discussed in Mr. Friedman's declaration. *Compare* Ex. 165, VGT0010623 *with* Ex. 166, VGT0007548; *see also* Friedman Decl. ¶ 56.

         **e)**        **Consumers Exercise Minimal Care in Selecting EGMs to Play.**

"[I]tems purchased on impulse are more likely to be confused than expensive items, which are typically chosen carefully.  The relevant inquiry focuses on the consumer's degree of care exercised at the time of purchase." *Sally Beauty*, 304 F.3d at 975 (citation omitted).

Here, VGT has evidence that casino patrons do not typically exercise a high level of care when selecting a game; rather, they typically play different games during a casino visit and move from one game to another if they do not win within what they believe to be a reasonable time. *See* Ex. 65, VGT0006965, -6970.  When combined with the low cost to play VGT and CHG's EGMs—as little as 25 cents—consumers are unlikely to exercise care in confirming that a familiar-looking EGM was in fact produced by a particular source.  *See* Ex. 114, Sevigny Dep. Tr. 88:22-89:20; *see also* Ex. 187, VGT0056086-87 (fan of VGT games played game believed to be VGT's Crazy Billions for ten minutes before realizing it was CHG game).

         **f)**        **CHG and VGT Offer the Same Products in the Same Casinos.**

Finally, similarity of products may be supported by evidence that "the parties were competitors in consumer markets." *Sally Beauty*, 304 F.3d at 974.  "[T]he possibility of confusion is greatest when products reach the public by the same retail outlets." *Id.* at 975.

CHG admits that it is a competitor of VGT, Dkt. 112 ¶¶ 2, 49, and understandably concedes that this factor favors VGT by not raising it in its brief.

         **3.**        **VGT's Trade Dress Is Non-Functional.**

A trade dress plaintiff must also demonstrate that its claimed trade dress is not functional. *Sally Beauty*, 304 F.3d at 977.  Trade dress is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001) (quoting *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995)).  Further, "a functional feature is one the 'exclusive use of [which] would

put competitors at a significant non-reputation-related disadvantage.'" *TrafFix Devices, Inc.*, 532 U.S. at 32 (quoting *Qualitex Co.*, 514 U.S. at 165). "Functionality is a question of fact, and depends on the totality of the evidence." Dkt. 56 (quoting *Value Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1273 (Fed. Cir. 2002)).

Once again, CHG identifies the appropriate test for this element, but misleadingly applies that test to the facts. Indeed, "by breaking [VGT]'s trade dress into individual elements and then attacking certain of those elements as functional, [CHG] misconceives the scope of the appropriate inquiry." *Hartford House*, 846 F.2d at 1272. Contrary to CHG's approach, "the appropriate inquiry is not whether each individual feature of the trade dress is functional but whether the whole collection of features, taken together, is functional." *Id.*; *see also* 1 McCarthy on Trademarks and Unfair Competition § 8:2 (5th ed.) ("A defendant cannot avoid liability for infringing a trade dress by segregating out individual elements of the trade dress as defined by plaintiff and arguing that no one of these is valid and protectable in and of itself. It is the total combination of elements of the 'trade dress' as defined by the plaintiff that is at issue. This has been the rule for close to a century.").

Although none of the individual trade dress features is functional, plainly when taken together the combination of features used by VGT is not functional. Rather, as CHG's own documents confirm, CHG has mimicked VGT's trade dress to benefit from VGT's established reputation, including by transitioning VGT players to CHG's non-accused trade dress:



Ex. 128, CHG0008304.

In other words, CHG has viewed VGT's trade dress as performing the quintessential trademark function of "reduc[ing] the buyer's cost of collecting information about goods and services by narrowing the scope of information into brand segments rather than have the buyer start a new search process with each purchase." 1 McCarthy on Trademarks and Unfair Competition § 2:5 (5th ed.). It is therefore disingenuous for CHG to suggest that VGT's exclusive use of its *combination* of elements unfairly puts CHG at a "significant non-reputation-related disadvantage." *TrafFix Devices, Inc.*, 532 U.S. at 32 (quoting *Qualitex Co.*, 514 U.S. at 165). CHG's own expert undermines CHG's argument. *See* Ex. 121, Valandra Dep. Tr. 176:7-19 ███████████████████████████████████████ 193:17-20 ████████████ ████████████████████████████████████, 202:4-14 ████████████████████ ████████████████████████████, 220:3-19 ████████████████████████████ ███████████████████████████████ 229:24-230:4 ██████████████████ ████████████████████████████████████████████████ Because VGT's trade dress is arbitrary, as discussed directly above and at 17-18, and has allowed CHG to "market [its] product more effectively, it is entitled to protection." *Brunswick*, 832 F.2d at 519.

Moreover, although CHG asserts—without citation to the record—that competitors have used similar trade dress elements, it makes no claim and sets forth no evidence that a competitor has offered VGT's particular combination of trade features. To the contrary, the record is replete with examples of third-party EGM trade dress that differs in overall appearance from VGT's trade dress. *See* Dkt. 103 at Ex. 5; Dkt. 30; Dkt. 35; Ex. 204, 4-73; Ex. 205, 2-5; Ex. 206, 4-6; Ex. 117, Sprinkle Dep. Tr. 396:11-433:11; Ex. 203, Fulton 30(b)(6) Dep. Tr. 22:11-60:25; Ex. 207, VGT0006992, -7005, -7019, -7022, -7033-34, -7059, -7069-70, -7101. In fact, as CHG

repeatedly notes in an apparent attempt to distract the Court from the product lines at issue, both CHG and VGT have provided their respective games in multiple cabinet designs. *See* Dkt. 189 ¶¶ 13, 49. Availability of so many alternative designs all but confirms that VGT's combination of trade dress elements is non-functional. *See TrafFix Devices, Inc.*, 532 U.S. at 33-34 (implying that existence of alternative designs is relevant factor "where a manufacturer seeks to protect arbitrary, incidental, or ornamental aspects of features of a product"); *see also, e.g.*, *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1274-76 (Fed. Cir. 2002).

Lastly, it bears mention that a non-functional combination of trade dress elements may, of course, contain elements that provide functional benefit. *See Hartford House*, 846 F.2d at 1272; *see also Valu Eng'g, Inc.*, 378 F.3d at 1274; *Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 1533 (Fed. Cir. 1994) ("In trademark law, 'functional' means not that a feature serves a function"). "Indeed, virtually every product is a combination of functional and non-functional features and a rule denying protection to any combination of features including a functional one would emasculate the law of trade dress infringement." *Hartford House*, 846 F.2d at 1272 (citation omitted). Despite CHG's rhetoric, VGT does not seek to exclude competitors from using some broad theme of expression or from improving their products (*e.g.*, by making games smaller to fit within a confined space), but rather only to protect its "specific artistic expression, in combination with other features to produce an overall [VGT] look." *Id.* at 1274.

### 4. VGT's Trade Dress Is Consistent.

Finally, CHG's argument that elements of VGT's trade dress are insufficiently "consistent" to constitute protectable trade dress is likewise unavailing.

As an initial matter, neither the Tenth Circuit nor the Northern District of Oklahoma has adopted the threshold "consistency" element advocated by CHG. Rather, the Tenth Circuit case cited by CHG, *Forney Industries, Inc. v. Daco of Missouri, Inc.*, merely reaffirms that a trade

dress plaintiff must identify the combination of elements that it claims as trade dress—as VGT has done.  *See* 835 F.3d at 1252.

Not only has VGT articulated the elements that constitute its trade dress, *see* Section IV.A.1, it has provided evidence that establishes the consistency of those elements over time. *Compare* Ex. 157, VGT0001732 *with* Ex. 157, VGT0013629; *see, e.g.*, Reg. Nos. 2,979,205, 4,306,260, 5,556,323, 5,120,201, 5,120,209, 3,755,296, 3,152,743, 3,395,857, 3,506,608, 4,138,672, and Ser. No. 87/676.450; Ex. 208, VGT0009510; Ex. 208, VGT0009512; Ex. 209, 1-7.

More centrally, though, CHG's efforts to point to non-asserted trade dress features included on non-asserted game variations is nothing more than a distraction.  As explained by a leading case, "in seeking protection for the trade dress of a line of products, the plaintiff can define the line as it sees fit. . . .  [A] plaintiff can group together any number of products in any way it sees fit, as long as the products have a consistent overall look."  *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 173 (3d Cir. 2000); *see also Classic Touch Decor, Inc. v. Michael Aram, Inc.*, No. 15-CV-453 NGG RLM, 2015 WL 6442394, at *8 (E.D.N.Y. Oct. 23, 2015) ("If [plaintiff] does not claim [a certain aspect of a product] as trade dress, this element (which therefore would not be 'specified as the trade dress' and not part of the 'claimed product line') will not be included in the 'consistent overall look' analysis.").  Thus, whether VGT offers some games in other types of cabinets (or with "jukebox" lighting) is irrelevant because the standard-sized LS cabinet (without "jukebox" lighting) is the only one on which VGT bases its claims (not to mention that most VGT's placements are in this cabinet).

Similarly, even though trade dress must be consistent, "the appearance of the series or line of products or packaging [need not] be identical. . . .  [A] party may have trade dress rights

even though there are slight variations in its package design so long as the change does not alter the distinctive characteristics and the trade dress conveys a single and continuing commercial expression." *Rose Art Indus.*, 235 F.3d at 173 (citation omitted); *see also Happy Sumo Sushi, Inc. v. Yapona, Inc.*, No. 2:08-CV-348 TS, 2008 WL 3539628, at *1–2 (D. Utah Aug. 11, 2008) (finding variations in trade dress to be "insignificant"); *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 453 (S.D.N.Y. 2000) (same). Just as the trade dress of a Classic Coca Cola bottle would not lose its distinctiveness by making tweaks to the label over time, or by occasionally offering bottles with translucent glass rather than transparent glass, VGT's trade dress has not lost protection by occasionally using different paytables, or by offering versions of its games with different artwork, so long as it conveys a continuous commercial expression.

### B.    CHG Is Not Entitled To Summary Judgment on VGT's Trade Secret and Confidential Information Claims.

Despite receiving more than 25 pages of interrogatory responses and more than 170 paragraphs of expert reports setting forth the basis of VGT's misappropriation claims, CHG moves for summary judgment on these claims in less than five pages. Mot. at 46–50. Because CHG ignores most of VGT's evidence, VGT begins with a brief overview of the claims.

### 1.    VGT Has Substantial Evidence of Misappropriation.

The trade secrets and confidential business information ("CBI") at issue relate to VGT's Class II bingo system and games, which VGT developed through years of effort and expenditure of resources. Davis Decl. ¶¶ 2–15; Shults Decl. ¶¶ 3–13. As CHG has told its investors, designing a successful Class II game is ███████████████████████████████████ ████████████████████████████ Ex. 159, CHG0015314; Ex. 112, Roireau Fact Dep. Tr. 132:20–23 ██████████████████████████████████████ In building its successful Class II games,

VGT developed proprietary knowledge, techniques, and solutions surrounding Class II game design. Friedman Decl. ¶¶ 12–16, 21–29, 36–43. VGT keeps this knowledge secret because if shared outside VGT, it would lower barriers to entry and would enable competitors to build better games. Friedman Decl. ¶¶ 38, 41, 43; Davis Decl. ¶¶ 11–15; Shults Decl. ¶¶ 6, 9, 12, 13.

Unlike VGT, CHG did not start from scratch. As discussed above in Sections V.A.1.b)(1) & V.A.1.c, CHG wanted to make Class II games that look and play like VGT's games so as to compete with VGT. After struggling with its initial games (which were not Class II), CHG had limited time and resources to develop its competing Class II system. Ex. 143, Roireau 30(b)(6) Dep. Tr. 111:17–20 ███████████████████████████

███████████████████; *id.* at 118:20–119:7, 120:10–23 ██████████████████████████

███████████████████████. So CHG took a short-cut. Mr. Roireau

hired ███████████████████████████████████████. *Id.* at 121:10–21. And as Mr.

Roireau acknowledges, ████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████ Ex. 146, CHG0023446; Ex. 112, Roireau Fact

Dep. Tr. 161:6–162:3; Ex. 143, Roireau 30(b)(6) Dep. Tr. 121:22–122:12.

████████████████████████████████████████████████

███████████████████████████ *See, e.g.*, Ex. 110, Morgan Dep. Tr.

173:18-177:18 ████████████████████████████████████████

███████████████████████ Ex. 142, CHG0124180; Ex. 141, CHG0124635; Ex. 107,

Larson Dep. Tr. 285:17–286:20; Ex. 143, Roireau 30(b)(6) Dep. Tr. 131:3–19, 133:18–23 ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

 Ex. 210,

CHG0079590; *see also* Ex. 143, Roireau 30(b)(6) Dep. Tr. 170:20–25.

CHG's documents and deposition testimony reveal broad use of VGT ideas, methods,

documents, and information, most of which represent VGT trade secrets or CBI. For example:[12]

-  Ex. 113, Scheiner Dep. Tr. 179–80.

-  *Id.* at 88:25–89:8, 226:23–25.

-  Ex. 119, Suggs Dep. Tr. 75:19–76:13, 81:7–17.

-  Ex. 212, CHG0018498; *see also* Ex. 213, CHG0018545; Ex. 214, CHG18489 Ex. 112, Roireau Fact Dep. Tr. 343:1–19. Ex. 112, Roireau Fact Dep. Tr. 32:21–33:2, 343:1–19.

-  Ex. 215, CHG0015278

---

[12] Additional information that CHG misappropriated is discussed in Mr. Friedman's declaration. *See* Friedman Decl. ¶¶ 53–54.



*Id.* at 249:5–251:7.



Ex. 116, Sisson 30(b)(6) Dep. Tr. 47:20–49:16.

Such use of VGT's trade secrets and CBI for CHG's benefit violated the confidentiality obligations that former VGT employees owed VGT. *See, e.g.*, Ex. 119, Suggs Dep. Tr. 24:18–25:19, 48:3–16; Ex. 218, VGT0006912–15. ███████████████████████

███████████████████████████████████████████

███████  Ex. 112, Roireau Fact Dep. Tr. 294:6–295:10, 297:11–298:12.

The misappropriation encompasses virtually every stage of CHG's product development and are addressed in two sets of claims.  First, VGT's claims under the Oklahoma Uniform Trade Secrets Act ("OUTSA") (Count V), the Virginia Uniform Trade Secrets Act ("VUTSA") (Count VIII), and Oklahoma common law (Count VI) address CHG's misappropriation of VGT's trade secrets and CBI in developing its Class II system and games that CHG has placed in the field.

████████████████████████████████████████████

████████████████████████████████████████████

███████  Second, VGT's claims under the federal Defend Trade Secrets Act ("DTSA") and VUTSA address additional acts of misappropriation in connection with subsequent development

---

13 █████████████████████████████████████  Shults Decl. ¶ 11.

work. ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███[14] Ex. 143, Roireau 30(b)(6) Dep. Tr. 74:13–76:9.

## 2.   Disputed Fact Issues Preclude Summary Judgment in CHG's Favor On VGT's Trade Secret Claims.

VGT's trade secret claims require a showing that VGT has a trade secret and that CHG has misappropriated this trade secret.  *See Space Sys./Loral, LLC v. Orbital ATK, Inc.*, No. 4:17-cv-00025-RAJ-LRL, 2018 WL 701280, at *5 (E.D. Va. Feb. 2, 2018) (DTSA); *id.* at *6 (VUTSA); *MTG Guarnieri Mfg., Inc. v. Clouatre*, 239 P.3d 202, 209 (Okla. Civ. App. 2010) (OUTSA).[15]  CHG's Motion provides no basis for summary judgment on these claims.

### a)   Existence of Trade Secrets

A trade secret is information that (a) "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and (b) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."[16]  78 Okla. Stat. § 86(4); *see also* 18 U.S.C. § 1839(3); Va. Code. Ann. § 59.1-336.

CHG is not entitled to summary judgment with respect to any of the three trade secrets or groups of trade secrets addressed in its Motion: ██████████████████████████████

---

[14] Because CHG's development work was coordinated from its headquarters in Virginia, Ex. 113, Scheiner Dep. Tr. 215:7–22, where Mr. Roireau (among other engineers) works, *see id.*, the VUTSA claim encompasses both categories of misappropriation.

[15] In *MTG*, the court stated that the OUTSA also requires "use of the trade secret to [the plaintiff's] detriment."  *MTG*, 239 P.3d at 209.  Because CHG's Motion does not address this element, VGT does not address it further.

[16] CHG's Motion does not contest the second requirement—*i.e.*, that VGT employed reasonable efforts to maintain its trade secrets.



As to one of these trade secrets (the ████████████), summary judgment should be granted in favor of *VGT*, *see* Dkt. 179, and there are genuine disputes of fact with respect to the others.

████████████████ As explained in VGT's summary judgment motion (Dkt. 179 at 31–33), this algorithm ████████████████

Dkt. 179 at 5–6; Ex. 119, Suggs Dep. Tr. 48:25–50:24, 85:15–21.[18]

---

[17] This declaration was previously submitted in connection with VGT's Motion for Partial Summary Judgment (Dkt. 179), and is being resubmitted in connection with this opposition.

[18] Likewise, CHG offers no evidence that a related trade secret ████████████████ Ex. 113, Scheiner Dep. Tr. 180:15–20. VGT's expert, Stacy Friedman also opines that it is not known. Friedman Decl. ¶¶ 12–16; Ex. 219, Friedman 10/12/18 Decl. ¶¶ 24–29; *see also* Ex. 220, Davis 10/10/18 Decl. ¶¶ 14–18.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████ [19]

Friedman Decl. ¶¶ 21–29; Davis Decl. ¶¶ 11–15.

VGT Know-How.  CHG fails to address any of the specific items of know-how described in VGT's interrogatory responses and expert reports.  Instead, CHG attempts to sweep away this entire category of VGT ideas, methods, and information based on a bare assertion that all of it amounts to "generalized 'know-how.'"[20]  Mot. at 48.

That is insufficient to meet CHG's burden as the summary judgment movant.  As the Tenth Circuit has explained, CHG "must make more than a simple conclusory assertion that [VGT] does not have enough evidence to carry [its] burden of persuasion at trial, otherwise summary judgment 'would be converted into a tool for harassment.'"  *Coit v. Zavaras*, 175 F. App'x 226, 229 (10th Cir. 2006) (quoting *Windon Third Oil & Gas Drilling P'ship v. Fed. Deposit Ins. Corp.*, 805 F.2d 342, 345 n.7 (10th Cir. 1986)).  "[T]he defendant must point the court to specific portions of the record where the plaintiff has admitted that he has no evidence or intends to rely on evidence which is insufficient as a matter of law."  *Haywood v. Nye*, 999 F. Supp. 1451, 1463 (D. Utah 1998).

_____

[19] CHG's reliance on the patent-law concept of obviousness has no bearing on whether the algorithm is a trade secret.  *See Rivendell Forest Prod., Ltd. v. Georgia-Pac. Corp.*, 28 F.3d 1042, 1045 (10th Cir. 1994) ("Novelty and invention are not requisite for a trade secret as they are for patentability."); *Sloan v. Mud Prod., Inc.*, 114 F. Supp. 916, 928 (N.D. Okla. 1953) (holding that unlike patents, which require "invention," a process may "be maintained in secrecy and be entitled to equitable protection even though invention is not present" (internal quotations omitted)); *Basic American, Inc. v. Shatila*, 992 P.2d 175, 183 (Idaho 1999) ("'[O]bviousness' is a patent law concept not within the [Idaho Trade Secrets Act] . . . .").

[20] Although CHG identifies two facts, *see* Mot. at 17, ¶¶ 69–70, CHG neither cites those facts in its argument nor explains why they justify summary judgment.

CHG makes no effort to meet this burden with respect to the know-how trade secrets. The motion should be denied for this reason alone: "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Arabalo v. City of Denver*, 625 F. App'x 851, 861 (10th Cir. 2015) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).

Summary judgment also should be denied because VGT has proffered evidence that its "know-how" includes trade secrets, including ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████ (Friedman Decl. ¶¶ 42–43).[21] The declarations of VGT expert Mr. Friedman and two long-time VGT engineers show that VGT keeps this information secret and it is valuable because it is not generally known outside VGT or readily ascertainable. Friedman Decl. ¶¶ 36–43; Davis Decl. ¶¶ 11–15; Shults Decl. ¶¶ 3–13.

VGT has additional evidence demonstrating that the VGT know-how is not, as CHG asserts (without support), mere general "knowledge, skill, and experience" in the Class II industry. Mot. at 50. For example, ███████████████████████████████████ █████████████████████ Ex. 143, Roireau 30(b)(6) Dep. Tr. 168:2–6. As seen in the examples above, *supra* § V.A, ████████████████████████████████

---

[21] Because CHG has not met its burden as the movant, VGT has not included all evidence in support of its misappropriation claims. *See Celotex*, 477 U.S. at 328 (White, J., concurring) (a plaintiff "need not . . . depose his witnesses or obtain their affidavits to defeat a summary judgment motion asserting only that he has failed to produce any support for his case" because it "is the defendant's task to negate, if he can, the claimed basis for the suit.").



█████████████████████████████████████████████████████████████

███████████████████████████████████████████ Ex. 146, CHG0023446.

### b)    Misappropriation of Trade Secrets

A trade secret may be misappropriated through the acquisition, use, or disclosure of the secret under certain circumstances.[22]  *See* 78 Okla. Stat. § 86(2); 18 U.S.C. § 1839(5); Va. Code Ann. § 59.1-336.  CHG's Motion does not challenge any of the requirements of misappropriation beyond whether there was an acquisition, use, or disclosure of a VGT trade secret.

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████ Friedman Decl. ¶¶ 17–19; Ex. 219, Friedman 10/12/18 Decl. ¶¶ 36–40.

██████████████████████████████████████████████

███████████████████████████ *See Integrated Global Srvs., Inc. v. Mayo*, No. 3:17-cv-563, 2017 WL 4052809, at *8 (E.D. Va. Sept. 13, 2017) ("[M]ere acquisition of a trade secret by the improper means listed in the statute is sufficient to establish misappropriation."). ████████████ ████████████████████████████████████████████ it cites no authority that the DTSA or VUTSA (the applicable statutes) has such a requirement. *Cf. Collelo v. Geographic Servs., Inc.*, 727 S.E.2d 55, 71 (Va. 2012) (VUTSA "does not require that one who is accused of misappropriating a trade secret use the allegedly misappropriated trade secret to compete with the holder of the trade secret.").  And even if use in commerce were a requirement, ██████ ██████████████████████████████████████████████████████ *See Wellogix v.*

---

[22] For example, acquisition constitutes misappropriation if the acquirer knows or has reason to know that the trade secret was acquired by improper means.  78 Okla. Stat. § 86(2)(a).

*Accenture, LLP*, 788 F. Supp. 2d 523, 541 (S.D. Tex. 2011) ("Even though xIEP may not have been piloted, deployed, or implemented, [defendant's] purported use of [plaintiff's] source or object code during xIEP's development can constitute a commercial use."); *see also* Ex. 112, Roireau Fact Dep. Tr. 302:17–20 █████████████████████████████████

CHG also argues that "VGT has not been harmed" by █████████████████████ ████████████████████████ Mot. at 48, but CHG fails to explain how purported absence of harm is relevant under the DTSA and VUTSA. *See Blue Star Land Servs., LLC v. Coleman*, Case No. CIV-17-931-R, 2017 WL 6210901, at *7 (W.D. Okla. Dec. 8, 2017) (DTSA does not require use of trade secret to detriment of owner). In any event, VGT has been harmed by

████████████████████████████████████████████████████

████████████████: "The reason why unauthorized use or acquisition of another's trade secret is actionable is that the adverse use or possession puts the value of the trade secret at risk." 4 Milgrim on Trade Secrets § 15.01[1][d][iii] (2018).

As to ███████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████ Ex. 113, Scheiner Dep. Tr. 178:20–180:14; Ex. 221, CHG0087703-04. ██████████████████████

██████████████████████████████████████████



Friedman Decl. ¶¶ 17–19.

Ex. 222, Zeidman Dep. Tr. 273:11–275:9.[24]

Mot. at 49.

<u>VGT Know-How</u>.  CHG again makes only a conclusory argument that VGT has no

evidence of misappropriation of any trade secret, which, as discussed above, fails to meet CHG's

burden as the summary judgment movant.  It also fails because CHG overlooks the evidence—

including its own documents (*e.g.*, Ex. 214, CHG0018489)—that it used trade secrets,

---

[23] Although                                                                                              Friedman Decl. ¶¶ 17–19; *see ProLine Prod., L.L.C. v. McBride*, 324 P.3d 430, 433 (Okla. Civ. App. 2014) ("A trade secret is 'used' if a product or process is substantially derived from the trade secret, even if it is with independent improvements or modifications."); *MTG*, 239 P.3d at 211 ("A well-established principle of trade secret law is that a party may not use another's genuine trade secret, even with independent improvements or modifications, so long as the product or process is substantially derived from the trade secret.").

[24] CHG also used the algorithm                                        .  Friedman Decl. ¶¶ 32–34.

██████████████████████████████████████████████████████

██████████████████████████████████████[25]

     CHG also repeats its tired (and irrelevant) refrain that its employees merely "remembered information from their time at VGT." Mot. at 48. That is not a defense where, as here, the information constitutes a trade secret or confidential business information. *See Ed Nowogroski Ins., Inc. v. Rucker*, 971 P.2d 936, 946 (Wash. 1999) (en banc); *accord Cent. Plastics Co. v. Goodson*, 537 P.2d 330, 334 (Okla. 1975); *see also* Dkt. 87 at 6 (citing authorities). Also, the misappropriation here has not been limited to what the employees remembered; ████████████

███████████████████████████████████ *See* Friedman Decl. ¶¶ 53–54.

### 3. Disputes Of Material Fact Preclude Summary Judgment On VGT's Claim For Misappropriation Of Business Information.

     VGT's claim for misappropriation of confidential business information ("CBI") (Count VI) stems from similar conduct as VGT's trade secret claims, but covers misappropriation of "business information not rising to the level of a trade secret." *Am. Biomedical Grp., Inc. v. Techtrol, Inc.*, 374 P.3d 820, 827 (Okla. 2016).

     CHG's argument that this claim is displaced by the OUTSA, Mot. at 50, is directly contrary to the Oklahoma Supreme Court's recent decision in *American Biomedical. Id.* at 827–28. As the court explained, "the uniform act's authors did not intend the displacement provision to apply to the common-law cause of action for misappropriation of business information not rising to the level of a trade secret." *Id.*; *see also Integrated Bus. Techs., LLC v. Netlink Sols.,*

---

[25] Because the know-how here consists of VGT trade secrets and confidential information, CHG's complaint about a lifetime non-compete, Mot. at 48, is a red herring. *See Skycam, LLC v. Bennett*, No. No. 09-CV-294-GKF-FHM, 2013 WL 5328937, at *13 (N.D. Okla. Sept. 20, 2013) (upholding jury instruction stating that "a person has the right to use ideas generally known to all and may combine with such general knowledge his own abilities and his knowledge of the customs of the market, as long as he does not make use of or disclose another's trade secrets").

*LLC*, No. 16-CV-048-TCK-PJC, 2016 WL 4742306, at *2 (N.D. Okla. Sept. 12, 2016).  Not only does CHG fail to cite *American Biomedical*, but CHG inexplicably relies on a decision from this District *rejecting* CHG's argument:  "[T]o the extent the claim is based upon breach of the alleged duties to keep other confidential business information secret, it is not displaced by OUTSA."  *CTI Servs. LLC v. Haremza*, 797 F. Supp. 2d 1257, 1262 (N.D. Okla. 2011).

CHG offers no other distinct argument on this claim and instead incorporates its arguments on the trade secret claims.  Mot. at 50.  For the reasons discussed above, VGT has raised a genuine dispute of material fact that CHG misappropriated information that is confidential to VGT (even if it does not rise to the level of a trade secret).  *See, e.g.*, Friedman Decl. ¶¶ 12–55; Davis Decl. ¶¶ 7–15; Shults Decl. ¶¶ 3–13.

## VI.    CONCLUSION

For the foregoing reasons, CHG's motion for summary judgment should be denied.

Respectfully submitted,

November 16, 2018                         */s/ Gary M. Rubman*
                                         Graydon Dean Luthey, Jr., OBA No. 5568
                                         GABLE GOTWALS
                                         1100 ONEOK Plaza
                                         100 West Fifth Street
                                         Tulsa, OK 74103-4217
                                         Telephone: (918) 595-4821
                                         Facsimile: (918) 595-4990
                                         dluthey@gablelaw.com

                                         Gary M. Rubman
                                         Peter A. Swanson
                                         Michael S. Sawyer
                                         Rebecca B. Dalton
                                         COVINGTON & BURLING LLP
                                         One CityCenter
                                         850 Tenth Street, NW
                                         Washington, D.C.  20001-4956
                                         Telephone: (202) 662-6000
                                         Facsimile: (202) 778-5465
                                         grubman@cov.com

pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
   (admitted pro hac vice)

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1221
Facsimile: (212) 841-1010
nroman@cov.com
   (admitted pro hac vice)

**Counsel for Video Gaming Technologies, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 16, 2018, I filed a redacted copy of the foregoing

Plaintiff Video Gaming Technologies, Inc.'s Response and Brief in Opposition to Defendants'

Motion for Summary Judgment via CM/ECF, which caused the foregoing to be served on the

following counsel for Defendants:

Robert C. Gill
Thomas S. Schaufelberger
Matthew J. Antonelli
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
tschauf@saul.com
matt.antonelli@saul.com

Sherry H. Flax
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA 4254
JAMES C. HODGES, PC
2622 East 21st Street, Suite 4
Tulsa, OK 74114
Telephone: (918) 779-7078
JHodges@HodgesLC.Com

Duane H. Zobrist
Jonathan S. Jacobs
ZOBRIST LAW GROUP PLLC
1900 Arlington Blvd. Suite B
Charlottesville, VA 22903
Telephone: (434) 658-6400
dzobrist@zoblaw.com
jjacobs@zoblaw.com

*Attorneys for Defendants*

*/s/ Gary M. Rubman*