# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OKLAHOMA

VIDEO GAMING TECHNOLOGIES, INC.,

         Plaintiff,

v.

CASTLE HILL STUDIOS LLC, *et al.*

         Defendants.

CASE NO. 17-CV-00454-GKF-JFJ

**PUBLIC – REDACTED VERSION**

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

I.    INTRODUCTION ................................................................................. 1

II.   STATEMENT OF DISPUTED MATERIAL FACTS ................................. 2

III.  STATEMENT OF UNDISPUTED MATERIAL FACTS ........................... 11

    A.  VGT's GAMES ARE NON-COMPLIANT AND LARGELY ILLEGAL ......................... 11

    B.  VGT's "TRADE DRESS" IS MISAPPROPRIATED AND COPIED ............................. 12

    C.  VGT's CHANGES TO "TRADE DRESS" INCREASES ALLEGED LIKELIHOOD OF CONFUSION 15

IV.   VGT IS NOT ENTITLED TO JUDGMENT ON ITS TRADE SECRET CLAIMS .. 16

    A.  VGT's ALLEGATION THAT ITS ███████████████████ IS A TRADE SECRET RAISES QUESTIONS OF FACT WHICH SHOULD NOT BE RESOLVED ON SUMMARY JUDGMENT .................................................................................... 18

       i.    The Alleged Trade Secret Lacks Independent Economic Value ...................... 19

       ii.   VGT Has Not Taken Reasonable Measures to Protect its Alleged Trade Secret ............ 20

       iii.  VGT's Algorithm is Not a Trade Secret Because it is Readily Ascertainable and Publicly Known .......................................................................... 21

    B.  VGT CANNOT MEET ITS BURDEN TO DEMONSTRATE MISAPPROPRIATION ..................... 25

       i.    The Two Algorithms Contain Significant Differences .................................... 25

       ii.   VGT Cannot Prove Castle Hill "Knew" the Algorithm Was a VGT Trade Secret ......... 26

       iii.  The Confidentiality Provision of Mr. Suggs' Employee Agreement With VGT is Overly Broad and Unenforceable as a Matter of Law ............................................ 26

    C.  VGT HAS NOT BEEN HARMED BY CASTLE HILL'S SUBMISSION OF THE ██████████ ██████ TO A TESTING LAB THAT ALREADY OWES VGT CONFIDENTIALITY OBLIGATIONS .................................................................................... 28

V.    VGT IS NOT ENTITLED TO JUDGMENT ON CASTLE HILL'S AFFIRMATIVE DEFENSES .................................................................. 29

    A.  THE EVIDENCE SUPPORTS CASTLE HILL'S UNCLEAN HANDS DEFENSE ............................ 30

i.    VGT's Hands are Unclean Because its Games are Non-Compliant ................................ 31

  1.    VGT's Games are Non-Compliant and Largely Illegal ................................ 32

  2.    VGT's Non-Compliant Games Deceive and Harm the Public ................................ 34

  3.    VGT's Non-Compliant Games Directly Harm Castle Hill ................................ 35

ii.    VGT's Hands are Unclean Because its "Trade Dress" is Misappropriated and Copied ... 37

iii.    VGT's Hands are Unclean Because VGT's Recent Changes to its "Trade Dress" Increases the Alleged Likelihood of Confusion ................................ 39

iv.    Castle Hill's Unclean Hands Defense Applies to VGT's Oklahoma Law Claims ........... 43

v.    Castle Hill's Unclean Hands Defense Applies to VGT's Trade Secret Claims ................ 44

B.   THE EVIDENCE SUPPORTS CASTLE HILL'S ILLEGALITY DEFENSE ................................ 45

i.    VGT's Games are Non-Compliant ................................ 46

ii.    There is a Nexus Between VGT's Non-Compliance & Trademark Use ........................ 47

iii.    VGT's Non-Compliance is Material ................................ 48

iv.    Castle Hill's Illegality Defense Applies to VGT's Oklahoma Law Claims ....................... 50

VI.   CONCLUSION ................................ 50

## TABLE OF AUTHORITIES

### CASES

*1-800 Contacts, Inc. v. Lens.com, Inc.,*
  722 F.3d 1229 (10th Cir. 2013) ..................................................................31, 38

*American Bank & Trust Co. v. Bond Intern. Ltd.,*
  2007 WL 188134 (N.D. Okla. Jan. 19, 2007) .......................................46, 50

*Anderson v. Kimberly-Clark Corp.,*
  570 Fed. Appx. 927 (Fed. Cir. 2014)...........................................................7

*Arctic Energy Servs., LLC v. Neal,*
  No. 18-CV-00108-PAB, 2018 WL 1010939 (D. Colo. Feb. 22, 2018).............18

*Bagby Elevator Co., Inc. v. Schindler Elevator Corp.,*
  2009 WL 10703109 (N.D. Tex. Jan. 23, 2009) ...........................................44

*Bambu Sales v. Testini,*
  1988 WL 138055 (E.D.N.Y. Dec. 21, 1988) ...............................................37

*BB&T Ins. Svcs., Inc. v. Thomas Rutherford, Inc.,*
  No. CL09-4550, 2010 WL 7373709 (Va. Cir. Ct. Feb. 9, 2010) .....................27

*CreAgri, Inc. v. Usana Health Sciences, Inc.,*
  474 F.3d 626 (9th Cir. 2007)..............................................................passim

*Dollar Rent A Car Sys., Inc. v. P.R.P. Enter., Inc.,*
  2006 WL 1266515 (N.D. Okla. May 8, 2006)........................................30, 43

*Dream Team Collectibles, Inc. v. NBA Properties, Inc.,*
  958 F. Supp. 1401 (E.D. Mo. 1997)...........................................................37

*Evra Pharm., Inc. v. American Cyanamid Co.,*
  755 F. Supp. 36 (D.P.R. 1991)................................................. 36, 47, 48, 49

*FN Herstal SA v. Clyde Armory Inc.,*
  838 F.3d 1071 (11th Cir. 2016) ............................................... 46, 47, 49

*Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City,*
  861 F.3d 1052 (10th Cir. 2017) (plurality opinion)...................................46

*General Mills Inc. v. Health Valley Foods,*
  24 U.S.P.Q.2d 1270 (T.T.A.B. 1992) .......................................................49

*GoClear LLC v. Target Corp.*,
   2009 WL 160624 (N.D. Cal. Jan 22, 2009) ..................................................................36

*Haagen-Dazs, Inc. v. Frusen Gladje Ltd.*,
   493 F. Supp. 73 (S.D.N.Y. 1980) ...............................................................................42

*Intermountain Wind & Solar, LLC v. All American Exteriors, LLC*,
   2017 WL 2999232 (D. Utah April 19, 2017) .........................................................3, 31

*Johnson v. Yellow Cab Transit Co.*,
   321 U.S. 383 (1944) ...................................................................................................31

*Keystone Driller Co. v. General Excavator Co.*,
   290 U.S. 245 (1933) ...................................................................................................31

*Lasership, Inc. v. Watson*,
   No. CL-2009-1219, 2009 WL 7388870 (Va. Cir. Ct. Aug. 12, 2009) ..........................27

*Lawn Managers, Inc. v. Progressive Lawn Managers, Inc.*,
   2017 WL 3189486 (E.D. Mo. July 27, 2017) ........................................................40, 42

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,
   342 F.3d 714 (7th Cir. 2003) ......................................................................................19

*Los Angeles News Service v. Tullo*,
   973 F.2d 791 (9th Cir. 1992) ......................................................................................11

*Metro Publishing, Ltd. v. San Jose Mercury News, Inc.*,
   861 F. Supp. 870 (N.D. Cal. 1994) .......................................................................41, 42

*Microstrategy, Inc. v. Business Objects, S.A.*,
   331 F. Supp. 2d 396 (E.D. Va. 2004) ....................................................................44, 45

*MicroStrategy, Inc. v. Li*,
   601 S.E. 2d 580 (Va. 2004) ...................................................................................18, 25

*Modern Envts., Inc. v. Stinnett*,
   561 S.E.2d 694 (Va. 2002) .........................................................................................27

*Nalco Chemical Co. v. Hydro Tech., Inc.*,
   148 F.R.D. 608 (E.D. Wis. 1993) ...............................................................................44

*On-Line Tech. v. Bodenseewek Perkin-Elmer*,
   386 F.3d 1133 (Fed. Cir. 2004) ..................................................................................22

*PartyLite Gifts, Inc. v. Swiss Colony Occasions*,
   246 F. App'x 969 (6th Cir. 2007) ...............................................................................28

*Peace v. Conway*,
    435 S.E.2d 133 (Va. 1993) ...............................................................................28

*Phoenix Renovation Corp. v. Rodriguez*,
    258 F. App'x 536...............................................................................................28

*POM Wonderful LLC v. Coca Cola Co.*,
    166 F. Supp. 3d 1085 (C.D. Cal. 2016) ................................................. 29, 36, 38

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*,
    324 U.S. 806 (1945)....................................................................................30, 31

*ProductiveMD, LLC v. 4UMD, LLC*,
    821 F. Supp. 2d 955 (M.D. Tenn. 2011) ..........................................................28

*Purzel Video GmbH v. St. Pierre*,
    10 F. Supp. 3d 1158 (D. Colo. 2014) ...............................................................31

*Radiancy, Inc. v. Viatek Consumer Prods. Group, Inc.*,
    138 F. Supp. 3d 303 (S.D.N.Y. 2014) ...............................................................42

*Rainbow Play Sys., Inc. v. Backyard Adventure, Inc.*,
    2009 WL 3150984 (D.S.D. Sept. 28, 2009) .......................................................42

*SFF-TIR, LLC v. Stephenson*,
    250 F. Supp. 3d 856 (N.D. Okla. 2017) ............................................................43

*Shondel v. McDermott*,
    775 F.2d 859 (7th Cir. 1985)......................................................................30, 32

*Southern California Darts Ass'n v. Zaffina*,
    762 F.3d 921 (9th Cir. 2014)......................................................................47, 48

*Space Systems/Loral, LLC v. Orbital ATK, Inc.*,
    306 F. Supp. 3d 845 (E.D. Va. 2018) ..........................................................18, 25

*Trace Minerals Research, L.C. v. Mineral Res. Int'l, Inc.*,
    505 F. Supp. 2d 1233 (D. Utah 2007) ..............................................................31

*Trident Prods. & Svcs., LLC v. Canadain Soiless Wholesale, Ltd.*,
    859 F. Supp. 2d 771 (E.D. Va. 2012), *aff'd* 505 F. App'x 242 (4th Cir. 2013).......................19, 22

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763 (1992) (Stevens, J., concurring) ..................................................41

*United Phosphorus, Ltd. v. Midland Fumigant, Inc.*,
    205 F.3d 1219 (10th Cir. 2000) .................................................................35, 46

*Utah Lighthouse Ministry, Inc. v. Discovery Computing, Inc.,*
    2005 WL 3263157 (D. Utah Dec. 1, 2005) .............................................31

*Water Pik, Inc. v. Med-Systems, Inc.,*
    726 F.3d 1136 (10th Cir. 2013) ...................................................41

*Worthington v. Anderson,*
    386 F.3d 1314 (10th Cir. 2004) ..........................................30, 31, 38

*Youngs Rubber Corp. v. C.I. Lee & Co.,*
    45 F.2d 103 (2d Cir. 1930) ........................................................36

*Zurco, Inc. v. Sloan Valve Co.,*
    785 F. Supp. 2d 476 (W.D. Pa. 2011) ...........................................39

## STATUTES

U.S.C. § 1117(a) .................................................................37

25 U.S.C. § 2702(2) ..............................................................35

25 U.S.C. § 2706(b)(10) ..........................................................34

## OTHER AUTHORITIES

25 C.F.R. 547 ..............................................................*passim*

Fed. R. Civ. P. 8(c) .............................................................45

Fed. R. Civ. P. 15(a)(3) .........................................................45

Fed. R. Civ. P. 30(b)(6) ........................................................2, 5

## I.    INTRODUCTION

Through its motion, VGT seeks partial summary judgment on VGT's claims that Castle Hill misappropriated VGT's ███████████████████, and Castle Hill's affirmative defenses of unclean hands and illegality. Castle Hill has also moved for summary judgment on VGT's ████████ ████████████ claims. Contrary to VGT's arguments, the undisputed facts prove that the algorithm is *not* a trade secret and it has *not* been misappropriated by Castle Hill. VGT is not entitled to summary judgment on its trade secret claim for at least three independent reasons. First, the algorithm is not a secret at all; instead, it is a common sense implementation of widely known programming techniques, utilizing publicly available source code found on the internet. Second, even if the algorithm were secret to begin with (it is not), it is a secret no longer, as VGT has disclosed it to third parties without confidentiality obligations. Finally, Castle Hill has never used its version of the allegedly similar algorithm in a single game in the field, has no plans to ever do so, and the only third party who received a copy of Castle Hill's algorithm, BMM Testlabs, has confidentiality agreements with both VGT and Castle Hill.

With respect to Castle Hill's defenses, VGT accuses Castle Hill of using these defenses to "throw mud" at VGT. It is VGT's hands, however, which are dirty, and it is telling that VGT did not submit a statement of undisputed material facts in support of its motion relative to these defenses. The undisputed evidence of record demonstrates that (1) ██████████████████ ██████████████████████████████s and therefore could not have created any trademark, trade dress, or trade secret rights; (2) ████████████████████████████ ████████████████████████████████ and (3) VGT has changed its games during the course of this litigation to be more like Castle Hill's games, and has made other changes to its games which may increase the likelihood of alleged confusion. VGT's motion for partial summary judgment should be denied.

1

II.    **STATEMENT OF DISPUTED MATERIAL FACTS**

Paragraphs 1-57 below correspond to and dispute the factual averments set forth in the same respectively numbered paragraphs in VGT's Statement of Material Facts Not in Dispute in its motion for partial summary judgment. *See* Doc. 179, ¶¶ 1-57. These disputed facts relate only to facts VGT proffers, and have no bearing on Castle Hill's Motion for Summary Judgment or the factual statement provided in support of that Motion. Castle Hill maintains that there are no genuine issues of material fact with respect to its motion for summary judgment.

In addition, Castle Hill notes that VGT's Statement relies heavily on the declarations of VGT employee Josh Davis and one of VGT's proffered experts, Stacy Friedman. Concurrently herewith, Castle Hill is filing a motion to strike both of those declarations. Castle Hill also previously filed a *Daubert* Motion to Exclude Plaintiff's Expert Stacy Friedman (Dkt. 172). For all of the reasons set forth in those motions, which are incorporated herein by reference, the declarations of Messrs. Davis and Friedman are improper and should not be considered in connection with VGT's motion.

With respect to the numbered paragraphs of VGT's Statement of Facts, Castle Hill responds as follows:

1.    Undisputed.

2.    Disputed. During his Rule 30(b)(6) testimony, when asked who wrote the code for VGT's ███████████████, Mr. Davis testified that ████████████████ ███" Ex. 1, Davis Dep. at 76:2-9.[1] Later, Mr. Davis stated that the original code was implemented ████████████████████████████████████████████ ██████████████████████████████████. *Id.* at 156:19-157:9.

---

[1]    All references to exhibits herein refer to the exhibits attached to the Declaration of Robert C. Gill, filed herewith.

Likewise, in its responses to Castle Hill's interrogatories, VGT did not identify "multiple engineers" or provide any factual support for its contention that its algorithm required "multiple years" to develop. *See* Ex. 2 at 123-55 (VGT's explanation of the basis for its trade secret claim).

3.      Undisputed.

4.      Undisputed.

5.      Undisputed.

6.      Disputed. The algorithm is not "contained" in a source code repository; *source code* implementing the algorithm is contained in the source code repository, not the algorithm itself.

7.      Undisputed only as to Exhibits C and D attached to VGT's motion. VGT's citation to these two documents does not demonstrate that *all* such documents are so designated.

8.      Disputed. VGT provides copies of manuals, ███████████████████████ ████████████████████, to casino operators. Ex. 3, McGill Dep. at 125:12-18; 126:4-6.



9.      Disputed. ███████████████████████

10.     Undisputed that VGT has disclosed the ████████████████ to testing laboratories, including ██████████, and that those testing laboratories undertake confidentiality obligations with respect to the submissions they receive from gaming companies. *See* Ex. 8, Williamson Dep. at 17:5-18:8 ████████████████████████

███████████████████████████████████████████████████████

████████████████). Castle Hill disputes VGT's contention that it has only disclosed the

algorithm to persons subject to confidentiality obligations. *See* Response to ¶ 9.

11.    Undisputed.

12.    Disputed. ████████████████████████████████████████

█████████████████████████████

13.    Disputed. ██████████████████████████████████

███████████████████████████████████████████

14.    Disputed. Mr. Davis testified that VGT did not invent or create the ████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████ ███████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

15.    Undisputed.

16.    Disputed. In his expert report and during his deposition, Castle Hill expert Robert

Zeidman cited multiple examples of slot and gaming companies, including bingo slot companies,

4

referring to use of ████████████████████████████████. *See* Ex. 12, Zeidman Dep. at 176:18-192:19; Exs. 13-17 (Exhibits D, E, F, G, H to Zeidman expert report).

████████████████████████████████████████

████████████████████████████████████████

████████████████████████. Ex. 12, Zeidman Dep. at 258:10-259:13.

17.    Disputed. As Mr. Roireau explained during his Rule 30(b)(6) testimony, ██████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████

18.    Disputed. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

    ████████████████████████████████████

████████████████████████████████████████

---

[2]    In paragraphs 17-22, VGT describes the "public disclosures that CHG has cited." Castle Hill never claimed that the examples given of public online information about ██████████████ were exhaustive. VGT as the plaintiff has the burden of demonstrating that its alleged trade secret is indeed a trade secret. It is not Castle Hill's burden to disprove VGT's conclusory and unsubstantiated allegations that its algorithm is secret.

██████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

████████████████████

19.    Disputed.    ██████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████. *See, e.g.*, Ex. 18, Generalized

System With Individualized Centrally Generated Random Number Generator Seeds, U.S. Patent

No. 6,533,664 ("batches, pools or lists of seeds are generated"; "With a known starting seed, the

terminal's internal random number generator will arrive at the correct reel stop . . . [t]his same

general procedure can be used in other games[.]"); Ex. 19, Gaming System and Process for

Generating Card Faces, U.S. Patent No. 5,588,913 █████████████████████████

"developing a seed list in a memory of the main station, transferring at least a portion of the seed list

to a plurality of remote devices, and creating, at the remote devices, gaming card arrays utilizing a

pseudo-random number generator seeded by the transferred portion of the seed list."); Ex. 20,

Method and System for Storing Preselected Numbers for Use in Games of Bingo, U.S. Patent No.

6,656,045 ("Each Bingo card is associated with a serial number which identifies the particular Bingo

card uniquely so that each Bingo card can be retrieved from the memory by entry into the memory

of the serial number."); Ex. 21, U.S. Patent Application No. 2005/0059469 (████████████

████ "generated using one or more RNG (random number generating) seeds, each of which will

provide a known outcome . . . [e]ach of the RNG seeds has been precalculated to produce a

predetermined outcome when processed by a pre-programmed "deterministic RNG.").[3]

20.    Disputed. *See* Response to SOF ¶ 19.

21.    Disputed. *See* Response to SOF ¶ 19.

22.    Disputed. *See* Response to SOF ¶ 19.

23.    Undisputed.

24.    Castle Hill objects to VGT's hypothetical statement that its algorithm could be "useful" as a statement of opinion; not fact. Castle Hill does not dispute that VGT's algorithm has been accepted by certain testing labs as compliant with certain regulatory requirements. Castle Hill states further that it has complied with regulatory requirements through the use of a completely different approach to ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████ .

25.    Undisputed that ████████████████████████████████████████

████████████████████████████

26.    Disputed. ██████████████████████████████████████████

███████████████████████████████████████

27.    Disputed. Despite what he now says in his declaration, Mr. Friedman testified at deposition that ████████████████████████████████████████████████

███████████████████████ " Ex. 11, Friedman Dep. at 121:1-3; 121:22-122:1. ██████████████

███████████████████████████████████████████████████

---

[3]    The Court may properly take judicial notice of the patents and patent applications cited herein. *See Anderson v. Kimberly-Clark Corp.*, 570 Fed. Appx. 927, 932 n.3 (Fed. Cir. 2014).

██████████████████████████████████████████████████████

████████ Ex. 12, Zeidman Dep. at 243:12-244:12.

28.    Undisputed.

29.    Undisputed.

30.    Undisputed, ████████████████████████████████████████

████████████████████████████████. Ex. 10, Suggs Dep. at 224:4-225:17.

31.    Undisputed.

32.    Disputed. Mr. Suggs explained that he █████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ Ex. 10, Suggs Dep. at 226:4-227:4. ████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████.

33.    Undisputed.

34.    Undisputed.

35.    Undisputed.

36.    Undisputed.

37.    Undisputed.

38.    Undisputed.

39.    Undisputed.

40.    Undisputed.

41.    Undisputed, subject to the clarification that █████████████████████████



42.     Undisputed; again, this is how ███████████████████ work.

43.     Undisputed.

44.     Undisputed.

45.     Disputed. ████████████████████████

████████████████. *See* Ex. 12, Zeidman Dep. 232:16-233:22, 234:22-240:20. ████

██████████████████████████████████████ at

257:13-21.

46.     Undisputed, subject to the further clarification that ████████████

██████████████████████████████████████████████████

████████████████████████████████████████. Ex. 9,

Roireau 30(b)(6) Dep. at 77:2-79:16; Ex. 23, Roireau 30(b)(1) Dep. at 299:23-300:9 (████

████████████████████).

47.     Undisputed, subject to the further clarification that ████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████████████████████████

████████████████████.

48.     Undisputed that VGT required some of its employees to sign employee agreements containing confidentiality provisions; Castle Hill disputes that the deposition citation VGT relies on demonstrates that "[a]ll VGT employees" actually signed such agreements.

9

49.    Undisputed.

50.    Undisputed.

51.    Disputed. ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████ Ex. 10, Suggs. Dep. at 39:21-40:4.

52.    Disputed. VGT has mischaracterized Mr. Suggs' statement. █████████████████

███████████████████████████████████████████████████

███████████████████████████████ *See* Ex. 24.

53.    Disputed. ███████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

54.    Undisputed, subject to the further clarification that █████████████████

███████████████████████████████████████████████████

████████████████████████████

55.    Undisputed.

56.    Undisputed. Mr. Roireau further explained that █████████████████████

████████████████████████████████ Ex. 23, Roireau Dep. 30(b)(1) at 295:2-5.

57.    Undisputed, subject to clarification that ████████████████████



## III.    STATEMENT OF UNDISPUTED MATERIAL FACTS[4]

### A.    VGT's Games are Non-Compliant and Largely Illegal

58.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ .

59.    A Class II gaming system is eligible for "grandfather status,"[5] meaning noncompliant but legal to use, if, *inter alia*, it was in use on or before November 10, 2008, or it if was manufactured before that date. "Manufactured," in this context, means "off the assembly line and ready to use." *See* Ex. 28, NIGC Bulletin No. 2008-3, "Compliance Guidance for New Technical Standards, 25 C.F.R. part 547" at 5.[6]

60.    ████████████████████████████████████████████████

---

[4]    Paragraphs 58-78 in Castle Hill's Statement of Undisputed Material Facts set forth undisputed material facts relative to the portion of VGT's motion for partial summary judgment seeking to dismiss Castle Hill's affirmative defenses of unclean hands and illegality. VGT did not assert any undisputed material facts for this portion of its motion, claiming those issues could be decided "purely as a matter of law." *See* Doc. 179, p.2, n.1. Castle Hill disagrees. *See, e.g., Los Angeles News Service v. Tullo*, 973 F.2d 791, 799 (9th Cir. 1992) ("The application of the unclean hands doctrine raises primarily a question of fact.") (internal citation omitted).

[5]    The NIGC regulations governing Class II games provide that any "gaming system" manufactured after November 10, 2008 must comply with the minimum technical standards in order to legally operate. *See* 25 C.F.R. § 547.5(b). The NIGC included a "grandfathering" provision for older gaming systems, which provided that gaming systems "manufactured" before November 10, 2008 which are not compliant with 25 C.F.R. 547.5(b) could continue to be used if certain other conditions were met. *See* 25 C.F.R. § 547.5(a).

[6]    This formal NIGC Guidance is available at https://www.nigc.gov/compliance/bulletins (last viewed November 15, 2018).

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████ *See* Ex. 28, Williamson 30(b)(6)

Dep. at 57-63; Ex. 29.

61.     ██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ *See* Ex. 28, Williamson 30(b)(6) Dep.

at 52-55.

62.     The "grandfathering" provision of the NIGC Regulations was "Intended to 'Freeze' the amount of player interfaces that can be used in the field with grandfathered Class II Gaming Systems." *See* Ex. 28, Williamson 30(b)(6) at 68:21-25; Ex. 31 at p. 6.

63.     ████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

64.     ███████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

**B.     VGT's "Trade Dress" is Misappropriated and Copied**

65.     A ███████████████████████████████████████████

██████████████████████████████████████████████████

█████████████ *See* Ex. 32, North Dep. at 111-13; Ex. 33. ████████████

██████████████████████████████████████████████████



66. ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████ *See* Ex. 37, Sevigny Dep. at 182-87; Ex. 1, Davis 30(b)(6) at 66-68, 104. ███████████████████

████████████████████████████████████████████

████████████████ *See* Ex. 37, Sevigny Dep. at 198-99; 225-26; Ex. 1, Davis 30(b)(6) Dep. at 66-68. ████████████████████████████████

████████████████████████████████████████████

████████████ *See* Ex. 37, Sevigny Dep. at 182-89; Ex. 38, Sevigny Dep. Ex. 126.

67. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

68.    VGT has a product strategy based on using industry-standard themes. *See* Ex. 4, Starr

13

Dep. at 168; Ex. 44, North Ex. 10 ███████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████

69.     VGT uses the same game cabinet as other Class II game manufacturers. *See* Ex. 4, Starr Dep. at 35. One of these other Class II game manufacturers, Cadillac Jack, and a game called Pot of Gold made by U.S. Coin, used the original Spec International cabinet which was the same as VGT's original cabinet. *See* Ex. 3, McGill Dep. at 54-55; Ex. 36, Sprinkle Dep. at 179-80. Pot of Gold used the round top cabinet before VGT's original cabinet was in use in 2001. *See* Ex. 43, Yarbrough Dep. at 73. Cadillac Jack was using the same gaming cabinets as VGT, "…close to the same time VGT – VGT did whenever they started, because it looks exactly the same as far as the cabinet." *See* Ex. 4, Starr Dep. at 35-36. Other Class II game manufacturers, including Nova Gaming, AGS, and possibly Eclipse Gaming, were also using the same game cabinet as VGT. *See* Ex. 4, Starr Dep. at 35-37; Ex. 36, Sprinkle Dep. pp. 179-80; *see also* Ex. 45, Harvie Dep. at 53-54; Ex. 46, Graham Dep. at 60-62; (Cadillac Jack, Bally, Williams, IGT, and Nova have all had similar cabinets).

70.     VGT did not invent the bingo patterns it uses. *See* Ex. 43, Yarbrough Dep. at 96-97. VGT's bingo patterns for its Class II games are historic standard or classic patterns and are available on the internet – whether using the same name or different names – including VGT's game-ending win, which it calls a "Cover-All", as well as at least the following other bingo patterns: VGT's "Kite" pattern; VGT's "Private Stripes" pattern; VGT's "L" pattern; VGT's "Small Pyramid" pattern; VGT's "Tee" pattern; VGT's "Double Postage Stamp" pattern; VGT's "Outside Corners" pattern; VGT's "Inside Corners" pattern; VGT's "Open Diamond" pattern; VGT's "X" pattern; VGT's "Lucky Seven" pattern; VGT's "Postage Stamp" pattern; VGT's "Six-Pack"; VGT's Small Diamond"; and VGT's Cross-Corners. *See* Ex. 32, North Dep. at 114-118; Ex. 47, North Dep. Ex.

17. Other companies in the Class II industry, including IGT, use similar bingo patterns on their Class II games. *See* Ex. 32, North Dep. at 120-21.

71.     VGT sends employees to industry conferences to look at and follow market trends to emulate and include new features in future products, including software, cabinets, lighting, and signage. *See* Ex. 4, Starr Dep. at 209-10; Ex. 48; Ex. 34, Carlson Dep. at 40-43.

72.     ███████████████████████████████████████████

███████████████████████████████████████████████

*See* Ex. 45, Harvie Dep. at 155-58; Ex. 49, Harvie Dep. Ex. 117.

### C.     VGT's Changes to "Trade Dress" Increases Alleged Likelihood of Confusion

73.     VGT has recently changed its red screen free spins feature to be more similar to Castle Hill's instant free pay feature. Castle Hill's instant free pay feature plays a video where the instant free pay logo is displayed. The instant free pay logo is orange and white. The screen where the instant free pay logo is displayed is red. *See* Ex. 50, Sisson Dep. at 225-27. The reels also turn red during the instant free pay feature, unlike VGT's reels, which did not turn red during the VGT red screen free spins feature at least as of July 12, 2018, when VGT's President was deposed. *Id.; see also* Ex. 37, Sevigny Dep. at 201.

74.     VGT's red screen free spins feature is a game play feature where VGT's screen displays a red tint. *See* Ex. 37, Sevigny Dep. at 80-81. As of July 12, 2018, when VGT's President was deposed, unlike CHG's instant free pay bonus feature, the reels on the VGT EGMs ███████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████

75.     VGT has subsequently changed its red screen free spins feature. The feature no longer displays a red tint or film on the screen, and instead plays a movie with persistent text like

Castle Hill's instant free pay. *See* Ex. 51, Fulton Decl., ¶ 3.

76.     VGT also added reels which turn red to its red screen free spins feature, another implementation which Castle Hill previously had in its instant free pay feature. *See* Ex. 51, Fulton Decl., ¶ 4; Ex. 1, Davis 30(b)(6) at 132-33.

77.     VGT has recently changed its "bingo play and pay" implementations to make its games more similar to Castle Hill's games. *See* Ex. 51, Fulton Decl., ¶ 5



78.     On some games, VGT has replaced its house mark on its cabinets with Aristocrat marks, leaving only a single VGT house mark on the top screen. *See* Ex. 51, Fulton Decl., ¶ 8.

## IV.    VGT IS NOT ENTITLED TO JUDGMENT ON ITS TRADE SECRET CLAIMS

Like so many of its claims in this action, VGT's claims of trade secret misappropriation have remained ambiguous throughout discovery and narrowed over time as VGT realized it could not support the allegations in its original Complaint. When VGT filed this case it alleged that it owned trade secrets relating to, among other things, its source code. Without any actual evidence, and *on information and belief*, VGT alleged that Castle Hill had misappropriated its source code and other trade secrets. Complaint (Dkt. 2) at ¶¶ 93, 97. VGT even filed an early motion to compel seeking a production of Castle Hill's source code. When VGT examined that source code, it quickly realized that its "information and belief" was plainly incorrect. Castle Hill did not misappropriate or otherwise copy VGT source code. This is undisputed. Despite this realization, at the time it filed its

Amended Complaint, VGT continued to allege "on information and belief" that Castle Hill misappropriated its source code. Amended Complaint (Dkt. 103) at ¶¶ 93, 100, 147, 157.[7]

Consistent with its failure to properly define its claims in its Amended Complaint, VGT's interrogatory responses likewise took a "see what sticks" approach to its trade secrets claim, identifying a list of 37 alleged "secrets" during discovery. It was only after VGT served expert reports that it made clear that it was abandoning nearly all of its allegations about what Castle Hill supposedly misappropriated. Despite identifying 37 alleged secrets and claiming that Castle Hill stole source code, VGT has now admitted that it has no such evidence. Rather, it bases its trade secrets misappropriation claim on the use of ███████████████████████████████ ███████████████████████. VGT does not allege that Castle Hill "stole" anything directly from VGT setting forth the algorithm or that any prior VGT employee working for Castle Hill took anything with them at the time they left VGT that included the ██████████████ █████. Rather, it alleges that Paul Suggs remembered that he had used ████████████ ████████████████████████████████████████████████████ and that the use of that *idea* ████████████████████████████████████ is trade secret misappropriation. It is not.

Further, Castle Hill has *never* even deployed this algorithm in the field and *never* received regulatory approval for it (and in fact, withdrew its request for approval from ████). VGT's entire complaint regarding the ████████████████████████████████████████████

---

[7]    Notably, and despite what it still alleges in the Amended Complaint, VGT now concedes that it *does not contend* that Castle Hill misappropriated VGT source code. VGT has gone so far as to move to exclude Castle Hill's technical expert's opinions regarding source code copying because ██████████████████████████ *See* VGT Motion to Exclude Robert Zeidman in Part (Dkt. 166) at 1. This is a remarkable admission in light of what VGT's Amended Complaint actually alleges, and is but one of so many examples of VGT maintaining broad and unsubstantiated allegations throughout discovery and then narrowed at the eleventh hour.

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████. At its core,

VGT's arguments regarding ████████████████████ is an attempt to save face for

having filed a baseless trade secret claim on "information and belief."

For all of the reasons set forth in Castle Hill's Motion for Summary Judgment, the alleged

"trade secret" is not one at all, because VGT uses a common algorithm in an application that is not

unique or secret. It is an obvious application of a well-known solution. Under both the Virginia

Uniform Trade Secrets Act ("VUTSA") and Defend Trade Secrets Act ("DTSA"), VGT must prove

both the existence of a trade secret and misappropriation by Castle Hill. *See Arctic Energy Servs., LLC*

*v. Neal*, No. 18-CV-00108-PAB, 2018 WL 1010939, at *2 (D. Colo. Feb. 22, 2018) (listing elements

of Defend Trade Secrets Act claim); *Space Systems/Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d

845, 855 (E.D. Va. 2018) (VUTSA elements).[8] The analysis of the elements is similar under either

statute, but here, VGT cannot meet its burden to establish a lack of disputed facts with respect to

either element. Indeed, while Castle Hill contends that it is entitled to summary judgment on VGT's

trade secrets claims, at a minimum there are disputed factual issues that demonstrate that VGT's

motion must be denied.

A.    **VGT's Allegation That its** ████████████████████ **is a Trade Secret Raises Questions of Fact Which Should Not Be Resolved on Summary Judgment**

The determination of whether a trade secret exists presents questions of fact to be

determined by the fact finder from the greater weight of the evidence. *See, e.g., MicroStrategy, Inc. v. Li*,

601 S.E. 2d 580, 589 (Va. 2004) (interpreting Virginia Uniform Trade Secrets Act and concluding

---

[8]    VGT's original Complaint alleged trade secret misappropriation under the Oklahoma Uniform Trade Secrets Act ("OUTSA"). VGT is *not* alleging an OUTSA violation with respect to the ████████████████ because Castle Hill has never used that algorithm in commerce in Oklahoma, or anywhere else.

that question of whether information "constitutes a trade secret ordinarily is best 'resolved by a fact finder after full presentation of evidence from each side.'") (quoting *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003)). To meet the definition of a trade secret, VGT must demonstrate that its ███████████████████: 1) has independent economic value; 2) has been subject to reasonable efforts to maintain its secrecy; and 3) is not known or readily ascertainable by proper means. *See Trident Prods. & Svcs., LLC v. Canadain Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 778 (E.D. Va. 2012), *aff'd* 505 F. App'x 242 (4th Cir. 2013) (summary judgment granted for defendant where plaintiff failed to establish its alleged secret was not readily ascertainable). Here, VGT cannot meet its burden with respect to any of the three elements. Accordingly, its motion for summary judgment should be denied.

### i.    The Alleged Trade Secret Lacks Independent Economic Value

VGT offers little in the way of facts to supports its conclusory allegation that its ███████ ████████████ is independently valuable. In support of its argument, VGT states that it is ████████████████████████████████████████████████, ████████████████████████." VGT Mot. at 39. VGT's argument is wrong: Castle Hill did not ████████████████████████████ The algorithm that Castle Hill developed and actually uses in commerce is a completely different algorithm. *See* Castle Hill's Statement of Disputed Material Facts ("SOF") ¶ 24. The only other source of "economic value" VGT points to is its allegation that █████████████████████████ ███████████████████████████████ But despite this allegation,



████████████████████████████████████ VGT has not met its burden to demonstrate its

alleged trade secret is independently valuable.

> ## ii.  VGT Has Not Taken Reasonable Measures to Protect its Alleged Trade Secret

In an attempt to demonstrate that it took reasonable measures to keep ████████

████████████████████ █████████████████████████████████████████

███████████████████████████████████████. Importantly, however, *VGT does*

*not allege that Castle Hill misappropriated, stole, or copied its source code or the source code implementing the*

*algorithm. See* Response to SOF ¶ 6. Rather, VGT alleges that Castle Hill has misappropriated the *idea*

of █████████████████████████████████████████████

████████████████. As Mr. Suggs explained, nobody at VGT ever told him that ████████████

████████████ was a trade secret. Ex. 10, Suggs Dep. at 56:12-20. In fact, Mr. Suggs did not

consider VGT's ███████████████████████ to be a trade secret at all, because ██████████████

███████████████████████████████████████████████████████

████████████████████████. VGT did not inform or instruct its engineers that all of their

work was "trade secrets."

The ambiguity of VGT's alleged trade secrets is demonstrated by the overbreadth of the

confidentiality provision of Mr. Suggs' Employee Agreement. That agreement defines ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████ Ex. 52.

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████ █████████████████████████████████████████

20



████ Ex. 10, Suggs. Dep. at 78:22-25, 79:6-14.

Further, there is a disputed issue of fact regarding the documents VGT has distributed which set forth and describe its ██████████████ . ███████████████████████ ████████████████████████████████████████ ████████████████████████████ The self-serving affidavit of Josh Davis cannot contradict the documents it produced in discovery and the sworn testimony of other witnesses demonstrating that VGT has revealed its alleged trade secret algorithm to third parties.

### iii.    VGT's Algorithm is Not a Trade Secret Because it is Readily Ascertainable and Publicly Known

VGT argues that its ████████████████████████████ ██████████████████████ e. To support this argument, VGT points to the opinion of its expert Stacy Friedman and to its allegation that Castle Hill has "failed to produce evidence showing that VGT's algorithm is generally known." VGT Mot. at 37. While Mr. Friedman indeed opines that VGT's algorithm is not generally known, his opinion is unreliable and lacks credibility given his admission that he did not even *attempt* to research whether or not other gaming companies use a similar approach to VGT for ████████████ . Ex. 11, Friedman Dep. at 134:20-135:8, 359:8-16.

On the other hand, Castle Hill's expert opined that none of the items VGT has identified as trade secrets, including its ████████████████ , meet the definition of a trade secret. Ex. 12, Zeidman Dep. at 80:16-18. In support of this opinion, Mr. Zeidman identified several instances

of publicly available information regarding the ███████████████████████████████

████████████████████████████████████:



Mr. Zeidman further pointed out that source code for ████████████████████ is readily available online, including in open sources such as GitHub. Ex. 17. And Mr. Zeidman's review of Castle Hill source code revealed that Castle Hill used third-party publically available code to create ██████████████████████████████████r. SOF ¶ 16. Further, the functionality VGT alleges is part of its "trade secret" is generally known and has been published in publicly available patents and patent applications. *See* SOF ¶ 19. Information available in patents and patent applications does not qualify as trade secrets. *See, e.g., On-Line Tech. v. Bodenseewek Perkin-Elmer*, 386 F.3d 1133, 1141 (Fed. Cir. 2004) (after patent issued, information therein is not protectable as trade secret because it is "reasonably accessible to competitors"). The foregoing citations are sufficient to, at a minimum, create a question of fact regarding whether or not VGT's alleged secret algorithm is readily ascertainable through proper means. *See Trident Prods.*, 859 F. Supp. 2d at 779 ("what constitutes readily ascertainable through proper means is heavily fact-dependent and simply boils down to

assessing the ease with which a trade secret could have been independently discovered") (internal quotation omitted).

Witnesses for both parties admit that VGT's use of a ███████████████████████ ███████████████████████████████, does *not* qualify as a trade secret. SOF ¶¶ 14, 16, 17, 18. In ████████████████████████████████████████████



Recognizing that the specific steps its algorithm undertakes are readily known, VGT next attempts to argue that it is the "secret combination" of the steps it undertakes that elevates its implementation of the ██████████████████████████ to a protectable "trade secret". *See* VGT Mot. at 38. But VGT's assertion, which it supports with nothing more than its own conclusory arguments, is rebutted by Mr. Suggs' testimony that ████████████████████████ ████████████████████████████████████████████ ████████████████████████████

---
[9] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████



Ex. 10, Suggs. Dep. at 52:10-53:3, 53:8-54:7 (emphasis added). Mr. Suggs' testimony is further

bolstered by Castle Hill's technical expert, who explained that ████████████████████

████████████████████████████████████████████████████. Ex. 12,

Zeidman Dep. at 197:23-25, 232:9-15 ███████████████████████). Mr.

Zeidman went on to explain that using ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

For all of the foregoing reasons, and for those set forth in Castle Hill's Motion for Summary Judgment, the undisputed facts demonstrate that VGT's alleged trade secret algorithm relating to ███████████ does not qualify as a trade secret at all. It is an obvious application of a well-known public algorithm that VGT did not independently develop or design. *See* Ex. 1, Davis Dep. at 75:9-76:1 ████████████████████████████████████████████ ██████. VGT has not met its burden to demonstrate that its use of ████████████████ ████████████████████████████████ is a trade secret. At a minimum there are disputed facts on this point that require denial of VGT's motion for partial summary judgment.[10]

### B.    VGT Cannot Meet its Burden to Demonstrate Misappropriation

Like the existence of a trade secret, the issue of whether a secret has been misappropriated is "uniquely factual in nature." *MicroStrategy*, 601 S.E.2d at 589. To satisfy this element, VGT must prove that Castle Hill acquired, disclosed, or used its trade secret without its consent, *and* that Castle Hill knew that its use of the trade secret was improper. *See Space Systems/Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 854 (E.D. Va. 2018). Even if VGT could demonstrate that its ████████████ ████████████████████████ was a trade secret, which it cannot, it still cannot meet its burden to show that Castle Hill misappropriated the algorithm.

### i.    The Two Algorithms Contain Significant Differences

First, Castle Hill's technical expert identified several key differences between VGT's ████████████████████████████████████████████████████████ ████████████████████████████. *See* Ex. 12, Zeidman Dep. at 219:12-220:22. VGT attempts to undercut Mr. Zeidman's opinions through the declaration of its own expert. *See* VGT

---

[10]    Moreover, Castle Hill has moved to strike the declarations of both Joshua Davis and Stacy Friedman. Without those declarations, upon which VGT relies extensively throughout its motion, VGT is plainly not entitled to summary judgment because it cannot demonstrate the facts upon which its motion is based.

Mot. at 43. All this does, however, is demonstrate that the two experts have differing opinions regarding the significance of the noted differences between the two algorithms. This creates a triable question of fact that requires the fact-finder to hear testimony from both parties' experts.

ii.     **VGT Cannot Prove Castle Hill "Knew" the Algorithm Was a VGT Trade Secret**

Second, VGT cannot demonstrate that Castle Hill knew or should have known that its development of ██████████████████████████████████████ was an acquisition of a VGT trade secret. In an attempt to prove misappropriation, VGT states that ████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████ This is hardly proof of knowledge by Castle Hill that Mr. Suggs had "stolen" the algorithm from VGT. To the contrary, it demonstrates that Castle Hill making independent decisions regarding the proper implementation.

iii.    **The Confidentiality Provision of Mr. Suggs' Employee Agreement With VGT is Overly Broad and Unenforceable as a Matter of Law**

Throughout its motion, VGT points to Mr. Suggs' Employee Agreement both as evidence of the alleged "reasonable measures" it took to protect its purported trade secrets, and as a source of

26

Mr. Suggs' obligation to hold VGT information in confidence. As set forth above, the Agreement is overly broad and does not properly define the information which it seeks to protect. Furthermore, the Agreement is not limited in time or scope. *See* Ex. 52 ¶ 4 (███████████████████████ ██████████████████████████████████████████).

Restrictive covenants on trade are disfavored under Virginia law, "will be strictly construed, and, in the event of an ambiguity, will be construed in favor of the employee." *Modern Envts., Inc. v. Stinnett*, 561 S.E.2d 694, 695 (Va. 2002).[11] Post-employment restrictions are only enforceable if they are: 1) narrowly tailored to protect a legitimate business interest; 2) not unduly harsh and oppressive in curtailing the employee's ability to earn a living; and 3) not against sound public policy. *See Lasership, Inc. v. Watson*, No. CL-2009-1219, 2009 WL 7388870, at *4 (Va. Cir. Ct. Aug. 12, 2009).

Confidentiality agreements are considered disfavored restraints on trade in Virginia. *Id.* at *8. Courts applying Virginia law further routinely hold confidentiality provisions with indefinite terms to be unenforceable. *See id.* at *8 (confidentiality provision in employment agreement overbroad where it precluded nearly all information concerning former employer in perpetuity); *BB&T Ins. Svcs., Inc. v. Thomas Rutherford, Inc.*, No. CL09-4550, 2010 WL 7373709, at *5 (Va. Cir. Ct. Feb. 9, 2010) (because confidentiality clause had indefinite duration, it was unenforceable as a matter of law).

Here, Mr. Suggs' Employee Agreement contains a non-compete provision, *see* Ex. 52 ¶10, a requirement that Mr. Suggs return all Proprietary Information to VGT upon the termination of his employment, *see id.* ¶ 4, and a confidentiality provision that purports to restrict Mr. Suggs from revealing ████████████████████████████ in perpetuity. *See id.* ¶ 4 (restriction

---

[11]    Mr. Suggs' Employee Agreement does not contain a choice of law provision; however, Mr. Suggs worked for VGT in Virginia and his Employee Agreement makes reference to the Virginia Code. *See* Ex. 52, ¶ 14. Mr. Suggs moved to Chicago to work for WMS Gaming after leaving VGT in 2011. He began working with Castle Hill in 2015 – *four years later.* Ex. 10, Suggs. Dep. at 10:20-11:2. Accordingly, the Court should look to Virginia law to assess the interpret the obligations Mr. Suggs owes as a former employee of VGT pursuant to the Employee Agreement.

lasts ▮▮▮▮▮▮"). [12] The Employee Agreement is unenforceable as a matter of law for two reasons. First, the scope of "Proprietary Information" is overly broad and not narrowly tailored. Indeed, it is hard to imagine any work that Mr. Suggs did as a VGT engineer not arguably falling within the scope of the Employee Agreement's definition of confidential information. Second, the confidentiality provision purports to impose obligations on Mr. Suggs in perpetuity. Virginia courts reject such indefinite restrictions as unenforceable. VGT's attempt to restrict Mr. Suggs in perpetuity should fare no better.

### C.    VGT Has Not Been Harmed by Castle Hill's Submission of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

VGT's motion for partial summary judgment seeks judgment on its VUTSA and DTSA claims as to liability only. *This is because VGT has no damages associated with Castle Hill's use of the alleged trade secret algorithm.* It is undisputed that Castle Hill uses a wholly different algorithm for ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ *See* SOF ¶¶ 24, 47. [13] VGT nevertheless claims that Castle Hill has "misappropriated" the

---

[12]    VGT has not sued Mr. Suggs directly, nor has it alleged that Mr. Suggs has violated any aspect of his Employee Agreement other than the confidentiality provision. Indeed, in its argument regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, VGT does not allege that Mr. Suggs took *anything* from VGT or copied VGT's source code or any other information regarding the algorithm. Rather, it alleges that Mr. Suggs improperly used the ***idea*** of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮, which he remembered. Courts applying Virginia law have rejected trade secret claims based on "remembered information" such as this. *See Phoenix Renovation Corp. v. Rodriguez*, 258 F. App'x 536, 538 (former employees had no duty to refrain from using remembered information); *Peace v. Conway*, 435 S.E.2d 133 (Va. 1993) (same). Likewise, if the Court were to look at Tennessee law (where VGT was headquartered) to define the post-employment obligations Mr. Suggs owed VGT, an employees' remembered information is "not a trade secret." *See ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 967 (M.D. Tenn. 2011) (quoting *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x 969, 973 (6th Cir. 2007)).

[13]    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮



Even if the algorithm were a trade secret (it is not), and even had that algorithm been misappropriated (it was not), VGT has suffered no harm as a result of Castle Hill's submission ▮▮▮▮, and is not entitled to any monetary or injunctive relief. For all of the foregoing reasons, VGT's request for partial summary judgment on its trade secret claims should be denied.

## V.    VGT IS NOT ENTITLED TO JUDGMENT ON CASTLE HILL'S AFFIRMATIVE DEFENSES

Despite VGT's contentions, Castle Hill's defenses are well supported by the facts and law, and the issues they raise are plainly relevant to the Court's duty to weigh the equities in fashioning the equitable remedy of disgorgement – the only monetary relief currently requested by VGT. Castle Hill's unclean hands and illegality defenses are based on three overarching categories of improper conduct by VGT: (1) VGT's games do not comply with federal regulations and its intellectual property rights and potential damages in this action are therefore limited; (2) VGT misappropriated or copied aspects of the very trade dress it claims it owns and which it alleges Castle Hill copied; and (3) VGT has changed its games during the course of this lawsuit in ways that may contribute to or increase the likelihood of alleged confusion. While VGT failed to set forth a statement of material facts in support of the portion of its motion seeking dismissal of Castle Hill's defenses, the evidence of record undisputedly supports Castle Hill's position, and at a minimum should be left for the trier of fact to determine at trial, as at the summary judgment stage, Castle Hill need only demonstrate the existence of a genuine, material dispute regarding whether VGT engaged in inequitable conduct. *See POM Wonderful LLC v. Coca Cola Co.*, 166 F. Supp. 3d 1085, 1097-98 (C.D. Cal. 2016). VGT's

motion for partial summary judgment should be denied.

### A.    The Evidence Supports Castle Hill's Unclean Hands Defense

VGT first moves to dismiss Castle Hill's unclean hands defense. The unclean hands defense is based on the maxim that "he who comes into equity must come with clean hands." *See Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814 (1945); *accord Dollar Rent A Car Sys., Inc. v. P.R.P. Enter., Inc.*, 2006 WL 1266515, at *27 (N.D. Okla. May 8, 2006) (applying Okla. law). "It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co.*, 324 U.S. at 814. Otherwise, the court would become an "abetter of inequity." *See id.*

"'[U]nclean hands' really just means that in equity as in law, the plaintiff's fault, like the defendant's may be relevant to the question of what if any remedy the plaintiff is entitled to." *Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985). The doctrine does not require that a party live a blameless life, but does require that a party "shall have acted fairly and without fraud or deceit as to the controversy in issue." *Precision Instrument Mfg. Co.*, 324 U.S. at 814-15.

To put it more simply, "the inequitable conduct must be related to the plaintiff's cause of action." *See Worthington v. Anderson*, 386 F.3d 1314, 1320 (10th Cir. 2004). In *Worthington*, the Tenth Circuit recognized two types of "related conduct" which permit application of the unclean hands doctrine in a trademark case. *See id.* "The first involves inequitable conduct toward the public, such as deception in or misuse of the trademark itself, resulting in harm to the public such that it would be wrong for a court of equity to reward the plaintiff's conduct by granting relief." *Id.* "The second type of related conduct arises when the plaintiff has acted inequitably toward the defendant in relation to the trademark." *Id.*

From this, VGT claims incorrectly that the defense is "narrow" in intellectual property cases.

To the contrary, a court of equity has a "wide range" of "discretion in refusing to aid the unclean litigant." *See Precision Instrument Mfg. Co.*, 324 U.S. at 815. The court is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Id.* (citing *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 245, 246 (1933)). Although VGT's conduct is both fraudulent and deceitful, VGT's argument that only fraudulent or deceitful conduct can give rise to an unclean hands defense is too limited. "Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim [of unclean hands] by the chancellor." *Precision Instrument Mfg. Co.*, 324 U.S. at 815.

Rather than apply the binding *Worthington* analysis, VGT endeavors to impose a higher burden on Castle Hill by relying on an unclean hands test set forth in non-binding authority from a copyright infringement case. *See* Doc. 179, p. 15 (citing *Purzel Video GmbH v. St. Pierre*, 10 F. Supp. 3d 1158, 1169 (D. Colo. 2014)).[14] As discussed below, the evidence demonstrates that VGT's inequitable conduct toward the public and Castle Hill renders VGT's hands unclean.

i. **VGT's Hands are Unclean Because its Games are Non-Compliant**

VGT's games do not comply with federal regulations which bear directly on its trademark, trade dress, and trade secret rights and claims, and its hands are therefore unclean. Under the clean hands doctrine, "a federal court should not, in an ordinary case, lend its judicial power to a plaintiff who seeks to invoke that power for the purpose of consummating a transaction in clear violation of law." *See Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 388 (1944). "An obviously sensible

---

[14]    It is settled that courts in the Tenth Circuit follow *Worthington* in trademark cases to determine whether an unclean hands defense applies. *See 1-800 Contacts, Inc.*, 722 F.3d at 1255 (applying *Worthington*); *Utah Lighthouse Ministry, Inc. v. Discovery Computing, Inc.*, 2005 WL 3263157, at *9 (D. Utah Dec. 1, 2005) (applying *Worthington*); *Trace Minerals Research, L.C. v. Mineral Res. Int'l, Inc.*, 505 F. Supp. 2d 1233, 1244 (D. Utah 2007) (discussing *Worthington* analysis); *Intermountain Wind & Solar, LLC v. All American Exteriors, LLC*, 2017 WL 2999232, at *6 (D. Utah April 19, 2017) (slip copy) (quoting *1-800 Contacts* application of *Worthington* in context of discovery dispute).

application of this principle is to withhold an equitable remedy that would encourage, or reward (and thereby encourage), illegal activity..." *Shondel*, 775 F.2d at 868. "A common modern application of 'unclean hands' is to intellectual-property cases in which an injunction is sought in aid of unlawful activity." *Id.*

### 1.    VGT's Games are Non-Compliant and Largely Illegal

A significant number of VGT's Class II games which form the basis of all of VGT's trademark, trade dress, and trade secret claims, including all claims for equitable relief, appear to be non-compliant with federal regulations. After discovering information regarding VGT's non-compliant games, Castle Hill proceeded, despite great resistance and requiring the assistance of the Court, *see* Docs. 117, 131, to take discovery regarding VGT's illegal scheme.[15] Based on what Castle Hill has been able to discern, a large portion of VGT's games did not or do not comply with the minimum technical requirements for Class II games, nor were they eligible for "grandfather" status, *i.e.* non-compliant but legal, but VGT has claimed that status nonetheless and placed its games in play.

The NIGC promulgated minimum technical standards governing the use of electronic Class II games in 2008. The regulations provided that any "gaming system" manufactured after November 10, 2008 had to comply with the minimum technical standards in order to legally operate. *See* 25 C.F.R. § 547.5(b). The NIGC also included what is referred to as a "grandfathering" provision for

---

[15]    In footnotes, VGT claims that Castle Hill failed to provide a basis for its unclean hands and illegality defenses during discovery and the Court should disallow the defenses at trial. *See* Doc. 179, p. 12 n.5, p. 23 n.11, p. 24 n.13. Castle Hill's defenses were made known to VGT, it had no duty to supplement its discovery, and regardless, VGT suffered no prejudice. *See* Defendants' Opposition to Plaintiff Video Gaming Technologies, Inc.'s Motion in Limine Regarding Castle Hill Defenses, filed concurrently herewith and incorporated herein by reference. Castle Hill consistently questioned VGT and third-party witnesses regarding these issues over the course of approximately fifteen 30(b)(1) and 30(b)(6) depositions, plus written discovery requests, correspondence between counsel, the meet and confer process, and Castle Hill's motion to compel on VGT's non-compliant games, which was briefed, argued, and granted by the Court. VGT is informed regarding these defenses and there is no basis for dismissal based on failure to provide notice or prejudice to VGT.

older gaming systems, which provided that gaming systems "manufactured" before November 10, 2008 which are not compliant with 25 C.F.R. 547.5(b) could be used if certain other conditions were met. *See* 25 C.F.R. § 547.5(a). In order to qualify as "manufactured" before November 10, 2008, a gaming system must be "off the assembly line and ready to use." *See* Ex. 28 at 5.

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████.

The regulation plainly defines "Class II gaming system" to include "*All components*, whether or not technological aids in electronic, computer, mechanical, or other technologic form, that function together to aid the play of one or more Class II games…" *See* 25 C.F.R. § 547.2 (emphasis added). Therefore, to be legally grandfathered, "all components" must be "manufactured" before November 10, 2008. *See id.*; *see also* 25 C.F.R. § 547.5(a).

████████████████████████████████████████████████████

████████████ *See* SOF ¶ 61. ███████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

█████████████████████████████████████████████████

██████████████. ███████████████████████████████████████

█████████████████████████████████████████████████



2.    **VGT's Non-Compliant Games Deceive and Harm the Public**

VGT's illegal games deceive the public. The NIGC's minimum technical standards establish standards governing the use of electronic, computer, or other technologic aids in connection with the play of Class II games. *See* 25 C.F.R. § 547.1. The minimum technical standards are authorized by the Indian Gaming Regulatory Act, 25 U.S.C. 2706(b), which provides that the NIGC "shall promulgate such regulations and guidelines as it deems appropriate to implement the provisions of this chapter." *See* 25 U.S.C. § 2706(b)(10). The purpose of the Indian Gaming Regulatory Act, under which the minimum technical standards are promulgated and implemented by the NIGC, include, *inter alia*, "to assure that gaming is conducted fairly and honestly by both the operator and players."

*See* 25 U.S.C. § 2702(2). The minimum technical standards also specifically discuss fairness to users as an overarching purpose and rule of general application of the regulations: "Fairness. No Class II gaming system may cheat or mislead users." *See* 25 C.F.R. § 547.4(a).

While VGT tries to disassociate the minimum technical standards from its goals of protecting the public to make VGT's illegal acts appear less harmful, it is evident that the minimum technical standards were promulgated to ensure the public is able to enjoy fair and honest gaming. VGT's efforts to circumnavigate the regulatory framework constitutes inequitable conduct toward the public. *See CreAgri, Inc. v. Usana Health Sciences, Inc.*, 474 F.3d 626, 630 (9th Cir. 2007) ("[T]o hold otherwise would be to put the government in the 'anomalous position' of extending the benefits of trademark protection to a seller based upon actions the seller took in violation of that government's own laws . . . It is doubtful that the trademark statute - passed pursuant to Congress's power under the Commerce Clause - 'was . . . intended to recognize . . . shipments in commerce in contravention of other regulatory acts promulgated [by Congress] under [that same constitutional provision].'").

### 3.    VGT's Non-Compliant Games Directly Harm Castle Hill

VGT's illegal games have also directly affected Castle Hill. VGT claims to have acquired trademarks, trade dress, and trade secret rights by using its illegal games in commerce. *See e.g.*, Doc. 103, ¶¶ 19-22, 39-40, 45, 141. Based on the rights it has allegedly acquired through the use in commerce of its illegal games, VGT has turned around and sued Castle Hill for trademark, trade dress, and trade secret misappropriation. *See generally id.*

Only lawful use in commerce, however, creates trademark rights. *See United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1225 (10th Cir. 2000) ("Midland correctly states that in order to obtain rights in the Quick-Phos trademark, United needed to show the name was lawfully used in commerce."). VGT's infringement claims premised on rights it purportedly acquired by using illegal games must fail under the doctrine of unclean hands. *See CreAgri, Inc.*, 474 F.3d at 633-34 (granting

summary judgment and dismissing plaintiff's trademark infringement and related claims based on

unlawful use).

VGT's claim of priority of its trademarks and alleged trade dress has a direct effect on the

claims in the current litigation. To the extent that VGT does not have priority in some or all of its

trademarks or claimed trade dress, its hands are not clean, and its claims fail. *See Evra Pharm., Inc. v.*

*American Cyanamid Co.*, 755 F. Supp. 36, 39, 39 n.1 (D.P.R. 1991) (awarding summary judgment to

defendant and dismissing plaintiff's infringement claims based on "unlawful use" defense and

recognizing doctrine evolved from unclean hands defense); *GoClear LLC v. Target Corp.*, 2009 WL

160624, at *3-6 (N.D. Cal. Jan 22, 2009) (awarding summary judgment on counterclaims based on

"unlawful use" and recognizing doctrine evolved from doctrine of unclean hands).

Further, as a matter of equity and public policy, the Court should not permit VGT to

blatantly ignore government regulations, claim rights based on the use of illegal games subject to

those regulations, and then seek the aid of this Court's equitable power to enforce those rights. *See*

*CreAgri*, 474 F.3d at 630 ("Second, as a policy matter, to give trademark priority to a seller who

rushes to market without taking care to carefully comply with the relevant regulations would be to

reward the hasty at the expense of the diligent."). And any deceitful conduct that VGT used to

acquire the business and market share it alleges has been lost constitutes unclean hands. *See Coca Cola*

*Co.*, 166 F. Supp. 3d at 1099 ("Indeed, because 'equity requires that those seeking its protection shall

have acted fairly and without fraud or deceit as to the controversy in issue,' Coca-Cola need only

prove that POM engaged in deceitful conduct to acquire the business and market share it alleges has

been lost to Coca-Cola.") (citation omitted).

VGT's illegal games also directly impact VGT's right to the damages VGT seeks for its

claims. *See Youngs Rubber Corp. v. C.I. Lee & Co.*, 45 F.2d 103, 110 (2d Cir. 1930) (holding plaintiff

with valid trademark only entitled to protect sales which are legal and ordering district court to

award no damages on accounting unless plaintiff "can show it has been injured in respect to sales it might legally have made"); *Bambu Sales v. Testini*, 1988 WL 138055, at *1 (E.D.N.Y. Dec. 21, 1988) (denying motion to strike affirmative defense of unclean hands as relevant to plaintiff's right to an accounting under Lanham Act); *Dream Team Collectibles, Inc. v. NBA Properties, Inc.*, 958 F. Supp. 1401, 1418 (E.D. Mo. 1997). The Lanham Act provides that an award of defendant's profits, which VGT seeks, is "subject to the principles of equity." *See* 15. U.S.C. § 1117(a).



Finally, to the extent that the Court applies a balancing of the equities, it would favor Castle Hill. The evidence of record proves ███████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████ Hill has now been dragged through costly litigation for over a year even though a significant number of VGT's games were never legal to begin with. The equities favor Castle Hill.

## ii. VGT's Hands are Unclean Because its "Trade Dress" is Misappropriated and Copied

VGT's alleged trade dress is misappropriated and copied from industry competitors. Because the very "trade dress" which forms the basis of its claims against Castle Hill is misappropriated and

---

[16]  VGT claims it would be "entirely inappropriate to permit CHG to reframe its unclean hands defense," arguing that Castle Hill "first expressed its "profits-focused relevance argument" in its "reply in support of its motion to compel on August 27, 2018." *See* Doc. 179, p. 21. But the plain language of the Lanham Act provides that the Court should weigh equitable considerations in fashioning appropriate relief, as any award of profits (or damages) is "subject to the principles of equity." *See* 15 U.S.C. § 1117(a). Castle Hill pled its defenses and made them known to VGT in a timely manner; discovered evidence of VGT's improper conduct; and made efforts met with great resistance from VGT to take further discovery regarding these affirmative defenses.

copied, VGT has acted inequitably toward Castle Hill "in relation to the trademark," and its hands are unclean. *See Worthington v. Anderson*, 386 F.3d at 1320.

VGT bases its trade dress claims on Castle Hill's alleged copying of VGT's (ever-changing) trade dress, which is comprised of VGT's Game Cabinet, VGT Themes, VGT Game Play Sound, Award Sound, Bingo Play and Pays, and VGT's Red Screen Free Spins features. *See* Doc. 103 ¶¶ 22-31. Aside from these features being non-distinctive and industry standard, *see* Doc. 184, VGT copied and emulated several of these features from its competitors, incorporated those elements into its games, and is now claiming Castle Hill took what was never VGT's to begin with.

Most shocking, ███████████████████████████████████████. *See* SOF ¶ 65. ████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████

VGT's trade dress claims against Castle Hill also include allegations that Castle Hill copied VGT's bingo patterns and payouts. *See e.g.*, Doc. 103, ¶¶ 26, 78-79. Because VGT's trade dress claims against Castle Hill are based in part on stolen confidential mathematical information, its hands are unclean on that basis alone. While VGT asserts this amounts to a *jus tertii* defense, this is not the case, because Castle Hill is not just pointing at inequitable conduct VGT committed toward a third party. *See 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1255 (10th Cir. 2013) (explaining *jus tertii* defense). The unclean hands doctrine expressly applies in situations where parties like VGT use inequitable conduct to acquire the rights which they assert in the present action. *See e.g., Coca Cola*

*Co.*, 166 F. Supp. 3d at 1091-92 ("The doctrine of unclean hands 'bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, *as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted.*'") (emphasis added) (citation omitted).

VGT's remaining trade dress elements, and VGT's trade dress claims against Castle Hill, are also based largely on copies of its predecessors and competitors. . VGT accuses Castle Hill of copying VGT's themes, when in actuality, VGT has a product strategy designed around using industry-standard themes used by other manufacturers. *See* SOF ¶ 68. VGT accuses Castle Hill of copying VGT's game cabinet, but VGT uses a game cabinet that other manufacturers used first. *See* SOF ¶ 69. VGT accuses Castle Hill of copying bingo patterns that VGT did not invent. *See* SOF ¶ 70.

*See* SOF ¶¶ 71-72.

Even to the extent the Court applies a balancing of the equities, it would favor Castle Hill. VGT cannot turn around and sue Castle Hill for all of the proprietary or generic ideas VGT stole or copied from its predecessors and competitors over the years. VGT's hands are dirty and summary judgment should be denied. *See Zurco, Inc. v. Sloan Valve Co.*, 785 F. Supp. 2d 476, 502 (W.D. Pa. 2011) (denying summary judgment of unclean hands defense where defendant alleged plaintiff was seeking to prevent competitors from using generic or merely descriptive mark).

      **iii.**    **VGT's Hands are Unclean Because VGT's Recent Changes to its "Trade Dress" Increases the Alleged Likelihood of Confusion**

VGT's hands are also unclean because it has changed its claimed trade dress during the

course of this litigation in ways that may increase the alleged likelihood of confusion.[17] "[I]f plaintiff's own misconduct is the source – or part of the source – of the alleged consumer confusion, then this may limit the scope of the plaintiff's related equitable claims and remedies, which include disgorgement of profits." *Lawn Managers, Inc. v. Progressive Lawn Managers, Inc.*, 2017 WL 3189486, at *6 (E.D. Mo. July 27, 2017). "Even if plaintiff's unclean hands do not bar its trademark claims outright, the defense may be relevant to plaintiff's scope of relief." *Id.* (denying plaintiff's motion for summary judgment on defendant's unclean hands defense).

VGT has made several changes to its games which are likely to increase the alleged consumer confusion, and for which VGT's claims should be barred or its relief limited.[18] VGT has changed its red screen free spins feature in multiple ways during the course of this litigation to make it more similar to Castle Hill's instant free pay feature. As of July 12, 2018, when VGT's President was deposed, VGT's red screen free spins feature did not feature a video; instead, it featured a translucent red film. *See* SOF ¶ 74. Likewise, VGT did not turn the reels red during the red screen free spins feature. *See* SOF ¶¶ 73-74. Castle Hill's instant free pay feature, on the other hand, has always played a video with the instant free pay logo, and its games' reels turned red. *See* SOF ¶¶ 73-74. VGT has now changed its red screen free spins feature in ways that make it more similar to

---

[17]     This section of Castle Hill's opposition and the related facts are further evidence of VGT's lack of a consistent trade dress. *See* Castle Hill's brief in support of motion for summary judgment (Doc. 184), pp. 34-38.

[18]     To the extent VGT claims late notice, the evidence demonstrates that Castle Hill did not become aware of VGT's addition of red reels to its red screen free spins feature until, at the earliest, the last day of fact discovery. As of July 12, 2018, when VGT's President, Jay Sevigny, was deposed, VGT was still planning to change its red screen free spins feature. On the afternoon of August 3, 2018, the final day of fact discovery, VGT's 30(b)(6) witness, Josh Davis, testified that the feature had been changed. Castle Hill employee, Dan Fulton, has submitted a declaration with additional details on the changes and exactly how similar VGT's feature now is to Castle Hill's feature. Castle Hill notes that VGT failed to supplement its discovery responses regarding facts supporting VGT's trade dress claims, in which VGT had previously claimed " ██████████████ to its red screen free spins and bingo play and pay features, among others, so Castle Hill should not be punished for material information withheld by VGT from Castle Hill in discovery. *See* Ex. 2 at 107-110.

Castle Hill's instant free pay feature. *See* SOF ¶¶ 73-76. VGT's feature now plays a video with persistent text on the screen like Castle Hill, instead of displaying a red tint or film. *See* SOF ¶ 73, 75. VGT has also added reels which turn red to its red screen free spins feature, another implementation which Castle Hill already used in connection with its instant free pay feature, and which makes the features and games more similar. *See* SOF ¶¶ 73, 76. VGT has also changed various implementations of the ways in which its games play and pay in ways that makes its games more similar to Castle Hill's games. *See* SOF ¶ 77. VGT has also changed its branding by mixing its branding with its parent company, and it has eliminated its house mark on some of its games. *See* SOF ¶ 78.

VGT's game changes constitute inequitable conduct toward the public and Castle Hill. First, as VGT has recognized, one purpose of the Lanham Act is to protect the public. *See* Doc. 179, p. 29 (quoting S. Rep. No. 1333, at 3 (1946) and *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 782 n.15 (1992) (Stevens, J., concurring) (quoting S. Rep. No. 1333, at 3)). VGT's active efforts to change its games to make them more similar to Castle Hill's games reduces the public confidence in its ability to play Castle Hill's games when it wants to do so. And VGT's removal of its house marks from its games increases the similarity of the products and the alleged likelihood of confusion to consumers. *See Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1156-57, 1159 (10th Cir. 2013).

VGT's efforts to copy Castle Hill's games is also inequitable conduct toward Castle Hill in relation to the trademarks. To allow VGT to create alleged confusion between VGT and Castle Hill's games during the course of the litigation, while suing Castle Hill for damages, is inequitable. *See Metro Publishing, Ltd. v. San Jose Mercury News, Inc.*, 861 F. Supp. 870, 880 (N.D. Cal. 1994) ("To allow Metro Publishing to create and exploit this link and then subsequently allow it to sue the Mercury News for damages because of it is completely inconsistent with the traditional notions of equity and fairness. Accordingly, summary judgment in favor of the Mercury News is warranted on this basis [unclean hands] alone.").

VGT accuses Castle Hill of the same conduct which VGT has engaged in during the course of the lawsuit. Castle Hill has invested significant time and resources in developing its Class II games. VGT nonetheless has changed its games during the course of this litigation to make its games more similar to Castle Hill's games, including emulating the Castle Hill instant free pay feature and modifying various other "bingo play and pay" features to make them more similar to Castle Hill's games. Simultaneously, VGT accuses Castle Hill of causing consumer confusion based on these very same purported trade dress features. *See e.g.*, Doc. 103, ¶ 75 ("Thus, CHG has copied VGT's . . . BINGO PLAY AND PAYS, and RED SCREEN FREE SPINS trade dress features."). VGT's game changes, however, may be the source of likelihood of confusion in the marketplace, and its claims and remedies should therefore be limited. *See Lawn Managers, Inc.*, 2017 WL 3189486, at *6. Castle Hill should be permitted to pursue its unclean hands defense. *See Radiancy, Inc. v. Viatek Consumer Prods. Group, Inc.*, 138 F. Supp. 3d 303, 319 (S.D.N.Y. 2014) (denying motion to strike unclean hands defense based on allegation that plaintiff was engaging in same conduct of which it was accusing defendant).

A balancing of the equities strongly weighs in favor of allowing Castle Hill to pursue this defense at trial. VGT's hands are dirty; it cannot in good faith sue Castle Hill for the same conduct it is engaging in. *See Metro Publishing, Ltd.*, 861 F. Supp. at 880; *Rainbow Play Sys., Inc. v. Backyard Adventure, Inc.*, 2009 WL 3150984, at *4-6 (D.S.D. Sept. 28, 2009) (awarding summary judgment to defendant on plaintiff's Lanham Act claim based on unclean hands defense because plaintiff was engaging in similar advertising conduct as defendant); *Haagen-Dazs, Inc. v. Frusen Gladje Ltd.*, 493 F. Supp. 73, 76 (S.D.N.Y. 1980) ("In short, since plaintiff's hands are similarly unclean, they may not secure equitable relief simply because the defendants' hands may be a shade or two less clean."). VGT's motion for partial summary judgment should be denied.

### iv.    Castle Hill's Unclean Hands Defense Applies to VGT's Oklahoma Law Claims

VGT only discusses Castle Hill's affirmative defenses in relation to VGT's federal Lanham Act claims, but the law and facts demonstrate VGT's unclean hands should preclude its recovery on its Oklahoma claims. In Counts III-VI, VGT brings claims under Oklahoma law. *See* Doc. 103, ¶¶ 113-17 (Oklahoma Deceptive Practices Act claim); ¶¶ 118-22 (common law unfair competition and infringement claim); ¶¶ 123-32 (Oklahoma Uniform Trade Secrets Act claim); ¶¶ 133-37 (misappropriation of confidential business information claim). Castle Hill raised its unclean hands defense in response to all of VGT's claims. *See* Doc. 112, ¶¶ 2, 17 (affirmative defenses). Castle Hill's unclean hands defense applies with equal force to defeat those claims.

Oklahoma recognizes the unclean hands defense. Under Oklahoma law, "[a] party must come before the court with 'clean hands' to obtain equitable relief." *See Dollar Rent A Car Sys., Inc.*, 2006 WL 1266515, at *27 (applying Okla. law). "An unclean hands defense requires showing that Plaintiffs tainted the transaction that they are challenging by undertaking the very fraudulent and deceitful conduct of which they complain." *SFF-TIR, LLC v. Stephenson*, 250 F. Supp. 3d 856, 994 (N.D. Okla. 2017) (applying Okla. law) (citation omitted).

Like federal law, Oklahoma recognizes that "[u]nder the 'clean hands' doctrine, a party cannot invoke the equitable powers of the court when guilty of unlawful or inequitable conduct in relation to the matter for which relief is sought. *See Dollar Rent A Car Sys., Inc.*, 2006 WL 1266515, at *27 (applying Okla. law). "Under the maxim, [h]e who comes into equity must come with clean hands, a court of equity will not lend its aid in any manner to one who has been guilty of unlawful or inequitable conduct in a transaction from which he seeks relief, nor to one who has been a participant in a transaction the purpose of which was to defraud a third person, to defraud creditors, or to defraud the government...." *SFF-TIR, LLC*, 250 F. Supp. 3d at 994 (applying Okla. law) (citation omitted).

The same evidence supports Castle Hill's unclean hands defenses to VGT's Oklahoma claims. As discussed above, (1) VGT's non-compliant, illegally grandfathered games constitute unlawful conduct which has harmed the public and Castle Hill; (2) VGT's misappropriation and emulation of its competitors and use of those alleged rights as the basis for its claims against Castle Hill has harmed Castle Hill; and (3) VGT's changes to its trade dress during the course of this case in ways to make its games more like Castle Hill's games and increase the likelihood of confusion render VGT's hands dirty. VGT's motion for summary judgment should be denied.

> **v.    Castle Hill's Unclean Hands Defense Applies to VGT's Trade Secret Claims**

VGT's trade secret claims will also fail at trial based on VGT's unclean hands and VGT's motion for summary judgment should be denied. In addition to the Oklahoma Uniform Trade Secrets Act claim (Count V), VGT has asserted claims under the Defend Trade Secrets Act (Count VII) and the Virginia Uniform Trade Secrets Act (Count VIII). *See* Doc. 103, ¶¶ 123-32, 138-57. Castle Hill's unclean hands defense also applies to defeat VGT's trade secret claims.

Unclean hands is recognized as a defense to trade secret claims. *See Microstrategy, Inc. v. Business Objects, S.A.*, 331 F. Supp. 2d 396, 419 (E.D. Va. 2004) (recognizing unclean hands defense to trade secret claim brought under Virginia Uniform Trade Secrets Act); *Nalco Chemical Co. v. Hydro Tech., Inc.*, 148 F.R.D. 608, 616-17 (E.D. Wis. 1993) (finding production of allegedly stolen competitor's price book in possession of plaintiff relevant because "its production may lead to circumstantial evidence helpful to defendants' equitable defense of unclean hands" to plaintiff's trade secret claim); *Bagby Elevator Co., Inc. v. Schindler Elevator Corp.*, 2009 WL 10703109, at *12 (N.D. Tex. Jan. 23, 2009) (finding testimony of plaintiff's former president that plaintiff's employees inquired into competitors' contract terms, expiration date, and pricing information, and that new hires brought confidential information from former employers with them relevant testimony that "if true, would support [defendant]'s unclean hands defense" to plaintiff's trade secret claims).

44

VGT's hands are unclean and its trade secret claims will fail. VGT alleges Castle Hill misappropriated various trade secrets, including "math underlying the games, the specifics of the manner in which the bingo game is played in the games (including the process and timing of the ball drops), and the source code used to operate the games…" *See* Doc. 103, ¶ 41. ███████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

VGT's alleged trade secrets were built through its inequitable conduct including █████

████████████████████████████. VGT's inequitable conduct is directly related to its trade secret claims, its hands are unclean, and its motion for summary judgment should be denied. *See Microstrategy, Inc.*, 331 F. Supp. 2d at 419 (finding unclean hands defense under Virginia Uniform Trade Secrets Act applies where there is evidence that inequitable conduct directly relates to matter in litigation)

## B.    The Evidence Supports Castle Hill's Illegality Defense

VGT next moves to dismiss Castle Hill's illegality defense. As set forth above, however, VGT's games are largely non-compliant, were improperly grandfathered, and are therefore illegal, and VGT's claims and potential damages should be limited.[19]

VGT asserts that the defense of illegality "stands on shaky grounds," but it is settled that "a

---

[19]    VGT asserts that Castle Hill's amended answer, which included its illegality defense, was improper because it was filed without leave of court. *See* Doc. 179, n.14. VGT filed its amended complaint, over Castle Hill's objection, after obtaining leave of Court. *See* Doc. 102. Castle Hill was required to file its responsive pleading within 14 days unless another time was ordered by the Court. *See* Fed. R. Civ. P. 15(a)(3). And Castle Hill was required to set forth its affirmative defenses in that responsive pleading. *See* Fed. R. Civ. P. 8(c). Castle Hill timely filed its answer to first amended complaint, which included affirmative defenses. *See* Doc. 112. Castle Hill's illegality defense – based largely on information VGT disclosed on the eve of the close of discovery – was properly raised.

court won't use its equitable power to facilitate illegal conduct." *See Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City*, 861 F.3d 1052, 1054 (10th Cir. 2017) (plurality opinion); *accord American Bank & Trust Co. v. Bond Intern. Ltd.*, 2007 WL 188134, at *4 (N.D. Okla. Jan. 19, 2007) (applying Okla. law). The Tenth Circuit has recognized the applicability of illegality defenses in trademark cases, finding that "lawful use" is required to acquire trademark rights. *See United Phosphorus, Ltd.*, 205 F.3d at 1225 (discussing "well-reasoned proposition that shipping goods in violation of federal law cannot qualify as the 'use in commerce' necessary to establish trademark rights"); *see also CreAgri*, 474 F.3d at 630 (recognizing that the Tenth Circuit "has adopted and applied" the lawful use rule).

VGT argues that the illegality defense is "difficult to establish," picking and choosing elements from various Circuit Courts which have discussed the unlawful use rule. While the Tenth Circuit has not yet had occasion to define the full scope of the lawful use analysis, the most commonly discussed elements applied by Circuit Courts all weigh in favor of Castle Hill.

### i.      VGT's Games are Non-Compliant

As discussed in connection with Castle Hill's unclean hands defense, VGT's games do not comply with federal regulations. VGT implores the Court to impose a heightened requirement for proving unlawful use which originates from the United States Trademark Trial and Appeal Board and discussed in *dicta* by the Eleventh Circuit: "A use is unlawful if 'the issue of compliance has previously been determined (with a finding of non-compliance) by a court or government agency having competent jurisdiction under the statute involved, or where there has been a per se violation of a statute regulating the sale of a party's goods." *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1087 (11th Cir. 2016) (recognizing but declining to adopt unlawful use doctrine).

Even if the Court were to apply this standard, VGT's conduct constitutes *per se* violations of the NIGC regulations. ████████████████████████████████████████████

████████████████████████████████████████████████████████████. *See* SOF ¶¶

46

59-60. Although the NIGC requires "[a]ll components" of a Class II gaming system to be "manufactured" before November 10, 2018, *see* 25 C.F.R. §§ 547.2, 547.5(a), ███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ . *See* SOF ¶ 60-61. VGT's willful violations of the regulations also included ██████████████████████ ████████████████████████████████████ . *See* SOF ¶ 63. These flagrant violations constitute *per se* regulatory non-compliance because they violate the regulation "on its face." *See Evra Pharm., Inc.*, 755 F. Supp. at 41 (finding *per se* violation of Food, Drug and Cosmetic Act and FDA regulations where label did not contain correct type size of drug name which were violations of statute on its face).

> ii.    **There is a Nexus Between VGT's Non-Compliance & Trademark Use**

VGT argues that even its if games are non-compliant, its misconduct is collateral to its trademark use. Again, although no Circuit Court appears to have adopted this requirement, the Eleventh and Ninth Circuits have both discussed the requirement in *dicta. See CreAgri, Inc.*, 474 F.3d at 631 ("The nexus requirement springs from decisions of the Trademark Trial and Appeal Board: 'There must be some nexus between . . . use of [a] mark and [an] alleged violation before it can be said that the unlawfulness of [a] sale or shipment has resulted in [a trademark's] invalidity…'" . . . We neither adopt nor reject [this] rule…"); *Southern California Darts Ass'n v. Zaffina*, 762 F.3d 921, 931 (9th Cir. 2014) ("We also noted that trademark protection *might not be* withheld on account of unlawful conduct that is 'collateral,' namely where there is an insufficient nexus between the unlawful behavior and the use of the mark in commerce.") (emphasis added); *FN Herstal SA*, 838 F.3d at 1087 ("Not every violation, however, will be sufficient to justify denial of trademark protection based on unlawful use. There must be a nexus between the use of the mark and the violation, and the violation must be material.").

47

Even assuming that the Tenth Circuit would impose a nexus requirement, VGT's regulatory non-compliance is directly related to its use of its trademarks and alleged trade dress. As discussed, VGT's trade dress claims brought under the Lanham Act and similar trademark statutes seeks protection of VGT's Game Cabinet, VGT Themes, VGT Game Play Sound, Award Sound, Bingo Play and Pays, and VGT's Red Screen Free Spins features. *See* Doc. 103 ¶¶ 22-31. The NIGC minimum technical standards, with which VGT has failed to comply, regulate the appearance, use, and functionality of all of these features. *See e.g.* 25 C.F.R. § 547.7 (minimum technical hardware standards for Class II games); § 547.8 (minimum standards for Class II gaming systems, including player interface displays and bingo games); § 547.14 (minimum technical standards for electronic random number generation); § 547.16 (minimum standards for game artwork, glass, and rules).

Simply put, the minimum technical standards specify the requirements for all components of a Class II gaming system, which directly relates to VGT's use of its alleged trade dress and each of its claimed trade dress features in commerce. VGT's failure to lawfully use its alleged trade dress means it has no rights or reduced trade dress rights and damages than it has claimed. VGT's attempt to equate its illegal conduct to collateral violations like unsubstantiated tax evasions, *see Zaffina*, 762 F.3d at 932, are unavailing. VGT's non-compliance is much more analogous to violations of misbranded products, *see CreAgri, Inc.*, 474 F.3d at 631-32, or labeling violations, *see Evra Pharm., Inc.*, 755 F. Supp. at 41, because the regulations which VGT violated govern how VGT's products appear to customers in commerce. In short, VGT's violations relate to regulations governing how VGT's alleged trade dress, as well as its trademark and trade secrets, must be used in commerce. To the extent a nexus between VGT's violations and its trademark use is required, Castle Hill will prevail on this factor.

### iii.    VGT's Non-Compliance is Material

VGT argues that its violations are not "material." To the extent the Court applies this factor,

this requirement means that "the violation must be of 'such gravity and significance that the usage must be considered unlawful – so tainted that, as a matter of law, it could create no trademark rights.'" *See FN Herstal SA*, 838 F.3d at 1087 (citation omitted). As Circuit Courts have explained, this "materiality" requirement comes from *General Mills Inc. v. Health Valley Foods*, 24 U.S.P.Q.2d 1270, 1274 (T.T.A.B. 1992), which involved a dispute between two manufacturers of cereal. As the *CreAgri* Court explained, in *General Mills*, only the first 18 boxes of cereal from General Mills was mislabeled under the regulations involved before the issue was corrected, and then General Mills sold over 600,000 correctly labeled boxes before the other party in the case even applied to register its product. The T.T.A.B. found that cancelation of General Mills' mark based on unlawful use under those facts would be draconian. *See CreAgri*, 474 F.3d at 633 (discussing *General Mills Inc.*, 24 U.S.P.Q.2d at 1274).

This case is nothing like *General Mills.* ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████
       ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████ *See e.g. Evra Pharm., Inc.*, 755

49

F. Supp. at 41 (violations of regulations concerning typesize and placement of information on pharmaceutical products not *de minimis*). A material amount of VGT's games are non-compliant and not legally grandfathered, and summary judgment should be denied.

>        iv.     **Castle Hill's Illegality Defense Applies to VGT's Oklahoma Law Claims**

VGT's Oklahoma claims similarly fail or its potential damages should be reduced because of its non-compliant and illegally grandfathered games and summary judgment should be denied. Castle Hill raised the defense of illegality to all of VGT's claims. *See* Doc. 112, ¶ 18 (affirmative defenses).

Oklahoma recognizes the illegality defense. *See American Bank & Trust Co.*, 2007 WL 188134, at *4 (N.D. Okla. Jan. 19, 2007) (applying Okla. law) (Court discussing prior ruling that it would not "invoke its equitable powers to protect a party that participated in the illegality of which it complains.").

The same evidence supports Castle Hill's illegality defenses to VGT's Oklahoma claims. As discussed above, VGT's non-compliant, illegally grandfathered games constitute material and unlawful conduct directly related to VGT's use of its trademarks and alleged trade dress in commerce. VGT's motion for summary judgment should be denied.

## VI.    CONCLUSION

For all of the foregoing reasons, VGT's motion for partial summary judgment should be denied.

Dated: November 16, 2018

Respectfully submitted,

/s/ Robert C. Gill
Robert C. Gill (admitted *pro hac vice*)
Henry A. Platt (admitted *pro hac vice*)
Thomas S. Schaufelberger (admitted *pro hac vice*)
Matthew J. Antonelli (admitted *pro hac vice*)
Jeremy B. Darling (admitted *pro hac vice*)
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
henry.platt@saul.com
tschauf@saul.com
matt.antonelli@saul.com
jeremy.darling@saul.com

Sherry H. Flax (admitted *pro hac vice*)
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA #4254
JAMES C. HODGES, P.C.
2622 East 21st Street, Suite 4
Tulsa, Oklahoma 74114
(918) 779-7078
(918) 770-9779 (facsimile)
JHodges@HodgesLC.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of November, 2018, I caused a copy of the foregoing **DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT – PUBLIC REDACTED VERSION** to be filed using the Court's ECF system, which will provide electronic notification of filing to the following counsel for Plaintiff:

Graydon Dean Luthey, Jr.
GABLE GOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, OK 74103-4217
(918) 595-4821
(918) 595-4990 (facsimile)
dluthey@gablelaw.com
*Counsel for Plaintiff*

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1221
(212) 841-1010 (facsimile)
nroman@cov.com
*Counsel for Plaintiff*

Gary M. Rubman
Peter Swanson
Michael Sawyer
Rebecca B. Dalton
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
(202) 778-5465 (facsimile)
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
*Counsel for Plaintiff*

*/s/ Robert C. Gill*
Robert C. Gill