IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1) VIDEO GAMING TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> 1) CASTLE HILL STUDIOS LLC <br>  (d/b/a CASTLE HILL GAMING); <br> 2) CASTLE HILL HOLDING LLC <br>  (d/b/a CASTLE HILL GAMING); and <br> 3) IRONWORKS DEVELOPMENT, LLC <br>  (d/b/a CASTLE HILL GAMING) <br><br> Defendants. | Case No. 4:17-cv-00454-GKF-jfj <br><br> **REDACTED** |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS**
**MOTION *IN LIMINE* REGARDING THIRD PARTY GAMES**

CHG's opposition to VGT's Motion *in Limine* Regarding Third Party Games (the "Opposition"), Dkt. 219, improperly seeks to shift the focus from the relief sought by VGT's motion to the merits of the underlying claims. Specifically, CHG's brief is dedicated almost exclusively to arguments relating to distinctiveness and consistency, which go to the nature of VGT's rights, and glosses over VGT's concerns about unfair surprise and prejudice. Tellingly, at no point does CHG state that it will not do what VGT fears: continue to keep the target moving as to the third-party games on which it intends to rely right up through trial itself. VGT first responds to the few points in the Opposition relevant to its Motion, Dkt. 155, before addressing the remaining arguments.

As an initial matter, to avoid burdening the Court further in light of the number of pending motions, VGT withdraws the portion of the Motion directed at precluding CHG from

changing its position with respect to the third-party games identified by Mr. Fulton. In the event that CHG does so at trial, we will point out the inconsistencies then.

With respect to the only remaining relief that VGT seeks—to preclude CHG from introducing or soliciting evidence of *undisclosed* third-party games—CHG misstates the nature of that relief. Contrary to CHG's claims that VGT seeks to "artificially limit CHG's ability to refer to games not set forth *in its interrogatory responses*," Opp. at 9 (emphasis in original), the Motion clearly states that it is not directed at games identified in CHG's "discovery responses, *document productions, deposition testimony, or expert reports*," Mot. at 1 (emphasis added).[1]

Similarly, CHG incorrectly implies that this proposed limitation to "certain games" is unduly restrictive. Opp. at 12. As CHG itself notes, CHG's interrogatory responses identify ███████████████, Opp. at 7, and CHG produced 339 pages of documents relating to third-party games, many containing images of several third-party games, as seen in Exhibit D to the Motion. Therefore, even if VGT's Motion is granted, at trial CHG will be able to point to *hundreds* of games. Indeed, CHG's Opposition does not identify a single *undisclosed* third-party

---

[1] CHG also misleadingly states that "VGT never requested that CHG identify 'every' game in existence that contradicts its specious claims of 'distinctiveness.'" Opp. at 14. VGT's Interrogatory No. 26 asked CHG to "[i]dentify all facts supporting CHG's contention that the features of the VGT Trade Dress, individually and collectively, are not distinctive." Ex. 1, Defs.' Supp. Objs. and Resps. to Pl.'s Seventh Interrogs., at 4-6; *see also* Ex. 2, Defs.' Objs. and Resps. to Pl.'s Ninth Reqs. for Produc. of Docs. and Things, at 3 (requesting "[a]ll Documents and Things relating to third-party games that CHG alleges support the defenses raised in CHG's answer to the Complaint").

Citations to lettered exhibits (*e.g.,* "Ex. A") are to the exhibits attached to the Motion or Opposition, as indicated, whereas citations to numbered exhibits (*e.g.,* "Ex. 1") are to the accompanying Declaration of Rebecca Dalton.

game on which it would want to rely at trial.[2] CHG thus fails to offer support for its claims that it would be unfairly disadvantaged by the Court granting the Motion.

CHG's remaining arguments as to unfair prejudice are likewise meritless—particularly when compared to the effect of denial of the Motion on VGT. As noted in the Motion (at 4-5), enabling CHG to introduce evidence of previously undisclosed third-party games would unfairly prejudice VGT because VGT would have to conduct additional research each time CHG identifies a new third-party game. In response, CHG absurdly argues that VGT already has a ███████████████████████████████████████████████ Opp. at 13, ███████████████████████████████████████████████████████ ███████████████████████████████████████████. To the contrary, CHG's own interrogatory responses show that information about third-party games, especially the dates during which each game has been in casinos and the geographic areas in which a game has been available, is not always readily available. *See* Ex. E attached to Motion, at 1-5.

Because CHG inaccurately characterizes the relief requested and fails to rebut VGT's concerns about unfair prejudice, VGT's motion to preclude CHG from introducing or soliciting evidence of undisclosed third-party games should be granted.

VGT now addresses the points raised in the Opposition that relate to the underlying claims.

First, with regard to distinctiveness, although VGT bears the burden of proof with respect to its unregistered trademarks and trade dress, CHG ignores the VGT word marks as well as

---

[2] CHG does express a desire to introduce evidence of games in "retro style" cabinets, but to the best of VGT's knowledge, CHG's document productions include images of "specific games" housed in cabinets that CHG claims are a "similar retro style cabinet." Opp. at 6. Therefore, contrary to CHG's assertions, VGT is not seeking to preclude CHG from introducing this evidence.

VGT's MR. MONEY BAGS & Design mark that are the subject of incontestable federal registrations. These registrations create a *conclusive* presumption that the marks are inherently distinctive. *See* Reg. Nos. 2,979,205, 4,306,260, 3,755,296, 3,152,743, 3,395,857, 3,506,608, and 4,138,672;[3] 6 McCarthy on Trademarks and Unfair Competition § 32:148 (5th ed.) ("There is no doubt that the status of an incontestable registration prevents a challenge to the validity of the mark based on an argument that the mark is not inherently distinctive and lacks secondary meaning."). As explained in VGT's Summary Judgment Opposition, Dkt. 241 at 16-17, because almost all of VGT's unregistered marks contain *both* registered word marks and design elements, thereby *increasing* the distinctiveness of the marks, the conclusive presumption that the relevant registered word marks are inherently distinctive should apply equally to the unregistered word-and-design marks that include such registered word marks.[4] Thus, not only is VGT's burden of proof met for the marks at issue, but CHG should not even be allowed to challenge the distinctiveness of any of VGT's word-and-design marks that contain incontestable registered word marks.

As for VGT's trade dress, CHG incorrectly implies that VGT must prove distinctiveness by comparing its games to every third-party game in the marketplace to show that its games are unique. Opp. at 11-12. Such an approach is impossible when, as here, thousands of games are in the marketplace. Instead, as discussed in VGT's Summary Judgment Opposition, Dkt. 241 at 15-

---

[3] As noted in VGT's Response and Brief in Opposition to Defendants' Motion for Summary Judgment ("VGT's Summary Judgment Opposition"), the Court can take judicial notice of U.S. Patent & Trademark Office ("USPTO") records. Dkt. 241 at 13. Registration certificates and file histories for all cited USPTO registrations and applications are available here: http://tmsearch.uspto.gov/.

[4] Similarly, because VGT's unregistered word-and-design marks that do not contain registered word marks, *e.g.*, the DYNAMITE DAISY & Design logo mark, do not differ in any meaningful way from those marks that do contain registered word marks, it does not take a great leap of logic to conclude that these marks too are inherently distinctive.

4

24, VGT has evidence that its trade dress is inherently distinctive or at the least has acquired distinctiveness, including evidence of CHG's intent to copy the VGT trade dress, VGT's commercial success, consumer recognition of the VGT trade dress, actual confusion, and the unique, arbitrary nature of the trade dress. *See, e.g.*, Ex. 3, Yarbrough Dep. Tr. 225:7-17 ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████). Because VGT has sufficient evidence of distinctiveness, the burden shifts to CHG to find evidence of relevant third-party games that rebuts VGT's evidence.[5]

CHG also misleadingly states that the individual trade dress features and themes at issue in this case are "ubiquitous" and that a "*multitude* of competing games utiliz[e] the exact same game features and themes." Opp. at 3 (emphasis in original). In particular, CHG misidentifies the marks and trade dress elements at issue, describing them at a higher level of generality than the level that forms the basis for VGT's claims. For example, contrary to CHG's assertion, Opp. at 2-3, VGT has never claimed exclusive rights to use of the "themes" identified by CHG, *see* Dkts. 2 and 103 ¶¶ 32, 68-71. Indeed, VGT has never disputed that games featuring money and other similar concepts are common in the industry; rather, as VGT has repeatedly explained to CHG, VGT claims exclusive rights to the specific imagery depicted on its games, including the colors, graphics, and prominence of elements (*e.g.*, Mr. Money Bags with his "slightly chubby pale face and a smirking smile wearing a light gray felt fedora that has a wide brim, indented

---

[5] Notably, despite what CHG implies in its Opposition, CHG has not produced evidence of a third-party game that uses a trademark or trade dress feature more similar to the VGT marks and trade dress at issue than CHG's. Indeed, the existence of so many different-looking third-party games further shows that CHG made a deliberate decision to copy VGT's marks and trade dress.

crown, and dark gray trim surrounded by stacks of both bound and loose dollar bills," Dkt. 103 at ¶ 69), regardless of whether one uses the term "themes," "artwork," or some other descriptor for this imagery.[6]

Second, with regard to consistency, as noted in VGT's Summary Judgment Opposition, Dkt. 241 at 36-37, neither the Tenth Circuit nor the Northern District of Oklahoma has adopted the threshold "consistency" element advocated by CHG.  Furthermore, even if the Court were to adopt this element, VGT would merely need to show that its products convey a consistent overall commercial impression throughout the product lines at issue; the consistency of VGT's *descriptions* of the trade dress, which is the focus of much of CHG's arguments, is irrelevant to this issue.

Indeed, although CHG criticizes VGT's definition of trade dress for "continually evolving," Opp. at 1, the underlying trade dress at issue has remained the same since VGT filed its Complaint; VGT has simply narrowed the definition to be as specific as possible.  In particular, the Complaint includes images that show the game cabinets at issue.  *See* Dkt. 103 at Exs. 1, 3, and 4.  VGT subsequently clarified that the only cabinets at issue are VGT's standard-sized LS cabinet with a six-inch video screen (the original LS cabinet) and a 19/20-inch video screen (the modernized alternative LS cabinet), without optional edge lighting, as seen in the images below, because these two product lines comprise the vast majority of VGT's three-reel mechanical games.  Ex. 4, Pl.'s Sixth Supp. Objs. and Resps. to Defs.' First Interrogs., at 92-122.[7]

---

[6] Also contrary to CHG's statements, Opp. at 6, VGT has never claimed that its paytables are distinctive separate from how they are used in combination with VGT's bingo patterns and corresponding awards as part of VGT's BINGO PLAY AND PAYS, *see* Dkts. 2 and 103 ¶ 26.

[7] It bears mention that CHG's description of the VGT trade dress in its Opposition (at 14) is inaccurate and inconsistent with descriptions provided in VGT's discovery responses.

6

Original LS Cabinet                              Modernized LS Cabinet

  

Such narrowing of the definition of plaintiff's trade dress is not unusual given the inherent difficulties in articulating trade dress. As one court has explained:

> A product's trade dress is not, in a legal sense, the combination of words which a party uses to describe or represent this "total image." Rather, the trade dress *is* that image itself, however it may be represented in or by the written word. Inasmuch as a description which closely approximates, represents, or encapsulates the total image may aid the finder of fact in considering a trade dress infringement claim, it is not uncommon for courts to permit trade dress claimants to alter their formulations of what constitutes a given trade dress.

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, No. 01 Civ. 11295, 2003 WL 21056809, at *5 (S.D.N.Y. May 8, 2003); *see also Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 540 (S.D.N.Y. 2011) (court itself defined trade dress based on photographs because plaintiff's description was inadequate).

Although CHG also criticizes VGT for "ignor[ing] reality" in defining the trade dress to consist of only some products and not others, Opp. at 14, it is well-established that "in seeking protection for the trade dress of a line of products, the plaintiff can define the line as it sees fit. . . . [A] plaintiff can group together any number of products in any way it sees fit, as long as

7

the products have a consistent overall look." *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 173 (3d Cir. 2000).  Indeed, to require a plaintiff to demonstrate a consistent look across every product it offers would effectively negate trade dress protection altogether for any company that offers more than one product:  For example, Coca-Cola would be precluded from protecting its well-known glass bottle (Reg. No. 1,057,884) because it also sells soda in cans and other packaging.



CHG's desperate attempt to distract the Court with products not at issue is readily apparent from the images CHG includes in Attachment A to its Opposition, which displays six games in VGT's Mr. Money Bags series, only one of which—the last—shows the trade dress of one of the product lines at issue.[8]  CHG's continued insistence that these other cabinets are relevant even though they plainly fall outside the scope of VGT's defined trade dress underscores the weakness of CHG's arguments with respect to the actual trade dress at issue.

Finally, it bears emphasis that the few differences that CHG identifies that are in fact variations within the trade dress actually at issue, *e.g.*, use of toppers on some of VGT's games and use of "inconsistent artwork," Opp. at 8, do not affect the overall commercial expression of the products.  *See Rose Art Indus.*, 235 F.3d at 173 ("[T]he appearance of the series or line of products or packaging [need not] be identical. . . . [A] party may have trade dress rights even though there are slight variations in its package design so long as the change does not alter the

---

[8] Again, it bears emphasis that the two product lines at issue comprise the vast majority of VGT's three-reel mechanical games.

distinctive characteristics and the trade dress conveys a single and continuing commercial expression." (citation omitted)).  To use the Coca-Cola bottle as an example again, Coca-Cola is not precluded from protecting its famous bottle because it sometimes uses different label designs or because it sells Diet Coke in the same bottle or because it has modified the bottles over the years, as seen in the below images all of which have been accepted by the USPTO as specimens for Coca-Cola's bottle design registration (Reg. No. 1,057,884).



## CONCLUSION

For the foregoing reasons and those set forth in the Motion, VGT respectfully moves the Court to preclude CHG from introducing or soliciting evidence of undisclosed third-party games.

December 14, 2018					Respectfully submitted,

*/s/ Gary M. Rubman*
Graydon Dean Luthey, Jr., OBA No. 5568
GABLE GOTWALS
1100 ONEOK Plaza
100 W. Fifth Street
Tulsa, OK 74103-4217
Telephone: (918) 595-4821
Facsimile: (918) 595-4990
dluthey@gablelaw.com

9

Gary M. Rubman
Peter A. Swanson
Michael S. Sawyer
Rebecca B. Dalton
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 778-5465
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
  (admitted pro hac vice)

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1221
Facsimile: (212) 841-1010
nroman@cov.com
  (admitted pro hac vice)

***Counsel for Video Gaming Technologies, Inc.***

## **CERTIFICATE OF SERVICE**

    I hereby certify that on December 14, 2018, I filed a redacted copy of the foregoing via ECF, which caused a true and correct copy of the foregoing to be delivered to the following counsel for Defendants:

Robert C. Gill
Thomas S. Schaufelberger
Matthew J. Antonelli
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
tschauf@saul.com
matt.antonelli@saul.com

Sherry H. Flax
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA 4254
JAMES C. HODGES, PC
2622 East 21st Street, Suite 4
Tulsa, OK 74114
Telephone: (918) 779-7078
JHodges@HodgesLC.Com

Duane H. Zobrist
Jonathan S. Jacobs
ZOBRIST LAW GROUP PLLC
1900 Arlington Blvd. Suite B
Charlottesville, VA 22903
Telephone: (434) 658-6400
dzobrist@zoblaw.com
jjacobs@zoblaw.com

*Attorneys for Defendants*

                   */s/ Gary M. Rubman*