# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1) VIDEO GAMING TECHNOLOGIES, INC., | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:17-cv-00454-GKF-jfj |
| 1) CASTLE HILL STUDIOS LLC (d/b/a CASTLE HILL GAMING); | ) **REDACTED** |
| 2) CASTLE HILL HOLDING LLC (d/b/a CASTLE HILL GAMING); and | ) |
| 3) IRONWORKS DEVELOPMENT, LLC (d/b/a CASTLE HILL GAMING) | ) |
| Defendants. | ) |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO EXCLUDE
THE TESTIMONY OF W. TODD SCHOETTELKOTTE IN PART**

CHG's opposition repeatedly ignores (and, therefore, concedes) arguments that VGT raised in its Motion, and for those issues that CHG does address, CHG misstates facts, mischaracterizes the law, or otherwise relies on sleight-of-hand to distract from the real issues.

## I. Mr. Schoettelkotte Improperly Relied Upon Withheld CHG Financial Information.

There are at least five reasons why Mr. Schoettelkotte's opinions based on withheld CHG financial information should be stricken.

*First*, and critically, CHG does not dispute that it withheld during fact discovery the underlying financial information in Schedule 11A. Nor could CHG dispute this fact given that Schedule 11A ███████████████████████. *See* Ex. K.[1] Although CHG describes Schedule 11A as "work-product prepared by its damages expert," Opp. at 1, Mr. Schoettelkotte's testimony undermines this attempt at recharacterization: not only does he testify that the information in Schedule 11A ███████████████████████████████████████████████████. Ex. B, Dep. Tr. 250:16-252:20.[2] He never asserted that Schedule 11A was his work product. Even if it were his work product, however, his opinions based on that schedule should still be excluded because CHG never produced the underlying financial information and, therefore, violated Federal Rule of Civil Procedure 26(a)(2)(B), which requires expert reports to "contain a complete statement of all opinions to be expressed and the basis and reasons therefor" as well as "the data or other information

---

[1] Citations to lettered exhibits (*e.g.,* "Ex. A") are to the exhibits to VGT's Motion, whereas citations to numbered exhibits (*e.g.,* "Ex. 7") are to the exhibits to CHG's opposition.

[2] When Mr. Schoettelkotte did create "work product" by using CHG financial data to create a schedule, he clearly indicates in those schedules the bates numbers of the source data from CHG on which he relies. *See, e.g.,* Ex. A, Schedules 10A, 10D. Schedule 11A contains citations to no such source data, but rather identifies the source as being "███████████." Ex. K.

considered by the witness in forming the opinions." VGT raised this argument in the Motion (at 9-10), but CHG did not respond.

*Second*, CHG likewise does not dispute that the financial information in Schedule 11A is responsive to VGT's discovery requests, *see* Mot. at 5 (identifying discovery requests), or that it was the subject of VGT's motion to compel. *See id.* at 6. VGT agreed to withdraw its motion to compel only after CHG provided assurances that CHG was not withholding financial information and would not rely on financial information that had not been produced. *See id.* at 6-7. It is now clear that CHG's assurances—provided to VGT and then to the Court—were false. CHG's opposition does not mention, let alone address, these issues.

*Third*, CHG does not dispute that Mr. Schoettelkotte relied upon the previously undisclosed financial information in Schedule 11A to create other schedules to his report, as identified in footnote 5 of VGT's Motion.

*Fourth*, CHG incorrectly asserts that VGT has not been unfairly prejudiced. To the contrary, and as discussed in VGT's Motion (at 9), by withholding CHG's financial information, CHG improperly impeded VGT's ability to take discovery relating to that information, including inquiring about from where it came, how it was collected, and what is included or excluded. It was for this reason that VGT moved to compel, a motion that VGT would not have agreed to withdraw but for CHG's assurances that it was not withholding data and that its damages expert would not rely on data that had not already been produced.[3]

---

[3] CHG attempts to justify its conduct by asserting that VGT's damages expert (Ms. Bennis) includes schedules supporting the opinions set forth in her reports, *see* Opp. at 4, and that VGT's experts spoke with VGT employees when forming their opinions, *id.* at 3. But CHG has raised no concerns about the information in any of Ms. Bennis's schedules and has not identified any information relied upon by VGT's experts that was improperly withheld during fact discovery.

*Fifth*, and finally, CHG incorrectly suggests that this issue goes to the weight of Mr. Schoettelkotte's opinions.  To the contrary, VGT's arguments relate to discovery misconduct by CHG: improperly withholding responsive financial information and then providing erroneous assurances to VGT to persuade VGT (and, ultimately, the Court) to cancel a motion to compel hearing.  In these circumstances, the appropriate remedy is exclusion of opinions based on the improperly withheld information.

## II.    Mr. Schoettelkotte Engaged In Improper *Ex Parte* Communications With Former VGT Employees.

Although CHG uses aggressive language in responding to VGT's arguments—calling them "outrageous" and accusing VGT of not being "up front and above board" and of "lay[ing] in wait" to "sandbag" CHG (Opp. at 4, 8)—CHG's rhetoric is contrary to the facts and unsupported by case law on which CHG itself relies.  CHG also ignores VGT's legal support, including the Oklahoma Rules of Professional Conduct.  *See* Mot. at 12.; *see also* Dkt. 220 (VGT's opposition to CHG's motion to exclude evidence about *ex parte* communications).

As an initial matter, contrary to CHG's suggestion, VGT is not arguing that the attorney-client privilege does not apply to communications with CHG employees. Opp. at 5.  Rather, as VGT has made clear, it is VGT's position that it was improper for Mr. Schoettelkotte and CHG's counsel to engage in *ex parte* communications with former VGT employees during which those employees were induced to breach confidentiality obligations they owe to VGT.  CHG's effort to hide behind the attorney-client privilege to avoid providing details about these *ex parte* communications is a separate issue that does not need to be addressed in this Motion given that both Mr. Schoettelkotte and CHG admit that such *ex parte* communications took place.[4]

---

[4] Ironically, CHG is asserting the privilege to prevent disclosure of communications about *VGT's* confidential information.  It bears mention that by engaging in *ex parte* communications with

Moreover, CHG's statement that VGT failed "to put Defendants on fair notice of the issue" (Opp. at 8) is difficult to reconcile not only with the communications between the parties at depositions (*see* Mot. at 13), but also the fact that VGT reached out to CHG with respect to VGT's efforts to communicate with a VGT employee, Dave Marsh, who previously served as a consultant to CHG. As discussed in VGT's response to CHG's motion *in limine* (filed the same day as this Motion), upon learning that Mr. Marsh may owe confidentiality obligations to CHG, VGT reached out to CHG and avoided engaging in *ex parte* communications that might cause him to breach those obligations. *See* Dkt. 220 at 3-5 (summarizing discussions with CHG's counsel). Ultimately, CHG agreed that Mr. Marsh would not violate his obligations as long as he was producing documents in response to CHG's document requests or giving testimony in response to CHG's deposition request or at trial. *Id.* at 4. CHG never took the position that it advances here, namely that VGT is free to engage in *ex parte* communications with Mr. Marsh as long as those communications relate to this litigation. To the contrary, CHG limited its response to production of documents and provision of testimony. Not surprisingly, CHG fails to acknowledge that the standard for which it now advocates for communications *by CHG's counsel* is lower than the standard on which it insisted when faced with an issue relating to communications *by VGT's counsel*.

Case law on which CHG relies also supports VGT's position. Notably, in *Chambers v. Capital Cities/ABC*, 159 F.R.D. 441 (S.D.N.Y. 1995), the court ultimately allowed a litigation adversary to interview former employees of the other side, but only if the other side's counsel was notified and had an opportunity to attend the interviews, a condition that CHG fails to

---

former VGT employees about VGT confidential information, CHG deprived VGT of an opportunity to assert privilege objections to prevent disclosure of VGT's privileged information.

acknowledge. *See id.* at 446. In reaching this conclusion, the court recognized the risks of allowing an adversary to be the decisionmaker on confidentiality issues. *See id.* at 445. Likewise, in *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913 (D. Nev. 2006), another case on which CHG relies (selectively), the court found confidentiality agreements with a former employee who was assisting an adversary in litigation to be valid and enforceable. *See id.* at 923.[5] As that court observed, "allowing employees to disregard confidentiality and trade secret agreements does seriously hinder protection of confidentiality and trade secrets." *Id.* at 921; *id.* at 922 (rejecting argument that it is within prerogative of former employee "to act as decisionmaker about what information [the former employer] does and does not have a legitimate confidentiality interest in").[6]

CHG's reliance on the Protective Order in this case also is misplaced. CHG suggests that the Order allows CHG to engage in *ex parte* communications with VGT employees, but CHG does not cite any provision of the Order, let alone a provision allowing such communications. *See* Opp. at 6. Although the Order allows CHG to share Confidential—but not Highly Confidential—information produced by VGT with up to three persons at CHG, CHG must first disclose those persons and provide VGT an opportunity to object. *See* Dkt. 55 ¶ (allowing

---

[5] Although CHG cites a comment in *Saini* that confidentiality agreements "might not" be enforceable in certain circumstances, including if being used to suppress an adverse party's access to evidence in litigation, *see* Opp. at 9, the court was referring to use of such agreements "as a barrier to discovery between two parties in litigation." *Saini*, 434 F. Supp. 2d at 922. This distinction is consistent with VGT's position that CHG should have used normal discovery processes, rather than *ex parte* communications, in seeking VGT confidential information.

[6] CHG also relies on a third case, *Otter Products, LLC v. Seal Shield, LLC*, 2014 WL 1213475 (D. Colo. Mar. 24, 2014), but that case involves an attempt to use a non-disclosure agreement entered into between two companies in connection with a potential business relationship to "prevent presentation of relevant, truthful evidence to a fact-finder and court" in subsequent litigation between those two companies. *Id.* at *6. Again, that is different than the situation here: VGT would have had no objection to CHG using normal discovery processes to obtain relevant non-privileged information.

5

disclosure of "Confidential" information produced by VGT to three "directors, officers, employees or other representatives"); *id.* ¶ 7 (requiring CHG to disclose in advance persons who will be receiving VGT "Confidential" information and allowing VGT an opportunity to object). CHG, however, has not disclosed anyone under these provisions. Having failed to take even the steps necessary to share with CHG employees Confidential information produced by VGT in this litigation, it is difficult to take seriously CHG's concerns about not being allowed to engage in *ex parte* communications to obtain VGT's Confidential *and Highly Confidential* information directly from VGT's former employees.[7]

    Finally, CHG does not appear to dispute the following VGT arguments:

- CHG had opportunities to ask Alan Roireau, CHG's Chief Technical Officer, about VGT confidential information at two different depositions, but did not do so. Mot. at 12-13.

- ████████████████████████████████████████. *Id.* at 11 (citing Ex. B, Dep. Tr. 23:12-24:3).

- Former VGT employees at CHG, including Mr. Roireau, continue to owe confidentiality obligations to VGT. *Id.* at 11.

CHG ignores these points in the apparent hope that the Court will not consider them.

### III.    CHG Failed to Comply With The Protective Order.

    Although CHG accuses VGT of overreaching, CHG never denies that it violated the Protective Order by providing VGT confidential information to Mr. Schoettelkotte before

---

[7] CHG includes several arguments that go to the merits of VGT's trade secrets and confidential information claims. Opp. at 10-11. These arguments are not relevant to VGT's Motion and are more appropriately addressed and resolved in the context of the parties' summary judgment motions. Moreover, CHG's arguments are inconsistent with its acknowledgement earlier in its brief that Mr. Roireau disclosed "confidential information" to Mr. Schoettelkotte. *Id.* at 5.

disclosing him to VGT.  CHG's attempt to avoid consequences for this violation on the basis that it was "inadvertent and harmless," Opp. at 12, should be rejected for at least six reasons.

*First*, CHG's reliance on a Tenth Circuit case, *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985 (10th Cir. 1999), is misplaced.  CHG incorrectly asserts that *Woodworker's Supply* requires courts to consider "bad faith or willfulness" as a factor when faced with a protective order violation.  *See* Opp. at 13-14.  That case (as well as the other two cases on which CHG relies), however, does not address protective order violations (the term "protective order" appears nowhere in the opinion), but rather a different issue: whether an expert should be allowed to testify at trial about a theory not timely disclosed under Rule 26(a).  *See Woodworker's Supply*, 170 F.3d at 993,  CHG's argument that *Woodworker's Supply* is "controlling law" and its criticisms of VGT for not discussing it plainly lack merit.

*Second*, even if the Court is required to consider "bad faith or willfulness" as a factor, there is evidence of it here.  As discussed in VGT's Motion (at n.10), Mr. Schoettelkotte testified that ███████████████████████████████████████████████████████████████████████████ Ex. B, Schoettelkotte Dep. Tr. 24:12-25:6.  CHG ignored this point in its opposition, providing no explanation as to why its counsel advised CHG employees that ████████████████████████████████████████████.

*Third*, CHG does not dispute that *Allergan* involves similar facts to those here.  CHG's only response is to criticize *Allergan* as an unreported decision from outside the Tenth Circuit. *See* Opp. at 13.  CHG, however, does not address the policy considerations discussed in *Allergan*, including deterring similar conduct and "condoning Defendants' 'inadvertent oversight' [such that it] would undermine the Court's integrity and ability to enforce its own

7

rules." *Allergan, Inc. v. Sandoz Inc.*, 2011 WL 2563238, at *2 (E.D. Tex. June 28, 2011). CHG's silence on these considerations, which are equally applicable here, is telling.

*Fourth*, CHG does not dispute that VGT seeks to strike only portions of Mr. Schoettelkotte's opinions on the basis of this Protective Order violation and that those portions are not critical to CHG's case. *See* Mot. at 15-16. Again, CHG ignores this issue.

*Fifth*, CHG incorrectly asserts that VGT has not been prejudiced and that the issue is moot in light of CHG's disclosure of Mr. Schoettelkotte after service of his report (albeit only after VGT complained about the violation). Prejudice is discussed in VGT's Motion (at 16), and CHG ignores that VGT should be allowed to rely on the Protective Order to safeguard its information (particularly in a case involving disclosure of trade secrets). CHG also is wrong about mootness: VGT never had an opportunity to object to Mr. Schoettelkotte before he was given access to VGT's confidential information. Moreover, under CHG's "mootness" theory, parties such as CHG that violate protective orders never would face repercussions because they could simply disclose the expert months after the violation and only after having been caught.

*Sixth*, and finally, CHG does not dispute that the Court has inherent powers to award sanctions or that Federal Rule of Civil Procedure 37 authorizes district courts to impose sanctions for failure to comply with protective orders. *See* Mot. at 15 n.11; *see also Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763 (1980) ("Rule 37 sanctions must be applied diligently both 'to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent.'").

**IV.     Mr. Schoettelkotte's Apportionment Opinion Does Not Satisfy *Daubert*.**

CHG's defense of Mr. Schoettelkotte's Apportionment Opinion relies on misdirection and conveniently ignores VGT's criticisms.

8

*First*, CHG does not address how the same range (███████████) could apply to each of VGT's claims, which are based on three different forms of intellectual property (trade dress, trademarks, and trade secrets). CHG appears to recognize that the purpose of the Apportionment Opinion is to approximate the portion of CHG revenues from the accused games attributable to CHG's use of each of the forms of intellectual property as opposed to other factors. Opp. at 15-16 (referring to "portion of an alleged infringer's [CHG's] profits [that] are due to the infringing activity rather than for other reasons").[8] Given the reasons for conducting an apportionment analysis, CHG's failure to defend Mr. Schoettelkotte's inability to distinguish among the three types of intellectual property—which relate to different aspects of the accused games—is fatal to his opinion (and does not simply go to weight, as CHG argues). This portion of VGT's Motion can be granted on this basis alone.

*Second*, although CHG seeks to create the impression that Mr. Schoettelkotte's range comes from information in addition to ████████████████████, this suggestion is a smokescreen. In its Motion (at 18), VGT explains in one paragraph how Mr. Schoettelkotte uses ██████████ to calculate both the lower end (█████) and upper end (█████) of his range. Indeed, Mr. Schoettelkotte's entire discussion of this issue is limited to a handful of sentences in two paragraphs in his report that contain no discussion or citations to the additional information (let alone anything from CHG) on which CHG now claims Mr. Schoettelkotte relies to support his opinions regarding calculation of his range. *See* Ex. A at ¶¶ 69-70.[9]

---

[8] This requirement is confirmed by the treatise on which CHG relies. *See* Ex. 7 at 30 (apportionment intended to "reflect the presence and influence of other factors on the *consumers' decision to do business with the infringer*") (emphasis added).

[9] Although Mr. Schoettelkotte includes a separate discussion of ████████████████████, he does not rely on those summaries to determine either the upper or lower ends of his range. Rather, he uses them solely to corroborate the range derived from the annual report. Mot. at 18

9

*Third*, although CHG claims Mr. Schoettelkotte's methodology is "widely-accepted," Opp. at 22, CHG does not cite to a single case in which a similar methodology has been offered, let alone accepted by a court. This failure is not surprising given that Mr. Schoettelkotte's methodology ignores evidence from the accused infringer (CHG), which as stated above is contrary to the purpose of an apportionment analysis.

*Fourth*, and finally, even if CHG had identified case law supporting Mr. Schoettelkotte's methodology, there still is no support for the manner in which he applies it here. For example, although VGT states in the Motion (at 19) that CHG (a new company trying to establish a presence in the market by making its games look and feel similar to VGT's games) is differently situated than either Aristocrat or VGT (the market leaders), CHG fails to explain why differently situated companies would place the same value in the infringed intellectual property.[10] It is not surprising that CHG ignores the examples of CHG internal documents and testimony showing the degree which CHG has placed value on VGT's intellectual property. *See* Mot. at 19-20 (identifying examples). That Mr. Schoettelkotte also ignores this evidence is one more reason his methodology is unreliable. *See id.* (citing cases).[11]

## V. CONCLUSION

For the reasons set forth above and in the opening brief, the Motion should be granted.

---

n.15. Moreover, CHG fails to explain why an accountant who acknowledges that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *Id*.

[10] VGT disputes that the numbers Mr. Schoettelkotte derives from the ▓▓▓▓▓▓▓▓▓▓ relating to its acquisition of VGT are indicative of how Aristocrat, let alone VGT, views the value of its intellectual property *to a competitor*.

[11] CHG also criticizes VGT on the basis that its damages theory for trade secret misappropriation ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *See* Opp. at 19. As VGT explained in its opposition to CHG's motion to exclude VGT's damages expert, avoided research and development costs is a widely-accepted measure of damages. *See* Dkt. 223 at n.6.

December 14, 2018                                    Respectfully submitted,

*/s/ Gary M. Rubman*
Graydon Dean Luthey, Jr., OBA No. 5568
GABLE GOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, OK 74103-4217
Telephone: (918) 595-4821
Facsimile: (918) 595-4990
dluthey@gablelaw.com

Gary M. Rubman
Peter A. Swanson
Michael S. Sawyer
Rebecca B. Dalton
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C.  20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 778-5465
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
   (admitted pro hac vice)

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1221
Facsimile: (212) 841-1010
nroman@cov.com
   (admitted pro hac vice)

***Counsel for Video Gaming Technologies, Inc.***

## **CERTIFICATE OF SERVICE**

      I hereby certify that on December 14, 2018, I caused a copy of the foregoing to be served by ECF on the following counsel for Defendants:

Robert C. Gill
Thomas S. Schaufelberger
Matthew J. Antonelli
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
tschauf@saul.com
matt.antonelli@saul.com

Sherry H. Flax
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA 4254
JAMES C. HODGES, PC
2622 East 21st Street, Suite 4
Tulsa, OK 74114
Telephone: (918) 779-7078
JHodges@HodgesLC.Com

Duane H. Zobrist
Jonathan S. Jacobs
ZOBRIST LAW GROUP PLLC
1900 Arlington Blvd. Suite B
Charlottesville, VA 22903
Telephone: (434) 658-6400
dzobrist@zoblaw.com
jjacobs@zoblaw.com

*Attorneys for Defendants*

                                                        */s/ Gary M. Rubman*