# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| VIDEO GAMING TECHNOLOGIES, INC., | |
| Plaintiff, | CASE NO. 17-CV-00454-GKF-JFJ |
| vs. | **PUBLIC – REDACTED VERSION** |
| CASTLE HILL STUDIOS LLC, *et al.,* | |
| Defendants. | |

# DEFENDANTS' REPLY BRIEF IN SUPPORT OF
# MOTION TO EXCLUDE PLAINTIFF'S EXPERT YORAM WIND

I.   INTRODUCTION

In its Motion to Exclude Plaintiff's Expert Yoram Wind ("Motion"), Doc. 169, Castle Hill argues that Dr. Wind's survey ("Survey") and testimony should be excluded as unreliable, irrelevant, and biased, because the Survey: (1) is a side-by-side survey, strongly disfavored in this Circuit; (2) used improper leading questions; (3) failed to replicate market conditions; (4) and was biased based on the selection and order of images shown to survey respondents, the quality of the images used, the controls selected, and use only of static, artist-rendered images, instead of actual photographs or videos. The Survey is fundamentally flawed in several technical respects, rendering it unreliable, and Dr. Wind's summaries of "facts" and his legal opinions and commentary on testimony are improper.

In its Response, Doc. 211, VGT expects this Court to: (1) ignore controlling law about the type and methodology of the Survey; (2) ignore the biases deliberately built into the Survey; (3) ignore the Survey's blatant technical flaws (arguing they should only go to "weight"); and (4) allow Dr. Wind to usurp the Court's role by weighing the evidence, because of his impressive pedigree and "flawless" record.[1] These arguments are meritless, and Castle Hill's Motion must be granted.

II.   ARGUMENT

A.   The Wind Survey Improperly Used a Side-by-Side Format

Instead of using the "gold standard" "*Ever-Ready*" type survey, Dr. Wind used a side-by-side

---

[1] Throughout its Opposition, VGT makes repeated *ad hominem* attacks on CHG's rebuttal expert, James Berger. Mr. Berger is a well-recognized expert in the field who has written two books on the use of surveys in trademark and trade dress cases, authored dozens of articles, taught graduate and undergraduate courses on market research at numerous colleges and universities, including Northwestern, Loyola, and De Paul Universities, been qualified as an expert more than 80 times, and has conducted around 120 surveys as an expert in Lanham Act cases. *See* Attachment A to Berger Rebuttal Report (Motion Exhibit D). Despite VGT's snide comments, it is noteworthy that **VGT has not moved to exclude or limit Mr. Berger**, thereby conceding that he is qualified to render his opinions in this action, including his scathing critique of Dr. Wind's flawed Report. *See* Motion Ex. D.

1

"*Squirt*" survey, which this Circuit has consistently rejected as improper for decades.[2] As the Court explained in *Jordache*, where it rejected a side-by-side survey:

> "A prospective purchaser does not ordinarily carry a sample or specimen of the article he knows well enough to call by its trade name, he necessarily depends upon the mental picture of that which symbolizes origin and ownership of the thing desired." [citation] Therefore, the court **must** determine whether the alleged infringing mark will be confusing to the public *when singly presented.*

*Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.* 828 F.2d 1482, 1488 (10th Cir. 1987) (quoting *Beer Nuts I*, 711 F.2d at 941 (emphasis added) (quoting and citing *Avrick v. Rockmont Envelope Co.*, 155 F.2d 568, 572-73 (10th Cir. 1946); *American Home Prods. Corp. v. Johnson Chemical*, 589 F.2d 103, 107 (2d Cir. 1978); *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976); *Union Carbide v. Ever-Ready*, 531 F.2d 366, 382 (7th Cir 1976)). The Tenth Circuit's cite to *Union Carbide* in support of its *mandate* that the analysis "must" be made with the mark "singly presented" is critical, *as this is the case that established the "Ever-Ready" survey standard* Mr. Berger insists should have been used. Berger Report at ¶¶ 23-28 (Motion Ex. D).

VGT generically, and falsely, argues that "[c]ase law supports the propriety of Dr. Wind's choice" to reject the "*Ever-Ready*" format and ignore this Circuit's clear admonition against use of side-by-side surveys. Response at 6. It does not. VGT purports to quote from *King of the Mountain*, 185 F.3d at 1090, to support this proposition, *but the quoted language does not actually exist anywhere in that case*. It then goes on to state "side-by-side comparisons *are* appropriate where 'products are simultaneously or sequentially accessible in the marketplace.'" Response at 7 (emphasis in original)

---

[2]   *See* Motion at 4-5 (citing *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1147 (10th Cir. 2013) ("a side-by-side comparison ordinarily is not the proper method of determining likelihood of confusion."); *Jordache*, 828 F.2d at 1487-88 (it is "axiomatic in trademark law that 'side-by-side' comparison is not the test.") (quoting *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir. 1983) ("*Beer Nuts I*")); *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002) (same)). *See also Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1005 (10th Cir. 2014); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084 (10th Cir. 1999) ("we do not engage in a 'side-by-side' comparison. Rather, the court must determine whether the alleged infringing mark will be confusing to the public when singly presented.") (citation and internal punctuation omitted).

(citing and quoting *Water Pik,* 726 F.3d at 1147). **Water Pik says no such thing**.

First, the Court in *Water Pik never* said that side-by-side comparisons are *ever* appropriate, and the language VGT attributes to the Court is actually a parenthetical for a "*see generally*" citation *to a treatise*, in which the Court merely observed that *the treatise's author* has noted "that *one* expert approves of side-by-side comparisons to compare two weak marks if products are simultaneously or sequentially accessible in the marketplace."[3] 726 F.3d at 1147 (citing 6 McCarthy § 32:173.50) (emphasis added). Second, this citation is found *immediately after* the Tenth Circuit *expressly* rejected the use of surveys utilizing side-by-side comparisons, *id.* (citing and relying upon *Jordache*, 828 F.2d at 1488, and *Beer Nuts I*, 711 F.2d at 941), which was followed by a "**but see**" citation to *SquirtCo v. Seven–Up Co.*, 628 F.2d 1086, 1089 n.4, 1091 (8th Cir. 1980) – which is the basis for the "*Squirt*" survey utilized by Dr. Wind. The Court's rejection of VGT's argument could not be clearer.

VGT's argument that "it bears emphasis" that *CHG's expert* did not conduct an *Ever-Ready* survey is irrelevant. At all times it is *Plaintiff's* "burden of proving a likelihood of confusion," as the party alleging infringement. *See Water Pik,* 726 F.3d at 1144 (citing *John Allan Co. v. Craig Allen Co.*, 540 F.3d 1133, 1138 (10th Cir. 2008); *Jordache*, 828 F.2d at 1484); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013) (same). It is *not* CHG's burden to *disprove* it.

As Dr. Wind's Survey was not conducted in accordance with the survey principles mandated in this Circuit, it is not trustworthy and must be rejected. *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 522 (10th Cir. 1987) (a "survey is trustworthy if it is shown to have been conducted according

---

[3]   Of course, VGT and Dr. Wind insist that it's marks are actually "strong" and "top-of-mind" – **not weak**, thereby making this argument irrelevant. *See* Wind Report at 31 (Motion Exhibit A) ("I conclude that the VGT trademarks and trade dress are strong."); Wind Dep. at 123:1-9 (Motion Exhibit E) (VGT is a "top-of-mind" brand). VGT's argument that *CHG* has been "inconsistent" as to whether it believes VGT's marks are "strong," *see* Opposition at 7, is incorrect and misses the point – which is that *Dr. Wind* should have used an *Ever-Ready* survey instead of the *Squirt* survey *because both he and VGT believe the marks are strong. See generally* Motion at 5 ("*If* VGT's trademarks, trade dress, and overall brand recognition are truly as strong *as Dr. Wind claims,* **then** there is no justification for his decision to use a side-by-side survey format.") (emphasis added).

to generally accepted survey principles") (citation omitted); *Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir. 1996) (quoting *id.*); *Vail Associates, Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 864 n.8 (10th Cir. 2008) (survey evidence was properly excluded as not sufficiently reliable to be admissible because it "suffered from systematic design flaws and utterly failed to comply with generally accepted survey principles.").

### B. The Wind Survey Used Impermissible Suggestive and Leading Questions

VGT also ignores the clear law of this Circuit about the use of suggestive and leading questions in a survey. The Tenth Circuit expressly rejected the use of leading survey questions that were virtually identical to the ones used by Dr. Wind in both *Water Pik* and *Hornady*. *See* Motion at 6-8 (citing *Water Pik*, 726 F.3d at 1147-48; *Hornady*, 746 F.3d at 1005-06).

VGT's only response is to try to distinguish Dr. Wind's Survey questions from the ones rejected in *Water Pik*. *See* Response at 9-10. VGT argues that Dr. Wind gave the respondents the opportunity to explain their responses in "open-ended questions," *id.* at 4, whereas "the answer options available to the *Water Pik* respondents did not provide details, but were instead limited to the simple choice between 'yes, no, or not sure.'" *Id.* at 10 (citing *Water Pik*, 726 F.3d at 1147-48).

Once again, VGT misreads *Water Pik*. As the district court's opinion makes absolutely clear, the *Water Pik* survey respondents *were* expressly asked to explain their answers in response to open-ended questions. *See Water Pik, Inc. v. Med-Systems, Inc.*, No. 10-CV-1221-PAB-CBS, 2012 WL 2153162, at *3 (D. Colo. June 13, 2012).[4] VGT's argument is thus wholly specious.

### C. Dr. Wind Utterly Failed to Replicate Market Conditions

The Survey failed to replicate market conditions, by using static, artist rendered images,

---

[4] The *Water Pik* respondents were asked: "What makes you say that these products are made by the same company? Anything else? … What makes you say that these products have a business affiliation or connection with another shown here? Anything else? … What makes you say that these products received permission or approval from another shown here? Anything else?" 2012 WL 2153162, at *3.

4

instead of photographs, video or casino intercept surveys (as VGT has many times before). Motion at 8-11. In response, VGT complains that CHG "cites no support for the remarkable proposition that a survey cannot employ an accurate depiction of a trademarked product simply because it does not adhere to the opposing party's preferred format." Response at 11. VGT misses the point.

CHG has provided *ample* authority for the proposition that, *to be meaningful*, a survey must replicate, to the extent possible, *actual* marketplace conditions. *See Water Pik*, 726 F.3d at 1146-47 ("By presenting the … mark differently from the way that it actually appears on packaging, … [the survey] exaggerated the similarities between the two marks, likely increasing the confusion of the respondents.") (citations omitted); *King of the Mountain*, 185 F.3d at 1090 ("we must examine them 'in the context of the marks as a whole as they are encountered by consumers in the marketplace.'") (citing *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986) ("*Beer Nuts II*")); *Bell Helicopter Textron, Inc. v. Helicomb Int'l Inc.*, No. 05-CV-0322-CVE-FHM, 2005 WL 8150059, at *3 (N.D. Okla. July 14, 2005) (citations omitted). It is thus not *CHG's* "preferred format" that was required in the Survey. Rather, it was a presentation of the EGMs "as a whole" as they are actually encountered in the marketplace that is required – *by the Tenth Circuit*.

CHG provided a detailed explanation of how the drawings failed to replicate the "cacophony of sights and sounds that a consumer would encounter on the casino floor," *see* Motion at 8-11, and how Dr. Wind used one particular configuration of only one VGT game (out of dozens of titles and configurations) to deliberately influence the results. *Id.* at 11-15. VGT's claim that, "if" Dr. Wind had actually replicated the casino marketplace, it "would almost certainly have led to even higher rates of confusion," Response at 11, is nothing but abject speculation, "which is no more than *ipse dixit* guesswork." *Bright v. Ohio Nat'l Life Assurance Corp.*, No. 11-CV-475-GKF-FHM, 2013 WL 12327512 at *2 (N.D. Okla. Jan. 09, 2013).

VGT also provides no explanation why Dr. Wind was allegedly unable to use photographs

5

or video for his survey, despite the hundreds of still images of VGT, Castle Hill and other competitors' games exchanged in discovery, including the actual photos he attached in Appendix A to his Reply Report, except for the unsworn argument of counsel. However, "[i]t is well established that 'argument of counsel is not evidence.'" *Murphy v. City of Tulsa*, No. 15-CV-528-GKF-FHM, 2018 WL 4088071, *3 (N.D. Okla. August 27, 2018) (Frizzell, C.J.) (quoting *Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1061 (10th Cir. 2009)). The Wind survey is fundamentally unreliable and must be excluded.

### D. The Order of the EGMs Used in the Survey Was Deliberately Biased

Using the passive voice, VGT argues that, despite the 120 different combinations possible, "the survey randomly assigned the VGT and CHG stimuli to adjacent positions in the initial array,"[5] Response at 13 n.10, which it concedes is a "downside" to Dr. Wind's methodology. *Id.* at 13. VGT does not dispute that this "downside" resulted in the VGT and CHG EGM's appearing side-by-side in 80% of the rotations, *see* Motion at 12, or that this resulted in "a 25 percent or more difference" from the results where the machines did *not* appear side-by-side. *See* Wind Dep. at 175:20-24.

Nevertheless, VGT argues that, although Dr. Wind failed to prevent this (objectively verified) bias, the Survey data reflected that no similar bias was found with respect to the controls that also appeared side-by-side in the Survey. Of course, as explained throughout the Motion, this was only *one* of the *multitude* of ways Dr. Wind biased the results, including his choice, quality, and presentation of the "controls," *see* Motion at 12-20, which, taken cumulatively, resulted in a biased and untrustworthy survey overall, making VGT's anecdotal arguments irrelevant. In *Vail Associates,*

---

[5] Of course, "the survey" did not "assign" anything; it was conducted under Dr. Wind's supervision, and, as he conceded in his deposition, "a professional survey expert will use standard procedures to ensure that the survey was administered in such as manner as to minimize error and bias." Wind Dep. at 126:3-9. If he did not *intend* for this obvious (and objectively verified) bias, Dr. Wind plainly could have changed the order of the "initial" array to any of the other 119 possibilities to avoid it. Plainly, *Dr. Wind* chose not to do so, not "the survey."

6

the Tenth Circuit, while addressing a similar situation, held that "the district court most assuredly did not abuse its discretion in excluding from trial [plaintiff's] survey evidence," because it "suffered from systematic design flaws and utterly failed to comply with generally accepted survey principles," including "question bias, interviewer bias, location bias, participant bias, and timing bias." 516 F.3d at 864 n.8. The Court should do the same here.

### E. The Survey's Systemic Flaws Renders it Unreliable

In its Motion, CHG argued that the Survey suffered from numerous other significant flaws which rendered it blatantly biased and unreliable, including Dr. Wind's: (1) improper selection of a single (biased) configuration of a single VGT game title (out of dozens) and improper *ipse dixit* attempt to extrapolate his findings to the *entire* line of (untested) VGT games and configurations with respect to both trademarks and trade dress, Motion at 12-15; (2) improper selection of "controls" in order to skew and bias the results of the survey, *id.* at 15-16; and (3) the blatant technical problems with the "zoom" feature which resulted in the elimination of 20% of the survey responses and the inability of respondents to accurately and carefully compare the stimuli, *id.* at 16-21, especially due to the obvious (and admitted) poor quality of the control stimuli images. *Id.* at 21. The crux of VGT's Response appears to be that these issues go to the "weight" of the survey, not its admissibility. *See* Response 5, 10, 12, & 18 (citing *Harolds Stores,* 82 F.3d at 1546 n.9).

VGT is wrong. First, the Tenth Circuit has repeatedly held that methodological "flaws may justify exclusion under Rule 702 if they are serious and pervasive enough." *1-800 Contacts,* 722 F.3d at 1245 (citing *Vail Assocs.*, 516 F.3d at 864 n.8). *See also Hornady*, 746 F.3d at 1005 n.9 ("Even on summary judgment, however, the district court may register 'concerns about the survey's methodology' and 'decid[e] that the survey failed to support a likelihood of confusion.'") (quoting *Water Pik*, 726 F.3d at 1145). In *Vail*, due to the "systemic design flaws" of the survey, the Court specifically refused to find that the district court abused its discretion in exercising its "*Daubert*

7

'gatekeeping' role in deciding whether to admit or exclude survey evidence." 516 F.3d at 864 n.8 (citing *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004)).[6] As set forth in CHG's Motion, the flaws in Dr. Wind's Survey were substantial, pervasive and systemic, rendering the Survey and testimony untrustworthy and irrelevant.

Second, VGT's efforts to excuse or minimize the systemic errors are unconvincing. As to the choice of the VGT stimuli, VGT does not dispute that it tested only *one* VGT trademark, Mr. Money Bags, and *one* Castle Hill trademark, New Money. It presented Mr. Money Bags in a single, specific cabinet configuration, failing to take into account that VGT offers Mr. Money Bags, and various spinoffs, in dozens of cabinet configurations, in direct contradiction to its allegations in the Amended Complaint that it has a "common" trade dress for all of VGT's "3-Reel Mechanical Games" that is "unique" and "inherently distinctive." Am. Compl. ¶¶ 22-29.

As to the impropriety of the "controls" selected, it defies logic how VGT can justify using Class III games as controls based upon its own internal market research studies, *see* Response at 16, where Dr. Wind himself expressly opined in his Reply Report that these very studies are unreliable. *See generally* Reply Report at 12-15. Likewise, VGT's assertion that it would somehow *not* have been appropriate to use the "alternative image" of Mr. Money Bags *that VGT used in its Amended Complaint*, Response at 18, is staggering in its irony.

As to the "zoom" function failures, VGT yet again misses point. While Dr. Wind (appropriately) removed 20% of the Survey participants due to the astounding "glitch" which resulted in respondents comparing the VGT game *with the same VGT game* instead of the CHG game, the point is that the sample size became significantly smaller, resulting in the exaggeration of the

---

[6] *See also Hodgdon Powder Co. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007) (where "deficiencies are so substantial as to render the survey's conclusions untrustworthy, a court should exclude the survey from evidence.") (quoting *Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1466 (D. Kan. 1996)).

8

numerous *other* pervasive biases. As Dr. Wind admitted, the Survey was *designed* for a universe of "400 plus," Wind Dep. at 140:16-19, and the "corrected" study only involved 353 people.

With respect to the "zoom" feature itself, VGT dismisses its technical flaw as "strain[ing] semantics." In fact, Dr. Wind called it a "zoom" function in the Survey itself, in his Report, in his Reply Report, *and* in his deposition. *See* Report at 9 (quoting from Survey itself) ("You can zoom in to see any element of a machine better."); Reply Report at 7 ("Even after zooming, the image of the Scientific Games EGM [but not the other two controls] has similar resolution to the images of the VGT and CHG EGMs."); Wind Dep. at 214:1-215:6 (explaining that, with the "zoom feature," "you could focus on a specific part of the picture."). Despite VGT's concession that this was an "inaccurate" description of the zoom functionality, Dr. Wind neither corrected his deposition on this point nor, more importantly, in his "corrected" Report – *issued* **after** *his deposition.* When combined with the fact that the image quality of two of the three controls was concededly of much lower resolution/quality, Wind Dep. at 221:2-6 ("Q: [O]nly one of the three controls you used had the same resolution when respondents tried to zoom in on them? A: Correct."), it is hard to imagine how this "technical" flaw does not result in an untrustworthy and biased Survey.

### F. Dr. Wind Cannot Summarize "Other Evidence" Picked by Counsel

VGT tries to justify Dr. Wind's improper regurgitation and use of "other relevant evidence" cherry-picked for him by its counsel by giving it a fancy name: "convergent validity." *See* Response at 22-25. Claiming that CHG's own expert "agree[s] that reliance on secondary data sources beyond the survey is appropriate," *id.* at 23 (citing Response Ex. D, Berger Dep. at 134:4-8), VGT argues Dr. Wind could look "beyond the survey itself" and weigh the evidence it showed him to determine "whether the right elements were measured in the right way." *Id.* at 24-25 (quoting Mishra & Corbin, *Internet Surveys in Intellectual Property Litigation: "Doveryai, No Proveryai,"* 107 Trademark Rep. 1097, 1103-04 (2017) and citing Hunt, *Scientific Validity and Error Rates: A Short Response to the PCAST*

9

*Report*, 25 Fordham L. Rev. 24, 38-39 (2017)). VGT mischaracterizes both Mr. Berger's testimony and the articles it (but not Dr. Wind) relies upon. While Mr. Berger did testify that "secondary data" could provide support for "primary data," he also made it absolutely clear that "secondary data" *must* be "actual research" that was "undertaken for some other purpose," such as other market research studies, but does *not* include things like "e-mails" or other "correspondence." Response Ex. D, Berger Dep. at 132:2-134:15. The articles cited by VGT confirm Mr. Berger's opinion, *not* Dr. Wind's.[7]

The only "secondary evidence" Dr. Wind could have relied on for "convergence" with his findings were the internal market research studies commissioned by VGT. Despite relying on these studies in his opening Report, at 25-29, Dr. Wind *expressly rejected* the validity, relevance and reliability of these studies in his Reply Report, arguing that the they: ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Reply Report at 12-15. If neither VGT nor *Dr. Wind himself* believe the "secondary" data he relied upon is valid or reliable, it is beyond cavil that his opinions based upon such data have no validity or value either, and must be excluded.

---

[7] *See* 107 Trademark Rep. at 1104 ("'Convergent validity' refers to the congruency of measurements from different methodologies. For trademark matters, findings in telephone surveys or mystery shopping studies similar to results obtained in an Internet survey would provide convergent validity.") (footnotes omitted); 25 Fordham L. Rev. 24, 38-39 ("the concept of 'convergent validity'" draws "conclusions regarding scientific validity from the body of relevant literature as a whole" and "recognizes that some studies can reinforce others and collectively support conclusions not warranted on the basis of a single study.") (footnotes omitted).

Dated:  December 14, 2018                    Respectfully submitted,

*/s/ Robert C. Gill*
Robert C. Gill (admitted *pro hac vice*)
Henry A. Platt (admitted *pro hac vice*)
Thomas S. Schaufelberger (admitted *pro hac vice*)
Matthew J. Antonelli (admitted *pro hac vice*)
Jeremy B. Darling (admitted *pro hac vice*)
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
henry.platt@saul.com
tschauf@saul.com
matt.antonelli@saul.com
jeremy.darling@saul.com

Sherry H. Flax (admitted *pro hac vice*)
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA #4254
JAMES C. HODGES, P.C.
2622 East 21st Street, Suite 4
Tulsa, Oklahoma 74114
(918) 779-7078
(918) 770-9779 (facsimile)
JHodges@HodgesLC.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of December, 2018, a copy of the foregoing **REPLY BRIEF IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFF'S EXPERT YORAM WIND – PUBLIC REDACTED VERSION** was filed using the Court's ECF system, which will provide notification of electronic filing to the following counsel for Plaintiff:

Graydon Dean Luthey, Jr.
GABLE GOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, OK 74103-4217
(918) 595-4821
(918) 595-4990 (facsimile)
dluthey@gablelaw.com
*Counsel for Plaintiff*

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1221
(212) 841-1010 (facsimile)
nroman@cov.com
*Counsel for Plaintiff*

Gary M. Rubman
Peter Swanson
Michael Sawyer
Rebecca B. Dalton
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
(202) 778-5465 (facsimile)
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
*Counsel for Plaintiff*

*/s/ Robert C. Gill*
Robert C. Gill