# EXHIBIT Q

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1)  VIDEO GAMING TECHNOLOGIES, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cv-00454-GKF-JFJ |
| | ) | |
| 1)  CASTLE HILL STUDIOS LLC | ) | |
| (d/b/a CASTLE HILL GAMING); | ) | |
| 2)  CASTLE HILL HOLDING LLC | ) | |
| (d/b/a CASTLE HILL GAMING); and | ) | |
| 3)  IRONWORKS DEVELOPMENT, LLC | ) | |
| (d/b/a CASTLE HILL GAMING) | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S OBJECTIONS AND RESPONSES TO**
**DEFENDANT CASTLE HILL STUDIO LLC'S**
**FIRST SET OF INTERROGATORIES  (NOS. 1-13)**

Pursuant to Federal Rule of Civil Procedure 33, Plaintiff Video Gaming Technologies, Inc. ("VGT") provides these objections and responses to the First Set of Interrogatories of Defendant Castle Hill Studio LLC (collectively with the other defendants, "CHG") (the "Interrogatories").

**PRELIMINARY STATEMENT**

In responding to these Interrogatories, VGT does not concede the relevance, materiality, or admissibility of any Interrogatory.  VGT's response to each Interrogatory is made subject to and without waiver of any objections as to privilege or as to the relevance, materiality, or admissibility, for any purpose, of any of the responses given herein.

VGT's responses to these Interrogatories are given without prejudice to VGT's right to provide or introduce at trial subsequently discovered evidence.  VGT has not completed its fact

1

investigation or discovery, and therefore all responses provided herein are subject to amendment and/or supplementation by VGT as investigation and discovery continues.

<u>**GENERAL OBJECTIONS**</u>

VGT asserts the following general objections to CHG's Interrogatories. These general objections are incorporated into each of the individual responses below as if fully set forth therein. These general objections may be specifically interposed for purposes of clarity or emphasis in response to an Interrogatory, but the failure to state a general objection in a response shall not be construed as a waiver of the objection.

1.      VGT objects to each Interrogatory to the extent that it seeks information that is not relevant to any claim or defense asserted in this action, is not proportional to the needs of the case, or is otherwise beyond the scope of permissible discovery in this action.

2.      VGT objects to each Interrogatory to the extent that it is inconsistent with, or seeks to impose obligations beyond those required by, the Federal Rules of Civil Procedure, the Local Rules of Civil Procedure for the United States District Court for the Northern District of Oklahoma, or any schedule or ruling that may be entered by the Court.

3.      VGT objects to each Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, work-product doctrine, or other applicable privileges, protections, or immunities (collectively, "Privileged Information"). Inadvertent production of Privileged Information shall not constitute a waiver of any privilege or protection or of the right to object to the use of the Privileged Information that was inadvertently produced. VGT reserves the right to recall from discovery any inadvertently produced Privileged Information. *See* Fed. R. Civ. P. 26(b)(5)(B).

4.      VGT objects to each Interrogatory to the extent that it seeks VGT trade secrets or other confidential, proprietary or sensitive information of VGT.  VGT objects to production of any such information until the Court enters an appropriate protective order.

5.      VGT objects to each Interrogatory to the extent that it seeks information related to source code without adequate protection.  Source code is among the most highly proprietary information within VGT, and the ease with which it can be copied and disseminated warrants the highest level of protection.

6.      VGT objects to each Interrogatory to the extent that it purports to require VGT to disclose information from a third party pursuant to a non-disclosure agreement, the content of any part of any agreement between VGT and a third party that may not be unilaterally disclosed by VGT, or any other confidential information, proprietary information, or trade secrets of a third party.

7.      VGT objects to each Interrogatory to the extent that it seeks information that is publicly available, already has been provided or made available to CHG, is reasonably available to CHG from other sources, or is otherwise already in CHG's possession, custody, or control.

8.      VGT objects to each Interrogatory to the extent that it is unreasonably cumulative or duplicative of a prior interrogatory or other discovery in this litigation.

9.      VGT objects to each Interrogatory, construction, definition, and instruction to the extent that it is vague or ambiguous, or fails to state with particularity the requested information. VGT interprets any undefined terms using its understanding of those words.

10.     By providing responses to the Interrogatories, VGT does not waive any right to object to the use of such responses, including, for example, on relevance, admissibility, or authenticity grounds.

11.     VGT objects to CHG's definition of "VGT," "you," and/or "your" to the extent that it purports to include entities and persons not a party to this action.  For purposes of its responses herein, VGT defines the terms "VGT," "you," and/or "your" to refer only to itself and its directors, officers, employees, and agents.

12.     VGT objects to CHG's definition of "VGT Game" in Defendant Castle Hill Studios LLC'S First Set of Interrogatories to the extent that it purports to include games that are not relevant to this action and to the extent it is inconsistent with CHG's definition of "VGT Game" in the Document Requests.  For purposes of its responses herein, VGT defines the term "VGT Game" as referring only to VGT's Class II bingo-based gaming machines that incorporate any marks and/or trade dress that VGT alleges CHG has infringed.

13.     VGT objects to CHG's definitions of "TDF" in Defendant Castle Hill Studios LLC'S First Set of Interrogatories as vague and ambiguous and inconsistent with CHG's definition of "VGT Trade Dress" in the Document Requests.  For purposes of its responses herein, VGT defines the term "VGT Trade Dress" as any trade dress belonging to VGT that VGT alleges CHG has infringed.

14.     VGT objects to CHG's characterizations of facts, documents, theories, or conclusions in CHG's constructions, definitions, instructions, and requests.  By responding to any Interrogatory, VGT does not admit or accept CHG's characterizations of facts, documents, theories, or conclusions.

15.     VGT objects to each Interrogatory as improper to the extent that CHG seeks to shift the burden on an issue for which it bears the burden of proof.

16.     VGT objects to each Interrogatory to the extent that it seeks information that is outside the possession, custody, or control of VGT and to the extent that it would require VGT to

4

search for or create new information.  VGT provides only information within its possession, custody, or control, that is maintained in the ordinary course of business, and that is located after a reasonable search.

17.    VGT objects to each Interrogatory to the extent that it seeks "all types" of information or documentation, or uses similar wording, as overly broad, unduly burdensome, duplicative, and not proportional to the needs of the case.  In instances where CHG requests that VGT identify "all" documents, information, individuals, or things, and VGT has committed to respond, responses sufficient to show the non-privileged information specified in the response, to the extent relevant and located after reasonably diligent efforts, will be provided.

18.    VGT objects to the numbering of the Interrogatories to the extent that the Interrogatories have discrete subparts and/or cover an overbroad range of topics.

19.    VGT objects to each Interrogatory to the extent that it calls for a legal conclusion or the mental impressions of VGT's attorneys, or that it purports to require VGT and its attorneys to form, read, set forth, or perform a legal analysis.  Any response by VGT shall not be construed as providing a legal conclusion regarding the meaning or application of any terms or phrases used in Defendants' Interrogatories, definitions, or instructions.  To the extent that a request seeks information other than factual information, VGT objects to such request as improper.

20.    The following responses are based on information reasonably available to VGT. VGT reserves its right to amend or supplement these objections and responses as additional information becomes available or is disclosed or in the event of error, inadvertent mistake, or omission.

<u>**SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES**</u>

<u>**INTERROGATORY NO. 1:**</u>

State all facts upon which you base the claims of trademark infringement alleged in the Complaint. (As part of your answer, state each CHG Mark and the corresponding VGT Mark with which you contend such CHG Mark is likely to be confused.)

<u>**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 1:**</u>

VGT incorporates the General Objections stated above as if set forth fully herein and in particular objects to this interrogatory as overly broad and unduly burdensome and to the extent that it seeks Privileged Information. Subject to and without waiving the preceding general and specific objections, VGT responds as follows:

As a preliminary matter, VGT disagrees with the suggestion implicit within this interrogatory and CHG's statements elsewhere that trademarks and trade dress are readily distinguishable. Both trademarks and trade dress serve as source indicators, but the concept of trade dress is both broader and narrower than the concept of a trademark. On the one hand, trade dress law is a subset of trademark law, but on the other, trade dress law encompasses trademark law in that it extends to the overall look and feel of a product (potentially including multiple source indicators as well as individually non-protectable elements), as opposed to being limited to an individual source indicator. For purposes of these responses, therefore, VGT attempts to follow CHG's request for separation of these concepts to the best of its ability, but in light of the overlap between the concepts of trademarks and trade dress, VGT states that all facts identified in response to Interrogatory No. 1 also apply to Interrogatory No. 2 and vice versa.

With that background, VGT owns exclusive rights to the VGT Marks that it uses in connection with the VGT Games. The VGT Marks include the names of the games, the games' logos, the games' characters, the games' artwork, and all other source-identifying words, names,

6

symbols, and designs.  VGT owns federal trademark registrations for several of the VGT Marks.
VGT also established common law rights for each of the VGT Marks, including any unregistered
Marks, on the date it began using each Mark.

The VGT Marks are inherently distinctive and have become commercially strong as a
result of, among other factors, the following:  (1) VGT has exclusively used the VGT Marks for
years in connection with its popular and successful games; (2) VGT has emphasized the VGT
Marks in its advertising, marketing, and promotional materials; (3) VGT has tried to develop and
foster the reputation, recognition, and goodwill associated with the VGT Games through the
VGT Marks; and (4) the VGT Marks have been the subject of unsolicited publicity.  The VGT
Marks are thus recognized by consumers as indicators that the source of the VGT Games is
VGT.

CHG, which was founded by former VGT employees and employs former VGT
employees, offers games with marks confusingly similar to marks used by VGT.  In or around
March 2015, CHG began advertising on its website its first four games, some of which
incorporated marks that resemble VGT Marks; however, these original CHG games were Class
III games, in contrast to VGT's Class II games.  Between March 2015 and June 2016, CHG
began offering Class II games that more closely resemble VGT's.  Indeed, more than half the 24
Class II games on CHG's website at the time of the Complaint incorporate marks (including the
names of the games and/or the games' artwork, characters, and/or logos) confusingly similar to
those of the VGT Games.  The chart below identifies the series of VGT games that include the
VGT Marks and the corresponding CHG games that include similar marks:

| VGT | CHG |
|---|---|
| Crazy Bill Series and Dynamite Daisy Series | Welcome to Nugget Mountain |

7

| | |
|---|---|
| Mr. Money Bags Series | New Money |
| Polar High Roller Series | Arctic Cash and Arctic Ice |
| The Lucky Leprechaun Series | Dublin Your Luck |
| Hot Red Ruby Series | Double Hotness |
| Gems and Jewels Series | Genie's Gems |
| Mr. Millionaire Series | Mr. Martini and Mr. Martini: Vegas Baby |
| Greenback Jack Series | Coin Slinger |
| Planetary Pigs Series | Aces & Hogs |
| Countin' Cash Series and Ca$hin' In Series | Amazing Ca$h |
| Diamond Fever Series and Radiant Rocks Series | 10,000 Diamonds and 20,000 Diamonds |
| Cap'n Crabby's Ca$h Series | Captain Bacon |
| Red Hot Rubies x2 Series | Pink Sapphires |
| Super Speedway Sevens Series | Soapbox Sally |
| Lucky Ducky Series | Quack-Tastic! |
| Crazy Cherry Series | Amazing Cherry |

As explained above, the VGT Marks include the names of the games as well as the visual images incorporated into the games, including the games' artwork, characters, and logos. The CHG games use similar visual images, including the games' artwork, characters, and/or logos. Below are examples of such similar visual images:

8

VGT - Crazy Billions



VGT - Dynamite Daisy



CHG - Welcome to Nugget Mountain

VGT - Mr. Money Bags



CHG - New Money



VGT - Polar High Roller



CHG - Arctic Cash



CHG - Arctic Ice



VGT - The Lucky Leprechaun



CHG - Dublin Your Luck



VGT - Hot Red Ruby



CHG - Double Hotness



VGT - Gems and Jewels

CHG - Genie's Gems



VGT - Mr. Millionaire

CHG - Mr. Martini: Vegas Baby

CHG - Mr. Martini





VGT - Greenback Jack

CHG - Coin Slinger



VGT - Planetary Pigs

CHG - Aces & Hogs





VGT - Countin' Cash

VGT - Ca$hin' In

CHG - Amazing Ca$h







10

VGT - Radiant Rocks[1]



CHG - 10,000 Diamonds



CHG - 20,000 Diamonds



VGT - Cap'n Crabby's Ca$h



CHG - Captain Bacon

VGT - Red Hot Rubies x2



CHG - Pink Sapphires

VGT - Super Speedway Sevens



CHG - Soapbox Sally



VGT - Lucky Ducky



CHG - Quack-Tastic!



---

[1] As described in the Complaint, VGT has another diamond-themed game, Diamond Fever, not pictured here.

That so many of CHG's Class II games contain marks similar to the VGT Marks suggests that CHG seeks to confuse players.

The likelihood of confusion created by this intentional offering of essentially identical goods with nearly identical marks is even greater because CHG's games are in direct competition with the VGT Games.  Indeed, CHG's games appear in the same casinos as the VGT Games, including in Oklahoma, and are often in close proximity to the VGT Games.

As a result of these actions and given that the relevant group of consumers includes both sophisticated and unsophisticated consumers, CHG has succeeded in sowing confusion among consumers, as described in greater detail in the response to Interrogatory No. 12, and is likely to cause further confusion if not enjoined.

**INTERROGATORY NO. 2:**

State all facts upon which you base the claims of trade dress infringement alleged in the Complaint. (As part of your answer, state the name of each CHG Game and the corresponding VGT Game with which each CHG Game is likely to be confused and describe with particularity the TDF present in each CHG Game.)

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 2:**

VGT incorporates the General Objections stated above as if set forth fully herein and in particular objects to this interrogatory as overly broad and unduly burdensome and to the extent that it seeks Privileged Information.  Subject to and without waiving the preceding general and specific objections, VGT responds as follows:

As a preliminary matter, VGT disagrees with the suggestion implicit within this interrogatory and CHG's statements elsewhere that trademarks and trade dress are readily distinguishable.  Both trademarks and trade dress serve as source indicators, but the concept of trade dress is both broader and narrower than the concept of a trademark.  On the one hand, trade

dress law is a subset of trademark law, but on the other, trade dress law encompasses trademark law in that it extends to the overall look and feel of a product (potentially including multiple source indicators as well as individually non-protectable elements), as opposed to being limited to an individual source indicator. For purposes of these responses, therefore, VGT attempts to follow CHG's request for separation of these concepts to the best of its ability, but in light of the overlap between the concepts of trademarks and trade dress, VGT states that all facts identified in response to Interrogatory No. 1 also apply to Interrogatory No. 2 and vice versa.

VGT owns exclusive rights to the trade dress that it uses in connection with Class II bingo-based games. The "VGT Trade Dress" for each of the VGT Games consists of the "look and feel" of each VGT Game as a whole. The VGT Trade Dress includes, but is not limited to, the following elements: (1) trade dress features shared throughout most or all of VGT's standard-sized Class II 3-Reel mechanical games (the "Shared Trade Dress Features") and (2) game-specific themes (which themselves include the names of the games and the games' characters, artwork, and logos), some of which are shared by multiple games within a given series (e.g., the Crazy Billions game and the Crazy Bill's Gold Strike game both incorporate the Crazy Bill theme and are therefore part of the Crazy Bill series of games).

The Shared Trade Dress Features include, but are not limited to, the following: the cabinet that houses the games ("GAME CABINET"), the red strobe light on top of the cabinet, to the extent it is not part of the cabinet ("RED CANDLE"), the sounds made during standard game play ("GAME PLAY SOUND"), the mechanical bell sound that signals that a player has won ("AWARD SOUND"), the winning bingo patterns and other game play elements ("BINGO PLAY AND PAYS"), and the red display during bonus play ("RED SCREEN FREE SPINS"), all of which have been copied by CHG in its Class II games.

13

The VGT Trade Dress (i.e., the look and feel of each VGT Game as a whole) does not consist of a common shape or design, nor is it a mere refinement of a commonly adopted and well-known form of ornamentation; instead, the VGT Trade Dress is unique and therefore inherently distinctive.  The VGT Trade Dress has also become commercially strong as a result of, among other factors, the following:  (1) VGT has exclusively used the VGT Trade Dress for years in connection with its popular and successful games; (2) VGT has emphasized the VGT Trade Dress in its advertising, marketing, and promotional materials; (3) VGT has tried to develop and foster the reputation, recognition, and goodwill associated with the VGT Games through the VGT Trade Dress; (4) and the VGT Trade Dress has been the subject of unsolicited publicity.  The VGT Trade Dress is thus recognized by consumers as an indicator that the source of the VGT Games is VGT.

In addition to being inherently distinctive and commercially strong, the VGT Trade Dress is arbitrary and therefore non-functional.  The VGT Trade Dress is not essential to the VGT Games because it is not the reason VGT Games work.  Furthermore, the design of the VGT Trade Dress is not especially simple or inexpensive; the VGT Trade Dress is not the subject of a utility patent; VGT does not emphasize the utilitarian advantages of the VGT Trade Dress in its advertising and marketing; and there are alternate designs to the VGT Trade Dress readily available to VGT's competitors.

CHG, which was founded by former VGT employees and employs former VGT employees, offers games with trade dress confusingly similar to that used by VGT.  In or around March 2015, CHG began advertising on  its website its first four games, some of which incorporated trade dress features that resemble the VGT Trade Dress; however, these original CHG games were Class III games, in contrast to VGT's Class II games.  Between March 2015

and June 2016, CHG began offering Class II games that more closely resemble VGT's. Indeed, more than half of the 24 Class II games on CHG's website at the time of the Complaint incorporate trade dress confusingly similar to the VGT Trade Dress. *See* Response to Interrogatory No. 1. The chart below identifies the infringed series of VGT Games and the corresponding CHG games that incorporate trade dress confusingly similar to the VGT Trade Dress:

| VGT | CHG |
|---|---|
| Crazy Bill Series and Dynamite Daisy Series | Welcome to Nugget Mountain |
| Mr. Money Bags Series | New Money |
| Polar High Roller Series | Arctic Cash and Arctic Ice |
| The Lucky Leprechaun Series | Dublin Your Luck |
| Hot Red Ruby Series | Double Hotness |
| Gems and Jewels Series | Genie's Gems |
| Mr. Millionaire Series | Mr. Martini and Mr. Martini: Vegas Baby |
| Greenback Jack Series | Coin Slinger |
| Planetary Pigs Series | Aces & Hogs |
| Countin' Cash Series and Ca$hin' In Series | Amazing Ca$h |
| Diamond Fever Series and Radiant Rocks Series | 10,000 Diamonds and 20,000 Diamonds |
| Cap'n Crabby's Ca$h Series | Captain Bacon |
| Red Hot Rubies x2 Series | Pink Sapphires |

Below are examples of specific games in each of the above series that incorporate the VGT Trade Dress as compared to CHG's games that incorporate similar trade dress:

VGT - Crazy Billions        VGT - Dynamite Daisy        CHG - Welcome to Nugget Mountain

  

VGT - Mr. Money Bags

CHG - New Money





VGT - Polar High Roller

CHG - Arctic Cash

CHG - Arctic Ice







VGT - The Lucky Leprechaun                    CHG - Dublin Your Luck




VGT - Hot Red Ruby                            CHG - Double Hotness




VGT - Gems and Jewels                    CHG - Genie's Gems





VGT - Mr. Millionaire      CHG - Mr. Martini: Vegas Baby      CHG - Mr. Martini







VGT - Greenback Jack

CHG - Coin Slinger





VGT - Planetary Pigs

CHG - Aces & Hogs







VGT - Countin' Cash          VGT - Ca\$hin' in          CHG - Amazing Ca\$h

VGT - Radiant Rocks[2]          CHG - 10,000 Diamonds          CHG - 20,000 Diamonds

---

[2] As described in the Complaint, VGT also has another diamond-themed game, Diamond Fever, not pictured here.

VGT - Cap'n Crabby's Ca$h

CHG - Captain Bacon





VGT - Red Hot Rubies x2

CHG - Pink Sapphires





22

CHG's use of similar themes, including the names of games and the games' artwork, characters, and logos, is further described in VGT's Response to Interrogatory No. 1, which is incorporated herein.

In addition, the following close-up images show examples of VGT pay tables that CHG has copied:





DOUBLE HOTNESS

HOT NEW CASH

DADDY MOREBUCKS

10,000 DIAMONDS

GEMS AND JEWELS





WELCOME TO NUGGET MOUNTAIN



PLATINUM EXPRESS



RED HOT RUBY



DUBLIN YOUR LUCK





In addition, CHG has copied VGT bingo patterns, including the following patterns: Inside Corners; Private Stripes; Postage Stamp; Corners; and Corporal Stripes.

Class II games offered by third-party competitors, examples of which are shown below, further demonstrate that the VGT Trade Dress is distinctive and that the CHG games are likely to cause confusion with VGT:








That so many of CHG's Class II games contain trade dress similar to the VGT Trade Dress suggests that CHG seeks to confuse players.

The likelihood of confusion created by this intentional offering of essentially identical goods with nearly identical trade dress is even greater because CHG's games are in direct competition with the VGT Games. Indeed, CHG's games appear in the same casinos as the VGT Games, including in Oklahoma, and are often in close proximity to the VGT Games.

As a result of these actions and given that the relevant group of consumers includes both sophisticated and unsophisticated consumers, CHG has succeeded in sowing confusion among consumers, as described in greater detail in the response to Interrogatory No. 12, and is likely to cause further confusion if not enjoined.

**INTERROGATORY NO. 3:**

State all facts supporting the claims of unfair competition claims alleged in the Complaint.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 3:**

VGT incorporates the General Objections stated above as if set forth fully herein and in particular objects to this interrogatory to the extent that it seeks Privileged Information.  Subject to and without waiving the preceding general and specific objections, VGT responds as follows:

The facts stated in responses to Interrogatory Nos. 2, 3, and 12, which VGT incorporates herein, also support claims for unfair competition.

**INTERROGATORY NO. 4:**

State all facts supporting your misappropriation of trade secrets claim. (As part of your answer, describe with specificity each trade secret you claim CHG misappropriated, and for each such trade secret (hereafter in this interrogatory, "it") state when it was taken, how it was taken, who took it, how CHG obtained it, how CHG has used it (including, if applicable, in which CHG Games it has been used), why it has independent economic value, the approximate value of it, VGT's efforts to keep it secret, when such efforts to keep it secret began and finished, and why it could not be derived independently with publicly-available information.)

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 4:**

VGT incorporates the General Objections stated above as if set forth fully herein and in particular objects to this interrogatory as overbroad and unduly burdensome and to the extent that it seeks Privileged Information.  VGT further objects to this interrogatory to the extent that it purports to be a single interrogatory under Civil Local Rule 33.1 and to the extent it seeks information that is in CHG's possession or otherwise not in the possession, custody or control of VGT.  VGT further objects to this interrogatory to the extent its seeks premature expert

28

discovery by, *inter alia*, asking VGT to place an "approximate value" on each trade secret. Subject to and without waiving the preceding general and specific objections, VGT responds as follows:

VGT owns trade secrets relating to the development, operation, and commercialization of its Class II bingo-based games.

The development and operation of VGT's games incorporate, reflect, or are based on trade secrets, including trade secrets relating to the math underlying the games, proprietary algorithms for playing bingo (including the process and timing for the ball drops), the hit frequency for winning bingo patterns, proprietary software development processes and tools, and the source code used to operate the games. VGT's bingo-based games operate based on source code, including, for example, the code used for purposes of controlling the bingo server and the code used for purposes of controlling the client bingo machines ("client source code"). VGT's Live Call 2003 Bingo Server is an example of VGT's server software. Client 6 and Client 7 are examples of VGT's client software.

The bingo server software, including the Live Call 2003 Bingo Server, controls, *inter alia*, functionality for the bingo game, including the ball calls, distribution of bingo cards, tracking of pay tables, and determination of wins. In addition, the bingo server software provides accounting, administration, and configuration functionality. The client source code controls other aspects of the bingo games, including the control of mechanical reels and the red screen free spin feature, the processes for accepting wagers, the processes for generating payouts, and the interactions with the bell used by the player terminals to indicate successful outcomes.

Operation of VGT's bingo-based games depends on the underlying math developed for the games. The math dictates, among other things, the probabilities of winning, the payouts for

each win, and the volatility of the game (*i.e.*, the level of risk associated with the game). Ultimately, it is the math behind the game that determines the percentage of wagered money that the game pays back to the players.

Other trade secrets relate to VGT's overall system architectures and designs, including designs that enable its bingo-based games to comply with regulatory requirements while providing a good customer experience. In addition, VGT created its bingo-based games using proprietary game development processes, including proprietary software and tools used to test the games, such as by determining the hit frequencies for winning bingo patterns. VGT also has trade secrets relating to financial and customer information, including the pricing of its games and the revenue attributable to those games.

The precise nature of VGT's trade secrets, including those described above, is confidential. VGT will provide additional information upon entry of a protective order.

VGT has invested time and resources in developing its trade secrets, which are integral to its business operations. VGT's trade secrets possess independent economic value by virtue of not being generally known to, nor readily ascertainable through legitimate means by, other persons who could benefit financially from their disclosure or use. VGT has enjoyed considerable success over the years and has developed loyal customers and players. This success is due, in part, to the value of VGT's trade secrets.

VGT has used layers of security to preserve and maintain confidentiality and to prevent unauthorized use or disclosure of its trade secrets and other confidential information. These methods include, without limitation, (1) restricting use of and access to documents that contain trade secrets and confidential information; (2) restricting use of and access to computer networks that contain trade secrets and confidential information; (3) requiring employees to sign

30

employment agreements, which require them to maintain in confidence trade secrets and confidential information; and (4) requiring employees to attend presentations that discuss trade secrets and the importance of protecting them.  Through these layers of security, including requiring employees to protect the secrecy of its trade secrets and other confidential information, VGT has taken reasonable steps to preserve the secrecy of its trade secrets.

The following is an example of relevant language contained in VGT's employee agreements requiring employees to maintain trade secrets in confidence:

3. I understand that my employment by the Company creates a relationship of confidence and trust between me and the Company with respect to any information of a confidential or secret nature that may be learned or developed by me during the period of my employment by the Company and which (i) relates to the business of the Company or to the business of any customer or supplier of the Company, or (ii) has been created, discovered or developed by, or has otherwise become known to the Company and has commercial value in the business in which the Company is engaged (hereinafter called "Proprietary Information"). By way of illustration, but not limitation, Proprietary Information includes trade secrets, processes, formulas, computer programs, data, know-how, inventions, improvements, techniques, marketing plans, product plans, strategies, forecasts and customer lists.

4. All Proprietary Information shall be the sole property of the Company and its assigns. I hereby assign to the Company any rights I may have or acquire in all Proprietary Information. At all times, both during my employment and after its termination, I will keep in confidence and trust all Proprietary Information, and I will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company. In the event of the termination of my employment by me or by the Company for any reason, I will promptly deliver to the Company all materials, documents and data of any nature containing or pertaining to any Proprietary Information and I will not take with me any such materials, documents or data or any reproduction thereof.

CHG was founded by former VGT employees and employs former VGT employees.  As of December 2016, three of five members of CHG's executive team were former VGT

employees:  John R. Taylor III was Vice President of Engineering at VGT for almost six years before becoming President and Chief Executive Office of CHG; Alan Roireau was Director of Software at VGT for almost eight years before becoming Chief Development Officer of CHG; and Jason Sprinkle worked at VGT for 17 years in senior roles, including as Treasurer, Director of Operations/General Manager, and Director of Hardware Development before becoming Chief Creative Officer of CHG.

In addition to these officials, other employees have left VGT to work for CHG, including George Weilacher (software engineer), Brian Cody (software engineer), Aaron Milligan (artist), Seth Morgan (software engineer). Josh Larson (software engineer), Paul Suggs (Software Engineer Group Manager), Rich Sisson (artist), Kelly Davis (software engineer), Robert Gilkerson (software engineer), Dan Fulton (statistician), and Teri Gomez (project manager).

During the time these former VGT employees were employed at VGT, they had access to VGT's trade secrets.  These former VGT employees were aware that VGT's trade secrets are confidential and proprietary and that such information should not be shared outside VGT or used for the benefit of anyone other than VGT.  The former VGT employees also signed agreements that included confidentiality provisions requiring them to protect the secrecy of VGT's trade secrets and other confidential information.

CHG's misuse of VGT's trade secrets can be seen in how the play of CHG's games mimics the play of VGT's games, including without limitation, the payouts, bingo mechanics, and volatility, which are determined by the source code and underlying math of the game.  It is unlikely that the play of VGT's games would so closely mimic CHG's games unless former VGT employees had used VGT's trade secrets in CHG's games.  It is also unlikely that CHG would have been able to release its games as quickly as it did without using VGT's trade secrets.

CHG's improper copying of VGT's trade dress features, such as red free spins, also suggests that CHG intended to unfairly compete with VGT and therefore would have used VGT's trade secrets.

Discovery is ongoing, and VGT expects to discover information about how CHG employees have used its trade secrets.

VGT will produce documents in accordance with Fed. R. Civ. P. 33(d), from which CHG may determine additional information responsive to this interrogatory, and VGT will supplement its response to this interrogatory to specify documents by Bates number or source code directory after the documents have been produced.

In light of the sensitive nature of the information sought, VGT will provide a further response to this interrogatory after entry of a suitable protective order.

**INTERROGATORY NO. 5:**

State all facts supporting your claim for misappropriation of confidential business information asserted in the Complaint. (As part of your answer, describe with specificity each piece of confidential business information you claim CHG misappropriated, and for each such piece of information (hereafter in this interrogatory, "it") state when it was taken, how it was taken, the name(s) of each person who took it, how CHG obtained it, how CHG has used it (including, if applicable, in which CHG Games it has been used), why it has independent economic value, the approximate value of it, all VGT's efforts to keep it secret, when such efforts to maintain secrecy began and finished, and why it could not be derived independently with publicly-available information.)

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 5:**

VGT incorporates the General Objections stated above as if set forth fully herein and in particular objects to this interrogatory as overbroad and unduly burdensome and to the extent that

it seeks Privileged Information.  VGT further objects to this interrogatory to the extent that it

purports to be a single interrogatory under Civil Local Rule 33.1, and to the extent it seeks

information that is in CHG's possession or otherwise not in the possession, custody or control of

VGT.  VGT further objects to this interrogatory to the extent its seeks premature expert

discovery by, *inter alia*, asking VGT to place an "approximate value" on each piece of

confidential business information.  Subject to and without waiving the preceding general and

specific objections, VGT responds as follows:

VGT incorporates by reference its Response to Interrogatory No. 4.  Additionally, VGT

reserves the right to identify additional confidential business information, after the entry of

suitable protective order.  Discovery is ongoing, and VGT expects that it will update this

response with information obtained from CHG.

**INTERROGATORY NO. 6:**

State the background and history of each trade secret and each piece of confidential

business information listed in your responses to Interrogatories 4 and 5. (Include as part of your

answer when the trade secret or confidential information (hereafter in this interrogatory, "it")

was created; the name, address, and telephone number of each person who helped create it; why

it was created; how it has been used (including, if applicable, the name of each VGT Game in

which it has been used); the name, address, and phone number of each person who has had

access to it; when such persons had access; which of the persons who had access actually

accessed it and when; and where and how it has been stored since it came into existence.)

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 6:**

VGT incorporates the General Objections stated above as if set forth fully herein and in

particular objects to this interrogatory as overbroad and unduly burdensome to the extent it seeks

a precise accounting of every individual involved in the development of each trade secret, each

person with access to each trade secret, and each time such an individual actually accessed the trade secret. VGT further objects to the extent that it purports to be a single interrogatory under Civil Local Rule 33.1. VGT further objects to this interrogatory to the extent it purports to place requirements on VGT inconsistent Federal Rule of Civil Procedure 33(d). Subject to and without waiving the preceding general and specific objections, VGT responds as follows:

VGT incorporates by reference its responses to Interrogatories Nos. 4 and 5. VGT began developing its bingo-based games in the late 1990's and/or early 2000's. VGT personnel contributing to this early work included Jon Yarbrough and David Wright. VGT redesigned its platform in or around 2003. VGT employees have developed, refined, and improved these systems since that time, including Josh Davis, Chris Shults, and Kelton Flynn. The source code and documents that VGT intends to produce in this action contain additional responsive information, including development dates and the individuals who have contributed to the development of VGT's trade secrets.

VGT employees and agents have had access to its trade secrets, under an obligation of confidentiality. These employees and agents include individuals who later worked for CHG, including John Taylor, Jason Sprinkle, Alan Roireau, Andy Scheiner, Bryan Cody, Dan Fulton, George Weilacher, Josh Larson, Kelly Davis, Paul Suggs, and Seth Morgan. Testing labs have also had access to some of VGT's trade secrets as part of certifying games, also under an obligation of confidentiality.

VGT has also developed its commercial, business, and financial trade secrets through more than two decades of hard work. Many officials and employees at VGT have been involved in developing these trade secrets.

VGT will produce documents in accordance with Fed. R. Civ. P. 33(d), from which CHG may determine additional information responsive to this interrogatory, and VGT will supplement its response to this interrogatory to specify documents by Bates number or source code directory after the documents have been produced.

**INTERROGATORY NO. 7:**

For each VGT Mark and for each TDF of a VGT Game (including but not limited to the TDF described in paragraphs 22-40 of the Complaint), state when it was created, the name address and telephone number of each person who helped create it, each VGT Game that uses it, the dates it was in use, and the locations it was in use.)

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 7:**

VGT incorporates the General Objections stated above as if set forth fully herein and in particular objects to this interrogatory as overbroad, unduly burdensome, vague, and ambiguous, including to the extent that it uses the term "create" with respect to the VGT Trade Dress and requests VGT to identify "each VGT Game that uses it" and "the locations it was in use" and to the extent that it purports to be a single interrogatory under Civil Local Rule 33.1 and to the extent that it seeks information already in the possession, custody, or control of CHG employees and to the extent that it seeks irrelevant personal information.  Subject to and without waiving the preceding general and specific objections, VGT responds as follows:

As a preliminary matter, VGT notes that some elements of trade dress identified below have been modified over time as VGT seeks to improve and update its products.  Accordingly, in responding to this interrogatory, VGT has attempted to identify the earliest date when the trade dress element was created or adopted.

To the best of VGT's knowledge, the concept for the Crazy Bill Theme was conceived by Jon Yarbrough (founder of VGT) and/or Jason Sprinkle (Director of Operations/General

36

Manager of VGT at the time) in or around the late 1990's and/or early 2000's, and the original artwork for the theme was created soon thereafter by Rob Lamb and/or Dean Yeagle (independent contractors).

To the best of VGT's knowledge, the Mr. Money Bags Theme originated in or around the early 2000's, when Mr. Sprinkle found artwork created by Troy Zurawski (Game Development Manager / Art Director at Suburban Graphics, Inc. at the time), and asked Suburban Graphics to incorporate that artwork (or a variation thereof) into a game entitled Mr. Money Bags (aka Mr. Moneybags).

To the best of VGT's knowledge, the concept for the Polar High Roller Theme was conceived by David (Dave) Marsh (Director of Creative Services at VGT at the time) and/or VGT artists in or around the late 2000's, and the original artwork for the theme was created soon thereafter.

To the best of VGT's knowledge, the concept for the Lucky Leprechaun Theme was conceived by Mr. Yarbrough and/or Mr. Sprinkle in or around the late 1990's and/or early 2000's, and the original artwork for the theme was created soon thereafter by Rob Lamb (independent contractor).

To the best of VGT's knowledge, the concept for the Hot Red Ruby Theme was conceived by Mr. Yarbrough and/or Mr. Sprinkle in or around the early 2000's, and the original artwork for the theme was created soon thereafter by Randy Jones (Art Director at Advanced Graphic Designs at the time).

To the best of VGT's knowledge, the concept for the Gems and Jewels Theme was conceived by Mr. Yarbrough and/or Mr. Sprinkle in or around the early 2000's, and the original artwork for the theme was created soon thereafter by Mr. Jones.

To the best of VGT's knowledge, the concept for the Mr. Millionaire Theme was conceived by Mr. Marsh and/or VGT artists in or around the mid 2000's, and the original artwork for the theme was created soon thereafter by Mikohn Gaming.

To the best of VGT's knowledge, the concept for the Greenback Jack Theme was conceived by Mr. Marsh and/or VGT artists in or around the late 2000's, and the original artwork for the theme was created soon thereafter by Dean Yeagle (independent contractor).

To the best of VGT's knowledge, the concept for the Planetary Pigs Theme was conceived by Ryan Cuddy (Vice President of Game Design at VGT at the time) and/or VGT artists in or around the early 2010's, and the original artwork for the theme was created soon thereafter.

To the best of VGT's knowledge, the concept for the Countin' Cash Theme was conceived by Mr. Marsh and/or Brian Reynolds (Artist at VGT) and/or other VGT artists in or around the mid 2000's, and the original artwork for the theme was created soon thereafter by Mr. Reynolds.

To the best of VGT's knowledge, the concept for the Diamond Fever Theme was conceived by Mr. Marsh and/or VGT artists in or around the mid 2000's, and the original artwork for the theme was created soon thereafter.

To the best of VGT's knowledge, the concept for the Radiant Rocks Theme was conceived by Mr. Marsh and/or VGT artists in or around the late 2000's, and the original artwork for the theme was created soon thereafter.

To the best of VGT's knowledge, the concept for the Cap'n Crabby's Ca$h Theme was conceived by Tracy Reynolds (independent contractor) in or around the late 2000's, and the original artwork for the theme was created soon thereafter by Ms. Reynolds.

To the best of VGT's knowledge, the concept for the Red Hot Rubies Theme was conceived by Mr. Yarbrough and/or Mr. Sprinkle in or around the early 2000's, and the original artwork for the theme was created soon thereafter.

To the best of VGT's knowledge, the concept for the Lucky Ducky Theme was conceived by Mr. Yarbrough and/or Mr. Sprinkle in or around the early 2000's, and the original artwork for the theme was created soon thereafter.

To the best of VGT's knowledge, the concept for the Super Speedway Sevens Theme was conceived by Mr. Marsh and/or VGT artists in or around the mid 2000's, and the original artwork for the theme was created soon thereafter by Mr. Jones.

To the best of VGT's knowledge, the concept for the Crazy Cherry Theme was conceived by Mr. Yarbrough and/or Mr. Sprinkle in or around the early 2000's, and the original artwork for the theme was created soon thereafter.

To the best of VGT's knowledge, VGT first adopted the GAME CABINET in or around the late 1990's. Mr. Sprinkle and Butch McGill (Technical Services Director at VGT at the time) worked with a particular third party to design a cabinet to VGT's specifications for all of VGT's 3-reel mechanical games.

To the best of VGT's knowledge, VGT first adopted the RED CANDLE in or around the late 1990's. Mr. Yarbrough and/or Mr. Sprinkle selected a red strobe light made by a particular third party and VGT installed the light on top of the cabinet for all of its 3-reel mechanical games.

To the best of VGT's knowledge, VGT first adopted the GAME PLAY SOUND in the 1990's. Mr. Yarbrough and/or David Wright (who worked in VGT's Engineering-Software department at the time) selected the sounds for all of VGT's 3-reel mechanical games.

To the best of VGT's knowledge, VGT first adopted the AWARD SOUND in or around 1998 or 1999.  Mr. Yarbrough selected a mechanical bell made by a particular third party from an assortment of sample bells purchased by Mr. McGill and VGT installed the bell in all of its 3-reel mechanical games.

To the best of VGT's knowledge, VGT first adopted the BINGO PLAY AND PAYS in or around the late 1990s or early 2000s.

To the best of VGT's knowledge, VGT first adopted the RED SCREEN FREE SPINS for all of its 3-reel mechanical games in or around 1998 or 1999 after Mr. Yarbrough and/or Mr. Wright conceived of the concept.

VGT will produce documents in accordance with Fed. R. Civ. P. 33(d), from which CHG may determine additional information responsive to this interrogatory, and VGT will supplement its response to this interrogatory to specify documents by Bates number after the documents have been produced.

**INTERROGATORY NO. 8:**

State the name, address, and telephone number of each person who provided information or documents that was reviewed in responding to these interrogatories, and for each person, the topics of information or documents provided, organized by interrogatory number.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 8:**

VGT incorporates the General Objections stated above as if set forth fully herein and in particular objects to this interrogatory as overbroad, unduly burdensome, vague, and ambiguous, including to the extent that it uses the term "reviewed" and to the extent that it seeks Privileged Information or irrelevant personal information.  Subject to and without waiving the preceding general and specific objections, VGT responds as follows:

40

VGT provides the following table sufficient to identify persons knowledgeable about the topics of Defendant Castle Hill Studio LLC's First Set of Interrogatories:

| | Individual | Address | Subject |
|---|---|---|---|
| 1. | Jon Cossin | c/o Covington & Burling LLP | Design and development of VGT products, including software and game play |
| 2. | Josh Davis | c/o Covington & Burling LLP | Design and development of VGT products, including software and game play; departure of VGT employees to CHG |
| 3. | Betsy Dickinson | c/o Covington & Burling LLP | Marketing and advertising of VGT products |
| 4. | Will Harvie | c/o Covington & Burling LLP | Design and development of VGT products, including software and game play; VGT products in comparison to other products in the marketplace, including CHG products; departure of VGT employees to CHG |
| 5. | Rob Lamb | c/o Covington & Burling LLP | Design and development of VGT products, including the game artwork |
| 6. | Jim Marcum | c/o Covington & Burling LLP | Instance of actual confusion between VGT products and CHG products |
| 7. | David Marsh | c/o Covington & Burling LLP | Design and development of VGT products, including the game themes, sounds and artwork; departure of VGT employees to CHG |
| 8. | Butch McGill | c/o Covington & Burling LLP | Design and development of VGT products, including VGT's cabinet, sounds, red screens, and other trade dress features; departure of VGT employees to CHG |
| 9. | Ryan North | c/o Covington & Burling LLP | VGT products in comparison to other products in the marketplace, including CHG products; design and development of VGT products; performance of VGT products; departure of VGT employees to CHG |
| 10. | Barry Smitherman | c/o Covington & Burling LLP | Source and history of VGT products, including VGT's cabinet, |

| | | | sounds, and other trade dress features |
|---|---|---|---|
| 11. | James Starr | c/o Covington & Burling LLP | Sales, placement, and performance of VGT products; VGT products in comparison to other products in the marketplace, including CHG products; departure of VGT employees to CHG |
| 12. | Kelton Flynn | c/o Covington & Burling LLP | Design and development of VGT products, including software and game play |
| 13. | Chris Shults | c/o Covington & Burling LLP | Design and development of VGT products, including software and game play |

**INTERROGATORY NO. 9:**

Identify the date when each VGT Mark that is not uncontested acquired secondary meaning in connection with its products, the territorial areas of acquired meaning, and the sales volume and advertising expenses up to the time of the acquired meaning.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 9:**

VGT incorporates the General Objections stated above as if set forth fully herein and in particular objects to this interrogatory as overly broad, unduly burdensome, vague, and ambiguous, including to the extent that it uses the term "uncontested" and requests VGT to identify "the date when each VGT Mark that is not uncontested acquired secondary meaning" and the "territorial areas of acquired meaning." VGT further objects to this interrogatory to the extent that it seeks legal conclusions and requests information that is not maintained in the ordinary course of business. Subject to and without waiving the preceding general and specific objections, VGT responds as follows:

In accordance with Fed. R. Civ. P. 33(d), VGT will produce documents maintained in the ordinary course of business, from which CHG may determine the sales volume of the VGT Games and the territorial areas in which the VGT Games have been offered as well as VGT's

42

advertising expenses for the company as a whole for the past ten years.  VGT will supplement its response to this interrogatory to specify documents by Bates number after the documents have been produced.

**INTERROGATORY NO. 10:**

Identify each person or entity who purchased or leased products from Plaintiff bearing any VGT Mark or TDF of a VGT Game prior to September 1, 2017, and list the dates during which each product was provided, annual placements for each year each product was provided, the amount spent annually on advertising each product, and the geographic area in which each product was advertised, provided, and/or sold.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 10:**

VGT incorporates the General Objections stated above as if set forth fully herein and in particular objects to this interrogatory as overbroad, overly broad, unduly burdensome, vague, and ambiguous, including to the extent it requests VGT to "[i]dentify each person or entity" and has no time period limitations with respect to a start date.  VGT further objects to this interrogatory to the extent that it purports to be a single interrogatory under Civil Local Rule 33.1 and to the extent that it requests information that is not maintained in the ordinary course of business.  Subject to and without waiving the preceding general and specific objections, VGT responds as follows:

In accordance with Fed. R. Civ. P. 33(d), VGT will produce documents maintained in the ordinary course of business, from which CHG may determine the annual placements of the VGT Games and the locations in which the VGT Games have been placed as well as VGT's advertising expenses for the company as a whole for the past ten years.  VGT will supplement its response to this interrogatory to specify documents by Bates number after the documents have been produced.

**INTERROGATORY NO. 11:**

For each VGT Game that has trademarks or trade dress you allege CHG has infringed, identify each advertisement promoting such game. (As part of your answer, include the date of each advertisement; the medium of each advertisement [e.g. television, radio, newspaper, internet]; the name of the publication, station or website on which it was advertised; in which geographic area the advertisement was distributed; and approximately how many persons received or viewed the advertisement.)

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 11:**

VGT incorporates the General Objections stated above as if set forth fully herein and in particular objects to this interrogatory as overly broad, unduly burdensome, vague, and ambiguous, including to the extent it seeks identification of "each advertisement" for "each VGT Game," "the date of each advertisement," "the medium of each advertisement," "the name of the publication, station or website," "in which geographic area the advertisement was distributed," and "approximately how many persons received or viewed the advertisement." VGT further objects to this interrogatory to the extent that it purports to be a single interrogatory under Civil Local Rule 33.1.  Subject to and without waiving the preceding general and specific objections, VGT responds as follows:

VGT has promoted the VGT Games through advertising and marketing materials and mediums, including catalogues, trade shows, cut sheets, product presentations, slicks, radio advertisements, billboards, swag, Facebook, and the VGT website.

VGT will produce a representative sampling of such documents in accordance with Fed. R. Civ. P. 33(d), from which CHG may determine additional information responsive to this interrogatory.  In VGT's first volume of document production, VGT refers CHG to Bates numbers VGT0000096 – VGT0000168 and VGT0001693 – VGT0001786 as responsive to this

44

Interrogatory.  VGT will supplement its response to this Interrogatory to specify any additional documents by Bates number after the documents have been produced.

**INTERROGATORY NO. 12:**

As to each incident known to you of a person having been confused, mistaken, or deceived as to the source of Plaintiff's or Defendant's products, identify each person involved, the dates and reasons for the confusion, the goods or services confused, and any notice received or record made of the confusion.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 12:**

VGT incorporates the General Objections stated above as if set forth fully herein and in particular objects to this request as overly broad, unduly burdensome, vague, and ambiguous, including to the extent that it is not limited to the VGT Marks and VGT Trade Dress.  Subject to and without waiving the preceding general and specific objections, VGT responds as follows:

VGT states that CHG's infringement of the VGT Marks and VGT Trade Dress has led to actual confusion.  VGT identifies examples of incidents of confusion below.  VGT reserves the right to supplement its response to identify additional incidents.

- The first incident happened within the past two years and involved Craig Eubanks (Tech II at VGT), who was filling in for the regular service technician at Choctaw Casino in Poteau, Oklahoma.  The last time Mr. Eubanks had been at the casino, the bank of VGT games was to the left of the door.  When he walked in the door, he saw that the third game from the left had an error message.  He noticed that the game was not one that he had seen before, and he was excited at the opportunity to work on a new game.  But when Mr. Eubanks opened the door to the machine and started looking at the parts inside, he noticed that some parts were in a different position from other games on which he had worked, so he closed the door to look at the

45

artwork on the game.  It was at this point that he noticed the Castle Hill logo and realized that it was not a VGT game.  Mr. Eubanks immediately called the casino manager (Laura Bailey, who was second in charge after the site manager) to apologize, and the casino manager laughed and said something to the effect they had made the same mistake.

- Mr. Eubanks was also involved in a second incident – this one within the past year or so at Choctaw Casino in Pocola, Oklahoma.  There, Candace Williams (a floor technician who had been working at the casino for a few years) asked Mr. Eubanks to fix a game.  Ms. Williams identified the broken game as being in a bank location that Mr. Eubanks did not recognize, so he followed her to the location.  When Mr. Eubanks saw the game, he told Ms. Williams that it was a CHG game, not a VGT game.  Ms. Williams responded to the effect that the cabinet looked like a VGT cabinet, and Mr. Eubanks agreed with her.

- Another incident occurred at the first Oklahoma Indian Gaming Association ("OIGA") annual conference and trade show where Castle Hill showed its games, which Jim Marcum (Sales Account Manager at VGT) and Josh Akins (Senior Sales Account Manager at VGT) believe was in 2015.  In the weeks before OIGA that year, William Harvey (Product Owner at VGT at the time) asked to shadow Mr. Marcum and Mr. Akins at the trade show, and they agreed to let him do so.  When the day came, Mr. Marcum and Mr. Akins were waiting in the VGT booth for Mr. Harvey.  When Mr. Harvey arrived at the booth, he apologized and said something along the lines of "I went to our other booth."  When Mr. Marcum and Mr. Akins asked Mr. Harvey to what other booth he was referring, Mr. Harvey said something like "it's

46

right over there" and pointed to Castle Hill's booth.  Mr. Marcum and Mr. Akins noted Mr. Harvey's mistake, to which Mr. Harvey said something along the lines of "Their games look just like ours.  How can they get away with that?"

- In May 2016, users on Jokers Wild Forum were discussing the opening of a new casino in Livingston, Texas called Naskila Entertainment.  *See* http://jokerswildforum.com/showthread.php?2542-A-new-casino-in-Texas! (VGT0001673 – VGT0001687).  User "KimKyle" said that he or she hoped the new casino would have "some red screen machines since it seems that people do well on those," but also noted that he or she did not "see any red lucky ducks in the pics" that the casino had posted on Facebook.  User "Brandon" responded to KimKyle, "I checked them out and I do think I see some VGT $1 machines in one of the pics on the right wall," and posted a photograph showing the games that he apparently believed belonged to VGT.  After KimKyle visited the casino, he or she posted: "I played the dollar reels hoping that they were red screen machines ( I couldn't tell), but I never got more than a cherry."  KimKyle then replied to Brandon's post and said, "Thanks Brandon, I think so to, but I forgot to look at the brand. I tried them just a bit but never even got a line hit. When I looked at the pays it only showed the bingo patterns, so I wasn't sure."  Later that same day, a third user named "Warren" commented that "VGT wasn't one of the manufacturers that I heard they have... I did hear they have some Castle Hill Gaming http://www.castlehillgaming.com/ Castle Hill Gaming was started by some ex VGT folks and the games look very similar. Not sure how similar they play, but I would guess pretty close."  At that point, KimKyle seems to have realized that the games he or she played belonged to CHG, not VGT,

and said, "Thanks @Warren . [sic] That's the ones they have. I forgot to look at manufacturers but I will next time."

- Another incident occurred in Spring 2017 at Choctaw Casino in Durant, Oklahoma. There, James Starr (Executive Vice President of Sales at VGT) and Mr. Marcum were standing in the high-limit section of the casino near the bar when Mr. Starr saw a bank of games that he thought were VGT's. When Mr. Starr said something along the lines of "those games look pretty good. I didn't know we had those," Mr. Marcum corrected Mr. Starr and told him that those games belonged to CHG, not VGT.

- On July 30, 2017, Naskila Gaming, a new casino in Livingston, Texas, posted three photos of players who had recently won jackpots on CHG games to its Facebook page. *See* https://www.facebook.com/naskilagaming/posts/1795969217098588 (VGT0001661 – VGT0001672). A Facebook user named Dana Ramsey-Keblish commented on the post, "Looks like I need to come play some VGT." Another Facebook user named Steven Hieronymus corrected this mistake by replying, "Castle Hill - CHG."

## INTERROGATORY NO. 13:

Please state with specificity the amount and category of damages you are seeking in this action, and how such damages are calculated.

## OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 13:

VGT incorporates the General Objections stated above as if set forth fully herein and in particular objects to this request as premature to the extent that it calls for expert testimony or

analysis.  Subject to and without waiving the preceding general and specific objections, VGT responds as follows:

VGT intends to seek at least (a) actual damages suffered by VGT as a result of CHG's trademark infringement, trade dress infringement, unfair competition, misappropriation of VGT's trade secrets, and misappropriation of VGT's confidential business information; (b) disgorgement of CHG's profits derived from its trademark infringement, trade dress infringement, unfair competition, misappropriation of VGT's trade secrets, and misappropriation of VGT's confidential business information; and (c) increased damages or profits and/or punitive damages.  Calculation of such damages will depend on factors including CHG's revenue from the accused games, VGT's revenue lost as a result of CHG's infringement, and other harm caused by CHG's unlawful actions.  VGT also intends to seek an award of its reasonable attorney fees and costs of suit.

## DECLARATION

A signed declaration verifying the facts set forth in the foregoing PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT CASTLE HILL STUDIO LLC'S FIRST SET OF INTERROGATORIES  (NOS. 1-13) is forthcoming.

Respectfully submitted,

November 22, 2017                    */s/ Michael S. Sawyer*
                                    Graydon Dean Luthey, Jr., OBA No. 5568
                                    GABLE GOTWALS
                                    1100 ONEOK Plaza
                                    100 West Fifth Street
                                    Tulsa, OK 74103-4217
                                    Telephone: (918) 595-4821
                                    Facsimile: (918) 595-4990
                                    dluthey@gablelaw.com

                                    Gary M. Rubman
                                    Peter A. Swanson
                                    Michael S. Sawyer
                                    Rebecca B. Dalton
                                    COVINGTON & BURLING LLP
                                    One CityCenter
                                    850 Tenth Street, NW
                                    Washington, D.C. 20001-4956
                                    Telephone: (202) 662-6000
                                    Facsimile: (202) 778-5465
                                    grubman@cov.com
                                    pswanson@cov.com
                                    msawyer@cov.com
                                    rdalton@cov.com
                                      (admitted pro hac vice)

                                    Neil K. Roman
                                    COVINGTON & BURLING LLP
                                    The New York Times Building
                                    620 Eighth Avenue
                                    New York, NY 10018-1405
                                    Telephone: (212) 841-1221
                                    Facsimile: (212) 841-1010
                                    nroman@cov.com
                                      (admitted pro hac vice)

                                    *Counsel for Video Gaming Technologies, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 22, 2017, I sent via email, a true and correct copy of

the foregoing PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT CASTLE

HILL STUDIO LLC'S FIRST SET OF INTERROGATORIES  (NOS. 1-13) to counsel of record

for Defendants Castle Hill Studios LLC, Castle Hill Holdings LLC, and Ironworks Development

LLC:

Robert C. Gill
Thomas S. Schaufelberger
Matthew J. Antonelli
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
tschauf@saul.com
matt.antonelli@saul.com

Sherry H. Flax
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA 4254
JAMES C. HODGES, PC
2622 East 21st Street, Suite 4
Tulsa, OK 74114
Telephone: (918) 779-7078
JHodges@HodgesLC.Com

Duane H. Zobrist
Jonathan S. Jacobs
ZOBRIST LAW GROUP PLLC
1900 Arlington Blvd. Suite B
Charlottesville, VA 22903
Telephone: (434) 658-6400
dzobrist@zoblaw.com
jjacobs@zoblaw.com

*/s/ Michael S. Sawyer*