# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1) VIDEO GAMING TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> 1) CASTLE HILL STUDIOS LLC <br>   (d/b/a CASTLE HILL GAMING); <br> 2) CASTLE HILL HOLDING LLC <br>   (d/b/a CASTLE HILL GAMING); and <br> 3) IRONWORKS DEVELOPMENT, LLC <br>   (d/b/a CASTLE HILL GAMING) <br><br> Defendants. | Case No. 4:17-cv-00454-GKF-jfj <br><br> **REDACTED** |

**PLAINTIFF VIDEO GAMING TECHNOLOGIES, INC.'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMONY OF ROBERT ZEIDMAN IN PART**

I.      INTRODUCTION

Defendant Castle Hill Gaming's ("CHG's") Opposition to Plaintiff's Motion to Exclude the Testimony of Robert Zeidman in Part (hereinafter, "Opposition" or "Opp."), Dkt. 231, rests on a misunderstanding of Plaintiff Video Gaming Technologies, Inc.'s ("VGT's") trade secret claims. Those claims are not about ▮▮▮▮▮▮ or generic software issues; instead, they concern issues specific to casino gaming. CHG does not dispute that Mr. Zeidman has no expertise in casino game design, let alone the specific type of games at issue (Class II bingo-based games), and the fact that the games run on software does not make a software engineer an expert on game design (▮▮▮▮▮▮).

CHG's choice of Mr. Zeidman in this case is consistent with its effort to reduce VGT's trade secret claims to a single issue: ▮▮▮▮▮▮ ▮ Having gone all-in on this misguided strategy, CHG is left with an expert whose expertise (source code copying) has no relevance and who lacks the experience to testify reliably on the gaming-specific trade secrets at issue. The challenged portions of his testimony, *see* Dkt. 166 ("Mot.") at 18, should therefore be excluded.

II.     ARGUMENT

A.      **VGT's Trade Secret Claims.**

In the Opposition, and many other briefs, *see, e.g.*, Dkt. 172 (motion to exclude Stacy Friedman); Dkt. 236 (motion to strike Friedman and Davis declarations), CHG mischaracterizes VGT's trade secret claims and the experts' analysis of the trade secret issues. Accordingly, VGT begins with a brief overview of its claims and the opinions offered by its expert.

In the Amended Complaint, VGT alleges that "CHG has used one or more of the VGT Trade Secrets," *e.g.*, Dkt. 103 ¶ 125; *see also id.* ¶¶ 98, 140, 150, which is defined to include

several categories of trade secrets, including "trade secrets relating to . . . the specifics of the manner in which the bingo game is played in the games," *id.* ¶ 41. Contrary to CHG's suggestion (Opp. at 6 & n.2), there is ███████████████████████. Only one of the categories within "VGT Trade Secrets" relates to source code, Dkt. 103 ¶ 41 (alleging that "VGT owns trade secrets *relating to* . . . the source code used to operate the games" (emphasis added)), and the complaint alleges only that CHG used "one or more of the VGT Trade Secrets," *id.* ¶ 125.[1]

VGT's interrogatory responses and reports of its expert Stacy Friedman set out a number of trade secrets that CHG misappropriated, many of which relate to the functionality of the bingo-based games at issue—specifically, functionality that is opaque to the user (*i.e.*, secret).[2] Although this functionality is *implemented* in the software on which the games run, there can be multiple ways to write software implementing the same functionality (just like there may be multiple ways to write instructions for how to install a dishwasher). For this reason, VGT's trade secret functionality can be misappropriated without copying VGT's specific implementation (*i.e.*, its source code), as Mr. Zeidman himself has recognized: "[T]rade secret theft can also involve copying a method for accomplishing some function without copying the actual source code that implements that function." Ex. A at 253.

---

[1] Although ███████████████████████████, it is not true (as CHG asserts, without citation) that VGT has "admi[tted] that [CHG] did not copy its source code," Opp. at 5, "admitt[ed] that it has no evidence of source code copying," *id.* at 6, and "determined . . . there is absolutely no evidence that [CHG] . . . misappropriated VGT's source code," *id.* at 6 n.2. Additionally, ████████████████████████████████████, there would have been nothing wrong with VGT narrowing its claims before trial.

[2] For example, with respect to VGT's ███████ algorithm, a user does not know how the ███████ ███████████.

VGT agrees that source code can be *relevant* to a claim for misappropriation of trade secret functionality—not to determine whether the code is copied, but to ascertain what it does. Indeed, Mr. Friedman relies on the source code, among other evidence, to support his opinions. In an apparent effort to manufacture a dispute between the experts, CHG falsely asserts (without citation) that Mr. Friedman "did not examine or compare the source code at issue." Opp. at 4. But Mr. Friedman discussed and cited VGT and CHG source code in his opening report[3] and his reply report,[4] and testified about his code review (on which he estimated having spent ▇▇▇ examining CHG's code alone) during his deposition.[5]

At the same time, in arguing that VGT's "allegations of misappropriation of its algorithms . . . *require* an analysis of the underlying source code," Opp. at 1–2 (emphasis added), CHG overstates the importance of source code in this case. VGT documents and witness testimony establish the details of its trade secret algorithms, and CHG documents and testimony establish CHG's use of those algorithms. Ex. I, Friedman Reply Rpt. ¶¶ 69–70.[6] Thus, although Mr. Friedman analyzed the code, this was not necessary for him to render his opinions.

---

[3] *See, e.g.*, Ex. D ¶ 63 (▇▇▇ (emphasis added)); *id.* ¶ 111 nn.10–11 (citing specific source code); ¶ 122 nn.18–19 (same).

[4] *See, e.g.*, Ex. I, Friedman Reply Rpt. ¶¶ 91–92, 99–100, 115–17, 119, 144.

[5] Ex. J, Friedman Dep. Tr. 81:7–15 (estimating having spent ▇▇▇; *id.* 160:15–20, 161:3–6 (stating he ▇▇▇).

[6] Citations to Exhibits A–H are to the exhibits accompanying the Declaration of Peter Swanson in Support of Plaintiff Video Gaming Technologies Inc.'s Motion to Exclude the Testimony of Robert Zeidman in Part (Dkt. 166). Citations to Exhibits I–K refer to the exhibits attached to the Declaration of Gary M. Rubman, filed herewith.

What is important for opining on the trade secrets is an understanding of the design of casino games, because those trade secrets concern functionality specific to gaming (*e.g.*, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓). This is precisely the expertise that Mr. Zeidman lacks. *See* Ex. C at 8:5–6 (admitting no ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).

### B. Mr. Zeidman's Source Code Copying Analysis Is Irrelevant and Non-Responsive to Mr. Friedman's Opening Report.

Because ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and its expert, Mr. Friedman, did not offer an opinion on this issue, Mr. Zeidman's source code copying analysis is not relevant and is not proper rebuttal. CHG's efforts to bootstrap this testimony into other issues—and turn the trial into a sideshow on source code copying—should be rejected.

Contrary to CHG's argument (Opp. at 4), Mr. Zeidman's opinion on source code copying does not—and cannot—"rebut" VGT's claim that CHG's games incorporate VGT's trade secret functionality. Tellingly, CHG offers no response to Mr. Zeidman's admissions that such functionality can be misappropriated without copying source code and that his software tool (CodeSuite) would be unable to detect such misappropriation: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. C at 96:21–97:4 (emphasis added); *see also id.* at 97:11–20 (agreeing that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (emphasis added)); Ex. A at 253 ("[T]rade secret theft can also involve copying a method for accomplishing some function without copying the actual source code that implements that function."). In short, even if Mr. Zeidman were to convince the Court that no source code copying took place, this would have no bearing on VGT's allegations of misappropriation.

4

While ignoring these admissions, CHG misleadingly claims that Mr. Zeidman's software tool has a broader scope in that it "looks at both literal and non-literal copying, and also examines whether the two sets of source code include similar functionality." Opp. at 4. This is a red herring. First, non-literal copying is still copying, and ███████████████. *See, e.g.*, Ex. E ¶ 31 (███████████████████████████████). Second, Mr. Zeidman admits that his software ███████████████████████████████████ ███████████—*i.e.*, unless the code itself is similar. Ex. K, Zeidman Dep. Tr. 105:21–24. As he concedes, functional correlation ███████████████████ of the software. Ex. C at 96:20; *see also* Ex. K at 107:2–18 (███████████████████████████████████ ██████████████████████████████████████████████████████████████) ████████████████████████████████████████████████████████████████████████ ██████████████████████ *Compare* Ex. E §§ VI.A–B (opining on numerous topics, including with references to source code, without relying on CodeSuite), *with id.* § VI.C (source code copying analysis relying on CodeSuite).[7]

CHG's reliance on *Vehicle Market Research, Inc. v. Mitchell International, Inc.*, No. 09-2518-JAR, 2015 WL 5021951 (D. Kan. 2015), is misplaced. Opp. at 7. As an initial matter, this was not a trade secret case, but rather a case over whether "royalties under a software development contract" were owed. *Vehicle Mkt. Research*, 2015 WL 5021951, at *1. Although allegations of "literal copying" were "no longer in dispute," the plaintiff continued to assert that

---

[7] CHG additionally argues that Mr. Zeidman should be permitted to opine on ███████████ ████████████████████████████████████████. Opp. at 5. But Mr. Zeidman's opinions on ██████████ do not appear in the sections of his report describing his source code copying analysis, and VGT did not move to exclude them on this ground. *See* Ex. E ¶¶ 63, 111–12. Rather, his discussion of ██████████████████████████████████ should be excluded because he is not qualified to render such opinions, as discussed in the following Section.

5

the defendant "re-architectured" the code—*i.e.*, non-literal copying. *Id.* at *2. The court did not hold that a source code copying analysis is relevant to determining functional similarity.

### C. Mr. Zeidman Is Unqualified to Render Gaming-Specific Opinions and His Methodology Is Unreliable.

#### 1. Mr. Zeidman's Lack of Expertise in the Class II Gaming Industry Makes Him Unqualified to Render Several of His Opinions.

Although CHG cannot deny that Mr. Zeidman lacks expertise in the gaming industry, CHG argues that such expertise is not necessary despite him offering many gaming-specific opinions in response to Mr. Friedman, a gaming expert. CHG's attempt to proffer Mr. Zeidman on areas outside his expertise should be rejected.

As an initial matter, CHG fails to address many of Mr. Zeidman's gaming-specific opinions that VGT seeks to exclude (*see* Mot. at 10–11), including, for example:

- Opinion that VGT's knowledge of ███████████████████ Ex. E ¶¶ 81–82.
- Opinions on the ways to ███████████████████, *id.* ¶ 105, despite ███████████████████ Ex. C at 16:22–23, and ███████████████████ *id.* at 23:11–15.
- Opinions that documents and emails in which CHG's employees discussed VGT information ███████████████████ Ex. E ¶ 117.

*See also id.* ¶¶ 72–80, 83–87, 89–94, 100, 111–14, and 119. CHG cites no education, training, or experience that would allow Mr. Zeidman to opine intelligently on these issues.

As to the two trade secret issues that CHG addresses—the ███████████████████ ███████████████████—CHG improperly focuses on certain *components* of the algorithms rather than the algorithms as a whole. CHG argues that because those components are not specific to gaming, Mr. Zeidman's generic software expertise qualifies him to opine on "whether the algorithms [used by VGT] are generally known in computer science applications generally." Opp. at 8. But the algorithms are not limited to the elements CHG identifies. Rather, these are

6

multi-step algorithms used to solve problems specific to Class II bingo games—namely, a method for ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████.

That Mr. Zeidman is familiar with one or two components of the algorithms from outside of gaming—*e.g.*, the ████████████████████████████████████ ████████████████████████████████—does not give him a basis to testify on whether these gaming algorithms as a whole are generally known or valuable. Such testimony requires *some* experience in the gaming industry, which Mr. Zeidman lacks. *See* Ex. C at 8:5–6 (admitting no ██████████████████████); *id.* at 23:11–15 (admitting uncertainty whether ██ ██████████████████). Indeed, Mr. Zeidman's ██████████████████████ ████████████████████ highlight the need for such experience. *See, e.g.*, Ex. H at 85:18–21 (██████████████████████████████████████████).

CHG's attempt to analogize this case to a copyright case, *Wood v. Cendant Corp.*, No. 03-CV-298-TCK-FHM, 2006 WL 6862723 (N.D. Okla. Mar. 28, 2006), is not convincing. In *Wood*, the court permitted an expert to testify on the ultimate issue of copyright infringement— "whether certain Excel-based computer programs are substantially similar or virtually identical"—despite the expert's lack of industry expertise. *Id.* at *2. Similarly, here, VGT does not dispute that Mr. Zeidman is *qualified* to testify as to source code copying because that analysis does not require gaming expertise. But such expertise is required for his many gaming-specific opinions, including whether ██████████████ algorithm is generally known, whether certain trade secrets were valuable, and the ██████████████████████████████████████.

7

### 2. CHG Fails to Meaningfully Address the Reliability of Mr. Zeidman's Gaming-Specific Opinions.

CHG fails to address VGT's argument that Mr. Zeidman's methodology is unreliable except in a single footnote. Opp. at 9 n.4. This is telling. As VGT explained in its Motion (at 15–17), Mr. Zeidman's lack of expertise led him to make a number of mistakes and rendered his conclusions unreliable.

In CHG's footnote, it attempts to distinguish *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398 (6th Cir. 2006) ("*MTH*"), in which the court found that the expert "lacked a rudimentary understanding of the . . . industry," causing the expert's methodology to "not reflect the realities of the" industry. *Id.* at 408. CHG contends that *MTH* is distinguishable because "Mr. Zeidman has extensive experience regarding trade secret misappropriation, and software and source code copying, and his methodology was not developed specifically for this case." Opp. at 9 n.4. But that misses the point. What the *MTH* expert lacked was "insight into this *industry*," *MTH*, 472 F.3d at 408 (emphasis added), which in both *MTH* and the present case, is necessary for a reliable trade secret analysis.

### D. CHG Fails to Explain the Relevance of ▮▮▮▮▮▮▮▮▮▮▮▮.

CHG fails to respond in any meaningful way to VGT's argument concerning references to ▮▮▮▮▮▮▮▮▮▮ in Mr. Zeidman's report. Mot. at 17–18. CHG does not explain how this has any bearing on its claim for misappropriation of trade secrets, instead making only a conclusory assertion of relevance. Opp. at 11. In desperation, CHG also seeks to tie this testimony to VGT's trademark and trade dress claims, *id.*, but Mr. Zeidman offers no opinion on those claims. Therefore, it has no place in his testimony.

8

### III. CONCLUSION

For the foregoing reasons and those contained in VGT's Motion and supporting brief, Dkt. 166, VGT respectfully requests the Court grant VGT's Motion to Exclude the Testimony of Robert Zeidman in Part.

Dated:  December 14, 2018           */s/ Gary M. Rubman*

Graydon Dean Luthey, Jr., OBA No. 5568
GABLE GOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, OK 74103-4217
Telephone: (918) 595-4821
Facsimile: (918) 595-4990
dluthey@gablelaw.com

Gary M. Rubman
Peter A. Swanson
Michael S. Sawyer
Rebecca B. Dalton
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C.  20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 778-5465
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
   (admitted pro hac vice)

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1221
Facsimile: (212) 841-1010
nroman@cov.com
   (admitted pro hac vice)

*Counsel for Video Gaming Technologies, Inc.*

**CERTIFICATE OF SERVICE**

   I hereby certify that on December 14, 2018, I caused a copy of the foregoing to be served by ECF on the following counsel for Defendants:

Robert C. Gill
Thomas S. Schaufelberger
Matthew J. Antonelli
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
tschauf@saul.com
matt.antonelli@saul.com

Sherry H. Flax
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA 4254
JAMES C. HODGES, PC
2622 East 21st Street, Suite 4
Tulsa, OK 74114
Telephone: (918) 779-7078
JHodges@HodgesLC.Com

Duane H. Zobrist
Jonathan S. Jacobs
ZOBRIST LAW GROUP PLLC
1900 Arlington Blvd. Suite B
Charlottesville, VA 22903
Telephone: (434) 658-6400
dzobrist@zoblaw.com
jjacobs@zoblaw.com

*Attorneys for Defendants*

                              */s/ Gary M. Rubman*


**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2018, I filed a redacted copy of the foregoing via ECF, which caused service to be effected on the following counsel for Defendants:

Robert C. Gill
Thomas S. Schaufelberger
Matthew J. Antonelli
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
tschauf@saul.com
matt.antonelli@saul.com

Sherry H. Flax
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA 4254
JAMES C. HODGES, PC
2622 East 21st Street, Suite 4
Tulsa, OK 74114
Telephone: (918) 779-7078
JHodges@HodgesLC.Com

Duane H. Zobrist
Jonathan S. Jacobs
ZOBRIST LAW GROUP PLLC
1900 Arlington Blvd. Suite B
Charlottesville, VA 22903
Telephone: (434) 658-6400
dzobrist@zoblaw.com
jjacobs@zoblaw.com

*Attorneys for Defendants*

                                                  */s/ Gary M. Rubman*