**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

VIDEO GAMING TECHNOLOGIES, INC.,

        Plaintiff,

v.

CASTLE HILL STUDIOS LLC, *et al.*

        Defendants.

CASE NO. 17-CV-00454-GKF-JFJ

**PUBLIC – REDACTED VERSION**

**DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.     INTRODUCTION..................................................................................................1

II.    CHG IS ENTITLED TO JUDGMENT ON VGT'S TRADEMARK CLAIMS ......... 2

    A.   VGT Has Abandoned All but One of its Registered Trademark Claims..................................2

    B.   CHG is Entitled to Judgment on Counts I, II, III, and IV as to All Games Not Identified in VGT's Identification of Extant Trademark Infringement Claims.............................................2

    C.   VGT Still Fails to Identify the Specific Trademarks it Alleges Are at Issue................................3

    D.   VGT Failed to Respond to Castle Hill's Argument Regarding the Lack of Similarity Between the Two Parties' Trademarks.....................................................................................................4

    E.   VGT Has Not Met its Burden to Establish Inherent Distinctiveness ......................................6

    F.   VGT Failed to Address Secondary Meaning for any Specific Trademark ...............................6

    G.   House Marks Further Distinguish Between Castle Hill and VGT Games.................................7

III.   CHG IS ENTITLED TO JUDGMENT ON VGT'S TRADE DRESS CLAIMS........ 7

    A.   VGT Does Not Have a Consistent Trade Dress ....................................................................7

    B.   VGT's Alleged Trade Dress Has Not Acquired Secondary Meaning .......................................11

        i.    VGT Must Prove Secondary Meaning ..............................................................................11

        ii.   VGT's Alleged Trade Dress Has Not Acquired Secondary Meaning .....................................13

            1.   Castle Hill Did Not Copy VGT's Alleged Trade Dress.....................................................13

            2.   VGT's Sales Evidence is Unrelated To Trade Dress.........................................................15

        iii.  VGT's Alleged Trade Dress is Not Inherently Distinctive...................................................16

    C.   There is No Likelihood of Confusion Based on VGT's Alleged Trade Dress...........................17

        i.    There is Little Similarity Between the Trade Dress ...........................................................17

        ii.   Castle Hill Did Not Copy VGT's Alleged Trade Dress.....................................................18

        iii.  VGT and Castle Hill's Casino Customers Are Careful and Discerning ..................................18

        iv.   VGT's Alleged Trade Dress is Weak ...............................................................................18

    D.   VGT's Trade Dress is Functional.........................................................................................19

IV.    VGT's "EVIDENCE" OF ACTUAL CONFUSION IS, AT MOST, DE MINIMIS AND OF LITTLE PROBATIVE VALUE ................................................................20

    A.   Dr. Wind's Survey is Inadmissible and of Limited Utility in Any Event...................................21

    B.   VGT's "Anecdotal Evidence" is De Minimis .......................................................................21

V.     CASTLE HILL IS ENTITLED TO JUDGMENT ON VGT'S TRADE SECRETS CLAIMS.............................................................................................................23

    A.   ████████████  .............................................................................................24

    B.   ████████████  .............................................................................................25

C.    "Know How"..................................................................................................................25

**VI.    CONCLUSION............................................................................................................25**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altira Grp. LLC v. Philip Morris Co.,*
207 F. Supp. 2d 1193 (D. Colo. 2002) .................................................................................23

*Boss Manuf., Inc. v. Parker Traps International, Inc.,*
1995 WL 767314 (D. Kan. Nov. 30, 1995) .......................................................................19

*Brunswick Corp. v. Spinit Reel Co.,*
832 F.2d 513 (10th Cir. 1987) ...........................................................................................19

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.,*
2003 WL 21056809 (S.D.N.Y May 8, 2003) ...................................................................7, 9

*First Sav. Bank, F.S.B. v. First Bank System, Inc.,*
101 F.3d 645 (10th Cir. 1996) ...........................................................................................19

*Forney Indus., Inc. v. Daco of Mo., Inc.,*
835 F.3d 1238 (10th Cir. 2016) ....................................................................................*passim*

*Groeneveld Trans. Efficiency, Inc. v. Lubecore Int'l,*
730 F.3d 494 (6th Cir. 2013) .............................................................................................14

*H.I.S.C., Inc. v. Franmar Int'l Importers, Ltd.,*
2018 WL 4945325 (S.D. Cal. Oct. 10, 2018) ...................................................................12

*Happy Sumo Sushi, Inc. v. Yapona, Inc.,*
2008 WL 3539628 (D. Utah Aug. 11, 2008) ....................................................................10

*Heartsprings, Inc. v. Heartspring, Inc.,*
143 F.3d 550 (10th Cir. 1998) ...........................................................................................18

*Henri Bendel, Inc. v. Sears, Roebuck & Co.,*
25 F. Supp. 2d 198 (S.D.N.Y. 1998) .................................................................................20

*Hornady Mfg. v. Doubletap, Inc.,*
746 F.3d 995 (10th Cir. 2014) .....................................................................................4, 5, 7

*Inspired by Design, LLC v. Sammy's Sew Shop, LLC,*
2016 WL 6093778 (D. Kan. Oct. 19, 2016) .....................................................................19

*King of the Mountain Sports, Inc. v. Chrysler Corp.,*
185 F.3d 1084 (10th Cir. 1999) ...........................................................................................4

*Leatherman Tool Group, Inc. v. Cooper Industries, Inc.*,
    199 F.3d 1009 (9th Cir. 1999) ...................................................................................19

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
    209 F. Supp. 3d 612 (S.D.N.Y. 2016)..........................................................................12

*Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*,
    292 F. Supp. 2d 535 (S.D.N.Y. 2003)............................................................................8

*Online Tools for Parents, LLC v. Vilsack*,
    65 F. Supp. 3d 1130 (D. Colo. 2014)...........................................................................22

*Oralabs, Inc. v. The Kind Group LLC*,
    2015 WL 4538444 ....................................................................................................14, 18

*Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*,
    863 F. Supp. 2d 1055 (D. Colo. 2012) .........................................................................13

*Predator Intern., Inc. v. Gamo Outdoor USA, Inc.*,
    669 F. Supp. 2d 1235 (D. Colo. 2009) .........................................................................15

*Ransom v. Edsall*,
    2009 WL 5216915 (W.D. Okla. Dec. 30, 2009) ............................................................5

*Rose Art Indus., Inc. v. Swanson*,
    235 F.3d 165 (3d Cir. 2000).............................................................................................9

*Savant Homes, inc. v. Collins*,
    809 F.3d 1133 (10th Cir. 2016).........................................................................13, 15, 17

*In re Slokevage*,
    441 F.3d 957 (Fed. Cir. 2006) .......................................................................................12

*Streamline Production Systems, Inc. v. Streamline Manufacturing, Inc.*,
    851 F.3d 440 (5th Cir. 2017).........................................................................................23

*Tie Tech, Inc. v. Kinedyne Corp.*,
    296 F.3d 778 (9th Cir. 2002) .........................................................................................19

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
    532 U.S. 23 (2001) .....................................................................................................14, 19

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763 (1992) .....................................................................................................12, 13

*Univ. Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*,
    22 F.3d 1527 (10th Cir. 1994) .........................................................................................7

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
529 U.S. 205 (2000)......................................................................................................11, 12, 15

*Walt Disney Co. v. Goodtimes Home Video Corp.*,
830 F. Supp. 762 (S.D.N.Y. 1993).................................................................................................11

*Water Pik, Inc. v. Med-Systems, Inc.*,
726 F.3d 1136 (10th Cir. 2013)..............................................................................14, 15, 18, 19

*Winning Ways, Inc. v. Holloway Sportswear, Inc.*,
913 F. Supp. 1454 (D. Kan. 1996)................................................................................................14

## I.    INTRODUCTION

VGT's Opposition to Defendants' Motion for Summary Judgment, Doc. 239, exemplifies Plaintiff's conduct in this entire litigation. It is littered with misstatements, half-truths and sleight of hand. The reality is that its claims have undergone constant metamorphosis. VGT first alleged – falsely – that Castle Hill misappropriated its entire computer source code, and pressed for discovery on this issue in its motion to compel (filed before the deadline to respond to that discovery even expired). While Plaintiff knew that this allegation was pure speculation, it then learned from Castle Hill's source code that it was absolutely false. VGT then changed the claim to allege that Castle Hill misappropriated the *concept or idea* for ███████████████████████████████ ██████████████████████████████. Every manufacturer of bingo-based electronic gaming machines ("EGMs") must perform these tasks, and Castle Hill did so using common computer science solutions to these universal problems. Plaintiff makes a further generic claim based on "know how," but hid the ball in discovery with its tired refrain that its claims "included but were not limited to" specific items. It now claims the right to all know-how necessary to operate its EGMs.

Plaintiff has continually changed and narrowed its trade dress claim as well. The simple fact is that Plaintiff claims proprietary rights to trade dress based on EGMs in old-style "retro" cabinets. These cabinets emulate classic old slot machines, and were used by companies before Plaintiff, and continue to be used by companies other than Plaintiff. The notion that Plaintiff has exclusive rights to this ubiquitous cabinet borders the absurd. This is illustrated by the fact that Castle Hill purchased its retro cabinets *used* on the open market.

The history of Plaintiff's trademark claims is no better. Its original and amended complaints allege infringement of twenty registered marks. *See, e.g.*, Doc. 103 ¶19(a)-(t). At the Court's direction (Doc. 142), Plaintiff later filed a statement identifying its extant trademark infringement claims. Doc.

143. In that document Plaintiff identified, in ambiguous fashion, 11 registered trademarks and applications on which it intended to proceed in this case. In its Opposition, Plaintiff only identified *four* games for which it claims infringement of unregistered marks (Mr. Money Bags, Polar High Roller, Crazy Bill and Greenback Jack), and one game for which it claims infringement of registered mark (Mr. Money Bags & Design). Opp. 12-13.

## II.    CHG IS ENTITLED TO JUDGMENT ON VGT'S TRADEMARK CLAIMS

### A.    VGT Has Abandoned All but One of its Registered Trademark Claims

In Count I of the Amended Complaint, VGT identified 20 registered trademarks allegedly at issue; in its Identification of Extant Trademark Infringement Claims (Doc. 143), VGT stated that its claims "include 11 federal trademark registrations and applications." Now, in response to Castle Hill's Motion, VGT reveals that despite what it says in the Complaint, and despite what it told the Court in its Identification of Extant Trademark Infringement Claims, its "*claim of registered trademark infringement is limited to its MR. MONEY BAGS & Design mark.*" Opp. at 13. Castle Hill is thus entitled to judgment on Count I as to all registered trademarks, including the additional 19 registrations enumerated in the Amended Complaint, other than the MR. MONEY BAGS & Design mark (Castle Hill is entitled to judgment on that mark for separate reasons).

### B.    CHG is Entitled to Judgment on Counts I, II, III, and IV as to All Games Not Identified in VGT's Identification of Extant Trademark Infringement Claims

VGT further concedes that the only *unregistered* marks at issue with respect to any of its claims are limited to four game series (Mr. Money Bags; Polar High Roller; Crazy Bill; and Greenback Jack). Opp. at 12. Once again, VGT has not withdrawn its allegations with respect to all of the other games that it maintained were at issue throughout discovery the case.[1] The Court

---

[1]    Despite VGT's statements in its Identification of Extant Trademark Infringement Claims that only four "series of VGT games" remain at issue, the allegations of the Amended Complaint and VGT's various discovery responses are far broader, and allege registered trademark infringement (Count I), unfair competition (Count II), violation of the Oklahoma Deceptive Practices Act (Count

should enter judgment in Castle Hill's favor on every count of the Amended Complaint to the extent each such count relates to marks for any game other than the four VGT has now specified.

### C.    VGT Still Fails to Identify the Specific Trademarks it Alleges Are at Issue

VGT has made an eleventh hour admission that only four game "series" remain at issue. But VGT has still failed to identify, as to the four game series, *the specific trademarks* it alleges have been infringed for each game within each series. VGT instead keeps its argument at a high altitude, making general and passing reference to "the trademarks, including the games' titles, logos, characters, and overall artwork," used on the "four series of games."[2] This vague description leaves Castle Hill and the Court guessing as to exactly which specific elements on any given EGM VGT alleges are at issue. *See, e.g.*, Mot. at 28 n.6. VGT's opposition concedes this argument by failing to respond to it. Judgment should be entered in Castle Hill's favor on this basis alone.

VGT's failure to describe with sufficient particularity each individual trademark alleged to be at issue is further exacerbated by the sheer volume and number of games VGT includes in its claims. While VGT has limited its trademarks claims to four "series of games," each of those series includes multiple game titles, each of which has different titles, logos, characters, and artwork. *See, e.g.*, Mot. at 21 (identifying the 10 different Mr. Money Bags titles); 28 n.6 (identifying the 5 different Crazy Bill titles). Each variation or game title within a "series" has its own title, artwork, and differing characters. *See* Appendix A (examples of artwork from various Mr. Money Bags titles); Appendix B (examples of artwork from various Polar High Roller titles); Appendix C (examples of artwork from various Crazy Bill titles); Appendix D (examples of artwork from Greenback Jack).

It is not sufficient for VGT to identify its alleged trademarks using such generic terms as

---

III) and trademark infringement and unfair competition under Oklahoma common law (Count IV) with respect to at least 13 additional VGT game titles/themes.

[2]    The only specific trademark VGT identified in its opposition is the MR. MONEY BAGS & Design mark.

"logos" and "artwork." As the trademark plaintiff VGT has the burden to prove – with regard to *each and every trademark* – that it is entitled to protection for the claimed mark and that the mark has been infringed. If VGT cannot even be bothered to describe or specify its trademarks, how does it expect the Court to evaluate the merits of its claims? How can Castle Hill or the Court address the likelihood of confusion with respect to unidentified VGT marks? VGT has had well over year to identify the individual trademarks at issue. Rather than specify and explain its claims early on, it adopted a litigation strategy which it kept its claims vague and generic, in order to increase Castle Hill's cost and defense burden. Enough is enough. The Court should find that Castle Hill is entitled to judgment because of VGT's failure to specify its marks.

**D.      VGT Failed to Respond to Castle Hill's Argument Regarding the Lack of Similarity Between the Two Parties' Trademarks**

In conducting a trademark likelihood of confusion analysis, the "similarity of the marks is the 'first and most important factor.'" *Hornady Mfg. v. Doubletap, Inc.*, 746 F.3d 995, 1001 (10th Cir. 2014) (citing *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1091 (10th Cir. 1999)). Accordingly, Castle Hill spent a significant portion of the Motion addressing the lack of similarity between its marks and VGT's marks, and explaining how and why the marks are unlikely to cause customer confusion. *See* Mot. at 22-24 and 30-32 (discussing lack of similarity between the marks in terms of, among other things, color, fonts used, words, and characters). It is very telling that VGT does not even address similarity until page 31 of its brief, and then essentially ignores Castle Hill's arguments in their entirety, instead devoting a *single paragraph* to making a passing reference to unspecified "conclusions drawn from visual comparisons." Opp. at 31. VGT does not say what those "conclusions" are or what specific comparisons it would like the Court to make, and completely fails to rebut Castle Hill's detailed arguments about the lack of similarity between the VGT and Castle Hill game titles. Instead, VGT attempts to "hand wave" away Castle Hill's multiple-page descriptions of the visual differences between its games and VGT games by characterizing

them as "often misleading." This is the sum and substance of VGT's rebuttal on this point. VGT does not say how it believes the descriptions were misleading or inaccurate, or offer any alternative argument regarding similarity or lack thereof between Castle Hill and VGT trademarks. This is true of both VGT's unregistered marks and its registered mark for Mr. Money Bags & Design.[3]

As the plaintiff VGT has an obligation to identify each specific mark at issue, and explain how a specific Castle Hill mark is confusingly similar in "sight, sound, and meaning." *Hornady*, 746 F.3d at 1001. Vague prose about "unavoidable conclusions" and "misleading" descriptions is not helpful, and is a legally insufficient response to Castle Hill's motion for summary judgment. By failing to rebut Castle Hill's arguments, VGT has conceded that the trademarks are not similar.

VGT further muddies the trademark water through conflicting statements about word marks. On the one hand, VGT admits that it "does not assert that CHG's word marks, *standing alone*, infringe VGT's word marks, *standing alone*[.]" Opp. at 12 (emphasis in original).[4] At the same time, however, VGT states that while Castle Hill's word marks "alone may not be similar in sound to VGT's word marks, those marks are similar in meaning, particularly when combined with similar visual themes bolstering those meanings." Opp. at 31. VGT offers no explanation of which marks it is referring to, what "similar visual themes" it believes exist, or how the marks are purportedly "similar in meaning." Instead, it attempts to rely solely on its unsupported conclusory allegation. This is plainly insufficient to overcome summary judgment. *See Ransom v. Edsall*, 2009 WL 5216915, at *1 (W.D. Okla. Dec. 30, 2009) ("conclusory arguments are insufficient" to rebut a summary judgment motion and it is "not the Court's responsibility to attempt to find evidence which could

---

[3]    On page 14 of its Opposition, VGT said it included a discussion "below" about how New Money allegedly infringes the Mr. Money Bags registered mark. But VGT's brief contains no argument or explanation of the alleged infringement, beyond vague references to "obvious similarities." Opp. at 2. VGT made no effort to rebut or otherwise respond to Castle Hill's discussion of the differences between the two marks.

[4]    Given Castle Hill's registrations for its word marks, including for New Money, VGT can no longer credibly argue that Castle Hill's word marks infringe VGT's word marks. *See* Mot. at 24.

support a plaintiff's position.").

### E.    VGT Has Not Met its Burden to Establish Inherent Distinctiveness

With respect to the lack of distinctiveness of its alleged trademarks, VGT fails to address Castle Hill's arguments about other games that share titles and themes similar to VGT's games. *See* Mot. at 26 (games with "money" names and themes similar to Mr. Money Bags); 29 (games with gold-mining, winter/arctic, and cowboy/wild west names and themes, similar to Crazy Bill, Polar High Roller, and Greenback Jack, respectively).[5] Instead, VGT argues, without any support or authority, that because its unregistered trademarks include registered word marks (which themselves it concedes are not infringed by Castle Hill's word marks) presented with "whimsical design elements," the Court should apply the presumption of distinctiveness applicable to registered marks. Other than a vague reference to "anthropomorphic animals," VGT does not explain what design elements it seeks protection for, or how those design elements, combined with the game titles, serve to "tell a customer that they refer to a brand and immediately signal a brand or a product source." *Forney Indus., Inc. v. Daco of Mo., Inc.*, 835 F.3d 1238, 1244-45 (10th Cir. 2016) (citation omitted). Again, VGT *does not even identify what unregistered trademarks it alleges to be specifically at issue*. Its unregistered marks are not entitled to any presumption, and VGT failed to offer evidence sufficient to overcome summary judgment on the issue of inherent distinctiveness.

### F.    VGT Failed to Address Secondary Meaning for any Specific Trademark

VGT's argument about secondary meaning also fails to address any individual, specific trademarks and explain how or why VGT alleges they have achieved secondary meaning. Instead, VGT asks the Court to accept its broad-sweeping statements about its total sales volume and the amount it has spent on advertising. As predicted, *see* Mot. at 29-30, VGT failed to connect its various promotional efforts and sales revenues to *specific* trademarks. For example, sales revenue generated

---

[5]    This same evidence also demonstrates the conceptual weakness of VGT's marks.

by VGT's Greenback Jack game is not probative at all as to alleged secondary meaning of the unregistered trademarks for Mr. Money Bags Deluxe Beach. As set forth above, there are an undisclosed and unspecified number of trademarks (titles, logos, characters, and artwork) at issue. For *each* such mark, VGT had the burden to prove secondary meaning, and failed to do so.

### G.    House Marks Further Distinguish Between Castle Hill and VGT Games

VGT does not dispute that both it and Castle Hill display "house marks" on their games. SOF ¶ 59. As set forth in the Motion, these house marks clearly identify games as manufactured by Castle Hill or VGT, and identify the source of the game and distinguish Castle Hill games from VGT games. *See, e.g., Hornady*, 746 F.3d at 1003 (use of house mark "further diminish[ed] the degree of visual similarity between the marks"); *Univ. Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1531 (10th Cir. 1994) (affirming summary judgment for defendant in part because distinctive house mark was clearly displayed on product). VGT failed to address Castle Hill's argument about house marks, thus conceding that both companies prominently display their respective house marks, and that those marks distinguish the parties' games.

## III.    CHG IS ENTITLED TO JUDGMENT ON VGT'S TRADE DRESS CLAIMS

### A.    VGT Does Not Have a Consistent Trade Dress

True to form, VGT articulates not only new trade dress elements, but redefines its entire trade dress claim in its Opposition, ignoring its admitted obligation to identify the specific combination of elements it claims as trade dress. *See* Opp. at 36-37 (citing *Forney Indus.*, 835 F.3d at 1252). VGT now includes new descriptions of its trade dress features which Castle Hill has never before seen.[6] Most egregious, VGT for the first time explains that it claims trade dress protection on

---

[6]    VGT cites *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 2003 WL 21056809 at *5 (S.D.N.Y May 8, 2003) for the proposition that it may continue to change its definition of the trade dress features during discovery. In *Cartier, Inc.*, however, the court was considering granting the plaintiff's motion for leave to amend the complaint to clarify the trade dress features. This Court gave VGT that opportunity virtually at the close of discovery, and VGT made no changes to the trade dress

"*two* of its most popular mechanical-reel product lines." Opp. at 11 (emphasis added). After the conclusion of discovery, expert reports, and Castle Hill's motion for summary judgment, VGT *now* redefines its entire trade dress claim to include two separate product lines, *i.e.* two completely separate trade dresses.[7]

Remarkably, VGT also removes any reference to "3-reel" mechanical games from its trade dress definition, *see* Opp. at 11, seemingly attempting to *expand* its trade dress definition after the close of discovery without leave of Court despite never previously placing any 5-reel mechanical or other games at issue, and representing to the Court on the very same page in its brief that it "has simply narrowed its definition" of its trade dress. Opp. at 11 n.4. To the extent the Court considers VGT's newly expanded definition of its trade dress, then the Court should likewise consider how the overall appearance of the same game titles in 3-reel mechanical games and 5-reel mechanical games will necessarily appear different to consumers. VGT has already admitted that games with the same titles in different cabinets appear different, SOF ¶ 14, and this analysis is the same.

VGT also materially changes an entire trade dress feature within its claims. *Compare* Am. Compl. ¶ 24 ("GAME PLAY SOUND" refers to sound reels "*spinning*") *with* Opp. at 11 ("REEL RESOLUTION SOUND" refers to sound of reels "*stopping*"). The only mention of the phrase "reel resolution sound" previously in the entire case was in a single paragraph of Mr. Friedman's *reply* expert report, which could hardly put Castle Hill on notice that VGT intended to modify one of the core trade dress elements at issue, long after the close of discovery.

VGT cannot amend its trade dress claim through its summary judgment opposition. *See Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 545-46 (S.D.N.Y. 2003)

---

features – instead VGT intentionally left them vague at its own peril.

[7]      VGT's new two product line theory appears designed intentionally to remove its inconsistent use of monitor sizes from the Court's consideration. *See* Opp. at 11 (describing GAME CABINET feature to include "either 6-inch or 19/20-inch video screens – the latter of which distinguish the two relevant product lines)."

(finding it inappropriate to remedy a legal deficiency in the trade dress articulation after summary judgment has been filed). VGT's shifting sands, hide-the-ball approach to its claims in this case flies in the face of Tenth Circuit law and the policies underlying it, and should not be condoned. *See Forney Indus.*, 835 F.3d at 1252-53 (plaintiff's failure to articulate trade dress increases litigation difficulty for court, defendant, and competitors in the market).

Substantively, VGT's trade dress claims fail out of the gate because of VGT's failure to establish a consistent trade dress. As the "leading case" VGT cites explains:

> A plaintiff, seeking protection for a series or line of products, must first demonstrate that the series or line has a recognizable and consistent overall look. Only after the plaintiff has established the existence of recognizable trade dress for the line or series of products should the trial court determine whether the trade dress is distinctive, whether the trade dress is nonfunctional, and whether the defendant's use of plaintiff's trade dress is likely to cause consumer confusion.

*Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 173 (3d Cir. 2000). "[I]f a plaintiff seeking trade dress protection cannot show that its packages have a 'consistent overall look,' the trade dress that the defendant is allegedly infringing 'does not exist,' and the defendant must prevail." *Id.*

Recognizing it has no consistent trade dress across its numerous products, or even within games in its LS cabinet only, VGT endeavors to narrow the definition of its trade dress as far as possible until the point where it can claim consistency with a straight face. But this is not the law and VGT's strategy fails. As VGT's own case law states, "[a] product's trade dress is not, in a legal sense, the combination of words which a party uses to describe or represent this 'total image.' Rather, the trade dress *is* that image itself, however it may be represented in or by the written word." *Cartier, Inc.,* 2003 WL 21056809, at *5 (emphasis in original). In other words, VGT cannot hide behind its own trade dress descriptions; it must live with the inconsistent products it has placed in the market.

While the non-binding *Rose Art* decision VGT relies on permits a plaintiff to "define the line as it sees fit," the decision says nothing about ignoring variations on products in the very line the plaintiff claims as trade dress. *See Rose Art*, 235 F.3d at 173. VGT admits it uses the same game titles

and themes in a variety of different cabinets in the same casinos in Oklahoma. These create different commercial impressions to consumers (SOF ¶ 14), as does VGT's "LS lighting" a/k/a jukebox lighting package, a customer option which VGT tries to define away even though it is widely available and in use on casino floors on the very cabinet VGT seeks to protect.

VGT's remaining argument, that variations in its games are so "slight" they do "not alter the distinctive characteristics" of its alleged trade dress, defy reality. Even considering only VGT's games in its LS cabinet, with VGT's self-defined exclusion of its jukebox lighting package and multiple monitor sizes, VGT used multiple versions of its LS cabinet for years; different sounds across its products, including award sounds, even within the same titles; 3-reel mechanical games which feature distinguishable fourth reel features in the top of the machine; games with or without toppers in all shapes and sizes; artwork with dark color schemes, bright color schemes, characters, no characters, cartoon characters, and realistic characters; games with paytables located in the top panel artwork, belly glass artwork, and games with no paytables at all; and games with different artists and art styles in the same titles under the same brand. SOF ¶¶ 18-20, 22-24. ██████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████ SOF ¶ 17; Fulton Decl. in Opp. to VGT Mot. For Partial Sum. Judg. (Doc. 240, Ex. 51), ¶¶ 3-4. And this is aside from 5-reel mechanical games and potentially others available in the LS cabinet, which VGT now includes in its new expanded trade dress definitions. VGT's substantial differences and inconsistencies among its games are nothing like the "insignificant differences" to which VGT analogizes them. *See e.g. Happy Sumo Sushi, Inc. v. Yapona, Inc.*, 2008 WL 3539628 at *2 (D. Utah Aug. 11, 2008) (differences between sushi restaurants included curtain rods and material on trim along the bottom of the sushi bar). The various topper styles, artwork styles, placement of paytables, lighting packages, and red screen free

spins feature renders VGT without a consistent overall look because even VGT's defined subset of LS cabinets feature different sizes, shapes, colors, textures, and graphics.[8] *See Walt Disney Co. v. Goodtimes Home Video Corp.*, 830 F. Supp. 762, 767-68 (S.D.N.Y. 1993). VGT's trade dress, much like its trade dress claim, is consistently inconsistent.

### B.    VGT's Alleged Trade Dress Has Not Acquired Secondary Meaning

### i.    VGT Must Prove Secondary Meaning

VGT alleges in its original and amended complaints, and argues in its Opposition, that its Trade Dress is inherently distinctive. Opp. at 17-20. In making this argument VGT stubbornly clings to its specious claim that its EGMs are "product packaging" and not products. VGT takes this position because it recognizes that products are not eligible for trade dress protection based on inherent distinctiveness. A plaintiff seeking trade dress protection for a product must prove that it has acquired secondary meaning. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 216 (2000).

There are a number of reasons for this rule. "The fact that product design almost invariably serves purposes other than source identification not only renders inherent distinctiveness problematic; it also renders application of an inherent-distinctiveness principle more harmful to other consumer interests." *Id.* at 213. The rule strikes an appropriate balance, because a manufacturer can obtain protection for a design that is source-identifying, but does not have secondary meaning, by securing a design patent or copyright. *Id.* at 214. That is directly relevant here, as VGT has obtained more than 50 issued U.S. patents for its EGMs. Defendants similarly

---

[8]    VGT's attempts to compare its wide-ranging inconsistencies in its games to Coca-Cola Co.'s purported "tweaks to the label" or bottles "occasionally" offered in translucent glass rather than transparent glass are a non-starter. Aside from the fact that Coca-Cola Co. bottles and labels are among the most famous and recognizable trade dress, whereas VGT's alleged trade dress has not even acquired distinctiveness, VGT's inconsistencies are not mere "tweaks" to its product design or occasional changes over time. Like in *Walt Disney Co.*, 830 F. Supp. at 767-68, VGT's inconsistent placement of artwork, colors, fonts, and colors, along with VGT's wide-ranging and inconsistent use of other features, means VGT cannot establish a trade dress claim.

secured copyright registrations for artwork used on their EGMs. SOF ¶ 12. These patents and copyrights clearly illustrate that other methods are available to protect VGT's product design. The parties here have availed themselves of these other methods.

VGT has a back-up position, that determination of whether an item is a product or packaging is an issue of fact which should not be resolved on summary judgment. Opp. at 18. However, courts can decide whether a case is a product design case on summary judgment. *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 651 n.43 (S.D.N.Y. 2016) (holding on summary judgment that shoe toe plate was classified as product design and plaintiff must prove secondary meaning); *H.I.S.C., Inc. v. Franmar Int'l Importers, Ltd.*, 2018 WL 4945325 at *3-4 (S.D. Cal. Oct. 10, 2018) (holding on summary judgment case was classified as product design case). The record here is more than sufficient to permit the Court to determine whether the EGMs are products or packaging. There are numerous photographs and countless pages of descriptions about the appearance and functionality of the EGMs. If VGT claimed that the record was insufficient for the Court to make this determination it could have supplemented that record with evidence and included it with its Opposition, as it was obligated to do under the rules. It does the parties no good for VGT to argue that the Court must hold a trial to determine if an EGM is a product or "packaging" when the record is sufficient to permit this determination to be made now. Plaintiff apparently seeks to postpone the inevitable reckoning on disposition of this issue.[9]

*Wal-Mart* supplies some guidance. 529 U.S. at 214-15 (discussing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992) (addressing trade dress protection for the décor used in a chain of

---

[9]    *In re Slokevage*, 441 F.3d 957, 959 (Fed. Cir. 2006), cited by Plaintiff, is not helpful in resolving the product vs. packaging issue. *Slokevage* involved an appeal of a refusal to register trade dress for clothing design because, as a product, it was not eligible for protection on the basis that it was inherently distinctive. *Slokevage*, like the Supreme Court's *Samara Bros.* decision, addressed trade dress protection for a line of clothing, but not for EGMs or other products.

Mexican restaurants)). In the Court's view, the décor at issue in *Two Pesos* involved ornamentation, such as "artifacts, bright colors, paintings and murals," which was deemed to be more similar to product packaging than to product design. *Id.* (citing *Two Pesos*, 505 U.S. at 765). The Court also commented on the "reality" that "even the most unusual of product designs – such as a cocktail shaker shaped like a penguin – is intended not to identify the source, but to render the product itself more useful or more appealing." *Id.* at 213. That is exactly the case here. VGT can keep repeating the fiction that its EGM cabinets, which it copied, are unique. But the reality is that its EGMs look like the traditional slot machines that inspired them, because if they looked different they would not appeal to the consuming public. As the Supreme Court instructed: "To the extent there are close cases, we believe that courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." *Id.* at 215.

### ii.    VGT's Alleged Trade Dress Has Not Acquired Secondary Meaning

"To acquire secondary meaning, a trade dress must have been used so long and so exclusively by one producer with reference to his goods or articles that, in the trade and to that branch of the purchasing public, the trade dress has come to mean that the article is his product." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1148 (10th Cir. 2016). The Court may make a determination as a matter of law on secondary meaning on summary judgment where there are no issues of fact. *Id.* at 1149-50; *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 863 F. Supp. 2d 1055, 1062 (D. Colo. 2012). VGT has failed to set forth evidence meeting its burden to demonstrate that the alleged VGT Trade Dress has acquired secondary meaning.

### 1.    Castle Hill Did Not Copy VGT's Alleged Trade Dress

Despite VGT's attempts to cast aspersions, Castle Hill's motive was only to compete legally in the marketplace by creating games reminiscent of classic, round-top slot machines in use for decades by numerous manufacturers. In an effort to overcome summary judgment, VGT urges use

of a relaxed standard of intent throughout its briefing. But the evidentiary hurdle VGT must clear is not that Castle Hill had an intent to copy, but an intent to deceive or cause confusion. *See Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1158 (10th Cir. 2013) ("[t]he relevance of intent is that one can infer a likelihood of confusion from a defendant's selection of a mark with the intent to cause confusion."); *Oralabs, Inc. v. The Kind Group LLC*, 2015 WL 4538444 at *6 ("The appropriate 'intent' to focus on is not the intent to *copy* but rather the intent to *deceive or confuse*.") (citation omitted). While VGT hangs its hat on its "evidence" of intent to copy, it has no evidence that Castle Hill intended to deceive consumers about the source of its games. To the contrary, Castle Hill took measured steps to prevent consumer confusion, including registering its game names as trademarks, its artwork as copyrights, and including its house marks and logos on every game it placed in the field. SOF ¶¶ 12, 59. As a result, all of VGT's "evidence" of intent to copy is legally insufficient. *Water Pik, Inc.*, 726 F.3d at 1159 (intent to manufacture similar products and sell to similar customers held unrelated to intent to confuse customers).

Evidence of intent to copy product design is given minimal weight. *See Oralabs, Inc.*, 2015 WL 4538444 at *6 (citing *Groeneveld Trans. Efficiency, Inc. v. Lubecore Int'l*, 730 F.3d 494, 516 (6th Cir. 2013)). "Trademark law does not protect against competition from imitative products, however." *Id.; see also Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1472-73 (D. Kan. 1996) ("stitch-for-stitch copies" of jackets insufficient to show secondary meaning because "trade dress law only protects goodwill toward a seller, not goodwill toward a product."). To the contrary, "in the absence of consumer confusion, and in the absence of any copyright or patent protection, copying is perfectly legal," and indeed "is more than just legal; it is often beneficial." *Groeneveld Transf. Efficiency, Inc.*, 730 F.3d at 513 (citing *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001)).

VGT's "evidence" of copying does not prove secondary meaning. Any "evidence" of copying product design features is meaningless, and there is not a shred of evidence that Castle Hill

14

intended to confuse any customers.[10]

### 2. VGT's Sales Evidence is Unrelated To Trade Dress

VGT spends multiple pages submitting evidence of sales and promotional material which do nothing to prove secondary meaning. Castle Hill does not dispute that VGT has generated sales or that it advertises its products. But as Castle Hill previously pointed out, and VGT failed to address, evidence of sales does not prove secondary meaning. *Savant Homes, Inc.*, 809 F.3d at 1148 ("[s]tanding alone, sales volume may not be indicative of secondary meaning because it could be related to factors other than source identification."); *Water Pik*, 726 F.3d at 1154-55 ("Evidence that its products had millions of users and that its products were sold through well-known retailers does not tell us whether the sales were stimulated by the mark.").

The advertising and promotional evidence VGT cites does not prove secondary meaning because it does not demonstrate a nexus between VGT's advertising and its marks or alleged trade dress. *See Forney Indus., Inc.*, 835 F.3d at 1254 ("advertising alone is typically unhelpful to prove secondary meaning when it is not directed at highlighting the trade dress"); *Predator Intern., Inc. v. Gamo Outdoor USA, Inc.*, 669 F. Supp. 2d 1235, 1247 (D. Colo. 2009) (finding no secondary meaning where there was no evidence that advertising and coverage "were aimed at the trade dress and its source identification qualities").

VGT relies on marketing research studies conducted for VGT, which its own expert, Dr. Wind, dismissed as wholly "unreliable." *See* Motion to Exclude Plaintiff's Expert Yoram Wind (Doc. 169) at Ex. B, Wind Reply at 13-15; *id.* at 13 ████████████████████████

███████████████████████████████████████████████

---

[10]     VGT's argument that copying alone is sufficient to establish secondary meaning is incorrect. *See Predator Intern., Inc. v. Gamo Outdoor USA, Inc.*, 669 F. Supp. 2d 1235, 1248 (D. Colo. 2009) ("That would gut 'secondary meaning' of any substance, replacing it with a rule that the first person to market a feature may prevent others from incorporating the feature into their products.") (citing *Wal-Mart*, 529 U.S. at 214).

████████████████████████████████████

████████ VGT's other evidence, websites and other promotional materials, do not focus on the marks or dress at issue. Much of VGT's "evidence" of secondary meaning actually shows cabinets, "jukebox" lighting, games, trademarks, or other items not at issue. *See, e.g.,* Opp. Ex. 178 ("VGT Lounge" advertisement showing games with "jukebox" lighting); Opp. Ex. 180 (collection of various promotional items, most of which do not show the trade dress features at issue, including XL cabinet (VGT0000156), Planetary Pigs game with jukebox lighting (VGT0000162-63), Mr. Money Bags with jukebox lighting (VGT0000164), "Red Spin Den" advertisement featuring a photograph with all or almost all games with jukebox lighting (VGT0000167), and VGT social media postings featuring jukebox lighting (VGT0001693-1702)). VGT's remaining "evidence" – articles and screenshots of a YouTube video posted by anonymous users – fail to even show a full image of a game at issue. *See* Opp. Ex. 181. None of this establishes recognition of VGT's trade dress or marks by consumers.[11]

The advertising and marketing materials VGT relies on are not "directed at highlighting its trade dress," with respect to any specific trade dress element, or VGT's collective trade dress. *See Forney Indus., Inc.,* 835 F.3d at 1254. Such materials therefore cannot establish secondary meaning.

### iii.    VGT's Alleged Trade Dress is Not Inherently Distinctive

To the extent the Court entertains VGT's specious argument that its trade dress qualifies as "packaging" and that it may either show inherent distinctiveness or secondary meaning, VGT still cannot succeed as a matter of law. VGT's trade dress does not qualify as inherently distinctive. Trade dress is inherently distinctive if its "inherent nature serves to identify a particular source." *See Savant Homes, Inc.,* 809 F.3d at 1147.

---

[11]    VGT's inconsistent trade dress undercuts its ability to prove secondary meaning through exclusive use. *See Forney Indus., Inc.,* 835 F.3d at 1255 (changes in packaging preclude finding of secondary meaning as a matter of law).

Each and every element of VGT's alleged trade dress, and the trade dress as a whole, is generic in the gaming industry. VGT uses the same game cabinet as other Class II game manufacturers. VGT's Executive Vice President described one such cabinet as appearing "exactly the same" as the cabinet VGT uses. SOF ¶26. Other manufacturers have had "slim-line" cabinets. *Id.* Gaming manufacturers commonly use red lights on cabinets. SOF ¶30. VGT admits that other manufacturers use mechanical bells to signal awards and that other manufacturers' machines also make game play sounds to attract players. SOF ¶¶31, 47. With respect to the red screen free spins feature, VGT witnesses admitted that red is a typical color used in the industry, including on bonus features. SOF ¶36.

████████████████████████████████████████████████████████████

██████████████████████████████. SOF ¶35. VGT's did not invent its bingo patterns, which are widely available on the internet and in print. SOF ¶34. VGT's game themes are not unique, but are common and ubiquitous in the industry. SOF ¶¶27-28. There are other gaming manufacturers, like IGT, who have similar round top cabinets, larger bingo cards, similar style artwork, similar themes, red screen bonus features, and toppers, just like VGT. SOF ¶38. VGT's trade dress features, individually and collectively, are not inherently distinctive.

### C.   There is No Likelihood of Confusion Based on VGT's Alleged Trade Dress

#### i.   There is Little Similarity Between the Trade Dress

VGT ignores all of the differences between the VGT and Castle Hill games to make its alleged trade dress appear more similar. And VGT accuses Castle Hill of inserting descriptions of misleading comparisons between the marks, when it is VGT alone who stretches the truth. Castle Hill distinguished Castle Hill's games and VGT's alleged trade dress in its Opening brief. *See, e.g.,* Mot. at 41 (enumerating differences in cabinet, toppers, light, sounds, monitor, etc.). VGT failed to

address any of these specific issues, and has thus conceded these differences.[12]

### ii.    Castle Hill Did Not Copy VGT's Alleged Trade Dress

As set forth above, Castle Hill did not copy VGT's alleged trade dress. This factor weighs against VGT because there is no evidence that Castle Hill intended to deceive purchasers as to the source of the product. *See Water Pik, Inc.*, 726 F.3d at 1158 ("The intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product") (citation omitted). Even where there is proof of copying of product design, that is given minimal weight. *Oralabs, Inc.*, 2015 WL 4538444 at *6.

### iii.    VGT and Castle Hill's Casino Customers Are Careful and Discerning

VGT ignores the party admission from its own President and Vice President of Sales identifying tribal casinos as VGT's customers. SOF ¶ 3. VGT also concedes "casino employees" are "VGT's direct customers" in its Opposition. Opp. at 27. There is no dispute of material fact about whether tribal casinos are knowledgeable and sophisticated about gaming machines, are familiar with VGT's products and those of competitors, and that casinos take these negotiations seriously. SOF ¶ 57. "VGT's direct customers" exercise a high degree of care in selecting their products, reducing the likelihood of confusion. *See Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 557 (10th Cir. 1998). This factor weighs in favor of Castle Hill.

### iv.    VGT's Alleged Trade Dress is Weak

There is no material dispute of fact over the strength of VGT's trade dress. As discussed above, its evidence of advertising and sales does not directly relate to its trade dress, so the commercial strength of its trade dress is weak. *See Water Pik, Inc.*, 726 F.3d at 1154. And VGT's

---

[12]    Further, VGT has now copied Castle Hill's instant free pay feature. It recently added video and red reels during this litigation. VGT cannot claim a feature of the games are similar, when it created that similarity itself. At a minimum, for the purposes of the likelihood of confusion analysis, the Court should only consider VGT's features identified before its recent changes.

conceptual strength is generic; its alleged trade dress, and all features of its games, are ubiquitous in the industry. *See id.* at 1152 (widespread use of component of a mark undermines strength of term as a whole). This factor weighs heavily against any likelihood of confusion. *See First Sav. Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 655 (10th Cir. 1996) ("Because the common feature of the two marks is weak, the dissimilarities weigh heavily against any likelihood of confusion.").

### D.    VGT's Trade Dress is Functional

VGT failed to meet its burden to prove that its alleged trade dress is *not* functional. Its trade dress claims fail as a result. *See TrafFix,* 532 U.S. at 24 ("Functionality having been established, whether the design has acquired secondary meaning need not be considered.").

VGT argues that functionality of its trade dress should be considered as a whole, but VGT failed to address the Castle Hill's authority explaining that products composed entirely of functional and aesthetically functional features are, by definition, functional. *Leatherman Tool Group, Inc. v. Cooper Industries, Inc.,* 199 F.3d 1009, 1013 (9th Cir. 1999); *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 786 (9th Cir. 2002); *Inspired by Design, LLC v. Sammy's Sew Shop, LLC,* 2016 WL 6093778 (D. Kan. Oct. 19, 2016); *Boss Manuf., Inc. v. Parker Traps International, Inc.*, 1995 WL 767314 (D. Kan. Nov. 30, 1995).

The Supreme Court defines functionality with two tests. VGT only focuses on whether its trade dress features are ones where "the exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." *TrafFix,* 532 U.S. at 24. But the other test is whether the features are "essential to the use or purpose of the article or if it affects the cost or quality of the article." *Id.* VGT also ignores that this Circuit recognizes the doctrine of aesthetic functionality, *i.e.*, "a feature intrinsic to the aesthetic appeal of those products may not be entitled to trademark protection." *Brunswick Corp. v. Spirit Reel Co.*, 832 F.2d 513, 519 (10th Cir. 1987).

As Castle Hill previously established, every element of VGT's asserted trade dress is functional and serves a utilitarian purpose. And although VGT itself defines the trade dress in terms

19

of individual functional trade dress elements (e.g., award sound, red strobe light), even considering the trade dress as a single combination, the analysis remains the same. VGT's "thin-line" LS cabinet is a functional product, fully equipped with an LCD monitor, mechanical bell, lights, sounds, reels, a printer, a button deck, colorful and attractive artwork, and signage, all designed to attract players with lights, noise, colors, and artwork, to keep them playing with game play features, additional lights and noise, and interface with the player to provide information to the player about the game through the reels, LCD monitor, sounds, and other game features.

If VGT is permitted a monopoly on classic style slot machines, or industry standard paytables, bingo patterns, bells, sounds, bonus features, red lights, or artwork, Castle Hill – and all other Class II EGM manufacturers – will be placed at a serious competitive disadvantage. *See Henri Bendel, Inc. v. Sears, Roebuck & Co.*, 25 F. Supp. 2d 198, 202 (S.D.N.Y. 1998) ("[Plaintiff] seeks in essence to do precisely what the functionality doctrine was designed to protect against, that is, [plaintiff] seeks to inhibit legitimate competition by controlling common and useful product features such as stripes, plastic coating, and gold zipper pulls."). VGT's trade dress claims fail.[13]

## IV.    VGT's "EVIDENCE" OF ACTUAL CONFUSION IS, AT MOST, DE MINIMIS AND OF LITTLE PROBATIVE VALUE

A consideration of VGT's evidence of alleged "actual confusion" is central to the trademark and trade dress claims. VGT intends to demonstrate actual confusion in two ways: through the survey of Dr. Wind; and through "anecdotal evidence" of 14 instances it alleges are of "actual confusion." *See* Opp. at 25-29.

---

[13]    In a last ditch effort to prove non-functionality, VGT blatantly misrepresents the content of a Castle Hill document by inserting "[VGT]" into the text in its quotation in the body of its Opposition. *Compare* Opp. at 34 and Opp. Ex. 128, CHG0008304. VGT makes this statement, ironically, in the context of arguing that Castle Hill was making a "disingenuous" suggestion. Opp. at 34-35.

### A.    Dr. Wind's Survey is Inadmissible and of Limited Utility in Any Event

As set forth in Castle Hill's *Daubert* motion as to Dr. Wind (Doc. 169) and reply in further support of that motion, which are incorporated by reference, the Wind Survey should be excluded. Even if the Court were to disagree and consider the results of the survey, they are in fact quite limited. The Wind Survey tested VGT's Mr. Money Bags in a single, specific cabinet configuration, using the "modernized" Mr. Money Bags artwork (not the registered design mark), against Castle Hill's New Money. The Wind Survey is not probative regarding any other Mr. Money Bags title within the "series," or regarding any of the other three game series at issue. To state the obvious, survey results regarding a comparison of Mr. Money Bags and New Money *are not probative at all* on the question of whether a casino patron would be confused by the artwork used in Castle Hill's Nugget Mountain and VGT's Dynamite Daisy. VGT has no survey evidence with respect to any trademarks other than those included on the Mr. Money Bags EGM actually presented in the survey.

Likewise, the Wind Survey provides little support for VGT's trade dress claim. The survey's still images did not show survey takers how the game sounded, felt, or looked during game play. It did not, therefore, test confusion with respect to the red strobe, reel resolution sound, award sound, bingo play and pays, or red screen "elements" of VGT's alleged trade dress. At most, the survey showed the shape of the game cabinet only.[14] VGT further concedes the survey did not test for secondary meaning as to any marks or trade dress, nor could it have. SOF ¶ 40.

### B.    VGT's "Anecdotal Evidence" is De Minimis

VGT misleadingly claims that it has "14 instances" of alleged actual confusion.[15] VGT hopes that the Court will not dig further into the nature of them, or their potential probative value. As set

---

[14]    Notably, the survey also did not test – at all – VGT's new "second product line" consisting of games using 6-inch screens.

[15]    In its motion in limine regarding these instances (Doc. 147), Castle Hill numbered the alleged instances 1 through 14.  The numbered references in this section refer to the corresponding alleged instances set forth in the motion in limine.

forth in Castle Hill's motion in limine to exclude this evidence (Doc. 147) and reply in support of that motion, which are incorporated by reference, VGT's evidence is inadmissible and thus should not be considered. Even if the Court substantively reviews the "14 instances" it will find that – to the extent VGT has any evidence at all with respect to *specific* marks or *specific* trade dress elements – VGT's evidence is de minimis and insufficient to defeat summary judgment.

Eight of the fourteen alleged instances involve confusion among non-consumers (VGT employees, CHG employees, and casino individuals uninvolved in the purchase of casino games). Other than three passing references to "red screens" or "red reels" (Nos. 4, 9, 14) and one passing reference to the "cabinet" (No. 6) none of VGT's alleged instances of actual confusion mention or in any way tie any alleged confusion to any of the features of VGT's trade dress.

Only four of the alleged instances even mention the name of a game at issue: Arctic Cash (No. 3);[16] Crazy Bill (No. 7); and Mr. Money Bags (Nos. 9-10). For the remaining ten alleged instances, the game title is unknown (and cannot serve as evidence of confusion for the four remaining game series at issue). The Court, however, must look at the evidence of confusion as to *each individual trademark*, or, at a minimum, each individual game "series." If it does so, the de minimis nature of VGT's evidence is clear: VGT has *no confusion evidence* for Greenback Jack/Coin Slinger or Polar High Roller/Arctic Ice; only one single alleged instance relating to Polar High Roller/Arctic Ice and Crazy Bill/Nugget Mountain; and two instances for Mr. Money Bags/New Money. De minimis evidence relating to one game series is **not** probative of confusion for other games with different marks. Moreover, only two of the instances where a game title is known (Nos. 7 and 9)

---

[16]   Aristocrat Chief Product Officer Rich Schneider viewed the Castle Hill artwork for Arctic Cash on his cell phone. This is not indicative of customer confusion based on encountering games in their "ordinary commercial context." *See Online Tools for Parents, LLC v. Vilsack*, 65 F. Supp. 3d 1130, 1135 n. 4 (D. Colo. 2014) (finding instances of confusion to be de minimis because "there is no evidence that either individual was a 'consumer' of OTFP's products or encountered the marks in their ordinary commercial context.").

involve a person actually playing a Castle Hill game and thinking it was a VGT game.

As to the "Jokers Wild Forum" posting (No. 4) the individual who purported to have visited the Naskila casino and played games, "KimKyle," was not confused. To the extent there was any confusion it was another user, "Brandon," who, based on a grainy Facebook picture stated that he thought the games pictured were "VGT $1 machines[.]" Regarding the comments on Naskila Gaming's Facebook page (No. 11), the photo at issue was zoomed in so that trade dress features were not shown. The game titles depicted in that post – Dublin Your Luck and Amazing Hot – are no longer at issue.

VGT cannot be allowed to conflate the foregoing instances and pretend they all relate to the same trademarks and trade dress. This is not the case. And VGT's attempt to point to things such as Rich Sisson's mix-up in typing "Crazy" instead of "Amazing" in front of the word "Cherry" is absurd. Rich Sisson momentarily mixing up those names – involving a game for which VGT *has no claim in this litigation* – does not make it more or less likely that a casino patron will play a Castle Hill Arctic Cash game thinking that it is made by VGT.  It is not probative on that question at all.  *See Streamline Production Systems, Inc. v. Streamline Manufacturing, Inc.,* 851 F.3d 440, 457 (5th Cir. 2017) ("[N]ot all confusion counts: evidence of actual confusion must show 'more than a fleeting mix-up of names'; rather it must show that '[t]he confusion was caused by the trademarks employed and it swayed consumer purchases.'") (quotation omitted); *Altria Grp. LLC v. Philip Morris Co.,* 207 F. Supp. 2d 1193, 1201 (D. Colo. 2002) (finding that mistyping in an internet search did not constitute actual confusion). VGT has no evidence to support most of its actual confusion claim, and what little evidence it does have is de minimis.

## V.    CASTLE HILL IS ENTITLED TO JUDGMENT ON VGT'S TRADE SECRETS CLAIMS

VGT's alleged trade secrets fall into three categories: 1) ████████████████████ ; 2) ███████████ ; and 3) generalized "know how."  Castle Hill is entitled to judgment on all three.

**A.**    ████████████████████████

VGT filed its own motion seeking judgment on its claim that Castle Hill misappropriated its

███████████████████ algorithm. Castle Hill's opposition to VGT's motion sets forth all of the

reasons why VGT's "trade secret" is not one at all: it is readily ascertainable and publicly known; it

lacks independent economic value; and VGT has not taken reasonable measures to protect it. *See*

Doc. 240 at 17-25. Moreover, the undisputed facts demonstrate that Castle Hill has not

"misappropriated" the algorithm. *See id.* at 25-29. For all of the same reasons that VGT is *not* entitled

to summary judgment on this issue, the Court should enter judgment in Castle Hill's favor.

Since filing its Amended Complaint, VGT's sole argument about ████████████████████

has been that Castle Hill misappropriated its algorithm that uses the ████████████████. Now,

however, VGT changed gears to assert that the algorithm that Castle Hill uses in its deployed games

(which is *not* ██████████████) is also part of its trade secret claim. This represents a shift from

VGT's prior positions (including its assertion that amending its complaint was necessary to add in

the ████████████████ algorithm issue because that claim was *not* covered under its existing

Oklahoma trade secrets cause of action). In support of this new theory, VGT offers yet an

additional declaration from Stacy Friedman (because apparently an expert report, rebuttal report,

deposition, and 23-page declaration submitted in support of VGT's motion for partial summary

judgment was not enough), in which Mr. Friedman coins the new term ████████████████

█████████ to refer to the algorithm Castle Hill actually has deployed on its games. This attempt to

introduce new claims and theories after the close of expert discovery and filing of dispositive

motions is clearly improper. Castle Hill moved to strike Mr. Friedman's original declaration as well

as the declaration of Josh Davis, which VGT submitted in support of its own dispositive motion.

Castle Hill is filing another motion to strike with respect to the new declarations VGT has produced

with its opposition, and incorporates its two motions to strike herein by reference.

**B.** ███████████████

Central to Castle Hill's argument regarding VGT's alleged "trade secret" algorithm for ███████████ is that the algorithm represents an obvious solution to a common computer science problem. VGT completely ignores this argument, conceding that the application of generally known ideas and principles is not "misappropriation" of a trade secret.

**C.    "Know How"**

VGT continues to eschew discussion of specific trade secrets in favor of its generic, catch-all "know how" category. This includes things such as "████████████████████████████ ████████████ Opp. at 48. VGT has done little more than point to an issue that every EGM manufacturer must address (████████████████████), and claim that because Castle Hill hired former VGT employees, it "must have" stolen "trade secrets" regarding these common issues. This shows, at most for VGT, that Castle Hill engineers relied on the skills and industry knowledge they developed at VGT and elsewhere to assist in their development work at Castle Hill. VGT cannot stop former employees from working for competitors, or to forget acquired skills. Further, VGT continues to misleadingly allege that Castle Hill employees ████████████ ████████████████████ Opp. at 49. As set forth in Castle Hill's motion in limine on this topic (Doc. 160) and supporting reply, VGT has no evidence of any allegedly taken materials being "used" by Castle Hill – and certainly no evidence that supports its trade secret claim.

**VI.    CONCLUSION**

Defendants respectfully request that their motion for summary judgment be granted.

Dated:  December  14, 2018                    Respectfully  submitted,

                                                 /s/  Robert C. Gill

Robert C. Gill (admitted *pro hac vice*)
Henry A. Platt (admitted *pro hac vice*)
Thomas S. Schaufelberger (admitted *pro hac vice*)
Matthew J. Antonelli  (admitted *pro hac vice*)
Jeremy B. Darling (admitted *pro hac vice*)
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania  Avenue, NW, Suite 550
Washington,  D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
henry.platt@saul.com
tschauf@saul.com
matt.antonelli@saul.com
jeremy.darling@saul.com

Sherry H. Flax (admitted *pro hac vice*)
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite  900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA #4254
JAMES C. HODGES, P.C.
2622 East 21st Street, Suite  4
Tulsa, Oklahoma 74114
(918) 779-7078
(918) 770-9779 (facsimile)
JHodges@HodgesLC.com

*Counsel  for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that on this 14th day of December, 2018, I caused a copy of the foregoing **DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT – PUBLIC REDACTED VERSION** to be filed using the Court's ECF system, which will provide notification of electronic filing to the following counsel for Plaintiff:

Graydon Dean Luthey, Jr.
GABLE GOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, OK 74103-4217
(918) 595-4821
(918) 595-4990 (facsimile)
dluthey@gablelaw.com
*Counsel for Plaintiff*


Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1221
(212) 841-1010 (facsimile)
nroman@cov.com
*Counsel for Plaintiff*

Gary M. Rubman
Peter Swanson
Michael Sawyer
Rebecca B. Dalton
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
(202) 778-5465 (facsimile)
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
*Counsel for Plaintiff*


                     */s/ Robert C. Gill*
                       Robert C. Gill