# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1)  VIDEO GAMING TECHNOLOGIES, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cv-00454-GKF-jfj |
| | ) | |
| 1)  CASTLE HILL STUDIOS LLC | ) | **REDACTED** |
| (d/b/a CASTLE HILL GAMING); | ) | |
| 2)  CASTLE HILL HOLDING LLC | ) | |
| (d/b/a CASTLE HILL GAMING); and | ) | |
| 3)  IRONWORKS DEVELOPMENT, LLC | ) | |
| (d/b/a CASTLE HILL GAMING) | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF VIDEO GAMING TECHNOLOGIES, INC.'S REPLY**
**IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

**Table of Contents**

                                                                          Page

I.    INTRODUCTION ................................................................................. 1

II.   ARGUMENT ....................................................................................... 2

      A.   CHG Does Not Rebut VGT's Entitlement to Summary Judgment on
           CHG's Unclean Hands and Illegality Defenses. ..................................... 2

           1.   CHG Lacks Support for Its Regulatory Theory of Unclean
                Hands and Its Similar Illegality Defense. ..................................... 3

           2.   CHG's ████████ and ████████ Theories Concern ████
                ████████. ................................................................. 10

           3.   CHG's Arguments in Support of Its Change Theory of
                Unclean Hands Are, at Best, Irrelevant. ..................................... 12

      B.   VGT Is Entitled to Summary Judgment on Its Claims That CHG
           Misappropriated VGT's ████████ Algorithm. ..................................... 14

           1.   VGT Is Entitled to Summary Judgment That VGT's ████
                ████ Algorithm Is a Trade Secret. ............................................. 15

           2.   VGT Is Entitled to Summary Judgement That CHG
                Misappropriated VGT's ████████ Algorithm. ............................ 21

           3.   VGT Has Been Harmed by CHG's Misappropriation. ..................... 24

           4.   VGT Is Entitled to Summary Judgment Even If the Court
                Grants CHG's Motion to Strike ............................................. 25

III.  CONCLUSION ................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
    722 F.3d 1229 (10th Cir. 2013) ....................................................................................5

*Am. Registry of Radiologic Technologists v. Bennett*,
    939 F. Supp. 2d 695 (W.D. Tex. 2013)......................................................................17

*Blue Star Land Servs., LLC v. Coleman*,
    Case No. CIV-17-931-R, 2017 WL 6210901 (W.D. Okla. Dec. 8, 2017).............................24

*Cartel Asset Mgmt. v. Ocwen Fin. Corp.*,
    No. 01-CV-01644-REB-CBS, 2010 WL 3522409 (D. Colo. Aug. 11, 2010)....................8, 11

*Cash Processing Servs., LLC v. Ambient Entm't, Inc.*
    320 Fed. Appx. 494 (9th Cir. 2008) (unpublished)..............................................7, 9

*Clinton E. Worden & Co. v. Cal. Fig Syrup Co.*,
    187 U.S. 516 (1903).....................................................................................5, 6

*Commission for Idaho's High Desert, Inc. v. Yost*,
    92 F.3d 814 (9th Cir. 1996) .........................................................................11

*CreAgri, Inc. v. Usana Health Sciences, Inc.*
    474 F.3d 626 (9th Cir. 2007) .........................................................................6

*Dionne v. Se. Foam Converting & Packaging, Inc.*,
    397 S.E.2d 110 (Va. 1990)........................................................................19, 23

*Erva Pharms v. Am. Cyanamid Co.*,
    755 F. Supp. 36 (D.P.R. 1991).........................................................................9

*First Am. Kickapoo Ops., LLC v. Multimedia Games, Inc.*,
    412 F.3d 1166 (10th Cir. 2005) ..............................................................3, 8, 9, 15

*First Fin. Bank, N.A. v. Bauknecht*,
    71 F. Supp. 3d 819 (N.D. Ill. 2014) .................................................................20

*General Mills Inc. v. Health Valley Foods*,
    24 U.S.P.Q.2d 1270, 1992 WL 296518 (T.T.A.B. 1992)..................................................9, 10

*Haagen-Dazs, Inc. v. Frusen Gladje Ltd.*,
    493 F. Supp. 73 (S.D.N.Y. 1980) ...................................................................14

*Integrated Global Srvs., Inc. v. Mayo,*
 No. 3:17-cv-563, 2017 WL 4052809 (E.D. Va. Sept. 13, 2017) ...........................................25

*Kewanee Oil Co. v. Bicron Corp.,*
 416 U.S. 470 (1974)........................................................................................................19

*Keystone Driller Co. v. Gen. Excavator Co.,*
 290 U.S. 240 (1933)....................................................................................................6, 11

*Lasership Inc. v. Watson,*
 79 Va. Cir. 205, 2009 WL 7388870 (2009)..................................................................22

*Lawn Managers, Inc. v. Progressive Lawn Managers, Inc.,*
 No. 4:16-CV-144 DDN, 2017 WL 3189486 (E.D. Mo. July 27, 2017) .................................14

*Metro Publishing, Ltd. v. San Jose Mercury News, Inc.,*
 861 F. Supp. 870 (N.D. Cal. 1994) .......................................................................14

*Microstrategy, Inc. v. Business Objects, S.A.,*
 331 F. Supp. 2d 396 (E.D. Va. 2004) ....................................................................12

*Peace v. Conway,*
 435 S.E.2d 133 (Va. 1993)........................................................................................23

*POM Wonderful LLC v. Coca-Cola Co.,*
 166 F. Supp. 3d 1085 (C.D. Cal. 2016) ..........................................................11

*Radiancy, Inc. v. Viatek Consumer Prod. Grp., Inc.,*
 138 F. Supp. 3d 303 (S.D.N.Y. 2014), *as amended* (Apr. 1, 2014)..........................14

*Rainbow Play Sys., Inc. v. Backyard Adventure, Inc.,*
 No. CIV-06-4166, 2009 WL 3150984 (D.S.D. Sept. 28, 2009) ............................14

*S. Cal. Darts Ass'n v. Zaffina,*
 762 F.3d 921 (9th Cir. 2014) ........................................................................7, 9

*Sally Beauty Co., Inc. v. Beautyco, Inc.,*
 304 F.3d 964 (10th Cir. 2002) ...................................................................8

*SFF-TIR, LLC v. Stephenson*, 250 F. Supp. 3d 856, 1041 (N.D. Okla. 2017)................................5

*Shire LLC v. Mickle,*
 No. 7:10-CV-00434, 2011 WL 3320506 (W.D. Va. Aug. 2, 2011) .......................................22

*Sloan v. Mud Prod., Inc.,*
 114 F. Supp. 916 (N.D. Okla. 1953) ...................................................................19

*Tryco, Inc. v. U.S. Med. Source, L.L.C.,*
 80 Va. Cir. 619, 2010 WL 7373703 (2010)..............................................................23

*United States v. Liew*,
   856 F.3d 585 (9th Cir. 2017) ...................................................................15

*Worthington v. Anderson*,
   386 F.3d 1314 (10th Cir. 2004) ......................................................5, 6, 7, 8

*Yeager v. Fort Knox Sec. Prods.*,
   602 Fed. App'x 423 (10th Cir. 2015) (unpublished) ..............................5

STATUTES

18 U.S.C. § 1839 .......................................................................................12

18 U.S.C. § 1839(3)(B) ..............................................................................19

18 U.S.C. § 1839(5)(A), (5)(B)(ii)(II) & (III)............................................24

Va. Code Ann. § 59.1-336 ..........................................................................19

Va. Code. Ann. § 59.1-337(A)....................................................................23

OTHER AUTHORITIES

25 C.F.R. § 547.3 .........................................................................................4

25 C.F.R. § 547.4(b) .....................................................................................4

25 C.F.R. § 547.7 .........................................................................................9

25 C.F.R. § 547.8 .........................................................................................9

25 C.F.R. § 547.14 .......................................................................................9

25 C.F.R. § 547.16 .......................................................................................9

73 Fed. Reg. 60508 ......................................................................................4

82 Fed. Reg. 61172 ...................................................................................7, 9

Restatement (Second) of Agency § 396 (1958)..........................................23

Restatement (Third) of Agency § 8.05, cmt. c (2006)................................24

Restatement (Third) of Unfair Competition § 39 cmt. d (1995)................17

McCarthy on Trademark and Unfair Competition
   § 31.39 (3d ed.) .....................................................................................11

McCarthy on Trademarks and Unfair Competition
§ 19:123 (5th ed.)......................................................................................7

1 Milgrim on Trade Secrets § 1.08 (2018)......................................................19

1 Milgrim on Trade Secrets § 4.02 (2018)......................................................23

4 Milgrim on Trade Secrets § 15.01[1][d][iii] (2018) ................................................25

## I.    INTRODUCTION

Over the course of this litigation, CHG has maintained vague defenses regarding VGT's supposedly unclean hands.  Despite promising to explain the bases and evidence for these defenses during discovery, CHG had, until its Opposition, failed to do so.  Through its Opposition, however, CHG has illustrated its motive:  to provide itself with as many opportunities as possible to impugn the character of VGT with non-specific, unsubstantiated allegations of bad behavior to distract from the real issues.

In its Opposition, which focuses on disparaging VGT in the eyes of the Court, CHG neglects to provide any meaningful response to VGT's core legal argument:  Even if CHG's allegations are assumed true for purposes of VGT's Motion, they are unconnected to the conduct at issue in this case and thus do not, as a matter of law, amount to an unclean hands or illegality defense.  Even where CHG attempts to address the legal insufficiencies of its defenses, CHG again relies on vague recitations of generalized or out-of-context authorities.

In response to VGT's motion for partial summary judgment on its trade secret claims, CHG offers *no* dispute as to many of the material facts.  CHG does not dispute that it



, Dkt. 240 ("Opp.") at 2 (¶ 1), 8–9 (¶¶ 36–43); that

, *id.* at 3 (¶ 3), 8 (¶¶ 30–31); or that

'" *id.* at 10 (¶ 56).  Nor does CHG dispute that

, *id.* at 6 (¶ 23); and that

*id.* at 5 (¶ 15).  Although CHG asserts that the VGT algorithm was not secret, CHG has no evidentiary support for this assertion.

CHG protests that ████████████████████████████████████████ *Id.* at 28 n.13. But CHG is conspicuously silent on why, if this is truly its intent, it will not agree to the relief VGT seeks—*i.e.*, an enforceable commitment not to use or disclose the algorithm and the destruction of all copies of it (including copies disclosed to third parties). Because there is no genuine factual dispute that CHG is in possession of an improperly obtained VGT trade secret, summary judgment should be granted in favor of VGT.

## II.    ARGUMENT

### A.    CHG Does Not Rebut VGT's Entitlement to Summary Judgment on CHG's Unclean Hands and Illegality Defenses.

CHG's opposition fails to establish the elements of any theory it advances in support of its unclean hands or illegality defense. In its Motion, VGT surmised that CHG might seek to base its unclean hands defense on three—factually unsupported—theories: a Regulatory Theory that some VGT games fail to comply with all NIGC regulations; a ██████ Theory that VGT has ██████████████████████; and a ███████ Theory that VGT has ████████████ ██████████████████. In its Opposition, CHG confirms that it intends to pursue each of these theories (although it seemingly collapses the latter two into a single theory), as well as a novel theory that VGT has begun emulating CHG's trade dress (the "Changes Theory").[1] None of these theories may be maintained.

---

[1] VGT disputes many of the assertions in CHG's "Statement of Undisputed Material Facts" regarding its unclean hands and illegality defenses, Opp. at 11–16, but does not endeavor to identify all such disputes herein. *See* LCvR56.1 (specific factual disputes required only in response to motion for summary judgment). Rather, as explained in VGT's Motion (at 2 n.1), the inapplicability of CHG's defenses can be decided assuming the truth of CHG's assertions.

      **1.**     **CHG Lacks Support for Its Regulatory Theory of Unclean Hands and Its Similar Illegality Defense.**

      **a)**     **CHG Has Failed to Establish a Regulatory Violation.**

Although VGT emphasizes in its Motion that, even if a regulatory violation were assumed, it would not amount to an unclean hands or illegality defense as a matter of law, CHG devotes several pages to VGT's supposed malfeasance, *see* Opp. at 11-12, 31-34, 46-47.  Now that CHG has, for the first time,[2] articulated the basis for its Regulatory Theory, it bears emphasis at the outset that this theory would fail, as a matter of law, to establish a regulatory violation on which to base an unclean hands defense—much less establish a *per se* violation as required for an illegality defense.

Specifically, relying on a non-binding NIGC Bulletin, *see First Am. Kickapoo Ops., LLC v. Multimedia Games, Inc.*, 412 F.3d 1166, 1174 (10th Cir. 2005) ("Rather than requiring our deference, such materials may be accepted by a court only as they have power to persuade."), CHG contends that many of VGT's EGMs were "illegally grandfathered" because they ████
████████████████████████████████████████████████████████████████
████████████████████████ *See* Opp. at 32–34.  Yet rather than support CHG's theory, the Bulletin confirms that VGT's accused conduct would be considered lawful.

As described in the Bulletin, there is a difference between a "Class II gaming system" (the collection of components that allow a casino to conduct bingo games) and a "player interface" (the physical mechanism through which a player can participate in the Class II gaming

---

[2] CHG claims "it had no duty to supplement its discovery" regarding affirmative defenses. Opp. at 32 n.15.  As explained in VGT's Reply in Support of Its Motion in Limine Regarding Castle Hill Defenses, CHG is incorrect.

system's bingo game—that is, the EGM). *See* 25 C.F.R. § 547.3 (2008)[3] (providing definitions).

For purposes of grandfather status, the relevant date is the date the "system" was manufactured

or in use. § 547.4(b). Importantly—and contrary to CHG's position—the Bulletin provides that

*new* player interfaces may be added to a grandfathered Class II gaming system:

> Q. Can new player interfaces, manufactured after November 10, 2008, be added to a grandfathered Class II gaming system and used with grandfathered game software?
>
> A. Yes, provided that the new player interfaces meet all of the applicable hardware requirements of the Technical Standards. 547.7. This will require a determination by the testing laboratory that the new interfaces are so compliant. For example, a gaming operation can add 50 new, fully hardware-compliant player interfaces to a grandfathered gaming system that already had 50 player interfaces on it as of November 10, 2008.

Ex. 28 at 7.

CHG misreads the regulations as proscribing ███████████████████████████

██████████████████████████████████. Opp. at 33. To the

contrary, the regulations expressly authorize the modification of hardware and software

components that maintain or improve system compliance with the Minimum Technical

Standards—*e.g.*, the scenario described in the Bulletin. *See* 25 C.F.R. § 547.4(b)(4); *see also id.*

§ 547.4(b)(3) (permitting repairs and replacement of components).

Thus, CHG has failed to show any violation of the regulations.[4]

---

[3] The numbering of these sections has changed over time. Unless otherwise stated, this Reply refers to the regulations in effect as of November 10, 2008. *See* 73 Fed. Reg. 60508.

[4] CHG identifies no authority for its claim that VGT ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

      **b)**     **CHG Has Failed to Establish That VGT's Supposed Regulatory Violation Was Fraudulent or Deceitful Conduct Related to VGT's Causes of Action.**

Despite criticizing VGT for insufficient attention to *Worthington v. Anderson*, 386 F.3d 1314 (10th Cir. 2004), CHG makes no meaningful attempt to tie the facts of this case to *Worthington*'s requirement that the facts "must be related to the plaintiff's cause of action." *Id.* at 1320.[5]  CHG also ignores the Tenth Circuit's recent guidance that "the clean-hands inquiry looks for fraudulent and deceitful conduct," *Yeager v. Fort Knox Sec. Prods.*, 602 Fed. App'x 423, 429 (10th Cir. 2015) (unpublished), as well as similar statements cited—indeed, *quoted*—by CHG elsewhere in its Opposition (at 30, 36, 43).  In fact, *SFF-TIR, LLC v. Stephenson*, on which CHG relies elsewhere, makes clear what kinds of conduct should be considered:  "In Oklahoma, an unclean-hands defense requires a defendant to show that the plaintiff tainted the transaction that they are challenging by undertaking 'the very fraudulent and deceitful conduct of which they complain.'"  250 F. Supp. 3d 856, 1041 (N.D. Okla. 2017) (quoting *Yeager*, 602 Fed. App'x at 429).  Yet, even focusing on the categories of related conduct discussed in *Worthington*, it is apparent that neither category is applicable here.

The first category identified in *Worthington* addresses "inequitable conduct toward the public, such as deception in or misuse of the trademark itself, resulting in harm to the public." 386 F.3d at 1320 (citing *Clinton E. Worden & Co. v. Cal. Fig Syrup Co.*, 187 U.S. 516 (1903)). Although this category was inapplicable to the dispute in *Worthington*, the Tenth Circuit pointed to the principle articulated by the Supreme Court over a century earlier:  "[I]f it appears that the trade-mark for which [the plaintiff] seeks protection is itself a misrepresentation to the public,

---

[5] CHG's criticism is unfounded.  Not only did VGT cite *Worthington*, it also quoted *Worthington*'s two categories of related conduct, as later expressed by the Tenth Circuit in *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1255 (10th Cir. 2013). *See* Mot. at 18.

and has acquired a value with the public by fraudulent misrepresentations in advertisements, all relief will be denied to him." *Clinton E. Worden & Co.*, 187 U.S. at 535-36.

Here, as in *Worthington*, this category is inapplicable because there is no allegation that VGT's marks or trade dress are themselves misrepresentations to the public, in advertising or otherwise. *See id.* (no protection for "Syrup of Figs" mark for medical preparation containing minimal fig juice). Although CHG asserts that "VGT's illegal games deceive the public," Opp. at 34, its scattershot recitation of irrelevant rules and regulations fails to support that assertion. Specifically, CHG identifies the NIGC's authority to promulgate regulations, notes that the purpose of the Indian Gaming Regulatory Act is "to assure that gaming is conducted fairly and honestly," and observes that the Minimum Technical Standards "specifically discuss fairness to users," *id.* at 35, but at no point does CHG explain how VGT's games—let alone its marks and trade dress—deceive the public.

Instead, CHG concludes that "VGT's efforts to circumnavigate the regulatory framework constitutes inequitable conduct toward the public." *Id.* This reading of the relatedness element is incompatible with Tenth Circuit and Supreme Court precedent because it would allow an unclean hands defense for violation of *any* regulation—all of which are intended to benefit the public. *See Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 244 (1933) (doctrine applies only where "wrongful conduct is directly connected with and material to the matter in litigation"); *Worthington*, 386 F.3d at 1320 (doctrine "does not empower a court of equity to deny relief for any and all inequitable conduct"). As explained in VGT's Motion (at 16–17), courts have found many types of legal and regulatory violations not to constitute unclean hands.

CHG's reliance on the Ninth Circuit's decision in *CreAgri, Inc. v. Usana Health Sciences, Inc.*, *see* Opp. at 35, is misplaced. There, unlike here, the trademarks at issue

addressed misbranding of a drug intended for human consumption, where labelling mistakes concerning the drug's potency or the drug's name could endanger a consumer's health. 474 F.3d 626, 631-32 (9th Cir. 2007). *CreAgri* also involved a scenario where there was "not a single instance of 'lawful use in commerce,'" *id.* at 633, unlike here where, even under CHG's theory, ████████████████████████████████████████. *Compare* Opp. at 11 (¶ 58) ███████ ████████ *with id.* at 60 ████████████████████████████████████).[6] More centrally, even the Ninth Circuit has clarified that *CreAgri* does not stand for the Draconian proposition that *any* unlawful act may be used to defeat a claim of infringement. *See S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 931-32 (9th Cir. 2014) (reigning in *CreAgri* and holding that misconduct "unrelated to the purpose of the federal trademark laws" is "collateral and immaterial"); *Cash Processing Servs., LLC v. Ambient Entm't, Inc.* 320 Fed. Appx. 494, 496 (9th Cir. 2008) (unpublished) (no illegality defense where business obtained illegally but trademark "was not obtained through fraud, nothing about its use was illegal, and there was an insufficient nexus between [the plaintiff']'s criminal activities and the trademark"); *see also* McCarthy on Trademarks and Unfair Competition § 19:123 (5th ed.) ("the Ninth Circuit [in *CreAgri*] erred in unthinkingly wrenching a draconian version of the U.S.P.T.O.'s 'unlawful use' policy out of its administrative registration setting and inserting it into federal court infringement lawsuits").

The second category of related conduct identified in *Worthington* occurs when a plaintiff has "acted inequitably toward the defendant in relation to the trademark." 386 F.3d at 1320. CHG understandably declines to argue that this category would apply to the conduct alleged

---

[6] CHG misleadingly suggests that ████████████████████████████. Opp. at 11 (¶ 58). But CHG's number includes ████████████████████████████████████ *see id.* at 11-12 (¶¶ 59-64), and ████████████████████████ *see* 82 Fed. Reg. 61172 (Dec. 27, 2017) (eliminating requirement to upgrade grandfathered systems).

under CHG's Regulatory Theory.  Indeed, unlike in *Worthington* and the cases cited in it, here there was no business relationship between CHG and VGT before CHG's infringement in which VGT could have acted inequitably toward CHG.  *See id.* at 1320-22; *see also Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, No. 01-CV-01644-REB-CBS, 2010 WL 3522409, at *4 (D. Colo. Aug. 11, 2010) (no unclean hands where alleged conduct "did not induce action by the [defendants] or change the equitable relations between the specific parties to this lawsuit").  Although CHG argues that the allegedly illegal games harmed CHG, Opp. at 34-35, harm is a separate and independent element of an unclean hands defense.  *See Cartel Asset*, 2010 WL 3522409, at *3.  And, in any case, the alleged harm is nothing more than VGT's alleged non-compliance with the regulations—which, as explained above, is not sufficient to support an unclean hands defense.

CHG later suggests that VGT's conduct would meet the similar nexus requirement for its illegality defense, *see* Opp. at 47-48; however, its proposed rationale is, at best, disingenuous.  A product's trade dress "is its overall image and appearance, and may include features such as size, shape, color or color combinations, texture, graphics, and even particular sales techniques," and is used "to identify and distinguish [the producer's] goods, including a unique product, from those manufactured or sold by others."  *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 972, 977 (10th Cir. 2002).  In an attempt to establish a nexus, CHG points to four sections of the Minimum Technical Standards before concluding summarily that they "directly relate[] to VGT's use of its alleged trade dress."  Opp. at 48.  This argument fails for at least two reasons.

*First*, the regulations cited by CHG in no way relate to the Lanham Act or other trade dress principles.  Rather than impose requirements on the unique visual and aural elements of VGT's claimed trade dress, these regulations exclusively concern protection of the "security and integrity" of the underlying bingo games offered through VGT's EGMs by making it easy for

players to understand the rules of the games while making it difficult for interlopers to tamper with those games.  *See* 82 Fed. Reg. 61172 (Dec. 27, 2017); *see also* 25 C.F.R. § 547.7 (technical requirements for, *inter alia*, security aspects of hardware features of game); § 547.8 (software and player interface requirements); § 547.14 (requirements for random number generators); § 547.16 (requirements for rules and instructions).  Unlike the drug-labelling laws at issue in *CreAgri* and *Erva Pharms v. Am. Cyanamid Co.*, which were *designed* to draw connections between drug trademarks and information about those drugs, 474 F.3d at 631-32 (proper dosage); 755 F. Supp. 36, 41 (D.P.R. 1991) (generic drug equivalency), these regulations have nothing to do with the trademarks and trade dress used to distinguish EGMs from one another, *see Zaffina*, 762 F.3d at 931-32 (tax laws unrelated to trademark); *Cash Processing Servs.*, 320 Fed. App'x at 496 (criminal laws unrelated to trademark).

  *Second*, CHG does not specify which, if any, of these regulations were allegedly violated. CHG's Regulatory Theory is based on VGT's ██████████████, but (a) ██████████████ ████████████████████████████, *see, e.g.*, 25 C.F.R. § 547.7 (minimum technical hardware standards), and (b) CHG ████████████████████ were not met and how this alleged non-compliance would relate to the VGT trademarks or trade dress, which concern the visible and aural aspects of the games.

### c)   CHG Has Failed to Establish Its Regulatory Theory Would Meet the Materiality Requirement of an Illegality Defense.

  CHG's reliance on *General Mills Inc. v. Health Valley Foods*, 24 U.S.P.Q.2d 1270, 1992 WL 296518 (T.T.A.B. 1992) for the proposition that VGT's supposed regulatory violation should be considered material is misguided for at least two reasons.

  *First*, the Board in *General Mills* did not find *any* regulatory violation to have been proven in that case.  *Id.* at *3 ("We find that applicant, as the charging party, has not met its

burden of proof relating to this [*per se* violation] portion of the counterclaim."). As a result, the quantity of affected products did not serve as the basis for the Board's opinion.[7]

Instead, the Board held that the materiality analysis focuses on whether the type of violation is "of such gravity and significance that the usage must be considered unlawful--so tainted that, as a matter of law, it could create no trademark rights--warranting cancellation of the registration of the mark involved." *Id.* This determination does not depend on the number of affected products, but rather on "the importance or materiality of the labeling requirement which a party may have violated." *Id.* at *4. Immaterial violations are typically "purely technical in nature," "may be relatively harmless," and "may be subsequently corrected." *Id.*

*Second*, the Board's guidance as to what constitutes an immaterial violation closely matches the facts postulated by CHG here. As discussed above, CHG's only—erroneous—allegation of illegality is that VGT ██████████████████████████████████

██████████████████████████████████████████████████████

██████████████. *See* § II.A.1.a., *supra.* Also as discussed above, CHG has not demonstrated how this act deceived, or otherwise harmed, the public. *See* § II.A.1.b., *supra.* Further, by CHG's own allegation, any such technical violation not only "may be subsequently corrected," *see General Mills*, 24 U.S.P.Q.2d 1270 at *4, but, in fact, ██████████████

██████████████████ *See* Opp. at 12 (¶ 64).

    2.  **CHG's** ██████████ **and** ██████████ **Theories Concern** ██████████
██████████

---

[7] In any event, CHG's allegation of unlawful grandfathering, even if accepted as true, ██████████████
          *Compare* Opp. at 11 (¶ 58)
*with id.* at 11-12 (¶ 60) (alleging that ██████████████████████████████████).

In responding to VGT's argument that CHG's ████████ and ████████ Theories

cannot support an unclean hands defense, CHG fails to meaningfully address the legal

requirement that any allegedly unclean conduct must "injure[] the other party." *Cartel Asset*,

2010 WL 3522409, at *3; *Keystone Driller*, 290 U.S. at 245. Instead, CHG spends nearly all of

Section V.A.ii. reciting factual allegations—allegations already assumed to be true for purposes

of VGT's legal argument—intended to cast VGT in a negative light, *see* Opp. at 37-39.

CHG offers only a brief statement that an unclean hands defense may be premised on the

plaintiff's supposed violation of ████████████████████████████████, Opp. at 38, but the

sole case CHG cites, *POM Wonderful LLC v. Coca-Cola Co.*, 166 F. Supp. 3d 1085 (C.D. Cal.

2016), is inapposite. There, POM Wonderful claimed that the Coca-Cola Company had engaged

in false advertising by implying that its pomegranate juice products were healthy even though

they contained little pomegranate juice. *Id.* at 1088–89. Coca-Cola countered that POM

Wonderful's hands were dirty because the "healthful" image of pomegranate juice was falsely

promoted by POM Wonderful. *Id.* at 1089. Thus, the court had no occasion to address a

plaintiff's supposed ██████████████████████████████████████████.

Indeed, the out-of-context conclusion for which CHG seeks to rely on *POM Wonderful*

has been rejected in the Ninth Circuit. In *Commission for Idaho's High Desert, Inc. v. Yost*, the

Ninth Circuit held that "a third party's prior use of a trademark is not a defense in an

infringement action." 92 F.3d 814, 820 (9th Cir. 1996). The Ninth Circuit added:

> [A third-party's rights] should not be allowed as a defense in any trademark case.
> So long as plaintiff proves rights superior to defendant, that is enough. Defendant
> is no less an infringer because it is brought to account by a plaintiff whose rights
> may or may not be superior to the whole world.

*Id.* at 820-21 (quoting McCarthy on Trademark and Unfair Competition § 31.39 (3d ed.)

(alteration in original)).

11

CHG's argument that its unclean hands defense also applies to VGT's trade secret claims is no more availing. CHG points to no Tenth Circuit law establishing applicability of an unclean hands defense to a claim of trade secret misappropriation, and the out-of-circuit authority cited by CHG suggests that the defense would require proof of the same elements as used in the trademark context. *See Microstrategy, Inc. v. Business Objects, S.A.*, 331 F. Supp. 2d 396, 419 (E.D. Va. 2004). In *Microstrategy*, a defendant accused of illicitly acquiring sensitive documents from the plaintiff in turn accused the plaintiff of having acquired sensitive documents from it. *Id.* The court dismissed the defense, however, because there was no adequate nexus between plaintiff's alleged wrongdoing and defendant's allegations regarding similar conduct:

> The proper rule is not simply one of hypocrisy or general bad character. It is not enough to claim that the opposing party engaged in similar conduct at some point in the past. . . . As the plaintiff points out, the allegation of inequitable conduct must relate directly to the matter in litigation. It is not sufficient that the wrongdoing was remotely or indirectly connected with the subject of the suit.

*Id.* (internal punctuation omitted). Here, as in *Microstrategy*, CHG has failed to show that its allegations of ▮▮▮▮▮▮▮ "relate directly to the matter in litigation" because CHG has not offered any evidence that VGT ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See id.*; Opp. at 12-13 (¶ 65), 38, 45.[8]

### 3. CHG's Arguments in Support of Its Change Theory of Unclean Hands Are, at Best, Irrelevant.

Finally, CHG's claims concerning changes VGT has allegedly made to its games are nonsensical on their face—most notably, CHG's suggestion that VGT, an established player in the market, made changes to mimic games made by CHG, which is trying to take VGT's market

---

[8] CHG has not explained how ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ would constitute "inequitable conduct" capable of supporting an unclean hands defense. *See* Opp. at 45; 18 U.S.C. § 1839 ("improper means . . . does not include reverse engineering"). Nor does CHG allege that the asserted trade secrets derive from these activities.

share by mimicking VGT's games.  CHG's asserted "facts" are vague and fail to identify any

specific games, but to the extent they can be understood, VGT disputes these allegations,

including CHG's characterization of the alleged changes, CHG's implied timeline for the alleged

changes, and CHG's implication that the alleged changes were made to games relevant to this

dispute.  Mot. at 15–16; Ex. 51, Fulton Decl. ¶¶ 2–8.

Even if one were to assume that the facts pled by CHG were true, CHG's argument that

these changes would create consumer confusion where there was none before is absurd.  Opp. at

40–41.  For example, replacing the VGT house mark with that of Aristocrat would not materially

affect consumer confusion between the VGT and CHG games because both the VGT and CHG

house marks are barely visible, as seen in the images below:

**VGT's Mr. Money Bags**                   **CHG's New Money**




Further, replacing a house mark with another house mark is not the same as removing a house

mark.  Although CHG's alleged facts describe the former scenario, Opp. at 16, its arguments

relate to the latter, *id.* at 41.  A similar analysis applies to the other changes.  If anything, CHG's

suggestion that the alleged changes are material to infringement undermines its defense as to the

far more numerous and significant similarities that are the subject of VGT's infringement claim.

CHG's reliance on *Metro Publishing, Ltd. v. San Jose Mercury News, Inc.*, 861 F. Supp. 870 (N.D. Cal. 1994), is misplaced.  There, the plaintiff created nearly identical similarity where there was almost no similarity before.  Specifically, the plaintiff had a weekly column called "Public Eye," but after the launch of the defendant's tabloid, entitled "eye," the plaintiff began using the word "eye" on the cover of its tabloid in the same typeface and admitted that it had done so to make its tabloid more similar to defendant's.  *Id.* at 876–77, 880.  Because of these actions, the plaintiff was precluded from recovering for the alleged harm caused by its own conduct.  *Id.* at 880.[9]

Here, by contrast, as discussed in VGT's opposition to CHG's summary judgment motion, Dkt. 239 at 31–32, the VGT and CHG games at issue share significant features—all of which were a part of VGT's games before CHG launched its games—beyond any similarities resulting from the alleged changes.  Indeed, VGT's infringement claims are not based on any similarities resulting from the alleged changes.

**B.     VGT Is Entitled to Summary Judgment on Its Claims That CHG Misappropriated VGT's ▮▮▮▮▮ Algorithm.**

CHG fails to raise a genuine dispute of material fact that (a) VGT's ▮▮▮▮▮ algorithm is a trade secret and (b) CHG misappropriated the algorithm.

---

[9] The four other cases that CHG cites are even more inapposite.  In three of the cases, the issue arose in the context of false advertising and/or metadata in online advertising, not traditional trademark or trade dress infringement, and the parties' conduct was nearly identical.  *See Radiancy, Inc. v. Viatek Consumer Prod. Grp., Inc.*, 138 F. Supp. 3d 303, 318-19 (S.D.N.Y. 2014), *as amended* (Apr. 1, 2014); *Rainbow Play Sys., Inc. v. Backyard Adventure, Inc.*, No. CIV-06-4166, 2009 WL 3150984, at *6 (D.S.D. Sept. 28, 2009); *Haagen-Dazs, Inc. v. Frusen Gladje Ltd.*, 493 F. Supp. 73, 76 (S.D.N.Y. 1980).  In the fourth case, the issue arose because the plaintiff allegedly violated a divorce decree by offering lawn services in the territory awarded to the defendant, which meant that the plaintiff may have been at least partly responsible for creating the confusion.  *Lawn Managers, Inc. v. Progressive Lawn Managers, Inc.*, No. 4:16-CV-144 DDN, 2017 WL 3189486, at *6 (E.D. Mo. July 27, 2017).

1.    **VGT Is Entitled to Summary Judgment That VGT's** ████████
      **Algorithm Is a Trade Secret.**

   a)    **There Is No Genuine Dispute That VGT's** ████████
         **Algorithm Was Protected by Reasonable Security Measures.**

CHG does not dispute the core measures VGT took to protect the secrecy of the ████

████ algorithm, including ██████████████████████████████████████████████████

█████████████████, Opp. at 3 (¶ 6); █████████████████████████████

██████████████████, *id.* (¶ 7); and ████████████████████████████

██████████████████████████████ *id.* at 3–4 (¶¶ 10–11).  Nor does

CHG dispute that these measures were reasonable. ██████████████████████████

███████████████████████████████████

CHG makes two unavailing attempts to create a factual dispute.  *First*, CHG has no

support for its claim that ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

████ [10]  Nothing more is required.  *United States v. Liew*, 856 F.3d 585, 601 (9th Cir. 2017).

---

[10] CHG also claims that the ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

*Second*, CHG makes the contradictory claim that VGT's security measures were unreasonable because VGT somehow both under-designated and over-designated its trade secrets.  Opp. at 20–21 ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████    To the contrary, █████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████    Ex. 52 ¶

3.  ██████████████████████████████████████████████████████

██████████████████████████████    Friedman Decl. ¶¶ 22–23; *see also* Ex. I, Suggs Dep. Tr. 87:12–88:5.  CHG cites no support for its suggestion that this standard confidentiality language—█████████████████████████████████[11]—is insufficient, or for its unwieldy suggestion that a company must create and distribute a specific list of all trade secrets to its employees lest it lose protection over those trade secrets.[12]

> **b)    There Is No Genuine Dispute That VGT's ████████ Algorithm Is Neither Generally Known Nor Readily Ascertainable.**

CHG does not dispute that "Class II companies typically do not disclose their algorithms for ███████████," Mot. at 5 (¶ 15); Opp. at 4 (¶ 15), and CHG has failed to provide any evidence that all components of the VGT algorithm, let alone the combination of those components, are generally known.  ███████████████████████████████████

---

[11] *Compare* Ex. 52 ¶ 3, *with* Ex. TT, at CHG0120674 (████████████████████████ ███████████).

[12] CHG also suggests that VGT did not take reasonable security measures because ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████   *See* Mot. at 5–6 (¶¶ 17–22).

Instead, CHG continues to mischaracterize the algorithm as the ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████   CHG's focus on individual components of the algorithm cannot create a

dispute of *material* fact, because the relevant issue is whether the algorithm as a whole is

generally known.  *See* Restatement (Third) of Unfair Competition § 39 cmt. d (1995) (the "fact

that some or all of the components of the trade secret are well-known does not preclude

protection for a secret combination, compilation, or integration of the individual elements").

Because CHG fails to identify any evidence showing that the actual algorithm is generally

known, summary judgment is warranted.  *See Am. Registry of Radiologic Technologists v.*

*Bennett*, 939 F. Supp. 2d 695, 712 (W.D. Tex. 2013) (granting summary judgment that identified

information was a trade secret because defendant did not provide any "reason to believe that the

precise questions Plaintiff has expended money to formulate are in the public domain").

In a tacit concession that its evidence is insufficient, CHG offers—for the first time in

this case—four entirely new patent publications that it alleges contain bits and pieces of VGT's

████████████   algorithm.  Opp. at 6–7.  The Court should disregard these publications because they

---

[13] For example, CHG claims there is a dispute about whether "the public disclosures that CHG
has cited in this case disclose ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

were never disclosed during discovery, despite VGT moving to compel on this precise issue. *See* Dkt. 105 at 3–4 ("VGT is entitled to understand the basis for Defendants' contentions that they have not misappropriated VGT's trade secrets."); Dkt. 113 at 1. VGT withdrew that motion as moot only after CHG confirmed that it "did not withhold information" regarding its trade secret defenses and that its responses were "complete based on what we have and know at this time." Dkt. 114. CHG should not be permitted to disclose patents months after discovery closed, after VGT moved to compel this information, and ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ CHG offers no excuse for its failure, which prejudices VGT because it was not able to seek discovery relating to these references and its expert, Mr. Friedman, had no opportunity to offer opinions on them.

In any event, CHG's untimely patent references do not create a genuine dispute of fact. CHG does not even assert ███████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████ More importantly, CHG does not contend, let alone demonstrate, that any one of these references discloses all, or even substantially all, of the algorithm. *Id.* at 22 ("the functionality VGT alleges is *part of* its 'trade secret' is generally known and has been published in publicly available patents and patent applications" (emphasis added)).

Having no evidence that the algorithm is generally known, CHG erroneously applies patent-law principles to this trade secret case. Specifically, CHG cites testimony from Paul

---

[14] For example, none of these references disclose ████████████████████████████ ████████████████████████████████████████████████████████

Suggs that VGT's algorithm is ███████████████████████████████████████

███████████████████████ Opp. at 4, 24 (internal citations omitted).[15]  But even

assuming, *arguendo*, this is true, it is legally irrelevant under trade secret law whether the

solution is innovative or non-obvious.  *See Dionne v. Se. Foam Converting & Packaging, Inc.*,

397 S.E.2d 110, 113 (Va. 1990) ("The crucial characteristic of a trade secret is secrecy rather

than novelty [as] '[n]ovelty, in the patent law sense, is not required for a trade secret'." (quoting

*Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974)); *Sloan v. Mud Prod., Inc.*, 114 F.

Supp. 916, 928 (N.D. Okla. 1953) (unlike patents, which require "invention," a process may "be

maintained in secrecy and be entitled to equitable protection even though invention is not

present" (internal quotations omitted)).  Whereas patent law is concerned with rewarding

inventors for novel and nonobvious inventions, "[t]rade secret law is designed to protect

commercial ethics in dealings," even as to information that does not provide a "a patentable level

of advance."  1 Milgrim on Trade Secrets § 1.08 (2018).

　　　　When asked the *relevant* question— ████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████  Thus, far from creating a dispute of fact, Mr. Suggs's testimony affirmatively establishes

that there is no dispute.[16]

---

[15] CHG also cites snippets of testimony from its expert, Robert Zeidman, but none ████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████

[16] Nor is there any genuine dispute that the algorithm is not readily ascertainable through proper
means.  CHG does not dispute that the algorithm cannot be reverse engineered or otherwise
discovered from the publicly available information about VGT's games.  Mot. at 36.  CHG's
one-sentence argument on this requirement relies on the same evidence as its claim that the
algorithm is generally known, Opp. at 22, and therefore fails for the same reasons.

      **c)**      **There Is No Genuine Dispute That VGT's** ███████
                                                  **Algorithm Has Independent Economic Value.**

Finally, there is no genuine dispute that the algorithm has independent economic value. CHG does not dispute that information has independent economic value, within the meaning of the relevant statutes, if it would be useful to a competitor and would require cost, time, and effort to duplicate. Mot. at 38 (citing authorities). With regard to the facts, CHG does not dispute that ████████████████████████████████████████████████████████████ Opp. at 7 (¶ 23); that █████████████████████████████████████████████████████████████ *id.* at 7 (¶ 24); and that █████████████████████████ ████████████████████████████████████████████████████████ *id.* at 2–3 (¶ 2). This alone is sufficient to grant summary judgment as to the independent value requirement. *See First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 841 (N.D. Ill. 2014) (granting summary judgment to trade secret plaintiff that its information had independent economic value).

Although, in light of these admissions, it is unnecessary to address CHG's arguments, the fact that CHG ███████████████████████████████████ Opp. 19–20, is irrelevant to whether VGT's algorithm is a trade secret.[17] And despite CHG's attempts ██████████ ████████████████████████████████████████████████████████████ Opp. at 7, 19, it cannot undo its expert's concession that █████████████████████████████████ ████████████████████████████████████████████████ Ex. M, Zeidman Dep. Tr. 244:21–245:22 ██████████████████████████████████████████ ███████████████████████████████

---

[17] ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ Ex. N, Scheiner Dep. Tr. 182:24–184:22, 233:14–235:11; *see also* Mot. at 6 (¶ 24).

2.      **VGT Is Entitled to Summary Judgement That CHG Misappropriated VGT's ▮▮▮▮▮▮ Algorithm.**

a)      **There Is No Genuine Dispute That CHG Acquired, Used, and Disclosed VGT's Algorithm.**

CHG does not dispute that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Compare* Opp. at 2 (¶ 1) *with id.* at 8–9 (¶¶ 36–43).

Nor does CHG dispute that it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ *See id.* at 8–9 (¶¶ 29, 34, 46).

Mr. Zeidman's testimony about purported differences in ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As there is no dispute that the Accused Algorithm has all

elements of the VGT algorithm as set forth in the Motion (at 2–3 (¶ 1)), the Court should enter

summary judgment that CHG has acquired, used, and disclosed VGT's ▮▮▮▮ algorithm.

b)      **There Is No Genuine Dispute That the Algorithm Was Acquired by Improper Means.**

CHG does not dispute that its acquisition of the algorithm ▮▮▮▮▮▮▮▮▮▮▮

fiduciary duty of loyalty to VGT under Virginia common law. Mot. at 43–44. For this reason

alone, VGT has established that CHG acquired the algorithm through improper means.

VGT has separately shown that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mot. at 43–44. In

response, CHG does not dispute that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ Mot. at 10 (¶ 56 (quoting Ex. JJ, 294:6–295:10)); Opp. at 10 (¶ 56).

Notwithstanding these admissions, CHG makes a newly minted argument that ███ ████ agreement is unenforceable under Virginia law due to its scope and duration.[18] Opp. at 26–28.  This is a remarkable argument considering that the agreement ███████████ ████████████████████████████████████████ *Compare* Ex. 52 ¶¶ 3, 4, *with* Ex. TT, at CHG0120674 ██████████████████████████████████ CHG0120678 ████████████████████████████████████ ██████████████████████████ Although it is unnecessary to reach this issue in light of the undisputed violation of ████████████ common-law duty of loyalty, VGT briefly addresses CHG's (troubling) attempt to nullify ████████████████████████ ████████████████████████████████.

As to scope, CHG mischaracterizes ██████████ agreement in comparing it to *Lasership Inc. v. Watson*, 79 Va. Cir. 205, 2009 WL 7388870 (2009), which involved an agreement that prohibited the employee even "from telling a neighbor for the rest of her life anything about Lasership, *including information that is not proprietary in nature or worthy of confidence*."  *Id.* at *8 (emphasis added).  In contrast, ████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████ Ex. 52 ¶ 3.

As to duration, CHG relies on two lower-court decisions, Opp. at 27, but "the Virginia Supreme Court has not held that the absence of [express geographic or temporal] limitations renders confidentiality clauses or assignment agreements . . .  invalid *per se*."  *Shire LLC v. Mickle*, No. 7:10-CV-00434, 2011 WL 3320506, at *3 (W.D. Va. Aug. 2, 2011) (refusing to

---

[18] For purposes of this Motion, VGT assumes that Virginia law governs ██████████ agreement. *See* Opp. at 27 n.11.

adopt the logic of the cases cited by CHG because the court was "unwilling to predict that the Virginia Supreme Court would adopt the position of these courts in light of other precedent suggesting that confidentiality clauses need to be analyzed under somewhat different standards" than non-compete provisions). As a leading treatise explains, rules requiring limited duration confidentiality clauses are "patently unsound because the covenant simply ceases to be enforceable upon the underlying matter's becoming generally known or otherwise ceasing to be a trade secret, and hence such restriction can never be unreasonably enforced." 1 Milgrim on Trade Secrets § 4.02 (2018). Similarly, Virginia law authorizes trade secret injunctions of indefinite duration. *See Dionne*, 397 S.E.2d at 114 (affirming a trade secret injunction that continued "until the further order of this Court"); Va. Code. Ann. § 59.1-337(A) ("[u]pon application . . . an injunction shall be terminated when the trade secret has ceased to exist").

Here, ███████ confidentiality agreement, like his common law duty, reasonably protects confidential information "after the employment relationship has ended until the confidential information known to the employee is no longer valuable to the former employer; that is, it no longer provides a competitive edge to the employer." *Tryco, Inc. v. U.S. Med. Source, L.L.C.*, 80 Va. Cir. 619, 2010 WL 7373703, at *2 (2010); *see also* Ex. 52 ¶ 3 ███████ ████████████████████████████████████████████████ ████████████████ Despite urging the Court to deem the agreement unenforceable, CHG cites no case holding that a former employee is free to use his former employer's trade secrets while they still remain trade secrets. CHG's request should be rejected.[19]

---

[19] CHG also claims, incorrectly, that "trade secret claims based on 'remembered information' such as" VGT's have been rejected under Virginia law. Opp. at 28 n.12. The principal case cited by CHG, *Peace v. Conway*, 435 S.E.2d 133 (Va. 1993), involved former employees who "did not execute employment contracts" and remembered their former employer's customer names. *Id.* at 134. But the authority on which the Court relied, the Restatement (Second) of

      c)      **There Is No Genuine Dispute That CHG Is Responsible for ███████ Misappropriation.**

Because CHG does not respond to VGT's argument that CHG is liable for █████

█████████ through the doctrine of *respondeat superior*, Mot. at 45–46, summary judgment

is appropriate without reaching the issue of CHG's knowledge.

As to CHG's knowledge of improper means, the Motion explained that CHG knew or

had reason to know that the VGT ████████ algorithm was obtained through improper means

because (a) ████████████████████████████████████████████████

████████████████████; (b) ████████████████████████████████████████

████; and (c) VGT identified the algorithm as a trade secret in this litigation.  Mot. at 44–45; ;

*id.* at 9 (¶ 46).  CHG does not dispute either (b) or (c), which is sufficient to grant summary

judgment that CHG knows or had reason to know that ████████████████████████

was acquired under circumstances giving rise to a duty to maintain secrecy of the algorithm.[20]

*See* 18 U.S.C. § 1839(5)(A), (5)(B)(ii)(II) & (III).

      3.      **VGT Has Been Harmed by CHG's Misappropriation.**

Federal and Virginia law do not require a showing of "harm" to the trade secret owner.

*See Blue Star Land Servs., LLC v. Coleman*, Case No. CIV-17-931-R, 2017 WL 6210901, at \*7

---

Agency § 396 (1958), distinguishes "trade secrets" (which may not be used) from "the names of the customers retained in his memory," and, even for the latter, the Restatement acknowledges that the parties may "otherwise agree[]" not to use them.  As explained in the Restatement (Third) of Agency (2006), "[a]n agent is not free to use or disclose a principal's trade secrets" by "retain[ing] them in the agent's memory," because "[f]eats of human memory . . . should not be privileged as instruments of disloyal conduct." § 8.05, cmt. c (2006); *see also* Mot. at 40 n.17.

[20] As to (a), CHG inaccurately claims that "VGT misquotes and mischaracterizes" these documents in some unspecified way.  Opp. at 26.  But CHG does not dispute that ████████ ████████████████████████████████████████████  *Compare* Mot. at 10 (¶¶ 52–53), *with* Opp. at 10 (¶¶ 52-53).  CHG's unfounded allegations of mischaracterization appear to be based on overlooking the term "*inter alia*."  *See* Mot. at 10 (¶ 52).

(W.D. Okla. Dec. 8, 2017) (DTSA); *Integrated Global Srvs., Inc. v. Mayo*, No. 3:17-cv-563, 2017 WL 4052809, at *8 (E.D. Va. Sept. 13, 2017).  Regardless, VGT has been harmed from CHG's and the testing lab's possession of trade secrets, which, if disclosed publicly, would destroy the secrets.  *See* 4 Milgrim on Trade Secrets § 15.01[1][d][iii] (2018) ("[t]he reason why unauthorized use or acquisition of another's trade secret is actionable is that the adverse use or possession puts the value of the trade secret at risk").[21]  Moreover, CHG has not made an enforceable commitment never to use or disclose the algorithm.  Therefore, VGT is entitled to injunctive relief prohibiting further use and disclosure by CHG and requiring CHG to destroy all copies, including those in the possession of the lab.

### 4.    VGT Is Entitled to Summary Judgment Even If the Court Grants CHG's Motion to Strike

CHG has filed a meritless motion to strike the Friedman and Davis Declarations (Dkt. 236), which should be denied.  *See* Dkt. 267.  But were the Court to grant that motion, summary judgment should still be granted in view of Mr. Suggs's and CHG's admissions and the undisputed material facts.  *See* Opp. at 2, 4, 7–11 (¶¶ 1, 15, 23, 24, 33–44, 46–50, 54–57).

## III.    CONCLUSION

For the foregoing reasons and those set forth in its opening memorandum, VGT's motion for summary judgment should be granted.

Respectfully submitted,

December 14, 2018                          */s/ Gary M. Rubman*
                                         Graydon Dean Luthey, Jr., OBA No. 5568
                                         GABLE GOTWALS
                                         1100 ONEOK Plaza
                                         100 West Fifth Street

---

[21] CHG asserts that the testing lab owes confidentiality obligations to VGT, but those obligations apply with respect to *VGT's* submissions to the lab.  Here, the offending submission was made by CHG, which has refused to notify the lab that the submissions contain a VGT trade secret.

Tulsa, OK 74103-4217
Telephone: (918) 595-4821
Facsimile: (918) 595-4990
dluthey@gablelaw.com

Gary M. Rubman
Peter A. Swanson
Michael S. Sawyer
Rebecca B. Dalton
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C.  20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 778-5465
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
   (admitted pro hac vice)

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1221
Facsimile: (212) 841-1010
nroman@cov.com
   (admitted pro hac vice)

***Counsel for Video Gaming Technologies, Inc.***

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2018, I I filed a redacted copy of the foregoing via

ECF, which caused a true and correct copy of the foregoing to be delivered to the following

counsel for Defendants:

Robert C. Gill
Thomas S. Schaufelberger
Matthew J. Antonelli
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
tschauf@saul.com
matt.antonelli@saul.com

Sherry H. Flax
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA 4254
JAMES C. HODGES, PC
2622 East 21st Street, Suite 4
Tulsa, OK 74114
Telephone: (918) 779-7078
JHodges@HodgesLC.Com

Duane H. Zobrist
Jonathan S. Jacobs
ZOBRIST LAW GROUP PLLC
1900 Arlington Blvd. Suite B
Charlottesville, VA 22903
Telephone: (434) 658-6400
dzobrist@zoblaw.com
jjacobs@zoblaw.com

*Attorneys for Defendants*

*/s/ Gary M. Rubman*