# EXHIBIT H

# FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1)  VIDEO GAMING TECHNOLOGIES, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cv-00454-GKF-JFJ |
| | ) | |
| 1)  CASTLE HILL STUDIOS LLC | ) | **CONTAINS CONFIDENTIAL OR** |
| (d/b/a CASTLE HILL GAMING); | ) | **HIGHLY CONFIDENTIAL** |
| 2)  CASTLE HILL HOLDING LLC | ) | **INFORMATION SUBJECT TO** |
| (d/b/a CASTLE HILL GAMING); and | ) | **PROTECTIVE ORDER** |
| 3)  IRONWORKS DEVELOPMENT, LLC | ) | |
| (d/b/a CASTLE HILL GAMING) | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S FIRST SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANT CASTLE HILL STUDIO LLC'S FIRST SET OF INTERROGATORIES  (NOS. 1-13)

Pursuant to Federal Rule of Civil Procedure 33, Plaintiff Video Gaming Technologies, Inc. ("VGT") provides these supplemental objections and responses to the First Set of Interrogatories of Defendant Castle Hill Studio LLC (collectively with the other defendants, "CHG") (the "Interrogatories"), which supplement its initial responses that were served on November 22, 2017 to Interrogatories Nos. 4 and 7.

### PRELIMINARY STATEMENT

In responding to these Interrogatories, VGT does not concede the relevance, materiality, or admissibility of any Interrogatory.  VGT's response to each Interrogatory is made subject to and without waiver of any objections as to privilege or as to the relevance, materiality, or admissibility, for any purpose, of any of the responses given herein.

VGT's responses to these Interrogatories are given without prejudice to VGT's right to provide or introduce at trial subsequently discovered evidence.  VGT has not completed its fact

**INTERROGATORY NO. 3:**

State all facts supporting the claims of unfair competition claims alleged in the Complaint.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 3:**

VGT incorporates the General Objections stated above as if set forth fully herein and in particular objects to this interrogatory to the extent that it seeks Privileged Information.  Subject to and without waiving the preceding general and specific objections, VGT responds as follows:

The facts stated in responses to Interrogatory Nos. 2, 3, and 12, which VGT incorporates herein, also support claims for unfair competition.

**INTERROGATORY NO. 4:**

State all facts supporting your misappropriation of trade secrets claim. (As part of your answer, describe with specificity each trade secret you claim CHG misappropriated, and for each such trade secret (hereafter in this interrogatory, "it") state when it was taken, how it was taken, who took it, how CHG obtained it, how CHG has used it (including, if applicable, in which CHG Games it has been used), why it has independent economic value, the approximate value of it, VGT's efforts to keep it secret, when such efforts to keep it secret began and finished, and why it could not be derived independently with publicly-available information.)

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 4:**

VGT incorporates the General Objections stated above as if set forth fully herein and in particular objects to this interrogatory as overbroad and unduly burdensome and to the extent that it seeks Privileged Information.  VGT further objects to this interrogatory to the extent that it purports to be a single interrogatory under Civil Local Rule 33.1 and to the extent it seeks information that is in CHG's possession or otherwise not in the possession, custody or control of VGT.  VGT further objects to this interrogatory to the extent its seeks premature expert

discovery by, *inter alia*, asking VGT to place an "approximate value" on each trade secret. Subject to and without waiving the preceding general and specific objections, VGT responds as follows:

VGT owns trade secrets relating to the development, operation, and commercialization of its Class II bingo-based games.

The development and operation of VGT's games incorporate, reflect, or are based on trade secrets, including trade secrets relating to the math underlying the games, proprietary algorithms for playing bingo (including the process and timing for the ball drops), the hit frequency for winning bingo patterns, proprietary software development processes and tools, and the source code used to operate the games. VGT's bingo-based games operate based on source code, including, for example, the code used for purposes of controlling the bingo server and the code used for purposes of controlling the client bingo machines ("client source code"). VGT's Live Call 2003 Bingo Server is an example of VGT's server software. Client 6 and Client 7 are examples of VGT's client software.

The bingo server software, including the Live Call 2003 Bingo Server, controls, *inter alia*, functionality for the bingo game, including the ball calls, distribution of bingo cards, tracking of pay tables, and determination of wins. In addition, the bingo server software provides accounting, administration, and configuration functionality. The client source code controls other aspects of the bingo games, including the control of mechanical reels and the red screen free spin feature, the processes for accepting wagers, the processes for generating payouts, and the interactions with the bell used by the player terminals to indicate successful outcomes.

Operation of VGT's bingo-based games depends on the underlying math developed for the games. The math dictates, among other things, the probabilities of winning, the payouts for

29

each win, and the volatility of the game (*i.e.*, the level of risk associated with the game). Ultimately, it is the math behind the game that determines the percentage of wagered money that the game pays back to the players.

Other trade secrets relate to VGT's overall system architectures and designs, including designs that enable its bingo-based games to comply with regulatory requirements while providing a good customer experience. In addition, VGT created its bingo-based games using proprietary game development processes, including proprietary software and tools used to test the games, such as by determining the hit frequencies for winning bingo patterns. VGT also has trade secrets relating to financial and customer information, including the pricing of its games and the revenue attributable to those games.

The precise nature of VGT's trade secrets, including those described above, is confidential. VGT will provide additional information upon entry of a protective order.

VGT has invested time and resources in developing its trade secrets, which are integral to its business operations. VGT's trade secrets possess independent economic value by virtue of not being generally known to, nor readily ascertainable through legitimate means by, other persons who could benefit financially from their disclosure or use. VGT has enjoyed considerable success over the years and has developed loyal customers and players. This success is due, in part, to the value of VGT's trade secrets.

VGT has used layers of security to preserve and maintain confidentiality and to prevent unauthorized use or disclosure of its trade secrets and other confidential information. These methods include, without limitation, (1) restricting use of and access to documents that contain trade secrets and confidential information; (2) restricting use of and access to computer networks that contain trade secrets and confidential information; (3) requiring employees to sign

employment agreements, which require them to maintain in confidence trade secrets and confidential information; and (4) requiring employees to attend presentations that discuss trade secrets and the importance of protecting them.  Through these layers of security, including requiring employees to protect the secrecy of its trade secrets and other confidential information, VGT has taken reasonable steps to preserve the secrecy of its trade secrets.

The following is an example of relevant language contained in VGT's employee agreements requiring employees to maintain trade secrets in confidence:

3. I understand that my employment by the Company creates a relationship of confidence and trust between me and the Company with respect to any information of a confidential or secret nature that may be learned or developed by me during the period of my employment by the Company and which (i) relates to the business of the Company or to the business of any customer or supplier of the Company, or (ii) has been created, discovered or developed by, or has otherwise become known to the Company and has commercial value in the business in which the Company is engaged (hereinafter called "Proprietary Information"). By way of illustration, but not limitation, Proprietary Information includes trade secrets, processes, formulas, computer programs, data, know-how, inventions, improvements, techniques, marketing plans, product plans, strategies, forecasts and customer lists.

4. All Proprietary Information shall be the sole property of the Company and its assigns. I hereby assign to the Company any rights I may have or acquire in all Proprietary Information. At all times, both during my employment and after its termination, I will keep in confidence and trust all Proprietary Information, and I will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company. In the event of the termination of my employment by me or by the Company for any reason, I will promptly deliver to the Company all materials, documents and data of any nature containing or pertaining to any Proprietary Information and I will not take with me any such materials, documents or data or any reproduction thereof.

CHG was founded by former VGT employees and employs former VGT employees.  As of December 2016, three of five members of CHG's executive team were former VGT

31

employees:  John R. Taylor III was Vice President of Engineering at VGT for almost six years before becoming President and Chief Executive Office of CHG; Alan Roireau was Director of Software at VGT for almost eight years before becoming Chief Development Officer of CHG; and Jason Sprinkle worked at VGT for 17 years in senior roles, including as Treasurer, Director of Operations/General Manager, and Director of Hardware Development before becoming Chief Creative Officer of CHG.

In addition to these officials, other employees have left VGT to work for CHG, including George Weilacher (software engineer), Brian Cody (software engineer), Aaron Milligan (artist), Seth Morgan (software engineer). Josh Larson (software engineer), Paul Suggs (Software Engineer Group Manager), Rich Sisson (artist), Kelly Davis (software engineer), Robert Gilkerson (software engineer), Dan Fulton (statistician), and Teri Gomez (project manager).

During the time these former VGT employees were employed at VGT, they had access to VGT's trade secrets.  These former VGT employees were aware that VGT's trade secrets are confidential and proprietary and that such information should not be shared outside VGT or used for the benefit of anyone other than VGT.  The former VGT employees also signed agreements that included confidentiality provisions requiring them to protect the secrecy of VGT's trade secrets and other confidential information.

CHG's misuse of VGT's trade secrets can be seen in how the play of CHG's games mimics the play of VGT's games, including without limitation, the payouts, bingo mechanics, and volatility, which are determined by the source code and underlying math of the game.  It is unlikely that the play of VGT's games would so closely mimic CHG's games unless former VGT employees had used VGT's trade secrets in CHG's games.  It is also unlikely that CHG would have been able to release its games as quickly as it did without using VGT's trade secrets.

32

CHG's improper copying of VGT's trade dress features, such as red free spins, also suggests that CHG intended to unfairly compete with VGT and therefore would have used VGT's trade secrets.

Discovery is ongoing, and VGT expects to discover information about how CHG employees have used its trade secrets.

VGT will produce documents in accordance with Fed. R. Civ. P. 33(d), from which CHG may determine additional information responsive to this interrogatory, and VGT will supplement its response to this interrogatory to specify documents by Bates number or source code directory after the documents have been produced.

In light of the sensitive nature of the information sought, VGT will provide a further response to this interrogatory after entry of a suitable protective order.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:**

VGT's bingo-based (or Class II) games provide an innovative and proprietary way to play bingo using electronic gaming machines (EGMs). As indicated above, VGT uses a client-server model for implementing its bingo-based games in casinos. The players interact with the clients—*i.e.*, the EGMs located on the casino floor. The EGMs accept wagers, display the results of the games, and award any prizes won by the player. The EGMs communicate with a server, which is responsible for managing the games (including calling a random sequence of bingo balls), initializing the EGMs (so that they can participate in games), and performing accounting and administrative functions related to the games. The bingo games can be played against other players on the same casino floor and, in some cases, against other players in different casinos.

33

At a high level, the games generally proceed in the following manner:  When a player places a wager, the EGM joins a bingo game and receives an electronic bingo card, which is compared to the bingo numbers that have been called in the game.  If this results in a win, the EGM awards the win amount to the player.

VGT has developed unique ways of determining and displaying bingo wins.  For example, and without limitation, rather than using only straight lines to determine a bingo win, VGT's bingo-based games offer a variety of winning patterns, which are correlated to different probabilities and different payouts.  For example, three winning patterns are shown below:



Open Diamond          Small Diamond          Private Stripes

The results of the game are displayed to the player as a variety of symbol combinations on mechanical reels, similar to the reels on certain slot machines.  For example, in one VGT game, the symbol combinations displayed on the reels correspond to the payouts shown below (e.g., three sevens corresponds to an 80-credit payout for a 1-credit wager):



VGT's bingo-based games consist of a complex system that includes servers, EGMs connected to the servers, mechanical reels controlled by the EGMs, and the mathematics and logic for playing the bingo game.  VGT has invested considerable resources in its bingo system—developing, refining, and improving the system over more than a decade and creating numerous versions and variants on it.  These efforts have resulted in numerous innovations, techniques, computer programs, devices, processes, know-how and negative know-how that VGT has sought to keep secret and that, as a result of this secrecy, have enabled VGT to become successful in the marketplace for bingo-based games.

Given the volume of trade secrets relating to VGT's bingo-based games, VGT cannot reasonably be expected to describe every trade secret in detail.  However, for purposes of this litigation, VGT has provided multiple identifications of its trade secrets.

First, VGT will make available for inspection specific versions of its proprietary source code for its bingo servers and EGMs.  Because the source code makes up the computer program

35

<u>CONTAINS HIGHLY CONFIDENTIAL INFORMATION</u>
<u>SUBJECT TO PROTECTIVE ORDER</u>

that control the operation of the bingo games and related functionality, the source code itself is a trade secret and also reflects many of VGT's trade secrets. Accordingly, the production of this source code is sufficient to identify many of VGT's trade secrets, particularly at this stage of the litigation.

Second, VGT has identified below certain specific features, functionalities, and processes that constitute trade secrets. As noted above, this identification is not exhaustive, and VGT reserves the right to supplement and amend this list. Furthermore, VGT has identified features of its products that embody the trade secrets, although VGT's trade secrets are not necessarily limited to the precise features described herein. For purposes of this interrogatory, VGT has organized the identification below into several categories: (a) bingo server, (b) bingo client, (c) mechanical reels, (d) math, (e) game development, and (f) business and financial. Many of the trade secrets, however, fall into more than one of these categories.

**\*BEGIN HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER\***

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER



CONTAINS HIGHLY CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER



<u>CONTAINS HIGHLY CONFIDENTIAL INFORMATION</u>
<u>SUBJECT TO PROTECTIVE ORDER</u>



<u>CONTAINS HIGHLY CONFIDENTIAL INFORMATION</u>
<u>SUBJECT TO PROTECTIVE ORDER</u>



CONTAINS HIGHLY CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER



<u>CONTAINS HIGHLY CONFIDENTIAL INFORMATION</u>
<u>SUBJECT TO PROTECTIVE ORDER</u>



**\*END HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER\***

<u>**INTERROGATORY NO. 5:**</u>

State all facts supporting your claim for misappropriation of confidential business information asserted in the Complaint. (As part of your answer, describe with specificity each piece of confidential business information you claim CHG misappropriated, and for each such piece of information (hereafter in this interrogatory, "it") state when it was taken, how it was taken, the name(s) of each person who took it, how CHG obtained it, how CHG has used it (including, if applicable, in which CHG Games it has been used), why it has independent economic value, the approximate value of it, all VGT's efforts to keep it secret, when such efforts to maintain secrecy began and finished, and why it could not be derived independently with publicly-available information.)

<u>**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 5:**</u>

VGT incorporates the General Objections stated above as if set forth fully herein and in particular objects to this interrogatory as overbroad and unduly burdensome and to the extent that it seeks Privileged Information.  VGT further objects to this interrogatory to the extent that it purports to be a single interrogatory under Civil Local Rule 33.1, and to the extent it seeks information that is in CHG's possession or otherwise not in the possession, custody or control of

Respectfully submitted,

December 27, 2017

*/s/ Michael S. Sawyer*
Graydon Dean Luthey, Jr., OBA No. 5568
GABLE GOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, OK 74103-4217
Telephone: (918) 595-4821
Facsimile: (918) 595-4990
dluthey@gablelaw.com

Gary M. Rubman
Peter A. Swanson
Michael S. Sawyer
Rebecca B. Dalton
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 778-5465
grubman@cov.com
pswanson@cov.com
msawyer@cov.com
rdalton@cov.com
  (admitted pro hac vice)

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1221
Facsimile: (212) 841-1010
nroman@cov.com
  (admitted pro hac vice)

**Counsel for Video Gaming Technologies, Inc.**

64

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 27, 2017, I sent via secure FTP, with email notification, a true and correct copy of the foregoing PLAINTIFF'S FIRST SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANT CASTLE HILL STUDIO LLC'S FIRST SET OF INTERROGATORIES  (NOS. 1-13) to counsel of record for Defendants Castle Hill Studios LLC, Castle Hill Holdings LLC, and Ironworks Development LLC:

Robert C. Gill
Thomas S. Schaufelberger
Matthew J. Antonelli
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
tschauf@saul.com
matt.antonelli@saul.com

Sherry H. Flax
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA 4254
JAMES C. HODGES, PC
2622 East 21st Street, Suite 4
Tulsa, OK 74114
Telephone: (918) 779-7078
JHodges@HodgesLC.Com

Duane H. Zobrist
Jonathan S. Jacobs
ZOBRIST LAW GROUP PLLC
1900 Arlington Blvd. Suite B
Charlottesville, VA 22903
Telephone: (434) 658-6400
dzobrist@zoblaw.com
jjacobs@zoblaw.com

*/s/ Michael S. Sawyer*