**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1)  VIDEO GAMING TECHNOLOGIES, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cv-00454-GKF-jfj |
| | ) | |
| 1)  CASTLE HILL STUDIOS LLC | ) | **REDACTED** |
| (d/b/a CASTLE HILL GAMING); | ) | |
| 2)  CASTLE HILL HOLDING LLC | ) | |
| (d/b/a CASTLE HILL GAMING); and | ) | |
| 3)  IRONWORKS DEVELOPMENT, LLC | ) | |
| (d/b/a CASTLE HILL GAMING) | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF VIDEO GAMING TECHNOLOGY INC.'S OPPOSITION
TO DEFENDANTS' MOTION TO CHALLENGING PLAINTIFF'S
<u>DESIGNATIONS UNDER THE PROTECTIVE ORDER</u>**

## Table of Contents

I.   INTRODUCTION.................................................................................................... 1

II.  BACKGROUND .................................................................................................... 3

    A.   CHG's Focus on NIGC's Minimum Technical Standards Issues in this Litigation............................................................................................................... 4

    B.   CHG's Parallel Efforts to Lobby the NIGC on Issues Relating to the Minimum Technical Standards. ................................................................................. 6

    C.   CHG Repeatedly Has Refused to Explain What It Intends to Do With The Challenged Information. ........................................................................................... 7

III.  ARGUMENT ........................................................................................................ 10

    A.   The Challenged Testimony and Documents Are Properly Designated As Highly Confidential or Confidential Under the Protective Order........................ 11

        1.   The Challenged Material Includes Highly Sensitive Business, Operational, and Regulatory Information. ................................................. 11

        2.   The Material Could Be Used—Improperly—in an Effort to Damage VGT's Reputation and Relationships. ....................................... 16

    B.   CHG Fails to Demonstrate Any Need for Lowering or Removing the Confidentiality Designations. ............................................................................... 17

    C.   CHG's Challenge Is Premature........................................................................... 18

IV.  CONCLUSION .................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Littlebear v. Advanced Bionics, LLC*,
No. 11-CV-418-GKF-PJC, 2012 WL 2979023 (N.D. Okla. July 20, 2012) ..........................16

*Oklahoma v. Tyson Foods, Inc.*,
No. 05-CV-329-GKF-PJC, 2009 WL 10271835 (N.D. Okla. Mar. 11, 2009) ......................10

*Ross v. University of Tulsa*,
225 F. Supp. 3d 1254 (N.D. Okla. 2016) ...............................................................................18

*Sears v. Nissan Motor Co.*,
932 F.2d 975 (10th Cir. 1991) .........................................................................................10, 17

**Other Authorities**

25 C.F.R. § 547 (2008) ...........................................................................................................4

25 C.F.R. §§ 547.7-8 (2008) ...................................................................................................4

1 Roger M. Milgrim & Eric E. Bensen, *Milgrim on Trade Secrets* § 1.07A (2018) ....................13

Fed. R. Civ. P. 26(c) ...............................................................................................................10

Fed. R. Civ. P. 30(b)(6)......................................................................................................13, 15

## I.      INTRODUCTION

Faced with compelling evidence that they intentionally copied VGT's games and improperly used VGT's trade secrets and confidential business information,[1] Defendants ("CHG") again try to distract from the merits of this case.  In a little over 13 pages—in a motion that purports to be about the propriety of confidentiality designations—CHG accuses VGT of illegal activity no fewer than 20 times, going so far as to assert that VGT has engaged in a "widespread, decade-long fraud," during which it "deceived the tribes, the public, and the government" by "flouting" federal regulations.  Defs.' Mot. Challenging Pl.'s Designations Under the Protective Order (Dkt. 284) (hereinafter, "Motion" or "Mot.") at 2, 8.

Not only are such allegations of illegality unwarranted and unnecessary, they are demonstrably false.  Most notably, they are undermined by statements in the documents on which CHG relies.  CHG fails to acknowledge the inconsistencies, much less that no one—not courts, the independent testing labs that certify VGT's games, or the regulatory agencies that require compliance with the regulations (and ultimately permit placement of only those games that meet the applicable standards)—has taken the position that CHG advances with respect to the legality of VGT's games.  Rather than re-litigating this sideshow here, VGT refers the Court to VGT's prior briefing on these issues, including VGT's motion for summary judgement (Dkt. 179, 277).

As for the purported subject of the Motion, VGT's confidentiality designations, CHG's argument is more notable for what it does not say than what it does, *i.e.,* it fails to identify a

---

[1] Examples of this evidence (all of which CHG designated as Confidential or Highly Confidential) are summarized in VGT's Opposition to Defendants' Motion for Summary Judgment.  *See* Dkt. 239 at 1-4.  As one of many examples, ███████████ ████████████████████████████████████████ *Id.* at 1 (quoting CHG0023869).

legitimate basis for the information it seeks to "declassify."  This omission is unsurprising:  As discussed below, during meet-and-confer correspondence, VGT repeatedly asked CHG to state why it was challenging the confidentiality designations, but CHG steadfastly refused to give a reason.

The reason for CHG's silence on this issue is that its apparent purpose has nothing to do with this litigation.  Rather, its efforts appear to be tied to its (so far unsuccessful) efforts to persuade the National Indian Gaming Commission ("NIGC") through the so-called "Coalition for Fair Gaming" to take action on the same issues it raises here concerning compliance with minimum technical standards.  Tellingly, when asked whether CHG intends to share the challenged information from this litigation with regulators, testing labs, or employees at CHG, CHG's "outside inside counsel," Mr. Jacobs[2]—whose firm, Zobrist Law Group, appears to be involved in the efforts to lobby the NIGC and filed this Motion despite not having appeared on a brief since CHG hired the Saul Ewing firm to serve as litigation counsel—stated that he has "no idea."  Ex. I at 7 (email chain containing Dec. 17, 2018 email from G. Rubman summarizing meet and confer).[3]  When pressed further, CHG's counsel stated that CHG's reasons for challenging the designations are "completely irrelevant" and that it "does not matter why [CHG] is challenging the designations."  *Id.*  But that is not so.  Under the Protective Order, subject to limited exceptions not applicable here, "all documents and other materials produced in this litigation shall be used only for purposes of this litigation" whether or not the documents and materials were designated as confidential.  Dkt. 55 ¶ 1(g).

---

[2] *See infra* at Section II.C.

[3] Citations to Exhibits A-I are to exhibits submitted in support of the Motion.  Citations to Exhibit 1-13 are to exhibits to the Declaration of Gary Rubman, submitted in support of this opposition.

The lobbying communications suggest that CHG's true purpose in seeking these materials has never been about defending against VGT's trademark and trade dress claims. In statements directly contrary to what CHG has told this Court in seeking to shoehorn the NIGC issues into affirmative defenses to those claims, CHG (through its coalition) has told the NIGC that the minimum technical standards "do not touch games, themes, or the 'look and feel' of a machine"—*i.e.*, the aspects of the games that make up the asserted trademarks and trade dress. Ex. 1 at 4 (Dec. 11, 2017 letter to NIGC). This admission not only calls into question CHG's basis for injecting this issue into the lawsuit, but it suggests that CHG is trying to use this motion, and the litigation more generally, to achieve through this Court what it has been unable to achieve from the NIGC directly.

With respect to the merits of the designations, CHG also is wrong. All the challenged testimony and documents reflect confidential information about VGT's business and thus meet the requirements for designation under the Protective Order. Indeed, CHG's efforts to obtain a competitive advantage by lobbying the NIGC on issues relating to the minimum technical standards (including issues relating to whether games could be grandfathered) supports VGT's position that the challenged testimony and documents are properly designated as confidential, as do CHG's own designations of similar testimony and documents.

## II.   BACKGROUND

This is an intellectual property case about longtime VGT officials who left to start a new gaming company, CHG, where they hired other VGT employees and began marketing and selling games that bear unmistakable similarities—in both appearance and gameplay—to VGT's most popular games. VGT asserts that CHG has infringed VGT's trademarks (including the symbols and artwork surrounding VGT's games), that CHG has infringed VGT's trade dress (the overall look and feel of VGT's games and gaming machines), and that CHG has misappropriated

VGT's trade secrets and confidential information (such as the know-how required to design and build successful games). Trial is scheduled to begin on May 20, 2019.

On October 12, 2018, both sides filed motions for summary judgment,[4] one of which encompasses issues raised by CHG's Motion—VGT's motion for summary judgment with respect to CHG's affirmative defenses of unclean hands and illegality. As discussed in VGT's motion, because unclean hands and illegality are narrow defenses that do not permit a defendant to raise at trial alleged misconduct of the plaintiff unrelated to the claims at issue (which is precisely what CHG seeks to do here), summary judgment on those affirmative defenses is appropriate. *See* Dkt. 179 at 15–22, 26–30. The motion is fully briefed, and a hearing on dispositive motions is scheduled for April 11.

### A. CHG's Focus on NIGC's Minimum Technical Standards Issues in this Litigation.

CHG has sought and obtained discovery from VGT on its compliance with the NIGC minimal technical standards,[5] including documents from VGT files, two depositions of VGT's

---

[4] CHG has filed *twelve* motions on or since October 12: a summary judgment motion on all claims, three *Daubert* motions (one against each of VGT's three experts), five motions *in limine*, two motions to strike declarations on which VGT relies in support of VGT's summary judgment motion and in opposition to CHG's summary judgment motion, and the present motion. (In contrast, VGT has filed five motions: a summary judgment motion directed to two targeted issues, two *Daubert* motions (against two of CHG's four experts) and two motions *in limine*.)

[5] The NIGC's "Minimal Technical Standards," promulgated in 2008, are codified at 25 C.F.R. § 547 (2008). *See* Minimum Technical Standards for Class II Gaming Systems and Equipment, 82 Fed. Reg. 61172 (Dec. 27, 2017). They are designed to protect against third-party threats to the security and integrity of Class II gaming systems and tribal operations. *See id.*; *see also, e.g.*, 25 C.F.R. §§ 547.7-8 (2008). Recognizing the cost and burden of upgrading existing systems to comply with these requirements, the NIGC allowed systems in existence at the time of enactment to remain in operation during a sunset period. *See* 82 Fed. Reg. 61172. In late 2017, as the expiration of the sunset period was approaching, the NIGC eliminated the sunset requirement. *See id.* That is, grandfathered systems no longer need to be upgraded. ██████████

██████████████████████████████████████████

Vice President for Gaming Compliance (Rich Williamson), and depositions of VGT's President (Jay Sevigny), VGT's founder and former CEO (Jon Yarbrough), and a VGT product manager (Will Harvie).

Notwithstanding a lack of evidence supporting its position, CHG now argues that "VGT has broken the law and *endangered the public* by placing illegal EGMs in casinos in Oklahoma and around the country." Mot. at 14 (emphasis added). CHG's primary argument appears to focus on whether certain of VGT's gaming systems are properly considered to be "grandfathered" and therefore exempt from certain of the NIGC's minimum technical standards.[6] CHG's argument fails for the reasons explained in VGT's reply in support of its summary judgment motion. Dkt. 277 at 3–4.

In the midst of briefing VGT's motion for summary judgment and a motion *in limine* on the NIGC issues,[7] CHG notified VGT that it was challenging the confidentiality designations of the entire transcripts from both depositions CHG took of Mr. Williamson as well as all exhibits used in both depositions. Ex. 2 at 5-6 (email chain containing Nov. 9, 2018 email from J. Jacobs).

In subsequent correspondence, and in an effort to avoid unnecessary motions practice, VGT agreed to de-designate or re-designate most of both transcripts as well as several exhibits. Ex. 3 (Nov. 28, 2018 letter to CHG) & Ex. 4 (Dec. 12, 2018 letter to CHG). Nonetheless, CHG

---

[6] CHG misleadingly ████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

[7] In opposing CHG's motion to compel further discovery on the NIGC regulatory issues, VGT expressed concerns about the possibility of "engaging in satellite litigation on regulatory issues." Dkt. 123 at 1. Unfortunately, this satellite litigation has become a reality.

has proceeded with this Motion in which it challenges the confidentiality designations of a small portion of the transcripts and exhibits, necessitating this response.

### B.    CHG's Parallel Efforts to Lobby the NIGC on Issues Relating to the Minimum Technical Standards.

At the same time CHG has been obtaining in this litigation discovery regarding VGT compliance with NIGC minimum technical standards (although refusing to explain what it intends to do with the information that it now seeks to de-designate, *see infra* at Section II.C), CHG has been lobbying the NIGC on similar issues.  CHG's lobbying of the NIGC appears to be through an organization called "The Coalition for Fair Gaming" formed by Richard Dreitzer, an attorney based in Las Vegas.  *See* http://www.fairnessfight.com (last visited on Feb. 6, 2019). On November 13, 2017, Mr. Dreitzer submitted comments on behalf of The Coalition for Fair Gaming to NIGC seeking to convince the NIGC that the grandfathering provisions should be allowed to expire in November 2018.  *See* Ex. 5 (available at http://www.fairnessfight.com) (the "November 13 letter").  On December 11, 2017, Mr. Dreitzer, again on behalf of The Coalition for Fair Gaming, submitted a second letter to NIGC on the same topic.  *See* Ex. 1 (available at http://www.fairnessfight.com) (the "December 11 letter").  The December 11 letter directly attacked VGT with regard to the grandfathering provisions.  *See id.* at 6.

There is little doubt that CHG played a key role behind the scenes in connection with Mr. Dreitzer's lobbying efforts.  Indeed, an early draft of the November 13 letter posted on the coalition's website contains at least two references to "Jason," who was providing information in support of the letter.  *See* Ex. 6 at 6, 7 (available at http://www.fairnessfight.com/wp-content/uploads/2017/10/NIGC_Letter.pdf) (last visited Feb. 6, 2019).  This appears to be a reference to Jason Sprinkle, a senior CHG executive who previously was at VGT and is a central

figure in this litigation.[8]  The draft also includes a statement (removed before the letter was finalized) that CHG believed that it was well-positioned to take advantage of the situation.  *See id.* at 7 ("If a manufacturer attempted to pass through compliance costs to any tribe, other manufacturers like Castle Hill Gaming stand ready to offer more favorable terms, making it cost-neutral for the tribes to have compliant or non-compliant class II machines.").  CHG also produced from its files ████████████████████████████████

████████████████████████████████████████████████████████████

████████▌ ████████████████████████████████████████████████

████████████████████████████████ Ex. 7 at 1.

CHG's motives are clear:  to use the NIGC minimum technical standards issue to gain a competitive advantage against VGT.  Having failed in its efforts before the NIGC, CHG now appears to be trying to use this Court's procedures in an effort to bolster its efforts.

### C.    CHG Repeatedly Has Refused to Explain What It Intends to Do With The Challenged Information.

Not surprisingly given the nature of this case—a lawsuit between two direct competitors that involves, among other things, claims of trade secret misappropriation—both sides have designated information produced during discovery as Confidential or Highly Confidential.  Despite this reality, CHG challenges a handful of designations from a single witness (Mr. Williamson) on a single issue (compliance with NIGC minimum technical standards) unrelated to the trademark, trade dress, or trade secret claims at issue in this case.  CHG has not challenged

---

[8] CHG's privilege log includes ████████████████████████████

████████████████████████████ *See* Ex. 8 (entry #31).

[9] ████████████████████████████████████████████████

████████████████████████████████████████████████

a single confidentiality designation of any document or witness testimony relating to trademark, trade dress, or trade secret issues.

As part of its efforts to resolve the present dispute, VGT repeatedly asked CHG to explain its reasons for challenging the designations of Mr. Williamson's testimony, including what CHG intends to do with the information.[10]  Notwithstanding the requirement in the Protective Order that documents and testimony provided during discovery "shall be used only for purposes of this litigation," Dkt. 55 ¶ 1(g), CHG has steadfastly refused to provide an explanation.  *See* Ex. I at 5 ("About our reasons for challenging these designations, I repeated what I have said over and over again in our email communication on this topic: our process for challenging the designations are not relevant under the protective order.  Nor is it relevant whether I have a plan about what to do with the information.") (Dec. 17, 2018 email from J. Jacobs); *id.* at 7 (CHG's reasons for challenging the designations "are completely irrelevant" and it "does not matter why [CHG] is challenging the designations") (Dec. 17, 2018 email from G. Rubman summarizing meet and confer); *id.* (Mr. Jacobs asserting that they "don't have a plan" as to what CHG intends to do with the information and that he has "no idea" whether CHG's intends to share the information with regulators, testing labs, or employees at CHG).[11]

---

[10] In an effort to understand CHG's seemingly inconsistent approach to confidentiality designations, VGT asked CHG on December 12 to explain its basis for designating the entirety of the testimony of a key CHG witness (Mr. Sprinkle), as well as every exhibit used in his depositions, as Highly Confidential.  *See* Ex. 4.  Although nearly two months have passed, CHG has not yet done so.  On January 25, 2019, VGT received an email from CHG's litigation counsel at Saul Ewing explaining that they are reviewing Mr. Sprinkle's testimony and exhibits, but that it will take them "roughly ten days to complete this task given other obligations." Ex. 9 at 1.  CHG still has not completed this task or given an update on when it will do so.

[11] *See also* Ex. 2 at 1 ("[T]he 'why' of our process does not matter under the protective order.") (Nov. 20, 2018 email from J. Jacobs); Ex. 10 at 1 ("I do not believe our process for determining when and which designations to challenge is at all relevant under the protective order.") (Dec. 12, 2018 email from J. Jacobs).

CHG's refusal to explain its reasons for challenging the confidentiality designations of Mr. Williamson's testimony, as well as what it intends to do with the information, is made more troubling by the fact that this entire dispute is being handled by an attorney who CHG's current litigation counsel introduced to the Court at a hearing as CHG's "outside in-house counsel."  Ex. 11 at 40 ("Mr. Jacobs and his firm basically serve as outside in-house counsel for this client."). Although CHG's litigation counsel (the Saul Ewing firm) appears in the signature block of the motion, Mr. Jacobs and a colleague at the Zobrist Law Group signed the motion.  *See* Mot. at 14. Moreover, Mr. Jacobs has handled all communications relating to this issue, and the Saul Ewing firm did not participate in the meet and confer.  With the exception of early in the case before Saul Ewing was retained as CHG's litigation counsel, and consistent with the representations previously made to this Court, Mr. Jacobs and his firm have functioned throughout the case in a role more akin to that of in-house counsel; among other things, they have attended hearings and depositions, but have not taken or defended a single deposition.  Indeed, with the exception of the present Motion, their names have not appeared on a single brief that CHG has submitted to the Court since Saul Ewing was retained in October 2017 to represent CHG.  In fact, CHG represented to the Court at that time that the Zobrist Law Group would be withdrawing from the case.  *See* Dkt. 44 ¶ 2.  They never did so and, therefore, remain counsel of record for CHG and in that role have unfettered access to VGT's confidential information.

Tellingly, when asked to explain why the Saul Ewing firm was not participating in the meet and confer process relating to this issue, Mr. Jacobs explained that it was because the insurance company is paying the Saul Ewing firm's fees.  *See* Ex. I at 7-8 (Dec. 17, 2018 email from G. Rubman summarizing meet and confer).  That CHG is using its "outside in-house counsel" (as opposed to its litigation counsel) for this dispute and is willing to pay for the costs

of this dispute on its own (presumably because the insurance company would not do so) raises further concerns about CHG's motivations.

## III.    ARGUMENT

As CHG acknowledges, "the 'good cause' standard of Rule 26(c) governs" this dispute over confidentiality designations.  Mot. at 7 (internal quotation omitted).  That standard requires "balanc[ing] the need for discovery of the trade secrets against the claim of injury resulting from disclosure."  *Sears v. Nissan Motor Co.*, 932 F.2d 975, at *2 (10th Cir. 1991) (unpublished) (citing *Centurion Indus., Inc. v. Warren Steurer & Assocs.*, 665 F.2d 323, 325 (10th Cir. 1981).  *Accord Oklahoma v. Tyson Foods, Inc.*, No. 05-CV-329-GKF-PJC, 2009 WL 10271835, at *3 (N.D. Okla. Mar. 11, 2009).  Although VGT bears the burden to show that the information is confidential and that its disclosure would be harmful, the burden is on CHG "to establish that disclosure of a trade secret or other confidential information is relevant and necessary to the action."  *Sears*, 932 F.2d at *2.  These competing interests must be weighed "against the background of the total situation, including consideration of such factors as the dangers of abuse, good faith, adequacy of protective measures, and the availability of other means of proof."  *Id.*

CHG's Motion does not undertake this balancing analysis; to the contrary, it does not identify *any* reason for requiring broader access to the challenged testimony and documents.  CHG offers only aspersions about VGT's conduct and generalized arguments that disregard the plainly confidential nature of the information.  The Motion is a transparent attempt to smear VGT in the public eye[12] and to support its separate efforts to lobby NIGC on the same issues.

---

[12] The public version of CHG's Motion leaves unredacted references to "illegal" activity.  *See, e.g.*, Dkt. 285 at 1, 2, 3, 4, 5, 10, 14.

As shown below, all the challenged testimony and documents reflect confidential—and in most cases competitively sensitive—information about VGT's business and thus meet the requirements for designation of the Protective Order.

### A.   The Challenged Testimony and Documents Are Properly Designated As Highly Confidential or Confidential Under the Protective Order.

The Protective Order's threshold for "Confidential Information" is low.  It is information that "constitute[s], reflect[s] or disclose[s] trade secret or other confidential research, development, or commercial information."  Dkt. 55 ¶ 1(b).  "Highly Confidential Information" is Confidential Information that "a party, and the party's counsel, believes to be extremely sensitive confidential and/or proprietary information, the disclosure of which, even limited to the restrictions placed on Confidential Information in this Order, would compromise and/or jeopardize the Supplying Party's competitive business interests."  *Id.* ¶ 1(d).

CHG's challenge to certain testimony from and exhibits to Mr. Williamson's depositions ("Challenged Material") is baseless.[13]  Mot. at 5–7.  As demonstrated below, all the Challenged Material meets the definition of "Confidential Information" because it is, at a minimum, "confidential . . . commercial information."  Most of the Challenged Material also constitutes "Highly Confidential Information" because of its competitive sensitivity.

### 1.   The Challenged Material Includes Highly Sensitive Business, Operational, and Regulatory Information.

In recklessly accusing VGT of "abus[ing] the protective order," Mot. at 10, CHG glosses over the non-public details about VGT's business and operations in the Challenged Material.  VGT does not and would not share this information with its competitors.  CHG has no evidence

---

[13] In an effort to narrow the issues in dispute, VGT agrees to de-designate and re-designate certain of the testimony challenged by CHG.  Specifically, VGT will de-designate Nos. 2, 11, 13, and 21 in CHG's Motion (pp. 5–6), and VGT will re-designate No. 12 from Highly Confidential to Confidential.

to the contrary and presents no cognizable basis for lifting the designations for this information, let alone a reason why a different standard should apply to similar information that CHG has designated as confidential.

Operational Data (Nos. 3–7, 16–20, 22, 23, 27–29).[14]  A significant portion of the Challenged Material discusses confidential data about the number and make-up of VGT games on casino floors over time (*e.g.*, number of three-reel mechanical games and number of grandfathered games).

Because VGT keeps this information confidential, *see* Declaration of Robert Schramer ¶ 2 ("Schramer Decl."); Declaration of Richard Williamson ("Williamson Decl.") ¶¶ 4–7, it qualifies as Confidential under the Protective Order.

It also constitutes Highly Confidential information.  VGT uses this operational data to make business decisions, and if it were disclosed to its competitors, including CHG, those competitors could similarly use it to gain advantages in the marketplace.[15]  *See* Schramer Decl. ¶ 3; Williamson Decl. ¶ 8.

CHG cites no evidence that VGT publishes any of this VGT-specific data, and CHG's suggestion that someone could independently count the "number of EGMs VGT has on casino floors," Mot. at 10, is inapt.  For one, CHG mischaracterizes the data at issue, which consists of details and averages not ascertainable to someone visiting a casino (*e.g.*, ███████████████).  And even if the data could theoretically be compiled if someone visited the more than 100 casinos that host VGT

---

[14] This Opposition refers to the testimony and exhibits using the numbers in CHG's Motion (pp. 5–7).  Some items fall within more than one category in this section.

[15] Certain of the challenged testimony (Nos. 22 and 23) discusses a Highly Confidential spreadsheet whose designation CHG does not challenge.  (*See* Ex. 12.)

games, Schramer Decl. ¶ 4, that would not preclude trade secret protection in light of the time and resources that would be required.  *See* 1 Roger M. Milgrim & Eric E. Bensen, *Milgrim on Trade Secrets* § 1.07A (2018) ("The question of independent economic value often arises where the purported trade secret is a combination of publicly-available information, but if a competitor would have to incur considerable expense to recreate the combination, generally such a combination will be found to have independent economic value.").  CHG has no evidence that anyone outside VGT has actually done this analysis, let alone published the results.

██████████████████████ (Nos. 3–7, 16–19, 27–29).  Certain of the challenged testimony and exhibits discuss████████████████████████████████████████ ████████████████ (*supra* n. 5).  VGT keeps the details of these efforts confidential, as indicated in the "Proprietary & Confidential Information" label in the two VGT presentations CHG seeks to de-designate.[16]  *See* Declaration of Richard Williamson ¶¶ 4–7 ("Williamson Decl.");  *see also* Exs. B, E.  If known to a VGT competitor, this information could allow the competitor to alter its plans (*e.g.*, ████████████████████████████████████████ ████████████████) in an attempt to compete with VGT.  *See* Williamson Decl.  ¶ 8.  Indeed, CHG has already attempted to capitalize on the existence of VGT's grandfathered games to improve its position in the market.  *See* Ex. 6 at 7.  Thus, not only is the information Confidential, but it is also Highly Confidential.

CHG's argument that "[i]t should not qualify as confidential commercial information or a trade secret that a business regulated by the NIGC tries to comply with NIGC regulations," Mot.

---

[16] Two of the other exhibits consist of natively produced data associated with the presentations. Exs. C, F; *see also* Williamson Decl. ¶ 6.  The fifth and final exhibit is a document prepared for Mr. Williamson's Rule 30(b)(6) deposition that ████████████████████████████████ ████████████████ Ex. D; *see also* Williamson Decl. ¶ 7.

at 10, misses the point. ███████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

Regulatory Process and Submissions (Nos. 1, 8–10, 14, 15, 20, 24–26).  CHG challenges

testimony discussing the steps VGT has taken to obtain certification for its games, including the

confidential submissions made to independent testing laboratories as well as VGT's

understanding of the regulatory requirements.

VGT treats these regulatory efforts as confidential business information because, if

known to competitors (actual or potential), they could provide those competitors an advantage in

seeking certification for their games.  *See* Williamson Decl. ¶¶ 2–3.  Moreover, this information

meets the definition of Highly Confidential because, similar to the previous category, CHG could

use this proprietary information about VGT's games to promote CHG's products to the detriment

of VGT.  *See id.*

Notably, CHG does not appear to dispute that the testing lab submissions themselves are

confidential, having failed to challenge any designations of VGT's submissions—including the

submission used as an exhibit in Mr. Williamson's October 2, 2018 deposition.  Ex. 13,

Williamson Dep., Oct. 2, 2018, Ex. 105.  That submission states that the "information contained

herein is confidential and proprietary information of VGT" and "may not be disclosed to any

third party without the prior written consent of VGT."  *Id.* at VGT0001949.  CHG, however,

inexplicably challenges Mr. Williamson's testimony about this confidential submission.  *See* Ex.

H at 25:16–27:19 (No. 10).  CHG's argument is inconsistent with its own designation of

documents and testimony concerning testing lab and regulatory submissions as Highly Confidential, including documents revealing that ██████████████████████████ ██████████████████████████████████ *See, e.g.*, Dkt. 74, Ex. H ██████ ████████████████████████████████████; Dkt. 74, Ex. P (CHG testing lab submissions).

Although CHG suggests that the challenged testimony is largely limited to Mr. Williamson's interpretation of the regulations, Mot. at 9 (discussing Nos. 8–10, 12, and 15), most describes measures VGT has undertaken to comply with the regulations—not some abstract discussion of them.  Nor does this testimony amount to a bare statement "[t]hat VGT read the regulations and applied for grandfathered status."  *Id.*  Rather, it details *how* VGT did so.

CHG is also wrong that VGT's interpretation of the regulations is not confidential business information.[17]  Regulated entities, including VGT, often invest in understanding regulations and developing compliance programs based on that understanding, and VGT typically keeps such compliance information confidential.  *See* Williamson Decl. ¶ 2.  Although CHG implies that VGT does not have such a program, Mot. at 8, VGT has ██████████ ██████████████████ responsible for ensuring that VGT complies with applicable law and regulations, Ex. G at 23:22–28:6.

---

[17] Although CHG repeatedly refers to "*Mr. Williamson's* interpretation of regulations," *e.g.*, Mot. at 9 (emphasis added), most of the challenged testimony comes from his Rule 30(b)(6) deposition, in which Mr. Williamson was testifying to the company's knowledge.

### 2.    The Material Could Be Used—Improperly—in an Effort to Damage VGT's Reputation and Relationships.

Unable to credibly dispute that the Challenged Material is, at a minimum, confidential commercial information, CHG resorts to arguing, both repeatedly and prejudicially, that "[t]he Protective Order is not designed to hide a party's illegal activity."  Mot. at 10.

But there has been no finding of illegal activity—not by a court, a regulatory body, or any of the testing laboratories that certify VGT's games.  There is only an *allegation* by CHG—an allegation that VGT denies in the strongest possible terms.  But the fact that CHG has so aggressively pursued accusations of illegality in this litigation—despite having no bearing on VGT's intellectual property claims—further supports maintaining the designations.

Notwithstanding CHG's ongoing refusal to identify a reason for bringing this challenge, it is clear that CHG believes that this information will be damaging if made public.  CHG might even try to inflict the damage itself—for example, by using the information to persuade customers not to lease VGT's games or by trying to convince federal and tribal regulators that VGT's games are non-compliant.  Even if these efforts are unsuccessful, they would force VGT to incur expense and would likely damage VGT's reputation and customer relationships.  Williamson Decl. ¶ 2.  This further supports maintaining the designations.  *See Littlebear v. Advanced Bionics, LLC*, No. 11-CV-418-GKF-PJC, 2012 WL 2979023, at *2 (N.D. Okla. July 20, 2012) (observing that the "United States Supreme Court has recognized it may be appropriate to protect a party's reputation and privacy from potential abuses of discovery").

Such maneuvers would not be the first time CHG sought to gain a competitive advantage from the NIGC regulations.  As discussed in Section II.B, there is evidence indicating that, in 2017, CHG—acting under the auspices of "The Coalition for Fair Gaming"—lobbied the NIGC not to eliminate the sunset provisions for grandfathered games.  Exs. 1, 3, 5, 6, 7.  CHG's

motivation was clear:  "If a manufacturer attempted to pass through compliance costs to any tribe, other manufacturers like Castle Hill Gaming stand ready to offer more favorable terms, making it cost-neutral for the tribes to have compliant or non-compliant class II machines."  Ex. 6 at 7.  In other words, CHG sought to abolish grandfathered games to create business opportunities for itself and to take market share from companies like VGT.  Having failed in its effort to lobby the NIGC, CHG now seeks to pursue a similar competitive goal using confidential discovery obtained in this litigation.

> **B.    CHG Fails to Demonstrate Any Need for Lowering or Removing the Confidentiality Designations.**

VGT's showing that the material falls under the Protective Order is dispositive.  CHG does not attempt to show that broader disclosure of the challenged material "is relevant and necessary to the action."  *Sears*, 932 F.2d 975, at *2.  Nor should CHG be permitted to do so on reply, particularly given its repeated refusal to explain its reasons for challenging the designations during the meet-and-confer.  *See supra* at Section II.C.  Because CHG has failed to justify a more expansive disclosure, it is unnecessary to "balance the need for discovery of the trade secrets against the claim of injury resulting from disclosure."  *Sears*, 932 F.2d 975, at *2.

Nevertheless, CHG's silence on the reason for singling out designations on this issue is troubling.  The Protective Order prohibits CHG from using the Challenged Material for non-litigation purposes:  "Subject to paragraph 13(c), all documents and other materials produced in this litigation shall be used only for purposes of this litigation *whether or not* a Supplying Party designates such documents or materials as 'Confidential,' 'Highly Confidential,' or 'Highly Confidential Source Code.'"  Dkt. 55 ¶ 1(g) (emphasis added).  As one court in this District has explained, this language "serves the distinct purpose of clarifying, at the outset of the protective order, that there are certain restrictions on all discovery, 'whether or not' the producing party

designates the material as confidential." *Ross v. University of Tulsa*, 225 F. Supp. 3d 1254, 1262 (N.D. Okla. 2016); *see also id.* at 1268 (finding litigant in contempt for using discovery materials in violation of such a provision). But this would not necessarily prevent CHG from including the material in papers filed publicly with the Court. *See id.* at 1262.

Here, CHG cannot credibly claim that it needs the designations removed to litigate the issue. Discovery is closed, and the parties have briefed a summary judgment motion on this issue, with CHG setting out its argument as to why it contends VGT games are or were non-compliant. Dkt. 239 at 32–34. Further, CHG does not ask the Court merely to lower the designations to Confidential so that CHG's outside counsel may discuss the information with its client representatives.[18] Rather, CHG's goal is to remove the designations altogether.

CHG's refusal to disclose the motivations behind this challenge raise serious questions, particularly given the burden CHG is imposing on the Court and VGT.

### C.    CHG's Challenge Is Premature.

Although CHG's Motion fails on the merits for the reasons discussed above, it also is premature for at least two reasons.

First, VGT has moved for summary judgment on CHG's unclean hands and illegality defenses (Dkt. 179)—the only issues to which the challenged material relates—and a motion *in limine* on this evidence (Dkt. 181). If these motions are granted, none of the challenged material would be relevant to the upcoming trial, and there would be no reason to consider the confidentiality designations.

---

[18] Also, CHG has never disclosed any company representatives pursuant to Paragraph 4.b.iv of the Protective Order. Dkt. 55 at 9. Therefore, CHG's outside counsel is not permitted to share Confidential information with anyone at CHG.

Second, there may be further disputes over confidentiality designations as the parties prepare for trial.  As noted above (n. 10), VGT has asked CHG to consider the Highly Confidential designation CHG applied to the entirety of the deposition transcripts of a key witness.  How CHG applies the Protective Order definitions in the context of its own testimony and documents may inform the Court's consideration of CHG's Motion, and deciding all such disputes at one time may result in efficiencies.

## IV.    CONCLUSION

For the foregoing reasons, VGT respectfully requests that the Court deny CHG's Motion.


February 7, 2019                              */s/ Gary M. Rubman*
                                             Graydon Dean Luthey, Jr., OBA No. 5568
                                             GABLE GOTWALS
                                             1100 ONEOK Plaza
                                             100 West Fifth Street
                                             Tulsa, OK 74103-4217
                                             Telephone: (918) 595-4821
                                             Facsimile: (918) 595-4990
                                             dluthey@gablelaw.com

                                             Gary M. Rubman
                                             Peter A. Swanson
                                             Rebecca B. Dalton
                                             COVINGTON & BURLING LLP
                                             One CityCenter
                                             850 Tenth Street, NW
                                             Washington, D.C.  20001-4956
                                             Telephone: (202) 662-6000
                                             Facsimile: (202) 778-5465
                                             grubman@cov.com
                                             pswanson@cov.com
                                             rdalton@cov.com
                                                (admitted pro hac vice)

                                             Neil K. Roman
                                             COVINGTON & BURLING LLP
                                             The New York Times Building
                                             620 Eighth Avenue
                                             New York, NY 10018-1405

Telephone: (212) 841-1221
Facsimile: (212) 841-1010
nroman@cov.com
   (admitted pro hac vice)

***Counsel for Video Gaming Technologies, Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2019, I caused the foregoing to be served via ECF on

the following counsel for Defendants:

Robert C. Gill
Thomas S. Schaufelberger
Matthew J. Antonelli
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
tschauf@saul.com
matt.antonelli@saul.com

Sherry H. Flax
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA 4254
JAMES C. HODGES, PC
2622 East 21st Street, Suite 4
Tulsa, OK 74114
Telephone: (918) 779-7078
JHodges@HodgesLC.Com

Duane H. Zobrist
Jonathan S. Jacobs
ZOBRIST LAW GROUP PLLC
1900 Arlington Blvd. Suite B
Charlottesville, VA 22903
Telephone: (434) 658-6400
dzobrist@zoblaw.com
jjacobs@zoblaw.com

*Attorneys for Defendants*

*/s/ Gary M. Rubman*