# EXHIBIT 1



**FAIRNESSFIGHT.COM**

Jonodev Chaudhuri, Chairman  December 11, 2017
National Indian Gaming Commission
1849 C Street Northwest
Washington, D.C. 20240

    Re: 25 C.F.R. 547.5
    Grandfathered Class II Gaming Systems
    November 12, 2017 Comment by OTGRA

We feel compelled to respond to the recent Comment presented to the NIGC by the Oklahoma Tribal Gaming Regulators Association (OTGRA), a copy of which is attached hereto with paragraphs added for ease of reference.  We feel that the OTGRA's Comment is indicative of a false and disturbing narrative that has been proliferated regarding the nature of the Minimum Technical Standards, what they hope to accomplish, and those that stand to benefit the most from them.  We hope that by reviewing some of the OTGRA's comments we can help to clarify to the NIGC why it has met such unexpected resistance to the Minimum Technical Standards, and to clarify to the OTGRA why the NIGC has tried so consistently for the past decade to implement them.

> (OTGRA ¶ 2) *As the NIGC notes in addressing comments on the Discussion Draft (82 Fed. Reg. 45,229), "the technical standards are intended to ensure the integrity and security of Class II gaming and the accountability of Class II gaming revenues. OTGRA concurs, and observes that eliminating the sunset provision recognizes that, over the 10-year grandfather period, <u>no</u> compliance issues or incidents have been reported.*

We concur that the technical standards are intended to ensure the integrity and security of Class II gaming and the accountability of Class II gaming revenues.  However, we do not follow, and are puzzled by, the OTGRA's conclusion that allowing machines to be exempted from most of those requirements somehow still leads to greater integrity and security.  Moreover, the Commission has itself disagreed with the OTGRA's assertions, stating on the Discussion Draft[1] that while "grandfathered machines have, for the most part, continued to operate with relatively few problems to the patron or the gaming

---

1. 77 Fed. Reg. 58,475 (Sept. 21, 2012) (codified at 25 C.F.R. pt. 547)

RICHARD I. DREITZER • 300 SOUTH 4TH STREET • 11TH FLOOR • LAS VEGAS, NV 89101-6014
702.727.1400 • RICHARD.DREITZER@WILSONELSER.COM



operations . . . Nevertheless, lack of a major incident in the past does not mean that the grandfathered Class II gaming systems pose no risk to patrons and the gaming operation." Specifically, because "a grandfathered system does not need to meet th[ese] standard[s], there may be a risk" of vulnerabilities.

> (OTGRA ¶ 2) *Further, many, if not all, of the Class II Systems in operation today have been subject to system modifications under the provisions of the Class II technical standards, which allow for modifications designed to maintain or to advance the overall compliance and integrity of these systems. So, under the rigorous oversight of our member regulators, the previously-grandfathered Class II Systems have improved their performance and compliance over time. The Proposed Rule, therefore, achieves the intent of the technical standards of "providing a means for TGRA's and operators to ensure that the integrity and security of Class II games played with technologic aides are maintained and that the games and aids are fully auditable." 73 Fed. Reg. 60,508, 60,509 (Oct. 10, 2008), while recognizing important role of our member regulators.*

If many, "if not all," Grandfathered systems have indeed undergone modification and become more compliant with the full Minimum Technical Standards, then achieving full compliance is easier than it has ever been, negating any such need for continued exemptions, much less permanent ones. We disagree that allowing manufacturers to permanently halt any efforts to become fully compliant somehow "provide[s] a means" for TGRA's and operators "to ensure that the integrity and security of Class II games . . . are maintained." In fact, it does quite the opposite, instead "providing a means" for manufacturers to permanently evade compliance with those same standards deemed by the NIGC as necessary to "ensure the integrity and security of Class II gaming."

As if to underline the point, the NIGC has specifically noted that Grandfathered components are dangerous and insecure, to the point that "if a grandfathered component is added to an otherwise fully compliant Class II gaming system, that system ceases to be fully compliant."[2] Grandfathered components are not safe and secure, they are a stop-gap measure on the road to compliance, not the destination.

---

2. 77 Fed. Reg. 58,475 (Sept. 21, 2012) (codified at 25 C.F.R. pt. 547)



This confused line of thinking by the OTGRA and others, that the end of Grandfathering would be harmful, continues a disturbing trend of misinformation presented to the tribes. It appears that many, if not most, of the tribes believe that requiring that machines be made compliant is somehow a burden upon them, instead of on manufacturers. This feeling is so prevalent that when the NIGC asked of the tribal regulators at a recent consultation[3] what progress had been made towards bringing older machines into compliance, the tribes did not cite a single example of progress. Instead, there was comment after comment about how prevalent, and how vital, Grandfathered machines remain. In fact, one chief went so far as to say that "every Class II game on the floor of [our] Casino is a . . . grandfathered system." His fear was that if Grandfathering were removed, the tribe would somehow lose the games, including their "loyal customer base," because older games "are preferred over newer games that lack familiar look and feel." These fears are echoed here by the OTGRA.

Nothing could be further from the truth. The NIGC has specifically stated that "part 547 as originally enacted and as amended only requires removal if the games are not made compliant with the testing standards for newer systems set forth in the regulation."[4] The regulations do not require that Grandfathered machines be removed, but rather that they become fully compliant, because any machines that are not fully compliant are not safe or secure. Grandfathering was a temporary means of easing the economic burden of transferring to safe and secure machines, not an ad-hoc declaration that such machines were compliant with all the rules.

Somehow certain manufacturers have convinced the tribes to take up their battle, and are cynically using them as a front to prevent passage of rules requiring manufacturers to provide the tribes with better and safer products. In reality, manufacturers will remain bound by their lease agreements, and will be required to either upgrade the machines to modern standards, or replace them with new machines.

---

3. National Indian Gaming Commission Consultation, March 23, 2017, Tulsa OK.
4. 82 Fed. Reg. 45,229 (Sept. 28, 2017) (to be codified at 25 C.F.R. pt. 547)

RICHARD I. DREITZER • 300 SOUTH 4TH STREET • 11TH FLOOR • LAS VEGAS, NV 89101-6014
702.727.1400 • RICHARD.DREITZER@WILSONELSER.COM



We are careful to note that this means an upgraded or new *machine*, not a different *game* or *theme*.  The Minimum Technical Standards do not touch games, themes, or the "look and feel" of a machine.  They mostly regulate internal security features.  Again, we reiterate, *patrons at a casino will not be able to distinguish between a Grandfathered machine and a newer, safer, and fully compliant machine.*

We also note that the OTGRA has been convinced to support exempting all records of the modification of Grandfathered machines from Freedom of Information Act requests (see ¶5), which would remove any means for the NIGC to ensure that manufacturers have "improved their performance over time."  Once again, certain manufacturers have somehow portrayed this issue to the tribes in such a way as to make them believe that such regulatory information could be harmful to the tribe if released, rather than to the manufacturer, and have misled the Tribal Gaming Regulatory Agencies into fighting their battle for them.

> (OTGRA ¶ 3) *The amendment to Subsection (a) also appropriately balances the regulatory performance of these systems and the rigorous regulatory oversight of our member regulators with the enormous potential economic impact of eliminating these systems, which total approximately 24,000 Class II Systems currently in operation, collectively comprising and [sic] estimated 41% of total units in play.*

First, we note that there is no reference to how the OTGRA arrived at these numbers.  There are currently no public records of the number of Grandfathered machines, either in 2008 or at the current time.  In fact, without such records it is virtually impossible to discover if Grandfathered machines are compliant with even the minimal standards of 25 CFR 547.5(a), or even if manufacturers are producing brand new copies of the Grandfathered gaming systems and putting them on casino floors.  According to the most recent Casino City report, in 2015 there were 31,111 Class II machines in Oklahoma.[5]  If we average the previous 3 years growth rate (approximately 2%) and extrapolate to 2017, there are approximately 32,367 Class II gaming machines on casino floors

---

5.  Casino City's Indian Gaming Industry Report 2017, pg 60

RICHARD I. DREITZER • 300 SOUTH 4TH STREET • 11TH FLOOR • LAS VEGAS, NV 89101-6014
702.727.1400 • RICHARD.DREITZER@WILSONELSER.COM



**FAIRNESSFIGHT.COM**

in Oklahoma.  If the OTGRA's numbers are to be believed, that means that *74.1% of all Oklahoma Class II machines are Grandfathered machines subject to virtually no regulations whatsoever, and from which the OTGRA and others now push to remain permanently exempt.*

Even taking the OTGRA's dubious statistic that these 24,000 machines represent only 41% of the current market as accurate, we find it damning evidence that 24,000 machines *remain unsafe and insecure.*  Indeed, if there remain 24,000 (or possibly many more) machines built before 2008 still in play, ten years later, it is difficult to believe that *any* Grandfathered Class II games have *ever* been made fully compliant.  Once again, certain manufacturers have managed to paint a picture where the NIGC is the villain putting burdens on the tribes, when in fact the NIGC is attempting to help the tribes by requiring that manufacturers provide them with safe and secure products.

These figures are, frankly, unbelievable.  In 2008 there were 18,373 Class II machines in the state of Oklahoma *total.*[6]  Yet somehow, we now have *at least* 24,000 grandfathered machines that manufacturers claim were built prior to 2008.  No matter how we look at the numbers available to us, we cannot find any way to contort the facts to avoid the inescapable conclusion that thousands of post-2008 non-compliant "Grandfathered" machines have been built and placed in casinos by manufacturers.

Even ignoring that outright impossibility, the conclusion remains inescapable.  The NIGC has assured Congress that the lifespan of 2008 machines is five years.[7]  Even allowing that manufacturers would stretch the life of their machines literally to the breaking point, adding another 50% to their expected life span, and even assuming that every Grandfathered machine was built exactly on the November 10, 2008 deadline, every single one of those 24,000 Grandfathered machines would have ceased functioning almost two years ago.  Even in this best-case scenario for Grandfathered machines, based on the data available to us have no choice but to conclude that *every Grandfathered machine has been replaced with a "new" Grandfathered machine at least once,* in disregard of the NIGC and its regulations.

6.  Casino City's Indian Gaming Industry Report 2017, pg 60
7.  Hearing Before the Committee on Indian Affairs, 110-405 (2008) (Statement of NIGC Chairman Philip N. Hogen)

RICHARD I. DREITZER • 300 SOUTH 4TH STREET • 11TH FLOOR • LAS VEGAS, NV 89101-6014
702.727.1400 • RICHARD.DREITZER@WILSONELSER.COM



**FAIRNESSFIGHT.COM**

We grow even more certain of this conclusion as we examine other submitted comments. For example, Video Gaming Technologies, Inc., (VGT) a manufacturer of electronic gaming machines, has submitted a Comment[8] in which they write that the regulations require "all systems *developed* after 2008" (emphasis added) to be compliant. However, the regulations, both as already enacted and as newly proposed, actually require that all machines "manufactured" after the deadline in 2008 be fully compliant.[9] That includes "all components, whether or not technologic aids in electronic, computer, mechanical, or other technologic form, that function together to aid the play of one or more Class II games, including accounting functions mandated by these regulations."[10] The difference is key. By VGT's interpretation, any machine approved for Grandfathered status could have unlimited new copies of the machine produced indefinitely. In reality, the regulations require that *no* new machines can be built, *even if identical* to Grandfathered machines, unless they are *completely compliant* with the *full* regulations. This gives further credence to our belief that many brand new machines have been exempted from compliance with regulations under the creatively misconstrued belief that they qualify as Grandfathered machines, and explains how there are more "Grandfathered" machines now than ever existed in 2008.

We return to the NIGC Consultation to a Chief's "great concern that vendors will not be able to upgrade systems at every tribal casino by November 2018." Here we see that, if manufacturers had not been flouting the regulations and providing the casinos with non-compliant Grandfathered machines, they would have *already replaced them.* Instead, certain manufacturers continue to equivocate and threaten to pull all their machines, while simultaneously refusing to make a single step forward towards compliance. They are holding the tribes, the entire industry, hostage. This is why we see representatives of tribes arguing against the very sunset provision designed to set them free. Or as one representative put it, "It is not that we do not want to meet the grandfather issue . . . but we are looking at it as we have gotten the corrective measures, I guess you might say, from vendors or from one vendor . . ." And what does this mystery vendor say? Once

---

8. Available at https://www.nigc.gov/commission/rulemaking
9. 25 C.F.R. 547.5(a)
10. 25 C.F.R. 547.2

RICHARD I. DREITZER • 300 SOUTH 4TH STREET • 11TH FLOOR • LAS VEGAS, NV 89101-6014
702.727.1400 • RICHARD.DREITZER@WILSONELSER.COM



again, that "it's going to be a timeframe issue."[11] Of course, if they never move towards compliance, they will find it impossible to meet any deadline.

If some manufacturers ignore the NIGC when asked to comply, then the NIGC must stop asking and start *requiring* that manufacturers comply. Clearly nothing else will get them to take even the smallest of steps towards full compliance.

These startling facts are, of necessity, based in part on inferences from available data. There are, not coincidentally, no public records which list the number of Grandfathered machines. The only way the NIGC could possibly make an informed decision regarding regulations, particularly when relying upon the guidance of *public comment,* is to allow the underlying facts to be made *available to the public.* Permanently exempting a totally unknown number of machines from virtually all regulation without a shred of evidentiary basis is the definition of arbitrary and capricious.

> **(OTGRA ¶ 3)** *The Proposed Rule achieves the NIGC's goal of seeking a "potential alternative that minimizes both the economic impact of the sunset provision and the risk to the gaming operation and the public of systems that are not compliant with the full set of technical standards."*

This has never been the goal of the NIGC. Only after ten years of hearing utterly groundless complaints by some manufacturers has the NIGC retreated to find a "potential alternative" to the Minimum Technical Standards. The NIGC has been clear that compliance with the full standards is the bare minimum required to ensure that machines are safe and secure for both the tribes and the public. It has frequently reminded the Tribal Gaming Regulatory Agencies (TGRAs) that they are free to make their own, higher standards that more quickly adapt to changing technology and risks.[12] It is not a compromise when the manufacturers take all the gains and the tribes and the public take all the losses.

---

11. National Indian Gaming Commission Consultation, March 23, 2017, Tulsa OK.

12. 12 e.g. see 25 C.F.R. pt. 547.5(a)(4) which allows TGRAs to implement higher technical standards for grandfathering. See also 25 C.F.R. pt. 547.17 which allows TGRAs to implement higher technical standards for non-grandfathered machines.



**COALITION FOR FAIR GAMING**

FAIRNESSFIGHT.COM

**(OTGRA ¶ 3)** *The NIGC states that it "understand[s]…concerns over removing non-compliant Class II Gaming Systems from the gaming floor." 87 FR 45229. However, OTGRA observes that this response appears not to fully capture the potential adverse impact that would have resulted from removing what have indisputably been compliant Class II Gaming Systems from the gaming floor in the absence of any evidence of integrity or performance issues.*

Here the OTGRA misunderstands the facts.  The NIGC has stated that the Grandfather period exists as a temporary stay "to avoid the potentially significant economic and practical consequences of requiring *immediate* compliance" (emphasis added) of these machines that "do not meet all of the requirements of the proposed rule."[13] Grandfathered machines are instead compliant with "a specific, minimum set of requirements" and temporarily "exempt from compliance" with the rest of the Minimum Technical Standards.[14]  By no means are Grandfathered machines "indisputably . . . compliant Class II Gaming Systems."  In fact, when the NIGC attempted to produce a lower standard than the complete Minimum Technical Standards, "the Justice Department came along and said to us, these aren't tough enough; you can't do that."[15]

And again, we note that Grandfathered machines are not required to be removed, only to be made compliant by the manufacturer, which they have had a decade to do. Whatever the adverse impacts of removing all Grandfathered machines may be, they are not applicable here, because the machines would only have to be removed if the manufactures refused to update them.

**(OTGRA ¶ 4)** *With respect to annual audit requirements, OTGRA notes that the Proposed Rule subjects Class II Gaming Systems to compliance auditing that exceeds the industry standards for rolling compliance testing for all other gaming devices by a magnitude of 10. OTGRA believes that this treatment is inconsistent with the NIGC's determination to remove the "grandfathered" label from Class II Systems and to eliminate the sunset provision, which is a recognition that these Systems are compliant.*

---

13. 72 Fed. Reg. 60,510 (Oct. 24, 2007) (codified at 25 C.F.R. pt. 547)
14. Id.
15. Hearing Before the Committee on Indian Affairs, 110-405 (2008) (Statement of NIGC Chairman Philip N. Hogen)



Again, the OTGRA misunderstands the facts. Annual audits are in line with, for example, Class III games, for which gaming operations are required to maintain a complete internal audit **department,** and they must annually review "all major gaming areas of the gaming operation,"[16] far in excess of the rolling compliance testing proposed by the NIGC. The TGRAs are not even required to submit their findings to the NIGC. It would be hard to conceive of a more toothless regulation.

Moreover, the NIGC has never determined to "remove" the Grandfathered label from pre-2008 Class II systems. They propose to remove the end of the Grandfather provision, thus making qualifying machines **permanently Grandfathered,** whatever name they choose to call it. Again, removing the Grandfather provision makes those machines permanently exempt from virtually all regulation. Allowing the Grandfather provision to end as intended makes the manufacturers update their old machines and provide them to the tribes.

> **(OTGRA ¶ 4)** *The Proposed Rule's annual testing and certification of pre-November 10, 2008 Class II Gaming Systems is a significant additional administrative burden imposed on TGRAs, and maintains 547.5 as the only section of the technical standards in which TGRAs are not the primary regulatory of gaming. [sic]*

A non-reported annual audit of some machines may be, technically, a burden, but it is not a mandatory one. In the proposed regulations, each casino has the choice of whether or not to accept a Grandfathered machine, or instead require that manufacturers provide a fully compliant, modern machine. We also fail to see how an internal audit that does not even have to be reported to the NIGC, much less conducted by the NIGC, in any way undermines the authority of the TGRAs or removes them from being the primary regulator.

---

16. 25 C.F.R. pt. 541.22(a)

RICHARD I. DREITZER • 300 SOUTH 4TH STREET • 11TH FLOOR • LAS VEGAS, NV 89101-6014
702.727.1400 • RICHARD.DREITZER@WILSONELSER.COM



**FAIRNESSFIGHT.COM**

Furthermore, this requirement does not effectively require *anything* from the TGRAs, because the OTGRA forgets that a *reported* annual audit is already required to be provided to the NIGC elsewhere.  Specifically, in order to provide Class II gaming at all a TGRA must, among other things, adopt an ordinance or resolution that is approved by the chairman of the NIGC.[17]  That ordinance may be approved by the chairman of the NIGC if, among other things, it requires that "annual outside audits of the gaming . . . be provided by the Indian tribe to the Commission."[18]  We also note that even here, the authority of the TGRAs is not undermined, because such outside audits "may be encompassed within existing independent tribal audit systems."[19]

> **(OTGRA ¶ 4)** *Nevertheless, OTGRA appreciates the clarification at 547.5(a)(3) that this audit requirement will not apply to Class II gaming systems that TGRAs have determined meet all of the requirements of 547.5, and is confident that OTGRA members will meet this responsibility fully and completely, and will continue to regulate Indian Gaming in Oklahoma with the very highest level of professionalism.*

Once again, the OTGRA misunderstands the NIGC, despite direct clarification of this very point.  The NIGC has stated that it is "clear that class II gaming systems approved pursuant to §547.5(b) are no longer 2008 Systems" and that such annual audits only apply to machines that comply with the much less stringent Grandfathering requirements found in § 547.5(a).[20]  Of course, to meet all of the requirements of the Grandfathering provisions a TGRA must, as the OTGRA points out, make a finding that the system qualifies under the provisions of 547.5(a) and thus fulfilling 547.5(a)(4).  However, the TGRA must also assure that the provisions of 547.5(a)(1, 2, 3, 5, and 6) are fulfilled.

> **(OTGRA ¶ 5)** *Finally, OTGRA observes that the Proposed Rule continues to hedge on a clear statement that sensitive, confidential and proprietary information should be made available to but not turned over to the NIGC. The NIGC comments that "the Commission agrees that sensitive testing and compliance records should not be disclosed" (82 Fed. Reg. 45230), and that "confidential commercial or financial information and law*

---

17. 25 U.S.C. § 2710(b)(1)(B)
18. 25 U.S.C. § 2710(b)(2)(C)
19. 25 U.S.C. § 2710(b)(2)(C)
20. 82 Fed. Reg. 45,230 (Sept. 28, 2017) (to be codified at 25 C.F.R. pt. 547)



*enforcement information exceptions to FOIA preclude the release of such information." 82 Fed. Reg. 45231. But, these aspirational statements would be unnecessary if the Proposed Rule made clear that such records are subject to review but not submission to the NIGC. OTGRA hopes that the final rule will provide such clear and certain protection, because experience demonstrates at both the state and federal level that the recipients of such information cannot always protect that information from disclosure once it is included in an agency's record, irrespective of the recipient's stated intention to do so.*

It is difficult to imagine how the NIGC might know that any of its regulations are being followed, much less if they are effectively fulfilling their purpose, if they are denied access to these "sensitive" records of whether or not gaming machines are compliant. Already, the NIGC proposes to cede regulatory control of nearly three-quarters of the machines in the marketplace to the TGRAs unreported oversight. Such additional protections requested by the OTGRA here would serve to effectively protect manufacturers from revealing to tribes or the public the very information they might use to protect themselves.

We also note that the OTGRA has not cited a single bit of evidence in favor of the proposed regulations that would be of benefit to the public or to the tribes. Every single benefit from the proposed regulations mentioned here accrues to the manufacturers. Again, the NIGC's proposal, supported here by the OTGRA, allows **permanent exemptions** to virtually all provisions designed to **protect the public,** and the only beneficiaries are certain **manufacturers** with Grandfathered machines that evidently control this entire industry.



**FAIRNESSFIGHT.COM**

In summary, the OTGRA woefully misconstrues both the facts and the regulations, and thus mistakenly believes that they must support the NIGC's proposal to cede virtually all authority over its own regulations, because they have been convinced that it is the tribes that will bear the burden of compliance to the regulations.  The truth is that it is certain manufacturers with Grandfathered machines, *not* the tribes, that must take responsibility to ensure that the machines they are providing are safe and secure.  These manufacturers may claim this fundamental duty is a burden, an impossible task, but it is their responsibility to see it done.  To the best of our knowledge, all Class II manufacturers have released new, compliant games since 2008.  They have the expertise, knowledge, and capacity to comply.

It is time for the tribes to act as one and demand that no manufacturer be permitted to give any tribe a dangerous, vulnerable machine ever again.

Richard Dreitzer
The Coalition for Fair Gaming



| **Chairperson:** | *Kelly Myers* | **Secretary:** | *Traci Atkinson* |
|---|---|---|---|
| **Vice Chairperson:** | *Jean Ann Blalock* | **Treasurer:** | *Jerrod Chester* |
| | | **Sergeant-at-Arms:** | *Wes Pappan* |

November 12, 2017

Jonodev Chaudhuri, Chairman
National Indian Gaming Commission     *Via Electronic & U.S. Mail*
1849 C Street Northwest
Washington, D.C. 20240

ATTN:  547.5_Comments@nigc.gov

Re:    Proposed Rule, 82 Fed. Reg. 45228-45233 (September 28, 2017)
       Amending 25 C.F.R. 547.5
       2008 Class II Gaming Systems

Dear Chairman Chaudhuri:

¶1  The Oklahoma Tribal Gaming Regulators Association (OTGRA) is a professional association of Tribal gaming regulators in the state of Oklahoma.  OTGRA's mission is to support and promote knowledge and education in tribal gaming regulation, to share information among its members regarding important regulatory issues, and to provide technical support to its member regulators in order to ensure best regulatory practices under Tribal gaming laws and regulations, the Indian Gaming Regulatory Act, the National Indian Gaming Commission (NIGC) Regulations, and the Oklahoma Tribal Gaming Compacts.  In this capacity, OTGRA has been closely engaged with member regulators and the NIGC regarding the status of Class II Gaming Systems that were in operation when the NIGC Technical Standards were implemented, and which have been grandfathered under 25 C.F.R. 547.5 until a sunset of November 10, 2018 (Class II Systems).   Specifically, this letter provides comments on the NIGC's Proposed Rule published on September 28, 2017 (82 Fed. Reg. 187, Sept. 28, 2017) (the Proposed Rule) and follows up on and supplements OTGRA's May 10, 2017 letter to you on this topic and its July 26, 2017 letter providing further comment on the Discussion Draft of proposed amendments to the Class II System technical standards that the NIGC issued on June 14, 2017.  The NIGC requested that comments on the Proposed Rule be submitted by November 13, 2017.

¶2  OTGRA thanks NIGC for the opportunity to comment on the Proposed Rule.  The effective regulation of Indian Gaming, and the success of the Indian Gaming industry is best served by the kind of government-to-government consultation that the NIGC has engaged in with the affected Tribes.  In furtherance of that consultation, OTGRA offers the following substantive comments on the Proposed Rule.

¶3 First, OTGRA welcomes the consolidation of "grandfathering" provisions and the elimination of the sunset provision in Subsection (a) of the Proposed Rule. As the NIGC notes in addressing comments on the Discussion Draft (82 Fed. Reg. 45,229), "the technical standards are intended to ensure the integrity and security of Class II gaming and the accountability of Class II gaming revenues. OTGRA concurs, and observes that eliminating the sunset provision recognizes that, over the 10-year grandfather period, <u>no</u> compliance issues or incidents have been reported. Further, many, if not all, of the Class II Systems in operation today have been subject to system modifications under the provisions of the Class II technical standards, which allow for modifications designed to maintain or to advance the overall compliance and integrity of these systems. So, under the rigorous oversight of our member regulators, the previously-grandfathered Class II Systems have improved their performance and compliance over time. The Proposed Rule, therefore, achieves the intent of the technical standards of "providing a means for TGRA's and operators to ensure that the integrity and security of Class II games played with technologic aides are maintained and that the games and aids are fully auditable." 73 Fed. Reg. 60,508, 60,509 (Oct. 10, 2008), while recognizing important role of our member regulators.

¶4 The amendment to Subsection (a) also appropriately balances the regulatory performance of these systems and the rigorous regulatory oversight of our member regulators with the enormous potential economic impact of eliminating these systems, which total approximately 24,000 Class II Systems currently in operation, collectively comprising and estimated 41% of total units in play. The Proposed Rule achieves the NIGC's goal of seeking a "potential alternative that minimizes both the economic impact of the sunset provision and the risk to the gaming operation and the public of systems that are not compliant with the full set of technical standards." The NIGC states that it "understand[s]…concerns over removing non-compliant Class II Gaming Systems from the gaming floor." 87 FR 45229. However, OTGRA observes that this response appears not to fully capture the potential adverse impact that would have resulted from removing what have indisputably been *compliant* Class II Gaming Systems from the gaming floor in the absence of any evidence of integrity or performance issues.

¶5 With respect to annual audit requirements, OTGRA notes that the Proposed Rule subjects Class II Gaming Systems to compliance auditing that exceeds the industry standards for rolling compliance testing for all other gaming devices by a magnitude of 10. OTGRA believes that this treatment is inconsistent with the NIGC's determination to remove the "grandfathered" label from Class II Systems and to eliminate the sunset provision, which is a recognition that these Systems are compliant. As our May 10, 2017 and July 26, 2017 comments indicate, OTGRA believes that audit requirements for these systems should be subject to, among other things, a minimum rolling compliance certification of 10% of the electronic layer interfaces in operation at each facility where a Tribe has Class II Gaming Systems in operation. The Proposed Rule's annual testing and certification of pre-November 10, 2008 Class II Gaming Systems is a significant additional administrative burden imposed on TGRAs, and maintains 547.5 as the only section of the technical standards in which TGRAs are not the primary regulatory of gaming. Nevertheless, OTGRA appreciates the clarification at 547.5(a)(3) that this audit requirement will not apply to Class II gaming systems that TGRAs have determined meet all of the requirements of 547.5, and is confident that OTGRA members will meet this responsibility fully and completely, and will continue to regulate Indian Gaming in Oklahoma with the very highest level of professionalism. OTGRA will, in turn, fulfill its role to assist its member regulators in meeting these requirements through education and information sharing regarding best regulatory practices.

¶6 Finally, OTGRA observes that the Proposed Rule continues to hedge on a clear statement that sensitive, confidential and proprietary information should be made available to but not turned over to the NIGC. The NIGC comments that "the Commission agrees that sensitive testing and compliance records should not be disclosed" (82 Fed. Reg. 45230), and that "confidential commercial or financial information and law enforcement information exceptions to FOIA preclude the release of such information." 82 Fed. Reg. 45231. But, these aspirational statements would be unnecessary if the Proposed Rule made clear that such records are subject to review but not submission to the NIGC. OTGRA hopes that the final rule will provide such clear and certain protection, because experience demonstrates at both the state and federal level that the recipients of such information cannot always protect that information from disclosure once it is included in an agency's record, irrespective of the recipient's stated intention to do so.

¶7 OTGRA hopes that these comments are helpful to the NIGC and offers them with all due respect and, again, OTGRA offers its thanks to the NIGC for its engagement with Tribal regulators on this important issue. If you have any questions, please feel free to contact me at Kelly-Myers@Cherokee.org and/or (918) 207-4914 or OTGRA legal counsel, Joseph F. Halloran at jhalloran@thejacobsonlawgroup.com and/or (651) 644-4710.

Respectfully,

*Kelly Myers*

Kelly Myers, Chairwoman


cc.     OTGRA Board Members
        Joseph F. Halloran