# EXHIBIT 5



FAIRNESSFIGHT.COM

Jonodev Chaudhuri, Chairman                                      November 13, 2017
National Indian Gaming Commission
1849 C Street Northwest
Washington, D.C. 20240

Re: 25 C.F.R. 547.5

Grandfathered Class II Gaming
Systems

Dear Chairman Chaudhuri,

We write concerning the minimum technical standards for Class II gaming systems set forth in 25 C.F.R. 547.5.  As you know, when these standards were first promulgated in 2008, the National Indian Gaming Commission ("Commission") implemented a five-year "grandfather period," temporarily exempting older gaming systems to "avoid any potential significant economic impact" of requiring immediate compliance.1  In 2012, before the first five-year grandfather period was about to expire, the Commission extended the grandfather period an additional five years because of the economic downturn which required "keeping a grandfathered system on the gaming floor for a longer period of time."2

As the expiration of this second set of five years approaches, we understand there has been lobbying for yet another extension, this time a permanent one.  The Commission should reject any additional extension, for multiple reasons.

First, as the Commission is aware, it is in the best interest of the tribes and the public to have a uniform minimum security standard across all Class II machines.  The Commission itself sets out as its first principle to "address and mitigate activity that jeopardizes the integrity of Indian gaming,"3 fulfilling the request of Congress through IGRA that Indian gaming be "conducted fairly and honestly by both the operator and players."4  The security risks posed by these obsolete machines threaten the integrity of Class II gaming, and those risks are only increasing with time.  As the Commission has noted, the "technical standards are intended to ensure the integrity and security of class II gaming and accountability of Class II gaming revenue," and "include minimum requirements that the Commission believes, in its judgment, are appropriate and consistent with its Federal regulatory oversight mission." 5

Hacking and security breaches have become commonplace, even within the Indian

1 Minimum Technical Standards for Class II Gaming Systems and Equipment, 77 Fed. Reg. 58,475 (Sept 21, 2012) (codified at 25 C.F.R. pt. 547)
2 Id.
3 National Indian Gaming Commission, Our Mission. https://www.nigc.gov/commission/principles-and-priorities. Accessed October 16, 2017.
4 25 U.S.C. 2702
5 Technical Standards, 82 Fed. Reg. 45,229 (September 28, 2017) (to be codified at 25 C.F.R. pt. 547)

gaming industry, and many of them are specifically targeted at older machines because they lack the protections of the minimum technical standards. As the Commission has noted, not only is the risk very real, but it increases over time "as technology advances and grandfathered machines remain static . . ."[6]

Second, requiring compliance will have little to no negative economic impact on the Tribes. In contrast to when the Commission last extended the grandfather period for five years because of concerns about the "economic downturn," Indian gaming has never been stronger. We are now on the 7th straight year of growth for Indian gaming nationwide, and on the heels of the best year ever, where revenue from Indian gaming was at an all-time high in 2016 of $31.2 billion.[7]

The Commission's decision to allow grandfathering was based on a 2008 study by Dr. Alan Meister ("Meister Report"),[8] which predicted dire economic consequences of requiring immediate compliance with the minimum technical standards. But these predictions have not held up over the last nine years. Thousands of new and compliant Class II gaming systems have been placed in service since 2008, and Class II gaming thrives. The technology to make compliant machines has already been developed over the past nine years, so there will be no additional development costs. And to the extent there are still costs of bringing grandfathered machines into compliance, the tribes will not see them; such costs would be borne by the manufacturers, who nearly always retain ownership of the gaming system and share revenue with the tribal casino operator.

Third, a permanent extension of the grandfather period would be anti-competitive in at least two respects. An extension would harm newer manufacturers of Class II gaming machines, thereby putting this regulation at risk of being found arbitrary and capricious. As compliant machines cost more to manufacture than non-compliant machines, the Commission's grandfather period has created, and continues to enable, an unequal playing field, granting the manufacturers of older Class II machines a competitive advantage against newer entrants to the market. Any more extensions would cement the selective applicability of this regulation as unlawfully arbitrary and capricious.

Fourth, a permanent extension would qualify the Class II regulations under 5 U.S.C. 804 (the Small Business Regulatory Enforcement Fairness Act) as a Major Rule in at least two ways. First, because the economic justification for the grandfathering claims an economic impact of between $1.2 billion and $3.7 billion, far in excess of the $100 million threshold under the Act, and second, because permanent grandfathering would have a significant adverse effect on the ability of domestic entities to compete with foreign entities, who own a majority of the grandfathered machines.[9]

Fifth, the Commission's proposed justification for the removal of the sunset provision is

---

[6] *Id.*
[7] See included report by Sage Policy Group, Inc.
[8] *The Potential Economic Impact of the October 2007 Proposed Class II Gaming Regulations*, available at: https://www.nigc.gov/images/uploads/NIGC%20Uploads/proposedregs/MeisterReport2FINAL2108.pdf
[9] Eilers-Fantini Quarterly Slot Review, 1Q CY17, pg. 14

both unnecessary and at odds with the stated purposes of the regulations of 25 C.F.R. 547. The Commission has justified cementing the grandfathering on the grounds that there is an alternative method of ensuring their security. However, the regulations *already contain* a process to create and approve an alternative standard. Overriding that process undermines the authority granted to the TGRAs to create such standards and present them to the NIGC for approval. And ultimately, the Commission's proposed alternate standard for all grandfathered machines does not, and cannot, meet the standards the Commission itself outlined for all proposed alternate standards.

Finally, there may be serious, unintended ripple effects from extending grandfathering any further. Outdated machines are a serious security risk to themselves, to other compliant machines on the same floor, and to the casino's internal systems. Yet the consequences of such a breach would be even greater than normal due to the nature of the Class II market, which is based on a loyalty system with many readily available and very similar alternative products but with low transfer between brands. In the event of such a highly visible and disruptive security breach in the industry, there is a small but significant chance that those in the Department of the Interior overseeing the NIGC may wish to reconsider allowing Class II gaming to retain its significantly softer regulatory environment when compared to Class III gaming.

For the foregoing reasons, we urge the Commission to remain unwavering, and allow the grandfather period to expire as originally intended. This will result in the equal treatment of all gaming machine manufacturers, and benefit the public and tribes by ensuring that *every machine* meets a minimum standard of security and integrity.

## I.    Regulatory History

In 2003, the Commission decided that "it is in the best interests of Indian gaming to adopt technical standards," governing Class II gaming machines to ensure their security and integrity. At that time, no such standards existed, and patrons had to rely solely on inconsistent tribal regulations to ensure the integrity of their gaming experience. In proposing the technical standards, the Commission decided to "remedy that absence."[10] The Commission took a variety of steps in preparation for proposing rules, including conducting over 300 separate government-to-government consultation meetings with various tribes and their representatives, establishing a joint Federal-Tribal Advisory Committee to assist in the creation of the regulations and, after the regulations were written, conducting lengthy notice and comment periods to allow interested parties an opportunity to discuss any objections.[11]

At that time, the Commission determined that, "it [was] in the best interest of Indian gaming to adopt technical standards that govern[ed] the implementation of … technologic aids used in the play of Class II games because no such standards currently exist[ed]."[12] The Commission further stated that these standards, "[sought] to… ensure that the integrity of Class II games… [was] maintained; that the games… [were] secure; and that the games… [were] fully

---

[10] Technical Standards for "Electronic, Computer, or Other Technologic Aids" Used in the Play of Class II Games, 71 Fed. Reg. 46,337 (Aug. 11, 2006) (codified at 25 C.F.R. pt. 547)

[11] *Id.* at 46,337

[12] Technical Standards for Electronic, Computer, or Other Technologic Aids Used in the Play of Class II Games, 72 Fed. Reg. 60,508-9 (Oct. 24, 2007) (codified at 25 C.F.R. pt. 547)

auditable," in order "to ensure the security and integrity of Class II games."[13]

While the proposed rule required all gaming systems to meet the new standards, after hearing concerns from manufacturers about the potential for negative economic consequences of requiring an immediate change, the Commission requested a study of the regulations' economic impact. Dr. Alan Meister's resulting report assumed that Class II games would "be slower, more cumbersome, and less appealing than what is being operated in Class II gaming facilities today [in February]." *See* Meister Report at 38. The study predicted a dire economic future: billions in lost revenue, and thousands of lost tribal jobs.

Because of these concerns, the Commission's final rule included a "grandfathering period" for older machines. Machines manufactured before November 10, 2008 had five additional years to become compliant.

In 2011, the Commission undertook a complete review of its regulations. Once again, the Commission consulted with tribes, established a Tribal Advisory Committee to allow tribal representatives input into the initial draft of the proposed rule changes, published a discussion draft of the proposed rule changes, and after publishing notice in the Federal Register, held an extended notice and comment period on the proposed rule changes.[14] Throughout this process, "[m]ore than any other topic, [the grandfathering period] has been the subject of long deliberation and analysis."[15] Though it received numerous comments against the sunset provision of the grandfathering period, the Commission opted to retain it.

The Commission extended the original five-year grandfathering period to ten years to "Balanc[e] those economic needs [of the tribal gaming operations] against a risk that increases as technology advances and grandfathered machines remain static . . ."[16] Specifically, the Commission stated that the "lack of a major incident in the past does not mean that the grandfathered Class II gaming systems pose no risk to patrons and the gaming operation," citing for an example the minimum security requirements of §547.15.[17] That risk remains more pressing as ever, but the benefit it was supposed to protect, the economic needs of the tribes in the face of the predicted economic recession the Commission anticipated compliance would trigger, has never materialized. Tribal gaming continues to experience significant growth in revenue even after thousands of compliant machines have been developed and placed.

## II.    Discussion

For the following reasons, we urge the Commission to allow the current grandfathering period to expire, as the Commission always intended it to.

---

[13] *Id.*

[14] Minimum Technical Standards for Class II Gaming Systems and Equipment, 77 Fed. Reg. 58,473 (September 21, 2012) (codified at 25 C.F.R. pt. 547)

[15] *Id.* at 58,475

[16] *Id.*

[17] *Id.*

A.    *The public and tribes are best served if all machines adhere to minimum security and integrity requirements.*

As the Commission is aware, a uniform minimum standard of security is in the interest of both the public and the tribes themselves. The integrity and security risks posed by these old, noncompliant machines—risks which drove the Commission to pass the minimum technical standards in the first place—is only increasing over time. The Commission believed that the Class II machines in question were out of date in 2008. Nearly 10 years have passed since then, and while it seems unnecessary to say, the Class II machines have only gotten older and even more out of date, while threats to the industry have grown.

Hacking and security breaches have gone mainstream in this country, affecting individuals, companies, and all branches and levels of government. The Indian gaming industry is not immune. The question is no longer if an attack will occur, but when. It is only a matter of time before Class II machines are the victims of an enormous security breach or fraud. As the grandfathered machines have the lowest security thresholds, they are the most vulnerable and will likely be the first targets of attack.

Specifically, we refer to the attached security analysis prepared by Conquest Security,[18] which notes that "security risks are the number one danger of older technology." The report goes on to describe the general dangers of outdated firmware, operating systems, hardware, and more, and continues to describe many of the security vulnerabilities mitigated by each of the Minimum Technical Standard's requirements. We also point out that such risks are not simply theoretical.

In 2014 several Missouri casinos' Aristocrat Legacy Mark VI machines (whose subsidiary Video Gaming Technologies, incidentally, we understand to be strongly against the sunset provision) were successfully targeted by a team of Russians, who stole tens of thousands of dollars, and who have already circumvented the methods used to detect them in that instance.[19] It turns out that Novomatic, Atronic, and Mega Jack machines have been targeted by similar, still poorly understood methods as far back as February of 2011,[20] which methods impacted the hold percentage at 50% to 400%.[21] And even now, six years after the discovery of this, one of many vulnerabilities of older machines, any grandfathered machines remain unchanged, and the NIGC proposes to ensure that these known and unknown vulnerabilities are never removed.

In discussing these breaches, Darrin Hoke, Vice President of Operation Protection at L'Auberge Du Lac Hotel and Casino,[22] said in a report entitled "Russian Slot Cheating Team: A Reference Guide" that the targeted machines use "relatively older technology" leaving "any number of methods" to cheat them.[23] He noted the likelihood that the intrusions made "use of a

---

[18] *Class II Gaming Systems Risk Analysis Report*, Conquest Security, November 13, 2017.

[19] Koerner, Brendan. Wired. *Russians Engineer a Brilliant Slot Machine Cheat—and Casinos have no Fix.* February 6, 2017. Available at: https://www.wired.com/2017/02/russians-engineer-brilliant-slot-machine-cheat-casinos-no-fix/

[20] Darrin Hoke, *Russian Slot Cheating Team: A Reference Guide,* 1. July 15, 2014. See Attached copy.

[21] *Id* at 2.

[22] As stated on his linkedin profile, accessible at https://www.linkedin.com/in/darrin-hoke-203925/

[23] *Id* at 2.

wireless technology,"[24] the security of which, not coincidentally, is covered by the Minimum Technical Standards[25] which grandfathered machines are exempted from.

When asked to comment, Aristocrat stated that it was "unable to identify defects in the targeted game," and told its customers in a Security Bulletin that it had "not identified any weaknesses in our software that would make these games susceptible to unlawful activity."[26] The specific targeting of these "older machines" running 50 Lions, 100 Lions, Hearts of Gold, Miss Kitty, Pelican Pete, Star Drifter, and Wild Panda indicates that these weaknesses do, in fact, exist.[27]  And worryingly, Aristocrat reassured their customers that, despite the "quite sophisticated"[28] methods used to compromise their machines, there was no impetus to change because "all Aristocrat products are built to and approved against rigid regulatory standards" and that "these standards include strict adherence to all aspects affecting the security and integrity" of their games.[29]

These reassurances are, since Aristocrat's acquisition of VGT and its many grandfathered games, no longer true, but more to the point, the public and the tribes continue under the mistaken belief that the NIGC has applied the Minimum Technical Standards to all Class II games.  The NIGC has exempted many of Aristocrat's, and others,' machines from the majority of the regulatory standards, and has failed to inform the public of doing so to allow them to protect themselves from these vulnerabilities.  It is in the interest of the public to ensure that the safety standards are applied to all Class II gaming, but we note that, Aristocrat's resistance aside, it is actually in the interest of those with grandfathered machines to avoid becoming a target by complying with the, we stress, *minimum* technical standards decided upon by the Commission almost a decade ago.

Allowing for the permanent exemption from security and safety requirements in the face of an acknowledged, *growing* security risk, even in light of evidence of actual targeting of those vulnerabilities, would go against the Commission's purpose in creating the minimum technical standards to "ensure the integrity and security" of class II games and is an abnegation of the Commission's duty to protect both the Indian Tribes and the public.

Moreover, allowing the continued use of the grandfathered systems perpetuates the regulatory nightmare caused by the initial grandfathering.  The Commission provided 10 years to retire these machines or bring them into compliance, yet there is no evidence this has been done. There is no way to know how many pre-2008 Class II machines remain in the marketplace, as per the 2008 Meister report, there were 43,179 machines distributed across the 15 states that had Class II gaming in 2008,[30] but the regulations allowed any stored, non-compliant machines to qualify so long as they were registered.  The list of registered machines has never been made public, and with the large surge in purchases just before the cutoff date, there could at this

---

[24] *Id* at 2.
[25] 25 C.F.R. pt. 547.15(b)
[26] Aristocrat. *Security Bulletin.* PN-14-020, July 16, 2014
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] Alan Meister, The Potential Economic Impact of the October 2007 Proposed Class II Gaming Regulations 26-37 (2008) [hereinafter Meister, Economic Impact].

moment be anywhere between 5,000 and 50,000 grandfathered games on casino floors. We also note that the Commission proposes to make all such "sensitive" compliance information immune from Freedom of Information Act discovery,[31] thus hiding from both the public and the industry which machines are potentially dangerous to them. The Commission may be willing to cement long-term risks to the public for the benefit of a select few manufacturers, but if it is going to sidestep its principle to protect the "health and safety of the public," at the very least it should allow a concerned public to have access to the information it needs to protect *itself* from these machines.

However many grandfathered machines there may be, any machines produced after 2008 would have to be compliant with the regulations. Replacing 4,300 machines a year over the past 10 years should have been easy to accomplish, particularly as only California and Oklahoma had more than 4,300 noncompliant machines in operation within those 15 states in the first place.[32] Unless the manufacturers have completely ignored the 2008 regulations, the number of non-compliant machines must surely be lower today than it was when the grandfathering was passed. Thus, the burden of compliance should have decreased as well.

Yet despite these increased risks and lower compliance costs, grandfathering, which was intended to help manufacturers become compliant, has not worked, and manufacturers have taken advantage of the Commission's helpful intentions. To fulfill its regulatory role, the Commission should end the grandfathering and require all Class II gaming systems to be brought into compliance with the minimum technical standards.

> B.    *Requiring compliance will not negatively impact tribes.*

There is no better time than now for the Commission to require Class II gaming machines to meet the its minimum technical standards. The Indian gaming industry is experiencing record expansion.[33] In 2015, growth more than doubled the already impressive expansion of the industry in 2014, setting a record.[34] Revenues were at an all-time high of $30.5 billion, with a value to the U.S. economy that exceeds $100 billion.[35] Indian gaming's recent growth more than doubled the growth of the U.S. economy, with a 5.5% improvement in 2015, compared to the U.S. economy's 2.5% growth in gross domestic product over the same period.[36]

In addition to the industry's boom minimizing the impact of any compliance costs, the costs themselves are substantially lower now than forecasted a decade ago in the Meister Report. Moreover, such costs have been borne by the manufacturers of gaming machines, not the Tribes. And with thousands of compliant gaming machines developed and placed since 2008, manufacturing and operating compliant machines is clearly feasible. The non-tribe owners of the non-compliant machines have both the technology and resources to bring all non-compliant gaming machines into compliance prior to the November 18, 2018 deadline.

---

[31] Technical Standards, 82 Fed. Reg. 45,230-45,231 (September 28, 2017) (to be codified at 25 C.F.R. pt. 547)
[32] *Id.*
[33] Alan Meister, Casino City's Indian Gaming Industry Report 13 (2017). [Hereinafter Casino City's Industry Report]
[34] *Id.*
[35] *Id.*
[36] *Id.*

The 2008 Meister Report predicted enormous costs and dire economic consequences for the tribes if the Commission required immediate compliance with its minimum technical standards.  These predictions included:

- Lost gaming revenue of $1.2 billion each year[37]
- Lost non-gaming revenue of $126.9 million annually[38]
- Increased capital, deployment, and compliance costs of $347.9 million, which "would be borne by the tribes"[39]
- Lost tribal member jobs totaling 7,890 per year, as a result of all the lost revenue mentioned above[40]

Based on these ominous predictions in the Meister Report, it is understandable that the Commission decided to implement the grandfather period and allow more time to meet the minimum technical standards.

However, with the benefit of history we can now see that the assumptions supporting these predictions were simply incorrect.  Chief among these predictions—and the one that supported the prediction for $1.2 billion in lost gaming revenue annually—was the Report's assumption that Class II machines that met the minimum technical standards would "be slower, more cumbersome, and less appealing that what is being operated in Class II gaming facilities [at that time]."[41]

As the Commission knows, the opposite has turned out to be true.  Instead of being "slower, more cumbersome, and less appealing," the new, compliant Class II machines today are faster, sleeker, and arguably more appealing than the old, non-compliant machines on the floor in 2007 and early 2008.

With just this one incorrect assumption, nearly the entire house of cards built in the Meister Report comes crashing down.  Certainly, the industry would no longer lose $1.2 billion each year due to "slower, more cumbersome, and less appealing" class II machines.  Nor would there be lost non-gaming revenue of $126.9 million annually, as that number was based on the lost gaming revenue.  And the loss of nearly 8,000 tribal member jobs each year would also never happen, as that was based on the non-existent lost revenues.

But there are still more false assumptions in the Meister Report.  The Report predicts, incorrectly, that it would cost nearly $90 million to develop compliant Class II gaming software, and that these costs would be passed on from the manufacturers to the tribes.  That has not happened.  The software to make compliant Class II games has already been developed, and the costs of developing has already been borne, by the manufacturers, as thousands of compliant

---

[37] Meister, Economic Impact at 50
[38] *Id.* at 52
[39] *Id.* at 56
[40] *Id.* at 58
[41] *Id.* at 38

machines have been placed into service since 2008. The tribes know that it costs them no more to have a compliant machine on their floor than it does to have a non-compliant one.

Indeed, since the tribes lease virtually all Class II gaming systems from the manufacturer, which retains ownership of the gaming system in exchange for a revenue share with the tribal casino operator, there are no increased costs whatsoever that are "borne by the tribes" for bringing machines into compliance. This means the remaining "capital, deployment, and compliance costs," which the Meister Report claimed would be approximately another $260 million, would not be borne by the tribes.

Moreover, the Commission has affirmed repeatedly for the last decade that the Minimum Technical Standards "will not cause a major increase in costs or prices" for the industry, the region, or local government agencies, both explicitly, and in its declaration that the regulations do not qualify as a Major Rule under the Small Business Regulatory Enforcement Fairness Act.[42] A level playing field with 100% compliant Class II gaming machines allows healthy competition among manufacturers to lease the Class II games on a competitive basis and protects the tribes from the more dominant manufacturers with many older and non-compliant gaming machines. This level playing field would make it, at worst, cost-neutral for the tribes to have compliant or non-compliant class II machines, and at best, offer them cheaper, more competitive lease agreements.

C.    *Another extension would unfairly, and unlawfully, benefit manufacturers of older machines.*

Permanent extension of the grandfathering provision would have anti-competitive effects. The Minimum Technical Standards contain a number of rules that require higher quality components (both in terms of the physical construction[43] and hardware-software interaction[44]), updated and improved software,[45] and some additional hardware components.[46] Not surprisingly, these improvements are associated with costs, both in terms of retroactively improving and upgrading machines to be able to comply, and in terms of newly constructed machines. Our calculations estimate that the price for compliance is $2,966.00 higher *per machine* to comply with the regulations,[47] to say nothing of the millions of dollars spent developing the technology required and paying for lab certifications of the compliant technology. As a result, manufacturers who comply with the rules are being economically punished, and manufactures who do not comply reap the rewards of the Commission's lenience.

And while this itself generates a competitive advantage, the problem is exacerbated by the widespread existence of grandfathered machines. Many manufactures choose their materials

---

[42] Technical Standards, 82 Fed. Reg. 45,231 (September 28, 2017) (to be codified at 25 C.F.R. pt. 547)
[43] e.g. 25 C.F.R. pt. 547.7(b) that requires the entire gaming system to be constructed of materials such that it is immune to human electrostatic discharge
[44] e.g. 25 C.F.R. pt. 547.7(a)(1) that requires that non-standard printed circuit boards bear unique and updated identifiers reflecting revisions to the board and software
[45] e.g. 25 C.F.R. pt. 547.8(d) that requires an additional Last Game Recall functionality
[46] e.g. 25 C.F.R. pt. 547.7(e) that requires a secure and locked area built into the cabinet to store all components that read account access media
[47] See attached spreadsheet entitled "Cost of Compliance vs. Non-Compliance"

based on the fluctuating market price, which in turn is driven by demand. When most manufactures want the same standard of materials (such as when required by a regulation), the demand increases, and the market responds by producing more, and cheaper, products. However, when a majority, or even a large minority, of the market continues to use inferior materials, the price for compliant materials remains high, placing the already advantaged non-compliant machines in an even more advantageous position. In this way, the existence of grandfathered machines makes it more difficult to comply with the Commission's regulations.

This anti-competitive effect is made worse by the nature of the market, which requires heavy up-front capital investments in terms of building the machines themselves and applying for all the relevant licenses, as well as the costs of certification from Independent Gaming Labs, in return for lower but long-term returns, making an already high barrier to entry even higher. Once again, this effect is made worse by the presence of cheaper, non-compliant machines in the marketplace, which drive down the demand both for more expensive (to the manufacturer) new machines as well as for replacements, as manufacturers push old machines past their normal lifespan to avoid replacing them with more expensive, compliant machines.

Due to this cost differential, the Commission would effectively be granting a competitive advantage to those with vulnerable machines. It would allow manufacturers to shift the costs of complying with the regulations, the very same regulations with which all others in the industry must comply, from themselves to the consumer in the form of security risks. This unequal treatment of manufacturers is the definition of arbitrary and capricious, and places the regulation at risk.

> D.      Removing the sunset provision would qualify both the Minimum Technical Standards as a whole, and the proposed modification individually, as Major Rules under the Small Business Regulatory Enforcement Fairness Act.

The Commission states that the proposed rule does not qualify under 5 U.S.C. 804 (the Small Business Regulatory Enforcement Fairness Act) as a major rule. However, such a statement is inconsistent with the rationale upon which the Commission relies in promulgating this proposed rule.

In proposing and adopting the minimum technical standards in 2008, the Commission stated that the proposed rules do not qualify as a major rule under 5 U.S.C. 804 because they do "not have an effect on the economy of $100 million or more," and because they "will not cause a major increase in costs or prices" for the industry.[48] After concern was expressed during the notice and comment period, the Commission created the initial, and later second, grandfathering periods largely based on accepting the Meister Report, which warned of between $1.2 billion and $3.7 billion in lost revenue as a direct result of the regulations.

It is not possible that the Minimum Technical Standards do "not have an effect on the

---

[48] Minimum Technical Standards for Class II Gaming Systems and Equipment, 77 Fed. Reg. 58,479 (September 21, 2012) (codified at 25 C.F.R. pt. 547)

economy of $100 million or more," and "will not cause a major increase in costs or prices"[49] while simultaneously requiring a grandfathering provision to relieve up to $3.7 billion in lost revenue. The Commission cannot believe and rely upon the Meister Report without making the entire Minimum Technical Standards a major rule, contradicting its earlier statements in the Federal Register, and potentially subjecting its decision to judicial review under the Small Business Regulatory Enforcement Fairness Act.

Likewise, the Commission states that the new proposed rule removing the sunset provision does not qualify as a major rule because it will not "have a significant adverse effect on competition, employment, investment, productivity, innovation, or the ability of the enterprises, to compete with foreign based enterprises."[50] This may have been true in 2008, when the initial rules were proposed, but with the proposed removal of the sunset provision it is no longer the case.

Specifically, we refer to the fact that the vast majority of grandfathered machines are now ultimately owned by foreign enterprises, and allowing foreign entities a competitive advantage (as discussed above) through a permanent exclusion from safety and security requirements has a significant, adverse effect on the ability of domestic entities to compete with them. As of March 31, 2012, 11% of the machines leased to tribes in North American were provided by foreign controlled manufacturers.[51] After a flurry of acquisitions, notably that of VGT by Aristocrat in 2014 and IGT by Gtech S.p.A in 2015, that number has soared. As of March 31, 2017, foreign entities control 63% of machines leased to tribes in North America.[52]

The Commission cannot rely upon the Meister Report without making the Minimum Technical Standards, both as originally enacted and as proposed here, into Major Rules under the Small Business Regulatory Enforcement Fairness Act. Nor can it ignore the changing realities of the industry and unknowingly offer special protections to foreign entities, offering competitive advantages over their domestic counterparts, without abiding by the statutory requirements for doing so.

    E.    *The Commission's rationale for removing the sunset provision is both insufficient and at odds with the stated purposes of the regulations of 25 C.F.R. 547.*

The Commission states that removal of the sunset provision is "justified provided that 2008 Systems are subject to additional annual review by the TGRA."[53] However, the proposed changes are unnecessary because the regulations already contain a process for creating and implementing such an alternative method of ensuring the safety and integrity of Class II gaming.

As written, the regulations in 25 C.F.R. 547.17 allow a TGRA to create an alternative standard, present it to the NIGC for approval, and allow non-compliant machines to become

---

[49] *Id.*
[50] Technical Standards, 82 Fed. Reg. 45,231 (September 28, 2017) (to be codified at 25 C.F.R. pt. 547)
[51] Eilers-Fantini Quarterly Slot Review, 1Q CY13, pg. 7
[52] Eilers-Fantini Quarterly Slot Review, 1Q CY17, pg. 14
[53] Technical Standards, 82 Fed. Reg. 45,229 (September 28, 2017) (to be codified at 25 C.F.R. pt. 547)

compliant by adhering to that standard. There is no need rewrite the regulations to accomplish a goal that can easily be done through them, particularly when not doing so produces so many other problems.

Moreover, overriding the already existing means of creating an alternative standard undermines the authority granted by the NIGC to the TGRAs. In effect, this proposed rule merely serves to bypass the TGRA's creation of the standard, the TGRA's determination that the alternate standard "will achieve a level of security and integrity sufficient to accomplish the purpose of the standard it is to replace," and the TGRA's proposal of the alternative to the Chair of the NIGC. [54] Instead, by altering the regulations instead of following them, the Commission effectively dictates a new standard of annual review by the TGRA *to* the TGRA, and replaces the TGRAs expertise in creating such an alternative with the advice of a single commenter.[55]

More egregious still, it completely strips the TGRA of the authority granted to it in the regulations when the Commission noted that these "are *minimum* standards and a TGRA may establish and implement *additional* technical standards" (emphasis added) that do not conflict with the regulations.[56] If under the assault of hacking attempts a new vulnerability is discovered, the TGRAs will be powerless to intervene with new protections for the oldest, most vulnerable machines, because those machines are exempted from any technical standards whatsoever.

This would be less worrisome if the Commission's imposed alternative standard were sufficient. However, even if the Commission's proposed alternative standard were properly created by a TGRA, which made the appropriate determinations and presented it to the Chair of the NIGC, the Chair would be unable to approve the "additional annual review" [57] standard because it fails to meet the criteria laid out in the regulations. The Commission's current rules found in 25 C.F.R. 547.17 require that any alternative standard achieve the same level of security and integrity as those of the initial standards.[58]

The Commission's proposed annual reviews may be able to *detect* intrusions or security breakdowns (though how such a review would be helpful when the machines are not required to record intrusion attempts[59] remains an open question), but hardware and software security provisions already present in the Minimum Technical Standards are designed to *prevent* such breaches, not simply detect them. Such an alternative standard cannot possibly fulfill the requirements set forth in the regulatory language, and by supplanting the regulations already in place for a decade with an inadequate alternative for a select set of the most vulnerable machines, the Commission fails to meet its principles to "swiftly act" on anything that jeopardizes health and safety, to engage in "sound regulation," and to "address and mitigate activity that jeopardizes the integrity of Indian gaming,"[60] and openly flouts it's third

---

[54] 25 C.F.R. pt. 547.17(a)-(b)
[55] Technical Standards, 82 Fed. Reg. 45,230 (September 28, 2017) (to be codified at 25 C.F.R. pt. 547)
[56] Minimum Technical Standards for Class II Gaming Systems and Equipment, 77 Fed. Reg. 58,480 (September 21, 2012) (codified at 25 C.F.R. pt. 547)
[57] Technical Standards, 82 Fed. Reg. 45,229 (September 28, 2017) (to be codified at 25 C.F.R. pt. 547)
[58] 25 C.F.R. pt. 547.17(a)-(b)
[59] 25 C.F.R. pt. 547.15(d)
[60] National Indian Gaming Commission, *Our Mission*. https://www.nigc.gov/commission/principles-and-priorities. Accessed October 16, 2017.

Foundational Priority of "Staying ahead of the technology curve"[61] by allowing decade-old machines to "remain static."[62]

   *F. There may be serious, unexpected ripple effects for the Class II gaming industry if the grandfathering period is extended indefinitely.*

   The rationale for the grandfathering periods was that the policy was a compromise "balancing . . . economic needs against a risk that increases as technology advances and grandfathered machines remain static.[63]  As discussed above, the economic justification for this policy is flawed, increasing the relative cost of grandfathering in this balancing analysis.  Yet while the supposed economic loss the policy was to protect against is completely absent, the risks associated with continuing the grandfathering exemptions continue to climb, further militating against the exemptions.

   Economic risk to the manufacturers that lease grandfathered machines, the casinos that operate them, and the patrons that frequent them, grow exponentially with each year that passes as the grandfathered EGMs become a greater and greater outlier in the market, drawing the attention of potential hackers as the easiest targets available, and courting security breaches and possibly accompanying lawsuits.  And this is to say nothing of the less-easily-measurable risks, such as the loss of trust of patrons when they discover that they have been playing machines that were deemed unsafe and insecure for their fellow customers ten years ago (or longer), or discovering that their favorite venue or game has been targeted by criminals.

   This risk is even more pronounced in a market based on the Loyalty business model, where there are very similar alternative products readily available, but transfer between brands is relatively low.  In this type of market, consumer retention is based on the association of previous, positive emotional experiences with a particular brand.  Such experiences are strong, but can be overshadowed by a newer, strongly negative experience, leading to feelings of betrayal and permanent abandoning of a brand or manufacturer.  The resulting long-term loss of market share can be very difficult to recover from.

   Such a potential high-visibility security breach would also court greater legislative intervention and higher mandatory standards.  Currently the Class II market functions in significant part because it has a lower regulatory burden than Class III games, as well as immunity from Compact Fees by the Tribes.  If the regulatory measures allowed by the governing body, in this case the NIGC, were to allow such insecure machines to suffer a major break in, it could potentially trigger a re-evaluation of the legitimacy of Class II gaming's significantly softer regulatory environment by the NIGC's superiors in the Department of the Interior.

   The longer grandfathered machines are allowed to remain in place, the greater the risk of significant direct loss by both the manufacturers and the casinos, an accompanying catastrophic loss in the marketplace, and possibly even a shakeup of the Class II market itself.

---

[61] *Id.*
[62] Technical Standards, 82 Fed. Reg. 45,229 (September 28, 2017) (to be codified at 25 C.F.R. pt. 547)
[63] *Id.*

**III.    Conclusion**

The Minimum Technical Standards were promulgated with an open acknowledgement that both the public and the tribes are best served if all machines adhere to security and integrity requirements.  For nearly the past decade, the Commission has exempted those machines most vulnerable to attack on the rationale that huge economic costs would ensue from compliance, despite its own repeated statements that no such costs would materialize and that no costs would be passed on to the tribes.  It now proposes to make such security flaws permanent, granting a competitive advantage in the industry to foreign entities despite its claims to the contrary, and replacing even the *minimum* technical standards with an annual review that would not pass even the loose requirements of its own regulations.  The proposed rule violates the NIGC's principles and potentially opens itself to the direct intervention of the courts in its affairs.

All of these problems will be avoided if the Commission instead chooses to do nothing.  If the sunset provision is allowed to expire as it was meant to, the Commission will have succeeded in its goal to create a uniform standard for all of Class II gaming, ensuring the safety and protection of patrons, the tribes, and manufacturers alike.  There will be no artificial advantages to certain manufacturers, especially foreign-owned, at the expense of our public's safety.  There will be fair competition, continued innovation, and investment in Class II gaming.  And as an added benefit, the administrative and recordkeeping costs of tracking each grandfathered machine, of ensuring that each modification makes each machine more compliant, and detailing where on the road to compliance each machine lies, will be a thing of the past.  Instead, there will be a single, simple, uniform standard fairly applied to everyone.  The Commission has bent over backwards to help lagging adherents long enough.  It is time to enforce the rules agreed upon in 2003.

For these reasons, we respectfully submit that the grandfathering provision in 25 C.F.R. 547.5 should run its course on November 10, 2018.


Richard Dreitzer

The Coalition for Fair Gaming