# EXHIBIT 6

[Date]

Jonodev Chaudhuri, Chairman
National Indian Gaming Commission
1849 C Street Northwest
Washington, D.C. 20240

        Re:    25 C.F.R. 547.5
                  Grandfathered Class II Gaming Systems

Dear Chairman Chaudhuri,

      We write concerning the minimum technical standards for Class II gaming systems set forth in 25 C.F.R. 547.5. As you know, when these standards were first promulgated in 2008, the National Indian Gaming Commission ("Commission") implemented a five-year "grandfather period," temporarily exempting older gaming systems to "avoid any potential significant economic impact" of requiring immediate compliance.[1] In 2012, before the first five-year grandfather period was about to expire, the Commission extended the grandfather period an additional five years because of "the economic downturn" which required "keeping a grandfathered system on the gaming floor for a longer period of time."[2]

      As the expiration of this second set of five years approaches, we understand there has already been lobbying for yet another extension. The Commission should reject any additional extension, for multiple reasons.

      First, as the Commission is aware, it is in the best interest of the tribes and the public to have a uniform minimum security standard across all Class II machines. The security risks posed by these obsolete machines threatens the integrity of Class II gaming, and those risks are only increasing with time. Hacking and security breaches have become commonplace, and with outdated machines still in operation it is only a matter of time before the Indian gaming industry becomes a victim as well.

      What's worse, the current state of the Class II environment makes it impossible to know the extent of the threat, as no one knows the number of grandfathered machines still in operation. This is a problem for the integrity of the Indian gaming industry. Fortunately the Commission already conceived of an easy solution to this problem years ago: allow the grandfathering provision to expire and require that the old machines be made compliant or replaced with compliant machines.

---

[1] Minimum Technical Standards for Class II Gaming Systems and Equipment, 77 Fed. Reg. 58,475 (Sept 21, 2012) (to be codified at 25 CFR pt. 547)

[2] *Id.*

Second, requiring compliance will have little to no negative economic impact on the tribes. In contrast to when the Commission last extended the grandfather period for five years because of concerns about the "economic downturn," Indian gaming has never been stronger. We are now on the 7th straight year of growth for Indian gaming nationwide, and on the heels of the best year ever, where revenue from Indian gaming was at an all-time high in 2016 of $31.2 billion.

Not only is the industry well positioned to absorb any costs of compliance, those costs will be negligible, and non-existent for the tribes. The Commission's decision to allow grandfathering was based on a 2008 study by Dr. Alan Meister ("Meister Report"),[3] which predicted dire economic consequences of requiring immediate compliance. But these predictions have not held up over the last nine years. Thousands of new, compliant Class II gaming systems have been placed in service since 2008, and Class II gaming thrives. The technology to make machines compliant has already been developed, so there will be no additional development costs. And to the extent there are still costs of bringing grandfathered machines into compliance, the tribes will not see them; such costs would be borne by the manufacturers, who nearly always retain ownership of the gaming system and share revenue with the tribal casino operator.

Finally, yet another extension of the grandfather period would harm newer manufacturers of Class II gaming machines, and puts this regulation at risk of being found arbitrary and capricious. As compliant machines cost more to manufacture than non-compliant machines, the Commission's grandfather period has created, and continues to enable, an unequal playing field, granting the manufacturers of older Class II machines a competitive advantage against newer entrants to the market. Any more extensions would cement the selective applicability of this regulation as an unlawful anticompetitive measure.

For the foregoing reasons, we urge the Commission to remain unwavering, and allow the grandfather period to expire as originally intended. This will result in the equal treatment of all gaming machine manufacturers, and benefit the public and tribes by ensuring that *every machine* meets a minimum standard of security and integrity.

I.   **Regulatory History**

In 2003, the Commission decided that "it is in the best interests of Indian gaming to adopt technical standards," governing Class II gaming machines to ensure their security and integrity. At that time, no such standards existed, and patrons had to rely solely on inconsistent tribal regulations to ensure the integrity of their gaming experience. In proposing the technical standards, the Commission decided to, "remedy that absence."[4] The Commission took a variety of steps in preparation for proposing rules, including conducting over 300 separate government-to-government consultation meetings with various tribes and their representatives, establishing a

---

[3] ***The Potential Economic Impact of the October 2007 Proposed Class II Gaming Regulations***, available at: <https://www.nigc.gov/images/uploads/NIGC%20Uploads/proposedregs/MeisterReport2FINAL2108.pdf>

[4] Technical Standards for "Electronic, Computer, or Other Technologic Aids" Used in the Play of Class II Games, 71 Fed. Reg. 46,337 (Aug. 11, 2006) (codified at 25 C.F.R. pt. 547)

joint Federal-Tribal Advisory Committee to assist in the creation of the regulations and, after the regulations were written, conducting lengthy notice and comment periods to allow interested parties an opportunity to discuss any objections.[5]

At that time, the Commission determined that, "it [was] in the best interest of Indian gaming to adopt technical standards that govern[ed] the implementation of … technologic aids used in the play of Class II games because no such standards currently exist[ed]."[6] The Commission further stated that these standards, "[sought] to… ensure that the integrity of Class II games… [was] maintained; that the games… [were] secure; and that the games… [were] fully auditable," in order "to ensure the security and integrity of Class II games."[7]

While the proposed rule required all gaming systems to meet the new standards, after hearing concerns about the potential for negative economic consequences of requiring an immediate change, the Commission had a study done about the regulations' economic impact. The study, done by Dr. Alan Meister, assumed that Class II games would "be slower, more cumbersome, and less appealing that what is being operated in Class II gaming facilities today [in February]." *See* Meister Report at 38. And based on that assumption, the study painted a dire economic picture: billions in lost revenue for the tribes, and thousands of lost tribal jobs.

Because of these economic concerns, the Commission's final rule included a "grandfathering period" for older machines. Machines manufactured before November 10, 2008 had 5 extra years to become compliant.

In 2011, the Commission undertook a complete review of its regulations. Once again, the Commission consulted with tribes, established a Tribal Advisory Committee to allow tribal representatives input into the initial draft of the proposed rule changes, published a discussion draft of the proposed rule changes, and after publishing notice in the Federal Register, held an extended notice and comment period on the proposed rule changes.[8] Throughout this process, "[m]ore than any other topic, [the grandfathering period] has been the subject of long deliberation and analysis."[9] Though it received numerous comments against the grandfathering period, the Commission opted to retain the period.

The Commission extended the original five-year grandfathering period to ten years to "Balanc[e] those economic needs [of the tribal gaming operations] against a risk that increases as technology advances and grandfathered machines remain static . . ."[10] Specifically, the

---

[5] *Id.* at 46,337

[6] Technical Standards for Electronic, Computer, or Other Technologic Aids Used in the Play of Class II Games, 72 Fed. Reg. 60,508-9 (Oct. 24, 2007) (codified at 25 C.F.R 547).

[7] *Id.*

[8] Minimum Technical Standards for Class II Gaming Systems and Equipment, 77 Fed. Reg. 58,473

[9] *Id.* at 58,475

[10] *Id.*

Commission stated that the "lack of a major incident in the past does not mean that the grandfathered Class II gaming systems pose no risk to patrons and the gaming operation," citing for an example the minimum security requirements of §547.15.[11]

## II.   Discussion

For the following reasons, we urge the Commission to allow the current grandfathering period to expire, as it originally intended.

### A.   *The public and tribes are best served if all machines adhere to minimum security and integrity requirements.*

As the Commission is aware, a uniform minimum standard of security is in the interest of both the public and the tribes themselves. The integrity and security risks posed by these old, noncompliant machines—risks which drove the Commission to pass the minimum technical standards in the first place—is only increasing over time. The Commission believed that the Class II machines in question were out of date in 2008. Nearly 10 years have passed since then, and while it seems unnecessary to say, the Class II machines have only gotten older and even more out of date, while threats to the industry have grown. As a single example of the potential risks, in 2014 several Missouri casinos discovered that thieves had specifically targeted their older model slot machines and took advantage of security vulnerabilities.[12]

Hacking and security breaches have gone mainstream in this country, affecting individuals, companies, and all branches and levels of government. The Indian gaming industry is not immune. The question is no longer if an attack will occur, but when. It is only a matter of time before Class II machines are the victims of an enormous security breach or fraud. As the grandfathered machines have the lowest security thresholds, they are the most vulnerable and will likely be the first targets of attack. Allowing the continued use of these machines in the face of that risk is irresponsible and an abnegation of the Commission's duty to protect both the Indian Tribes and the public.

Moreover, allowing the continued use of the grandfathered systems perpetuates the regulatory nightmare caused by the initial grandfathering. The Commission has given the tribes 10 years to retire these machines or bring them into compliance, yet there is no evidence that the tribes have done so. There is no way to know how many pre-2008 Class II machines remain in the marketplace, but as per the 2008 Meister report, it cannot be more than 43,179 machines distributed across the 15 states that had Class II gaming in 2008.[13] Any machines put into service after that would have to be compliant with the regulations. Replacing 4,300 machines a year over the past 10 years should have been easy to accomplish, particularly as only California and Oklahoma had more than 4,300 noncompliant machines in operation within those 15 states in the

---

[11] *Id.*

[12] https://www.wired.com/2017/02/russians-engineer-brilliant-slot-machine-cheat-casinos-no-fix/

[13] Alan Meister, The Potential Economic Impact of the October 2007 Proposed Class II Gaming Regulations 26-37 (2008) [hereinafter Meister, Economic Impact].

first place.[14] Unless the tribes have completely ignored the 2008 regulations, that number must surely be lower today. Thus, the burden of compliance should have decreased as well.

Yet despite these increased risks and lower compliance costs, grandfathering, which was intended to allow time for compliance, has not worked. While we have been unable to find any data respecting the grandfathered machines still in service today, it is generally accepted that very few of the pre-2008 Class II games systems have been brought into compliance. If there is no record of the number of noncompliant machines, then the Commission cannot reasonably know the magnitude of the risk to the tribes or the public. To fulfill its regulatory role, the Commission must be able to access this information. In the absence of that information, the only rational and reasonable regulatory solution is what the Commission intended at the beginning: to end the grandfathering and require all Class II gaming systems to be brought into compliance with the minimum technical standards.

### B.   *Requiring compliance will not negatively impact tribes.*

There is no better time than now for the Commission to require Class II gaming machines meet the its minimum technical standards. The Indian gaming industry is experiencing record expansion.[15] In 2015, growth more than doubled the already impressive expansion of the industry in 2014, setting a record.[16] Revenues were at an all-time high of $30.5 billion, with a value to the U.S. economy that exceeds $100 billion.[17] Indian gaming's recent growth more than doubled the growth of the U.S. economy, with a 5.5% improvement in 2015, compared to the U.S. economy's 2.5% growth in gross domestic product over the same period.[18]

In addition to the industry's boom minimizing the impact of any compliance costs, the costs themselves are subtantially lower now than forecasted a decade ago, and will be borne largely by the manufacturers of gaming machines, not the tribes.

The 2008 Meister Report predicted enormous costs and dire economic consequences for the tribes were the Commission to require immediate compliance with its minimum technical standards. These predictions included:

- Lost gaming revenue of $1.2 billion each year[19]
- Lost non-gaming revenue of $126.9 million annually[20]

---

[14] *Id.*

[15] Alan Meister, Casino City's Indian Gaming Industry Report 13 (2017). [Hereinafter Casino City's Industry Report]

[16] *Id*.

[17] *Id*.

[18] *Id*.

[19] Meister, Economic Impact at 50

[20] *Id.* at 52

- Increased capital, deployment, and compliance costs of $347.9 million, which "would be borne by the tribes"[21]
- Lost tribal member jobs totaling 7,890 per year, as a result of all the lost revenue mentioned above[22]

Understandably, the Commission's decision to implement the grandfather period was based on these dire predictions in the Meister Report.

With the benefit of history, we can now see that the assumptions supporting these predictions were simply incorrect. Chief among these predictions—and the one that supported the prediction for $1.2 billion in lost gaming revenue annually—was the Report's assumption that Class II machines that met the minimum technical standards would "be slower, more cumbersome, and less appealing that what is being operated in Class II gaming facilities [at that time]."[23]

As the Commission knows, the opposite has turned out to be true. Instead of being "slower, more cumbersome, and less appealing," the new, compliant Class II machines today are faster, sleeker, and arguably more appealing than the old, non-compliant machines on the floor in 2007 and early 2008. [A SENTENCE OR TWO MORE HERE WOULD BE GOOD; JASON SHOULD HAVE SOME INFO ON WHY NEW MACHINES ARE BETTER].

With just this one incorrect assumption, nearly the entire house of cards built in the Meister Report comes crashing down. Certainly, the industry would no longer lose $1.2 billion each year due to "slower, more cumbersome, and less appealing" class II machines. Nor would there be lost non-gaming revenue of $126.9 million annually, as that number was based on the lost gaming revenue. And the loss of nearly 8,000 tribal member jobs each year would also never happen, as that was based on the non-existent lost revenues.

But there are still more false assumptions in the Meister Report. The Report predicts, incorrectly, that it would cost nearly $90 million to develop compliant Class II gaming software, and that these costs would be passed on from the manufacturers to the tribes. That has not happened. The software to make compliant Class II games has already been developed, as thousands of compliant machines have been placed into service since 2008. The tribes know that it costs them no more to have a compliant machine on their floor than it does to have a non-compliant one.

Indeed, since the tribes lease virtually all Class II gaming systems from the manufacturer, which retains ownership of the gaming system in exchange for a revenue share with the tribal casino operator, there is no increased costs whatsoever that is "borne by the tribes" for bringing machines into compliance. This means the remaining "capital, deployment, and compliance

---

[21] *Id.* at 56

[22] *Id.* at 58

[23] *Id.* at 38

costs," which the Meister Report claims will be approximately another $260 million, would not be borne by the tribes. If a manufacturer attempted to pass through compliance costs to any tribe, other manufacturers like Castle Hill Gaming stand ready to offer more favorable terms, making it cost-neutral for the tribes to have compliant or non-compliant class II machines.

### C. *Another extension would unfairly, and unlawfully, benefit manufacturers of older machines.*

Yet another extension of the grandfathering provision would have anti-competitive effects. [NEED MORE FROM JASON SHOWING COSTS MORE TO MAKE A COMPLIANT MACHINE THAN A NON-COMPLIANT MACHINE].

Due to this cost differential, the Commission would effectively be granting a competitive advantage to those with vulnerable machines. It would allow them to shift the costs of complying with the regulations, the very same regulations with which all others in the industry must comply, from themselves to the consumer in the form of security risks. This unequal treatment of manufacturers is the definition of arbitrary and capricious, and places the regulation at risk.

### III. Conclusion

For these reasons, we respectfully submit that the already extended grandfathering provision in 25 C.F.R. 547.5 should run its course on November 10, 2018.