IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| VIDEO GAMING TECHNOLOGIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 17-CV-00454-GKF-JFJ |
| | ) **FILED UNDER SEAL** |
| CASTLE HILL STUDIOS LLC | ) |
| (d/b/a CASTLE HILL GAMING); | ) |
| CASTLE HILL HOLDING LLC | ) |
| (d/b/a CASTLE HILL GAMING); and | ) |
| IRONWORKS DEVELOPMENT, LLC | ) |
| (d/b/a CASTLE HILL GAMING), | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

This matter comes before the court on the Motion to Exclude Plaintiff's Expert Yoram Wind [Doc. 170] of defendants Castle Hill Studios LLC, Castle Hill Holding LLC, and Ironworks Development, LLC (collectively, "Castle Hill").[1] For the reasons discussed below, the motion is denied.

**I.     Background/Procedural History**

Plaintiff Video Gaming Technologies, Inc. ("VGT") develops, manufactures, and distributes class II bingo-based player terminals. Castle Hill, which is operated by former VGT employees, allegedly developed and offered class II games that closely resembled VGT's class II games, incorporated marks and themes confusingly similar to VGT's marks and themes, and

---

[1] Castle Hill also filed a sealed, unredacted version of the motion as [Doc. 169]. The references contained in this order are to the unredacted version. As set forth below, the court will enter an unsealed order after consideration of the parties' proposed redactions, if any.

c/ All Counsel

utilized VGT's trade secrets.  In this litigation, VGT asserts trademark infringement, trade dress infringement, and misappropriation of trade secrets and confidential information claims under both state and federal law.  Both federal trademark and trade dress infringement require evidence of likelihood of confusion.  *See King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999) ("Likelihood of confusion forms the gravamen for a trademark infringement action."); *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1227 (10th Cir. 2007) ("To establish a claim of trade dress infringement, a plaintiff must show . . . [t]here is a likelihood of confusion among consumers as to the source of the competing products . . . .").

VGT retained Yoram Wind, Ph. D., Lauder Professor Emeritus at the Wharton School of the University of Pennsylvania, to "provide expert opinions and analysis related to likelihood of confusion between electronic gaming machines ("EGMs") made by VGT and those made by Castle Hill Gaming . . . among consumers who have played or intend to play such machines in Oklahoma casinos."  [Doc. 169-4, p. 5].  To do so, Wind oversaw a survey that presented qualifying respondents with artistic renderings of one VGT machine, one Castle Hill machine, and three "control" machines manufactured by third-party manufacturers.  [*Id.* p. 6].  The survey then asked the respondents to answer three baseline questions: (1) whether or not any of the machines were made by the same company; (2) whether or not any of the machines were made by companies that are associated or affiliated with each other; and (3) whether or not any of the machines were made by a company that has to get permission or authorization from the maker of any of the other machines.  [*Id.*].  The survey then followed up each of these baseline questions with open-ended questions to determine the reasoning behind the initial responses.  [*Id.*].

On September 24, 2018, Wind provided a FED. R. CIV. P. 26(a) expert report, titled "Likelihood of Confusion Between VGT and CHG Electronic Gaming Machines."[2] *See* [Doc. 169-4]. The report presented the results of the likelihood of confusion survey, and, based on the results and "other relevant evidence," extrapolated that a likelihood of confusion exists between the VGT machines and Castle Hill machines at issue in this litigation. Castle Hill deposed Wind on September 20, 2018. *See* [Doc. 169-6]. Castle Hills now seeks to disqualify Wind's opinions as unreliable pursuant to FED. R. EVID. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

## II. Survey Methodology

In order to determine the reliability of Wind's opinions, it is first necessary to understand his methodology.

Wind designed a "double-blind experiment" to be administered by third-party Research Now to qualifying respondents recruited from online panels maintained by Research Now. [Doc. 169-4, pp. 10-11 and 49]. The experiment was "double-blind" because neither Research Now nor the respondents were aware of the identity of the sponsor of the study or the objectives of the study. [*Id.* at 10 n. 2]. Qualifying respondents were "consumers who played slot or bingo-based EMGs in an Oklahoma casino within the past year or intend to play such games within the next year." [*Id.* at 11]. A total of 446 respondents took the survey during the period from June 21, 2018 to June 27, 2018. [Doc. 169-2, p. 12].

---

[2] Wind originally provided a Rule 26 report on August 10, 2018. *See* [Doc. 169-2]. However, for the reasons discussed below, Wind revised his report to remove the results of ninety-three (93) respondents. [Doc. 169-4]. For ease of reference and consistency, the court refers to the September 24 report, [Doc. 169-4].

The survey presented respondents with images of five "stimuli": VGT's "Mr. Money Bags"; Castle Hill's "New Money"; and three "control" machines manufactured by third-parties. [Doc. 169-4, pp. 10-11]. Wind required control EGMs to satisfy two criteria. [*Id.* at 11]. First, the control EGMs must portray a wealth or money theme. [*Id.*]. Second, the EGM must be found in Oklahoma casinos; in this case, all electronic gaming machines were in the Choctaw-Durant Casino. [*Id.* at 11 n. 4]. Based on these criteria, Wind selected the following three control EGMs: Konami's "Imperial Wealth"; Scientific Games's "Gold";[3] and IGT's "Good Gold." The images presented were artistic renderings of the five machines, each standing in isolation. [*Id.* at 11]. The array initially appeared as follows:



[*Id.*]. In the arrays, the VGT machine corresponds to "K," the Castle Hill machine corresponds to "M," the Konami machine corresponds to "P," the Scientific Games machine corresponds to "S," and the IGT machine corresponds to "T." [*Id.*]. Wind ordered the array to be rotated, and each

---

[3] The Scientific Games machine, designated as Control S, appears to include additional words other than "Gold." However, due to the size and resolution of the materials submitted by the parties, the court is unable to ascertain what, if any, words may follow or precede "Gold."

respondent saw one of five arrays: K-M-P-S-T; T-K-M-P-S; S-T-K-M-P; P-S-T-K-M; and M-P-S-T-K. [*Id.* at 10].

The survey's main questionnaire first showed respondents the array of the five machines and directed the respondent to "look at the five machines the way you normally would before selecting a machine to play." [*Id.* at 13]. The questionnaire also informed respondents "[y]ou can zoom in to see any element of a machine better."[4] [*Id.*].

Respondents were then asked the first of three base questions.

> Q1. Now looking at these machines,
> 
> a. Do you think that any of these machines are made by the same company? OR
> b. Do you think that each of the machines is made by a different company? OR
> c. Don't you have an opinion?
> 
> 1. Two (or more) of the machines are made by the same company
> 2. Each of the machines is made by a different company
> 3. No opinion

[*Id.*]. The computer program rotated the individual options and responses within each question. [*Id.* at 13 n. 8]. If the respondent selected "[t]wo (or more) of the machines are made by the company," the respondent was then asked to select the machines he or she believed were made by the same company and explain what made the respondent think the listed machines were made by the same company. [*Id.*].

---

[4] In fact, the functionality did not permit respondents to zoom in to focus on a specific part of the photograph. [Doc. 211-4, pp. 213:17 to 215:25]. Rather, when clicked on, respondents viewed an enlarged photograph of the machine. [*Id.* at 245:11-22].

Respondent then viewed the second base question:

> Q2. Looking at the five machines again,
>   a. Do you think that any of the machines are made by companies that are associated or affiliated with each other? OR
>   b. Do you think that none of these machines are made by companies associated or affiliated with each other? OR
>   c. Don't you have an opinion?
>
>   1. Two (or more) of these machines are made by companies that are associated or affiliated with each other.
>   2. None of these machines are made by companies that are associated or affiliated with each other.
>   3. No opinion

[*Id.* p. 14]. If the respondent selected "[t]wo (or more) of these machines are made by companies that are associated or affiliated with each other," the respondent was asked to select the machines believed to be made by associated or affiliated companies and explain the reasons behind the respondent's belief. [*Id.*].

Finally, respondents viewed the third base question:

> Q3. And looking at the five machines again,
>   a. Do you think that any of these machines are made by a company that had to get permission or authorization from one or more of the companies that make the other machines? OR
>   b. Do you think that none of these machines are made by a company that had to get permission or authorization from one or more of the companies that make the other machines? OR
>   c. Don't you have an opinion?
>
>   1. One (or more) of the companies had to get permission or authorization from one or more of the other companies.
>   2. None of the companies had to get permission or authorization from any of the other companies.
>   3. No opinion.

[*Id.* at pp. 14-15]. Again, if the respondent selected "[o]ne or more of the companies had to get permission or authorization from one or more of the other companies," respondents were prompted to select the machines made by a company that had to get permission/authorization from one or more of the companies that make the other machines and explain their reasoning for the selection. [*Id.* p. 15].

As previously mentioned, Wind first provided a Rule 26 report analyzing the results of the survey on August 10, 2018. [Doc. 169-2]. However, during his September 20 deposition, Wind learned that, in the context of the T-K-M-P-S array, respondents who clicked to enlarge the "M" stimuli (Castle Hill's "New Money") were in fact shown an enlarged photo of the "K" stimuli, VGT's "Mr. Money Bags." [Doc. 169-6, pp. 249:1 to 250:16]. Because of this "glitch," Wind issued a "corrected" version of the initial report that eliminated the results of all 93 respondents that viewed the T-K-M-P-S array. [Doc. 170-16, p. 2]. The elimination of the respondents who viewed the "T-K-M-P-S" array resulted in a sample universe of 353 respondents. [*Id.*]. The memorandum accompanying the Corrected Report concluded:

> Given that the results for the 353 respondents are virtually identical to the results for the original 446 respondents, the potential implications of this technical glitch do not cause me to question or change any of the opinions set forth in my Initial Report. Accordingly, I attach a Corrected Report with the only changes being removal of the 93 potentially affected respondents from all applicable tabulations and appendices.

[*Id.* at 2 and 4].

### III.   Standard

Pursuant to Federal Rule of Evidence 702,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and methods; and
>
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 imposes on the trial court an important gate-keeping obligation, "to 'ensure that any and all [expert] testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). Thus, "the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co., Ltd.*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). To determine whether an expert's opinion is admissible, the district court must generally undertake a two-step analysis: (1) first, to determine "whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion," and (2) second, to determine "whether the expert's opinion is reliable by assessing the underlying reasoning and methodology[.]" *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1307 (10th Cir. 2015) (internal quotations omitted).

The court notes, however, this case is scheduled for a bench trial. [Doc. 202 and Doc. 312]. "[W]hile *Daubert*'s standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial." *Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009). Thus, "the 'gate-keeping' function is less important" and "a judge conducting a bench trial maintains greater leeway in admitting questionable evidence, weighing its persuasive value upon presentation." *Valley View Dev., Inc. v. U.S. ex rel. U.S. Army Corps of Eng'rs*, 721 F. Supp. 2d 1024, 1047 (N.D. Okla. 2010) (quoting *Tyson Foods, Inc.*, 565 F.3d at 779-80).

**IV.    *Daubert* Analysis**

Castle Hill contends Wind's opinions are unreliable and therefore inadmissible under *Daubert*. In response, VGT asserts Castle Hill's criticisms are the proper subject of cross-examination and not the basis for exclusion. The court considers Castle Hill's objections as three general categories, below.

A.   *Use of Side-by-Side Format*

Castle Hill first criticizes Wind's survey for its use of the side-by-side format, which Castle Hill contends is disfavored in the Tenth Circuit. Background information with respect to survey evidence informs the court's analysis.

The Tenth Circuit previously recognized that "[s]urveys can be used as evidence of actual confusion, but their evidentiary value depends on the relevance of the questions asked and the technical adequacy of the survey procedures." *1-800 Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1246 (10th Cir. 2013) (quoting *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1534 n. 3 (10th Cir. 1994)). Surveys designed to test for consumer confusion typically adopt one of two basic formats: the *Ever-Ready*[5] format and the *Squirt*[6] format. Pursuant to the *Ever-Ready* format, survey respondents are shown an image of the allegedly infringing product and questioned regarding who the respondent thinks manufactured the product. *See* 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 32:174 (5th ed. 2019); *see also* Jerre B. Swann, *Eveready and Squirt – Cognitively Updated*, 106 TRADEMARK REP. 727, 729 (2016) ("In a typical *Eveready* study, respondents are shown only a contextual stimulus of the allegedly infringing junior mark, and are asked the open-ended source question, 'Who makes or puts [this] out?', typically followed by 'Why do you say that?'") (internal footnote omitted). In an *Ever-Ready* survey, respondents are not shown the "senior"—*i.e.*, infringed upon—mark, but rather it is assumed that the respondent is aware of the mark. 6 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 32:173.50. Thus, the *Ever-Ready* format is appropriate to test the potential

---

[5] *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976), *cert. denied,* 429 U.S. 830 (1976).

[6] *SquirtCo. v. Seven-Up Co.,* 628 F.2d 1086 (8th Cir. 1980).

for confusion with "strong marks" for high-involvement or experience goods. Swann, 106 TRADEMARK REP. at 733.

Conversely, under the *Squirt* format, respondents are shown both marks and questioned regarding potential connections. 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 32:173.50 (5th ed. 2019). Commentators also recognize "[a] more subtle form of '*Squirt*' survey[,] . . . a product line-up survey in which the respondent is shown an array of branded products, including the contesting brands, and is asked questions about the relation between the companies that sell the products with the contesting marks." *Id.; see also* Swann, 106 TRADEMARK REP. at 738-39 ("Today, therefore, traditional Squirts are infrequently utilized . . . . As the less frequent of two principal 'spotlight' removing variants, respondents (as to marks that exist side-by-side in the marketplace) are shown an array or 'sorting board' (including the senior and junior uses) and are asked" whether they believe the brands are from the same or affiliated companies).

In the Tenth Circuit, "a side-by-side comparison ordinarily is not the proper method of determining likelihood of confusion." *Water Pik, Inc. v. Med-Systems, Inc.,* 726 F.3d 1136, 1147 (10th Cir. 2013). However, the court does not interpret Tenth Circuit precedent to wholly preclude use of the *Squirt* format. Rather, to determine the suitability of the *Squirt* method, the court must consider "the actual workings of the marketplace." *Id.* (quoting *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1488 (10th Cir. 1987)); *see also Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir. 1983) ("The marks 'must be compared in the light of what occurs in the marketplace, not in the courtroom.'") (quoting *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976)). Wind testified that he selected the *Squirt* survey format, as opposed to the *Ever-Ready* format, based on the market reality that casino patrons are

"confronted with a lot of machines." [Doc. 211-4, pp. 117:25 to 118:15]. Accordingly, in the market, one companies' electronic gaming machines "often appear side-by-side with other companies' EGMs." [Doc. 211-2, p. 10]. However, casino photos relied on by Wind do not show VGT and Castle Hill machines "side-by-side." *See* [Doc. 169-4, pp. 656-659]. Rather, based on the court's review of those photos, it appears that Castle Hill machines appear side-by-side with other Castle Hill machines, and VGT machines are side-by-side with other VGT machines. Although the companies' products may appear in close proximity (for example, a row of Castle Hill machines be placed in the row directly in front of a row of VGT machines), the evidence presented does not suggest VGT and Castle Hill products are "isolated and displayed next to one another." *See Water Pik, Inc.*, 726 F.3d at 1147.

Further, although VGT contends Wind designed the study to permit respondents to "look at the five machines the way [they] normally would before selecting a machine to play," the court is not persuaded. *Cf.* [Doc. 169-4, p. 13]. VGT submits evidence that casinos consist of potentially "disorienting" "rows upon rows of gaming machines with blinking lights or displays," which utilize various techniques to encourage consumers to approach the game and, once closer, influence a consumer to play. *See* [Doc. 211-7, p. 14, ¶ 23]. Attention-drawing techniques include lights, audio cues, and video animation. [*Id.*]. Moreover, product details that are only viewable upon closer examination, such as theme, pay table, and game rules, may persuade consumers to play. [*Id.* ¶ 24]. Thus, a prospective game player would not ordinarily view all five products simultaneously—as presented by the Wind arrays—but, instead, would move throughout the casino and approach various machines individually to determine whether they wish to play.

Further, the Wind arrays fail to present the video display, lights, or audio cues associated with the machines.[7]

Use of the *Squirt* format is appropriate in instances of physical proximity in the marketplace only where "the aiding in the format is reflective of market reality and a Squirt does not create an 'artificial' market." Swann, 106 TRADEMARK REP. at 743; *see also Bell Helicopter Textron, Inc. v. Helicomb Int'l Inc.,* No. 05-CV-0322-CVE-FHM, 2005 WL 8150059 (N.D. Okla. July 14, 2005) ("Generally, 'any meaningful inquiry into the likelihood of confusion necessarily must replicate the circumstances in which the ordinary consumer actually confronts (or probably will confront) the conflicting mark.'") (quoting *Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.,* 103 F.3d 196, 201 (1st Cir. 1996)). The Wind survey creates an artificial market in which the stimuli presented are devoid of the video display, lights, audio, and other features that, not only are utilized specifically to attract consumers and differentiate electronic gaming products from those of other manufacturers, but are at issue in this litigation. Accordingly, the Wind survey fails to adequately replicate the circumstances in which the ordinary consumer actually confronts the products at issue, and the court questions Wind's use of the *Squirt* format.

---

[7] VGT states Wind was unable to utilize videos or photographs of the stimuli as they appear in the casino because the casinos withheld permission. Accordingly, VGT contends "[it] is using the best photographs, images and videos available to it." [Doc. 211, p. 16]. However, VGT cites no authority for the extraordinary proposition that practical difficulties circumvent *Daubert*'s reliability requirements. Nor does any appear to exist. Further, with respect to photographs, VGT's assertion is undercut by its inclusion of photographs of its machines on casino floors throughout its briefing, including as appendices to Wind's report. *See, e.g.,* [Doc. 169-4, pp. 656-659]. Finally, VGT's assertion that, if Wind's survey had included lights and sounds to better replicate the casino floor, the approach "would almost certainly have led to even *higher* rates of confusion," [Doc. 211, p. 15], is "no more than *ipse dixit* guesswork." *Bright v. Ohio Nat'l Life Assurance Corp.,* No. 11-CV-475-GKF-FHM, 2013 WL 121479, at *4 (N.D. Okla. Jan. 9, 2013).

### B. *Suggestive and Leading Questions*

Castle Hill next argues Wind utilized suggestive and leading questions in the survey. It is well-established that "[a] survey question that begs its answer by suggesting a link between plaintiff and defendant cannot be a true indicator of the likelihood of consumer confusion." *Water Pik, Inc.*, 726 F.3d at 1147 (quoting *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 488 (5th Cir. 2004)). In *Water Pik*, the Tenth Circuit concluded a district court could reasonably view survey questions as improperly leading, describing the survey as follows:

> Respondents were shown only three products and were asked whether two or more of the products were made by the same company; whether two or more of the products' makers had a business affiliation; and whether one or more of the makers had received permission or approval from one of the others. They could answer yes, no, or not sure.

*Id.* at 1147. The court concluded

> By suggesting the possibility that SinuSense might be connected with another brand, and limiting the candidates to Sinu*Cleanse* and NeilMed, the survey questions risked sowing confusion between SinuSense and Sinu*Cleanse* when none would have arisen otherwise.

*Water Pik, Inc.*, 726 F.3d at 1148. Castle Hill criticizes the Wind survey for using "nearly identical questions to the ones found to be leading in *Water Pik* in his survey[.]" [Doc. 169, p. 10]. However, some differences exist. Castle Hill is correct that Wind's base questions are similar to those disfavored by the Tenth Circuit in *Water Pik*. Unlike the *Water Pik* survey, though, Wind did not limit respondents to a "yes, no, or not sure" response, but included a "no opinion" option. Further, Wind modified the presentation of the questions, asking, "Do you think that any of these machines are made by the same company, or do you think that each of the machines is made by a different company, or don't you have an opinion?" The Federal Judicial Center has approved of a similar approach. *See* Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 359, 391 (3d ed. 2011); *see also* 6 MCCARTHY ON

TRADEMARKS & UNFAIR COMPETITION § 32:175 ("In the author's view, it is not improperly leading to present the respondent with a fair and accurate representation of the contesting marks and ask in a neutral manner if the respondent thinks there is or is not some connection, affiliation or sponsorship relation between the owners of the marks—or that the respondent doesn't know."). The questions and responses were presented in random order. [Doc. 169-4, p. 13 n. 8].

Despite these variances, other aspects of the survey questions may reasonably be construed as leading. Like the improperly leading questions in *Water Pik*, the questions in the Wind survey suggest the possibility of a connection between the products. *See Water Pik, Inc.*, 726 F.3d at 1147-48. Further, although the Wind survey did not limit the control "stimuli" to one (as in *Water Pik*) the control stimuli utilized by Wind themselves were unduly suggestive. Most concerning to this court, in three of the four arrays[8] the VGT product and Castle Hill product appear next to each other. Thus, despite Wind's adoption of an "array" approach to the *Squirt* survey, in seventy-five percent (75%) of the surveys, respondents were presented with a literal side-by-side comparison. Notably, respondents to the M-P-S-T-K array (the only array in which the VGT product and Castle Hill product were not presented side-by-side) identified the VGT and Castle Hill products as being connected only 15.8% of the time, whereas respondents that viewed arrays in which the VGT and Castle Hill products appeared side-by-side identified a connection between the two products 20% to 22% of the time. *See* [Doc. 169-4, p. 229].

The court's concern regarding presentation of the VGT product and Castle Hill product side-by-side in the majority of the arrays is exacerbated by other unduly suggestive aspects of the

---

[8] The court does not consider the "T-K-M-P-S" array, as it was disregarded by Wind for purposes of the September 24 expert report.

Wind survey. Only the VGT and Castle Hill products include the word "money."[9] None of the control stimuli incorporate drawings of persons, but instead include only text or images of fantastical beings (a ghost or dragon). Further, only one of the control stimuli is presented in the same frontal view as the VGT and Castle Hill's products, which prohibited the respondents from ascertaining the depth of the machines or aspects of the button panel.[10] *See* [Doc. 169-2, p. 11]. By presenting the VGT and Castle Hill games in a frontal, 2-D manner, respondents could not assess the products as they actually appear in the market. Finally, as previously stated, the array did not permit respondents to assess differences in lighting or sound which may distinguish the machines.

Based on the foregoing, it is clear that the fact that the VGT and Castle Hill products appear side-by-side in the majority of the arrays, coupled with the suggestive nature of the base questions, "risk[s] sowing confusion . . . when none would have arisen otherwise." *See Water Pik, Inc.*, 726 F.3d at 1148. While VGT points to commentary and practical considerations to justify Wind's choices, this court is bound by Tenth Circuit precedent. Because Wind adopted a survey

---

[9] The court does not criticize Wind's selection of "Mr. Money" and "New Money." However, the court critiques Wind's failure to include control stimuli that also incorporated the word "money," particularly based on evidence of other pairings that respondents identified as being connected or affiliated. Wind correctly notes that the K-M pairing (VGT-Castle Hill) identified the highest level of confusion. *See* [Doc. 169-4, pp. 24-25]. The pairing identified with the second highest level of confusion was S-T—both of which include the word "gold." [*Id.*].

[10] For these reasons, the court is not persuaded by Wind's conclusion that the side-by-side presentation of VGT and Castle Hill's products did not result in bias because respondents did not identify other side-by-side pairs as being connected. *See* [Doc. 211-4, pp. 168:22 to 170:10 ("And if you look at the data, then it suggests that there's no other pair that basically appears even close to these two, even though if your hypothesis is that it's the location that makes the difference here, you're expected to have equal number of people selecting M and P or P and S or S and T or T and K and the other kind of addressing items.")].

methodology similar to that determined to be unreliable in *Water Pik*, the court questions the reliability of the Wind survey.

However, the court agrees that "in a non-jury trial, the better course is 'to receive the evidence and then ignore it or give it such weight as the court [thinks] appropriate.'" *Inc. Publ'g Corp. v. Manhattan Magazine, Inc.,* 616 F. Supp. 370, 390 (S.D.N.Y. 1985) (quoting *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F. Supp. 1189, 1204-05 (E.D.N.Y. 1983)); *see also Oklahoma v. Tyson Foods, Inc.*, No. 05-CV-329-GKF-SAJ, 2008 WL 1994910, at *1 (N.D. Okla. May 5, 2008), *aff'd,* 565 F.3d 769 (10th Cir. 2009) (characterizing *Daubert* gatekeeping function as "not a prevailing concern in a bench trial or hearing to the court, because the court functions as the trier of fact"). Thus, the court will not exclude the Wind survey from trial, and Castle Hill's objections will be considered as to weight.

      C.     *Remaining Objections*

Castle Hill's remaining objections also bear on the weight, rather than the admissibility, of the Wind survey. *See Brunswick Corp v. Spinit Reel Co*., 832 F.2d 513, 523 (10th Cir. 1987) ("As to the technical and methodological deficiencies in the survey . . ., those relate not [*sic*] the survey's admissibility but to the weight to be given such evidence."). Castle Hill criticizes Wind for his use of only one cabinet configuration. However, Wind provided a reasonable explanation for his selection and Castle Hill does not dispute that the cabinet configuration is commonly utilized by VGT in its "Mr. Money Bags" product. *See* [Doc. 211-4, pp. 189:6 to 193:11]. Castle Hill's criticisms of Wind's discretionary decisions may be explored through cross-examination.

Castle Hill also points to what it dubs "fatal technical errors." *See* [Doc. 169, pp. 20-25]. However, technical deficiencies do not preclude admission of survey evidence unless the deficiencies "are so substantial as to render the survey's conclusions untrustworthy[.]" *Hodgdon*

*Powder Co., Inc. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007) (quoting *Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1465 (D. Kan. 1996)). Castle Hill first raises the fact that twenty-percent (20%) of the original respondents were shown an image of VGT's "Mr. Money Bags" instead of Castle Hill's "New Money" when the respondent attempted to enlarge the stimuli image. However, as discussed above, Wind issued the Corrected Report that eliminated the results of all respondents who viewed the defective array. Castle Hill challenges the reliability of the Corrected Report because, by removing the 93 respondents, Wind narrowed the universe of respondents to 353, and Wind testified in this matter that he designed the survey for approximately 400 respondents. *See* [Doc. 169-6, p. 140:16-19]. However, Castle Hill's own rebuttal expert, James T. Berger, conceded that the elimination of the 93 respondents: "solved the problem. [Wind] accounted for the error. There was still a sufficient number of responses for him to reach a conclusion, but by removing that, you somewhat weaken the survey. That's all." [Doc. 211-5, pp. 235:22 to 236:6]. Thus, the removal of the 93 respondents is not an appropriate ground for exclusion.

Castle Hill also criticizes Wind's opinions for their continued assertion that a "zoom" function existed in the survey, when, in fact, respondents could only view enlarged images of the stimuli but were not permitted to focus on any specific portion of the image (*i.e.*, "zoom"). Further, Castle Hill contends that, when enlarged, only one of the controls appeared in the same resolution as the VGT and Castle Hill products, while the other images appeared in a lesser, grainy resolution. The court is unable to independently assess the enlargement capabilities with respect to any specific feature of the stimuli (*i.e.,* "zoom"), as neither party provided the court with images of the stimuli as they appeared when enlarged. Nor can the court adequately address the resolution of the control stimuli when enlarged as compared to the VGT and Castle Hill products. However, it

is clear to the court that the survey did permit respondents to view enlarged images of each of the five stimuli and therefore any technical deficiencies are not so substantial to render the survey untrustworthy. Any technical deficiencies associated with the enlargement bear on the weight of the Wind survey, not admissibility.

Finally, Castle Hill objects to what it characterizes as Wind's improper summary of evidence and testimony of fact witnesses "in an effort to put an 'expert' stamp of approval on VGT's spin on the purported evidence." [Doc. 169, p. 26]. Castle Hill is correct that district courts within the Tenth Circuit have prohibited experts from summarizing facts or testimony. The principle underlying the prohibition, however, is inapplicable because the court will act as the finder of fact, rather than a jury. *See iFreedom Direct Corp. v. First Tenn. Bank Nat'l Ass'n*, No. 09-CV-205-DN, 2012 WL 3067597, at *3 (D. Utah July 27, 2012) (With respect to an upcoming jury trial, a federal district judge in Utah ruled that "no expert or any other witness will be permitted to simply summarize the facts and the depositions of others. Such testimony comes dangerously close to usurping the fact-finder's function . . . .").

Castle Hill specifically criticizes Wind for his reliance on material provided to him by VGT's counsel rather than independently verifying the information. Federal Rule of Evidence 703 permits an expert to base his or her opinions "on facts or data in the case that the expert *has been made aware of* or personally observed," provided that other experts in the particular field would reasonably rely on those facts or data. FED. R. EVID. 703 (emphasis added). Accordingly, the Rules do not require an expert to personally observe all data relied upon. Further, objections to the factual underpinnings of an expert's opinions go to the weight, not the admissibility, of the testimony. *Ortega v. City & Cnty. of Denver*, No. 11-CV-02394-WJM-CBS, 2013 WL 438579, at **4-5 (D. Colo. Feb. 5, 2013); *In re Commercial Fin. Servs., Inc.,* 350 B.R. 559, 568 (N.D.

Okla. Bankr. 2005) ("An expert's assumption of certain facts to the exclusion of others does not necessarily render the expert's opinion unreliable.").[11]

## V.     Conclusion

WHEREFORE, Defendant's Motion to Exclude Plaintiff's Expert Yoram Wind [Doc. 169] is denied. The parties may file proposed redactions, or state their non-objection to public filing of this order, no later than June 21, 2019.

DATED this 7th day of June, 2019.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE

---

[11] In a footnote, Castle Hill seeks exclusion of pages 12 through 15 of Wind's Reply Report, which serves as a rebuttal of Castle Hill's damages expert, W. Todd Schoettelkotte. *See* [Doc. 169, p. 26 n. 9]. Castle Hill contends "Dr. Wind, of course, is not a financial or accounting expert . . . and his critiques of Castle Hill's damages expert are little more than the arguments of counsel regarding the evidence Castle Hill's expert relied on." [*Id.*]. VGT did not respond to the argument. However, Castle Hill's request to exclude portions of Wind's report related to Schoettelkotte's opinions is inadequately briefed. Further, as recognized by the Tenth Circuit, "while *Daubert*'s standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial." *Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009). Given that this case will be tried before the court, Wind's lack of knowledge of finance and accounting principles may be explored through cross-examination, but the court will not strike the opinions. *See Benham v. Ozark Materials River Rock, LLC*, No. 11-CV-339-JED-FHM, 2013 WL 5592975, at *3 (N.D. Okla. Oct. 10, 2013).