# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1)  VIDEO GAMING TECHNOLOGIES, INC., | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. 4:17-cv-00454-GKF-jfj |
| | ) |
| 1)  CASTLE HILL STUDIOS LLC | )    **REDACTED** |
| (d/b/a CASTLE HILL GAMING); | ) |
| 2)  CASTLE HILL HOLDING LLC | ) |
| (d/b/a CASTLE HILL GAMING); and | ) |
| 3)  IRONWORKS DEVELOPMENT, LLC | ) |
| (d/b/a CASTLE HILL GAMING) | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF VIDEO GAMING TECHNOLOGY INC.'S
## OPPOSITION TO DEFENDANTS' MOTION FOR RELIEF
## <u>UNDER PROTECTIVE ORDER AND OTHER RELIEF</u>

## **TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................... 1

II.    STATEMENT OF THE CASE.................................................................................. 2

III.   ARGUMENT ............................................................................................................ 6

      A.     VGT would suffer tangible prejudice that outweighs any potential benefit of modifying the Protective Order. ......................................................... 8

      B.     CHG does not need to share VGT's highly confidential information for its defense. .................................................................................................. 11

      C.     CHG stipulated to the Protective Order despite its current objections. ............... 15

      D.     VGT is not using the Protective Order as a sword................................................ 16

IV.   CONCLUSION....................................................................................................... 17

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bayer AG & Miles, Inc. v. Barr Labs., Inc.*,
  162 F.R.D. 456 (S.D.N.Y. 1995) ........................................................................7, 15

*Beckman Indus., Inc. v. Int'l Ins. Co.*,
  966 F.2d 470 (9th Cir. 1992) ....................................................................................11

*Chipman v. Sabol & Rice*,
  No. 2:10-CV-01016-DN-DBP, 2012 WL 6020031 (D. Utah Dec. 3, 2012) ..........10

*Intel Corp. v. VIA Technologies, Inc.*,
  198 F.R.D. 525 (N.D. Cal. 2000) ............................................................................14

*James River Ins. Co. v. Rapid Funding, LLC*,
  658 F.3d 1207 (10th Cir. 2011) ...............................................................................13

*Jochims v. Isuzu Motors, Ltd.*,
  145 F.R.D. 499 (S.D. Iowa 1992) .......................................................................7, 11

*Layne Christensen Co. v. Purolite Co.*,
  271 F.R.D. 240 (D. Kan. 2010)...................................................................................8

*McAirlaids, Inc. v. Kimberly-Clark Corp.*,
  299 F.R.D. 498 (W.D. Va. 2014) .......................................................................10, 12

*Medtronic Sofamor Danek, Inc. v. Michelson*,
  No. 01-2373-GV, 2002 WL 33003691 (W.D. Tenn. Jan. 30, 2002) .......................14

*Murata Mfg. Co. v. Bel Fuse, Inc.*,
  234 F.R.D. 175 (N.D. Ill. 2006).........................................................................11, 15

*Northbrook Digital, LLC v. Vendio Servs., Inc.*,
  625 F. Supp. 2d 728 (D. Minn. 2008)...................................................................8, 12

*Nutratech, Inc. v. Syntech (SSPF) Int'l, Inc.*,
  242 F.R.D. 552 (C.D. Cal. 2007) .............................................................................10

*Pansy v. Borough of Stroudsburg*,
  23 F.3d 772 (3d Cir. 1994)..........................................................................................6

*Raytheon Co. v. Indigo Sys. Corp.*,
  No. 4:07-CV-109, 2008 WL 4371679 (E.D. Tex. Sept. 18, 2008)....................11, 15

*Richard Wolf Med. Instruments Corp. v. Dory*,
   130 F.R.D. 389 (N.D. Ill. 1990)...............................................................................7

*Rohrbough v. Harris*,
   549 F.3d 1313 (10th Cir. 2008) ..............................................................................6

*S.E.C. v. Merrill Scott & Assocs., Ltd.*,
   600 F.3d 1262 (10th Cir. 2010) ...............................................................6, 8, 10, 11

*Safe Flight Instrument Corp. v. Sundstrand Data Control Inc.*,
   682 F. Supp. 20 (D. Del. 1988)...........................................................................10, 12

*Suture Exp., Inc. v. Cardinal Health, 200, LLC*,
   No. 12-2760-RDR, 2013 WL 6909158 (D. Kan. Dec. 31, 2013)...................................8, 9, 10

*THK Am., Inc. v. Nippon Seiko K.K.*,
   141 F.R.D. 461 (N.D. Ill. 1991).............................................................................14

## I.     INTRODUCTION

CHG agreed to the Protective Order entered by this Court on December 22, 2017, knowing that its employees would not have access to VGT's "highly confidential" information and documents.  As if it had not stipulated to the Protective Order, CHG now laments the Order's restrictions and incorrectly claims that they hamper CHG's ability to defend itself at trial, evaluate VGT's claims (which have been pending for two years), and formulate and respond to settlement proposals.  CHG seeks to grant its CEO, its Chief Technology Officer, and two of its engineers access, on the eve of trial, to a significant amount of trade secrets and other sensitive technical information that VGT produced in reliance on the restrictions in the Protective Order.

CHG's request for relief from the agreed-upon Protective Order should be denied because it would expose VGT to the very risks against which the Order is designed to protect.  Because CHG is not challenging VGT's confidentiality designations, the documents CHG seeks to provide to its officers and employees are, by definition, those that "would compromise and/or jeopardize the Supplying Party's competitive business interests."  Dkt. 55 ¶ 1.d.  Not only is CHG, a direct competitor of VGT, capable of using this highly confidential information to its advantage, but CHG has *already* misappropriated VGT's trade secrets and confidential information.  CHG does not limit its request to a few specific documents or pieces of information, but rather seeks broad access to dozens of documents, including every document cited by the technical experts and every exhibit submitted in connection with the parties' summary judgment motions.

CHG has not shown a compelling reason for such access.  Despite taking numerous depositions of VGT employees on other issues in the case, CHG largely ignored the trade secret

issues during fact discovery, taking only a short Rule 30(b)(6) deposition on these issues (while not deposing any VGT engineer in a personal capacity). CHG also chose to retain an expert witness (Mr. Zeidman) on trade secret issues even though he lacks any experience in the gaming industry. Now, in an apparent attempt to remedy this problem on the eve of trial, CHG wants to engage three former VGT employees (Messrs. Roireau, Suggs, and Scheiner) to provide an analysis of the VGT trade secrets at issue in the case. Putting aside the clear harm to VGT if CHG gains even *more* access to VGT's trade secrets than it already has, none of CHG's employees have been offered as experts in this case or are allowed to serve in such a role at this point even if CHG wanted them to do so. The only expert that CHG has offered on these issues (Mr. Zeidman) has had full access to all of the information since February 2018, shortly after CHG first disclosed him to VGT. In short, any concerns CHG may have about its ability to prepare for trial on the trade secret issues are largely of its own making and do not warrant modifying the Protective Order.

Similarly, CHG's assertion that its CEO needs this highly technical information in order to consider settlement, understand the case and its potential exposure, and advise CHG's board of directors accordingly, is belied by the fact that CHG has litigated the case for the past two years without such access. In any case, as VGT informed CHG during the meet-and-confer, VGT remains willing to share specific documents or information with CHG's CEO for the purpose of settlement. But CHG's request to share dozens of VGT's most sensitive documents with its CEO is unacceptable—and unfair given that it shared substantially less with VGT's decision-makers for purposes of settlement.

## II.    STATEMENT OF THE CASE

Because VGT and CHG are direct competitors, the parties jointly moved for entry of a protective order on December 22, 2017. Although CHG expressed reservations with VGT's

proposed restrictions, it recognizes that "the parties *stipulated* to the current Protective Order." Defs.' Mot. for Relief, Dkt. 356 at 6 (emphasis added); *see also id.* at 5.[1]

The Protective Order entered by the Court limits use of "confidential," "highly confidential," and "highly confidential source code information."  *See* Dkt. 55.  As CHG acknowledges, confidential information "can be shared with the receiving party's outside counsel, experts, consultants, and up to three of the receiving party's client representatives." Dkt. 356 at 2 (citing Dkt. 55 ¶ 4).  "Highly confidential" or "highly confidential source code" information "can only be shared with the receiving party's outside counsel, experts, and consultants, and cannot be shared with the receiving party."  *Id.* (citing Dkt. 55 ¶¶ 5-6).

In other words, CHG agreed to litigate VGT's trade secret claims knowing—and agreeing—that its CEO and other employees would not have access to VGT's highly confidential information.

VGT has relied on the protections afforded by the Protective Order throughout the litigation.  It produced more than 67,000 pages of documents and more than 50 gigabytes of source code in response to CHG's discovery requests, understanding that the Protective Order would limit access to sensitive material, such as technical documents describing the operation of VGT's Class II system and games, information about the math and performance of the games, and the software submissions that VGT provides to testing labs.

---

[1] The parties disagreed about the number of non-lawyer employees that should be allowed access to "confidential information" under the Protective Order, with VGT proposing three and CHG proposing five.  *See* Dkt. 53 at 2-6.  The Court adopted VGT's position.  Ironically, even though CHG told the Court that it needed to provide the "confidential information" to five non-lawyer employees, it has yet to disclose a single such employee under the Protective Order, as it must do before it shares information with those employees.  *See* Dkt. 55 ¶ 7.

VGT has respected the Protective Order, rarely pushing back on CHG's discovery requests.  CHG filed only one motion to compel, which VGT opposed in part based on the lack of relevance and sensitive nature of the requested documents.  *See* Dkt. 117.  Judge Jayne granted CHG's request because the documents "are subject to the attorneys' eyes only provision of the protective order."  Dkt. 146 at 48:20-22.

VGT has reason to be concerned for the protection of its highly confidential information.  For one, the record in this case shows that CHG repeatedly used VGT's proprietary information to develop CHG's products.  *See* Pl.'s Opp'n to Defs.' Mot. for Sum. J., Dkt. 239 at 38-42.  Further highlighting its disregard for VGT's confidential information, CHG has also unsuccessfully challenged VGT's confidentiality designations for certain documents and deposition testimony.  *See* Dkt. 284.  Denying its request, the Court found that "VGT designated the materials in good faith," "[t]here is no dispute VGT and [CHG] are direct competitors," and CHG had "not articulated any need for greater access" to the requested information.  Dkt. 314 at 5, 10, 12.[2]

Despite these failed attempts to seek relief from the Protective Order, CHG once again argues that "VGT has designated virtually all material it alleges to be relevant to its trade secret and misappropriation of confidential business information claims as highly confidential or highly confidential source code, preventing Castle Hill's counsel from sharing it with Castle Hill."  Dkt. 356 at 6.  Specifically, CHG wants to share (1) three expert reports, including all underlying documents cited in the reports; (2) two expert depositions, including all deposition exhibits; and

---

[2] VGT has been willing to de-designate documents where appropriate.  *See* Dkt. 290 at 11 n.13 ("In an effort to narrow the issues in dispute, VGT agrees to de-designate and re-designate certain of the testimony challenged by CHG.").

(3) all summary judgment briefing, including "all exhibits, declarations, and other supporting materials," with its CEO, CTO, and two of its software engineers.  *Id.* at 3.

Despite claiming that it "made an effort to both limit and be specific in its requests," *id.* at 4, CHG's request encompasses many dozens of documents and hundreds of pages, many unrelated to the issues to be tried.  As a few examples, this overbroad request includes (a) documents and information unrelated to the trade secret claims, including documents relating to CHG's rejected National Indian Gaming Commission defense;[3] (b) trade secrets and confidential information that have never been at issue in this case (*e.g.*, information that happens to be in a VGT document that also contains information about the trade secrets at issue);[4] and (c) documents and information that the Court already found to be competitively sensitive in response to CHG's unsuccessful de-designation motion.[5]

Although CHG tries to frame its request as narrowed to "a limited group of Castle Hill representatives," *id.*, the roles of these employees is more significant than the quantity.  CHG purports to share this highly confidential information with its CEO (Mr. Watson), its CTO (Alan Roireau), and two engineers (Paul Suggs and Andrew Scheiner).  That is, CHG officials and employees with influence over CHG's competing products who have already misused, and could further misuse (inadvertently or not), VGT's trade secrets.

CHG's justifications for its eleventh-hour request for relief from the Protective Order ring hollow.  As an initial matter, it is unclear why CHG would have agreed to the Protective Order

---

[3] *See, e.g.*, Defs.' Mot. for Sum. J., Dkt. 184, Ex. 4; *id.* Ex. 5.

[4] For example, VGT's bingo reference manuals describe VGT's bingo card algorithm, one of the asserted trade secrets, as well as sensitive information about VGT's system that is not at issue in the case (*e.g.*, information about the way in which VGT transmits data over the network).  *See* Dkt. 179, Ex. D at 15-16.

[5] *See, e.g.*, Dkt. 184, Ex. 3 at 15-16 (Williamson Dep. 82:1-17, 20-23); Defs.' Mot. Challenging Designations, Dkt. 284 at 5; Order on Mot. Challenging Designations, Dkt. 314.

if, as it now claims, the Order does not allow it "to adequately prepare for trial." Dkt. 356 at 1. Nevertheless, during the meet-and-confer process, VGT offered to consider a request to grant Mr. Watson access to a more limited set of documents (with appropriate redactions) for settlement purposes. *See* Dkt. 356, Ex. F. In this respect, it bears mention that although CHG allowed VGT to show redacted versions of three confidential expert reports on damages issues to two client representatives for settlement purposes, CHG granted that request subject to restrictions—redacting CHG information and excluding exhibits and financial data—that CHG is unwilling to accept with respect to Mr. Watson. *See* Dkt. 356, Ex. E. Moreover, CHG allowed VGT access to this damages information only for settlement purposes, not to prepare its witnesses for trial. Notably, in providing this limited authorization, CHG expressly noted that it "does not agree to the disclosure of any other information which has been designated by it as Highly Confidential." *Id.*

CHG never responded to VGT's offer, instead filing the present motion for relief under the Protective Order.

## III.    ARGUMENT

The Court has "sound discretion" to modify a protective order. *Rohrbough v. Harris*, 549 F.3d 1313, 1321 (10th Cir. 2008). "Typically, when considering whether to modify a protective order, courts examine any tangible prejudice to the party opposing modification that outweighs the benefits of modification." *S.E.C. v. Merrill Scott & Assocs., Ltd.*, 600 F.3d 1262, 1272 (10th Cir. 2010). In evaluating a motion to modify a protective order, "deference is to be paid to the plain meaning of the [Order's] language," and "courts should be wary" of undermining a "justified reliance" on the order. *Id.* at 1271-72.

Other courts have echoed this concern for "reliance by the original parties on the confidentiality order." *See, e.g.*, *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 790 (3d Cir.

1994).  As one court explained, by modifying a protective order after a party has produced documents, "the Court would be sending a negative message to future litigants."  *Bayer AG & Miles, Inc. v. Barr Labs., Inc.*, 162 F.R.D. 456, 467 (S.D.N.Y. 1995).  Parties "must know that they can rely on protective orders to protect sensitive commercial information from disclosure to competitors."  *Id.*; *see also Jochims v. Isuzu Motors, Ltd.*, 145 F.R.D. 499, 502 (S.D. Iowa 1992) ("[A] party which in good faith negotiates a stipulated protective order and then proceeds to produce documents pursuant to that protective order is entitled to the benefit of its bargain; namely, to rely upon the terms of the stipulated protective order.").

Within its discretion, the Court can also consider the "nature of the protective order—that is, its scope and whether it was court imposed or stipulated to by the parties."  *Bayer*, 162 F.R.D. at 465.  As one court observed, "there is general unanimity among the courts that where a party to [a] stipulated protective order seeks to modify that protective order, *that party must demonstrate particular good cause in order to gain relief from the agreed to protective order*."  *Jochims*, 145 F.R.D. at 501 (citing *Richard Wolf Med. Instruments Corp. v. Dory*, 130 F.R.D. 389, 392 (N.D. Ill. 1990) (emphasis added)); *see also Bayer*, 162 F.R.D. at 466 ("A party's prior consent to the protective order will weigh against its motion for modification.").

Similarly, the Court can consider "the foreseeability at the time of the original protective order of the modification now requested."  *Bayer*, 162 F.R.D. at 463.  Hence, "a party's oversight in not negotiating a provision in a protective order concerning a matter which should have been reasonably foreseeable at the time of the agreement has been held to not constitute good cause for relief from the protective order."  *Jochims*, 145 F.R.D. at 502.

Here, CHG has not established good cause for modifying the stipulated Protective Order.

**A.    VGT would suffer tangible prejudice that outweighs any potential benefit of modifying the Protective Order.**

In weighing the prejudice to the party opposing modification against the benefits of modification, *Merrill Scott*, 600 F.3d at 1272, courts routinely enter or uphold protective orders to prevent disclosure of trade secrets with business competitors.  *See, e.g.*, *Layne Christensen Co. v. Purolite Co.*, 271 F.R.D. 240, 246-47 (D. Kan. 2010) (granting protective order with "attorneys' eyes only" provision because parties are "business competitors" and "litigation will probably involve disclosure of trade secrets"); *see also Northbrook Digital, LLC v. Vendio Servs., Inc.*, 625 F. Supp. 2d 728, 735 (D. Minn. 2008) ("[T]he key issue in many cases is whether the litigants are direct competitors and whether the people who would be denied access to information under a protective order are involved in a party's competitive decisionmaking.").

Here, "[t]here is no dispute VGT and [CHG] are direct competitors."  Order on Mot. Challenging Designations, Dkt. 314 at 10.  Therefore, it is critical that disclosure of VGT's trade secrets and confidential information be limited—especially given that CHG has already misappropriated VGT's trade secrets and confidential information.  As CHG's own cases recognize, this concern is even greater considering the persons with which CHG requests to share the documents: engineers who develop, or supervise development of, CHG's games and its CEO, who has ultimate responsibility for all company decisions.  *See* Dkt. 356 at 9 ("The court looks to whether the person is a competitive decision maker by his participation in, *inter alia*, product design, marketing, and pricing decisions.") (citing *Suture Exp., Inc. v. Cardinal Health, 200, LLC*, No. 12-2760-RDR, 2013 WL 6909158, at *7 (D. Kan. Dec. 31, 2013)).

CHG wrongly argues that "no further harm could come from sharing information with witnesses which the witnesses already have."  Dkt. 356 at 12.  CHG has it backwards.  Leaving aside the question as to need for information they already have, CHG—having already

8

misappropriated VGT's trade secrets and confidential information—should not be rewarded with greater access to such information.  More important still, granting the requested access could increase the risk that they will misuse it again.[6]

If history is any indication, VGT's concern is warranted.  As VGT has shown ████



Sharing information with Mr. Watson, CHG's CEO, would also increase VGT's risk of harm.  Unsurprisingly, courts have refused to allow company executives with case-management authority from viewing highly confidential information.  *See, e.g.*, *Suture*, 2013 WL 6909158, at *7.

Although it involved the entry of a Protective Order rather than its modification, *Suture* is instructive.  There, defendants sought to exclude a member of the plaintiff's board of directors

---

[6] CHG has consistently maintained that no one brought VGT documents to CHG and that the former VGT employees have only "remembered" information from VGT.  *See* Dkt. 184 at 48. ████ the relief CHG requests would provide them with the very documents they claim not to have taken.

from access to highly confidential information.  The board member was "responsible for managing this litigation and [was] involved in all significant decisions," including "evaluating settlement decisions."  *Id.* at *6.  Although he declared that "he only attends four board meetings a year and plays an insignificant role in day-to-day commercial decisions"—a sharp contrast to the day-to-day officers and employees for whom CHG seeks access to VGT's highly confidential information—the court granted defendants' request on the basis that his position created "a major risk and unacceptable opportunity for the inadvertent disclosure of information" given the difficulty to "compartmentalize and selectively suppress information once learned."  *Id.* at *6-*7.

Because Mr. Watson has much more involvement in day-to-day activities than the board member in *Suture*—he is the CEO of a direct competitor—the risk for inadvertent disclosure is even greater here.[7]  Moreover, unlike the plaintiff in *Suture*, who argued against *entering* a protective order that restricted the board member's access to highly confidential documents, CHG *stipulated* to the Protective Order knowing that it would not be able to share highly confidential information with Mr. Watson.

Finally, compelling VGT to share highly confidential documents with CHG employees would betray VGT's reliance on the Protective Order.  *See Merrill Scott*, 600 F.3d at 1272; *see also Chipman v. Sabol & Rice*, No. 2:10-CV-01016-DN-DBP, 2012 WL 6020031, at *1 (D. Utah Dec. 3, 2012) ("[T]he court 'should be wary of' modifying an order where the opposing party

---

[7] Other courts have reached similar conclusions.  *See, e.g.*, *Safe Flight Instrument Corp. v. Sundstrand Data Control Inc.*, 682 F. Supp. 20, 21 (D. Del. 1988) (entering protective order barring party's president from reviewing confidential documents because "[t]he potential for abuse" and "competitive loss is real"); *Nutratech, Inc. v. Syntech (SSPF) Int'l, Inc.*, 242 F.R.D. 552, 556 (C.D. Cal. 2007) (approving AEO provision despite president of one party claiming need to direct litigation strategy); *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 299 F.R.D. 498, 501 (W.D. Va. 2014) (declining to amend protective order to allow "technical advisers," including company's president, to view AEO documents, noting that this is "exactly the unacceptable opportunity for inadvertent disclosure" to avoid).

justifiably relied on it.") (citing *Merrill Scott*, 600 F.3d at 1272). "Such reliance is elevated where, as here, the information at issue pertains to trade secrets, and where that information would be disclosed to a direct competitor." *Raytheon Co. v. Indigo Sys. Corp.*, No. 4:07-CV-109, 2008 WL 4371679, at *3 (E.D. Tex. Sept. 18, 2008) (citations omitted); *see also Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 475 (9th Cir. 1992) ("[R]eliance would be greater where a trade secret was involved.").

As noted, VGT produced documents and source code[8] constituting or concerning the trade secrets at issue in this case (as well as additional trade secrets) relying on the Protective Order to protect their confidentiality. That Order has been in place since December 2017. *See Murata Mfg. Co. v. Bel Fuse, Inc.*, 234 F.R.D. 175, 180 (N.D. Ill. 2006) ("[I]t is worth noting that the protective order has been in effect for nearly two years. Certainly it can be said that Bel Fuse has come to rely on it; it is part of the landscape of this case."). As a party that negotiated in good faith and stipulated to a protective order, VGT "is entitled to the benefit of its bargain; namely, to rely upon the terms of the stipulated protective order." *Jochims*, 145 F.R.D. at 502 (citations omitted).

**B.**    **CHG does not need to share VGT's highly confidential information for its defense.**

CHG has failed to demonstrate any legitimate need to modify the Protective Order.

<u>Messrs. Roireau, Suggs, and Scheiner.</u>  Although CHG argues that its CTO and the two engineers "are uniquely qualified to understand and help the defense prepare for trial on the trade secrets claims," specifically, comparing the VGT and CHG algorithms, Dkt. 356 at 11, they are

---

[8] Although CHG asserts that it is not requesting that any CHG employee be allowed to review native VGT source code, Dkt. 356 at 4, the expert reports and declarations they seek to disclose to the employees describe VGT source code.

not. CHG has offered expert testimony on this precise issue from Mr. Zeidman, who has had access to both VGT and CHG highly confidential information. *See Safe Flight*, 682 F. Supp. at 22 (plaintiff's claim that its president "is 'uniquely qualified' is speculative [because] Safe Flight has yet to investigate the availability of qualified outside experts"); *McAirlaids*, 299 F.R.D. at 501 ("[The party] must assess the merits of the litigation and develop strategy using litigation counsel and outside experts to review information marked confidential or attorney eyes only, and present it in a non-confidential manner to the client for decision-making purposes."); *Northbrook Digital*, 625 F. Supp. 2d at 743 (outside "technical experts" can provide required analysis).

Mr. Zeidman compared VGT and CHG's algorithms in his expert report—exactly what CHG now wants its fact witnesses to do. *See, e.g.*, Pl.'s Mot. to Exclude Zeidman, Dkt. 166, Ex. E at 21 (comparing VGT and CHG bingo card algorithms); *id.* at 24 (comparing VGT and CHG ████████ algorithms). To the extent CHG is dissatisfied with its own expert because, as the Court has stated, he "admittedly lacks specific expertise in casino gaming and has no experience developing wagering games," Dkt. 316 at 7, that is a problem of CHG's own making, and it should not be solved at the expense of VGT's confidentiality protections. Indeed, VGT has used an independent expert (Stacy Friedman)—rather than VGT engineers—to analyze CHG's algorithms.

Moreover, CHG has not designated any of these individuals as expert witnesses. Ironically, CHG successfully moved to strike declarations from two VGT software engineers on this basis. *See* Dkt. 236; Dkt. 272. That CHG's engineers "have *already* seen much of the alleged VGT trade secrets at issue" only weakens its claim. Dkt. 356 at 11. As the Court held when granting in part CHG's motion to strike: "Knowledge derived from previous professional

experience falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701." Dkt. 320 at 11 (quoting *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1215 (10th Cir. 2011)).

Nor has CHG demonstrated any need to ask the CTO and engineers for factual information about VGT's trade secrets. CHG had the opportunity to obtain such information from VGT, but it largely declined to do so. CHG also could have asked Messrs. Roireau, Suggs, and Scheiner about their work for VGT during their depositions (when VGT would have had a chance to cross-examine them), but CHG chose not to do so. CHG should not be permitted to cure this shortcoming on the eve of trial.

CHG's alleged concerns about preparing its defense lack merit. Nothing in the Protective Order prevents the CHG employees from testifying about their work at CHG, including how they developed the accused aspects of CHG's games, or from conferring with CHG's counsel regarding the numerous *CHG* documents in which the employees discussed VGT's information. Likewise, CHG is free to cross-examine VGT's witnesses about the VGT trade secrets and proffer *expert* testimony comparing VGT's and CHG's systems. In short, providing enhanced access to CHG employees would give it an unfair advantage. Preserving VGT's confidentiality interests does not preclude CHG from effectively defending itself; it simply puts CHG in the same position as VGT, which took discovery from CHG witnesses on these issues and hired an expert witness to address them at trial. Indeed, even though it would help VGT prepare for trial, VGT is not permitted to show its fact witnesses CHG's highly confidential documents or ask them to analyze both parties' algorithms.

Mr. Watson. Similarly, CHG has failed to provide adequate justification for Mr. Watson to receive access to VGT's proprietary documents to understand the nature of VGT's claims.

Merely stating that a protective order makes it more difficult to prepare a defense is not a sufficient basis for modification. *Intel Corp. v. VIA Technologies, Inc.*, 198 F.R.D. 525, 528 (N.D. Cal. 2000) ("The protective order must actually prejudice presentation of the moving party's case, not merely increase the difficulty of managing the litigation."). In particular, the broad access that CHG requests is neither necessary nor appropriate for settlement purposes. As noted, however, VGT would consider a request to grant Mr. Watson access to a more limited set of documents (with appropriate redactions) for settlement purposes.

CHG relies on inapposite case law to support sharing highly confidential information with its witnesses. In *Medtronic Sofamor Danek, Inc. v. Michelson*, No. 01-2373-GV, 2002 WL 33003691, at *1 (W.D. Tenn. Jan. 30, 2002), for example, the court granted a protective order without an "Attorneys Eyes Only" provision for reasons that do not apply here: (i) the president of the small defendant company was "uniquely qualified" to help determine which devices were covered by the agreement, unlike here where Mr. Zeidman can compare the algorithms in controversy; (ii) the parties had a years-long confidential relationship and mutual confidentiality agreement with no history of misappropriation; (iii) the defendant-inventor had served as an expert for the plaintiff; and, most important, (iv) plaintiff and defendant were "*not directly in competition*," whereas here the Court held the contrary. *Id.* at *3-*4 (emphasis added); Dkt. 314 at 10. Accordingly, the court found "the danger of [defendant-inventor] abusing his knowledge of confidential information is small," whereas he would be impaired in defending himself by the AEO provision because he would not be able to assist his attorneys. *Medtronic*, 2002 WL 33003691, at *4.[9]

---

[9] CHG's reliance on *THK Am., Inc. v. Nippon Seiko K.K.*, 141 F.R.D. 461, 462 (N.D. Ill. 1991), is likewise misplaced. There, the plaintiff's company president was the product-in-controversy's inventor and "most knowledgeable" about the issues in the case, so he was uniquely qualified to

More broadly, the cases CHG cites involved disagreement over which restrictions to include in a protective order that had yet to be entered.  Unlike CHG, the parties were not seeking to modify protective orders to which they had already agreed and that the court had already approved.

### C.    CHG stipulated to the Protective Order despite its current objections.

In addition to considering a party's "prior consent" to a protective order as "weigh[ing] against its motion for modification," *Bayer*, 162 F.R.D. at 466 (citations omitted), courts also consider whether a party's current problems with an order were foreseeable.  *See, e.g.*, *Raytheon*, 2008 WL 4371679, at *2 (explaining that the foreseeability inquiry asks "could the parties have been reasonably expected to anticipate the exigency which prompted the instant Motion?").  CHG's agreement to the Protective Order after expressing concern about this precise situation thus also counsels against the relief it belatedly seeks.  Indeed, CHG argued in November 2017 that the restrictions of an earlier version of the protective order "would significantly impair Castle Hill's ability to assist in the defense of this case."  Dkt. 50 at 12.  It "echoed these sentiments on the record at the hearing before Judge Jayne."  Dkt. 356 at 5.  Instead of pressing these concerns, CHG agreed to the Protective Order that it now seeks to avoid.  As one court has explained:  "If the Defendants sought to have their decision-making and technical personnel, many of whom they knew to be accused of wrongdoing, intimately involved in the preparation of their defense to the misappropriation claim, that was a point that could have been negotiated into the protective order."  *Raytheon*, 2008 WL 4371679, at *2 (citing *Murata*, 234 F.R.D. at 180).

---

discuss the products at issue, unlike here where CHG retained Mr. Zeidman to compare the algorithms.  If CHG wanted to offer testimony on these topics from someone who has experience in the gaming industry, it could have retained an expert with such experience, as VGT did.

### D.    VGT is not using the Protective Order as a sword.

CHG's suggestion that VGT has been using the Protective Order "as a sword, rather than a shield," Dkt. 356 at 6, is incorrect.  For example, CHG points to the fact that VGT showed CHG's par sheets to Mr. Schmid during a deposition.  But, as CHG acknowledges, Mr. Schmid is a third party (not a VGT employee) and VGT showed him the par sheets *in a deposition* (not though an *ex parte* discussion) and only after receiving permission from CHG's counsel on the record.  *Id.* at 7-8.  This approach is expressly authorized by the Protective Order.  *See* Dkt. 55 at 5(b)(iv) (allowing disclosure if the producing party "agrees in writing or on the record in advance of the disclosure").  Mr. Schmid was not allowed to keep any of the par sheets after the deposition and was shown them only briefly in order to clarify testimony elicited by CHG earlier in the deposition.

Likewise, CHG complains about the fact that VGT showed Mr. Roireau portions of transcripts from the depositions of other CHG engineers during his Rule 30(b)(6) deposition.  *See* Dkt. 356 at 7.  As is clear from the excerpts CHG included with its motion, however, VGT pointed Mr. Roireau to only portions of those transcripts—which were designated as highly confidential by *CHG*, not VGT—in which the former VGT employees were asked whether they took VGT materials with them when they left VGT.  *See id.*, Ex. C.  This limited testimony was directly relevant to Mr. Roireau's testimony (as CHG's Rule 30(b)(6) designee) about CHG's knowledge concerning VGT materials that were taken by CHG's employees.  Nothing precluded CHG from preparing Mr. Roireau on this topic.

Finally, CHG raises concerns about VGT's position that the former VGT employees who are now employed at CHG should not be allowed to engage in *ex parte* communications about VGT confidential information with CHG's counsel in violation of their confidentiality

obligations to VGT.  *Id.* at 6-7.  For the reasons VGT already has explained in prior briefing on these issues (*see* Dkt. 163 at 10-13; *see generally* Dkt. 220), CHG's complaints are misplaced.

## IV.    CONCLUSION

For the foregoing reasons, VGT respectfully requests that the Court deny CHG's Motion.


August 13, 2019                                */s/ Gary M. Rubman*
                                               Graydon Dean Luthey, Jr., OBA No. 5568
                                               GABLE GOTWALS
                                               1100 ONEOK Plaza
                                               100 West Fifth Street
                                               Tulsa, OK 74103-4217
                                               Telephone: (918) 595-4821
                                               Facsimile: (918) 595-4990
                                               dluthey@gablelaw.com

                                               Gary M. Rubman
                                               Peter A. Swanson
                                               Rebecca B. Dalton
                                               COVINGTON & BURLING LLP
                                               One CityCenter
                                               850 Tenth Street, NW
                                               Washington, D.C.  20001-4956
                                               Telephone: (202) 662-6000
                                               Facsimile: (202) 778-5465
                                               grubman@cov.com
                                               pswanson@cov.com
                                               rdalton@cov.com
                                                  (admitted pro hac vice)

                                               Neil K. Roman
                                               COVINGTON & BURLING LLP
                                               The New York Times Building
                                               620 Eighth Avenue
                                               New York, NY 10018-1405
                                               Telephone: (212) 841-1221
                                               Facsimile: (212) 841-1010
                                               nroman@cov.com
                                                  (admitted pro hac vice)

                                               ***Counsel for Video Gaming Technologies, Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 13, 2019, I caused the foregoing to be served via ECF on the following counsel for Defendants:

Robert C. Gill
Thomas S. Schaufelberger
Matthew J. Antonelli
SAUL EWING ARNSTEIN & LEHR, LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, D.C. 20006
(202) 295-6605
(202) 295-6705 (facsimile)
robert.gill@saul.com
tschauf@saul.com
matt.antonelli@saul.com

Sherry H. Flax
SAUL EWING ARNSTEIN & LEHR, LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 332-8764
(410) 332-8785 (facsimile)
sherry.flax@saul.com

James C. Hodges, OBA 4254
JAMES C. HODGES, PC
2622 East 21st Street, Suite 4
Tulsa, OK 74114
Telephone: (918) 779-7078
JHodges@HodgesLC.Com

Duane H. Zobrist
Jonathan S. Jacobs
ZOBRIST LAW GROUP PLLC
1900 Arlington Blvd. Suite B
Charlottesville, VA 22903
Telephone: (434) 658-6400
dzobrist@zoblaw.com
jjacobs@zoblaw.com

Thomas G. Connolly
HARRIS WILSHIRE & GRANNIS LLC
1919 M ST NW FLR 8
Washington, DC 20036
(202) 730-1339
tconnolly@hwglaw.com
*Attorneys for Defendants*

*/s/ Richard Rothman*