IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA


VIDEO GAMING TECHNOLOGIES, INC.,    )
    )
        Plaintiff,    )
    )
-vs-    ) No. 17-CV-454-GKF-JFJ
    )
CASTLE HILL STUDIOS, INC., et al.,    )
    )
        Defendant(s).    )




TRANSCRIPT OF PRETRIAL HEARING

**BEFORE THE HONORABLE GREGORY K. FRIZZELL**

**UNITED STATES DISTRICT JUDGE**

SEPTEMBER 3, 2019




*REPORTED BY:*    *BRIAN P. NEIL, RMR-CRR*
                 *United States Court Reporter*

*A P P E A R A N C E S*

**Gary M. Rubman, Peter A. Swanson,** and **Rebecca B. Dalton,** Attorneys at Law, Covington & Burling, 850 Tenth Street N.W., Washington, DC, 20001, attorneys on behalf of the Plaintiff;

**G. Dean Luthey, Jr.**, Attorney at Law, Gable & Gotwals, 100 West 5th Street, Suite 1100, Tulsa, Oklahoma, 74103, attorney on behalf of the Plaintiff;

**Robert C. Gill, Henry A. Platt, and Matthew J. Antonelli,** Attorneys at Law, Saul, Ewing, Arnstein & Lehr, 1919 Pennsylvania Avenue N.W., Suite 550, Washington, DC, 20006, attorneys on behalf of the Defendants;

**Jonathan S. Jacobs,** Attorney at Law, Zobrist Law Group, 1900 Arlington Boulevard, Suite B, Charlottesville, Virginia, 22905, attorney on behalf of the Defendants;

**James C. Hodges,** Attorney at Law, 2622 East 21st Street, Suite 4, Tulsa, Oklahoma, 74114, attorney on behalf of the Defendants.

**Thomas G. Connolly,** Attorney at Law, Harris, Wiltshire & Grannis, 1919 M Street N.W., Suite 800, Washington, DC, 20036, attorney on behalf of the Defendants.

1                    Tuesday, September 3, 2019

2                            * * * * *

3          **DEPUTY COURT CLERK:**  This is Case No. 17-CV-454-GKF,

4   Video Gaming Technologies, Inc. v. Castle Hill Studios, LLC.

5   Counsel, please state your appearances for the record.

6          **MR. LUTHEY:**  Dean Luthey for the plaintiff.

7          **MR. RUBMAN:**  Good afternoon.  Gary Rubman from

8   Covington for the plaintiff.  I'm joined by Peter Swanson and

9   Rebecca Dalton also from Covington.

10         **THE COURT:**  Welcome.

11         **MR. GILL:**  Good afternoon, Your Honor.  Robert Gill

12  and Henry Platt and Matthew Antonelli from the Saul, Ewing,

13  Arnstein & Lehr law firm on behalf of defendants.

14         **THE COURT:**  Good afternoon.

15         **MR. HODGES:**  Afternoon, Your Honor.  James Hodges

16  for the defendants.  I'd like to also introduce a new counsel

17  for the defendants, Thomas Connolly.

18         **MR. CONNOLLY:**  Your Honor, good afternoon.  Thank

19  you.

20         **THE COURT:**  Good afternoon.  And, in addition, we

21  have one more on the phone, Karen?

22         **DEPUTY COURT CLERK:**  Mr. Jacobs.

23         **THE COURT:**  Mr. Jacobs, can you hear us?

24         **MR. JACOBS:**  Yes.  I can hear -- I can hear some

25  portion of what's going on.  Nice to be here and be a voice,

1    Your Honor.   Thanks for having me.

2              **THE COURT:**   And where were you detained, Atlanta?

3              **MR. JACOBS:**   I'm stuck in Atlanta.   My flight to

4    Atlanta was delayed and so I couldn't make it to Tulsa on time.

5    Bad luck.

6              **THE COURT:**   I see some knowing nods in the attorneys

7    in front of me who've also been stuck in Atlanta at times in

8    the past.   I recommend Charlotte when you're coming to and from

9    Washington.

10             All right.   We've got a number of issues here.   This is

11   one of these rare cases where unfortunately we're at the final

12   pretrial conference and we don't know yet what's going to be

13   tried because the parties take disparate positions with regard

14   to the claims that remain even after what the court believed to

15   be clear rulings.

16             The first issue is one that was raised in the brief

17   filed by Castle Hill with regard to unusual objections to

18   deposition designations at docket No. 366.   The court concurs

19   with Castle Hill's position contained in its briefing that VGT

20   is reading the court's ruling on page 9 of docket No. 344 --

21   that is the ruling on the motion for partial summary judgment

22   of Plaintiff VGT -- in that VGT is reading that ruling too

23   broadly.   In that order, the court merely held that Castle Hill

24   had produced insufficient evidence as to its affirmative

25   defense of unclean hands with respect to VGT's asserted

1    trademarks and trade secrets.   The court limited Castle Hill

2    Gaming's unclean hands defense to VGT's trade dress claims.

3        It appears that VGT is now reading that decision to

4    preclude fast-follow evidence from CHG to defend VGT's know-how

5    claim.  For example, in an effort to defend against VGT's

6    know-how claim with respect to claim volatility, it appears to

7    the court that Castle Hill may attempt to show that an

8    observer, for instance, can determine volatility without resort

9    to alleged know-how trade secrets.  So VGT's position goes too

10   far.  And I thought that was important because it's showing up

11   in a lot of permutations, objections to deposition

12   designations, that sort of thing.

13       Now, you all have framed up a number of the issues

14   fairly well in the joint proposed pretrial order.  The first

15   issue begins on page 2 of the joint proposed pretrial order.

16   With respect to the dispute regarding trade dress on pages 1

17   through 3 of the proposed pretrial order, VGT attempts to

18   insert "themes" as a seventh element of its trade dress claim

19   and 14 new game series which it proposes the court evaluate at

20   trial.

21       The court rules, based upon the briefing, that VGT

22   shall not be permitted to backdoor 14 additional game titles

23   into its trade dress claim.  Specifically, the court cites the

24   following:  First, VGT's current position is contrary to the

25   position that it took during the dispositive motion hearing.

1    In that hearing, counsel for VGT stated as follows, and I

2    quote:   "But anyway, to make clear what is at issue here, this

3    is the trade dress that's at issue.   There's six elements.

4    There's the game cabinet, the red strobe at the top, the reel

5    resolution sound that we heard, the award sound that we heard,

6    the bingo pays and plays and the red swing free spins.   These

7    six elements in combination, no one in isolation, but all six

8    in combination are the trade dress at issue.

9         "The trademarks at issue, there are four series of

10   games in which we are -- on which we are basing our claims:

11   Crazy Billions, Mr. Money Bags, Polar High Roller, and

12   Greenback Jack.   Within those trademarks, there are -- within

13   each series of those, there are four types of marks for which

14   we seek protection:   The word marks, the logo marks, the

15   artwork on each panel, and then the characters."

16        Further, the PowerPoint presentation provided by VGT to

17   the court identifies only the foregoing six elements as being

18   VGT's trade dress at issue and the four VGT game series.

19        Further, as discussed in the court's order on Castle

20   Hill's motion for summary judgment, the Tenth Circuit

21   previously recognized that "an articulation requirement for a

22   protectable mark" and noted that other circuits have adopted a

23   requirement that a plaintiff "articulate the specific elements

24   which comprise its distinct dress."

25        And I'm citing *Forney Industries*, 835 F.3d 1238, at

1    page 1232, (10th Cir. 2016), quoting *Landscape Forms, Inc*.  I

2    won't further burden the record with the citation there.

3          Further, when a plaintiff claims protection of trade

4    dress utilized across a line of products, courts have required

5    a plaintiff to "articulate the specific common elements sought

6    to be protected."

7          VGT now points to its "themes/marks" but failed to

8    identify any themes or marks in its summary judgment briefing

9    apart from the four-game series discussed in the order.  The

10   general concept of themes is overbroad and cannot constitute a

11   specific common element, particularly in view of VGT's

12   representations to the court at the summary judgment hearing to

13   be protected as trade dress.

14          So that addresses the first issue.

15          Secondly, with regard to the issue at pages 4 through 6

16   of the proposed pretrial order with regard to trademark, VGT

17   contends that the VGT common law trademark claim includes,

18   No. 1, the character of Mr. Money Bags himself; and No. 2,

19   Mr. Money Bags and design mark as it appears in color.

20          It would appear to the court that VGT has never before

21   asserted these specific claims.  This court granted summary

22   judgment on all common law trademark claims other than those

23   based on the marks Crazy Billions; Mr. Money Bags, the

24   modernized version; and Polar High Roller.  So, I mean, it

25   would appear, unless there's something that the court is

1    completely missing, that we've ruled on this and this is

2    asserted now for the very first time in this lawsuit.

3            Mr. Rubman.

4            **MR. SWANSON:**  Actually, I'll address that, Your

5    Honor.

6            **THE COURT:**  Yes, sir.

7            **MR. SWANSON:**  With respect to the common law

8    trademark claim for Mr. Money Bags, Your Honor, we believe we

9    have been consistent, that that claim includes the logo and

10   Mr. Money Bags' character in color.  This was in our

11   interrogatory response that Your Honor has reviewed.  We

12   included color photographs or color images of the artwork of

13   all the games at issue, including Mr. Money Bags.  In the

14   identification of the extant claims, we further made clear that

15   it was the artwork for Mr. Money Bags.

16           A couple of other points.  In our summary judgment

17   opposition, in describing the unregistered marks on page 12 --

18           **THE COURT:**  Got it right in front of me.

19           **MR. SWANSON:**  -- we included the original Mr. Money

20   Bags artwork or logo in color on page 12 and that was

21   underneath unregistered trademarks.

22           **THE COURT:**  So does VGT agree apparently that the

23   registered mark in color does not fall within the registered

24   trademark claim?

25           **MR. SWANSON:**  So the trademark registration is not

1    limited to color.

2         THE COURT:  Now, that's not my question.  That's not

3    my question.

4         MR. SWANSON:  Uh-huh.

5         THE COURT:  You appear to concede here that the

6    registered mark in color does not fall within the registered

7    trademark claim.  Is that correct?

8         MR. SWANSON:  That's -- yes.  If I understand your

9    question, Your Honor, the --

10        THE COURT:  Because you're trying to insert it here

11   in the common law trademark claim; correct?

12        MR. SWANSON:  Correct.  That would be the

13   distinction between --

14        THE COURT:  So you're conceding here on the record

15   that the registered marked in color does not fall within the

16   registered trademark claim; correct?

17        MR. SWANSON:  The Mr. Money Bags design mark that's

18   part of the registered trademark claim --

19        THE COURT:  Yes.

20        MR. SWANSON:  -- is not in color, correct.  Yeah.

21        THE COURT:  Okay.  So point out to me where you have

22   alleged either that the character of Mr. Money Bags himself is

23   one of your common law trademarks claims and/or that Mr. Money

24   Bags, the design mark, as it appears in color is part of your

25   common law trademark claim.

1    MR. SWANSON:  Sure, Your Honor.  So in our -- again,

2  in our interrogatory response -- this is our response to

3  interrogatory No. 1 on the trademark claims --

4    THE COURT:  Okay.  Where's that in the pile of stuff

5  that's been prepared to me?

6    MR. SWANSON:  Sure.

7    THE COURT:  And I've got a room next door that is

8  covered on three lengthy tables with the materials that you've

9  provided to me so I can take a quick jaunt over there and find

10  it in the mountain of paper.

11    MR. SWANSON:  Sure.  Actually, why don't I grab --

12        *(Discussion held off the record)*

13    THE COURT:  And that's 185-11 or something; is that

14  correct?

15    MR. SWANSON:  The document for the interrogatory

16  response?

17    THE COURT:  Yes.

18    MR. SWANSON:  I actually don't have it in front of

19  me but that --

20    THE COURT:  I think we're going to run and get it.

21    MR. SWANSON:  Okay.

22    THE COURT:  In speaking with my clerk, the concern

23  here was to the extent that the registered mark in color would

24  fall within the registered mark claim, our concern was that you

25  couldn't seek recovery for both.  And now that you concede that

1   it's not part of the registered claim, the view is that the

2   order on summary judgment would allow you to include in your

3   common law claims the registered mark in color.  So that would

4   leave us then only dealing with your position that the

5   character of Mr. Money Bags himself is part of your common law

6   trademark claim.

7            **MR. SWANSON:**  Sure.  And on that, Your Honor, I can

8   show you in the interrogatory response, once we have that,

9   where we referred to the character in the response.  I would

10  also refer Your Honor to docket No. 143 which was VGT's

11  identification of extant trademark infringement claims.  And --

12            *(Discussion held off the record)*

13           **THE COURT:**  Okay.  I've got 185-11 and it appears to

14  be easily -- well, it's 198 pages.

15           **MR. SWANSON:**  Yes.

16           **THE COURT:**  So you might want to refer me somewhere

17  within the 198 pages.  Forgive me for not having instant

18  recall.

19           **MR. SWANSON:**  Sure, Your Honor.  So page -- the

20  bottom of page 8 --

21           **THE COURT:**  The words as well as the visual images

22  incorporated into the games?

23           **MR. SWANSON:**  Correct.  Including the game's

24  artwork, characters, and logos.  And we made a similar

25  statement in docket No. 143.  Actually, to be more specific,

1  Your Honor, on page 22 of the interrogatory response, which was

2  the subpart of that interrogatory response in which we were

3  discussing Mr. Money Bags specifically, in the middle of that

4  paragraph in the middle of the page on 22, we say, "VGT relies

5  on at least the following marks used in connection with

6  Mr. Money Bags game title, the word mark, the artwork," and

7  then towards the end of that paragraph, "and the Mr. Money Bags

8  character as depicted on the Mr. Money Bags game and elsewhere.

9       THE COURT:  I don't seem to be following -- are you

10  saying 22 of 199 or 22 with the page number on the bottom as

11  22?

12       MR. SWANSON:  Page number on the bottom, Your Honor.

13       THE COURT:  Okay.  Refer me again to the sentence.

14       MR. SWANSON:  So if we're looking at the same thing,

15  it's the paragraph that begins "for purposes of this

16  litigation."

17       THE COURT:  Yes, sir.

18       MR. SWANSON:  And it goes on to say, "VGT relies on

19  at least the following marks used in connection with the

20  Mr. Money Bags game title," and then we list several.  If you

21  jump to the end of that paragraph, four lines up from the

22  bottom, "and the Mr. Money Bags character as depicted on the

23  Mr. Money Bags game and elsewhere."

24       *(Discussion held off the record)*

25       THE COURT:  All right.  Anything else?

1    **MR. SWANSON:**  That in docket No. 143, again, refers

2    specifically to the Mr. Money Bags character.

3              **THE COURT:**  All right.  And let me take a look at it

4    here.

5              **MR. SWANSON:**  And this would be starting at the

6    bottom of page 1 and then going on to page 2, "and the game's

7    characters; i.e., Crazy Bill, Dynamite Daisy, Mr. Money Bags."

8              **THE COURT:**  All right.  Frankly, you had used this

9    language that's contained on page 22 -- it's actually page 23

10   of 199 -- in your sixth supplemental objections and responses

11   to Defendant Castle Hill Studio, LLC's first set of

12   interrogatories, the 199-page document.  That paragraph was

13   used as a common response with respect to many of these series,

14   and we read this as being one of the factors in combination

15   that you relied upon as evidenced by the colon followed by the

16   words "the Mr. Money Bags word mark," etcetera, etcetera

17   etcetera, etcetera.

18             **MR. SWANSON:**  Uh-huh.

19             **THE COURT:**  So let me get a response here from

20   Mr. Gill.

21             **MR. SWANSON:**  And just to be clear on that, Your

22   Honor, I mean, I do think that we are suggesting the approach

23   the court took in the summary judgment ruling is the correct

24   approach, looking at the name, the artwork, the character, the

25   colors, looking at all those elements together.

1    THE COURT:  All right.  But now as I understand

2    it -- maybe I misunderstand -- but you're saying that the

3    common law trademark claim includes, as a stand-alone claim,

4    the character of Mr. Money Bags himself?

5    MR. SWANSON:  I mean, the way we've defined it is

6    it's the artwork, including the character, and the name.  It is

7    those elements looking at all those elements together.

8    THE COURT:  Perhaps this is just a failure to

9    communicate.  Let me get Mr. Gill's view here.

10    MR. SWANSON:  Yes.

11    MR. GILL:  Thank you, Your Honor.  I'm a little

12    hesitant to raise this issue that I brought up when we were

13    here for our summary judgment argument, but it's an issue that

14    presents itself again and here we are 13 days before trial.

15    THE COURT:  Right.

16    MR. GILL:  And, first of all, let me start with the

17    very first issue your Honor addressed with Mr. Swanson, which

18    was the issue of the Mr. Money Bags mark and whether or not the

19    colorization was part of the claim, and I think he agreed that

20    it was not part of the claim but I have to say I agree.  Having

21    seen the registration and the application for registration, I

22    think that is not part of the registered mark claim.

23    So the only way --

24    THE COURT:  Color?  Color is not?

25    MR. GILL:  Exactly.

1    THE COURT:  Right.

2    MR. GILL:  The only way it could be part of a claim

3    would be part of the common law claim.

4    My problem with the common law claims in this case as

5    general matter is -- and you and I actually had this colloquy

6    at the summary judgment hearing -- with a claim based on a

7    registered mark, I have a very precise identification of what

8    the mark is at issue.  I have a specimen of the mark that's

9    been accepted for registration by the Patent and Trademark

10    Office and that has been vetted by them.

11    But with a common law mark --

12    THE COURT:  You chose this area of law to practice

13    in.

14    MR. GILL:  I understand that.  I understand that.

15    The problem with a common law mark is that we don't

16    have in this case a sufficiently specific description of the

17    mark.  So we do have a generic description that was given by

18    the plaintiff that includes the artwork and the logos and the

19    characters.  The problem is, the way the language was used it

20    looks as if to me what the claim was was the characters as part

21    of the overall artwork that's used in what's depicted on the

22    game, not the character individually.  So I did not understand

23    and the statement of extant trademark claims that was filed by

24    the plaintiff with this court did nothing to inform me that

25    they were making a claim based on any kind of character on an

1    individual basis.

2         As a matter of fact, when Your Honor engaged Mr. Roman

3    on an issue at the summary judgment hearing and Your Honor

4    asked him about the issue or the doctrine of family of marks,

5    Mr. Roman said in response to Your Honor that I'm not familiar

6    with that, we're not claiming that here.

7         So to me, in order for them to make a claim for

8    infringement of a common law mark based on a character, then

9    that's something that would need to be specifically alleged so

10   we know what the nature of it is to the claim that they're

11   alleging.  It remains to me a defect with the common law claims

12   in this case that the plaintiff has never specifically

13   identified the common law marks.  They have generically.

14        So, for example, they would say, we claim the Mr. Money

15   Bags modernized version is a common law mark.  But what they

16   don't do is accompanying that put in the very specific artwork

17   that they're claiming to get protection from.  And what we do

18   know is that other variations of the Mr. Money Bags mark have

19   now been dismissed from this lawsuit in the course of summary

20   judgment.

21        So what seems clear to me on this record is that this

22   plaintiff may not claim trademark protection for common law

23   trademarks for the characters used in the Mr. Money Bags mark

24   and all those derivations of the Mr. Money Bags games that, for

25   example, have been dismissed from this lawsuit.  The only

1    Mr. Money Bags mark that remains is the registered mark, which

2    is the design logo, and then the common law mark for the

3    modernized version.  Those two marks are it.

4          **THE COURT:**  Which would be colorized; correct?

5          **MR. GILL:**  The modernized version?

6          **THE COURT:**  Yes.

7          **MR. GILL:**  Yes, Your Honor.  Yes, yes.

8          **THE COURT:**  And that's on page 35 of the court's

9    order.

10         **MR. GILL:**  Right.

11         **THE COURT:**  But to go the direction that VGT is now

12   urging the court to go now only 13 days before trial basically

13   I'd undermine the court's ruling, right or wrong, as to

14   Mr. Money Bags 2, Mr. Money Bags Deluxe, Mr. Money Bags Deluxe

15   (Beach Marks), Mr. Money Bags Lucky Streak, Mr. Money Bags

16   Bring in the Bucks, Mr. Money Bags Road to Riches, and

17   Mr. Money Bags Sparkling Wilds.

18         **MR. GILL:**  I agree with that a hundred percent and

19   that is our position.  Those are out of this case and I do not

20   feel like this plaintiff has sufficiently identified for us --

21   it's one thing for the plaintiff to say early in the litigation

22   that in a 200-page interrogatory response, we're claiming the

23   following, and the language which was always used in the

24   interrogatory answers is, the plaintiff claims the following,

25   including, but not limited to, and then there's a long

1    description.

2          But now we're at the very end of this funnel that is

3    the litigation process where things are supposed to be defined

4    over time.  I didn't view the filing and identification of

5    extant trademark claims to include what they're claiming now,

6    and I think that's a problem for them and it's a problem for

7    me.

8          **THE COURT:**  Well, I do as well.  What I'm hearing

9    now, the last statement from the podium, was it seemed to me a

10   stepping away from the claim that the character of Mr. Money

11   Bags himself constituted a common law trademark claim.

12         Did you not hear it the same way?

13         **MR. GILL:**  I'm having a hard time articulating this.

14   I'm trying to be as polite about this as I can.  And I have

15   respect for Mr. Swanson.  This isn't a personal dig.

16         **THE COURT:**  Right.

17         **MR. GILL:**  But I find that the language that the

18   plaintiff uses in connection with these claims to be imprecise

19   and very difficult for me to be able to identify what is at

20   issue.  I will say confidently I do not understand them to have

21   clearly articulated that as a basis for the claim.

22         **THE COURT:**  The summary judgment ruling will stand.

23   And to the extent that VGT is contending that the VGT common

24   law trademark claim includes the character of Mr. Money Bags

25   himself standing alone, that will not be permitted.

1    **MR. GILL:**  And I understand that includes other

2    characters as well, Your Honor?

3            **THE COURT:**  I'm sorry?

4            **MR. GILL:**  Other characters are included in that

5    ruling as well I understand?

6            **THE COURT:**  I'm just addressing what they raised.

7    I'm not going beyond that here.  Go ahead.

8            **MR. SWANSON:**  Oh, yes, Your Honor.  I was actually

9    going to stand up and just try to clarify even further that we

10   will not claim based on a character standing alone --

11           **THE COURT:**  All right.  Thank you very much.

12           **MR. SWANSON:**  Yes.

13           **THE COURT:**  The next issue, VGT asserts that its

14   trade secret claims are not limited to three-reel mechanical

15   games.

16          I don't know that it's even necessary to invite comment

17   here.  It seems absolutely clear to the court that in the

18   factual allegations of the amended complaint -- and I'm

19   referring to paragraphs 41 to 43 of the amended complaint --

20   VGT refers to its "three-reel mechanical games."

21          Moreover, in the court's order on summary judgment at

22   docket 373, pages 43 and 44, the court held, I thought clearly,

23   that Castle Hill would be prejudiced if VGT were permitted to

24   expand its claim to five-reel games at this late date.

25          So I'm scratching my head and I'm wondering if this is

1    how law is practiced in other jurisdictions.  But unless

2    someone wants to clarify VGT's position, we'll move on to the

3    next item.

4              MR. SWANSON:  Your Honor, that would be me

5    again.

6              So, Your Honor, we do recognize that the complaint does

7    say that the trade secrets relate to three-reel mechanical

8    games.  However, from our earliest interrogatory response --

9              THE COURT:  Look, I just read from your sixth

10    interrogatory response, item 185-11.  This was the sixth

11    supplemental objections and responses.  We're not operating

12    under the sixth supplemental interrogatory responses.  We're

13    operating on the amended complaint and the court's order.

14              Anything else?

15              MR. SWANSON:  Yes, Your Honor.  I mean, to that very

16    point, the court's order was clear on the specific trade

17    secrets and confidential information at issue.

18              THE COURT:  Yes, sir.

19              MR. SWANSON:  And so as I understand the issue for

20    trial, it's whether those -- I think it's ten -- if you count

21    the trade secrets and know-how together, it's ten specific

22    items of information.  So the issue for trial is, is that

23    information a trade secret or confidential and has it been

24    misappropriated?

25              It seems to me like Castle Hill is trying to engraft

1   this additional requirement where we also have to prove that

2   the information relates to our three-reel mechanical games.

3   THE COURT:  Oh, I see.  Well, I mean, I suppose -- I

4   mean, we're now getting into the theoretical.  I mean, to the

5   extent that these trade secrets might spill over, that's just

6   the case; right?  I mean, you've limited your trade secret

7   claims to three-reel mechanical games, and it may very well be

8   then that these trade secrets are used with respect to other

9   games but that's not my focus here.

10  MR. SWANSON:  Right, yes.  And we just don't think

11  it's necessary that we, you know, prove this additional element

12  of our claims that they seem to be -- that we show that each of

13  those ten items also relates to our three-reel mechanical

14  games --

15  THE COURT:  Well, isn't that --

16  MR. SWANSON:  -- as opposed to our games generally.

17  THE COURT:  Isn't that part and parcel of your

18  burden, though?

19  MR. SWANSON:  I think it's our burden to show that

20  each one is a trade secret or is confidential and has been

21  misappropriated by the defendants.  I don't --

22  THE COURT:  Well, don't you also have to show that

23  it's being used in connection with the three-reel mechanical

24  games?  I mean, it should be fairly simple to do, shouldn't it?

25  MR. SWANSON:  That it's being used, yes, in

1    connection with our games?  I mean, yes, I do believe we can

2    show that with respect to most, if not all, of them.

3            THE COURT:  So does this have to do with the

4    features that are not integrated into the Oklahoma Class II

5    games?

6            MR. SWANSON:  No, Your Honor.  I think this is a

7    separate issue.

8            THE COURT:  Okay.  So I'm trying to understand

9    because you're hedging in your language.

10           MR. SWANSON:  Yeah.  It just -- I mean, this came in

11   at the eleventh hour in negotiating the pretrial order.  I

12   mean, given that we now have from Your Honor a very clear

13   identification of the trade secrets and confidential

14   information for trial, we view our burden at trial as just

15   proving up that those are trade secrets or confidential

16   information and that they've been misappropriated in connection

17   with the defendants' games.

18           You know, I don't know that we have to show -- make

19   some additional showing that we have used each trade secret in

20   connection with our three-reel mechanical games specifically as

21   opposed to Class II games more generally.

22           THE COURT:  Can you give me an example of where that

23   might be a problem?

24           MR. SWANSON:  Yeah.  For instance, Your Honor, one

25   of the items of know-how -- well, you know, one that we've

1    talked about a lot is the bingo card algorithm, which is

2    certainly not specific to VGT's three-reel mechanical games.

3    Another one in the items of know-how would be the QR code

4    project, which again may not be specific to three-reel

5    mechanical games.

6              THE COURT:  I'm not suggesting that you might --

7    that you would have to prove that it's specific to three-reel

8    mechanical games.  But are you saying that you might have

9    difficulty showing that those trade secrets apply at all to any

10   three-reel mechanical games?

11             MR. SWANSON:  I think on -- I think on a couple of

12   them, it's not clear that they would be related to three-reel

13   mechanical games.

14             THE COURT:  All right.  Let me get them in front of

15   me here.

16        Okay.  Including QR code project?  Or that's know-how.

17   So what are we talking about?

18             MR. SWANSON:  Yes, Your Honor.  Yeah, for instance,

19   in the know-how, like the use of the lease agreement would be

20   an example of one that --

21             THE COURT:  I see.  Well, but the use of the VGT

22   lease agreement is -- and, frankly, I think you've got an

23   uphill climb there -- but that's going to apply, at least at

24   this point, theoretically to three-reel mechanical games and

25   others; correct?

1       MR. SWANSON:  Yeah.  Presumably it would, yes.  Yes,

2    Your Honor.  So I think I understand what Your Honor is saying

3    is as long as each one relates at least in part to three-reel

4    mechanical games --

5       THE COURT:  Well, that would be my impression as I

6    sit here.  I mean, that's my surface impression.

7       Mr. Gill, your thoughts here?

8       MR. GILL:  I'll have Mr. Antonelli address that,

9    Your Honor.

10      THE COURT:  Very well.

11      MR. ANTONELLI:  Good afternoon again, Your Honor.

12      THE COURT:  Good afternoon.

13      MR. ANTONELLI:  I think -- I think I'm struggling a

14   little bit to, again, understand exactly what VGT's position

15   is.  We think what they -- they crafted the language of the

16   amended complaint, they wrote it, we didn't write it, and they

17   said that the trade secrets were, quote, relating to the

18   development and operation of the VGT three-reel mechanical

19   games.  So I'm not sure why they wouldn't need to demonstrate

20   that the alleged trade secrets are -- is information related to

21   their games.

22      I think one of the reasons that you're hearing counsel

23   for VGT struggle with that is because, without getting too deep

24   into the merits of some of these know-how claims, they know

25   full that some of these things were just ideas that they never

1    used and that the evidence will show are things that perhaps

2    were discussed at some point at Castle Hill and quickly

3    dismissed.

4            THE COURT:  Right.  Like the QR codes --

5            MR. ANTONELLI:  Like the QR codes are a perfect

6    example.

7            THE COURT:  Right.

8            MR. ANTONELLI:  Somebody at Castle Hill said, oh, we

9    think that's a bad idea.  Somebody told me at VGT that one of

10   the lawyers said there were patents on that.  That's the sum

11   and substance of the QR code.

12           So I'm not sure why we're going to trial on that issue

13   in the first place from VGT's perspective, but I think that's

14   what they're struggling with on the -- you know, applying it to

15   the three-reel mechanical games.

16           And, again, Your Honor, I think the -- they pled the

17   complaint the way they pled the complaint and they specified

18   that it were trade secrets relating to their development and

19   operation of the VGT three-reel mechanical games.  That's the

20   way they articulated their claim, that's the claim that we're

21   going to trial on, and we think that's the burden that they

22   need to meet.

23           THE COURT:  Okay.  Well, it seems to me that that's

24   not something that has to be decided here definitively.  It

25   would appear, though, that it was pled as a three-reel

1   mechanical game matter and arguably, as we sit here right now,

2   with respect to know-how, at least some of these could apply

3   not only to three-reel mechanical games, but maybe five-reel

4   mechanical games or five-reel video games or three-reel video

5   games.  But it seems to me that as long as it applies to --

6   that know-how applies to a three-reel mechanical game, then

7   we'd need to be prepared to address it at trial; right?

8           MR. ANTONELLI:  Yes, Your Honor.

9           THE COURT:  Okay.  Great.  Thank you very much.

10          The next issue is as to whether the VUTSA claim is

11  limited to the bingo card algorithm and uniqueness testing

12  algorithm in nondeployed machines.  That's one that will keep

13  you on the edge of your seat, huh?

14          Just to give you the benefit of our thinking here, it

15  appears that VGT's position is consistent with its position on

16  summary judgment and with the PowerPoint provided by VGT during

17  the dispositive motion hearing.  I mean, it appears to us that

18  the VUTSA claim is not limited to the bingo card algorithm and

19  uniqueness testing algorithm in nondeployed machines.

20          So maybe I need to turn then to Castle Hill.

21          MR. ANTONELLI:  Yes.  Thank you, Your Honor.  I

22  think what we struggled with when we were drafting the pretrial

23  language on this particular issue was that VGT amended its

24  complaint to add the Defend Trade Secrets Act claim and the

25  Virginia Uniform Trade Secrets Act claim.

1    Specifically with respect to the -- what we refer to as

2    the BMM code -- I know Your Honor is familiar with us using

3    that nomenclature -- that has to do with a version of a bingo

4    card generation algorithm that was submitted to BMM and was

5    never deployed in the field.  So the reason that VGT stated --

6    when it amended its complaint, its stated reason for amending

7    was that they didn't think that because that algorithm was

8    never used in Oklahoma, or elsewhere, in commerce, they said

9    that we don't think it's encompassed by our Oklahoma Uniform

10   Trade Secrets Act claim.  Therefore, they sought leave of

11   court, which was granted, and they amended to add the Virginia

12   Trade Secrets claim and the Defend Trade Secrets Act claim.

13       Our understanding all along has been that those claims

14   related to the BMM code, which was the nondeployed bingo card

15   generation algorithm, and an algorithm regarding uniqueness

16   testing that was experimental code that was submitted to BMM

17   and never deployed in the field and that those claims only

18   related to those two issues.

19       And then for the first time in the -- when we were

20   going back and forth on the pretrial, we heard oh, no, no, no,

21   no, the Virginia Uniform Trade Secrets Act applies to all of

22   our know-how claims and it applies to the bingo card generation

23   algorithm that you have in the field but the Oklahoma Uniform

24   Trade Secrets Act also applies to that.

25       We're just struggling to try to understand exactly what

1    -- which claim fits under -- which specific set of allegations

2    fits under which legal theory of recovery.

3              THE COURT:  I'll confess that I'm struggling as

4    well.  Because I have plaintiff's motion for leave to file

5    amended complaint here, docket No. 73, page 7 of 13, subsection

6    (e), on page 7, and VGT says, "VGT's claim for trade secret

7    misappropriation under Oklahoma law may not encompass

8    defendants' misappropriation of VGT's bingo card generation

9    algorithm because defendants claim that they have not yet

10   deployed the misappropriated algorithm in Oklahoma."

11             But it was our understanding that -- and correct me if

12   I'm wrong -- that we have another algorithm that includes the

13   uniqueness testing algorithm.  I thought these two things were

14   separate and apart, bingo card generation algorithm, uniqueness

15   testing.  And as I understand it, our position had to do with

16   that lack of clarity.

17             So can you clarify this a bit?

18             MR. ANTONELLI:  I can try.

19             THE COURT:  Yeah.

20             MR. ANTONELLI:  So there are -- from Castle Hill's

21   perspective, there are two bingo card generation algorithms.

22   So on the one hand, there's what we'll refer to -- you'll hear

23   us talk a lot at trial about the GUID-based approach.  So the

24   GUID algorithm, we distinguish that from the BMM code on the

25   other hand.  The uniqueness testing is actually -- it's -- it

1    is a separate algorithm but it needs to be considered kind of

2    in the same breath with the bingo card generation.  Because the

3    end goal of what a Class II manufacturer is doing is they're

4    trying to generate a bingo card and then demonstrate that that

5    bingo card is unique from all other bingo cards.  So --

6              THE COURT:  Got it.  All right.  So I haven't

7    completely wrapped my arms around that so you all need to make

8    that clear to me.  Because I had understood these were two

9    separate but I can understand why those two functions have to

10   be performed at the same time.  Right?

11             MR. ANTONELLI:  So the last time when we were here

12   for the dispositive motions hearing, we talked a lot about the

13   Mersenne Twister and ceding it with a 32-bit integer.  That is

14   all BMM code and that's the -- what we talk about being never

15   deployed in the field, the experimental code.  That's what we

16   consider to fall under the Virginia Trade Secrets Act and

17   Defend Trade Secrets Act claims because it was never deployed

18   in the field.

19             So VGT says we do bingo card generation one single way,

20   and you, Castle Hill, have misappropriated that trade secret

21   through the BMM code and also through a completely separate and

22   different way that you do bingo card generation with your

23   deployed games.  The way they generate the bingo card is

24   different, the way they do uniqueness testing is different for

25   the deployed games, the stuff in the field, what we would

1  consider as falling under -- if it's in the case at all, coming

2  only under Oklahoma Uniform Trade Secrets Act.  That's a

3  different algorithm and different approach from the BMM code,

4  which is the Mersenne Twister-based algorithm.  And VGT alleges

5  that the two very different ways that Castle Hill has

6  approached bingo card generation -- one deployed, one never

7  deployed -- that both of those ways are a violation of its

8  trade secret.

9          So, again, to kind of end where we started, the purpose

10  of their amendment was to allege that the BMM code, never

11  deployed, they say we learned about this in the course of

12  discovery, we need to amend our complaint, because we don't

13  think it falls under our existing claims.  I don't read their

14  amended complaint as saying, oh, by the way, all these know-how

15  issues, those actually arise under the Virginia Uniform Trade

16  Secrets Act.  That's not what they've alleged.

17          **THE COURT:**  Well, it's very general.

18          **MR. ANTONELLI:**  I agree.  And it's, again, one of

19  the reasons that we asked the court -- and I thought the court

20  did do this -- in terms of narrowing and defining what trade

21  secrets and know-how claims the plaintiff is going to be

22  permitted to present at trial --

23          **THE COURT:**  And I do that and you're not happy.

24          **MR. ANTONELLI:**  Well, I was happy, Your Honor, until

25  we got to the pretrial order drafting, and then I learned that

1   the know-how allegedly arises under the Virginia Uniform Trade

2   Secrets Act as well.

3            THE COURT:  All right.

4            MR. ANTONELLI:  So I -- or, you know, other --

5   that's the first I heard that.  So --

6            THE COURT:  Okay.

7            MR. ANTONELLI:  -- that's the struggle we're having.

8            THE COURT:  Well, we need to resolve this here

9   today, folks.  We need to know what we're going to go to trial

10  on in 13 days.

11           So VGT?

12           MR. SWANSON:  Yes, Your Honor.  I think there's two

13  issues.  One is the scope of the VUTSA claim, one is the scope

14  of the OUTSA claim.

15           I appreciate that counsel never heard about our

16  position that the VUTSA claim includes the know-how and all

17  development work in Virginia.  But we were very clear about

18  this in our summary judgment opposition on page 42 in footnote

19  14, in which we said that because CHG's development work was

20  coordinated from its headquarters in Virginia, the VUTSA claim

21  encompasses both categories of misappropriation, both

22  categories being the original development work that led to the

23  deployed games and the subsequent BMM work.  So they may not

24  have read it but we said it, and I think Your Honor's summary

25  judgment ruling recognized that and notes on pages 58 and 59

1   that the VUTSA claim covers both the bingo algorithm, the

2   uniqueness testing algorithm, and the know-how.  So that's

3   point one.

4          THE COURT:  All right.  Give me just one second to

5   take a look at this footnote in our order.  Just one second.

6          MR. SWANSON:  Really, it starts on page 41.  We say

7   that VGT's claims under the OUTSA, the VUTSA, and Oklahoma

8   common law addressed Castle Hill's misappropriation of VGT's

9   trade secrets and confidential business information in

10  developing its Class II system in games that Castle Hill has

11  placed in the field.  And then at the end of that paragraph, we

12  dropped a footnote explaining why the VUTSA covers that as well

13  as the BMM software.

14         THE COURT:  All right.  Now, what about the argument

15  about deployed and nondeployed games?

16         MR. SWANSON:  With respect to the OUTSA claim, Your

17  Honor, or the --

18         THE COURT:  Well, right now I'm focused on Virginia.

19         MR. SWANSON:  Oh, Virginia?

20         THE COURT:  Yeah.

21         MR. SWANSON:  Yes.  So, again, I think we were clear

22  in our summary judgment opposition on this so they have heard

23  about it before the pretrial order as point one.

24         Point two, the amended complaint clearly is not limited

25  to the additional BMM development work.  Specifically,

1    paragraph 152 of the amended complaint, Castle Hill has used

2    one or more of the VGT trade secrets when developing games for

3    Castle Hill, including the CHG-infringing games in Virginia.

4    CHG has disclosed one or more of the VGT trade secrets in or

5    from Virginia to third parties, including testing labs.  So we

6    didn't limit it just to the BMM claims.

7         And, Your Honor, I would just add, I mean, they're

8    trying to hold us to every allegation in the amended complaints

9    with respect to the definition of trade secrets and trademarks

10   and trade dress.  Well, it should work both ways.

11        **THE COURT:**  No.  It does seem to the court that VGT

12   is correct here and it appears that these additional trade

13   secrets may be pursued under VUTSA.

14        Now, what about -- I've got a reference to trade

15   secrets 1 and 2 and 3 through 5.  Are you taking the position

16   that the other trade secrets do not apply under VUTSA?

17        **MR. SWANSON:**  No.  I think what we said is that all

18   five apply to the VUTSA.  I think the dispute on that one is

19   the OUTSA.  The question was whether trade secret No. 2, which

20   is the uniqueness testing, whether that is part of the OUTSA.

21        **THE COURT:**  Okay.  I'm confused.  I'm sorry.

22        So it would appear to the court that the plaintiff may

23   proceed on the VUTSA claim and all five trade secrets there.

24   Just one second.

25                *(Discussion held off the record)*

1    THE COURT:  All right.  The next issue is similarly

2    confusing and perhaps more so.  I'm looking at page 8 of the

3    proposed pretrial order, middle of the page, and VGT makes the

4    statement at the beginning of the second full paragraph here:

5    "Contrary to CHG's position, nothing in the complaint or

6    amended complaint excludes trade secret 2," which is uniqueness

7    testing," from the OUTSA claim."  And we understand that to be

8    a reference to the BMM code which was not deployed in Oklahoma.

9         So, first of all, is that -- are we understanding that

10   correctly?

11        MR. SWANSON:  That does relate to the code submitted

12   to BMM, that's correct, Your Honor.

13        THE COURT:  All right.  So how does that -- how does

14   OUTSA apply if it wasn't deployed here in Oklahoma?

15        MR. SWANSON:  So I think the issue from our

16   perspective is, you know, that fact has not been proven yet and

17   at -- you know, they didn't seek summary judgment to limit the

18   scope of the OUTSA claim to exclude that trade secret.

19        What we have from discovery is that they submitted --

20   they used that trade secret in connection with software that

21   they had submitted to BMM, and at the time discovery closed

22   they were still seeking approval of a bingo card method that we

23   claim incorporates the uniqueness testing algorithm.  We have

24   not received updated discovery on that.  We don't know whether

25   they've gotten approval of that, whether they've deployed it,

1   whether -- you know, what the status of that.

2          So if they want to -- if they want to prove at trial

3   that they've not -- they've not done anything with the BMM code

4   in Oklahoma, then that probably falls out at that point but

5   let's see what the facts are at trial, I guess.

6          **THE COURT:**  Don't you have the burden of proof?

7          **MR. SWANSON:**  We do and we would ask their witnesses

8   on that.  But we think it's -- we think it is a fair issue for

9   trial given that they --

10         **THE COURT:**  So you'd agree that they don't have to

11  prove it?  It's your --

12         **MR. SWANSON:**  Sure, sure.  It's our burden to show

13  that, yeah, that code was used in Oklahoma, but I think we

14  should be able to ask their witnesses about that.  And if we

15  have no proof, then we fail on that at trial.  But if they had

16  wanted to exclude that from trial, they could have sought

17  summary judgment that we had no evidence and they haven't done

18  that.

19         **THE COURT:**  All right.  And so it doesn't apply to

20  this GUID code, it's clearly BMM code?

21         **MR. SWANSON:**  With respect to the uniqueness

22  testing, that's correct, Your Honor.

23         **THE COURT:**  Okay.

24         **MR. SWANSON:**  Sorry.  Just to be clear because I

25  don't want --

1       THE COURT:  Mr. Luthey, are you clear on this?

2       MR. LUTHEY:  Very, Your Honor.

3       MR. SWANSON:  There are several permutations.  We

4   will make this very clear at trial as to the timeline and the

5   permutations of the bingo card algorithm.

6           What I mentioned there, that at the close of discovery

7   they were trying to get approval of this new method, it does

8   include the GUID method but it also incorporated an aspect of

9   uniqueness testing.  They kind of fused the two together.

10      THE COURT:  See, that's where I'm unclear here.

11      MR. SWANSON:  Yeah.

12      THE COURT:  Can you maybe try to explain that to me

13  and how it falls out here in terms of the various claims --

14      MR. SWANSON:  Sure.

15      THE COURT:  -- this merging together of these codes

16  or algorithms?

17      MR. SWANSON:  So we have Castle Hill's original

18  algorithm which is the GUID.

19      THE COURT:  Right.

20      MR. SWANSON:  That's the one that we know was

21  deployed or has been deployed in Oklahoma.  We do claim that

22  that misappropriates the VGT bingo card algorithm.

23          Then once they received -- they tried to submit that

24  code to BMM.  BMM said that that algorithm doesn't work based

25  on the way their system had it configured.  That's when they

1   switched to what you've heard them call the Mersenne Twister

2   approach and they tried to submit that to BMM.  We claim that

3   that also misappropriates the VGT bingo card algorithm and

4   that's what they've said they've not deployed in Oklahoma.

5        But then once they withdrew that code from BMM, they

6   then went on to a third algorithm in which they went back to

7   the GUID approach, but then they incorporated an aspect of the

8   uniqueness testing algorithm.  We call it the "on-the-fly

9   uniqueness check."

10            THE COURT:  You call it what?

11            MR. SWANSON:  "On-the-fly uniqueness check."  It

12  does a check for uniqueness kind of in realtime as we

13  understand it.

14        And so that -- and that's where things stood at the end

15  of discovery.  We don't know if that, again, has been approved,

16  if it's been deployed in Oklahoma.  We have not received

17  updated discovery on that.

18            THE COURT:  What do they call this approach?

19            MR. SWANSON:  The third approach?  I don't know if

20  -- if I've heard them refer to it by any specific name.

21            THE COURT:  All right.  Thank you very much.

22  Whack-A-Mole.

23            MR. ANTONELLI:  I mean, Your Honor, we're again 13

24  days out from trial and I don't have the ability to put on a

25  clean sheet of paper, you know, what their -- what their claim

1    is and what trade secrets specifically relate to it.  Because

2    it is confusing, and I understand why it's difficult for the

3    court to grasp, when we're talking about bingo card generation

4    and uniqueness testing and BMM and all these phrases that we

5    throw around but we're talking about very different approaches.

6    The three -- I mean, what counsel just said is that Castle Hill

7    approached bingo card generation three completely different

8    ways --

9              THE COURT:  Right.

10             MR. ANTONELLI:  -- at different points in time,

11   three different ways.  But each --

12             THE COURT:  And necessarily so because apparently it

13   didn't pass muster the very first two times.  Is that correct?

14             MR. ANTONELLI:  The code that was originally

15   deployed in the field passed muster with one regulatory -- or

16   one --

17             THE COURT:  I stand corrected.

18             MR. ANTONELLI:  -- testing lab.

19             THE COURT:  You're right.

20             MR. ANTONELLI:  There was a second testing lab that

21   they subsequently submitted that algorithm to.  They raised

22   some issues.  That was when the BMM -- what I call the "BMM

23   code" was submitted.  That code was ultimately withdrawn.

24        The way the BMM code did bingo card generation and

25   uniqueness testing was different from the way they did it in

1    the deployed code and different from the bingo card generation

2    approach and uniqueness testing approach that was then

3    submitted to BMM.  So they're all different but I guess VGT is

4    going to prove at trial that they all violate their same trade

5    secret.

6         Again, it's confusing to me as to is the uniqueness

7    testing just Virginia Uniform Trade Secrets or is it Oklahoma?

8    Counsel saying the fact hasn't been proven.  They say they

9    don't have any evidence of it.  So that was something I was

10   struggling with understanding how to respond to that.  But, I

11   mean, I guess we'll see what the testimony at trial is.

12        **THE COURT:**  I think at this point we have to, given

13   that it wasn't resolved at summary judgment, just on a

14   procedural basis.

15        **MR. ANTONELLI:**  Understood, Your Honor.

16        **THE COURT:**  Okay.

17        **MR. ANTONELLI:**  One final issue that I want to raise

18   as we're talking about the trade secrets is the Defend Trade

19   Secrets Act claim and understanding exactly what that applies

20   to.

21        Again, we understood that the Defend Trade Secrets Act,

22   which was enacted after -- plaintiff amended their complaint

23   because the Defend Trade Secrets Act wasn't enacted when our

24   games that they say misappropriate their trade secrets were

25   actually originally deployed in the fold, that that claim --

1   and it doesn't have a retroactive effect -- that that claim is

2   only related to the BMM nondeployed algorithm and unique

3   testing associated with the nondeployed BMM code algorithm.

4   Again, that's what we have understood the claim to be, and I

5   just want to see if we can get a little clarity on that last

6   point.

7            THE COURT:  All right.  That's not an issue that I

8   had identified.

9            MR. SWANSON:  We don't think that's an issue either.

10           THE COURT:  Okay.

11           MR. SWANSON:  We agree with that.  I thought it was

12   clear in the pretrial order.

13           THE COURT:  Very good.  I do have a question here.

14   Does OUTSA apply to the bingo card generation algorithm claim

15   for games deployed in Oklahoma?

16           MR. SWANSON:  Yes, Your Honor.

17           THE COURT:  All right.  And what is the defense

18   position?  What is the defense position?

19           MR. ANTONELLI:  I think we need to be very exact on

20   which algorithm we're talking about.

21           THE COURT:  Right.

22           MR. ANTONELLI:  So I don't -- I don't know -- I

23   apologize for not answering the court's question directly, but

24   I'm not sure -- when counsel says, yes, it applies to bingo

25   card generation, counsel also just described that Castle Hill

1    has done this three different ways.  So which one?

2              THE COURT:  Well, your response is basically where

3    we were left.  We're not clear as to which algorithm we're

4    talking about.  So let's see if we can nail this down.

5              MR. SWANSON:  Sure.  With respect to the OUTSA

6    claim, what we're talking about is the original bingo card

7    algorithm primarily.  And then, as we've just been talking

8    about, again if the evidence in trial shows that any of these

9    -- the second or third algorithm has actually been approved and

10   deployed in Oklahoma, then presumably that would be a violation

11   of --

12             THE COURT:  Well, but he's admitting here that the

13   second one was withdrawn; correct?

14             MR. SWANSON:  Yes.  That's what they've said, yeah.

15             THE COURT:  So --

16             MR. SWANSON:  So it may just be an issue with

17   respect to the third one.

18             THE COURT:  Is that --

19             MR. ANTONELLI:  I don't -- I don't understand there

20   to be an allegation in the amended complaint about a third

21   algorithm.  So we had the deployed code -- the originally

22   deployed code and we had the BMM code.  Those were the two

23   algorithms that were at issue.  So now we're talking about -- I

24   agree that Castle Hill has approached this a third way but that

25   is -- I'm not sure where that is in the amended complaint.

1    THE COURT:  All right.  Let me quickly try to find

2    this in the amended complaint.

3    MR. SWANSON:  Okay.  I don't think the amended

4    complaint is specific to certain algorithms.  We did put -- in

5    our summary judgment papers, again, and in the expert

6    declaration submitted in opposition to their summary judgment

7    motion, we did talk about the third algorithm.

8    THE COURT:  Well, I'm looking at your presentation

9    from the hearing on the motion for summary judgment and you say

10   -- this is the Oklahoma Uniform Trade Secrets Act -- and you

11   say "bingo card algorithm."

12   MR. SWANSON:  Correct.

13   THE COURT:  Now, you say you're talking about the

14   original bingo card algorithm?  Have we used an acronym for

15   that?

16   MR. SWANSON:  The GUID approach is --

17   THE COURT:  Okay.  So I've got, as you could say,

18   GUID right there.  So you're seeking as to GUID, which is the

19   original, and now you're seeking with regard to this alleged

20   third approach?

21   MR. SWANSON:  Yes.

22   THE COURT:  But you don't have any evidence of that?

23   MR. SWANSON:  Again, at the end of discovery the way

24   things stood -- this was about a year ago -- they were trying

25   to get approval of this third approach.  We haven't gotten

1   updated information from them on whether they have gotten

2   approval, whether it's been deployed in Oklahoma, if they have.

3            THE COURT:   Well, but you don't have any evidence

4   that it --

5            MR. SWANSON:   And they didn't seek summary judgment

6   on --

7            THE COURT:   -- that it infringes your trade secret.

8            MR. SWANSON:   No.   We do, Your Honor.   In opposition

9   to their summary judgment motion in Mr. Friedman's declaration,

10  he says in paragraph 32, "I understand that after CHG withdrew

11  its bingo algorithm that relied on the exhaustive uniqueness

12  check" -- that's the second one -- "CHG developed a new

13  algorithm that developed a 'on the fly' or realtime uniqueness

14  check."

15           THE COURT:   All right.

16           MR. SWANSON:   Skipping ahead to the next paragraph,

17  "Castle Hill's on-the-fly method uses the same bingo card

18  compression scheme as the prior exhaustive uniqueness testing

19  approach by compressing each cell to just four bits, and like

20  VGT's uniqueness testing algorithm, the compressed values

21  enable the entire bingo card" -- and it goes on with the

22  details.

23           THE COURT:   Okay.   You're refreshing my

24  recollection.   That's exactly what he says there.

25           MR. SWANSON:   Yeah.   So --

1      THE COURT:  So for purposes of the pursuit of

2  justice here, to prevent the need for another lawsuit relative

3  to the additional algorithm here, and to try to get it wrapped

4  up, to the extent that we can, in one lawsuit, we'll allow it

5  to proceed with regard to that, and particularly in view of --

6  is it Dr. Friedman?  I've forgotten.

7      MR. SWANSON:  Mr. Friedman.

8      THE COURT:  -- Mr. Friedman's statement contained in

9  the response to the motion for summary judgment.

10      MR. SWANSON:  Thank you, Your Honor.

11      THE COURT:  Or was it in the response or is it -- it

12  was the response.

13      MR. SWANSON:  Response, yeah.

14      THE COURT:  Right.  All right.  Next, I need to know

15  how many days does plaintiff anticipate needing for its portion

16  of the trial which would obviously include cross-examination by

17  defendant?

18      MR. RUBMAN:  Your Honor, consistent with -- sorry --

19  Your Honor, our view continues to be that we expect to wrap up

20  our case in five days, assuming reasonable crosses and no real

21  surprises, but we've been on track for five days.

22      THE COURT:  All right.  Now, as I hope you can

23  appreciate, having waded through a lot of these depositions and

24  having had a few nonjury trials before, I know attorneys,

25  particularly for purposes of possible appeal, like to dump just

1   as much onto a trial court as possible and ask to admit these

2   various depositions for consideration.  It's not very

3   realistic, particularly given the condition of some of these

4   depositions.  I mean, there have been a lot of designations of

5   irrelevant material.  Just going through these, I see broad

6   swaths of these depositions that don't contain objections to

7   portions that have been designated, and I scratch my head as to

8   how these could possibly be -- this testimony could possibly be

9   relevant.

10          Not having the technical expertise, as some of you do,

11  I've been, I think, a little generous in terms of relevance

12  objections.  Because if I think some of this testimony may well

13  be relevant, I've allowed it, but I think it's important for

14  you all to whittle this down as succinctly as you possibly can.

15          So to the extent that you wish to submit deposition

16  testimony at trial, it needs to be presented during the course

17  of the trial or whittled down to the extent that I can read it,

18  you know, after the end of the day so I can try to absorb this

19  information.  Because this certainly is not the type of

20  information or the area in which I've been trained.  I'm doing

21  the best I can.  But, you know, I'm hearing some concepts here

22  today that I've not heard even before in this lawsuit.

23          **MR. RUBMAN:**  Right.  Understood.

24          **THE COURT:**  So fortunately not very many.

25          **MR. RUBMAN:**  Yeah.

1    THE COURT:  But I think it's important that you all

2    distill and edit, and the depositions that have been submitted

3    for ruling on objections have very clearly not been distilled

4    very well.

5         So what other issues do I need to address here?

6         MR. RUBMAN:  Well, on that point, Your Honor, I do

7    appreciate you raising it.  And speaking for VGT, we are in the

8    process of narrowing ours down.  We did a runtime, if you take

9    all those original depositions, how much time it would take.

10   And, you know, Castle Hill had 38 hours and we had 21 hours,

11   neither of which is realistic.

12        THE COURT:  Yeah.  I spent a good time this vacation

13   weekend trying to digest some of the objections.  And, frankly,

14   this is the first time I've ever had to try to rule on a

15   14-page swath of a deposition and try to pick out the

16   objectionable portions of those 14 pages from multiple

17   objections listed only by a letter.  I mean, it's virtually --

18   well, it's difficult to do.

19        MR. RUBMAN:  Yeah.

20        THE COURT:  I have to hunt for the question amongst

21   the 14 pages that supposedly contains hearsay.  I remember

22   vividly one last night at about midnight after going through

23   about 16 pages of deposition on a hearsay objection, and the

24   last, you know, four lines of those 16 pages had the question

25   that was calling for hearsay.  Well, I mean, you know, that's

1    just not good legal work, frankly.  And I don't know whether

2    you had a paralegal do that or what.  But you shouldn't call

3    upon a federal judge, who's trying to deal with criminal

4    matters and other matters, to try to hunt for some

5    objectionable testimony in a broad swath of pages in a

6    deposition.

7         **MR. RUBMAN:**  Your Honor, we certainly understand

8    that.  It was a challenging exercise in part because -- I think

9    you're referring now to Castle Hill's designations and our

10   objections to them?

11        **THE COURT:**  Yes.

12        **MR. RUBMAN:**  And there were lots of them that were

13   10 to 12 pages and we certainly understand the challenge there.

14        What I'm expecting will happen is all of those

15   designations were done prior to your rulings.  They also were

16   done prior to the parties doing objections on exhibits and all

17   that.  What we are doing, in light of those rulings, is cutting

18   down ours in light of the rulings which I think will eliminate

19   some.  Also, in light of hopeful some issues about documents

20   where there's no dispute over authentication, for example.  You

21   probably saw lots of that stuff in there, much more so in ours.

22   I think ours were quite a bit more fine-tuned or narrow.  So

23   that process is underway.

24        We certainly respect your time and we're not planning

25   to overburden you with unnecessary designations.  They're as

1   painful for us as they are for you.  Maybe they're more painful

2   for you than for us.  But we certainly expect to be very narrow

3   on that.

4            There was one --

5            THE COURT:  I'm sure you can appreciate there lots

6   of duplication in these depositions.

7            MR. RUBMAN:  There is.

8            THE COURT:  And you can tell the depositions that

9   were taken early on when you and opposing counsel were trying

10  to understand the facts.

11           MR. RUBMAN:  Sure.

12           THE COURT:  And then you obviously get better as

13  time goes on.  But there's a lot of duplication in these

14  things.

15           MR. RUBMAN:  Yeah.  Can I raise one specific issue

16  relating to the depositions?

17           One thing that we have been struggling with, in terms

18  of preparing for trial and to do it in an efficient way, is how

19  to deal with their counter-designations to ours because they

20  never line them up.  And one specific example that we think is

21  particularly acute, because we want to play Mr. Yarborough's

22  testimony in our case in chief, we designated -- this is one

23  where both sides designated in the first instance and then both

24  sides did counters to the other side's designations.  We

25  designated 37 minutes.  They responded by counter-designating

 1    two hours.

 2           Now, in our case in chief, we want to play his

 3    testimony.  But to play it with their two hours of

 4    designations, which don't match up, we don't quite know how to

 5    do that and we're seeking guidance.  Our preference would be

 6    just to play ours because they want to play theirs separately

 7    and they can just play theirs in their case as long as it

 8    doesn't overlap.  Given it's a witness that's been designated

 9    by both sides, that seems fair.

10           **THE COURT:**  Yeah.

11           **MR. RUBMAN:**  There's no lack of completeness because

12    they can play in theirs their two hours, if they ultimately

13    decide that that's how they want to spend their time.  But if

14    we can get a little assistance and guidance on that, that would

15    be helpful to us.

16           **THE COURT:**  Well, that's a fair way to do it.

17    Because obviously if a party overdesignates, then they have to

18    suffer the eye rolls from the finder of fact.

19           Yarborough is an interesting guy; right?

20           **MR. RUBMAN:**  He's an -- sorry.

21           **THE COURT:**  He's interesting.

22           **MR. RUBMAN:**  Interesting, yes.

23           **THE COURT:**  Yeah.  Or I could employ the old Thomas

24    R. Brett method, you get equal time, you know.  If you take 37

25    minutes, you get 37 minutes which, I think, has been upheld by

1    the Tenth Circuit.

2            So let me hear from the other side here.

3            **MR. PLATT:**   Thank you, Your Honor.   Henry Platt.

4            Just as a preliminary point on Mr. Yarborough, both

5    sides have designated him.   We've designated him on the theory

6    that Mr. Yarborough, who lives in Memphis, or somewhere in

7    Tennessee, near Nashville will be unavailable.   Covington &

8    Burling represents Mr. Yarborough.   They represented him at the

9    -- at the deposition.   If he's not available, it's because

10   they're not making him available, okay?   Maybe he doesn't want

11   to come.   Maybe -- they have an obligation to make a reasonable

12   effort to bring their witness here.

13           We have asked them.   They have not responded to our six

14   e-mails on this issue, okay?   So they have the burden of

15   establishing that he's unavailable.   If he's not unavailable to

16   them and he's unavailable to us, we should be able to play

17   our -- or have Your Honor read -- and we don't want to waste

18   everybody's time showing a video -- his deposition.

19           **THE COURT:**   Well, what I'm telling you is, you need

20   to whittle it down --

21           **MR. PLATT:**   I understand that.

22           **THE COURT:**   -- and not waste my time either way.

23           **MR. PLATT:**   I agree with that 100 percent, Your

24   Honor.   But the idea that, you know, ours is just a

25   counter-designation to their designation is a little

1    frustrating to us.  Because, as I said, they haven't responded

2    to our request of whether or not they're actually going to make

3    him available.

4           I am sure that when he sold his company --

5           **THE COURT:**  Well, he wants to utilize the

6    taxpayer-funded services of the federal courts but doesn't want

7    to show up to testify.

8           **MR. PLATT:**  Yes, Your Honor.  He was paid one and a

9    half billion dollars for his company.  I was told that many

10   times by him.

11          **THE COURT:**  It's Australian money.

12          **MR. PLATT:**  I can assure Your Honor that there's an

13   agreement with VGT that he will make himself available for

14   reasonable litigation issues, okay?  We've asked them if that's

15   the fact; we haven't gotten a response.  That's all I'd like to

16   say on that.

17          And yes, we also will be whittling down our deposition

18   designations now that we have an agreement on which, as we

19   understand, they are definitely calling as witnesses.  Certain

20   people obviously we don't have to waste the court's time with

21   since they've now finally agreed that they're going to bring

22   them in, like Mr. Sevigny, for example.

23          Thank you, Your Honor.

24          **MR. RUBMAN:**  Your Honor, I know you want to get this

25   resolved.  A few points.

1    We've told them several times that Mr. Yarborough is

2    unavailable.  We tried.  We would desperately like

3    Mr. Yarborough here.  We've tried.  We've had others reach out

4    to him.  We've reached out to him directly, to his assistant.

5    He's not at the company anymore; we can't force him to be here.

6    If we could, we would because we want him here.  And we've told

7    them already -- I don't understand how he could say that we

8    haven't told them because we have.  So I'll just -- I don't

9    know that we need to debate that, but we certainly made our

10   effort because we would love for him to be sitting in that

11   stand.

12          THE COURT:  My understanding he's essentially just a

13   stockholder now; right?

14          MR. RUBMAN:  I think he testified that he does own

15   some stock, if I remember.  I believe that's right.  Or at

16   least he did back then.  I don't know.  I haven't spoken to him

17   since the deposition other than trying to reach out to contact

18   him to agree to be here.  So we are as frustrated as they are

19   on that one, I can assure you.

20          THE COURT:  Franklin, Tennessee, is that where he is

21   or --

22          MR. RUBMAN:  I know that he at least had a home

23   there.  I think he also spends a lot of time, he told me, in

24   Florida.  But I don't know where he is.

25          THE COURT:  Well, of course.  There's no personal

1    income tax in Florida.

2              **MR. RUBMAN:**  I don't know what motivates him.  But

3    this is something that we certainly wanted him to be here.

4              **THE COURT:**  All right.  Well, let me just probe a

5    little bit of defense counsel.

6         I haven't really looked at your designations in this

7    light.  Are you saying that there's so much rich content here

8    that you need to broadcast two hours of Mr. Yarborough's

9    testimony to me?

10             **MR. GILL:**  Let me address that, Your Honor.

11        I think it's fair to say that, based on the fact that

12   the case has been narrowed somewhat from the summary judgment

13   rulings, that we have already determined internally to make a

14   serious effort at cutting down our deposition designations.

15   Obviously, that's a case-by-case decision.  And with

16   Mr. Yarborough, who obviously was an important -- he was the

17   top guy at VGT, he is not available to testify at trial, the

18   ability to narrow his testimony may be more difficult than our

19   ability to narrow some other testimony.

20        What we may find, too, is that -- at least for the

21   defense case -- you may find that once a witness has taken the

22   stand, even if it's a representative of a party as an officer,

23   once we've been able to go through the exercise of direct and

24   cross-examination, some of the prior designations may then be

25   mooted.  So it may be that, you know, some of that material may

1    fall away as the trial progresses.

2          And if the court please, I do have a few items of my

3    own relating to the conduct of the trial that I wouldn't mind

4    raising with the court.

5          **THE COURT:**  Okay.  Let's deal with this first,

6    though.

7          **MR. GILL:**  Sure.

8          **THE COURT:**  It would seem to me that to the extent

9    that designations from the defense are such as described here

10   with Mr. Yarborough, it would seem to me that I'm going to

11   require the defendants to present that testimony in the defense

12   of the case.  I think we can put those two pieces together to

13   -- there won't be so much time between the two that I can't

14   understand the full context there.  So, I mean, if it's 37

15   minutes versus two hours, you need to present that during your

16   portion of the case.

17         **MR. GILL:**  I understand, Judge.

18         **THE COURT:**  Right.  And if it's equal, we'll just

19   hear it all together.  It makes it a little easier.

20         **MR. GILL:**  Okay.

21         **THE COURT:**  Okay.  Now, your housekeeping matters?

22         **MR. GILL:**  Well, I have a few, Your Honor, if the

23   court please.

24         **THE COURT:**  Oh, we need to take a break.

25         **MR. GILL:**  Sure.

1    **THE COURT:**  All right.  We'll be in recess.

2    *(Short break)*

3    **THE COURT:**  Just one topic I'll bring back up.

4    Although I've watched a good deal of gaming now on the

5    Internet, you know, most of this is videotaped by people who

6    are hooked on it and they're more interested in seeing the

7    reels spinning than they are on the actual bingo table.

8    Frankly, the thing that intrigues me is the fact that this is

9    really bingo and I'd be interested in looking at the bingo

10   card.  You know, as you've told me over and over, this is a

11   facade.

12   I did happen to look at the gaming compact over the

13   weekend to see the 4, 5, and 6 percent versus the 10 percent.

14   I know now why we're here, by the way.

15   **MR. GILL:**  That's right.

16   **THE COURT:**  As Mr. Luthey smiles.

17   So one of the other things I get to read about -- and

18   it probably is no surprise that I'm not a denizen of casinos --

19   that I read about how you can feel these mechanical bells even

20   across the casino floor, but you all haven't believed it

21   important enough that I actually experience that.  I don't even

22   know how these strobes actually light up because, as I say,

23   most of the videos are these guys who love to focus on the

24   facade, you know, the reels spinning, you know, talking about

25   how, oh, I'm going to try my left hand now instead of my right

1    hand because that will give me a whole lot more luck.   My gosh,

2    what are we doing to our people here?

3           But in any event, it fills everyone's pockets.   So go

4    ahead.

5           MR. GILL:   Right.   Well, actually responding to some

6    of Your Honor's remarks, when we were here for a status

7    conference before you back in November, it was certainly my

8    understanding at that conference that you had expressed some

9    reluctance about personally visiting a casino.

10          THE COURT:   That I had?

11          MR. GILL:   That you had.   And you had inquired of

12   the parties to try to think about a way to try to bring the

13   casino experience in your courtroom, which I think was the

14   genesis for both parties to get --

15          THE COURT:   Oh, I was told the casinos didn't want

16   me.

17          MR. GILL:   Okay.

18          THE COURT:   No.   That was communicated to me, that

19   they didn't want to have anything to do with this.

20          MR. GILL:   Got it.

21          THE COURT:   They wanted me to stay a mile away.

22          MR. GILL:   All right.

23          THE COURT:   And did not -- because they don't want

24   to throw themselves in the middle here.

25          MR. GILL:   Right.

1        THE COURT:   They like competition.

2        MR. GILL:   I'm sure they do.

3        THE COURT:   So --

4        MR. GILL:   But I think Your Honor had said to us,

5   for whatever reason, that you were reluctant to go experience

6   this yourself in a casino and could we figure out a way to try

7   to bring that experience to you in the courtroom.   And one

8   thing that both sides have done is we have taken photographs of

9   not only the plaintiff's machines and the defendants' machines,

10  but other competitor machines and we've also done videos.

11  That's why those are, you know, on the parties' exhibit lists,

12  to be able to try to show you, to the extent we can --

13        THE COURT:   Okay.

14        MR. GILL:   -- what this looks like.   We can't make

15  it 100 percent like, you know, could you hear the deafening

16  bell in here like you could if you were standing next to one in

17  a casino?   No, we can't do that for you.   But we have made an

18  effort to try to bring the, you know, visual imagery to you and

19  to do it in a way that we hope would be useful for you.

20        THE COURT:   Well, maybe that's what the record

21  reflects.   I don't recall it that way.

22        But in any event, I did have -- I sat next to a guy who

23  is head of security at one of these big casinos here in town on

24  an airplane and he's invited me out to see the security.   Now,

25  I've been out there once before but he claims it's been greatly

1    upgraded since then and had invited me to come out.

2          If there's no objection -- and I won't even say which

3    casino it is -- if there is objection, I won't do it.

4          **MR. GILL:**  Let me caucus with my team and perhaps we

5    should -- the parties should caucus together.  I think

6    certainly for -- it's less of a concern for the

7    trademark-related claims.  For the trade dress claims, I think

8    the law is pretty clear that Your Honor needs to consider the

9    plaintiff's product, obviously as well as the defendants'

10   products, but also other relevant competitors so you understand

11   what the marketplace is like.  The different marketplaces are

12   different so you find different compositions or different

13   machines in different casinos.

14         So for us that may be fine for you as long as we're

15   sure that you're going to be able to see not only the

16   plaintiff's machines and our machines --

17         **THE COURT:**  Right.

18         **MR. GILL:**  -- because the case law makes it very

19   plain it would be error to decide the case just based on that.

20   You've got to also look at the full panoply of the marketplace.

21   As long as we know that you have the ability to go to the right

22   destination and see that and experience that, that may be fine,

23   okay?

24         **MR. RUBMAN:**  Your Honor, we have no objection.  It

25   would be great, if you could do that.

1    **THE COURT:**  All right.  Well, I do think it's

2    something that you need to talk to your clients about, because

3    I would share the same concerns that Mr. Gill does, and not as

4    a lawyer to personally give my go-ahead.  Because as he states,

5    this is multi-faceted and you need to make sure that I decide

6    this on all of the factors rather than just a few.  It's

7    difficult to control when a federal judge is just wandering

8    about.

9        I did happen years ago to go through the Cherokee

10    Casino long ago.  I wasn't focused on the games.  I was mainly

11    focused on all the elderly people pulling their oxygen behind

12    them as they're going from game to game plugging the machines

13    which I found to be very depressing.  But --

14    **MR. GILL:**  And probably smoking cigarettes at the

15    same time.

16    **THE COURT:**  Yes.

17    **MR. GILL:**  Right.  Well, we appreciate Your Honor

18    giving us that thought and we will caucus as a group and give

19    you a response.

20        There are some additional issues.  To the extent Your

21    Honor doesn't have anything else you want to raise with us, I

22    have some issues I wouldn't mind raising with Your Honor, if

23    now is a good time.

24    **THE COURT:**  Please.

25    **MR. GILL:**  All right.  First of all, one of those

1    is, do you want or will you accept opening statements from the

2    parties?  Without being presumptive and speaking for the

3    plaintiff, it is our view for the defendants that you are as

4    prepared and knowledgeable at this point in the case, having

5    ruled on a lot of motions and reviewed a lot, that we really

6    don't feel like an opening statement is necessary in this case

7    and we begin trial and we're ready to start with the

8    presentation of evidence.  That being said, obviously we're

9    mindful of the fact this is your courtroom and we'll give you

10   whatever you want and you feel like is helpful.

11            **THE COURT:**  I do think here, given the many

12   claims -- relatively many claims here, that if you can distill

13   -- it's possible for the plaintiffs, for instance, to distill

14   their claims and say, this is what we're asking for and this is

15   our focus, and the defense to respond, you know, these are our

16   defenses, I do think it would be helpful.

17            **MR. GILL:**  Okay.  Do you -- I'm guessing you're

18   going to want to impose some sort of limit on that as well?

19   Have you thought about what limit you would like the parties to

20   use in terms of an opening?

21            **THE COURT:**  Well, my suitemate in state court used

22   to say, "The United States Supreme Court allots 30 minutes per

23   side on the most important cases in the country and this ain't

24   one of them."  So I would say 30 minutes per side would be

25   fine.

```
 1           MR. GILL:  Very good.  And on the flip side of that,
 2    when this trial is over, I understand you're going to be
 3    wanting proposed findings of fact and conclusions of law from
 4    the parties --
 5           THE COURT:  Yes, sir.
 6           MR. GILL:  -- and there may be legal briefing in
 7    support of that as well?
 8           THE COURT:  Correct.
 9           MR. GILL:  I'm guessing at that point you don't need
10    a closing argument because we'll be submitting extensive
11    written materials; is that correct?
12           THE COURT:  Correct.  Now, obviously I would expect
13    Rule 50 motions.
14           MR. GILL:  Yes, sir.
15           THE COURT:  Yes, sir.
16           MR. GILL:  Yes, sir.  We'll be prepared to do that,
17    no question.
18           THE COURT:  Right.  Because there very well may be
19    opportunities to reduce certain of the claims.  You know, we've
20    discussed them today --
21           MR. GILL:  Right.
22           THE COURT:  -- you know, some of these know-how
23    claims.
24           MR. GILL:  Yes, sir.  Yes, sir.  And we're mindful
25    of the fact that we're not trying to try the case -- pretry the
```

1    case today necessarily.  We just want to know what's -- you

2    know, what the rules are --

3              THE COURT:  Right.

4              MR. GILL:  -- when we show up here on the 16th.

5         With regard to the rule on witnesses, what's the rule

6    with respect to experts?  Our view is that it's helpful in some

7    circumstances for experts to be able to see the testimony

8    that's coming in from the fact witnesses; or if not that, to

9    have the ability to review a transcript.  Those are things that

10   are verboten for fact witnesses when the rule is invoked so we

11   want to raise that with you as well.

12             THE COURT:  That's always been my approach.

13             MR. GILL:  All right.

14             THE COURT:  Now, how does that interact with the

15   confidentiality?

16             MR. GILL:  Well, the experts are covered under the

17   protective order and have the ability to receive and review

18   information on the protective order so I don't think the

19   protective order is implicated by that at all.

20             THE COURT:  All right.  I just wanted to make sure

21   all of the experts were covered here, all right?

22             MR. GILL:  Right.  With respect to the order of

23   proof, I've seen this obviously done a couple of different

24   ways.  It depends sometimes if it's a jury trial or a bench

25   trial.  It does affect the Rule 50 analysis; that is, does the

1    scope of cross-examination, is it limited to the scope of

2    direct; or do you want us to rather put on a witness and have

3    that witness testify one time and be done?

4         That affects, for example, my planning a little bit

5    logistically.  I have been asked by the plaintiff to produce a

6    couple of witnesses for them to be able to examine those

7    witnesses in their case in chief.  To be candid, I feel like

8    it's my obligation to produce for them witnesses that I plan on

9    calling in my case so they can call them in their case, if they

10   wish.

11        If I have to -- and none of my witnesses are local.  So

12   if I have to fly those witnesses here twice, that presents an

13   extra challenge for me; or if I have to have the witness fly

14   here and remain here for an extended period, that's an issue

15   for me as well.

16             THE COURT:  Right.  Well, typically lawyers in this

17   community permit more expansive examination of witnesses who

18   are outside -- from outside the jurisdiction --

19             MR. GILL:  Right.

20             THE COURT:  -- to accommodate them, their schedule,

21   and the cost to the parties.

22        Now, that may affect Mr. Rubman's estimate of five

23   days.  And, you know, I've had judges -- I've never had to do

24   this -- have a stopwatch on an attorney.  But that would be my

25   general approach.  I think it's more reasonable to accommodate

1   those witnesses to allow you to go beyond the scope of direct.

2           **MR. GILL:**  Right.  I think it is too.  And let me

3   volunteer that where I have had that experience, to be able to

4   cross-examine a witnesses in a more fulsome matter and not be

5   limited to scope of direct, sometimes that eliminates the need

6   for me to call that witness in my case at all.

7           **THE COURT:**  Right.

8           **MR. GILL:**  And so that shortens my case.  So it may

9   lengthen the plaintiff's case on the front end and it lengthens

10  the defense case on the back end but I think it's a zero-sum

11  game.  I don't think doing it that way adds any time to the

12  trial at all.  I think as a practical matter it probably

13  shortens it.

14          **THE COURT:**  I think it could lengthen it.  It's not

15  been my experience that that occurs.

16          **MR. GILL:**  Right.  So --

17          **THE COURT:**  Any view from plaintiff?

18          **MR. SWANSON:**  We're fine with that, Your Honor.

19          **THE COURT:**  All right.

20          **MR. GILL:**  All right.  Thank you, Judge.

21          The parties received an e-mail from your clerk,

22  Ms. Perkins, who obviously is in charge of keeping the trains

23  running on time here, and asked the parties to submit three

24  copies of all the exhibits in this case.  That's something I

25  wanted to raise with you, too, because we have so many and some

1  of them -- some individual exhibits are extremely lengthy.  So

2  there's some here that are more than a thousand pages for just

3  one exhibit.

4          I was wondering if we could perhaps relax the rule a

5  bit here.  I believe counsel is in agreement with that.  That

6  each side would produce obviously one hard copy of everything

7  for you, you've got that for your record.  But if we're going

8  to have multiple copies of this record, it is going to be

9  extremely voluminous and bulky and take up more of your real

10  estate.

11          **THE COURT:**  The first problem that jumps to mind is

12  that if there's only the original, which we normally allow you

13  then to -- we turn back to you, then we have nothing to refer

14  to.

15          So you're suggesting one original that the witness

16  would see, but then do I have an opportunity to make notes?  I

17  mean, that would make it very difficult for me to --

18          **MR. GILL:**  I understand.

19          **THE COURT:**  -- say, give me that, reach over to the

20  witness stand and take it and make notes on it, highlight it,

21  that sort of thing.

22          **MR. GILL:**  Sure, sure.

23          **THE COURT:**  Well, unless you can provide it to the

24  witness electronically.

25          **MR. GILL:**  Well, that's actually exactly where I was

1    going.

2              THE COURT:  All right.

3              MR. GILL:  It is our intention to present most, if

4    not all, of our evidence in an electronic form.  I understand

5    you need at least one hard copy for purposes of your record and

6    purposes of maintaining a record for purposes of any appeal but

7    I prefer the electronic presentation.  I think it's easier, I

8    think it takes less time, I think it's more impactful than just

9    a regular paper presentation, and that may reduce the need to

10   have multiple paper copies of what is a voluminous record.

11             THE COURT:  Well, that would at least reduce one

12   copy.

13             MR. GILL:  Sure.

14             THE COURT:  The other problem, though, is if we need

15   to have one copy for purposes of appeal --

16             MR. GILL:  Sure.

17             THE COURT:  -- then I can't mark on that copy.

18             MR. GILL:  Sure so you want a working copy you can

19   markup, et cetera?

20             THE COURT:  Yes, sir.

21             MR. GILL:  Okay.  Well, we're happy to do that.

22                *(Discussion held off the record)*

23             THE COURT:  Yes, sir.

24             MR. RUBMAN:  I'm glad we're trying to work through

25   this issue.  One idea that we wanted to suggest is we will give

1    you a full set of paper so you have one full set of everything,

2    if you want it.  For each witness that we are going to call,

3    whether on direct or doing our cross, we will bring a witness

4    binder that has the exhibits most likely to be used.  We will

5    give you a copy, we'll give the witness a copy, and we can give

6    the clerk a copy so you can take your notes in that binder.  It

7    will be called the Sevigny direct binder, presumably they would

8    bring a Sevigny cross binder, and that's something you could

9    keep and take whatever notes you want.  The witness would have

10   it.  The witness would also see the exhibits show up on the

11   monitor that we'll have a tech person here.

12            And then at the end of the trial, or whenever you want,

13   we would also suggest that we give to the court an electronic

14   copy of everything that was admitted.  So we'll give you a

15   CD-ROM or a drive that has every exhibit that's been admitted

16   so you --

17            **THE COURT:**  Searchable?

18            **MR. RUBMAN:**  I'm sorry?

19            **THE COURT:**  Searchable?

20            **MR. RUBMAN:**  Searchable.  It would be on there by

21   exhibit number.  But that would mean you would have one full

22   hard copy, if you still want it.  You would get the binders

23   from -- a copy of the binder that's given to the witness that

24   should have most, if not all, of the exhibits they're using.

25   Then you would also get an electronic set of the exhibits that

1  are admitted.

2       **THE COURT:**  So you're proposing having hard copies

3  in notebooks for the witness and the court and the record?  So

4  you're proposing having three actual hard copies, plus an

5  electronic copy after trial?

6       **MR. RUBMAN:**  Yes.  And if you wanted a full

7  hard-copy set, we could do that.  I would recommend for any

8  extra-long documents, maybe things above 25 pages or whatever,

9  we just put in the first 25 pages and then supplement it, if we

10  actually use that exhibit later, just to save a few trees here

11  and some space.  But that's up to you.  There are some long

12  exhibits, some of which won't get used.  I know the parties, as

13  often happens, tend to put more on the exhibit list than

14  they'll ultimately use.

15       **THE COURT:**  Correct.  Let me counsel here.

16              *(Discussion held off the record)*

17       **THE COURT:**  Don't say this old dog ain't willing to

18  learn new tricks.  I'm willing to just go electronic entirely.

19  Can we then instead of having separate notebooks for each

20  witness, just present it to the witnesses electronically?  I'll

21  take extensive notes and note the exhibits and we'll just

22  search the electronic database after trial.

23       **MR. RUBMAN:**  We're happy to try that.  It does tend

24  to lead to some more leading questions if we have to point --

25  if we have to tell the hot-seat guy what page to show on the

1    screen.  But assuming there's -- this is a bench trial.  I

2    assume we're going to be a little flexible on our pointing them

3    to the right parts of the document.  I mean, in that case the

4    witness doesn't have a physical document to flip through.

5              THE COURT:  Right.

6              MR. RUBMAN:  So it just -- I mean, would you allow

7    us to give a binder, if we want, if we think that will make it

8    go faster?

9              THE COURT:  If you'd like to.  I mean, Mr. Gill,

10   your thoughts?

11             MR. GILL:  Well, my only concern is that, I mean,

12   the plaintiff had originally listed 1,080 exhibits.  So if we

13   don't get a copy of whatever that binder is they're giving the

14   witness, then we're scrambling to get access to whatever

15   documents there are.

16        So in theory, it sounds like a good idea but I don't

17   want to be having to spend time when I should be paying

18   attention to what the witness is testifying to looking for

19   whatever the appropriate document is.

20             THE COURT:  All right.  So maybe I misunderstood

21   your proposal.  Under your proposal, you would not present a

22   copy for the court, but you'd demand one from the plaintiff's

23   attorney?

24             MR. GILL:  Well, if we're going electronically and

25   there's no binders, then everybody sees it at the same time,

1    there's no issue, you know.  So --

2         **THE COURT:**  Okay.  I thought you were professing

3    difficulties with that approach.

4         **MR. GILL:**  So if that's what you're doing, if we're

5    just, you know, displaying the documents electronically to Your

6    Honor and the witness and all counsel at the same time, I think

7    that's fine.

8              *(Discussion held off the record)*

9         **THE COURT:**  Let's try to go all electronic.

10        **MR. GILL:**  Okay.  Very good.  Then we will do that.

11             With regard to the protective order, I mean, obviously

12   we have a protective order in this case that addresses both

13   confidential and highly confidential information.  I don't

14   know -- the order suggests that Your Honor will address issues

15   regarding presentation of evidence that's affected by that

16   order at trial.  I don't know how that is or what -- you know,

17   what sort of protocol Your Honor wants to put in place for

18   this.  But a related issue is, is the courtroom going to be

19   sealed?

20        **THE COURT:**  Specifically, what are you concerned

21   about with regard to confidential and --

22        **MR. GILL:**  Well, obviously certain discovery

23   material has been designated by the parties under the

24   protective order.  And, you know, with regard to presentation

25   of evidence in the courtroom, ordinarily if I'm representing a

1    corporate client, I'm going to have a corporate representative

2    present in the courtroom.

3              THE COURT:  Right.

4              MR. GILL:   The corporate representative is going to

5    be present in the courtroom when there's testimony of highly

6    confidential and confidential documents being flashed on the

7    screen.  Seems to me that's just inherent in the nature of

8    having a trial in a case like this; correct?

9              THE COURT:  Sorry.  I didn't pick up on that obvious

10   point with your first mention.

11             MR. GILL:  Right.

12             THE COURT:  Mr. Rubman, your thoughts?

13             MR. RUBMAN:  If the question is whether the

14   courtroom should be sealed at times, I think the answer's yes.

15   There are going to be sensitive trade secrets and confidential

16   information on both sides disclosed --

17             THE COURT:  But exclusion of corporate

18   representatives?

19             MR. RUBMAN:  Yeah, that's what I was going to get

20   to.

21        If that is a separate issue, I think it depends

22   somewhat on who that corporate representative is.  I know

23   there's already been issues that you've ruled on with respect

24   to Mr. Watson and, you know, I think the same concerns that we

25   express there would apply.  I don't know who the witness would

1   be -- or who the corporate representative would be but we do

2   have concerns.

3        Our corporate representative, the person we would

4   submit to go through it, would be the general counsel so we

5   think there's less of a concern from a business side.  We're

6   doing that partly to address this issue to not make it as

7   acute.  But I think in that sense, it will depend on who it is.

8        THE COURT:  So would your proposal be then that we

9   just go step by step with regard to, say, particular witnesses

10  or particular documents, and then you would approach -- or ask

11  that the courtroom be sealed and certain individuals excluded

12  during that portion of the trial?

13       MR. RUBMAN:  I reluctantly say yes.  I think that

14  both sides will have to be careful and sensitive to the need

15  for there to be an open courtroom, but there are things where I

16  think we would -- our position should be that it should be

17  sealed.  I think there's a lot of internal back and forth and

18  documents and I'm less concerned about some of the e-mails.

19  But when we start getting really about trade secrets and

20  confidential business information, we would request that the

21  courtroom be sealed.

22       We can -- we can try to put all of that together for a

23  certain -- like if a witness is going to testify on -- like

24  Stacy Friedman is going to testify about trade secrets and

25  trade dress issues and trademark issues -- I guess mostly trade

1  dress issues -- we would do our best to keep the trade secrets

2  apart so we can allow the corporate representative to see as

3  much as possible.

4          THE COURT:  Yes.  Right.

5          MR. RUBMAN:  But that would be our view.

6          THE COURT:  Mr. Gill, your thought as to that

7  approach?

8          MR. GILL:  Well, my thought is that as the defendant

9  in a trade secret action where it has been difficult at times

10 to figure out exactly what the nature is of the claims, I would

11 object to that.  I think my client has an absolute right to be

12 present in the courtroom at all times and see the evidence

13 that's being unfolded against them and to be able to advise me

14 how to respond to some of it.

15         I've been in a position where during the duration of

16 this case, I have been prohibited and we have strictly complied

17 with those requirements under the protective order to not share

18 highly confidential information to our client.  But when time

19 comes for trial, I need to be able to communicate with my

20 client about the claims and how to refute those claims and I

21 need somebody in the courtroom for the duration of the trial.

22 So I object to that.

23         And I also would note that the Tenth Circuit law on

24 this issue takes a certain position with respect to judicial

25 records, and obviously the record of the conduct of this trial

1   is a judicial record within the meaning of the cases.  I had

2   cited this Tenth Circuit case in my motion for relief under the

3   protective order to obtain consent to show certain highly

4   confidential information to limited Castle Hill personnel, and

5   it seems to me that's implicated about this as well.

6        I think it's a thorny issue.  I have had a trade

7   secrets trial in the Eastern District of Virginia where the

8   district court just flat refused to seal the courtroom and said

9   that that's one of the risks of a trial in this case.  But

10  there's no question my client has an absolute right to be

11  present for that and I strongly object to any suggestion that

12  they don't.

13          THE COURT:  You mean there's a constitution?

14          MR. GILL:  Yes, there is.  And I also want to say --

15  and, again, I think I understand where the plaintiff is going

16  in terms of its selection of its corporate representative.  On

17  the one hand, I think the plaintiff has the right to choose who

18  its corporate representative is.  Castle Hill also has some

19  sensitive information that we've produced in discovery in this

20  case.  It includes, but is not limited to, financial data.  And

21  if it includes Mr. Dunn, who is not only general counsel, but

22  also functions in a business role, as I understand it, based on

23  the settlement conversation we had in Oklahoma City, I have

24  concerns about him being able to hear some of that information.

25  But, again, we may not be able to control that when we're here

1    for the trial.  But that's something I didn't think we should

2    be addressing for the first time on the 16th.

3            THE COURT:  I think you're exactly right.  I think

4    these issues are fascinating.  I think courts often err in

5    sealing cases, the courtroom.  Clearly the pressure, which is

6    right-minded from the Administrative Office of the Courts and

7    the appellate courts, is that matters in cases and documents

8    should be sealed only when necessary.

9            I'm going to have to do a little bit of research as to

10   a corporate representative.  I've never been presented with

11   this issue in the 22 years I've been on the bench.  So I'm

12   sensitive to your concerns.

13           MR. GILL:  I appreciate that, Judge.  I have tried a

14   number of trade secrets cases and I've never had a corporate

15   representative excluded from the courtroom at trial.

16           THE COURT:  I've also had those sorts of arguments

17   made to me and I have found that the law is to the contrary.

18   So I'm going to -- I'm going to research the law and find out.

19           MR. RUBMAN:  And, Your Honor, we're happy to have it

20   go both ways.  We didn't mean to suggest that our person would

21   be able to sit through the whole trial.  If you're sealing it

22   for some things, we're happy -- we want it to go both ways.

23   We're not suggesting we should allow our corporate

24   representatives to hear everything.

25           THE COURT:  Sure, sure.  All right.  Any other

1    housekeeping --

2              **MR. GILL:**  Actually, one additional issue that's

3    exhibit related, Judge.  And that is -- and actually this is

4    probably a mooted issue based on your statement that you're

5    willing to go completely electronic.  But a number of the

6    documents in this case are Excel spreadsheets and they have

7    been produced in native format.  So we can display them on a

8    screen and they look nice on a screen and we can manipulate

9    them on a screen.  They're very difficult to print out and make

10   hard copies of.  They print out with a large number of pages,

11   you know, chopping up the data on different pages in a way it's

12   very hard to follow.

13             **THE COURT:**  Right.

14             **MR. GILL:**  But based on your ruling, I don't think

15   we're going to have an issue on being able to use those in a

16   good way.  The hard copy -- and we can certainly produce

17   electronic copies of everything.  If that's sufficient for you,

18   that's great.  I know for purposes of transmission of the

19   appellate record, I know that that's traditionally done

20   electronically now.  So it may be that we don't need to worry

21   about anything else for purposes of the record.

22             **THE COURT:**  It would seem to moot the problem.

23             **MR. GILL:**  I think that's right.

24             **THE COURT:**  Right.  Any housekeeping matters that we

25   have not discussed?

1    **MR. RUBMAN:**  Your Honor, Mr. Gill did a great job

2    going through our list as well so we're all set, except one

3    issue as I stand here.

4         The normal hours that you'd like us here, starting and

5    stopping for lunch, and then how long?  These are the important

6    things; we have to figure out where everyone's eating lunch.

7    But what's your preference on that?

8         **THE COURT:**  Well, my preference -- and we can

9    discuss this; I'm not set in stone at all -- but would be 9:00

10   to 5:00 with an hour, wherever the hour most appropriately

11   falls.  It doesn't need to be at straight up 12:00.  It could

12   be 12:30, it could be at 1:00, depending on whether we're close

13   to the end of a witness who could be put on an airplane and

14   sent off to do productive things.

15        **MR. RUBMAN:**  Sure.  Perfect.

16        **THE COURT:**  But that would be my recommendation.  So

17   that's -- well, that would only allow for seven hours per day.

18   Any thoughts?

19        **MR. RUBMAN:**  That's fine with us, Your Honor.

20        **THE COURT:**  Mr. Gill?

21        **MR. GILL:**  I think that's fine as well, Your Honor.

22        One related note on witnesses, and that is it may be

23   helpful for the parties to inform the court and opposing

24   counsel who they plan on calling.  So, for example, for the

25   plaintiff to tell us who they're going to put on on Monday, it

1    helps us be able to figure out what to do with regard to

2    management of our own evidence, particularly if scope of cross

3    is not limited to direct.  And vice versa.  We would obviously

4    do the same thing for them when we're in our case in chief,

5    telling them who we're going to put on the stand and what we

6    expect the presentation of evidence to be.

7              THE COURT:  Well, that's the normal practice around

8    here.  At a minimum, inform counsel the evening before who

9    you're going to produce the next day.  Is that what you're

10   suggesting?

11             MR. GILL:  We agree with that.

12             MR. RUBMAN:  Yeah.  I was going to suggest 48 hours

13   but we can -- maybe we can talk about it.

14             MR. GILL:  Sure, we can talk.  But that's fine.

15             THE COURT:  Can you do 48 hours?

16             MR. GILL:  I don't see why not.

17             THE COURT:  All right.

18             MR. RUBMAN:  And then we would -- we would --

19   normally I find that we also tell the court so that we can

20   submit something to the court so you know who's coming, if

21   you'd like.

22             MR. GILL:  If you want.

23             THE COURT:  It would be sometimes helpful.  Most of

24   the time it's more important that you know.  But obviously if

25   you can transmit that to opposing counsel, you might as well

1  let us know as well so I can maybe get ready for a particular

2  witness.

3       MR. RUBMAN:  Sure.

4       THE COURT:  Now, I don't want to suggest that at

5  straight-up 5:00 we're going to stop.  Obviously, again, if

6  there's a witness that we can get on a plane and out of town,

7  if we take an additional, you know, 35 minutes, we're going to

8  do that to accommodate that witness.  So --

9       MR. GILL:  Thank you, Judge.

10      THE COURT:  All right.  Anything else?

11      MR. RUBMAN:  Nope.  Thank you.

12      THE COURT:  All right.  When can you submit a

13  revised proposed pretrial order?

14      MR. GILL:  This is the first suggestion that -- or

15  thought we had on our side that we would need to submit a

16  revised order, Your Honor.  Do you mean based on today's

17  rulings?

18      THE COURT:  Correct.

19      MR. GILL:  Is there any reason -- we've asked your

20  court reporter for a transcript of today.  Is there any reason

21  why we couldn't just use that instead of revising the order?

22      THE COURT:  I would prefer a revised order.

23  Obviously, the record today will reflect my rulings on these

24  various issues that you've set out.  But it's not --

25      MR. GILL:  Correct.

1          THE COURT:   -- my practice to have a pretrial order

2   where you all argue about what cases -- or what claims are

3   going to be presented at trial.  I want a pretrial order

4   setting forth and governing the course of the trial based, at

5   least in part, on these rulings today.

6          MR. GILL:   Okay.

7          MR. RUBMAN:   Can I suggest -- we have our pretrial

8   briefs due on Monday, I believe.  How about a week from -- so

9   next Wednesday?

10          THE COURT:   That's fine with me.

11          MR. RUBMAN:   If that's okay with you?

12          MR. GILL:   We can live with that, Your Honor.

13          THE COURT:   All right.

14          MR. GILL:   And that actually unfortunately reminds

15   me of a couple other things --

16          THE COURT:   That's fine.

17          MR. GILL:   -- that we need to discuss.

18          THE COURT:   I'd rather address it today.

19          MR. GILL:   With respect to briefs, obviously the

20   parties submitted a document to Your Honor asking what Your

21   Honor wanted, and I think Your Honor said to us that this case

22   has been pretty well briefed, but if we felt the need to brief

23   something, we could file a brief of up to twenty pages.

24          With respect to, for example, when we had summary

25   judgment argument, the plaintiff had some significant

1    PowerPoint preparations they presented at the morning of trial.

2    We obviously hadn't seen those before and would not have a

3    chance to respond to something like that.

4         Can we have an understanding that whatever brief is

5    submitted is submitted on the deadline on the 9th and there's

6    not going to be any further submission on the morning of trial

7    that we don't have an opportunity to respond to?

8         **THE COURT:**  Well, if it's submitted on the morning

9    of trial, the court's not going to be -- have the opportunity

10   to read it.  So any -- don't we have a deadline for any trial

11   briefs?  That's typically in our schedule.

12        **MR. GILL:**  I think it's the 9th.  Right.  I think

13   it's the 9th, Your Honor.

14        **THE COURT:**  Which is next Monday?

15        **MR. GILL:**  Right.

16        **THE COURT:**  Well, that's the order of the court.

17        **MR. GILL:**  That's the deadline?

18        **THE COURT:**  Right.

19        **MR. GILL:**  All right.  And the only remaining is

20   to -- and this relates to the plaintiff's witnesses because the

21   plaintiff had identified, I believe, 20 witnesses on its

22   expect-to-call list and another 18, I believe, on the may call

23   should the need arise.  And I don't know if the plaintiff still

24   plans to call the may-call witnesses.  It seems to me that some

25   of them may be mooted.  I don't recall seeing a statement of

1    what the testimony would be from those witnesses.  So if the

2    plaintiff is going to call those witnesses, we would request

3    that as part of the revised pretrial order.

4         THE COURT:  I didn't scrutinize the appendices here

5    with regard to witnesses.  Was there expected testimony not set

6    forth in the -- well, there, I'm looking at appendix D, VGT

7    witnesses.

8         MR. RUBMAN:  Your Honor, I think the issue is is

9    that in your form pretrial order, it refers to identifying and

10   describe the testimony of the witnesses that you will call.

11        THE COURT:  Yes.

12        MR. RUBMAN:  And so that's what we limited it to.

13        THE COURT:  Yes, sir.

14        MR. RUBMAN:  And I understand defendants also

15   included descriptions for their may-calls, but we didn't

16   understand that that was required by your pretrial order.

17   That's the difference.

18        THE COURT:  Well, it looks to me, as I'm looking at

19   appendix E, you've describe what the witnesses on your may-call

20   list are expected to testify about.

21        MR. RUBMAN:  That's what Castle Hill did.  Ours is

22   -- ours is --

23        THE COURT:  Oh, I'm sorry.

24        MR. RUBMAN:  -- appendix D.  We included

25   descriptions only for our will-call list which is what we

1    understood the rule to say.

2               THE COURT:   Okay.  I would ask that you specify what

3    these may-call witnesses --

4               MR. RUBMAN:   Okay.

5               THE COURT:   -- are expected to testify about as

6    well.

7               MR. RUBMAN:   Sure.  We can add that.

8               THE COURT:   So you didn't even list those may-call

9    witnesses?

10              MR. RUBMAN:   The may-call are in the pretrial

11   disclosures --

12              THE COURT:   Yes, sir.

13              MR. RUBMAN:   -- which were submitted a few days or a

14   week before so they do have that list.  But in the pretrial

15   order, we understood that it was just limited it to the

16   will-calls was our reading.

17              THE COURT:   All right.  We'll take a look at that

18   language.  But I'd ask that you include then in your appendix D

19   those that you may call as well as the summary of their

20   expected testimony.

21              MR. RUBMAN:   Okay.

22              THE COURT:   All right.  Anything else?

23              MR. RUBMAN:   Thank you.

24              MR. GILL:   Nothing else from the defendant, Your

25   Honor.

1    THE COURT:  All right.  And have you all attempted

2  in any way to resolve this matter?

3    MR. GILL:  Yes is the short answer.

4    THE COURT:  All right.  The magistrate judge said he

5  would stand ready, if necessary.

6    MR. GILL:  Right.  I think at this point the

7  logistics of involving the magistrate judge might make that

8  difficult given the location of the parties.

9    In the ordinary case, counsel are, you know, integrally

10  involved in the discussions and negotiations.  There are --

11  it's my understanding is there are active discussions that are

12  underway between a representative of the plaintiff and the CEO

13  of my client which counsel are not in the middle of.  And it's

14  my understanding generally, not having been in the middle of

15  those negotiations, that they've actually made fairly

16  significant progress and that there remains a possibility that

17  this case may resolve.

18    MR. RUBMAN:  I just want to make sure the record's

19  not inaccurate.  We are involved and we're familiar with what's

20  going on, and I believe Mr. Jacobs is involved as well, who's

21  on the phone, from what we can tell.  There are -- there have

22  been drafts that have gone back and forth.  Whether we'll get

23  to the finish line or not is anyone's guess.

24    THE COURT:  All right.  Well, very well.  We'll

25  stand ready to try it, if necessary, and let me know if any

1    other issues pop up prior to trial.

2         We, I think, have our decks cleared.    No criminal cases

3    set for trial?  I guess we had the Tan case, which

4    interestingly is alleged theft of trade secrets from Phillips

5    66 by a Chinese national educated at Caltech.   FBI contends

6    that certain trade secrets with regard to the manufacture of

7    high-tech coke used in the production of metals for batteries

8    has been sent to China.  So interesting.  But I think the

9    attorneys who are trying to set up depositions of Chinese

10   nationals in Hong Kong are having some difficulties, as might

11   be expected right now.

12        Anyway, thank you all very much and we're adjourned.

13             MR. GILL:   Thank you, Judge.

14             MR. RUBMAN:    Thank you.

15                  *(The proceedings were concluded)*

16

17

18

19

20

21

22

23

24

25

*C E R T I F I C A T E*

I, Brian P. Neil, a Certified Court Reporter for the Northern District of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in above-captioned case.

I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 5th day of September 2019.

s/ Brian P. Neil
_____
*Brian P. Neil, RMR-CRR*
*United States Court Reporter*