IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA


VIDEO GAMING TECHNOLOGIES, INC.,    )
                                     )
            Plaintiff,     )
                                     )
-vs-                           )  No. 17-CV-454-GKF-JFJ
                                     )
CASTLE HILL STUDIOS, INC., LLC, et al., )
                                     )
           Defendant(s).    )


TRANSCRIPT OF MOTION HEARING

**BEFORE THE HONORABLE GREGORY K. FRIZZELL**

**UNITED STATES DISTRICT JUDGE**

JUNE 11, 2019


*REPORTED BY:*      *BRIAN P. NEIL, RMR-CRR*
                      *United States Court Reporter*

A P P E A R A N C E S

  **Gary M. Rubman and Peter A. Swanson,** Attorneys at Law, Covington & Burling, 850 Tenth Street N.W., Washington, DC, 20001, attorneys on behalf of the Plaintiff;

  **Neil K. Roman,** Attorney at Law, Covington & Burling, 620 Eighth Avenue, New York, New York, 10018, attorney on behalf of the Plaintiff;

  **G. Dean Luthey, Jr.**, Attorney at Law, Gable & Gotwals, 100 West 5th Street, Suite 1100, Tulsa, Oklahoma, 74103, attorney on behalf of the Plaintiff;

  **Robert C. Gill, Henry A. Platt, and Matthew J. Antonelli,** Attorneys at Law, Saul, Ewing, Arnstein & Lehr, 1919 Pennsylvania Avenue N.W., Suite 550, Washington, DC 20006, attorneys on behalf of the Defendants;

  **Jonathan S. Jacobs,** Attorney at Law, Zobrist Law Group, 1900 Arlington Boulevard, Suite B, Charlottesville, Virginia, 22905, attorney on behalf of the Defendants;

  **James C. Hodges,** Attorney at Law, 2622 East 21st Street, Suite 4, Tulsa, Oklahoma, 74114, attorney on behalf of the Defendants.

Tuesday, June 11, 2019

* * * * *

**DEPUTY COURT CLERK:** This is Case No. 17-CV-454-GKF-JFJ, Video Gaming Technologies, Inc. v. Castle Hill Studios, LLC, et al. Counsel, please state your appearances for the record.

**MR. LUTHEY:** Dean Luthey here for the plaintiff.

**MR. RUBMAN:** Good afternoon. Gary Rubman on behalf of the plaintiff.

**MR. ROMAN:** Good afternoon, Your Honor. Neil Roman also from Covington & Burling for plaintiff.

**MR. SWANSON:** Good afternoon, Your Honor. Peter Swanson, Covington, on behalf of plaintiff.

**MR. GILL:** Good afternoon, Your Honor. Robert Gill from Saul, Ewing, Arnstein & Lehr on behalf of the defendants.

**MR. PLATT:** Afternoon, Your Honor. Henry Platt on behalf of the defendants.

**MR. ANTONELLI:** Good afternoon, Your Honor. Matthew Antonelli, also from Saul, Ewing, Arnstein & Lehr, on behalf of the defendants.

**MR. HODGES:** James Hodges for the defendants, Your Honor.

**MR. JACOBS:** Hello, Your Honor. Jonathan Jacobs with the Zobrist Law Group on behalf of defendants.

**THE COURT:** Good afternoon, all. If there's no

1    objection, let's start with the plaintiff's motion for partial

2    at docket 178.  You all can assume that the court's familiar

3    with the arguments, and I'd be pleased to hear any additional

4    focus that you'd like to bring to the issues.

5              MR. RUBMAN:  Good afternoon, Your Honor.  Again,

6    Gary Rubman from Covington & Burling on behalf of Plaintiff

7    VGT.  Before I begin, may I hand up some slides to Your Honor?

8              THE COURT:  Oh, of course.

9              MR. RUBMAN:  And I have a copy for your clerk, if

10   that's okay.

11             THE COURT:  Please.

12             MR. RUBMAN:  Thank you.

13             THE COURT:  All right.  I'm told Covington won some

14   little case in front of the Supreme Court yesterday.  Is that

15   right?

16             MR. RUBMAN:  We did and we're very happy about that.

17   None of us were involved, it was our colleagues, Beth Brinkmann

18   and a few others, and it was a nice win.  I think we brought

19   together both sides of the court to a 6-3 decision so that

20   doesn't happen too often.  Although it was a patent case.

21             THE COURT:  At least it's not advertised very often.

22   I think that focus is always on the 5-4.  So --

23             MR. RUBMAN:  That is -- that is true.  But thank you

24   for acknowledging that.

25             I think we're going to bring up the slide there on the

1    screen as well.  And our plan, Your Honor, for this motion is

2    that I was going to handle part of it, which was the portion on

3    the affirmative defenses, and my colleague, Mr. Swanson, was

4    going to handle the portion on the trade secret.

5                 *(Discussion held off the record)*

6                 **MR. RUBMAN:**  Despite lots of testing -- this worked

7    earlier.  So thank you.

8                 **THE COURT:**  Off the record.

9                 *(Discussion held off the record)*

10                 **MR. RUBMAN:**  If we need to, we can just talk from

11    the handouts.

12                 **THE COURT:**  That's fine.

13                 **MR. RUBMAN:**  For the other slide deck, we do have

14    some sounds.  That won't work too well from the paper but we

15    will do our best.  My colleague, Neil Roman, will make the

16    sounds himself, if we need to.

17                 **MR. ROMAN:**  And they'll sound exactly alike.

18                 **THE COURT:**  Well, what we can do is get IT here

19    because I do think some of the sounds would be helpful.  Not

20    being --

21                 **MR. RUBMAN:**  Oh, we had it.

22                 *(Discussion held off the record)*

23                 **THE COURT:**  Not being a person with much experience

24    in these things, the two videos that were submitted in

25    connection with some of these motions were helpful to me

1    because I'd been reading about them.  But I'm not fairly clear

2    that I hadn't really conceived what those sounds would be like,

3    like the reel resolution sound and that sort of thing.  So --

4              **MR. RUBMAN:**  Yes.  Understood.  And we do have some

5    sound clips to hopefully help Your Honor.

6                    *(Discussion held off the record)*

7              **MR. RUBMAN:**  Your Honor, I heard what you said about

8    having read the briefs and having seen all the decisions come

9    out.  I know your chambers have been working very hard.  So I

10   don't want to stand here and repeat what's in the briefs.  The

11   slides, I think, do a good job of summarizing our positions,

12   most of which is reflected -- or all of which is reflected in

13   the briefing back and forth.  There are just a couple points I

14   think are important on the issue of the affirmative defenses

15   that I'll just address briefly and then I'm happy to respond to

16   any questions you may have.

17             First, I believe the case law is fairly clear in our

18   minds that these are narrow defenses, and for these defenses to

19   apply, they need to be closely tied to the specific causes of

20   action.  Here, we've given three quotes.  These are all in the

21   briefs.  There's also other cases.  But the takeaway from these

22   is that you can't just assert unclean hands or illegality in

23   any case for any reason.  It has to be closely tied to the

24   cause of action; in this case, trademark, trade dress, and

25   trade secret.

1    You know, I think in some ways -- perhaps the easiest

2    way to resolve this dispute or this part of the motion is just

3    to look at their disclosures during discovery.  Here, we gave a

4    brief timeline of -- we requested information about these

5    affirmative defenses back in January 2018.  We never got them.

6    They said that they were going to supplement; they never did.

7    I think that alone is a basis to grant our motion with respect

8    to both illegality and unclean hands.

9    I'll pause on this slide just because it lays out the

10    elements for unclean hands and I don't think there's meaningful

11    dispute on this.  I think there was maybe some disagreement at

12    the margins but you'll see here that there's four elements.

13    You know, there's got to be some degree of something improper,

14    whether it's fraud, deceit, unconscionability, or bad faith.

15    And there, there might be a little bit of a disagreement over

16    exactly what's required, but I think the gist is everyone

17    agrees something along those lines is required.

18    Then the next two ones, I think, are the key ones and

19    perhaps the easiest ones to focus on for purposes of this

20    motion.  They have to be directly related to the matter at

21    issue and they have to have injured Castle Hill.  I think both

22    of those issues, I think, are the most straightforward ways to

23    say that their defenses of unclean hands and illegality are not

24    related to the matters at issue and they do not involve injury

25    to Castle Hill.

1    You know, I'm reluctant to march through our slides

2    here, which again are largely repetitive of the briefing.  I

3    think a lot of the arguments come down to those issues so I'm

4    happy to pause there and answer questions or keep going, if

5    it's of help to, Your Honor.  I don't want to be unproductive

6    with your time.

7            THE COURT:  Well, let me cut to the chase here.

8    Because at least in reading the briefs, the court's thought was

9    that the only matter that unclean hands might apply to here

10   because there's not been sufficient evidence to create a

11   genuine issue of fact, for instance, as to whether VGT's

12   products failed to comply with NIGC regs.  I don't see that the

13   asserted regulatory noncompliance is related to the conduct

14   here at issue.  But to a certain extent, we're sitting here

15   trying to conjure up, like we do so often with pro se habeas

16   corpus defendants, what this possible claim could bear to.

17           As we looked at a recent decision by Judge Brimmer in

18   Colorado, where he addressed the issue of disgorgement of

19   profits, he said that courts must weigh the equities to fashion

20   a remedy that matches the harm, and the considerations of

21   equity that he related had been articulated by the Second

22   Circuit which includes five factors, including plaintiff's

23   unclean hands.

24           So as I sit here right now, we're wondering whether or

25   not insofar as VGT seeks disgorgement of profits, and in so far

1    as the court, if it accepts Judge Brimmer's approach, must

2    weigh the equities to fashion a remedy that matches the harm,

3    the court could consider plaintiff's alleged unclean hands with

4    respect to the trade dress claim.

5         Any thoughts in that regard?

6         **MR. RUBMAN:**  Sure.  And in particular, with respect

7    to the regulatory theory?  Is that the question?  That's the

8    way I understood the question.

9         **THE COURT:**  Well, frankly, we thought as opposed to

10   regulatory.  Because I don't see anything here, any evidence,

11   of noncompliance with NIGC technical standards at all, let

12   alone related to the conduct at issue.  I was looking at the

13   allegations that recent changes to trade dress increase the

14   likelihood of confusion.  And, of course, the first question

15   that begged itself is, all right, at what point do I judge

16   trade dress?

17        But to the extent that you're seeking equity here in

18   terms of disgorgement, don't I have to look at continuing

19   conduct?  And to the extent that they claim that you're now

20   adjusting your trade dress to increase the confusion more to

21   look like CH appearances, don't I have to consider the alleged

22   changes that occurred, what did they say, August of 2018, or

23   something like that, in your trade dress?  That could

24   potentially be unclean hands.  As I say, it's not my job to

25   make arguments for the defendant.

1           MR. RUBMAN:  Right.

2           THE COURT:  But we're trying to conceive of how

3   unclean hands could possibly be a defense here.  Go ahead.

4           MR. RUBMAN:  Understood.  And thank you.  The short

5   answer is no but I'll expand on that a little bit.

6           THE COURT:  Uh-huh.

7           MR. RUBMAN:  First, this is a new theory.  And I

8   mentioned --

9           THE COURT:  Well, it was raised in -- unclean hands

10  was raised generally.  But you're saying new theory to the

11  extent that they claim that there have been changes to trade

12  dress?

13          MR. RUBMAN:  Exactly.

14          THE COURT:  Okay.

15          MR. RUBMAN:  The first time we ever -- so in our

16  motion, we tried to predict the ones that we thought they were

17  going to raise and we got three out of four, the other three.

18  This one is the one we didn't mention because it was never

19  disclosed.  They didn't ever mention this, they never asked

20  about this in depos, as far as I know, they didn't serve an

21  interrogatory response at any time.  This is the interrogatory

22  that we served back in January and never got a response.  The

23  only response they said for any of these defenses that are

24  relevant they referred to laches and then they didn't say

25  anything else.  And then there's an e-mail from Castle Hill's

1    counsel saying that we will be supplementing these.  That was

2    included in the record.  I can give you the cite, if you'd

3    like, but then they never did.

4         And so then the next thing we heard -- we file this

5    motion.  In their opposition brief a few months -- or it worked

6    out to be a few months after the e-mail -- we hear about this

7    change theory, this game change theory.  That's the first time

8    we ever heard about it.

9         So there's been very little, if any -- essentially no

10   discovery on this, no ability to develop it.  All we have from

11   them is a two-page -- I believe it's two-page -- affidavit from

12   one of their employees, a gentleman named Dan Fulton.  Doesn't

13   include anything about dates.  Doesn't identify any games at

14   all.  Doesn't tie it to any of the games at issue in this case.

15   Includes very generalized allegations, some of which we don't

16   even fully understand.  You know, so that's kind of a starting

17   point.

18        Second point is, I mean, really what they're arguing

19   here is that VGT, who's been the market leader who filed this

20   case because it's concerned about consumer confusion, for some

21   reason had an incentive to make their games look more like the

22   defendants' games that they're accusing of confusion.  And

23   that's, in our minds, nonsensical, they wouldn't do that.

24   They've invested the time and effort in this case because they

25   want to avoid confusion, not create further confusion.  So

1    that's another problem with this theory.

2        But without more information, without any specific

3    testimony at this point, they don't have anything to create a

4    triable issue with other than an unsubstantiated declaration

5    that came late in the game with no support in it, no citations,

6    no exhibits.  There's not a triable issue of fact on this, and

7    it's not even clear whether they're even referring to any games

8    at issue in this case.

9        THE COURT:  Well, they were talking about the red

10   screen and talking about -- this is from memory -- but they're

11   talking about a tape, I guess, that would make your red screen

12   look more like theirs, all right, as I recall.

13       MR. RUBMAN:  That is one of them, yeah.

14       THE COURT:  So they were specific in that regard;

15   right?

16       MR. RUBMAN:  At that level but not with respect to

17   what games.

18       THE COURT:  I see.

19       MR. RUBMAN:  Are these referring to three-reel

20   mechanical games; for example, most of the ones at issue in

21   this case; or next-generation video screen games, which, you

22   know, our client does continue to develop, and those are not at

23   issue in this case.  There's not anything in the record to say

24   what they're even referring to.  And so it feels to me like a

25   last-ditch effort to save these affirmative defenses.  And, you

1    know, from what we've seen right now, we don't even know fully

2    how to respond to it because we don't even know what they're

3    exactly referring to.

4         The other point here -- and this is the last point on

5    this slide -- is that there's also a certain amount of irony

6    here.  They're referring to very minor changes that they allege

7    have happened, who knows when, and saying that those caused

8    confusion, those make things look more similar -- they make our

9    games look more similar to theirs.  When you take a step back

10   and think about our allegations against them, they're dwarfed

11   by comparison.  And so, you know, for whatever that's worth,

12   it's a little bit of -- that's why I say this is a little bit

13   of a Hail Mary.  There's no there there in my mind to create a

14   triable issue at this late stage of the game.

15         THE COURT:  Well, it's an interesting argument.  I

16   mean, simplistically, as I read it, they were accusing you

17   after you accused them of using the red screen of actually

18   adopting their improvements on your red screen.

19         MR. RUBMAN:  Yeah.

20         THE COURT:  I'm not sure that they can't do that

21   legally, I mean, to the extent that you're seeking equity;

22   right?  I mean, you're seeking disgorgement of profits; right?

23         MR. RUBMAN:  That, we are.  But for it to come into

24   the case as part of an unclean hands defense, they have to meet

25   the elements of an unclean hands defense, one of which is it

1    relates to our cause of action.  I hear what you're saying.

2    Second is injury to -- or the third is injury to Castle Hill.

3    You know, if they truly believe they're injured here, they're

4    always free to file a lawsuit claiming that we're somehow

5    infringing their rights.

6         **THE COURT:**  But they're not claiming that.  They're

7    just raising it as an affirmative defense.

8         **MR. RUBMAN:**  But it has to be harm to them, and I

9    haven't seen any harm to them that they've articulated as a

10   further problem here.

11        **THE COURT:**  As an affirmative defense, they have to

12   show harm to them?

13        **MR. RUBMAN:**  Yes.  I've put on the screen the

14   elements that I don't believe there's much dispute over.  That

15   has to be something we're guilty of, fraud, deceit,

16   unconscionability, bad faith; number two, directly related to

17   the matter at issue; three, that injured Castle Hill.  That's

18   what I meant by harm to them, injury to Castle Hill that

19   affects the balance of equities between Castle Hill and VGT.

20        I think that given what's in the record at this late

21   stage of the game and their failures to disclose this theory

22   earlier -- and I know that they say that they couldn't disclose

23   it earlier because of something with timing of depositions --

24   but even putting that aside, I don't believe that they can show

25   a triable issue of fact with respect to all four of these

1    elements on that theory.

2              THE COURT:  All right.  Unclean hands.  Illegality?

3              MR. RUBMAN:  Sure.  Again, I don't want to repeat

4    things that you've already read, and I think some of this is

5    similar to the discussion we just had.

6              THE COURT:  Right.

7              MR. RUBMAN:  My understanding is their illegality

8    defense, again, they've never really articulated in a discovery

9    response, but my understanding from their briefing is that it

10   focuses on the regulatory issue.  I heard what you said on that

11   so I don't want to belabor the point.

12            But on the screen, we've shown the elements which,

13   again, I don't believe are in dispute, but there has to be an

14   indisputable violation of the statute.  Again, has to relate --

15   there has to be a nexus between the use of the mark and the

16   violation and it has to be a material violation.  We might

17   disagree over exactly how those are applied, but those are the

18   three elements.

19            I think for all the reasons you articulated earlier, we

20   don't believe they can prove any of these.  But in particular,

21   indisputable violation of the statute, I think the evidence in

22   the record is just to the contrary.

23            THE COURT:  All right.  Thank you very much.

24            MR. RUBMAN:  Do you want to hear on the other issues

25   now from us or go and back forth on this one?

1          **THE COURT:**  Let's go back and forth because they're

2    really different.  Let's respond to the unclean hands and

3    illegality affirmative defenses.

4          **MR. GILL:**  I will, Your Honor.

5          **THE COURT:**  Yes, sir.  Mr. Gill.

6          **MR. GILL:**  Thank you, Your Honor.  There are several

7    things that I would like to cover in response to Mr. Rubman's

8    arguments.  The first, I think, is based on your comment that

9    you made a few minutes ago about not seeing a basis for the

10   illegality defense and I think we did address this in our

11   brief.

12         But the NIGC regulations that addressed the

13   grandfathering status that we raised is set forth at Section

14   547.5.  And to put a sharp point on it, the regulations require

15   that in order for a party to have games that qualify as

16   grandfathered, those games needed to have been manufactured in

17   their entirety by no later than November 10 of 2018.  So the

18   evidence that we cited in our brief is evidence that we

19   obtained from the plaintiff in discovery, which shows the

20   significant placement of games by the plaintiff in commerce

21   that were manufactured after that cutoff date of November 10 of

22   2008.  So it is that which is the basis for our illegality

23   defense; it's based directly on the NIGC regulations.

24         And so we have a fact, which we have, I think, pled in

25   our papers with specificity, that show a substantial number of

1    VGT games did not comply with the regulations.  Yet, the

2    plaintiff is claiming intellectual property rights based on its

3    games.  The regulations also require -- and one of their

4    overall overarching purposes of the regulations is to provide

5    for fairness in the gaming process.  That's set forth at

6    Section 547.4(a) in the NIGC regulations.

7         So the cases that address the illegality defense

8    require that -- well, they provide two opportunities for use of

9    the defense.  The first is for something that harms the public.

10   And based on the NIGC regulations and the stated purpose of

11   protecting the gaming public, we think we have fairly

12   implicated that factor that this defense is something that

13   relates to potential injury to the public --

14        **THE COURT:**  But has a court or government of

15   competent jurisdiction previously made a finding on

16   noncompliance in this regard?

17        **MR. GILL:**  No, no, Your Honor.  And I'm not so

18   contending as I stand here.  But I will also tell you that I

19   don't think it is a prerequisite for me to assert as a defense

20   illegal conduct that it have been adjudicated by another court.

21   I think it's fair and proper for me to assert that as a defense

22   here without having had a prior adjudication.

23        **THE COURT:**  How would you address then the argument

24   that the Trademark Trial and Appeal Board in this *General Mills*

25   case states that the better practice in trying to determine

1    whether a use of a mark is lawful under the one or more of the

2    myriad regulatory acts is to hold a use in commerce unlawful

3    only when the issue of compliance has previously been

4    determined by a court or a government agency having competent

5    jurisdiction?

6         **MR. GILL:**  I'm familiar with the precedent that was

7    cited.  First of all, I don't think it's binding on Your Honor.

8    And if we take into context what it is that I'm trying to do

9    here, I have not asserted a civil claim against VGT for the

10   recovery of monies based on illegal conduct.  What I'm doing is

11   I'm a defendant who's been hailed into court on various

12   claims -- intellectual property claims, trademark claims, trade

13   dress claims, trade secret claims -- and I'm wanting to use

14   this only as a defense.

15        And so what I don't want is I don't want you to be

16   unfairly limited in your consideration of this case as the

17   trier of fact, because as you know there's no longer any jury

18   in this case, and you have the right to consider this conduct

19   if there's an ultimate determination of liability in connection

20   with a determination of a fair and appropriate damage.

21        I think Your Honor put your finger right on it when you

22   were talking about the opinion from Judge Brimmer.  That's

23   exactly what we want.  We don't want you to be bound with your

24   hands behind your back and be unable to consider this conduct

25   as it relates to the plaintiff and our defense.  We think it's

1     a fair consideration for you to take into account.

2          I'm not asking for a judgment against VGT.  I'm not

3     asking for money damages against VGT.  But it is fair for me to

4     raise this as a defense in the case.  As the numerous papers in

5     this case allege, not only is this an issue, because one of the

6     openings for asserting this defense is it's something that

7     affects the public -- and as I've indicated to you a few

8     minutes ago, this is something that implicates the public based

9     on the fairness and the purpose behind the regulations -- but

10    it also affects us.  We are a competitor.  We have to compete

11    against them in this marketplace.  This allegation is that we

12    are competing against them including, among other things, with

13    games that are not properly and legally in the marketplace and

14    we don't think that's fair.

15         How does that tie into certain of the claims in the

16    case?  Well, you're going to hear some arguments today about

17    secondary meaning, I expect, and how secondary meaning relates

18    to the claims of the defenses in this case.  Well, if you look

19    at the plaintiff's brief in response to our motion for summary

20    judgment, they have allegations in there about how they have

21    proven secondary meaning.

22         Well, there's two ways to prove secondary meaning.  You

23    can have direct evidence of secondary meaning so you might have

24    a survey that addresses it.  The survey in this case, which

25    Your Honor already ruled on, by Dr. Wind did not address

1    secondary meaning.  But there's no other survey to address

2    secondary meaning and there's no other consumer direct evidence

3    of secondary meaning.  So what we don't have in this case is,

4    we don't have direct evidence of secondary meaning.  So that

5    puts the plaintiff then in a position of trying to establish

6    secondary meaning through circumstantial evidence and that's

7    what they're trying to do.  So in their briefs, for example,

8    they recite how they have ███████████ in revenue from the prior

9    ten years of operations and they recount how they've expended

10   ███████████ in advertisement.

11       Well, you're going to hear from us that those

12   generalized statements about either revenue that was received

13   or advertising expenditures that were made are not sufficient

14   to be able to connect the dots and show secondary meaning.

15   Because if you look to the Tenth Circuit's commands to us from

16   the *Water Pik* decision, the Tenth Circuit said to us -- and

17   this is consistent with the holdings in other circuits as well,

18   it's not an aberration -- that in order to show secondary

19   meaning, you have to show a nexus between the advertising

20   expenditures and the particular trademark or trade dress at

21   issue.  And they don't do that.  So what they've got is they're

22   saying, hey, we spent ███████████ in advertising as a company

23   and we received ███████████ in revenue as company but they

24   don't tie it to specific things.

25       Well, one of my problems is, their secondary meaning

1   evidence is related to illegality because they've received

2   revenue from these illegal games and that illegal revenue is

3   part of that ████████ worth of revenue and those advertising

4   expenditures, I think, relate to advertising that would cover

5   those illegal games as well.  So the illegality defense is

6   something that is tied to both the public component and as to

7   Castle Hill.  That's how it's relevant to this case.  And we

8   want you in fairness to be able to consider it.

9        Now, I also would like to just factually correct a

10  misstatement.  Mr. Rubman indicated that the plaintiff had

11  asked us -- asked Castle Hill about affirmative defenses back

12  in January of 2018 and we didn't respond.  Illegality and

13  unclean hands were not asserted as a defense in January of

14  2018.  We didn't assert those defenses until we responded to

15  the plaintiff's first amended complaint which was filed in

16  July, mid-July, of 2018.  So when we filed our responsive

17  pleading to the first amended complaint, that's when we

18  asserted those defenses.  That was -- when that complaint was

19  filed, we were approximately two weeks out from the close of

20  discovery.  So that's the chronological progression with regard

21  to the defendants' assertion of those defenses when discovery

22  closed.

23        Now, what we don't have is, we didn't have any requests

24  from the plaintiff; for example, under Rule 56, to take any

25  further depositions related to this issue.  So the plaintiff

1    did not pursue that.  But with respect to the defense, the

2    defense was timely asserted in response to the first amended

3    complaint.  It wasn't pending earlier in the case.

4         I'd like to address also the colloquy between you and

5    Mr. Rubman about the issue that you asked about, Judge, which

6    was changes that were made to the game late in the process, and

7    this is something that we also addressed in our briefs.

8         The problem that we had is that, for example, the

9    changes that were made to the red screens to make the

10   plaintiff's red screen feature more like Castle Hill's red

11   screen feature, to the best we can tell, that change was not

12   implemented by the plaintiff in the marketplace until August of

13   2018 after the close of discovery in this case.

14        Did we ask about it in discovery?  Yes, we did.  And we

15   have the testimony, which we cited in our papers, from the

16   president of VGT, Mr. Jay Sevigny, who said we have not

17   previously had the technology in order to be able to implement

18   that change to our red screen feature because their feature

19   previously was basically having a red film present itself over

20   the screen.  They didn't have the technology to be able to do a

21   red screen feature that was more sophisticated than that.

22   That's something that Castle Hill has always done with its

23   machines and they have since implemented that.  So apparently

24   they have made the technological enhancements or adjustments to

25   their machines in order to be able to do this, and that wasn't

1    implemented, as near as we can tell, until August of 2018 so it

2    didn't fall within the discovery period.

3         So we didn't have an opportunity to address this in the

4    course of discovery, but that doesn't mean that it's unfair for

5    us to be able to address this issue because it does address the

6    issue of confusion in the marketplace which is directly

7    relevant to the plaintiff's claims against us at the time this

8    case goes to trial.

9         So we think, again, we are not pursuing a monetary

10   claim based on this.  We are only raising this as a defense to

11   the claims that the plaintiff has made against us in order to

12   be able to defend against these accusations.  So that's where

13   the record leaves us.

14        Now, I also want to just make clear for the record the

15   plaintiff's motion for partial summary judgment, in addition to

16   the trade secret allegations, addresses, as Your Honor knows,

17   these two defenses of unclean hands and illegality.  That part

18   of their motion is related closely to a motion in limine they

19   filed, which is technically not before the court today, where

20   they also seek to exclude at trial evidence of unclean hands

21   and illegality.  But that motion actually goes further and

22   seeks to exclude other evidence.  Basically, it seeks to

23   exclude evidence and argument in support of a defense theory of

24   the case.  It's not an affirmative defense; it's just a theory

25   of defense of the case.

```
 1          I don't understand that to be something that's up on

 2     this motion today.  To the extent Your Honor wants to address

 3     it, I'm happy to do that.  But I want to make clear for the

 4     record that by not addressing it, I'm not ceding any ground on

 5     that, I'm not abandoning any opposition to that motion, but

 6     that's not something that Mr. Rubman addressed in his remarks

 7     to Your Honor either.  I just wanted to make clear on the

 8     record that that's not something we understood to be up today.

 9          THE COURT:  So how do you respond to the court's

10     impression that at most the unclean hands affirmative defense

11     would apply to trade dress?

12          MR. GILL:  No.  I think it goes beyond just trade

13     dress.  The change to the games of the -- for example, the red

14     screen feature, that's a trade dress issue, but the illegality

15     and unclean hands defense more broadly -- I mean, the law

16     supports that defense for other claims --

17          THE COURT:  I thought we were talking about two

18     separate affirmative defenses, unclean hands on the one and

19     illegality on the other.

20          MR. GILL:  That's true.  That's true.  But on the

21     illegality issue --

22          THE COURT:  On the unclean hands affirmative

23     defense.

24          MR. GILL:  I think the unclean -- first of all, I

25     think they're related.  I think those two defenses are somewhat
```

1  related.  But I think that for the -- well, this actually

2  implicates that other motion that I just mentioned to you.  So,

3  for example, I think some of the subjects of that other motion

4  would be more fairly categorized as unclean hands evidence

5  rather than illegality evidence.  To me, the illegality

6  evidence is based on the regulatory scheme that I've already

7  addressed and other conduct relates more to the unclean hands

8  defense.  I think unclean hands defense relates to the trade

9  dress claim based on these features.  I think the illegal

10  defense relates to all the claims because all the claims

11  contain a monetary component and seek, you know, disgorgement

12  of the defendants' profits.  So I think the illegality defense

13  covers all of the claims.

14       **THE COURT:**  All right.  Anything else on affirmative

15  defenses?

16       **MR. GILL:**  Not on those two defenses, I don't think,

17  Your Honor, unless Your Honor has any further questions for me.

18       **THE COURT:**  No, sir.  Oh, sorry.  I do.

19       **MR. GILL:**  Okay.

20       **THE COURT:**  What is the exact nature of the alleged

21  noncompliance, the regulatory noncompliance?

22       **MR. GILL:**  The exact nature of the regulatory

23  noncompliance is the placing into commerce of games that were

24  manufactured after the cutoff date in the regulations of

25  November 10 of 2008.  Because those regulations, if you look

1    not just at the regulations themselves but also the comments

2    that interpret those regulations, made very clear that that

3    meant that that cutoff date of November 10 of 2008, that's for

4    any component part of those machines.  That would include the

5    cabinet, that would include the software, that would include

6    anything else, which is all part of what's described as the

7    gaming system under the NIGC regulations.

8            So in order to comply, all of those parts needed to

9    have been manufactured and "off the assembly line" by that date

10   in 2008.  If they were already manufactured but may not have

11   yet been assembled, then that's something that could still

12   comply with the regulations.  But for things manufactured after

13   that date, they just don't comply and those games are illegal.

14           **THE COURT:**  So with regard to the software that you

15   say is non compliant, what specifically is the allegedly

16   noncompliant software?

17           **MR. GILL:**  It was the software that was in place in

18   the machines before the 2008 deadline.

19           **THE COURT:**  And specifically what is that?

20           **MR. GILL:**  Well, it's the entirety of the software

21   that was used to run the system.  So part of the intent of the

22   regulations that we were talking about earlier with regard to

23   protecting the gaming public in fairness in gaming was

24   security-related concerns.  The NIGC was concerned that older

25   gaming systems, based on older software, were not secure enough

1    and they wanted to update the software in order to address

2    those security concerns.  That was, as I understand it, the

3    genesis of the concern about the software.

4                MR. PLATT:  Your Honor?

5                THE COURT:  Yes, sir.

6                MR. PLATT:  If I may just interject.  To answer your

7    question directly, ███████████████████  So it's VGT

8    ████████, which is not compliant, versus VGT ██████.  Sorry

9    to interrupt.

10               THE COURT:  Thank you.  Now, so that would be part

11   of -- with regard to software, VGT ██████, that would be part

12   of VGT's asserted trade secret?

13               MR. GILL:  Yes.

14               THE COURT:  All right.  So specifically, how does

15   VGT's alleged regulatory noncompliance then result in

16   unfairness or dishonesty to the public?

17               MR. GILL:  Well, only in the sense that it

18   implicates the overarching purpose of the NIGC regulations to

19   provide for fairness in gaming and to protect the public.  So

20   these were, you know, a modernization and security-related

21   concern in an overarching manner, and the concern was the older

22   machines didn't satisfy the current requirements for that.

23               THE COURT:  And then how do you allege that that

24   alleged regulatory noncompliance resulted in unfairness to you,

25   to Castle Hill?

1    MR. GILL:  Well --

2    THE COURT:  Because you had to comply and they

3  didn't?

4    MR. GILL:  Well, first of all, that's a, first of

5  all, true point and it's an interesting point.  Because, you

6  know, earlier in this case the plaintiff had alleged that we

7  had copied their source code which turned out to not be true

8  and turned out to be an allegation that they dropped.  We had

9  actually purchased most of our software as an over-the --

10  off-the-shelf, over-the-counter purchase and then modified it

11  to suit our needs because it was actually written for a

12  different type of game and we modified it for Class II games.

13  So our software is very different and more modern in nature.

14      But we have to comply -- we had to go through the cost

15  and expense to comply with those regulations which VGT didn't.

16  VGT has had the ability to enjoy revenue from those games that

17  weren't properly in the market to begin with, and VGT seems to

18  be relying on those games and the revenue from those games and

19  the advertising expenditures expended for those games in

20  support of its secondary meaning argument.  So we think that's

21  the nexus to Castle Hill.

22    THE COURT:  Okay.  Anything else?

23    MR. GILL:  Not unless you have any further

24  questions, Your Honor.

25    THE COURT:  No.  I think I need to give Mr. Rubman

1    an opportunity to reply on that.

2                **MR. RUBMAN:**    Thank you, Your Honor.    I'll be very,

3    very brief and there were only a few points that I was

4    intending to respond to unless you had questions.    I wasn't

5    going to respond to the whole secondary meaning thing.    I think

6    that's probably more relevant to the next -- to the other

7    motions.

8                **THE COURT:**    Yes.

9                **MR. RUBMAN:**    But, first, with respect to the timing

10   of the affirmative defenses, I perhaps didn't hear correctly.

11   But in Exhibit W in the briefing, which is Castle Hill's

12   response to our interrogatories, those are dated February 20th,

13   2018, they talked about unclean hands there, or at least they

14   acknowledged that there was an unclean hands affirmative

15   defense already in the case at that point.    This is on page 4

16   of those responses under the third affirmative defense.    They

17   say "Plaintiff's claims are barred or reduced by the doctrines

18   of estoppel, laches, unclean hands," and it goes on, "consent,

19   acquiescence, and/or waiver."

20         So it already was in the case, at least at the level

21   that some parties tend to assert affirmative defenses, where

22   they throw in -- I think they had 20 or 30 affirmative

23   defenses.    We said tell us the reasons for those and that was

24   the interrogatory.    So as early as February, we already had a

25   response in which they didn't tell us the response.    The only

1    thing that they said in that response was about laches.   So on

2    the issue of timing, I think that's something I just wanted to

3    note.

4         The only other point I was planning to make was on the

5    issue of -- you know, I didn't hear them say exactly what

6    regulations they claim our software violates.  I think they are

7    suggesting we violate maybe -- I don't know.  But they didn't,

8    I don't think, answered your question.  There is a bulletin

9    from the NIGC that we quoted in our reply brief -- this is on

10   page 4 and I think it starts at the bottom of page 3 -- where

11   it addresses this issue about adding a new game or new cabinet

12   to a system that's already in place that's grandfathered.

13        And so our understanding is that this addresses the

14   issue quite clearly and confirming there is no violation, which

15   is consistent with the fact that these games have repeatedly

16   been certified by the testing labs and the Indian gaming

17   regulatory bodies, that we don't think that there's a violation

18   there, and that's confirmed by the bulletin by they actually

19   cited in your brief but not this portion.  So we put a block

20   quote.  It's on page 4.  It's Exhibit 28 at page 7 of that

21   exhibit which we think is helpful on that point.

22        And unless you have questions, I don't have anything

23   further I wanted to respond to.

24             **THE COURT:**  I don't believe so.  Thank you very

25   much.

1              MR. RUBMAN:  Thank you.

2              THE COURT:  Just one second.

3                   (Discussion held off the record)

4              MR. SWANSON:  Good afternoon, Your Honor.  Peter

5    Swanson again.

6              THE COURT:  Good afternoon.

7              MR. SWANSON:  And would it be possible to pull up

8    the computer screen?

9         Okay.  Your Honor, I will be addressing the second

10   issue in our motion for partial summary judgment, the trade

11   secret claim with respect to the bingo card.  We're now getting

12   into -- I think we've been talking about maybe some

13   confidential.  We're now getting into some pretty sensitive

14   confidential issues, and I don't see any members of the public

15   in here, but certainly we would ask the court to seal the

16   courtroom if anyone from the public comes in.

17             THE COURT:  I doubt that anyone's going to come in

18   but we'll --

19             MR. SWANSON:  They're probably not --

20             THE COURT:  But if that occurs, just bring it to my

21   attention.  Go ahead.

22             MR. SWANSON:  Thank you, Your Honor.  And, again,

23   I'm happy to address any issues or questions that are of

24   interest to Your Honor.  Otherwise, I can walk through some of

25   the big-picture points and I'll try to keep this brief.

1          I think the first point is this is a motion for partial

2     summary judgment that we're bringing on one particular act of

3     misappropriation by Castle Hill.  There are -- as you may have

4     seen in the briefs, there are many other instances of

5     misappropriation of trade secrets and confidential information

6     which we intend to prove at trial.  But on this particular

7     issue, we believe the evidence is so one-sided, and, in fact,

8     undisputed, that summary judgment was warranted.

9          **THE COURT:**  Well, let me ask two overarching

10    questions then in that regard, or more.

11         First of all, you're really focused on both the bingo

12    card generation algorithm and the uniqueness testing algorithm,

13    which, as I understand it from my reading of these various

14    declarations, are really two separate things; correct?

15         **MR. SWANSON:**  That's correct, Your Honor.

16         **THE COURT:**  So when you say one thing, you're

17    talking about both of those algorithms together?

18         **MR. SWANSON:**  So they are two different algorithms.

19    They're closely related.

20         **THE COURT:**  Yes.

21         **MR. SWANSON:**  And I can explain how they relate to

22    one another.

23         **THE COURT:**  Yes.  I think those long declarations,

24    I've spent some time trying to understand them and so I've got

25    a rudimentary understanding.

1    So let me just ask then:  Some of these elements do

2  seem to favor VGT, but in our reading of the briefs it appears

3  to us that perhaps there are genuine issues of material fact

4  with respect to some of these elements.  Number one, the

5  existence of a trade secret; number two, whether or not Castle

6  Hill has raised a genuine issue of material fact regarding the

7  element of reasonable efforts to maintain secrecy; and then

8  finally, whether Castle Hill has raised a reasonable -- a

9  genuine issue of material fact as to the similarity between

10  VGT's algorithm and Castle Hill's algorithm.  Although, my

11  understanding from, once again, on a very rudimentary basis is

12  once Castle Hill had attempted to create its own algorithm with

13  regard to bingo card generation, it discarded that and then

14  adopted VGT's.

15    So those three things -- well, then and a fourth thing.

16  Is it possible under Virginia law that the confidentiality

17  agreement with Mr. Suggs and others is unenforceable due to

18  indefinite duration?  Specifically, I was looking here earlier

19  today on these more recent -- or at the more recent decisions.

20  I think it was in the Western District of Virginia and one of

21  the other districts, maybe Eastern District --

22          **MR. SWANSON:**  Eastern.

23          **THE COURT:**  -- 2017, 2018 decisions, and one

24  referenced a Fourth Circuit affirmance of one of those

25  decisions saying that the confidentiality agreement -- or such

1    a confidentiality agreement is unenforceable if it is of

2    indefinite duration.

3              MR. SWANSON:   Okay.  Happy to address all of those

4    issues.

5              THE COURT:   Yes, sir.

6              MR. SWANSON:   So maybe we can start with the

7    reasonable efforts to maintain secrecy, which comes first at

8    least in our presentation.

9         I think in this slide we've listed the material

10   undisputed facts that entitle VGT to judgment on this element.

11   The algorithm is implemented in source code, which is

12   maintained in a password-protected repository; the documents

13   that describe the algorithm are marked as confidential; the

14   testing lab's employees who have access to it are bound by

15   confidentiality agreements.  All of those are undisputed.  And

16   both Mr. Suggs, a Castle Hill employee and former VGT employee,

17   and our expert, Mr. Friedman, agreed VGT took reasonable

18   efforts, and Castle Hill's expert, Mr. Zeidman, does not

19   provide a rebuttal opinion on that.

20        I think the main argument that Castle Hill raises on

21   this element is something about the disclosure of operator

22   manuals.  They cite testimony of one VGT witness.

23             THE COURT:   Right.

24             MR. SWANSON:   The operator manuals are given to

25   customers and Castle Hill says, and not all customers have

1   confidentiality obligations.

2          THE COURT:  Right.

3          MR. SWANSON:  And the issue with that argument is

4   that they've not shown the algorithm is contained in those

5   manuals.  Operator manuals are higher level manuals that don't

6   describe the inner workings of the system and they don't

7   describe the bingo card algorithm.  We produced the operator

8   manuals in discovery and so they have them, and they've not

9   come forward and actually submitted them as part of the record

10  on summary judgment.  So there's no genuine dispute as to that

11  one.

12         THE COURT:  Well, it would be highly unusual for the

13  algorithms to be in operator manuals.

14         MR. SWANSON:  Exactly.  And the customers don't need

15  to know how the bingo cards are generated.

16         THE COURT:  Right.

17         MR. SWANSON:  And so the operator manuals are more

18  at the level of, you know, how do you run the software, how do

19  you, you know, maintain and service the machines, things like

20  that.

21         THE COURT:  So it's your position then, without

22  showing that the algorithms themselves are contained in those

23  operator manuals, Castle Hill has failed to raise a genuine

24  issue of material fact?

25         MR. SWANSON:  That's correct, Your Honor.

1          THE COURT:  Okay.

2          MR. SWANSON:  So moving on then to the not generally

3    known or readily ascertainable, so, you know, is this a trade

4    secret or, you know, is this something that's generally known,

5    as Castle Hill says, the first point on this one is, I don't

6    believe there's a dispute that it's not readily ascertainable,

7    which would be if you're playing the games can you figure out

8    how the bingo cards are generated?  I don't understand there to

9    be a dispute that that's not possible.

10         We also believe there's no genuine dispute as to

11   whether it's generally known.  Castle Hill does not dispute

12   that Class II companies typically do not disclose their

13   algorithms.  We've proffered evidence that VGT has not

14   disclosed this algorithm.  They have not come forward with any

15   evidence showing that it's been publicly disclosed anywhere.

16   And, again, Mr. Suggs agreed it's not generally known and our

17   expert agrees that it's not generally known.

18         THE COURT:  He does, however, say that -- and I know

19   this is self-serving, but he's saying it's simplistic enough in

20   approach that others with experience in client-server

21   architecture tour would think of the approach.

22         MR. SWANSON:  Yes, Your Honor.  And the problem with

23   that is that's not the relevant test in trade secret law.

24   That's more of a patent law issue, is something obvious.  This

25   is an argument, I think, that comes up in both sets of briefs

1    or motions.

2        But the Tenth Circuit in a couple of cases -- I think

3    both are applying Colorado law -- but this is a generally

4    applicable principle to trade secret law.  The Tenth Circuit's

5    made clear that obviousness and novelty are not the requisites

6    under trade secret law.  Trade secret exists to protect, you

7    know, hard work, discovery, things that would be valuable and

8    are kept secret and that would require time and effort to

9    compile.  They don't require the same level of invention as

10   patent law does.

11        So while we disagree with them, we think this actually

12   is a pretty unique, not obvious, and complex solution.  We

13   think that's not a germane dispute to whether it's a trade

14   secret.

15        THE COURT:  I believe the argument in response is

16   that -- citing a U.S. Supreme Court case -- is that secrecy in

17   the context of trade secrets implies at least minimal novelty.

18   So although novelty is a patent law concept, it's relevant

19   here.  Your response?

20        MR. SWANSON:  So the *Rivendell* case from the Tenth

21   Circuit that's cited, I believe, in our opposition to Castle

22   Hill's motion -- it's 28 F.3d 1042 -- that case makes clear,

23   along with other authorities that we've cited in both briefs,

24   that novelty is not a prerequisite for something to be a trade

25   secret.

1    I think -- and I'm not familiar with the exact context

2    of that statement in the Supreme Court case that Your Honor

3    mentioned.  But, I mean, certainly if something has been done

4    before and has been publicized, then that means it's generally

5    known.  And so in that sense, if something's, you know, not

6    novel and it's so kind of widely known, then it's not going to

7    be a trade secret.  So that may be the context in which that

8    statement was made, but otherwise novelty is not a requirement.

9    And I guess the other point I would make as a factual

10   matter, a Castle Hill has not come forward with evidence that

11   this is not novel.  I believe Mr. Suggs' testimony that Your

12   Honor referred to, I don't think he says someone else has

13   actually done this before.  I think he just says, I think it's

14   simple, I think someone could do it, I think someone else could

15   re-create it, but he doesn't say that it's actually been done

16   before.

17   Okay.  I think Your Honor also asked about similarity,

18   and there's also no dispute on this one.  I think the best

19   place to look for similarity is Castle Hill's response to our

20   statement of facts, paragraph 36 through 43.  That's where we

21   -- those paragraphs go through the ▉ steps of the algorithm,

22   the ▉ elements, and they didn't dispute any of those facts

23   that their algorithm has the exact same ▉ elements as the VGT

24   algorithm as we've set forth in our motion.  And in our view,

25   Your Honor, that's dispositive.

1    The issues that their expert raised, there were a

2    couple of issues about the specific implementation details.

3    That goes beyond the ███ elements that make up the trade secret

4    as we've defined it, and so it's irrelevant whether they have

5    those different implementation details.

6    You know, for instance, I think one of them has to do

7    with, are there 24 spaces on the bingo card or 25 spaces, which

8    if you have the free space or not.  We're not claiming that 25

9    spaces or 24 spaces is part of the trade secret.  So the fact

10   that they have a different number is not material.

11   **THE COURT:**  The last thing I raised was this -- I

12   found the case -- it's the *Darton Environmental* case.  That was

13   a Western District of Virginia case of 2018, and they cite an

14   Eastern District of Virginia case of 2015 affirmed by the

15   Fourth Circuit in 2017 for the proposition that the

16   confidentiality agreement is unenforceable.

17   **MR. SWANSON:**  Yes, Your Honor.  I'm not familiar

18   with the *Darton* case.  We cited a case in our brief, *Shire*,

19   from the Western District of Virginia that declined to follow

20   the two Virginia state court cases that Castle Hill has cited,

21   it's *LaserShip* and *BB&T*.  The court in that case said it was

22   unwilling to predict that the Virginia Supreme Court would

23   follow those two -- those are lower court Virginia cases -- and

24   the court said it was reluctant to find that the Virginia

25   Supreme Court would follow those cases in light of case law

1    distinguishing between noncompetes, where generally you can't

2    have a noncompete of perpetual duration and a confidentiality

3    agreement.   And so the court in *Shire* drew that distinction and

4    we think that's the right one here.

5         I think if you actually look at *LaserShip* and *BB&T*,

6    those two lower court Virginia cases, the *LaserShip* case was

7    focused not just on duration, but was focused on the scope of

8    the confidentiality agreement there.   The court says that it

9    found the agreement covered all sorts of information, including

10   information that was not confidential or proprietary, and it

11   would apply to disclosures to anyone, including a neighbor.

12   And so I think that distinguishes the *LaserShip* case and

13   probably, you know, influenced the court's decision there.

14        And then the *BB&T* case, which does talk about duration,

15   that relies solely on the *LaserShip* case.   And incidentally,

16   *the LaserShip* case doesn't cite any authority on this point, it

17   just made the finding.

18        And so I think the type of confidentiality agreement

19   that VGT had with Mr. Suggs and other employees, which notably

20   is similar to the confidentiality agreement that Castle Hill

21   has, which is also for a perpetual duration, these are very

22   common agreements and it's consistent with general trade secret

23   law, that something remains a trade secret until it ceases to

24   be a trade secret until it becomes generally known to the

25   public.   And so I think to find that these agreements are

1    unenforceable would be -- would be pretty remarkable.

2         I will have to look at the *Darton* case and I'd be happy

3    to get back to Your Honor on that.

4         THE COURT:  I'd hesitate to be the first court to

5    find them unenforceable but --

6         MR. SWANSON:  Yes.  The other point I would mention

7    on this issue, Your Honor, is putting aside the contractual

8    confidentiality duty, there's also in Virginia a common law

9    duty of confidentiality to your former employee.  And I did not

10   see Castle Hill disputing that point in their brief, and so I

11   think we can -- it's unnecessary to address the enforceability

12   of the contracts for that reason.

13        THE COURT:  Right.

14        MR. SWANSON:  So --

15        THE COURT:  All right.  Response?

16        MR. ANTONELLI:  Good afternoon, Your Honor.  Matthew

17   Antonelli again for defendants.  I'll be addressing the trade

18   secrets issues today.

19        So I want to start kind of towards the end of the

20   discussion you were having with Mr. Swanson regarding the

21   enforceability of Mr. Suggs' agreement.  Just one quick comment

22   on the *Shire* case which plaintiffs rely on for the proposition

23   that Virginia courts have not uniformily rejected

24   confidentiality agreements with indefinite durations in scopes.

25        What's interesting about that case is the posture it

1    was in at the time that the ruling that they cite was made, and

2    that was actually on a motion to dismiss where the court ended

3    up saying in its ruling that there were -- the court needed to

4    have a more fully developed factual record in order to really

5    understand the limits of what that agreement did or did not

6    provide for.

7          So the court here is not faced with that limitation;

8    you have a full factual record.  We've referenced specific

9    items from Mr. Suggs' agreement, and the significance of those

10   items are that it's indicative of VGT's entire approach to what

11   it considers to be its trade secrets and confidential

12   information because essentially they think it's everything they

13   ever do with respect to their business.  It's been an issue

14   that we've encountered throughout the case as we've really

15   drilled down on the specific trade secrets --

16          **THE COURT:**  Well, but even if that's true, we're

17   focused here on the algorithms, right, the bingo card

18   generation and the testing algorithm?  Correct?

19          **MR. ANTONELLI:**  Correct.

20          **THE COURT:**  I mean, surely that would be -- those

21   are things that would commonly be covered both by a common law

22   obligation and a contractual obligation if that's enforceable;

23   correct?

24          **MR. ANTONELLI:**  If the agreement is enforceable, it

25   would cover those items, yes.

1    **THE COURT:**  Okay.  Let me ask you then just

2    procedurally for purposes of summary judgment:  I note that in

3    paragraph 11 of the motion for partial summary judgment, VGT

4    states that VGT requires its employees to undertake

5    confidentiality obligations to VGT, and then that's undisputed

6    in docket 240, paragraph 11.

7          Based on this concession for the purposes of summary

8    judgment, do I even need to inquire as to whether the Suggs'

9    agreement is enforceable under Virginia law because you've

10   conceded it away?

11   **MR. ANTONELLI:**  I don't know that I agree that we've

12   conceded it completely away, Your Honor.  I think the

13   concession was that they require their employees to sign

14   certain agreements.

15   **THE COURT:**  I figured that's --

16   **MR. ANTONELLI:**  Whether that agreement is

17   enforceable or not when signed by an employee who's not a

18   lawyer when a document's stuck in front of their face and they

19   say, here, sign this or you can't work here I think presents

20   some different issues that the court can consider.

21   **THE COURT:**  All right.  Well, I anticipated that

22   argument.

23          So what court in Virginia has definitively said that

24   such agreements are unenforceable if they're of indefinite

25   duration?

1    **MR. ANTONELLI:** So there is not a universal rule in

2    that respect, Your Honor.  The cases that we cited in the brief

3    addressed the fact that courts routinely reject both

4    noncompetes and confidentiality provisions that have indefinite

5    scope or indefinite duration.  But we have not -- we've not

6    argued that it was a hundred percent in all cases that all

7    confidentiality agreements would be unenforceable.

8         I think when we look at the specifics of the

9    confidentiality agreement here -- and also Mr. Swanson raised a

10   point a little bit in passing about one of the cases and an

11   employer interpreting it as someone couldn't share something

12   with their neighbor.  I mean, here, we've actually dealt with

13   the issue of how restrictive VGT believes its agreements are in

14   the context of one of the other motions that's been filed and

15   briefed.  We understand it's not before the court today, but it

16   has to do with VGT's assertion throughout this case that Castle

17   Hill employees have violated their employment agreements by

18   potentially discussing certain issues with counsel in the

19   course of the defense.

20        So we actually have some more evidence here about how

21   broadly VGT really interprets their agreement.  The language of

22   the agreement actually dovetails into Mr. Suggs' testimony,

23   which we cited in our opposition, where he says, yes, I

24   signed -- you know, I signed a confidentiality agreement.  With

25   respect to the individual items that are at issue, with respect

1    to the bingo card generation algorithm, he says, well, no, I

2    never specified that that was necessarily one of the items that

3    was covered under my agreement.

4        So if you look at the agreement itself, it's written in

5    such broad language that anything that an employee worked on

6    while an employee at VGT, I believe VGT could -- would assert

7    that any discussion of that material later on would be a

8    violation of, you know, trade secrets or confidential business

9    information.

10        **THE COURT:**  But isn't it rather compelling to assume

11    that something of that importance would be covered by a

12    confidentiality agreement?  Isn't that kind of an integral part

13    of this software and game configuration?

14        **MR. ANTONELLI:**  Well --

15        **THE COURT:**  Both the bingo card generation algorithm

16    and the verified -- now, did Suggs work -- remind me:  Did he

17    develop the other algorithm, the uniqueness testing algorithm?

18        **MR. ANTONELLI:**  Mr. Suggs worked on both algorithms,

19    Your Honor.

20        **THE COURT:**  All right.  They're both pretty

21    important and pretty integral to this whole machine, aren't

22    they?

23        **MR. ANTONELLI:**  Well, I don't want to conceded that

24    the bingo card generation algorithm is a trade secret.  I think

25    that's a little bit of a separate issue.

1    THE COURT:  Right.

2    MR. ANTONELLI:  So if the court's question is, would

3    obvious trade secrets be covered by the agreement, I think the

4    answer is perhaps yes, but I do not agree that the bingo card

5    generation algorithm is a trade secret.

6    THE COURT:  All right.  Discuss the law with me here

7    briefly.  Because I read Judge Brinkema, who's fairly

8    well-known, he says in this *Brainware* case that -- of course

9    the context in which he made this statement perhaps describes

10   why he used this wording -- but he says, "Defendant provided no

11   legal support for his argument that the indefinite duration of

12   the nondisclosure provision rendered it per se unenforceable."

13          So as I read this thing, I thought at first, Well,

14   either an indefinite duration in a nondisclosure provision is

15   enforceable or it's not.  So you suggest that it depends.  What

16   would it depend on?  Isn't it a binary decision, either

17   indefinite duration is enforceable or it's unenforceable?  Why

18   would it depend on the facts of a case?

19   MR. ANTONELLI:  I think in the cases that we've

20   cited, the courts have uniformily found that indefinite

21   duration is improper under Virginia law.  So that would be the

22   ruling that we would ask the court to make here, is to find the

23   indefinite duration that's included within VGT's

24   confidentiality agreement particularly because of its breadth.

25          So I understand -- I understand VGT's argument that

1    there may be obligations with respect to a narrow scope of

2    trade secrets, the secret sauce, but that's not what the

3    confidentiality agreement here is limited to.  It goes to

4    essentially, again, all aspects of anything an employee can

5    conceivably work on while an employee of VGT.

6           And further, Your Honor, under Virginia law, the

7    Virginia courts do not blue-pencil or modify agreements so they

8    -- if an agreement is overbroad, it's thrown out wholesale.

9           **THE COURT:**  Okay.

10          **MR. ANTONELLI:**  But turning back to the underlying

11   issue of whether or not this is a trade secret in the first

12   place, unless the court has any further questions regarding the

13   confidentiality agreement --

14          **THE COURT:**  No, sir.

15          **MR. ANTONELLI:**  -- one thing that I thought was

16   interesting that Mr. Swanson argued was with respect to the

17   operator manuals and the various manuals that VGT routinely

18   provides to customers, including casino customers.  One such

19   manual is part of the record, it's included as Exhibit D to

20   VGT's motion.  I know we also included it -- we made reference

21   to it in response to VGT's motion and also included it as part

22   of our affirmative motion for summary judgment.

23          And what's interesting about that manual is that while

24   it -- no, it does not contain the bingo card generation

25   algorithm in that it's a paper document that doesn't contain

1    source code.  It lists in significant detail the various steps

2    that VGT claims consist of its trade secret.  And this is an

3    important point because VGT has consistently pointed to or

4    relied upon the declaration of Mr. Davis, which the court

5    recently addressed in one of its rulings, as evidence that this

6    operator manual was, in fact, not provided to any casinos or

7    not provided to casinos that didn't have confidentiality

8    agreements.  And as the court's ruling early this week held,

9    Mr. Davis' declaration has been stricken on those points except

10   for his qualified statement that to his knowledge the bingo

11   card algorithm had not been provided to casinos.

12         That's specifically in VGT's affirmative motion for

13   partial summary judgment.  In their statement of fact No. 13,

14   they claim they haven't publicly disclosed this.  The only

15   evidence that they cite for that proposition is the Davis

16   declaration at paragraph 16 which is a paragraph that the court

17   has stricken its entirety.

18         And while I know we're not talking about Castle Hill's

19   motion for summary judgment now, the same is true on our side

20   of the fence, where Mr. Davis has been pointed to as the source

21   of facts to rebut our proposition and the testimony that we

22   cited from their employees that operator manuals are provided

23   to casinos.  We think that makes sense based on what the

24   document itself says.

25         So at a minimum, I think there is a question of fact

1   here regarding what exactly is or isn't provided to the casinos

2   with respect to the operator manuals and the extent to which

3   the operator manuals address the bingo card generation

4   algorithm.

5            THE COURT:   Okay.   Explain to me, a

6   nonmathematician, non-casino owner, what steps there are, you

7   say, claim trade secrets that would disclose -- within these

8   manuals disclose trade secrets to me if I'm a casino.

9            MR. ANTONELLI:   So VGT essentially says our trade

10  secret consists of ██████████████████████████████

11  ████████████████████████████████████████████████████

12  ██████████

13           THE COURT:   No.   But that's apparently ubiquitous.

14  ████████████████████████████████, I mean, they're not claiming

15  that that's a trade secret.

16           MR. ANTONELLI:   Well, they claim that it's one of

17  their ████ steps in their trade secret.

18       So I agree with the court, I think the record is

19  abundantly clear that the ████████████████████████████████

20  ██████ is not a trade secret.

21           THE COURT:   Correct.

22           MR. ANTONELLI:   What VGT would argue is that despite

23  the fact that we've demonstrated that all the component parts

24  are readily known and available in patents and online, you can

25  find them on Google, that, nevertheless, because that complete

1   -- the exact steps as they describe them is not set forth, that

2   they get trade secret protection.  I don't think that's what

3   the law provides.

4         But with respect to the manuals, I mean, the manual --

5   I'll just read to Your Honor from the manual.  Again, it was

6   included as Exhibit D to VGT's motion for summary judgment.

7   There's a page that says "bingo card generation." ███████

8   ████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████

10  █████████████████████████████████████████████████████████████

11  ███████████████████████████████████████████████████████

12  ██████████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████████████

14  ███████████████████████████████████

15         THE COURT:  So your position is that alone gives the

16  roadmap?

17         MR. ANTONELLI:  That is the roadmap.  When they talk

18  about their ███ steps, it's articulated perhaps slightly

19  differently than they'll articulate it to the court in the

20  context of this motion, but those are the steps.

21         So, again, we think it's pretty clear that these

22  manuals have been provided to casinos, including with ██████

23  ████████████████████████████████████████████████ in

24  place.  But at a minimum -- Certainly with respect to VGT's

25  motion for partial summary judgment, at a minimum there's a

1    question of fact here, and that's particularly in light of the

2    court's recent rulings with respect to the Davis declarations.

3              THE COURT:  All right.  Anything else?

4              MR. ANTONELLI:  Yes, Your Honor.  Turning to, again,

5    the specific steps that VGT says consist of its trade secret,

6    again, as the court just noted, VGT doesn't claim that use of

7    the ███████████████ itself is a trade secret.  They don't

8    claim that ██████████████████████████████████████████████

9    is a trade secret.  Again, we've cited many instances included

10   from Wikipedia about use of these things.

11             And then when we get to the idea of ████████████████

12   ██████, which is something that VGT focuses on, ██████████████

13   ████████████████████████████████████████████████████████████

14   ██████████████████████████████████████████████████████

15   ██████████████████████████████████████████████████████

16   ██████████████████████████████████████, we cited in

17   response to their motion at our response to statement of fact

18   19 at least four patents or patent applications that implicate

19   the very steps that VGT claims consists of its trade secrets.

20             In response to our citation of those patents, which is

21   certainly something the court can, and we urge should, take

22   judicial notice of, something that VGT does not contest, they

23   themselves in their opposition to our motion asked the court to

24   take judicial notice of some trademark registrations, VGT

25   really doesn't address any of those patents on the merits.

1   They just say the court should ignore them because they've been

2   raised in an opposition to their summary judgment motion.

3           What's important on that point, Your Honor, is that we

4   did not argue and we did not offer those patents as something

5   that we are claiming that Mr. Suggs or others at Castle Hill

6   specifically referenced.  That was not the argument we made in

7   our opposition.  We just thought it was important and clearly

8   relevant to the question of whether or not this ███████

9   ███████-based bingo card generation algorithm is a trade secret

10  in the first instance.  We think it's very significant that

11  there's patents filed many years ago which implicate the

12  requisite steps that VGT claims you combine to come up with

13  their algorithm.

14          And one other point, Your Honor, which I think is

15  important here, and it's one that Mr. Gill touched on earlier,

16  is that this case started out in large part as involving

17  allegations of source code misappropriation.  And as our expert

18  opined and explained, and as we've cited in our various

19  filings, there is no evidence of source code copying here.

20          And specifically with respect to the bingo card

21  generation algorithm, as we explained in our papers, Castle

22  Hill went out and actually found open source code on the

23  Internet with respect to the ███████████ pseudorandom

24  number generator algorithm and that's what they modified to put

25  into their code.  So this is not a case where VGT is alleging

1    Mr. Suggs stole source code and then reviewed it.

2              THE COURT:  I understand that.

3              MR. ANTONELLI:  I think it's an important point

4    because they've continued to raise this issue about materials

5    that have been taken, or allegedly taken, without drawing a

6    cause and axis between any of those materials and the actual

7    trade secrets at issue.

8              THE COURT:  I don't think they have to show

9    materials taken for purposes of that trade secret, do they?

10             MR. ANTONELLI:  I don't think it's necessary for

11   them to, Your Honor.  However, in their reply brief, I think

12   they again asserted, well, there is evidence that they took

13   source code.  Well, that's really irrelevant to the question of

14   and shouldn't -- if they can't -- if they cannot draw a

15   connection between the materials that were allegedly taken and

16   the actual trade secret at issue, we're then talking about an

17   idea that Mr. Suggs just remembered, is what they would say,

18   because he worked on it at VGT and then he worked on something

19   solving a similar problem for bingo card generation at Castle

20   Hill.

21             And finally, Your Honor, the court was asking

22   Mr. Swanson a little bit about the timeline in terms of Castle

23   Hill's development of their bingo card generation algorithm and

24   I just want to lay it out for the court.  The bingo card

25   generation algorithm using the ███████████ has never been

 1    used on any machines that are in the field.  Castle Hill does

 2    not have any, and has never had any, slot machines in any

 3    casinos that use that algorithm.  There is a different

 4    algorithm that uses a different pseudorandom number generator

 5    that Castle Hill has used for the life of the company.

 6            **THE COURT:**  Well, perhaps I got the wrong

 7    impression, but I just didn't see that the particular random

 8    number generator is particularly important here.  Is it?

 9            MR. ANTONELLI:  ████████████████████████

10    ████████████████████████████████████████████████████

11    ██████████████████████████████████████████████████

12    ██████████████████████████████████████████

13    █████████████████████████████████████████████████████

14    ████████████████████

15            And as I understand VGT's motion for partial summary

16    judgment, it relates only to the code that was submitted to BMM

17    Testlabs and not to the -- not to any other bingo card

18    generation algorithm, not to the bingo card generation

19    algorithm that's currently used in the field and not to --

20    there's actually a third approach, a slightly different

21    implementation that has since been explored, which Al Roireau,

22    one of Castle Hill's engineers and one of the 30(b)(6)

23    designees in this case, explained the withdrawal of what we

24    refer to as the "BMM code" -- that's the ████████████████

25    code -- and Castle Hill's movement in a different direction.

1    THE COURT:  Okay.

2    MR. ANTONELLI:  Unless the court has any other

3    questions.

4    THE COURT:  Is it Castle Hill's contention that the

5    Trade Secrets Act and/or the Virginia Trade Secrets Act require

6    proof of damages or harm?

7    MR. ANTONELLI:  Your Honor, that would go to perhaps

8    the appropriate remedy, but those statutes do not require a

9    show of harm as an element of establishing a claim.

10    THE COURT:  All right.  Thank you very much.

11    Any reply, given that this is the plaintiff's motion,

12    Mr. Swanson?

13    MR. SWANSON:  Yes, Your Honor.  Just briefly.

14    THE COURT:  Then we'll take a short recess after

15    Mr. Swanson.

16    MR. SWANSON:  So I just wanted to start by, if I

17    can, showing Your Honor the manual that Mr. Antonelli

18    mentioned, which is Exhibit --

19    THE COURT:  I've got so many in front of me.  Which

20    number is it?

21    MR. SWANSON:  The docket number would be 179, I

22    believe, Exhibit D.

23    THE COURT:  Yeah.  I don't have it in front of me.

24    MR. SWANSON:  Okay.  I can also pull it up here on

25    the screen.

1          THE COURT:  Oh, I'm sorry.  I do have it here,

2   179-D.

3          MR. SWANSON:  Exhibit D.

4          THE COURT:  Thank you.

5              *(Discussion held off the record)*

6          MR. SWANSON:  And just point Your Honor to the first

7   page of this document.  This is not an operator manual; this is

8   a reference manual.  That's what it says on the first page.

9   The testimony they're relying on for operator manuals from an

10  employee named Butch McGill, he was not asked about this

11  document and they didn't ask any other witness if this

12  reference manual was ever disclosed to customers.

13         The only evidence in the record is the sentence in the

14  Davis declaration that was not stricken that to his knowledge

15  this reference manual has never been disclosed to casinos.

16  That's the only evidence we have; therefore, there's no genuine

17  dispute.

18         THE COURT:  All right.  You're saying it's apples

19  and oranges?

20         MR. SWANSON:  Yes, Your Honor.

21         THE COURT:  This is not the operating --

22         MR. SWANSON:  This is not.  And, again, we produced

23  the operator manual, they have it, and it's different.

24         THE COURT:  All right.

25         MR. SWANSON:  On the point about they've produced

1    patents and other documents that, you know, each one may have

2    one step or one element of the algorithm, just on the patent

3    point we asked them for any documents they had during discovery

4    that they would rely on in defense of the trade secret claims.

5    They didn't disclose the patents.  We actually filed a motion

6    to compel on this which we withdrew after they represented that

7    they had produced everything they intended to rely on.  Their

8    expert did not produce the patents.  The first time we saw them

9    was in their opposition to the summary judgment motion.

10          But putting all of that aside, their argument is still

11   legally insufficient, and I would point Your Honor to the *Hertz*

12   case that we cite, 576 F.3d 1103, in which the Tenth Circuit,

13   again applying Colorado law but it's the Uniform Trade Act,

14   says, "The presence of all of the elements of an idea in

15   technical literature does not suffice, per se, to destroy trade

16   secret status since the secret might be in a combination of

17   otherwise well-known principles," quoting *Milgrim*, the treatise

18   on that.  So their arguments -- even if you credit the factual

19   statements they're making, the argument's legally insufficient.

20          And I think that's -- I think those are the points I

21   wanted to make.

22          **THE COURT:**  Thank you very much.  Let's take a

23   ten-minute break.  We'll be back for defendants' motion for

24   summary.

25                        *(Short break)*

1    **THE COURT:**  Before we move on to the other motion

2    for summary judgment, I want to ask here:  I have in my hand

3    docket 179-5, which is a page from the 2003 bingo reference

4    manual.  It's page 3 of 26.  The first sentence on that page

5    says, ████████████████████████████████████████████████

6    ████████████████████████████████████████████████

7    ████████████████████████████████████████████████

8    ████████████████████████

9    Now, as I understand it, VGT was saying, well, these

10   games are leased so they're not owned by the casinos, and

11   therefore, the bingo reference manual doesn't go to the casinos

12   because they're not the rightful owner.  Well, if that was the

13   case, why didn't this just say, "This document must remain

14   within the confines of VGT"?  I mean, who is a rightful owner

15   of the particular VGT cabinet, if not the casino?  Although my

16   understanding of the law under leaseholds is, you know, VGT

17   would own it if they're leasing it.

18   So who does this bingo reference manual go to?

19   **MR. SWANSON:**  Your Honor, you are right that VGT

20   owns all of its machines and leases them so VGT is the owner of

21   all the machines.

22   Candidly, I'm not exactly sure how that language ended

23   up here.  It looks like it was maybe just "inartfully" drafted.

24   But this reference manual would be used internally and it's

25   given to the test labs like BMM, and there are a couple of

 1    others, who would receive this to understand in certifying

 2    VGT's games how the games work so they can verify that they

 3    comply with regulations and other technical requirements.

 4              THE COURT:  Well, the next sentence says, "This

 5    document may be provided to gaming regulatory agencies or

 6    attorneys as an evaluation and/or informational tool," and that

 7    makes sense.  But that language is just head-scratching.

 8              MR. SWANSON:  Yes, Your Honor.  Again, VGT does own

 9    all the games.  Yeah, it's --

10              THE COURT:  All right.  Let me get Castle Hill's

11    view of that.  Mr. Antonelli.

12              MR. ANTONELLI:  Yes.  Thank you, Your Honor.  The

13    question that the court just raised was an issue that we did

14    raise in connection with our briefing on this issue.  And,

15    again, I think it seems apparent to us that that document was

16    intended to be circulated outside of VGT.  I think, again, at a

17    minimum, this presents an issue of fact as to whom that

18    document was distributed and for what purpose.  The reference

19    in there to the ███████████████████████████ really doesn't

20    make sense if that's just a document that's internal to VGT.

21              And, again, when VGT had an opportunity to explain this

22    manual, they offered the declaration of Mr. Davis, which the

23    court has stricken, and portions related to the manual.

24              THE COURT:  In part.

25              MR. ANTONELLI:  But even what was stricken,

1    Mr. Davis doesn't say, this is a manual that we use for

2    internal purposes at VGT.  He says, well, I don't think this

3    has ever been sent outside of VGT.

4          So I think there remain some significant questions of

5    fact there that would preclude a finding of judgment on this

6    issue.

7          THE COURT:  Castle Hill has no evidence that it was,

8    in fact, distributed to casino owners or outside of VGT;

9    correct?

10         MR. ANTONELLI:  Well, we have the testimony of

11   Mr. McGill that we cited where he's -- where he's referencing

12   operator manuals.  I understand VGT's argument today that this

13   is not an operator manual.  Although, I think that presents

14   another question of fact because VGT hasn't presented what they

15   assert an operator manual is to the court as part of this

16   record.  So it's our -- it's our understanding that that is an

17   operator manual and it's provided to the casinos.

18         The evidence is undisputed that ████████████████

19   ████████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21         THE COURT:  And you've not been provided in

22   discovery with a separate operator manual?

23         MR. ANTONELLI:  Your Honor, I would have to go back

24   and look as to whether or not there is a separate document that

25   says "operator manual" on the front of it.  As I stand here

1   today, I'm not aware of one but I don't want to represent to

2   the court something that I'm not sure -- I'm not certain of.

3                **THE COURT:**  Very good.  Thank you.

4                **MR. SWANSON:**  Your Honor, may I just briefly

5   respond?

6                **THE COURT:**  Yes, sir.

7                **MR. SWANSON:**  Which is, I don't recall how many

8   depositions they took in this case, but they did not obtain

9   testimony from any VGT employee that this manual is distributed

10  outside of VGT other than to testing labs.  And what matters

11  for purposes of the motion and our claim is not what it was

12  said in the document but what actually happened to the

13  document.  And on that, the only evidence we have is Mr. Davis'

14  statement that to his knowledge this is not distributed outside

15  of VGT.

16               **THE COURT:**  All right.  Defendants' motion for

17  summary judgment.

18               **MR. GILL:**  Thank you, Your Honor.  Robert Gill once

19  more for the defendants.  I'm going to address the trademark

20  claims; my colleague, Mr. Platt, is going to address the trade

21  dress claims; and Mr. Antonelli will once again address the

22  trade secret claims.

23        In the course of this litigation, which has been raging

24  on with some intensity for a little over a year and a half,

25  going on two years, there have been very little that the

1    parties have seemed to be able to agree to.  But finally in the

2    course of briefing, the summary judgment motions, it seems

3    we've reached some ground where there is perhaps some agreement

4    in terms of where the dust has settled and where that needs

5    leads us.

6                    *(Discussion held off the record)*

7              **MR. GILL:**  So at this point, my understanding from

8    the papers is the only registered trademark claim that remains

9    by the plaintiff is the registered trademark for Mr. Money Bags

10   design.

11             **THE COURT:**  Correct.

12             **MR. GILL:**  And that the remaining claims, based on

13   infringement of registered trademarks, have been abandoned.

14   Therefore, the remaining claims under Count 1 of the amended

15   complaint should at this point be dismissed because the

16   plaintiff is not prepared and has not produced the evidence in

17   support of those claims.

18             So, for example, the claims based on -- for registered

19   trademark claims based on Crazy Bill and Mr. Money Bags -- or

20   actually not Mr. Money Bags -- Polar High Roller and Greenback

21   Jack are now gone.

22             Now, I understand that VGT has common law trademark

23   claims that remain.  VGT also has -- to be clear they have

24   registered trademark claims, just word mark claims, not design

25   logos or other registered marks for certain of their games, but

1    VGT has said we are not making claims for infringement of those

2    word marks standing alone.   They are making a claim for

3    infringement of those word marks in the context of the entirety

4    of the appearance of the electronic gaming machines, meaning

5    use of the name, use of the character, use of the artwork in

6    connection with the games.   Those claims remain.   Those are

7    common law claims, not registered trademark claims.

8         So other than the registered trademark claim for

9    Mr. Money Bags' design, defendants at this stage of the

10   proceedings are entitled to judgment on Count 1, which is for

11   breach of -- or for infringement of registered trademark for

12   all claims other than the Mr. Money Bags' design mark.

13             THE COURT:   And just for the record, plaintiff

14   agrees in that regard?

15             MR. ROMAN:   Yes, Your Honor.

16             THE COURT:   Very good.

17             MR. ROMAN:   Now, to be clear, Your Honor, we don't

18   agree that judgment is warranted on the claims that have been

19   withdrawn.   But we agree with Mr. Gill that we've narrowed the

20   claims over the course of the litigation and Mr. Gill has

21   accurately set forth the claims that are still live.

22             MR. GILL:   Okay.   I'm not sure I understand why

23   defendants would not be entitled to judgment on those claims.

24   Those claims were asserted in the original complaint.   They

25   were asserted in the amended complaint the plaintiff appended

1    to its original and amended complaints --

2         THE COURT:  Yeah, I've not wrapped my mind around

3    that statement either.  I mean, to the extent that they are all

4    other registered trademark claims, why wouldn't they be

5    entitled to summary judgment on those?

6         MR. ROMAN:  I believe, Your Honor, it's common in

7    litigation to narrow and refine your claims.  If we had not

8    brought the claims at all, they would have no claims of

9    judgment on them.  If we were to later reassert them, they

10   could make whatever claims they want of waiver, estoppel, you

11   know, claim preclusion.  They could assert that later but

12   they're not entitled to judgment.

13        We haven't conceded that we cannot establish it as a

14   matter of law.  We're just not prosecuting them in this

15   lawsuit.  So it's a withdrawn claim, it's not a judgment, and,

16   you know, it's not a litigated claim.

17        MR. GILL:  With due respect to Mr. Roman, with whom

18   I enjoy a good working relationship that I have a considerable

19   amount of respect, I'm not sure I understand that comment.

20        THE COURT:  That's not a common approach with me and

21   maybe he can further explain that.  But let me ask just a

22   couple questions here just to get the ball rolling.

23        MR. GILL:  Yes, sir.

24        THE COURT:  Does Castle Hill concede that Mr. Money

25   Bags and design mark is incontestable?

1       MR. GILL:  I believe that -- we do concede that it

2    is incontestable in the sense that the registration was made

3    and has been pending for such a time that they are eligible for

4    have incontestable status.

5       THE COURT:  All right.  Does the --

6       MR. GILL:  Now, I will add that merely because a

7    mark becomes incontestable doesn't mean that it may not be

8    attacked on any ground.

9       THE COURT:  I understand.

10       MR. GILL:  It means that certainly for purposes of

11   distinctiveness then, the distinctiveness of the mark is

12   something that's incontestable.

13       THE COURT:  I understand.  Question two:  Does the

14   Castle Hill house mark always appear on the artwork title card?

15       MR. GILL:  Yes, it does.

16       THE COURT:  All right.  And is the same true with

17   VGT?

18       MR. GILL:  It is true, it's my understanding, with

19   one exception.  In the former practice, I believe VGT used its

20   house mark on all its games.  It's my understanding that in

21   recent times, VGT has modified which house mark it uses on its

22   games because VGT was acquired by Aristocrat and the parent,

23   and I understand the Aristocrat house mark now appears on the

24   games.  So with that, you know, correction, I think Your

25   Honor's statement is correct, that either the VGT mark or the

1    Aristocrat mark appears on their all games.

2              THE COURT:   Does the Virginia Trade Secrets Act

3    require use of the trade secret to VGT's detriment?

4              MR. GILL:   I believe it does.

5              THE COURT:   And does detriment require actual

6    damages?

7              MR. GILL:   I think it does.   Because I think to have

8    constitutional standing to be able to sue requires actual

9    injury.

10             THE COURT:   Does Castle Hill concede that the

11   Oklahoma common law claim is not displaced to the extent it's

12   premised on information that does not or may not satisfy the

13   Oklahoma Uniform Trade Secrets Act's definition of trade secret

14   but is otherwise confidential?

15             MR. GILL:   That's a mouthful.

16             THE COURT:   Yes, sir.

17             MR. GILL:   I believe as a conceptual matter, what

18   Your Honor has stated is correct.   I think that it is

19   theoretically possible to have an Oklahoma common law claim

20   that is distinct from, and is not extinguished by, the federal

21   claim.

22             THE COURT:   Right.

23             MR. GILL:   But I will also state that the discovery

24   record in this case is such that Castle Hill asked the

25   plaintiff to identify the evidence that supported the Oklahoma

1    claim, and all the plaintiff did was refer to the same evidence

2    that supported the federal claim.  It's on that basis, that

3    we've asserted that the Oklahoma claim has been extinguished

4    because it is the exact same evidence in support of it.

5             THE COURT:  Well, but just trying to think logically

6    here -- and I may be wrong -- but to the extent -- even if they

7    rely on the same evidence, if the Uniform Trade Secrets Act

8    requirement, including the definition of trade secret, is not

9    met, then theoretically the Oklahoma common law claim might

10   still be able to proceed?

11            MR. GILL:  I agree with that.

12            THE COURT:  Okay.  I suppose since you're addressed

13   to trademark, I need to limit my questions to you regarding

14   trademark; correct?

15            MR. GILL:  I would appreciate that.  My colleague,

16   Mr. Antonelli, is the one that is prepared to address those

17   issues today.

18            THE COURT:  Okay.

19            MR. GILL:  So I will defer to him.  But I will

20   answer your questions to the extent I can.

21            THE COURT:  All right.  I think that's it.  Go

22   ahead.

23            MR. GILL:  All right.  Thank you.  With the court's

24   indulgence, let me grab a document.

25            THE COURT:  Yes, sir.

1    **MR. GILL:** I can't help myself, but before I move on

2    to the rest of my points, to address Mr. Roman's statement

3    about what registered mark claims were made in this case.

4        Your Honor, I reference Exhibit 4 to the plaintiff's

5    first amended complaint, and in the complaint they reference

6    this exhibit as depicting those registered marks that are being

7    infringed, VGT marks as compared with the Castle Hill marks.

8    So, for example, the very first depiction on Exhibit 4 depicts

9    the VGT game Crazy Billions and on the right-hand side it

10   depicts the Castle Hill game Welcome to Nugget Mountain.

11       So based on the use of this exhibit in reference to

12   this exhibit in the body of the complaint, it's clearly

13   incorporated into the complaint, I certainly understand the

14   formal registered mark claims to include more than Mr. Money

15   Bags. And while I understand and appreciate the plaintiff's

16   statement, that it has made a decision to not pursue those

17   claims at this point, if we were earlier in the litigation I

18   might agree with what Mr. Roman said, but given that we are now

19   at the summary judgment stage, I'm entitled to know

20   conclusively what claims remain for trial. The fact remains

21   that the plaintiff did not contest our motion for summary

22   judgment on these remaining claims and it's conceded those

23   claims.

24       And so with due respect to what Mr. Roman said, I do

25   believe we're entitled to judgment on all registered trademark

1    claims other than the Mr. Money Bags design based on the state

2    of the pleadings in the case.

3            THE COURT:  Okay.  I've got Exhibit 4 in front of

4    me.  I don't have the reference in the first amended complaint.

5    But you're saying Exhibit 4 is purporting to reference all of

6    the registered trademark claims?

7            MR. GILL:  Yes.  So these are mostly -- other than

8    Mr. Money Bags' design, these are word mark claims.  But

9    they're nonetheless registered trademarks and they represent

10   valid -- I mean, procedurally they're not, you know,

11   incompetently done or invalid registered trademark claims.

12   It's just the plaintiff has not contested these at this stage

13   of the proceeding.

14           Based on that, I'm entitled to judgment based on the

15   state of play, other than as to the Mr. Money Bags' design,

16   which is something I will address again in the course of my

17   remarks to you.  I'm not giving up on that point.  I'm just

18   pointing out what I thought was, in essence, agreed to, based

19   on the state of the pleadings, what we're entitled to judgment

20   on.  Under Count 1, that would be everything by agreement,

21   everything other than Mr. Money Bags' design.

22           THE COURT:  All right.  Doesn't a genuine issue of

23   material fact exist with respect to likelihood of confusion

24   regarding Mr. Money Bags?

25           MR. GILL:  With regard to the design mark, Your

1    Honor?

2                    THE COURT:  Yes.

3                    MR. GILL:  No, I don't believe it does.  And this is

4    true for the Mr. Money Bags design mark and this is also true

5    for the remaining common law marks that the plaintiff continues

6    to assert and claim in this case.

7                    If you look -- and one of the issues in this case --

8    and this is a pervasive theme that we have dealt with as

9    defendants in this case through its entirety -- when we had a

10   very first hearing in the case, the hearing concerned the

11   sufficiency of the alleged trade secret claims, and then later

12   on we have dealt with the sufficiency of the allegations of

13   trademark and trade dress claims.

14                   And with regard to the trademark claims, the -- if

15   you're talking about the registered mark claim, I think it's

16   clear they are not entitled to judgment actually on the -- and

17   we would be entitled to judgment on the Mr. Money Bags design

18   mark just based on the comparison of the marks themselves.  And

19   the *Hornady* case from the Tenth Circuit tells us that the most

20   important of the six factors is a comparison of the marks.

21                   And one thing that is to me remarkably absent from the

22   plaintiff's briefs on summary judgment in this case is an

23   analysis of the likelihood of confusion factors for each of the

24   trademarks that are asserted in this case.  And so what instead

25   the plaintiff has done is the plaintiff has melded together in

1    one section, if you will, not just all of the marks for which

2    they're claiming, but also lumped in together the trade dress

3    which they're claiming, which we assert is improper and is a

4    violation of the pleading standards.

5         The *Forney* case, which the parties have cited in this

6    matter, also from the Tenth Circuit, makes clear that a

7    plaintiff has the burden of articulating clearly what the

8    elements of his Lanham Act claim are.  And we think that's an

9    issue here.

10        But to be clear, the similarity of the marks element

11   alone of the likelihood of confusion factor for Mr. Money Bags

12   I think compels judgment against the plaintiff.  We have, you

13   know, the opposite mark for Mr. Money Bags, the one that

14   plaintiff claims Castle Hill's infringing is the game New

15   Money, and the plaintiff didn't do the likelihood of confusion

16   analysis on these two marks.  But, again, if you just look at

17   the similarity of the marks alone, which *Hornady* says is the

18   most important factor, you know, that tells us that there's no

19   likelihood of confusion among the consuming public.

20        Obviously, there are other elements of the analysis as

21   well.  We have the -- you know, it depends on which case you

22   look at and which order these elements come in.  We have the

23   actual confusion element or factor.  In this case, that's a

24   factor that cuts against the plaintiff.  The plaintiff doesn't

25   have evidence of confusion.  They had the survey, which they

1    had commissioned by Dr. Wind, and Your Honor, of course, issued

2    the ruling.

3              THE COURT:  Little weight.

4              MR. GILL:  Exactly.

5              THE COURT:  Right.

6              MR. GILL:  And the methodology was flawed.

7         And then we have -- in addition, we have, which the

8    plaintiff relies on -- and I understand their inclination to

9    rely on it -- is the evidence of actual confusion.  But the

10   evidence of actual confusion -- and with due respect to the

11   plaintiff, I know they disagree with me on this -- but this is

12   really de minimis evidence.  Because if you look at the

13   instances --

14             THE COURT:  Two of fourteen.

15             MR. GILL:  Exactly.  So the governing law requires

16   that the instances of actual confusion involve members of the

17   consuming public, and the vast majority of these involve VGT or

18   casino employees and not members of the consuming public.

19        So this evidence is not only -- is there not much of

20   it, it's de minimis in quantum, but it is also not probative.

21   You know, it's not an instance, for example, where -- you know,

22   there's very few where specific marks or trade dress can be

23   identified.  I definitely saw -- of the few that could be

24   specifically identified, one did involve Mr. Money Bags but

25   that's just one.  There's none other, no other such evidence,

1    for this claim.  So we don't have a survey to provide that

2    confusion evidence.  We don't have, other than this literally

3    one instance that I can find for Mr. Money Bags, a single

4    instance of actual confusion.

5          We have the dissimilarity of the marks.  You know, we

6    have the intent.  Well, the intent -- of course intent's

7    usually a factual issue, but here we have -- but it's intent

8    that's measured at the time the mark is adopted.  So we have

9    the New Money mark that was adopted by Castle Hill, which the

10   evidence establishes is used always with the Castle Hill house

11   mark.

12         *Water Pik* and other cases tell us that when you have a

13   manufacturer of consumer goods that routinely uses its house

14   mark on its goods, that's an evidentiary point that helps

15   prohibit or stop any risk of confusion, it doesn't sew

16   confusion.

17         We also have evidence in the record where Castle Hill

18   used on its games the so-called "topper," which kind of looks

19   like an iPad stuck on the top of one of these games, which

20   further helps distinguish the appearance of the Castle Hill

21   games --

22              THE COURT:  Not much.

23              MR. GILL:  Well, you know, to me to look at a game

24   that has the topper with the iPad appearance and a game that

25   doesn't have it, it's a remarkably different appearance.

1    **THE COURT:**  Given the statement of the Castle Hill

2    employee -- and I'm forgetting the name right offhand -- when

3    shown the New Money concept, I mean, that's pretty persuasive

4    evidence of intent to pass off goods as those of another, is it

5    not?  And that, in turn, supports a finding of likelihood of

6    confusion, doesn't it?

7    **MR. GILL:**  Well, could you help me with the

8    statement that you're referring to, Your Honor, the statement

9    of the Castle Hill employee?

10    **MR. ROMAN:**  Your Honor, I can help there.

11    **THE COURT:**  Yes, sir.  Go ahead.

12    **MR. ROMAN:**  Okay.  It's statements by two Castle

13    ██████████████████████████████████████████████████████

14    ████████████████████████████████████████████████████████

15    ████████████████████████████████████████████

16    **THE COURT:**  Right.

17    **MR. GILL:**  Well, what we have is, we don't have a

18    statement of intent by somebody who's in management at Castle

19    Hill.  We have banter between employees that are either

20    software people or artists, but not management of the company,

21    that are joking between themselves about the New Money look.

22    This isn't, you know, any nefarious internal admission by

23    Castle Hill, this is, oh, you know, we're trying to make a copy

24    of Mr. Money Bags.  That's not what this says.  The appearance

25    of the game doesn't support that conclusion because the

1    appearance of the game is actually significantly different.

2    We've actually cited in our summary judgment motion where

3    there's another game maker that actually has a game called

4    "Money Bags" that's not the plaintiff.

5          So based on those facts, I think the likelihood of

6    confusion analysis cuts against the plaintiff.  I don't think

7    they can show that -- you know, they don't have it on the

8    similarity of the mark.  They don't have it on the confusion

9    issue.  With regard to the intent --

10          THE COURT:  Even with regard to the hat?  I mean,

11    how similar does it have to be to get summary judgment -- or

12    dissimilar rather?  I mean, isn't this really an issue for

13    trial?

14          MR. GILL:  Well, I don't think so.  Because if we

15    had a character that we were using that looked like the

16    Mr. Money bags, that would be one thing, but we have literally

17    a baby in a hat.  They're using this, you know, fat,

18    high-roller type of guy who makes it looks like, you know, he's

19    a frequent casino regular and he's a high-roller and he goes to

20    casinos and he does well.

21          THE COURT:  Right.

22          MR. GILL:  That's the image that he's portraying and

23    we're showing -- the emphasis in our game is this is new, like

24    new and improved, this is new, but it's literally a baby with a

25    hat.  I don't see it.

1    **THE COURT:**  Yeah.  But it's nudge, nudge, wink,

2    wink, inside joke, this is Mr. Money Bags' baby; right?  I

3    mean, it presents kind of an interesting question.  I mean, is

4    that similar enough?

5    **MR. GILL:**  Well, I understand that one way or

6    another it's going to be decided by you, if not today, but at

7    trial.  But I would submit to you respectfully that I don't

8    think the plaintiff has made the case here.  I think the fact

9    that the plaintiff didn't go through the likelihood of

10   confusion analysis for this mark, or for the rest of its marks,

11   is basically a concession on this point.  They haven't done

12   what they need to do to be able to establish the fact that

13   there -- they win on the likelihood of confusion analysis.

14       Based on the dissimilarity of the marks and the lack of

15   confusion and the intent issue, the intent that's been shown in

16   this case is really not an intent to copy marks because, again,

17   we have, you know, use of the house mark.  And a few of the

18   instances of actual confusion that the plaintiff relies on here

19   are interesting to me because in actually a couple of these

20   instances the patrons that were discussing this talked about

21   the mark.

22       So, for example, if you look at -- in our motion to

23   exclude evidence of actual confusion, our paragraph 4 talks

24   about an online message board forum called "Jokers Wild" and it

25   references a user who identified herself as "Kim Kyle."  And

1    Kim Kyle says that she visited the new casino and played the

2    machines, she was hoping to see red screens but she couldn't

3    tell, and she forgot to look at the brand.  So even the

4    consumer that's having this discussion as this instance of

5    confusion cited by the plaintiff indicates that she knows

6    enough to look at the house brand to be able to indicate what

7    the origin of the games are.

8            THE COURT:  But which way does it cut?  I mean, as

9    someone not a regular, it seems to me from the images that

10   you've provided that those are fairly discrete.  Your eye's

11   definitely not taken to that lower right corner; right?

12           MR. GILL:  Well, I think that, you know, the same --

13   the visibility or prominence of the mark that's displayed by

14   Castle Hill is certainly no less than that that is displayed by

15   the plaintiff.  So this isn't a situation where Castle Hill is

16   trying to camouflage its house mark is such a way that it's not

17   something that's obvious and discerning to the consuming

18   public.  As a matter of fact, in most instances, the house mark

19   actually appears on the gaming machines in multiple locations.

20   So, to me, on the issue of intent, that clearly shows a

21   conscience effort by the manufacturer to not confuse the

22   consuming public which, of course, is the intent that's

23   relevant to the analysis.

24           But once we get beyond the Mr. Money Bags design issue,

25   there's, of course, the issue of -- the issue of the common law

78

1    marks that the plaintiff claims.  But --

2              THE COURT:  Before you go on, some of these marks in

3    the lower right-hand corner on, for instance, Welcome to Nugget

4    Mountain, it's fairly prominent because it's a white Castle

5    Hill insignia on a --

6              MR. GILL:  For the record, may I ask Your Honor what

7    you're looking at?

8              THE COURT:  I'm looking at Exhibit 4 that you just

9    referenced me to --

10             MR. GILL:  All right.  And it says page 2 at the

11   bottom; is that correct?

12             THE COURT:  Let's see.  Got to get down there.

13   Yeah, page 2.

14             MR. GILL:  Okay.  Right.

15             THE COURT:  And your "CHG" is up against a brown

16   barrel so it's fairly readable.  Then you go down to page 3,

17   New Money, and you've got "CHG" superimposed on green and

18   white.  And granted, you can make it out but it's certainly not

19   a prominent feature, is it?

20             MR. GILL:  Well, but think about the context,

21   though, Judge.  This is a very small image in terms of the size

22   of this image that appears on this page.  That image is about

23   an inch in height.  When in life-size reality, the top of one

24   of these electronic gaming machines is taller than I am

25   standing here at the podium.  So we're compressing what is in

1    reality a fairly significant size piece of equipment into

2    something that's an inch in height.

3          So, yeah, does it make it more difficult to see what

4    the house mark is based on this image?  Yeah, it does.  And I

5    think that's why.

6          THE COURT:  Well, of course you're referencing the

7    entire height of the machine, but you've got five different

8    images running up and down that machine; right?

9          MR. GILL:  Right.

10         THE COURT:  Yeah.

11         MR. GILL:  Right.

12         THE COURT:  Okay.  Well, small point.

13         MR. GILL:  Right.  Now, there's a different issue,

14   of course, that Castle Hill has raised with regard to the

15   Mr. Money Bags design mark, and that is whether or not --

16   regardless of the incontestable status, whether or not the mark

17   was properly registered by VGT in the first place because the

18   record does not conclusively show that VGT has exclusive rights

19   to that mark.

20         THE COURT:  I thought you said it was incontestable?

21         MR. GILL:  Well, it's contestable for purposes --

22   but actually you and I had discussion too.  Yes, it's

23   contestable for purposes of determining whether or not it's

24   considered to be distinctive under trademark law, but that

25   doesn't mean that it's not possible to assert a claim as to the

1    validity of the underlying mark.  One of the ways that you can

2    do that is to raise issues about whether or not the mark -- you

3    know, it represented exclusive rights that belonged to the

4    registrant at the time of the registration.

5         The factual record that was developed in this case

6    didn't show that VGT was the exclusive owner of those rights.

7    So the record actually shows that VGT obtained this mark, this

8    image, the design mark, from a third party, and that when it

9    bought this image or leased the image, it bought what was known

10   as a conversion kit, which included artwork, and it changed the

11   name from something called "Fat Cash" and changed it to

12   "Mr. Money Bags," but it acquired this from a company called

13   "Suburban Graphics."

14   ████████████████████████████████████████████

15   ███████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████    The record showed the Fat Cash

18   machine on a flier, a marketing flier, because that was one of

19   the things that Suburban Graphics was in the business of doing,

20   which was selling these conversion kits, among other things, as

21   well as artwork.

22   ████████████████████████████████████████████

23   █████████████████████████████████████████

24   ███████████████████████████████████████████

25   ███████████████████████████████████████████



. And if you want to sue for infringement of a mark, then you must be the owner of the goodwill, and the failure to include the goodwill, I believe, is fatal to that.

So for those reasons, I think the VGT claim based on Mr. Money Bags is procedurally defective for that reason.

THE COURT:  Couldn't goodwill be presumed as part of that which was required?  Does it have to be explicit?

MR. GILL:  My understanding is that it does need to be explicit.  I've actually been in a circumstance where I needed to represent a client that was contemplating the sale of a mark and possibility of litigation based on infringement of

1    the mark so I've actually had experience with this issue in

2    another context.  The legal conclusion that we reached was that

3    the goodwill must accompany the transfer of the mark in order

4    to be able to sue for infringement.

5          And so for those reasons, we think that the claim by

6    VGT, based on Mr. Money Bags, is something that should be

7    dismissed.

8          And with that, I believe that brings us to the

9    plaintiff's claim for its common law marks.  The common law

10   marks that are at issue don't just include specific machines,

11   it includes, according to the plaintiff, a family of marks that

12   go with those machines.

13         So, for example -- and this is just an example because

14   Mr. Money Bags is not one of the machines for which the common

15   law claim is asserted -- but, for example, there's the original

16   Mr. Money Bags and then there's, you know, Mr. Money Bags Road

17   Tripping and then Mr. Money Bags Lighting Wilds and then

18   there's Mr. Money Bags this.  So there are variance, which the

19   industry tends to refer to game extensions, and the game

20   extensions have different artwork on them than the original

21   game.

22         So with the plaintiff's claim that it is asserting a

23   common law trademark for these other marks, then they are

24   effectively asserting a claim for not just the original mark,

25   but also the other derivative uses of those marks by them with

1    different artwork in commerce, and their claim expressly

2    encompasses those additional artworks that are used in

3    connection with those game extensions.

4           One of the problems that the plaintiff has for these

5    claims is that the -- the claims are unusual to me as somebody

6    who has had an opportunity to litigate trademark infringement

7    in other contexts.  These claims that are asserted as common

8    law trademark claims by the plaintiff for these other games are

9    really more like trade dress claims because, according to the

10   plaintiff, it includes the name of the games that they're

11   claiming, it also includes the artwork for the game without

12   defining which specific artwork, for example, would be

13   included, and it includes the characters.  And, you know, to

14   me, if that's the nature of the protection that's claimed, the

15   plaintiff really elected the wrong method in which to seek

16   protection for these things, and what they probably should have

17   done was obtain a copyright to try to protect the characters.

18   That way a modification of those characters in other artwork

19   would be a derivative work and they would have the rights to

20   those characters and that would be an easier and cleaner way to

21   do this.

22          But what the plaintiff has instead chosen to do is to

23   assert these common law claims with regard to its registered

24   word marks for which it doesn't have registrations for the

25   design or the logos or anything else, and it is making a

1    combination claim basically of those registered word marks

2    together with the artwork and the characters and the other

3    incidences of the appearance of those games, even though the

4    remaining incidences of the appearance of those games are not

5    protected by trademark registration.

6              THE COURT:  All right.  Help me out conceptually

7    then.

8              So we're not talking about a family of marks theory;

9    right?  You're saying these are common law claims and implicate

10   a theory that you reference as game extensions?

11             MR. GILL:  Yes, sir.

12             THE COURT:  All right.  And we're not to the

13   unregistered mark claims yet at all?

14             MR. GILL:  No.  These are unregistered mark claims.

15             THE COURT:  All right.

16             MR. GILL:  Yeah.

17             THE COURT:  All right.  So do you understand that

18   VGT has invoked the family of marks doctrine?

19             MR. GILL:  Yes.

20             THE COURT:  And is that separate and apart from game

21   extensions as you described them?

22             MR. GILL:  It's in this case is they -- as these

23   other marks are used, the other marks are part and parcel of

24   the game extension concept.  So, for example, I was a minute

25   ago using the example of Mr. Money Bags and Mr. Money Bags Road

1    Tripping.  Well, the original Mr. Money Bags has different

2    artwork that appears on the glass of the machine.

3              THE COURT:  I understand.  But I'm just trying to

4    put these so that you and I are talking the same language here.

5              MR. GILL:  Right.

6              THE COURT:  So what's the difference between the

7    family of marks doctrine versus game extensions as you

8    explained them to me?

9              MR. GILL:  The plaintiff, I believe, is making a

10   claim for a family of marks based on the fact that it uses them

11   in connection with these game extensions.

12             THE COURT:  Okay.  So you're saying it's the same

13   thing?

14             MR. GILL:  Right.

15             THE COURT:  Okay.  So we're using the same language?

16             MR. GILL:  I think so.

17             THE COURT:  All right.  Except that they've not used

18   the term "family of marks."  They're using the term, as I

19   understand it, "a series."

20             MR. GILL:  Yes, that's exactly right.  That is --

21   that is the name that they use in connection with the marks.

22             And I will tell you that one of the problems I have

23   with this claim is that the plaintiff, in my view, has not

24   adequately identified exactly what it is it's claiming as a

25   trademark infringement -- as a common law trademark

1    infringement claim.

2         So, for example, it's given us a description and

3    basically said, attached to the complaint are images of our

4    machines and we are claiming the name and the artwork and the

5    characters.  And in using their usual language, they're saying

6    including but not limited to.  So we have a difficult time

7    understanding exactly what the borders or parameters are of

8    claim.  But, to me, it's a defective claim, and the reason it's

9    defective is the plaintiff should have clearly articulated what

10   the claim is that it's asserting for common law trademark

11   infringement and it has not done so.

12        And, you know, a few minutes ago you heard me say that

13   the common law mark claims that the plaintiff is asserting are

14   really kind of in the nature of trade dress and they are.

15   They're very much like their trade dress claim.  They don't

16   include, as I understand it, the cabinet like the trade dress

17   claim does, but even if its papers the plaintiff melds together

18   the way that it assesses these claims and it assesses them and

19   addressing them in one lump in both the common law infringement

20   claims and the trade dress claim.

21        But, to me, the legal obligation that was clearly

22   enunciated in the *Forney* case for a plaintiff to clearly

23   articulate what its claim is is a command that the plaintiff

24   violated here.  Because I think the plaintiff should have

25   included in the text of its complaint an image of exactly what

1    it's claiming is a common law mark and, you know, how exactly

2    we are violating it or infringing it, and they should have done

3    that not just for one game in the series but for every game in

4    the series and they have not done that.

5         And on a related point, as you heard me say with

6    respect to the Mr. Money Bags and design mark, the plaintiff

7    also did not conduct an individual analysis of likelihood of

8    confusion for each of these marks, instead choosing to lump all

9    these marks together and address them together in one fashion,

10   which makes it very difficult for us as the defendant and for

11   the court to assess the issues of the likelihood of confusion

12   factors with regard to these marks.

13        It's our position that the plaintiff has failed by

14   failing to do that, by failing to articulate the claim clearly

15   and properly as they should have, and by failing to conduct the

16   likelihood of confusion analysis for each of the claims, the

17   plaintiff has failed to meet its burden with respect to these

18   claims.

19        And in addition to that, the plaintiff asserts argument

20   with regard to its common law claims.  I'm looking for my

21   reference to that now.  In VGT's opposition to our motion for

22   summary judgment, on pages 16 and 17, the plaintiff makes

23   certain argument with regard to its marks.  So VGT says, "VGT

24   does not assert infringement of all of its registered marks.

25   The distinctiveness of these marks, though, is relevant to

1    VGT's unregistered marks because many of the unregistered marks

2    contain VGT's registered marks together with additional design

3    elements."  And that's a quote from page 16 of the VGT

4    opposition.

5          And then in its concluding sentence in this subsection

6    on page 17 of its brief, VGT says, "Thus, the conclusive

7    presumption that the relevant registered word marks are

8    inherently distinctive should apply equally to the unregistered

9    word and design marks that includes such registered word

10   marks."

11         **THE COURT:**  Yeah, do you know of any authority for

12   that proposition?

13         **MR. GILL:**  None.  And certainly none is cited for

14   that proposition in the VGT brief.  As a matter of fact, it is

15   our position that this statement is fundamentally legally

16   incorrect.

17         A registered mark is entitled to a presumption; an

18   unregistered mark is not entitled to that presumption.  VGT's

19   claims are for unregistered marks.  The fact that they may

20   include a registered word mark within them doesn't mean the

21   entire common law mark is then entitled to a legal presumption.

22         The plaintiff knowingly and willingly and intentionally

23   did not assert a claim for trademark infringement of just its

24   word marks.  It is asserting a claim only for these common law

25   marks that include the word marks and the artwork and the

1    characters, you know, in addition to other design elements that

2    have not been identified.

3              THE COURT:   It's the court's intention to ask

4    counsel for authority for that proposition.

5              We're sitting at seven after 4:00 and we've got quite a

6    bit of additional argument to go on trade dress and trade

7    secret, as well as from the plaintiffs.  So we'll need to --

8              MR. GILL:  We do.  We do.

9              THE COURT:   -- hit the accelerator here.

10             MR. GILL:  I will do that, Your Honor.

11             But I hope you understand the defendants' position here

12   that required some time to explain that the claims that the

13   plaintiff has asserted for these unregistered marks are

14   problematic in that they weren't sufficiently articulated in

15   the first instance, and the plaintiff did not properly respond

16   to the motion in such a way as to create legitimate material

17   issues of fact for purposes of summary judgment.

18             And in that regard, the plaintiff has not shown -- with

19   regard to the likelihood of confusion factors, the plaintiff

20   has not shown a similarity of the marks, which, of course,

21   *Forney* tells us this is the most important of the factors.  The

22   plaintiff has not shown confusion as to the marks.  We've

23   already addressed the issue that the survey was weak and the

24   instances of actual confusion were few, they were de minimis.

25   And, of course, the law requires a likelihood of confusion, not

1    a possibility of confusion, no matter how remote.

2            We have the issue of intent.  The issue of intent has

3    not been addressed with regard to each of individual marks.  We

4    haven't had the plaintiff address the issue of the strength of

5    the marks in an individual basis.  We haven't had the plaintiff

6    address on an individual basis the issue of the degree of care

7    to be exercised by purchasers, or in this case, you know,

8    lessees of these machines.

9            The evidence shows pretty clearly that this is not a

10   low-involvement consumer purchase.  It's not like going to the

11   7-11 and buying a pack of gum, where you might buy something

12   new that you haven't seen before based on the color of the

13   packaging.  These machines are expensive.  The floor space on

14   these casinos is dear to the casinos because they want every

15   machine -- basically these were reverse ATM machines.  People

16   walk in these casinos every day and they shove money into them

17   and VGT makes money on them and so it's a great system.  So if

18   they have a machine that's not performing well, then it's not

19   in their interest to leave that machine taking up floor space.

20           So these tribes that lease these machines are

21   sophisticated, and the record clearly establishes that they're

22   sophisticated.  They know exactly what they're doing and they

23   monitor the performance of these machines on their floor.  So

24   this factor cuts against the plaintiff because this is a

25   high-involvement purchase or lease by these casinos.

1      And then, you know, the one point I will concede, in

2   terms of the similarity of the products, they're both

3   electronic gaming machines and they are sold and used in the

4   same line of commerce.  So that's a point that cuts against the

5   defendant but the other points, I think, all cut in favor of

6   us.

7          **THE COURT:**  I do have a question for you.  Who are

8   the relevant consumers for purposes of likelihood of confusion

9   analysis?  The tribal casinos or the players or both?

10         **MR. GILL:**  That's a great question.  There's no

11  question that it's probably both in different contexts.  The

12  casinos are the ones that make the decision about whether or

13  not they're going to place one of these machines on the floor

14  and give it exposure to a consumer in the first instance.  But

15  on the other hand, it's the consumers that make the decision

16  when they come up to the machine whether they put money in the

17  machine or whether they go back and put money in a different

18  machine.

19         The record in this case suggests that the consumers

20  that actually go to the casinos and put money in the machines,

21  they are creatures of habit, they like to go back to machines

22  where they've won money.  So not only will they go back, for

23  example, and play a Mr. Money Bags machine that they've played

24  before, they'll go back and play the very Mr. Money Bags

25  machine that paid them money the last time they were there.  So

1    that's what the evidence shows and that evidence shows that

2    they are sophisticated.

3            And, of course, the example that I gave you --

4            THE COURT:  Is that evidence of sophistication?

5            MR. GILL:  Well, it's evidence that they're not

6    going to be duped by playing a machine that's not the one they

7    were looking for.  So in that sense, it's evidence of

8    sophistication.  Are they sophisticated because they're shoving

9    their money into a reverse ATM?  Maybe not.  But for our

10   purposes, you understand what I'm saying?

11           THE COURT:  Yes, sir.

12           MR. GILL:  All right.  If you have any other

13   questions, I'm happy to address any of the other issues and

14   respond to Mr. Roman.

15           THE COURT:  Thank you very much.  Do we want to

16   address trade mark?

17           MR. ROMAN:  Your Honor, I was prepared to respond to

18   both the trademark and trade dress, Mr. Swanson the trade

19   secret issues.  I am mindful of the time.  I'd like to get my

20   points out.  There's a lot that Mr. Gill has brought out that I

21   would like to respond, but obviously it's your courtroom, Your

22   Honor, and we'll be guided by --

23           THE COURT:  Why don't you address trademark.

24           MR. ROMAN:  Okay.  I was going to do them together.

25   Actually that's one of Mr. Gill's criticisms because the

1    analysis is so overlapping --

2              THE COURT:  Well, as he referenced, let's hear trade

3    dress then from the movant.

4         I sentenced a guy yesterday to two years in prison.  He

5    started out selling bingo supplies and then graduated with the

6    industry and he wound up placing ATMs in various casinos around

7    the state of Oklahoma.  Apparently, he would get a piece of

8    every ATM transaction so he was making three-quarters of a

9    million bucks a year just on placing ATMs in casinos.  His

10   mistake was he didn't pay the IRS for about eight years in a

11   row.

12             MR. ROMAN:  So this is open for others to come take;

13   right?

14             THE COURT:  Well, there was another lawsuit two

15   doors down that he filed against his employer when his employer

16   started -- the executives saw that their salesman was making

17   more money than they were and they fired him.  So that's been

18   resolved.  Go ahead.

19             MR. PLATT:  Thank you, Your Honor.  Henry Platt for

20   defendants talking about the trade dress.

21        As you've heard from Mr. Gill and from Mr. Antonelli,

22   we've been plagued with sort of a moving target on a lot of

23   these issues in this case, none more so than the trade dress.

24   The trade dress that is alleged in the original complaint is

25   night and day different than the trade dress that's alleged in

1    their opposition to their motion for summary judgment.  That's

2    not withstanding the fact that they've requested and received

3    leave of court to file an amended complaint at the close of

4    discovery.  I would then add that the trade dress described in

5    the discovery is quite different than what was in the amended

6    complaint, the original complaint, the opposition to the

7    summary judgment motion, and everything else.

8         So their description -- it's not just their description

9    that has changed, which we've sort of walked through a little

10   bit in the briefs.  It's not that -- they keep saying that

11   they're entitled to refine their description, which is true,

12   but they haven't refined it, they've changed it.  They've

13   completely changed what they're actually claiming to be the

14   trade dress.

15        The Tenth Circuit in the *Forney* case was very clear

16   that they have a duty to clearly articulate what their trade

17   dress is, and that's so that -- it's, A, so the court can

18   fashion an appropriate remedy; it's also so that people in the

19   industry, like our client, would know what, you know, is and

20   isn't off limits.

21        But they also fundamentally misconstrue the idea of

22   what a trade dress is.  A trade dress is the overall look, the

23   total look of their product.  It's not a little piece here, a

24   little piece there.  Now, the courts are clear they can assert

25   the trade dress elements, the uniqueness or the distinctiveness

1   of trade dress elements, to just certain things, not the entire

2   product.  But you still have to look at the entire product, the

3   totality of the circumstance to decide what they're talking

4   about.

5          So we have a moving target here.  We also have

6   absolutely no consistency in the trade dress.  They have these

7   same games, these three-reel mechanical games, in multiple

8   different cabinets, the same -- we'll use Mr. Money Bags

9   because it's their favorite.  Mr. Money Bags is in what they

10  call a stand-up -- a C6 slant cabinet -- not slant -- an LS

11  cabinet, an upright cabinet.  That's the one you saw the

12  picture of in the complaint.

13         They also have a sit-down version of it, a slant

14  cabinet.  Same game, three-reel, Mr. Money Bags, not part of

15  the family, not the series.  The same Mr. Money Bags, they have

16  it in a giant one that they have on the floor of the casinos.

17  They have it with nine different size screens that have

18  different artwork on each one of those.  They have machines

19  that have -- the screens are smaller and have little tiny bingo

20  patterns in them which are part of their elements.  They have

21  bigger screens that have big giant bingo patterns in a

22  different place.  They have -- that's just for Mr. Money Bags

23  in the same casino, all right?

24         Across their line of machines they have -- you know,

25  they talk about the pay tables that they use.  They have a

1    bunch of exhibits attached to the complaint -- I think it's

2    Exhibit 6 to the complaint -- where they show all the different

3    pay tables and they claim that we use the same pay tables,

4    putting aside the fact that those are industry-standard pay

5    tables.

6        If you look at the pictures submitted of various games,

7    sometimes they have them in the round top and sometimes they

8    don't.  Sometimes they're in the belly glass, what they call

9    it, all right?  So there's no consistency across their line.

10   Plus all those different permutations, we have an undisclosed

11   number of games that have this jukebox lighting option, okay?

12   Your Honor allowed in one of the motions one of the witnesses

13   to testify that the majority of their games don't have the

14   jukebox lighting, okay -- they say they don't track it -- at

15   least 50 percent.  So somewhere less than 50 percent but almost

16   50 percent have this lighting which shows up in all their

17   pictures.  It shows up in their marketing materials.  It shows

18   up in their complaint.

19       They have a picture of something called "planetary

20   pigs" that has purple light around it.  These same games have

21   the halo lighting in yellow, in red, in orange.  So each game

22   is different.  Some of them have toppers, the oval toppers as

23   opposed to our iPad topper.  They have oval toppers, some of

24   them are round, some of them are square, some of them are

25   there, some of them aren't there.  The point is, there's no

1    consistency, and without consistency there is no trade dress,

2    period.  That's the end of the analysis right there.

3         Now, let's get into a little bit of the specifics of

4    what is actually articulated.  In the amended complaint, which

5    I think controls frankly, not what's in their summary judgment

6    motion -- but we'll talk about that -- the summary judgment

7    opposition.  The amended complaint -- oh, and I forgot to

8    mention that all those different elements of their trade dress

9    have changed consistently over time which the *Forney* court says

10   destroys the trade dress as well because it's not consistent.

11        Now, in the amended complaint and the original

12   complaint, because it wasn't changed, they talk about, one, the

13   game cabinets; two, the game play sounds; three, the award

14   sounds, which they define as the mechanical bell, use of a

15   mechanical bell; the bingo pay and plays, which they -- that's

16   where they attach the examples of the pay tables, which are

17   actually called "pseudopay tables," that appear in the round

18   top and other places on the machines; the red screens, which is

19   their bonus spins game where there's a film that goes over the

20   video screen.  Again, remember, some of them are -- we're

21   talking about a six-inch rectangle, that's the screen, that has

22   a red film over it.  That's the whole thing.  Sometimes they

23   have a bigger screen where there's a red film on it.  We're not

24   talking about even the new version that's changed as opposed to

25   what ours is.  And they have various themes which they say are

1    part of the trade dress but they don't quite explain how.

2         Now, in the opposition for summary judgment -- and it's

3    our contention that they cannot amend the complaint through an

4    opposition to a summary judgment -- they talk about the cabinet

5    and they limit it to -- they've now limited it to the LS

6    cabinet so it's one out of five or six cabinets that they have.

7    Because those series of games, that Mr. Money Bags Goes to the

8    Beach, Mr. Money Bags Goes Shopping, whatever it is that they

9    have, all the endless versions, those are in three-reel,

10   five-reel, they're in video, they're in progressive machines,

11   those are in at least five different cabinets, all right?  So

12   now they're limiting it to one specific cabinet, okay, which

13   they say -- you know, with two different screen sizes, which

14   now for the very first time in the entire case they're claiming

15   there's two separate lines they're talking about.  Though,

16   quite frankly, they have never actually said in their

17   opposition which of the two lines, if any, we're infringing on.

18   I mean, I don't know how you can infringe on two separate lines

19   with the same image but that's what their argument is.

20        They say the court should just ignore the jukebox

21   lighting, pretend it doesn't exist, even though it's got this

22   huge deployment.  And for the first time, they have not -- as

23   opposed to the complaint -- they have not limited their

24   description to three-reel mechanical games; they just say

25   "mechanical games."  Well, they have five-reel games, they have

1    four-reels, three-reels.  Some of them have this round --

2    another reel in the top.  Same games with another reel on the

3    top.  And that's for the first time.  And that opens up,

4    frankly, a whole new front because there's a whole lot of

5    differences between the five-reel games and the three-reel

6    games.

7            The second thing they talk about is the red strobe,

8    they call it, the light that's on top of the cabinet.  The red

9    strobe is not in the complaint, it is not in the amended

10   complaint, it's not there.  They are now saying that's

11   something separate from the cabinet itself, this red strobe.

12   There's a lot of talk about it in discovery, and we can talk

13   about ours versus theirs, but it's not in the complaint.

14           They also now talk about the reel resolution sound as

15   opposed to in the complaint where they talked about the -- the

16   right word was the reel -- the sound of the reels spinning.

17   Now they're talking about the reel resolution.  Not really sure

18   what a reel resolution sound is but I think I get from their --

19   whatever.  It's noises that come out of the machine when the

20   reels stop.  That's different from the reels spinning.

21           They talk about the award sound which is -- okay,

22   that's the mechanical bell.  We get that.  The bingo pay and

23   plays, that is a feature that's different in every single game.

24   They have different pay tables.  They have different -- as far

25   as I -- my understanding is that for the games that are still

1    at issue, there's three, maybe four different actual pay

2    tables, what they call ████████████████. I'm not really

3    sure which ones are technically still in the case. But that's

4    how out of ██ pay tables that they have. So the bingo pay and

5    plays is different in every game, and so I'm not sure how that

6    can be a consistent trade dress across their lines but that's

7    what the allegation is. And the red screen free spins, which

8    ignores, like we said, the new versions and it ignores video

9    versions of it.

10          The point in all this is that they don't have a trade

11   dress. It's inconsistent. It's changed over time. *Forney*

12   says it's not a trade dress if it's not consistent and if it's

13   changed. You can't ignore the entirety of it. They can't

14   pretend that the jukebox lighting isn't there sometimes and not

15   there other times. They can't pretend that it doesn't have the

16   toppers.

17          Now, assuming they can pretend that this narrow version

18   that they like, because they think if you take away all these

19   other things, it looks the most like our machines or our

20   machines look the most like -- if you strip out all the other

21   stuff that makes it look different, then it looks similar.

22   That's their position.

23          So assuming there's some sort of trade dress there, the

24   next question the court needs to look at is functionality.

25   They have the burden -- the Supreme Court has said it

1   repeatedly -- of proving that their trade dress is

2   nonfunctional.  It's the *TrafFix* case.  If the trade dress is

3   functional, nothing else matters.  No matter how much they say

4   we copied it, we have the absolute right to do that, unless

5   they have copyright protection or some sort of patent

6   protection.  If they don't have the trade dress or if their

7   trade dress is functional, copying doesn't matter.  I'm not

8   saying we did copy.  I'm just saying it doesn't matter because

9   that's the allegation.

10          Now, in the *Wal-Mart* case, the *Wal-Mart v. Samara* --

11  it's the seminal case in all this -- the court pointed out that

12  product design almost invariably serves purposes other than

13  source identification, which is what we're talking about here.

14          In the *TrafFix* case, the Supreme Court said that to be

15  functional there's basically two tests.  It has to be essential

16  to the use or purpose of the product or it affects the cost or

17  quality of it; or the second one is, exclusive use of the trade

18  dress would create a competitive disadvantage.

19          Now, I'm not going to go through, in the interest of

20  time, obviously how each element of their alleged trade dress

21  is plainly functional because their argument is that, well,

22  yeah, but if you put it all together, you know, you have to say

23  whether the totality of it is functional.

24          Well, I think the *Leatherman* case, which we cited in

25  the brief, Second Circuit case, hits it on the head when they

1    say that when an article is nothing more than a combination of

2    functional parts, it's functional.

3           Now, the key point in all this, I think, is when we're

4    talking about the totality of the machines.  If Castle Hill

5    cannot use its games, which it has made in the style of classic

6    Las Vegas slot machines, then it's at a serious competitive

7    disadvantage.

8           We cited in the brief, in our opening brief, the

9    deposition testimony of Mr. Starr who at the time was the

10   executive vice president of VGT, executive vice president of

11   sales.  He is their current president.  What he said was that

12   the purpose of the design -- the purpose of their design is to

13   emulate the classic, traditional slot-gaming experience.

14          That's the key to what Castle Hill has done here.

15   That's the key to everything in this case.  These are not slot

16   machines.  They look like slot machines but they're not.

17   They're bingo games that are dressed up to look like slot

18   machines.  They have this -- both VGT and Castle Hill have

19   tried to emulate this classic slot machine look, what they used

20   to call the "one-arm bandits."  Of course they've gotten rid of

21   the arms but I'm sure you've heard the expression, okay?  This

22   classic, old-time, Las Vegas look.

23          So Castle Hill uses what they call the "classic retro

24   cabinet," which VGT does too, which several other people in the

25   industry use, all right?  We buy them used, all right?  So

1    that's how common they are.  Now, they're retro -- the reason

2    they're called "retro" is because they're this classic look,

3    the shape, the round top.

4         These machines are three-reel mechanical games, meaning

5    they have spinning reels.  Reels have absolutely nothing to do

6    with the game of bingo, nothing.  They call it an entertaining

7    display, all right?  It's all an illusion to make you think

8    that you're playing an old-time slot machine, a classic,

9    old-time slot machine.

10        VGT uses in its pay tables -- it's now completely

11   undisputed that those pay tables that are attached to the

12   complaint as pictures are the same pay tables that they took --

13   that were used by a company called "IGT" for decades.  They are

14   standard industry pay tables, okay?  There's no dispute about

15   that.  They come from something called "Double Diamond" and

16   "Double Triple Cherry" or something like that.  ████████████

17   ██████████████████████████████████.  That's not in dispute,

18   okay?  So they're using these classic pay tables so that people

19   have this familiarity to the classic games that they always

20   used.

21        The other issue is the mechanical bell.  Why on earth

22   do people use a mechanical bell in the age where my phone can

23   remake any ring tone in the world?  Because they're trying to

24   emulate the classic, original, one-arm bandit look and feel of

25   these games.  They have bonus spins because that's how the

1    classic games already did it.   They have ubiquitous themes.

2    It's no longer in dispute.   They sort of gave up on all the

3    theme business a long time ago, that money is ubiquitous

4    themes, that gems and gold and mining, these are all things

5    that are used throughout the machine's history, throughout the

6    gaming history.   That's what people do.   They expect to -- it

7    came from Double Diamonds.   All of these things have diamonds

8    on them, okay?

9         So the point is, the functionality of the whole -- the

10   gestalt of the whole thing is the classic Las Vegas gaming

11   experience and that's what would -- the functionality of this.

12   It's not because -- yeah, you could use a million other things.

13   You could, instead of using the mechanical bell, yeah, we could

14   use a ring tone from Apple or whatever.   But the point is that

15   they're trying to make an experience or make the player

16   comfortable with what they've been playing for years, which is

17   this classic slot machine thing, when it's not a slot machine.

18        Now, if -- and let me know if I'm going to fast, Your

19   Honor.   I'm trying to move it along for you here.   If, and only

20   if, the court finds that there's a consistent trade dress, and

21   if, and only if, the court finds that they've established that

22   it's nonfunctional does the court need to get to secondary

23   meaning, okay?   And they need secondary meaning.

24        They have pretended in their opposition that this is

25   product packaging and not product design.   I can spend some

1    time on it, if you want.   The Supreme Court says if it's

2    product packaging -- I mean, if it's product design, they must

3    prove secondary meaning.   I think it's not even a close call.

4    If Your Honor thinks it's a close call, then the Supreme Court

5    says the court has to assume it's product design and apply.   So

6    I'm not going to spend a whole more time on there unless the

7    court has specific questions on that.

8         Just on that, I will note that in the complaint, the

9    amended complaint itself, right before paragraph 16 of the

10   amended complaint, they have something -- a title that says

11   "VGT's Products," okay, the products.   Then in paragraph 16,

12   they describe -- all of its products are categorized as, quote,

13   Class II bingo-based player terminals.   It's the terminals.

14   It's this entire machine that's the game.   It's the interface.

15   It's three-reel mechanical.   It's the bonus spins which is part

16   of their game.   It's the game play sounds.   It's the playing of

17   the game.   It's not -- it's not a box.   In any event, if

18   there's any doubt, the Supreme Court says you have apply

19   secondary meaning.   Again, we don't think it's a close call on

20   secondary meaning either.

21        Mr. Gill talked about direct versus circumstantial.

22   I'm not going to spend any time talking about the Wind survey

23   because I don't think it's worth talking about.   I'm not going

24   to spend -- unless the court has any questions.   And the same

25   thing with the actual confusion evidence, I don't think there's

1  anything there.  But --

2          THE COURT:  If the court determines that VGT has

3  submitted sufficient evidence of Castle Hill's intent to pass

4  off products as those of VGT, couldn't a reasonable fact-finder

5  find that VGT's trade dress had acquired a secondary meaning?

6          MR. PLATT:  They would need to show an intent to

7  confuse, not an intent to copy the product.  I think the *Forney*

8  case and the *Water Pik* case are pretty clear on that; right?

9  Intentional copying, there's nothing wrong with intentional

10  copying.  The question is unless it's copying -- you know,

11  patented or copyrighted or -- the question is whether or not

12  there is an intent to deceive the public.

13          So if your question is, if the court finds that there's

14  an intent to deceive the public into thinking that these games,

15  notwithstanding the prominent house marks and the different

16  looks and the fact that we put a rectangle topper on top of

17  theirs and we have a different light than theirs and so forth

18  and so on --

19          THE COURT:  Well, your light isn't that different.

20          MR. PLATT:  I'm sorry?

21          THE COURT:  Your strobe on the top is not that

22  different; correct?

23          MR. PLATT:  Well, you haven't seen them.  Granted,

24  you saw their pictures, okay?  First of all, ours have a white

25  layer and theirs has a red and white --

1    **THE COURT:**  Are you making -- are you making an

2    argument that since I haven't seen them, I need to deny all the

3    motions for summary and have the trial?

4    **MR. PLATT:**  Well, it's their evidence.  I mean, it's

5    their burden to establish it but --

6    **THE COURT:**  Well, but you're moving for summary

7    judgment --

8    **MR. PLATT:**  And we have -- and what we have in the

9    record is that theirs is an incandescent light, ours is a LCD

10    light.  Ours has a white level, a candle really, I mean, it's a

11    candle with a strobe on top.  They're different.  It's just one

12    of the elements, okay?

13    **THE COURT:**  Same manufacturer; right?

14    **MR. PLATT:**  Same manufacturer, yes.  Philips makes

15    lots of different light bulbs too.

16    **THE COURT:**  Good point.

17    **MR. PLATT:**  The bell is from the same manufacturer.

18    They're different sizes.  They're different, you know, voltage.

19    They're different.

20    Now, the other thing that they have to do, though, is

21    find secondary meaning for -- you know, if they -- when they're

22    trying to prove it through their ad revenue and through their

23    marketing, they need to show that the ad revenue and the

24    marketing is all directly related to the marks themselves, to

25    the trade dress themselves.  What they've produced is a lot of

1    evidence that they have a guy dressed up like Mr. Money Bags

2    that goes around and they push, you know, the different names

3    of their characters.   There's some evidence that they pushed

4    the red screens.   They think people like that term, "red

5    screens," okay?

6         Again, the trade dress is the gestalt, it's the total

7    look of the machine.   There is nothing in the record tying the

8    total look of their machine, absent, you know, in the version,

9    the specific version, that they're talking about here, not all

10   their Mr. Money Bags machines.   The Mr. Money Bags machine

11   that's in this particular cabinet without the lighting, without

12   the topper, that has -- all right.   They don't have anything

13   tying specifically to that trade dress, to the extent the court

14   finds that that could be a trade dress, but we obviously don't

15   think they can.

16        So they've also changed, as we said, over time the size

17   of the machine and their trade dress has changed.   The Tenth

18   Circuit in *Forney* says that when you change it over time, you

19   can't prove secondary meaning because it doesn't have a

20   consistent, over time appearance, it destroys secondary

21   meaning.

22        So as far as likelihood of confusion, we think there's

23   little similarities.   The cabinets are generic.   They're

24   widespread.   Again, I don't have to go through -- we have the

25   toppers.   They have the lighting.   I mean, I think they all

1    look very different.  We have the house marks, which think

2    about where it is in that curved top, all right, the round top.

3    It's at eye level when you're sitting there, okay, or when

4    you're standing there.  You walk by, that is at eye level.  So

5    if you're looking at machines one by one, it's right there,

6    okay?

7          Granted, Mr. Money Bags, who doesn't like it's very

8    prominent when it's in black and white or color in the papers,

9    but when you have a machine with lights on it's a prominent

10   thing and people see it and there's no -- it's there and we

11   can't pretend that it's not there.

12         As far as other differences, you know, like I said, we

13   have different lights, the different bells, our cabinets have

14   different dimensions.  But a critical one, I think, is the red

15   screens because they put a lot of emphasis on that.  Again,

16   they have this red film that goes over their little six-inch

17   box or the bigger one.  Ours is a video, it plays a movie that

18   says "instant free pay" across it with stuff going on like

19   that.  Our reels turn red, the whole machine turns red, and

20   starts doing stuff, okay?  It's night and day, night and day.

21         I understand they're upset about it because -- the

22   reason they're upset about it is because the president of their

23   company testified -- and what was referenced earlier -- that,

24   well, ████████████████████████████████████████████████

25   ████████████████████████████████████.  And then ultimately on

1   the last day of discovery, they admitted that █████████

2   ████████ which was, we said, August of this year -- of last

3   year, all right?  So they've now changed their trade dress

4   again because they want what we have.  That's why they're

5   upset, not -- there is no comparison to their red screen to our

6   "instant free pay."  They're completely different.

7          Again, on intent to copy, your question before, our

8   intent was to compete, to compete by emulating the classic slot

9   machines experience.  It's not by trying to make people think

10  that they're playing VGT games.  They were trying to get them

11  to think that they're playing classic slot machines.  There's a

12  bunch of -- in those discredited surveys that VGT did over the

13  years, most people don't have any idea they're playing bingo,

14  they think they're playing slot machines.  I think that's a

15  fair assumption.  I know I've played them.  I forget I'm

16  playing bingo.  You got reels spinning.

17         That's the experience that we're trying -- that the

18  company is trying to emulate, not trying to make people

19  think -- and to compete in that space head on with VGT, yes,

20  that is our intent.  We intend to have more customers play our

21  games than theirs because we think they're better games.  But

22  it's the same style of game.  That's where we're competing and

23  that's where we're entitled to compete.

24         And along that line, regarding what Your Honor asked

25  before, in *Water Pik* itself on page 1157 the Tenth Circuit

1    said, "When we have said that evidence of intent to copy may

2    justify an inference of confusion, we have been referring to a

3    particular mark, not copying a competitor's product."  And I

4    think that's what's critical here.

5          We've already talked about the evidence of actual

6    confusion.  The casino customers, whether they're sophisticated

7    or not, we've talked about that.  VGT admits that their

8    customers are the tribal casinos.  Do the players, you know,

9    casino-goers play the games?  Yes.  But the relevant customers

10   from VGT's mouth is the tribal casinos.  They're the ones that

11   lease the games.  They're the ones that decide what goes on the

12   machine.  They're the ones they have to deal with on the

13   amount.  They're the ones who care what style it is.  They're

14   the ones that want the classic -- the ones that look like

15   classic machines because they know what their customers --

16   their customers pay who want to play.

17         And as far as the strength of their trade dress, it's

18   weak.  I mean, the secondary meaning is a sliding scale.

19   There's a threshold you have to get to to secondary meaning,

20   but since we don't think they can get there, I really don't

21   think you can say that it's strong.  I mean, it's just a

22   routine cabinet in a sea of other routine cabinets.

23         And if Your Honor has no other questions, I think

24   that's about all I want to say on this.

25               THE COURT:  So I'm looking at *Forney* here and your

1    reference to changing over a period of time.  You don't contest

2    that VGT can properly -- I know you are saying that this is a

3    traditional cabinet, lots of people with traditional cabinets.

4    But you're not contending that they can't select a subset of

5    their machines and contend that those are the proper focuses of

6    a trade dress claim; correct?

7              **MR. PLATT:**  No, I disagree.  I think they can't --

8    they can focus on specific elements that they think are unique

9    or distinctive, if we're going the distinctive route, about

10   their products as opposed to everybody else's, but you still

11   have to look at the overall total machine.

12             **THE COURT:**  Correct, correct.  But they can --

13             **MR. PLATT:**  So they can claim just A, B, and C and

14   then you can decide whether A, B, and C, given that the entire

15   thing, you know, has all these other things, you know, is

16   enough.  So they can articulate it that way, but whether that's

17   enough, I don't think so.  I don't think it makes it

18   distinctive enough.  I don't think it's something that's

19   recognizable that they've even pretended to get secondary

20   meaning on, the entire -- this very narrow, specific

21   permutation of a subset of all these games that are on the same

22   casino floors.

23             I mean, to say it's not -- you know, in one sense

24   they're saying we really have 22 products out there, 22 product

25   lines of the same game, and you should ignore them all and just

1    focus on this one.  But if you do that, then they don't have a

2    trade dress because they have all -- they have 20 different

3    versions of the same thing in the same store -- in the casino.

4    You know what I mean.  So that's why they don't have a trade

5    dress.

6                 THE COURT:  All right.  Thank you very much.

7                 MR. PLATT:  Thank you, Your Honor.

8                 THE COURT:  Mr. Platt.

9                 MR. ROMAN:  It's Mr. Roman, sir.

10                THE COURT:  I'm sorry.

11                MR. ROMAN:  Unless you want more of Mr. Platt.

12                THE COURT:  Mr. Roman.  I'm sorry.

13                MR. ROMAN:  I don't want anymore from Mr. Platt.

14                THE COURT:  No, sir.  Go ahead.

15                MR. ROMAN:  Your Honor, may I please hand up the

16   printout of our PowerPoint presentation?

17                THE COURT:  Please.

18                MR. ROMAN:  Okay.  Also to your law clerks?

19                THE COURT:  Thank you.

20                MR. ROMAN:  And, Your Honor, I really like our

21   PowerPoint presentation.  I'm not going to go through the whole

22   thing.  I don't think it's fair to keep everybody here for

23   that.  But I would urge the court to go through it.

24           I guess I'd like to start with the principle that seems

25   to have been ignored by Castle Hill.  It's the overriding

1  principle on this motion and it's set forth in *Sally Beauty* and

2  the other Tenth Circuit cases, and that is that summary

3  judgment is almost never granted in trademark and trade dress

4  cases and that's because each element of those claims is so

5  fact-intensive.  You've heard from counsel and they say that,

6  you know, the marks don't look at all the same.  We obviously

7  are going to take a contrary position and it's going to be up

8  to Your Honor to choose, but I don't believe it's an

9  appropriate time to do so in the motion for summary judgment.

10              THE COURT:  Believe me, this has gone through my

11  mind as to whether or not this is just a dress rehearsal to

12  acquaint me with some of your arguments.  Because as I

13  mentioned to you before, you know, to the extent that one has

14  to look at the entire gestalt, looking at these things by

15  reading briefs doesn't get a fact-finder there.

16              MR. ROMAN:  And Your Honor, in the limited time --

17  and I don't want to keep the court staff here longer than

18  necessary -- the limited time I have what I'd like to do is go

19  through the marks to kind of give you that preview and then hit

20  of some their main points and then call it a day, if that's

21  okay.

22              So let's start with the similarity of the marks, Your

23  Honor.  You know, Mr. Gill took me to task again today for not

24  setting out in our briefs a narrative description of the trade

25  dress at issue.  But, you know, as they say, a picture is worth

1   a thousand words.  Here on the left is VGT's Mr. Money Bags

2   machine and on the right is the Castle Hill New Money machine.

3   It's the same type of Class II, three-reel mechanical game,

4   similar cabinet, nearly identical red strobe at the top made by

5   the same company, Seco-Larm, similar artwork, the same bingo

6   patterns with the similar payouts.

7           Now, let's go to -- I want to play the sounds for Your

8   Honor.  Let's go to -- I hope it works.  We did it in dress

9   rehearsal here.  Okay.  So we have -- this is the real

10  resolution sound, Your Honor.  This is what happens when they

11  -- oh, shoot -- when the reels come to a close.  Here we go.

12  This is VGT's.

13                      *(Sound played)*

14          **MR. ROMAN:**  Would you like me to play that again,

15  Your Honor, or --

16          **THE COURT:**  No, that's fine.

17          **MR. ROMAN:**  And here's Castle Hill's.

18                      *(Sound played)*

19          **MR. ROMAN:**  Okay.  Then here's the award sound.

20  Again, the same bell from the same company -- or a similar

21  bell, I should say, from the same company.  This is the W.L.

22  Jenkins bell.  This is what happens when you win.  This is VGT

23  first.

24                      *(Sound played)*

25          **MR. ROMAN:**  And here's Castle Hill's.

1                    *(Sound played)*

2              MR. ROMAN:  Okay.  So then you also, Your Honor,

3    have the same pseudopay tables.  It's VGT on the left, Castle

4    Hill on the right.  They're generally in the same position at

5    the top of the cabinets.  You have the same bingo patterns.

6    And here, Your Honor, you see the private stripes pattern used

7    by both of them.  It's one of many patterns they use in common.

8    The payouts are similar.

9              THE COURT:  In terms of those tables, Mr. Platt had

10   argued that these are traditional pay tables, that they've been

11   in place for a long time, multiple manufacturers.  So you're

12   just focusing on --

13             MR. ROMAN:  No.  And we would not be claiming on

14   just the pay table, Your Honor.  It's just one more factor

15   that's similar or the same.

16             And I did not do the red screen free play -- where did

17   that go?  Here we go.  So this is the red screen free spins.

18   First VGT.

19                    *(Sound played)*

20             MR. ROMAN:  That was a happy customer.  Okay.

21   Here's Castle Hill.

22                    *(Sound played)*

23             MR. ROMAN:  So not everything, Your Honor, is

24   identical.  It doesn't have to be.  And the Tenth Circuit made

25   it plain in *King of the Mountain* that the court is to give

1    weight more to the similarities than to the differences.

2          And then I guess one last point.  We talked about the

3    house marks.  I guess -- here they are in terms of the

4    prominence and whether they're a distinguishing feature and I

5    gather it does differ from game to game.  And we did not mean

6    to just take the one where it's the least obvious, but we chose

7    the Mr. Money Bags because ████████████████████.  You can

8    see that the house mark is not just small but obscure on both

9    the VGT and the Castle Hill machines.

10          Now, this is not an accident, Your Honor, and this goes

11   to the intent point.  By the way, *Sally Beauty* makes plain --

12   and this is particularly relevant here, Your Honor -- that

13   intent to copy -- not intent to deceive -- but intent to copy

14   standing alone may be enough to preclude summary judgment.  And

15   we submit, Your Honor, that we have intent to deceive, but just

16   intent to copy is enough to defeat summary judgment.  Virtually

17   everything Castle Hill has done has been modeled after VGT.

18          Let me start --

19          **THE COURT:**  Now, you're just focused for the moment

20   on the register mark?

21          **MR. ROMAN:**  Well, it's -- no, it's everything, Your

22   Honor, as you'll see.  Let's start here on the screen where we

23   have -- there are two documents.  These are both from Castle

24   Hill documents.  But the product hardware strategy, this is a

25   Castle Hill strategy document and talking about creating a

1    familiar player experience with cabinet interface, color

2    scheme, and feature set that is easily recognizable and

3    familiar in the marketplace.  We have deposition testimony

4    tying that to VGT.

5         And actually, it's interesting, Your Honor.  They talk

6    -- Mr. Platt was talking about that the intent was to make

7    classic -- I wrote this down -- classic slot machines.  That

8    doesn't appear in any of their documents.  What appears in any

9    of their documents is what appears in the next section here on

10   retro cabinet, where all doubts as who they're copying is made

11   plain where it says what type of retro cabinet they're making?

12   VGT style.

13        In fact, you see throughout their documents, Your

14   Honor, there are all these references to VGT.  No reference --

15   or maybe no.  I don't want to go that far.  But I believe that

16   there are either one or two or no references to any other

17   manufacturer, it's all VGT, and it's not to classic slot

18   machines.

19

20

21

22

23

24

25



And, Your Honor, to the extent that there is an issue about whether it is intent to copy or intent to deceive, at best -- at best -- that's a credibility issue, a fact issue, and at this stage all doubts are to be resolved against Castle Hill.

And, again, the Tenth Circuit in *Sally Beauty* wrote, "One who adopts a mark similar to another already established in the marketplace does so at his peril because the court presumes that he can accomplish his purpose; that is, that the public will be deceived.  All doubt must be resolved against him."

Now, the intent to copy or deceive -- well, actually let me go first:  There is some -- okay.  Let's go there.  So clearly it worked.  We talked about actual confusion and Your Honor has admitted two forms of the -- the two core forms of actual confusion, the survey, the consumer survey, and the anecdotal evidence.  Those are going to be -- those will be -- that evidence will be presented at trial.

1    Now, I know that Your Honor has expressed concerns

2    about the --

3         **THE COURT:**  The Wind?

4         **MR. ROMAN:**  -- about the Wind survey.  We intend to

5    allay those concerns at trial, but for now it will be

6    introduced pursuant to Your Honor's order and it is evidence of

7    actual confusion.  In fact, it's more than twice the amount of

8    confusion needed -- that the courts have typically required.

9         As with respect to the anecdotal evidence, we will have

10   14 evidences of actual confusion, and I believe can it's either

11   seven or eight of those involve consumers.  That's a big

12   number.  Fourteen's a big number.  It's especially a big number

13   given the difficulty of finding such evidence.  It occurred in

14   a relatively short time when Castle Hill has had a limited

15   presence in the market.  Because the games are so similar, the

16   players may not realize they're confused.  Even if they do

17   realize they're confused, because the games cost so little --

18   some of these games cost as a little as a quarter to play --

19   they may not complain.

20        In fact, that's a phenomena that was recognized by the

21   Tenth Circuit in the *Brunswick* case.  They just say they may

22   just go avoid the product, which, of course, is a terrible

23   outcome and one of the ones that's at the core -- one of the

24   core concerns of the trademark clause.  And even those players

25   who realize they're confused and complain will do so to the

1  casino employees, not to the manufacturers.  Nobody's going to

2  call VGT up and, you know, complain about a bad Arctic Cash

3  game, they're going to go complain to the casino.

4      And what's worse, Your Honor, is not only is there this

5  confusion out there -- and you saw -- I think you've ruled

6  specifically on these two -- on these two posts that are up

7  there, social media posts, one where a consumer -- one consumer

8  says that, looks like I need to come play some VGT, and he's

9  corrected, said, no, no, no.  It's Castle Hill, CHG.

10     And then there's another -- the one on the right, Your

11 Honor, is a reference -- the consumer says that it looks

12 like -- look at these VGT $1 machines.  That's at a casino

13 where there are no VGT machines; they're Castle Hill machines

14 there.  And what's worse, Your Honor, is Castle Hill's aware of

15 this confusion and they find it amusing.  It's a joke between

16 Mr. Starr and Mr. Milligan.

17     Now, with respect to -- let me step back for a moment,

18 Your Honor.  You know, as Your Honor's well aware, the test is

19 not actual confusion; the test is likelihood of confusion.

20 But, of course, the best evidence of actual confusion --

21 likelihood of confusion is actual confusion because if it's

22 actually happening, it's hard to argue that it's unlikely to

23 happen.

24     Castle Hill argues that it should be disregarded as de

25 minimis, the number of instances.  But it's important to bear

1    in mind the limited instances in which courts dismiss evidence

2    of actual confusion as de minimis.  There are basically three

3    circumstances:  Where the products aren't similar, it's not the

4    case here; whether the defendant has put on substantial

5    evidence demonstrating no confusion, no evidence here, no

6    survey here; and there are other reasons to discount, such as,

7    you know, from people not familiar with the industry or

8    isolated instances, and, again, not the case here.

9         We are not aware of any case in the Tenth Circuit that

10   has ever held that more than seven instances, let alone

11   fourteen instances, are de minimis.  In fact, you know, the

12   Tenth Circuit in the *Big O Tires* case held that a dozen

13   instances was not de minimis, and the Court of Appeals in

14   *Brunswick* held that one instance -- even one instance may be

15   worthy of consideration if it's the right type of confusion.

16   And there, the consumer sent the reel to the wrong manufacturer

17   for repair.  I just have to note that was a Zebco reel and that

18   was my very first fishing reel, a closed-face reel that I

19   caught a lot of smallmouth bass on it.

20              **THE COURT:**  Made here in Tulsa, Oklahoma.

21              **MR. ROMAN:**  And a good reel it was.

22        So there's some question that was raised at the

23   beginning about what exactly we're claiming and whether it's

24   been shifting or not.  And actually it's interesting.  First of

25   all, we did set forth clearly in the amended complaint, and I

1  was really taken aback when there was an allegation or there

2  was an assertion made in the Castle Hill's presentation that we

3  haven't set it forth in any detail.  I believe they complained

4  that our interrogatory responses, where we set out -- specified

5  the trademarks and trade dress at issue, I think they said it

6  was too lengthy, they complained it was too long.  So, you

7  know, damned if you do, damned if you don't.

8         But anyway, to make clear what is at issue here, this

9  is the trade dress that's at issue.  There's six elements.

10  There's the game cabinet, the red strobe at the top, the reel

11  resolution sound that we heard, the award sound that we heard,

12  the bingo pays and plays, and the red screen free spins.  Those

13  six elements in combination, no one in isolation, but all six

14  in combination are the trade dress at issue.

15         The trademarks at issue, there are four series of games

16  in which we are -- on which we are basing our claims:  Crazy

17  Billions, Mr. Money Bags, Polar High Roller, and Greenback

18  Jack.  Within those trademarks, there are -- within each series

19  of those, there are four types of marks for which we seek

20  protection:  the word marks, the logo marks, the artwork on

21  each panel, and then the characters.

22         And then here are the Castle Hill games with the VGT

23  analogs right next to them.  So on the left-hand side of each

24  of these, you have the VGT game, and on the right you've got

25  the Castle Hill game.  So I think the first one is Crazy Bill,

1    which is a VGT game, and then Welcome to Nugget Mountain on the

2    right.  You've got Mr. Money Bags on the left and New Money on

3    the right.  You've got Polar High Roller on the left and Arctic

4    Cash on the right.  And then you've got -- what is this one? --

5    Coin Slingers on the right and Greenback Jack on the left.

6          So let me talk a moment, if I could, about secondary

7    meaning.

8               THE COURT:  Before we do that --

9               MR. ROMAN:  Sure.

10               THE COURT:  -- you used the term "series" and we've

11    picked up on this doctrine of family of marks.  Are you

12    invoking that doctrine of family of marks?

13               MR. ROMAN:  Well, I'm unfamiliar with that precise

14    concept.  I think I agree with it, that, Your Honor, it's not

15    just -- it's not just Mr. Money Bags, but there are brand

16    extensions and they are -- we seek protection on all of those.

17    There's a whole -- there is, I guess, a family of Mr. Money

18    Bags marks.

19               THE COURT:  All right.  Does VGT have authority for

20    the proposition that the court can consider the marks as a

21    series?  And just to be clear, are you talking about all of the

22    Mr. Money Bags games or just the classic one?

23               MR. ROMAN:  Well, it's all the Mr. Money Bags games

24    that are -- well, for the marks, yes, all the Mr. Money Bags

25    games.  Now, I would like to have an opportunity to provide you

1    with authority, if I could, Your Honor.

2            THE COURT:  Let me ask here:  Aside from whether the

3    court will grant partial summary judgment or not, it's my

4    understanding then that VGT will at least concede that its

5    trademark claims as they now stand are limited to Mr. Money

6    Bags as the sole registered trademark claim and then the

7    unregistered trademark claims premised on four series,

8    Mr. Money Bags, Polar High Roller, Crazy Bill, and Greenback

9    Jack?

10           MR. ROMAN:  That's correct, Your Honor.

11           THE COURT:  All right.  Secondary meaning.

12           MR. ROMAN:  Secondary meaning.  So, first of all,

13   Your Honor is correct when you asked counsel for Castle Hill

14   about the -- I don't know whether you were quoting from *Sally*

15   *Beauty* or not -- but proof of an intent to copy, which we have

16   here, is enough to show secondary evidence -- secondary

17   meaning.  I'm sorry.  So that should end the matter right

18   there.

19           Also, Your Honor, secondary meaning comes into play

20   only if the court finds that the marks and trade dress at issue

21   are not inherently distinctive, and we submit that they are,

22   Your Honor.  I'm sure Your Honor is aware of the categories of

23   distinctiveness.  Here, they are listed from least distinctive

24   to most.  We suggest that the VGT trademarks and the VGT trade

25   dress are arbitrary, that they are -- they don't describe

1    anything.  I'm sorry.

2         So secondary meaning or acquired distinctiveness comes

3    into play only with respect to descriptive marks.  The VGT

4    trademarks and VGT trade dress don't describe anything.  They

5    are -- they are things that are arbitrary, they're pulled out

6    of the air.  So it's not -- it's not -- we don't even have to

7    get there.

8         If we do get there, here are the factors for acquired

9    distinctiveness.  They're all set forth on this page and we

10   submit that, frankly, all of them apply.  We've already talked

11   about actual consumer confusion.  We've talked about

12   intentional copying.  The length and manner of use, the VGT

13   marks and trade dress has been in use for years and years and

14   years, sometimes more than a decade.  VGT has spent -- has got

15   unbelievable sales success,  ██████  of dollars in sales.  It's

16   the dominant EGM provider in Oklahoma, which in turn is one of

17   the largest Class II markets in the United States.  That

18   results from having spent  ████████████  in advertising,

19   including by promoting characters such as Mr. Money Bags and

20   the red free -- screen free spin feature.  Say that five times

21   fast.

22        I guess let me finish off, Your Honor, with the trade

23   dress issues, the issues that are unique to trade dress.

24   Actually, let me just -- so, Your Honor, the reason why we

25   treat the trademark and the trade dress claims together is

1    because the first two -- the first two elements overlap.  It's

2    ownership of distinctive trademarks and trade dress and

3    likelihood of confusion with those trademarks and trade dress.

4    The trade dress adds really only one element, and that is that

5    you have to show that the trade dress is not functional.

6    Mr. Platt's correct that the burden is on VGT to show that.

7    Mr. Platt also -- so he's right about that.  What he's wrong

8    about is he says that we also need to show that the trade dress

9    is consistent.

10        As far as we are aware, no court in the Tenth Circuit

11    has ever adopted this requirement but it doesn't matter because

12    VGT's trade dress is consistent.  It's well settled that VGT

13    gets to define the trade dress elements at issue and, as I said

14    earlier, we have those six elements.

15        Let me go to the functionality point.  So there are

16    basically -- so functional here does not mean that the trade

17    dress serves a function.  So in that respect, it's a misnomer.

18    Trade dress is functional in only one of the following

19    circumstances:  It's essential to the product's ability to

20    function; it's the cheapest or best way of designing a product;

21    or the exclusive use of the trade dress would put competitors

22    at a nonreputational competitive disadvantage.  The easy answer

23    to that question is, if the VGT trade dress is functional, why

24    do all the games from all the other competitors look so

25    different from VGT's?

1    But in any event -- here, we'll go through them.

2  Again, it's not essential or the cheapest or the best way to

3  make the games.  There are all these alternatives.  And, again,

4  at a minimum, Your Honor, these are fact issues.  But here's

5  some -- here's some alternative ways.  These are third-party

6  games, games made by other manufacturers, that look nothing

7  like the VGT machines, that look nothing like the Castle Hill

8  machines.  There are two -- I think there are two panels of

9  those.

10    And, in fact, Castle Hill's expert, Mr. Valandra,

11  confirmed that there's no functional advantage to the way VGT

12  has made its machines.  And we're still waiting, but Castle

13  Hill has not identified any third-party game that uses trade

14  dress features more similar to VGT's trade dress than Castle

15  Hill, let alone the same combination of features.

16    And then finally, Your Honor, you know, again, although

17  consistency of trade dress is not required in the Tenth

18  Circuit, I'd like to address that as well.  The question, Your

19  Honor, is whether the products within the product lines are

20  themselves relatively consistent?  Identity of appearance is

21  not required.  And that's from the *Rose Art* case.  In fact, I

22  think we got criticized for citing the *Rose Art* decision, which

23  is out of the circuit.  The reason there are no cases within

24  the circuit is because consistency is not a requirement in the

25  circuit.

1      Slight variations do not render trade dress

2   inconsistent so long as the trade dress conveys a single and

3   continuing overall commercial expression.  And that's why Coke

4   can make modifications to its bottle, can sell Diet Coke, can

5   sell it in bottles, sell it cans.  Everybody knows it's Coke.

6   It's why Mickey Mouse can change over the years.  Everybody

7   still knows it's Mickey.

8      It's enough that consumers see a machine and because of

9   the combination of elements associated with VGT.  And here are

10   some examples of VGT's six-inch screen games that show

11   different artwork but, again, a single, continuing, overall

12   commercial expression.  Here's one, and then here's some of the

13   same thing with the 19- and 20-inch screen games.

14      These images makes clear the differences are slight and

15   players would clearly recognize that these games all come from

16   the same manufacturer.

17      Unless Your Honor has questions, I think I'll stop

18   there.

19      THE COURT:  Let me ask:  Does VGT have any authority

20   to support its contention -- and I've discussed this previous

21   with Mr. Platt -- for its contention that the conclusive

22   presumption that the relevant registered word marks are

23   inherently distinctive should apply equally to the unregistered

24   word and design marks that include such registered word marks?

25      MR. ROMAN:  I think, Your Honor, it follows from

1    established trademark principles, but I do not certainly off

2    the top of my head have a case that stands for that

3    proposition.

4         THE COURT:  I notice there was very little

5    discussion -- I don't mean to extend this unnecessarily -- but

6    there was very little discussion in the briefing of alleged

7    trade secret claims that were premised on, quote, the

8    functionality for translating bingo outcomes into outcomes on

9    game reels.

10        MR. ROMAN:  That would be Mr. Swanson, Your Honor.

11        THE COURT:  All right.  Let me see if there's

12   anything else.  And in terms of relevant consumers?

13        MR. ROMAN:  Oh, yes.  Thank you, Your Honor.  So I

14   think the -- two points on that, Your Honor.  First of all,

15   there are two classes of consumers here.  One is the direct

16   consumers, who are the casino operators, but then the ultimate

17   consumer, Your Honor, is the consumer patrons who's, of course,

18   the -- the casinos are going to under Mr. Gill's reverse ATM

19   theory, you know, they're going to stock the games that the

20   players are playing.

21        And it's important in this respect to bear in mind --

22   and I think we cited the TTAB decision in our brief, Your

23   Honor, for the proposition that the relevant degree of care is

24   that of the least sophisticated consumer, who in this case

25   would be that player who is stuffing dollar bills into the

1    reverse ATM.

2         THE COURT:  All right.  And is the trade dress claim

3    limited to three-reel mechanical games?

4         MR. ROMAN:  So that's a good question, Your Honor.

5    When we filed the complaint, Castle Hill was making only

6    three-reel mechanical games and we asserted that all of Castle

7    Hill's games were infringing our games.  Since then, they've

8    started making five-reel mechanical games so we believe that

9    those are now in play.

10        THE COURT:  All right.  Trade secrets.  Oh, we need

11   to take a short break for our court reporter.  And before we do

12   that?

13        MR. GILL:  Well, Your Honor, Mr. Platt and I would

14   like a brief opportunity to respond to Mr. Roman's comments as

15   well.

16        THE COURT:  All right.

17        MR. GILL:  Which we understand that would be after a

18   break.  But I just didn't want to sit here silent --

19        THE COURT:  Let's take a short recess.

20                    *(Short break)*

21        THE COURT:  Mr. Gill.

22        MR. GILL:  Yes, Your Honor.  I will be brief.  And

23   actually, I will speak as to the trademark and trade dress

24   issues, so I'll cover both mine and Mr. Platt's issues, and I'm

25   going to work backwards.

1    With regard to the trade dress issues, the argument in

2    the plaintiff's papers were that they've now reduced their

3    trade dress claim to two different lines of trade dress.  They

4    said today that there's no requirement in this circuit that

5    there be a consistent trade dress among different lines, yet

6    they themselves in their papers said we've now reduced our

7    claim to two lines of trade dress.  And they also cited the

8    *Rose Art* decision from out of this circuit for the authority

9    that if you have multiple lines of products, you've got to have

10   consistent trade dress among them in order for it to be

11   protectable.

12        The Tenth Circuit, while not addressing that issue

13   directly, has certainly not addressed it and said there's no

14   need to have consistent trade dress among multiple lines; they

15   just haven't addressed the question that we know of.  The Third

16   Circuit's addressed it, the Second Circuit's addressed it, and

17   they both said you must have consistent trade dress if you have

18   multiple lines of product.  So to be clear, the Tenth Circuit

19   hasn't looked at that issue and taken a pass on it; they just

20   have not had a chance to address it to our knowledge.

21        One of the things that you experienced in the

22   presentation from Mr. Roman is the comparison of photographs of

23   the plaintiff's games and the defendants' games and these were

24   side-by-side comparisons.  But we can't help but point out to

25   you that under the law of this circuit, and under the law of

1    every other circuit that I know of, side-by-side comparisons

2    for trade secret -- trade dress analysis rather -- is not

3    permissible.  You need to look at the market.  You can't look

4    at just the plaintiff's games and the allegedly infringing

5    games in order to perform that analysis yet.  That's exactly

6    what Mr. Roman did.  And with regard to the plaintiff's

7    statements about there being two lines of trade dress, in his

8    argument this afternoon we only heard about one line of trade

9    dress.  So what happened to the other line?

10          With regard to the trademark claims, the common law

11   trademark claims, it's interesting that the plaintiff produced

12   this PowerPoint presentation and used it for Your Honor, and on

13   page 8 there's a depiction of some artwork that relates to the

14   claims.  But even after summary judgment briefing, even after

15   an amended complaint, and even after the PowerPoint

16   presentation this afternoon, we still don't have a complete

17   description of exactly what it is the plaintiff is claiming as

18   part of its common law trademarks.

19          We have on page 8 of this PowerPoint presentation the

20   statement that they have four series of games -- the Crazy

21   Bill, Mr. Money Bags, Polar High Roller, and Greenback Jack --

22   and we have images from each of those games, but we don't have

23   images even from all of those games in the series, in the

24   various series.  All we have is what is supposed to be a

25   representative sample, but in fact the artwork for these

1    various games is all different, the artwork on the various game

2    extensions is different.  So even now after the amended

3    pleading, after summary judgment briefing, and after the

4    presentation to Your Honor, we still don't have a definitive

5    definition of what is the common law trademark that's being

6    claimed here.  And if a picture is worth a thousand words, then

7    why don't we have images of each and every claim that

8    constitutes the common law trademark you're suing over.  We

9    don't have that and we don't have an analysis of confusion for

10   that.

11        Also relevant on this point is, for the plaintiff's

12   game they have -- the only registrations they have are for

13   their word marks other than for Mr. Money Bags.  They don't

14   have registrations for their artwork.  They don't have

15   copyright registrations for their artwork.

16        But Castle Hill, on the other hand, does have.  Castle

17   Hill has copyright registrations for its artwork and it also

18   has trademark registrations for its games.  Castle Hill's

19   trademark registrations come with a presumption, too, and the

20   Castle Hill presumption should trump the lack of a presumption

21   that comes with a common law claim that doesn't have the

22   benefit of a presumption.

23        A common law is not vetted before the Patent and

24   Trademark Office like the registration that from comes from an

25   application in a granted registration.  The Patent and

1    Trademark Office pushes back on marks that it feels are not

2    protectable with something called an "office action," and the

3    registrant or applicant needs to then submit a response to the

4    office action explaining why the mark is registrable and

5    protectable, and only then if they're successful in persuading

6    the PTO does the registration come through.  With that

7    registration, you get a legal presumption; without that

8    registration, you don't get a legal presumption.

9         That's what they have here.  They have common law

10   marks, no legal presumption.  They haven't shown likelihood of

11   confusion.  They haven't shown protectable rights.  Those

12   common law trademark claims should go.  Those common law

13   trademark claims are also encapsulated within the trade dress

14   claims and the trade dress claims should go.

15        The trade dress is not protectable.  It's a generic

16   appearance of a classic Vegas slot machine that the plaintiff

17   doesn't own the propriety rights and image to.  There are other

18   competitors that make the same sort of slot machine.  They

19   don't own that image.  They don't own that right.  They've

20   never done anything that gives them that right.  It is a

21   product, it is not a packaging.  They got to show secondary

22   meaning for it to be protectable at all even if it is

23   protectable, even if it's consistent.

24        That's all we have.

25             THE COURT:  Thank you.  Trade secrets.

1    **MR. ANTONELLI:**  Thank you, Your Honor.  As the

2    court's aware, a significant portion of defendants' motion for

3    summary judgment on the trade secrets claim, there's

4    significant crossover with the issues we discussed earlier in

5    the context of the motion for partial summary judgment so I'm

6    not going to rehash all that.  Other than to say that we think

7    that the evidence is clear in our favor on that point on the --

8    certainly as to the bingo card generation algorithm.

9        To address two other what I think are interrelated

10   issues with respect to the trade secrets, one was a question

11   you were asking Mr. Gill earlier with respect to displacement

12   and the displacement argument.  And I agree with the court's

13   questioning that to the extent VGT asserts confidential

14   business information claims, that would be almost

15   lesser-includeds for their trade secrets.

16       So if it turns out that something they allege to be a

17   trade secret, it turns out it doesn't meet that trade secret

18   standard, could it nevertheless be confidential business

19   information?  From a theoretical legal perspective, I think the

20   answer is yes.  I don't know that that could or will play out

21   practically speaking with our facts.  But to answer the court's

22   legal question there, I think the answer is yes.

23       The issue we have here is one where, as Mr. Gill

24   touched on, we asked VGT a series of interrogatories, one of

25   which asked them to describe all of the facts in evidence in

1    support of their trade secrets and how we had misappropriated

2    those, or allegedly misappropriated those.   VGT provided a

3    lengthy description, not necessarily of what they allege had

4    been misappropriated, but rather a list of trade secrets they

5    say they own.   That has narrowed somewhat over time but remains

6    a little broad.

7         But then separately we asked a second interrogatory

8    with respect to the confidential business information claim,

9    where we basically said, describe that claim to us, identify

10   any confidential business information, and they completely

11   failed to do so.   What they did was they said, see our response

12   to the trade secrets allegations.

13        So from our perspective, perhaps VGT can maintain its

14   confidential business information claim, but VGT has not

15   identified any confidential business information separate and

16   apart from its alleged trade secrets.   I think that's an

17   important point as we start to narrow the issues as we head

18   towards trial.

19        And related to that issue, Your Honor, is this -- what

20   we refer to as the "catchall category" for VGT's trade secrets

21   with respect to know-how or alleged negative know-how.   And,

22   again, as I mentioned a minute ago, VGT's response to

23   interrogatories and description of its trade secrets identified

24   approximately 40 or so alleged trade secrets.   Many of those

25   trade secrets were categories of information and it spanned a

1    couple dozen pages.  We attached their interrogatory responses,

2    the most recent amendments to their interrogatory responses, as

3    Exhibit 82 to our motion for summary judgment.

4          As we stand here today, what we understand the alleged

5    trade secrets to be are the bingo card generation algorithm,

6    the uniqueness testing algorithm, and then the third category

7    of know-how.  The problem with that third category is that it's

8    been amorphous and undefined throughout the case.  And

9    essentially, from our perspective, what VGT's attempting to do

10   through that know-how allegation is something that Oklahoma law

11   would not otherwise allow them to do, which is essentially

12   impose lifelong noncompete agreements with their former

13   employees.  Under VGT's view of how know-how and negative

14   know-how works, I don't think an employee could ever work in

15   the Class II gaming space had that employee worked for VGT at

16   some point in time.

17         So I think it's really important again as we begin to

18   narrow the issues for trial to hear from VGT specifically what

19   the trade secrets and know-how issues that they believe remain

20   at issue are.  Because, again, from our perspective, the trade

21   secrets are bingo card generation, uniqueness testing, and then

22   within the know-how category I think there's only three.

23         They relate, number one, to the concept of ████████.

24   VGT essentially says, we designed our games with different

25   ████████████████ than theirs, but we only did that because we

1    understood that the casinos didn't like ██████████████.

2        The second issue is with respect to avoiding █████

3    ████████████████████████████████████████████

4    ████████████████████████████████████████████

5    ██████████████████████████████████.

6        And then finally, an issue of using these █████████

7    ██████████████████████████.

8        So as we understand it, those are the only know-how

9    issues and there's nothing else.  But with respect to Castle

10   Hill's affirmative motion for summary judgment, we think that

11   those know-how categories remain undefined and, again,

12   amorphous and really need to be viewed both in light of

13   Oklahoma's forbidding noncompete agreements; and then

14   separately, balancing the employees' abilities to go on and use

15   the knowledge, skill, and experience that they develop in Class

16   II gaming to work at other Class II gaming companies.  That's

17   something that the employees need to be able to do.

18        So if the court has any specific questions, we'd be

19   happy to address them.

20        THE COURT:  You say Oklahoma law forbidding

21   noncompete.  I don't believe that's the law.  I think they're

22   constrained; correct?

23        MR. ANTONELLI:  That's correct, Your Honor.

24        THE COURT:  All right.  Let me see if I have any

25   other questions of you.  I don't believe so.  All right.  Thank

1    you.

2                MR. ANTONELLI:   Thank you, Your Honor.

3                THE COURT:   And VGT.   Mr. Swanson.

4                MR. SWANSON:   Thank you, Your Honor.   So I won't go

5    through the presentation, instead I'll just focus on responding

6    to Mr. Antonelli, although if I could just put up the

7    presentation here.

8          I will just note Castle Hill's brief in support of its

9    summary judgment motion on the trade secrets and confidential

10   information claim, it's short and we submit that they've not

11   even met their initial burden as a summary judgment movant of

12   identifying material facts that are not in dispute.   They just

13   kind of said that there's nothing to these claims; therefore,

14   we're entitled to summary judgment.   We don't think -- we don't

15   think that's sufficient and is reason alone to deny the motion.

16         Nevertheless, one problem with that is it sort of

17   effectively requires us to put on our entire trade secret case

18   in response, and we did nevertheless submit quite a bit of

19   evidence in response to their motion, although not necessarily

20   everything that we would put on at trial.

21         In the slides, we've just highlighted some of the

22   evidence, substantial evidence, here showing that there are

23   genuine issues of fact on the two principle elements of the

24   trade secret claims.   This is for the bingo card algorithm -- I

25   won't walk through all of this but just to show the court --

1    and the unique testing algorithm -- again, substantial evidence

2    on both elements of the claim -- and on the know-how.  There's

3    a lot of evidence there.  And, again, this is not -- this is

4    not everything but there's more than enough evidence here to

5    warrant a trial.

6              **THE COURT:**  Well, let me ask then:  With regard to

7    know-how, Mr. Antonelli outlined three areas that Castle Hill

8    understands to be the know-how claims of VGT:  ████████████

9    ████████████████████████████████████████████████████████████.

10             We are approaching trial and I do think it's incumbent

11   upon the plaintiff to specify if there are any further know-how

12   claims.

13             **MR. SWANSON:**  Yes, Your Honor.  And those are what I

14   would say are the three principle trade secrets within the

15   know-how bucket.  There's other confidential information that

16   may not rise to the level of trade secrets but would be subject

17   to the Oklahoma common law claim for misappropriation of

18   confidential business information.  This is set forth in

19   Mr. Friedman's declaration as well as other evidence that we

20   cited in our opposition.

21             One example of this would be the ████████████████

22   ████████████████████████████████████████████████████████

23   ██████████████.  Another example of this that we cited was Castle

24   Hill used its knowledge of VGT's experimentation with an ████

25   ████ feature in its games, and they decided not to pursue that

1    because they realize -- they knew from their time at VGT that

2    there were issues with that and --

3              THE COURT:   Negative know-how?

4              MR. SWANSON:   That one's a negative know-how, yes.

5    Yes, Your Honor.

6              THE COURT:   All right.  But is there anywhere a list

7    of these things that you contend constitute negative know-how

8    or know-how in addition to what you say are the principle trade

9    secrets within the know-how bucket?

10             MR. SWANSON:   Yes, Your Honor.  I mean, I think that

11   list is set forth in Mr. Friedman's declaration as well as in

12   his expert reports and our interrogatory responses.

13             THE COURT:   Mr. Friedman's declaration -- and I

14   think I've read three of them -- gets rather lengthy.

15             MR. SWANSON:   Yes.  Yes, Your Honor.  That's in part

16   because candidly there was a lot of use of VGT information.

17   This was pretty pervasive, that they were frequently discussing

18   issues that they encountered at VGT and discussing that while

19   at Castle Hill.  So there's quite a bit of references to VGT

20   information throughout the record.

21             THE COURT:   Well, I've got to pin you down.

22             MR. SWANSON:   Yes.

23             THE COURT:   And it's not my job; it's yours.

24   Frankly, I don't think Mr. Friedman -- I forget how many

25   paragraphs he had in that longest declaration but it was

1    lengthy.  He did a pretty good job of describing to a novice

2    like myself what he was trying to communicate but that's a long

3    list and we -- for all of us, we've got to pin down what these

4    know-how claims are.

5            **MR. SWANSON:**  Yes, Your Honor.

6            **THE COURT:**  So you say among these are ████

7    ██████.  I saw a reference to the ████████████ and I saw

8    a reference to the specific negative know-how that you had

9    mentioned.

10            But where are we to derive these know-how claims other

11    than trying to pick through Friedman's declaration?

12            **MR. SWANSON:**  Well, again, Your Honor, I mean, I

13    think his declaration, you know, identifies the specific

14    information that he's relying on to form his opinion that they

15    used confidential information.  I believe this was also set

16    forth -- I know it was set forth in our interrogatory responses

17    as well.

18            So, I mean, it's -- you know, there are different ways

19    of, you know, listing it and, you know, certainly we could, you

20    know, put together a, you know, enumerated list, if that's

21    helpful for the court.

22            **THE COURT:**  Well, as I sit here, I mean, we're at

23    summary judgment and we really ought to all know what those

24    know-how claims are and they ought to be listed.  So I don't

25    want to give you an opportunity here, frankly, to list things

1    that haven't been clear and might reasonably generate another

2    round of summary judgment.  I'm not going to allow it.  I've

3    got other cases that I've got to deal with and, frankly, this

4    case is fairly weighty and has taken a lot of resources.

5              MR. SWANSON:  Understood, Your Honor.  Again, I

6    think this is all in our interrogatory responses and

7    Mr. Friedman's reports.  I don't think the specific issues here

8    are a surprise to Castle Hill.

9              THE COURT:  Well, let me just ask:  With regard to

10   interrogatory responses, Mr. Antonelli, did you specifically

11   request and receive a response to what are the plaintiff's

12   know-how claims?

13             MR. ANTONELLI:  We did not ask for specific know-how

14   claims, in large part because neither the complaint nor the

15   amended complaint makes any mention of know-how or alleged

16   negative know-how, no mention of a ▮▮▮▮▮▮▮▮▮.  So no, we

17   did not ask a specific interrogatory on that.

18        We did ask for a specific interrogatory on, "State all

19   facts supporting your claim for misappropriation of

20   confidential business information asserted in the complaint."

21   It goes on to request the specificity, each piece of

22   information, how they alleged it was misappropriated, who they

23   say misappropriated it.  It's interrogatory No. 5 in VGT's

24   fourth amended response to Castle Hill's interrogatories.  It

25   appears on page 155 of the document.

1      And VGT's response was to state some objections and

2   then to incorporate by reference its response to interrogatory

3   No. 34.   They later amended it to say that for avoidance of

4   doubt, they incorporate by reference its first, second, third,

5   and any future supplemental response to interrogatory No. 4.

6   Interrogatory No. 4 asked specifically about trade secrets.

7      So I'm trying to understand Mr. Swanson's contention

8   that there is potentially know-how that is separate and apart

9   from the trade secrets or it doesn't rise to the level of a

10  trade secret.   That certainly has not been VGT's contention

11  thus far.   VGT alleges a lot of things in their interrogatory

12  response.   But as the court noted -- I mean, it's well over a

13  hundred pages -- and as the court noted, we're only a couple

14  months out from trial and we can't just list off that these are

15  the following five things of know-how that are at issue.   That

16  was one of the primary purposes for our motion.

17      **THE COURT:**   All right.   Is this interrogatory

18  response and any supplementary interrogatory responses to

19  interrogatory No. 4, is that amongst the filings before the

20  court on summary judgment?

21      **MR. ANTONELLI:**   Yes, Your Honor.   I know that -- I

22  know that Castle Hill included VGT's interrogatory responses,

23  the fourth amended, which was the most recent amendment.

24      **THE COURT:**   Is that 82?

25      **MR. ANTONELLI:**   That was Exhibit 82 yes, Your Honor.

1      THE COURT:  All right.

2      MR. ANTONELLI:  And VGT may have included it in

3  theirs as well.

4      THE COURT:  And, Mr. Swanson, if I were to look at

5  Exhibit 82 and interrogatory response No. 4, is that going to

6  set forth some of these know-how claims?

7      MR. SWANSON:  Yes, Your Honor.  I believe that

8  should have everything.  What we did is we responded to their

9  trade secret interrogatory and set forth all of the

10  information, recognizing that the confidential business

11  information is subsumed within the trade secret claims.

12      I would also point Your Honor to paragraph 50 of

13  Mr. Friedman's declaration as one place where he lists several

14  of these items, including the ███████████████, including the

15  ███████████ issue that I mentioned, VGT's investigation of using

16  ███████████, and a couple of other items.  And so, you know, I

17  think the specifics are in both places.

18      THE COURT:  And which declaration of the three?

19      MR. SWANSON:  Yes.  That's the declaration submitted

20  in opposition to Castle Hill's motion so that would be the

21  second Friedman declaration.

22      THE COURT:  So that's in opposition to Castle Hill's

23  motion for summary judgment?

24      MR. SWANSON:  For summary judgment, yes.

25      THE COURT:  All right.  Anything else for our

1    purposes today?

2              MR. GILL:  If you're asking us, Your Honor, I think

3    we've produced everything and had an opportunity to say

4    everything to you today that we needed to say.

5              THE COURT:  All right.  Thank you.  And,

6    Mr. Swanson, if you could give the court a copy of what you

7    were relying on here as to trade secrets, I would very much

8    appreciate it.

9              MR. SWANSON:  Sure.  It's part of that presentation,

10   Your Honor.

11             THE COURT:  Oh, it is?

12             MR. SWANSON:  Yeah, yeah, yeah.  We put all of that,

13   both the trademark, trade dress, and trade secrets, all

14   together.

15             THE COURT:  Okay.  Anything else, Mr. Rubman?

16             MR. RUBMAN:  No, Your Honor.  Thank you.

17             THE COURT:  Thank you very much.  Hope you all make

18   your flights.  Thank you.

19                  *(The proceedings were concluded)*

20

21

22

23

24

25

*C E R T I F I C A T E*

1

2

3

4       I, Brian P. Neil, a Certified Court Reporter for the

5   Northern District of Oklahoma, do hereby certify that the

6   foregoing is a true and accurate transcription of my

7   stenographic notes and is a true record of the proceedings held

8   in above-captioned case.

9

10      I further certify that I am not employed by or related

11  to any party to this action by blood or marriage and that I am

12  in no way interested in the outcome of this matter.

13

14      In witness whereof, I have hereunto set my hand this

15  17th day of June 2019.

16

17

18                           s/ Brian P. Neil
                      _____
19                      *Brian P. Neil, RMR-CRR*
                        *United States Court Reporter*

20

21

22

23

24

25