IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| VIDEO GAMING TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-CV-00454-GKF-JFJ |
| | ) | **REDACTED** |
| CASTLE HILL STUDIOS LLC | ) | |
| (d/b/a CASTLE HILL GAMING); | ) | |
| CASTLE HILL HOLDING LLC | ) | |
| (d/b/a CASTLE HILL GAMING); and | ) | |
| IRONWORKS DEVELOPMENT, LLC | ) | |
| (d/b/a CASTLE HILL GAMING), | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

This matter comes before the court on the Motion for Partial Summary Judgment [Doc. 178] of plaintiff Video Gaming Technologies, Inc.[1] For the reasons set forth below, the motion is granted in part and denied in part.

**I.   Background**

This is a dispute between two Class II bingo-based player terminal developers.[2] Plaintiff Video Gaming Technologies ("VGT") is a Tennessee corporation founded in 1991. VGT holds

---

[1] Plaintiff also filed a sealed, unredacted version of the motion as [Doc. 179]. The references contained in this order are to the unredacted version. Accordingly, the court files this order under seal, attorneys' eyes only. As set forth below, the court will enter an unsealed order after consideration of the parties' proposed redactions, if any.

[2] The Indian Gaming Regulatory Act, which regulates the operation of gaming by Indian tribes, defines three separate classes of games: (1) class I gaming, which includes social games and traditional forms of tribal gaming; (2) class II gaming, which includes bingo and, if played in the same location, pull-tabs, lotto, punch boards and tip-jars; and (3) class III gaming, which includes any form of gaming not included in class I or class II. 25 U.S.C. § 2703. *See also Diamond Game Enters., Inc. v. Reno*, 230 F.3d 365, 367 (D.C. Cir. 2000).

itself out as one of the top providers of Class II player terminals in the United States and, specifically, Oklahoma, which is one of the largest Class II markets in the United States. One of VGT's Class II products is a mechanical reel game. As the name suggests, a mechanical reel game features mechanical reels that physically spin when the player places a wager and then pushes a button or pulls a handle (as opposed to a graphical representation of spinning reels on a video screen).

Castle Hill Studios LLC and Ironworks Development, LLC are single-member limited liability companies that are wholly owned by Castle Hill Holding LLC. Collectively, the entities do business as Castle Hill Gaming ("Castle Hill"). Castle Hill was launched in 2013, and its founding members include former VGT officers and employees. Castle Hill directly competes with VGT in the Class II market, specifically with respect to mechanical reel games.

In this case, VGT alleges that Castle Hill intentionally developed Class II games that closely resembled VGT's Class II games and incorporated marks and themes confusingly similar to VGT's marks and themes. Further, VGT alleges Castle Hill misappropriated VGT's trade secrets, confidential information, and proprietary information, including VGT's algorithm for creating and distributing bingo cards, its bingo card uniqueness testing algorithm, and VGT's "know how." Based on these general allegations, the First Amended Complaint (the operative pleading) includes eight counts: (1) federal trademark infringement in violation of § 32 of the Lanham Act (15 U.S.C. § 1114); (2) unfair competition and trade dress infringement for product packaging in violation of § 43(a) of the Lanham Act (15 U.S.C. § 1125(a)); (3) unfair competition, trade dress infringement, and trademark infringement in violation of the Oklahoma Deceptive Practices Act (78 OKLA. STAT. §§ 51-56); (4) unfair competition, trade dress infringement, and trademark infringement under Oklahoma common law; (5) misappropriation of trade secrets in

violation of the Oklahoma Uniform Trade Secrets Act, 78 OKLA. STAT. §§ 85-94; (6) misappropriation of confidential business information in violation of Oklahoma common law; (7) misappropriation of trade secrets in violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA"); and (8) misappropriation of trade secrets in violation of the Virginia Uniform Trade Secrets Act, VA. CODE ANN. §§ 59.1-336 to 59.1-343 ("VUTSA"). [Doc. 103]. In its Answer to the First Amended Complaint, Castle Hill asserts various affirmative defenses, including unclean hands and illegality. [Doc. 112]. VGT seeks summary judgment in its favor as to those affirmative defenses, as well as its claims for misappropriation of trade secrets in violation of the Virginia Uniform Trade Secrets Act, VA. CODE ANN. §§ 59.1-336 to 59.1-343, and Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836.

## II.　The Standard on Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013) (quoting *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002)). Thus, to survive summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting FED. R. CIV. P. 56(e)). "An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *1-800 Contacts, Inc.*, 722 F.3d 1242 (quoting *Sally Beauty Co., Inc.*, 304 F.3d at 971). The court must

"construe the evidence and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant." *Sally Beauty Co., Inc.*, 304 F.3d at 972 (citing *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999)).

**III.     Analysis**

As previously stated, VGT seeks summary judgment as to two of Castle Hill's affirmative defenses—unclean hands and illegality—as well as its trade secret claims under the VUTSA and DTSA.  The court first considers the unclean hands affirmative defense.

   A.     *Unclean Hands*

VGT seeks summary judgment as to Castle Hill's affirmative defense of unclean hands. As the party asserting the affirmative defense, Castle Hill bears the burden to produce evidence demonstrating a genuine issue of material fact exists.  *Nalley v. Dunn*, No. 09-CV-0771-CVE-TLW, 2010 WL 2868180, at *6 (N.D. Okla. July 20, 2010).

VGT first argues that Castle Hill should be precluded from asserting its unclean hands defense at trial because Castle Hill failed to adequately disclose the factual basis of the defense during discovery and, to the extent disclosed, now seeks to improperly reframe the defense through its summary judgment briefs.  However, the Federal Rules permit a defendant to assert *unpleaded* affirmative defenses in pretrial motions, "particularly in the absence of any showing of prejudice to the opposing party and assuming it has had an opportunity to respond." *Cornaby's LLC v. Carnet, LLC*, No. 14-CV-00462-JNP-DBP, 2017 WL 3503669, at *17 (D. Utah Aug. 15, 2017) (quoting 5 CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE & PROCEDURE § 1278 (3d ed. 2004)).  Castle Hill pled the unclean hands defense [Doc. 112] and Castle Hill's reframing of the defense is permissible, particularly because VGT does not show it has been prejudiced by the shift.  Moreover, the court notes that prejudice—to the extent it exists—may be cured through

- 4 -

pretrial disclosures and the parties' cooperative efforts to prepare the proposed pretrial order. *See* [Doc. 312]. *Cf. Woods v. Nationbuilders Ins. Servs., Inc.,* No. 11-CV-02151-CMA-KMT, 2014 WL 1303504, at **2-3 (D. Colo. Mar. 27, 2014). Thus, Castle Hill is not precluded from asserting its unclean hands affirmative defense, and the court considers the substance of the defense.

The equitable defense of unclean hands arises from the maxim "that 'he who comes into equity must come with clean hands'" and "is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). The defense "'does not demand that its suitors shall have led blameless lives,' as to other matters, it does require that they shall have acted fairly and without fraud or deceit *as to the controversy in issue*." *Id*. at 814-15 (internal citation omitted) (emphasis added) (quoting *Loughran v. Loughran*, 292 U.S. 216, 229 (1934)). Thus, as recognized by the Tenth Circuit, "the 'unclean hands' doctrine does not empower a court of equity to deny relief for any and all inequitable conduct on the part of the plaintiff. Instead, the inequitable conduct must be related to the plaintiff's cause of action." *Worthington v. Anderson*, 386 F.3d 1314, 1320 (10th Cir. 2004) (citing *McCullough Tool Co. v. Well Surveys, Inc.*, 395 F.2d 230, 238 (10th Cir. 1968)).

In the trademark context, the Tenth Circuit has recognized two forms of "related conduct" that permit application of the unclean hands doctrine:

> The first involves inequitable conduct toward the public, such as deception in or misuse of the trademark itself, resulting in harm to the public such that it would be wrong for a court of equity to reward the plaintiff's conduct by granting relief . . . . The second type of related conduct arises when the plaintiff has acted inequitably toward the defendant in relation to the trademark.

*Worthington*, 386 F.3d at 1320 (internal citation omitted); *see also 1-800 Contacts, Inc.,* 722 F.3d at 1255. Castle Hill argues that unclean hands also constitutes an equitable defense to VGT's

- 5 -

Oklahoma law claims (both statutory and common law) and trade secrets claims. [Doc. 240, pp. 50-51]. Assuming without deciding that Castle Hill is correct, the asserted misconduct must nevertheless relate to the matter for which relief is sought. *See State ex rel. Dep't of Human Servs. v. Baggett*, 990 P.2d 235, 244 (Okla. 1999) (emphasis added) ("[H]e who would invoke the equitable powers of a court must come before the court *in relation to the matter at issue* with clean hands.").

Castle Hill premises its unclean hands defense on three separate categories of alleged conduct: (1) VGT's non-compliance with regulations promulgated by the National Indian Gaming Commission; (2) VGT's asserted "trade dress" is misappropriated and copied; and (3) recent changes by VGT to its trade dress increase the likelihood of confusion.

1. <u>Non-Compliance with NIGC Minimum Technical Standards</u>

With respect to VGT's alleged non-compliance with NIGC regulations, this argument for the affirmative defense fails for two reasons. *First,* Castle Hill fails to offer sufficient evidence that VGT's gaming systems do not comply with the regulations. The NIGC regulations require Class II gaming systems to satisfy minimum technical standards by November 10, 2008, but permit games manufactured before that date to be "grandfathered" upon satisfaction of certain conditions. 25 C.F.R. § 547.5(a). Castle Hill contends that VGT illegally placed into commerce Class II gaming systems manufactured after the regulatory cut-off date that included software that did not comply with the minimum technical standards. However, Castle Hill offers no direct evidence of non-compliance, nor any evidence originating from the National Indian Gaming Commission of a regulatory violation. Rather, Castle Hill relies primarily on testimony by Richard Williamson, VGT's Vice President of Gaming Compliance, interpreting a chart labelled "FY2017 EGM NIGC Compliant" and "deciphering" from the chart that only 978 of VGT's Class II games were

compliant with minimum technical standards, as well as documents entitled "NIGC Workflows" and "NIGC Progress Dashboard." [Doc. 240-9, p. 82:1-17; Doc. 240-23; Doc. 240-24]. However, during his 30(b)(6) deposition, Williamson reviewed the "NIGC Workflows" and "NIGC Progress Dashboards," and explained "non-compliant" actually referred to "grandfathered compliant" products. [Doc. 239-24, pp. 43:4 to 44:20]. As the party asserting the affirmative defense, Castle Hill bears the burden of establishing VGT's non-compliance. Castle Hill fails to do so. Thus, Castle Hill fails to create a genuine dispute of material fact as to VGT's regulatory compliance.

*Second,* the asserted regulatory non-compliance is unrelated to the conduct at issue in this litigation. Castle Hill contends that the non-compliance deceives and harms the public, primarily arguing that the purpose of the minimum technical standards is to ensure "fairness." *See* [Doc. 240, pp. 41-42 (citing 25 U.S.C. § 2702(2) and 25 C.F.R. § 547.4(a))]. Section 547.4 contemplates fairness and honesty to the public or game users. 25 C.F.R. § 547.4(a) ("No Class II gaming system may cheat or mislead users. All prizes advertised must be available to win during the game."). However, Castle Hill offers no evidence or explanation of how VGT's alleged non-compliance deceives or harms the public.

Nor is the non-compliance inequitable toward Castle Hill in relation to the marks, trade dress, or secrets at issue in this litigation. The minimum technical standards were designed "to assist tribal gaming regulatory authorities (TGRAs) and operators with ensuring the integrity and security of Class II gaming, the accountability of Class II gaming revenue, and provide guidance to equipment manufacturers and distributors of Class II gaming systems." 82 Fed. Reg. 61172, 61172 (Dec. 27, 2017). Providing guidance to manufacturers does not amount to protection of competition. Because the minimum technical standards were not intended to protect competition, the standards are irrelevant to VGT's relationship and dealings with Castle Hill. *See generally*

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 15-CV-1202-WCB, 2017 WL 275465, at \*\*8-9 (E.D. Tex. Jan. 20, 2017).  Thus, Castle Hill fails to offer sufficient evidence that VGT's alleged regulatory noncompliance relates to its claims in this litigation, and VGT is entitled to summary judgment with respect to Castle Hill's unclean hands affirmative defense to the extent premised on VGT's asserted non-compliance with NIGC minimal technical standards.

2. Allegations that VGT's Trade Dress is Misappropriated and Copied

Castle Hill next premises its unclean hands defense on assertions that VGT misappropriated its trade dress from industry competitors.  Specifically, Castle Hill offers evidence that VGT obtained confidential PAR sheets[3] from its industry competition and converted them to VGT math tables [Doc. 240-29, p. 79:6-15; Doc. 240-30, pp. 69:20 to 70:2; Doc. 240-31, pp. 98:14 to 99:14], and that VGT uses common paytables, specifically a paytable originated by IGT.  [Doc. 240-5, pp. 181:5 to 186:9].[4]

VGT argues that the evidence relates only to VGT's conduct toward third-parties—and therefore cannot provide a foundation for an unclean hands defense.  *See 1-800 Contacts, Inc.*, 722 F.3d at 1255.  However, VGT's argument fails to acknowledge that mathematical performance—including the specific bingo patterns and the bingo pattern-payout combinations utilized in each

---

[3] A PAR sheet is a document given to a casino that specifies bingo patterns, the probabilities of achieving the various patterns with a given number of balls, and the payouts.  [Doc. 184-21, p. 111:11-16; Doc. 184-34, p. 4].

[4] Castle Hill also offers evidence that VGT attempted to reverse engineer the math performance for its competitors' games based on public information.  [Doc. 240-32, pp. 182:18 to 186:2]. However, the DTSA defines "improper means" of acquiring a trade secret to specifically *exclude* reverse engineering.  18 U.S.C. § 1839(6).  Nor is the court persuaded a Virginia court would conclude that reverse engineering constitutes improper means under the VUTSA.  *Hair Club for Men, LLC v. Ehson*, No. 16-CV-236, 2016 WL 3636851, at \*5 (E.D. Va. May 6, 2016) ("Just as independent development or reverse engineering do not constitute misappropriation of an invention . . ., the Court finds [defendant's] own, independent development of a contact list does not constitute misappropriation of [plaintiff's] client information.").

pseudo-paytable—is part of its trade dress claim. It is well-established that courts "apply the maxim requiring clean hands only where some unconscionable act of one coming for relief *has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation*." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933) (emphasis added). Thus, the doctrine applies when a plaintiff has engaged in inequitable conduct in acquiring the right asserted. *Pom Wonderful LLC v. Welch Foods, Inc.*, 737 F. Supp. 2d 1105, 1110 (C.D. Cal. 2010). Castle Hill presents evidence from which a reasonable finder of fact could conclude that VGT engaged in inequitable conduct with respect to elements of its trade dress. Accordingly, a genuine dispute of material fact exists with respect to the unclean hands defense to VGT's trade dress claim and therefore VGT is not entitled to summary judgment as to this theory of the defense.

However, Castle Hill offers no evidence that VGT engaged in inequitable conduct with respect to its asserted trademarks or trade secrets. None of Castle Hill's evidence relates specifically to VGT's trademarks or trade secrets. Although Castle Hill presents general evidence with respect to its theory that VGT adopted a "fast follow" approach (which evaluated industry trends to develop better products), Castle Hill offers no evidence that VGT's competitive research amounted to a misappropriation of confidential information from its competitors or otherwise inequitable conduct. *Cf.* [Doc. 240-5, pp. 209:1 to 210:23; Doc. 240-39; Doc. 240-29, pp. 40:25 to 43:9; Doc. 240-37, pp. 155:17 to 158:24; Doc. 240-40]. Castle Hill offers no authority for the proposition that generalized market or competitive research amounts to "unclean hands." Further, Castle Hill offers no evidence that VGT conducted competitive research *against Castle Hill*. Inequitable conduct toward third parties does not justify submission of the unclean hands defense to the trier of fact. *See 1-800 Contacts, Inc.*, 722 F.3d at 1255. Accordingly, Castle Hill's unclean

hands defense, to the extent premised on VGT's alleged misappropriation, is limited to VGT's trade dress claims.

### 3. Changes to "Trade Dress" Increase Likelihood of Confusion

Finally, Castle Hill contends that VGT's hands are unclean "because it has changed its claimed trade dress during the course of this litigation in ways that may increase the alleged likelihood of confusion." [Doc. 240, pp. 46-47]. VGT's red screen free spins feature previously displayed only a red tint over the screen and the red reels did not turn red during that feature. [Doc. 240-32, pp. 80:9 to 82:24]. In contrast, Castle Hill utilized an instant free pay feature that played a movie and lit the reels red. [Doc. 240-41, pp. 225:22 to 227:24]. Castle Hill offers the Declaration of Daniel Fulton, a Castle Hill mathematician, as evidence that VGT, sometime after August 1, 2018, changed its red screen free spin feature such that the reels now turn red and the screen plays a movie with persistent text on the screen. [Doc. 240-42, ¶¶ 3-4 (describing changes based on observation/playing the game)]. Additionally, Fulton states that VGT changed its "bingo play and pay" implementation and replaced its house mark with Aristocrat's house mark. [Doc. 240-42, ¶¶ 5-8]. Although the ultimate weight to be given the Fulton evidence has yet to be determined, construing this evidence in favor of non-movant Castle Hill as the court must, a reasonable finder of fact *could* conclude that an increased likelihood of confusion exists between the VGT and Castle Hill trade dress after VGT's recent changes. To the extent VGT's conduct may result in increased consumer confusion, VGT's conduct is relevant to its right to equitable relief, including disgorgement of profits. *Lawn Managers, Inc. v. Progressive Lawn Managers, Inc.*, No. 16-CV-144-DDN, 2017 WL 3189486, at *6 (E.D. Mo. July 27, 2017). However, because Castle Hill only presents evidence with respect to VGT's trade dress, the affirmative defense based on this theory is limited to VGT's trade dress claims.

B.   *Unlawful Use/Illegality*

Castle Hill asserts the affirmative defense of illegality based on VGT's alleged non-compliance with NIGC regulations. In its summary judgment motion, VGT characterizes illegality as being "on shaky ground" as an affirmative defense in trademark litigation. [Doc. 179, pp. 33-34]. It is true the "unlawful use doctrine" originated in United States Trademark Trial and Appeal Board proceedings "to oppose trademark applications or cancel registrations." *FN Herstal SA v. Clyde Armory Inc.,* 838 F.3d 1071, 1086 (11th Cir. 2016). However, the Tenth Circuit has recognized in a trademark infringement case that, in order to obtain protectable trademark rights, a plaintiff must show the mark "was lawfully used in commerce." *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1225 (10th Cir. 2000). The court interprets the Tenth Circuit's statements in *United Phosphorus* as recognizing the unlawful use doctrine as a potential affirmative defense in trademark litigation.

Although not expressly adopted by the Tenth Circuit, other circuits impose a "nexus requirement," stating "trademark protection might not be withheld on account of unlawful conduct that is 'collateral,' namely where there is an insufficient nexus between the unlawful behavior and the use of the mark in commerce." *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 931 (9th Cir. 2014). Further, the violation must be material, that is "of 'such gravity and significance that the usage must be considered unlawful—so tainted that, as a matter of law, it could create no trademark rights.'" *FN Herstal SA*, 838 F.3d at 1087 (quoting *Gen. Mills, Inc. v. Health Valley Foods*, 24 U.S.P.Q.2d 1270, 1274, 1992 WL 296518, at *3 (T.T.A.B. 1992)).

Castle Hill premises its illegality affirmative defense on VGT's alleged noncompliance with NIGC regulations. Although not binding on this court, the court is persuaded by the Trademark Trial and Appeal Board's approach in *General Mills, Inc.*:

> [T]he better practice in trying to determine whether use of a mark is lawful under one or more of the myriad regulatory acts is to hold a use in commerce unlawful only when the issue of compliance has previously been determined (with a finding of noncompliance) by a court or government agency having competent jurisdiction under the statute involved, or where there has been a per se violation of a statute regulating the sale of a party's goods.

*General Mills, Inc.*, 1992 WL 296518, at *3. Castle Hill offers no evidence that a court or government of competent jurisdiction previously made a finding of noncompliance. Moreover, as discussed above, Castle Hill fails to offer sufficient evidence to create a genuine dispute of material fact as to whether VGT's gaming systems constitute a *per se* violation of the NIGC regulations. Thus, Castle Hill's unlawful use/illegality defense fails, and VGT is entitled to partial summary judgment as to the defense.[5]

    C.    *Trade Secret Claims*

Finally, the court considers VGT's Virginia Uniform Trade Secrets Act ("VUTSA") and Defend Trade Secrets Act ("DTSA") claims premised on Castle Hill's alleged misappropriation of the bingo card generation algorithm and uniqueness testing algorithm (collectively, "bingo card algorithm"). The DTSA "provides a private cause of action against those who have misappropriated trade secrets related to a product or service intended for interstate commerce." *Blue Star Land Servs., LLC v. Coleman*, No. CIV-17-931-R, 2017 WL 6210901, at *4 (W.D. Okla. Dec. 8, 2017). To establish a claim under the DTSA, a plaintiff must establish:

> (1) the existence of a trade secret that relates to a product or service used in, or intended for use in, interstate or foreign commerce; (2) the acquisition of the trade secret, or the use or disclosure of the trade secret without consent; and (3) the person acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by improper means.

---

[5] Because the court concludes that Castle Hill fails to offer sufficient evidence to create a genuine dispute of material fact with respect to its illegality defense, the court need not determine whether the defense applies to VGT's Oklahoma statutory and common law claims.

*Arctic Energy Servs., LLC v. Neal*, No. 18-CV-00108-PAB-KLM, 2018 WL 1010939, at *2 (D. Colo. Feb. 22, 2018). "The VUSTA's elements are similar to the DTSA and require a plaintiff to prove: (1) the existence of a 'trade secret'; and (2) the 'misappropriation' of that trade secret by the defendant."[6] *Space Systems/Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 855 (E.D. Va. 2018). The court concludes genuine disputes of fact exist and therefore VGT is not entitled to summary judgment with respect to its VUTSA and DTSA claims.

*First*, a genuine dispute of fact exists as to the existence of a trade secret. The DTSA defines "trade secret" as follows:

> All forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if –
>
> (A)    the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B)    the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. §1839(3). Similarly, under the VUTSA, "an alleged trade secret must 'meet all the criteria listed in the statute: (1) independent economic value; (2) not known or readily ascertainable by proper means; and (3) subject to reasonable efforts to maintain secrecy.'" *Space Systems/Loral, LLC*, 306 F. Supp. 3d at 855 (quoting *Trident Prods. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 778 (E.D. Va. 2012), *aff'd per curiam*, 505 F. App'x 242 (4th Cir. 2013)). Generally, the existence of a trade secret is a question of fact. *See generally Select Energy Servs.,*

---

[6] During the dispositive motions hearing in this matter, Castle Hill conceded that neither the VUTSA nor DTSA requires damages or harm to VGT to establish a claim.

*Inc. v. Mammoth Energy Servs., Inc.,* No. 19-CIV-28-R, 2019 WL 1434586, at **5-6 (W.D. Okla. Mar. 29, 2019) (DTSA claim); *MicroStrategy, Inc. v. Li*, 601 S.E.2d 580, 589 (Va. 2004) ("[T]he determination whether a trade secret exists ordinarily presents a question of fact to be determined by the fact finder from the greater weight of the evidence.").

VGT describes its bingo card algorithm as including **[REDACTED]** "salient features." [Doc. 179, pp. 39-40].  In opposition to summary judgment, Castle Hill generally points to evidence that each specific salient feature is publicly known or reasonably ascertainable.  However, VGT premises its claim on the *unique combination* of elements included in the bingo card algorithm.  In UTSA jurisdictions, "[a] trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret."  *Hertz v. Luzenac Grp.,* 576 F.3d 1103, 1109 (10th Cir. 2009) (quoting *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003)); *see also Decision Insights, Inc. v. Sentia Grp., Inc.,* 416 F. App'x 324, 329 (4th Cir. 2011); *Rivendell Forest Prods., Ltd. v. Georgia-Pacific Corp.*, 28 F.3d 1042, 1046 (10th Cir. 1994) ("We hold that the doctrine has been established that a trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation.").  Thus, the court cannot consider the salient features in isolation and must consider whether the unique combination of elements is known or reasonably ascertainable.  *See Harvey Barnett, Inc.*, 338 F.3d at 1130.

With respect to the unique combination of elements, Castle Hill presents the testimony of Paul Suggs, an engineer who worked on the VGT bingo card algorithm and went on to design the

Castle Hill algorithm at issue in this case. Suggs testified that a person with experience in Class II client-server architecture would think of the solution based, in part, on "common knowledge" in the industry and that the approach is "simplistic enough that it is – it is one that is easily thought of."[7] [Doc. 240-11, pp. 52:10 to 53:22]. In the trade secret context, "[w]hat constitutes *readily* ascertainable through proper means is heavily fact-dependent and simply boils down to assessing the ease with which a trade secret could have been independently discovered." *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 417 (E.D. Va. 2004) (emphasis in original); *see also Bimbo Bakeries USA, Inc. v. Sycamore*, 372 F. Supp. 3d 1291, 1303 (D. Utah 2019) (in UTSA jurisdiction, "a compilation cannot be a trade secret if it is already known to a defendant or to knowledgeable persons in the industry"), *appeal docketed* No. 19-4040, (10th Cir. Mar. 22, 2019). Viewing the summary judgment record in the light most favorable to Castle Hill and given the factually dependent nature of the inquiry, a genuine dispute of material fact exists as to whether the bingo card algorithm was "readily ascertainable."

A genuine dispute of fact also exists as to whether VGT's asserted trade secrets were the subject of reasonable efforts to maintain secrecy. VGT submits evidence that it requires its employees to undertake confidentiality obligations to VGT and that the security measures taken by VGT were reasonable under the circumstances. [Doc. 179, p. 11, ¶ 11; Doc. 240, p. 11, ¶ 11;

---

[7] VGT argues Suggs's testimony improperly seeks to inject novelty, a patent law concept, into the inquiry. However, as recognized by the Supreme Court "some novelty will be required if merely because that which does not possess novelty is usually known; secrecy, in the context of trade secrets, thus implies at least minimal novelty." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974). The subject of a trade secret cannot be a matter of general knowledge in the business. *Id.* at 475; *see also Li v. Shuman*, No. 14-CV-00030, 2016 WL 7217855, at *19 (W.D. Va. Dec. 9, 2016) (internal citations omitted) ("[T]o receive trade secret protection, [the information] 'must be secret, and must not be of public knowledge or of a general knowledge in the trade or business.' Indeed, in order to have economic value, a trade secret must not be readily ascertainable through legitimate means. If a competitor could easily discover the information legitimately, the inference is that the information was either essentially 'public' or is of *de minimus* economic value.")

Doc. 179-7, pp. 12-13, ¶¶ 22-23]. In response, Castle Hill presents evidence that VGT did not require confidentiality or non-disclosure agreements with all of its clients. [Doc. 240-5, p. 276:6-15; Doc. 240-6; Doc. 240-7; Doc. 240-8]. Further, Castle Hill points to a document entitled "Live-Call® 2003 Bingo Reference Manual," which it contends was given to casinos as an "operator manual." *See* [Doc. 179-5; Doc. 240-4, p. 126:4-6]. The reference manual provides a description of VGT's bingo card generation, which includes information as to each of the six salient features of VGT's asserted trade secret. [Doc. 179-5, p. 20]. VGT contends that the Live-Call® 2003 Bingo Reference Manual is not an operator's manual provided to casinos, and is instead solely intended for VGT's internal use. However, the manual includes a "Proprietary Copyright Notice" which states: **[REDACTED]**. [Doc. 179-5, p. 3]. VGT offers no explanation as to who may constitute **[REDACTED]** does VGT submit admissible evidence that the document is not an operator's manual. Accordingly, viewed in the light most favorable to Castle Hill, a reasonable finder of fact could conclude that VGT provided the Live-Call® 2003 Bingo Reference Manual to persons or entities not subject to confidentiality agreements and therefore a genuine dispute of fact exists as to whether VGT undertook reasonable efforts to maintain the secrecy of the bingo card algorithm.

Finally, genuine disputes of fact exist as to whether Castle Hill misappropriated the bingo card algorithm through improper means. Under the DTSA, "misappropriation" includes

> use of a trade secret of another without express or implied consent by a person who—

>> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>
>> (I) derived from or through a person who had used improper means to acquire the trade secret;
>
>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret."

18 U.S.C. § 1839(5). "Improper means" includes breach or inducement of a breach of a duty to maintain secrecy, but does not include "reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6). The VUTSA is similar and requires the following:

> the plaintiff must establish two elements: (1) that the defendant acquired, disclosed, or used a trade secret developed by the plaintiff through improper means (namely, without express or implied consent); and (2) that the defendant knew or had reason to know that its knowledge of the trade secret was either acquired under circumstances giving rise to a duty to maintain its secrecy or derived through a person owing such a duty to the plaintiff.

*Space Systems/Loral, LLC*, 306 F. Supp. 3d at 855. The parties present conflicting evidence as to whether Suggs chose the allegedly infringing algorithm, or based the allegedly infringing algorithm, on trade secrets obtained during his employment with VGT.[8]

---

[8] The parties also dispute the enforceability of the confidentiality provision included in the Employee Agreement between VGT and Suggs. The court did not consider the Suggs Employee Agreement to determine whether genuine issues of material fact exist with respect to the elements of VGT's trade secret claims. Therefore, the court need not opine as to the enforceability of the agreement at this time. *See generally* [Doc. 179-15]. However, assuming that the employee agreement was unenforceable, the court notes that Virginia imposes a common law duty on former employees prohibiting misappropriation of trade secrets. *See Feddeman & Co., C.P.A., v. Langan Assocs., P.C.*, 530 S.E.2d 668, 672 (Va. 2000).

Genuine disputes of fact exist with respect to each element of VGT's trade secret claims pursuant to the VUTSA and DTSA premised on the bingo card algorithm, and VGT is not entitled to summary judgment with respect to its VUTSA and DTSA claims.

## IV. Conclusion

WHEREFORE, Plaintiff Video Gaming Technologies, Inc.'s Motion for Partial Summary Judgment [Doc. 178] is granted in part and denied in part. Summary judgment is granted with respect to Castle Hill's unclean hands affirmative defense premised on non-compliance with NIGC minimum technical standards; the unclean hands affirmative defense with respect to VGT's trade secret and trademark claims; and the illegality affirmative defense. The motion is otherwise denied.

The parties may file proposed redactions, or state their non-objection to public filing of this order, no later than August 5, 2019.

DATED this 22nd day of July, 2019.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE