**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| VIDEO GAMING TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-CV-00454-GKF-JFJ |
| | ) | **REDACTED** |
| CASTLE HILL STUDIOS LLC | ) | |
| (d/b/a CASTLE HILL GAMING); | ) | |
| CASTLE HILL HOLDING LLC | ) | |
| (d/b/a CASTLE HILL GAMING); and | ) | |
| IRONWORKS DEVELOPMENT, LLC | ) | |
| (d/b/a CASTLE HILL GAMING), | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

This matter comes before the court on the Motion for Summary Judgment [Doc. 188] of

defendants Castle Hill Studios LLC; Castle Hill Holding LLC; and Ironworks Development, LLC

(collectively, "Castle Hill").[1]  For the reasons discussed below, the motion is granted in part and

denied in part.

**I.      Background**

This is a dispute between two Class II bingo-based player terminal developers.[2]  Plaintiff

Video Gaming Technologies, Inc. ("VGT") is a Tennessee corporation founded in 1991.  VGT

---

[1] Defendants also filed a sealed, unredacted version of the motion at [Doc. 184].  The references contained in this order are to the unredacted version, and this order contains, in part, information that has been filed under seal.  Accordingly, the court files this order under seal, attorneys' eyes only.  As set forth below, the court will enter an unsealed order after consideration of the parties' proposed redactions, if any.

[2] The Indian Gaming Regulatory Act, which regulates the operation of gaming by Indian tribes, defines three separate classes of games:  (1) class I gaming, which includes social games and traditional forms of tribal gaming; (2) class II gaming, which includes bingo and, if played in the

holds itself out as one of the top providers of Class II player terminals in the United States and, specifically, Oklahoma, one of the largest Class II markets in the United States.  One of VGT's Class II products is a three-reel mechanical game.  As the name suggests, a three-reel mechanical game features mechanical reels that physically spin when the player places a wager and then pushes a button or pulls a handle (as opposed to a graphical representation of spinning reels on a video screen).

Castle Hill Studios LLC and Ironworks Development, LLC are single-member limited liability companies that are wholly owned by Castle Hill Holding LLC.  Collectively, the entities do business as Castle Hill Gaming ("Castle Hill").  Castle Hill was launched in 2013, and its founding members include former VGT officers and employees.  Castle Hill directly competes with VGT in the Class II market, specifically with respect to three-reel mechanical games.

In this case, VGT alleges that Castle Hill intentionally developed Class II games that closely resemble VGT's Class II games and incorporate marks and themes confusingly similar to VGT's marks and themes.  Specifically, VGT possessed a registered trademark in MR. MONEY BAGS & design mark (reg. no. 3,152,743), set forth below:



same location, pull-tabs, lotto, punch boards and tip-jars; and (3) class III gaming, which includes any form of gaming not included in class I or class II.  25 U.S.C. § 2703.  *See also Diamond Game Enters., Inc. v. Reno*, 230 F.3d 365, 367 (D.C. Cir. 2000).

VGT also asserts common law trademark rights arising from four series of VGT games: "Mr. Money Bags" (modernized version), "Polar High Roller," "Crazy Bill," and "Greenback Jack." The alleged common law trademarks include the titles, logos, characters, and overall artwork associated with the four game series. Exemplars of the four relevant VGT games series are set forth below alongside the allegedly infringing Castle Hill titles:

VGT – Mr. Money Bags                    CHG – New Money

    

VGT - Polar High Roller          CHG - Arctic Cash          CHG - Arctic Ice

        

VGT - Crazy Billions                    CHG - Welcome to Nugget Mountain[1]

    

VGT - Greenback Jack                    CHG - Coin Slinger#

    

In addition to trademark, VGT asserts unregistered trade dress rights in a combination of the following elements used in its products:  (1) the game cabinet (the size, shape, color, material, and placement of components in the standard-sized "LS" cabinet, without "jukebox" lighting, and with 6-inch or 19/20-inch video screens); (2) red strobe; (3) reel resolution sound (*i.e.*, the sound made as each reel comes to a stop); (4) award sound (the mechanical bell sound that signals that a player has won); (5) bingo play and pays (the bingo pattern-payout combinations that VGT uses within each pseudo-paytable); and (6) red screen free spins.

Finally, VGT alleges Castle Hill misappropriated VGT's trade secrets, confidential information, and proprietary information, including VGT's algorithm for creating and distributing bingo cards, the uniqueness testing algorithm, the functionality for translating bingo outcomes into outcomes on game reels, and VGT's "know how."

Based on these allegations, the First Amended Complaint (the operative pleading) includes eight counts: (1) federal trademark infringement in violation of § 32 of the Lanham Act (15 U.S.C. § 1114); (2) unfair competition and trade dress infringement in violation of § 43(a) of the Lanham Act (15 U.S.C. § 1125(a)); (3) unfair competition, trade dress infringement, and trademark infringement in violation of the Oklahoma Deceptive Trade Practices Act (78 OKLA. STAT. §§ 51-56); (4) unfair competition, trade dress infringement, and trademark infringement under Oklahoma common law; (5) misappropriation of trade secrets in violation of the Oklahoma Uniform Trade Secrets Act (78 OKLA. STAT. §§ 85-94); (6) misappropriation of confidential business information in violation of Oklahoma common law; (7) misappropriation of trade secrets in violation of the Defend Trade Secrets Act of 2016 (18 U.S.C. §§ 1836 *et seq.*); and (8) misappropriation of trade secrets in violation of the Virginia Uniform Trade Secrets Act (VA. CODE ANN. §§ 59.1-336 to 59.1-343).  [Doc. 103].  Castle Hill moves for summary judgment on all of VGT's claims.

## II.    The Standard on Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *1-800 Contacts, Inc. v. Lens.com, Inc*., 722 F.3d 1229, 1242 (10th Cir. 2013) (quoting *Sally Beauty Co., Inc. v. Beautyco*, *Inc.*, 304 F.3d 964, 971 (10th Cir. 2002)).  Thus, to survive summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (emphasis in original) (quoting FED. R. CIV. P. 56(e)).  "An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *1-800 Contacts, Inc.*, 722 F.3d 1242 (quoting *Sally Beauty Co., Inc*., 304 F.3d at 971).  The court must "construe the evidence and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant."  *Sally Beauty Co., Inc.*, 304 F.3d at 972 (citing *King of the Mountain Sports, Inc. v. Chrysler Corp.,* 185 F.3d 1084, 1089 (10th Cir. 1999)).

## III.    Undisputed Material Facts

The following facts are undisputed for purposes of summary judgment.  Plaintiff VGT is a Tennessee corporation, based in Tennessee.  [Doc. 184, pp. 7-8, ¶ 1; Doc. 239, pp. 12-16].  Castle Hill Studios LLC and Ironworks Development, LLC are single-member limited liability companies that are wholly owned by Castle Hill Holding LLC.  Collectively, the entities do business as Castle Hill Gaming.  [Doc. 184, pp. 8-9, ¶ 6; Doc. 239, pp. 12-16].

VGT manufactures Class II bingo-based electronic gaming machines in North America. [Doc. 184, pp. 7-8, ¶ 1; Doc. 239, pp. 12-16]. VGT does not brand or develop Class III games. [Doc. 239-14, p. 35:12-23]. VGT's primary product is a "stepper," also known as a mechanical reel game. [*Id.* at p. 34:12-21]. VGT currently leases approximately 22,000 steppers, which are primarily located in Oklahoma. [*Id.* at p. 36:4-21].

In approximately 2010, former VGT employee John Taylor created Castle Hill Holding, LLC in Charlottesville, Virginia. [Doc. 184-3, pp. 53:22 to 55:1]. VGT had terminated Taylor in September of 2009 and he was unemployed for a period of time prior to creating Castle Hill Holding. [*Id.* at pp. 38:8 to 39:4; 54:10 to 55:14]. Castle Hill began by making Class III games utilizing Intuicode as a third-party platform provider. [Doc. 184-3, pp. 92:1 to 94:4]. However, Castle Hill subsequently ceased offering Class III games and shifted its focus to Class II games. [Doc. 184-7, p. 67:12-17 and Doc. 239-22, p. 163:17-22].

A.    *Trademarks*

VGT's trademark infringement claims relate to four "series" of three-reel mechanical bingo-based casino games: Crazy Bill; Mr. Money Bags; Polar High Roller; and Greenback Jack. [Doc. 103]. In the Amended Complaint, VGT identifies only five registered trademarks related to these four game series: CRAZY BILLIONS (reg. no. 3,395,857); MR. MONEY BAGS (reg. no. 4,138,672); MR. MONEY BAGS & design (reg. no. 3,152,743); POLAR HIGH ROLLER (reg. no. 3,755,296); and GREENBACK JACK (reg. no. 3,506,608). [Doc. 184, p. 10, ¶ 11; Doc. 239, pp. 12-16; Doc. 103, p. 5, ¶ 19]. Only MR. MONEY BAGS & design includes a design mark; the remainder are only word marks. [*Id.*]. VGT registered the MR. MONEY BAGS & design mark

effective       October       10,       2006.       [Reg.       No.       3,152,743, http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4805:3v6et5.2.73,152,743].[3]

B.    *Trade Dress*

VGT offers Class II bingo-based games in three separate cabinets: the thin-line "LS" (a/k/a "C6") cabinet; sit-down (a/k/a slant) cabinet; and the XSpin video cabinet.[4]  [Doc. 184-20, p. 246:10-17; Doc. 239-43, pp. 92-122].  VGT also offers an enlarged version of the LS cabinet, called the XL.  [Doc. 184-20, p. 141:11-16; Doc. 184-21, p. 78:4-13].  VGT has games in commerce in all of these cabinets.  [Doc. 184, p. 11, ¶ 14; Doc. 239, pp. 12-16].  The same game titles and themes are offered by VGT in different cabinets.  [Doc. 184, p. 11, ¶ 14; Doc. 239, pp. 12-16].  Castle Hill purchases its game cabinets from GTSource.  Castle Hill has three cabinets in the market: the Atlas-style cabinet; the refurbished "retro" style cabinets; and new Retro cabinets. [Doc. 103-1, p. 6; Doc. 184, pp. 19-20, ¶¶ 49-50; Doc. 239, pp. 12-16].

It is common for electronic gaming machines to have a "candle," a light of stacked colors. [Doc. 184-2, p. 70:4-12].  VGT utilizes a red strobe light, rather than a stacked candle.  [Doc. 184-20, p. 238:9-14; Doc. 239-8, p. 60:11-20].  Castle Hill utilizes a red strobe on top of a white LED light mount assembly.  [Doc. 239-6, 122:14 to 124:23].

---

[3] For purposes of summary judgment, the court takes judicial notice of the online records related to reg. no. 3,152,743, of the U.S. Patent & Trademark Office.  *Winzler v. Toyota Motor Sales U.S.A.*, *Inc.*, 681 F.3d 1208, 1213 (10th Cir. 2012) (permitting judicial notice of publicly available records of an administrative agency).

[4] Castle Hill also submits evidence that VGT offers newer games in the Helix and Helix+ cabinets. However, the evidence presented indicates that use of the Helix and Helix+ cabinets was limited to Ovation platform titles, and VGT did not offer any of the Class II bingo-based games at issue in this litigation in the Helix or Helix+ cabinets.  *See* [Doc. 184-20, pp. 43:18-25 and 246:22 to 248:20].  Thus, the Helix and Helix+ are not material to VGT's claims in this case.

With respect to screens, VGT has offered its products with a 6-inch, 9-inch, 14-inch, 19-inch, 20-inch, and 22-inch screen. Some VGT games with the same title are available in cabinets with a variety of screen sizes. [Doc. 184-22, pp. 119:2 to 120:17; Doc. 184-24, p. 36:11-15].

VGT adopted a red screen feature to signify the industry-common feature of a "free" or "extra" spin. [Doc. 184-2, pp. 80:9 to 81:18]. During the red screen free spin feature, VGT's screen displays a red tint. [Id.]. As of July 12, 2018, the VGT reels did not display a red tint during the red screen bonus feature. [Id. at pp. 82:19-24 and 201:18-20]. Castle Hill's instant free pay feature plays a video where the instant free pay logo is displayed. The instant free pay logo is orange and white, and the screen where the logo is displayed is red. [Doc. 184-16, pp. 225:22 to 227:24]. Castle Hill's reels turn red during the instant free play. [Doc. 184-16, pp. 226:7 to 227:3].

In some of its electronic gaming machines, VGT utilizes a 120-coil AC (alternating current) mechanical bell produced by W.L. Jenkins. [Doc. 239-8, pp. 113:25 to 114:12]. VGT has used the same mechanical bell since the 1990s. [Id. at p. 115:8-24]. Castle Hill uses a 12-volt DC (direct current) mechanical bell produced by W.L. Jenkins. [Doc. 239-17, pp. 323:4-7; 370:3 to 371:17].

VGT and Castle Hill both display their "house marks" or company name and/or logos on their games. [Doc. 184, p. 21, ¶ 59; Doc. 239, pp. 12-16].

VGT's survey expert, Dr. Yoram Wind, did not perform a secondary meaning study. [Doc. 184, p. 18, ¶ 40; Doc. 239, pp. 12-16].

VGT leases its products directly to tribal casinos. [Doc. 184-20, p. 65:6-10; Doc. 239-22, p. 70:11-13]. Negotiations concern the lease of expensive equipment, and contracts are negotiated for multiple pieces of equipment. [Doc. 184-20, p. 86:3-5 and 14-19]. Oklahoma tribes as

customers take negotiations seriously and exercise care in negotiating the deals.  [Doc. 184-20, p. 86:8-13].

## IV.    Analysis

VGT's eight counts may be grouped into three general categories:  trademark, trade dress, and trade secrets/confidential information.  The court first considers the trademark claims.

### A.    Trademark Claims

"A trademark is a distinctive mark, symbol, or emblem used by a producer or manufacturer to identify and distinguish his goods from those of others." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 939 (10th Cir. 1983) (quoting *Educ. Dev. Corp. v. Econ. Co.*, 562 F.2d 26, 28 (10th Cir. 1977)).  Although trademarks existed at common law, in order to foster national uniformity, Congress enacted the Lanham Act, pursuant to which "trademarks that are 'used in commerce' may be placed on the 'principal register,' that is, they may be federally registered." *Matal v. Tam*, 137 S. Ct. 1744, 1751-52 (2017).  The Lanham Act creates a federal cause of action for trademark infringement.  *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1301 (2015).  However, "an unregistered trademark can be enforced under state common law." *Matal*, 137 S. Ct. at 1753.

VGT asserts a claim for federal trademark infringement in violation of the Lanham Act for its registered trademark, as well as claims for unregistered trademark violations under the Oklahoma Deceptive Trade Practices Act, 78 OKLA. STAT. §§ 51-56 and Oklahoma common law. With respect to trademark, the Amended Complaint includes allegations that VGT "owns more than 200 U.S. federal trademark registrations and applications in connection with its Class II bingo-based games," and cites twenty (20) as being relevant to its trademark claims.  *See* [Doc. 103, pp. 4-5, ¶ 19].  Castle Hill contends it is entitled to summary judgment as to all of VGT's

trademark claims, in part because VGT has abandoned portions of its claims.  Thus, the court first considers the scope of VGT's trademark claims.

In its Response in Opposition to Defendants' Motion for Summary Judgment, VGT concedes that its claim of registered trademark infringement is limited to its MR. MONEY BAGS & design mark (reg. no. 3,152,743).  [Doc. 239, p. 20].  Additionally, both VGT's Identification of Extant Trademark Infringement Claims [Doc. 143] and summary judgment response [Doc. 239], limit VGT's common law trademark claims to four series of games:  "Mr. Money Bags," "Polar High Roller," "Crazy Bill," and "Greenback Jack."  [Doc. 239, p. 19].  Thus, Castle Hill is entitled to summary judgment as to VGT's registered trademark claims to the extent premised on any mark (word or design) other than MR. MONEY BAGS & design mark (reg. no. 3,152,743), and its common law trademark claims to the extent premised on any games or marks other than those in the four foregoing games series.

The court next considers VGT's registered trademark infringement claim with respect to MR. MONEY BAGS & design mark (reg. no. 3,152,743).

### 1.   Registered Trademark Claim

As previously stated, the Lanham Act permits a mark owner to register its mark with the U.S. Patent & Trademark Office.  Registration confers certain rights and benefits including providing "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate."  *B & B Hardware, Inc.*, 135 S. Ct. at 1300 (quoting 15 U.S.C. § 1057(b)).  After five years and upon satisfaction of certain conditions, a mark "shall be incontestable."  15 U.S.C. § 1065 (section 15 of the Lanham Act).

It is undisputed that VGT possesses a registered trademark for MR. MONEY BAGS & design (reg. no. 3,152,743).[5]  [Doc. 184, p. 10, ¶ 11; Doc. 239, pp. 12-16].  Pursuant to § 32 of Lanham Act, any person who

> use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive

without the consent of the registrant shall be subject to civil liability.  15 U.S.C. § 1114(1)(a).  Because the Lanham Act imposes liability only if the use "is likely to cause confusion," "[t]he key inquiry in a trademark infringement case is the likelihood of confusion between two similar marks."  *Team Tires Plus, Ltd. v. Tires Plus, Inc*., 394 F.3d 831, 832 (10th Cir. 2005).  "Even a plaintiff who is relying on an incontestable registration has the burden of proving likelihood of confusion."  *Navajo Nation v. Urban Outfitters, Inc.,* 935 F. Supp. 2d 1147, 1161 (D.N.M. 2013).  The Tenth Circuit has articulated six relevant factors to assist the court in determining the likelihood of confusion:

(a)    the degree of similarity between the marks;

(b)    the intent of the alleged infringer in adopting its mark;

(c)    evidence of actual confusion;

(d)    the relation in use and the manner of marketing between the goods or services marketed by the competing parties;

(e)    the degree of care likely to be exercised by purchasers; and

---

[5] VGT switched to a "modernized" or alternative version of the "MR. MONEY BAGS & design" mark in the late 2000s or early 2010s.  *See* [Doc. 239, p. 21 n.7; Doc. 239-43, p. 14].  The court's consideration of VGT's registered trademark claim is limited to the MR. MONEY BAGS & design registered as reg. no. 3,152,743.  The court will consider the "modernized" or alternative of the "MR. MONEY BAGS & design" mark with respect to VGT's common law trademark claim.

(f)    the strength or weakness of the marks.

*King of the Mountain Sports, Inc. v. Chrysler Corp.,* 185 F.3d 1084, 1089-90 (10th Cir. 1999).[6]

"This list is not exhaustive.  All of the factors are interrelated, and no one factor is dispositive." *Id.* at 1090 (quoting *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1530 (10th Cir. 1994)).  Further, "[t]he importance of any particular factor in a specific case can depend on a variety of circumstances, including the force of another factor." *Water Pik, Inc.*, 726 F.3d at 1143. In all cases, "the key inquiry is whether the consumer is 'likely to be deceived or confused by the similarity of the marks.'" *Heartsprings, Inc. v. Heartspring, Inc.,* 143 F.3d 550, 554 (10th Cir. 1998) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 780 (1992)).  "Although 'likelihood of confusion is frequently a fairly disputed issue of fact on which reasonable minds may differ, the issue is amenable to summary judgment in appropriate cases.'" *King of the Mountain Sports, Inc*., 185 F.3d at 1089 (quoting *Universal Money Ctrs*., 22 F.3d at 1530 n.2).

### Similarity of the Marks

The Tenth Circuit has described the "similarity of the marks" as "the first and most important factor." *Id.* at 1091.  This factor requires the court to "test the degree of similarity between marks on three levels: sight, sound, and meaning." *Id.* at 1090.  The court must afford similarities in the marks more weight than differences. *Id*.  On each level, the court must evaluate the marks "as they are encountered by the consumer in the marketplace." *Heartsprings, Inc.*, 143 F.3d at 554 (citing *First Sav. Bank v. First Bank Sys., Inc.*, 101 F.3d 645, 653 (10th Cir. 1996)).

---

[6] The court notes that *King of the Mountain* and other cases relied on by this court herein with respect to its registered trademark claim analysis are § 43(a) cases (unregistered trademark claims) rather than § 32(a) (registered trademark claims).  However, as recognized by the Tenth Circuit, whether brought under § 32 or § 43(a), "the central inquiry is the same: whether the junior user's mark is likely to cause confusion with the senior user's mark." *Water Pik, Inc. v. Med-Systems, Inc.,* 726 F.3d 1136, 1143 (10th Cir. 2013).

The court must consider each mark as a whole, rather than the independent components. *Hornady Mfg. Co., Inc. v. Doubletap, Inc*., 746 F.3d 995, 1001-02 (10th Cir. 2014).

Applying these principles, similarities exist between "Mr. Money Bags" and "New Money." Although not dispositive, both marks utilize the word "money." *Universal Money Ctrs., Inc.*, 22 F.3d at 1531. And the name "New Money" explicitly suggests that Castle Hill's character is a newer, younger version of "Mr. Money Bags." However, the court is not "free to focus solely on name similarity." *Hornady Mfg. Co.*, 746 F.3d at 1002 (quoting *Heartsprings*, 143 F.3d at 555). Rather, "[t]he court must consider the effect of marketplace presentation, including 'lettering styles, logos and coloring schemes.'" *Id.*

Differences exist in the design of VGT and Castle Hill's marks. Castle Hill's "New Money" uses a block, serif font, similar to the font that appears on U.S. currency. The text is outlined in a darker color to create the appearance of depth. A phrase—"Gotta Bet Max to Win Stacks" appears on a scroll beneath the "New Money" text. [Doc. 185-11, p. 33; Doc. 189-6, p. 7]. Conversely, "Mr. Money Bags" appears in a sans serif font. "Mr." is italicized and "Money Bags" is outlined in Christmas lights. "Mr. Money Bags" does not appear in a single color, and VGT's mark does not utilize a secondary phrase. [Doc. 185-11, p. 24; Reg. No. 3, 152,743, http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4805:3v6et5.2.73,152,743]].

However, similarities exist in the associated design artwork. Both the "Mr. Money Bags" and "New Money" characters are depicted as wearing a fedora, which is slightly tipped or angled. [Doc. 185-11, pp. 24 and 33]. Further, both characters are surrounded by dollar bills. [*Id.*]. The court must afford these similarities more weight than the differences. *See King of the Mountain*

*Sports, Inc.*, 185 F.3d at 1090.  Thus, giving the similarities more weight than the differences, the similarities in the visual appearances of the marks outweigh the differences.[7]

VGT concedes that the marks are not similar in sound.  *See* [Doc. 239, p. 31].  Thus, the court turns to the marks' meaning.  "New Money" connotes *nouveau riche*.  *Nouveau riche*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, 795 (10th ed. 1994).  "Mr. Money Bags" also implies a wealthy person.  Moneybags, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, 750 (10th ed. 1994).

Castle Hill contends that the presence of the house mark weighs against a finding of similarity.  *Water Pik, Inc.*, 726 F.3d at 1157.  It is undisputed that both VGT and Castle Hill display their "house marks," or company name and logos, on their games.  [Doc. 184, p. 21, ¶ 59; Doc. 239, pp. 12-16].  However, the summary judgment record suggests that the house mark does not appear in a consistent location, and Castle Hill presents no evidence with respect to the prominence of the marks on the products.  [Doc. 184-23, pp. 64:13 to 65:7].  Thus, *Water Pik* is distinguishable and the undisputed presence of the house mark does not weigh against a finding of similarity.

Based on the foregoing, weighing similarities more than differences as the court must, the two marks are sufficiently similar that the first factor weighs slightly in VGT's favor.

### Intent of the Alleged Infringer in Adopting the Mark

With respect to the second factor, the Tenth Circuit has held that the "deliberate adoption of a similar mark may lead to an inference of intent to pass off goods as those of another which in turn supports a finding of likelihood of confusion[.]"  *Universal Money Ctrs., Inc.*, 22 F.3d at 1532

---

[7] In addition to a visual comparison to establish similarity, VGT relies on expert testimony that the marks are similar.  However, the court is free to draw its own conclusions with respect to similarity and need not rely on expert testimony.  *Water Pik, Inc.*, 726 F.3d at 1156.

(quoting *Beer Nuts, Inc. v. Clover Club Foods Co*., 805 F.2d 920, 927 (10th Cir. 1986)); *see also John Allan Co. v. Craig Allen Co. L.L.C*., 540 F.3d 1133, 1139 n.4 (10th Cir. 2008) (explaining permissive nature of the inference). However, "mere knowledge [of a similar mark] should not foreclose further inquiry." *Universal Money Ctrs., Inc*., 22 F.3d at 1532 (quoting *GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir. 1990)). "The proper focus is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Jordache Enters., Inc. v. Hogg Wyld, Ltd*., 828 F.2d 1482, 1485 (10th Cir. 1987) (quoting *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 431 (5th Cir. 1984)). All doubts must be resolved against the owner of the junior mark. *Sally Beauty Co. v. Beautyco, Inc*., 304 F.3d 964, 973 (10th Cir. 2002). Further, "intent to copy, standing alone, may be enough to preclude summary judgment in [defendant's] favor." *Sally Beauty Co.,* 304 F.3d at 976.

VGT presents evidence from which a reasonable finder of fact could infer that Castle Hill intended to copy VGT's registered trademark. Specifically, VGT submits a February 19, 2015 e-mail exchange between Castle Hill Chief Creative Officer Jason Sprinkle and Rich Sisson in which Sprinkle states, "I want new money must look [*sic*] as close to mmb as possible, in color and patterns." [Doc. 239-32, p. 2]. Additionally, the summary judgment record includes the transcript of an electronic conversation between Castle Hill employees Brandon Booker and Seth Morgan, specifically the following exchange:

**Booker 10:23 AM:**
yup worked
looks considerably better than I expected
the curved monitors we got at vgt looked like s**t
omg the new money guy
first time Im seeing him
for f***s sake
we are literally making mmb baby

**Seth Morgan 10:25 AM:**
yup

[Doc. 239-35, p. 3].  Finally, VGT cites evidence that Castle Hill adopted a "Product Strategy" to "[i]ncrease IP value and success by [c]reating developing and [t]rademarking, fun and memorable character names, feature names and family names that foster familiar fun and rewarding player experiences" and "[u]tilize familiar color schemes, hardware, sounds etc. to foster player acceptance."  [Doc. 239-33, p. 4].  The "Product Strategy" identified and described Castle Hill's three-reel mechanical game titles, and, with respect to "New Money" states: "Single line 3RM complete with **Instant Free Pay**™ screen bonus and RGB Reel Lighting.  *Colors and sounds that players will recognize as fun and enjoy like having Bags of Money*."  [Doc. 239-33, p. 6 (emphasis added)].  Sprinkle concedes that the emphasized portion was a reference to "Mr. Money Bags." [Doc. 239-17, pp. 334:24 to 335:8; Doc. 184-17, pp. 162:19 to 163:9].  Based on the foregoing, and viewing the evidence in the light most favorable to VGT, a reasonable finder of fact could infer that Castle Hill intended to copy VGT's "Mr. Money Bags" mark in order to derive benefit from VGT's reputation or good will.  Thus, the second factor weighs in favor of VGT.

### Evidence of Actual Confusion

In the Tenth Circuit, "[a]lthough not necessary to prevail on a trademark infringement claim, evidence of actual confusion in the marketplace may be the best indication of likelihood of confusion."  *Sally Beauty Co.*, 304 F.3d at 974.  VGT points to two forms of evidence of actual confusion:  (1) a survey prepared by Dr. Yoram Wind [Doc. 169-4], and (2) anecdotal evidence of actual confusion among consumers.

With respect to the survey evidence, Wind did not utilize the version of the "Mr. Money Bags" mark identical to that registered with the USPTO but rather included a modernized version of "Mr. Money Bags" in the array.  VGT contends that Dr. Wind's conclusions are applicable to

the "full range of VGT's infringed trademarks" based on Dr. Wind's use of open-ended questions and convergent evidence. However, this court previously expressed concerns regarding the reliability of the Wind survey. *See* [Doc. 322]. The court specifically expressed concern that the base questions were unduly suggestive and "risked sowing confusion . . . when none would have arisen otherwise." *See Water Pik, Inc.*, 726 F.3d at 1148. Based on the methodological flaws previously identified by this court with respect to the Wind Survey, the court concludes the evidence is entitled to little weight as to actual confusion. *Hornady Mfg. Co.*, 746 F.3d at 1005.

As for the evidence of actual confusion, VGT points to fourteen instances of actual confusion. However, of the fourteen instances, only two specifically relate to "Mr. Money Bags" and "New Money." *See* [Doc. 239-72 and Doc. 239-73]. The remaining instances are irrelevant to VGT's registered trademark claim. The Tenth Circuit has consistently recognized that "isolated, anecdotal instances of actual confusion may be *de minimis* and may be disregarded in the confusion analysis." *Hornady Mfg. Co.*, 746 F.3d at 1005 (quoting *Water Pik, Inc.*, 726 F.3d at 1150); *see also Water Pik, Inc.*, 726 F.3d at 1150-51 (three instances); *King of the Mountain Sports, Inc.*, 185 F.3d at 1092-93 (seven instances). Thus, evidence of only two anecdotal instances of actual confusion as to VGT's registered trademark are *de minimis* and not probative of actual confusion. Further, one of the instances relates to confusion by a VGT employee and is not probative as to *consumer* confusion. *Heartsprings, Inc.*, 143 F.3d at 557.

Based on the foregoing, VGT presents only *de minimis* evidence of actual confusion and therefore this factor weighs in favor of Castle Hill.

### Relation in Use and Manner of Marketing

The Tenth Circuit analyzes the fourth factor by separately considering "(1) the similarity of products and (2) the similarity in the manner of marketing the products." *Sally Beauty Co., Inc., 304 F.3d at 974*.

"The greater the similarity between the products . . ., the greater the likelihood of confusion." *Sally Beauty Co., 304 F.3d at 974* (quoting *Universal Money Ctrs., Inc.*, 22 F.3d at 1532). It is undisputed that both parties manufacture and market Class II bingo-based electronic gaming machines—specifically three-reel mechanical games. Further, as discussed above, the marks themselves are similar. *Cf. Universal Money Ctrs., Inc.*, 22 F.3d at 1532. Thus, this consideration weighs in VGT's favor.

With respect to manner of marketing, the Tenth Circuit has previously considered "whether the parties were competitors in consumer markets." *Sally Beauty Co., Inc., 304 F.3d at 974*. Castle Hill concedes that both company's products are sold and used in the same line of commerce. [Doc. 329, p. 91:1-6]. Castle Hill further concedes that it designed "New Money" to directly compete with "Mr. Money Bags." [Doc. 184-17, pp. 162:19 to 163:9]. Further, Castle Hill offers no evidence of differences in the companies' respective marketing strategies, which could reduce the likelihood of confusion. *Sally Beauty Co., 304 F.3d at 975*. Thus, this factor weighs in VGT's favor.

### Degree of Care Likely to be Exercised by Consumers

Consumers that recognize a high degree of care reduce the likelihood of confusion. *Heartsprings, Inc., 143 F.3d at 557*. The Tenth Circuit previously reasoned that "buyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse," and therefore "items purchased on impulse are more likely to be confused than expensive items[.]"

*Sally Beauty Co.,* 304 F.3d at 975 (citations and quotations omitted).  Castle Hill presents evidence with respect to Oklahoma tribes as consumers and, based on that evidence, it is undisputed that electronic gaming machines are expensive products, and that contracts are negotiated for multiple pieces of equipment.  [Doc. 184-20, p. 86:3-5 and 14-19].  Further, Oklahoma tribes take negotiations seriously and exercise care in negotiating the deals.  [*Id.* at 86:8-13].

However, VGT cites evidence that the majority of *casino patrons* play multiple games during a single visit to a casino, and that the manufacturer of the game is not a relevant consideration.  *See* [Doc. 184-41, pp. 11-13].  Further, VGT provides evidence that it offers games in low denominations, including quarter machines.  [Doc. 239-14, pp. 88:22 to 89:20].  Accordingly, VGT presents evidence from which a reasonable finder of fact could infer that, unlike Oklahoma tribes as consumers, casino patrons do not exercise a high degree of care.

Castle Hill concedes that both the tribes and casino patrons (that is, the game players) are relevant consumers in this case.  [Doc. 329, p. 91:7-18].  Because the parties present evidence that Oklahoma tribes exercise a high degree of care, but that casino patrons do not, this factor is neutral for purposes of this motion.

### Strength or Weakness of the Mark

A mark's strength is "its 'capacity to indicate the source of the goods or services with which it is used.'"  *Water Pik, Inc.*, 726 F.3d at 1151 (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 21 cmt. *i* (1995)).  "Strength has two components: conceptual strength, or the mark's place on the spectrum of distinctiveness; and commercial strength, or its level of recognition in the marketplace."  *Hornady Mfg. Co.,* 746 F.3d at 1007.

To measure the conceptual strength of a senior mark, the court must place the mark on a "spectrum of distinctiveness ranging along the following five categories (from least to most

distinctive): (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful."[8]  *Hornady Mfg. Co.,* 746 F.3d at 1007 (citing *Water Pik, Inc*., 726 F.3d at 1152).  Suggestive, arbitrary, and fanciful marks are considered inherently distinctive and therefore strong.  *See Water Pik, Inc*., 726 F.3d at 1152.  It is undisputed that VGT possesses registered trademark no. 3,152,743 in the MR. MONEY BAGS & design mark, and VGT registered the MR. MONEY BAGS & design mark effective October 10, 2006.  VGT asserts—and Castle Hill concedes—that the mark is incontestable.  *See* [Doc. 329, p. 65:1-12].[9]

A generic term cannot be registered as a trademark.  *Heartsprings, Inc.,* 143 F.3d at 555. Nor may an incontestable mark be challenged as merely descriptive.  *Park 'N Fly, Inc. v. Dollar*

---

[8] The Tenth Circuit defines the categories as follows: "A generic term is a term used to describe the relevant type or class of goods.  It is the weakest mark and cannot become a trademark under any circumstances.  A descriptive term describes a characteristic of a product or service . . . .  The third, and stronger, mark is the suggestive mark, which suggests rather than describes a characteristic of the product and requires the consumer to use imagination and perception to determine the product's nature.  Finally, the arbitrary or fanciful mark is the strongest mark.  An arbitrary mark has a common meaning unrelated to the product for which it has been assigned, such as APPLE when applied to computers, while a fanciful mark, such as KODAK or EXXON, signifies nothing but the product."  *Heartsprings, Inc.,* 143 F.3d at 555 (quoting *First Sav. Bank,* 101 F.3d at 654-55).

[9] Although Castle Hill concedes that the mark is incontestable for purposes of distinctiveness, Castle Hill contends that it may still challenge VGT's registration of the mark on the basis of whether it was properly registered because VGT did not have the exclusive right to use the mark at the time of the registration.  [Doc. 329, pp. 79:13 to 81:19].  However, pursuant to 15 U.S.C. § 1115, an incontestable registration "shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and *of the registrant's exclusive right to use the registered mark in commerce*."  15 U.S.C. § 1115(b) (emphasis added).  Although the section provides the presumption is subject to various defenses, Castle Hill does not identify an applicable statutory exception.  Further, assuming that the alleged defect in VGT's initial registration may constitute a defense, "defenses or defects" "merely reduc[e] the status of a conclusive presumption down to that of *prima facie*, with the challenger allowed to raise common law defenses."  6 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 32:157 (5th ed. June 2019).  Accordingly, even if the alleged defect constitutes a defense, a question of fact still exists.

*Park & Fly, Inc.*, 469 U.S. 189, 196 (1985) ("The language of the Lanham Act also refutes any conclusion that an incontestable mark may be challenged as merely descriptive."); *Beer Nuts, Inc. v. Clover Club Foods Co.,* 805 F.2d 920, 924 (10th Cir. 1986) (incontestable marks "are conclusively presumed to be nondescriptive"). Thus, as a registered incontestable mark, MR. MONEY BAGS & design cannot be characterized as either generic or descriptive and must be suggestive, arbitrary, or fanciful. *See Sally Beauty Co.*, 304 F.3d at 976 ("Suggestive, fanciful, and arbitrary marks are considered inherently distinctive[.]"). Thus, VGT's registered mark is conceptually strong, and the court turns to consideration of the mark's commercial strength.

"Commercial strength is 'the marketplace recognition value of the mark.'" *Water Pik, Inc.,* 726 F.3d at 1153 (quoting *King of the Mountain, Inc.*, 185 F.3d 1093). Commercial strength is analogous to secondary meaning. *Id.* at 1154.[10] To evaluate commercial strength, the Tenth Circuit considers a number of factors including:

> "direct evidence, such as consumer surveys or testimony from consumers," and "circumstantial evidence regarding: (1) the length and manner of [the mark's] use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture."

*Id.* (quoting *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1218 (10th Cir. 2004)).

VGT offers direct evidence of a 2016 consumer survey identifying VGT products, including "Mr. Money Bags," as "required legacy products" [Doc. 239-63, p. 7], and other anecdotal evidence demonstrating consumers' association of VGT with the "Mr. Money Bags" mark. [Doc. 238-68, pp. 2-4]. Further, VGT submits circumstantial evidence indicating

---

[10] Incontestable marks are conclusively presumed to have acquired secondary meaning. *See Beer Nuts, Inc.*, 805 F.2d at 924. However, "[a]lthough secondary meaning is presumed, the fact that [VGT's] mark is statutorily incontestable does not resolve the commercial strength inquiry." *Hornady Mfg. Co.*, 746 F.3d at 1008 n.13.

commercial strength.  First, VGT has utilized the "Mr. Money Bags" mark since the early 2000s.

Although Castle Hill offers evidence that VGT is **[REDACTED]** submits evidence in its

response demonstrating that VGT generated over **[REDACTED]** in revenue on games utilizing

the original "Mr. Money Bags" (as registered) mark as late as 2017.  *See* [Doc. 239-46, p. 2].

Second, there is evidence that VGT expended between approximately **[REDACTED]** each

year on marketing and promotion between 2012 and 2017, [Doc. 239-66], some of which

was specifically directed to marketing the "Mr. Money Bags" mark.  *See* [Doc. 239-67, pp.

13, 21-22, and 31].  There is evidence that VGT's promotion resulted in an increase in

revenue from VGT games in participating casinos and VGT's promotions were more

effective at creating lasting effects than competitors.  *See* [Doc. 239-69, pp. 48-49].  Third,

based on the foregoing evidence, a reasonable finder of fact could conclude that VGT undertook

efforts to promote a conscious connection, in the public's mind, between the mark and VGT's

products.  Accordingly, the mark is commercially strong.

Because VGT's "Mr. Money Bags" mark is both conceptually and commercially strong,

this factor weighs in VGT's favor.

### Balancing the Factors

Based on the foregoing, four factors—similarity of marks, intent, similarity of

products and marketing, and strength of the contesting mark—weigh in VGT's favor.  The

consumer's degree of care is neutral for purposes of this motion.  The remaining factor—actual

confusion—counsels in favor of Castle Hill.  Significantly, the Tenth Circuit has held that intent

to copy alone may be sufficient to withstand summary judgment.  *Sally Beauty Co.,* 304 F.3d

at 976.  This, coupled with the similarities in marks and the strength of VGT's mark, lead the

court to conclude

that a reasonable finder of fact could find in VGT's favor. Accordingly, a genuine dispute of material fact exists with respect to likelihood of confusion, and summary judgment is inappropriate on VGT's registered trademark claim.

2.      Common Law Trademark Claims

As previously stated, VGT also asserts common law trademark claims.[11]  To make out a claim, "the plaintiff must prove: (1) '[the] identifying mark . . . is inherently distinctive or . . . has acquired distinctiveness through secondary meaning,' (2) the mark is nonfunctional, and (3) the competitor's alleged violation of the plaintiff's rights in its mark is likely to cause consumer confusion." *Forney Indus., Inc.,* 835 F.3d at 1244 (quoting *Two Pesos, Inc.,* 505 U.S. at 769).

VGT premises its common law trademark claims on allegations that Castle Hill has infringed marks that VGT uses in connection with the following four series of mechanical reel bingo-based casino games:  "Crazy Bill," "Mr. Money Bags," "Polar High Roller," and "Greenback Jack."  [Doc. 143].  VGT cites ten registered word marks, but claims that it is not alleging that Castle Hill's "word marks, *standing alone*, infringe VGT's word marks, *standing alone*."  Rather, VGT alleges that Castle Hill "has infringed the trademarks, including the games' titles, logos, characters, and overall artwork."  [Doc. 239, p. 19; *see also* Doc. 143; Doc. 329, p. 123:15-21].

_____

[11] The Lanham Act also protects unregistered marks pursuant to § 43(a) of the Act. *Forney Indus., Inc. v. Daco of Mo., Inc.,* 835 F.3d 1238, 1244 (10th Cir. 2016).  The same standards of proof apply to the Oklahoma Deceptive Trade Practices Act and Oklahoma common law claims as to claims for unregistered marks under § 43(a) of the Lanham Act. *Two Men & a Truck Int'l, Inc. v. Two Men & a Truck Movers*, No. 12-CV-00632-R, 2013 WL 12073228, at *3 (W.D. Okla. Jan. 14, 2013) (same standards of proof apply to ODTPA claims and Oklahoma common law claims as Lanham Act claims).  *See also Brunswick Corp. v. Spinit Reel Co*., 832 F.2d 513, 527 (10th Cir. 1987) ("Thus we hold that Section 53(a)(1) of the Oklahoma Act . . . requires the same standards of proof as does an action under Section 43(a) of the Lanham Act.").  Accordingly, the court may look to cases interpreting claims pursuant to § 43(a) of the Lanham Act to determine summary judgment with respect to VGT's common law trademark claims.

Castle Hill criticizes VGT for failing to specifically identify the allegedly infringed upon trademarks. The court shares in Castle Hill's concerns. VGT asserts claims based on marks "use[d] in connection with" the four game series, but does not specifically identify any games within the series or otherwise define the scope of the marks. [Doc. 143, p. 1]. However, in its summary judgment response, VGT points to its supplemental interrogatory responses to Castle Hill's interrogatory no. 1 as "clarify[ying] its position." [Doc. 239, p. 20]. The supplemental response to interrogatory no. 1 states that, for purposes of this litigation, VGT relies on the following unregistered trademarks: CRAZY BILL'S GOLD STRIKE & design logo; CRAZY BILLIONS & design mark; DYNAMITE DAISY word mark and DYNAMITE DAISY & design mark; MR. MONEY BAGS & design mark (modernized alternative version); MR. MONEY BAGS II word mark and MR. MONEY BAGS II & design mark; MR. MONEY BAGS DELUXE! & design mark; MR. MONEY BAGS DELUXE beach marks; MR. MONEY BAGS LUCKY STREAK word mark and MR. MONEY BAGS LUCKY STREAK & design; MR. MONEY BAGS ROAD TO RICHES word mark and MR. MONEY BAGS ROAD TO RICHES & design; MR. MONEY BAGS SPARKLING WILDS & design mark; MR. MONEY BAGS BRINGIN' THE BUCKS & design; POLAR HIGH ROLLER & design mark; POLAR HIGH ROLLER LIGHTNING WILDS word mark and POLAR HIGH ROLLER LIGHTNING WILDS & design mark; and GREENBACK JACK & design mark. [Doc. 239-43, pp. 8-29].[12] VGT therefore

---

[12] Because VGT did not identify all of these marks in its Amended Complaint, Castle Hill argues it should be precluded from pursuing claims based on the marks at this stage of the litigation. However, in the Tenth Circuit,

> [a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover "provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits."

premises its unregistered trademark claim on marks used in connection with fourteen separate games.

VGT consistently refers to the marks as being part of four separate "series" of games, which the parties understand to invoke the "family of marks" doctrine. *See* [Doc. 329, p. 84:17 to 85:16]. Although never directly discussed by the Tenth Circuit, a "family of marks" is defined by the Federal Circuit as

> a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner.  *Simply using a series of similar marks does not of itself establish the existence of a family.  There must be a recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods*.

*J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1462 (Fed. Cir. 1991) (emphasis added); *see also AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 814 (7th Cir. 2002) (family of marks "exists only if and when 'the purchasing public recognizes that the common characteristic is indicative of a common origin of the goods'") (quoting *Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 1336 (Fed. Cir. 2001)).  "Whether a family of marks exists is an issue of fact based on the common formative component's distinctiveness, the family's use, advertising, promotion, and inclusion in party's other marks."  *AM Gen. Corp.*, 311 F.3d at 815. "A family of products in a particular field does not necessarily connote a family of marks.  Merely

---

*Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090-91 (10th Cir. 1991) (quoting 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1219 at 194 (1990)).  This is particularly true when the new allegations serve only to support another way of proving an existing claim.  *Torres v. Cintas Corp.*, 672 F. Supp. 2d 1197, 1206 (N.D. Okla. 2009).  To the extent VGT relies on marks not identified in its Amended Complaint, allegations and evidence related to the additional marks serve only to support another way of proving VGT's existing trade mark claim, which was asserted in its original Complaint.  Further, consideration of the additional marks will not prejudice Castle Hill as Castle Hill received notice of the scope of VGT's claims in discovery.  *See* [Doc. 239-43, pp. 8-29].

adopting and using—and even registering—a group of marks with a common feature does not create a family of marks, even if the user intended to create a family." *Id.* at 816 (internal citation omitted).

VGT does not offer any legal argument or point to any evidence of consumer recognition of each game in the series as being VGT products. Nor does VGT offer any evidence that the series are advertised together. Thus, VGT fails to create a genuine dispute of fact as to whether VGT has a family of marks. *See Primepoint, L.L.C. v. PrimePay, Inc.*, 545 F. Supp. 2d 426, 433-34 (D.N.J. 2008); *J & J Snack Foods Corp.*, 932 F.2d at 1462 ("Simply using a series of similar marks does not of itself establish the existence of a family."). Accordingly, the court separately considers the marks associated with each specific game.

At the outset, the court notes that merely reciting that a trademark is inherently distinctive does not create a genuine dispute of fact to survive summary judgment. *See Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1149 (10th Cir. 2016). *See also Forney Indus., Inc.*, 835 F.3d at 1244 (VGT must first offer evidence that the mark is inherently distinctive or has acquired distinctiveness through secondary meaning). "A trade [mark] is inherently distinctive if its 'intrinsic nature serves to identify a particular source.'" *Sally Beauty Co.*, 304 F.3d at 977 (quoting *Two Pesos, Inc.*, 505 U.S. at 768). VGT generally asserts that its unregistered trademarks are "inherently distinctive," [Doc. 239, p. 23], and points to registration of various word marks. VGT contends "the conclusive presumption that the relevant registered word marks are inherently distinctive should apply equally to the unregistered word-and-design marks that include such registered word marks." [Doc. 239, p. 24]. However, VGT cites no authority for the proposition that the presumption applicable to the registered word marks "applies equally" to the unregistered word and design marks, nor has the court identified any. Moreover, VGT specifically disclaims

any claims premised solely on infringement of the word marks in and of themselves.  *See* [Doc. 239, p. 19; Doc. 143].  Thus, the court declines to apply the statutory presumption.

VGT offers no further evidence or argument to substantiate its claim that the intrinsic nature of the unregistered marks serves to identify the marks as being associated with VGT games. Thus, VGT's bare assertions do not create a genuine dispute of material fact as to inherent distinctiveness.  *Savant Homes, Inc.*, 809 F.3d at 1149.  As a result, the court considers whether VGT's claimed common law trademarks have acquired a secondary meaning.

To determine whether trademarks have acquired a secondary meaning "[t]he ultimate inquiry is whether in the consumer's mind the mark denotes a single thing coming from a single source.  That single source, however, need not be known by name by consumers." *Sally Beauty Co.*, 304 F.3d at 978 (quoting *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir. 1995)).  Secondary meaning may be established through direct or circumstantial evidence.  *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1148 (10th Cir. 2016).  Direct evidence may include consumer surveys or testimony.  *Id.*  VGT offers no direct evidence of secondary meaning.[13]  With respect to circumstantial evidence, the Tenth Circuit has identified six relevant types of evidence:

> (1) the length and manner of the trade [mark's] use; (2) the nature and extent of advertising and promotion of the trade [mark]; (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the trade [mark] and a particular product or venture; (4) actual consumer confusion; (5) proof of intentional copying; or (6) evidence of sales volume.

*Savant Homes, Inc.*, 809 F.3d at 1148 (internal citations, quotations, and footnote omitted). Although "'whether a trade dress has acquired secondary meaning is a question of fact and thus generally should not be decided at the summary judgment stage,' a factfinder must nevertheless

---

[13] It is undisputed that VGT's survey expert, Dr. Yoram Wind, did not perform a secondary meaning study.  [Doc. 184, p. 18, ¶ 40; Doc. 239, pp. 12-16].

have sufficient evidence upon which to base a ruling in plaintiff's favor in order to survive summary judgment." *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 863 F. Supp. 2d 1055, 1062 (D. Colo. 2012) (internal citation omitted), *order clarified by,* No. 09-CV-00970-PAB-KMT, 2012 WL 2014280 (D. Colo. June 5, 2012).

### Crazy Bill Series vs. Welcome to Nugget Mountain

Crazy Bill's Gold Strike

VGT offers the following circumstantial evidence of secondary meaning with respect to "Crazy Bill's Gold Strike."[14]  First, VGT began using the marks as depicted on the game in April of 2005.  [Doc. 239-43, p. 10].  However, VGT offers no evidence regarding the manner of its use of the design logo mark or the associated artwork and character, including exclusive use or uniqueness of the mark.  Rather, the summary judgment evidence indicates that other games have a miner theme and that the "Crazy Bill" miner is an "iconic picture."  [Doc. 184-20, p. 40:7-18].  In fact, VGT submits as evidence with its response brief Castle Hill's discovery responses that identify three electronic games manufactured by other companies with a miner theme and depicting a bearded miner wearing a hat.  *See* [Doc. 239-86, pp. 34-36].  Thus, VGT's own evidence belies any suggestion of exclusivity.

Second, VGT presents evidence of its total expenditures for marketing and promotion for the calendar years 2007 to 2014 and fiscal years 2015 to 2017. [Doc. 239-66, VGT 0010605].  But

---

[14] VGT points to an article from *Slots Guy: The Ultimate Online Slots Guide* discussing "Crazy Bill's Gold Strike Slots" as evidence that players recognized VGT marks.  *See* [Doc. 239-68, pp. 5-6].  However, one instance of consumer recognition is of limited probative value, particularly because the article begins with the author's statement, "[i]t is now [*sic*] secret that I love the red screen free spin machines from Video Gaming Technologies," rather than a discussion of the mark.  Thus, the article gives no indication that the author saw the mark as a source identifier.  *See Predator Int'l, Inc.*, 863 F. Supp. 2d at 1061.  Further, VGT offers no evidence to establish that consumers thereafter connected "Crazy Bill's Gold Strike" with VGT.  *See Water Pik, Inc.,* 726 F.3d at 1154-55.

"advertising alone is typically unhelpful to prove secondary meaning when it is not directed at highlighting the trade [mark]." *Forney Indus., Inc.,* 835 F.3d at 1254. VGT's total advertising budget is not evidence that VGT emphasized or directed its advertising toward the "Crazy Bill's Gold Strike" mark and therefore is not probative of secondary meaning.

To the extent that VGT relies on evidence of advertising and promotion from the 2011 National Indian Gaming Association ("NIGA") featuring only the "Crazy Bill" character, such evidence does not create a genuine dispute of fact sufficient to survive summary judgment with respect to this mark. *See* [Doc. 239-67, pp. 5 and 11]. First, VGT does not base its unregistered trademark claim solely on the "Crazy Bill" character, but rather asks the court to also consider the word marks, logo marks, and artwork. *See* [Doc. 143]. Second, the "Crazy Bill" character as depicted in the 2011 NIGA materials differs significantly from the character as depicted in "Crazy Bill's Gold Strike." Only the head and face of the "Crazy Bill's Gold Strike" character is depicted, he is surrounded by gold nuggets, and, although drawn, appears somewhat realistically as an older man, whereas the "Crazy Bill" character featured in the 2011 NIGA materials is cartoonish, his entire body and clothing are depicted, and he is shown with a donkey. *Cf.* [Doc. 239-43, pp. 9 and 10]. That the "Crazy Bill" character has changed significantly undercuts VGT's claim of secondary meaning. *See Forney Indus., Inc*., 835 F.3d at 1255. Additionally, although "Crazy Bill [*sic*] Gold Strike" is specifically mentioned in connection with the VGT Lounge in the Native Light Casino, such mention is not probative of secondary meaning because the mark is not depicted. *See* [Doc. 239-65, pp. 2-3]. As previously stated, VGT expressly disclaims any claim based solely on the word mark.

Third, VGT argues it presents evidence of consumer confusion, but only one of VGT's asserted instances of actual consumer confusion relates to "one of VGT's Crazy Bill games." The

evidence does not tie the instance to any specific mark in the "Crazy Bill" series. *See* [Doc. 239-71]. Further, as previously discussed, one incident of consumer confusion is *de minimis* and may be disregarded. *Hornady Mfg. Co.*, 746 F.3d at 1004-05. Nor is Yoram Wind's survey probative as to actual confusion for the reasons discussed above, and, further, because Mr. Wind's stimuli did not include any marks associated with the "Crazy Bill" game series.

VGT offers no evidence that Castle Hill intended to copy its "Crazy Bill's Gold Strike" mark specifically.

Finally, VGT offers proof of its sales from 2014 to 2017. *See* [Doc. 239-57]. However, "[s]tanding alone, sales volume may not be indicative of secondary meaning because it could be related to factors other than source identification." *Savant Homes, Inc.,* 809 F.3d at 1149 (quoting *Sally Beauty Co., Inc*., 304 F.3d at 978). VGT offers no additional evidence that is probative of secondary meaning and therefore VGT fails to create a genuine dispute of material fact.

Because VGT offers insufficient evidence to create a genuine dispute of material fact as to secondary meaning, Castle Hill is entitled to summary judgment with respect to VGT's unregistered trademark claim for "Crazy Bill's Gold Strike."

Crazy Billions

VGT offers the following circumstantial evidence with respect to "Crazy Billions." First, VGT began using the "Crazy Billions" mark in commerce as early as January 2007. [Doc. 239-43, p. 11]. However, VGT offers no evidence of the uniqueness of the mark or the exclusivity of VGT's use. As discussed above, the summary judgment record indicates that mining is a common theme in the industry.

Second, VGT offers evidence of its use of the "Crazy Bill" character as he appears in "Crazy Billions" in its 2011 NIGA promotional materials. *See* [Doc. 239-67, pp. 5 and 9]. In one

promotional item, the "Crazy Bill" character appears with other VGT characters, the slogan "Free Spinnin'" and the VGT logo. [Doc. 239-67, p. 5]. Further, VGT offers evidence of its total promotional expenditures. *See* [Doc. 239-66]. Although VGT's unregistered trademark claim is not limited to the "Crazy Bill" character, based on the foregoing evidence, a reasonable finder of fact could conclude that VGT directed efforts to creating conscious connection between the "Crazy Billions" mark and VGT products. Thus, a sufficient nexus may be found between the mark and promotional advertising expenditures.

VGT offers only *de minimis* evidence of actual consumer confusion and offers no evidence that Castle Hill intended to copy the "Crazy Billions" mark specifically. Finally, VGT offers proof of sales evidence specific to "Crazy Billions," totaling over **[REDACTED]**. *See* [Doc. 239-57].

In light of the evidence that VGT directed efforts to create a conscious connection between the "Crazy Billions" mark and the total sales volume exceeding **[REDACTED]**, a genuine dispute of material facts exists as to whether the "Crazy Billions" common law mark has acquired a secondary meaning or distinctiveness.

Castle Hill does not dispute that the "Crazy Billions" mark is non-functional. Thus, the court next considers whether VGT offers evidence to create a genuine dispute of material fact as to the likelihood of consumer confusion. *Forney Indus., Inc.,* 835 F.3d at 1244 (plaintiff must submit evidence of inherent distinctiveness, non-functionality, and likelihood of confusion). As previously stated, the Tenth Circuit articulated six relevant factors to determine likelihood of confusion: (1) degree of similarity of the marks; (2) intent of the alleged infringer; (3) actual confusion; (4) relation in use and manner of marketing between the goods marketed by competing parties; (5) degree of care likely to be exercised by purchasers; and (6) strength of the mark. *King of the Mountain Sports, Inc.,* 185 F.3d at 1089-90.

- 31 -

With respect to similarity, viewing the marks as whole, the court concludes the marks are visually similar. First, the location of the various component parts are similar, creating a similar overall layout. Each mark includes a mountain-scape in the background, the game's "name" is located near the center, and the miner character is situated to the right of the name at an angle. [Doc. 103-1, p. 9]. Where an open mineshaft appears in "Crazy Billions," a "Old-West" style building with an open door appears in "Welcome to Nugget Mountain," creating a visually comparable effect. Second, the characters are similar. Both characters appear with a wide-brimmed, brown miner's cap, white beard, bushy eyebrows, reddened nose, and are depicted as cartoons. [*Id.*]. Finally, both marks include gold nuggets, and utilize an orange, gold, and brown color scheme to evoke a nature scape at dusk.

The marks are not similar in sound. However, the marks evoke a like meaning. Both "Welcome to Nugget Mountain" and "Crazy Billions" connote an Old West, gold-rush theme. Thus, the marks are similar and this factor favors VGT.

With respect to the remaining factors, as previously stated, VGT offers no evidence that Castle Hill intended to infringe the "Crazy Billions" mark in adopting "Welcome to Nugget Mountain," and the second factor weighs in favor of Castle Hill. Nor does VGT offer probative evidence of actual confusion with respect to "Crazy Billions." However, as discussed above, the fourth factor favors VGT, particularly because the marks are similar. The fourth factor, consumer care is neutral for purposes of this motion, and the fifth factor weighs in favor of Castle Hill. Finally, applying a similar analysis as with respect to secondary meaning, viewing the evidence in the light most favorable to VGT, a genuine dispute of material fact exists as to the strength of the

"Crazy Billions" mark.[15]   Because the marks are similar and a genuine dispute of material fact exists as to the mark's strength, on balance, the factors weigh in favor of VGT.  Thus, a genuine dispute of material fact exists as to likelihood of confusion, and Castle Hill is not entitled to summary judgment with respect to the "Crazy Billions" common law mark.

Dynamite Daisy

VGT offers only proof of sales evidence specific to "Dynamite Daisy."  *See* [Doc. 239-57. Proof of sales evidence alone is insufficient to create a fact issue as to secondary meaning.  *Savant Homes, Inc.*, 809 F.3d at 1149.  Castle Hill is entitled to summary judgment as to this mark.

### Mr. Money Bags Series v. New Money[16]

Mr. Money Bags (unregistered mark)

The court analyzes the "modernized" or alternative version of the registered MR. MONEY BAGS & design mark as a common law trademark.  Further, as set forth above, the court declines to apply the statutory presumption applicable to the registered trademark to the common law mark.

---

[15] Castle Hill submits evidence that it obtained registered trademarks (word only) for the following: NUGGET MOUNTAIN (reg. no. 5,408,181); NEW MONEY (reg. no. 4,871,351); ARCTIC CASH (reg. no. 4,998,719); ARCTIC ICE (reg. no. 5,292,150); and COIN SLINGER (reg. no. 4,875,096).  [Doc. 189-2 to 189-5].  Castle Hill also registered federal copyrights over its artwork associated with "New Money," "Arctic Cash," and "Coin Slinger."  [Doc. 189-6 to 189-8].  Castle Hill argues that its own registered trademarks and copyrights with respect to the disputed marks preclude a finding of strength.  *See* [Doc. 184, p. 39].  However, Castle Hill fails to identify any authority for the proposition decided in the context of a *trademark* infringement case and therefore the cases cited by Castle Hill on this issue are distinguishable.  Further, pursuant to the Lanham Act, registration "shall not preclude another person from proving any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered."  15 U.S.C. § 1115(a).

[16] With respect to a "family of marks," VGT does not point to a recognizable common characteristic that the public associates with VGT.  *See J & J Snack Foods Corp.*, 932 F.2d at 1462.  VGT offers evidence that its advertising and promotions feature the "Mr. Money Bags" character, but VGT expressly disclaims any reliance on the character alone.  *See* [Doc. 143; Doc. 239-43, pp. 13-23].

Thus, the court first considers whether the modernized "Mr. Money Bags" mark is inherently distinctive or has acquired distinctiveness through secondary meaning.

VGT submits the following circumstantial evidence of inherent distinctiveness or secondary meaning. First, VGT began using the modernized alternative version of the MR. MONEY BAGS & design logo mark in the late 2000s or early 2010s, and the mark continues to be used. [Doc. 239-43, p. 14].

Second, VGT offers evidence that it engaged in advertising and promotion of the modernized "Mr. Money Bags" mark, including efforts to promote a conscious connection in the public's mind between the modernized "Mr. Money Bags" mark and VGT products. *See* [Doc. 239-67, pp. 5-7, 21-22, 25-26 and 28]. Further, there is evidence that VGT expended between approximately **[REDACTED]** each year on marketing and promotion. [Doc. 179]. VGT presents evidence that its promotion resulted in an increase in revenue from VGT games in participating casinos and VGT's promotions are more effective at creating lasting effects than competitors. *See* [Doc. 239-69, pp. 48-49].

Although VGT offers only *de minimis* evidence of actual consumer confusion, as discussed above, VGT submits evidence of VGT's intent to copy the "Mr. Money Bags" mark. *See* [Doc. 239-32, p. 2; Doc. 239-35, p. 3; Doc. 239-33, pp. 4-5]. Finally, VGT provides evidence of total sales revenue for "Mr. Money Bags" totaling in the millions. Accordingly, a genuine dispute of fact exists as to whether the common law "Mr. Money Bags" mark is inherently distinct or has acquired a secondary meaning.

Castle Hill concedes that the mark is non-functional. Thus, the court considers likelihood of confusion. Applying a similar analysis with respect to the registered MR. MONEY BAGS & design mark, the court concludes increased similarities exist between "New Money" and the

common law "Mr. Money Bags" mark.  In the modernized version, the words "Mr. Money Bags" are no longer surrounded by Christmas lights.  Instead, the words appear in an increasingly dark color variation, but each letter is outlined in gold.  The gold outline in more analogous to the outline creating the illusion of depth in "New Money."  The modernized "Mr. Money Bags" character is more cartoon-like than the original "Mr. Money Bags" and appears in colors that more closely resemble those used in "New Money."  [Doc. 239-43, p. 15].  Additionally, as previously stated, the marks are similar in meaning.  Weighing similarities more heavily than differences as the court must, this factor weighs in favor of VGT with respect to the common law mark.

Further, as noted above, VGT offers evidence of intent to copy the mark, weighing in favor of VGT.  The fourth factor—similarity of products and manner of marketing—also weighs in favor of VGT.  Finally, VGT offers evidence of the commercial strength of the mark.  Accordingly, on balance, the factors weigh in VGT's favor, particularly given evidence of intent to copy.  Thus, a genuine dispute of material fact exists and Castle Hill is not entitled to summary judgment with respect to the modernized "Mr. Money Bags" mark.

Mr. Money Bags, 2; Mr. Money Bags Deluxe!; Mr. Money Bags Deluxe! (Beach Marks); Mr. Money Bags Lucky Streak; Mr. Money Bags Bringin' the Bucks; Mr. Money Bags Road to Riches; and Mr. Money Bags Sparkling Wilds

VGT offers only proof of sales evidence specific to these marks.  *See* [Doc. 239-57].  Proof of sales evidence alone is insufficient to create a fact issue as to secondary meaning.  *Savant Homes, Inc.*, 809 F.3d at 1149.  Castle Hill is entitled to summary judgment as to these marks.

**Polar High Roller Series v. Arctic Cash and Arctic Ice[17]**

<u>Polar High Roller</u>

VGT offers the following circumstantial evidence with respect to "Polar High Roller."[18] VGT began using the mark as early as October 2009. [Doc. 239-43, pp. 24-25]. However, VGT offers no evidence of the uniqueness of the mark or the exclusivity of VGT's use.

As with "Mr. Money Bags," VGT offers evidence of VGT's use of its polar bear character with other VGT characters, the slogan "Free Spinnn,'" and the VGT logo in its 2011 NIGA promotional materials. *See* [Doc. 239-67, p. 5]. VGT also offers evidence of its total promotional expenditures. *See* [Doc. 239-66]. Although VGT's common law trademark claim is not limited to the polar bear character, based on the foregoing evidence, a reasonable finder of fact could conclude that VGT directed efforts to creating conscious connection between the artwork associated with the "Polar High Roller" mark and VGT products.

VGT offers evidence of a single instance of actual consumer confusion with respect to "Polar High Roller," [Doc. 239-76, pp. 2-6], but one incident of consumer confusion is *de minimis*

---

[17] Again, VGT fails to identify any common characteristic indicative of a common origin between the "Polar High Roller" and "Polar High Roller Lightning Wilds" games. *J & J Snack Foods Corp.,* 932 F.2d at 1462. Although both marks contain the polar bear character, VGT's response brief does not discuss the polar bear as a "recognizable common characteristic," nor does VGT offer any evidence that the public associates "Polar High Roller" and "Polar High Roller Lightning Winds" as being within the same group of marks.

[18] VGT offers an article from *Slots Jack: Your Guide to Slots and More* discussing "Polar High Roller" as evidence that players recognize VGT marks. *See* [Doc. 239-68, pp. 7-8]. However, as previously stated, one instance of consumer recognition is of limited probative value. Further, VGT offers no evidence to establish that consumers thereafter connected "Polar High Roller" with VGT. *See Water Pik, Inc.,* 726 F.3d at 1154-55. Additionally, as discussed above with respect to "Crazy Bill's Gold Strike," the inclusion of "Polar High Roller" in advertising associated with the Native Lights Casino VGT Lounge is not probative because only the name was included and VGT expressly disclaims any common law trademark claim based solely on word marks.

and may be disregarded.  *Hornady Mfg. Co., Inc.*, 746 F.3d at 1004-05.  Further, the instance relates to confusion by a VGT employee and therefore does not "demonstrate actual confusion among consumers within the marketplace."  *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 557 (10th Cir. 1998).

VGT offers evidence of Castle Hill's intent to copy the "Polar High Roller" mark with its "Arctic Cash" and "Arctic Ice" mark.  *See* [Doc. 239-17, pp. 167:4 to 169:4; 321:3-12; Doc. 239-28; Doc. 239-39].  Specifically, Sprinkle requested that changes be made to "Arctic Cash" to more closely resemble "Polar High Roller."  [Doc. 239-17, pp. 167:4 to 169:4; 321:3-12; Doc. 239-28, p. 2 ("The colors should follow the polar high roller a little more, maybe the clothing will reflect and bring out more of them."); Doc. 239-39, p. 2 ("It just needs to be reminiscent of this color scheme, for player familiarity and comfort.")].  "[I]t is understandable that a court generally presumes one who chooses a mark similar to an existing mark intends to confuse the public."  *Jordache Enters., Inc.*, 828 F.2d at 1486.  Additionally, as previously stated, VGT provides evidence Castle Hill adopted a "Product Strategy" to "[i]ncrease IP value and success by [c]reating developing and [t]rademarking, fun and memorable character names, feature names and family names that foster familiar fun and rewarding player experiences" and "[u]tilize familiar color schemes, hardware, sounds etc. to foster player acceptance."  [Doc. 239-33, p. 4].  With respect to "Artic Ice," the "Product Strategy" included the following description:  "This Polar gem keeps the high Rollers running!"  [Doc. 239-33, p. 6 (emphasis added)].  Sprinkle concedes this was a reference to "Polar High Roller."  [Doc. 239-17, pp. 166:23 to 167:6].  Based on this evidence, a reasonable fact finder could conclude that Castle Hill intended to copy and derive benefit from VGT's goodwill associated with the "Polar High Roller" mark.

Finally, VGT offers evidence of sales volume for Polar High Roller games exceeding **[REDACTED]** in upright machines and **[REDACTED]** sitdown machines.  *See* [Doc. 239-57]. Although evidence of sales volume alone is insufficient to create a fact issue as to secondary meaning, VGT's total sales volume coupled with evidence of VGT's advertising and Castle Hill's intent to copy, creates a genuine dispute of fact as to secondary meaning.  Thus, the court continues with the common law trademark analysis.

Castle Hill concedes that VGT's unregistered trademark is non-functional, and therefore the court applies the six likelihood of confusion factors.

With respect to similarity, "Polar High Roller" and "Arctic Cash" are visually similar. Structurally, the marks feature ice in the lower portion of the mark, the title of the game in the middle of the mark in large letters, and colors reminiscent of the aurora borealis in the top portion of the mark.  [Doc. 239-43, pp. 24 and 26-27].  Both marks feature cartoon penguins in the lower portions of the design, under the title of the game, as well as larger cartoon animals to the side of the title.  [Doc. 239-43, pp. 24 and 26].  Parallels also exist in the games' titles as one word appears in rounded, block letters ("Polar" and "Cash," respectively), and the other words appear in thinner, elongated lettering ("High Roller" and "Artic").  The art is also alike in that both marks feature cartoon artic animals wearing Hawaiian shirts and sunglasses.  [Doc. 239-43, pp. 24 and 26].  Thus, the marks are visually similar.[19]

---

[19] Based on its review, the court concludes that "Polar High Roller" and "Arctic Ice" are dissimilar. [*Cf.* Doc. 239-43, pp. 24 and 27].  Unlike "Arctic Cash" and "Polar High Roller," "Arctic Ice" does not feature a solid sheeting of ice, the aurora borealis, or a larger cartoon animal to the side of the title.  [Doc. 239-43, p. 27].  The title appears in only one font—a block, serif font—rather than a more rounded, sans serif font.  The cartoon animals are not wearing Hawaiian shirts and sunglasses.  Nor is the meaning similar, as "Arctic Ice" does not include any element of free spending.  Even when interpreted in the slang or conversational sense, "ice" connotes "expensive jewelry, usually in the form of diamonds," rather than liquid assets like cash.  *See* URBAN

The marks do not sound alike. However, the marks are akin in meaning. "Polar" is defined as "of or relating to a geographical pole or the region around it," and "arctic" specifically relates to the "north pole or region near it." *Cf.* Polar, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, 900 (10th ed. 1994) *with* Arctic, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, 61 (10th ed. 1994). Both "high roller" and "cash" connote easy money or free-spending. Thus, the marks are similar in meaning. Because the marks are visually similar and similar in meaning, the first factor weighs in favor of VGT.

As previously stated, VGT offers evidence that Castle Hill intended to copy VGT's "Polar High Roller" mark in order to derive a benefit from VGT's reputation and goodwill. Thus, the second factor weighs in favor of VGT. Further, for the reasons discussed above, the similarity of products and manner of marketing factor weighs in favor of VGT.

On balance, the court concludes that a question of fact exists as to likelihood of confusion between "Polar High Roller" and "Arctic Cash" and "Artic Ice." Castle Hill is not entitled to summary judgment with respect to this mark.

Polar High Roller Lightning Wilds

VGT offers only proof of sales evidence specific to "Polar High Roller Lightning Wilds," which is insufficient to create a fact issue as to secondary meaning. *Savant Homes, Inc.*, 809 F.3d at 1149. Castle Hill is entitled to summary judgment as to this mark.

---

DICTIONARY, https://www.urbandictionary.com/define.php?term=ice (last visited May 28, 2019). However, because the intent factor weighs in VGT's favor, a genuine dispute of fact exists.

**Greenback Jack v. Coin Slinger**

VGT offers the following circumstantial evidence with respect to "Greenback Jack."[20] VGT began using the mark as early as January 2007. [Doc. 239-43, p. 28]. However, VGT again fails to offer any evidence of exclusivity or uniqueness.

Although VGT offers its total promotional expenditures, VGT offers no evidence of advertising or promotion specific to "Greenback Jack," nor VGT's efforts made in connection with promoting a conscious connection in the public's mind between the mark and VGT products. VGT cites no evidence of actual confusion with respect to "Greenback Jack," and Wind's survey is not probative as it did not include stimuli featuring the "Greenback Jack" mark. VGT cites the 2015 Castle Hill "Product Strategy" as evincing Castle Hill's intent to copy its "Greenback Jack" mark, pointing specifically  to "[w]atch them [c]atch familiar colors and sounds that players will recognize as fun and enjoy.  Lookout, there's a new Sherriff in town!"  [Doc. 239-33, p. 7]. However, viewing the mark in the light most favorable to VGT, it is not clear that the "Greenback Jack" mark depicts either a sheriff or someone that needs to be caught.  In fact, VGT's own summary judgment evidence describes "Greenback Jack" only as a cowboy.  [Doc. 239-68, p. 9]. Thus, the 2015 Castle Hill "Product Strategy" is not probative as to Castle Hill's intent to copy. Nor is a February 19, 2015 e-mail from Jason Sprinkle probative as to Castle Hill's intent to copy Greenback Jack.  *See* [Doc. 239-32].  With respect to "Coin Slinger" specifically, Sprinkle states only that he "like[s] the character on Coin Slinger" and the e-mail discusses other Castle Hill

---

[20] VGT offers an article from *Slots Guy: The Ultimate Online Slots Guide* discussing "Greenback Jack" as evidence that players recognized VGT marks. *See* [Doc. 239-68, p. 9].  However, as previously stated, one instance of consumer recognition is of limited probative value and VGT offers no evidence to establish that consumers thereafter connected "Greenback Jack" with VGT. *See Water Pik, Inc.,* 726 F.3d at 1154-55.

games including "New Money" and "Nice Ice." Although Sprinkle goes on to state that he is "firm on them looking like *some* of the competition," Sprinkle does not specifically refer to "Greenback Jack." [Doc. 239-32 (emphasis added)]. Thus, the e-mail is not probative of Castle Hill's intent to copy "Greenback Jack." VGT offers no additional evidence of intent. Finally, although VGT offers evidence of its sales volume with respect to "Greenback Jack," as previously stated, "[s]tanding alone, sales volume may not be indicative of secondary meaning because it could be related to factors other than source identification." *Savant Homes, Inc.,* 809 F.3d at 1149 (quoting *Sally Beauty Co., Inc.,* 304 F.3d at 978). VGT fails to create a genuine dispute of material fact as to secondary meaning, and Castle Hill is entitled to summary judgment on VGT's common law trademark claims with respect to "Greenback Jack."[21]

B.    *Trade Dress*

VGT next asserts a claim for federal trade dress infringement in violation of the Lanham Act.[22] The Tenth Circuit defines the trade dress of a product as "its overall image and appearance" and "may include features such as size, shape, color or color combinations, texture, graphics, and even particular sales techniques." *Sally Beauty Co.,* 304 F.3d at 977. Although a trade dress may be registered, "a plaintiff may obtain relief for the infringement of an unregistered trade dress." *Savant Homes, Inc.,* 809 F.3d at 1147. To establish a valid claim for infringement of an unregistered trade dress pursuant to § 43(a) of the Lanham Act, VGT must demonstrate: "(1) The

---

[21] Nor does the evidence create a genuine dispute of material fact as to likelihood of consumer confusion. The marks are dissimilar, VGT offers no evidence with respect to intent or actual confusion, and there is no evidence that the mark is strong.

[22] VGT also asserts claims for trade dress infringement in violation of the Oklahoma Deceptive Trade Practices Act, 78 Okla. Stat. §§ 51-56, and common law. As previously stated, the same standards and analysis apply as used with respect to the federal claim. *See Two Men & A Truck Int'l, Inc.,* 2013 WL 12073228, at *3.

trade dress is inherently distinctive or has become distinctive through secondary meaning; (2) There is a likelihood of confusion among consumers as to the source of the competing products; and (3) The trade dress is nonfunctional." *Id.* (quoting *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1227 (10th Cir. 2007)).

Castle Hill first argues that VGT's trade dress claims fail because VGT does not identify—or utilize—a consistent trade dress. *See Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 173 (3d Cir. 2000) ("Only after the plaintiff has established the existence of recognizable trade dress for the line or series of products should the trial court determine whether the trade dress is distinctive, whether the trade dress is nonfunctional, and whether the defendant's use of plaintiff's trade dress is likely to cause consumer confusion."). The Tenth Circuit previously recognized an "articulation requirement for a protectable mark," and noted that other circuits have adopted a requirement that a plaintiff "articulat[e] the specific elements which comprise its distinct dress." *Forney Indus., Inc.*, 835 F.3d at 1252 (quoting *Landscape Forms, Inc. v. Columbia Cascade Co*., 113 F.3d 373, 381 (2d Cir. 1997)). Further, when a plaintiff claims protection of trade dress utilized across a line of products, courts have required a plaintiff to "articulate the *specific common elements* sought to be protected." *Id.* (emphasis in original) (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 118 (2d Cir. 2001)).

VGT's response brief identifies the following elements "shared across two of its most popular mechanical-reel product lines" that VGT alleges constitute its distinctive trade dress for purposes of this litigation:

> (1)  the GAME CABINET (*i.e.*, the size, shape, color, material, and placement of components in VGT's standard-sized legacy or "LS" cabinets without optional lighting around the sides of the machine, *i.e.*, "jukebox" lighting, and with either 6-inch or 19/20-inch video screens—the latter of which distinguish the two relevant product lines);

(2)     the RED STROBE (*i.e.*, the red light on top of the cabinet);

(3)     the REEL RESOLUTION SOUND (*i.e.*, the sound made as each reel comes to a stop);

(4)     the AWARD SOUND (*i.e.*, the mechanical bell sound that signals that a player has won);

(5)     the BINGO PLAY AND PAYS (*i.e.*, the bingo pattern-payout combinations that VGT uses within each pseudo-paytable, *i.e.*, the visual representation of what combinations of reel symbols correspond with wins); and

(6)     the RED SCREEN FREE SPINS (*i.e.*, a free spin feature in which the video screen turns red signifying that players are being provided escalating awards).

[Doc. 239, p. 18].[23]  The allegations of the Amended Complaint and VGT's discovery responses limited VGT's claims to *three-reel* mechanical games.  *See* [Doc. 103, p. 7, ¶¶ 22-23; Doc. 185-11, pp. 108-123].  However, during the dispositive motion hearing held on June 11, 2019, VGT disclosed for the first time its belief that *five-reel* mechanical games are "now in play."  [Doc. 329, p. 131:2-9].  As previously stated, in the Tenth Circuit, a party may pursue a claim based on new allegations raised at the summary judgment stage, "provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits."  *Evans,* 936 F.2d at 1090-91 (citation omitted).   Unlike VGT's identification of its common law trademarks, Castle Hill did not receive notice during discovery that VGT intended to pursue claims based on its five-reel mechanical games.  Accordingly, if VGT was permitted to pursue claims

---

[23] Castle Hill contends that, in opposition to summary judgment, "VGT for the first time explains that it claims trade dress protection on '*two* of its most popular mechanical-reel product lines.'" [Doc. 274, pp. 13-14].  However, the record does not support Castle Hill's contention.  In its second supplemental answer to Castle Hill's second interrogatory, VGT specifically stated "[a]s the LS cabinets with the 6-inch video screen and 19/20-inch video screens comprise the vast majority of the LS cabinets that VGT uses for its 3-reel mechanical games, these are the only two variations of the LS cabinet, with respect to the size of the video screen, that are included within the VGT Trade Dress." [Doc. 185-11, p. 122].

based on its five reel games, Castle Hill would be prejudiced because it was unable to conduct discovery on five-reel mechanical games. Further, the court is mindful that VGT raised the issue in June of 2019, nearly two years after initiating this litigation and one year after filing the Amended Complaint. The court will not permit VGT to expand its claim at this late date to Castle Hill's prejudice. Accordingly, the court limits VGT's trade dress claims to *three-reel* mechanical games.

With respect to the identified six elements, Castle Hill contends that VGT's "Game Cabinet" element is not consistent because VGT offers the games at issue in multiple cabinets, including the LS cabinet, the sit-down slant cabinet, and XL cabinet. However, other circuits have recognized that the existence of alternative designs is not fatal to a trade dress claim provided that plaintiff does not seek trade dress protection for those alternatives. *Rose Art Indus., Inc.,* 235 F.3d at 175 ("We conclude that when applying the 'consistent overall look' standard, that is, when determining whether the trade dress alleged by the plaintiff is recognizable, protectable trade dress, a trial court should consider only the products or packaging for which the plaintiff is seeking trade dress protection."); *Paramount Farms In'tl LLC v. Keenan Farms Inc*., No 12-CV-01463-SVW-E, 2012 WL 5974169, at **2-3 (C.D. Cal. Nov. 28, 2012) (denying summary judgment). VGT expressly disclaims any trade dress claims arising from any cabinet other than the LS cabinet, including the sit-down slant cabinet and XL cabinet. Thus, the existence of alternative cabinets is not fatal to VGT's claim. Nor is the presence of alternative lighting features—such as the jukebox lighting—or toppers dispositive as to VGT's claim for the same reason.

Castle Hill next criticizes VGT's asserted "Reel Resolution Sound" and "Award Sounds," as having changed over time. However, a genuine dispute of material fact exists as to the consistency of VGT's use of the sounds. [*Cf.* Doc. 184-22, p. 113:5-24 and Doc. 184-25, p. 72:10-

25 *with* Doc. 239-8, pp. 113:25 to 115:24].   Castle Hill also contends that VGT's summary

judgment response—which articulates the elements—"materially changes" the "Reel Resolution

Sound" element.  [Doc. 274, p. 14].  VGT's Amended Complaint describes the "Game Play Sound"

as the "sound made by the VGT 3-Reel Mechanical Games during standard play (*e.g.,* the sound

of the reels spinning)," [Doc. 103, p. 7, ¶ 24], whereas VGT's response brief points to the "Reel

Resolution Sound (*i.e.*, the sound made as each reel comes to a stop)."  [Doc. 239, p. 18].  VGT's

description of the "Game Play Sound" is broad enough to include the "Reel Resolution Sound"

and therefore constitutes a permissible narrowing of VGT's trade dress claim, rather than an

impermissible "material alteration" of VGT's trade dress claim.

Castle Hill also contends an inconsistency exists with respect to the "Red Screen Free

Spins" element.  It is undisputed that VGT's reels did not turn red during the red screen bonus

feature as of July 12, 2018.  [Doc. 184-2, pp. 82:19-24 and 201:18-20].  In its reply brief, Castle

Hill refers to the Declaration of Daniel Fulton as evidence that VGT has altered its red screen free

spin such that the reels turn red.  However, the court does not consider new exhibits appended to

reply briefs.  Thus, a dispute of fact exists as to consistency of VGT's "Red Screen Free Spin."

Finally, although Castle Hill criticizes the individual elements of VGT's trade dress claim,

"'each element of a trade dress individually might not be inherently distinctive, . . . the combination

of elements' may be indicative of source."  *Landscape Forms, Inc.,* 113 F.3d at 381 (quoting

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995)).  Thus, viewing

the evidence in the light most favorable to VGT as the court must, Castle Hill is not entitled to

summary judgment based on inconsistency of trade dress and the court must consider the elements

of VGT's § 43(a) claim.

1.   <u>Inherently Distinctive or Distinctiveness Through Secondary Meaning</u>

To obtain relief under § 43(a) of the Lanham Act, plaintiff must first show:

> either (a) that [the] trade dress features (or feature) are inherently distinctive because their intrinsic nature is such as to almost automatically tell a customer that they refer to a brand, or (b) that the trade dress has become distinctive through acquisition of secondary meaning, so that its primary significance in the minds of potential consumers is no longer as an indicator of something about the product itself but as an indicator of its source or brand.

*Savant Homes, Inc.*, 809 F.3d at 1147 (quoting *Vornado Air Circulation Sys., Inc., v. Duracraft Corp.,* 58 F.3d 1498, 1502 (10th Cir. 1995)).  As recognized by the Tenth Circuit, the Supreme Court has given little guidance on what kind of trade dress may be inherently distinctive but "has been more definitive in saying what kind of trade dress *cannot* be inherently distinctive." *Forney Indus., Inc.*, 835 F.3d at 1247 (emphasis in original).  In *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, the Court held that a product's design cannot be inherently distinctive and therefore "a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning." 529 U.S. 205, 216 (2000).  Castle Hill argues that VGT's asserted trade dress constitutes product design and therefore VGT must establish secondary meaning.  However, VGT likens its trade dress to product packaging and, as such, argues its trade dress is inherently distinctive.

In *Wal-Mart Stores*, the Supreme Court described product design as "intended not to identify the source, but to render the product itself more useful or more appealing." *Id.* at 213.  Recognizing that its holding "will force courts to draw difficult lines between product-design and product-packaging trade dress," the Court counseled "[t]o the extent there are close cases, we believe that courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." *Id.* at 215.

VGT analogizes its trade dress to physical features of a restaurant which the Supreme Court characterized as "some *tertium quid* that is akin to product packaging." *Id.* Castle Hill argues that VGT's asserted trade dress claims arise from the products' design because the features render VGT's products more appealing to the consuming public. Based on the summary judgment evidence, the court concludes that whether VGT's asserted trade dress is product design, product packaging, or some *tertium quid* is a close call. Heeding the Supreme Court's guidance, at this summary judgment stage, the court errs on the side of caution and requires a showing of secondary meaning.

"Trade dress is said to have developed secondary meaning 'when in the minds of the public, the primary significance of the mark is to identify the source of the product rather than the product itself.'" *Forney Indus., Inc.*, 835 F.3d at 1253 (quoting *Wal-Mart Stores, Inc.*, 529 U.S. at 211). As with unregistered trademarks, to establish secondary meaning, VGT may rely on direct evidence—such as consumer surveys or testimony—or circumstantial evidence. *Id.* VGT offers no direct evidence of secondary meaning and therefore the court need only consider circumstantial evidence.[24] Relevant circumstantial evidence includes:

> (1) the length and manner of the trade dress's use; (2) the nature and extent of advertising and promotion of the trade dress; (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the trade dress and a particular product or venture; (4) actual consumer confusion; (5) proof of intentional copying; or (6) evidence of sales volume.

*Id.* (quoting *Savant Homes,* 809 F.3d at 1148). However, "[p]roof of copying may be sufficient in and of itself to establish secondary meaning because there is no reason to copy a non-functional

---

[24] VGT apparently concedes that it offers no direct evidence and, instead, relies on circumstantial evidence. *See* [Doc. 239, p. 28]. It is undisputed that VGT's survey expert, Dr. Yoram Wind, did not perform a secondary meaning study. [Doc. 184, p. 18, ¶ 40; Doc. 239, pp. 12-16]. Although VGT cites the results of a survey conducted by Meczka Marketing/Researching/Consulting as evidence of "the prevalence and success of VGT," the survey was not a secondary meaning survey.

feature except to capitalize on an already existing secondary meaning." *Hartford House Ltd. v. Hallmark Cards Inc.*, 647 F. Supp. 1533, 1542 (D. Colo. 1986), *aff'd*, 846 F.2d 1268 (10th Cir. 1988); *see also Craft Smith, LLC v. EC Design, LLC*, No. 16-CV-01235, 2019 WL 2161560, at *17 (D. Utah May 17, 2019), *appeal docketed,* No. 19-4087 (10th Cir. June 19, 2019).  Evidence of copying is evidence of secondary meaning "if the defendant's *intent* in copying is to confuse consumers and pass off his product as the plaintiff's." *Craft Smith, LLC*, 2019 WL 2161560, at *17 (emphasis in original) (quoting *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 663 (7th Cir. 1995)).

VGT submits evidence that Castle Hill intentionally copied its trade dress in order to capitalize on VGT's goodwill, including the following:  the "2015 Product Road Map" touting Castle Hill's "Retro Cabinet" as "a Launch platform that is universally accepted in the market as the top performer.  This familiarity is key to reducing if not eliminating any player fear and animosity for trying new games" [Doc. 239-27, p. 6] and designed to "[c]reate a familiar player experience with cabinet, interface, color scheme and feature set that is easily recognizable and accepted in the Oklahoma market place," including the Retro Cabinet, top LCD touchscreen that mimics small screen format and integrates IFP into the win experience, and strobe light and bell [Doc. 239-27, p. 48]; statements by Castle Hill employees that "VGT is the standard and what palyers [*sic*] expect.  If we are different (even in things which wouldn't seem at all significant as we design our games), we could be hurting our selves" [Doc. 239-139, p. 3]; a "2015 Product Strategy" to "[i]dentify successful on floor niche product offerings," "[d]evelop similar game mechanics and extend by adding key features to enhance play," and "[u]tilize familiar color schemes, hardware, sounds, etc. to foster player acceptance" [Doc. 239-33, p. 4]; an e-mail exchange between Sprinkle and Sisson including a discussion of "hedg[ing]" bets" and utilizing

similar colors which may create brand confusion [Doc. 239-34, p. 2]; an e-mail from Sprinkle advising a Castle Hill designer to stay with a cabinet "reminiscent of the old sizes" as best [Doc. 239-30, p. 2]; an email from Sprinkle to Roireau telling him to "watch some vgt you tube and listen to the background, we need that ringing in our area as well" [Doc. 239-59, p. 2]; deposition testimony of Sprinkle that Castle Hill intended to use a cabinet, bell, strobe, and Red Screen Free Spin that were similar to VGT's cabinet, bell, strobe, and Red Screen Free Spin [Doc. 239-17, pp. 322:18 to 323:16; 343:6 to 344:7; 385:21 to 386:8].

The foregoing evidence is probative of Castle Hill's intent to pass off its products as those of VGT and therefore a reasonable finder of fact could find that VGT's trade dress has acquired a secondary meaning. Additionally, VGT submits evidence from which a reasonable trier of fact could infer that VGT expended substantial sums in advertising and promotion of its trade dress in order to promote a conscious connection in the public's mind between the trade dress and VGT's products, including the following: red promotional items featuring the slogan, "I Live for Red Spins" [Doc. 239-67, pp. 4, 8, 10] and advertisements for the "Red Spin Den" in Sugar Creek Casino, a VGT exclusive gaming room [*Id.* at p. 27]. VGT further provides evidence that consumers associated VGT's trade dress with VGT and that the promotions increased brand awareness: [Doc. 239-68, p. 14; Doc. 239-69, pp. 48-49]. Thus, a genuine dispute of fact exists as to whether VGT's trade dress has acquired a secondary meaning and therefore the court next considers whether a likelihood of confusion exists between the VGT trade dress and Castle Hill trade dress.

### 2.    Likelihood of Confusion

To determine likelihood of confusion with respect to trade dress, "the relevant inquiry is 'whether there is a likelihood of confusion resulting from the total image and impression created

by the defendant's product or package on the eye and mind of an ordinary purchaser.'" *Sally Beauty Co.*, 304 F.3d at 979 (quoting J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:15 (4th ed. June 2002 database update)). "The factors underlying a likelihood of confusion analysis in a trademark infringement claim apply equally to trade dress infringement claims." *Id*.

### Similarity of Trade Dress

As previously stated, the court must "test the degree of similarity . . . on three levels: sight, sound, and meaning." *King of the Mountain Sports, Inc*., 185 F.3d at 1090. First, the trade dress is visually similar. Both cabinets feature a rounded top. The paytable appears in the upper-most, rounded portion of the cabinet. The credit card insert appears immediately thereunder, followed by the screen. Below the screen appear the three mechanical reels. Artwork displaying the games' themes appears above the base of each cabinet. *See* [Doc. 239-43, p. 103]. Each trade dress features a red strobe manufactured by Seco Alarm. [Doc. 239-6, pp. 124:3 to 125:16; Doc. 184-17, p. 257:4-24]. Second, the court has listened to audio submitted by VGT and the VGT and Castle Hill reel resolution sounds and award sounds are similar. [Doc. 239, Ex. 65 and Doc. 239, Ex. 66]. Both reel resolution sounds are melodic and become more distinct chimes when the reels stop spinning. Both award sounds are a traditional, mechanical bell and the court notes that it is undisputed that the bells are manufactured by the same company—W.L. Jenkins. [Doc. 239-8, pp. 113:25 to 114:7; Doc. 239-17, pp. 323:4-7; 370:3 to 371:17]. Third, the trade dress are similar in meaning as they both connote bingo-based Class II electronic gaming machines. Thus, based on its review, the court concludes the VGT trade dress and Castle Hill trade dress are similar and therefore this factor weighs in favor of VGT.

### Intent to Copy

As discussed above, VGT submits evidence of Castle Hill's intent to copy its trade dress in order to capitalize on VGT's goodwill. Accordingly, this factor weighs in favor of VGT.

### Actual Confusion

VGT points to both the Wind Survey as well as fourteen (14) instances of alleged actual confusion. With respect to the Wind Survey, the court concurs with VGT that the survey evidence is more probative with respect to trade dress than VGT's trade marks. Wind concluded "consistently high levels of confusion" exist, and noted that 47.6% of respondents associated Castle Hill's game with VGT's game in response to at least one of the three standard questions. [Doc. 169-4]. However, based on the reliability concerns previously articulated by this court, Wind's conclusions are not entitled to substantial weight.

VGT also cites fourteen (14) instances of actual confusion. Castle Hill contends that eight (8) of the instances of alleged confusion are irrelevant because the instances involve non-consumers—specifically, instances nos. 1, 2, 3, 5, 6, 8, 12, and 13. It is axiomatic in the Tenth Circuit that, to be relevant, evidence of actual confusion "should demonstrate actual confusion among consumers within the marketplace." *Heartsprings, Inc.,* 143 F.3d at 557. Thus, evidence of confusion among persons who do not encounter the marks "in their ordinary commercial context" is of *de minimis* consequence to the trademark analysis. *See Online Tools for Parents, LLC v. Vilsack,* 65 F. Supp. 3d 1130, 1135 n. 4 (D. Colo. 2014); *Jordache Enters., Inc.,* 828 F.2d at 1487 (affording evidence of confusion among industry professionals little weight); *Klein-Becker USA, LLC v. Prod. Quest Mfg., Inc.,* 429 F. Supp. 2d 1248, 1253-54 (D. Utah 2005) (affording little weight to instances of employee confusion).

VGT cites out-of-circuit case law for the proposition that non-consumer confusion may be relevant if the confusion "could create an inference that consumers are likely to be confused." *Rearden LLC v. Rearden Commerce, Inc.,* 683 F.3d 1190, 1214 (9th Cir. 2012). However, this court is bound by the decisions of the Tenth Circuit. Further, although acknowledging the potential relevance of non-consumer confusion, the out-of-circuit decisions nevertheless recognize the non-consumer confusion must "bear[] a relationship to the existence of confusion on the part of consumers themselves" and recognize "[t]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally." *Id.* (quoting *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005)); *see also Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 322 (3d Cir. 2015) ("[C]onfusion is relevant when it exists in the minds of persons in a position to influence the purchasing decision or persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner.") (quoting *Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc*., 466 F.3d 630, 634 (8th Cir. 2006)). Six of VGT's alleged instances of actual consumer confusion reflect only confusion amongst VGT or Castle Hill employees and do not evince any relationship to a consumer purchasing relationship or risk to VGT's sales, goodwill, or reputation—instance nos. 1, 2, 3, 8, 12, and 13. Thus, the court gives no weight to these instances.

However, the court is not persuaded that instance nos. 5 and 6 have no relevance to VGT's claims. In instance no. 5, VGT game technician Craig Eubanks mistakenly opened the door of a Castle Hill machine in the Choctaw Casino in Poteau, Oklahoma believing it to be a VGT game in need of repair. Upon realizing his mistake, Eubanks apologized to casino shift manager Laura Bailey who said, "something to the effect they had made the same mistake." [Doc. 239-74, ¶¶ 7-14]. Similarly, in instance no. 6, casino manager Candace Williams at the Choctaw Casino in

Pocola, Oklahoma, asked Eubanks to repair a game that was actually a Castle Hill game. Williams indicated the cabinet looked like a VGT cabinet. [*Id.* ¶¶ 16-20]. Casino shift managers encounter games in their ordinary commercial context and have routine interactions with the consuming public. *See Sara Lee Corp. v. Sycamore Family Bakery Inc.*, No. 09-CV-523-DAK, 2009 WL 3617564, at *4 (D. Utah Oct. 27, 2009) (recognizing relevance of confusion amongst those "involved regularly in the sale and distribution" of the relevant product).

Thus, VGT presents eight instances of actual consumer confusion that are probative of its trade dress claim. In light of the degree of similarity between trade dress, the court concludes that the remaining examples, while anecdotal, are not *de minimis* and this factor weighs slightly in favor of VGT. *Cf. King of the Mountain Sports, Inc.,* 185 F.3d at 1092.

### Relation in Use and the Manner of Marketing Between the Goods

Based on the summary judgment evidence presented, as discussed above with respect to VGT's registered trademark claim, this factor weighs in favor of VGT, particularly because the court concludes the trade dress is similar. *Cf. Universal Money Ctrs., Inc.,* 22 F.3d at 1532.

### Degree of Care Likely to be Exercised by Purchasers

As discussed above with respect to trademarks, because the evidence demonstrates that the Oklahoma tribes as consumers exercise a high degree of care in selecting electronic gaming machines to put on their floor, but that casino patrons do not exercise a high degree of care in selecting which game to play, this factor is neutral for purposes of this motion.

### Strength or Weakness of the Trade Dress

Finally, to determine the strength or weakness of the trade dress, the court must assess the trade dress's conceptual and commercial strength. With respect to conceptual strength, the Tenth Circuit generally applies the five-category framework set forth in *Abercrombie & Fitch Co. v.*

*Hunting World. Forney Indus., Inc.*, 835 F.3d at 1245 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976)). However, in a trade dress case, the court may supplement the test to consider additional factors including "(1) 'whether it was a 'common' basic shape or design,' (2) 'whether it was unique or unusual in a particular field,' and (3) 'whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods.'" *Forney Indus., Inc.*, 835 F.3d at 1246 (quoting *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342 (C.C.P.A. 1977)). Based on the summary judgment evidence, the court concludes this component favors Castle Hill because the elements appear to be common in the industry.

"Commercial strength is a concept analogous to secondary meaning." *Water Pik, Inc.*, 726 F.3d at 1154. As discussed above, VGT presents sufficient evidence to create a genuine dispute of material fact as to secondary meaning. Accordingly, the commercial strength component favors VGT. Because the conceptual strength component favors Castle Hill and the commercial strength component favors VGT, this factor is neutral.

### Balance of Factors

Based on the foregoing, on balance, the factors weigh in favor of VGT, particularly because both the similarity of trade dress and the intent to copy factors weigh in VGT's favor. Thus, a genuine dispute of material fact exists as to likelihood of confusion.

3.    Functionality

Finally, the court considers whether VGT's trade dress is functional. The U.S. Supreme Court has articulated two tests for functionality. *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001). First, "'a product feature is functional,' and cannot serve as a trade[dress], 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'"

*Id.* (quoting *Qualitex Co. v. Jacobson Prods. Co., Inc.,* 514 U.S. 159, 165 (1995)).  Second, a trade dress is functional if "the exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'"  *Id.*; *see also Brunswick Corp.*, 832 F.2d at 519 (adopting a test that focuses on "the effect on competition," and turns on whether "the protection of the configuration would 'hinder competition or impinge upon the rights of others to compete effectively in the sale of goods'") (quoting *Sno-Wizard Mfg., Inc. v. Eisemann Prods. Co.,* 791 F.2d 423, 426 n.3 (5th Cir. 1986)).  A determination of the functionality of features intrinsic to the aesthetic appeal of the product must rest on "whether alternative appealing designs or presentations of the product can be developed."  *Brunswick Corp.*, 832 F.2d at 519.  The Tenth Circuit has recognized that "[a] combination of features may be nonfunctional and thus protectable, even though the combination includes functional features."  *Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1272 (10th Cir. 1988).  Thus, "the appropriate inquiry is not whether each individual feature of the trade dress is functional but whether the whole collection of features, taken together, is functional."  *Id.*

In its summary judgment motion, Castle Hill offers evidence directed to the functionality of each individual element of VGT's asserted trade dress.  Castle Hill's argument is inconsistent with the Tenth Circuit's approach as set forth in *Hartford House*.  *Id*.  Nevertheless, Castle Hill argues that, because each individual component is functional, the combination is not protectable.  However, VGT submits evidence that the mechanical bell (award sound), reel resolution sound, red strobe, and "Red Screen Free Spins" are non-functional.  *See* [Doc. 239-26, pp. 80:18 to 81:19 and 223:23 to 224:2; Doc. 239-50, pp. 298:7 to 299:20; Doc. 239-21, p. 202:4-14].  Additionally, VGT offers evidence of alternative designs that do not hinder the ability to compete.  *See* [Doc. 239-89; Doc. 239-21, pp. 151:2 to 153:145, 174:18 to 175:10, 195:6-22, 204:3-21, and 227:6-20].

In fact, it is undisputed that both VGT and Castle Hill offer Class II games in alternative cabinets. [Doc. 184-20, pp. 246:10-17; Doc. 239-43, pp. 92-122; Doc. 103-1, p. 6; Doc. 184, pp. 19-20, ¶¶ 49-50; Doc. 239, pp. 12-16].

In short, VGT presents sufficient evidence from which a reasonable finder of fact could conclude that its asserted trade dress is non-functional. Accordingly, Castle Hill is not entitled to summary judgment with respect to VGT's trade dress claims.

C.     *Trade Secret and Confidential Business Information Claims*

Finally, VGT asserts claims for misappropriation of trade secrets in violation of the Oklahoma Uniform Trade Secrets Act, 78 OKLA. STAT. §§ 85-94 ("OUTSA"); misappropriation of confidential business information in violation of Oklahoma common law; misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.* ("DTSA"); and misappropriation of trade secrets in violation of the Virginia Uniform Trade Secrets Act, VA. CODE ANN. §§ 59.1-336 to 59.1-343 ("VUTSA").[25] VGT premises its OUTSA, VUTSA and Oklahoma common law claims on Castle Hill's misappropriation of VGT's trade secrets and confidential business information, specifically the bingo card generation algorithm and "know how." The VUTSA claim, as well as the DTSA claim, are premised on Castle Hill's misappropriation of two trade secrets: (1) the bingo card generation algorithm and (2) the uniqueness testing algorithm. [Doc. 239, pp. 48-49].

_____

[25] In its motion for summary judgment, Castle Hill argues that VGT's common law misappropriation of confidential business information claim is displaced by its Oklahoma Uniform Trade Secrets Act claim. [Doc. 184, p. 56]. However, to the extent VGT's claim is premised on information that does not satisfy the OUTSA's definition of "trade secret," but is otherwise confidential, Castle Hill's position is contrary to well-established Oklahoma law. *See Am. Biomedical Grp., Inc. v. Techtrol, Inc.*, 374 P.3d 820, 827 (Okla. 2016). During the dispositive motion hearing, Castle Hill conceded that it "is theoretically possible to have an Oklahoma common law claim that is distinct from, and is not extinguished by, the federal claim." [Doc. 329, p. 66:10-21].

- 56 -

In its Opinion and Order dated July 22, 2019, the court concluded that genuine disputes of material fact existed with respect to the VUTSA and DTSA claims premised on the bingo card generation algorithm and uniqueness testing algorithm and therefore declined to grant summary judgment in favor of VGT. For the same reasons discussed in the July 22 Opinion and Order, Castle Hill is not entitled to summary judgment with respect to those claims. Thus, the court need only consider VGT's OUTSA and common law claims premised on the bingo card generation algorithm and "know-how," as well as the VUTSA claim but only to the extent premised on VGT's "know-how."

Each of the three claims requires VGT to prove both the existence of a trade secret or confidential business information and misappropriation or procurement through improper means. *MTG Guarnieri Mfg., Inc. v. Clouatre*, 239 P.3d 202, 209 (Okla. Civ. App. 2010) (OUTSA claim); *Space Systems/Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 855 (E.D. Va. 2018) (VUTSA claim); *Am. Biomedical Grp., Inc.*, 374 P.3d at 825 (common law claims).

Castle Hill argues that neither the bingo card generation algorithm nor VGT's "know how" constitutes a "trade secret" or confidential business information and therefore it is entitled to summary judgment. The federal and state statutes all define "trade secret" to require proof of three criteria: "(1) independent economic value; (2) not known or readily ascertainable by proper means; and (3) subject to reasonable efforts to maintain secrecy." *Space Systems/Loral, LLC*, 306 F. Supp. 3d at 855 (quoting *Trident Prods. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 778 (E.D. Va. 2012), *aff'd per curiam*, 505 F. App'x 242 (4th Cir. 2013)). *See also* 78 OKLA. STAT. § 86(4); 18 U.S.C. § 1839(3).

VGT offers evidence based upon which a reasonable finder of fact could find in VGT's favor as to each element. Specifically, VGT offers the declaration of Stacey Friedman averring

that the bingo card generation algorithm is independently valuable because it permits VGT to **[REDACTED]** which "produces efficiencies over other methods." [Doc. 239-101, ¶¶ 30-35]. Although Castle Hill argues that the **[REDACTED]** is generally known, VGT submits evidence that the **[REDACTED]** is only one element of VGT's total algorithm and that the algorithm as a whole is not generally known or reasonably ascertainable. [*Id.* ¶¶ 24-29]. Finally, VGT offers evidence of reasonable methods undertaken by it to ensure secrecy. [*Id.* ¶¶ 22-23]. Thus, a genuine dispute of fact exists as to whether VGT's bingo card generation algorithm constitutes a "trade secret" or "confidential business information" as defined by the state statutes and common law.

With respect to VGT's "know-how," Castle Hill contends that VGT has failed to sufficiently identify the information that qualifies as a trade secret or confidential business information. The court agrees that VGT has been somewhat evasive with respect to its "know how" claim and reluctant to define its limits. However, in its motion for summary judgment response, VGT cites evidence that its "know how" consists of knowledge of server bottlenecks, game volatility, and automatically generated façade files. [Doc. 239-154, ¶¶ 36-43]. Further, during the dispositive motion hearing, VGT pointed to paragraph 50 of Friedman's declaration in support of its response to Castle Hill's motion for summary judgment as identifying VGT's "know how": (1) information related to the QR code project; (2) issues with respect to the development of an autospin or autoplay feature; (3) the importance **[REDACTED]** (4) ways to improve façade generation and storage; and (5) use of a VGT lease agreement. [*Id.* ¶ 50]. The court concludes that VGT sufficiently identifies the foregoing as being encompassed within its "know how."

However, the Friedman declaration also refers to the fact that Roireau was known to say, "stay[] worried" because at VGT "we had to deal with [blank]" and that Sprinkle was known to conjecture about various "ghost-in-the-machine" issues.  [Doc. 239-154, ¶ 50].  Such "fill-in-the-blank" theories of liability do not provide sufficient evidence—or even notice—of a "trade secret" or "confidential business information."  Additionally, during the dispositive motion hearing, VGT referenced its discovery responses as setting forth the definition of its "know how" claim.  [Doc. 329, p. 143:6-21].  VGT does not cite the discovery responses as evidence of the scope of its "know how" claim in its summary judgment response  [Doc. 239].  Further, the cited discovery response is thirty-two (32) pages long, and includes a litany of issues.  [Doc. 185-11, pp. 124-157].  Federal Rule of Civil Procedure 56 requires a party asserting that a genuine dispute of fact exists to support the assertion by citation to *particular parts* of the materials in the record.  FED. R. CIV. P. 56(c)(1) (emphasis added).  General reference to a 32 page discovery response at a hearing after the close of briefing does not satisfy Rule 56's particularity requirement and does not create a genuine dispute of material fact.

By failing to adequately define its "know how" claim, VGT essentially asks the court to permit trial of this matter with respect to this claim to become a game of "Whack-A-Mole" or "Choose Your Own Adventure."  The court will not do so.  Accordingly, based on the foregoing, Castle Hill is entitled to summary judgment in its favor with respect to any theories of its "know how" claim other than the following:  (1) knowledge of server bottlenecks; (2) game volatility; (3) automatically generated façade files; (4) information related to the QR code project; (5) issues with respect to the development of an autospin or autoplay feature; (6) the importance **[REDACTED]** (7) ways to improve façade generation and storage; and (8) use of a VGT lease agreement.

- 59 -

With respect to the remaining elements of the "know how" claim, VGT points to the Friedman declaration as evidence that VGT's "know-how" was independently valuable, not generally known or cannot be reasonably ascertained, and that VGT undertook reasonable efforts to maintain the secrecy of its "know how." [Doc. 239-154, ¶¶ 36-55]. Accordingly, a genuine dispute of fact exists as to whether VGT's "know-how" constitutes a "trade secret" or "confidential business information" with respect to the foregoing eight (8) items.

Castle Hill next argues that VGT cannot establish that Castle Hill misappropriated or procured through improper means its asserted trade secrets or confidential business information because Castle Hill employees simply utilized information recalled from their prior employment with VGT. However, the OUTSA and VUTSA define "misappropriation" to include use of a trade secret or confidential information without the owner's consent. *See ProLine Prods., L.L.C. v. McBride*, 324 P.3d 430, 433 (Okla. Civ. App. 2014); 78 OKLA. STAT. § 86(2) (defining "misappropriation" to include use of a trade secret of another without consent of that person with knowledge or reason to know that the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use); VA. CODE. ANN. § 59.1-336 (same); *Informatics Applications Grp., Inc. v. Shkolnikov*, 836 F. Supp. 2d 400, 423 (E.D. Va. 2011). VGT submits evidence that Castle Hill employees developed its bingo card generation algorithm based on confidential information obtained from prior employment with VGT and VGT's "know how," and that Castle Hill officers were aware of the use. *See, e.g.,* [Doc. 239-19, pp. 225:6 to 226:2; Doc. 239-94; Doc. 239-95; Doc. 239-23, pp. 154:15 to 156:17; Doc. 239-12, pp. 161:6 to 162:3]. Thus, a genuine dispute of fact exists as to whether Castle Hill "misappropriated" VGT's trade secrets or confidential information.

Finally, Castle Hill argues VGT cannot establish a OUTSA or common law claim because it offers no evidence that Castle Hill used the secrets or information to VGT's detriment as required by the OUTSA and Oklahoma common law.[26]  *See MTG Guarnieri Mfg., Inc.,* 239 P.3d at 209. VGT submits evidence that Castle Hill achieved an unfair competitive advantage through its use of the bingo card generation algorithm and VGT's "know how," and used the secrets and confidential information to sell their own games.  *See* [Doc. 239-154, ¶¶ 44-55].  The OUTSA does not require "damages" and "detriment" is sufficient.  *See Blue Star Land Servs., LLC v. Coleman*, No. CIV-17-931-R, 2017 WL 6210901, at **7-8 (W.D. Okla. Dec. 8, 2017); OKLA. UNIFORM JURY INSTR. 29.1.  A court's ability to construct an award includes "unjust enrichment" and "a reasonable royalty for a misappropriator's unauthorized . . . use of a trade secret."  78 OKLA. STAT. § 88(A); OKLA. UNIFORM JURY INSTR. 29.5.  *See also In re Mandel,* 578 F. App'x 376, 390 (5th Cir. 2014) ("Damages need not be proved with great specificity . . . .  Where the damages are uncertain . . . we do not feel that the uncertainty should preclude recovery; the plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown.") (quoting *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974)).  Thus, although liability has not been established, VGT offers sufficient proof of use to detriment to create a genuine dispute and survive summary judgment.

## V.    Conclusion

WHEREFORE, Defendants' Motion for Summary Judgment [Doc. 188] is granted in part and denied in part.  The motion is granted with respect to the following:  the registered trademark claims premised on any mark other than MR. MONEY BAGS & design mark (reg. no. 3,152,743);

---

[26] Castle Hill points to no statute or case law for the proposition that the VUTSA also requires use to VGT's detriment.  *See MicroStrategy Inc. v. Li*, 601 S.E.2d 580, 588 (Va. 2004).

the common law trademark claims premised on any marks other than "Crazy Billions," "Mr. Money Bags" (modernized version), or "Polar High Roller"; the VUTSA, OUTSA, and common law trade secret and confidential business information claims premised on VGT's "know how," other than the eight items of "know how" identified herein.  The motion is otherwise denied.  The parties may file proposed redactions, or state their non-objection to public filing of this order, no later than September 3, 2019.

DATED this 20th day of August, 2019.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE